### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 21 CR 665 |
| | ) | |
| v. | ) | Judge Matthew F. Kennelly |
| | ) | |
| ALFREDO VIVEROS-CHAVEZ, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT'S MOTION TO DISMISS INDICTMENT DUE TO THE UNCONSTITUTIONALITY OF 8 U.S.C. §1326 UNDER THE EQUAL PROTECTION CLAUSE OF THE FIFTH AMENDMENT

**NOW COMES** the Defendant, **ALFREDO VIVEROS-CHAVEZ**, by and through his attorney, **CARLA I. ESPINOZA**, and pursuant to Fed. R. Crim. P. 12(b) and the Equal Protection Clause of Fifth Amendment to the U.S. Constitution, respectfully moves this Honorable Court to dismiss his indictment and, in support thereof, states as follows:

### INTRODUCTION

The statute criminalizing illegal reentry, 8 U.S.C. §1326, violates the Equal Protection Clause of the Fifth Amendment to the U.S. Constitution because it was originally enacted with discriminatory intent and it has a disparate impact on Mexican and Latin(x)[1] individuals. When a law discriminates on the basis of race it is subject to strict scrutiny. *Hunt v. Cromartie*, 526 U.S.

---

[1] The term Latinx refers to a person of Latin American origin or descent, particularly those living in the United States. The term is gender neutral but used as a substitute for the masculine, feminine, non-binary, singular and plural forms of the word Latin in the Spanish pronunciation. *See* https://www.dictionary.com/browse/latinx (Last visited February 7, 2022).

541, 546 (1999); *Shaw v. Hunt*, 517 U.S. 899, 904 (1996) (Shaw II); *Miller v. Johnson*, 515 U.S.

900, 904–905 (1995); *Adarand Constructors, Inc. v. Peña*, 515 U.S. 200, 227 (1995). A law

that is enacted with a discriminatory intent or purpose and which disparately impacts a particular

racial group is unconstitutional under the standard set forth in *Arlington Heights*. *Vill. of

Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266, 97 S. Ct. 555, 564, 50 L. Ed.

2d 450 (1977). A determination of whether a law was enacted with invidious discriminatory

intent or purpose requires a "sensitive inquiry into such circumstantial and direct evidence of

intent as may be available." *Arlington Heights*, 429 U.S. at 266. The main relevant factors are

"disproportionate impact, the historical background of the challenged decision, the specific

antecedent events, departures from normal procedures, and contemporary statements of the

decisionmakers." *Id*. at 263.

      The indictment in this case charges the Defendant with illegal reentry by a deported alien

in violation of 8 U.S.C. §1326(a) & (b). (ECF No. 10). Defendant will show that Section 1326

was originally enacted with a discriminatory intent through historical background, sequence of

events leading up to the enactment, and legislative history including statements by members of

the decisionmaking body. The 1920s was a period when support for white supremacy and

eugenics ran rampant; "the Ku Klux Klan was reborn, Jim Crow came of age, and public

intellectuals preached the science of eugenics." *See* Proposed Expert Declaration of Dr.

Hernandez p.1, attached hereto as Exhibit A. Non-white immigrants were perceived as

undesirable and inferior, and many politicians sought to "restrict and even end immigration to the

United States from every region of the world other than western Europe." *Id*. It was during this

time that Congress passed the original illegal reentry law–the Undesirable Aliens Act of 1929

-2-

(hereinafter the "Act of 1929") in an effort to ensure that Mexican agricultural workers would not remain in the United States after their work was done and, if so, they would be subject to deportation and criminal prosecution.[2]  Defendant will further show that since its original enactment, Section 1326 has had a disparate impact on Mexican and Latinx individuals. Although Section 1326 is a reenactment of the Act of 1929, recent Supreme Court precedent establishes that later reenactments do not cleanse a law of the racial motivations that fueled the original law; when a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Hunter v. Underwood*, 471 U.S. 222, 233 (1985).

Because a motivating factor for the original enactment of Section 1326 was racial discrimination and the law continues to have a racially disparate impact, it is presumptively unconstitutional under the Equal Protection Clause of the Fifth Amendment as argued below.

**ARGUMENT**

**A.** *Arlington Heights* **Controls This Constitutional Challenge.**

Mr. Viveros can demonstrate that a motivating factor for the original enactment of Section 1326 was racial discrimination under the Supreme Court's precedent in *Arlington Heights*.  Under *Arlington Heights*, a facially neutral law violates Equal Protection if (1) it was enacted with a racially discriminatory intent or purpose, and (2) it has a racially disparate impact.

---

[2]It is important to note that the original enactment of the illegal reentry law was so tainted with racial animus that even its title- ***Undesirable Aliens*** Act of 1929 - denotes a racially discriminatory intent. Immigrants were derogatorily referred to as "aliens," a term which appears in the illegal reentry statute even today. *See* 8 U.S.C.A. § 1326 (a).

*Arlington Heights*, 429 U.S. at 265. "Determining discriminatory intent requires a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available,' including, but not limited to: '[t]he historical background of the decision'; '[t]he legislative or administrative history'; '[t]he specific sequence of events leading to the challenged action'; '[d]epartures from normal procedural sequence'; or whether the impact of the law 'bears more heavily on one race than another.'" *United States v. Carrillo-Lopez*, No. 320 CR 26, 2021 WL 3667330, at *4 (D. Nev. Aug. 18, 2021)(citing to *Arlington Heights*, supra, 429 U.S. at 266-268). While not exhaustive, these factors constitute the "proper inquiry in determining whether racially discriminatory intent existed." *Arlington Heights*, 429 U.S. at 268.

