# EXHIBIT E

Congressional Record - House
April 8, 1924

CONGRESSIONAL RECORD—HOUSE

that they are the exceptions. I will take an example and stand by it any lowly, inconspicuous, humble immigrant—I will take the average Jewish immigrant. Where will you find him? You will find him in the factories, you will find him in the shop, you will find him back of the pushcart, you will find him doing the most laborious work from the moment he lands here until he is laid away. What is he doing it for? He is doing it because he has come here for one great purpose, and that is to give his children an opportunity which was denied to him and his ancestors for centuries. This humble Jewish immigrant, and he is typical of 999 out of 1,000, kisses the land the moment he gets here, thanks God for his arrival here, and it is one uninterrupted, continuous life of sweat and labor from that moment to the very end. His children know no other land, owe allegiance to no other flag, love no other country but the United States. I speak for the Jewish immigrant because I have the honor of representing a great Jewish district, and I will say that there are no more loyal people in this country than the Jewish immigrants and their children. The children of the Jewish immigrant, given an opportunity of an education, they will take their place in the community; and in every city where Jewish immigrants have settled I will show you development, progress, business industry as the result of their labor, determination, and efforts.

The Italian immigrants—let us take the most humble again as example—leaving a country, unlike the Jew, a country that was his for centuries, where the sky is clear and the climate good, where he is surrounded by beauty that has been his for generations, leaves that home for the same laudable reason that prompted the Jewish immigrant. To come here he sells his little piece of land, his little home, and knocks at the door at Ellis Island for admission. He lands, and where do you find him? You soon find him with the pick and shovel building our railroads, digging our canals, boring our subways, or in the depths of our mines. He saves money, you say. Yes; saves money and saves money so that he may send to the other side for his wife and babies or for his bride who is awaiting him, and he establishes his little home, he builds his little house—you show me the house of an Italian laborer, no matter how humble, and I will show you every inch of the ground of his back yard cultivated as a garden; I will show you every place where there is space enough for one seed a beautiful flower; I will show you that Italian laborer on his day of rest, with his coat off, working around his home to beautify it—it is his only home and he wants to make it a real home. Come to our schools in New York and you will see hundreds of thousands of little black-headed sons of Romans poring over their a, b, c's in the grade schools; in the high schools preparing themselves for the duties and responsibilities of American citizenship. Is it fair, is it manly, is it accurate to paint an instance here and there out of a population running into millions of a crime committed and hold that such a case is typical of the immigration of an entire race? The Croatians, hard working, honest, industrious, you will find in the mines all over the country, and what better example of assimilation than that of the Croatian and the Italian—why, on the other side a Croatian and an Italian can not get along; they have been instigated and primed to hate each other by the cunning and trickery of European politics. They come here, work side by side, live in the same neighborhood, their children go to the same schools, no hatred, no hard feeling, living in perfect harmony, friendship, and love, their children intermarry. Why? Because they have immediately become entirely and absolutely assimilated. They are Americans in thought, spirit, and in attitude, and yet you come here and say that this newer immigration can not be assimilated.

Gentlemen, you will have to find some other justification for this law. I do not hesitate to say why I am against it. I am against it because it is unscientific, because it does not fit with the economic condition of the country, because it is the result of narrow-mindedness and bigotry, and because it is inspired, prompted, and urged by influences who dare not come out in the open, by the influences who have no intelligent information of conditions, but who have a fixed obsession on Anglo-Saxon superiority, who have an obsession as to religious dominance, and who believe that it is proper to take vengeance upon these humble, harmless, helpless immigrants, in the course of the work allocated by themselves to themselves, and in so doing believe they are rendering service to their country.

I feel sorry for them. As was stated by the very gentlemen who are sponsoring this bill in a boastful spirit, the districts they represent have no immigration problem, to use their own phrase. If these people could only see, could only hear, could only know, they would understand. If they could observe in

an unbiased manner the immigrant in his labors, in his work, their children in their studies, their development and progress, their devotion to the country, all of this prejudice and fear would disappear and how much happier we would be in this country if we could abolish forever religious differences, racial hatreds, and concentrate all our efforts and reconsecrate ourselves as one people, regardless of race or origin to service and united loyalty to our country.

While the Jewish immigration is not charged to any country because it comes from various parts of Europe, I think it can be approximately located. We have no statistics of religions as far as I can ascertain, and prior to 1920 statistics account for country of origin only. That would leave us entirely to the immigration records which sometimes classify immigrants as Hebrew "nationality." From my own experience at Ellis Island I find that this classification is incorrect owing to many Jewish immigrants being classified as Austrian, Hungarian, Russian, or Polish. The Census Bureau in the 1920 census compiled statistics in accordance to "mother tongue of the foreign white stock" and from that it will be seen that 1,091,820 were classified as "Yiddish and Hebrew mother tongue," with a total of 2,043,613. Of these 1,091,820 were foreign born, classified principally as follows:

| | |
|---|---|
| Russia | 791, 181 |
| Austria | 99, 279 |
| Rumania | 37, 287 |
| Hungary | 16, 064 |
| England | 9, 845 |
| Germany | 3, 100 |
| Canada | 2, 687 |

The remainder being scattered among foreign countries, principally, I believe, Jewish immigrants from the above-named countries who emigrated first to another country.

Several explanations have been offered why the 1890 census is now taken and why the 1910 census was taken in the original quota law. The truth of it, gentlemen, is that the 1910 census was taken because at the time the original act was approved on May 19, 1921, it was the last United States census and the only census that should have been taken. You will find that the 1920 census was transmitted by the Director of the Census to the Department of Commerce on November 21, 1921, the census containing the number of foreign born in this country. The census of 1910 was not arbitrarily taken, as some might have been led to believe. When the original act was enacted it was the last census. Since then the 1920 census has been made available. As I said just a moment ago, the percentage or whatever percentage you decide should be based on the last available census, namely, 1920, as was done in the original act in 1921.

I pointed out, gentlemen, in my remarks Saturday when the rule was under consideration that the doors are left wide open on the Mexican line. I stated—and no one dares contradict, because the report of the Commissioner General of Immigration shows that 67,000 Mexicans entered the United States last year, also that the Secretary of Labor has publicly stated that an equal number unlawfully entered. It is not disputed that several hundred thousands came in in 1917 and 1918 and that they have not left the United States but are going from place to place where cheap labor is desired and where manufacturers or growers are specially calloused to want to exploit this peon labor at the expense of natives, yes, and of decent immigrants who come here to make their home and want to live up to the American standard, so that as long as the proponents of this measure permit the intolerable condition of the exploitation of cheap Mexican labor at starvation wages then they can not be heard to say that they are seeking to protect American wages and the American standard of living.

Let me point out some of the testimony given before the committee and received with a great deal of interest by the committee. Mr. W. R. Satterfield appeared. He stated he was not a real-estate promoter but interested in the development of the "alluvial territory along the Mississippi River and its tributaries." To give you an idea first of this gentleman's attitude toward immigrants, he states, and you will find his testimony on page 1052 of the hearing:

We believe there has been too much of the scum of Europe, so to speak, to use the original expression, coming into this country.

Then, again, he says, on page 1057:

The reason we have been advocating a selective form of immigration is because we made "a survey of these birds that come over here," if you will pardon that common expression, to see if we could not induce them.

I mention these expressions to show the attitude of this gentleman toward these very people that he seeks to bring to his "alluvial territory" and tells the committee he is not a real-

estate promoter. This very "scum," these "birds" that he refers to, ought to be induced, he asks, to go out to his territory.

Mr. VAILE. Will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. VAILE. Does the gentleman know how far he got with that proposition?

Mr. LaGUARDIA. I am telling you.

Mr. VAILE. Let me tell the gentleman that the southern Members of the committee repudiated that proposition with the same scorn they would repudiate a proposition to let in unassimilable people from anywhere else.

Mr. LaGUARDIA. But he was in favor of your bill, nevertheless.

The negroes can not do the work, continues Mr. Satterfield, and because the negroes, he claims, will not till the undeveloped ground. Then, the witness continues, he does not want to draw from other sources of the country, although later on he says an attempt was made and he just could not get people to go down to his alluvial territory after "combing the country." What does he offer them? He offers them to go down, mark you this is not a land scheme at all, says he, to buy the land; he will finance it, says he, and he wants $10 an acre for this undeveloped land and he holds this "purchase" for 14 years at $10 an acre. In other words, he wants the immigrant to go there, stay on his land for 14 years, pay $140 a acre for absolutely untilled, undeveloped land which the poor immigrant himself has to develop, and by the time he has developed the land at the end of 14 years he will be so much in hock, as every farmer in this country knows, that what he will have to do is to pick up, go to some place near by, leaving the fruit of 14 years of labor of himself and his family to this generous Mr. Satterfield and his corporation. Why, this offer is so attractive that he is unable to find anyone in this country who will accept his generosity. He states on page 1054 of the hearing, "We are sending out constant literature to try to get people in the Southland to raise cotton," and yet he can not get them, notwithstanding that he paints a pretty picture as to the possibilities of cotton and the high price of cotton in the future, although some of the very gentlemen from the Southland who will vote for this bill will take every opportunity to protest, and properly so, against conditions in the Cotton Belt and the need of doing something for the cotton grower.

Again to show the attitude of this generous Mr. Satterfield:

If there is a Greek—

He says at page 1084—

except in the restaurant business, or a few of those dark-complexioned persons, we do not know it; and there are a few of these Italians down there that we commonly called "dagoes." If our white folks mix with them, I do not know it.

What a splendid type of man to come forward and suggest a colonization scheme to make landowners out of the immigrant. A swell chance the poor, unfortunate immigrant who falls victim to the claws of this man with hatred in his heart, seeking to get rich on the labor and exploitation of the poor immigrant. He wants to stock up this land with Nordics; and on behalf of the Nordics I protest against any such land scheme—any such promotion scheme—and I tell you right now if you are friends of the Nordics you will prevent them from becoming the victims of Mr. Satterfield and his gang of exploiters of human beings.

Reference is made from time to time concerning the statistics of aliens in our insane asylums. Gentlemen, when you refer to statistics in an insane asylum and you charge that to racial causes, when you charge that to immigration, I say with all due deference and respect that you do not know what you are talking about. It is true we have aliens in our insane asylums in New York, and you have them in other asylums in other parts of the country, but, gentlemen, they are not there because they are aliens. If they were at home and never came to this country they would not be in an insane asylum. If instead of aliens we had to draw entirely from your native Nordic stock to put in our factories, in our mills, in our shops, under the river-boring tunnels, the toll of the industry of modern industry under our production system, just as your toll of death and casualties of war, you would have an equal number in those insane asylums of your preferred Nordic stock. It is the presence, the tension, of modern machine industry to which human beings are subjected that accounts for the number of insane. It is the constant, continuous go, go, go of your big industrial centers that breaks the human system. Do not believe that in stopping immigration from Italy and Rumania and Russia that you are going to stop insanity. As long as

under the present competitive system we use human beings as cogs in a machine we will have our insane asylums occupied. No greater mistake has ever been made than to charge that cost up to immigration. Charge it up where it belongs—to the inevitable casualties and cost of modern industry, competitive system, and the existing economic condition under which we are living.

Let me give you a few statistics as a proof of the industry and thrift of the alien. Let us not take Atlanta or the insane asylum, and I believe that a careful, honest, unbiased analysis of the figures of either of these institutions would wipe away entirely the conclusions presented by the sponsors of this measure, but let us take the records of the postal savings banks. Surely those figures are not juggled. I have before me the annual report of the operation of the Postal Savings System for 1923 as contained in the letter from the Postmaster General to the Speaker of the House of Representatives dated December 6, 1923, Sixty-eighth Congress, first session, document 102. The gentleman from South Carolina [Mr. BYRNES], who is as keen and able a Representative as there is in this House and for whom I have the greatest admiration, took the floor last Saturday in defense of this restrictive immigration measure and finished in an eloquent expression that in his district he did not have one-half of 1 per cent of alien population. The gentleman from South Carolina hails from the city of Aiken and according to the report of the Postmaster General there is not a single solitary depositor in the city of Aiken in the postal savings system of the United States. To-day the gentleman from Chattanooga brought out the same point, and we find there are just 22 depositors in the postal savings bank. Mr. CABLE who comes from Lima, Ohio, and in the city of Lima there are just 18 depositors having funds in the Postal Savings System; and the energetic whip, the gentleman from Anderson, Ind. [Mr. VESTAL], who made a passionate appeal for restrictive immigration a few days ago, we find that he has 31 depositors in his city putting their savings with the postal system. Now, along comes the gentleman from California [Mr. RAKER], a member of the committee, and he, too, refers to these terrible aliens, and in the city of Alturas, Calif., from whence the gentleman comes, there is just one depositor with $10 deposit, and I bet you a dollar to a doughnut that that $10 comes from some little Greek peanut dealer who has saved a penny at a time. The chairman of the committee, Mr. JOHNSON, who is given to the country by the citizens of Hoquiam, Wash., boasts of 149 depositors in the postal savings bank, while the champion of restriction, the gentleman from Colorado, Mr. VAILE, coming from Denver, has 1,096 depositors, and knowing Denver as I do, I tell you that if you inspect the list of the depositors making up this 1,096, you will find they are Italians, Jews, and Poles and among the foreign population of the city of Denver who make up the list.

Now, let us take New York City, my little town with its terrible, tremendous foreign population. When you mention it you gasp and you refer to it as the vicious evil that you are seeking to obliterate. Why, my town has 186,086 depositors with a total deposit in Uncle Sam's bank of $56,486,528, out of a total savings in the entire United States of $131,671,300 [applause], and if you will take the centers where you have large foreign populations and add them up you will see how much is left in the territories where there is no foreign population and who are hounding their Congressman to pass this vicious law. From an inspection of the list from New York City you will find that it is the humble Jew, Italian, Pole, Russian, and Greek immigrant bringing his savings to Uncle Sam because he trusts him, because he knows him, because he loves him, and because he is here to stay. These savings represent the sweat of their brow, the fruit of their honest labor, their part and contribution to the wealth, greatness, and the welfare of their adopted country.

I am willing to take the savings not only in Uncle Sam's savings bank but the savings banks generally, and show you where you have big foreign populations, you have big savings deposits. You tell us that these immigrants are a drain on the country; that they send money home. How contrary to American spirit, to real American generosity, it is to throw into their face the few pennies of their hard-earned money which they send to an aged parent or to a poor relative. The figures of the postal savings bank in Uncle Sam's bank are figures which belie that statement and show entirely the contrary to be true, that these millions of newly arrived immigrants not only contribute to the country their labor, but use the fruits of their labor for the benefit of the entire country by putting it in these institutions.

Mr. WATKINS. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. WATKINS. They are contributing something else, too. The Attorney General[1] says that despite the fact that the foreign born is less than 11 per cent, they contribute more than 50 per cent of the criminal record in this country.

Mr. LaGUARDIA. If the gentleman had been in this Chamber when I began my remarks he would have heard my statement on that point. If you take the average, you will find that it is nothing like as much as 50 per cent. While that is suggested by the gentleman from Oregon, let me say that the way to assimilate, the way to teach Americanism, is by setting a good example. You talk about keeping out radicalism; you talk about keeping out Bolshevism. You can not keep it out by an immigration law or by a censorship. But we are in no danger of radicalism or Bolshevism in this country.

Our form of government is as perfect a form of government as imperfect human beings can live under. The way to keep out radicalism and bolshevism is to put honest, decent officials in office, and kick out officials who betray the confidence of the people. That is the way to do it. Set a good example to these new Americans. [Applause.] Let us end these hatreds, these prejudices; let us restore to the people the kind of representative government the liberty-loving framers of our Constitution intended, and drive from public office men who have violated the trust given them. By all means let our conduct on the floor of this House be an example and inspiration to every newly arrived immigrant of American fair play, American manhood, and the spirit of brotherhood and love which our Republic typifies.

Mr. OLIVER of New York. Will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. OLIVER of New York. May I say to the gentleman, in regard to Oregon, that the district court of appeals recently declared un-American a law passed by referendum in the great State of Oregon, where our teacher on Americanism comes from.

Mr. LaGUARDIA. That is correct. The forceful gentleman from Tennessee [Mr. McREYNOLDS] criticized a meeting I attended. Gentlemen, that meeting was public; everybody could come to that meeting, and at that meeting everybody's face was visible. [Applause.]

Yes; the opponents of this bill were directly charged with being influenced by the aliens in our respective districts. It has been repeatedly stated by the sponsors of this bill that pressure was being brought to bear by the foreign-born citizens. I say in reply to that that the foreign-born citizen as I know him, and I think I know him intimately, would not ask their Representative in Congress to vote against any measure that was for the good of the entire country, and I say with equal force that when the foreign born is made the target of a small organized minority who do not understand him and who refuse to learn to know him are directly framing legislation to hurt him and his family at the expense of the welfare of the country, it is only natural that loyal American citizens should call upon their chosen Representatives in Congress and ask them to oppose this measure. There has been no secret about it; protest meetings have been held in every large center. Petitions have been filed right here in the basket, witnesses have appeared before the committee—how can you create any improper influence out of anything, out of a movement carried on in the open honestly A great deal has also been said about the foreign press. The foreign press is not the only kind of press taking an interest in this proposition. I have here in my hands a publication which has featured restrictive immigration legislation for a long time. If you will read the Fiery Cross of January 18, 1924, you will find there an alarming headline entitled "Americans' Heritage Menaced," says Doctor Evans; and who is Doctor Evans? Why, the Fiery Cross says that he is no less than their imperial wizard, Knights of the Ku-Klux Klan, and a five-column article carrying the imperial wizard's views, opinions, and instructions to Congress is printed in detail in the Fiery Cross publication of the hooded knights. Then the imperial wizard says:

Ku-Klux Klansmen have been underlining it for some years, and now many leading American journals and publicists are sounding a deep and loud alarm. Action can not be too quick. Something has been done, but not enough; the quota law is but a step in the right direction. Illiteracy, disease, insanity, and mental deficiency are still pouring in upon us. Immigrants are streaming into cities to make modern Sodoms and Gomorrahs. Up to 1880, 95 per cent of our immigration was of the Nordic types—kindred, desirable, easily assimilable people. * * * What Nordic greatness has wrought in this country, if the Ku-Klux Klan has anything to say—and it is going to have something to say—neither shall be torn down by political madness nor shall be dragged down by disease and imbecility.

And in the Fiery Cross issue of Friday, March 28, 1924, we find that the energetic gentleman from Ohio [Mr. CABLE] put the floor leader of the majority on record and required him to do so in writing, according to the news report in the flaming paper, and I read:

Congressman CABLE, one of the sponsors of the immigration bill, was determined that a vote be urged with the least possible delay, so he obtained the following written promise from Mr. LONGWORTH—

Then the written promise we find was the statement given to the press by Mr. LONGWORTH in outlining the legislative program of the House some 10 days ago and I quote from the so-called written promise as contained in the paper:

The immigration bill will be considered immediately following the passage of these bills.

The bills referred to being the regular appropriation bills.

Then turning the page of the Fiery Cross to the editorial section, we find this startling pronunciamiento:

For those who may not be aware of it, it might be stated here that Ohio is one of the chief strongholds of the Klan, ranking next to Indiana, which at this time leads the Nation in Klandom. Taking Ohio as a single unit, Dayton is one of the strongest Klan cities in Ohio. Dayton is "Klan all through"—

And then let me read the next editorial criticizing one of the great New York dailies, the Brooklyn Eagle, and it is not necessary for me to go to the defense of that great daily. There is no better, more loyal nor square daily in this whole country than the Brooklyn Daily Eagle. That paper is not of bi-political faith, nor of my school of politics. It often criticizes me and does so squarely, but I will say right here that its ownership, its editorial staff, is of the very highest type of Americans, and nothing that may be said by the Fiery Cross can in the slightest affect the standing of that paper or its personnel. But let me read:

The entire country is aware that the Catholic and the Jew are for unrestricted immigration. Americans, however, are not. They see the deadly menace that faces America at this critical time. It is possible that the editor of the Eagle, too, sees the menace; but with less than 1,000,000 people who are of white Protestant, Gentile, American extraction in a city of approximately 6,000,000 souls, it is only natural that the Eagle should play to the overwhelming majority.

There is hardly any doubt but that the editor really meant the people of New York City are not for it. Some kind person should send the Eagle editor a map of the United States that he might learn that America only starts in New York and runs clear to the Pacific Ocean before stopping. Also inform him that the opinion of " the average New Yorker " is not necessarily the opinion of the millions of Americans west of Jersey City.

I read these quotations to show the warp-minded attitude of the official organ of the hooded organization and to demonstrate the one-sidedness of its argument; why, gentlemen, every Member of this House knows that the word of the floor leader is his bond. The Fiery Cross, of April 4, 1924, states that thousands of letters are being received by Mr. JOHNSON from New York, and that New Yorkers complain that they have to depend upon Congressman JOHNSON and upon the efforts of the Ku-Klux Klan, because their Representatives in Congress are going to vote against the bill. Why, gentlemen, I have a whole file full of the publications, and I say to you that the leaders responsible for the activities of the Ku-Klux Klan are doing more to divide this country and to divide the people of a country than any agency that ever existed in the history of the world. These arguments, these articles, are read all over the country. You can not prevent the people of the East forming their opinion of this organization.

They can not understand how you can stand up for Americanism, how you want to shut the doors against those who you believe do not understand American traditions, and how, in the darkness of night, these same people, with masks or hoods, will take some poor defenseless negro and chastise him by corporal punishment or by hanging him, and burning down the houses of the poor undefended negro—they can not understand why, in order to create law and fear, to establish brutal dominance, it is necessary to burn the very symbol of Christianity, which they have been brought up from infancy to revere and worship; they can not understand why it is that this organization has directed its activities and the power of its organized force at a group of people, at races, and religions who are defenseless, who want to take their place in the one big American family. Do you not see what harm is being done, what irreparable harm is being done, and in the name of the same God we all worship and for the glory of our only flag, I ask the Ku-Klux Klan to take off their mask and to meet us in the light of day to

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 5 of 90 PageID #:209

talk these things over and to act in accordance with the best interests and in accordance with the tradition and spirit of America.

I will tell you gentlemen that he who steals my purse steals trash but he who attempts to take my Americanism away from me takes all I have and all that is dear to me. Gentlemen, I was raised out in the big State of Arizona, and anyone who seeks to question that Americanism, I do not care how big he is, will do so at his peril. [Applause.]

Mr. RAKER. Will the gentleman yield?

Mr. LAGUARDIA. Certainly.

Mr. RAKER. Would the gentleman mind telling the committee, if he knows, about an organization composed of about 1,200 lodges with about 150,000 members to which you can not belong unless you speak and write a foreign language?

Mr. LAGUARDIA. Yes; and let me tell the gentleman something—

Mr. RAKER. I am asking for information.

Mr. LAGUARDIA. I want to be perfectly fair. Let me inform my colleague that he is laboring under a mistaken translation. I have their by-laws and have had a translation made. What it says is: "Without regard to language, religion, or political affiliations." I have a correct translation here, Mr. RAKER.

Mr. RAKER. I am asking for information.

Mr. LAGUARDIA. Well, the gentleman has obtained it.

The CHAIRMAN. The time of the gentleman from New York has again expired.

Mr. RAKER. Mr. Chairman, I yield myself 20 minutes.

The CHAIRMAN. The Chair will state to the gentleman from California that the present condition of the time does not permit that.

Mr. RAKER. We have from now until half past 5 o'clock, and I was to have one-fourth of that time.

The CHAIRMAN. Let the Chair state what the parliamentary situation is. By the rules of the House the time is divided four hours on a side. By a subsequent unanimous-consent agreement, after the expiration of that time, the general debate will run on until recess, and run on commencing at 8 o'clock until the House shall adjourn, which shall not be later than 11 o'clock. The Chair has no means of knowing whether there will be any more than eight hours used, and except by unanimous consent the Chair will allow the gentleman from Washington but four hours until after the gentleman from Illinois [Mr. SABATH] has consumed four hours.

Mr. SABATH. May I inquire how much time the gentleman from Washington [Mr. JOHNSON] has remaining?

The CHAIRMAN. The gentleman from Washington has personally used two hours and two and a half minutes, and has yielded the gentleman from California [Mr. RAKER] 1 hour and 56 minutes, which leaves the gentleman from Washington with one minute and a half.

Mr. JOHNSON of Washington. That will be sufficient for me to close the debate.

The CHAIRMAN. The gentleman from Illinois has consumed 3 hours and 42 minutes. I have no doubt there will be plenty of time for this speech, but——

Mr. JOHNSON of Washington. I ask unanimous consent, Mr. Chairman, that the gentleman from California have 15 minutes in addition to the time remaining to his credit and that the gentleman from Illinois have 15 minutes additional.

Mr. SABATH. In addition to the time I have left?

Mr. JOHNSON of Washington. Yes; that the gentleman from Illinois have 15 minutes additional.

Mr. SABATH. In other words, that I have as much time additional as the gentleman will use above his time.

Mr. JOHNSON of Washington. That will be 15 minutes additional, and thereafter we will see about the hour of rising.

Mr. MADDEN. Reserving the right to object, I understand the gentleman from Washington has one and a half minutes, and the gentleman from Illinois [Mr. SABATH] has 18 minutes, and that closes the debate.

Mr. RAKER. I have four minutes.

Mr. MADDEN. And the gentleman from California four minutes. This would close the debate until 8 o'clock to-night.

Mr. RAKER. No; we had an agreement that it should run until we adjourned, which would be at half past 5 or 6 o'clock to-night. That was the agreement this morning, the gentleman from Illinois will recall.

Mr. SABATH. That was the unanimous-consent agreement day before yesterday, as I recall it.

Mr. MADDEN. Let us see what you are going to do with the time.

Mr. JOHNSON of Washington. I am perfectly willing that the gentleman from California [Mr. RAKER] shall have 15 minutes in addition to the 4 minutes and the gentleman from Illinois [Mr. SABATH] 15 minutes additional.

The CHAIRMAN. The Chair is of the impression that the Committee of the Whole can not by unanimous consent change the order set by the House, and the Chair is of the opinion that until the eight hours have been exhausted the Chair must follow the order which was directed by the House, and that even by unanimous consent in the committee we can not change it. I might suggest to the gentleman from Illinois that if he desires to yield time to the gentleman from California, on the presumption the House will have plenty of additional time, the gentleman can do so; but so far as the Chair is concerned, he will leave the time in the control of the gentleman from Illinois, with a minute and a half in the control of the gentleman from Washington.

Mr. SABATH. Mr. Chairman, for the convenience of the House, I am willing to yield the time to the gentleman from California now, with the understanding that later on I will be yielded that time back by the gentleman from Washington.

The CHAIRMAN. The gentleman from Washington yields to the gentleman from California the balance of his time.

Mr. SABATH. And I yield him the balance of my time.

The CHAIRMAN. And the gentleman from Illinois yields the balance of his time, and therefore, under the rule, the gentleman from California is recognized for nineteen minutes and a half.

Mr. RAKER. And also my four minutes.

Mr. JOHNSON of Washington. Yes.

Mr. RAKER. Mr. Chairman and gentlemen of the House, I do not know whether a man ought to attempt to qualify himself or not, but I feel I ought to say just a word or two on this matter before proceeding.

For 13 years I have been a member of this committee. I assisted in the bill when President Taft was in office, and it was vetoed; and then, as a member of the committee during all the legislation that brought about the act of 1917, which was vetoed twice and then passed over the President's veto, and also assisted in the subsequent legislation.

The Committee on Immigration was given the power to study the immigration question. The committee took testimony in Washington and went to New York and other places and spent two months and a half in the Western States taking testimony relating to immigration.

In addition to that, during the last year I spent practically all of my time after the adjournment of Congress on March 4 in going over the United States and visiting practically all the cities of the United States. I spent two and a half months on the Hawaiian Islands and I visited every island and saw every sugar plantation there except one. I visited every nationality and every organization that had any headquarters. I went there at my own expense and in my own time for the purpose of seeing the situation. I then again crossed the American continent and spent over two and a half months in Europe, having been there three years before, shortly after the armistice, when we went over a great part of Europe. This last time I went there for the purpose of seeing the conditions as they then existed and as they exist now.

In addition to this the committee has taken possibly 8,000 pages of testimony during the last four years. We have heard every conceivable question that relates to immigration discussed. We have studied the Mexican situation. We have gone into the labor situation, and we have gone into the different methods that have been suggested.

Mr. MADDEN. Will the gentleman yield for a question?

Mr. RAKER. I yield.

Mr. MADDEN. Now that the gentleman has given us a certificate of his own qualifications, I would like to ask him what it was that induced him and the rest of the committee to leave the floodgates open for the admission of people from Mexico?

Mr. RAKER. In one word I will answer that. The committee gave great thought to that question. We had 25 or 30 witnesses before us some four years ago and went into it in every particular, and the committee also looked into the law, and I am convinced absolutely that with the literacy test and the $8 head-tax provision, and under the law regarding contract labor, I will say to the distinguished gentleman from Illinois I believe, as I believe I am standing here, that if the contract labor law was enforced to-day there would not be a thousand Mexicans who would cross the border.

That is the reason we did not pass on that.

Mr. VAILE. How would it be enforced?

Mr. RAKER. They took some 78 guards away about four years ago. It needs men and money to enforce it. A man told me the other day, testified under oath before another committee, that he saw 58 Chinamen cross the border. The in-

spectors were within half a mile. They walked up to the immigration station and said they wanted to be sent back to China.

Mr. SABATH. Is it not a fact that daily Mexicans do come here under the law?

Mr. RAKER. No; they do not; if the law was enforced they would not do so.

Mr. SABATH. They do come in legally?

Mr. RAKER. They do not come in legally. I stand on that as I stand on my two feet here.

Mr. SABATH. The department says——

Mr. RAKER. I do not care what the department says.

Mr. DICKSTEIN. Will the gentleman yield?

Mr. RAKER. Yes; I yield.

Mr. DICKSTEIN. How does the gentleman justify the exclusion of families and children and that they have to reside in Mexico 10 years before it gives them the right to come in?

Mr. RAKER. Well, it does not mean that. That is intended for people who have been advised to get in that way. There would be a perfect stream of steamboats going to Mexico if there was no limitation, and that was intended that if they went to Mexico they would have to live there 10 years before they could come in. That was to plug up that hole.

There has been much discussion here as to the ineligible clause—those ineligible as citizens of the United States. I will make the statement here now that this bill as now presented does not violate a single treaty that has been entered into by the United States with any foreign government. I make that statement and stand on it, and will be prepared to meet it if it comes up later.

There has been only one treaty since the formation of this Government whereby we dealt with immigration, and that treaty was with China. That has been abrogated, and we have now an exclusion law. Since the beginning of the Government we said that these people of the race on the Pacific coast, such as Malays, and Chinese, and Japanese and others were not entitled to be citizens, and that they could not be naturalized. That has been the law for 137 years. The Supreme Court of the United States has decided that Chinese can not be naturalized. The Supreme Court of the United States says that Hindus can not be naturalized, and the Supreme Court of the United States has said the Japanese could not be naturalized. The Supreme Court of the United States has said that Filipinos can not be naturalized, as well as every Malay. So from the beginning of the Government those people can not be naturalized under our fundamental law, which has been the law down to the present time.

For the last 20 years the people of the West have been struggling as no people ever struggled before to keep out these people ineligible to become citizens and be naturalized. The people of California and many States have passed similar laws that these ineligible citizens can not come in under our laws. The Supreme Court of the United States has held that that act is valid and is not against the treaty; so that covers that. The Supreme Court has also used the language that it would be a dangerous thing to admit these people to obtain agricultural lands who were not subject to our laws, and who were not able to become citizens of the United States.

I want to say here that every man who has been opposing this law and has said that we would have trouble with Japan has made the same argument in regard to that question, and some who have appeared before the Supreme Court of the United States made the same argument they make in regard to the exclusion of these people who have been declared ineligible to become citizens of the United States.

Now, here is the story of a century: Look at this chart. Here is a graphic presentation of the past, present, and future of Hawaiians disappearing, Japanese already risen to predominance, and whites in hopeless minority.

You will see here demonstrated that in 1900 there were 230,000 Hawaiians. Look at the line coming down and you will see that there are now 23,723 Hawaiians on the Hawaiian Islands.

Now look again; Hawaiians, 18,000. For awhile there were many others, but they pinched them out.

With the gentlemen's agreement that there was to be no increase in the Japanese population in the islands or the possessions of the United States or in continental United States, starting in 1880 down to 1890 they got very few, and they run up until there was 109,274 Japanese in the Hawaiian Islands. I visited the schools of the Hawaiian Islands, one where the teacher told me there were over a thousand pupils present. So help me God, there were not over six white people attending that school. Anybody knows that within the last 10 years with those born in Hawaii they can dominate everything in

the island of Hawaii and elect all the officers. Then they say there is no danger in this increase of population.

These are from the census, and I will tell you another thing that I was unable to get into the RECORD and which I tried to prove. I talked with the immigration official. He told me that when the student goes out, the native-born student, he registers as a Japanese. He gets a Japanese passport. When he comes into the country he comes in as an American citizen, and there is no record kept in regard to his entrance as a Japanese. Then people talk about an increase! There are 15,000 native Japanese in the Japanese schools, and when they come back they come in as American citizens, and they tell us that because there is not as large an increase because of this fact, there is no increase in the islands.

Let us take the map of continental United States—Japanese and Chinese population—continental United States, 1870 to 1920. In 1870 we had only 55 Japanese in continental United States. Follow the line up to 1880, 1890, up to 1900, and then it will be seen that between 1905 and 1907, when they were working on the gentlemen's agreement that the Japanese population had increased tremendously. The Department of Labor has never seen this gentlemen's agreement and we have their letter on file. No man has seen it except the Secretary of State and his officials. The committee members have been there and the members of the delegation have been there, and I call attention again to the fact that even the treaty, with that postscript upon it, is still a secret document and among the secret files in the Senate, and I have the letter from the Secretary of the Senate within the last three weeks about that. They have never yet admitted the American people to see how, or why, or what was done when they adopted the treaty of 1911. While they were doing that, we find, coming to the United States during that period, over 20,000 Japanese, and then when they adopted the gentlemen's agreement for about a year, it will be noted that the invasion slackened. Since that time, up until 1920, we find that they have now over 110,000 and they have been coming in continually and are coming in to-day.

During that period from 1912 to 1915 there were over 30,000 Japanese picture brides who came to the United States, and I have here a list on one vessel. The Committee on Immigration saw them coming, from 50 to 100 in a vessel. In the year 1923 I saw the same thing with my own eyes in the Hawaiian Islands. I saw them landing over 60 picture brides at one time, and 50 others during the month of May and June of last year. They shut out the picture brides so far as the continental United States is concerned in 1920. Within the last week I received this paper from Tokyo itself and here is one family which runs up to about a hundred. There is a memorandum showing that before the picture-brides order was made in 1919—it took effect in 1920, in August—they began coming over as picture brides. The Japanese Government, when a Japanese returned to Japan, made him enter the military service. They have abandoned that and they now give him from six months to a year, so that he goes himself to Japan and gets his bride and brings her in. The Japanese Government encourages that and the steamship companies give him credit, so that it really does not cost him any more to go over and get his bride than to go and come back. Here is a list showing that there were some 50 in the last month. That is a paper that is published in Japan and a friend of mine sent it to me.

Every child born in the United States is an American citizen. They want to own the land. It is transferred to them immediately, and then they appoint a guardian. We have gone so far in California in order to save our own homes and save the western part of continental United States as to provide by law that a person ineligible to become a citizen of the United States can not be the guardian of his own child, for the purpose of preventing the Japanese and their Government from controlling the lands in that country. At one place in Placer County there were 23,000 acres of deciduous fruits growing there. They use the old mining ditches that brought water down in the early days for hydraulic purposes, and when the mining ceased they converted those into irrigation ditches for deciduous fruits.

One-third of all of the deciduous fruits raised in California are raised there. Judge Box saw it and Mr. VAILE saw it. We took testimony in that locality. We saw where the white schools used to be, and we saw them abandoned. We saw where the American churches used to be, and we saw the windows knocked out and unused; but in the Japanese colony we saw where they were occupying the land and running the country. In that year, 1920, over 19,000 acres of that land were under the domination and control and use of the Japanese in that one locality. That is the situation. We went through the State of Washington, down through the valley between

Seattle and Tacoma, and we found in that wonderful valley over 80 per cent of the land in the control of the Japanese. We found that in the city of Seattle 47 per cent of every hotel in that great city was under the control and domination of the Japanese. We found the fish markets in Seattle under their domination and supervision. We found the vegetable markets under their control and supervision. We found banks and every other enterprise—barber shops, small stores, and others—under their domination and control. Go on down through California and down into Los Angeles, and the people there did the work themselves. We found that over 75 per cent of these occupations in these places are being controlled by these people, and then some people say that we do not have occasion to worry. As a boy I went to the normal school down near San Jose.

The CHAIRMAN. The time of the gentleman from California has expired. The entire eight hours provided in the rule have now expired, and the time from now on is to be equally divided between the gentleman from Washington and the gentleman from Illinois.

