# EXHIBIT R

## Law and Society: The Criminalization of Latinx in the United States

City University of New York (CUNY)

# CUNY Academic Works

Dissertations, Theses, and Capstone Projects CUNY Graduate Center

9-2019

# Law and Society: The Criminalization of Latinx in the United States

Gabriela Groenke
*The Graduate Center, City University of New York*

## How does access to this work benefit you? Let us know!

More information about this work at: https://academicworks.cuny.edu/gc_etds/3421

Discover additional works at: https://academicworks.cuny.edu

This work is made publicly available by the City University of New York (CUNY).
Contact: AcademicWorks@cuny.edu

LAW AND SOCIETY:

THE CRIMINALIZATION OF LATINX IN THE UNITED STATES

by

GABRIELA GROENKE

A master's thesis submitted to the Graduate Faculty in Liberal Studies in partial fulfillment of the

requirements for the degree of Master of Arts, The City University of New York

2019

© 2019

GABRIELA GROENKE

All Rights Reserved

Law and Society:
The Criminalization of Latinx in the United States

by

Gabriela Groenke

This manuscript has been read and accepted for the Graduate Faculty in Liberal Studies in satisfaction of the thesis requirement for the degree of Master of Arts.

_____

Date

_____

Leslie Paik

Thesis Advisor

_____

Date

_____

Elizabeth Macaulay-Lewis

Executive Officer

THE CITY UNIVERSITY OF NEW YORK

iii

ABSTRACT

Law and Society:
The Criminalization of Latinx in the United States

by

Gabriela Groenke

Advisor: Leslie Paik

The United States leads the world in incarceration with just over 2.2 million people in state or federal prisons or local jails in 2014 (Bureau of Justice Statistics 2016). Although the number of incarcerated individuals has declined by about .5 percent since its peak in 2008 (Bureau of Justice Statistics 2016), the fact remains that mass incarceration is an epidemic in the United States. Over the last decade much has been written about the effects of mass incarceration on people of color, with many analysts pointing to the fear of crime as contributing to the formulation of current policies, which in turn produce racial and ethnic inequalities in the American penal system (Morin 2009). For example, the "war on drugs" is often cited as the greatest force behind the growth of the prison population and has largely targeted the Latinx and African American communities, based on the misperception that they are responsible for a majority of drug-related crimes (Morín 2009). That Latinx have historically been perceived as criminals, drug-lords, and as particularly prone to violence has only increased support for punitive policies and harsher sentences.

As the country's largest racial and ethnic group and the fastest growing ethnic group being imprisoned, it is important to examine the ways in which the Latinx community has been impacted by the relationship between law and society in the U.S. Beginning with the understanding that law is both constituted by and constitutes social relations; this thesis aims to demonstrate the ways in which negative cultural stereotypes have been used to 1) create laws that criminalize Latinx groups and 2) sanction their mistreatment in legal and non-legal settings. By focusing on the specific time periods of the 1980s, 1990s, and early 2000s, we can see that negative images of Latinx groups perpetuated in the media are used strategically by policymakers to rouse public outcry and garner support for harsher, more punitive criminal justice and immigration policies for both adults and juveniles, contributing to higher incarceration rates and mass deportation. Once validated and reinforced by official law, these negative stereotypes then trickle down into non-legal social institutions.

## Table of Contents

I.      Introduction……………………………………………………………….      1

II.     The Social Construction of Latinx as "Other":
        The Latinx Experience in the U.S………………………………………….      4

III.    Political Rhetoric and the Law:
        How Perceptions of Latinx Inform Legislation……………………………      8

        *From the War on Crime to the War on Drugs*……………………………….      10

        *From the War on Drugs to Crimmigration*………………………………..      16

IV.     Enforcement and Interpretation:
        Racial Bias in the Criminal Justice System…………………………………      27

        *Law Enforcement: Latinx as Drug Criminals and "Illegals"*……………………..      27

        *Interpretation of the Law:*
        *Judicial Rulings, Sentencing, and Prosecutorial Discretion*…………………      39

V.      Non-Legal Institutions: Latinx Youth as Unintelligent Criminals…………………      48

VI.     Conclusion: The Legacy of the War on Drugs and Crimmigration on Latinx……..      53


Works Cited…………………………………………………………………………      56

I.     **Introduction**

In 2015, Donald Trump began his Presidential campaign by declaring that Mexicans were rapists, drug dealers, and criminals. In the two years since his inauguration, Donald Trump has doubled down on his position against Mexico and Latin America, separating and detaining families at the border, limiting those eligible to apply for asylum, attempting to shut down the Deferred Action for Childhood Arrivals (DACA) program and even shutting down the federal government over disputes of building a physical barrier between Mexico and the United States. While the President's rhetoric on Latinx immigrants has been unique in its frankness, he is not the first president or politician to invoke the use of racial and ethnic stereotypes of Latinx groups to garner support for tougher, more punitive policies on immigration, criminal justice, and even education. The invocation of these stereotypes by the dominant group has proven to be an effective tool in creating laws that are designed to both criminalize Latinx people and perpetuate existing social and economic inequalities by reinforcing the collective perception of Latinx as criminals.

The role of law in the U.S. has often served to perpetuate and reinforce the status quo, marginalizing and subjugating different racial and ethnic groups throughout its history. With the rise of mass incarceration, this tradition has exacerbated the criminalization of African Americans and Latinx. Understanding mass incarceration through the complex economic and social arrangements that fostered it requires examining not just laws and punitive policies, but the society that created them. How do these laws get written, passed, and implemented? What is the role of cultural views towards specific groups in that process? In particular, this thesis explores the law's impact on the way Latinx are perceived/treated and how these perceptions

limit the opportunities for social and economic mobility available to Latinx groups –both within and outside of legal settings.

One need only look to the racial and ethnic disparities in U.S. incarceration rates to understand that Latinx people are being systematically criminalized. With just over 2.2 million people in state or federal prisons or local jails at yearend 2014 (Bureau of Justice Statistics, 2016), the United States leads the world in incarceration. While much of the focus has been on African Americans specifically, Latinx groups have also been routinely targeted by the American legal system and are incarcerated at higher rates than whites. In 2017, the rate of imprisonment for Latinx (823 per 100,000) was over three times that of whites (272 per 100,000) (Gramlich 2019). Moreover, Latinx represent the largest ethnic group of sentenced federal offenders at 48 percent in 2012 (Light, Lopez, and Gonzalez-Barrera 2014), nearly triple their share (16.7%) of the population (U.S. Census 2012).

While the available data demonstrates an overrepresentation of Latinx in the criminal justice system, inconsistencies in reporting of race and ethnicity across national, state and county systems suggest an undercount of those in the system. For example, many data systems only collect information on race, offering choices for "White," African American," and "Other" – leaving out ethnic categories such as "Hispanic," (Walker et al. 2004). With limited choices for race, analysis of Census data reveals that more than 90% of Latinx reported their race as "White," which has often led to an overreporting of the number of "White" prisoners (Walker et al. 2004). In 1997, for example, Holman (2001) found that the percentage of "White" prisoners reported in Federal prison was 58%, while the actual number was slightly over 31% (cited in Walker et al. 2004). In 8 out of the 10 states surveyed, the study found an overreporting of Whites by as low as 6% and as high as 54% (Holman 2001 cited in Walker et al. 2004).

Due to the inconsistencies in reporting, the available data should therefore be interpreted as a conservative estimate. In fact, the true scale of Latinx in the criminal justice system is likely much larger. Nevertheless, even by conservative estimates Latinx are overrepresented at every stage of the criminal justice system. They are more likely than Whites to be arrested, detained before trial, incarcerated in state and federal prisons and jails, given longer sentences when convicted, and more likely to be on parole or probation (Walker et al. 2004). Because many Latinx individuals are immigrants, both documented and undocumented, they are also more likely to be arrested, detained and deported for immigration violations (Walker et al. 2004).

As the country's largest racial and ethnic group and the fastest growing ethnic group being imprisoned, it is important to examine the ways in which the Latinx community has been impacted by the relationship between law and society in the U.S. Beginning with the understanding that law is both constituted by and constitutes social relations; this thesis aims to demonstrate the ways in which negative cultural stereotypes have been used to 1) create laws that criminalize Latinx groups and 2) sanction their mistreatment in legal and non-legal settings. By focusing on the specific time periods of the 1980s, 1990s, and early 2000s, we can see that negative images of Latinx groups perpetuated in the media are used strategically by policymakers to rouse public outcry and garner support for harsher, more punitive criminal justice and immigration policies for both adults and juveniles, contributing to higher incarceration rates and mass deportation. Once validated and reinforced by official law, these negative stereotypes then trickle down into non-legal social institutions. In schools, for example, we see that Latinx youth are more likely to drop out of high school and less likely to attend college, limiting their employment opportunities. They are also punished more severely than their white peers and policed in such a way that makes their entrance into the criminal justice

system almost inevitable. The system, made up of social and legal institutions, is designed in such a way as to perpetuate the social and economic inequality of Latinx groups through laws, customs and politics.

This thesis is organized as follows. It first discusses the longstanding stereotypes of Latinx groups that serve to dehumanize and further marginalize them. It then turns to the ways in which these stereotypes were strategically invoked by dominant groups, via political rhetoric and news media coverage, to pass legislation and public policies that have contributed to the expansion of the American penal system. In particular, this section will focus on the political rhetoric and media coverage of crime and criminals leading up to the passing and implementation of the Anti-Drug Abuse Act of 1986, the Violent Crime Control and Law Enforcement Act of 1994, and the Illegal Reform and Immigrant Responsibility Act of 1996; as well as legislative initiatives such as Operation Tarmac, and Operation Streamline to name a few. The section that follows will examine how said laws are enforced, highlighting the use of stereotypes to inform police practices and discretionary decision making in criminal legal proceedings. The next section discusses the role of stereotypes in the everyday interactions of Latinx, particularly in schools, and the extent to which the law impacts the Latinx experience in non-legal spaces. Finally, this thesis will conclude with the enduring legacy of these laws and their impact on Latinx individuals today.

## II.     <u>The Social Construction of Latinx as "Other": The Latinx Experience in the U.S.</u>

The "Latin lover," the "Drug lord," the "hot-tempered, spicy Latina/o," the lazy drunkard who would prefer to "siesta" all day rather than work, the promiscuous and extremely fertile Latina who burdens the State, the unintelligent Latina/o who is either incapable or unwilling to learn English. These stereotypes, as well as others, have a long history in American culture. The

social construction of Latinx people in the United States as "other" dates as far back as the nineteenth century and has, historically, been strategically employed to justify U.S. laws and policies having to do with Latin American immigrants and their U.S.-born descendants (Morín, 2009).

Characterized by Alfredo Mirandé (1987) as "gringo justice," the U.S. has continuously formulated policy around the subordination of their neighbors across the border (cited in Morín 2009). The belief that Americans were destined to expand and remake the west in their image because of their racial, cultural and religious superiority provided the justification for the Mexican-American War. By the end of the war, in 1848, Mexico had been reduced to approximately half of its previous land-base, and the U.S. had succeeded in securing control over its territory and its people (Morín 2009). Rather than granting Mexicans in conquered territories U.S. citizenship and equal rights, they were characterized as "barbaric" and "inferior," undeserving of citizenship (Morín 2009). Similarly, Puerto Rico came under U.S. control in 1898 and was officially declared a territory of the United States in 1917, granting U.S. citizenship to Puerto Ricans. However, to this day Puerto Ricans do not benefit from the full rights afforded to American-born citizens under the U.S. Constitution. For example, Puerto Ricans cannot vote for the President of the United States and have no voting representation in the U.S. Congress, nor would they automatically have the right to a trial by jury (Morín 2009). While Puerto Ricans can be called upon to serve and fight in U.S. wars, they are not considered "part" of the U.S. and are relegated to a "second-class citizenship" (Morín 2009). The historical experiences of Mexicans and Puerto Ricans, who would come to form the largest groups of the Latinx community, paved the way for similar patterns of legal abuse and subordination of Latinx from other Latin American countries; constructing a group identity and what it means to be a Latinx in the United

States (Oquendo 1996; Morín 2009).

In his conceptualization of a Latinx "race," Oquendo (1996) argues that there are two aspects, or dimensions, that have come to shape a collective Latinx identity in the United States. The first, he argues, is the historical experience, which he notes distinguishes the Latinx community from all other immigrant communities in the United States. Citing first the colonial expansion of the nineteenth-century and then "an analogous Twentieth Century neo-colonial enterprise," Oquendo (1996) argues that the Latinx community is a part of the United States not by choice necessarily but due to similar patterns of conquest and subjugation. These historical experiences set up the necessary conditions – political, social, and economic – that "made a group of Latino(a)s part of the United States reality," and paved the way for subsequent rounds of migration (Oquendo 1996).

The second dimension critical to the shaping of a Latinx "race" is the Latinx community's ties to the Spanish language. While noting the complexities of this dimension, such as the fact that not all Latinx speak Spanish, Oquendo (1996) argues that all Latinx have some relationship to Spanish that affects how they perceive themselves and how others perceive them. Citing the use of the derogatory term "spik" for all Latinx groups, which focuses on the way Latinx *speak*, it is clear that language has played a crucial role in shaping the Latinx identity and how dominant groups respond to it (Oquendo 1996). To that end, the concept of a Latinx identity is useful in its application to Law and Society research in that it allows for patterns of discrimination and legal subordination to be more easily identified and understood within this context.

Recognizing the historical need for certain defined legal and subordinating relationships allows for a better understanding of why negative perceptions of Latinx are created, reinforced,

and perpetuated, and how these perceptions shape their subsequent treatment. As Armenta (2017: 6) points out, "ideas about race shape anti-immigrant legislation, and laws produce racial inequality, foster racial stereotypes, and imbue legal categories with racial meanings." Chavez's "Latino Threat Narrative" suggests that this has been particularly true for Latinx immigrants in the United States. He notes that while previous immigrant groups were eventually accepted into the American collective, such as the Irish and Italians, Latinx immigrants are generally perceived as either unwilling or unable to assimilate, making them a cultural threat to the nation (Timberlake et al. 2015). While the characterization of Mexicans as "barbaric" and "inferior" justified colonial expansion, the social and legal construction of Latinx as criminally inclined played a vital role in controlling the newly acquired population through legislation.

The Anti-Vagrancy Act of 1855, more commonly known as the "Greaser Act," was an anti-vagrancy law that defined vagrants as "all persons who are commonly known as 'Greasers' or the issue [children] of Spanish and Indian blood" (Morín 2009, 21). At the time, the term *greaser* referred to anyone of Mexican appearance in California and the Southwest, stemming from either the practice of Mexican laborers greasing their backs to facilitate the unloading of hides and cargo, the similarity between Mexican skin color and grease, or the general conception of Mexicans as unclean with dirty, greasy black hair (Bender 2003). Under the Greaser Act, those suspected of vagrancy, as defined by the law, were arrested and were either deported or sent to forced labor. It also legalized the confiscation of their property and the lynching of "recalcitrant individuals" (Heidenreic 2015). The Greaser Act is one of the earlier examples of the criminalization of Latinx through U.S. law and would continue to shape the perception of Latinx for years to come.

**III.**     **Political Rhetoric and the Law: How Perceptions of Latinx Inform Legislation**

That Latinx have historically been perceived as criminals, drug-lords, and as particularly prone to violence has only increased support for punitive policies and harsher sentences, as reflected in the growth of Latinx in the criminal justice system. While politicians and public officials have a vested interest in the social construction of Latinx as criminally inclined, evidence suggests that the media also plays a crucial role in promoting and perpetuating negative stereotypes of Latinx (Reinarman and Levine 1997; Beckett and Sasson 2004). In 1871, for example, a Texas newspaper wrote about the perceived lack of sanitation among Mexicans, suggesting that they kept their hogs in the house and even equating them with the animals writing, "…from the similarity it was hard to tell where the hogs left off and inhabitants began" (Bender 2003, 115). The undisguised racial animus expressed in this article was characteristic of the time, reflecting and perpetuating popular sentiments.

Larson (2006) emphasizes the power of news media to help readers and viewers "develop, reinforce, or challenge assumptions about race," by using a variety of techniques to shape news. While racial stereotypes tend to be thought of as crude or explicit, they are often conveyed more subtly in news stories through story selection, the types of stories that feature people of color, or in the phrasing of headlines and sentences (Larson 2006 citing Dashiell 1996). To that end, when racial minorities are the subjects of hard news, most often in crime stories, the focus is on the threat they pose to the social structure and their opposition to whites (Larson 2006). Conversely, soft news coverage of racial minorities tends to highlight their "otherness" by focusing on colorful festivals, celebrations, rituals, and clothing, which ultimately trivializes them by "demonstrating how 'different' they are" (Larson 2006).

In addition to the types of news stories about people of color, news media often depict

only two types of racial minorities – the "good" and the "bad" – reinforcing American ideals. Upper- and middle-class racial minorities, the "good" type, are held up as the epitome of the American Dream, having overcome their circumstances through hard work and determination (Larson 2006). These individuals demonstrate that "discrimination is a thing of the past" (Larson 2006). On the other hand, "bad" minorities – poor people, protestors, and criminals – are portrayed as victims of their own making and pose a threat to society (Larson 2006). The emphasis on individual behavior to explain success or failure serves to dispel the notion of an inherently flawed system, built on racism, that works to preserve the status quo.

News coverage of the Latinx community in Los Angeles in the early 1940s demonstrates the impact of story selection, language and the depiction of Latinx as "bad" minorities on public attitudes and behaviors toward Latinx. Local newspapers' constant use of racially inflammatory language to sensationalize crime among the Latinx community and highlight their "otherness" largely incited the anti-Mexican sentiment that culminated in the Zoot Suit Riots of 1943. With headlines referring to "Mexican goon squads," and "pachuco killers," the media cited zoot suits as further proof of Mexicans' unwillingness to assimilate and to adopt American styles of dress and culture. Charged with a patriotism that was characteristic of the time and bolstered by reports of increased violence and crime, white off-duty servicemen sought out and assaulted Latinx youth dressed in zoot suits in the barrios of Los Angeles, starting riots in Los Angeles as well as other major cities around the country (Bender 2003).

The characterization of Latinx as criminals and as unwilling to assimilate justified their punishment at the hands of vigilantes, just as their inherent "inferiority" had justified their subordination in 1848. As demonstrated by public opinion polls and studies of the time, many Americans shared these views. For example, a public opinion poll in 1940 and a study of

American attitudes in 1949 revealed a significant number of Americans believed Latinx to be "quick-tempered," "lazy," "ignorant," "suspicious," "unintelligent," and "promiscuous" among other things (Bender 2003, 12). These characterizations lead to larger societal issues, namely the perceived "problem" of immigration and the association of immigrant status with criminality.