Under *Arlington Heights*, the challenger need not show that the "challenged action rested solely on racially discriminatory purposes." *Id*. at 265. Legislatures are rarely "motivated solely by a single concern," and the challenger need only show "proof that a discriminatory purpose has been a *motivating factor*" in the passage of the law. *Id*. (emphasis added). Once the challenger meets this low threshold, the government must prove that "the same [law] would have resulted even had the impermissible purpose not been considered." *Id*. at 270. If the government fails to do so, the court must find that the law violates the Equal Protection guarantee of the Fifth Amendment and, thus, is unconstitutional.

For decades, courts have applied the *Arlington Heights* framework to assess facially neutral laws enacted with a discriminatory purpose that have disparately impacted particular groups. *See Hunt v. Cromartie*, 526 U.S. 541, 546 (1999). For example, in *Hunter v. Underwood*, 471 U.S. 222 (1985), a facially neutral Alabama law barring voting for any person convicted of a "crime involving moral turpitude" was found to be unconstitutional under *Arlington Heights*

because it disenfranchised significantly more blacks than whites. *Hunter*, 471 U.S. at 227. The Supreme Court reviewed transcripts of the law as well as historical studies and expert testimonies, and it found that because the provision "would not have been adopted by the convention or ratified by the electorate in the absence of the racially discriminatory motivation," the law violated equal protection. *Id*. at 229-31.

Even later reenactments of a law which was originally motivated by a discriminatory purposes have been found to violate equal protection under *Arlington Heights*, especially when the reenactment continues to produce the intended discriminatory effect. *See Hunter*, 471 U.S. at 233. In *Ramos*, the Supreme Court held that recodification does not cure the laws' original animus. *Ramos*, 140 S. Ct., at 1401 n.44. Similarly, the Supreme Court established in *Hunter* that a law that has been serving a legitimate purpose for decades can still be struck down under *Arlington Heights* if it was originally motivated by discriminatory purpose and continues to have disparate impact. *See Hunter*, 471 U.S. at 233.

Lastly, the *Arlington Heights* framework is especially necessary when the government seeks to "punish by deprivation of liberty and property," even when the subject is a non-citizen. *See Wong Wing v. United States*, 163 U.S. 228, 237, 16 S.Ct. 977, 41 L.Ed. 140 (1896)(holding that "even aliens should not be held to answer for a capital or other infamous crime, unless on a presentment or indictment of a grand jury, nor be deprived of life, liberty, or property without due process of law"). Here, Mr. Viveros is facing the deprivation of his liberty.

Consequently, Mr. Viveros challenges the constitutionality of Section 1326 by challenging the Act of 1929, the original illegal reentry law from which Section 1326 was derived. Mr. Viveros will demonstrate throughout this motion that (1) the Act of 1929 was

enacted with a discriminatory intent; (2) the Act of 1929 disparately impacted Hispanic and

Latinx communities; (3) Section 1326 is a continuation of the Act of 1929 and is tainted by the

discriminatory purpose of its predecessor; (4) the 1952 reenactment of the illegal reentry statute,

Section 1326, was also motivated by racial animus; and (5) Section 1326 has been disparately

impacting Mexican and Latinx communities.

### B. The Original Illegal Reentry Law Was Enacted With Discriminatory Intent.

In *Arlington Heights*, the Supreme Court of the United States provided four relevant

factors for determining whether a challenged law was enacted with a discriminatory intent.

*Arlington Heights*, 429 U.S. at 253. These non-exhaustive factors include (1) the historical

background surrounding the law, (2) the law's legislative history, (3) the specific sequence of

events leading to the challenged law as well as departures from the normal procedure, and (4)

whether the law bears more heavily on one race than another. *Id*. at 266-68. Under the *Arlington*

*Heights* framework, the challenger need only demonstrate that the discriminatory purpose was a

*motivating factor*–as opposed to the sole purpose–behind the law. *Id*. at 265 (emphasis added).

Section 1326 was directly derived from the Act of 1929. Section 1326 reads as follows,

in relevant part:

> Subject to subsection (b), any alien who--
> (1) has been denied admission, excluded, deported, or removed or
> has departed the United States while an order of exclusion,
> deportation, or removal is outstanding, and thereafter
> (2) enters, attempts to enter, or is at any time found in, the United
> States, unless (A) prior to his reembarkation at a place outside the
> United States or his application for admission from foreign
> contiguous territory, the Attorney General has expressly consented
> to such alien's reapplying for admission; or (B) with respect to an
> alien previously denied admission and removed, unless such alien
> shall establish that he was not required to obtain such advance

> consent under this chapter or any prior Act, shall be fined under
> Title 18, or imprisoned not more than 2 years, or both.

8 U.S.C.A. § 1326 (a). Section 1326 closely tracks the language of its predecessor, the Act of

1929, which states, in relevant part:

> That (a) if any alien has been arrested and deported in pursuance of
> law, he shall be excluded from admission to the United States
> whether such deportation took place before or after the enactment
> of this act, and if he enters or attempts to enter the United States
> after the expiration of sixty days after the enactment of this act, he
> shall be guilty of a felony and upon conviction thereof shall, unless
> a different penalty is otherwise expressly provided by law, be
> punished by imprisonment for not more than two years or by a fine
> of not more than $1,000 or by both such fine and imprisonment.