Mr. JOHNSON of Washington. Does the Chair hold that I can not ask unanimous consent——

The CHAIRMAN. The Chair holds that the gentleman can now yield time. The time is now under the control of the gentleman from Washington and the gentleman from Illinois.

Mr. JOHNSON of Washington. Mr. Chairman, I yield 10 minutes to the gentleman from California [Mr. RAKER].

Mr. RAKER. They had great orchards of almonds, peaches, and apricots. They had great fields of other work. In those days of 1883 and 1884 the American boy and the American high school and college girl assisted in doing this work. There were not any Chinese in the fields; there were not any Japanese in the fields. We go back 25 years and we find these boys and girls driven from their places of employ. You know and I know that high-strung American girls would rather go hungry than work in the same field with a Chinaman or a Jap. The same way with the American boy.

Mr. DICKSTEIN. Will the gentleman yield?

Mr. RAKER. I will.

Mr. DICKSTEIN. Will the gentleman kindly make it clear to the House that the minority is with the majority on this proposition?

Mr. RAKER. I did, and I state this in fairness to all: This matter came up before the committee, and the committee unanimously voted for these provisions in this bill. [Applause.] So we have the united strength of the entire committee on that part of this bill. I took this time for this reason.

There has been considerable agitation and there has been some literature circulated in regard to this provision that we were violating treaties, and now everybody yields and concedes that we do not violate any treaty. The next question is as to the gentlemen's agreement, which is not written, unknown, unseen, unworkable; and above and beyond all of that my contention is in reading our Constitution, reading the decisions of our Supreme Court, the treaty-making power itself could not enter into a treaty and give a foreign country the control of who should come to the United States. [Applause.] If Congress itself, if every vote cast upon it in the House and Senate, and the President should sign it, should pass a law yielding to a foreign country, as this gentlemen's agreement does, to say that Japan should say who should come to our country, it is against our Constitution, it is against our very sovereignty, and can not be done. [Applause.] Now the only point that we desire is that this matter might be fully and fairly presented to the House, so that we might put in positive law that the gentlemen's agreement is not in operation any longer, and that the statutes of Congress may control, and that our officials may determine who shall come to the United States. The immigration officers hold up their hands when you ask them, "Why do you not exclude these persons?" They have not a word to say. When a Japanese comes to our shores and presents a passport and he is admissible we can not exclude him unless he is diseased. Now, the dignity and honor and stability of our country demand that all the other nations of the earth abide by and with our sovereignty as a Nation. And we must say that one nation we have been good and kind to, and we have a high regard for their people and their civilization, but we want them to stay where they are. They said there would be war when we kept these grown men from sitting side by side with our little girls in school; they said war and the breaking of friendly relations would come when we passed the alien land laws; when we said our territories could not be used by an alien race of whom we could not make citizens—but the legislature took its usual,

even course and the cases went into the courts, and from the lower courts to the Supreme Court of the United States, and the best brains and ability the Japanese could muster and bring together there argued and reargued, and the Supreme Court without a dissenting voice held in five cases, one from the State of Washington and four from the State of California, first, that they had the right to pass the law and it was not against any treaty.

Second, that they could not even lease, they could not belong to a corporation of which the majority of stock was held by aliens; and, next, they could not even have a copying contract, because it affected the soil, and they have been moving along in an even way; and, as the distinguished President said, if Japan ever increased her population we can and will pass an exclusion law, and then the gentlemen's agreement is wiped out. Now, I will just ask men to look at the map of Hawaii and then look at the map of continental United States.

Mr. BOX. I have here the words of the President.

Mr. RAKER. Will the gentleman read them?

Mr. BOX. I will read just that section:

I secured an arrangement with Japan under which the Japanese themselves prevented any immigration to our country of their laboring people, it being distinctly understood that if there was such immigration the United States would at once pass an exclusion law.

Mr. RAKER. Yes. That is the part of the "gentlemen's agreement" that was never put into the report of 1908. That is the part of the "gentlemen's agreement" that everybody left out. That is the part of the "gentlemen's agreement" that we ask to be enforced. It was dictated by the great President Roosevelt, and nobody will complain, nobody will object to our asserting our sovereign rights in such matters as this.

There is just one other thought that I wish to leave with the attention of the committee, and that is that we have been patient, we have done everything that has been within the human power of man to prevent any infractions of the law, believing in our Government, and believing that we would get legislation. We have secured it all except this, and there was sent here the other day by an organization from Los Angeles the statement that the American Legion refused to permit Japanese to build a church in Hollywood. Those are great boys.

Mr. McLAUGHLIN of Michigan. Mr. Chairman, will the gentleman yield?

Mr. RAKER. Yes.

Mr. McLAUGHLIN of Michigan. It is my recollection that when the Legislature of the State of California was considering the passage of a land law relating to Japanese matters President Roosevelt asked the legislature not to pass that law, and later when one or both of these matters was up in California President Wilson sent Mr. Bryan, the Secretary of State, to California to intercede with the legislature not to pass it.

Mr. RAKER. Yes. I will refer to that. When President Roosevelt was in office we had a long telegram from him to this effect:

Be patient, gentlemen. We will have it adjusted, so that there will be no more need of legislation.

That was the "gentlemen's agreement." Then you had Governor Johnson's administration in California, and this legislation was pending; and President Wilson, thinking that this thing could be disposed of and adjusted, proposed to send Secretary Bryan out to California. Before Secretary Bryan left, the Committee on Immigration had Secretary Bryan before it, on two several days, most of the forenoons, and he said it would be adjusted.

And without any egotism—far be it from me—when we heard that Mr. Bryan was to leave Washington, I went to see the President a number of times, and I begged him to recall Mr. Bryan and not send him to California, because, as I said, "Just as sure as he goes, the legislature will pass that bill, irrespective of anything relating to the treaty." It was all right so far as the treaty was concerned. I think that answers it.

Mr. MILLER of Washington. Mr. Chairman, will the gentleman yield?

Mr. RAKER. Yes.

Mr. MILLER of Washington. In order to satisfy some Members here, will the gentleman explain whether there is anything in this bill prohibiting immigration of Japanese to the Hawaiian Islands and the Philippines?

Mr. RAKER. It cuts them off from the Hawaiian Islands.

Mr. MILLER of Washington. And from the Philippines?

Mr. RAKER. Yes; and from the Philippines. We except a certain class—Government officials, and so forth.

Now, one word in conclusion. The Supreme Court has said that the treaty of 1911 was a treaty of navigation and trade, and therefore we provide in this legislation that those who come to this country for the purpose of engaging in foreign trade are permitted to enter. So we will have no question about the treaty. We will admit those who come here to engage in trade, in interstate and foreign commerce; but we limit it, and the question will be settled, once and for all, to the satisfaction not only of the West but of the entire United States.

Mr. MADDEN. Mr. Chairman, will the gentleman yield?

Mr. RAKER. Yes.

Mr. MADDEN. If their children are born here, of course they will become Americans?

Mr. RAKER. I will answer that by saying they become Americans by virtue of the Constitution, but God knows they will never become Americans at heart, no matter how long they stay here.

Mr. MADDEN. I mean literally.

Mr. RAKER. Yes; literally, I say. I want to thank the House for its courtesy. [Applause.]

Mr. SABATH. Mr. Chairman, I desire to take five minutes for the purpose of making clear to the House that the minority of the committee, realizing that the four members of the committee who have sponsored this provision are from that part of our country confronted with the Japanese situation, and were better informed as to the conditions than we, we of the minority have agreed to their views. Therefore there is no question as to the Japanese and Chinese proposition to-day.

I also wish to say, in connection with a statement that has been made here as to foreign powers, that we of the minority also resent interference on the part of any foreign nation or any foreign people. Unfortunately some of the Members are sometimes under the impression that because people who are born here have foreign names, that they are foreigners. That is not true. These people, though of foreign parentage, and those naturalized have, under the Constitution, the same rights and the same privileges, I believe, as American citizens whose parents might have been born of so-called Nordic parents.

Now, as to the picture brides I wish to state that my colleage [Mr. RAKER] and the rest of the Members worked hard, and I have cooperated with them, to eliminate that practice, and am mighty glad that it has been eliminated. [Applause.]

Mr. Chairman, I yield five minutes to the gentleman from Rhode Island [Mr. ALDRICH]. [Applause.]

The CHAIRMAN. The gentleman from Rhode Island is recognized for five minutes.

Mr. ALDRICH. Mr. Chairman and gentlemen of the committee, in speaking against this bill I desire to make it clear that my opposition is not to the administrative features of the bill, but to that provision which limits the number of quota immigrants who can enter this country in any one year to 100 and 2 per cent of the number of foreign-born individuals of a particular nationality residing in the United States as determined by the census of 1890, instead of using the census of 1910 as the quota basis. The administrative features are, for the most part, a great improvement over those contained in the present law, and that part of the bill which grants exemption in favor of parents, husbands, and wives, and children is especially commendable from a humanitarian standpoint. I recognize the importance of some restriction upon immigration, at least until the present disturbed economic conditions of the world have quieted down and until this country has had an opportunity to more completely assimilate those people who have already taken up their residence among us. But I believe that this should be done according to American principles and without discrimination against the nationals of any country or group of countries.

The principal argument of the committee in its report in favor of numerical restriction of immigration is that we should prevent foreigners from coming into our country faster than we are able to assimilate and Americanize them, and at the same time they present a bill which will have the effect of slowing up the Americanization of those nationals of foreign countries who are already among us. It is my opinion that this bill, in so far as it discriminates against the nationals of the countries of southern Europe by taking the census of 1890 as a basis for the quotas to be admitted, fails completely in its avowed purpose of Americanizing our foreign-born population. We tell the immigrant when he arrives upon our shores that you have now arrived in a land of liberty and equal opportunity, where all people are treated alike and without discrimination. He is asked to live under a Constitution based upon these principles. He is taught the evils of class legislation, and he is rightly looked down upon if he does not enter into the spirit of our institutions.

We expect him to become a thoroughly American citizen, and now by the provisions of section 10 of this bill we are attempting to put into the law a provision which says to a very large group of those people, who are already naturalized or about to become so, that we do not consider you particularly good citizens and are, therefore, materially reducing the number of your kind that may come into this country hereafter.

It must be apparent to every fair-minded Member of this House that this is the worst kind of discrimination against a large class of individuals and absolutely opposed to our American ideas of equality and justice. Is it not also apparent that a law of this kind will not have the effect of Americanizing our foreign born more rapidly but, on the contrary, will have the opposite effect and cause them to doubt our sincerity, to lose faith in the fairness of our Government, and to lose their desire to become loyal American citizens? In discussing the reasons for limiting admission of quota immigrants to 2 per cent of our foreign-born population based on the census figures of 1890, instead of 3 per cent based on the census of 1910, the committee said in its original report:

An impelling reason for the change is that it is desired to slow down the streams of the types of immigrants which are not easily assimilated. Naturalization does not necessarily mean assimilation. The naturalization process can not work well with the continued arrival in large numbers of the so-called new immigration. The new type crowds in the larger cities. It is exploited. It gains but a slight knowledge of America and American institutions. It has grown to be a great undigested mass of alien thought, alien sympathy, and alien purpose. It is a menace to the social, political, and economic life of the country. It creates alarm and apprehension. It breeds racial hatreds, which should not exist in the United States and which need not exist when the balance shall have been restored.

Does not this statement show that the committee has taken upon itself to decide that the nationals of certain European countries are undesirable citizens, and has it not practically insulted all the people from those countries living in the United States, whether they are American citizens or not? It is true that they disclaim this intention in rather apologetic and unconvincing language on page 17, where they say:

Our citizens do not speak of any type of peoples as actually undesirable. Nonassimilable or slow of assimilation is meant. The undesirables are the criminals, the insane, the paupers, and the other classes excluded by section 3 of the act of 1917.

In the later majority report they modify their language somewhat, but the fact remains they have made very serious accusations against the nationals of these countries; and this is hardly the way to encourage the Americanization of these nationals. Discrimination against those already here does much more to "breed racial hatreds" than anything else. If we desire assimilation, we must treat all alike.

There is another reason advanced for limiting immigration numerically, and that is to protect our own workingmen from abnormal competition from foreign countries; for example, when there is a general industrial depression in foreign countries, such as exists in some European countries to-day, there are likely to come into our country unusually large numbers of foreign laborers, a great many of them coming for a short time only, who come here for the purpose of making a living in competition with our own people, with the result that the standard of living of our own workers, who have built up this country, is temporarily, if not permanently, impaired by this abnormal competition. The committee has not discussed this phase of the question, and I simply call attention to it, as I believe it is the reason why a large number of national organizations have filed petitions with the committee registering their approval of this bill. I believe their reasoning is sound, but they are not interested in the question whether we adopt the census of 1890 or the census of 1910 as the basis of figuring the quotas, but favor some limitation on immigration and indorse the Johnson bill, as it is the only immigration bill before the House.

Now, let us see who the people are that are discriminated against by this bill. I happen to come from a State which has next to the largest foreign-born population of any State in the Union. Twenty-eight and seven-tenths per cent of our total population is foreign born and probably about one-half of the population is foreign born or born of foreign parents. As a result I have had an opportunity to observe intimately the Americanization of our foreign-born population and what they have done in the way of becoming assimilated and how they have adapted themselves to our industrial, social, and political life. One of the countries which would be most severely dis-

criminated against by going back to the census of 1890 for our quota basis is Italy. Under the present law 42,057 Italians are admissible each year. Under the proposed law this number would be cut to 4,089. What is true of the Italians, I think, is also true to a very great extent of the nationals of the other countries of southern Europe; but let us take the Italians as an example, and I shall speak of them as Italians for the sake of brevity, although a large part of them are Americans of Italian descent.

Industrially the Italians of our State have been extremely successful, and this is noteworthy when we consider the fact that a large number of them were unskilled laborers when they first arrived in this country. They are thrifty and a great many of them have acquired their own homes. Some have farms, and even those who have not are extremely skillful in raising agricultural products upon the lands which they possess or on small gardens around their houses. They do not confine their efforts to any one line of industry. They work on our farms, in our mills, and in our stores. We have successful Italian farmers, bankers, lawyers, doctors, and business men, and many of them rank at the top of their respective businesses or professions, having worked their way up from humble beginnings. For instance, one of the justices of our superior court was born in Italy, having come to Rhode Island in his youth, and because of his remarkable ability was chosen for the position he now holds.

Those Italians who have lived among us for a number of years have proved by their interest and activities in civic affairs that they are rapidly becoming completely Americanized and have adopted our social customs. They take an interest in the development of our institutions and charities. Whenever there is an effort made to raise funds for building hospitals or supporting charitable institutions the Italians always do their part, and do it cheerfully and energetically.

In regard to the political tendencies of the Americans of Italian descent and also the nationals of the other southern European nations there is a popular impression that they are inclined to be radical, but an examination of the citizens in Rhode Island, where we have as large a percentage of these people as any State in the Union, shows this to be untrue. For example, at the last election for governor in Rhode Island there were less than 1,000 votes cast for the socialist candidate. The New England States are traditionally conservative, and the large increase of foreign population during recent years has done nothing toward destroying this traditional conservatism. The Italians are becoming naturalized rapidly and are taking a deep and active interest in our political affairs. In the city of Providence one member of the board of aldermen and several members of the common council are of Italian descent. Several members of our State legislature and an assistant attorney general are also of Italian extraction. In examining the votes of these members of the various political bodies there is nothing to indicate that they are radical, and there is nothing to indicate that they are influenced by any racial considerations, but vote according to what they consider is for the best interest of the country and of the State of Rhode Island.

If we compare the radicalism existing in Rhode Island, where 28 per cent of our population is foreign born and largely from those countries against which this bill would discriminate, with some of the Western States, where the foreign-born population is made up largely of Nordic races, I think that we will find that there is much less radicalism in Rhode Island than there is in these Western States.

The record of American soldiers of Italian parentage during the war has already been called to our attention on the floor of this House, and I simply wish to add that what has been said of them is borne out by the opinion of a friend of mine who, as a colonel during the World War, commanded a regiment which contained a large number of these soldiers from Rhode Island, and he speaks of them as extremely brave and efficient.

Furthermore, let us not forget what men like Dante, Michael Angelo, Leonardo Da Vinci, Verdi, Galileo, Marconi, and innumerable other illustrious Italians have contributed to literature, art, music, and science. Should we hesitate to welcome the descendants of these men to our citizenship? Are they not likely to contribute something of value to our country and our civilization?

If we adopt the census of 1890 as the basis for the quotas to be admitted under our immigration law, we will greatly discriminate against the nationals of Italy and the other countries of southern Europe. If we amend this bill and retain the census of 1910 as our quota basis, we avoid this discrimination and we will have an opportunity to enact an immigration law which will be fair and just to the nationals of all countries and which will not offend any of our citizens. Whether our ancestors were born in northern or southern Europe or elsewhere we have all done our share in building up this great country of ours, and we are entitled to equal consideration in the framing of its laws, and I trust that the Members will keep this fact in mind in voting on the bill now before the House. [Applause.]

Mr. SABATH. Mr. Chairman, I yield 15 minutes to my colleague from Illinois [Mr. KUNZ].

The CHAIRMAN. The gentleman from Illinois is recognized for 15 minutes.

Mr. KUNZ. Mr. Chairman and gentlemen of the committee, let us be as generous in peace as we have been brave in battle.

There seems to be a great deal of alarm among the Members of Congress and more so than there is amongst the people of this country. There seems to be a great deal of national hatred among some of the Members of Congress, and I regret it very much. In the last year or two, since I have been a Member of Congress, I have observed it. I remember a year or two ago that I attended the Army and Navy game. I rose in my seat, with some of my friends from Chicago, and a Congressman from the State of Tennessee was asked who I was, and he stated I was a Polish Jew.

Now, gentlemen, if I were a Polish Jew I would be proud of it, because I believe the same sun that shines upon me shines upon that gentleman; that the very star which enlightened him enlightened me, and there is no difference between him and me; that the same Lord and Creator created him who created me, and I believe when the day of judgment comes he will be judged as I will be judged, whether he belongs to one creed or another, whether he worships in one church and I in another. It will not be a question as to the church in which he worships, but the question will be, What have you done for humanity and what kind of a man have you been during your time of life? [Applause.]

I was very much impressed when I heard the gentleman from Tennessee [Mr. McREYNOLDS] mention Gen. Andrew Jackson, a name so eminently known in history, one who led an army of men through the hills and valleys of Tennessee and through the swamps and lowlands of Louisiana during the War of 1812.

It put me back to my days of youth, when history recited that in 1778 not only did the Anglo-Saxons fight for the liberty of this country—who were here and had to defend their rights— but history tells us that in 1778 Kosciusko, Pulaski with a Polish army, Lafayette [applause], Rochambeau, and others came to this country, not to defend themselves or their rights but to defend the honor of liberty, to defend a home for those who were persecuted and those who desired to live under the banner of freedom and liberty. General Pulaski fell in battle at Savannah, Ga.

I read in the Appendix only yesterday where my worthy colleague of West Virginia [Mr. ALLEN] stated that in some Jersey town some foreign paper had published the fact that a Polish judge was elected.

That must be a crime. I do not know whether it is a felony or whether it is a crime against the Constitution of this country. I remember when in the city of Chicago, which is known to be a cosmopolitan city, Frederick A. Busse was elected mayor of Chicago on the Republican ticket by an overwhelming majority, and I remember reading in the German papers where they took pride in the fact that Fred Busse was a German and the heading was "Busse, one of our Germans, elected mayor of Chicago." There was no crime in that. When President Harding appointed Mr. Davis as Secretary of Labor, I have heard it said by a great many Welshmen, who took pride in the fact, that Mr. Davis, one of the Welshmen in this country, was appointed in the President's Cabinet, and there was no crime in that. In every locality, in a great country like ours, the melting pot of the world, where the people of every nation come to better themselves, we find instances of that kind. Why, gentlemen, it ought to be a lesson to us. When we go back to Germany we find that after the partition of Poland, Prince Bismarck tried to Germanize Germany. Those Poles who were partitioned and cast into Germany were prevented from using their language. Their schools were closed and they were forced to use the German language. They, being God-fearing and law-abiding, abided by the law; but when opportunity was offered them they took arms with the Allies against their persecutors.

Mr. VAILE. Will the gentleman yield?

Mr. KUNZ. Yes, sir.

Mr. VAILE. As the gentleman has remarked on the floor here, this is a very important subject, and while I do not care to raise the point of no quorum, as the gentleman did the other

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 10 of 90 PageID #:214

day, I am sorry the gentleman has not a quorum present to hear his remarks.

Mr. KUNZ. Well, I wish there was a quorum present. If the gentleman raises the point, I will be glad of it. Does the gentleman raise the point?

Mr. VAILE. No; I am a little more considerate than the gentleman was to me the other day when I was speaking.

Mr. KUNZ. I feel, Mr. Chairman, it is the duty of every Member of Congress, on a question so vitally important to the people of this country, to be here in order to be thoroughly advised without prejudice as to the conditions about which we all can learn.

I want to state to the gentlemen that in 1922 I visited Europe. Congressman Rainey, who is now dead, and myself spent 10 weeks in Europe studying the conditions of emigration, and I am better versed than a great many men who are on the floor of this House and have taken up this bill for consideration. [Applause.] The fact is I visited those countries and I did not need an interpreter to find out conditions, and I would like to tell you what happened there and the conditions as they are, but I have not the time. If I could have sufficient time it would be a great pleasure for me to tell you the conditions as they were.

Mr. CABLE. Will the gentleman yield?

Mr. KUNZ. Yes, sir.

Mr. CABLE. Could the gentleman give us any idea how many would come to this country if we did not have a quota law?

Mr. KUNZ. If the gentleman will give me the time I will be only too glad to describe the conditions as they were at that time.

Mr. CABLE. I have not control of the time.

Mr. KUNZ. If I had the time I would be only too glad to do it.

There has been a great deal of alarm among the Members of Congress in talking about bolshevism, about nihilism and a great many other disturbances in this country, and it is all placed in front of the foreigner. I am not here protecting the foreigner. I am an American, just as good an American as there is upon the floor of this House and just as good an American as there is in this country, and I can prove my Americanism way back yonder while some of the other gentlemen probably can not.

When you talk about communism and nihilism, you say it is the foreigner that breeds it. Why, gentlemen, let me call your attention to some facts. You remember the I. W. W., do you not? You remember Mr. Debs and you remember Mr. Foster.

You remember that whole aggregation. Were they of southern Europe or were they Anglo-Saxons? Then why point your finger to one nation as against the other? Why say to one, You shall enter the gates of heaven, and you shall enter the gates of hell? He who created you and me will pass judgment as to inferiority and as to qualifications without our passing judgment upon people of that kind. [Applause.]

In August, 1922, I was in Berlin. I was there while the chairman of the Committee on Appropriations was in London, England. I was in Munich and talked to the minister of Germany. I was in Berlin and met every German official in that country. I was in Helsingfors, Finland. I was in Warsaw, Poland. I was in the office of the consul of America there when I saw 1,500 refugees from Russia waiting to have their passports viséed to come to America. In every country that I visited there were people who were waiting anxiously to come to this country; and while I was in Munich talking to the minister of Germany, Von Karl, with Congressman Rainey, who is now dead, Mr. von Karl said to Mr. Rainey and myself, "You gentlemen are both from America. Let me tell you that we have not been treated fairly or honestly by America. After the war and before the election emissaries were sent to the German people with the promise of helping out Germany, but after the election Mr. Harding washed his hands and said he wanted nothing to do with the entanglements of Europe; but," he said, "remember that three-fifths of the population of America is German, and we will send a propaganda to America before the next election that will compel the American Congress to give the Germans aid."

At that time I paid very little heed to it; but only a few days ago our American Congress passed a measure, and while I voted for the measure because I believe there is a great deal of suffering there, yet our American Congress appropriated $10,000,000 to help the suffering Germans.

Now, you might say to me, "Well, they need it." I want to say to you in return, without fear of contradiction, that I have not visited a place in Germany where there was not a house of amusement where you did not have to reserve your seat three days in advance. There was not a public restaurant that was not crowded, and in the hotels when you registered as an American you had to pay 4,500 marks a day for a room where a native European would come in and receive the same accommodations for 1,000 marks. Of course, we were in the hotel where there were a great many people; Germans mixed with all other nations. I want to say that I talked with a great many Germans and they said that if it was not for President Wilson Germany would not be in the position it is, and they were only waiting the time when Germany would come back on its feet and be where it was before the war.

Now, gentlemen, there is no question in my mind but that Germany will be back on its feet. There is no question but that we desire to be friends with Germany, but I want to call the attention of the chairman of the Committee on Labor and Members so deeply interested in this bill to the fact that you are discriminating against other nations. As the gentleman from Colorado [Mr. VAILE] said, the 1920 census would give southern Europe five times more than they have now.

The CHAIRMAN. The time of the gentleman from Illinois has expired.

Mr. SABATH. I yield to the gentleman five minutes more.

Mr. KUNZ. What difference would it make how many times more any nation would get if it was an honest deal? Do you intend to give Germany more? You know that in the last war we fought Germany bitterly and I have the courage to tell you, in spite of the German influence I speak as an American to you and stand up as an American. With what Von Karl told me and Mr. Rainey, that they would send propaganda to this country because three-fifths was German; under your bill you had approximately 50,000, which will strengthen the Germans, and finally you will be run by the German element and not by the Anglo-Saxon and those from southern Europe.

According to your census figures under the 1910 census Germany received 45,000; under the 1900 they received 48,000; and under the 1890, 50,000. It makes no difference to me what figure you give to Germany, whether you give 50,000 or 100,000; if they are justly entitled to 100,000, if it be just according to the census of 1920, I would say give it to them; but you are trying to discriminate in going back to the census of 1890 against other nations, and then you inject into it this assertion that they are inferior.

The American people have just emerged from the thick darkness of national distress, and emerged as no other nation could reasonably have expected to from such dangers—triumphant, though bleeding at every pore. The first impulse of a great people on being delivered from imminent perils is that of joy and thanksgiving. Then comes gratitude for those by whose achievements, under the guidance of the Almighty, safety has been attained; then a sad reflection upon the fearful sacrifices by which success has been purchased and a tender recollection of those who have fallen in the strife; and finally the composed mind gathers up the teachings of such a fearful experience—wisdom for the guidance of future years.

On the surrender of Germany and Austria, when the armistice was signed, our people gave themselves up to the wildest rejoicings. For a time the toils, the trials, the sufferings of five dreadful years were all forgotten. Business places were closed, our people rushed out of doors, impromptu processions filled the streets with all nationalities participating. Music led our exultant emotions as far as musical sounds could conduct them. Bands played, whistles blew, bells rang, and the shoutings of the multitude took up the joyful strains and bore them in tumult to the skies. Our people are fond of excitement and may be aroused to enthusiasm upon slight provocation. But then the grounds for national rejoicing were adequate and philosophical. Such dangers as had threatened our Government had been averted; such dangers as the world had never seen before had been suppressed; such results as had never before been accomplished by war had been achieved. We plunged into the war unprepared, sending millions of our fellow men across the sea. We came forth a Nation of free men no longer recognizing any distinction of nationalities or creed. Our Republic had successfully ended the experiment of its existence and took its place, a full, round, high place—first—among the powers of the earth. We had to thank the Almighty after the storms of war had passed that we had come out of the terrible conflict with the knowledge that we had fought for the right and had upheld the traditions of our fathers. [Applause.]

The brother love of man, the absolute equal rights of all men, the right of all to participate in the privileges and benefits of civil government, as they share its burdens, although to our minds familiar and self-evident truths, have dawned gradually

upon the earth and made their way slowly into the creeds of men. The Jew denied to everyone not a Jew not only the rights of citizenship in temporalities but all hope of enjoying the blessings of heaven.

The gentile might indeed be adopted into the Jewish commonwealth, but as gentile he was as nothing. When Pericles boasted that in Athens all men enjoyed equal privileges and were preferred for their merits and not for their birth, he spoke in a city of which no inconsiderable portion of its inhabitants were slaves. By all men he meant all Athenians; he did not recognize that any but Athenians were men. Jesus first burst the bonds of national selfishness. He came to establish a kingdom that should know no end; to be united with the destinies of no nation; which should survive all and supersede all, and its foundations were laid broadly accordingly. The Jew, the gentile, the Scythian, the barbarian, the bond, the free, the black, and the white were invited to share equal benefits in His kingdom. He first taught principles broad enough to include without discrimination all nations, races, and colors in a common benefit.

The Declaration of Independence, the corner stone of our nationality, was man's first attempt to introduce the liberal principles of Christian faith into the framework of civil government. It was a declaration, not that all Americans, all Englishmen, all Frenchmen were equal, but that all men were equal, no matter where born, no matter whether educated or ignorant, rich or poor, black or white. It deduced the right to equality before the law, the right to participate in civil government, not from the accident of birth or condition, nor yet from race or color, but from the fact of manhood alone. [Applause.]

Upon this principle, as the one great faith of our people, the ideal we intended to realize, the consummation to the accomplishment of which we pledged ourselves, our fathers appealed to the God of battles and succeeded. A more solemn covenant was never entered into between a nation and the God of nations. Upon that principle we stood through years of bloody wars against some of the most powerful nations of the world. Without an army, without a navy, without an exchequer we stood and withstood all the power of England, because the truth will always stand and right triumph over wrong while God sits on the throne of the universe.

Thousands of brave young men, without discrimination, left our shores to suppress war, with the Declaration of Independence in their minds—embodying liberty, freedom, and equality to all men—sleep in bloody graves across the seas, with tombstones above their graves, bearing foreign unpronounceable names, yet live in our tender and grateful memories. Their example should appeal to our manhood and our conscience.

They helped to carry our Government through a crisis in its existence; they strove to establish it firmly upon immutable truth and to give it the noblest opportunity a nation ever had to benefit mankind. It now devolves upon us who survive to determine whether their lives were laid down in vain and in no way, I conceive, can we so truly honor them as in studying well and performing faithfully the duty they have helped to cast upon us. If we prove equal to our opportunity; if we stand for justice and for equality among men; if we keep the lamp of liberty trimmed and burning and allow its light to shine from our altitude throughout the world, we honor them; they have not died in vain. Therefore, it seems to be appropriate to inquire into our duties to the best of our ability and gird ourselves for their performance. They died for others, not for themselves. Therefore let us so live as to exert the influence of the exalted position that has been conferred upon us for the welfare of mankind and not for the attainment of selfish ends.

The policy of our Government as expressed by the act which was passed in Congress in 1917 for a distinctive selective immigration measure has been to welcome to our shores all foreigners who are desirable, namely, those who are mentally, physically, and morally fit and friendly to our form of government. We are all the extract of the foreigner and the only question is, when did our forefathers touch the shores of this land of promise and freedom? Those people born here of foreign parentage and those born in foreign countries comprise one-third of the entire population of this great Nation, and 20 per cent of the recent immigration constitutes the young men and women of to-day's laboring classes so necessary to us to our industrial prosperity. We are in need of both skilled and common laborers, also domestic help, but this bill tends to keep out that class of immigrants best suited for such occupations. Under the provisions of the bill now under consideration it would not bring into this coun-

try a better class or a more assimilable body of immigrants than have come under the present law. This bill goes further than the present law in fixing an arbitrary number of immigrants than can be admitted. It is the purpose of this bill to embody our permanent policy of immigration and bind us to a program which will be inflexible, unscientific, and unjust; and furthermore, it is an attempt to treat a human problem upon a cold mathematical formula, since it is based on quantity rather than quality.

The present bill is particularly objectionable because it discriminates against certain nationalities already going to make up a great portion of our population and fans the flames of racial, religious, and national hatreds and brands forever those already here as an inferior stock. It discriminates against Poland, the home of culture and art and literature, from whence came Copernicus, the astronomer; two of our Revolutionary heroes, Thaddeus Kosciusko, who history tells us planned the defense of West Point and whose statue stands on the West Point parade grounds; and Kasimir Pulaski, who died on the battle field at Savannah, Ga., fighting for the freedom of these United States of America. Both of these heroes of Polish birth have been honored with statues and monuments in the Capital of our Nation and in several of the States. America has a strong artistic bond with Poland in the memory of Helena Modjeska, the tragedienne; in the memory of Chopin, the composer; Adam Mickiewciz, the poet. This bill discriminates against the Poles, who have volunteered their services in the late World War, and who, when opportunity was offered by our Congress have taken the oath of allegiance to fight for the Stars and Stripes and the freedom of the world against their land of birth. It discriminates against Italy, from whence came the discoverer of this great continent and to whom the world owes a great debt. It discriminates against France from whence came the immortal Lafayette and Rochambeau, both defenders in our great cause for freedom and liberty. Have we so soon forgotten the World War when the soldier was a hero, when the youth of those same nationalities residing in the United States joined hands with their relatives across the seas and brought victory to us and our allies in that great conflict? Shall we exclude these compatriots in arms, now claiming them to be inferior, by a mere mathematical formula? Is it fair? Is it American? Is it within the meaning of the Declaration of Independence of this great Nation? Statistics show that over 400,000 foreigners—that is, of immediate foreign extraction and foreign born—enlisted in the military forces of this country and when Congress passed the special act granting the privilege to become citizens to aliens having served in the allied forces, living in the United States one year, approximately 300,000 took advantage of this privilege. At that time no cry was raised against the foreigner, many of whom were of Polish ancestry, born in Germany, Austria, and Russia, and who took up arms against their land of birth to fight for the principles and ideals of their adopted country. Statistics also show that in the large cities, thickly populated by the foreign element, the sale of Liberty bonds far overreached the quota.

That in itself shows the loyalty of the alien to his adopted country. However, there seems to be a determined effort to be as unfair as possible. In addition to reducing the percentage from 3 per cent, this bill takes as a basis census figures 34 years old, before the resurrection of Poland and the birth of Czechoslovakia, Yugoslavia, Latvia, and so forth, instead of taking the census of 1920 now available, or even the census of 1910, the basis of the present law. There is no provision in our Constitution as to seniority by birth or naturalization; once you become a citizen your rights are equal. Then why should we give preference to those of the 1890 census as against those who are here and have the same rights and privileges legislating this present date. This basis was deliberately selected to favor the so-called Nordic races and to discriminate against the races of southern and eastern Europe, which discrimination is a perilous doctrine for democratic America, founded upon the Declaration of Independence that all men are created equal. I believe that there have come from the Nordic race, noble as it is, those whom they would not recognize as their children; and so with other countries celebrated for the noble characteristics of their race as a whole.

Our country is still large enough geographically, politically, and socially to receive those immigrants knocking at our doors, whether of brain or brawn, who answer our moral, mental, and physical requirements, and who can contribute to our art, our science, our literature, our commerce, and our industry. We have acres enough, industries enough, mechanical and natural resources enough, and sources of credit enough to make out of

1924         CONGRESSIONAL RECORD—HOUSE         5897

this Nation the greatest nation on earth under our Constitution which gives us freedom and under our self-government, under which it has its rise and growth.

I realize the force of what has been said here by several gentlemen who are supporting the bill, that the first and the main obligation of an American, especially a Member of Congress, is to look out for the welfare of the American people. If the admission of immigrants to this country, however it might ease conditions in Europe, would in the slightest degree imperil not merely the safety of our institutions but the prospects of employment for our own laborers, or of the prosperity of the American people as a whole, I would advocate not only lessening immigration but prohibiting it. But because I believe the immigrant who cultivates our soil contributes to the welfare of the country as much, if not more, than he derives from it, I am opposed to discriminately restricting a force of benefit so important to our country.

Our most developed industrial States are those which have had the largest immigration. Our most backward States, industrially, are those which have had no immigration to speak of. The extraordinary and unprecedented growth of the United States is undoubtedly due to the effect of immigration. The States of the South pride themselves on keeping the foreigner from their territory, and yet it is a fact that their industrial progress has been slow. A new feature now confronts those States. The negro, to the number of 500,000, has migrated to the North to fill the places in factories, street jobs, and domestic places that have formerly been filled by the immigrant. This migration of the negro can only mean a decrease in the population of the South, which will have the effect of reducing the representation of the South in Congress.

The proponents of this bill repeat the exploded theory that there have been two periods of immigration—the good period before 1890 and the bad period since that time. The strange feature in our history is that the greatest progress we have made in industry, in science, and even in the last war, where no question was raised as to nationality, and everyone fought, whether he happened to be a foreigner or an American, for the preservation of our institutions and the freedom of the entire world, has occurred since 1890. Immigration yields the incalculable advantage·of affording means by which the skilled labor of the country can be employed. It is true in some respects that the foreign laborer does displace the American laborer, but he displaces him by lifting him on his shoulders up to a higher plane of employment, where his wages are higher, his hours of labor shorter, and his conditions immeasurably improved.

The claim that there has been a great influx of·foreigners to come into this country since the war by the proponents of this bill is somewhat in error. For instance, take the year 1923. The total immigration for that year was 522,919—215,397 female immigrants and 302,522 male immigrants, of which 46,241 were under 16 years of age. During the year of 1923 statistics show that 81,450 aliens left the United States and returned to their native countries. During that year 117,011 Canadians and 63,768 Mexicans crossed our borders and were classed as nonquota immigrants. I for one, Mr. Chairman, believe that if we are to have a restrictive measure it should also apply to these bordering countries. These people do not come into this country to become citizens, but only to accumulate wealth and return to enjoy the fruits of their labor in their native country.