By the 1960s, the issue of crime in America dominated political rhetoric, shaping the public's perception of the crime issue in America and calling for measures to combat it. Politicians relied on the media to highlight "street crime" and used it to amplify its message that crime and violence were the results of immoral individuals encouraged by excessively lenient welfare and criminal justice systems (Beckett and Sasson 2004). While the rhetoric seemed race-neutral, focusing on crime and drugs as important issues that needed to be addressed to keep the public safe, race relations and racist sentiments lay at the heart of these discussions. In order to contain and control communities of color through public policy, politicians invoked longstanding stereotypes of African Americans and Latinx as violent criminals through coded political rhetoric and media representations of crime that focused, almost exclusively, on communities of color. Thus, as Beckett and Sasson (2004) argue, "the war on crime and drugs is the consequence of political efforts to shift perception of and policy regarding a variety of social problems—including crime, addiction, and poverty—toward harsher, more repressive solutions." This same political strategy would later be used to exploit the war on terror, which would have a detrimental effect on the incarceration and deportation of Latinx.

### From the War on Crime to the War on Drugs

While the politicization of crime and the perception of people of color as inherently criminal has a long history in the U.S. (*see* Muhammad 2010 and Murakawa 2008), it reached national levels in the 1960s as a response by conservative politicians to the civil rights movement

and the expansion of War on Poverty programs (Beckett and Sasson 2004). In an attempt to steer state policy away from social welfare programs and toward social control, political leaders sought to frame crime-related issues as the result of a lenient criminal justice system and an overly supportive welfare system. Seeking to discredit the civil rights movement and its leaders, southern officials mobilized the law and order discourse, framing civil protests as criminal rather than political. Those who challenged segregation were labeled "hoodlums" and "lawbreakers" (Beckett and Sasson 2004). At the same time, conservative politicians who were intent on curtailing government spending on welfare programs sought to reframe the issue of crime in America as the result of individual behavior rather than poverty itself. Where Great Society programs sought to ameliorate poverty and, by extension, crime, the law and order discourse helped to establish a new "war on crime" that could only be resolved through more punitive measures.

By 1964, the law and order discourse had gained national prominence when Republican presidential candidate Barry Goldwater made it the central issue of his campaign, citing the "abuse of law and order" as a country-wide issue (Beckett and Sasson 2004). In heightening the fear of crime and highlighting crime rates among the urban poor, who were predominantly African American and Latinx, GOP leaders sought to appeal to white voters who were opposed to racial reform. Thus, the law and order discourse "provided a means by which a number of preexisting fears and concerns—about the pace and nature of social change, as well as the means used in an attempt to bring this change about—were tapped, organized, and given expression" (Beckett and Sasson 2004). In this way, it is clear that while political rhetoric does have the power to shape public perception around social issues, it must be expressed under the right social conditions and to an audience that is already predisposed to its message. How that rhetoric then

11

translates into policy is best exemplified by the initiatives that came out of the war on drugs and, later, the war on terror.

As a presidential candidate, Ronald Reagan renewed the law and order discourse and put the issue of crime back in the national spotlight, promising to enhance measures to combat "crime in the streets" (Beckett and Sasson 2004). Once elected, Reagan sought to circumvent the federal government's lack of authority over criminal law enforcement by focusing on "drugs as a crucial cause of crime," as Nixon had before him (Beckett and Sasson 2004). In order to enlist support for federal changes from lawmakers, the issue of drugs had to be of national concern to the American public. Public opinion polls of the early 1980s, however, indicate that the issue of drugs as a precursor to crime, necessitating tougher law enforcement, was not widely supported by the American public. By 1981, for example, only 3% of the American public believed that a reduction of the drug supply would lead to lower crime rates (Beckett and Sasson 2004). The administration and public officials turned to the media to change this. As described by Robert Stutman, Director of the DEA office in New York City, the role of the media was key:

> In order to convince Washington, I needed to make it [drugs] a national issue and quickly. I began a lobbying effort and I used the media. The media were only too willing to cooperate, because as far as the New York media [were] concerned, crack was the hottest combat reporting story to come along since the end of the Vietnam war (Beckett and Sasson 2004, 63 citing Stutman 1992).

News media played an instrumental role in establishing a "moral panic;" cultivating public fear around the issue of drugs and tapping into unacknowledged racism by perpetuating racial stereotypes.

Political efforts to employ the use of the media in the war on drugs were largely successful. After the highly publicized cocaine-related deaths of two celebrity athletes, news coverage of crack cocaine skyrocketed in the latter half of 1986 and focused primarily on poor African Americans and Latinx (Reinarman and Levine 1997; Beckett and Sasson 2004). The

crack "epidemic" became a nightly news event for major TV networks, generating high ratings and advertising dollars, and was covered extensively by print media as well (Reinarman and Levine 1997). Although crack was largely contained in impoverished urban areas that were predominantly African American or Latinx, or likely because of that, it was portrayed as a nation-wide issue. As Reinarman and Levine (1997) point out, there was little to no political or media coverage when cocaine use, in its powder form, among middle- and upper-class whites rose sharply in the late 1970s. The message about crack, however, was clear: it was a danger to Americans everywhere, and something had to be done about the criminals who used and sold it.

Prominent political leaders, led by the Reagan administration, heard this call to action and antidrug legislation soon followed in both the House and the Senate, culminating in the Anti-Drug Abuse Act of 1986, which was later amended in 1988. Among other things, the Act increased federal spending on antidrug efforts and assigned the military to aid in the control of narcotics (Beckett and Sasson 2004). Most importantly, however, were the sentencing statutes imposed by the Act. The Act set forth mandatory minimum sentences that differentiated between two forms of cocaine: powder and crack, imposing more severe penalties for crack offenses.

For example, under the Act, trafficking of 5 grams or more of crack cocaine triggers a five-year mandatory minimum sentence for first-time offenders. Conversely, trafficking of *500 grams* or more of powder cocaine triggers the same sentence for first-time offenders (United States Sentencing Commission 1995). In addition, the Act made crack cocaine the only drug to trigger a mandatory minimum sentence for simple possession. Possession of any other substance, of any quantity, by a first-time offender is classified as a misdemeanor and carries a maximum sentence of one year (United States Sentencing Commission 1995). The consequences of this law, as well as subsequent anti-crime legislation, would lead to the dramatic expansion of the

American penal system and would significantly contribute to the racial and ethnic disparities of its prisoners.

Since 1980, the number of individuals incarcerated for drug offenses went from 40,900 to 452,900 by 2017 (The Sentencing Project 2018). Between 1995 and 2001 alone, the U.S. Department of Justice attributed the 61% growth in the number of prison inmates in the federal system largely to the increase in the number of drug offenders, which accounted for 48% of the total growth (Walker et al. 2004). As historically perceived "drug-lords" and "narco-traffickers," Latinx have been routinely targeted for drug arrests and convictions. By yearend 2015, almost half of all prisoners sentenced in federal prisons were convicted for drug offenses. Of the total number of prisoners sentenced for drug offenses, 38% were Latinx – just over twice their share of the population (Carson and Anderson 2016; U.S. Census 2015).

Rather than neutralizing the war on drugs, the Drug Abuse Act seems to have galvanized political efforts to take it further. In President Bush's first nationally televised address in September 1989, for example, he focused exclusively on the drug crisis and mapped out his plan to combat it (Reinarman and Levine 1997; Beckett and Sasson 2004). During this address, Bush held up a bag of crack and claimed that it was "seized" in a park across the street from the White House, in order to demonstrate how widespread the drug trade had become (Reinarman and Levine 1997). The truth, however, was that federal drug agents had a difficult time finding anyone selling crack in the area and had to get creative in order to do so (Reinarman and Levine 1997). Nevertheless, the prop used by the President had the desired effect. Shortly after this address, 64% of those polled by the *New York Times/CBS News* identified drugs as the most important problem in America (Reinarman and Levine 1997), when only 1% had held that opinion in January 1985 (Reinarman and Levine 1997). Evidently, intentionally misleading the

public was a necessary evil in the quest for the social and legal subordination of racialized "others."

By the time President Clinton took office in 1993, political rhetoric had shifted yet again from being drugs-centered to focusing on crime in general and violent crime in particular. As a presidential candidate, Clinton adopted the tough-on-crime strategy that proved successful for his GOP predecessors. He supported tougher penalties for drug offensives, police expansion efforts, and aggressive border control measures (Beckett and Sasson 2004). Once elected, Clinton helped pass some of the toughest crime policies to date, resulting in the largest increases in federal and state prison inmates of any other president (The Justice Policy Institute 2001). By the end of his presidency, the federal incarceration rate under Clinton was 42 per 100,000, which was more than double that of Reagan's (17 per 100,000) and 61% higher than at the end of Bush's term (25 per 100,000) (The Justice Policy Institute 2001). Over 50% of these inmates were serving time for drug-offenses (The Justice Policy Institute 2001).

Although the rate of violent crime in the United States had begun to decline by 1992, Republicans and Democrats alike began introducing anticrime legislation in August 1993, differing only in their positions on gun control, crime prevention programs, and the use of federal aid to local law enforcement (Beckett and Sasson 2004). As was the case at the start of the drug war, the American public was not particularly concerned with crime before the campaign for anticrime legislation began, with only 9% of those polled in June 1993 feeling as though crime was the most important issue in America (Public Opinion Survey 1994). By October of that same year, however, that number increased to 22% and then to 32% by January 1994 (Public Opinion Survey 1994). While the publicity surrounding the proposed anticrime legislation likely influenced this shift in public perception, news coverage of crime played an

15

important role as well.

Between 1993 and 1994, newspaper and television coverage of violent crime increased by more than 400% (Beckett and Sasson 2004 citing Chiricos, Eschholz, and Gertz 1997). Crime stories dominated nightly newscasts on major news networks such as ABC, NBC, and CBS between 1990 and 1999 (Beckett and Sasson 2004); and although the homicide rate had declined by 33% between 1990 and 1998, network news coverage of homicide increased by 473% (Beckett and Sasson 2004 citing Dorfman and Schiraldi 2001, p. 10).

Once again, the use of the media proved effective in the war on crime efforts. By 1994, Democrats and Republicans settled on the Violent Crime Control and Law Enforcement Act. In addition to authorizing billions of dollars for crime prevention, law enforcement and state prison construction (Beckett and Sasson 2004), the law imposed even harsher sentencing statutes and encouraged states to increase the use of incarceration (Sabol et al. 2002). For example, the "three strikes" provision, an adaptation of California's state law, mandated life sentences for three-time federal offenders (Hurwitz and Peffley 2010); while the "truth in sentencing" program granted federal funds to states that implemented laws requiring convicted violent offenders to serve no less than 85% of their sentence (Sabol et al. 2002). Clearly an excessively punitive policy, Clinton succeeded in wresting the tough-on-crime platform away from the GOP and made it his own.

### From the War on Drugs to Crimmigration

While the "war on drugs" is often cited as the greatest force behind the growth of the prison population, targeting the African American and Latinx communities, the convergence of criminal and immigration law, or "crimmigration" as it is now referred to, has played a crucial role in the incarceration of Latinx specifically. In fact, the criminal justice system has become

16

the primary means for identifying, detaining and deporting immigrants – documented and undocumented alike.

The political rhetoric on the war on crime, revitalized by the Reagan administration in the drug war and invoked by politicians thereafter, was not confined to the issue of drugs that targeted African American and U.S.-born Latinx communities. Reagan also took a law and order approach to immigration, implementing policies that prohibited, detained, and deported refugees seeking asylum (Macías-Rojas 2018). Beginning in the early 1980s, the United States and other industrialized countries saw an increase in the number of asylum seekers from Cuba, El Salvador, Haiti, and Nicaragua, among other countries (Macías-Rojas 2018). While the United States has, historically, vacillated between restrictive and loose immigration policies, the Refugee Act of 1980 demonstrated an alignment of U.S. immigration law with international human rights law (Macías-Rojas 2018). An influx of refugees seeking safety and fleeing civil wars, however, shifted the political narrative. Suddenly, Cuban and Haitian refugees were depicted as "criminals" and "dangerous classes" and public concerns over immigrants and immigration grew (Macías-Rojas 2018).

In 1982, 84 percent of the public expressed concerns about the number of "illegal aliens" in the country (Espenshade and Calhoun 1993). By 1984, the Reagan administration began to frame unauthorized immigration as a national security issue, stating "The simple truth is that we've lost control of our borders and no nation can do that to survive" (Nevins 2010, 55 citing Morganthau 1984). Public opinion continued to support these views, as demonstrated by a 1990 Roper poll in which more than three-fourths of those surveyed believed that U.S. immigration levels should not be increased and nearly one-half felt that it should be lowered (Espenshade and Calhoun 1993). This would lead not only to punitive legislation in immigration but would also

include immigrants as targets in the war on drugs.

The first instance of legislation that specifically targeted immigrants in the drug war was in the aforementioned Anti-Drug Abuse Act of 1986. In addition to the provisions already noted, the law expanded grounds for deportation, making drug convictions a deportable offense for noncitizens (Macías-Rojas 2018). It also established pilot programs that enhanced the communication and information exchange between the Immigration and Naturalization Service (INS) and state and local law enforcement (Macías-Rojas 2018). Following the Anti-Drug Abuse Act of 1986, the Immigration Reform and Control Act (IRCA) included a similar provision that further expanded grounds for deportation. The act included funding for an "Alien Criminal Apprehension Program," which sought to deport immigrants in the criminal justice system after completing their sentences (Macías-Rojas 2018). Not satisfied with the deportation provisions set forth under the two acts, the Anti-Drug Abuse Act was later amended in 1988 to include a new "aggravated felony" category (Macías-Rojas 2018). At the time, the term "aggravated felony" referred to convictions for murder and illicit drug and firearms trafficking as deportable offenses (Macías-Rojas 2018). Today, however, there are over 30 types of crimes that are considered "aggravated felonies," including minor infractions, that would not be classified as felonies for citizens. Although Reagan's immigrant detention and deportation policies were largely contested by civil rights groups, the immigration provisions set forth under these criminal justice policies paved the way for a renewed discourse on immigration and criminality.

The presence of a growing immigrant population in the 1990s generated heated debates over immigrant rights and immigration policies throughout the country. Many anti-immigrant advocates argued for a zero-tolerance policy in which even the most basic rights were denied. They argued that basic rights for immigrants would lead to additional rights claims and would

only encourage "further rounds of immigration" (Nicholls 2013, 24). While crime-centered political rhetoric initially focused largely on the war on drugs and targeted U.S.-born communities of color, immigrants were rounded up and deported after being convicted of drug crimes largely because of prison overcrowding (Macías-Rojas 2018). In the early 1990s, however, Democrats shifted their position on unauthorized migration and began campaigning for tougher immigration laws, including making unauthorized border crossings a criminal offense (Macías-Rojas 2018).

As it had during the drug war, national reporting of the "Latino threat" helped shape public perception on immigration and encouraged support for stricter policies. Between 1992 and 1994 alone, eighteen magazine covers were devoted to the topic of immigration (Chavez 2001). The *Time's* 9 April 1990 cover is particularly revealing in both its text and imagery. The cover depicted an American flag with black, brown, and yellow stripes standing in for the traditional red, white and blue. While still present, the color white had been "squeezed out" and was practically nonexistent; its meaning unambiguous and made explicit by the accompanying text: "America's Changing Colors: What will the U.S. be like when whites are no longer the majority?" (Chavez 2001, 137). As one of the articles in the issue stated, "The 'browning of America' will alter everything in society, from politics and education to industry, values and culture," (Chavez 2001, 137). The article implied that the demographic changes America was undergoing would change the way White Americans saw themselves, as they were generally "accustomed to thinking of themselves as the very picture of their nation" (Chavez 2001, 138). While the article did not explicitly argue for or against immigration reform, it no doubt played on White Americans' fear of becoming a minority in "their own nation."

Magazine covers and articles continued to focus on immigration and demographic shifts

in the early 1990s. The *New Republic* chose to focus on racial tensions between Latinx immigrants and African Americans in 1991, after an African American police officer shot and killed a Salvadoran immigrant in a neighborhood park; while others depicted the state at the border as a crisis that threatened the nation (Chavez 2001). The cover of the May 1992 issue of the *Atlantic Monthly*, for example, read: "The Border: In the tense, hybrid world along the U.S.-Mexico border, Mexico's problems are becoming America's problems." (Chavez 2001, 145). In August of 1993, *Newsweek* put an image of a drowning Statue of Liberty on its cover with text that read: "Immigration Backlash: A Newsweek poll: 60% of Americans say immigration is 'bad for the country.'" (Chavez 2001, 161). In fact, a September 1993 Gallup Poll found that three out of ten Americans listed "illegal immigration" as the country's most important problem (Nevins 2010 citing McDonald 1997).

As more and more Americans were beginning to view immigration as a threat to the nation, the magazine covers grew more hostile. The cover of *American Heritage*'s March issue of 1994, for example, featured yet another image of the Statue of Liberty, but instead of holding a torch, the image had been altered to depict her pointing away. The text of the cover underscored the gesture: "Go Back Where You Came From: Since the very beginning, many Americans have wanted this to be our immigration policy. Is it starting to happen?" (Chavez 2001, 175). As the debates over immigration intensified in the media, political debates over immigration reform were no less intense.

Democrats and Republicans alike blamed undocumented immigrants for "crowding" social institutions, such as schools and hospitals, as well as the labor market, and American taxpayers were portrayed as the victims of this overcrowding (Macías-Rojas 2018). In doing so, they garnered support for equally punitive federal and state-level anti-immigration laws.

Although immigration authority generally lies with the federal government, states have the authority to pass legislation restricting immigrants' rights, access to social institutions and government assistance. Because congressional leaders and local politicians also have the power to shape public perception and policy, it is important to examine the immigration issues developing at the state and local levels around this time to assess their impact on the federal immigration policies that came out of the 1990s.

In California, for example, the immigrant issue was strategically exploited to explain the economic recession. In an effort to win his reelection, Governor Pete Wilson lashed out at immigrants and blamed them for the state's economic problems. As described by Santa Ana (2002, 6),

> Wilson claimed that federal mandates to educate the children of illegal immigrants and provide these families emergency health care accounted for $1.75 billion of California's debt. The 'perverse incentives' that Wilson proposed to abolish included those arising from federal laws that mandate public education and health services for immigrant families, as well as the Fourteenth Amendment of the U.S. Constitution, which grants citizenship to children born in the United States, regardless of the status of their parents. This baldly nativist rhetoric won Wilson roars of approval from recession-weary voters. Immigration became an emotionally charged political issue, as it had been in other recessionary times, and the mood of the dominant constituencies of California political life became perceptively negative toward Latinos.

Public outrage ensued and anti-Latinx sentiments were no longer confined to private discussions. Anti-Latinx legislation soon followed and Proposition 187 was received by the general public with open arms. Commonly known as the "Save Our State (SOS) initiative," Proposition 187 sought to deny undocumented immigrants the right to social services and undocumented children the right to attend primary and secondary schools (Nicholls 2013). Despite being "certifiably unconstitutional," the proposition was approved, and Pete Wilson was reelected in November of 1994 (Santa Ana 2002, 6).