Undesirable Aliens Act, Pub. L. No. 70-1018, ch. 690, 45 Stat. 1551 (1929). In fact, Section

1326 adopts portions of its predecessor's language almost verbatim. *United States v. Carrillo-*

*Lopez*, 2021 WL 3667330, 7 (D. Nev. Aug. 18, 2021)(applying *Arlington Heights* and holding

that Section 1326 violates the Equal Protection Clause because racial discrimination was a

motivating factor in its original enactment). The intent behind the original enactment of the

illegal reentry law bears on whether the current law, Section 1326, is unconstitutional under

*Arlington Heights*. Accordingly, Mr. Viveros addresses each of the five *Arlington Heights*

factors in relation to the Act of 1929 and demonstrates that the original illegal reentry law was

enacted with a discriminatory purpose.

> **i.** **The Historical Background and Specific Sequence of Events Surrounding the Enactment of the Act of 1929 Indicate Discriminatory Intent.**

"The historical background of the decision is one evidentiary source, particularly if it

reveals a series of official actions taken for invidious purposes." *Arlington Heights*, 429 U.S. at

267; *see also Lane v. Wilson*, 307 U.S. 268, 59 S.Ct. 872, 83 L.Ed. 1281 (1939). "The specific

sequence of events leading up to the challenged decision also may shed some light on the decisionmaker's purposes." *Id.* at 267; *see also Reitman v. Mulkey*, 387 U.S. 369, 373-376, 87 S.Ct. 1627, 1629-1631, 18 L.Ed.2d 830 (1967).

Here, Mr. Viveros presents compelling historical evidence that demonstrates the discriminatory purpose behind the Act of 1929. The 1920s, referred to by historians as the 'Tribal Twenties', was a time of division and nativism in the United States. This was in large part due to World War I, which created a "combination of nativism, job scarcity, and anti-Bolshevism that fueled the politics of restriction;"[3] restrictionists "spoke increasingly of 'racial indigestion,'" and "the 'contamination' of Anglo American society."[4] Eugenics also grew in popularity among leading intellectuals, and the negative perception of non-white immigrants continued to strengthen.[5] Eugenics even influenced legislation throughout the 1920s; Dr. Harry H. Laughlin, the then-Director of the Eugenics Record Office, frequented Congress to advise on immigration legislation and to discuss topics such as "race crossing," "fecundity," "mate selection," and "racial composition." *The Eugenical Aspects of Deportation: Hearings before the Committee on Immigration and Naturalization House of Representtive*, 70th Cong. 70.1.4, pp. 2, 3 (1928), attached hereto as Exhibit C. He stated that the job of any government was to "demand fit mating and high fertility from the classes who are better endowed physically, mentally, and morally by heredity . . . . Immigration control is the greatest instrument which the Federal Government can

---

[3]Mae M. Ngai, *Impossible Subjects*, 19, 20 (2004 William Chafe, et al.).

[4]*Id*. at 23; Kelly Lytle Hernandez, *Migra!: A History of the U.S. Border Patrol*, 28 (2010).

[5]*See generally* Daniel Okrent, *The Guarded Gate: Bigotry, Eugenics, and the Law That Kept Two Generations of Jews, Italians, and Other European Immigrants Out of America* (2019).

use in promoting race conservation of the Nation." Ex. B supra, at 19. Dr. Laughlin even compared drafters of immigration laws to breeders of thoroughbred horses. Ex. C, at 44.

The Act of 1929, the first of its kind criminalizing illegal reentry, was enacted during a time when Eugenics heavily influenced Congress. Section 1326 is the recodification of the Act of 1929. In her attached declaration, Professor Kelly Lytle Hernandez (hereinafter "Professor Hernandez") concludes that "the archival record marks the criminalization of unauthorized entry as a racially motivated act." Ex A supra at 8.

The specific sequence of events and laws enacted in the years preceding the Act of 1929 further reinforces the notion that Section 1326 was derived from a law enacted with a discriminatory purpose. At the turn of the 20th century, nativists and eugenicists had a strong influence over Congress and had realized a number of victories restricting immigration on the basis of race.[6] Their first major victory came in 1882 with the passage of the Chinese Exclusion Act, "the first piece of immigration legislation prohibiting immigration based on race." Proposed Expert Witness Declaration of Professor Benjamin Gonzalez O'Brien at 2, attached hereto as Exhibit B. This was followed by the implementation of a literacy test in 1917, which was meant to prevent the entry of undesirable immigrants primarily from Southern and Eastern Europe, as well as the creation of an Asiatic barred zone that same year. *Ibid.* at 2-3. As a result, Asian immigration was decimated under the false narrative that individuals of Asian descent were a racial threat to the United States. *Ibid.* at 3.

In 1921, Congress passed its very first numerical restriction on immigration. *Emergency Immigration Act of 1921*, Pub.L. 67-5, 42 Stat. 5 (1921). Legislators enacted this "emergency"

---

[6]Nativism and eugenics are ideologies are now generally referred to as white supremacy.

restriction hoping for "'America [to] cease to be a "melting pot."'" Jia Lynn Yang, *One Mighty and Irresistible Tide: The Epic Struggle Over American Immigration*, 2020, 3 (2020) (quoting Senator David A. Reed). In 1924, Congress passed the National Origins Act of 1924 (hereinafter the "Act of 1924"), which reserved 96 percent of quota slots for European immigrants, thereby significantly "narrow[ing] the pathways of legal immigration" to the disadvantage of non-white immigrants. *Carrillo-Lopez*, 2021 WL 3667330 at 7. The intent was clearly to prevent immigrants of color from coming to the United States.

While the Act of 1924 did not limit the number of immigrants from Mexico, this was because large agricultural businesses which relied heavily on Mexican labor pressured legislatures to exempt Mexicans from the act. Ex. A at 5[7]. This exemption resulted in a "pretty rapid turn to focusing on getting Mexican immigrants included on the quota," but Congress could not overcome the protests from "major employers and industries across the west" who were "concerned that they w[ould] be cut off from access to Mexican workers." *United States v. Carrillo-Lopez*, 2021 WL 3667330 at 7.