For the welfare of the American laborers, for the prosperity of our country, for the safety of our Government, for the welfare of humanity, and for the progress and peace of the world, I believe this bill should be amended, striking out the discriminating feature and the 1890 census. The pending question before the American people is to keep the undesirables out of this country. Even under the discriminating limitations of this bill, as of the 1890 census, it will permit the entry of a great many friends and relatives of those against whom charges have been brought as being disloyal to this country. We will find in most cases where a man is opposed to the institutions of our country that he does not willingly take the oath of allegiance and is free to do as he pleases. It is he who breeds nihilism and bolshevism, being imbued with that idea before he arrives on account of the conditions in the country from whence he came where every effort was made to throttle his spirit of manhood, birth, and ancestry. My remedy would be that instead of permitting a certain percentage of any census of foreign born that we amend the bill to read " quota of foreign-born naturalized citizens," which would decrease the number under the present quota and permit bringing into this country relatives of citizens only who have been loyal to our

Nation. We have in the United States a large number of foreign-born aliens who have willfully neglected their duty in becoming citizens and who to-day, on account of the progress they have made, are anxious to bring their relatives to this country so that they may benefit by the prosperity of our country. But if this law was limited to citizenship alone we would keep away those who come here for profit and to carry away our money.

We stand upon the broad platform of the Declaration of Independence that—

All men are created equal; that they are endowed by their Creator with certain inalienable rights; that among these are life, liberty, and the pursuit of happiness.

We say that these rights are not given by laws, they are not given by the Constitution, but they are the gift of God, given to every man born in the world. Oh, sir, how glorious is this great principle compared with the inhuman—I might say the heathenish—appeal to the prejudice of race against race; the endeavor further to excite the strong against the weak; the endeavor further to deprive the weak of their rights of protection against the strong. God never made a man for the sake of making him nor that he might amass wealth and corrupt himself with its enjoyment.

Every man is sent into this world with certain qualities to be cultivated and developed; charged with duties to be performed and clothed with responsibilities commensurate with his power; sent into the world that some other may be better for his having lived and then say, do you believe God had no part, no design in all those wonderful events? He saw the end from the beginning, and the beginning would not have been if the end had not been intended. It is true that the love of liberty and freedom in their hearts, the critical condition of their countries, their fleeing to these shores, their founding of a free commonwealth, their growth in education and power as a people are all natural events.

The result of my observations thus ·made is that there is nothing to be more dreaded in this country than feuds arising from exaggerated feelings of religion and nationality. On the other hand, the one thing needed for making our country the happiest of nations is to rub down all sharp angles and to remove these asperities which divide our people on questions of origin and religious profession. The man who says this can not be done consistently with any set of principles founded on the charity of the gospel or on the right use of human reason is a " know-nothing," as every bigot is; while under the influence of his bigotry he sees no further than his nose. For a man who has grown to years of discretion, though some never do come to those years—who has not become wedded to one idea, who like some are ready to regulate their conduct as to set their watch when the church clock declares it wrong; who is ready to be taught by high as well as by low and to receive any stamp of truth—I may say that such a man may come to this conclusion: That there are in all origins, races, and religions men good, bad, and indifferent; yet for my part my experience has been that in all classes the good predominate. [Applause.]

Mr. WHITE of Kansas. Mr. Chairman, I have strongly favored the admission of a nonquota class of aliens, as defined in section 4 of this bill. For it should appeal to the fairminded man that the man who has come here with the fixed purpose to establish a home and become a citizen, who has lived up to that purpose, who has become a citizen, and who, by his industry and frugality, has accomplished that worthy achievement—the establishment of a home—is entitled to and should be permitted to have admitted his wife and minor children to share in the enjoyment of that home. For has he not proven beyond question that he is a highly desirable citizen, and it is highly desirable to him, to his family, and to the public welfare that in all such instances the home circle should be restored and preserved.

For it is well approved that upon the integrity and prosperity of the American home rests the strength, and through it is guaranteed the perpetuity of the social structure. It may further be said with absolute confidence the record of such a man furnishes the very best proof that those for whom he seeks admission will not become a public charge. He is here; we have admitted him; he has made good; and the admission of his immediate family carries with it the very minimum of risk for society and the Government.

I believe the sentiment in favor of limitation of immigration by a strong restrictive measure is almost unanimous. The necessity for such a measure must be apparent to every thoughtful American.

More and more is the welfare of America bound up in the solution of this problem. The statement of Chairman Johnson in the Record of April 5, calling attention to the vast number of applications—600,000—for passports and visés by persons in Russia, awaiting an opportunity to come to their relatives in the United States, and his further statement that the reports that there are now in Warsaw 70,000 people trying to get to the United States are true, has been questioned, but has not been disproven. And the very fact that many, many refugees are temporarily domiciled in the countries on the western border of Russia, waiting to come here, temporarily domiciled, because those adjacent countries will not receive them as permanent residents, proves that those countries, in their own best interests, are now pursuing a policy more drastic than is proposed in this bill. And in further support of the chairman's statement, I desire to here call the attention of this House to the statement of Mr. Nathan Grosshandler, of Youngstown, Ohio, a native of Hungary and a citizen of the United States for 23 years, a publisher of several newspapers, two of them foreign language—Hungarian and Slavic. His testimony gave evidence throughout of his intense Americanism.

Even the gentleman from Illinois could not, nor has he in the employment of his expressive phraseology portrayed a higher type. The witness said he had traveled in 14 countries in northeastern Europe as a student of economic, financial, and industrial conditions, and had this to say when interrogated on the subject of wages—the prevalence of the desire of the people of those countries to come to America. I quote:

Speaking of the psychology of the masses that prevails in Europe to-day, I might as well say to you honestly, you ask a hundred men if they want to come to America, and 99 out of the 100 responses will be that they want to come to America. Those are the conditions.

It would seem superfluous to pursue further the argument to prove this condition, but I here introduce one more quotation from Mr. Grosshandler's statement:

Mr. Cable of Ohio (a member of the committee). How many people did you ask that question?

Mr. Grosshandler. I have asked that question by the thousand.

Mr. Cable. When you were in Europe?

Answer. Yes, sir.

Mr. Cable. And if we did not have the 3 per cent law, all would migrate here?

Now note the language of the witness:

Answer. I believe of course, I will be honest with you, if the doors were open now, you might just as well figure, if the boats could carry them, they would come here by the millions.

And to be perfectly fair with the witness, he afterwards stated it would take a man four years to earn money to pay his passage to America.

A carpenter in Budapest earns 42,000 crowns a day, or 80 cents in American money. In the United States, from $6 to $10, and the proceeds of one day's labor for a mechanic in the United States will purchase from six to ten times as much flour as in Budapest. That is the main reason they are pressing to come to our shores.

### ADMINISTRATION OF THE LAW

We have wisely provided by law that this country shall not be the dumping ground of undesirable elements of foreign population from whatsoever source they may seek to enter.

It can not be reasonably expected that foreign governments will have a great care for the interests or rights in this respect. Indeed, reliable statistics prove beyond question that there have been grave and serious abuses in this particular, whether with the connivance of foreign governments I do not pretend to say. But every loyal American admits the imperative need of the strictest enforcement of the provisions of law in relation to this subject.

I have believed and have spoken before to-day for the mitigation of the harsh and distressing features of the law's administration, I have always been in favor of some flexibility in administration as against iron rigidity. Certainly when we come to the quota line in any case where a mother comes within the count we should not exclude her baby, although outside the quota. For this reason I have not severely criticized the temporary admittance, under bond, of some slight excesses of arrivals above the fixed quotas. While strong criticisms have been directed against what seemed in the instances I have quoted a lax enforcement of the law, I have felt that the error has been on the side of a recognition of humane sentiments.

I believe the present bill will eliminate any excuse for such procedure in the future. Now, as to whether there is unjust discrimination in the 1890 census as a basis of computation of quotas, the subject has been much discussed. Gentlemen who feel that it discriminates against certain nationalities have in-

sisted that the peoples referred to have rendered great service to America in time of war and have contributed by their industry to her advancement in time of peace. This is true; and I would withhold from them no meed of praise that is justly theirs. And if that is a fair argument in their behalf, and if they who have been here so short a time have done well, and are entitled for that reason to be given a basis of admission most propitious for their former countrymen, is it then an unfair argument that the basic stock of America should be given commensurate consideration in the adjustment of this great problem, who have cherished the memory and the principles of those men who laid the foundation of civil and religious liberty in this country more than 300 years ago, principles which later found expression in our Constitution, a document which represented all the progress in government from the beginning of history until that good day? If it shall be true, is it strange that the millions of our population derived from that basic origin should believe because the principles enunciated in our organic law inhere within their very souls, who think with veneration and contemplate with gratitude the names and public service of the men who promulgated that great document? Is it strange that these millions who have borne the storms and trials of all the centuries should ask at least as much consideration as those who have come at a later date?

It is a question for America to decide, and to decide in the light of her own best interest—not for to-day alone, not for this generation, but for America and posterity. [Applause.]

Mr. SABATH. Mr. Chairman, I now yield to the gentleman from Connecticut [Mr. O'Sullivan].

Mr. O'SULLIVAN. Mr. Chairman, of all the changes contemplated by the proposed immigration bill none appeals with greater force than does that which abolishes the brutality of existing law whereby this Government, after an invitation to the immigrant, turns him back to his own country because the quota for his race is exhausted when he reaches our shores. I can conceive few things more cruel than, having permitted these helpless immigrants to travel over the watery wastes, to compel their returning over the same useless journey to their homeland. Such unfortunate instances should not occur as where, during the past year, a steamship arrived at New York with a number of immigrants on board who were threatened with deportation because the vessel had reached its destination a few minutes before the time when a new monthly quota would begin. A certificate granted by the American authorities in the foreign land should be a ticket of admission, and the immigrant should not be permitted to sail on a useless journey to this country unless he is to be admitted, providing, of course, he can pass such tests as are by law provided.

However, the main thought of the bill is its restrictive feature, and the weakness of its restrictive philosophy revolves around that section which takes the census of 1890 as the basis upon which the various quotas are to be computed. This will cause an extraordinary change in the present immigration law, which is based on the census of 1910 for quota computation. The following table of figures will best explain what this proposed change involves:

| | Present quota, 3 per cent, 1910 | 2 per cent, 1890 |
|---|---|---|
| Albania | 288 | 4 |
| Armenia | 230 | 13 |
| Austria | 7,451 | 1,103 |
| Belgium | 1,563 | 510 |
| Bulgaria | 302 | 81 |
| Czechoslovakia | 14,557 | 2,031 |
| Danzig | 301 | 228 |
| Denmark | 5,619 | 2,785 |
| Finland | 3,921 | 472 |
| Fiume | 71 | 11 |
| France | 5,729 | 3,914 |
| Germany | 67,607 | 51,227 |
| Greece | 3,294 | 47 |
| Hungary | 5,638 | 474 |
| Iceland | 75 | 37 |
| Italy | 42,057 | 3,912 |
| Luxemburg | 92 | 58 |
| Memel | 150 | 114 |
| Netherlands | 3,607 | 1,637 |
| Norway | 12,202 | 6,454 |
| Poland | 21,076 | 5,156 |
| Eastern Galicia | 5,786 | 870 |
| Pinsk | 4,284 | 305 |
| Portugal | 2,465 | 474 |
| Rumania | 7,419 | 638 |
| Bessarabian region | 2,792 | 258 |
| Russia | 21,613 | 1,199 |
| Esthonian region | 1,348 | 124 |
| Latvian region | 1,540 | 142 |
| Lithuanian region | 2,310 | 313 |

| | Present quota, 3 per cent, 1910 | 2 per cent, 1890 |
|---|---|---|
| Spain | 912 | 91 |
| Sweden | 20,042 | 9,561 |
| Switzerland | 3,752 | 2,082 |
| United Kingdom | 77,342 | 62,458 |
| Other Europe | 6,426 | 801 |
| Palestine | 86 | 5 |
| Syria | 57 | 1 |
| Turkey | 928 | 13 |
| Other Asia | 2,388 | 129 |
| Africa | 81 | 45 |
| Atlantic Islands | 122 | 44 |
| Australia | 121 | 41 |
| New Zealand and Pacific Islands | 279 | 120 |
| | 80 | 42 |
| Total | 357,803 | 168,837 |

Note these startling figures: The quota for Greece is reduced from 3,294 to 47; Hungary's from 5,638 to 474; Italy's from 42,057 to 3,912; Poland's from 21,076 to 5,156; and similar reductions are to be observed for all those countries which have supplied what is now known as the "new immigration."

Another interesting table is the following, which gives the number of quota immigrants and the number of their relatives to be admitted under the proposed act, as compared with the number of immigrants admitted under the law in force during the past two years:

| Nationality | Quota immigrants admitted under the act of May 19, 1921 | Quota and quota relative immigrants admitted under proposed Johnson bill | Relative percentage |
|---|---|---|---|
| United Kingdom | 77,342 | 125,316 | 162.0 |
| Germany | 67,607 | 102,854 | 152.0 |
| France | 5,729 | 8,228 | 143.6 |
| Norway | 12,202 | 13,308 | 109.0 |
| Denmark | 5,619 | 5,970 | 106.3 |
| Sweden | 20,042 | 19,522 | 97.2 |
| Poland | 21,076 | 10,712 | 50.8 |
| Eastern Galicia | 5,786 | 2,140 | 37.0 |
| Austria | 7,451 | 2,606 | 35.0 |
| Yugoslavia | 6,426 | 2,112 | 32.9 |
| Czechoslovakia | 14,357 | 4,462 | 30.7 |
| Hungary | 5,638 | 1,348 | 23.9 |
| Italy | 42,057 | 8,224 | 19.6 |

Proponents of this measure maintain there are too many southern Europeans in America. Yet for the two years of the present bill's existence the net result between immigration to and emigration from this country indicates there are 4,619 less Greeks here, 5,039 less Portuguese, 13,343 less Spaniards, while the Italians show a slight increase of 2,207, and Yugoslavians have remained about stationary.

In order to justify his opinion, man is capable of some splendid demonstrations of mental somersaulting. Two years ago, when a bill similar to the one under consideration was before the House, the committee proposing the measure said in its report:

It should be stated that the reduction of the quotas of the foreign born in the United States, according to the 1890 census, is not proposed for reasons in any sense discriminatory.

Yet the author of the present bill, writing for the Nation's Business for the issue of July, 1923, said:

The new measure thus aims to change the character of our future immigration by cutting down the number of aliens who can come from southern and eastern Europe. In other words, it is recognized that, on the whole, northern and western Europe furnish the best material for citizenship.

In the Journal of Commerce on January 15, 1924, W. W. Husband, Commissioner General of Immigration said that the purpose of the law—

is clearly to leave the way wide open for all northern and western Europeans who may desire to come, but to close the doors as much as possible to those coming from southern and eastern Europe.

The position assumed two years ago by the proponents of this bill rested on the assumption that there was no discrimination as the basis of its philosophy, yet to-day that position has been abandoned for one admittedly discriminatory against the Italian, the Hungarian, the Pole, and the people of those other nations of southern and eastern Europe. No longer is there any question of the real issue in this controversy. It focuses itself on the theory that because a youngster was rocked in his cradle in the city of Naples, or of Budapest, or of Athens he is not wanted in America, because he comes from stock which is alleged to be inferior to that of his brother in the north.

In the background of this doctrine of the inferiority of the southern European a rather extraordinary fiction is built relating to a race known as the Nordic, which appears to have been quite overlooked by the anthropologists until recently. Where this race had its origin is a matter of great conjecture, and an equal amount of light is thrown upon the manner in which it reached the lands its people now occupy. The anthropologists do say, however, that the Nordic is a dolichocephalic race, whose men are tall, blond, blue-eyed, rugged, and handsome. Being somewhat in doubt as to the meaning of the word "dolichocephalic," I consulted my dictionary to learn that it means the possession of a cephalic index of 77.6 or less. Thereafter, and still in the pursuit of learning, I discovered that "cephalic index" means the ratio of the breadth of the cranium to the length, usually expressed by a number denoting hundredths of the length, which ordinarily is measured from the glabella to the most prominent part of the occiput. The habitat of this race is mostly in Scandinavia, Scotland, and the north of England. While it is claimed that this race is vastly superior to others in deeds of daring, in vitality, in mentality, and in stalwartness, it would appear anomalous that this race is now passing away, and with all the rugged qualities graciously bestowed upon it, at least by the anthropologists, races which are alleged to be inferior have been the cause of its gradual extermination.

But wherein do we find the alleged superiority of the one over the other? Surely, if performances in the past count for aught, the people of Italy have much of which to be proud. Italy can well boast of a history wherein leaders of the world in art, science, and philosophy have played their part. What other nation has given a poet greater than Dante, a sculptor greater than Michael Angelo, a painter greater than Titian, a scientist greater than Galileo, an explorer greater than Marco Polo? Perhaps we occasionally forget that America was discovered by a Genoese whose caravel was manned by Jews, Portuguese, Spaniards, and Italians, men of those very races whose exclusion is now sought.

The following table shows the net increase or decrease of the various nationalities through immigration to and emigration from the United States for the past two years:

*Increase and decrease of various nationalities to and from the United States the past two years.*

| Country of last residence | Admitted 1922 | Departed 1922 | Increase (+) or decrease (−) | Admitted 1923 | Departed 1923 | Increase (+) or decrease (−) | Total increase (+) or decrease (−) |
|---|---|---|---|---|---|---|---|
| Austria | 5,163 | 735 | +4,428 | 8,296 | 433 | +7,863 | +12,291 |
| Bulgaria | 304 | 781 | −477 | 427 | 200 | +227 | −250 |
| Czechoslovakia | 12,641 | 8,550 | +4,091 | 14,090 | 2,427 | +11,663 | +15,754 |
| Germany | 19,139 | 6,286 | +12,853 | 50,575 | 3,646 | +46,929 | +59,782 |
| Greece | 3,809 | 8,682 | −4,873 | 3,605 | 3,351 | +254 | −4,619 |
| Italy | 42,412 | 63,647 | −21,235 | 50,828 | 27,386 | +23,442 | +2,207 |
| Norway | 5,865 | 2,356 | +3,509 | 12,670 | 1,696 | +10,974 | +14,483 |
| Poland | 28,933 | 35,127 | −6,194 | 26,915 | 6,010 | +20,905 | +14,711 |
| Portugal | 2,038 | 6,798 | −4,760 | 2,434 | 2,713 | −279 | −5,039 |
| Russia | 17,274 | 6,909 | +10,365 | 17,815 | 2,894 | +14,921 | +25,286 |
| Spain | 1,729 | 13,145 | −11,716 | 1,897 | 3,524 | −1,627 | −13,343 |
| Sweden | 7,186 | 2,774 | +4,412 | 18,493 | 1,881 | +16,612 | +21,024 |
| United Kingdom | 46,904 | 23,547 | +23,357 | 74,832 | 20,594 | +54,438 | +77,795 |
| Yugoslavia | 6,130 | 10,173 | −4,043 | 6,292 | 6,240 | +4,052 | −1 |
| British North America | 57,634 | 21,682 | +35,952 | 126,742 | 24,222 | +102,520 | +138,472 |
| Mexico | 23,028 | 8,675 | +14,353 | 67,287 | 5,063 | +62,224 | +76,577 |

As usually happens in movements of national import, those most active in the interest of a measure are those least affected. The State of Connecticut, with a large foreign-born population, is naturally vitally interested in the immigration problem. Yet Connecticut has raised no cry against the Italian, the Hungarian, or the Pole as an inferior type. To be sure, there are some among their number who are not the most desirable, but of what nation or race is not the same thing true? Rascals and scamps may be found in any country, whether it be America, Italy, or Sweden. It is no just criticism of a nation to single out the exceptions and base a critical conclusion thereon.

As one who has rubbed shoulders all his life with the immigrant from almost every land, in a State where the immigrant has settled in large numbers, I feel that I know something of their habits, their lives, and their desirability. Take the Italian. Wherever he has settled, he has been industrious, law-abiding, and ambitious. He buys a little farm to till the soil; he starts a little business; or perhaps he works in the mill. But wherever he is, he adds to our prosperity. He is ambitious for his children and their education, and, thank God, he usually has plenty of them, a fact most unhappily criticized by some of our modernists, as though the bringing of little tots into the world was a sign of inferiority.

He becomes naturalized in a comparatively short time; he tries to become Americanized. His tendencies are not those of a radical. The foreign-born population of Rhode Island, consisting largely of Italians and Slavs, amounts to 42.6 per cent, yet the total Socialist vote in that State at the last election was but 2.6 per cent. Wisconsin, which has a small population of the newer immigration, but a large number of the Nordic stock, polled a Socialist vote of 12.1 per cent. Connecticut, which is second in the number of foreign-born whites with a total of 41.2 per cent, cast but 2.8 per cent for the Socialist Party. Practically all the great leaders of radicalism in this country come from the old-time stock, while few, if any, are the product of the newer immigration.

But the crowning insult to the peoples of southern Europe arrives when we exclude them at the front door and permit to enter at the back door hoards of Mexicans. Last year 63,768 Mexicans came into the States, and a million more could have done likewise, had they so desired, for there is no quota law, or restriction of any sort for our southern neighbors. I do not know what standard is used to measure desirability, but I do know that the average Italian is as much superior to the average Mexican as a full-blooded Airedale is to a mongrel. Yet this bill will permit every Mexican in Mexico to enter the United States, and the same bill limits the number of Italians to 3,912 immigrants.

The impression is prevalent among some of the Members of this Congress that the Johnson bill develops a sharp issue between the sons of Italy and the sons of the American Revolution. A statement of that sort always suggests to my mind a cheap vaudeville team which drags into its closing number the American flag to pull the act out of mediocrity. However, there are some associations which appear to have taken a position against this bill whose names indicate a background of good American stock. Such a list includes, among others, the following organizations:

Federated Industries of Washington.
West Virginia Manufacturers' Association.
Wisconsin Manufacturers' Association.
American Cotton Manufacturers' Association.
American Electric Railway Association.
American Hardware Manufacturers' Association.
American Malleable Castings Association.
American Paper and Pulp Association.
American Pig Iron Association.
Electrical Manufacturers' Council.
Institute of Makers of Explosives.
Manufacturing Chemists' Association of the United States.
National Association of Cotton Manufacturers.
National Association of Farm Equipment Manufacturers.
National Association of Finishers of Cotton Fabrics.
National Association of Manufacturers of the United States of America.
National Association of Sheet and Tin Plate Manufacturers (Inc.).
National Association of Wool Manufacturers.
National Automobile Chamber of Commerce.
National Boot and Shoe Manufacturers' Association of the United States (Inc.).
National Electric Light Association.
National Erectors' Association.
National Founders' Association.

National Industrial Council.
National Lumber Manufacturers' Association.
National Metal Trades Association.
Railway Car Manufacturers' Association.
Rubber Association of America (Inc.).
Silk Association of America.
Tobacco Merchants' Association of the United States.
United States Rubber Co.
Labor Department, Michigan Sugar Co.
National Association of Manufacturers of the United States.
National Founders' Association.
California Manufacturers' Association.
Manufacturers' Association of Connecticut (Inc.).
Manufacturers' Association of Wilmington (Del.).
Associated Industries of the Inland Empire (Idaho).
Indiana Manufacturers' Association.
Iowa Manufacturers' Association.
Associated Industries of Kansas.
Associated Industries of Kentucky.
Associated Industries of Maine.
Merchants and Manufacturers' Association of Baltimore.
Associated Industries of Massachusetts.
Michigan Manufacturers' Association.
Associated Industries of Missouri.
Nebraska Manufacturers' Association.
Associated Industries of New York State (Inc.).
Ohio Manufacturers' Association.
Oklahoma Employers' Association.
Manufacturers and Merchants' Association of Oregon.
Pennsylvania Manufacturers' Association.
Employers' Association of Rhode Island.
Manufacturers and Employers' Association of South Dakota.
Tennessee Manufacturers' Association.
Utah Associated Industries.
Associated Industries of Vermont.
Virginia Manufacturers' Association.

Mr. Chairman, there is a mighty big difference between restriction and discrimination. If it is restriction we seek, you may rely on my support. The workers in our mills and factories must be protected against an influx of millions who will seek their places. But I can not agree to any policy that violates all prior adopted American ideas. With such a bill, grounded on discrimination, we do violence to traditions that have come down to us from the fathers, and as well do we offer insult to those large groups of our citizens of the blood of southern Europe by proclaiming that they are of an inferior brand of human being.

But the main thought is a criticism of those societies with foreign-sounding titles, such as the Order of the Sons of Italy, which have petitioned against the passage of this bill. Since when has a man's love for this country been tested by the name of some fraternal or singing society of which he may be a member? What if these people of foreign parentage bind themselves together for beneficial reasons so long as the love of this land is not placed in jeopardy? Am I any the less an American if I, perchance, belong to some society with a name suggestive of Ireland? And who will deny my Americanism if I take pride in the glory of that land or hope for her prosperity and happiness, or if, forsooth, I hum a little Irish ditty on St. Patrick's Day, or wear a spray of shamrock?

My own humble judgment is that he lacks some element in his make-up who does not retain some affection for the land of his forebears.

A short journey it is from this building to Arlington Cemetery, where rests amid lavish appointments the body of the unknown soldier. Perhaps he was an Italian, who may have belonged to the Order of the Sons of Italy, for our Army numbered 250,000 Italians, of whom 20,000 were killed. Is there anyone with soul so shriveled with prejudice as to lower this unknown from his unattainable plane of homage because, forsooth, he was an Italian? Let me relate the tale of a little Italian lad, whom I had the privilege and honor of knowing. During the winter after the war I met him for the first time. He was tottering up the street, a decrepit, pathetic figure, almost lost in an oversized army overcoat that seemed to swallow his whole form. He was bent almost in two, partly from pain, but mainly from his new deformities. His eyes were like burning coals; his face, while flushed, was gaunt, and furrows wrinkled his forehead. The overcoat was tattered and ragged, while the shoes he wore had fallen to pieces, and at the ends you could see his toes. He told me his name was Jimmy Congillino. He had been in the country a short time when the war was declared, and he had joined the army. He had been gassed, and it was most apparent he was suffering severely

from tuberculosis. He had been hit with a bit of shrapnel in the back and legs, and a part of his spine had been affected. The wonder of it all was that the lad was alive to tell it. Whether it was due to his fault or to that of the Veterans' Bureau, is immaterial. The fact was that Jimmy was receiving no attention from the Government—from his Government—and he was eking out his meager living at the hands of his good friends. But not a whimper would he utter against the delay of the Government in providing him with his due. Eventually his claim was recognized, and he received his first real money. I met him again when he was given a day off from the hospital. "Jimmy, why don't you go back to Italy, where your folks are?" I said to him. "You have nobody near to you in America, and it might do you a lot of good to go back to your country." Jimmy's English was wretched; I doubt if he could read or write. But I did understand him when he said, "Italy is-a not-a my countree. This-a countree is-a my countree. I fight for him; I die in him." Jimmy's prophecy came true, for he died shortly thereafter. He has gone to the land that does not discriminate against the Italian. And in the days to come when the records of loyalty to country are disclosed, I will wager that Jimmy's name will stand out with greater glory than many of those self-proclaimed perfect Americans who want to keep other Congillinos from our shores, because they do not make good Americans.

I insert an article entitled "Eight American soldiers," which carries its own moral:

### EIGHT AMERICAN SOLDIERS
#### (By Samuel McCoy)

The heroism of the eight Americans whom I am about to name was duplicated in every one of the hundreds of regiments which were sent from America to serve in France; I name these eight men merely because their war records happen to be before me at the moment and because much has been said of late in regard to the proper qualifications for American citizenship.

Each of these men was awarded the distinguished-service cross. Twenty thousand men who fought in the same division to which they belonged all acquitted themselves with honor in the face of danger. A thousand men of the division were singled out to appear in the divisional citations for feats of heroism performed in that campaign. But these eight were ranked even higher than all these. They were of the handful who won the distinguished-service cross—a decoration awarded only "for extraordinary heroism in action."

The first man, a sergeant, in the assault launched against the seemingly impregnable Hindenburg line, "although twice wounded, refused to leave the field, but remained with his platoon, exhibiting magnificent courage and bravery, until he was wounded a third time. His devotion to duty set a splendid example to the men of his company."

The second, a corporal, in the same fearful fire of the enemy, "was an advance scout for his platoon. The platoon was temporarily halted by machine-gun fire from a section of the enemy trench in their immediate front. He rushed through the heavy enemy fire to the trench, and at the point of his rifle compelled 12 of the enemy to surrender. He then signaled for the platoon to advance."

The third, also a corporal, "left shelter, went forward under intense machine-gun fire, and carried a wounded officer to safety. In accomplishing this mission he was severely wounded."

The fourth man, a private, first class, "when the advance of his battalion was checked by heavy machine-gun fire, went forward, with two other soldiers, under heavy fire to reconnoiter the enemy position. By effective rifle fire they drove the gunners from two machine-gun nests into a dugout near by, which they captured, together with 35 prisoners, including 3 officers."

The fifth man, also a private, "after being severely wounded by shrapnel, took shelter in a shell hole somewhat in advance of his company, from which he had become separated in the fog and smoke. He saved the lives of four of his wounded comrades who were occupying the shell hole by throwing live grenades, which had been tossed into the shell hole by members of his own company in the rear, into the enemy's lines."

The sixth, a private, "under heavy shell and machine-gun fire, left the shelter of his trench, and going forward under a thick smoke screen, single handed captured between 30 and 40 prisoners * * *. Three weeks later, in a second battle, after the advance of his company had been stopped by strong hostile machine-gun fire, he, with three companions, advanced far ahead of the front line to attack an enemy position located in a large farmhouse. By skillful maneuvering in the broad daylight they covered all entrances to the house and forced the surrender of the entire force of the enemy, numbering 36 men and 2 officers. During the exploit they killed 2 of the enemy, who attempted to take cover in the cellar."

The seventh, a private, "exhibited exceptional bravery by leaving shelter and going into an open field under heavy machine-gun and shell fire to rescue wounded soldiers."

The eighth man, also a private, "while the advance against the Hindenburg line was at its height, seeing an American machine gunner exposed to the enemy, ran to his assistance. On the way he was seriously wounded, but continued on, reaching the position and using his body to shield the gunner while the latter poured a fire into the enemy. He was wounded three times, finally losing consciousness, but after his wounds were dressed he insisted on leaving the field unaided."

The names of these eight American soldiers, all of whom are still living, are John N. F. Bilitzki, Lonnie J. Moscow, Aloizy Nagowski, Isaac Rabinowitz, Epifanio Affatato, Wasyl Kolonoczyk, Daniel Moskowitz, and Antony Sclafoni.

Mr. JOHNSON of Washington. Mr. Chairman, I yield to the gentleman from New York [Mr. BACON], a member of the committee.

Mr. BACON. Mr. Chairman, that we are facing a crisis in our policy as a people toward immigration there can be no doubt. We must determine whether the old plan in vogue before the Great War of permitting all to come to our shores without limit shall be reverted to, whether all further immigration shall be shut off, whether there shall be a reduction based upon census figures, such as in the extension of the present law, or whether some other solution shall be found.

I dare say that no question confronting the country during the entire period of its history has ever been fraught with such momentous consequences as this one of what new bloods shall be fused with our stock, what new energies shall be added to the future of American life, what new elements shall compete with our labor, and what new points of view shall contribute to our political and social ideas and ideals. The scientific results of immigration are so exact that our children and our children's children can not but enjoy or suffer from the effects of what we do at this time. Therefore it devolves upon us to consider all the facts in the broadest and most patriotic light possible. As a member of the Committee on Immigration, I have tried to do so.

I have tried to approach this subject with an open mind, but solely, however, from the viewpoint of what is best for this country of ours and for no other country. I am convinced that what is for the best interest of the United States on this immigration question may be diametrically opposed to the selfish interest of other countries.

We are the greatest immigrant-receiving country in the world to-day, and probably the greatest in history. Nearly 10,000,000 immigrants have come to our shores during the past 15 years, and during 4 of these 15 years the World War stopped immigration entirely. The vital influence on the history of civilization of the migrations of people can not be minimized and should not be ignored. The Secretary of Labor recently has said:

One of the prime factors in the molding of civilization since the days when the first prehistoric man preempted for his dwelling the cave of the bear that he had killed has been the migration of peoples. Throughout the ages, wherever a given race or people has set up a strong, prosperous, comfortable state of life there have flocked the throngs of less advanced races seeking the ease of the better civilization. There is no instance in all history since the Goths, starving and in danger of extinction by their enemies, succeeded in begging their way into the Roman Empire, which does not demonstrate that soon or late the immigrant people overthrow the older civilization. This has not been accomplished by force or by armed invasion. In almost every instance great civilizations have perished through peaceful penetration of aliens who were admitted to do the work of the community. In some cases they drifted in as free labor, many entered as slaves, or as soldiery in the employ of the higher civilization. In every case, however, these migrations have resulted in the overthrow of the higher civilization by the infiltrating aliens.

But few of these migrations of the past have been characterized by great movements of population in short periods of time. Only some 200,000 Goths were in the original group which the Emperor Valens accepted as residents of Italy. There has never been in the history of all mankind a like movement of peoples of the magnitude of the tide of immigration which has come to the United States during the last century and a half.

Every nation, at least of Europe, is an emigrant-sending country. There you have at once the great clash of divergent interests. Every foreign country and every foreign representative here in Washington is watching the debate on this bill with intense interest. It behooves Americans to watch also. We can be sympathetic to Europe's efforts to solve some of their problems by encouraging their people to come to this country, but we must never lose sight of the fact that this is an American problem and only an American problem. Unless we in this country look after ourselves and our own interests no one will do it for us.

# EXHIBIT F

Congressional Record - House
February 3, 1928

to do so was of doubtful construction. They have introduced no bill to the present Congress, doubtless because of the Walsh resolution pending in the Senate for the investigation of the power companies; but there are two bills for Government operation or lease, and it is probable that they will gain control of the electric power under these if the Madden bill is not enacted. It is also quite certain if the Madden bill is not passed the present Congress there will be no proposition from a company manufacturing fertilizers in the future, and the Muscle Shoals power will all pass into the hands of the power companies and be lost to the agricultural interests of the country.

There is another point I would call your attention to: The Air Nitrates Corporation and the American Cyanamid Co. are chemical manufacturing companies and not water-power companies. The construction of the dams on the Clinch River will assure ample power at Muscle Shoals all the year to conduct their business to produce the maximum amount of fertilizers provided for in the lease. They must dispose of the power produced by the dams on the Clinch River, and it will be more profitable for them to sell it to manufacturing companies located near the dams, which will be of very great advantage to Tennessee in the increase of population and taxable property. They in all probability will have no expensive distribution lines to transmit it a distance or out of the State.

I do not wish anything I have said in this letter to be construed as a criticism upon the members of the Railroad and Public Utilities Commission of Tennessee, for they are all gentlemen of integrity and ability and are patriotically asserting and defending the sovereign rights of Tennessee and the people in the water power resources of Tennessee and are not and can not in any way be influenced in the discharge of their duties contrary to the interests of the people of the State by anyone. I favor and approve their assertion of the State's rights which the power companies have ignored and are now attacking by a bill in the chancery court of Nashville.

I have written you quite at length about this matter because I am deeply interested in the manufacture of cheap fertilizer at Muscle Shoals, the provisions for the national defense, and the development of the water-power resources of the Tennessee River for the benefit of the people of Tennessee.

Yours truly,

JOHN K. SHIELDS.

PERMISSION TO ADDRESS THE HOUSE

Mr. CASEY. Mr. Speaker, I ask unanimous consent that, following the special order just made, I may address the House for one hour on Tuesday on the coal-strike situation.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Tuesday, following the address of the gentleman from Indiana [Mr. VESTAL], he may address the House for one hour on the coal-strike situation. Is there objection.

Mr. BARBOUR. Reserving the right to object, Mr. Speaker, would not some other day be just as convenient to the gentleman from Pennsylvania?

Mr. CASEY. I will say to the gentleman that I had an allotment of time in the general debate on this bill, but I was compelled to postpone speaking on account of attendance on a hearing on another appropriation bill.

Mr. BARBOUR. I do not want to object to the gentleman's request, but I am very anxious to dispose of this appropriation bill at the next session of the House, and if an hour were allowed to the gentleman on Tuesday that could not be done.

Mr. TILSON. I doubt if next Calendar Wednesday will be crowded. Perhaps the gentleman might get time on Calendar Wednesday. He can get it by unanimous consent.

Mr. CASEY. Then I modify my request, Mr. Speaker, to the extent that I be given one hour on Calendar Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, immediately after the reading of the Journal and the disposal of business on the Speaker's table, he may address the House for one hour. Is there objection?

There was no objection.

IMMIGRATION AND THE CRIME WAVE

Mr. LANKFORD. Mr. Speaker, on January 27, 1928, my colleague, Hon. ROBERT ALEXIS GREEN, of Florida, delivered an address over the radio on the subject of "Immigration and the crime wave," which address I ask may be inserted in the RECORD by unanimous consent.