Relying on the perceived threat of immigrants as competitors for economic resources,

Wilson used welfare tropes and the association of immigrants as "illegals" to garner public support for himself and for harsher state policies. Wilson's anti-Latinx message resonated so deeply with the public because it connected to long-held beliefs that had otherwise been dormant while economic conditions had been stable. Although the crime rate in California had declined and a majority of immigrants in California were documented and lawfully present, Wilson highlighted immigrants as a burden on taxpayers and cited their overrepresentation in prisons as evidence of that burden (Macías-Rojas 2018). Rather than addressing the punitive criminal policies responsible for prison overcrowding, immigrants and Latinx immigrants in particular were depicted as criminals and thus unworthy of the social benefits and the constitutional rights afforded to "real" Americans. As Hagan and Palloni (1999) argue, the government and the media have the power to perpetuate and reinforce stereotypes and misperceptions of Latin American immigrants by reporting on the growing number of Latinx in prison, which obscure the policies and practices that increase incarceration rates in the first place. Wilson's decision to focus his campaign on immigrants, often linking them with criminality, proved to be an effective strategy. His re-election demonstrates an acceptance of the rhetoric and reflects the anti-immigrant sentiment held by many in California at the time.

At the national level, the convergence crime politics and immigration began to recast immigration as a criminal matter. Perhaps encouraged by Governor Wilson's success, candidates in the 1996 Presidential election also highlighted the immigration "problem" and promised to put an end to it. The media continued to add fuel to the immigrant fire by using divisive language to exacerbate the fear over the impact of immigration on society. The *Wall Street Journal*, for example, published an article titled, "Backlash Over Immigration Has Entered Mainstream This Year," in which it noted the public's concern over a "fraying of the social order" (Hagan and

Palloni 1999, 618). That same year, Congress increased the budget of the Immigration and Naturalization Service (INS), and the growing concern over the issue of "illegals" and their threat to society lead to the implementation of the 1996 Antiterrorism and Effective Death Penalty Act (AEDPA) and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA).

After the Oklahoma City bombing in April 1995, legislators seized the opportunity to pass anti-terrorism legislation that targeted "alien terrorists" and included measures "aimed at deporting and denying asylum to immigrants with membership in designated 'terrorist organizations.'" (Macías-Rojas 2018, 9). While acknowledging that the Oklahoma City bombing was caused by "our own people," legislators used the event to mobilize national security rhetoric and garner support for AEDPA, which was signed into law on April 24, 1996 (Macías-Rojas 2018). Although the bill's "counterterrorism" measures targeted Arab and Muslim immigrant communities in the U.S., the domestic crime provisions in the bill, such as restrictions on habeas corpus in death penalty cases, disproportionately impacted Blacks and Latinx in the criminal justice system; while the "criminal alien deportation" provisions that sought to expedite deportation proceedings mostly affected Latin American and Caribbean immigrants (Macías-Rojas 2018). Because of the affect AEDPA had on legal permanent residents and asylum seekers, debates over immigration continued and the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA) soon followed.

In addition to allocating more funding for border protection, IIRIRA expanded "zero tolerance" approaches to "immigration reform" and ultimately lead to the increased involvement of immigrants in the criminal justice system (Macías-Rojas 2018, 13). While IIRIRA was an immigration bill, it was shaped by crime politics and the law and order discourse that had

dominated political rhetoric since the 1960s. IIRIRA further expanded grounds for deportation and added convictions "accompanied by a sentence of one year or longer" to the already expanded list of "aggravated felonies" (Macías-Rojas 2018, 13 citing Osuna 1996 and Smith and Grant 1996). It also provided funding for criminal enforcement priorities, mandatory detention of "aliens" with orders of removal, fast-tracked deportation, and authorized the formal cooperation of state and local law enforcement personnel in federal immigration enforcement under the 287(g) program (Macías-Rojas 2018). This law, and the 287(g) program in particular, would have a profound impact on the convergence of criminal justice and immigration, and significantly increased the incarceration and deportation of Latinx immigrants.

The effort to target "criminal aliens" was bipartisan and was characterized as necessary to ensure the safety of the American public. Lamar Smith, a Republican Representative from Texas, and Edward Grant drew on crime rhetoric to link immigration with crime, writing:

> When immigration is accompanied by lawlessness, the American people suffer through loss of life, health and property. In addition, when accompanied by crime, immigration comes to be seen not as a source of pride and renewal for all Americans but as a contributor to our problems. In the end, therefore, it is the immigrants themselves who pay for our failure to be decisive in our treatment of criminal aliens (Macías-Rojas 2018, 12 citing Smith and Grant 1996, 963)

While noting that a vast majority of legal immigrants were law-abiding, and that even "illegal" immigrants commit mostly immigration-related offenses, they still emphasized the association of immigrants and criminality in their justification for punitive immigration policies. The war on crime had expanded to include immigration policies and would continue to expand with the war on terror.

While the fear of terrorism was a reality most Americans were grappling with after the attacks on 9/11, the long history of unequal and unjust treatment of Latinx within the criminal justice system would indicate that terrorism was incidental. The primary agenda was border

24

control and the subordination of those who managed to get past the border. The political climate

of post-9/11 America was one that, according to Nicholls (2013, 35),

> …encouraged the enactment of increasingly repressive measures. Between 2001 and 2005 three new restrictive immigration laws were passed by Congress, and six different operations were initiated by Homeland Security… The discursive coupling of immigration and terrorism played an instrumental role in driving restrictive immigration policies and directing them disproportionately at Mexican immigrants.

Although the war on terror has always focused on and targeted Arab Americans and Muslims,

the long association of Latinx with violence and criminality has made the Latinx community an

easy, secondary target of the war on terror. As Bender (2002, 1154) argues, "Given their societal

construction as violent, foreign, criminal-minded, disloyal, and as overrunning the border, there

are numerous grounds by which Americans might similarly construct Latinas/os as a terrorist

threat." More specifically, the association of Latinx with drugs and gang activity, "could shape a

conception of Latinas/os as 'narco-terrorists,'" (Bender 2002, 1155).

Public officials encouraged this conception by highlighting the link between drugs and

terrorist activity. Congressman Mark Souder (R-IL), for example, stated that "Americans who

buy and sell illegal narcotics are lending a helping hand to people like those who attacked

American on September 11" (Bender 2002, 1155). In citing the production of heroin in

Afghanistan, whose proceeds helped fund al-Qaeda terrorist campaigns, government officials

were able to further justify policing measures and military intervention in the national and

international war on drugs (Bender 2002). Under this pretense, the federal government launched

Operation Tarmac in 2002, which primarily targeted undocumented airport workers, most of

whom were Latinx, with access to restricted areas such as flight meal kitchens, runways and

airplanes (Bender 2002). "Illegals," however, were not the only targets. As Bender (2002, 1162)

points out, "Congress imposed a citizenship requirement on airport screeners, a substantial

number of which are non-citizen Latinas/os." In support of this initiative, an anti-immigrant group in Utah justified these tactics by denouncing Mexican airport employees as disloyal to America and thus easily susceptible to bribes from "Arab" terrorists to plant weapons on planes (Bender 2002).

Congress continued to demonstrate its commitment to the criminalization of immigrants through the merging of the criminal justice system and immigration enforcement bureaucracies; which, until the 1990s, seldom coordinated with one another (Gottschalk 2015). In 2003, Congress established the Department of Homeland Securities (DHS), replacing the Immigration and Naturalization Services (INS) agency with three new entities: U.S. Citizenship and Immigration Services (USCIS), U.S. Immigration and Customs Enforcement (ICE), and U.S. Customs and Border Protection (CBP) (Department of Homeland Securities 2019). Under the DHS, ICE and Border Patrol have initiated their own programs aimed at apprehending and removing undocumented immigrants, often with the help of state and local law enforcement agencies. The DHS and the Justice Department have also made this partnership more formal through joint initiatives aimed at capturing, incarcerating and then deporting undocumented immigrants.

The criminal and immigration policies that came out of the 1980s,1990s and early 2000s were endorsed and enacted by political leaders aiming to control communities of color and ensure their subordination. Whether in campaigns or nationally televised speeches, the law and order discourse enabled politicians to use racially coded language that tapped into deeply held racial and ethnic biases by dominant groups in society. News media played a crucial role in this regard by not only establishing "moral panics" but also in perpetuating negative stereotypes of Latinx that persist today. In criminalizing specific groups, political rhetoric succeeded in shaping

public opinion on crime, drugs and immigration; dramatically altering the American penal system.

## IV.    Enforcement and Interpretation: Racial Bias in the Criminal Justice System

While perceptions of Latinx as inherently criminal provide the justification for harsher criminal justice policies, they also influence the ways in which those laws are then enforced and interpreted. As mentioned, Latinx are overrepresented at every stage of the criminal justice system and are continually subjected to racial and ethnic biases from actors within the system. From practices of racial profiling by law enforcement agents, decisions regarding whom to prosecute and what charges to file, racial and ethnic bias among jurors, sentencing and judicial discretion, Latinx are often burdened by the cultural and ethnic stereotypes that assume they are not law-abiding citizens or even lawfully present in the United States.

The drug war and the federal government's policies on immigration have not only exacerbated these perceptions, they have also incentivized law enforcement agencies to produce results, i.e. narcotics, fire-arms, and undocumented migrants (Walker 2001). In addition to the federal funding provided to federal, state, and local law enforcement agencies for anti-drug efforts, a considerable increase in funding has led to the establishment of several federal institutions, initiatives and programs that rely on law enforcement tactics and strategies to enforce immigration; arguably resulting in the widespread practice of racial profiling of Latinx individuals (Gottschalk 2015).

### Law Enforcement: Latinx as Drug Criminals and "Illegals"

At the earliest stage, the stage of arrest, decisions made by law enforcement officials regarding what areas to target for crime and which individuals to stop for suspected criminal activity often negatively impact Latinx and people of color in general. Minority communities are

27

targeted for greater surveillance and aggressive arrest policies by city police departments because they are typically designated as "high crime" areas (Walker et al. 2004). Referencing a study funded by the National Institute of Justice of the San Jose Police Department (SJPD) in California, Walker et al. (2004: 58) note that a greater number of police officers are typically assigned to areas with relatively high minority populations "because of the greater number of calls for police service and reported crimes those areas." At face value, it would seem that "high crime" areas warrant greater police surveillance to ensure the safety of its residents and because citizen calls for service necessitate patrol officers' presence in those areas (Walker 2001). However, the practice of patrolling "high crime" areas also exposes people of color to more police attention, often yielding disproportionate rates of traffic stops and subsequent arrests. Unlike direct calls to service, traffic stops are entirely discretionary, opening the door to potential abuses of power and racial profiling (Walker 2001).

As Bender (2003, 8) points out, "Racial profiling by law enforcement authorities is based on their perceptions of the criminality of racial and ethnic groups." The practice of racial profiling is commonly understood as the "detention, interdiction or other disparate treatment of an individual [by police] solely on the basis of the racial or ethnic status of such individual" (Mucchetti 2005, 2 citing West 2003). Officially, law enforcement agencies and government officials have publicly condemned racial profiling. By 2003, more than twenty states had enacted legislation prohibiting the practice and, under the Bush administration, the Department of Justice released federal guidelines on racial profiling that expressly prohibited the practice for federal law enforcement agencies, except in cases of national security (Banks 2003). It should be noted, however, that Title VI of the 1964 Civil Rights Act had already prohibited law enforcement agencies receiving federal funds to discriminate against individuals based on race or ethnicity,

which, in theory, would include stop-search practices that used racial or ethnic markers to identify suspected criminals (Feder 2012). In 2014, the Department of Justice updated the federal guidelines on racial profiling and expressed a "commitment to ensuring that its law enforcement agencies conduct their activities in an unbiased manner" (U.S. Department of Justice 2014). Yet despite these efforts, countless studies reveal that the problem of racial profiling persists, either explicitly or implicitly, and disproportionately affects Latinx and people of color generally. This is particularly true in the wake of the drug war and anti-immigration legislation.

The pressure to increase drug arrests and convictions is evident in studies of racial disparities in arrests and policing strategies. In the early 1990s, for example, an investigation revealed that Latinx and African Americans constituted nearly 70 percent of the drivers stopped on a portion of Interstate 95 in Florida although they only accounted for 5 percent of the drivers in that particular county (Walker et al. 2004). In 2001, the *Compendium of Federal Justice Statistics* reported that 38.1% of arrests made by the Drug Enforcement Agency (DEA) by September 2001 were of Latinx individuals – a rate three times higher than their proportion in the general population, which was estimated at 12.5% in 2000 (Walker et al. 2004). In Louisiana, the State Police Department used a training video that encouraged officers to use traffic stops to search for narcotics. Specifically, officers were to stop "males of foreign nationalities, mainly Cubans, Colombians, Puerto Ricans, or other swarthy outlanders" (Walker et al. 2004). In New Jersey, a state trooper openly admitted to stopping Latino drivers, based on their ethnicity, and charging them with driving while impaired. When asked why he stopped a particular driver, the state trooper replied, "Because he's Mexican;" adding that he suspected any Latinos driving would likely be intoxicated (Walker et al. 2004). Whether officially encouraged through department training videos or simply the result of individual bias, the use of racial and ethnic

markers, such as skin color, language, and style of dress to identify suspected criminals is extremely problematic and makes Latinx individuals particularly susceptible to law enforcement practices that result in their overrepresentation in arrests.

While the above examples demonstrate explicit racial bias and the conscious use of stereotypes as the basis for arresting suspected criminals, studies of implicit bias reveal that the widespread and *unconscious* reliance on racial stereotypes also impact perceptions of crime, disorder and danger (Walker et al. 2004). Two studies conducted in Seattle provide insight into how implicit bias effects police practices in drug-enforcement efforts. The first study found that law enforcement efforts focused almost exclusively on crack users, rather than drug users more generally, resulting in the overrepresentation of African Americans and Latinx among those arrested for drug possession (Beckett et al. 2005). The second study revealed that police tended to focus their attention on mixed-race neighborhoods and outdoor venues, yielding higher arrest rates for nonwhites (Beckett et al. 2006). The authors also noted a pervasive tendency of police officers to overlook whites making drug deals. Although racial animus could not be ruled out as a factor, the authors believed that this was more likely the result of implicit bias, as police officers were "simply less likely to perceive whites who are involved in illicit drug activity as drug offenders" (Beckett et al. 2006, 130). That Latinx are so easily identified as drug dealers and users by police officers, despite evidence of relatively equal rates of consumption and distribution with whites (Beckett et al. 2006), demonstrates that perception plays an important role in determining how antidrug resources are used and who they target.

In addition to being perceived as drug dealers, the perception of Latinx as "illegals" has made them particularly vulnerable to racial profiling tactics used to enforce immigration. Although the war on drugs expanded grounds for the deportation of immigrants convicted of

criminal offenses, anti-immigration legislation made immigration offenses criminal and subject to incarceration or detention prior to removal. As mentioned, the merging of the criminal justice system and immigration enforcement bureaucracies has indisputably led to an increase of Latinx in the criminal justice system. By 2015, for example, the DHS had referred more cases to the Justice Department for prosecution than all other major law enforcement agencies combined (Gottschalk 2015). Programs like 287(g), CAP, and the Secure Communities program have been crucial in this regard, subjecting Latinx to a higher risk of arrests through "proactive" policing practices that include the pursuit of minor infractions. In addition, ethnic profiling at the border, home and worksite raids, as well as joint initiatives of the DHS and Justice Department have increased the arrest, incarceration, and deportation of Latinx.

As the federal government began to crack down on immigration enforcement, framed as necessary measures to prevent terrorism, state and local law enforcement agencies supported these efforts by entering into 287(g) agreements. Enacted as part of IIRIRA in 1996, Section 287(g) of the Immigration and Nationality Act grants state and local authorities jurisdiction over immigration offenses under formal agreement with the federal government. Though state and local law enforcement have always played a role in immigration enforcement, either by participating in immigration raids or by making immigration arrests without official authority (Armenta 2017), the 287(g) program deputized state and local authorities as immigration enforcement officials and essentially sanctioned problematic policing practices that continue to disproportionately affect Latinx individuals.

In 2002, the Florida Department of Law Enforcement became the first law enforcement agency to participate in the 287(g) program as part of its "counterterrorism strategy" (Armenta 2017). By 2011, there were sixty-eight state and local law enforcement agencies in 287(g)

agreements, spanning more than two dozen states (Gottschalk 2015). The program's objective, as stated by ICE officials, was to address serious crimes (Armenta 2017). In practice, however, many local law enforcement agencies used their newfound authority to process suspected immigrants for minor crimes.

Under the 287(g) program, Latinx communities have been routinely targeted by law enforcement officials, resulting in civil rights abuses and their overrepresentation in the criminal justice system. Armenta (2017, 32) cites Maricopa County, Arizona as "the most infamous example," stating that under Sheriff Joe Arpaio, the agency enlisted "over 160 deputies to conduct immigration patrols, neighborhood sweeps, investigative police stops, raids on local businesses, and immigration in the local jail." Eventually, after a series of lawsuits alleging various civil rights abuses, the DOJ conducted a three-year investigation of the Maricopa County Sheriff's Office and found that they had engaged in "a pattern or practice of unconstitutional policing" (Armenta 2017, 32). The investigation found that Latinx were routinely racially profiled; unlawfully stopped, detained, and arrested; and denied services as inmates in jail (Armenta 2017). In other words, racial and ethnic markers such as brown skin, a foreign accent, or being of visible "Latino or Mexican ancestry" were used as probable cause to justify an arrest and mistreatment after the fact.

As more states entered into 287(g) agreements, new programs were established to facilitate direct communication between state and local authorities and the federal government. They also enhanced immigration screening tools and provided direct, round-the-clock access to the DHS's immigration database. As described by Gottschalk (2015), the first of these programs, the Criminal Alien Program (CAP), was established in 2007 in an effort to consolidate the several programs that immigration authorities had previously relied on to screen for "criminal

aliens" in prisons and jails. Under CAP, ICE officials are notified by participating law enforcement authorities when they have someone whom they suspect of being deportable in custody. The detainees are then subject to an interview by ICE agents and can be placed on an immigration hold, known as a "detainer," if they are deemed potentially deportable (Gottschalk 2015). These detainers greatly increase the likelihood of more time spent in custody, as courts are more likely to set higher bails or to deny bail altogether for defendants with detainers. As noted by Gottschalk (2015), CAP provides police with an incentive to make an arrest in order to check that individual's immigration status, resulting in many Latinx being arrested and detained for low-level misdemeanors that are not punishable by jail time.

The second program, the Secure Communities program, was established in 2008 and quickly became "one of the most controversial weapons in the criminalization and localization of immigration enforcement" (Gottschalk 2015, 228). The program provides police, jails, and other booking facilities with access to the DHS's immigration database to crosscheck fingerprints when an arrest is made. In addition, all local, state, and federal law enforcement officers can obtain immediate immigration status and identity information through access to ICE's Law Enforcement Support Center (LESC) (Gottschalk 2015). Under the Secure Communities program, anyone stopped – not just arrested or detained – can be subjected to an immediate status check. Those found to be undocumented are immediately reported to ICE and subject to detainers. Not surprisingly, the Secure Communities program, like CAP, has resulted in the overpolicing of Latinx, typically for minor infractions. As Gottschalk (2015, 228) notes, "nearly 80 percent of the people deported through the Secure Communities program had no criminal conviction or had been found guilty of only traffic violations or other minor offenses."