"The nativists [were] furious in Congress." Ex. A at 5. Representative Madden complained that the Act of 1924 "leaves open the doors for perhaps the worst element that comes into the United States–the Mexican peon."[8] Meanwhile, Representative Patrick O'Sullivan criticized the restrictions on Italian immigrants, stating that "the average Italian is as much

---

[7]Until 1910, with the beginning of the Mexican Revolution, Mexican immigration to the United States had been fairly modest and many Mexican laborers would return to Mexico after working in the United States. Ex. B at 4. By the 1920s, Mexican immigration to the U.S. had significantly surged and, thus, nativists began to see Mexicans as a racial threat to the 'nation's 'Aryan' stock." Ex. A at 5.

[8]Benjamin Gonzalez O'Brien, Chap. 1, *Handcuffs and Chain Link* (2018).

superior to the average Mexican as a full-blooded Airedale is to a mongrel." Representative

O'Sullivan, "Administration of the Law." *Congressional Record* 65:6 (1924) p. H5900, attached

hereto as Exhibit D.  Mexicans were generally referenced with pejorative adjectives used to

describe animals such as dogs, pigeons, or rabbits. Ex. A at 5.  Representative Box believed the

"importation" of Mexicans was "raising a serious race question" because Mexicans were

"essentially different from us in character, in social position." Ex. D at H3619.

Legislators "proposed bill after bill" to restrict Mexican immigration, but none survived

opposition from the major agricultural and industrial employers. Ex. A at 5. This was largely due

to the promise by prominent nativist agricultural owners in the west of the country, who

otherwise supported the immigration restrictions on non-whites, that Mexican immigration was

temporary in nature and, thus, would not affect the Aryan stock of the nation.  For example, S.

Parker Friselle, who was an influential farmer and lobbyist from California, testified before

Congress in January 1926 arguing that Mexicans were not immigrants because "the Mexican

does not remain" and "he always goes back." Hearings Before the Committee on Immigration

and Naturalization on Seasonal Labor Agricultural Laborers From Mexico (Jan. & Feb.1926) p.

6, attached hereto as Exhibit I; *see also* Ex. A. at 5. Friselle further testified that "[l]ike the

pigeon [the Mexican] goes home to roost" and, thus, is a "bird of passage." *Ibid*.  Similarly, in

1928, George C. Clemens, a lobbyist and leader among the California  agribusiness owners,

reassured fellow nativists that Mexicans were "swallows" and would never settle in the U.S.

because "his homing instincts take him back to Mexico." Ex. A at 6.  More importantly, Clemens

began to argue that Mexicans "[were] deportable" and thus further restrictions were unnecessary.

*Id*. Clemens also created an ominous  disjunctive for the nativists in Congress, he argued: "I warn

you. American business has no conscience. *If the Mexican is denied us*, the [Puerto Rican] *negro will come*" so "which do you choose[?]" *Id*. (emphasis added). Clemens successfully argued that the Puerto Rican "negro" who was a citizen was the real problem for the racial stock of the country not, as Clemens put it, Mexico's deportable birds of passage. *Id.*

The nativists in Congress immediately sought to pursue an agenda which would ensure Clemens' promise of Mexican laborers as disposable by means of deportation. Consequently, the nativists eventually proposed to control Mexican migration by criminalizing their unwanted entries into the U.S. Ex. A at 7. The resulting bill, the Act of 1929, was meant to penalize "aliens who have been expelled from the United States and who reenter the country unlawfully." The Committee on Immigration Report Supporting the Passage of Senate Bill 5094, H. S. Rep. No. 1456, at 1 (1929) attached hereto as Exhibit J. It is the expert opinion of both Professor Hernandez and Professor O'Brien that the illegal reentry criminal statute was enacted in 1929 with the intent to target individuals of Mexican and Latinx origin . *See* Ex. A at 8 & Ex. B at 25-26.

In 1929, federal, state, and local authorities began a program of Mexican repatriation which lasted until 1936. Ex. B at 13. "As with the Undesirables Aliens Act, Mexican repatriation was exclusively focused on Mexicans, legal and illegal, citizen and immigrant, and would result in an estimated two million Mexicans being 'repatriated.'" *Id*. In 2005, California passed the "Apology Act for the 1930s Mexican Repatriation Act" which estimates that 60% of those forced to return to Mexico were American citizens. Apology Act For the 1930s Mexican Repatriation Program, attached hereto as Exhibit Q. The Apology Act formally acknowledges that the raids "targeted persons of Mexican ancestry" even when they were U.S. citizens or lawful permanent

-12-

residents. *Id*. Simply put, over a million American citizens were forcibly removed to Mexico because of their race.

The open support for racism, white supremacy, and eugenics in the 1920s and the sequence of racist laws before and after the enactment of the Act of 1929 demonstrate that a discriminatory purpose was a motivating factor for its enactment.

ii.   **Legislative History of the Act of 1929 and Contemporary Statements of its Drafters and Proponents Indicate That the Law Was Enacted With a Discriminatory Purpose.**

Another *Arlington Heights* factor courts examine to identify discriminatory intent is the law's legislative history. *Arlington Heights*, 429 U.S. at 268. "The legislative or administrative history may be highly relevant, especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 268; *see also City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 196-97, 123 S.Ct. 1389, 155 L.Ed.2d 349 (2003) ("[S]tatements made by decisionmakers or referendum sponsors during deliberation over a referendum may constitute relevant evidence of discriminatory intent in a challenge to an ultimately enacted initiative."); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 945 F.3d 83, 111 (2d Cir. 2019) ("[E]vidence [of discriminatory purpose] may include the series of events leading up to a ... decision, the context in which the decision was made, ... [and] statements made by the decisionmaking body ....") (internal quotation marks omitted); *Cook Cty., Illinois v. Wolf*, 461 F. Supp. 3d 779, 788 (N.D. Ill. 2020), motion to certify appeal denied, No. 19 C 6334, 2020 WL 3975466 (N.D. Ill. July 14, 2020)(relying on statements by President's advisors and officials to find plausible that "DHS issued the [immigration] Rule knowing and intending that it would

have a disproportionate negative impact on nonwhite immigrants").