The SPEAKER. The gentleman from Georgia asks unanimous consent to extend his remarks in the RECORD by inserting an address recently delivered over the radio by the gentleman from Florida [Mr. GREEN]. Is there objection?

There was no objection.

Mr. LANKFORD. Mr. Speaker, under leave granted me to-day, I herewith insert in the RECORD an eloquent and patriotic address delivered by the Hon. ROBERT ALEXIS GREEN, Representative of the second congressional district of Florida, over the radio on January 27, 1928, discussing the subject Immigration and the Crime Wave. The address is instructive, entertaining, and worthy of the careful consideration of the Nation.

The address is as follows:

Friends and citizens of America, the subject of immigration is so wide in its scope that it will be impossible for me to give a detailed discussion of it in the short time which I will talk to you this evening; however, it is one of the most important subjects now affecting the citizenship of our great Nation. A high order of citizenship is vital to any nation. A nation's strength in itself and its power and position in the affairs of other nations is established and maintained solely by the stable type of citizenship comprising it.

Our Constitution vested in the Congress the power to regulate and control immigration. However, the subject of immigration was vainly attempted to be regulated by treaty up until about the year 1882, when the American Government tried to settle the Chinese question by a treaty in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the Chinese millions and the United States. Thus it was found imperative that the United States should pass her first immigration law. The influx of aliens grew steadily until by the year 1907 the high peak was reached with the admission of 1,285,349 persons.

This alarming situation brought about the passage of the illiteracy test act in 1917, which only retarded slightly the great influx of foreign hordes. In 1910, 1,041,570; in 1913, 7,197,892; and in 1914, 1,218,480 entered. The abnormal conditions during the World War period, of course, directed the attention of the world in channels other than that of immigration, but soon after the World War—during the reconstruction period—again immigrants by the hundreds of thousands turned their eyes and hopes toward the United States, causing the necessity of the 1921 numerical control act. This act was found inadequate to cope with the situation, and on May 26, 1924, Congress made its third effort to limit the annual influx of aliens. The immigration department of our Government is now working rather effectively under the provisions of this and subsequent acts of Congress, but in spite of all efforts of Congress and the diligence of immigration officials there are to-day in the United States probably 16,000,000 persons of foreign birth, 7,000,000 of whom are not American citizens. Thus you will see the necessity of all efforts at the restriction of immigration.

NEED MORE HELP

The immigration department employs about 2,700 persons. Of this number, nearly 800 are immigrant inspectors and more than 700 are border patrolmen. It can readily be seen that this number is inadequate to cope with some 7,000,000 aliens and some 10,000 miles of border to patrol.

If the border to be patroled could be averaged among the few patrolmen on the 8-hour basis, making allowance for sick leave and other possible absentees, it would be reasonable to approximate 25 miles of border per day to be inspected by one patrolman. Then when we consider that the quota law does not apply to Canada, Mexico, Central America, South America, and some of the islands, it is very easy to see the weakest place of our present immigration laws and their enforcement. Hundreds of thousands of aliens cross these borders annually, thousands of whom remain in the United States. Millions of aliens come into this country either by land or sea annually; the admissibility of these people has to be passed upon by our Bureau of Immigration. Of course, this number includes tourists, students, and aliens of all classes. I merely mention this to show how impossible it is for the limited personnel of our department to cope with this tremendous situation.

GIGANTIC TASK

Our country has a total population of more than 100,000,000, 15 per cent or possibly 20 per cent of which is foreign born, and in almost every case speaking a language foreign to ours. It is readily seen that we have a great task to Americanize, assimilate, and amalgamate these foreigners. These 15,000,000 or possibly 20,000,000 persons of foreign birth, 7,000,000 of whom are aliens, are indeed a heavy burden for American society and for American institutions to carry. These foreigners, in general, exact a tremendous toll from our civilization. In January, 1927, 113,105 aliens were inmates of United States prisons, penitentiaries, jails, insane asylums, hospitals, and poorhouses. The economic loss represented by these figures is appalling. Each of these aliens, considered economically, is less than zero; he is a distinct liability. The amount of money expended annually to support these aliens would, within a few years, build hard roads enough to "checker-board" the United States from the Atlantic to the Pacific and from the Rio Grande to Canada. I know of no good reason why the United States should be so foolish as to permit these conditions to continue.

There are many suggestions to the Congress which would strengthen our National immigration and deportation laws. Recently the House Committee on Immigration, of which I am a member, approved a depor-

tation law which, if passed, will help a great deal; however, my feeling in the matter is that any and all aliens in the United States who are found guilty of violating any law whatsoever of the United States or of any State of the Union, should be, without delay, deported. Aliens who are found guilty of operating gambling houses, "gun-toting," violating in any manner State or Federal prohibition laws, or any other infraction of our minor laws, should be instantly deported the same as if he had committed a graver offense. Probably 80 per cent of those who violate the laws are "repeaters." You can examine the statistics of almost any penal institution and find that a high percentage, in some cases more than 80 per cent, of those who are in prison have been convicted of offenses other than the one for which they are serving.

### ALIENS SHOULD BE REGISTERED

In my opinion all aliens, by law and practice, should be compelled to register upon entering the United States and should be compelled to carry on their person such certificate of registration. I believe further that omission of or refusal of any alien to avail himself of the United States laws of naturalization should be grounds for his deportation at the discretion of the trial court. No alien should be permitted to stay in the United States more than five years without becoming a naturalized citizen. To-day there are hundreds of thousands of foreigners in the United States who have been here for years and years, have never declared their intention of becoming citizens of the United States, do not desire to be citizens of the United States; but on the other hand many of them are ready, waiting, and willing at all times to foment trouble and disloyalty to the United States Constitution, laws, and institutions.

A few months ago the United States was brought face to face with the underhanded bolshevistic and communistic working of undesirable aliens. This was brought to a climax during and just after the notorious Sacco-Vanzetti trial. These two depraved and abhorrent murderers committed their acts some seven years before justice was administered to them. A perverted sympathizer of Sacco and Vanzetti, named Edward H. James, a socialist or Red, referring to the trial said:

"You had a crazy judge and jury in Plymouth. You had the same crazy judge and jury in Dedham. You had a crazy Supreme Court of Massachusetts sitting in the courthouse in Boston, saying it was right. The trial of these men was an infamy that cries to Heaven. Take them out from prison. Then punish those who committed the infamy. I am not telling you what to do. I am interpreting history for you. * * * Justice is terrible when it strikes. Revolutions are not made to order. Either we break the Government or the Government breaks us."

These statements of his were taken up by sympathizers of Sacco and Vanzetti and so radical did their minds incline until the courthouse, the court, and other officials had to be guarded and protected from unlawful attacks. Even the homes of the judge and attorney had to be protected by armed guards. After the conviction of these men their friends perpetrated a series of outrages all over the world, exploding bombs and blowing up buildings. So vicious were their designs until when the veterans of the Allied Armies of the World War made a pilgrimage back to Paris and other scenes of their great deeds of heroism, it was necessary for these exponents of humanity and democracy to have guards against the inroads of these numerous Reds.

A leader in the movement to set free these two murderers was Felix Frankfurter, who worked for the defense of Mooney and Billings, red murderers. Notable among this array of reds may be mentioned Charlotte A. Whitney, who was convicted of criminal syndicalism in California for advocating the overthrow of the State by force, and who was not long ago pardoned by the Governor of California. A petition purporting to contain almost half a million signatures protested the execution of Sacco and Vanzetti; thus we see there are hundreds of thousands of these reds, communists, bolshevists who are here working in this country to destroy our Constitution, our people, our Army, our Navy, our churches, our schools, our homes.

It is time that the United States should have a general awakening and educate her citizens to the needs of the hour; educate them to pure Americanism and the protection of our Nation and her institutions. It is time that our immigration and deportation laws have teeth put into them whereby the courts and other officials of our country can instantly ascertain the activity of aliens in crime, lawlessness, and red propaganda and promptly deport them.

### CRIME WAVE

The crime wave is engulfing America. Almost every newspaper you pick up has a startling headline like the following: "Fireburg sets seven fires;" "Paroled moron sought as girl's slayer;" "Lost girl sought on Island;" "Hickman, fiendish slayer, captured;" "Fox (Hickman) wins plea for new judge;" "Hotelling confesses attacking and slaying 5-year-old girl;" "Hickman seeks highbrow jury;" "Remus declared insane." This, my friends, is evidence that the crime wave is sweeping the United States because the red-blooded American citizens are apparently becoming careless relative to the enforcement of the laws of the country and apparently careless relative to properly educating the rising generation.

It is time we were instilling in the youth of our land their duties as courts, as peace officers, jurors, and law-abiding citizens. The youth

of to-day will fill these places to-morrow. It is time the citizens of the United States should look with disgust and contempt upon the violation of laws and discontinue signing requests for pardons, paroles, and other impediments to the justice of the law. It is time that Americans should look upon real American laws and institutions as theirs and endeavor to protect them instead of taking the side of and protecting and shielding criminals, law violators, and enemies of society. It is time the country should denounce so-called alienists along with other deterrents to law enforcement, justice, and civilization. Often the origin of these ills can be traced to undesirable immigrants. I do not mean to say that all aliens are undesirable; some are high type, splendid people, and make good citizens.

### ACROSS THE BORDERS

From south of the Rio Grande hundreds of thousands of Mexicans are pouring into our country, oftentimes at the behest of the various employers or large industrial enterprises. These who would decoy to our lands and then employ undesirable alien labor in competition with the splendid American laborer surely should be stopped. Cheap labor to-day may be an expensive liability to-morrow, and surely in the Mexican peon laborer this condition has obtained. The American laborer resides among us, pays taxes, contributes to the welfare and upbuilding of society and really stands at the helm of the ship of state of our mighty Nation. On the contrary, foreign labor drifts into our country, obtains what it can for its hire, gives as little return as possible, in most cases, and then invariably thrusts itself for a charitable existence upon society, in the founding of which it has not assisted.

Another reason why the quota should apply to the country south of the Rio Grande and the islands is because their population in the main is composed of mixtured blood of white, Indian, and negro. This makes their blood a very great penalty upon the society which assimilates it. The United States already has sufficient race and blood troubles.

Influx of all types of undesirable aliens and their amalgamation with our people will cause a general weakening, physically and mentally, of our civilization; and instead of our Nation then being the mistress of the world, leading in art, science, invention, finance, statesmanship, culture, and general civilized development, would it not be reasonable to believe that we would assume a secondary place as compared to those nations which have kept their blood white and purely Caucasian? I do not tell you that these things will come to pass, but I do say we already have enough Japanese, Chinese, Italians, Negroes, and other foreign strains. It is time to entirely stop the islands, Europe, Asia, and Africa from dumping their scum and riffraff on our beautiful American shores.

### PERMISSION TO ADDRESS THE HOUSE

Mr. MORIN. Mr. Speaker, I ask unanimous consent that the gentleman from New York [Mr. LaGUARDIA], who is now in the coal districts investigating the conditions there, be permitted to address the House for half an hour on Monday. I do that in pursuance of a request by wire that I have just received.

Mr. GARRETT of Tennessee. The gentleman says he is in the coal districts?

Mr. MORIN. Yes. I have just received a wire from him. I did not know before that he was there.

Mr. GARRETT of Tennessee. That is the same subject that the gentleman from Pennsylvania [Mr. CASEY] wishes to speak about?

Mr. MORIN. Yes.

The SPEAKER. The Chair will endeavor to discourage unanimous consent for talking on Monday, which is set aside for the Consent Calendar.

Mr. MORIN. Then I make it Wednesday.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent that on Wednesday, at the conclusion of the speech of the gentleman from Pennsylvania [Mr. CASEY], the gentleman from New York [Mr. LaGUARDIA] may be permitted to address the House for half an hour. Is there objection?

There was no objection.

### AMENDMENT OF THE HOUSE RULES

Mr. SNELL. Mr. Speaker, I submit a privileged report from the Committee on Rules.

The SPEAKER. The gentleman from New York presents a privileged report from the Committee on Rules, which the Clerk will report.

The Clerk read as follows:

Report to accompany House Resolution 107, amending paragraph 34 of Rule XI of the Rules of the House of Representatives.

The SPEAKER. Ordered printed.

### CHANGE OF REFERENCE

Mr. ARENTZ. Mr. Speaker, I have here a bill (H. R. 6461) for the construction of an irrigation dam on Walker River, Nev. It is an Indian matter. It was referred to the Committee

# EXHIBIT G

Congressional Record - House
February 9, 1928

Mr. SPEAKS. Have I the right, Mr. Speaker, to demand a separate vote upon the amendment which I introduced and which was agreed to in the committee?

The SPEAKER. Any gentleman may demand a separate vote on any amendment.

Is a separate vote demanded on any other amendment? If not, the Chair will put the other amendments in gross.

The other amendments were agreed to.

### CONSTRUCTION OF PUBLIC BUILDINGS

Mr. ELLIOTT. Mr. Speaker, I submit a conference report on the bill (H. R. 278) to amend section 5 of the act entitled "An act to provide for the construction of certain public buildings, and for other purposes," approved May 25, 1926.

### MISSOURI RIVER BRIDGE, GLASGOW, MONT.

Mr. DENISON. Mr. Speaker, there is a Senate bill (S. 1501) on the Speaker's table. I ask unanimous consent that it may be indefinitely postponed, a similar bill having passed the House and also the Senate.

The SPEAKER. The gentleman from Illinois asks unanimous consent that the bill (S. 1501) on the Speaker's table be indefinitely postponed. Is there objection?

There was no objection.

### LEAVE OF ABSENCE

By unanimous consent, leave of absence was granted as follows:

To Mr. SEARS of Florida, indefinitely, on account of sickness in family.

To Mr. CELLER, for one week, on account of sickness.

### RESTRICTION OF MEXICAN IMMIGRATION

Mr. BOX. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing an address delivered by me at an immigration conference.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. BOX. Mr. Speaker, under authority granted by the House, I submit for printing in the RECORD an address delivered by me on January 19, 1928, before the immigration conference held in Memorial Continental Hall, Washington, D. C., under the auspices of the Key Men of America, a patriotic organization composed of authorized representatives of a great number of other affiliated patriotic societies engaged in the study of immigration problems.

The address is as follows:

Mr. Chairman, ladies, and gentlemen, during the present session of Congress immigration discussion and legislation will probably center around four important questions:

(1) Shall our deportation laws be strengthened, extended, and better enforced?

(2) Shall the endless chain of relationship existing between immigrants and their kindred abroad be permitted to start dragging out of Europe thousands of those whom the laws now exclude?

(3) Shall we retain in the law the national-origins provisions, written into the act of 1924, making it more accurately and adequately serve the Nation's purpose to keep itself American, or shall they be suspended or repealed at the dictation of certain hyphenated minorities of our population?

(4) Shall the quota provisions of the immigration law be made applicable to Mexico, South America, and adjacent islands?

To this last question I shall devote my brief remarks.

The people of the United States have so definitely determined that immigration shall be rigidly held in check that many who would oppose this settled policy dare not openly attack it. The opposition declares itself in sympathy with the policy and then seeks to break down essential parts of the law and opposes any consistent completion of it making it serve the Nation's purpose to maintain its distinguishing character and institutions. Declaring that they do not believe that paupers and serfs and peons, the ignorant, the diseased, and the criminal of the world should pour by tens and hundreds of thousands into the United States as the decades pass, they nevertheless oppose the stopping of that very class from coming out of Mexico and the West Indies into the country at the rate of 75,000, more or less, per year.

Every reason which calls for the exclusion of the most wretched, ignorant, dirty, diseased, and degraded people of Europe or Asia demands that the illiterate, unclean, peonized masses moving this way from Mexico be stopped at the border. Few will seriously propose the repeal of the immigration laws during the present Congress, but the efforts of those who understand and support the spirit and purpose of these laws to complete them and make them more effective by the application of their quota provisions to Mexico and the West Indies, will be insidiously and strenuously opposed.

The admission of a large and increasing number of Mexican peons to engage in all kinds of work is at variance with the American purpose to protect the wages of its working people and maintain their standard of living. Mexican labor is not free; it is not well paid; its standard of living is low. The yearly admission of several scores of thousands from just across the Mexican border tends constantly to lower the wages and conditions of men and women of America who labor with their hands in industry, in transportation, and in agriculture. One who has been in Mexico or in Mexican sections of cities and towns of southwestern United States enough to make general observation needs no evidence or argument to convince him of the truth of the statement that Mexican peon labor is poorly paid and lives miserably in the midst of want, dirt, and disease.

In industry and transportation they displace great numbers of Americans who are left without employment and drift into poverty, even vagrancy, being unable to maintain families or to help sustain American communities. Volumes of data could be presented by way of support and illustration of this proposition. It is said that farmers need them. On the contrary, American farmers, including those of Texas and the Southwest, as a class do not need them or want them. I state the rule as of country-wide application, without denying that a small percentage of farmers want them, and that in some restricted regions this percentage is considerable. I doubt if a majority of the bona fide farmers of any State want or need them. I have given much attention to the question and am convinced that as a state-wide or nation-wide proposition they are not only not needed and not wanted, but the admission of great numbers of them to engage in agricultural work would be seriously hurtful to the interests of farmers, farm workers, and country communities. They take the places of white Americans in communities and often thereby destroy schools, churches, and all good community life.

American farmers are now burdened with a surplus of staple farm products which they can not sell profitably at home or abroad. That surplus weighs down the prices of the entire crop in both the domestic and foreign markets until it threatens agriculture with financial ruin. Individual farmers, farm organizations, their Representatives in Congress, students of farm economics, bankers, and business men of the farming sections, all are striving to find a means of getting rid of this surplus of farm products, with its dead weight upon the price of farmers' crops. Congress is continually being urged to make appropriations to help carry the farmers' surplus, to levy taxes on farm products, to restrain overproduction, and otherwise to provide a method of getting rid of this oversupply of the farmers' leading crops. The President in his messages to Congress has repeatedly discussed this surplus and dealt with proposed remedies for it.

The importers of such Mexican laborers as go to farms at all want them to increase farm production, not by the labor of American farmers, for the sustenance of families and the support of American farm life, but by serf labor working mainly for absentee landlords on millions of acres of semiarid lands. Many of these lands have heretofore been profitably used for grazing cattle, sheep, and goats. Many of them are held by speculative owners.

A great part of these areas can not be cultivated until the Government has spent vast sums in reclaiming them. Their development when needed as homes for our people and in support of American communities is highly desirable. Their occupation and cultivation by serfs should not be encouraged. These lands and this mass of peon labor are to be exploited in the enlargement of America's surplus farm production, possibly to the increased profit of these speculative owners, but certainly to the great injury of America's present agricultural population, consisting of farmers, living and supporting themselves by their own labor and that of their families, on the farms of America.

The dreaded surplus, which already makes an abundant crop worse for farmers as a whole than a scant one, is to be made more dreadful by the importation of foreign labor working for lower wages and under harder conditions. The surplus which I have mentioned often hurts worse than a pest of locusts on the wheat crop or of boll weevil in the cotton fields.

While farmers, business interests in agricultural sections, Congress, and the President are deep in the consideration of the great problem presented by the farm surplus, and when presidential campaigns may turn on the condition and its consequences, labor importers are scheming and propagandizing for the purpose of bringing in armies of alien peons, claiming that they are needed on the farms, where they would only make the farm-surplus problem worse. If the Government tries to relieve this distress of the farmer caused by surplus production, shall it at the same time be de-Americanizing farms and farming communities and making the surplus and price situation worse by importing masses of serf laborers? Some think that agricultural prices can be sustained by a high tariff. Why have a tariff wall to keep out the products of pauper labor abroad and at the same time be bringing in armies of peons to increase the oversupply inside the tariff wall to the ruin of our own farmers?

Another purpose of the immigration laws is the protection of American racial stock from further degradation or change through mongrelization. The Mexican peon is a mixture of Mediterranean-blooded Spanish peasant with low-grade Indians who did not fight to extinction

but submitted and multiplied as serfs. Into that was fused much negro slave blood. This blend of low-grade Spaniard, peonized Indian, and negro slave mixes with negroes, mulatoes, and other mongrels, and some sorry whites, already here. The prevention of such mongrelization and the degradation it causes is one of the purposes of our laws which the admission of these people will tend to defeat.

Every incoming race causes blood mixture, but if this were not true, a mixture of blocs of peoples of different races has a bad effect upon citizenship, creating more race conflicts and weakening national character. This is worse when the newcomers have different and lower social and political ideals. Mexico's Government has always been an expression of Mexican impulses and traditions. Rather, it is an exhibition of the lack of better traditions and the want of intelligence and stamina among the mass of its people. One purpose of our immigration laws is to prevent the lowering of the ideals and the average of our citizenship, the creation of race friction and the weakening of the Nation's powers of cohesion, resulting from the intermixing of differing races. The admission of 75,000 Mexican peons annually tends to the aggravation of this, another evil which the laws are designed to prevent or cure.

To keep out the illiterate and the diseased is another essential part of the Nation's immigration policy. The Mexican peons are illiterate and ignorant. Because of their unsanitary habits and living conditions and their vices they are especially subject to smallpox, venereal diseases, tuberculosis, and other dangerous contagions. Their admission is inconsistent with this phase of our policy.

The protection of American society against the importation of crime and pauperism is yet another object of these laws. Few, if any, other immigrants have brought us so large a proportion of criminals and paupers as have the Mexican peons. If time permitted, I could present masses of authentic reports sustaining the truth of this statement. As one of a great many instances, I read a news item from the Dallas News of January 5, 1928:

MEXICANS SUFFERING FROM UNEMPLOYMENT, AGENCY MAN REPORTS

"Unemployment conditions among Mexicans in Dallas is the most acute in the history of 'Little Mexico,' A. Luna, operator of an employment agency, said Wednesday. He declared that hundreds of families are suffering severely, especially on account of the recent cold weather.

"'These people are badly in need of immediate relief,' Mr. Luna said, 'perhaps much more relief than is now available.'"

Note the term "Little Mexico" used in this news item. These "Little Mexicos" are springing up in many sections in and about the cities and industrial centers and all over the Nation. Some of them are assuming large proportions, and all of them together are becoming disturbingly large.

The number of such reports coming from California, Colorado, Arizona, New Mexico, and the whole Southwest, through the press and from public and private charity organizations, is very great and covers the whole period of mass peon immigration from its beginning until now.

The statements made in connection with each of these propositions are presented to this company, containing many students of the problem and a large percentage of those with whom the present and future public welfare is a paramount consideration, with the assurance that such citizens will give further attention to the question and disprove or verify the statements made.

The volume of Mexican immigration, the attending circumstances, and the prospects for its continuance and enlargement are such as to make this an important part of one of the Nation's greatest problems. Mexico has nearly 15,000,000 people who are prolific breeders, capable of producing millions of new inhabitants every year.

Their economic condition will continue worse than ours for an indefinite time and cause their laborers to want to migrate to the United States. Under a well-known law of population, the gaps left at home by those who come from year to year will be rapidly refilled by a natural increase. Thus Mexico will become an inexhaustible source of this low-grade immigration.

Immigrants who have poured upon our shores from Europe and Old World countries have had to pay the expense of land travel in reaching foreign seaports, after which the heavy expense of ocean transportation had to be paid. Mexico's masses have only to tramp to the border. The expense of their transportation, whether paid by them or others, is trifling compared to the cost of crossing the ocean from Europe or Asia to America. The methods by which labor importers reach them and induce them to come are inexpensive and easy. The building of barriers against the flood flowing in from elsewhere must increase the inpouring from Mexico. Unless it is checked it will continue with increasing volume.

The most dangerous mass immigration now menacing us is that from Mexico.

Our efforts to deal wisely and adequately with Mexican peon immigration from the standpoint of public and patriotic interest are opposed by some selfish interests which have hindered all the Nation's efforts in dealing with our immigration, namely, the short-sighted, present profit-seeking interests of those who want cheap labor. If it were not for this opposition, the grave question which I am suggesting would be settled soon and the settlement made would be with a patriotic view to the public welfare now and hereafter.

If we ask Mexico, Haiti, Cuba, and South America to consent to the application of this necessary restriction, they will, of course, refuse and the evil stream will continue to pour its pollution into the mass of our population.

Efforts to obtain the consent of foreign countries to our immigration policy have been an unbroken failure throughout the history of our dealing with the problem. More than one presidential administration tried to settle the Chinese immigration question by the Burlingame treaty, in which it was recited that the right of races to migrate was inherent and inalienable. This was to apply as between the hundreds of Chinese millions and America. The United States Congress had to cut the Nation's way out of that ruinous entanglement.

Italy did not consent to our present law, but wanted to handle the subject by treaty to which her consent would be necessary, but the Constitution had vested this power in Congress, and Congress exercised it, accomplishing the Nation's purpose and helping to save its future. Other instances could be cited; one more will be enough. Japan had interests and a will concerning Japanese immigration in conflict with the interests and will of the United States. Every effort was made to avoid having America declare its will by congressional action as our Constitution contemplates. So long as we dickered with that question, consulting any but our constitutional rule, it remained unsettled and troublesome. It would have been with us yet had Congress waited for the consent of a foreign power or left that question to be settled in any but the constitutional way; but the will of America was accomplished in the manner provided by the fathers. The world did not crumble, its peace was not disturbed, but our friends of former times remain our friends, respecting us and being by us respected. Any other course would have continued the question and the irritation it caused.

These and other national experiences in dealing with the immigration problem should be recalled by the public when men say that in this instance we must consult the wishes of the people south of the Rio Grande or farther south.

Ladies and gentlemen, practically all of the reasons which have moved the United States to adopt and adhere to the policy of restricting immigration from Europe and Asia argue for the restriction of peon immigration from Mexico and the countries to the south and east. The difficulties which folly and greed have heretofore thrown in the Nation's path are being thrown in its way now. Let us hope that the people of these times and the membership of this Congress will be as wise and courageous as those who have preceded us.

LEAVE TO FILE MINORITY VIEWS

Mr. GIBSON. Mr. Speaker, I ask unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] may file minority views on the so-called market site bill, and that I may have the privilege also of filing separate minority views on the same bill.

The SPEAKER. The gentleman from Vermont asks unanimous consent that the gentleman from Wisconsin [Mr. LAMPERT] and himself may file separate minority views on the market site bill. Is there objection?

There was no objection.

AGRICULTURAL RELIEF

Mr. CONNALLY of Texas. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Texas?

There was no objection.

Mr. CONNALLY of Texas. Mr. Speaker, under leave granted me to extend my remarks in the RECORD, I desire to include my speech before the Committee on Agriculture on February 9, 1928, which is as follows:

Mr. CONNALLY. Mr. Chairman and gentlemen of the committee, I thank you for giving me this opportunity to make a few observations in reference to agricultural legislation, and I thank also the gentleman from Michigan, Mr. KETCHAM.

Probably most of you know I voted against the McNary-Haugen bill. I have been abused by many cooperative representatives here who are drawing pretty handsome salaries. But I have been trying to vote for the farmer, whether he belonged to a cooperative organization or not; and what I wanted to suggest to the committee this morning is that it seems to me as a Member of Congress that it is about time for this committee and for the Congress to quit fooling the farmer and really pass some practical measure that stands some chance of becoming a law.

# EXHIBIT H

Hearings Before the Committee On Immigration and Naturalization On the Proposed Deportation Act of 1926 Held On January 12, 1926

*4. Imb: Ã 44*

# DEPORTATION

## HEARINGS

### BEFORE

## THE COMMITTEE ON IMMIGRATION AND NATURALIZATION HOUSE OF REPRESENTATIVES

### SIXTY-NINTH CONGRESS

#### FIRST SESSION

JANUARY 12, 1926

### STATEMENTS OF
### HON. ROBE CARL WHITE, HON. HARRY E. HULL, MR. W. H. WAGNER

#### ON

### PROPOSED DEPORTATION ACT OF 1926

HEARING No. 69.1.3



WASHINGTON
GOVERNMENT PRINTING OFFICE
78672                     1926

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.319510835851758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

COMMITTEE ON IMMIGRATION AND NATURALIZATION

HOUSE OF REPRESENTATIVES

SIXTY-NINTH CONGRESS

ALBERT JOHNSON, Washington, *Chairman*

| | |
|---|---|
| J. WILL TAYLOR, Tennessee. | ADOLPH J. SABATH, Illinois. |
| HAYS B. WHITE, Kansas. | JOHN E. RAKER, California. |
| ARTHUR M. FREE, California. | RILEY J. WILSON, Louisiana. |
| WILLIAM P. HOLADAY, Illinois. | JOHN C. BOX, Texas. |
| BIRD J. VINCENT, Michigan. | SAMUEL DICKSTEIN, New York. |
| WILLIAM I. SWOOPE, Pennsylvania. | SAMUEL RUTHERFORD, Georgia. |
| ROBERT L. BACON, New York. | JOHN W. MOORE, Kentucky. |
| THOMAS A. JENKINS, Ohio. | |
| BENJAMIN M. GOLDER, Pennsylvania. | |

P. F. SNYDER, *Clerk*

II

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.319510835051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

# DEPORTATION

House of Representatives,
Committee on Immigration and Naturalization,
*Washington, D. C., January 12, 1926.*

The committee met at 10.30 o'clock a. m., Hon. Albert Johnson (chairman) presiding.

The Chairman. This committee is considering a bill which it is proposed to call the deportation act of 1926, introduced by Mr. Holaday, and which passed the House in the last Congress. The first few paragraphs deal with the arrival of sailors, and we will defer consideration of that for the present and look at page 5, on line 14, beginning with section 19, referring to aliens who shall be taken into custody and deported, as follows:

Sec. 19. (a) At any time after entering the United States (whether the entry was before or after the enactment of the deportation act of 1926) the following aliens shall be taken into custody and deported:

(1) An alien who at the time of entry was a member of one or more of the classes excluded by law from admission to the United States;

(2) An alien who entered the United States at any time or place other than as designated by immigration officials, or who eluded examination or inspection, or who obtained entry by a false or misleading representation. This paragraph shall not apply to any alien who entered the United States before June 3, 1921;

(3) An alien who remains in the United States for a longer time than authorized by law or regulations made under authority of law;

(4) An alien who is a public charge from causes not affirmatively shown to have arisen subsequent to entry into the United States;

(5) An alien who, from causes not affirmatively shown to have arisen subsequent to entry into the United States, is an idiot, imbecile, feeble-minded person, epileptic, insane person, person of constitutional psychopathic inferiority, or person with chronic alcoholism;

(6) An alien who is convicted of any offense (committed after the enactment of the deportation act of 1926) for which he is sentenced to imprisonment for a term of one year or more;

(7) An alien who is convicted of any offense (committed after the enactment of the deportation act of 1926) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of the same or any other offense (committed after the enactment of the deportation act of 1926) amounts to eighteen months or more;

(8) An alien who is convicted of a violation of, or conspiracy to violate (committed or entered into after the enactment of the deportation act of 1926) any statute of the United States or a State or Territory prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of intoxicating liquors for beverage purposes, for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of a violation of or conspiracy to violate any of such statutes (such previous violations or conspiracies having been committed or entered into after the enactment of the deportation act of 1926), amounts to one year or more;

(9) An alien who was convicted, or who admits the commission, prior to entry, of an offense involving moral turpitude;

**681530**

1

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d03d051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

(10) An alien who has, after the enactment of the deportation act of 1926, violated or conspired to violate, whether or not convicted of such violation or conspiracy, (A) the white slave traffic act, or any law amendatory of, supplementary to, or in substitution for, such act; or (B) any statute of the United States prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves;

(11) An alien who is found practicing prostitution or is an inmate of, or connected with the management of, a house of prostitution, or who receives, shares in, or derives benefit from, any part of the earnings of any prostitute, or who manages or is employed by, in, or in connection with, any house of prostitution or music or dance hall or other place of amusement or resort habitually frequented by prostitutes or where prostitutes gather, or who in any way assists any prostitute, or protects or promises to protect from arrest any prostitute, or who imports or attempts to import any person for the purpose of prostitution, or for any other immoral purpose, or who enters for any such purpose, or who has been convicted and imprisoned for a violation of any of the provisions of section 4 hereof;

(12) An alien who willfully conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor, any alien liable to deportation;

(13) An alien who willfully aids or assists in any way any alien to unlawfully enter the United States;

(14) An alien who is found employed on a vessel engaged in the coastwise trade of the United States without having been admitted to the United States for permanent residence. This paragraph shall not apply to any alien who entered the United States before July 1, 1924.

(b) No conviction shall serve as a basis for deportation proceedings under paragraph (6), (7), or (8) of subdivision (a) unless such conviction is in a court of record and the judgment on such conviction has become final. In the case of a sentence for an indeterminate term in which the minimum term under the sentence is less than one year, the term actually served shall, for the purposes of paragraphs (6), (7), and (8) of subdivision (a), be considered the term for which sentenced. An alien who has been pardoned after conviction of an offense as specified in paragraph (6), (7), or (8) of subdivision (a) shall not be deported.

(c) An alien sentenced to imprisonment shall not be deported under any provision of law until after the termination of the imprisonment.

The CHAIRMAN. Other sections of the bill need not be read for the purposes of this hearing.

You will notice this enlarges the present deportation clauses of the law and goes into detail on each one of these classes, and the committee would like to know from the officers of the Department of Labor something about the number of deportations, the cost of deportations, and the possible number of deportations, based on your best estimate, under these provisions.

Mr. ROBE CARL WHITE. The Commissioner General has the figures with him and I will ask him to furnish them.

The CHAIRMAN. Then we will hear Mr. Hull.

### STATEMENT OF HON. HARRY D. HULL

Mr. HULL. You want to know the number of deportations. They are on the increase, and are now running something like 900 a month. May I be permitted to give you an analysis of this bill before I answer your question?

The principal purpose of the pending deportation bill is to provide legislation for ridding the country of several classes of undesirable aliens who could not be reached because of shortcomings or defects in the act of February 5, 1917.

Generated at Indiana University on 2022-02-09 19:48 GMT  /  https://hdl.handle.net/2027/umn.31951d035051758
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

 Digitized by Google          Original from
UNIVERSITY OF MINNESOTA

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 28 of 90 PageID #:2

The principal characteristic of the new legislation would be the factor which the so-called "statutory period" now bears to the deportation problem. In other words, aliens would be deportable regardless of the length of time which has elapsed since their entry into the United States.

Under the present law we are limited in our activities with respect to deporting alien criminals, first, by the period of their residence here; second, by the vexatious question whether the offense of which they have been convicted involves moral turpitude; and, lastly, the duration of the sentence imposed.

Under the act of February 5, 1917, convictions must result in a sentence of one year or more imposed within five years after entry, or there must be two such sentences for convictions after May 1, 1917, and, of course, the offense must be one which can be said to involve moral turpitude.

With respect to the foregoing feature the new legislation proposes to wipe out the moral turpitude question which is one that has vexed the law officers of the bureau and the department for almost 20 years. There was a time when the question was comparatively simple, because whether or not a particular offense involved moral turpitude depended upon whether the crime was malum prohibitum or malum in se.

If the former, then the tendency was to hold that the offense did not come into the category which made deportation possible even at this late date, although, as when heretofore stated, case after case has arisen in the courts, we have not yet concluded as a matter of department policy that alien violators of the Harrison narcotic law (as distinguished from those who are convicted under the act of May 26, 1922, which relates only to those having knowledge that narcotics were imported contrary to law) should be deported.

The same, of course, applies to violators of the prohibition law, and because of the solicitor's opinions holding that the offenses do not involve moral turpitude the bureau has as a rule denied applications for warrants of arrest in these cases, notwithstanding the fact that the Supreme Court of the District of Columbia decided (in a divided opinion) that this means of determining whether an offense involves moral turpitude is a thing of the past and that violation of the liquor laws constitute an offense involving moral turpitude.

Then, too, as you are aware, many States have legislation covering indeterminate sentences; that is, defendants are sentenced, for example in New York, to serve from six months to three years for a specified offense. The District Court for the Southern District of New York has held such a sentence to be one of three years within the meaning of the immigration law and that the alien could upon the expiration of his imprisonment be deported. There are several States, however, where, were the question tried in the courts, we could not with confidence look forward to similar favorable decisions. The new legislation, if passed, would once and for all dispose of these two important questions which in the past have been generally decided in favor of the alien.

One of the most far-reaching and important features of the new law is that section which proposes to vest in such officials as you

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951003051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

may designate the right to issue warrants of arrest, without the necessity of submitting applications to the bureau as has been the practice since warrant procedure as such became established. Undoubtedly at those stations where we have officials expert in that line material advantages (solely in the way of saving time, however) will result, but what we may expect from extending the authority to the average immigration officer in charge I hesitate to say. If the number of applications which the warrant division here has denied is any criterion, I know that, in the past, we would have found ourselves in very serious difficulties, not only financially but legally as well.

Another important feature of the new law is that by means of "tacking" sentences, it becomes possible to deport aliens who are chronic petty offenders. For instance, there recently came to our attention the case of an alien who had been sentenced no less than thirty times, but as he did not receive two sentences of at least one year, we are unable to deport him. Such a situation can not arise under the new law.