Studies conducted in New Jersey, Maryland, Texas, Pennsylvania, Florida, Illinois, Ohio, New York, and Massachusetts reveal that Latinx are more likely to be stopped by police officers for traffic violations than whites (Mucchetti 2005). In some states, county police regularly set up roadblocks in areas with a high number of immigrants to check whether drivers have a valid license, registration, and insurance (Gottschalk 2015). Because most states require proof of legal residence in the United States to obtain a driver's permit or license, driving without a license is a common infraction among undocumented immigrants (Gottschalk 2015). Under programs like CAP and Secure Communities, these minor infractions allow police to detain suspected immigrants and immediately check their legal status. Even driving with a broken taillight could trigger a status check if the officer chooses to do so. For Latinx, these traffic stops often result in arrest. In Nashville, Tennessee, for example, while only 8 percent of all traffic stops resulted in arrests in 2007, stops made on Latinx drivers led to arrest about 29 percent of the time (Armenta 2017). For state and local law enforcement officials, traffic stops are a relatively easy method to police immigrants. In areas with a high population of Latinx, this inevitably leads to their persecution, as they are often perceived as foreigners and easily identified by racial and ethnic features.

Pretextual stops allow law enforcement agents to check the legal status of suspected immigrants, but they are not the only method of immigration enforcement. ICE also conducts home and worksite raids to search for deportable immigrants under the National Fugitive Operations Program (NFOP) and the Worksite Enforcement Unit (WEU), respectively (Gottschalk 2015). Under the NFOP, Fugitive Operations Teams (FOTs) are charged with locating and removing dangerous fugitive immigrants, defined as anyone with a criminal history or are otherwise deemed a threat to national security (Mendelson, Strom, and Wishnie 2009). In

practice, however, evidence suggests that the program is persecuting undocumented immigrants indiscriminately. Based on ICE's publicly released data on FOT criminal apprehensions from 2003 through February 2008, for example, Mendelson, Strom, and Wishnie (2009) noted that 73 percent of the individuals apprehended had no criminal conviction. Additionally, these home raids are often carried out based on "grossly inaccurate" database information (Gottschalk 2015, 221).

Conversely, worksite raids target businesses suspected of employing undocumented workers and have long been used by immigration enforcement officials to target Latinx. Before its dissolution in 2003, for example, the INS regularly conducted worksite raids, explicitly using ethnicity to guide its enforcement efforts (Walker et al. 2004). Though agents had denied using this tactic, a review of 37 INS worksite raids in New York City, between 1997 and 1999, revealed that agents frequently cited skin color, use of Spanish, and clothing as the primary evidence of workers' legal status (Walker et al. 2004). Not surprisingly then, nearly all of the arrests made during these raids were of Latinx individuals (Walker et al. 2004).

Under ICE, the WEU began carrying out more high-profile worksite raids in 2006, continuing the practice of primarily targeting undocumented workers rather than the businesses and employers who knowingly hired them (Gottschalk 2015). Despite issuing new guidelines in 2009 that expressly shifted the focus to the criminal prosecution of employers, ICE reaffirmed its commitment "to arrest and process for removal any illegal workers" encountered during worksite raids (Gottschalk 2015). In fact, the data reflects that "illegal" workers continued to be the primary target. In 2009, only thirteen employers in eight cases were prosecuted for hiring undocumented workers, a felony offense, of the nearly 92,000 immigration-related prosecutions conducted that year (Gottschalk 2015).

As mentioned, federal law prohibits discrimination based on race and ethnicity, and DOJ guidelines prohibit the use of racial or ethnic markers as probable cause to stop, question, or detain individuals while conducting criminal investigations. Notably, however, CBP, a separate entity under the DHS, cites a few exceptions in the *CBP Policy on Nondiscrimination in Law Enforcement Activities and all other Administered Programs*. For example, according to the agency's policy, available on their website, "the consideration of race or ethnicity in law enforcement, investigation, and screening activities," is prohibited "in all but the most *exceptional* circumstances" (emphasis added). The policy goes on to note that CBP personnel may use race or ethnicity "when a compelling governmental interest is present and its use is narrowly tailored to that interest," such as in cases of national security. Moreover, the agency distinguishes race and ethnicity from nationality, stating that nationality is "expressly relevant" in anti-terrorism, customs, or immigration activities; and that the use of nationality to trigger screening, inspection, or investigation in the administration or enforcement of a statute, regulation, or executive order is "entirely appropriate and needs no further justification" (U.S. Customs and Border Protection). Given the CBP's broad jurisdiction and its propensity to operate outside of it, the implications of these caveats for Latinx are significant.

In addition to operating along the border, at or between ports of entry, federal regulations grant CBP officials authority to stop and conduct searches on vessels, trains, aircraft, or other vehicles anywhere within one hundred miles of the border (*see* 8 U.S.C. § 1357(a)(3) and 8 C.F.R. § 287.1(b)). As the ACLU notes, that area encompasses nine of the ten largest cities, the entirety of ten states, and nearly two-thirds of the population; resulting in warrantless searches at various immigration checkpoints. Moreover, investigations conducted by the ACLU found that Border Patrol agents frequently ignore or misunderstand their geographical limitations while

conducting individual stops, "resulting in violations of the constitutional rights of innocent people," (ACLU). According to a report put out by the New York Civil Liberties Union, an investigation of transportation raids in New York revealed that traffic arrests frequently occur far from the border, as well as an established pattern of misconduct by Border Patrol agents in conducting these stops. Specifically, Border Patrol agents consistently targeted people of color and frequently harassed Latinx citizens; opening their line of questioning with "What country are you a citizen of?" and demanding proof of citizenship, which U.S. citizens are not required to carry (Añon et al. 2011, 7). As a result, hundreds of arrests were made of lawfully present individuals, while only 1 percent resulted in initiation of removal proceedings. Notably, individuals from Latin America represented 73 percent of the arrestees (Añon et al. 2011).

Additional investigations reveal that Border Patrol agents often conduct generalized criminal investigations, abandoning any pretext of immigration enforcement, which the Supreme Court has declared unconstitutional. They have also been found to conduct invasive searches, relying on false alerts by service canines to establish probable cause. The ACLU further suggests that Border Patrol agents "collude with local law enforcement officials," particularly in places where anti-immigration legislation has led to widespread racial profiling. As demonstrated in states like New York, these practices leave Latinx individuals uniquely vulnerable to civil rights abuses, as investigations of legal status and criminal activity are often predicated on the perception of them as "foreigners" and inherently criminal.

The above programs launched by ICE and Border Patrol, as well as their problematic policing strategies, would likely not have been as effective if it were not for the cooperation of state and local law enforcement agencies. While these programs have facilitated more direct communication between agencies, the DHS and Department of Justice have also made their

partnership more formal with joint initiatives such as Operation Streamline. Launched in 2005, Operation Streamline employed a zero-tolerance policy toward unauthorized border-crossings through the criminal prosecution of offenders (Nicholls 2013; Light, Lopez, and Gonzalez-Barrera 2014). Prior to 2005, immigrants apprehended at the border were largely released and sent back to their country of origin, depending on their criminal history. Under Operation Streamline, however, first-time offenders are charged with a misdemeanor that carries a maximum six-month sentence. Previously deported migrants caught trying to re-enter the country without authorization are then charged with felony reentry and sentenced to two years before being deported again. The impact of this initiative on the number of Latinx convicted of federal offenses has been catastrophic. As Gottschalk (2015, 223) notes, "Sentencing for felony immigration crimes – which overwhelmingly involve instances of illegal border crossing, not more serious crimes like human smuggling – accounted for nearly 90 percent of the rise in the number of Hispanics sentenced to federal prison in the first decade of the twenty-first century."

According a report released by the Pew Research Center in 2014, the number of offenders sentenced in federal courts between 1992 and 2012 more than doubled, with the increase in unlawful reentry convictions alone accounting for 48 percent of the growth (Light, Lopez, and Gonzalez-Barrera 2014). With respect to the Latinx population specifically, the numbers are no less striking. In 1992, Latinx made up 23 percent of sentenced offenders and by 2012, they represented the single largest racial/ethnic group at 48 percent. Over the same period, the number of offenders who were not U.S. citizens increased from 22 percent to 46 percent. Among federal sentenced offenders in 1992, 12 percent were unauthorized immigrants, increasing to 40 percent by 2012. Federal convictions of immigration crimes made up 30 percent of offenders in 2012, the second largest group after drug convictions. By contrast, immigration

offenses made up only 5 percent of federal convictions in 1992 (Light, Lopez, and Gonzalez-Barrera 2014). By yearend 2015, 95 percent of all prisoners sentenced for immigration offenses in federal prison were Latinx (Carson and Anderson 2016).

Despite the above initiatives and programs, federal and state efforts to identify, detain, and deport immigrants show no sign of slowing down. In 2010, a law passed in Arizona authorized local police to check the immigration status of anyone arrested or detained if there was a "reasonable suspicion" that they were in the country illegally (Pew Research Center 2010). Not surprisingly, Latinx represented 30 percent of the population in Arizona in 2008, of which 33 percent were foreign born (Pew Research Center 2010). While Latin Americans have not been the only targets of anti-immigration policies, proximity and volume help explain why they are targeted so routinely.

### Interpretation of the Law: Judicial Rulings, Sentencing, and Prosecutorial Discretion

While the practice of racial and ethnic profiling is prohibited, court rulings on the matter have been widely inconsistent, particularly in cases of drug and immigration arrests. Not only have they set precedents for exceptions and loose interpretations, but they have also set the standard of proof extremely high, making it difficult to successfully challenge instances of racial profiling. More importantly, however, they reveal that judges can also be influenced by their own perceptions of crime, and which groups of people are more likely to commit crimes, when making decisions. As noted by Provine (2007), judges are a part of the "symbiotic relationship" that exists between political order and public opinion. As such, they are not impervious to the cultural perception of Latinx as "illegals" and prone to criminal behavior.

Cases that challenge racial profiling practices typically invoke Fourth, Fifth and Fourteenth Amendment violations. Under the U.S. Constitution, the Fourth Amendment grants

citizens protection from unreasonable searches and seizures, and that warrants issued for arrest, search, or seizure must be based on probable cause. In *Terry v. Ohio* (1968), however, the Supreme Court ruled that police officers may conduct warrantless searches and seizures "where swift action based upon the on-the-spot observations of the officer on the beat is required" (392 U. S. 20). *Terry* employed a "totality of circumstances" test to determine the reasonableness of police investigatory stops; finding that "reasonable, articulable suspicion was sufficient grounds for a police officer to stop and question a citizen" (Feder 2012). Under *Terry*, police officers are generally allowed to "stop and frisk" an individual in search for weapons or evidence of criminal activity, if the police officer has a reasonable suspicion that a crime has been or is about to be committed. Such suspicion must be particularized and based on the specific circumstances; it cannot, for example, be based merely on a police officer's "hunch" (Feder 2012). *Terry* would also lay the foundation for pretextual traffic stops.

On the question of race as a factor in determining reasonable suspicion, however, two Supreme Court rulings are particularly illuminating when it comes to how Latinx are perceived by others and how this perception often leads to legally-sanctioned mistreatment by police officers and federal agents. In *United States v. Brignoni-Ponce* (1975), the Supreme Court found that "the officers relied on a single factor to justify stopping respondent's car: the apparent Mexican ancestry of the occupants" (Feder 2002, 2). In this case, the officer's belief that the occupants of the car were "illegal aliens" did not satisfy the constitutional minimum for an investigatory stop (Feder 2002). However, the Court revealed its own bias when it stated that, "[t]he likelihood that any person of Mexican ancestry is an alien is high enough to make Mexican appearance a relevant factor" (Feder 2002, 2). Such language would later provide

justification for immigration enforcement agencies to, at least partially, rely on race as a factor in determining suspicion, as in the case of *United States v. Martinez-Fuerte* (1976).

In *Martinez-Fuerte*, Border Patrol agents had been selectively referring motorists to a secondary inspection area based on several factors, including apparent Mexican ancestry (Feder 2002). Here, the Supreme Court ruled that such referrals were not unconstitutional, citing the relevance of nationality given that roughly 20 percent of the vehicles referred for secondary inspection over the period in question included unauthorized immigrants (Feder 2002). Notably, in Brennan's dissenting opinion, joined by Marshall, he argued: "That law in this country should tolerate use of one's ancestry as probative of possible criminal conduct is repugnant under any circumstances" (cited in Alschuler 2002, 165). Ultimately, the majority opinion held that "Border Patrol officers must have wide discretion in selecting the motorists to be diverted" (cited in Alschuler 2002, 175).

Complicating matters further, pretextual stops in search for drugs have also been sanctioned by the courts. In *Whren v. United States* (1996), defendants were charged with drug offenses after they were pulled over by cops for minor traffic infractions (Feder 2002). The defendants, who were African American, argued that they were the victims of racial profiling, claiming that they would not have been pulled over had they been White. The Court agreed that selective enforcement of the law based on considerations of race is prohibited under the Constitution, however, "the constitutional basis for objecting to intentionally discriminatory application of laws is the Equal Protection Clause, not the Fourth Amendment. Subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis" (cited in Alschuler 2002, 193 and Feder 2012, 6). In maintaining that claims of racial discrimination can only be brought under Fourteenth Amendment violations, the Court declared pretextual traffic

stops constitutionally legal as long as there was an objective, nonracially motivated basis for the stop, such as a traffic violation. As noted by Alschuler (2002, 165), "*Whren's* separation of the Fourth Amendment and the Equal Protection Clause prevents courts from weighing all of the interests impaired by a police action against all of the justifications asserted for it."

The Fourteenth Amendment of U.S. Constitution grants that, "[n]o state shall … deny to any person within its jurisdiction the equal protection of the laws" (U.S. Const. amend. XIV cited in Feder 2012, 4). In addition, the Fifth Amendment's guarantee of due process to individuals in their dealings with the federal government has also been interpreted to include the Fourteenth Amendment's equal protection clause (Feder 2012). Under the Equal Protection Clause, claims of racial profiling may be challenged if there is clear proof of racial animus and/or selective enforcement of the law (Feder 2012). In other words, claimants may argue that an officer's conduct was racially motivated, thus, violating the Equal Protection Clause; or that they were the victims of selective enforcement (Feder 2012).

Essential to any equal protection claim is proof of discriminatory intent (Feder 2012). In practice, courts have required claimants to provide statistical evidence of racially discriminatory practices unless a law or policy "contains an express racial classification" (Feder 2012, 4 citing *Brown v. City of Oneonta,* 221 F.3d 329). That is, absent of direct evidence of racial animus in police motivation, or an overtly discriminatory policy, claimants must show that similarly situated individuals of a different race were treated differently (Feder 2012; Alschuler 2002). In cases of drug and immigration enforcement, these requirements pose evidentiary burdens on defendants claiming racial discrimination.

For example, in *United States v. Armstrong* (1996), the Supreme Court rejected the criminal defendants' claim that they were victims of selective prosecution based on race ruling

that there was no statistical evidence to show that similarly situated Whites were not prosecuted. The defendants in this case provided preliminary evidence of racial discrimination in crack cocaine offense prosecutions in the federal district courts of Los Angeles and sought an order requiring the United States Attorney's office to provide information about the races of crack defendants prosecuted to support their claim (Alschuler 2002). The Court held that the defendants were not entitled to this discovery, noting that their "study failed to identify individuals who were not black and could have been prosecuted for the offenses for which respondents charged" (517 U.S. at 470 cited in Alschuler 2002, 203). Subsequent rulings have cited *Armstrong* in rejecting similar claims, while others have contended that even if racial animus is evident, it is not enough to constitute an Equal Protection Clause violation if it is not the sole factor.

In the case of *United States v. Valenzuela* (2001), a Latino motorist was stopped by a Colorado trooper for weaving in traffic. The trooper suspected that the driver might be a drug courier because, among other reasons cited, the driver was traveling from Tucson, which was a known source of illegal drugs (Feder 2012). Upon receiving consent from the driver to search the vehicle, the trooper found large amounts of cocaine and arrested the driver (Feder 2012). The officer later testified that he relied on information provided by the DEA – that the majority of drug smugglers in the area were Latinx – when making probable cause determinations (Feder 2012). Though evidence was provided of a significant number of Latinx arrestees, the district court denied the defendant's motions to suppress because there was "no persuasive evidence that the Trooper targeted any of these suspects *solely* because of their race" (emphasis added) (Feder 2012, 5 citing *United States v. Valenzuela* 2001).

The above rulings demonstrate the difficulty of challenging practices of racial profiling as violations of an individual's constitutional rights. Moreover, they reveal that racial discrimination in criminal justice is not limited to law enforcement practices, but also in prosecutorial and judiciary decision making. Most importantly, however, they reveal that judges are also impacted by their own perceptions of criminality when it comes to Latinx defendants, as in *United States v. Martinez-Fuerte*. While judges are often viewed as impartial interpreters of the law, they are clearly not immune to the cultural stereotypes that often subject Latinx to unjust legal treatment. In fact, evidence suggests that beliefs in negative stereotypes can also inform judges' decisions on sentencing; arguably the most important stage of the criminal justice system (Walker et al. 2004).

In their 2014 report, *Racial Disparities on Sentencing*, the ACLU asserted that Black and Latinx offenders "sentenced in state and federal courts face significantly greater odds of incarceration than similarly situated white offenders and receive longer sentences than their white counterparts in some jurisdictions." While this is due, in large part, to the mandatory minimums set in drug offense convictions and truth-in-sentencing programs, studies show that judges often impose harsher sentences on non-U.S. citizens and people of color in general (Albonetti 1997). For example, Morín (2009) references a study done in 2001 in which the sentencing practices in Pennsylvania revealed that Latinx are "vulnerable to harsher penalties because of the prevalence of negative stereotypes and biases that associate Latino/as with illegal drugs activities, low intelligence, and the rise in neighborhood crime." With statements from judges such as,

> We shouldn't kid ourselves. I have always prided myself for not being prejudiced but it is hard not to be affected by what is taking place. The whole area has changed with the influx of Hispanics and especially Puerto Ricans. You'd hardly recognize

> the downtown from what it was a few years ago. There's more dope, more crime,
> more people on welfare, more problems in school (Morín 2009, 27),

it seems highly unlikely that these beliefs would not affect their ability to remain impartial when

sentencing a Latinx person convicted of a crime. This judge's stated "experience" with Puerto

Ricans, merely a reflection of the collective discourse on Latinx, is what will undoubtedly inform

his decision on sentencing.

Additional court rulings regarding sentencing show that a defendant's legal status can

also have a direct, negative impact on the sentence they receive. For example, when deliberating

on sentencing, the trial judge in *U.S. v. Onwuemene* (1991) stated,

> You are not a citizen of this country. This country was good enough to allow you
> to come in here and to confer upon you . . . a number of the benefits of this society,
> form of government, and its opportunities, and you repay that kindness by
> committing a crime like this. We have enough criminals in the United States
> without importing any (Logue 2009, 427)

The appellate court in this case ruled that consideration of the defendant's citizenship status was

a violation of his constitutional rights. As such, they vacated the sentence and ordered the district

court to resentence him "in a manner consistent with its opinion" (Logue 2009, 427).