In 1928, Laughlin was again called to testify before Congress at a hearing titled "The Eugenical Aspects of Deportation." Ex. B at 9. Laughlin testified that "'deportation is the last line of defense against the contamination of American family stocks by alien heredity degeneracy.'" *Id*. Congress relied heavily on Laughlin's testimony to criminalize illegal entry and reentry a year later. *Id*.

The drafters and primary proponents of the Act of 1929 were Secretary of Labor James Davis and Senator Coleman Blease, both of whom were avid supporters of eugenics and white supremacy.[9] Secretary Davis often referred to Mexican immigrants as "rat type" or "rat men," and he believed Mexicans were jeopardizing the American gene pool.[10] Meanwhile, Senator Blease was a suspected Ku Klux Klan member who shared Secretary Davis's animosity toward non-white immigrants.[11] Together, Secretary Davis and Senator Blease developed a law that would criminalize border crossing, rather than directly prevent it.[12] This way, non-white immigrants could be expelled after the growing season was over, and major agricultural

---

[9] *See* Hans P. Vought, *The Bully Pulpit*, 179 (2004).

[10] *Id*. at 174-175.

[11] For biographical and historical context about Senator Blease, see B. Simon, *The appeal of Cole Blease of South Carolina: Race, Class, and Sex in the New South*, The Journal of Southern History, 62:1, pp. 57-86 (Feb. 1996), *available at* http://www.jstore.com/stable/2211206.

[12] Ian MacDougall,, *Behind the Criminal Immigration Law: Eugenics and White Supremacy*, ProPublica (June 19, 2020), https://www.propublica.org/article/behind-the-criminal-immigration-law-eugenics-and-white-supremacy.

-14-

employers would not be adversely impacted.[13] Many of the agricultural employers were in

agreement; one said, "[w]e, in California, would greatly prefer some set up in which our peak

labor demands might be met and upon the completion of our harvest these laborers returned to

their country." Ex. A at 7.

Other proponents of the Act of 1929 were Representatives John C. Box and Albert

Johnson.  Representative Box firmly believed that the purpose of immigration laws was to

protect "American racial stock from further degradation or change through mongrelization."

*Congressional Record*, (Feb. 9, 1928) pp. H2817-18, attached hereto as Exhibit G.  In one

speech, Rep. Box stated as follows:

> The Mexican peon is a mixture of Mediterranean-blooded Spanish
> peasant with low-grade Indians who did not fight to extinction but
> submitted and multiplied as serfs. Into that was fused much negro
> slave blood . . . . The prevention of such mongrelization and the
> degradation it causes is one of the purposes of our [immigration]
> laws.

*Ibid*.  Representative Johnson also shared a similar view on immigration; he was an "energetic

and vehement racist and nativist" who headed the Eugenics Research Association, an

organization that supported forced sterilizations and opposed interracial marriage. Dennis

Wepman, *Immigration: From the Founding of Virginia to the Closing of Ellis Island*, p. 242-43

(2002).

 In January of 1929, Senator Blease presented the Act of 1929 on the Senate floor, and it

passed with little to no discussion or debate.  *Congressional Record* (Jan. 23, 1929) at p. S2092,

attached hereto as Exhibit K. When the Act of 1929 was debated before the House, many

---

[13]*Id*.

-15-

members expressed hostility toward Mexican immigrants, often referring to them derogatorily as "hordes." For example, Representative Thomas L. Blanton complained that Mexicans "come into Texas by hordes" and that "my friend Judge Box has been making a just fight against this situation for years." *Congressional Record* (Feb. 16, 1929) at p. H3619 attached hereto as Exhibit D. He then challenged his colleagues to visit the international ports of entry in Texas to see the "hordes that come across the bridges with no intention of ever going back." *Id*. Representative Blanton urged the House to "apprehend the thousands of these Mexicans who are in Texas now unlawfully and put them back across the Rio Grande and keep them there." *Id*. Other supporters within the House made outright racist remarks; Representative Fitzgerald stated that, from a "moral standpoint," Mexicans were "poisoning the American citizen" because they are "of a class" that is "very undesirable." *Id*. at p. H3620.

Thus, the racist ideologies and remarks of the drafters and supporters of the Act of 1929–and their explicitly discriminatory reasoning for drafting and supporting said law–indicate that discriminatory purpose was, at the very minimum, a motivating factor behind the enactment of the Act of 1929.

### iii. The Act of 1929 Was Enacted in the Midst of Congress's Departures From Normal Procedural Sequence.

"Departures from the normal procedural sequence also might afford evidence that improper purposes are playing a role." *Arlington Heights*, 429 U.S. at 267. For example, procedural irregularity could suggest discriminatory intent. *Pac. Shores Properties, LLC v. City of Newport Beach*, 730 F.3d 1142, 1164 (9th Cir. 2013).

The debates relating to the Act of 1929 revolved exclusively around Mexican immigrants,

when in fact, Canadians were entering the United States in comparable numbers. *See* Ex. D at p.