So far as the 1917 law relating to the deportation of criminal classes, its language is as follows:

> Any alien who is hereafter sentenced to imprisonment for a term of one year or more because of conviction in this country of a crime involving moral turpitude, committed within five years after the entry of the alien to the United States, or who is hereafter sentenced more than once to such a term of imprisonment because of conviction in this country of any crime involving moral turpitude, committed at any time after entry.

The pertinent portion of the proposed legislation with respect to criminal classes reads:

> An alien who is convicted of any offense (committed after the enactment of the deportation act of 1925) for which he is sentenced to imprisonment for a term of one year or more.
>
> An alien who is convicted of any offense (committed after the enactment of the deportation act of 1925) for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of the same or any other offense (committed after the enactment of the deportation act of 1925), amounts to eighteen months or more.
>
> An alien who is convicted of a violation of, or conspiracy to violate (committed or entered into after the enactment of the deportation act of 1925), any statute of the United States or a State or Territory prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of intoxicating liquors for beverage purposes, for which he is sentenced to imprisonment for a term which, when added to the terms to which sentenced under one or more previous convictions of a violation of or conspiracy to violate any of such statutes (such previous violations or conspiracies having been committed or entered into after the enactment of the deportation act of 1925), amounts to one year or more.
>
> An alien who was convicted, or who admits the commission prior to entry, of an offense involving moral turpitude.
>
> An alien who has, after the enactment of the deportation act of 1925, violated or conspired to violate, whether or not convicted of such violation or conspiracy (A) the white slave traffic act or any law amendatory of, supplementary to, or in substitution for, such act; or (B) any statute of the United States prohibiting or regulating the manufacture, possession, sale, exchange, dispensing, giving away, transportation, importation, or exportation of opium, coca leaves, or any salt, derivative, or preparation of opium or coca leaves.

At present we have no law for deporting, for instance, an alien who assists another to unlawfully enter the country unless by a stretch of the imagination we conclude that he was a person likely

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d035051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by  Google     Original from
UNIVERSITY OF MINNESOTA

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 30 of 90 PageID #:2

to become a public charge, an opinion in which we would most likely be promptly overruled by, for instance, Judge Anderson of the district court of Boston, and other judges holding views somewhat similar to his. For that reason the new legislation provides machinery for the deportation at any time after entry of "an alien who conceals or harbors, attempts to conceal or harbor, or aids, assists, or abets any other person to conceal or harbor any alien liable to deportation; an alien who aids or assists in any way any alien to unlawfully enter the United States."

Another very important feature is the inclusion in the deportable classes of any alien "who is found employed on a vessel engaged in the coastwise trade of the United States without having been admitted to the United States for permanent residence."

The bill also makes some very important changes in section 18 of the immigration act with respect to deportation expenses as well as the power of the Secretary to direct the alien's removal at the expense of the steamship company to certain specified places or countries, as well as other important features.

Now, I can give you some figures. In 1910, we deported 3,520; in 1911, 3,310; in 1912, 2,853; in 1913, 3,626, etc. The following table gives the number for the fiscal years 1910–1913, and 1919–1925, and five months of the current fiscal year.

DEPORTATION OF ALIENS

| Fiscal year: | Number deported | Fiscal year: | Number deported |
|---|---|---|---|
| 1910 | 3,520 | 1925 | 9,495 |
| 1911 | 3,310 | 1926 (5 months)— | |
| 1912 | 2,853 | July | 919 |
| 1913 | 3,626 | August | 940 |
| 1919 | 3,103 | September | 855 |
| 1920 | 2,762 | October | 909 |
| 1921 | 4,517 | November | 869 |
| 1922 | 4,345 | | 4,492 |
| 1923 | 3,661 | | |
| 1924 | 6,409 | | |

Mr. Holaday. What was the number in 1912?

Mr. Hull. In 1912 there were 2,853. There was a little drop in there. In 1919 there were 3,103; in 1920, 2,762; in 1921 (which was, of course, just before the enactment of the first quota law), there were 4,517. I presume a part of that was after the enactment of the first quota law. In 1922, there were 4,345; in 1923, 3,661; in 1924, 6,409; and in 1925, 9,495—which is the best gauge that you have of the number that we are deporting at the present time. We are running along, at the present time, at about the same rate as for 1925, the number being about 4,492 for the five months. That is up to the first day of December.

The Chairman. Let me ask you right there, in order to be very clear: When you say, "deportation," you mean an alien picked up some place in the United States and deported?

Mr. Hull. Yes, sir.

The Chairman. As differentiated from being debarred?

Mr. Hull. Yes.

The Chairman. Now, you gave some figures there and indicated the first quota act, which became effective June 3, 1921, might have

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d03b051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

affected the figures that fiscal year, which was within less than a month of expiring.

Mr. HULL. Yes.

The CHAIRMAN. Do you think the first quota law had any effect on deportations in that short space of time?

Mr. HULL. Well, I do not know. I was not, of course, in the Bureau at that time. I do not know. I presume it had a slight effect. At any rate, the figures would indicate it did. The first quota act went into effect, as I recollect, on June 3, 1921.

The CHAIRMAN. Yes. How could the restrictive policy of that act cause an enlargement of deportations?

Mr. HULL. Well, of course, it would make the number greater that could be deported in the following years. When you have a restricted policy, you make a larger class deportable.

Mr. WHITE. I would like to ask Mr. Hull this question: Have you reason to think, Mr. Hull, or do the statistics prove that a large part of these deportations are parties who have surreptitiously entered the United States, or are we to conclude these persons largely have passed muster and gotten in here and it has subsequently been determined they were not eligible to admission?

Mr. HULL. Largely there are smuggled in, some come as visitors and others become public charges after legal entry. Most of these we are deporting.

Mr. WHITE. Illegally?

Mr. HULL. Some of them criminals; perhaps a few of them who legally came in are criminals.

Mr. DICKSTEIN. You do not mean to say you have deported anybody who came in in excess of the quota; you are referring to those who came in here illegally or did not go through the proper medical inspection, who you found subsequently in the States and found illegally in the United States?

Mr. HULL. They might be here in excess of the quota.

Mr. DICKSTEIN. Yes, a man might come in in excess of the quota and be found in the United States in certain circumstances, and yet be legally admitted to the United States.

Mr. WILSON. You do not mean in excess of the quota as provided by law?

Mr. HULL. No; he is here; he came in under the quota.

Mr. WILSON. But came in in violation of some other law?

Mr. HULL. Yes.

Mr. HOLADAY. Can you place, in your statement, the reason for the deportations in the year 1925?

Mr. HULL. The reasons?

Mr. HOLADAY. Yes, the grounds.

The CHAIRMAN. He means a table. I think you have the same thing in your report.

Mr. HOLADAY. Yes; I think that is in the report.

Mr. HULL. Yes, that can be done.

The CHAIRMAN. Let that be inserted at this point, from your annual report.

(The table above referred to is as follows:)

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.319510835051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google                    Original from
                                  UNIVERSITY OF MINNESOTA

TABLE 56.—Aliens deported to countries whence they came after entering the United States, fiscal year ended June 30, 1925, by race or people and causes

| Race or people | Number deported | Feeble-minded | Insanity | Epileptics | Constitutional psychopathic inferiority | Other mental conditions | Tuberculosis (contagious) | Other contagious diseases | Pregnancy | Other physical conditions | Prostitutes, and aliens coming for any immoral purpose | Support by or received the proceeds of prostitution, or connected with house of prostitution, or other place habitually frequented by prostitutes | Aliens who procure or attempt to bring in prostitutes or aliens for any immoral purpose, or assists, or protects prostitutes from arrest | Found in the U. S. after having been deported as a prostitute or a procurer or as having been connected with the business of prostitution or importation for, or prostitution or other immoral purposes | Anarchists, and violations under the act of Oct. 16, 1918, as amended June 5, 1920 | Criminals | Under narcotic act | Polygamists | Without proper visa under immigration act of 1924 | Under per centum limit act of 1921 (excess quota) | Without passport under the State Department regulations | Under passport provision of sec. 3, act of 1917 | Under Chinese exclusion act | Geographically excluded classes (natives of that portion of Asia and islands described in sec. 3, act of 1917) | Under last proviso of sec. 23, act of 1917; immigration act of 1924 | Contract laborers | Unable to read (over 16 years of age) | Under 16 years of age, unaccompanied by parent | Assisted aliens | Professional beggars and vagrants | Likely to become a public charge | Entered the United States within one year of previous deportation | Entered without inspection, or at a time or place not designated by immigration officials. Deportation required within three years | Other causes |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Total | 9,495 | 4 | 527 | 6 | 24 | 47 | 28 | 76 | 9 | 9,165 | 209 | 51 | 53 | 14 | 22 | 2,687 | 42 | 9 | 2,723 | 394 | 430 | 26 | 93 | 57 | 115 | 66 | 474 | 24 | 37 | 3 | 3,758 | 164 | 1,169 | 39 |
| African (black) | 167 | | 28 | | 1 | 3 | 1 | 9 | 2 | | 3 | | | | 13 | | | 35 | | 6 | | | | | | 9 | | 1 | | 42 | 2 | | 10 |
| Armenian | 29 | | 2 | | 1 | 1 | 1 | | | | 1 | | | | 1 | | | 10 | | | | | | 1 | | 2 | | | | | | 3 | 3 |
| Bohemian and Moravian (Czech) | 30 | | | | | | | 1 | | 1 | 1 | | | | | | | 4 | 2 | 3 | | | | | | 1 | | | | 4 | | 1 | |
| Bulgarian, Serbian, and Montenegrin | 105 | | 3 | | 1 | 1 | | 1 | | 3 | 3 | | | | | | | 37 | 17 | 13 | | | | 1 | | 4 | | | | 24 | | 57 | 1 |
| Chinese | 261 | | 10 | | 1 | | | 3 | | 3 | | | 4 | | | 117 | | 22 | | 18 | | 93 | 47 | | | 5 | 1 | | | 43 | | 11 | |
| Croatian and Slovenian | 117 | | | | | 1 | | 3 | | 3 | 3 | 1 | | | | | | 22 | 9 | | | | | | | | | | | 16 | | 11 | |
| Cuban | | | 3 | | | | | 1 | | 4 | 4 | | | | 1 | | | 11 | | | | | | | | 1 | | | | 8 | 1 | | |
| Dalmatian, Bosnian, and Herzegovinian | 22 | | 1 | | | 1 | | | | | | | | | | | | | | | | | | | | | | | | | | | |
| Dutch and Flemish | 249 | | 4 | | 1 | 7 | 3 | 2 | | 5 | 26 | 5 | 14 | | 1 | | | 115 | 63 | 22 | | | | 47 | | 34 | 2 | 2 | | 43 | | 21 | 2 |
| East Indian | 67 | | | | | | | | | | | | | | 1 | | | 305 | 9 | 13 | | | | | | 3 | 1 | | | 227 | | 154 | 1 |
| English | 1,072 | | 45 | 1 | 4 | 4 | 2 | 2 | 1 | 19 | 18 | 10 | | | 1 | | | 30 | 3 | 14 | | | | | | | | 2 | | 120 | 31 | 10 | 6 |
| Finnish | 94 | 2 | 3 | 1 | | 6 | 2 | 4 | | 3 | 5 | 1 | | | 1 | | | 88 | 38 | 2 | | | | | | | 3 | 2 | | 121 | 4 | 89 | 2 |
| French | 460 | | 18 | | 2 | 6 | 1 | 2 | 2 | 8 | 11 | | | | 1 | | | 315 | 30 | 11 | | | | | | | | 1 | | 42 | 21 | 21 | 1 |
| German | 750 | | 56 | 1 | 5 | 12 | 2 | 3 | 1 | 8 | 15 | | | | 7 | | | 93 | 47 | 21 | | | | | | | 5 | | | 49 | 5 | 84 | 2 |
| Greek | 279 | | 15 | | 2 | 2 | 1 | 3 | | | 5 | | | | 2 | | | 66 | 65 | 57 | | | | | | 13 | | | | 77 | 6 | 21 | 4 |
| Hebrew | 280 | 1 | 38 | 1 | 2 | 4 | 2 | 7 | 1 | 11 | 10 | | | | 2 | | | 177 | 6 | 17 | | | | | | 11 | 5 | 2 | | 111 | 1 | 48 | 8 |
| Irish | 554 | | 37 | | 5 | 1 | 1 | 1 | | | 5 | | | | 3 | | | 30 | 47 | 56 | | | | | | | | 3 | | 42 | 4 | 28 | 1 |
| Italian (north) | 151 | | 2 | | | 2 | | 2 | | 8 | | | | | 4 | | | 301 | 34 | 50 | | | | | | 15 | 5 | 5 | | 49 | 2 | 48 | 6 |
| Italian (south) | 644 | | 60 | | 1 | | | 2 | | 12 | 8 | | | | 7 | | 3 | 231 | 34 | 50 | | | | | | 15 | 10 | 6 | 2 | 101 | 8 | 36 | |

TABLE 56.—*Aliens deported to countries whence they came after entering the United States, fiscal year ended June 30, 1925, by race or people and causes—Continued*

Column headings (left to right across the table):

1. Number deported
2. Feeble-minded
3. Insanity
4. Epileptic
5. Constitutional psychopathic inferiority
6. Other mental conditions
7. Tuberculosis (contagious)
8. Other contagious diseases
9. Pregnancy
10. Other physical conditions
11. Prostitutes, or inmates of houses of prostitution, and aliens coming in for any immoral purpose
12. Support by or received the proceeds of prostitution, or connected with house of prostitution or other place habitually frequented by prostitutes
13. Aliens who procure or attempted to bring in prostitutes or aliens for any immoral purpose, or assists, or protects prostitutes from arrest
14. Found in the U.S. after having been deported as a prostitute or a procurer or as having been connected with the business of prostitution or importation for prostitution or other immoral purposes
15. Anarchists, and violations under the act of Oct. 16, 1918, as amended June 5, 1920
16. Criminals
17. Under narcotic act
18. Polygamists
19. Without proper visa under immigration act of 1924
20. Under per centum limit act of 1921 (excess quota)
21. Without passport under the State Department regulations
22. Under passport provision of sec. 3, act of 1917
23. Under Chinese exclusion act
24. Geographically excluded classes (natives of that portion of Asia and islands adjacent thereto described in sec. 3, act of 1917)
25. Under last proviso of sec. 23, act of 1917; and under sec. 17, immigration act of 1924
26. Contract laborers
27. Unable to read (over 16 years of age)
28. Under 16 years of age, unaccompanied by parent
29. Assisted aliens
30. Professional beggars and vagrants
31. Likely to become a public charge
32. Entered the United States within one year of previous deportation
33. Entered without inspection, or at a time or place not designated by immigration officials. Deportation required within three years
34. Other causes

| Race or people | Number deported |
|---|---|
| Japanese | 83 |
| Korean | 6 |
| Lithuanian | 23 |
| Magyar | 72 |
| Mexican | 1,751 |
| Pacific Islander | |
| Polish | 161 |
| Portuguese | 65 |
| Roumanian | 83 |
| Russian | 93 |
| Ruthenian (Russniak) | 44 |
| Scandinavian (Norwegians, Danes, and Swedes) | 512 |
| Scotch | 463 |
| Slovak | 94 |
| Spanish American | 67 |
| Spanish | 116 |
| Syrian | 18 |
| Turkish | 18 |
| Welsh | 42 |
| West Indian (except Cuban) | 7 |
| Other peoples | 150 |

Digitized by Google     Original from UNIVERSITY OF MINNESOTA

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 34 of 90 PageID #:2

Mr. HULL. I might say, by months, so far this year, that we have deported in July, 919; August, 940; September, 855; October, 909; and November, 869.

Now, of course, I presume what you want to get is something in regard to the expense of deportation. Of course, on the details, Mr. White or Mr. Wagner, probably Mr. Wagner, will be better than I am. I have only been in the bureau something like 10 months and, of course, I have not accumulated all the knowledge, but I find the deportation costs are something like $87, on an average, per man. That is the way they are running, at least, this year.

The CHAIRMAN. That is the average between sending him back across the land borders and sending him overseas?

Mr. HULL. That is the actual expense of the average amount for all. The overhead is not included in that. The actual dollars and cents that we are out, on the average, for every alien that we deport, rail and water transportation, detention charges, etc., or the actual money that it costs our bureau to deport an alien, on the average, is $87, and that may be at the land border or it may be at the port. Of course, that does not include, you know, the aliens that we allow to depart voluntarily; it is the actual deportation under warrant of the Secretary of Labor.

Mr. DICKSTEIN. How long have most of the people been in this country that you have deported since 1925?

Mr. HULL. It would be hard to say, but then the great bulk of them are here less than five years.

The CHAIRMAN. In most of the cases, the law forbids you to go back of five years?

Mr. HULL. I think it is five years.

The CHAIRMAN. Three years.

Mr. HULL. Some of them you can go back to five, and some of them you can go further; but in many cases it is less than three years.

Mr. DICKSTEIN. A man who has committed two felonies—the statute as against him would not apply, would it, Mr. Hull? A man who had served two prison sentences for a felony, you could deport him at any time, if he were an alien?

Mr. HULL. As I understand it, you mean a man who has had two convictions of felony?

Mr. DICKSTEIN. Yes.

Mr. HULL. Of course, there is the question of moral turpitude there. Of course, just how far you can go is sometimes debatable.

The CHAIRMAN. Now the figures show that deportations are increasing, and you have given us the average cost per deportation?

Mr. HULL. Yes.

The CHAIRMAN. And that includes those who go out under the plan by which they are permitted to ship foreign? Do you get the average by including all methods you adopt to save money?

Mr. HULL. Well, if here is a warrant out, I understand that is included.

The CHAIRMAN. I know, but you arrange that quite a large number may depart?

Mr. HULL. Yes.

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d03b051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

se: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 35 of 90 PageID #:2

The CHAIRMAN. Are they then called deportees?

Mr. HULL. Well, it depends on how far you have gone, as I understand that. If you have arrested a man and taken him down and gotten him to the seaport and he says, " If you let me go, I will ship foreign," and that can be arranged, he would count as a deportation.

The CHAIRMAN. Then when you actually deport a man and it is arranged he can ship foreign, does that man count in your average cost of deportations?

Mr. HULL. Why, as I understand it, he does. He certainly would, because there is some expense connected with his detention and arrest and carrying him down to the port, but we save a great deal of money along that line.

The CHAIRMAN. In making your estimates of the amount of money to be secured for any one year, how can you arrive at any such figure?

Mr. HULL. Well, so far as it relates to the time since I have been in the bureau, we have not arrived at any positive figures. It is estimated at $1,000,000.

The CHAIRMAN. Do you feel obliged at any time to delay the matter of deportations for lack of funds?

Mr. HULL. Why, we certainly do. When I went into the bureau I found the bureau facing a potential deficit. I went in in May and there was a deficit of about $100,000, and if we had gone ahead, why we would then have had a deficit of close to $100,000.

Mr. BOX. Gone ahead with what, Mr. Commissioner?

Mr. HULL. Deportations.

Mr. BOX. Under the law?

Mr. HULL. Under the law.

The CHAIRMAN. That is the point we are trying to arrive at, in the preparation of a bill which would greatly enlarge the number of deportations.

Mr. WILSON. Do you understand, Mr. Hull, they had to check up on deportations because they did not have the money?

Mr. DICKSTEIN. No; they had to stop deportations because they did not have the money.

Mr. HULL. We had to stop.

Mr. WILSON. I say, you would have deported more if you had had sufficient funds?

Mr. HULL. Certainly.

Mr. BACON. Have you brought that to the attention of the Appropriations Committee?

Mr. HULL. We have brought the facts to the attention of the Bureau of the Budget and I think it has been brought to the attention of the Appropriations Committee.

Mr. BACON. I understand.

Mr. HULL. But I was asked to sign an order stopping deportations so that, when the 1st of July came, we would not show a deficit for the year.

The CHAIRMAN. When did you sign such an order?

Mr. HULL. I think it was the 25th of May, if I remember rightly.

The CHAIRMAN. Of last year?

Mr. HULL. Ten days after I went in the bureau.

Generated at Indiana University on 2022-02-09 19:48 GMT  /  https://hdl.handle.net/2027/umn.31951d035051758
Public Domain, Google-digitized  /  http://www.hathitrust.org/access_use#pd-google

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 36 of 90 PageID #:2

Mr. Wilson. When you made an estimate for the Budget, did you make that known, that you needed more money for deportations?

Mr. Hull. Absolutely.

Mr. Wilson. You sent that in?

Mr. Hull. Oh, certainly. We have asked for more money and told them why.

Mr. Wilson. Did they recommend it, or do you know?

Mr. Hull. Well, they have not recommended it so far; that is, for the fiscal year 1927.

The Chairman. Now, let us get that. That was May, 1924, then, you signed the order?

Mr. Hull. No; May, 1925.

The Chairman. 1925?

Mr. Hull. I went into the bureau on May 15, 1925.

The Chairman. And the new fiscal year came on the following July 1?

Mr. Hull. The following July 1.

The Chairman. So that you would go into the new fiscal year, then, short of money?

Mr. Hull. No; we did not. We had the money, but we stopped deportations the 25th of May; absolutely stopped them.

The Chairman. What happened with individuals who were waiting deportation?

Mr. Hull. They were detained.

The Chairman. For how long?

Mr. Hull. Well, until the first of the next fiscal year.

The Chairman. And then did you have sufficient funds to start in and catch up with the work?

Mr. Hull. We have not yet; we hope to get them.

The Chairman. Have you many now awaiting deportation?

Mr. Hull. No; we are going right ahead, so far.

The Chairman. Well, when they are detained, where are they detained?

Mr. Hull. Well, at the points of deportation, or they may be detained back in the country, or they may be left in jail. We do not start after a party, that is all; we just let them stay.

Mr. Box. They are all in custody, are they not, Mr. Commissioner?

Mr. Hull. Most of them. I won't say "all," because it might be some of them are paroled.

Mr. Box. That is the exception?

Mr. Hull. Yes; that is an exception.

The Chairman. Could you put a table in this record showing the number on hand awaiting deportation at any given date that is convenient to you?

Mr. Hull. Yes; what date do you want?

The Chairman. You select the date that would fit the records of the various stations, just so we can see how we are running in deportations.

Mr. Hull. Well, it would be higher the 25th of June or the 1st of July, than it would be at other times.

The Chairman. Why?

Mr. Hull. Well, because we stopped.

Mr. Box. And they continued to accumulate?

Mr. Hull. They accumulated to some extent.

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d035051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Se: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 37 of 90 PageID #:2

Mr. Box. I think that statement ought to show the greatest number that accumulated, the persons then in custody that had accumulated on your hands, because of lack of funds to deport them.

The Chairman. That is one point. Another table that is desirable would be the number on hand now.

Mr. Holaday. Why would it not be a good idea for that first statement to be as of date June 30, 1925. That would show the number on hand at the close of the fiscal year. Then a statement of the number on hand at a recent date, say, January 1, or whatever date would be possible.

The Chairman. Yes.

(The table above referred to is as follows:)

Number of aliens under orders of deportation—

| | |
|---|---|
| June 30, 1925 | 1,150 |
| Jan. 1, 1926 | 2,786 |
| Jan. 15, 1926 | 2,835 |

The Chairman. Now, then, where are you now on deportations this month? Are you proceeding with cases as they come along, or are you deferring?

Mr. Hull. Well, we are proceeding, but not proceeding quite as fast as we would like to.

The Chairman. How is your deportation money prorated per month, or is it dosed out by the month?

Mr. Hull. Well, we have only sufficient funds for about seven months deportation work.

The Chairman. Is it allotted to you by the month?

Mr. Hull. No, it is allotted in a lump sum. But, then, we have been exceeding out apportionment; that is, we have been exceeding the amount that was appropriated up to the present time, and we have asked for a deficiency from the Budget and it has been granted by them; that is, the Budget have recommended a deficiency for this year, as I understand.

The Chairman. A supplemental appropriation?

Mr. Hull. A supplemental appropriation.

The Chairman. How large will that be?

Mr. Hull. I do not know, of course. That depends on Congress. The Budget has recommended, I understand, $600,000.

The Chairman. To take care of pending deportation matters?

Mr. Hull. Oh, yes, and other expenses. The border patrol comes in here.

The Chairman. The border patrol—operating expense?

Mr. Hull. Yes. I think about $450,000 for border patrol. You see, there are, you might say, two things in regard to the enforcement of this act; first, your border patrol, which stops the alien at the border and it is much cheaper, in my opinion, to stop the alien at the border than it is to let him get in; but you must have a very effective force, and you have to have a larger force than we have at the present time. Of course, the border patrol, you see, is a creation of the last year and, while it is doing wonderful work, marvelous work you might say, it is not large enough by quite a bit.

Mr. Bacon. It ought to be twice as large, ought it not, Mr. Hull?

Mr. Hull. I do not think there is anybody wise enough to say what that border patrol will have to be. It will have to be twice;

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d03d051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



and, more than that, I will say that if you desire 95 per cent efficiency.

It will never be 100 per cent efficient, but it can be made very close to what you might say is 100 per cent efficient, but it will take work and it will take time. You can not create it in a minute.

Mr. WILSON. Can you give an estimate of the number of aliens now held who are subject to deportation and who you are unable to deport because of the lack of funds?

Mr. HULL. No. We have not stopped deporting this year.

Mr. WILSON. What I mean is you had to cut down?

Mr. HULL. We have not stopped. No, I do not think, officially, that we cut down.

The CHAIRMAN. Let me get at it on another tack——

Mr. HULL. We have told them to go ahead.

Mr. WHITE. I got that mixed a little, Mr. Chairman. He was speaking a little while ago of the last fiscal year. This fiscal year you have not discontinued deportations, as yet?

Mr. ROBE CARL WHITE. They have been curtailed.

Mr. HULL. We have curtailed to some extent; that is the point.

Mr. WHITE. Are you going to be short of funds?

Mr. HULL. We will have to do more than that, if we do not get some funds.

The CHAIRMAN. When you warn your officials out through the country with regard to expenditures for deportations, what do you do? Do you send them a telegram saying, " Slow down," or how do you word it?

Mr. HULL. I think they are simply warned that they can not have any more money for their allotments.

The CHAIRMAN. For deportation purposes?

Mr. HULL. No——

Mr. ROBE CARL WHITE. When we went before the Budget, we made our representations and then we were advised that our appropriation would be the same for this coming year as for last year and at that time we had not curtailed any of our activities, and our financial man reported to me and Mr. Hull that if we continued on the same basis we were then going, we would wind up the year with a deficit of $350,000 to $400,000. When that fact became known, I immediately approved an order of Mr. Hull notifying the field officers that they must cut down in their deportation work, as that is about the only phase of the work where we can save money. This is the only flexible part of our appropriation, unless we reduce the personnel. If you do not mind, I will quote a letter received yesterday from one of the district directors, which will give you an idea of the whole situation, or the situation in most of the districts. He wrote:

The financial problem, as regards meeting expenses chargeable against the immigration appropriation, with which we are confronted here, simply can not be solved without funds. The immigration allotment given this district on July 1, to cover expenses for the fiscal year, is now completely exhausted and the deficit which has already been created is rapidly increasing. On the 1st of January, the balance in our immigration allotment was only $697.87.

That is for an entire district.

* * * Our fixed obligations alone, for the remainder of the year, such as telephone, rentals, etc., will total about $1,200, and, in addition, our detention bills at the present time are running over $14 per day.

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d03b051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

That is for the detention of aliens.

* * * There is only one way to meet this situation, if additional funds can not be supplied, and that is to immediately release all the aliens we are now holding in jails, make no more arrests, and refuse to take into custody those aliens for whom we hold warrants and are due for early release from penal institutions within the district.

This program does not appeal to me and, if put into actual operation, nothing short of absolute chaos would be the result. However, with our allotment completely exhausted and a debt of $700 already contracted, and with positive instructions outstanding that we must keep within the amount given the district at the beginning of the year, there seems to be no other course to follow.

I would greatly appreciate some advice or instructions as to how this situation is to be handled.

Mr. DICKSTEIN. Where did that come from?

Mr. ROBE CARL WHITE. This came from Buffalo, from the man in the Buffalo district. In the Buffalo district, the last knowledge I had of it, they had about 700 unserved warrants. They had several hundred (I have forgotten the exact number) warrants that were served, but the hearings have not yet been held. Now, at the time that order was issued, we had been informed that our appropriation for 1927 was the same as for 1926. Since then we have asked for a deficiency, covering this year, and we understand, or have been informed by the Budget, that the President has approved the submission of our estimate of $600,000 to Congress. Therefore, we can ease up on these districts by giving them a new allotment, providing the Appropriations Committee of Congress approves the recommendation of the President and the Budget, which we have reason to believe, or I presume we are safe in believing, they will do. The order curtailing the activities of all districts has not yet been withdrawn, so that is the occasion for this letter from the district director. The men were driven desperate to try to handle the situation. If we had been compelled to operate under our appropriation, without a deficiency appropriation this year, it would simply mean marking time.

Mr. BACON. What is the situation for the coming fiscal year in the Budget?

Mr. ROBE CARL WHITE. Well, the coming fiscal year, for 1927, the appropriation is the same as for 1926.

Mr. BACON. In spite of the fact it has been proved that you needed a $600,000 additional appropriation to carry on?

Mr. ROBE CARL WHITE. Well, I do not know as I can say "proved." Our representations to the Budget were made along the lines of needing additional moneys. We failed to convince them of that fact.

Mr. BOX. You did convince them, however, you needed some $600,000 additional for the present year?

Mr. ROBE CARL WHITE. Yes; we convinced them of that fact.

Mr. BACON. Is the Budget for 1927 $600,000 short of what you asked for?

Mr. ROBE CARL WHITE. $1,350,000 short.

Mr. BACON. In other words, you asked $1,350,000 that you did not get from the Budget?

Mr. BOX. Yes; and even this deficiency appropriation, I understand, is not what they said they needed for this immediate work. Is that correct, Mr. Secretary?

Mr. BACON. I understood that too, Mr. Box.

Digitized by Google　　　　　Original from　UNIVERSITY OF MINNESOTA

Mr. JENKINS. Suppose a man is arrested and held for deportation, because of lack of funds; has he any right to get a release from jail?

The CHAIRMAN. Oh, yes.

Mr. ROBE CARL WHITE. Yes; he has rights. The courts repeatedly have held we have no right to hold an alien an unreasonable length of time. Three months has been held by the courts to be an unreasonable length of time. It is true that we have held aliens as high as two years, but it was generally because the aliens themselves refused to disclose their country of nativity, or to give any information whatever on which we could get a passport, or we carried them on because they were generally bad ones and we figured they should be confined. However, that eats up our appropriation very rapidly.

Mr. JENKINS. That is what I thought; that it would be useless to hold these fellows there if the law gave them a right to release themselves. But I see your point. Now let me ask you another question: Has your enforcing or parole department any system whereby they can take into custody the worst ones and pass up the less offensive?

Mr. ROBE CARL WHITE. Oh, yes. That is exactly what the last order said. You understand, gentlemen, we have never gone out and made surveys of districts to ascertain whether or not aliens are in that district unlawfully—illegally in this country. We have had numerous demands for this character of work to be done, but we have instructed our men to confine themselves to what we call the emergency work—the work that is right in front of them, the deporting of aliens who are reported to the Immigration Service through various sources, civil authorities, and individuals; and the ones they run across in their everyday work. At the present time, I have requests from four places for surveys claiming many are in these localities illegally and that serious trouble might arise unless we clean out the aliens who are illegally there, and we are arranging to-day for one party of three inspectors to go and make a survey of one district. That is only one of many districts and places where we really ought to go and make a survey and get the aliens who are illegally here and deport them. That kind of work we have been unable to do.

The CHAIRMAN. Now, is it not just that situation that is probably responsible for the very insistent demand that Congress enact an enlarged deportation act?

Mr. ROBE CARL WHITE. I presume it is; yes, sir.

Mr. VINCENT. Mr. White, you said that the Budget had recommended the same appropriation, as originally made in 1924, for 1925?

Mr. ROBE CARL WHITE. Yes.

Mr. VINCENT. Now, let me see if I understand it exactly. As I remember it, after we passed the immigration law in 1924, this committee was instrumental in getting an amendment put on the appropriation bill, for an item concerning immigration, of $1,200,000, in addition to that recommended by the Bureau of the Budget.

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA


Now, do I understand that their recommendation now includes that amount, or that it goes back to the amount with that off?

Mr. ROBE CARL WHITE. It includes that amount.

Mr. VINCENT. It includes that amount?

Mr. ROBE CARL WHITE. In other words, our appropriation for 1925 is $5,084,000.

Mr. WAGNER. $5,084,865.

Mr. ROBE CARL WHITE. And the appropriation recommended to Congress for 1927 is the same amount. Now, you understand the Budget Committee appreciates the fact that when they give us $600,000 additional this year, something will be required for next year. Of course, they hope that we will be able to curtail our activities in such way as to absorb this extra amount, and we will make every honest effort to do so.

Mr. BACON. Mr. White, is it not true that the item Mr. Vincent speaks of, namely, the $1,200,000, was entirely designed for the use of the border patrol?

The CHAIRMAN. Except $200,000; $1,000,000 for the border patrol.

Mr. BACON. $1,000,000 for the border patrol, and the other $200,-000 for what?

Mr. WAGNER. Just the general immigration expenses.

Mr. BACON. In other words, it did not largely affect your question of deportations?

Mr. ROBE CARL WHITE. No.

Mr. HOLADAY. Mr. White, your sole reason for the department pursuing the restricted deportation policy and confining its activities to what you term "emergency cases" is because of the lack of funds to finance the border and more active policy, is it not?

Mr. ROBE CARL WHITE. Oh, yes. Yes; we must live within our appropriations. You understand, gentlemen, that we have certain fixed charges. The salary roll is fixed, and it is about $4,097,571 at the present time. Now, that is a fixed charge, unless you reduce your personnel. That leaves us $987,294 with which to pay all other expenses, including deportation. Now, out of that, the cost of deporting aliens for the first five months of this year was $395,129, and the overhead estimated expense outside of salaries is about $500,000 for the year. Now, then, we have already spent in five months almost all that was available for deportation work for the whole year. Now, the added $600,000 will enable us to get by for the rest of this year, continuing the same policy we have been following; that is, deporting about 900 aliens a month.

Mr. VINCENT. If you had more money, without passing any new deportation law at all, taking the one you have now and making the surveys such as you have very properly suggested, I think, there would be a tremendous increase in deportations, would there not?

Mr. ROBE CARL WHITE. Oh, yes. We could make the deportations almost anything you wanted, until we rid the country of the aliens who are illegally here. And our best estimate, secured from the director recently (and it can only be an estimate, you understand), and which I believe is conservative, is there are now between 250,000 and 275,000 aliens in this country who are illegally here, and who are supposed to have entered since 1921. Some of those, probably, are entitled to relief. But the greater proportion of

Digitized by  Google

Original from
UNIVERSITY OF MINNESOTA

se: 1:21-cr-00665  Document #: 24-4 Filed: 02/17/22 Page 42 of 90 PageID #:2

them should not be here; they should be out of the country and, if they want to remain in the United States, they should come back properly and with proper documents and a clean bill of health as to their character and morals.

Mr. FREE. Will you describe the process of deportation; that is, is a man picked up and then there is a ticket bought for him, or does some inspector go with him?

Mr. ROBE CARL WHITE. Do you want me to describe the method?

Mr. FREE. Will you please do that and give us an estimate of the expense per person?

Mr. ROBE CARL WHITE. Our inspectors first locate the man, make some inquiries and, if they think the alien is here illegally, they then ask the Secretary of Labor for a warrant of arrest. They serve the warrant of arrest, take the alien in charge, and then the alien, under the law, is entitled to a hearing, with his own attorney present, if he wishes. This hearing is recorded and transcribed and the inspector recommends to the Secretary, after the hearing is completed, whether or not in his judgment the alien is here illegally; and, if so, the grounds upon which he should be deported. That is forwarded to the department, passed upon there, and if they approve the recommendation of the inspector a warrant of deportation is issued, under which the alien is taken in charge and deported.

Then it becomes necessary for us to secure a passport and to take the alien, at Government expense, from wherever he is found in the country (if he is to go across the water) to the port of embarkation. If he is found in Nevada, and he should go to France or England, he is taken to New York. The expense of that part of the deportation is defrayed by the Government. Then, in many cases, the steamship companies pay the expense from the port of embarkation to his destination. Of course, we have quite a number that we deport entirely at Government expense.

That, in short, is about the process.

Mr. VINCENT. That would be true in all cases where the deportation arises solely upon some act of the individual after he has been legally brought into the country?

Mr. ROBE CARL WHITE. Yes. There are a great many grounds upon which deportation occurs.

Mr. VINCENT. The steamship companies would not be responsible for some crime he committed here?

Mr. ROBE CARL WHITE. That is correct.

The CHAIRMAN. Let me ask you, right on that point; I was informed, last summer, in the effort to break up tong wars, or Chinese factional wars, in New York City, the Department of Labor, through its immigration service, stepped in and arrested and arranged for the deportation of about 250 Chinese?