In *U.S. v. Borrero-Isaza* (1989), the trial judge imposed a harsher sentence on the

appellant relative to his white codefendant in a drug trafficking case (Logue 2009). In explaining

his rationale, "the judge repeatedly referenced the appellant's country of origin (Colombia),

which is highlighted as a drug source country" (Logue 2009, 427). As in *U.S. v. Onwuemene*, the

appellate court held that the judge's actions constituted a violation of the appellant's right to due

process and ordered the district court to resentence him (Logue 2009).

While sentencing guidelines such as the Sentencing Reform Act of 1984 have been put in

place to neutralize the effects of such biases, studies show that in practice, judges can circumvent

these guidelines and will often impose harsher sentences on non-U.S. citizens and people of

color when they do (Albonetti 1997). Under the Sentencing Reform Act, gender, ethnicity, education, and citizenship status are all legally defined as irrelevant. However, a study conducted in 1997 revealed that even when guidelines are followed, "defendant's gender, ethnicity, education, and citizenship status exert significant *direct* effects on sentence outcomes when guideline-defined legally relevant variables and processing variables are controlled for," (Albonetti 1997, 817). Consistent with these findings, Walker et al. (2004) note that the average length of time that immigrants were in detention increased from 4.6 months in 1991 to 15.1 months in 1997.

As seen in the above examples, judges play a significant role in contributing to sentencing disparities. They can be, and often are, influenced by their own prejudices when presiding over criminal cases involving Latinx defendants. While the Sentencing Reform Act may have reduced the amount of leeway afforded to judges in sentencing, it has not diminished their discretionary authority entirely. It did, however, extend this discretionary authority to prosecuting attorneys.

Under the federal guidelines, prosecuting attorneys were given much more authority over the sentencing process, potentially undermining the overall goal of the guidelines (Albonetti 1997). Additionally, like judges, prosecuting attorneys can circumvent the guideline-defined sentence through charging and guilty plea negotiations, as well as motions for a sentence departure (Albonetti 1997). Given prosecutorial control over charging and plea negotiations, knowing which sentences are attached to each charge, prosecuting attorneys have an immense amount of power over who gets sent to prison. Statistical evidence suggests that this tends to negatively affect Latinx and people of color in general. For example, according to the U.S. Department of Justice, 84 percent of the persons referred to the U.S. Attorney's Office for drug

offenses in 1999 were prosecuted, with suspects involved in marijuana and/or opiate cases among those most likely to be charged and sentenced – a significant number of whom were Latinx (Walker et al. 2004).

As scholars have pointed out, fewer studies have been conducted to test the influence of race on charges brought against defendants relative to racial discrimination in law enforcement (Albonetti 1997; Mauer 2011; Sommers and Marotta 2014). This is partially due to the fact that more than 90 percent of guilty verdicts are a result of plea bargains, rather than jury verdicts, and because most of these plea bargains happen "behind closed doors" (Mauer 2011, 92S). While it may be difficult to ascertain whether racial discrimination is happening at the prosecutorial level, available data that suggests that it is. In 1991, for example, the U.S. Sentencing Commission conducted a study of federal mandatory sentencing and found that prosecutors were more likely to offer negotiated plea deals to White defendants than African American or Latinx defendants in cases that would have carried a mandatory minimum otherwise (Mauer 2011). In addition, prosecutors are more likely to charge and try Latinx juvenile offenders as adults. As Walker et al. (2004) point out, Latinx youth were 6.2 times more likely than White youth to be prosecuted as adults between 1996 and 1998. Additional studies suggest that prosecutors make decisions regarding which charges are worth pursuing based on the likelihood of conviction at trial, taking into consideration how juries are likely to assess a particular defendant (Sommers and Marotta 2014).

That Latinx face consistent patterns of racial and ethnic bias at every level of the criminal justice system is evident in rates of arrest, the likelihood that they will be over-charged or are less likely to be given a plea deal that carries a less punitive sentence, and the fact that they are more likely to be deemed as deserving of harsher sentences by judges, based on their perceived

criminality or their legal status. While cultural stereotypes have often been invoked to garner

support for laws that further marginalize Latinx, it is the belief or acceptance of those stereotypes

as inherent truths, either consciously or unconsciously, by actors within the criminal justice

system that make those laws so dangerous. Moreover, as society is made up of more than just

political and legal actors, the use of and belief in cultural stereotypes continues to shape the

treatment of Latinx even outside of legal institutions.

**V.     Non-Legal Institutions: Latinx Youth as 'Unintelligent Criminals'**

While the wars on crime, drugs, and terror resulted in laws that drastically expanded the

American penal system, the nation's turn toward punitiveness was not limited to the criminal

justice system, nor did it only target adults of color. Politicians and public officials tackled

education reform with the same fervor that they approached criminal justice. By the early 1990s,

a significant number of schools across the nation had adopted zero-tolerance policies that were

aimed at drugs, weapons, school disruptions and other minor infractions (Verdugo 2002). Such

policies have contributed to the disproportionality of school discipline that overwhelmingly

affects African American and Latinx students. For example, as Skiba et al. (2011, 86) point out,

"students of color have been found to be suspended at rates two to three times that of other

students, and similarly overrepresented in office referrals, corporal punishment, and school

expulsion." Moreover, zero-tolerance policies have brought the justice system directly into

schools with the presence of police officers patrolling the hallways. This convergence between

the education and legal systems has led to what is now commonly referred to as the "school to

prison pipeline" (Heitzeg 2014 citing Advancement Project 2005; Children's Defense Fund

2007; NAACP 2005); where "youth of color in particular are at increased risk for being 'pushed

out' of schools – pushed out into the streets, into the juvenile justice system, and/or into adult

prisons and jails" (Heitzeg 2014).

While noting that the school to prison pipeline is "most immediately related to zero tolerance policies, their police-based enforcement, and to failing schools that are overcrowded, inadequately resourced, and highly segregated," Heitzeg (2014, 12) argues that "it is also the result of larger social and political trends. The school to prison pipeline is consistent with media-driven fears of crime and 'super-predators,' an increasingly harsh legal system for both juveniles and adults, and the rise of the prison industrial complex." As they had during the drug war, political rhetoric and news media contributed to a moral panic around gang violence, focusing almost exclusively on African American and Latinx gangs (Heitzeg 2014). The constant attention on youth of color as violent "super-predators," both in the media and among policy makers, reinforced stereotypes of them as dangerous criminals deserving of harsh punishments. Punitive legislation soon followed.

Congress enacted the Federal Gun-Free Schools Act (GFSA) in 1994 as a direct response to school shootings and the perceived surge in teen violence. As a result of the super-predators discourse, the GFSA was only the beginning of punitive policies in schools. The 1996 Violent Youth Predator Act created mandatory minimum sentences for youth convicted of violent crimes and lowered the minimum age for trying juveniles as adults from 16 to 14 years of age (Mora and Christianakis 2013). Similarly, Proposition 21: The Gang Violence and Juvenile Crime Prevention Act of 1998 in California called on harsher punishments for youth crimes associated with gang-related activity and gave prosecutors more discretionary power to try juveniles as adults (Mora et al., 2012).

Although the number of youths committed to juvenile facilities has steadily declined since its peak in 1999, the fact remains that youth of color are more likely to enter the justice

system than their white counterparts and at a significantly higher frequency (Rovner 2016). Latinx youth in particular are 61 percent more likely than white youth to be in placement (Rovner 2016). Important to note is that most committed juveniles have been adjudicated on nonviolent offenses. In 2003, 76 percent of all committed juveniles were held for nonviolent offenses and in 2013 that number had barely declined to 74 percent (Rovner 2016).

As Heitzeg (2014) argues, the acceptance of negative stereotypes impacts the daily interactions that youth of color have in social settings, particularly with their teachers, school administrators, and the police officers that patrol their schools. Perceived as criminals in the making with a propensity towards violence, teachers and school administrators can be quick to see students of color as oppositional, disruptive, and disrespectful. Punishments for youth of color are swift and often more severe, with minor infractions leading to suspension or expulsion at best or reported to the police at worst (Heitzeg 2014).

In an ethnographic study of a predominantly minority, urban school, Morris (2005) found that many of the adults perceived the African American and Latino boys as particularly "bad" and occasionally threatening. School officials considered many of the Latino boys "dangerous and subjected them to constant surveillance and bodily discipline" (Morris 2005: page number of quote). Students suspected of being gang-affiliated, often based on their clothing, hairstyle, and response to authority, were disciplined accordingly and almost always Latino (Morris 2005). Although many of the students resisted the dress code and refused to "tuck in their shirt," the Latino boys were viewed as especially threatening and oppositional in their resistance (Morris 2005). One teacher commented that, "The gang influence is bad among these Hispanics," while other teachers expressed similar views and thought of the Latino boys as untrustworthy (Morris 2005: page number of quote).

Morris (2005, 37) describes a particularly revealing exchange during an interview with a white fourth-year teacher, in which she was asked how she identified gang members:

> 'Like if one of my Hispanic boys is wearing all blue – blue shirt and blue pants. The Crips, they wear blue rag.' Many students, irrespective of race or gender, wore blue clothing at Matthews, occasionally all blue. Yet Ms. McCain implied that she interprets such clothing to indicate gang membership only when worn by Latino boys. The combination of race and gender with dress in this case could signal the difference between a potentially dangerous student and a harmless one.

That the Latino boys in this school were easily identified as gang members, despite similar styles of dress with other students, signifies an acceptance of the notion that they are inherently criminal among many of the teachers.

While there is no doubt that the shift towards zero-tolerance policies in schools and the school to prison pipeline have perpetuated the criminalization of Latinx, there are other barriers to educational attainment that Latinx are forced to contend with. Many of these barriers are a result of anti-immigrant sentiments and the perpetuation and acceptance of cultural stereotypes. At a policy level, this is best exemplified by the legislative changes that occurred in the 1990s in California. While the previously-mentioned Proposition 187 sought to deny undocumented children the right to public education, it was soon followed by the "California Civil Rights Initiative" of 1996, and the "English for Children" initiative of 1998, Propositions 209 and 227 respectively. Proposition 209 effectively ended the use of affirmative action in education and state hiring and promotion practices, while Proposition 227 eliminated bilingual education from California public schools.

The fact that 1.3 million schoolchildren were non-English speakers was further proof that Latinx were unwilling or unable to assimilate (Santa Ana 2002; Bender 2003). Senator Alan Simpson, for example, observed that "[t]he assimilation of the English language and other aspects of American culture by Spanish-speaking immigrants appears to be less rapid and

complete than for other groups" (Bender 2003, 82). Pat Buchanan, a former presidential candidate, instilled fear by suggesting that Mexican Americans were creating their own nation, just as Cubans had:

> Unlike the immigrants of old, who bade farewell to their native lands when they boarded the ship, for Mexicans, the mother country is right next door. Millions have no desire to learn English or to become citizens. America is not their home; Mexico is; and they wish to remain proud Mexicans. They have [only] come here to work. Rather than assimilate, they create Little Tijuanas in U.S. cities, just as Cubans have created a Little Havana in Miami . . . With their radio and TV stations, newspapers, films, and magazines, the Mexican Americans are creating a Hispanic culture separate and apart from America's larger culture. They are becoming a nation within a nation. (Bender 2003, 82)

While Simpson's remarks imply an inability to assimilate, Buchanan implies that Mexican Americans and Cubans are unwilling to assimilate and thus, unpatriotic. The connection of Proposition 209 to stereotypes is less obvious but no less damaging. Affirmative action practices, particularly in education, were seen as unfair to white applicants by "giving preference in the admissions process to the stereotypical unintelligent Latina/o (and African Americans)," (Bender 2003, 5). Laws such as these reinforce discriminatory practices in education and have real consequences for Latinx students.

The perception of Latinx as unintelligent or unable to learn English is yet another barrier to educational attainment for Latinx youth. Reardon and Galindo (2003) for example, found that teachers were more likely to rate Latinx students entering kindergarten lower than white students, regardless of their academic ability (cited in Schneider, Martinez, and Owens 2006). The study indicated that these initial findings were likely based on the student's ethnicity alone and that such biases set the stage for lower expectations for and underperformance by Latinx students (Schneider, Martinez, and Owens 2006). In fact, additional studies that focused on student-teacher relationships found that teachers who exhibit negative attitudes toward minority

students directly impact their educational outcomes, as the students no longer view the teacher as a credible source of information (Schneider, Martinez, and Owens 2006 citing Payne 1994 and Valenzuela 1999).

The fact is that Latinx youth are far behind any other racial or ethnic group in terms of educational attainment. In 2017, for example, the percentage of Latinx 25 years and older with a bachelor's degree in the United States was only 12.2, compared with 23.8% of whites, 15.1% of blacks, and 30.5% of Asian Americans (U.S. Census 2017). Although high school dropout rates for Latinx have declined considerably from 2006 to 2017, 21 to 8.2 percent respectively, it still remains much higher than that of African Americans (6.5 percent) and white students (4.3 percent) (National Center for Education Statistics 2019). While there are plenty of other factors that contribute to educational attainment for Latinx, such as neighborhood segregation, overcrowding and underfunding to name a few, societal perceptions of Latinx youth as unintelligent and criminally inclined play a significant role as well.

## VI.    Conclusion: The Legacy of the War on Drugs and Crimmigration on Latinx

Whether they are being described by politicians as dangerous criminals and a burden on taxpayers, or are overrepresented in news stories depicting violent crimes, Latinx are forced to contend with the racial and ethnic stereotypes that have served to justify their subjugation by those in positions of power and their subsequent mistreatment by society. Legally, the Greaser Act was an early example of how law has been used to dehumanize and criminalize Latinx, but as the country moved towards a less openly racist rhetoric, politicians and public officials employed more subtle tactics to continue using the law to subordinate people of color. As the nation became "colorblind," it also became more punitive; and crime, which had long been synonymous with color, became the primary talking point for elected officials. Though crime

had been on the decline, and most Americans were not too concerned with either crime or drug use, public officials warned of the "street crime" and "hoodlums" that posed a danger to society and American values. Images of violent criminals and drug addicts, all of color, flooded the media, convincing the American public that crime and drugs were serious issues that needed to be addressed with more punitive measures. Later, terrorism would pose a similar, if not more dangerous threat to the nation, and "illegal aliens" would become the new criminals in need of being locked away. Though Latinx, arguably, were not the primary targets of either the drug war or the war on terror, the historical perception of Latinx groups as less intelligent, unwilling or incapable of assimilating, narco-terrorists, perpetual foreigners and inherently criminal made them vulnerable to the punitive policies that came out of the 1980s, 1990s, and early 2000s.

Though political figures were the driving force behind these changes, they relied heavily on the media to transmit their message. In 2002, the National Association of Hispanic Journalists reported that 66 percent of network news stories about Latinx focused exclusively on crime, terrorism and illegal immigration (Morín 2009). Lou Dobbs, in particular, has falsely reported on the number of foreigners in federal custody in the past, reinforcing the misperception that immigrants are more likely to commit crimes (Morín 2009). These myths and stereotypes about immigrants and crime, as Rumbaut et al. (2006) point out, "provide the underpinnings for public policies and practices and shape public opinion and political behavior" (cited in Morín 2009, 32). The overrepresentation of Latinx in news stories regarding crime can and does shape the way they are perceived by society – often as criminals and illegals.

When Donald Trump declared that all Mexicans were rapists, drug dealers, and criminals in 2015, he was only reiterating a narrative that had been created centuries earlier. As with Wilson back in the 1990s, Trump's xenophobic message hit home for people who were

economically frustrated and needed someone to blame. In employing the stereotypes of Mexicans as innately criminal, Trump succeeded in scapegoating Latinx for all that is wrong with the America of today. The fact that this narrative has been proven to be effective throughout America's history implies that these beliefs are deeply embedded in our culture. Understanding how Latinx are perceived on a cultural level informs our understanding of how certain laws are shaped around those perceptions. Support for and implementation of punitive policies on the basis of negative stereotypes has contributed significantly to the mass incarceration epidemic plaguing the United States.

# Works Cited

American Civil Liberties Union. 2014. "Racial Disparities in Sentencing." Retrieved from https://www.aclu.org/sites/default/files/assets/141027_iachr_racial_disparities_aclu_submission_0.pdf

American Civil Liberties Union. n.d. "ACLU Factsheet on Customs and Border Protection's 100-Mile Zone." Retrieved from https://www.aclu.org/other/aclu-factsheet-customs-and-border-protections-100-mile-zone?redirect=immigrants-rights/aclu-fact-sheet-customs-and-border-protections-100-mile-zone

American Civil Liberties Union. n.d. "The Constitution in the 100-Mile Border Zone." Retrieved from https://www.aclu.org/other/constitution-100-mile-border-zone

American Civil Liberties Union. n.d. "U.S. Border Patrol's Interior Enforcement Operations." Retrieved from https://www.aclusandiego.org/wp-content/uploads/2014/11/100-Mile-Zone.pdf

Albonetti, Celesta A. 1997. "Sentencing under the Federal Sentencing Guidelines: Effects of Defendant Characteristics, Guilty Pleas, and Departures on Sentence Outcomes for Drug Offenses, 1991-1992." *Law & Society Review* 31, no. 4: 789-822. https://doi.org/10.2307/3053987

Alschuler, Albert W. 2002 "Racial Profiling and the Constitution." *University of Chicago Legal Forum* 2002, iss. 1 (2002): 163-269. http://chicagounbound.uchicago.edu/uclf/vol2002/iss1/10

Añon, Ada, Benjamin Locke, Alba Villa, Udi Ofer, Michael Cummings, Sara LaPlante, and Andrea Callan. 2011. "Justice Derailed: What Raids on New York's Trains and Buses Reveal about Border Patrol's Interior Enforcement Practices." https://www.nyclu.org/sites/default/files/publications/NYCLU_justicederailedweb_0.pdf

Armenta, Amada. 2017. *Protect, Serve and Deport: The Rise of Policing as Immigration Enforcement.* Oakland, California: University of California Press.

Banks, R. Richard. 2003. "Beyond Profiling: Race, Policing, and the Drug War." *Stanford Law Review* 56, no. 3 (December): 571-603. https://www.jstor.org/stable/1229637

Beckett, Katherine and Theodore Sasson. 2004. *The Politics of Injustice: Crime and Punishment in America.* Thousand Oaks, CA: Sage Publications.

Becket, Katherine, Kris Nyrop, Lori Pfingst, and Melissa Bowen. 2005. "Drug Use, Drug Arrests, and the Question of Race: Lessons from Seattle." *Social Problems* 52, no. 3 (August): 419-441. https://doi.org/10.1525/sp.2005.52.3.419

Beckett, Katherine, Kris Nyrop, and Lori Pfingst. 2006. "Race, Drugs, and Policing: Understanding Disparities in Drug Delivery Arrests." *Criminology* 44, no. 1 (February): 105-137. https://doi.org/10.1111/j.1745-9125.2006.00044.x

Bender, Steven W. 2002. "Sight, Sound, and Stereotype: The War on Terrorism and Its Consequences for Latinas/os." *Oregon Law Review* 81, no. 4 (Winter): 1153-1178.