H3621 (in 1928, 81,506 Canadians entered the United States). The inconsistency in the

legislators' discussion of Mexicans and Canadians is a departure from the legislative procedure

which demonstrates that Congress was not concerned with the manner of entry as much as the

race of the immigrants coming to the U.S. Thus, the primary goal of the legislators was to

prevent the entry of Mexican immigrants due to their race.

Moreover, the Act of 1929 was passed during the first and only period in American

history when Congress openly relied on eugenics when enacting immigration legislation. For

example, in the late 1920s, the House committee held a hearing on "The Eugenical Aspects of

Deportation," and the principal witness was Dr. Laughlin, the well-known eugenicist referenced

above. At the hearing, Dr. Laughlin shared his report, the goal of which was to "protect

American blood from alien contamination." *The Eugenical Aspects of Deportation: Hearings

before the Committee on Immigration and Naturalization House of Representative*, 70th Cong.

70.1.4, pp. 2, 3 (1928), attached hereto as Exhibit C.  Both the Act of 1924 and the Act of 1929

were heavily influenced by Dr. Laughlin's beliefs that immigration control was akin to horse

breeding. *Id*. Also, testimonies by historians–corroborated by statements by senators and

representatives at the time–illustrate the influence eugenics and nativism held over the

enactments of the Acts of 1924 and 1929.  Thus, the Act of 1929 was enacted when Congress

departed from its traditional methods of conceiving, drafting, and passing laws.

Congress's departure from its normal legislative procedures and its inconsistent reactions

to Mexican and Canadian immigrants suggest that discriminatory purpose was a motivating

factor behind the enactment of the Act of 1929.

iv.     **The Act of 1929 Bore More Heavily On Mexican And Latinx Individuals Than On Other Races.**

The final *Arlington Heights* factor used to identify discriminatory intent is whether the impact of the official action "bears more heavily on one race than another." *Arlington Heights*, 429 at 266 (citing to  *Washington v. Davis*, 426 U.S. 229, 242 (1976).

The Act of 1929 disparately impacted Mexicans. In the year following the passage of the Act of 1929, the government prosecuted 7,001 border crossing crimes, and this number soared to over 44,000 by 1939.[14] Throughout these years, Mexican immigrants comprised of at least 84% and up to 99% of those convicted.  Based on these statistics, it is evident that the Act of 1929 had a heavier impact on Mexicans than it did on other races or ethnicities. Under *Arlington Heights*, such disparity indicates discriminatory intent.

The analysis of the four *Arlington Heights* factors reveals that the Act of 1929 was formulated and enacted by overtly racist legislators who wanted to control the immigration of Mexican laborers during a unique period of time in American history when eugenics heavily influenced Congress.  It was part of a series of laws intended to restrict entry of non-white immigrants, and it adversely impacted Mexicans and Latinx more heavily than it did any other races or ethnicities.  This evidence demonstrates that a racially discriminatory intent was at least a motivating factor behind the original enactment of the illegal reentry statute and, thus, unconstitutional under the Equal Protection Clause of the Fifth Amendment.

B.      **Supreme Court Precedent Dictates That the Discriminatory Purpose Behind the Act of 1929 is Imputed Upon Section 1326.**

---

[14]*Annual Report of the Attorney General of the United States for the Fiscal Year 1939, 37*; Kelly Lytle Hernandez, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965*, n.6, at 138-39 (UNC Press, 2017).

-18-

Supreme Court precedent establishes that the discriminatory purpose behind an original law is relevant when determining the constitutionality of a derivative law. In *Ramos*, the Supreme Court struck down a law allowing convictions by non-unanimous juries upon considering the "racially discriminatory *reasons* that Louisiana and Oregon adopted their peculiar rules *in the first place*." *Ramos*, 140 S. Ct., at 1401 (emphasis in original). Even though both states had recodified their laws, the Court held that recodification does not cure the laws' original animus; they held that for courts to accurately "assess the functional benefits" of a law, it must not "ignore the very functions those rules were adopted to serve." *Id*. at 1401 n.44. Similarly, in *Espinoza v. Montana Dep't of Revenue*, the Supreme Court invalidated a law that derived from a "checkered tradition" of religious discrimination. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2259 (2020). Concurring, Justice Alito stated, "Under *Ramos*, it emphatically does not matter whether Montana readopted the no-aid provision for benign reasons. The provision's 'uncomfortable past' must still be 'examined.'" *Id*. at 2273 (quoting *Ramos*, 140 S. Ct., at 1396 n.44.)

Even a law that currently serves a legitimate purpose can be held unconstitutional if found to have been derived from a discriminatory law that disparately impacted a disfavored group. In *Hunter*, the Supreme Court rejected Alabama's argument that "events occurring in the succeeding 80 years had legitimated" a racially motivated disenfranchisement provision. *See Hunter*, 471 U.S. at 233. When a court determines that a law's "original enactment was motivated by a desire to discriminate . . . on account of race and the section continues to this day to have that effect," the court must conclude that the law "violates equal protection under *Arlington Heights*." *Id*.

-19-

Section 1326 is a 1952 reenactment of the Act of 1929; however, as established by Supreme Court precedent, later reenactments do not cleanse a law of the racial motivations that fueled the original law. *Ramos*, 140 S. Ct., at 1401 n.44. This is especially the case for Section 1326, considering that it closely resembles the Act of 1929 and even contains some identical language. *Carrillo-Lopez*, 2021 WL 3667330 at 5. Therefore, because the Act of 1929 was motivated by a discriminatory intent, its virtually identical reenactment in Section 1326 also violates Equal Protection.