Mr. ROBE CARL WHITE. No, Mr. Chairman, this is what happened——

The CHAIRMAN. I would like to know.

Mr. ROBE CARL WHITE. The tong war broke out in New York City and the Department of Justice, through Mr. Buckner, made raids. After they had taken into custody a great many Chinese, they asked the Immigration Service to come there and see whether they were deportable, or not. In the first place, we did not initi-

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d03505l758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Digitized by  Google

Original from
UNIVERSITY OF MINNESOTA

se: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 43 of 90 PageID #:2

ate a single arrest; it was initiated by the Department of Justice or the city authorities, and we only took the ones that we knew were deportable, and that amounted to——

Mr. WAGNER. Two hundred and fifty-three was my recollection.

Mr. ROBE CARL WHITE. Mr. Wagner says it amounted to 253 from New York. Now that, without any initiative of our own, without any way of preventing it, loaded our appropriation with almost $40,000. Then the same process was undertaken at Cleveland. I have forgotten the details, but it never reached any great proportion.

The CHAIRMAN. Right along that line—that is exactly why I brought it up—your service could have inaugurated an inquiry among the Chinese of New York as to their right to be in the United States?

Mr. ROBE CARL WHITE. Yes, sir. We have often made surveys— we used to in years gone by.

The CHAIRMAN. But you did not do it in this case?

Mr. ROBE CARL WHITE. We did not do it in this instance, we have for years had reason to believe that there are probably from two to three thousand Chinese in the city of New York alone, who would be subject to deportation if their cases were gone into carefully.

Mr. BACON. You did not have the money to make a survey?

Mr. ROBE CARL WHITE. We did not have the money. It would probably mean half a million dollars to clean up the New York Chinese situation alone, to say nothing of every other community in the United States.

The CHAIRMAN. That is what I am trying to get at; that is where this discussion comes in, to aid the Committee in its consideration of an enlarged deportation bill.

Mr. DICKSTEIN. Mr. White, did you glance through page 5, section 19, and all the way down, to page 15, the section, we will say, referring to aliens who entered the United States at any time, at a place other than designated by the Immigration officials, etc.?

Mr. ROBE CARL WHITE. Where is that?

Mr. DICKSTEIN. That is on page 5, section 19, subdivision 2.

Mr. ROBE CARL WHITE. Yes.

Mr. DICKSTEIN. Now, let us assume that in the past 10 or 15 years men have come to this country and did not go through the proper legal steps; they have married American wives and have American children. Now, if they were found, the way the section reads, you would have a right to deport them?

Mr. HOLADAY. Mr. Dickstein, I think you failed to read the last line there.

Mr. DICKSTEIN. Who entered the United States before June 3, 1921. But I am going back 10 years before that.

Mr. HOLADAY. It would not apply to them.

Mr. DICKSTEIN. It would apply only to those who came after?

Mr. ROBE CARL WHITE. After June 3, 1921.

Mr. HOLADAY. Yes.

Mr. DICKSTEIN. What would you do in that case where the man had married and had American children, and was otherwise admissible, of good moral character, and everything else?

 Digitized by Google                    Original from
UNIVERSITY OF MINNESOTA

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 44 of 90 PageID #:2

Mr. BACON. Do you call it good moral character if they break the laws of the country by coming in, by smuggling?

Mr. DICKSTEIN. I can see the argument that they came here illegally, say, on June 4, 1921.

Mr. BACON. Since the first quota law.

Mr. DICKSTEIN. Yes; but they are otherwise fit; they are not bolsheviks; are not anarchists, and do not believe in the destruction of this Government, and they have married and have American children. What are you going to do with them?

The CHAIRMAN. Why, give them a clean bill of health and let them tell all the rest of their relatives back home how to get in the same way.

Mr. DICKSTEIN. I am only trying to get the information.

The CHAIRMAN. Well, you have got it.

Mr. DICKSTEIN. You have given it to me.

Mr. ROBE CARL WHITE. I think the circumstances of each case should govern. There are some cases in which I think an injustice would be done to aliens who are illegally in this country if we deported them. I know all along the border, in the sparcely settled districts, we have run across cases where men residing near the border have sold their belongings and come across, there was no immigration officer within many miles of them, and they drove across, and later they were picked up in the United States. There was no intention on the part of the alien to evade our laws. There are some few instances of that kind where it seems to me an injustice would be done if they were deported. I am, however, personally opposed to Congress passing a blanket law legalizing the entry of all aliens who came into this country prior to any given date.

Mr. DICKSTEIN. Prior to June 3, 1921?

Mr. ROBE CARL WHITE. I would be opposed to that, for this reason, that I think every case should be investigated, and I would much prefer that you give authority to some one to legalize their entry, after investigation.

Mr. DICKSTEIN. How about the Commissioner of Immigration, or the Department of Labor?

Mr. ROBE CARL WHITE. I think the Commissioner General of Immigration would be the proper man, of course, in whom to lodge that discretionary authority.

Mr. GOLDER. When you deport an alien, is it necessary to make some arrangement with the country from which he came?

Mr. ROBE CARL WHITE. Only to secure passports.

Mr. GOLDER. Do you ever have any difficulty in securing the approval of the country to which you intend to send him?

Mr. ROBE CARL WHITE. Oh, yes; we have questions arising all the time. We have two or three aliens in custody now who have been in custody for some time, waiting passports, because the country to which they are going refuses to issue the passport on the ground they have no record of his having been born there. We have a little child now—I have forgotton its affliction—but it is a mandatory deportation case, so far as the deportation law is concerned. The father is a naturalized citizen of the United States. The child was admitted temporarily several years ago; has been here ever since,

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d035051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

 Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

and now the laws of the country of its nativity—I think it is Poland—is such that when the father became a naturalized American citizen the child expatriated itself, and so it refuses to take her back. Under Polish laws the child is now an American citizen, and, under our laws, it is still a Polish citizen.

Mr. GOLDER. What do you do in those cases?

Mr. ROBE CARL WHITE. Well, we do not know what to do.

Mr. VINCENT. Well, is it not a fact, to be perfectly truthful about it, that the United States can not do anything about a case of that kind?

Mr. ROBE CARL WHITE. I do not know, but I am inclined to believe there is nothing we can do. I do not know.

Mr. BOX. With reference to those cases of aliens that are held in custody, the Government pays the expenses of those aliens, does it not?

Mr. ROBE CARL WHITE. Yes, where we pick them up under a deportation order.

Mr. BOX. And the ones who are to be deported, if you had to hold them six months or a year, the cost of deporting is then very much greater than if they were deported promptly?

Mr. ROBE CARL WHITE. Oh, yes indeed.

Mr. BOX. And if you had had the funds to deport those aliens immediately upon arrest, the expense would have been very much less than now?

Mr. ROBE CARL WHITE. Yes. The natural flow of deportation should continue, and it is continuing on those we are actually taking in custody. You understand, we use every method we can to avoid detention expenses.

Mr. BOX. Have you any idea now how many remained in custody on the 1st of July, this fiscal year?

Mr. ROBE CARL WHITE. I have not any figures. Mr. Wagner reminds me it was something like one thousand. You understand, Congressman, that our officers, immediately on receiving the order to cease all deportations, permitted every alien possible, to leave the jails under bond or recognizance, in order to avoid detention expense.

Mr. BOX. By that method you reduced it to what is now estimated as 1,000?

Mr. ROBE CARL WHITE. That is my recollection. I can give you the figures later if you want.

Mr. BOX. Can you give us any information about what the average cost is—I know you can not do it accurately, but the average cost—of maintaining those deportees, per man?

Mr. ROBE CARL WHITE. About 90 cents per day.

Mr. BOX. And if you had 1,000 on hand, then you would have about $900 a day expense on that account?

Mr. ROBE CARL WHITE. Yes. There is another point. In our published records, as to the number deported, no account is taken of the number picked up along our borders, who are given the opportunity of returning voluntarily. In one district last year three thousand one hundred and some odd were permitted to return in this way.

The CHAIRMAN. In what district?

Mr. ROBE CARL WHITE. In the San Antonio district.



se: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 46 of 90 PageID #:2

The CHAIRMAN. Did they go back to Mexico?

Mr. ROBE CARL WHITE. They went back to Mexico.

Mr. BOX. To what country did they go?

Mr. ROBE CARL WHITE. Mexico. They were all Mexicans. We do not permit European aliens from Mexico to return to Mexico voluntarily.

Mr. BOX. I want to get that because the committee has some matters pertaining to that very phase of the question.

Mr. ROBE CARL WHITE. Yes.

Mr. BOX. How many did you say went back voluntarily from San Antonio to Mexico last year?

Mr. ROBE CARL WHITE. It was over 3,000.

Mr. BOX. Over 3,000 that you had ordered deported, and voluntarily returned?

Mr. ROBE CARL WHITE. No.

Mr. BOX. Subject to deportation?

Mr. ROBE CARL WHITE. They were Mexicans, apprehended and subject to deportation and, rather than be detained, expressed a preference to return of their own will. They signed releases and waivers and we carted them back.

Mr. BOX. Do you actually see that they go back over the border?

Mr. ROBE CARL WHITE. Oh, yes; every one is put across and delivered to the Mexican authorities.

The CHAIRMAN. That is at Federal expense?

Mr. ROBE CARL WHITE. Yes.

Mr. BOX. Can you give any idea of the expense, roughly, of sending back that 3,000?

Mr. ROBE CARL WHITE. No. The service maintains large trucks, and when these men are apprehended, they are taken back by the truckload.

Mr. BOX. You carry them back across the Rio Grande in truckloads, then?

Mr. ROBE CARL WHITE. Yes; and they are delivered to Mexican authorities.

The CHAIRMAN. A sort of holiday trip. [Laughter.]

Mr. BACON. In addition to the 32,000 Mexicans that came in legally for permanent residence last year, how many came in illegally; have you any idea—a rough estimate?

Mr. ROBE CARL WHITE. No. That would be the wildest kind of a guess, but I think I am safe in saying since the establishment of the border patrol 75 per cent of alien smuggling across the Mexican and Canadian borders has been stopped.

Mr. BACON. Can you tell me how many Mexicans you deported last year?

Mr. ROBE CARL WHITE. I have not the figures, but they are given in the Commissioner General's annual report.

Mr. BACON. That figure would not show, however, the number of Mexicans who were politely turned back?

Mr. ROBE CARL WHITE. No; it would not.

Mr. BACON. The figures of those turned back are not in your annual report, are they?

Mr. ROBE CARL WHITE. No.

Mr. BACON. You say there were 3,000 from the San Antonio district. How many are there for the El Paso border?



Mr. ROBE CARL WHITE. I haven't the figures in my mind now, as to the entire Texas border, but the number is quite large in both the El Paso district and the California district. We have had some trouble in the California district. They are tightening upon the Mexican side as well as on the American side and there has been some objection to our returning Mexicans under a voluntary procedure.

Mr. WILSON. Now, what does he do? When you drive a truck load up to the consulate, does he refuse to receive them?

Mr. ROBE CARL WHITE. No.

Mr. WILSON. But he simply objects to it in words?

Mr. ROBE CARL WHITE. No. I remember only one objection being made, and that was in the California district. We are having quite a little difficulty in the Southern California district from our own people, who claim the law is being enforced too stringently. It seems to come principally from chambers of commerce along the border.

Mr. BACON. In other words, the people down there are looking for cheap labor?

Mr. ROBE CARL WHITE. Well, they are like the most of us, I guess; they want the law enforced when it does not affect them personally.

Mr. VINCENT. That is a uniform proposition.

Mr. BACON. Can you give the committee any information to show the number of Mexicans handled by the border patrol—not only those deported, but those turned back?

Mr. ROBE CARL WHITE. Yes, I think we have those figures. I am not sure we have them with us.

Mr. BACON. I understand.

Mr. ROBE CARL WHITE. For the last year, Mr. Wagner tells me, the persons questioned, or investigated, for the entire border, that is, for both borders, was 1,252,379; the persons detained temporarily, 9,321; persons referred to local immigrant inspector for further investigation, 14,078; persons apprehended, or assistance rendered in their apprehension, for violation of customs regulations, 1,185; aliens arrested involving seizures of vehicles or contraband goods, 536; aliens arrested on warrants, 2,847; aliens attempting to enter the United States turned back without resorting to warrant procedure, 14,711; alien smugglers captured, 331; smuggled aliens captured, 4,641; miles patroled (on foot, by vehicle, and by boat), 2,288,000.

Then in the inspection of trains, motor vehicles, etc., freight and passenger trains examined were 104,094; passengers on same, estimated, 1,553,500; automobiles and motor busses stopped and examined 418,128; boats and other means of transportation stopped and examined, 33,485. The estimated number of passengers on these automobiles, motor busses, boats, and other means of transportation were 1,543,400.

The seizures, including assistance given other officials, for violation of customs, prohibition, and immigration laws, were, automobile, 253; boats and other conveyances, 195. The value of these vehicles, including the seized contraband goods, estimated, was $475,672.

The special investigation made, such as requests by immigration officers to establish responsibility and willingness to support rela-


Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

tives applying at various ports of entry for admission into the United Statets, were 2,177.

Mr. Bacon. Now, what is the total force of your border patrol?

Mr. Robe Carl White. Four hundred and ninety-seven.

Mr. Bacon. Four hundred and ninety-seven on the Mexican and on the Canadian borders?

Mr. Robe Carl White. Yes, sir.

Mr. Bacon. On both borders?

Mr. Robe Carl White. Yes. That is the entire force. That does not mean that many men are actually patrolling it. The actual number of officers on the border patrol roll at present is 497, with a total annual salary obligation of $865,000. This leaves only $135,000 to pay for all other expenses incident to the operation and maintenance of the border patrol, which is insufficient. In order to maintain the present forces during the remainder of the year and to take care of the incidental expenses, an additional appropriation of at least $250,000 is necessary. That is a memorandum I wrote to the Secretary.

Mr. Bacon. Could we have that memorandum made a part of our record, as far as it affects the border patrol?

The Chairman. We would be very glad to have that.

(The following memorandum was submitted for the record by the Assistant Secretary:)

### IMMIGRATION BORDER PATROL

The actual number of officers on the border patrol at present is 497, with a total annual salary obligation of $865,000. This leaves only $135,000 to pay for all other expenses incident to the operation and maintenance of the border patrol, which is insufficient. In order to maintain the present force during the remainder of the year and take care of the incidental expenses. an additional appropriation of at least $250,000 is necessary.

In addition, the bureau believes that at least 200 patrol officers should be added to the force. In order to do this, it would require a further appropriation of $200,000 over and above the stated amount of $250,000. making a total of $450,000, and if the border patrol is to function at all in a reasonable manner. a supplemental appropriation in the latter amount should be granted to this branch of the service.

### CHARACTER OF WORK

| | Number |
|---|---|
| Persons questioned or investigated | 1, 252, 379 |
| Persons detained temporarily | 9, 321 |
| Persons referred to local immigrant inspector for further investigation | 14, 078 |
| Persons apprehended (or assistance rendered in their apprehension) for violation of customs regulations | 1, 185 |
| Aliens arrested involving seizure of vehicles or contraband goods | 536 |
| Aliens arrested on warrants | 2. 847 |
| Aliens attempting to enter the United States turned back without resorting to warrant procedure | 14. 711 |
| Alien smugglers captured | 331 |
| Smuggled aliens captured | 4. 641 |
| Miles patrolled (on foot, by vehicle, and by boat) | 2, 288, 000 |

### INSPECTION OF TRAINS, MOTOR VEHICLES, ETC.

| | |
|---|---|
| Freight and passenger trains examined | 104, 094 |
| Passengers on same, estimated | 1. 553, 500 |
| Automobiles and motor busses stopped and examined | 418, 128 |
| Boats and other means of transportation stopped and examined | 33, 485 |
| Passengers on above | 1, 543, 400 |


Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.319510035061758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

SEIZURES (INCLUDING ASSISTANCE GIVEN OTHER OFFICIALS) FOR VIOLATION OF CUSTOMS, PROHIBITION, AND IMMIGRATION LAWS

|  | Number |
|---|---|
| Automobiles | 253 |
| Boats and other conveyances | 195 |
| Value of above, including seized contraband goods, estimated | $475,672 |
| Special investigations made, such as requests by immigration officers to establish responsibility and willingness to support relatives applying at various ports of entry for admission to the United States | 2,177 |

Mr. GOLDER. Did I understand you to say, in your judgment, there are about 250,000 aliens now in the United States deportable under the existing laws?

Mr. ROBE CARL WHITE. That is the judgment of the district directors, in all of the districts, which meets with my approval. I believe they are conservative in that.

Mr. GOLDER. I understand Mr. Hull to say that the average cost of deportations is about $89; is that correct?

Mr. ROBE CARL WHITE. Yes; $87.

Mr. GOLDER. That was the average, I understood. Now, does that include the cost of office work connected therewith?

Mr. ROBE CARL WHITE. Oh, no.

Mr. GOLDER. Or is it merely the cost of transportation?

Mr. ROBE CARL WHITE. No.

Mr. BACON. It does not include the cost of investigating and making the surveys?

Mr. ROBE CARL WHITE. It does not include what I call the overhead—the salaries, office expenses, etc.

Mr. GOLDER. Adding, then, the cost of investigation and other incidental expenses, it would cost close to $25,000,000 to deport those now subject to deportation under existing law?

Mr. ROBE CARL WHITE. Something like that. It would extend, of course, over a period of years; you will not get them all at one time.

Mr. BOX. Now, then, this 14,000 that you say returned voluntarily and you carried back, you carried them to the border and there unloaded the truck?

Mr. ROBE CARL WHITE. We turned them over to the Mexican officials.

Mr. BOX. But you have no method, then, of telling what became of them, after they got across the border?

Mr. ROBE CARL WHITE. No.

Mr. BOX. And if they were smuggled back into the country, they would have to be detected?

Mr. ROBE CARL WHITE. Oh, we have picked up some who have been in before, but the number is not large.

Mr. VINCENT. Are you correct in saying you turned them over to the Mexican consul?

Mr. ROBE CARL WHITE. The Mexican immigration officials at the port. They all go to some port of entry. Most of those were turned over at Laredo, Eagle Pass, and Brownsville, in the Texas territory.

The CHAIRMAN. Now, I want to ask you in regard to the overseas deportations under a limited policy. I assume you first look after those who have served sentences for crime?

Mr. ROBE CARL WHITE. Yes; we try to empty the institutions.

The CHAIRMAN. And you have a pretty good system of keeping in touch with the State officials?

Mr. ROBE CARL WHITE. We have direct contact with some of them and rely upon the State officials to advise us. Some of the States have laws requiring State officials to notify the Immigration Service of all aliens confined in their institutions; others do not.

The CHAIRMAN. Now, then, your next line: Is that likely to be the alien insane?

Mr. ROBE CARL WHITE. Well, they are generally in the institutions, you know.

The CHAIRMAN. And you clean out the institutions first?

Mr. ROBE CARL WHITE. Yes.

The CHAIRMAN. Then you take care of the most pressing cases that come under the observation of your inspectors?

Mr. ROBE CARL WHITE. Yes.

Mr. FREE. Is the literacy test being applied strictly along the Mexican border now?

Mr. ROBE CARL WHITE. Much more so than ever before in the history of immigration. That is one of the reasons for the great decrease in the number of Mexicans coming in legally through our ports. That is one of the things they object to all along the border having the literacy test enforced.

Mr. BOX. They object to the head tax too, do they not?

Mr. ROBE CARL WHITE. Well, I have never heard of an objection coming from our people with reference to the head tax, but it may come from some of the Mexicans themselves.

Mr. BACON. Who is it that objects—the large employers of labor?

Mr. ROBE CARL WHITE. No, I have never had any objection from the large employers of labor. It is mostly from the chambers of commerce, whoever they represent.

Mr. FREE. I can answer that question, Mr. Bacon. Take the beet-sugar people, for instance: They are very anxious to get Mexicans to work in the beet fields.

Mr. BACON. I suppose that is true of the silver and lead mines?

Mr. FREE. Not so much so. I am speaking now of California. But there is a concerted effort on behalf of most of the beet-sugar factories to get in Mexicans to do that work. I understand in the old days they used to bring them in and then pass them back, and there was sort of a string coming and a string going.

Mr. ROBE CARL WHITE. Mr. Chairman, I would like to ask if it is possible or is it advisable for a section to be added to your deportation law giving the Immigration Service authority to forfeit and use vehicles captured from smugglers of aliens.

The CHAIRMAN. Yes, and I think, if we are not able to prepare a deportation law quickly, that should be sent in as a separate resolution.

Mr. ROBE CARL WHITE. I would be glad to have this done. The Customs Service, the Prohibition Service, can use automobiles seized by their service. We are unable to use a one; we can not even pay for gasoline to run one of them, and the result is that we are confined to the sum of $80,000 for care and maintenance and purchase of vehicles, which is entirely inadequate to properly equip the border patrol.


Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 51 of 90 PageID #:2

Mr. BACON. I should think even General Lord could understand that 475 men could not patrol 6,000 miles of border on foot.

Mr. ROBE CARL WHITE. Here is the problem—I want to be fair: The Customs Service are probably asking General Lord, or the Budget Committee, for money to equip and keep a patrol in the same district in which you are keeping an immigration patrol. I happen to know that is true, and I think the time is coming when it will be necessary for Congress to place control of the border patrol in some one place and not have a dual patrol. In my opinion the entire border outside of ports of entry at least should be placed under the Commisioner General of Immigration. Almost any man can detect a case of liquor or narcotics, or goods of any kind, and turn them over to the proper authorities, but it is only the trained immigration officer who can decide whether a person has the right to enter the United States. And without a trained man to deal with the human traffic across our borders you will soon run into many difficulties.

Mr. BACON. It is much cheaper to stop the smuggling of aliens at the border than it is to send them back after they once get in?

Mr. ROBE CARL WHITE. Oh, yes.

Mr. BACON. In other words, to increase your border patrol is in the interest of real economy?

Mr. ROBE CARL WHITE. Yes.

Mr. DICKSTEIN. How many Mexicans came in legally to the United States in 1925?

Mr. BACON. Thirty-two thousand plus immigrants for permanent residence.

Mr. DICKSTEIN. Legally came in?

Mr. BACON. Legally; absolutely.

Mr. WHITE. As I understood you, you say there have been 14,000 apprehended on the Mexican border, who had elected to go back without proceedings?

Mr. ROBE CARL WHITE. On both borders. Very few on the Northern border.

Mr. WHITE. Have you any information which you could submit to the committee, even approximately, of how many of these Mexicans entered surreptitiously to perform seasonal work, or for other purposes, and voluntarily returned, or stayed until they were apprehended or investigated?

Mr. ROBE CARL WHITE. I do not believe, Mr. White, I have any information on that. We, of course, have not endeavored or attempted to interfere with legitimate business along the border any more than we have to.

Mr. WHITE. Are they mainly laborers who elect to go back without proceedings, as a rule?

Mr. ROBE CARL WHITE. I judge so. But, of course, I can not say without referring to our records.

The CHAIRMAN. Now, I want to ask Mr. Hull a question, and that is this: Have you had occasion to deal to any extent with persons admitted under a bond—visitors whose time has expired and who who have to go out?

Mr. HULL. Oh, we have that, of course, very often.

Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 52 of 90 PageID #:2

The CHAIRMAN. Is that going to require inquiry and investigation by the Immigration Service?

Mr. HULL. I think the time will come, probably, that we will have to have a little more efficiency, but we have a fairly efficient system. That, of course, is taken care of by the different districts. You know the country is divided into 35 districts.

The CHAIRMAN. It means ultimately an enlargement of the activities of the Immigration Service with a view to enforcing embarkation, in some cases?

Mr. HULL. I presume there will have to be some more efficient systems adopted, perhaps, but I think it is fairly efficient now, as far as the giving of bonds at the port for coming in as tourists or visitors is concerned.

The CHAIRMAN. Have we proceeded far enough so that you have had to proceed to enforce the collection of bonds?

Mr. HULL. Oh, yes. We have to proceed to enforce the collection of bonds very often.

The CHAIRMAN. In the case of visitors?

Mr. HULL. In the case of visitors or tourists, or something. I do not know exactly which they were. I say, "very often;" I do not mean a whole lot of cases, but they do come up, where we have to breach the bond.

The CHAIRMAN. Now, let us see what the procedure is: After you forfeit the bond, do you then proceed to look for the person who was admitted as a visitor and who has forfeited his bond?

Mr. HULL. We certainly do. We try to apprehend them. They are sometimes out of the country. We have all angles to that. We have cases very often where they claim the man went out, and he has gone, and the bond has been fulfilled; but we usually breach the bond, just the same, because we have no evidence.

The CHAIRMAN. What I am trying to get is whether or not the forfeiture of bonds for visitors will enlarge the necessity for deportation, as time grows on.

Mr. HULL. Of course, that depends; I think, perhaps, when they find out that the bond will be enforced thoroughly, they will probably protect themselves by complying with the bond.

The CHAIRMAN. It has not become an acute matter as yet in deportation?

Mr. HULL. Oh, no. We can handle the bond question. I, myself, think it is a very good way to protect the Government against aliens staying here. I wish we had authority in some cases where we do not have authority, especially in the case of students.

The CHAIRMAN. To exact bonds?

Mr. HULL. To exact bonds. I think you will have to come to that.

Mr. Box. In what cases and under what circumstances can you do it now, in the cases of visitors and students?

Mr. HULL. As I understand it, you can not exact a bond for a student. You can exact a bond for people who are liable to become a public charge at the ports.

Mr. Box. You do not do that, though, as to ordinary visitors and commercial people, and people of that class?

Mr. HULL. Oh, certainly not; not ordinarily. It is only when suspicious parties are coming here and liable to become a public

 Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

se: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 53 of 90 PageID #:2

charge, or liable to try to stay in the country, or something like that. Then the ports usually protect themselves by exacting a bond.

The CHAIRMAN. Now, I want to ask you a question on an entirely different matter. Do you know how it comes that the immigration inspectors are started on a base pay of $140 per month? While the customs inspectors are started on a base pay of $150 a month?

Mr. HULL. No, sir; I do not know. I would like to know.

The CHAIRMAN. Has the department made any recommendations that would result in correcting that inequality?

Mr. HULL. As I understand it, they have, but they have not been able to do it.

The CHAIRMAN. Do you know with what result?

Mr. HULL. They have not been able to do it.

Mr. BACON. Who has the power to correct that?

Mr. ROBE CARL WHITE. The Secretary. Our entrance pay for immigrant inspectors is $1,860, now.

The CHAIRMAN. Has it been raised?

Mr. ROBE CARL WHITE. Yes.

Mr. WAGNER. I do not know about the customs, but I think some misunderstanding exists from the fact our officers received the $240 bonus in addition to their base pay prior to July 1, 1924, and a great many inspectors said they got $1,500 when they were getting $1,740, or something like that. But since July 1, 1924, $1,860 has been the entrance salary for immigration inspectors, and $1,680 for patrol inspectors.

Mr. BACON. The Secretary of Labor could increase the base pay?

Mr. WAGNER. He can.

Mr. BACON. But he would have to get the approval of the Budget?

Mr. WAGNER. No, sir.

Mr. ROBE CARL WHITE. No, sir; but he would have to get the money to pay them.

Mr. VINCENT. And it is the failure to get the money to pay them that has prevented you from increasing the base pay?

Mr. ROBE CARL WHITE. We have not been able to make promotions, except in individual cases, for two years, and we have many men in the service who ought to be promoted, in justice to them and to work they are doing.

The CHAIRMAN. Will you place in the record, at this place, if you can ascertain, the base pay of the various inspectors in the various services of the United States; that is, in the customs, immigration, meat inspection, and any others?

Mr. ROBE CARL WHITE. I think I can do that.

(The information above called for is as follows:)

| | Per annum |
|---|---|
| Immigration patrol inspector | $1,680 |
| Immigrant inspectors | 1,860 |
| Customs patrol inspectors | 1,700 |
| Deputy collector inspectors | 1,700 |
| Quarantine inspectors, Department of Agriculture | 1,860 |

Mr. WHITE. If I understood you right, Mr. Hull, you said part of the $600,000 supplemental appropriation would be applied to patrol expenses, and I would like to ask you if sufficient of that $600,000 supplemental appropriation could be applied to deportations; that is, to the strictly deportation work, to keep your work current for the balance of the year?

 Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.319510035051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google

Mr. HULL. Why, no, not current; you can not do it.

Mr. WHITE. Well, how much would it lack?

Mr. HULL. Well, we have asked for $250,000 more than they gave us, and that would not keep us up to what we might be doing; but it would probably be as near as we can figure what we can use efficiently. You can try to spend too much money.

Mr. WHITE. Yes.

Mr. HULL. If you want to.

Mr. WHITE. Without anticipating any raise in the pay of your inspectors and agents, would you then be able to apply enough of the $600,000 supplemental appropriation to the distinct work of deportation, as you have outlined it here, to keep the work reasonably current?

Mr. HULL. No, sir.

Mr. WHITE. You could not?

Mr. HULL. No, sir.

The CHAIRMAN. I want to ask you this: In your opinion, would a sufficient sum, to take care of double the number of deportations we now have, effect a saving in the long run to the Government, through reducing activities in the Federal courts for the prosecution of aliens for liquor violations and narcotic violations and criminal proceedings of every kind?

Mr. HULL. I think that the deportation of these people in an economic proposition and that it should be done as fast as it can be done efficiently.

The CHAIRMAN. It is the place to start, for real economy, is it not?

Mr. HULL Yes; it is the place to start for real economy. As to whether if you would spend a million dollars in deporting, you would save that in court cases, I would not want to go on record.

The CHAIRMAN. Now we have one letter right to the point. Here is a man who writes from El Paso, on the 6th of January, and says:

> With great bunches of men standing in front of the entrance to the Southern Pacific yards here this a. m. wanting work, and this is one day out of the year, with 86 per cent of the defendants in Federal court here aliens, of the bootleg variety, and the thief kind, with 76 per cent of the defendants in the several District courts here aliens, of the bootleg class and criminal kind—

And then he goes on to make an appeal for effective deportations that will reduce the activities in the courts, and I believe he is giving the key as to where we should begin to spend money to save the expansion and congestion in other activities in the Government.

Mr. HULL. I think he is right.

Mr. Box. I have some letters, Mr. Chairman, just like that.

The CHAIRMAN. I am going to put this letter in the record.

(The letter above referred to is as follows:)

EL PASO, TEX., *January 6, 1926.*

Hon. ALBERT JOHNSON,
*Washington, D. C.*

DEAR SIR: I am writing this in defense of restricted immigration. Why leave the back door of Mexico open? To leave the back door of Mexico open, of itself will paralyze the European quota law, by virtue of the fact that they come to Mexico when they feel like it and bootleg themselves in the United States when they get hungry.

With great bunches of men standing in front of the entrance to the Southern Pacific yards here this a. m. wanting work, and this is one day out

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.31951d035051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



of the year; with 86 per cent of the defendants in Federal court here aliens, of the bootlegged variety and the thief kind; with 76 per cent of the defendants in the several district courts here aliens of the bootlegged class and criminal kind, 86 bales of cotton was ginned off of my farm last year. I have a valley farm 20 miles from El Paso.

With 67 American families coming into the Mesilla Valley during 1925, all farmers, all bought land and were living on it January 1, 1926, the foreigners are being shipped out bodily; I beg to suggest that more Americans be allowed to come here, instead of the scoff and scum, the mongrel, the bootlegger element, from Mexico, which is composed of the riff raff of southern Europe.

As for a labor shortage, I did not have any trouble last year; I have never had any trouble with the labor question. I could get 10 times the labor that I want, and get it in 10 minutes at that, with great bunches of men standing around all over this town, any day and every day the year around.

With hundreds of Americans here staggering under the enormous burden of taxation—the limit, it can not be raised any more—trying to Americanize these aliens against their will. I have just made a call. It was a two months old baby. It had inherited syphilis and will die. It belongs to an alien woman. Another evidence of the cross section of the aliens that come here.

Put Mexico under the rule, certainly so, and deport all undesirable citizens; forfeit all naturalization papers obtained through fraud, and then two of the three district judges here can go on leave of absence for an indefinite time; the Federal judge can go fishing for six months, if he likes. The courts here are waterlogged with alien business. Take them out of here; send them home; we can cut taxes in 30 days and a 90 per cent perfect enforcement of the eighteenth amendment will be possible in 24 hours.

The citizens in the lower valley are fighting the Hindoo now.

     Very truly yours,

                                    ———— ————.

---

The CHAIRMAN. Now, when you talk of deporting 250,000 persons (and I assume that number does not contemplate those who have come here in the long years past without certificates of arrival), I assume a deportation, we will say, of 25,000 a year, of the flagrant cases, would act as a deterrent and reduce Federal activities along all other lines?

Mr. HULL. Will you allow me to suggest I think Mr. White, in his answer, might have been misunderstood. I think he was correct; I think the surveys made by the district directors brought forth this fact. When I asked for it, I divided it into two classes; those that came in before June 3, 1921, and those that came in since June 3, 1921.

The CHAIRMAN. Yes.

Mr. HULL. And the 250,000 Mr. White mentioned applied to those that apparently had come in since June 3, 1921.

Mr. ROBE CARL WHITE. I did not know that.

Mr. BOX. That did not apply to the great number back of that date?

Mr. ROBE CARL WHITE. No.

Mr. HULL. Now, I have been quoted, and I think every member of the Department of Labor has been quoted, as to the number of aliens here who came in before June 3, 1921. That is a very important question, and I have noticed by some of the questions you are interested in that, and what we are doing with it. Now, nobody knows how many there are.

Mr. BOX. You mean those that came illegally?

Mr. HULL. Yes.



Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 56 of 90 PageID #:2

Mr. Box. All of them?

Mr. Hull. No; they did not come legally, they are illegally in this country.

Mr. Box. That is what I mean—illegally.

Mr. Hull. Illegally in this country, but it is a technical question.

Mr. Box. About what is that number, as a rough outline?

Mr. Hull. Nobody knows. The only basis that we have, so far as we know, for the computation is, in the applications for reentry permits, about 20 per cent, so far, have been rejected, if I remember rightly, for lack of verification at the ports or wherever they filed. Now you apply that on through the number of aliens that we know are in the country, and you can make a rough guess and it will run you over 1,300,000. That, probably, is too many, but it may be right. It may be less; we do not know.

The Chairman. That would apply to all the people who are here and unable to prove legal entry into the United States?

Mr. Hull. And the payment of the head tax and inspection.

Mr. Box. That is all prior to June 3, 1921.

Mr. Hull. They came in before June 3, 1921. Now those people are all kinds. Some of them are the nicest people in the world. We have those cases every day, and I have on my desk now a letter from a man who has been voting right along, illegally in the country.

Mr. Bacon. How did he become a citizen?

Mr. Hull. I do not know.

Mr. Bacon. Or didn't he become a citizen? Perhaps he was voting without becoming a citizen.

Mr. White. I would like to answer that question. We had a case in my neighborhood of a German who had come to this country possibly 45 or 50 years ago, possibly longer; his children were born here, but it transpired, during the war, that he had neglected to take all the steps necessary to become a citizen. He had been voting for years and years, was counted as a citizen in the general estimate of the people; his children were born here, but during the war he was apprehended and he was compelled to go to Kansas City, 250 miles, to establish the fact and circumstances. That answers the question.

The Chairman. And, further, until very recently, quite a number of States permitted them to vote, on taking out their first papers. Now there is only one State that does that.

Mr. Robe Carl White. Of the total number of permits, since we had a law permitting us to grant them, 178,195 have been refused because of failure to verify their landings.

Mr. Bacon. That is a permit for what?

The Chairman. A permit to go out of the country and return.

Mr. Robe Carl White. Now, then, I want to put one more item in the record. The revenue derived by our Department for the issuance of permits, to date, is $360,920.11.

The Chairman. To the end of the fiscal year, or to date?

Mr. Wagner. That is up to date, December 31, 1925.

The Chairman. With about 20 per cent of the applicants unable to secure those permits to travel abroad and return, because they could not prove legal entry into the country?

78672—26——3

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 57 of 90 PageID #:2

Mr. ROBE CARL WHITE. Yes; unable to get permits, and yet we have received three hundred and sixty odd thousand dollars from that source.

The CHAIRMAN. Has you department got together and discussed the advisability of increasing the head tax? Has that ever been discussed down there?

Mr. ROBE CARL WHITE. Only incidentally.

The CHAIRMAN. I believe that is all. I am sorry we were unable to give Mr. Hull more time.

Mr. WHITE. There is one question I would like to ask. Some allusion has been made to the making of a survey or appraisal of the number of deportable aliens in certain districts—the total number. That would include those who had not been taken into custody, and you used the word "survey" in speaking of the reports, as I understood you, I think, of your superintendents or directors, in certain districts, and I want to ask you, Mr. Hull, if you think it would be possible to make the duty of making that survey supplemental to the duties of your present agents in those districts, so as not to require a large number, or any number, for that matter, of additional employees?

Mr. HULL. If you did so with any efficiency, you would have to provide the money. You can not do it without providing the money. Now, we say "survey"; it is more an estimate by the districts.

Mr. WHITE. Yes.