Bender, Steven W. 2003. *Greasers and Gringos: Latinos, Law, and the American Imagination.* New York, NY: New York University Press.

Capps, Randolph. 2009. "Local Enforcement of Immigration Laws: Evolution of the 287(g) Program and Its Potential Impacts on Local Communities." In *The Role of Local Police: Striking a Balance Between Immigration Enforcement and Civil Liberties*, edited by Anita Khashu, 155-168. National Police Foundation. https://www.policefoundation.org/publication/the-role-of-local-police-striking-a-balance-between-immigration-enforcement-and-civil-liberties/.

Carson, E. Ann and Elizabeth Anderson. 2016. "Prisoners in 2015". U.S. Department of Justice. https://www.bjs.gov/content/pub/pdf/p15.pdf

Chavez, Leo R. 2001. *Covering Immigration: Popular Images and the Politics of the Nation.* Berkley and Los Angeles, California: University of California Press.

Espenshade, Thomas J., and Charles A. Calhoun. 1993. "An Analysis of Public Opinion Toward Undocumented Immigration." *Population Research and Policy Review* 12, iss. 3 (October): 189-224. https://link.springer.com/article/10.1007/BF01074385

Feder, Jody. 2012. "Racial Profiling: Legal and Constitutional Issues." *CRS Report for Congress.* Congressional Research Service.

Gottschalk, Marie. 2015. "Catch and Keep: The Criminalization of Immigrants." In *Caught: The Prison State and the Lockdown of American Politics*, 215-240. Princeton; Oxford: Princeton University Press. https://doi.org/10.2307/j.ctv7h0svq.15.

Gramlich, John. 2019. "The Gap Between the Number of Blacks and Whites in Prison is Shrinking." Last modified April 30, 2019. https://www.pewresearch.org/fact-tank/2019/04/30/shrinking-gap-between-number-of-blacks-and-whites-in-prison/

Hagan, John and Alberto Palloni. 1999. "Sociological Criminology and the Mythology of Hispanic Immigration and Crime." *Social Problems* 46, no. 4 (November): 617-632. https://doi.org/10.2307/3097078

Heidenreic, Linda. 2015. "'Greaser Act' (1855)." In *Latino History and Culture: An Encyclopedia*, edited by David J. Leonard and Carmen R. Lugo-Lugo, 218. New York: Routledge.

Heitzeg, Nancy A. 2014. "Criminalizing Education: Zero Tolerance Policies, Police in the Hallways, and the School to Prison Pipeline." *Counterpoints* 453 (2014): 11-36.

Hurwitz, Jon, and Mark Peffley. 2010. "And Justice for Some: Race, Crime, and Punishment in the US Criminal Justice System." *Canadian Journal of Political Science/Revue Canadienne de science politique* 43, no. 2 (June): 457-479. https://www.jstor.org/stable/20743157

Larson, Stephanie Greco. 2006. *Media & Minorities: The Politics of Race in News and Entertainment.* Lanham: Rowman & Littlefield.

Light, Michael T., Mark H. Lopez, and Ana Gonzalez-Barrera. 2014. "The Rise of Federal Immigration Crimes." Pew Research Center. http://www.pewhispanic.org/2014/03/18/the-rise-of-federal-immigration-crimes/

Lopez, Mark H., and Michael T. Light. 2009. "A Rising Share: Hispanics and Federal Crime." Pew Research Center. https://www.pewresearch.org/wp-content/uploads/sites/5/reports/104.pdf

Macías-Rojas, Patrisia. 2018. "Immigration and the War on Crime: Law and Order Politics and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996." *Journal on Migration and Human Security* 6, no. 1 (January): 1-25. https://doi.org/10.14240/jmhs.v6i1.110

Mauer, Marc. 2011. "Addressing Racial Disparities in Incarceration." *The Prison Journal* 91, no. 3, suppl (August): 87S-101S. https://doi.org/10.1177/0032885511415227

Mendelson, Margot, Shayna Strom, and Michael Wishnie. 2009. "Collateral Damage: An Examination of ICE's Fugitive Operations Program." *Migration Policy Institute*. https://www.migrationpolicy.org/research/ice-fugitive-operations-program

Mora, Richard and Mary Christianakis. 2013. "Feeding the School-to-Prison Pipeline: The Convergence of Neoliberalism, Conservativism, and Penal Populism." *Journal of Educational Controversy* 7, no. 1 (2013): 1-10. https://cedar.wwu.edu/jec/vol7/iss1/5/

Morín, José Luis. 2009. "Latino/as and U.S. Prisons." In *Behind Bars: Latino/as and Prison in the United States*, edited by Suzanne Oboler, 17-38. New York, NY: Palgrave Macmillan.

Morris, Edward W. 2005. "'Tuck in the shirt!' Race, Class, Gender, and Discipline in an Urban School." *Sociological Perspectives* 48, no. 1 (Spring): 25-48. https://doi.org/10.1525/sop.2005.48.1.25

Mucchetti, Anthony E. 2005. "Driving While Brown: A Proposal for Ending Racial Profiling in Emerging Latino Communities." *Harvard Latino Law Review* 8, (March): 1-32.

National Center for Education Statistics. 2019. "Status Dropout Rates." The Condition of Education. Last modified May 2019. https://nces.ed.gov/programs/coe/indicator_coj.asp

Nevins, Joseph. 2010. *Operation Gatekeeper and Beyond: The War on "Illegals" and the Remaking of the U.S.-Mexico Boundary*. New York: Routledge.

Nicholls, Walter J. 2013. *The DREAMers: How the Undocumented Youth Movement Transformed the Immigrant Rights Debate*. Stanford, California: Stanford University Press

Oquendo, Angel. 1996. "Comments by Angel Oquendo." *Berkeley La Raza Law Journal* 9, no. 1 (1996): 43-47. https://doi.org/10.15779/Z38NS91

Pew Research Center. 2010. Hispanics and Arizona's New Immigration Law. http://www.pewhispanic.org/2010/04/29/hispanics-and-arizonas-new-immigration-law/

Provine, Doris Marie. 2007. *Unequal Under Law: Race in the War on Drugs*. Chicago: The University of Chicago.

Reinarman, Craig and Harry G. Levine. 1997. *Crack in America: Demon Drugs and Social Justice*. Berkeley, CA: University of California Press.

Rovner, Joshua. 2016. "Racial Disparities in Youth Commitments and Arrests." The Sentencing Project. Last modified April 1, 2016. https://www.sentencingproject.org/publications/racial-disparities-in-youth-commitments-and-arrests/

Sabol, Willian, Katherine Rosich, Kamala Mallik Kane, David P. Kirk, and Glenn Dubin. 2002. "The Influences of Truth-in-Sentencing Reforms on Changes in States' Sentencing Practices and Prison Populations." Urban Institute. https://www.urban.org/sites/default/files/publication/60401/410470-The-Influences-of-Truth-in-Sentencing-Reforms-on-Changes-in-States-Sentencing-Practices-and-Prison-Populations.PDF

Santa Ana, Otto. 2002. *Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse*. Austin, Texas: University of Texas Press.

Schneider, Barbara, Sylvia Martinez, and Ann Owens. 2006. "Barriers to Educational Opportunities for Hispanics in the United States." In *Hispanics and the Future of America*, edited by Marta Tienda and Faith Mitchell, 179-227. Washington, DC: The National Academies Press. https://doi.org/10.17226/11539.

Skiba, Russell J., Robert H. Horner, Choong-Geun Chung, M. Karega Rausch, Seth L. May, and Tary Tobin. 2011. "Race Is Not Neutral: A National Investigation of African American and Latino Disproportionality in School Discipline." *School Psychology Review* 49, no. 1 (March): 85-107.

Sommers, Samuel R. and Satia A. Marotta. 2014. "Racial Disparities in Legal Outcomes: On Policing, Charging Decisions, and Criminal Trial Proceedings." *Policy Insights from the Behavioral Sciences* 1, no. 1 (October): 103-111. https://doi.org/10.1177/2372732214548431

The Sentencing Project. 2018. "Trends in U.S. Corrections." Last modified June 22, 2018. https://www.sentencingproject.org/publications/trends-in-u-s-corrections/

Timberlake, Jeffrey M., Junia Howell, Amy Baumann Grau, and Rhys H. Williams. 2015. "Who 'They' Are Matters: Immigrant Stereotypes and Assessments of the Impact of Immigration. *The Sociological Quarterly* 56, iss. 2 (March): 267–299. https://doi.org/10.1111/tsq.12076

United States Census Bureau. 2012. "Hispanic Heritage Month 2012: Sept. 15-Oct. 15." https://www.census.gov/newsroom/releases/archives/facts_for_features_special_editions/cb12-ff19.html

United States Census Bureau. 2015. "Facts for Features: Hispanic Heritage Month 2015." https://www.census.gov/newsroom/facts-for-features/2015/cb15-ff18.html

United States Customs and Border Protection. n.d. "CBP Policy on Nondiscrimination in Law Enforcement Activities and all other Administered Programs." https://www.cbp.gov/about/eeo-diversity/policies/nondiscrimination-law-enforcement-activities-and-all-other-administered

United States Department of Justice. 2014. "Guidance for Federal Law Enforcement Agencies Regarding the use of Race, Ethnicity, Gender, National Origin, Religion, Sexual Orientation, or Gender Identity." https://www.justice.gov/sites/default/files/ag/pages/attachments/2014/12/08/use-of-race-policy.pdf

United States Sentencing Commission. 1995. "Special Report to Congress: Cocaine and Federal Sentencing Policy." https://www.ussc.gov/research/congressional-reports/1995-report-congress-cocaine-and-federal-sentencing-policy

Verdugo, Richard R. 2002. "Race-Ethnicity, Social Class, and Zero-tolerance Policies: The Cultural and Structural Wars." *Education and Urban Society* 35, no. 1 (November): 50-75. https://doi.org/10.1177/001312402237214

Walker, Nancy, J. Michael Senger, Francisco A. Villarruel, and Angela M. Arboleda. 2004. *Lost Opportunities: The Reality of Latinos in the U.S. Criminal Justice System*. Washington DC: National Council of La Raza.

Walker, Samuel. 2001. "Searching for the Denominator: Problems with Police Traffic Stop Data and an Early Warning System Solution." *Justice Research and Policy* 3, no. 1 (Spring): 63-95. https://doi.org/10.3818/JRP.3.1.2001.63

# EXHIBIT S

Professor Kelly Lytle Hernandez
Curriculum Vitae

**Professor Kelly Lytle Hernández**
Department of History
Department of African-American Studies
Department of Urban Planning
University of California, Los Angeles
6265 Bunche Hall, Box #951473
Los Angeles, California 90095-1473
hernandez@history.ucla.edu

**EDUCATION**

Ph.D., Department of History, University of California at Los Angeles, 1998 - 2002

B.A., Department of Ethnic Studies, University of California at San Diego, 1992 - 1996

**ACADEMIC POSITIONS**

Director, Ralph J. Bunche Center for African American Studies at UCLA, July 1, 2019 to present

Tom Lifka Endowed Chair in History (UCLA), July 1, 2019 to present

Interim Director, Ralph J. Bunche Center for African American Studies at UCLA, July 1, 2017 to June 30, 2019

Professor, departments of History, African American Studies, and Urban Planning, July 1, 2017 to present

Associate Professor, Department of History, University of California at Los Angeles, 2010 - 2017

Director, UCLA Public History Initiative, 2012 - 2014

Associate Director, National Center for History in the Schools, 2010 - 2012

Associate Director, Chicano Studies Research Center, University of California at Los Angeles, 2008 - 2010

Assistant Professor, Department of History, University of California at Los Angeles, 2004 - 2010

University of California President's Postdoctoral Fellow, Department of Ethnic Studies, University of California, San Diego, 2002 - 2004

Research Fellow, Center for U.S.-Mexican Studies at the University of California, San Diego, 2001 - 2002

Research Fellow, Center for Comparative Immigration Studies at the University of California, San Diego, 2001 - 2002

Visiting Scholar, Immigration and Naturalization Service Historical Library, Washington, D.C., 2000

1

**MAJOR RESEARCH PROJECTS**

*Bad Mexicans: Race, Empire, and Revolution in the Borderlands* (Norton Books, 2022)

Million Dollar Hoods ([milliondollarhoods.org](milliondollarhoods.org))

*City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771 – 1965* (University of North Carolina Press, April 2017).

*MIGRA! A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010).

**AWARDS and PRIZES**

2020, *City of Inmates* selected for the Literature for Justice Reading List, National Book Foundation

Commendation from the Los Angeles County Board of Supervisors for work on incarceration and immigration (November 19, 2019)

2019 John D. and Catherine T. MacArthur Fellow

2019 Catalyst Award. Awarded by CADRE for Million Dollar Hoods

2018 Local Hero Award. Awarded by KCET/PBS for Million Dollar Hoods as well as historical scholarship on the rise of mass incarceration in Los Angeles.

2018 John Hope Franklin Prize for most outstanding book in American Studies. Awarded by the American Studies Association for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 Athearn Book Award for the best book on the history of the twentieth-century American West. Awarded by the Western History Association for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 American Book Award for excellence in American literature. Awarded by the Before Columbus Foundation for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017).

2018 FREEDOM NOW! AWARD. Awarded for Million Dollar Hoods by the Los Angeles Community Action Network.

2018 John A. Rawley Prize for best book in U.S. race relations. Awarded by the Organization of American Historians for *City of Inmates: Conquest, Rebellion and the Rise of Human Caging in Los Angeles, 1781-1965* (University of North Carolina Press, 2017)

2015 Louis Knott Koontz Award for best article published in *Pacific Historical Review*, American Historical Association – Pacific Coast Branch. Awarded by the Board of Editors of the *Pacific Historical Review* to "Hobos in Heaven: Race, Incarceration, and the Rise of Los Angeles, 1880 -1910."

2010 Clements Book Award, Clements Center for Southwest Studies, Southern Methodist University. Awarded for *MIGRA! A History of the U.S. Border Patrol.*

Honorable Mention, 2010 Lora Romero First Book Prize, American Studies Association

Honorable Mention, 2010 John Hope Franklin Book Prize, American Studies Association

2007 Oscar O. Winther Prize for the best article published in the *Western Historical Quarterly* (2006). Awarded by the Board of Editors of the *Western Historical Quarterly* to "The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* (Winter 2006), 421-444.

2007 Bolton-Kinnaird Prize in Borderlands History. Awarded by the Western History Association to "The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* (Winter 2006), 421-444.

Norris F. Hundley Dissertation Prize (UCLA), 2002.

**<u>SELECTED ESSAYS and ARTICLES</u>**
Kelly Lytle Hernández, "The Rise of Mass Incarceration in Los Angeles," in Care First, Jails Last: Health and Racial Justice Strategies for Safer Communities (Los Angeles County Alternatives to Incarceration Work Group Final Report, February 2020)

Kelly Lytle Hernández, guest editor for "Carceral West," a Special Volume of *Pacific Historical Review* (January 2019)

Kelly Lytle Hernández and Mark Vestal, "[Million Dollar Hoods: A Fully-Loaded Cost Accounting of Mass Incarceration in Los Angeles,](#)" *Radical History Review* (March 28, 2019)

Kelly Lytle Hernández, "Reforming Deportees: Imprisonment and Immigration Control during the 1930s," *Beyond the Borders of the Law: Critical Legal Histories of the North American West*, eds., Katrina Jagodinsky and Pablo Mitchell (University of Kansas Press, 2018), 263-280.

Kelly Lytle Hernández, Khalil Gibran Muhammad, and Heather Ann Thompson, co-editors and co-authors of "Constructing the Carceral State," in "Constructing the Carceral State," a Special Volume of the *Journal of American History* (June 2015).

"Hobos in Heaven: Race, Incarceration, and the Rise of Los Angeles, 1880 -1910," *Pacific Historical Review* v. 83, n. 3 (August 2014), 410-447.

"The Deportees: Mexican Immigration and the Rise of U.S. Immigration Control during the 1920s," in Rafael G. Alarcón Acosta and Fernando Saúl Alanís Enciso, ed. *Historia de la Migración Mexicana a Estados Unidos. Visiones Comparadas* (Siglo XIX, 2013).

"Amnesty or Abolition? Felons, Illegal Immigrants and America's Unfinished Abolition Movement," *Boom: A Journal of California* (Winter 2012), 54-68.

"Borderlands and the Future History of the American West," *Western Historical Quarterly* v 42, n 3 (Autumn 2011), 325-330.

Interchange participant, "Latino History: An Interchange on Present Realities and Future Prospects," v 97, n 2 *Journal of American History* (September 2010), 424-463.

"Mexican/Central American Migration to the United States," *OAH Magazine of History* v 23 (October 2009), 25-30.

Kelly Lytle Hernández and Pablo Yankelevich, eds. "Dossier 1: The Archive," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

Kelly Lytle Hernández and Pablo Yankelevich, "An Introduction to el Archivo Histórico del Instituto Nacional de Migración," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

"Persecuted Like Criminals: The Politics of Labor Emigration and Mexican Migration Controls during the 1920s and 1930s," *Aztlán: A Journal of Chicano Studies* (Spring 2009).

"The Crimes and Consequences of Illegal Immigration:  A Cross-Border Examination of Operation Wetback, 1943-1954," *Western Historical Quarterly* v 37, n 4 (Winter 2006), 421-444.

"Ni blancos ni negros: mexicanos y el papel de la patrulla fronteriza estadounidense en la definición de una nueva categoría racial, 1924-1940," *Cuicuilco* v 11, n 31 (Mayo-Agosto 2004), 85-104.

*Mexican Immigration to the United States, 1900 – 1999: A Sourcebook for Teachers*, published by the National Center for History in the Schools (Fall 2002).


**POLICY REPORTS  and ARTICLES**
Co-author, "Immigration Enforcement at the Orange County Jail," (Million Dollar Hoods), June 11, 2019

Co-author, "Bookings into the Los Angeles County Jail (2010-2016): A Million Dollar Hoods White Paper prepared for the Los Angeles County Alternatives to Incarceration Work Group," (Million Dollar Hoods), June 11, 2019

Co-Author, "The Los Angeles Police Department's Metropolitan Division," (Million Dollar Hoods, April 2, 2019.

Co-author, "Women in the Los Angeles County Jail: An Analysis of LASD Booking Data (2010-2016)," (Million Dollar Hoods), January 8, 2019

Co-author, "Policing Our Students," (Million Dollar Hoods), October 30, 2018.

Co-author, "The Price of Freedom: Bail in the City of L.A.," (Million Dollar Hoods), May 14, 2018.

Co-author, "Policing the Unemployed in Los Angeles," (Million Dollar Hoods), May 2, 2018.

Co-author, "Race, Cannabis, and Recent Disparities in Cannabis Enforcement by the LAPD," (Million Dollar Hoods), February 28, 2018.