### C. The 1952 Reenactment of the Illegal Reentry Statute, 8 U.S.C. §1326, Was Also Motivated By Racial Animus.

The racial animus which led to the original enactment of the illegal reentry statute in 1929 continued to influence Congress in the 1950s even though eugenics were partly debunked as a result of WWII. Mexicans were derogatorily called "wetbacks" by legislators. In fact, in 1952, Senate Bill 1851 called the "Wetback Bill" was introduced with the intent to target Mexican immigrants by criminalizing the sheltering or transport of illegal immigrants at the southern border. Ex. B at 17. Three months later, on June 27, 1952, Congress passed the McCarran-Walter Act which reenacted the illegal reentry statute as 8 U.S.C. §1326.

Congress not only failed to address the history of racial animus tainting Section 1326 but perpetuated it. There was little debate leading up to the passage of the McCarran-Walter Act but the intent was still clearly to keep the country as white as possible by regulating immigration. For example, Representative John Wood of Idaho noted: "It seems to me the question of racial-origins, though I am not a follower of Hitler, there is something to it. . . I believe that possibly statistics would show that the Western European races have made the best citizens in America."

Ex. B at 19.  Moreover, the only direct reference to Section 1326 during the debate related to a letter from Attorney General Peyton Ford in which he asked for the phrase "found in" to be added to Section 1326 to make it easier to prosecute "wetback[s]," the pejorative term repeatedly used for Mexicans by legislators during the debate.  Legislators obliged Ford's request to add the phrase "found in"  making it easier to prosecute Mexicans crossing the southern border. *See* 8 U.S.C. §1326(a).  Pat McCarran, a known racist, had previously noted "[w]e changed the language a little to meet the wetback situation, which applies to the southern section of the country." Ex. B at 21.  This not only perpetuated the legacy of racial animus tainting Section 1326 but enhanced the racially discriminatory intent behind its reenactment.

The McCarran-Walter Act was so racist that President Truman vetoed it noting in was part of "a mass of *legislation which would perpetuate injustices of long standing against many other nations* of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and *intensify the repressive and inhumane aspects of our immigration procedures.* The price is too high, and in good conscience I cannot agree to pay it." Ex. B at 20 (emphasis added). Congress passed the bill over the presidential veto and the racist McCarran-Walter Act, which reenacted Section 1326, became law.

Congress made the  racially discriminatory intent behind Section 1326 crystal clear by creating an exception for Canadians called "pre-examination." "In the case of those who had entered the US illegally from Canada, largely European or of European descent, a pathway was provided to normalize their status.  Between 1935 and 1959, approximately 58,000 pre-examination requests were made and most were also granted." Ex. B at 22.  By contrast, Mexicans and Latinx individuals coming through the southern border in similar numbers were

-21-

being criminally prosecuted under the illegal entry and reentry statutes. *Id*. Creating an exception for Canadians to avoid criminal prosecution and obtain lawful status denotes a significant departure from the legislative procedure under *Arlington Heights* and demonstrates that Section 1326 was not about manner of entry as much as the race of the immigrants entering the country. A law such as this one violates the Equal Protection guarantee of the Fifth Amendment and should be held unconstitutional by this Court.

**D.     Section 1326 Disparately Impacts Mexicans and Latinx People.**

Section 1326 is unconstitutional under *Arlington Heights* because it disparately impacted Mexicans and Latinx individuals. "Disproportionate impact is not irrelevant" when determining the validity of a law under Equal Protection. *Washington v. Davis*, 426 U.S. 229, 96 S.Ct. 2040, 48 L.Ed.2d 597 (1976). "The test for disparate impact only requires evidence that Section 1326 'bears more heavily on one race than another.'" *Arlington Heights*, 429 U.S. at 265-68. In other words, Mr. Viveros must show that Section 1326 has a "disproportionate 'adverse effects upon' nonwhite immigrants." *Cook Cty., Illinois*, 461 F. Supp. 3d at 796 (relying on *Alston v. City of Madison*, 853 F.3d 901, 907 (7th Cir. 2017). This is a low threshold which can be shown through statistical or comparative evidence. *See generally Arlington Heights*, 429 U.S. at 259-61.

Mr. Viveros provides statistical evidence which demonstrates that the impact of Section 1326 "bears more heavily on one race than another." There are no publicly available statistic concerning the national origin of individuals prosecuted for Section 1326 today; however, the overwhelming majority of Border Patrol arrests along the southern border are of individuals of Mexican or Latinx origin. For example, over 97% of people apprehended at the border in 2000 were Mexican, and the number was steadily high with 86% in 2005, and 87% in 2010. *Border*

*Patrol Total Apprehensions by Mexico and Other Than Mexico, 2000-2019*, attached hereto as

Exhibit N.  Since 2010, due to increased migration from Central America,  Mexican and Latinx

individuals combined constitute the overwhelming majority of border apprehensions. *U.S.*

*Border Patrol Nationwide Apprehensions by Citizenship and Sector, 2007-2019*, attached hereto

as Exhibit O.  Similar disparities have been identified as sufficient disparate racial impact under

*Arlington Heights*. *See, e.g., Ave. 6E Invs., LLC v. City of Yuma*, 818 F.3d 493, 497 (9th Cir.