Mr. HULL. And it varies. You can say it was not accurate, it was nothing more than a mere approximate guess. Now, if you make a survey, you have to provide the money for makng that survey. We have no men at the present time to do the work. Our personnel is cut to the very bone and I want to reiterate what Mr. White said, that they are very much underpaid and very much overworked.

Mr. WHITE. It would occur to most any mind that those agents are engaged in that very work now, the apprehension of those men on complaint or evidence furnished, and would not these deportable alens come under their notice constantly from day to day?

Mr. HULL. No; not in a great district like we have; they do not come under their notice.

Mr. BOX. You did not employ any extra men to make this survey; it was all done about the time you had in mind, I understand?

Mr. WHITE. Yes; I understand.

Mr. HULL. Simply a request from the office, to send us the information they have. I sent out the request myself, for my own information. I do not place a great deal of reliance on it, I want to say, for fear anybody starts up any scare stories about our going out and trying to deport a lot of people who have been here. We have not been trying to deport anybody who came in before June 3, 1921, unless there is good cause, but there are a lot of people in this country who ought to have their records straightened out.

Mr. DICKSTEIN. How about those who came here prior to June 3, 1921? They can not become citizens?

Mr. HULL. They can not until their records are straightened out. That is one reason we are asking for a registration law, so that those aliens can be taken care of and be registered.



Digitized by Google                    Original from
                              UNIVERSITY OF MINNESOTA

Case: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 58 of 90 PageID #:2

Mr. DICKSTEIN. Why not legalize those who came here prior to June 3, 1921, if they are otherwise admissible, if they are of good moral character, and fit in with the standards of the United States and would make good American citizens?

Mr. HULL. As we come to them, we are trying to take care of them ourselves; but, as Mr. White has said, it would be the mistake of mistakes for Congress to try to pass a blanket act, because you do not want to legalize a lot of people who ought not to be here.

Mr. DICKSTEIN. That blanket act, or any act, no matter what the act should be, should have some qualification giving power to the Secretary of Labor, that if that person who came here illegally was otherwise fit and admissible, he could be permitted to stay.

The CHAIRMAN. That is section 1 of the proposed registration bill that will be before the committee in the course of time, to find and provide a place where those domiciled in the country would have a place to permit them to naturalize and allay the fear there would be a gigantic deportation.

Mr. HULL. I think you can do no better work, in my opinion, than to straighten that matter out.

Mr. DICKSTEIN. I think so.

The CHAIRMAN. We are very much in sympathy with the suggestion you made, and I think the committee will approve an effort to bring up, immediately before the appropriation act, a resolution that would authorize the use of seized vehicles.

Mr. BOX. I understand that is done in other services now. I think Congress took some action in reference to that at the last session.

Mr. HULL. It has been done.

The CHAIRMAN. It went out of one of the bills passed this year on a point of order, for the reason it had been put in irregularly, and I think this committee should endeavor to pass a resolution immediately to take care of that.

Mr. ROBE CARL WHITE. We asked the Budget committee to put it in the appropriation act, but they said it should be separate legislation.

The CHAIRMAN. We will now adjourn until 10.30 o'clock to-morrow morning.

·(Thereupon, at 12 o'clock noon, the committee adjourned until to-morrow, Wednesday, January 13, 1926, at 10.30 o'clock a. m.)

Generated at Indiana University on 2022-02-09 19:48 GMT / https://hdl.handle.net/2027/umn.319510835051758
Public Domain, Google-digitized / http://www.hathitrust.org/access_use#pd-google



Digitized by Google

Original from
UNIVERSITY OF MINNESOTA

# EXHIBIT I

Hearings Before the Committee On Immigration and Naturalization On Seasonal Agricultural Laborers From Mexico Held On January 28 and 29, February 2, 9, 11, and 23, 1926

# SEASONAL AGRICULTURAL LABORERS FROM MEXICO

106
363

# HEARING



### BEFORE

# THE COMMITTEE ON
# IMMIGRATION AND NATURALIZATION
# HOUSE OF REPRESENTATIVES

## SIXTY-NINTH CONGRESS

### FIRST SESSION

### JANUARY 28 AND 29, FEBRUARY 2, 9, 11, AND 23, 1926

#### STATEMENTS OF

| | | |
|---|---|---|
| S. P. FRISSELLE | CHARLES BAYER | ADDISON T. SMITH |
| T. A. SULLIVAN | E. K. CUMMING | CHARLES E. WINTER |
| C. S. BROWN | E. J. WALKER | AUGUST H. ANDRESEN |
| S. MASTON NIXON | E. F. HECKMAN | HARRY AUSTIN |
| D. A. BANDEAN | S. R. McLEAN | EDWARD T. TAYLOR |
| FRED CUMMINGS | L. B. TOMPKINS | ROY O. WOODRUFF |
| I. D. O'DONNELL | JOHN N. GARNER | GILBERT N. HAUGEN |
| C. V. MADDUX | CARL HAYDEN | SCOTT LEAVITT |
| T. W. TOMLINSON | GUY U. HARDY | C. B. HUDSPETH |
| J. T. WHITEHEAD | OLGER B. BURTNESS | EDGAR WALLACE |
| W. J. BREAKENRIDGE | JOSEPH J. MANSFIELD | JOHN C. BOX |
| HOWARD OTTINGER | CHARLES B. TIMBERLAKE | |

#### ON

## H. R. 6741, H. R. 7559, H. R. 9036

#### HEARING No. 69.1.7



WASHINGTON
GOVERNMENT PRINTING OFFICE
1926

83947

Digitized by Google

## COMMITTEE ON IMMIGRATION AND NATURALIZATION

### HOUSE OF REPRESENTATIVES

#### SIXTY-NINTH CONGRESS

ALBERT JOHNSON, Washington, *Chairman*

J. WILL TAYLOR, Tennessee.
HAYS B. WHITE, Kansas.
ARTHUR M. FREE, California.
WILLIAM P. HOLADAY, Illinois.
BIRD J. VINCENT, Michigan.
WILLIAM I. SWOOPE, Pennsylvania.
ROBERT L. BACON, New York.
THOMAS A. JENKINS, Ohio.
BENJAMIN M. GOLDER, Pennsylvania.

ADOLPH J. SABATH, Illinois.
RILEY J. WILSON, Louisiana.
JOHN C. BOX, Texas.
SAMUEL DICKSTEIN, New York.
SAMUEL RUTHERFORD, Georgia.
JOHN W. MOORE, Kentucky.

———— ————

P. F. SNYDER, *Clerk*

II

MAY 1 4 1927

Da: . .


Digitized by Google

# CONTENTS

Statements of—                                                          Page
August H. Andresen------------------------------------------------------ 249
Harry Austin------------------------------------------------------------ 250
D. A. Bandean---------------------------------------------------------- 52
Charles Bayer---------------------------------------------------------- 128
John C. Box------------------------------------------------------------ 323
W. J. Breakenridge----------------------------------------------------- 113
C. S. Brown------------------------------------------------------- 32, 183
Olger B. Burtness------------------------------------------------------ 203
E. K. Cumming---------------------------------------------------------- 137
Fred Cummings------------------------------------------------- 60, 98, 173
S. Parker Frisselle---------------------------------------------------- 4
John N. Garner--------------------------------------------------------- 188
Guy U. Hardy----------------------------------------------------------- 202
Gilbert N. Haugen------------------------------------------------------ 279
Carl Hayden------------------------------------------------------------ 190
E. F. Heckman---------------------------------------------------------- 154
C. B. Hudspeth--------------------------------------------------------- 287
Scott Leavitt---------------------------------------------------------- 281
S. R. McLean----------------------------------------------------------- 177
C. V. Maddux------------------------------------------------- 81, 102, 233
Joseph J. Mansfield--------------------------------------------- 212, 231
S. Maston Nixon---------------------------------------------- 41, 83, 97
I. D. O'Donnell---------------------------------------------------- 78, 83
Howard Ottinger-------------------------------------------------------- 124
Addison T. Smith------------------------------------------------------- 220
T. A. Sullivan--------------------------------------------------------- 27
Edward T. Taylor------------------------------------------------------- 259
Charles B. Timberlake-------------------------------------------------- 215
T. W. Tomlinson-------------------------------------------------------- 98
L. B. Tompkins--------------------------------------------------------- 176
E. J. Walker----------------------------------------------------------- 148
Edgar Wallace------------------------------------------------- 97, 98, 295
J. T. Whitehead-------------------------------------------------------- 102
Charles E. Winter------------------------------------------------------ 226
Roy O. Woodruff-------------------------------------------------------- 271

III

Digitized by Google

Digitized by Google

# SEASONAL AGRICULTURAL LABORERS FROM MEXICO

HOUSE OF REPRESENTATIVES,
COMMITTEE ON IMMIGRATION AND NATURALIZATION,
*Washington, D. C., January 28, 1926.*

The committee met at 10.30 a. m., Hon. Albert Johnson (chairman) presiding.

The CHAIRMAN. The committee will be in order. I find on the calendar of bills introduced and referred to this committee a bill (H. R. 6741) by Representative Box, to amend the immigration act of 1924 by making the quota provisions thereof applicable to Mexico, Cuba, Canada, and the countries of continental America, and adjacent islands.

You will find also a bill (H. R. 7559) by Mr. Bacon, also a member of this committee, to amend section 4 of the immigration act of 1924, by amending it to read as follows:

An immigrant who was born in the Dominion of Canada, Newfoundland, the Republic of Cuba, the Republic of Hayti, the Dominican Republic, the Canal Zone, or an independent country of Central or South America, and his wife and his unmarried children under eighteen years of age, if accompanying or following to join him.

Without reading those bills, the purpose is clear, and I will put the full text in the record.

[H. R. 6741, Sixty-ninth Congress, first session]

A BILL To amend the immigration act of 1924 by making the quota provisions thereof applicable to Mexico, Cuba, Canada, and the countries of continental America and adjacent islands

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That section 4 of the immigration act of 1924 be amended by the repeal of the following language constituting subdivision (c) thereof: " An immigrant who was born in the Dominion of Canada, Newfoundland, the Republic of Mexico, the Republic of Cuba, the Republic of Haiti, the Dominican Republic, the Canal Zone, and his wife, and his unmarried children under eighteen years of age, if accompanying or following to join him ; " and by the redesignation of subdivisions (d) and (e) thereof as (c) and (d), respectively.

That subdivision (c) of section 11 of said immigration act of 1924 be amended by the repeal of the following language therein: " (except the geographical areas specified in subdivision (c) of section 4)."

That subdivision (d) of section 11 of said immigration act of 1924 be amended by the repeal of the following language therein: "(1) immigrants from the geographical areas specified in subdivision (c) of section 4 or their descendants," and by the renumbering of clauses (2), (3), and (4) thereof as (1), (2), and (3), respectively.

[H. R. 7559, Sixty-ninth Congress, first session]

A BILL To amend section 4 of the immigration act of 1924

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That subdivision (c) of section 4 of the immigration act of 1924 is amended to read as follows:

" (c) An immigrant who was born in the Dominion of Canada, Newfoundland, the Republic of Cuba, the Republic of Haiti, the Dominican Republic,

1

Digitized by Google

the Canal Zone, or an independent country of Central or South America, and
his wife and his unmarried children under eighteen years of age, if accompany-
ing or following to join him;"

SEC. 2. This act shall take effect on July 1, 1926.

Another proposition is before the committee and not in the form of
a bill, to the effect that the quota provisions of the act of 1924 be
extended to the independent countries of North America, Central
America, and South America.

Mr. BOX. That would make it applicable to Mexico?

The CHAIRMAN. Yes; all independent countries. The theory of
that suggestion is that certain dependencies in the West Indies draw
their quota portions from the mother countries, and that the inde-
pendent countries might be placed under the quota.

In this connection the chairman has received for distribution to
the committee the resolutions of the National Woolgrowers at its
sixty-first annual meeting, as follows:

Whereas a resolution has been introduced into the House of Representatives
by Congressman Box, of Texas, the number of the resolution being 674; and

Whereas, if said resolution is adopted, it will so amend the immigration act
of 1924 as to close all doors against Mexican labor; and

Whereas it is imperative that the great Southwest must have Mexican labor
for cotton and other crops as well as common labor for railroads and mines.
It is also well known that in the sheep industry all of the herders and other
common labor are Mexicans, and the passage of Resolution 6740 will create
stagnation and be of incalculable injury to the industries of the West: There-
fore be it

*Resolved,* That the National Wool Growers, at its sixty-first annual meeting
duly assembled, hereby protests against the passage of House Resolution 6740
as being inimical to the best interests of the wool industry and respectfully
ask that the same be defeated.

The president and secretary of this association are hereby directed to send
this protest immediately to the Speaker of the House, with the request that
the same be presented at the hearing on this matter to be held in Washington
on January 28, 1926.

Without objection, those resolutions will be placed on the record.

The chairman has a list of the witnesses who have appeared here
to discuss the problem from several Western States, witnesses who
will appear in behalf of the agricultural interests, as follows:

Mr. S. P. Frisselle, Kearney Park, Calif., on behalf of the farmers
of California.

Mr. T. A. Sullivan, East Grand Forks, Minn., representing the
farmers of the Red River Valley of Minnesota and North Dakota.

Mr. C. S. Brown, of Phoenix, Ariz., representing the farmers of
Arizona.

Mr. S. M. Nixon, Robstown, Tex., representing the farmers of
southeast Texas.

Mr. C. B. Yandell, San Antonio, Tex., representing San Antonio
Chamber of Commerce.

Mr. D. A. Bandeen, El Paso, Tex., representing the border
chambers of commerce.

Mr. Fred Cummings, Fort Collins, Colo., representing Colorado
farmers.

Mr. I. D. O'Donnell, Billings, Mont., representing farmers of
Wyoming and Montana.

Mr. J. T. Whitehead, Mitchell, Nebr., representing the farmers of
Nebraska.

Mr. W. J. Breakenridge, Emmittsburg, Iowa, representing the farmers of Iowa.

Mr. Howard Ottinger, Chaska, Minn., representing the farmers of Minnesota.

There are other witnesses whose names will appear from time to time, and without objection we will put that list in the record.

How shall we arrange as to who we shall hear first? We have not a great deal of time.

Mr. TAYLOR (Congressman from Colorado). I do not know what the procedure of the committee will be, whether or not the proponents of the Box bill, H. R. 6741, desire to be heard at this time or whether you will hear this delegation of farmers principally and the representatives of the farmers from these 15 or 20 States who are here in the room at the present time.

The CHAIRMAN. I believe it was agreed when this date was set that we would hear those who were assembled here, or as many as we could, and the committee would proceed to determine on a line of action after that.

Mr. TAYLOR of Colorado. My understanding was in my conference with you that you would give these gentlemen an opportunity to be heard at this time, and if necessary extend the hearing until to-morrow, if required.

The CHAIRMAN. Yes. Just as much time as we can spare.

Mr. TAYLOR of Colorado. Yes. And as far as I am concerned and as far as I know it is entirely informal, and I assume that the committee wants to hear the conditions that prevail in these various 10 or 12 States concerning this matter of agricultural labor and seasonal agricultural help, and this is a tentative list that they have presented, and there will be a number of others. There is no disposition at this time by any Congressman from any State to take up any of your time—at least, not until after this hearing is over—but we want to present these direct representatives of these people.

The CHAIRMAN. In that connection I notice in the room Representative Garner, Representative Knutson, and several others, and a number of the Members of the House have spoken to me about this matter.

Mr. TAYLOR of Colorado. There are a number of Members of the House that desire to be heard, but we think that all of these gentlemen who have come from one to three thousand miles to be here that they ought to be heard first, unless your committee will take up these witnesses in substantially the order in which they appear on your list.

Mr. GARNER (Congressman from Texas). I ask if later on you will hear the Members of the House who are interested in the subject?

The CHAIRMAN. Yes; we will be very glad to.

Mr. TAYLOR of Colorado. I expect 50 Congressmen would like to say something in this matter, but not at the present time.

Mr. RUTHERFORD. Some of these gentlemen who have come here to testify have asked me to ask the committee if they might be permitted to make a connected statement and then yield to questions afterwards.

The CHAIRMAN. I think that would be well. I think if Members of the House desire to submit written statements that they may do that. Go ahead with your first witness.

Digitized by Google

Mr. TAYLOR of Colorado. The first witness, I think, will be Mr. Frisselle, of California, who will present the attitude and the desire and opinion of the California farmers, especially cotton growers.

Mr. SABATH. Will he speak just for the California farmers or for their so-called organization?

Mr. TAYLOR of Colorado. Oh, no. We are going to have somebody from each of these States, and it will probably be collated later on. At the present time we assume that you want information, and you can get information from these gentlemen.

## STATEMENT OF S. P. FRISSELLE, KEARNEY PARK, CALIF.

The CHAIRMAN. Give your name and address to the stenographer there.

Mr. FRISSELLE. S. Parker Frisselle, Kearney Park, Calif.

The CHAIRMAN. And what is the organization or organizations represented by you?

Mr. FRISSELLE. I am chairman of the agricultural committee of the Fresno County Chamber of Commerce. I have credentials from the California Federated Farm Bureau; credentials from the California Development Association; and a farmer in person, handling 5,000 acres of cultivated land.

I would like to introduce our subject by saying that we are here representing 20 western States interested in agriculture and to enter our direct protest against the Box bill. We are perfectly aware of the fact that our agricultural program can not continue without man power. We are aware of the fact that the act of 1924 reduced the immigration from our southern borders 65 per cent. We are quite sure that if the Box bill is passed the reduction in agricultural labor will be approximately 100 per cent.

In presenting the situation from California, I would like to have your indulgence for a minute to read a resolution passed by the California Development Association which tells my whole story. For the benefit of you gentlemen who are not familiar with that organization, I would like to state that the California Development Association is a State chamber of commerce composed of 5,000 firms, corporations, individuals, chambers of commerce, boards of supervisors, and agricultural and industrial organizations, whose entire efforts are devoted to the carrying out of the program affecting the major problems of agriculture, such as conservation and agricultural labor. The control of the organization is vested in a board of directors of 25 men scattered over the State of California. This resolution, as I stated, covers our California attitude. I will enlarge upon it perhaps a little later, but it gives to you a cross-section view of the whole State of California as it sees this problem. This resolution was passed in San Diego on the 15th of January, 1922, and it has forwarded it to me for presentation to this committee:

Whereas the maintenance of a profitable farming in California and further expansion of California's present agriculture is of vital importance to the welfare of the entire State; and

Whereas it is necessary that there should be adequate farm labor available for the harvesting of California crops; and

Digitized by Google

Whereas there appears sufficient evidence pointing to an insufficiency in farm-labor supply for the harvesting of cotton, fruits, and grapes in the season of 1925 and evidence further points to greater shortage of labor for the season of 1926; and

Whereas it is clearly demonstrated that there is not a sufficiency of farm-labor supply from within the boundaries of the State of California; and

Whereas it has been and will continue to be the purpose of agricultural leaders to pay fair wages to maintain proper living quarters and to avoid the creation of social problems arising out of an oversupply or unemployment of farm labor: Now, therefore, be it

*Resolved,* That the directors of the California Development Association at meeting assembled in San Diego this 15th day of January, 1926, do hereby take definite and affirmative action urging upon the Representatives of the State of California in Congress and upon the various departments of the Federal Government the necessity of providing a plan whereby there may be provided a sufficiency of farm labor during the period of year in which such labor is in demand and further urging that action be taken that will allow farm labor to cross the line from Mexico for such temporary needs under proper supervision and in adequate numbers and in accordance with the declared policy of the Secretary of Labor set forth in his annual reports, which suggests that provision be made for such emergencies.

I have that suggestion by the Secretary of Labor here. Probably you gentlemen are all familiar with it. In his report for 1924 and reiterated in his report for 1925, he makes the suggestion to the President that when labor is needed for permanent employment, skilled or unskilled, where labor of like kind can not be found unemployed in the United States, and no strike or lockout exists or impends in industry needing labor, provision should be made for extra importation within the quota upon special immigration certificates issued at the direction of the Secretary of Labor after full and ample investigation of the conditions under which it is sought to bring labor into the United States. That is the Secretary of Labor's recommendation in 1924, reiterated in 1925 to the President.

*Further be it resolved,* That this board of directors appoint Mr. S. Parker Frisselle, of Kearney Vineyard, Fresno County, Calif., one of the leading cotton producers and vineyardists and a member of the advisory council of this association and chairman of the agricultural committee of the Fresno County Chamber of Commerce, to appear before the various Federal officials in Washington and before the congressional Committees on Immigration at their forthcoming hearings to present the urgent needs of California agriculture for adequate farm-labor supply and to bring before all such officials and committees the fact that this is a State-wide problem of the agricultural interests of California, supported and concurred in by the California Development Association.

That, gentlemen, is a cross section of the view of California on this proposition.

The CHAIRMAN. Let me interrupt you a minute. The movement for a larger number of laborers to come into the United States for seasonal labor from Mexico began some time before the introduction of the Box bill, which is H. R. 6741, and which provides that quota limitation to Mexico. So that your bill, Mr. Box, really is a bill for an enlargement of such restrictions as we now have which tend in a way to reduce Mexican immigration into the United States.

Mr. Box. That is correct, Mr. Chairman. This hearing was first set on the application of a number of gentlemen made through Members of Congress for a liberalization or loosening of the present law.

The CHAIRMAN. Yes, Mr. Box.

83947—26——2



Mr. Box. And then when my bill, which was pending through some Congresses, as the committee will remember, was reintroduced at this session, this was changed into a hearing of those who wanted to oppose its passage and the passage of the Bacon bill.

The Chairman. All right. Now I understand it.

Mr. Frisselle. To show what California agriculture means to the United States, the Government reports show that there was invested in agriculture in that State of California in 1925 the sum of $3,161,-000,000. The Government reports show that California was third in production in agriculture and produced $466,000,000 worth of agricultural products in 1925. That gives you a conception of the size of the agricultural problem of the State of California.

The Department of Agriculture, as well as our President, has been for the past year or so intensely interested in agriculture, and in order to assist us in producing a prosperous agriculture in these United States, has advised diversification, has advised a crop variety program for the farming districts of this country. We in California have tried to follow out the plans laid down by the department and the President in diversifying our crops. In doing so we have introduced cotton into the San Joaquin Valley, where cotton is produced in larlger quantities per acre than any place in America, and is produced at cheaper cost per ton than any place in America. In 1924 the yield per acre in that valley was 488 pounds of lint per acre. We have tried to diversify to that extent. We have 90,000 acres of cotton in the San Joaquin Valley alone. We are producing about $10,000,000 from that 90,000 acres of cotton this year, and there are on my ranch acres yet unpicked of cotton because of an impossible labor situation. If we are to follow out the instructions given us as to the proper procedure in agriculture, then we must have, gentlemen, and we can not exist without, man power, and man power in crops of this sort is essential to their production. And if we are going to get back to the grainfields and the tractor, then we are going against all the precepts which have been given us from Washington, and which we realize and recognize as the salvation of the farmer in the West. Diversified farming needs and must have man power to succeed. Without it we will go back to the grainfields and the tractor.

There is an idea in the minds of many that we in California are attempting, or others are attempting, to introduce into America cheap labor. I have employed thousands of Mexicans in the 14 years I have been farming the 5,000 acres of land which I have. And I believe that anybody that has been in the same position will agree that Mexican labor is anything but cheap labor. There is also in the minds of many the thought that the Mexican is an immigrant. My experience of the Mexican is that he is a " homer." Like the pigeon he goes back to roost. He is not a man that comes into this country for anything except our dollars and our work; and the railroads, and all of us, have been unsuccessful in keeping him here because he is a " homer." Those who know the Mexican know that that is a fact.

We recognize in California, perhaps somewhat differently from the other gentlemen, whom you will hear later, that with the Mexican comes a social problem. We in California think we can handle that social problem. It is a serious one. It comes into our schools,

Digitized by Google

it comes into our cities, and it comes into our whole civilization in California. We, gentlemen, are just as anxious as you are not to build the civilization of California or any other western district upon a Mexican foundation. We take him because there is nothing else available. We have gone east, west, and north, and south and he is the only man power available to us. We recognized the social problem and want you to know it because it is more serious in California than any other territory which will be heard from later; but we have it, and I want to be on record as attacking that social problem and saying that California believes that it can meet and handle the social problem and develop agriculture at the same time.

But California's agricultural program can not continue without man power and from the south is the only possibility we know of where man power is available to our intensified farming. You know the raisin story, where it takes thousands of hands to harvest the raisin crop and the grape crop and the grapes that come here for your consumption are picked by Mexicans. The cotton has to be picked by hand. In my little district alone it takes 35,000.

Mr. Box. How large is the district?

Mr. Frisselle. Two hundred fifty miles by 50 miles wide. The San Joaquin takes 35,000 labor hands to come in to harvest our crops.

I have been intimately associated for eight years on the public service groups, who came on out of war time to try and solve the labor problem. These men for eight years have tried to handle the problem and I have handled it for five. I know the problem and I think we can handle the problems provided we have your permission to bring in sufficient labor to handle the crops which we produce in California.

You gentlemen know the importance of agriculture in America. You know that the cities are merely the service stations for the country. The back country is what keeps the ball going. If we are going to develop your prosperity and ours, it depends upon the success of our agricultural program. We come here asking for only what the Secretary of Labor has recommended to the President in his report two years in succession. We come here asking for relief in man power to handle the production of our acres. I thank you.

The Chairman. Let us clear that up a minute, about the Secretary of Labor's report, as I heard it read. It asks for the admission of those to be " permanently employed."

Mr. Frisselle. That is a quotation taken from his report of 1924 and also of 1925. If I have your permission I will read the passage again.

The Chairman. In the San Joaquin Valley do you propose permanent employment for those who might be brought in?

Mr. Frisselle. We have in California 180 crops. We reach from the Imperial Valley to the perpetual snows. We have a cycle and these people travel. In California we want them for the fruit farms. Then follows the grapes. They start at the border with the cantaloupes and the lettuce, and they go on up to the grape and citrus harvests, and they complete the harvests.

The Chairman. Are they are all Mexicans now?

Mr. Frisselle. No; they are not.

Digitized by Google

The CHAIRMAN. You spoke of a social problem. Do you know of wives and children of Mexicans in San Joaquin Valley?

Mr. FRISSELLE. Yes; I have many of them on my ranch.

The CHAIRMAN. Are the school facilities sufficient?

Mr. FRISSELLE. Yes; we make them sufficient.

The CHAIRMAN. Are they public schools?

Mr. FRISSELLE. Yes, sir.

The CHAIRMAN. How many Mexicans are there in the valley?

Mr. FRISSELLE. I could not give you the figures. It is a transient population and it is impossible to give a figure. It depends entirely on the season of the year.

The CHAIRMAN. Have you any idea as to how many are there with their wives and children, with any degree of permanency?

Mr. FRISSELLE. The one we want is the family Mexican, and we are dependent on him for the harvesting of our crops before the school opens, because the men and their wives and children all work in the grape harvests and the Mexicans earn from $4 to $6 a day, with the family.

The CHAIRMAN. Have you any idea of the established Mexican population?

Mr. FRISSELLE. There is no such thing, in my opinion, as an established Mexican population.

The CHAIRMAN. Have any of them homes?

Mr. FRISSELLE. Very few of them have homes.

Mr. Chairman, may I have the privilege of concluding my statement before your committee definitely outlining our position in California.

I have presented facts here that should prove conclusively that the development of our agricultural program, as outlined at this hearing, requires additional man power.

We would prefer white agricultural labor and we recognize the social problem incident to the importation of Mexicans. We are loath to burden our State with this type of immigrant, but after a complete survey of all possibilities, it seems that we have no choice in the matter. The Mexican seems to be our only available supply.

We, in California, would greatly prefer some set up in which our peak labor demands might be met and upon the completion of our harvest these laborers returned to their country.

We must have labor; the Mexican seems to be the only available source of supply, and we appeal to you to help us in the matter, imposing upon California the least possible burden.

The CHAIRMAN. You have no permanent residents to amount to anything in the San Joaquin Valley?

Mr. FRISSELLE. We all of us have some very good Mexicans that have been selected as the best of these groups.

The CHAIRMAN. And they are permanent residents?

Mr. FRISSELLE. They are permanent residents.

The CHAIRMAN. They are domiciled there?

Mr. FRISSELLE. They are domiciled there.

The CHAIRMAN. So far as you know, they will stay there?

Mr. FRISSELLE. They will stay there, so far as I know.

The CHAIRMAN. Have you any idea of the number?

Mr. FRISSELLE. It would only be a guess. I could not give you that.

Digitized by Google

The CHAIRMAN. Have you been increasing the number of Mexican laborers in the last few years?

Mr. FRISSELLE. Yes. Since the war we have had to.

The CHAIRMAN. Prior to that you did not have many Mexicans?

Mr. FRISSELLE. Not as many as we have now.

The CHAIRMAN. Whom did you employ before that time, before you started to employ your Mexicans?

Mr. FRISSELLE. We employed anyone we could get, but so many more acres have been brought into production that we have put upon us a much greater labor demand now than we had prior to the war.

Mr. SABATH. In other words, you are increasing year by year the acreage of that section of the country?

Mr. FRISSELLE. We are.

Mr. HOLADAY. You stated that the immigration act of 1924 cuts down the labor quota from Mexico 65 per cent. In what way does that affect the immigrants from Mexico?

Mr. FRISSELLE. It kept them from coming in on account of the expense of entry, which the Mexican family could not meet. The single man, the floater, the fellow who is to us not as desirable because he is only one man——

Mr. BOX (interposing). Did the organization of the border patrol and the border enforcement of the restrictions also restrict the number?

Mr. FRISSELLE. This fall; yes.

The CHAIRMAN. Now, let us make that clear. The Mexican has always had to pay the head tax, hasn't he?

Mr. FRISSELLE. I understand so.

Mr. SABATH. That is, those that came in legally.

The CHAIRMAN. The head tax since 1917 has been $8, and the Mexican since that act has had to pass the literacy test. Since the new act he has had to pay the consular fee of $10, so it amounts to $18 now. He must be healthy and pass the literacy test and pay $18; isn't that right?

Mr. FRISSELLE. Yes.

The CHAIRMAN. And they are coming in in very considerable numbers legally now, aren't they?

Mr. FRISSELLE. Not in sufficient numbers.

Mr. HOLADAY. I would like to ask what, in his opinion, the lifting of the ban on the Japanese would do toward relieving the foreign situation in California, or would he favor that?

Mr. FRISSELLE. No.

Mr. SABATH. What was that?

Mr. HOLADAY. I asked the gentleman if he would favor lifting the ban on the Japanese.

Mr. FRISSELLE. No; I would not.

Mr. HOLADAY. That would furnish you agricultural labor, wouldn't it?

Mr. FRISSELLE. That is true.

Mr. FREE. The Japanese does not want to work for anybody else. He wants to work his own farm. In that he differs from the Mexican.


Digitized by Google

Mr. HOLADAY. I have always understood that it was a commendble thing that a man wanted to own his own farm; and he would be a permanent citizen.

Mr. FREE. What suggestion have you to make, if any, regarding letting these Mexicans in? Do you want the law to remain as it is, or do you want some proposition for these men to come in under bond, or just what is your position?

Mr. FRISSELLE. My position is just what is suggested by the Secretary of Labor, that where a stringency is shown, that otherwise admissible aliens may be permitted for agricultural purposes, and, as he says, skilled or unskilled labor.

Mr. FREE. To remain?

Mr. FRISSELLE. He says remain, but the Mexican does not remain.

Mr. VINCENT. Isn't it the proposition of the Secretary of Labor that the piece of machinery that he suggests shall apply to all the quota countries as well as to Mexico?

Mr. FRISSELLE. Yes.

Mr. VINCENT. And apply to all lines of endeavor in this country as well as to agriculture?

Mr. FRISSELLE. Yes.

Mr. BOX. And may I ask if he does not want the quota applied to American countries—the Secretary of Labor?

Mr. FRISSELLE. The Secretary of Labor makes that recommendation even to countries under quota.

Mr. BOX. And he also recommends the placing of the quota upon all American countries?

Mr. FRISSELLE. I have not that information.

Mr. VINCENT. His proposition, then, is to extend this piece of machinery so that manufacturers of all lines of goods in this country, whenever they deem themselves in a situation where it would be, according to their judgment, better for themselves if they could get some cheap labor, that they could put this piece of machinery in operation and with respect to all the countries—is not that his proposition?

Mr. FRISSELLE. I think not.

Mr. VINCENT. Or, all except those who are barred by actual statutes, where immigration is completely barred, it would apply to all quota and nonquota countries, isn't that it?

Mr. FRISSELLE. That is his recommendation.

Mr. VINCENT. And it would apply to all lines of endeavor in this country?

Mr. FRISSELLE. Where insufficiency could be proven and without possibility of getting labor from any other source.

Mr. VINCENT. Were we to adopt into the immigration law a principle so wide as that, what effect do you think it would have on the restrictive and selective features that we are trying to bring about in this country with respect to our incoming people?

Mr. FRISSELLE. I am a farmer and the matters which pertain to the general immigration problem I am not able to discuss with you

Mr. VINCENT. Then your proposition is as you feel in your mind, confined to your own interests in the matter, is that it?

Mr. FRISSELLE. On the Mexican border.

Mr. VINCENT. And you want some more labor for your farm, and I am perfectly willing to concede the facts which you state here, I

Digitized by Google

think you are telling me the truth probably about it, but are you willing to come before this committee and support in toto the recommendation of the Secretary of Labor with respect to this wide principle that he seeks to inject into the law?

Mr. FRISSELLE. Only as it refers to agriculture——

Mr. VINCENT. Only as it refers to agriculture?

Mr. FRISSELLE. Am I able to understand the situation in its general application.

Mr. VINCENT. I wanted to be clear as to your position.

Mr. FREE. Do you think you would get labor enough if the law remains as it is at the present time, and no quota was put on it at all?

Mr. FRISSELLE. I do not.

Mr. FREE. What suggestion do you want to make as to the way the law should be changed?

Mr. FRISSELLE. By a proper showing that insufficiency was there and that the need was there, by a proper showing before the proper people, the proper board, constituted for that purpose; and waiving of the monetary requirement for entry.

Mr. SABATH. Namely, the elimination of the head tax and the visa fee?

Mr. FRISSELLE. Under a temporary emergency, as recommended by the Secretary.

Mr. VINCENT. Have you had your attention called to the fact that in the present immigration law, folks who live on farms in the old countries and who state their intention of coming to the land in this country are placed in a preferred class in the quota?

Mr. FRISSELLE. I understand so.

Mr. VINCENT. Have you any information as to how this worked out with respect to getting farm labor in this country?

Mr. FRISSELLE. I have not, because we are on the western rim and our information is confined largely to that territory.

Mr. VINCENT. Don't you think that this is true that everyone of those men that have got a visa based on his farm experience in the old country has got it properly, but that as soon as he gets to this country, there being no power in government to compel him to stay in any particular place, that at once the difference between the economical conditions on the farm and in the factory has pulled him from the farm and put him in the factory?

Mr. FRISSELLE. That is why we are trying to get a bill that will attract people instead of repel them.

Mr. VINCENT. And is not that a solution of your problem?

Mr. FRISSELLE. It can not be reached without man power.

Mr. VINCENT. But how are we going to do it? How are we going to provide a piece of machinery that will prevent men from being attracted into higher wages in the factory field as against the farm?

Mr. FRISSELLE. You can do all you can to make the farmer prosperous.

Mr. VINCENT. We wrote into this bill a preferred clause for farmers, and I have confidence enough in the consuls, and I have looked into this thing, that I think that practically all of them proved their case before they got into this preferred class, but when they come

Digitized by Google

to this country they do not stay on the farm. So it does not work, as a matter of fact, to produce farm labor here.

Mr. SABATH. Will you permit me to suggest this, that the large quota that has been allowed to the countries that would avail themselves of this preferred class are Great Britain and Germany, and you can not secure farm labor from those two countries, because there is very little farm labor obtainable in those two countries; and the other countries, where the farm labor can be secured, the quotas are all so small that really you can not expect any from those countries.

Mr. VINCENT. Do you agree that there is no farm labor available in Germany that would like to emigrate?

Mr. FRISSELLE. It has taken me 40 years to get to Washington, and I do not expect to get to Germany, and I do not know the situation there.

Mr. FREE. Isn't it true in this connection that the Mexican is the exception; that he does stick on farm labor? In other words, he comes into this country and he does not go off into the mine or the mill or the factory, but he sticks at farm labor?

Mr. FRISSELLE. Well, in the main, that is true in our territory.

Mr. FREE. And in that he is different from the immigrants from other countries?

Mr. FRISSELLE. He is not experienced enough to do anything but the farm work.

Mr. FREE. I take it your position is this: That you would like to have the head tax and the visa fee removed upon a showing being made of the shortage of labor and all the other restrictive provisions of the immigrant laws applied?

Mr. FRISSELLE. Decidedly; on the otherwise admissible aliens.

Mr. HOLADAY. The figure of 35,000 was mentioned as being needed in your particular valley; did that include the permanent residents there, or do you in that include the outsiders coming in each year?