Co-author, "Access to Freedom: Caged L.A.," *Items: Insights from the Social Sciences* (Social Science Research Council), February 20, 2018

Co-author, "Policing the Houseless 2.0." (Million Dollar Hoods), December 5, 2017

Co-author, "The Price for Freedom: Bail in the City of Los Angeles," (Million Dollar Hoods), December 5, 2017

Co-author, "Policing the Houseless," (Million Dollar Hoods), October 10, 2017

"How Crossing the U.S.-Mexico Border Became a Crime," *The Conversation*, April 30, 2017.

"Largest Deportation Campaign in U.S. History is No Match for Trump's Plan," *The Conversation*, March 8, 2017.

"America's Mass Deportation System is Rooted in Racism," *The Conversation*, February 26, 2017


**SELECTED BOARDS and PROFESSIONAL SERVICE**
Co-chair, Program Committee, Organization of American Historians 2023 Annual Meeting

Elected member, American Academy of Arts and Science, 2021-present

Elected member, Pulitzer Prize Board (2020-2023)

Member, 2019 Literature for Justice Committee, National Book Foundation

Society of American Historians, executive board, 2020 - present

Society of American Historians, elected member, 2019 - present

Los Angeles Civic Memory Working Group, 2019 - present

Appointed by Supervisor Hilda Solis to the Los Angeles County Alternatives to Incarceration Workgroup, co-chair of the Data and Research Committee, March 2019 to March 2020.

Chair, American Talent Initiative Faculty Committee (UCLA), 2019/20

Committee Member, Time to Degree Taskforce (UCLA), 2019/20

Foundation Board Member, ACLU of Southern California, March 2018 – present

UC Systemwide Faculty Advisory Committee, UCLA representative, UC President's Postdoctoral Fellowship Program, 2017 to present

Editorial Board Member, *The Journal of American History*, March 2017 to March 2020

Program co-chair with Andrew Graybill (Southern Methodist University) and Katherine Benton-Cohen (Georgetown University), Western History Association 2017 Annual Meeting, current

Editorial Board, David J. Weber Series in New Borderlands History, University of North Carolina Press, 2012 – present

*American Quarterly,* Managing Board, 2010 – 2014

*Western Historical Quarterly,* Editorial Board, 2011 – 2014

*LABOR: Studies in Working-Class History of the Americas*, Contributing Editor, current

Distinguished Speaker, Western History Association, 2012-2016

Distinguished Lecturer, Organization of American Historians, 2011 - present

Organization of American Historians, member and 2013 Program Committee member


**SELECTED MEDIA INTERVIEWS**
Interview for Latino USA (December 18, 2020)

Interview for *Factually! With Adam Conover,* episode title, "The Racist Roots of America's Immigration Laws." Originally aired on February 18, 2020.

Interview for United States of Anxiety (WNYC), episode title, "Fragility in Liberty." Originally aired February 20, 2020.

"LAUSD Plans to Expand List of Offenses Eligible for Diversion to Reduce Racially Disparate School Arrests," WitnessLA, October 7, 2019

"San Diego Native Wins MacArthur "Genius" Grant," Midday Edition, KPBS San Diego, October 3, 2019

"Los Angeles Working to Expand Diversion Programs to Further Reduce Student Arrests and Increase Services," LAUSD Press Release, October 1, 2019.

Live television interview about MacArthur grant, Univision, September 30, 2019.

Live radio interview about MacArthur grant on Press Play with Madeleine Brand, KCRW, September 26, 2019.

"Rebel Historian Who Reframes History Receives MacArthur Genius Grant," All Things Considered," National Public Radio, September 25, 2019.

"MacArthur Genius Grant Winners of 2019: The Full List," New York Times, September 25, 2019

"Who's behind the law making undocumented immigrants criminals? An 'unrepentant white supremacist," *Washington Post*, June 27, 2019.

Live radio interview on Worldview with Steve Bynum on WBEZ (Chicago), June 27, 2019.

"Million Dollar Hoods: Why L.A. Cages More People than Any Other City," *Justice Not Jails*, July 4, 2018.

"Councilmember Harris-Dawson Joins Community Groups to Urge State and Local Officials to End Cash Bail: *New study from UCLA's Million Dollar Hoods Project highlights the disproportionate Price for Freedom,"* Los Angeles Sentinel, May 17, 2018.

Mother's Day Bailout press conference (Skid Row, Los Angeles), May 10, 2018

"We Live as Second-Class Citizens: What It's Like to Face Border Patrol Agents Every Day." *The Guardian,* May 3, 2018.

"Many Latinos Answer Call of the Border Patrol in Age of Trump," *Los Angeles Times*, April 23, 2018.

Mexican Americans and the History of U.S. Anti-Cannabis Laws, *Mitu* (first posted February 2018)

"The American Detention Machine," *The Atlantic*, February 23, 2018

"The Double Punishment for Black Undocumented Immigrants," *The Atlantic*, December 30, 2017 (interviewee)

On-camera interview, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, C-SPAN Book TV (2017)

"Life on a Million Dollar Block," six-week "Off the Block" series for KCRW (NPR affiliate) based on Million Dollar Hoods mapping project. September/October 2016.

Interviews with the following outlets in response to Donald Trump's deportation and border enforcement strategy: *Los Angeles Times, New York Times, Washington Post, The Intercept,* and *FactCheck.org.*

"A Two-Minute History of Operation Wetback" . CNN. First aired January 2016.

Podcast, "The Carceral State," *Journal of American History.* Conducted June 2015.

On-air interview, "States, Feds Battle over Border Control," *The World* hosted by Marco Werman for Public Radio International. Interview conducted in July 2010.

On-camera interview for History Channel production entitled, "El Camino Real" on the history of the Spanish mission system in California. Interview conducted on August 11, 2005

Consultant and on-camera interview for History Channel production entitled, "The Border Patrol." Interview conducted spring 2001.

**SELECTED TALKS, PRESENTATIONS, AND LECTURES**

"Million Dollar Hoods," Vera Institute of Justice, Board Meeting, January 13, 2020

Keynote, "Nation of Settlers," Cal State Long Beach Ethnic Studies Anniversary, November 13, 2019

Guest Speaker, American Civil Liberties Union of Southern California, October 4, 2019

*City of Inmates* book talk, The Bail Project (Los Angeles), June 25, 2019

"Nation of Settlers," Build Power! Launch Party (Hollywood), May 16, 2019

Million Dollar Hoods, Institute for Research on Labor and Employment (UC Berkeley), May 14, 2019

Keynote, Nation of Settlers, Teaching History Conference (UCLA), May 3, 2019

Keynote, City of Inmates book talk, Los Angeles County Alternatives to Incarceration Workgroup Retreat, April 26, 2019

Keynote, Million Dollar Hoods, Oberlin College, April 24, 2019

Keynote, Immigrant Detention Conference, University of Maryland, March 28, 2019

Keynote, Immigration Conference, California State University, Sacramento, March 7, 2019

Panelist, The Future of Incarceration, The State of Black California Conference (Sacramento, CA), February 27, 2019

City of Inmates book talk, Marquette University, February 21, 2019

City of Inmates book talk, University of Wisconsin - Madison, February 22, 2019

Keynote, Mass Deportation/Incarceration, LatinoJustice, November 16, 2018

Panelist, "Sorry to Bother You" Screening at UCLA, November 6, 2018

Panelist, Men's Empowerment Conference hosted by KJLH and Senator Bradford at California State University, Dominguez Hills, September 8, 2018.

Keynote, New Left Coast Forum hosted by *L.A. Progressive* at Los Angeles Trade Tech, August 24, 2018.

Panelist, People Power Conference sponsored by the Community Coalition (South Central Los Angeles), June 9, 2018.

Presentation, "The Facts and Fictions of Latinos and the U.S. Criminal Justice System," LatinoJustice convening at UCLA, May 29, 2018

*City of Inmates* book talk, California Historical Society (San Francisco, CA), May 23, 2018.

*City of Inmates* book talk for Los Angeles Department of Public Health, May 31, 2018.

Guest Presentation, Women and Incarceration in LA, for A New Way of Life Fundraiser (Los Angeles), May 19, 2018.

Press conference on money bail. Sponsored by Community Coalition (South Central Los Angeles), May 15, 2018.

Comments, Dream Mentor Program organized by the Miller Center at the University of Virginia (Charlottesville, CA), May 10, 2018.

Keynote, Caughey Foundation Lecture at the Autry Museum (Los Angeles, CA), April 29, 2018

Keynote, Public Records and the Movement to End Mass Incarceration, California Public Records and Open Meetings Conference (Los Angeles, CA), April 27, 2018

Book talk, *City of Inmates*, University of North Texas (Denton, TX), April 26, 2018.

Book talk, *City of Inmates*, Pan-African Studies Department at California State University, Los Angeles (Los Angeles, CA), April 23, 2018.

Book talk, *City of Inmates*, Main Museum (Los Angeles, CA), April 19, 2018.

Book talk, *City of Inmates*, Cerritos Community College (Los Angeles, CA), April 19, 2018.

Panelist, Crimmigration, Organization of American Historians Annual Meeting (Sacramento, CA) April 12, 2018

Keynote, Death by Police conference at University of Illinois at Urbana-Champagne, April 11, 2018

Public Talk, Labor and the Crisis of Mass Incarceration, United Food and Commercial Workers Local 770 (Los Angeles, CA), March 15, 2018

Book talk, *City of Inmates*, University of California, Berkeley, March 14, 2018.

Book talk, *City of Inmates*, California State University, Channel Islands, February 28, 2018.

Moderator for a public conversation with Patrisse Khan-Cullors and Asha Bandele, *When They Call You a Terrorist: A Black Lives Matter Memoir* (2018) at The California Endowment (Los Angeles, CA), February 14, 2018

Book talk, *City of Inmates*, Immigration History Research Center, University of Minnesota, January 25, 2018.

Moderator for a public Conversation with Heather Anne Thompson, *Blood in the Water: The 1971 Attica Uprising and its Legacy* at the Los Angeles Public Library, January 18, 2018.

Panelist, District 2 Town Hall, hosted by JusticeLA and White People for Black Lives, (Hollywood, CA), January 11, 2018.

Book Talk, *City of Inmates*, University of Southern California (Los Angeles, CA), January 10, 2018.

Panelist, #SocialJustice with Common and Kareem Abdul-Jabbar (Los Angeles, CA), January 6, 2018

Project Talk, Million Dollar Hoods, UCLA Medical School, December 15, 2017

Book Talk, Watts Labor Community Action Center, December 14, 2017.

Expert Witness, Civil Society Meeting on Criminalization of Poverty and Homelessness with United Nations Special Rapporteur on Extreme Poverty and Human Rights
Professor Philip Alston, (Los Angeles, CA), December 4-5, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles,* California State University, San Bernardino, (San Bernardino, CA), November 28, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles* ACLU-Southern California (Los Angeles, CA), November 19, 2017.

Presenter, UCLA Luskin Center for History and Policy, November 15, 2017.

Keynote Speaker, Eqbal Ahmed Symposium, Hampshire College (Amherst, MA), November 9, 2017.

Panelist, Historians and Activism, Western History Association (San Diego, CA), November 3, 2017.

Closing Speaker, Race and Capitalism Conference, UCLA, October 20, 2017.

Presenter, UCLA Criminal Justice Faculty Workgroup, October 18, 2017.

Panelist, Beyond the Bars Conference, University of California, Los Angeles, October 14, 2017.

Presenter, The Racial and Sexual Politics of Migrancy and Border Control, University of Michigan Centennial Event, October 13, 2017

Keynote Address/Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Latino Studies University of Michigan (Ann Arbor, MI), October 12, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Warren Center at Harvard University (Cambridge, MA), September 19, 2017.

LAPD Recruit Training Session. Los Angeles, CA, August 14, 2017.

Million Dollar Hoods, Building Healthy Communities – Long Beach, California, August 9, 2017

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Book Soup (Hollywood, CA), August 6, 2017.

Plenary Panel, Labor and Working Class History Association 2017 Meeting (Seattle, WA), June 22, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Skylight Books (Los Angeles, CA), May 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, University of California, San Diego, May 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Claremont College of Theology (Claremont, CA), May 2, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Eso Won Book Store (Los Angeles, CA), April 26, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Occidental College (Pasadena, CA), April 25, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, California State Univeristy, Dominguez Hills, April, 20, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Tarleton College (Texas), April 18, 2017.

Book Talk, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles*, Southern Methodist University (Dallas, Texas), April 17, 2017.

Keynote, Western History Association Lecture at University of Oklahoma. April 13, 2017.

Keynote, National Humanities Center, March 30, 2017.

Presenter, Laying Down the Law Symposium at University of Nebraska at Lincoln, November 16-17, 2017.

Million Dollar Hoods, South Central (Los Angeles) Re-Entry Coalition, September 11, 2016.

Million Dollar Hoods, California Endowment, September 18, 2016.

Plenary Session/Podcast, "Behind the Scholar's Studio: Inside the World of Latino Studies," American Historical Association – Pacific Coast Branch. August 6, 2016.

Public Lecture, "Caged Birds: Immigration Control and the Rise of Mexican Imprisonment in the United States," Franklin and Marshall College. Lancaster, Pennsylvania. March 21, 2016.

Presenter, Immigration since 1965 Conference hosted at University of Texas, Austin. March 4-5, 2016.

Public talk, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Puget Sound University. February 29, 2016.

Discussant, UCLA Emerging Immigration Scholars Conference. February 26, 2016.

Keynote Address, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Caged/Uncaged Graduate Student Conference. University of California, Los Angeles. January 29, 2016.

Keynote Address, "Caged Birds: Conquest and the Rise of Mexican Imprisonment in the United States," Borderlands Conference, University of Texas at El Paso. November 6, 2015.

Lecture, "The Colonial Origins of the Carceral State," From the Color Line to the Carceral State: Policing, Prisons, and Surveillance in the 20th and 21st Centuries conference, Stony Brook University and Fairfield University. October 27-28, 2015.

Panelist, "Legal Borderlands," Annual Meeting of the Western History Association. October 24, 2015.

Panelist, "Reforming Deportees: Race, Incarceration, and the Settler State during the New Deal Era," Annual Meeting of the Western History Association. October 22, 2015.

Public Talk, "The History of Race and Policing in Los Angeles," LAPD Trust Talks organized by the Downtown Clergy Council, Skid Row. October 3, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," plenary panel, Annual Meeting of the Organization of American Historians. St. Louis, Missouri. April 18, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," Immigration Conference, Columbia University. April 4, 2015.

"Caged Birds: Conquest and the Rise of Mexican Imprisonment," Department of History, Yale University. March 31, 2015.

Panelist, "Is there an LA School of Western History?" Western History Association Annual Meeting. Newport Beach, California. October 17, 2014.

Presenter, "Borderlands," NEH-Newberry Workshop. Chicago, Illinois. June 23, 2014

Lecture, "Caged Birds: Conquest and the Rise of Mexican Incarceration," University of California, Davis Law School. September 11, 2014.
Public Lecture, "Caged Birds: Conquest and the Rise of Mexican Imprisonment," University of California, Santa Barbara. May 20, 2014.

Public Talk, "Caged Birds," Linfield College. McMinnesville, Oregon. May 6-7, 2014.

OAH Distinguished Lecture at University of Missouri. April 24, 2014.

Panelist, Mass Incarceration/Mass Deportation," UCLA Labor Center. April 19, 2014.

Discussant, UCLA-COLEF Migration Conference. November 22, 2013.

Keynote Discussant for Douglas Blackmon's Talk, "Slavery by Another Name," Historians Against Slavery Conference. Cincinnati, Ohio. September 19, 2013.

Workshop for K-12 History teachers on California History. UCLA History-Geography Project. June 13, 2013.

TAH-OAH Public Talk, "A History of U.S. Immigration Control." Rockford, Illinois. January 26, 2013

TAH workshop, "California Under Three Flags," UCLA History-Geography Project. January 22, 2013.

OAH Distinguished Lecturer Public Talk, "Hoboes in Heaven: Race, Manifest Destiny, and the Rise of Los Angeles," Purdue University. March 7, 2013.

Public Talk, "The Invention of Immigrant Detention," University of California, Berkeley, Boalt Law School. March 20, 2014.

Book Talk, *MIGRA! A History of the U.S. Border Patrol,* at the Center for the Study of the Pacific Northwest, University of Washington, Seattle. May 17, 2012.

Keynote Address, "Amnesty or Abolition? Felons, Illegals, and America's Unfinished Abolition Movement," Immigration Policy and Reality Symposium, San Jose State University, April 13, 2012.

Working Paper, "Rebellion from the Jail: A History of Community, Incarceration, and Revolution in Los Angeles, 1900 – 1910," Sunbelt Prisons Conference, Southern Methodist University, March 24, 2012.

Book Talk, *MIGRA! A History of the U.S. Border Patrol* at the Center for Comparative Immigration Studies at the University of California, San Diego. February 21, 2012.
Public Lecture, "Hobos in Heaven: Tramps, Chain Gangs, and the Rise of Los Angeles," University of Indiana. February 26, 2012.

Public Talk, "Amnesty or Abolition: Felons, Illegals, and America's Unfinished Abolition Movement," Boxcar Books, Bloomington, Indiana. February 26, 2012.

Conference Paper, "Rebellion from the Jails: A History of Incarceration and Community in Los Angeles, 1907-1910," Sunbelt Prisons workshop, University of Colorado, Boulder. September 15-16, 2011

Keynote Address, Latino/a Scholars Luncheon, 2011 American Historical Association-Pacific Coast Branch Meeting. Seattle, Washington. August 11, 2011.

K-12 Teacher Training, "History of Immigration Control," Denver, Colorado School District. July 11, 2012. Los Angeles, California.

Panel Participant, "Prison State: Incarceration in California," UCLA Department of History, Why History Matters series. Autry Museum. May 11, 2011.

Panel moderator, conference for the UC Center for New Racial Studies. UCLA. April 22, 2011.

Presenter, "*MIGRA! A History of the U.S. Border Patrol*," Critical Race Studies Symposium – Race and Sovereignty. UCLA Law School. April 2, 2011.

Book Talk, "*MIGRA! A History of the U.S. Border Patrol*," Arizona State University. March 25, 2011.

Keynote Address, "Beyond Borders: Migration and the Next California," Symposium to celebrate the launching of *Boom: A Journal of California* (University of California Press). Davis, California. March 10, 2011.

Presenter, "Hoboes in Heaven: Tramps, Convict Labor and the Rise of Los Angeles, 1880-1910," Autry Western History Workshop. November 30, 2010

Panelist, "Hoboes in Heaven: Tramps, Convict Labor and the Rise of Los Angeles, 1880-1910," Latin American Studies Association. Toronto. October 8, 2010.

Book talk, "*MIGRA! A History of the U.S. Border Patrol*," UCLA Law School. October 4, 2010.

Panel moderator, Forty Years of Ethnic Studies at UCLA. May 13, 2010

Panelist, "Crossing Borders, Creating Borders: Nations, Migrants, and Constructions of Law," 2009 Annual Meeting of the Association of American Law Schools. San Diego, California. January 9, 2009.