2016) (finding disparate impact when the city's refusal to rezone mainly affected low-income

housing neighborhoods where 75% of residents were Hispanic); *Arce v. Douglas*, 793 F.3d 968,

978 (9th Cir. 2015) (finding disparate impact when a law targeting a program in which 90% of

enrollees were Hispanic); *Metro. Hous. Dev. Corp. v. Vill. of Arlington Heights*, 616 F.2d 1006,

1008 (7th Cir. 1980)(holding that the village's refusal to rezone had a discriminatory effect when

40% of the individuals eligible for low-income housing would be black although blacks

composed a far lower percentage of the total population in the village); *U.S. v. City of Chicago*,

549 F.2nd 415, 428 (7th Cir. 1977)(finding disproportionate impact when 34% of the total pool

of qualified patrol applicants were black or Hispanic but only 10% of those candidates were

hired).

       Further, as was the case under the Act of 1929, Section 1326 has caused mass

prosecutions that predominantly impacted Mexican and Latinx individuals. In 2018, Stephen

Miller, a senior policy advisor to President Trump, created the zero-tolerance policy toward

illegal entry and reentry, and then-Attorney General Jefferson Sessions took measures to have

such cases prosecuted by the Department of Justice.[15] "In the last three years, the number of Section 1326 cases has risen by nearly 40% to 22,077, making illegal reentry one of the most common federal felonies today. *See* U.S. Sentencing Commission, *Quick Facts: Illegal Reentry Offenses*, Fiscal Year 2019, attached hereto as Exhibit P. In leaked emails, Stephen Miller spoke highly of the immigration policies during the 1920s, stating, "[t]his would seem a good opportunity to remind people about the heritage established by Calvin Coolidge" between the Act of 1924 and its repeal in 1965."[16] Similarly, Sessions expressed his fondness for the 1920s immigration legislation when he suggested that the repeal of the Act of 1924 had primed the country for a "surge fast past what the situation was in 1924."[17]

This is compelling data demonstrating how Section 1326 is disparately impacting Mexican and Latinx individuals. Considering the evidence presented by Mr. Viveros identifying the discriminatory intent imputed upon Section 1326, Section 1326's own discriminatory history, and its persisting disparate impact, this Court should find Section 1326 in violation of Equal Protection under *Arlington Heights* and, therefore, unconstitutional.

**E.** **The Government Cannot Meet Its Burden To Show The Illegal Reentry Statute Would Have Been Enacted Absent Discriminatory Intent.**

---

[15] "Attorney General Sessions Delivers Remarks Discussing the Immigration Enforcement Actions of the Trump Administration," Dept. Of Justice, May 7, 2018, San Diego, California, https://www.justice.gov/opa/speech/attorney-general-sessions-delivers-remarks-discussing-immigration-enforcement-actions.

[16] Katie Rogers & Jason DeParle, *The White nationalist Websites Cited by Stephen Miller*, N.Y. Times (Nov. 18, 2019), https://www.nytimes.com/2019/11/18/us/politics/stephen-miller-white-nationalism.html.

[17] Adam Serwer, *Jeff Sessions' Unqualified Praise for a 1924 Immigration Law*, Atlantic (Jan 10, 2017), https://www.theatlantic.com/politics/archive/2017/01/jeff-sessions-1924-immigration/512591/.

The government cannot meet its burden to show the illegal reentry statute would have enacted absent a discriminatory intent. Because Mr. Viveros has shown that the Act of 1929 was enacted with a discriminatory intent and that Section 1326 continues to have a disparate racial impact, the government has the burden to show that the Act of 1929 would have been passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266-68. However, the government cannot change the historical and legislative record demonstrating that the illegal reentry statute was first conceived and enacted with the purpose of targeting the deportation and prosecution of Mexican immigrants after the agricultural season was over. The congressional record openly demonstrates the racial animus which pervades the illegal reentry statute and other immigrations laws of the time. Unable to re-write history, the government cannot meet its burden. Consequently, Section 1326 should be held in violation of the Equal Protection guarantee of the Fifth Amendment and, thus, unconstitutional.

## CONCLUSION

The evidence presented along with this motion sufficiently demonstrates the discriminatory intent and disparate racial impact tainting the illegal reentry statute from its inception until today. However, the Defendant stands ready to further develop this evidence and the expert testimony of Professor Hernandez and Professor O'Brien at an evidentiary hearing or at oral arguments. *Hunt v. Cromartie*, 526 U.S. 541, 545 (1999) (evidentiary hearings regarding an Equal Protection challenge are appropriate). In light of the foregoing, the Court should find the illegal reentry statute, 8 U.S.C. §1326, unconstitutional and dismiss Mr. Viveros' indictment.

Dated:   Chicago, Illinois                      Respectfully submitted,
             February 17, 2022

                                                          */s/Carla I. Espinoza*
                                                          **CARLA I. ESPINOZA**
                                                          *Attorney for Defendant*
                                                          **ALFREDO VIVEROS-CHAVEZ**

**CARLA I. ESPINOZA**
Attorney at Law
Chicago Immigration Advocates Law Offices
208 South LaSalle Street, Suite 1602
Chicago, Illinois 60604
(312)704-8000
Ill. Atty. Reg. No. 6308967

**CERTIFICATE OF SERVICE**

I hereby certify that on February 17, 2022, I electronically filed the foregoing document with the Clerk of the Court for the United States District Court for the Northern District of Illinois, Eastern Division, by using the CM/ECF system. All parties to this case are registered CM/ECF users and will be served through the CM/ECF system.

Dated:  February 17, 2022
      Chicago, Illinois

Respectfully submitted,


 /s/ Carla I. Espinoza
**CARLA I. ESPINOZA**
*Attorney for Defendant*
**ALFREDO VIVEROS-CHAVEZ**

**CARLA I. ESPINOZA**
Attorney at Law
Chicago Immigration Advocates Law Offices
208 South LaSalle Street, Suite 1602
Chicago, Illinois 60604
(312) 704-8000
Ill. Atty. No. 6308967