Mr. FRISSELLE. That means the hands necessary to harvest our crops, both permanent and immigrant.

Mr. HOLADAY. None of those 35,000 are permanent residents of the district now?

Mr. FRISSELLE. Yes, Mr. Holaday.

Mr. HOLADAY. How many?

Mr. FRISSELLE. I guess about 15,000.

Mr. HOLADAY. And you need about 20,000?

Mr. FRISSELLE. Yes.

Mr. HOLADAY. You say you can furnish that 20,000 work the year round?

Mr. FRISSELLE. No; I do not. I did not mean to, sir.

Mr. HOLADAY. I mean can they secure it, say, in the State of California?

Mr. FRISSELLE. Yes.

Mr. HOLADAY. Following the seasons?

Mr. FRISSELLE. If they are industrious and follow the crops they can secure that in the State of California.

Mr. HOLADAY. Do you think it is better for agriculture in the State of California to have this itinerant labor rather than to have permanent residents?

Mr. FRISSELLE. No.



Mr. HOLADAY. You prefer to have permanent residents?

Mr. FRISSELLE. Yes.

Mr. HOLADAY. The Japanese are inclined to become permanent residents, aren't they?

Mr. FRISSELLE. Yes; they are. They become very permanent.

Mr. HOLADAY. And in that respect they would be more desirable than the Mexican?

Mr. FRISSELLE. No. I will not say that they would be more desirable than Mexican labor.

Mr. HOLADAY. From the standpoint of being permanent residents, wouldn't they?

Mr. FRISSELLE. I think that the Japanese question has been pretty thoroughly thrashed out. The Mexican situation seems to be the only available one. I employ Japanese, and they are good workmen.

The CHAIRMAN. Let me divert that matter. I want to ask a question to get at the crux of this. Have you any plan by which, if 20,000 Mexicans were permitted to step into that valley for any part of the year, that you can take care of them when through working that valley?

Mr. FRISSELLE. We are forming now a State-wide organization by which we hope by joining the three labor groups together, to give them employment the year around. We are starting an organization in southern California, one in central California, and one in northern California, and we hope by this means to employ this labor the year around.

The CHAIRMAN. Is it your thought that there will not be the proposition of their becoming the owners of the land?

Mr. FRISSELLE. Yes.

The CHAIRMAN. Is it your thought that they will be under penalty of being sent back in case of declining to work?

Mr. FRISSELLE. That has to come out of Washington. That is not a ruling that we——

The CHAIRMAN (interposing). It is not a ruling, is it your thought?

Mr. FRISSELLE. We are going to try to keep them busy by moving them from one job to another, but if they stay within the State of California and not permanently at any one location——

The CHAIRMAN (interposing). You admit that you can not require them to stay within the State of California. You admit that?

Mr. FRISSELLE. Certainly.

The CHAIRMAN. You can not.

Mr. FRISSELLE. We can not.

The CHAIRMAN. You are proposing to introduce them to the United States, though, a number of people who would be in a different class from all the rest of the people of the United States. All the people here are free individuals.

Mr. FRISSELLE. Yes.

The CHAIRMAN. Some are naturalized and some in the process of naturalization, but they all have perfect freedom. Is there any purpose to bring these people in permanently?

Digitized by Google

Mr. WILSON. Is it your intention that these people should come in permanently or go back again to Mexico?

Mr. FRISSELLE. I think the Mexican pretty well solves that problem himself. He always goes back.

The CHAIRMAN. If he goes as far north as Michigan?

Mr. FRISSELLE. That is pretty far north. That is a pretty good country up there, but when he is in California he does go back.

Mr. SABATH. Is not California just as good as Michigan?

Mr. VINCENT. I accept that as a great compliment from a man from California.

Mr. WILSON. Do you think that the Mexicans make good American citizens?

Mr. FRISSELLE. I said in my opening sentence that they are homers, that they do not stay in this country.

Mr. WILSON. They have children, and a child born in California is an American citizen.

Mr. FRISSELLE. That is true.

Mr. HOLADAY. What is the average wage that you pay these Mexicans?

Mr. FRISSELLE. The bulk of our harvesting is piecework. We pay $3.50 a ton on raisins, and there are 250,000 tons of raisins harvested on a normal crop.

Mr. HOLADAY. What does the average man pick?

Mr. FRISSELLE. The average man experienced in raisin gathering and cotton picking makes from $2.50 to $4 a day, working alongside of white families, completely satisfied with the wages being paid.

Mr. HOLADAY. Do you feed them or do they feed themselves?

Mr. FRISSELLE. We do both. At some ranches they board at the ranch house and at others quarters are provided for them.

Mr. BOX. About your social problem which you state you have, just exactly what are its leading features?

Mr. FRISSELLE. Yes, sir. I want that to be of record, because the people that I represent recognize that social problem.

Mr. BOX. What are its leading features?

Mr. FRISSELLE. The congestion in the cities is one which we hope to overcome by this labor organizaiton which I have outlined. At the present time they have difficulties, like in Los Angeles, by the Mexicans congregating there. But we are trying to solve that by our labor organization.

Mr. BOX. That is a phase, if I may say so, that this committee has to do with in connection with practically all immigration problems.

Mr. FRISSELLE. Yes, sir.

Mr. BOX. The next one?

Mr. FRISSELLE. The next one is the school problem in the rural districts.

Mr. BOX. Then another? Don't they fill the hospitals and tax your public charities?

Mr. FRISSELLE. I have not any figures at all on that.

Mr. BOX. May I read you some figures from official sources in your State, recently prepared? I will say that I got these on request of the governor of your State.

Mr. FRISSELLE. Yes.

Digitized by Google

Mr. Box. These figures were prepared this month. In Los Angeles, where approximately 7 per cent of the population is Mexican, the relief division, this is all charity and work of that kind—states that 27.44 per cent of its cases are Mexicans. The bureau of Catholic churches reports that Mexican families consume at least 50 per cent of its budget; 25 per cent of the budget of the general hospital is used for Mexicans, who comprise 43 per cent of its cases. The city's maternity service reports that 62½ per cent of its cases are Mexican and they use 73 per cent of its budget. The bureau of municipal nursing and the division of child welfare both state that 40 per cent of their clients are Mexicans, and in the Jay Home of the children's hospital 25 per cent of the children are Mexicans.

At Pasadena, where 2.8 per cent of the population is Mexican, 6 per cent of the cases of its welfare department are of Mexican nationality.

In Long Beach the welfare department reports 21 per cent of its cases are Mexican, and they use 16 per cent of its budget, while only 1 per cent of the population is Mexican.

Orange County, in which 10 per cent of the population is Mexican, reports that one-third of the general hospital cases are Mexican, as are also 50 per cent of the cases of the county aid commission.

In the county of San Diego half the patients in the county hospital are Mexicans, while in the city of San Diego, where 75 per cent of the population is Mexican, two-thirds of the milk delivered to the free-milk stations goes to that nationality.

In San Bernardino the welfare department reports 36.2 per cent of its cases as Mexican, using 33 per cent of its budget. The county hospital states that 25 per cent of its cases are Mexican and 35 per cent of its budget is used by them.

I could read you a very long list of these things; I have not read them all. It says here: "It is necessary to use farm labor in our State."

Now, in connection with the request that more Mexicans come, it says: "Nevertheless, it believes that unrestricted immigration from Mexico should be stopped."

Do you feel that these things ought to be stopped?

Mr. Frisselle. Unrestricted immigration—I agree with them entirely.

Mr. Box. He says "this ought to be stopped"; dealing with conditions now prevailing.

Mr. Frisselle. Unrestricted immigration ought to be stopped.

Mr. Box. Yes.

Mr. Frisselle. We recognize the social problem and that has been the reason for the attempted organization that started late this fall to get those people out of the congested areas and circulate them with the crops from place to place by our three organizations which will keep them moving.

Mr. Box. If you find a solution of that problem dealing with that branch of immigration from foreign countries, I know there is not a member of this committee that would not like to have it furnished but so we had our predecessors have wrestled with it for 50 years.

Mr. Frisselle. I appreciate that, and we want help on our problem and we want a solution and that is why we are here.

Digitized by Google

Mr. VINCENT. Mr. Frisselle, just another question, if you please. You stated as your first social problem a tendency to congregate in cities?

Mr. FRISSELLE. Yes, sir.

Mr. VINCENT. That has been one of the most serious things that has confronted this committee with respect to all incoming immigrants, and was one of the reasons why the immigration act of 1924 was written. Now, is it or isn't it your experience that there is a less tendency on the part of the Mexicans to congregate in cities than other immigrants, generally speaking?

Mr. FRISSELLE. I have not had experience with other immigrants, only with the Chinese and the Japanese in the earlier days, and they, of course, did not congregate in cities. We have very few other immigrants in California.

Mr. VINCENT. But you have not had any experience with the general tide of immigrants from Europe?

Mr. FRISSELLE. No. We do not have them in the western rim.

Mr. SABATH. You have had a large number of immigrants from Italy into California, and there is a large percentage of the California population that is Italian, isn't there?

Mr. FRISSELLE. That is true. The only ones we find in the rural districts are tenants and on dairying ranches but not as agricultural workers in large numbers.

Mr. SABATH. But as to agricultural sections, people owning a great many hundreds and thousands of small farms, they are not in the San Joaquin Valley but north of there, aren't there a great many of these people, Italians?

Mr. FRISSELLE. Yes; a great many of them. They are people who live in the cities and come out into the country, and they help to make up our 15,000 workers.

Mr. DICKSTEIN. What effort have you made to obtain white labor or whatever labor you have outside of Mexican?

Mr. FRISSELLE. In our organization we have advertised widely through California in the cities for labor. We realize perfectly well that if we go outside of the State into Arizona or other States we would take their labor. We are spending money, and we have for some time past, in trying to induce people to come out of the towns and work on the ranches during the harvest seasons, but the difficulty would be white labor in the city is that it is not experienced, and a man who has to go into grape picking or cotton picking when he is not experienced can not make a good wage.

Mr. VINCENT. What success have you had in getting them from the towns?

Mr. FRISSELLE. We have had considerable success. We have helped our labor needs to a large extent, but if they are not skilled in that type of labor those men can not make a good wage and their families can not.

Mr. VINCENT. So even if you can get men from town it is some time after they begin work before they can really make a living wage?

Mr. FRISSELLE. Unless they have had previous experience.

Mr. DICKSTEIN. What class of white laborers do you get from the cities?

Mr. FRISSELLE. American citizens.

Mr. Taylor of Tennessee. Is it not true that this grape picking and cotton picking is hand work and that it is back-breaking work, as a matter of fact, especially the beet business, and that these people will not get down and pull weeds and thin beets and do that kind of work?

Mr. Frisselle. I think you understand this.

Mr. Taylor of Tennessee. The European laborers do not go into that field at all.

Mr. Frisselle. Here is an instance which you can multiply by the thousands: A university chap came down to the ranch to pick grapes, and he hardened up for two weeks in the hay field so as to get into condition to go into the vineyards and pick grapes. After that he went into the vineyards and earned $1.25 the first day and $1.50 the second day, and the third day he was in bed. A white man who is not experienced in that kind of labor can not do it, and that chap wanted to be able to do it to get the money to complete his education.

Mr. Wilson. Can the Japanese or the Chinese do that labor?

Mr. Frisselle. Excellently.

Mr. Wilson. And as a matter of fact they are more law-abiding than the Mexicans, aren't they?

Mr. Frisselle. I think that is a fact.

Mr. Holaday. What is the average size of these ranches?

Mr. Frisselle. You mean the fruit ranch?

Mr. Holaday. The ranches in your valley?

Mr. Frisselle. There are 14,800 members in the Sunmaid Raisin Growers Cooperative Association, and their ranches average 35 acres.

Mr. Holaday. This question really resolves itself down to a question of obtaining cheap labor?

Mr. Frisselle. Not in my mind.

Mr. Holaday. Is not that the real question?

Mr. Frisselle. No.

Mr. Holaday. Of obtaining cheap labor?

Mr. Frisselle. Leave out the word " cheap " and I will agree with you.

Mr. Holaday. Of obtaining the labor?

Mr. Frisselle. Yes, sir.

Mr. Holaday. And the question of obtaining labor becomes one of the wage?

Mr. Frisselle. If it does not——

The Chairman. It is the question of obtaining the labor for a short period?

Mr. Frisselle. No; all the year.

Mr. Holaday. I understand the witness to say that there will be labor the year round. I want to develop this Japanese question a little more. I confess I have been inclined to favor their exclusion, but I want to know this: You say that the Japanese are inclined to become permanent residents and home owners, and that is what you want, and that they are skilled laborers, and that is what you want. Why is it, then, that they are not satisfactory?

Mr. Frisselle. The Japanese as workmen on ranches that we have now are city laborers.

Mr. HOLADAY. Is this from the social standpoint?

Mr. SABATH. Give the real reason that exists in California.

Mr. HOLADAY. Why are they not as desirable as the Mexicans?

Mr. FRISSELLE. The real reason in California, of course, is well known to you, and me, that being on the western rim of the country, it is not desirable to people it with people who come to stay permanently on the land.

Mr. VINCENT. The truth is that you are confronted with a race problem and there is no race problem with the Mexicans?

Mr. FRISSELLE. Yes.

Mr. WILSON. Is not that the same race problem confronting you with the Mexicans?

Mr. FRISSELLE. I do not see it.

Mr. DICKSTEIN. Don't you have a race problem involved in connection with the schools with the Japanese?

Mr. FRISSELLE. Yes.

Mr. DICKSTEIN. And haven't you just stated that one phase of this is the trouble that you have in connection with the schools?

Mr. FRISSELLE. Not in connection with the race problem.

Mr. DICKSTEIN. You say that the Mexicans constitute a social problem growing out of the schools?

Mr. FRISSELLE. Yes, sir.

Mr. DICKSTEIN. It is different language, but meaning the same thing?

Mr. FRISSELLE. It is the education of these people in the proper housing conditions and sanitary regulations that they are not familiar with. That is the social problem in the schools that we have to take care of them.

Mr. SABATH. And establishing schools on these large ranches where they have a large number of people?

Mr. FRISSELLE. We have tents out on the big ranches. The employer furnishes the teacher and sets up a school on the ranch.

Mr. VINCENT. So that your school problem is due somewhat to the fact that they are for a short time and then somewhere else?

Mr. FRISSELLE. That is it exactly.

Mr. VINCENT. So that the school work is liable to be considerably disconnected even if there is a teacher in both places?

Mr. FRISSELLE. That is the true problem, the transient nature of the labor.

The CHAIRMAN. Do you educate the Mexican children in separate schools?

Mr. FRISSELLE. No; we do not, but where the schools are established on these ranches, as we call them, they are almost entirely Mexican schools teaching hygiene, sanitation, and the American language.

The CHAIRMAN. You say that you raise 400 pounds of cotton to the acre?

Mr. FRISSELLE. Four hundred and eighty-eight in 1924.

The CHAIRMAN. Per acre?

Mr. FRISSELLE. Per acre.

The CHAIRMAN. In the San Joaquin Valley?

Mr. FRISSELLE. Yes, sir.

The CHAIRMAN. How does that compare to the average yield in the southern cotton States?

Mr. FRISSELLE. I think it is about treble.

The CHAIRMAN. Treble?

Mr. FRISSELLE. Well, nearly.

The CHAIRMAN. Do you imagine that if you were permitted to have labor pour into California to help you produce cotton crops of such a number of pounds per acre that that would not disturb the situation in Mississippi and Alabama?

Mr. FRISSELLE. Our available acres are so limited that I think it would have no effect whatever on the world market.

Mr. WILSON. This statement about 480-acre pounds of cotton, we treble that in some of our lower lands in the Mississippi Valley.

Mr. FRISSELLE. My information is that the average was 176 pounds for 1925.

Mr. TAYLOR of Colorado. This is only a very limited section and on irrigated land. That is the difference.

Mr. WILSON. Yes; and we have nothing but the colored man farming, and sometimes they get a thousand pounds to the acre.

Mr. HOLADAY. How many men are necessary to be employed to harvest a crop over a ranch of 35 acres?

Mr. WILSON. What crop?

Mr. HOLADAY. Cotton, we will say.

Mr. FRISSELLE. I would have to do some figuring.

Mr. HOLADAY. Just approximately.

Mr. FRISSELLE. A 35-acre cotton crop, a man and his family can harvest without any help if they had to.

Mr. VINCENT. But these 35-acre ranches apply to the grapes?

Mr. FRISSELLE. Yes.

Mr. HOLADAY. On the average farm a man living there can handle the cotton as far as that 35 acres is concerned, but in grapes how much outside help would he need?

Mr. FRISSELLE. A 35-acre vineyard, if he hired all of his help, it would take probably 10 men three or four days to harvest the crop.

Mr. HOLADAY. Is there any crop which you raise in that valley that requires more labor than a vineyard?

Mr. FRISSELLE. Yes.

Mr. HOLADAY. What is it?

Mr. FRISSELLE. Cotton.

Mr. HOLADAY. I understood you to say that the man himself could handle the cotton crop on 35 acres. I mean a crop that would require the hiring of outside help?

Mr. FRISSELLE. Grapes is a perishable product and cotton is not.

Mr. HOLADAY. So I understand. What I am getting now is, is there any crop there which you raise that will require more than 10 men or three or four days to harvest, outside of the man living and operating the 35 acres?

Mr. FRISSELLE. That figure I gave you was simply a guess. I think there is no crop that takes more.

Mr. SABATH. You are mistaken. I know several crops that require a great many more than 10 men, 3 or 4 or 5 or 10 days. You take

Digitized by Google

onions and celery and asparagus and all that, it requires a great number of men to harvest and to take care of 35 acres.

Mr. FRISSELLE. You are quite right. I am not a truck garden grower. That, of course, requires infinitely more men.

Mr. SABATH. I happen to know.

Mr. HOLADAY. What I am trying to develop here is that in this particular valley on the average farm of 35 acres all of the outside labor that would be required, outside of the man living on the farm, to harvest the crop that requires the most labor would only require about 40 days' labor out of the year—10 men three or four days, as I understood you to say?

Mr. FRISSELLE. On a vineyard.

Mr. HOLADAY. Then the demand for this labor comes from the large ranches, those ranches that in acreage are far in excess of the average?

Mr. FRISSELLE. A great deal of it does.

Mr. HOLADAY. I believe that is all.

The CHAIRMAN. What is the population of California, estimated?

Mr. FRISSELLE. Upward of there million, I think.

The CHAIRMAN. Something over three million?

Mr. FRISSELLE. Yes.

The CHAIRMAN. What percentage of that is in the cities?

Mr. FRISSELLE. I could not give you that, Mr. Chairman.

The CHAIRMAN. It is pretty large.

Mr. SABATH. What is the percentage of the married and unmarried Mexicans that you have in California?

Mr. FRISSELLE. I could not give you that figure.

Mr. SABATH. Isn't it a fact that the percentage of married people is very small?

Mr. FRISSELLE. Yes. The Mexican families, you mean, as against the single men?

Mr. SABATH. Yes.

Mr. FRISSELLE. I think so, under present conditions. A workman who has a family is in less numbers than the one without a family.

Mr. SABATH. It is not only in less numbers, but isn't it a fact that there is not more than 10 per cent of married families, as compared with single men?

Mr. FRISSELLE. That would simply be a guess on my part.

Mr. BOX. I read your figures showing that in the charity hospitals of your State the percentage of those treated was greater than any other.

Mr. FRISSELLE. They come very fast.

Mr. BOX. In the maternity hospitals?

Mr. FRISSELLE. Yes.

Mr. HOLADAY. Do you know of any points in California where the Mexicans are clustered together and becoming permanent inhabitants, building cities and villages of their own?

Mr. FRISSELLE. No. They have districts, as all of our foreigners do in the cities, but as far as building towns of their own is concerned, I am not familiar with any.

Mr. HOLADAY. So far as you know, none have been established in California?

Mr. FRISSELLE. No. I do not think it is an important matter with us at all.

Digitized by Google

Mr. DICKSTEIN. In other words, your point is that it is not the question of cheap labor. It is a question of getting labor to man your farms?

Mr. FRISSELLE. Man power is what we require. It is not cheap. As I said in the opening, Mexican labor is not cheap. We require man power, and Mexico seems to be the only source.

Mr. TAYLOR of Tennessee. And you want to get the class of people to do this kind of work?

Mr. FRISSELLE. Yes.

Mr. TAYLOR. And your provision is that we have some provision in the act of 1924 by some amendment to allow Mexicans to come in here for this kind of work?

Mr. FRISSELLE. Yes.

Mr. TAYLOR of Tennessee. And your suggestion that we remove the head tax and all of the other fees under the immigration act?

Mr. FRISSELLE. Only the fees.

Mr. HOLADAY. Say, we would bring in about 50,000 Mexicans, or the number we need, how are you going to get them out?

Mr. FRISSELLE. I think the first statement I made will take care of that. The Mexican will take care of that.

Mr. HOLADAY. And you are depending on the good will of the Mexican to leave?

Mr. FRISSELLE. I would like to have some method provided, but I do not know of any method which would be legal.

Mr. TAYLOR of Tennessee. Have you any Mexican landowners in that section?

Mr. FRISSELLE. No; the Mexican is not aggressive, he is amenable to suggestions and does his work. He does not take the Chinese or the Japanese attitude. He is a fellow easy to handle and very quiet in his living, a man who lends himself very well to ranch labor, a man who gives us no trouble at all. He takes his orders and follows them, and as far as that goes, without the other difficulties we have with them, he is a very desirable man; and we have found, contrary to many other opinions, the Mexicans on our ranch are as good or better than any other laborers we have on the farm, and personally I have a great respect for him as a good agricultural laborer.

The CHAIRMAN. It would not help your valley at all to have 50,000 or 60,000 Mexican families placed out there.

Mr. BACON. Mr. Frisselle, just assume that the suggestion of the Secretary of Labor relative to seasonal immigration of agricultural industries is not followed, that the law in that respect stands as it is, and that there will be no other change; I would like to know how you are getting on about this labor situation under the present existing law.

Mr. FRISSELLE. For our own district this is the situation. We have this year 90,000 acres of cotton in the San Joaquin Valley. Some of it is not picked. A great deal of it was sold on futures, 25 cents a pound for the delivery on the 1st of December.

Mr. WILSON. The point that I am driving at is about bringing in labor. Of course, I understand about the emergency of the season; but to what extent, say take 1925, to what extent have you been able under the present law to supply your emergency labor needs by bringing in people from Mexico?

Digitized by Google

e: 1:21-cr-00665 Document #: 24-4 Filed: 02/17/22 Page 85 of 90 PageID #

Mr. FRISSELLE. I should guess about 75 per cent of our needs in our district have been supplied for the season of 1925.

Mr. WILSON. Under the law as it exists?

Mr. FRISSELLE. Yes.

Mr. WILSON. About what number of people did they get in from Mexico for the purpose?

Mr. FRISSELLE. I do not know the exact figures. But some of the other gentlemen here who are familiar with that can give you the correct information about it.

Mr. Box. A little over 32,000.

Mr. WILSON. Came into California?

Mr. FRISSELLE. No; into the whole country.

Mr. WILSON. I am speaking of his immediate State. When this cotton season is over and the emergency is relieved, what becomes of its influx of labor from Mexico?

Mr. FRISSELLE. The citrus harvest follows the cotton harvest, and that is the second largest important industry in California, and the Mexican is a skilled orange picker. He follows the crops, and our attempted organization is going to try to eliminate the social problem by seeing that he does follow the crops.

Mr. WILSON. When the emergency arises relative to cotton or the raisin industry and you need this extra influx of labor, how do you go about letting that be known and getting the men?

Mr. FRISSELLE. We have emissaries that go into the centers and induce them to come out, by advertising and other means.

Mr. WILSON. In the centers in California?

Mr. FRISSELLE. Yes.

Mr. WILSON. Do you have any agents to go down into Mexico?

Mr. FRISSELLE. No; we have not from our own district.

Mr. WILSON. Is there anyone in Mexico that looks to getting these people across?

Mr. FRISSELLE. I understand the railroads have people of that sort in Mexico that gather up the men. Some of those who will follow me, who have the same difficulty in their own districts, can tell that story better than I can. We do not go across the border.

Mr. WILSON. Is it all in California?

Mr. FRISSELLE. The help we use in the San Joaquin is nearly all in California; but the border people bring them across, and we take them from the people on the south.

Mr. WILSON. When they come across, the requirements of the immigration laws are applied and they pay the $8 and $10, making $18?

Mr. FRISSELLE. They are supposed to.

Mr. WILSON. If he gets in legally, he does it, doesn't he?

Mr. FRISSELLE. Yes.

Mr. WILSON. But, of course, if he gets in some other way——

Mr. FRISSELLE (interposing). Bootlegging. They call it bootlegging on the border.

Mr. WILSON. Then, is it your position that it is not possible to take care of this agricultural situation in California without a change in existing law?

Mr. FRISSELLE. I feel quite confident of that, that if our agriculture is going to develop and expand as we hope it will, and we find

now under present conditions, as I say, we have had about a 25 per cent shortage of our needs for the season of 1925.

Mr. WILSON. We have, of course, in the Southern States, the cotton problem. I believe I corrected the record relative to cotton production, that in the Mississippi Valley and other sections we sometimes produce more than three times as much cotton according to the acreage as you have stated.

Mr. FRISSELLE. So do we.

Mr. WILSON. And also in Texas.

Mr. FRISSELLE. We do in peak spots.

Mr. WILSON. And we have the question similar to yours of shortage of labor, not such as you describe, however, for as soon as this crop is over, there is a surplus of labor that we can not put back to work until it becomes farming time again in the spring. Of course, we make no effort whatever to do that except to try to hold our labor together. Your position there is that there must be some relaxation of the present law before you can get the needed labor?

Mr. FRISSELLE. Before we can have sufficient labor for the season which is past and without any prospect of any alleviation of the border conditions, our program for 1926 will have to be completely revised.

Mr. HOLADAY. How many acres are there in this valley?

Mr. FRISSELLE. Two hundred and fifty miles by fifty.

Mr. HOLADAY. Do you know approximately how many acres there are under cultivation?

Mr. FRISSELLE. About 1,000,000.

Mr. HOLADAY. How many of those million acres are in cotton?

Mr. FRISSELLE. About something over 90,000 this last year.

Mr. HOLADAY. A rather small per cent?

Mr. FRISSELLE. Yes. If you had the help, there would be 250,000 acres in cotton this coming year.

Mr. HOLADAY. That is about 10 per cent?

Mr. FRISSELLE. Yes, sir.

Mr. HOLADAY. Roughly, what are the other 90 per cent?

Mr. FRISSELLE. About 55 different crops of all sorts and descriptions.

Mr. SABATH. If you can secure some other white labor, we will say like Portuguese and Hollanders, or some of the Italian farmers, and others, would you treat them the same way you do the Mexicans?

Mr. FRISSELLE. We would prefer them.

Mr. SABATH. Do you prefer the Mexicans to the whites?

Mr. FRISSELLE. No.

Mr. SABATH. You prefer the white to the Mexican?

Mr. FRISSELLE. There is no quarrel with them if we could get them.

Mr. SABATH. It seems to me you are speaking from a very small section, and you do not state the needs of the San Joaquin Valley lower down, where they early in the year start to raise a great deal of lettuce and carrots and tomatoes and onions, and where they need a great deal of labor about March 1 and keep that labor until July or August, when it is finally released and gradually goes into your section of the country. Is not that the way?

Mr. FRISSELLE. They circulate. That is what we are trying to work out.

Digitized by Google

Mr. SABATH. In former years this need did not exist, because most of your acres down there were in grain—in barley and wheat—and in hay, and thousands upon thousands of these acres, and even those which have been used for grazing, are being used now and cut up in small farms for diversified farming. Is not that true?

Mr. FRISSELLE. Yes, sir; that is true. There is one section of 450,000 acres in Fresno County to be cut up into diversified farms, but, as I say, development is restricted entirely by the number of folks we can get to come in and help us.

The CHAIRMAN. Is your tenant farming on the increase in California?

Mr. FRISSELLE. I think it is.

The CHAIRMAN. Do your laws permit the leasing of farms to any people?

Mr. FRISSELLE. So far as I know they do.

Mr. SABATH. That is, outside of those who can not be naturalized?

Mr. FRISSELLE. Yes; Japanese and Chinese.

Mr. DICKSTEIN. Do you really believe that if we would remove the head tax and the expense attached thereto that that would induce Mexicans of the kind that you speak of to come in and work?

Mr. FRISSELLE. Yes. We are quite sure it would.

Mr. DICKSTEIN. Do you think that that is the only obstacle in their way?

Mr. FRISSELLE. Yes.

Mr. DICKSTEIN. And would that bring in the families you are talking about of the finer Mexicans?

Mr. FRISSELLE. I think with that removed there would be a selective board set up, and we can pick and choose.

Mr. DICKSTEIN. How about the literary tests? Do you think the Mexicans could pass that?

Mr. FRISSELLE. I think we could find enough of them.

Mr. DICKSTEIN. Have you made any survey?

Mr. FRISSELLE. The gentlemen who will follow me can tell you about that. I have not gone across the border.

Mr. DICKSTEIN. If we could give you white labor from Europe, would you accept that in preference to the Mexicans?

Mr. FRISSELLE. Yes. We would accept white men always in preference.

Mr. WILSON. Two years ago California came before this committee and stated herself in opposition to Chinese and Japanese immigration and in favor of Chinese and Japanese exclusion; stated that they wanted to develop a great big white State in California, a white man's country; and now you come before us and want unlimited Mexican immigration, so far as I can see. I can not see the consistency.

Mr. FRISSELLE. I do not think that our story carries unlimited Mexican immigration.

Mr. WILSON. You want some Mexican immigration?

Mr. FRISSELLE. We want some Mexican immigration. We would not want them and be asking for them if we had anyone else. That is the point I am trying to make.

Mr. WILSON. You do not want Chinese and Japanese?

Mr. FRISSELLE. No.

Digitized by Google

Mr. FREE. They will take the Chinese. They do not want the Japanese.

Mr. WILSON. It seems to me you are creating a situation that is going to bring about a great many undesirable citizens in this country, people of a race that is not white. I see that here in the city of Los Angeles 62 per cent of all the cases in the city maternity services are Mexicans.

Mr. FRISSELLE. They go quite often to that.

Mr. HOLADAY. Let us be entirely frank about this matter. As a matter of fact, what you want is a class of labor that will be of sufficiently low type that they will not have the ambition or make any effort to become owners of any of your land. Is not that really what you want?

Mr. FRISSELLE. No.

Mr. HOLADAY. Is not that the reason you object to the Japanese?

Mr. FRISSELLE. We want men to develop our agriculture, and the only available source that we can see is from across the Mexican border, and that is the complete story.

Mr. HOLADAY. Without developing an ambition to own any land.

Mr. WILSON. In other words, the Mexican does not save money and has no ambition to own any land. He is a gambler and he is always broke and always looking for more wages, and therefore you have a constant population that does not develop good citizenship or become landowners.

Mr. SABATH. They are asking for the Mexican, because they can not get the white labor, because you make it impossible to get the white labor; but being unable to get the white labor they are contented to get Mexicans, so as to enable them to farm their lands.

Mr. WILSON. Yes; but, Judge, I can not see the difference between Mexicans and Japanese and Chinese, except that the Japanese and Chinese are infinitely better.

Mr. SABATH. You know there is a question there.

Mr. Box. Mr. Frisselle, we had a gentleman here from another section of the United States, who presented a plea somewhat similar to yours for farm labor, but he said—I just want to see how nearly your position corresponds to his—in speaking of the agriculture in the South, run largely by negro or colored labor, he said:

> It is run on the basis of negro labor, which is better adapted to heavy work, say, in an iron foundry or a rolling mill. Negroes do not have the intelligence back of them to make good at scientific farming. They lower the standard of the whole agricultural situation.

Now, if any element of population of any color does that, on the whole, is it desirable for your State or for the country as a whole to have them?

Mr. FRISSELLE. It seems to me the problem for you to weigh is whether or not the development of agriculture is worth what it costs to carry it on.

Mr. Box. May I ask you another question? Have you studied the history of what my forefathers did in trying to solve the labor problem in the beginning of the organization of the Government of the United States in bringing in black labor because they could not get anybody else? They opened these magnificent farms that my colleague speaks of, in my section. Have you studied the his-

Digitized by Google

tory of that effort, with all the consequences it brought to the South and our country? Are you free from apprehensions that if you carry it forward in your State you will not bring about that or some kindred trouble?

Mr. FRISSELLE. No, sir.

Mr. Box. May I ask you, have you ever known how the country or read of one in history which filled the body of its citizenship with underling labor that did not have some dire consequences, just such as the South had from bringing black labor from Africa? I have not.

Mr. FRISSELLE. I take it that this is not comparable with that, in my opinion, because I maintain the Mexican is not an immigrant coming here for permanent residence.

Mr. Box. You say he has already brought you social problems?

Mr. FRISSELLE. Yes.

Mr. BACON. His children born here are citizens of this country.

Mr. FRISSELLE. They do not stay here.

Mr. BACON. Nevertheless, they may come back and are entitled to their citizenship.

Mr. FRISSELLE. The experience of railroads and others is that they do not stay. They are not immigrants. They come and go. They are homers and are not permanent residents.

Mr. Box. The final figures which I get from official sources in your State show that you received last year 4,800 Mexican immigrants from Mexico; that is those who came in legally. In your judgment, did you receive from Mexico a greater or a less number than that?

Mr. FRISSELLE. That would only be a guess.

Mr. Box. I am talking about California. There were 32,000 into the country, and 5,000, I will say, into California, who paid the head tax, and the other fees required by law.

Mr. FRISSELLE. Your border patrol proved that more came in than that.

Mr. Box. And you think more came into California than that?

Mr. FRISSELLE. Yes.

Mr. Box. You want 35,000 in your valley?

Mr. FRISSELLE. No; I beg your pardon. That is not a matter of record, that we need 35,000.

Mr. Box. I thought you said that.

Mr. FRISSELLE. I said we had 15,000 residents and we need 20,000 more.

Mr. Box. You need 35,000 altogether?

Mr. FRISSELLE. Yes, sir.

Mr. Box. You have 15,000 right there now, living there?

Mr. FRISSELLE. That is approximate.

Mr. Box. So then, if four-sevenths of those you do need become permanent residents——

Mr. FRISSELLE (interposing). The 20,000 we have are not laborers. They are the Italians and they are the tenants on the farms that come there and do work. They are not 20,000 Mexicans that come in there to do the work. This 20,000 people that we can call upon in the harvest season to do the work of various kinds.

Digitized by Google

Mr. Box. Some of them are permanent and some are not?

Mr. Frisselle. Most of them are not.

Mr. Dickstein. But that does not apply to Mexicans?

Mr. Sabath. That applies to Japanese, Portugese, Chinese, Filipinos, and all others.

Mr. Frisselle. Yes, sir.

Mr. Sabath. That is your supply of labor?

Mr. Frisselle. That is our permanent supply of labor.

## STATEMENT OF T. A. SULLIVAN, REPRESENTING THE FARMERS OF THE RED RIVER VALLEY, EAST GRAND FORKS, MINN.

The Chairman. Give your name and address to the stenographer.

Mr. Sullivan. Mr. Chairman and gentlemen, my name is T. A. Sullivan, and I live at East Grand Forks, Minn.

Mr. Taylor of Colorado. And whom do you represent?

Mr. Sullivan. I represent the farmers and beet growers of the Red River Valley of Minnesota and North Dakota. I live in a community of the Red River Valley that has been known as one of the great wheat-producing districts of the world. We have been known as the bread basket of the world for many years, and we maintain and defend that title against any other wheat-producing country in the Western Hemisphere. Our land, especially during the war time, of course, we have grown more wheat and continuous wheat until our lands are wheated out. It got so it did not pay, and we have turned our attention toward diversified farming—potato raising, and our latest crop is the growing of sugar beets. Corn does not do so well there because we are pretty well north.

We started in six years ago with 150 acres of sugar beets, and last year we had, I believe, in the neighborhood of 4,600 acres, and in the coming year we expect to have in the neighborhood of 15,000 acres of sugar beets. Take the great number of acres of potatoes that we have now. Potatoes were so high that we have possibly in the Red River Valley one-third of our lands in cultivated crops.

In the reports that have been made as to our beet crop, we have the tonnage for the farmer and the sugar content and purity for the manufacturer. The American Beet Sugar Co. has thought so much of our community that they are now building a two-million-dollar beet sugar factory there, which is expected to be completed for next year's crop.

You gentlemen, of course, know very well that there is a vast difference, so far as the demand for labor in producing a grain crop and producing a cultivated crop. The cultivated crop needs more help. Last year we had a vast number of sugar beets that we were unable to harvest, and a great many fields of potatoes that we did not get harvested, that was lost. Of course, our season fell a little irregular and we had a pretty early frost.

The cry of our farmers is this, that we have not enough labor, and many of our good old early settlers that have fought the battles and the storms of early days are compelled to leave their farms. The young boys and girls have been educated and gone to the cities, and the labor problem is a serious one with us. We are not in favor of any change in any way that is going to injure us in

Digitized by Google