Keynote lecture series, *Los caminos de la exclusión: migración y racismo en la historia de los Estados Unidos de América.* Sponsored by Sociedad y Estado en el México Moderno del Posgrado de Historia y Etnohistoria de la Escuela Nacional de Antropología e Historia y el Proyecto de Investigación "Nación y Extranjería en México." Mexico City. December 7-11, 2009.

K-12 Teacher Training, "U.S.-Mexico Relations: Immigration Policy," UCLA History-Geography Project's Teaching American History Summer Institute.  Glendale, California. July 17, 2008.

Panel Participant, "Immigration Control in the Carceral Era," invited presentation at University of Texas at Austin.  22nd Annual Hemann Sweatt Civil Rights Symposium. March 26, 2008.

K-12 Teacher Training, "Gold Rush to Gold Rush:  African American Migration to California, 1848 to 1944," presentation for the National Center for History in the Schools.  University of California, Los Angeles.  August 17, 2007.

K-12 Teacher Training, "The Long Civil Rights Movement: New Strategies in Teaching the Civil Rights Movement," presentation for the UCLA History-Geography Project's Teaching American History Summer Institute.  Glendale, California. July 28, 2007.

Training Workshop, "Where Do We Go From Here?:  New Strategies in Teaching Late Twentieth Century American History,"  2007 OAH Community College Workshop at El Camino Community College. Torrance, California.  June 23, 2007.

K-12 Teacher Training, "A History of the Problem of Illegal Immigration at the U.S.-Mexico Border," presentation for the Latin American Immigrants and Mobile Communities in the United States Conference for Teachers, sponsored by the UCLA Latin American Center. April 20, 2007.

K-12 Teacher Training, "The Making of MexAmerica: Race, Migration, and Incorporation in the 19th and 20th Centuries," presentation for the National Center for History in the Schools at the University of California, Los Angeles.  January 19, 2007.

Chair, "Smuggling in the Southwest Borderlands:  State Regulation and Resistance," panel at the 2007 Annual Conference of the Western History Association. Oklahoma City, Oklahoma. October 3-6, 2007

"The Crimes and Consequences of Illegal Immigration: A Cross-Border Examination of Operation Wetback, 1943-1954," presented at the Annual Conference of the Organization of American Historians held from April 19-22, 2006 in Washington, DC.

"Negotiating the Barrier: Migration Control and Social Order between the U.S. and Mexico during the Bracero Era, 1942 – 1964," presented at the Latin American Studies Association 2004 Conference held from October 7-9, 2004 in Las Vegas, Nevada.

"Constructing the Criminal Alien:  A Historical Framework for Analyzing Border Vigilantes at the Turn of the 21st Century" presented at the Center for Comparative Immigration Studies at the University of California, San Diego. La Jolla, California. October 7, 2003.

"Distant Origins: The U.S. Border Patrol and the Mexican Roots of Race in the United States, 1924-1965" presented at the XI Reunión de Historiadores Mexicanos, Estadounidenses y Canadienses. Monterrey, Mexico. October 1-4, 2003.

# EXHIBIT T

Professor Benjamin Gonzalez O'Brien
Curriculum Vitae

# Benjamin Gonzalez O'Brien

**Associate Professor of Political Science**
**San Diego State University**
5500 Campanile Dr.
San Diego, CA 92182
Phone: (619)594-3072
Email: bgonzalezobrien@sdsu.edu

## Education

Ph.D., Political Science                                     2014, University of Washington

M.A., Political Science                                    2009, University of Washington

M.A., Political Science                                    2007, University of Victoria

B.S., Political Science & Psychology                     2001, University of Oregon

1

**Benjamin Gonzalez O'Brien**                                                            **Curriculum Vitae**

## Teaching Positions

| | |
|---|---|
| August 2018-present | Associate Professor |
| San Diego State University | Political Science |
| | |
| 2014-2018 | Professor (Tenured) [1] |
| Highline College | Political Science |
| | |
| 2013-2014 | Lecturer |
| University of Washington-Tacoma | Political Science |
| | |
| 2007-2013 | Teaching Assistant |
| University of Washington | Political Science |

## Publications

### Refereed Books

1) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. *Sanctuary Cities: The Politics of Refuge* Oxford, England: Oxford University Press, in press.

2) **Gonzalez O'Brien, Benjamin**. 2018. *Handcuffs and Chain Link: Undocumented Immigration and the Politics of Criminality*. Charlottesville, VA: University of Virginia Press.

---

[1]Highline does not have academic ranks for tenured faculty.

**Benjamin Gonzalez O'Brien** *Curriculum Vitae*

## Refereed Journal Articles

1) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2021. "Is Distance to Drop Box an Appropriate Proxy for Drop Box Treatment? A Case Study of Washington State." *American Politics Research*
https://doi.org/10.1177/1532673X211022192

2) **Gonzalez O'Brien, Benjamin**, Matthew Barreto, and Gabriel Sanchez. 2020. "They're All Out to Get Me! Assessing Inter-Group Competition Among Multiple Populations." *Politics, Groups, and Identities*.
https://doi.org/10.1080/21565503.2019.1629305

3) McGuire, William, **Benjamin Gonzalez O'Brien**, Katherine Baird, Benjamin Corbett, and Loren Collingwood. 2020. "Does Distance Matter? Evaluating the Impact of Drop Boxes on Voter Turnout." *Social Science Quarterly*, Vol 101(5): 1789-1809.
https://doi.org/10.1111/ssqu.12853

4) **Gonzalez O'Brien, Benjamin**, Elizabeth Hurst, Justin Reedy, and Loren Collingwood.2019. "Framing Refuge: Media, Framing, and Sanctuary Cities." *Mass Communication and Society*, Vol 22(6): 756-778.
https://doi.org/10.1080/15205436.2019.1685106

5) **Gonzalez O'Brien, Benjamin**. "Sanctuary Cities". In Oxford Bibliographies in Latino Studies. Ed. Ilan Stavans. New York: Oxford University Press, 26 Feb. 2020.
https://www.oxfordbibliographies.com/view/document/obo-9780199913701/obo-9780199913701-0141.xml

6) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. "Covert Cross-Racial Mobilization, Black Activism, and Political Participation Pre-Voting Rights Act." *Florida Historical Quarterly*, vol. 97(4): 435-463.

7) Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Joe Tafoya. 2019. "Partisan Learning or Racial Learning: Opinion Change on Sanctuary City Policy Preferences in California and Texas." *Journal of Race, Ethnicity, and Politics*, vol. 5(1): 92-129.
https://doi.org/10.1017/rep.2019.25

8) Collingwood, Loren and **Benjamin Gonzalez O'Brien**. 2019. "Public Opposition to Sanctuary Cities in Texas: Criminal Threat or Latino Threat?" *Social Science Quarterly*, vol. 100(4): 1182-1196.
https://doi.org/10.1111/ssqu.12632

9) Collingwood, Loren, Stephen El-Khatib and **Benjamin Gonzalez O'Brien**. 2018. "Sustained Organizational Influence: The American Legislative Exchange Council and the Diffusion of Anti-Sanctuary Policy." *Policy Studies Journal*, 44(3): 735-773.

3

**Benjamin Gonzalez O'Brien**                    **Curriculum Vitae**

https://doi.org/10.1111/psj.12284

10) Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Sarah Dreier. 2018. "Evaluating Ballot Initiative Support for Legalized Marijuana: The Case of Washington." *International Journal of Drug Policy*, Vol. 56 (June): 6-20.

https://doi.org/10.1016/j.drugpo.2018.02.010

11) Collingwood, Loren, William McGuire, **Benjamin Gonzalez O'Brien**, Katie Baird and Sarah Hampson. 2018. "Do Drop Boxes Improve Voter Turnout? Evidence from King County, Washington." *Election Law Journal*, Vol. 17(1): 58-72.

https://doi.org/10.1089/elj.2017.0450

12) **Gonzalez O'Brien, Benjamin**, Loren Collingwood, and Stephen Omar El-Khatib. 2017. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration" *Urban Affairs Review*, Vol. 55(1): 3-40.

https://doi.org/10.1177/1078087417704974

13) Barreto, Matt, Betsy Cooper, **Benjamin Gonzalez O'Brien**, Chris Towler, and Christopher Parker. 2012. "The Tea Party in the Age of Obama: Mainstream Conservatism or Out-Group Anxiety?" *Political Power and Social Theory*. 22:1(Jan): 105-137.

https://doi.org/10.1108/S0198-8719(2011)0000022011

## Refereed Book Chapters

1) Gonzalez O'Brien, Benjmain. "Reacting to Refuge: Presidential Responses to Sanctuary Policies under the Reagan, Bush, and Trump administrations." In Monica Verea (ed.) *Trump: Anti-Immigrant Rhetoric, Actions, and Policies 2017-2019*: 67-98. Mexico City: CISAN/UNAM.

## Non-Refereed Book Chapters

1) Barreto, Matt, Gabriel Sanchez and **Benjamin Gonzalez O'Brien**. 2013. "Rainbow Coalition in the Golden State? Exposing Myths, Uncovering New Realities in Latino Attitudes Towards Blacks." In Laura Pulido and Josh Kun (eds.) *Black and Brown Los Angeles: A Contemporary Reader*: 1-36. Berkeley, CA: University of California Press.

2) Barreto, Matt, Loren Collingwood, **Benjamin Gonzalez O'Brien**, and Chris Parker. 2011. "Tea Party Politics in a Blue State: Dino Rossi and the 2010 Washington Senate Election." In William Miller and Jeremy Walling

4

**Benjamin Gonzalez O'Brien**                                   *Curriculum Vitae*

(eds.) *Tea Party Effects on 2010 U.S. Senate Elections: Stuck in the Middle to Lose: Tea Party Effects on 2010 U.S. Senate Elections*: 255-272. Rowan and Littlefield Publishing Group.

## Non-Refereed Publications

**Gonzalez O'Brien, Benjamin**. 2020. "Washington is safer because of its sanctuary status." *The Seattle Times*, January 1st, 2020.

**Gonzalez O'Brien, Benjamin**. 2019. "No, Ken Blackwell, sanctuary city policies aren't a threat to anyone". *The Hill*, October 24, 2019.
https://thehill.com/opinion/immigration/467294-no-ken-blackwell-sanctuary-city-policies-arent-threat-to-anyone

**Gonzalez O'Brien, Benjamin**. 2018. "The 1929 Law That Turned Undocumented Entry Into a Crime". *Zocalo Public Square*, November 27, 2018.
https://www.zocalopublicsquare.org/2018/11/27/1929-law-turned-undocumented-entry-crime/ideas/essay/

**Gonzalez O'Brien, Benjamin**. 2017. "The Trump team's mythology on sanctuary city crime rates". *The Seattle Times*, July 23rd, 2017.
https://www.seattletimes.com/opinion/the-trump-teams-mythology-on-sanctuary-city-crime-rates/

**Gonzalez O'Brien, Benjamin** and Loren Collingwood. 2017. "How conservative media and Jeff Sessions got it wrong on sanctuary cities". *The Hill*, July 14th, 2017.
https://thehill.com/blogs/pundits-blog/immigration/342043-how-conservative-media-and-jeff-sessions-got-it-wrong-on

Collingwood, Loren, **Benjamin Gonzalez O'Brien** and Stephen El-Khatib. 2017. "Jeff Sessions used our research to claim sanctuary cities have more crime. He's wrong." *Washington Post Monkey Cage*, July 14, 2017.
https://www.washingtonpost.com/news/monkey-cage/wp/2017/07/14/jeff-sessions-used-our-research-to-claim-that-sanctuary-cities-have-more-crime-hes-wrong/?utm$_term = .de1f041b8cb3$

Collingwood, Loren, **Benjamin Gonzalez O'Brien**, and Stephen El-Khatib. 2017. "Sanctuary Cities Do Not Experience an Increase in Crime". *Washington Post Monkey Cage*, October 3, 2016.
https://www.washingtonpost.com/news/monkey-cage/wp/2016/10/03/sanctuary-cities-do-not-experience-an-increase-in-crime/?utm$_term = .aecb2d3f1bf1$

Benjamin Gonzalez O'Brien                                                                    *Curriculum Vitae*

## Participation in Professional Organizations

2019 *Local Democracy Academy* (June) Umea, Sweden. "Criminalizing Refuge: Sanctuary Cities and the Politics of Immigration in the United States"

2019 CISAN/UNAM *Trump: Anti-immigrant rhetoric, actions and policies 2017-2019 conference* (February) Mexico City, Mexico. "Reactions to Refuge: Presidential Responses to Sanctuary Policies under the Reagan, Bush, and Trump Administrations"

2018 *American Political Science Association Annual Meeting* (September) Boston, MA. "Framing Refuge: Media Coverage of Sanctuary Cities 1980-2017"

2018 *Election Sciences, Reform, and Administration conference* (July) Madison, WI. "Evaluating the Impact of Drop Boxes on Voter Turnout"

2018 *Western Political Science Association Annual Meeting* (March) San Francisco, CA. "Framing Refuge: Partisanship, Crime, and Media Coverage of Sanctuary Cities"

2017 *Law and Society Association Annual Meeting* (June) Mexico City, Mexico. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration"

2017 *Western Political Science Association Annual Meeting* (April) Vancouver, BC. "Voter Turnout in King County Washington: Do Dropboxes Matter?"

2017 *Western Political Science Association Annual Meeting* (April) Vancouver, BC. "The Politics of Refuge: Sanctuary Cities, Crime, and Undocumented Immigration"

2016 *American Political Science Association Annual Meeting* (September) San Francisco, CA. "Inter-Group Attitudes Among Multiple Populations: Competition and Context"

2016 *Western Political Science Association Annual Meeting* (March) San Diego, CA. "Laughing Away Prejudice? Evaluating the Role of Comedy in Reducing Anti-Muslim Attitudes"

2016 *Western Political Science Association Annual Meeting* (March) San Diego, CA. "Gimme Shelter: The Myth and Reality of the American Sanctuary City"

2015 *Western Political Science Association Annual Meeting* (April) Las Vegas, NV. "IRCA, IIRIRA and the Cost of Critical Policy Failures"

**Benjamin Gonzalez O'Brien**                                    **Curriculum Vitae**

2014 *Politics of Race, Immigration, and Ethnicity Consortium Meeting* (November) Eugene, OR. "Path Dependence and Immigration Policy in the 1920s"

2014 *Western Political Science Association Annual Meeting* (April) Seattle, WA. "Path Dependence and Immigration Policy in the 1920s"

2013 *American Political Science Association Annual Meeting* (September) Chicago, IL. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2013 *Midwestern Political Science Association Annual Meeting* (April) Chicago, IL. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2012 *Law and Societies Association Annual Meeting* (June) Oahu, Hawaii. "Towards Crimmigration: Path Dependence and the Evolution of Immigration Policy."

2012 *Western Political Science Association Annual Meeting* (March) Portland, OR. "The Undocumented Threat: Beliefs, Policy Preferences, and the Politics of Immigration."

2011 *Pacific Northwest Political Science Association Annual Meeting* (October) Seattle, WA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2011 *American Political Science Association Annual Meeting* (September) Seattle, WA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2011 *Politics of Race, Immigration and Ethnicity Consortium Meeting* (May) Davis, CA. "The Undocumented Threat: Beliefs, Policy Preferences and the Politics of Immigration."

2010 *International Society of Political Psychology Annual Meeting* (July) San Francisco, CA. "An Examination of Inter-Group Attitudes Among Multiple Populations: The Role of Neighborhood Context and Group-Based Threat."

2010 *Western Political Science Association Annual Meeting* (April) San Francisco, CA. "Declaring Sanctuary: Politics, History and the Enforcement of Immigration Policy."

2009 *Pacific Northwest Political Science Association Annual Meeting* (October) Victoria, BC. "Immigration Enforcement's Discontents: The Creation and Endurance of the American Sanctuary City."

2009 *Political Psychology and Immigration Conference* (April) Austin, TX. "Correcting Misperceptions: Undocumented Immigrants, Group Size and Political Attitudes."

7

**Benjamin Gonzalez O'Brien** <span style="float:right">**Curriculum Vitae**</span>

2009 *Western Political Science Association Annual Conference* (March) Vancouver, BC. "Correcting Misperceptions: Undocumented Immigrants, Group Size and Political Attitudes."

## Teaching

### Thesis or Comprehensive Exam Supervision

Spring 2019-Spring 2020: Cynthia Neira, Masters
Committee Member:       American Foreign Policy and Latin American Politics comprehensive examination


Fall 2020-Spring 2020: Jereme Umali, Masters
Committee Member:    Racial & Ethnic Politics comprehensive examination


### Courses Taught, San Diego State University

Introduction to American and California Government, Political Science 102
Politics of Race and Ethnicity, Political Science 333
The Legislative Process, Political Science 338
Immigration and Border Politics, Political Science 430


### Courses Taught, Highline College

Introduction to Political Science, Political Science 101
American Government, Political Science 202
Introduction to International Relations, Political Science 203
Comparative Government, Political Science 204
Racial and Ethnic Politics, Political Science 217


### Courses Taught, University of Washington-Tacoma

Introduction to American Politics, Political Science 202
Mass Media and Politics, Political Science 300
Politics of Race and Ethnicity in the United States, Political Science 317
United States Congress, Political Science 353
Advanced Campaigns and Elections, Political Science 405

**Benjamin Gonzalez O'Brien**                                        **Curriculum Vitae**

## Service

### Service for the Department, San Diego State University

| | |
|---|---|
| 1) Fall 2019-present | Adviser, Washington Center Internship Program |
| 2) Fall 2019-present | Adviser, Sacramento Internship Program |
| 3) Fall 2019-present | Member, Diversity Planning Committee |
| 4) Fall 2019-present | Member, Graduate Committee |
| 5) Fall 2018-present | Department Secretary |
| 6) Fall 2018-Spring 2019 | Member, Scholarship Review Committee |

### Service for the College of Arts & Letters

| | |
|---|---|
| 1) Spring 2019 | Member, Critical Thinking Grant Committee |

### Service, Highline College

| | |
|---|---|
| 1) Fall 2017-Spring 2018 | Division Senator, Faculty Senate |
| 2) Fall 2015-Spring 2017 | Member, Graduation Review Committee |
| 3) Fall 2015-Spring 2016 | Member, Faculty Advising Committee |

**Benjamin Gonzalez O'Brien**                                                                 **Curriculum Vitae**

## Service to the Profession

| | |
|---|---|
| 2019 | Session Leader, Local Democracy Academy |
| 2019 | Co-organizer, "Immigration Politics and Policy in the Age of Trump" conference at UCSD |
| 2019 | Reviewer, *State and Local Government Review* |
| 2019 | Reviewer, *Social Inclusion* |
| 2018 | Reviewer, *Urban Affairs Review* |
| 2018 | Panelist, 2018 Pearson-Chambers Symposium on the 2018 election, Univ. of San Diego |
| 2018 | Reviewer, *Urban Affairs Review* |
| 2018 | Reviewer, *Sociological Quarterly* |
| 2016 | Reviewer, *Politics, Groups, and Identities* |