UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | Case No. 21 CR 665 |
| v. | ) | |
| | ) | Hon. Matthew F. Kennelly |
| ALFREDO VIVEROS-CHAVEZ | ) | |

## GOVERNMENT'S REPONSE TO DEFENDANT'S
## MOTION TO DISMISS THE INFORMATION

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................ 1

INTRODUCTION ............................................................................................... 5

FACTUAL BACKGROUND ................................................................................ 7

STATUTORY BACKGROUND ........................................................................... 8

ARGUMENT ..................................................................................................... 11

I.      Section 1326 Is Subject to Rational-Basis Review and It Easily Passes that Test. ................................................................................ 11

II.     Defendant's Challenge Fails Under the *Arlington Heights* Standard. .......................................................................................... 16

      A.     Defendant Cannot Establish Discriminatory Intent in the Passing of § 1326. ................................................................. 18

      B.     Defendant's Attempt to Impute the 70th Congress's Intent on the 82nd and Later Congresses Is Inconsistent with the Historical Record and Supreme Court Precedent. ............................... 25

      C.     Section 1326's Impact on Mexican and Latinx Defendants Does Not Give Rise to an Inference of Discriminatory Intent. .......................... 32

III.    In Any Event, Congress Would Have Passed § 1326 Absent the Alleged Animus. .............................................................................. 35

CONCLUSION .................................................................................................. 36

i

# TABLE OF AUTHORITIES

## Cases

*Abbott v. Perez,* 138 S. Ct. 2305 (2018)...........................................................................23, 24, 26

*Adarand Constructors, Inc. v. Pena* 515 U.S. 200 (1995) ...........................................................7

*Apodaca v. Oregon,* 406 U.S. 404 (1972) ...................................................................................26

*Arizona v. United States,* 567 U.S. 387 (2012) ...........................................................................8

*Arlington Heights v. Metropolitan Housing Development Corp.,.* 429 U.S. 252 (1977) . passim

*Bolling v. Sharpe*, 347 U.S. 497, 499 (1954)...............................................................................7

*Brnovich v. DNC,* 141 S. Ct. 2321 (2021) ...........................................................................23, 26

*United States v Carrillo-Lopez*, No. 3:20-cr-00026-MMD-WGC, 2021 WL 3667330 (D. Nev.
    Aug. 18, 2021)......................................................................................................................19, 25

*City of Chicago v. Shalala*, 189 F.3d 598 (7th Cir. 1999) ......................................9, 10, 11, 21

*City of Mobile v. Bolden,* 446 U.S. 55 (1980).......................................................23, 24, 25, 26

*Cook County, Illinois v. Wolf,* 461 F. Supp. 3d 7799 (N.D. Ill. 2020)....................................11

*Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020) ...................................27

*Fiallo v. Bell,* 430 U.S. 787 (1977) ........................................................................................8, 9

*Hampton v. Mow Sun Wong,* 426 U.S. 88 (1976) .......................................................................7

*Heller v. Doe,* 509 U.S. 312 (1993) .......................................................................................9, 12

*Homeland Security v. Regents of the University of California,* 140 S. Ct. 1891 (2020) ..23, 29,
    30

*Hudson v. United States,* 522 U.S. 93 (1997) ...........................................................................12

*Hunter v. Underwood,* 471 U.S. 222 (1985)................................................................14, 15, 22

*Johnson v. Governor of the State of Florida*, 405 F.3d 1214 (11th Cir. 2005) .......................25

*Kimbrough v. United States,* 552 U.S. 85 (2007) .....................................................................20

*Kleindienst v. Mandel,* 408 U.S. 753 (1972) ..............................................................................8

*Klementanovsky v. Gonzales,* 501 F.3d 788 (7th Cir. 2007) ...................................................10

*Ledezma-Cosino v. Sessions*, 857 F.3d 1042 (9th Cir. 2017) ..................................................11

*Lopez-Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) ............................................................10

*Luft v. Evers*, 963 F.3d 665 (7th Cir. 2020) ........................................................................14

*Mathews v. Diaz*, 426 U.S. 67 (1976) ...........................................................................8, 11

*McCleskey v. Kemp,* 481 U.S. 279 (1987)......................................................................23, 26

*Oceanic Navigation Co. v. Stranahan,* 214 U.S. 320 (1909).................................................8

*Pena-Cabanillas v. United States,* 394 F.2d 785 (9th Cir. 1968) .....................................11, 15

*Pers. Adm'r of Mass. v. Feeney,* 442 U.S. 256 (1979) ..........................................13, 14, 28, 31

*Ramos v. Louisiana,* 140 S. Ct. 1390 (2020) ..................................................................26, 27

*Robledo-Gonzales v. Ashcroft,* 342 F.3d 667 (7th Cir. 2003) .........................................9, 10, 12

*Trump v. Hawaii,* 138 S. Ct. 2392 (2018).........................................................................8, 9

*United States v. Amador-Bonilla,* No. CR-21-187, 2021 WL 5349103 (W.D. Okla. Nov. 16, 2021)............................................................................................................................2, 12

*United States v. Arenas-Ortiz,* 339 F.3d 1066 (9th Cir. 2003)................................................30

*United States v. Baeza-Suchil,* 52 F.3d 898 (10th Cir. 1995)..................................................10

*United States v. Carlos-Colmenares,* 253 F.3d 276 (7th Cir. 2001) ..................................10, 12

*United States v. Coleman,* 24 F.3d 37 (9th Cir. 1994) ...........................................................31

*United States v. Corrales-Beltran,* 192 F.3d 1311 (9th Cir. 1999) ..........................................17

*United States v. Dumas,* 64 F.3d 1427 (9th Cir. 1995) ..........................................................31

*United States v. Ferreira,* 275 F.3d 1020 (11th Cir. 2010) .......................................................7

*United States v. Flores-Montano,* 541 U.S. 149 (2004) ..........................................................31

*United States v. Gutierrez-Barba,* No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021) ...............................................................................................................3

*United States v. Hernandez-Guerrero,* 147 F.3d 1075 (9th Cir. 1998)............................11, 12

*United States v. Hernandez-Lopez,* No. H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022) ....................................................................................................................................2, 14, 15

*United States v. Johnson,* 40 F.3d 436 (D.C. Cir. 1994) .............................................21, 25, 31

*United States v. Lopez–Flores,* 63 F.3d 1468 (9th Cir. 1995) .........................................................7

*United States v. Lue*, 134 F.3d 79 (2d Cir. 1998) .........................................................................7

*United States v. Machic-Xiap*, No. 3:19-CR-407-SI, 2021 WL 3362738 (D. Or. Aug. 2, 2021) ..................................................................................................................................passim

*United States v. Maurico-Morales*, No. CR-21-298, 2022 WL 99996 (W.D. Okla. Jan. 10, 2022) ..............................................................................................................................2, 12

*United States v. Medina Zepeda,* No. CR 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021) ......................................................................................................................................3

*United States v. Mendoza-Lopez,* 481 U.S. 828 (1987) ........................................................18, 19

*United States v. Montenegro,* 231 F.3d 389 (7th Cir. 2000) ............................................... 7, 10

*United States v. Munoz-De la O,* No. 2:20-CR-134-RMP-1, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022)...........................................................................................................................2, 14

*United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229 (D. N.M. Aug. 12, 2021) .................................................................................................................................3, 12

*United States v. O'Brien,* 391 U.S. 367 (1968) ..........................................................15, 21, 22

*United States v. Ortiz-Martinez,* 557 F.2d 214 (9th Cir. 1977) .................................................19

*United States v. Owolabi,* 69 F.3d 156 (7th Cir. 1995) .....................................................10, 11

*United States v. Ponce-Galvan,* No. 21-CR-2227-H-1, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022) ......................................................................................................................................2

*United States v. Porras,* Case No. 21 CR 158 (ECF No. 36) (Durkin, J.) ...............................2

*United States v. Rivera-Sereno,* No. 21-CR-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021)2, 12

*United States v. Samuels-Baldayaquez,* No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021) .................................................................................................................................3, 12

*United States v. Sanchez-Felix*, No. 21-CR-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021) .........................................................................................................................2, 14, 16

*United States v. Santos–Riviera,* 183 F.3d 367 (5th Cir. 1999).................................................7

*United States v. Sifuentes-Felix*, No. 21-CR-337-WJM 2022 WL 293228 (D. Colo. Feb. 1, 2022) ......................................................................................................................................2

*United States v. Suquilanda,* No. 21 CR 263, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021) ....3

*United States v. Wence,* No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021)....3, 14, 16, 17

*Washington v. Davis*, 426 U.S. 229 (1976) ............................................................................12

*Wayte v. United States*, 470 U.S. 598 (1985) ..........................................................................7

*Wong v. United States*, 163 U.S. 228 (1896) ..........................................................................7

## Statutes

8 U.S.C. § 1182(c) ...............................................................................................................10

8 U.S.C. § 1324(a) ...............................................................................................................16

8 U.S.C. § 1326 .......................................................................................................3, 5, 16, 20

Pub. L. No. 100-690 ...............................................................................................................6

Pub. L. No. 101-649 ...............................................................................................................6

Pub. L. No. 103-322 ...............................................................................................................6

Pub. L. No. 104-132 ...............................................................................................................6

U.S. Const. amend. V ..............................................................................................................7

## Other Authorities

Pub. L. No. 64-301 ...............................................................................................................4

Pub. L. No. 70-1018 ...............................................................................................................4

Pub. L. No. 82-414 ...............................................................................................................5

Pub. L. No. 82-283 ...............................................................................................................16

Pub. L. No. 104-208 ...............................................................................................................6

## INTRODUCTION

Defendant Alfredo Viveros-Chavez's Motion to Dismiss, R. 25, challenges the constitutionality of Title 8, United States Code, Section 1326, a criminal statute that makes it a felony to reenter or be found in the United States after having been removed or deported, absent the Attorney General's consent to reapply for admission. Defendant contends that Congress acted with discriminatory intent against Mexican and Latinx individuals in enacting Section 1326, and that Section 1326 therefore violates his equal-protection rights under the strict scrutiny test set out in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). But Section 1326 is not subject to the *Arlington Heights* strict scrutiny standard; it instead is properly subject to—and satisfies—rational basis review. And Section 1326 would satisfy the *Arlington Heights* standard, even if it were to govern. Accordingly, defendant's claim fails.

Defendant's challenge goes to a core immigration regulation—over which Congress has plenary power—and it is therefore subject to the deferential rational-basis review. Section 1326 easily passes that review, as it acts as a deterrent against successive illegal reentry. Even if the standard set forth in *Arlington Heights* applied, though, defendant has not met his burden of showing that Congress acted with discriminatory intent in enacting Section 1326. Defendant's principal contention is that this Court should infer discriminatory intent based on the comments of select members of a Congress that preceded Section 1326's enactors by two decades. That premise is inconsistent with the historical record, which shows no discriminatory

intent on the part of the 1952 Congress that passed Section 1326, and Supreme Court precedent, which affords a good-faith presumption to legislative action and disapproves of imputing one Congress's alleged motives to another. And even if defendant had shown a degree of animus in Section 1326's passing, the record demonstrates that Congress would have passed the illegal-reentry statute in its absence. Notably, some of defendant's purported examples of animus in the lead-up to Section 1326's passage contain certain historical inaccuracies, which the government's brief clarifies below.

Defendant's challenge is one of several similar motions to dismiss Section 1326 charges currently pending in this district,[1] and numerous similar motions have been ruled on in other districts. Only one of those out-of-district motions has been granted–*United States v. Carrillo-Lopez*, No. 3:20-cr-00026-MMD-WGC (D. Nev. Aug. 18, 2021)—and that ruling currently is on appeal in the Ninth Circuit. No court before or after *Carrillo-Lopez* has declared this facially neutral, federal criminal statute unconstitutional for being enacted with discriminatory intent—let alone done so based on the supposedly discriminatory intent of a prior Congress.[2] The Court should

---

[1] *See, e.g., United States v. Calvillo-Diaz*, Case No. 21-CR-445 (ECF No. 19) (Tharp, J.); *United States v. Leonides-Seguria*, Case No. 21-CR-390 (ECF No. 35) (Feinerman, J.); *United States v. Fuentes-Santos*, Case No. 21-CR-430 (ECF 34) (Lefkow, J.); *United States v. Porras*, Case No. 21 CR 158 (ECF No. 36) (Durkin, J.).

[2] *See United States v. Munoz-De la O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022); *United States v. Ponce-Galvan*, No. 21-cr-2227-H-1, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022); *United States v. Hernandez-Lopez*, No. H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022); *United States v. Sifuentes-Felix*, No. 21-cr-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022); *United States v. Maurico-Morales*, No. CR-21-298, 2022 WL 99996 (W.D. Okla. Jan. 10, 2022); *United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021); *United States v. Rivera-Sereno*, No. 21-cr-129, 2021 WL 5630728 (S.D. Ohio Dec. 1, 2021); *United States v. Amador-Bonilla*, No. CR-21-187, 2021 WL 5349103

deny the Motion, just as every district court before and after *Carrillo-Lopez* correctly has done.

## FACTUAL BACKGROUND

Defendant is a native and citizen of Mexico with no legal claim to U.S. residence. Compl. ¶ 4. R. 1. In 2009, he was convicted in Cook County for felony robbery. *Id.* ¶ 5. Following that conviction, he was deported to Mexico, in March 2010. *Id.* ¶ 6. In September 2012, defendant pleaded guilty to violating 8 U.S.C. § 1326. *Id.* ¶ 6; 12 CR 188. Following that conviction, defendant was deported to Mexico a second time, in December 2013. Compl. ¶ 8. Defendant returned to the United States and, in May 2019, was convicted in Cook County for felony aggravated robbery. *Id.* ¶ 10. According to DHS record checks, in May 2019, defendant did not have citizenship or immigration status in the United States. *Id.* ¶ 11.

On November 17, 2022, a grand jury returned an indictment against defendant charging him with illegal reentry, in violation of 8 U.S.C. § 1326, for being "found in" the United States after being deported twice and without having applied for readmission. Indictment, R. 10.

---

(W.D. Okla. Nov. 16, 2021); *United States v. Samuels-Baldayaquez*, No. 4:20 CR 83, 2021 WL 5166488 (N.D. Ohio Nov. 5, 2021); *United States v. Suquilanda*, No. 21 CR 263, 2021 WL 4895956 (S.D.N.Y. Oct. 20, 2021); *United States v. Novondo-Ceballos*, No. 21-CR-383 RB, 2021 WL 3570229 (D. N.M. Aug. 12, 2021); *United States v. Machic-Xiap*, No. 3:19-cr-407-SI, 2021 WL 3362738 (D. Or. Aug. 2, 2021); *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567 (D. V.I. June 16, 2021); *United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021); *United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021).

## STATUTORY BACKGROUND

In the Immigration Act of 1917, the 65th Congress passed legislation requiring deportation of aliens who entered the United States "at any time or place other than as designated by immigration officials, . . . or who enter[ed] without inspection." Immigration Act of 1917, Pub. L. No. 64-301, § 19, 39 Stat. 874, 889. The Immigration Act of 1917 imposed criminal penalties for individuals who had been deported for certain "immoral acts," but otherwise imposed no penalty for reentering after deportation, other than repeated deportation.

In 1929, to enhance the deterrent value of U.S. deportation laws, the 70th Congress made "enter[ing] or attempt[ing] to enter" the United States after a deportation a felony offense punishable by up to two years' imprisonment. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018.[3] The Senate Report from the Committee on Immigration outlined the purpose of the law:

> Except [for "members of the anarchistic and similar classes"] . . . there is no provision of law under which a penalty, other than repeated deportation, can be imposed on aliens who have been expelled from the United States and who reenter the country unlawfully. It frequently happens that aliens of the criminal and other classes who are deported under the general immigration law reenter the country unlawfully. As a matter of fact, in some instances such aliens have been deported four or five times, only to return as soon as possible to the United States in an unlawful manner.

S. Rep. No. 70-1456, at 1 (Jan. 17, 1929) (attached as Exhibit A).

---

[3] The 1929 Act was *not* titled "the Undesirable Aliens Act," as defendant claims. *See* Mot. at 2, 3 at n.2, and 7. A more expansive bill bearing that name was introduced in the House. *See* H.R. Rep. No. 70-2418, at 12 (Feb. 7, 1929) (Sec. 10); 70 Cong. Rec. 3542 (Feb. 15, 1929). But the House ultimately abandoned the name. *See* 70 Cong. Rec. 4952 (Mar. 1, 1929) (explaining the development of the Act and "[t]hat the House recede[d] from its amendment to the title of the bill").

In 1952, the 82nd Congress passed the Immigration and Nationality Act ("INA"), a comprehensive act designed to "revise the laws relating to immigration, naturalization, and nationality" in the United States. *See* Pub. L. No. 82-414, 66 Stat. 163 (introduction). Prior to passage of the INA, the Senate Judiciary Committee was tasked with making "a full and complete investigation of our entire immigration system" and providing "recommendations for changes in the immigration and naturalization laws as it may deem advisable." S. Rep. No. 81-1515, at 803 (1950) (excerpts attached as Exhibit B). The Judiciary Committee's investigation yielded a 925-page report, which, among other things, described "difficulties encountered in getting prosecutions and convictions" under existing laws "relating to illegal entry and smuggling of aliens," "especially in the Mexican border area." *Id.* at 654-55. It also noted that existing law criminalized illegal reentry in different provisions subject to different penalties and "suggested that one act would suffice for all persons who have been deported, regardless of the reason therefor." *Id.* at 655.

Congress responded by passing Section 276 of the INA, codified as 8 U.S.C. § 1326. In line with the Judiciary Committee's recommendation, the INA eliminated the disparate penalties applicable to reentry defendants depending on the basis for their deportation—creating, instead, a single offense that subjected all reentry defendants to the same penalties as the 1929 Act: two years' imprisonment and a fine. Pub. L. No. 82-414, § 276, 66 Stat. 230. The statute also sought to offset some difficulties in enforcing prior statutes by adding a new basis for liability—being "found in" the United States without authorization—to "overcome the inadequacies

9

in existing law," namely, the difficulty in finding proper venue if the place of reentry was unknown. *See* Statement of Dep. AG Ford at 6 (May 14, 1951) (attached as Exhibit C). Congress passed Section 1326, and the broader INA, with a supermajority of votes over President Harry Truman's veto.

Congress has since altered Section 1326 on multiple occasions, increasing its deterrent value each time. In the Anti-Drug Abuse Act of 1988, the 100th Congress added subsection (b) to Section 1326, creating enhanced penalties for aliens with prior felony convictions. *See* Pub. L. No. 100-690, § 7345, 102 Stat. 4181. Other modifications occurred in the Immigration Act of 1990, Pub. L. No. 101-649, 104 Stat. 4978 (increasing the fine provision); the Violent Crime Control and Law Enforcement Act of 1994, Pub. L. No. 103-322, 108 Stat. 1796 (increasing penalties); the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. No. 104-132, 110 Stat. 1214 (among other things, limiting collateral attacks on deportation orders in Section 1326 prosecutions); and the Omnibus Consolidated Appropriations Act of 1997, Pub. L. No. 104-208, 110 Stat. 3009 (among other modifications, striking "arrested and deported, has been excluded and deported," and inserting "denied admission, excluded, deported, or removed").

## ARGUMENT

### I.   Section 1326 Is Subject to Rational-Basis Review and It Easily Passes that Test.

Defendant's challenge is subject to the rational-basis test, which it fails.[4]   The challenge arises under the Fifth Amendment to the Constitution, which unlike the Fourteenth Amendment, does not contain an express equal-protection provision. Since 1954, however, the Supreme Court has construed the Amendment's guarantee of "due process of law" for all "person[s]," U.S. Const. amend. V., to provide analogous protection. *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954). The Court has generally applied the same equal-protection standards in both contexts. *E.g.*, *Wayte v. United States*, 470 U.S. 598, 608 n.9 (1985). Importantly, however, federal immigration laws are an exception to that rule. *See, e.g.*, *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 217-18 (1995) (citing *Hampton v. Mow Sun Wong*, 426 U.S. 88, 100, 101-102,

---

[4] Defendant does not argue that Section 1326 would fail rational basis review nor even mention rational basis review in his motion. Defendant also does not address the longstanding deference afforded immigration regulations—which, importantly, implicate national security and foreign relations—discussed further *infra*. Defendant's apparent reasoning for why Section 1326 should be subject to *Arlington Heights* strict scrutiny review is that Section 1326 is a criminal statute. Mot. at 5. However, the Seventh Circuit—like the Second, Fifth, Ninth, and Eleventh Circuits—have applied rational basis review to Equal Protection challenges to a federal criminal statute.  *United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000); *United States v. Lue*, 134 F.3d 79, 87 (2d Cir. 1998); *United States v. Santos–Riviera*, 183 F.3d 367, 373 (5th Cir. 1999); *United States v. Lopez–Flores*, 63 F.3d 1468, 1473–74 (9th Cir. 1995); *United States v. Ferreira*, 275 F.3d 1020, at 1025 (11th Cir. 2010).  Defendant's citation to *Wong v. United States*, 163 U.S. 228, 237 (1896) is unavailing: *Wong*, merely held that certain aliens enjoyed Fifth (and Sixth) Amendment rights and therefore could not be jailed absent trial. 163 U.S. at 238. *Wong* did not address the correct standard for equal-protection claims under the Fifth Amendment, and predated by 60 years the Supreme Court's application of equal-protection principles to federal action. *See Bolling*, 347 U.S. at 499.

n.21 (1976)); *Mathews v. Diaz*, 426 U.S. 67, 81 (1976); *Kleindienst v. Mandel*, 408 U.S. 753, 769 (1972).

"For reasons long recognized as valid," the Supreme Court has explained, "the responsibility for regulating the relationship between the United States and our alien visitors has been committed to the political branches of the Federal Government." *Mathews*, 426 U.S. at 81. Indeed, "'over no conceivable subject is the legislative power of Congress more complete than it is over' the admission of aliens." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977) (quoting *Oceanic Navigation Co. v. Stranahan*, 214 U.S. 320, 339 (1909)). There is thus "a need for special judicial deference to congressional policy choices in the immigration context." *Fiallo*, 430 U.S. at 793. That is, "[b]ecause decisions in these matters may implicate 'relations with foreign powers,' or involve 'classifications defined in the light of changing political and economic circumstances,' such judgments 'are frequently of a character more appropriate to either the Legislature or the Executive.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2418-19 (2018) (quoting *Mathews*, 426 U.S. at 81); *see also Arizona v. United States*, 567 U.S. 387, 394-95 (2012) (federal government's authority over "immigration and status of aliens" rests in part on "its inherent power as sovereign to control and conduct relations with foreign nations" as federal immigration policy, "can affect trade, investment, tourism, and diplomatic relations for the entire Nation."). "The reasons that preclude judicial review of political questions" thus "also dictate a narrow standard of review of decisions made by the Congress or the President in the area of immigration and naturalization," *Mathews*, 426 U.S. at 81-82—including congressional enactments

that "regulate the admission and exclusion of aliens," *Fiallo*, 430 U.S. at 793 n.5; *see also Hawaii*, 138 S. Ct. at 2420 ("our inquiry into matters of entry and national security is highly constrained").

The Seventh Circuit has equated that narrow standard of review with the rational-basis test. *E.g.*, *City of Chicago v. Shalala*, 189 F.3d 598, 604 (7th Cir. 1999) ("Although the [*Mathews*] Court did not adopt explicitly the 'rational basis' standard of scrutiny, it in effect applied rational basis review, upholding the legislation because it was not 'wholly irrational'") (citations omitted). That test is deferential. The government need not articulate the purpose underlying its policy or "produce evidence to sustain [its] rationality." *Heller v. Doe*, 509 U.S. 312, 320 (1993). A "statute survives rational basis scrutiny 'if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose.'" *Shalala*, 189 F.3d at 605 (quoting *Heller*, 509 U.S. at 320).

The Supreme Court and the Seventh Circuit have applied this standard to an array of equal-protection challenges to immigration laws, including criminal enforcement provisions. The Court in *Fiallo*, for example, "underscore[d] the limited scope of judicial inquiry into immigration legislation," before applying minimal scrutiny to a law that drew a gendered distinction by giving special immigration preferences to mothers, but not fathers, of U.S.-citizen children. 430 U.S. at 792-99. Likewise, in *Robledo-Gonzales v. Ashcroft*, 342 F.3d 667, 682-83 (7th Cir. 2003), the Seventh Circuit applied rational-basis scrutiny to an equal-protection challenge of a regulation precluding aliens who have illegally reentered the United States from

13

applying for discretionary relief under 8 U.S.C. § 1182(c). Those are just examples; the Seventh Circuit has repeatedly applied rational-basis review to equal-protection challenges concerning the INA. *See, e.g.*, *Lopez-Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) (scheme automatically conferring citizenship on some children born abroad but not others); *Klementanovsky v. Gonzales*, 501 F.3d 788 (7th Cir. 2007) (statute providing for humanitarian waiver of deportability for criminal aliens who seek to be admitted to United States but not for criminal aliens being deported from the United States); *Shalala*, 189 F.3d at 603-04 (considering a law that disqualified noncitizens from various welfare programs). And it has applied this same level of scrutiny to an equal-protection challenge involving a federal criminal statute. *United States v. Montenegro*, 231 F.3d 389, 395 (2000) (rational basis review appropriate for criminal statute that distinguished between conduct by citizens and non-citizens). Each of these decisions reflects the same, well-established proposition: "[c]lassifications that distinguish among groups of aliens are subject to rational basis review." *Robledo-Gonzales*, 342 F.3d at 682.

Section 1326 is such a classification. It does not apply to all noncitizens, but singles out those who have been previously deported and reenter without applying for permission. As the Seventh Circuit has said, Section 1326 is a part of a "national policy of excluding illegal—especially, previously deported—aliens." *United States v. Carlos-Colmenares*, 253 F.3d 276, 278-79 (7th Cir. 2001). It is "designed to effectively enforce the immigration laws" by providing a deterrent to successive illegal entry. *United States v. Owolabi*, 69 F.3d 156, 166 (7th Cir. 1995) (quoting *United States v.*

14

*Baeza-Suchil*, 52 F.3d 898, 900 (10th Cir. 1995)). In other words, "Congress sought in § 1326 to give teeth to civil immigration statutes and to ensure compliance with civil deportation orders." *United States v. Hernandez-Guerrero*, 147 F.3d 1075, 1078 (9th Cir. 1998). Indeed, as the Seventh Circuit has recognized, the statute concerns the nation's "right to police our borders, and expel immigrants who have been convicted of felonies, [which] is essential to our national security and welfare." *Owolabi*, 69 F.3d at 166; *see also, e.g.*, *Pena-Cabanillas v. United States*, 394 F.2d 785, 788 (9th Cir. 1968) (§ 1326 is a "regulatory statute enacted to assist in the control of unlawful immigration by aliens"). As a "decision[ ] made by the Congress" squarely regulating "the area of immigration and naturalization," Section 1326 is subject to a "narrow standard of review." *Mathews*, 426 U.S. at 81-82; *accord Ledezma-Cosino v. Sessions*, 857 F.3d 1042, 1049 & n.5 (9th Cir. 2017) (collecting cases from Sixth Circuit, Second Circuit, and Third Circuit).[5]

Section 1326 easily passes that standard. The relevant question is whether "there is a rational relationship" between the "disparity of treatment" associated with the challenged provision and "some legitimate governmental purpose." *Shalala*, 189

---

[5] *Cook County, Illinois v. Wolf*, 461 F. Supp. 3d 779, 788-89 (N.D. Ill. 2020), is not to the contrary. *Wolf* concerned a challenge to an agency's interpretation of a statute that the agency defended "solely on economic grounds," making it distinguishable from this case, and from *Hawaii*. 461 F. Supp. 3d at 789. This case, unlike in *Wolf*, involves a challenge to a congressionally passed statute that is "a necessary piece of the immigration-regulation framework." *Hernandez-Guerrero*, 147 F.3d at 1078. In addition, although at least one court has suggested that the Supreme Court's precedent applies in this context only when the regulation concerns who is allowed to enter the country, *Machic-Xiap*, 2021 WL 3362738, at *9, the Supreme Court and Seventh Circuit have applied the standard when the challenge, like the present one, concerns alleged discrimination against noncitizens apparently already present in the United States. *See Mathews*, 426 U.S. at 81; *Shalala*, 189 F.3d at 604.

F.3d at 605 (quoting *Heller*, 509 U.S. at 320). There can be no reasonable question that deterring illegal reentry is a legitimate government interest or purpose under the rational-basis standard. *See Hudson v. United States*, 522 U.S. 93, 105 (1997) (calling deterrence "a traditional goal of criminal punishment"). As the Seventh Circuit has explained, the "United States has a legitimate interest in seeing that individuals who cross their borders do so legally and in accordance with set procedures" and a "corollary interest in deterring individuals from crossing its borders illegally." *Robledo-Gonzalez*, 342 F.3d at 683.

Section 1326 is rationally designed to advance that legitimate interest in deterring illegal reentry. *Carlos-Colmenares*, 253 F.3d at 278-79. "[W]ithout the threat of criminal prosecution that it provides, Congress's immigration-regulation authority would be fatally undermined—all bark and no bite." *Hernandez-Guerrero*, 147 F.3d at 1078. As every district court to apply rational-basis review to analogous challenges has held, Section 1326 is constitutional under that standard.[6]

## II. Defendant's Challenge Fails Under the *Arlington Heights* Standard.

Defendant's challenge alternatively fails under the *Arlington Heights* standard for which he advocates. Claims based on disparate impact alone are not cognizable under the Equal Protection Clause; "[p]roof of racially discriminatory intent or purpose is required." *Arlington Heights*, 429 U.S. at 265; *see Washington v. Davis*,

---

[6] *See, e.g.*, *Maurico-Morales*, 2022 WL 99996, at *1; *Amador-Bonilla*, 2021 WL 5349103, at *1; *Samuels-Baladayaquez*, 2021 WL 5166488, at *2; *Novondo-Ceballos*, 2021 WL 3570229, at *4; *Rivera-Sereno*, 2021 WL 5630728, at *4.

16

426 U.S. 229, 239-42 (1976). Where, as here, the challenged law is neutral on its face, courts perform the "sensitive inquiry" set forth in *Arlington Heights*. 429 U.S. at 266.

Under *Arlington Heights*, "[t]he impact of the official action—whether it bears more heavily on one race than another—may provide an important starting point." *Id.* at 266 (quotation marks and citation omitted). But outside of extreme circumstances not alleged here, disparate "impact alone is not determinative," and courts must assess other evidence in deciding whether a racially discriminatory purpose was "a motivating factor in the decision." *Id.* at 265-66. Pertinent evidence includes "[t]he historical background of the decision," "[t]he specific sequence of events leading to" it, "departures" from "[s]ubstantive" or "procedural" norms, and "[t]he legislative and administrative history . . . , especially . . . contemporary statements by members of the decisionmaking body." *Id.* at 267-68. The challenger has the burden of establishing discriminatory intent. 429 U.S. at 265-68. If he bears that burden, it shifts to the government to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21.

Discriminatory motive has a particular meaning in the equal-protection context. A challenger must show "that the decisionmaker, in this case [the] legislature, selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979). That standard requires more than proof that the legislature had "awareness of [the] consequences" for the affected

group or that those consequences were "foreseeable*." Id.* at 278-79; *see also Luft v. Evers*, 963 F.3d 665, 670 (7th Cir. 2020).

### A. Defendant Cannot Establish Discriminatory Intent in the Passing of Section 1326.

Defendant has been indicted for violating Section 1326, not the 1929 Act. As to Section 1326, he has not established that Congress acted with discriminatory intent in passing that statute in 1952, or in amending it multiple times since then. In crafting his argument, defendant highlights executive-branch statements unrelated to Section 1326, as well as extrinsic historical events, to reach his conclusion that Section 1326 must have been passed with racial animus. Mot. at 20-22. This theory does not pass muster under the *Arlington Heights* standard, as courts have repeatedly concluded.[7]

As the Supreme Court has recognized, proving discriminatory intent "is often a problematic undertaking." *Hunter v. Underwood*, 471 U.S. 222, 228 (1985). Analyzing the intentions of a local and contemporary body is one thing, *see Arlington Heights*, 429 U.S. at 265, but proving the "actual motivations of the various legislators that produced a given decision" is more difficult—especially where, as here, that decision occurred 70 years ago, and was made by hundreds of legislators from both sides of the aisle and from across the country. *Hunter*, 471 U.S. at 228.[8] For that

[7] *See Muñoz-De La O*, 2022 WL 508892, at *14; *Hernandez-Lopez*, 2022 WL 313774, at *6; *Sanchez-Felix*, 2021 WL 6125407, at *7; *Machic-Xiap*, 2021 WL 3362738, at *11-14; *Wence*, 2021 WL 2463567, at *9.

[8] In *Hunter*, the Supreme Court concluded that plaintiffs had established discriminatory intent in challenging an Alabama disenfranchisement constitutional provision that was enacted during an explicitly white-supremacist convention, and was still on the books, and

reason, the Supreme Court has resisted when "asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it." *United States v. O'Brien*, 391 U.S. 367, 384 (1968). Selected statements are not generally representative of all majority-voting legislator's intentions, "and the stakes are sufficiently high for" the courts "to eschew such guesswork." *Id.*

In this case, the INA "represents the final product of a most intensive and searching investigation and study over a three[-]year period." *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968). It entailed a near-thousand-page committee report, substantial floor debate, and was passed by two-thirds of the 82nd Congress over a presidential veto. Despite that long record, and as the historians on whom defendant relies have previously testified, "the legislative history of the INA was largely free of explicitly racist expressions." *Machic-Xiap*, 2021 WL 3362738, at *13 (citing Professor Kelly Lytle Hernandez's and Professor Benjamin Gonzalez O'Brien's testimony); *Hernandez-Lopez*, 2022 WL 313774, at *4 (same). Defendant nevertheless asks this Court to engage in the "guesswork" of inferring the 82nd Congress's intent from a handful of episodes peripheral to Section 1326's passing. *O'Brien*, 391 U.S. at 384. This Court should not assign invidiousness to a Congress under such speculative circumstances.

---

where the state had conceded that race was a factor in its passing. 471 U.S. at 229-230. This case presents no such compelling evidence.

Defendant cites a separate law, passed a few months before the INA— the anti-harboring provision colloquially referred to by some as the "Wetback Bill." Mot. at 20. That provision is irrelevant here. It did not target noncitizens; it targeted those who facilitated noncitizens' entry and residence in the United States, but exempted employers. *See* Pub. L. No. 82-283, 66 Stat. 26 (1952) ("An Act To assist in preventing aliens from entering or remaining in the United States illegally"), codified as amended at 8 U.S.C. § 1324(a). Defendant also highlights a statement by a Representative who was speaking about a proposed immigration law that would offer certain pathways to citizenship or lawful resident status, Mot. at 20, and not about Section 1326. Of course, one representative's description of a different bill does not reveal the entire legislature's motivations for passing the distinct Section 1326. *See Sanchez-Felix*, 2021 WL 6125407, at *7; *Wence*, 2021 WL 2463567, at *7.[9] A separate bill, and how it was referred to by some, does not confer racial animus on to the passage of Section 1326.

Defendant also cites a pre-examination procedure enacted in 1935 as "crystal clear" evidence of Congress' discriminatory intent in passing Section 1326. Mot. at 21. This is not so. The procedure referenced pre-dated Section 1326's passage by almost two decades, and the need for the procedure *ended* with the passage of the INA.[10] The pre-examination procedure was a product of the 1924 Immigration Act's

---

[9] *Wence* addresses the related "wetback amendment," which proposed measures to curb illegal entry. 2021 WL 2463567, at *7-8. That amendment was voted down 65-11, 82 Cong. Rec. 8123 (June 26, 1952), and every senator who argued for the amendment voted against the veto override that passed the INA. 2021 WL 2463567, at *7-8.

[10] https://www.uscis.gov/policy-manual/volume-7-part-b-chapter-1.

requirement that persons intending to immigrate to the U.S. obtain an immigrant visa while abroad. The 1924 Immigration Act did not allow individuals located in the United States to become lawful permanent residents of the United States without first leaving the United States to obtain visas abroad. *Id.* The pre-examination process allowed non-citizens temporarily in the United States to obtain permanent resident status faster, by enabling persons in the United States already to be screened for eligibility for an immigrant visa, and then for travel to prearranged appointments at a U.S. consulate in Canada or elsewhere, followed by the immigrant's prompt return to the United States. *Id.* According to the defendant's own exhibit (Mot. Ex. B at 22), the pre-examination process was the result of an agreement between the U.S. and Canada, and Mexican immigrants could use the process but, like other immigrants, would have to travel to U.S. consulates in Canada or elsewhere to do so; the Exhibit references statements by Congresspersons expressing sympathy for families disrupted by deportations, but offers no support for the claim that the 1924 pre-examination process evidenced racial animus on the part of Congress, and especially not the 1952 Congress that passed Section 1326.

Congress passed Section 1326 following "a full and complete investigation of our entire immigration system." S. Rep No. 81-1515 (Ex. B), at 803. After that investigation, Congress added the "found in" clause that now appears in Section 1326(a). *See* Ex. C. In doing so, Congress created a "substantive offense[ ]" that is "distinct" from the two grounds for liability (entry and attempted entry) in the 1929 Act. *See United States v. Corrales-Beltran*, 192 F.3d 1311, 1319 (9th Cir. 1999).

Notably, *that* offense—for being "found in" the United States, which was not made illegal until 1952—is the offense with which defendant has been charged. R. 17.

The 82nd Congress made other changes, too. It made Section 1326 serve as a single illegal-reentry statute that applied the same penalties, repealing other provisions that had prescribed different penalties for defendants deported for subversive or immoral activities. *See* INA § 403, 66 Stat. 279-80; S. Rep. No. 81-1515 (Ex. B), at 646-47, 655-56 (1950); *United States v. Mendoza-Lopez*, 481 U.S. 828, 835 & n.10 (1987). In addition, Congress (1) changed the reentry prohibition to reach those "excluded and deported," not just those "arrested and deported," INA § 276, 66 Stat. 229; (2) omitted a phrase in the 1929 Act ("in pursuance of law") that the Supreme Court later identified as a potential textual basis for allowing defendants to challenge the validity of their deportation orders in an illegal-reentry prosecution, *see Mendoza-Lopez*, 481 U.S. at 836; and (3) added language "except[ing] those aliens who have either received the express consent of the Attorney General to reapply for admission or who otherwise establish that they were not required to obtain such consent," *id.* at 831 n.2. That tailoring belies the claim that Section 1326 was passed without attention.

Defendant's citation to President Truman's veto of the INA does not aid his claim. Mot. at 21.[11] That veto noted that "certain provisions" met the President's

---

[11] The letter written by Deputy Attorney General Peyton Ford (who was not a member of Congress) also does not help defendant. Mot. at 21; *see* Ex. C. Defendant misleadingly submits that the letter referenced "wetbacks" in reference to Section 1326. Mot. at 21. In reality, the term appeared in a portion of Ford's letter wholly unrelated to Section 1326, and in which Ford quoted a report of President Truman's Commission on Migratory Labor discussing immigration officers' authority to enter onto private property. Ex. C. at 9.

approval, and described the INA as a "long and complex piece of legislation." Statement of Pres. Trum., *Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality* (June 25, 1952) (attached as Exhibit D). The veto explained, however, that the proposed INA "would perpetuate injustices long standing" and "intensify the repressive and inhumane aspects of our immigration procedures." *Id.* But President Truman's veto mentioned neither Section 1326 nor the impact on Mexican or Latinx individuals. To the contrary, the veto's focus was an objection to the INA's maintenance of certain parts of the national-origin quota system, to which North Americans were not even subject. *See* Ex. D; *see also Carrillo-Lopez*, 2021 WL 3667330, at *12; *Machic-Xiap*, 2021 WL 3362738, at *13.

Section 1326, by contrast, was uncontroversial. *Accord United States v. Ortiz-Martinez*, 557 F.2d 214, 216 (9th Cir. 1977) ("An exhaustive reading of the congressional debate indicates that Congress was deeply concerned with many facets of the [INA], but §§ 1325 and 1326 were not among the debated sections."). Even Senate opponents of the version of the INA that passed gave no pause to Section 1326. *See* Joint Statement by Sponsors of New Omnibus Immigration and Naturalization Bill – Senators Humphrey, Lehman, Benton, Langer, Kilgore, Douglas, McMahon, Green, Pastore, Murray, Kefauver, Morse, and Moody, 98 Cong. Rec. 2141-2143 (Mar.

---

Defendant also wrongly claims that the letter "suggest[ed] adding the term 'found in' to Section 1326. Mot. at 21. That is false. Ford did not propose the "found in" clause; rather, he wrote in "response" to the Senate Committee's request for the Justice Department's views on a draft bill that already contained the clause. *See* Ex. C. at 7 (noting that the proposed version of INA § 276 Ford was asked to review "adds to existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States"). Read in its proper context, the Ford letter does not advance defendant's argument.

12, 1952) (attached as Exhibit E). And, tellingly, the competing Senate bill proposed by the INA's opponents—who criticized the national-origin quotas as xenophobic (*see, e.g.*, 98 Cong. Rec. 5169, 5768 (1952) (Sen. Lehman))—contained an illegal-reentry law identical to what became Section 1326. *See* S. 2842, § 276, 82d Cong., 2d Sess. (Mar. 12, 1952) (excerpt attached as Exhibit F). The veto, therefore, did not highlight for Congress any alleged racism in the illegal-reentry law. It concerned ongoing debates ancillary to the uncontested Section 1326, and as such, provides no evidence of discriminatory intent of the 82nd Congress in passing that law.

Defendant submits that discriminatory intent should be inferred from the lack of debate surrounding Section 1326's enactment. Mot. at 21. This argument defies the general rule against "[d]rawing meaning from [Congressional] silence." *Kimbrough v. United States*, 552 U.S. 85, 103 (2007). But even setting aside that principle, defendant identifies nothing out of the "[s]ubstantive" or "procedural" norm in the passage of the uncontroversial Section 1326. *Arlington Heights*, 429 U.S. 267-68. The Senate Judiciary Committee's report specifically addressed the criminal reentry and harboring laws, noting concerns that commentators and witnesses had with the enforcement of those laws, and explaining the Committee's position that "a more severe penalty for illegal entry and smuggling, as suggested by many, would not solve the problem." S. Rep. No. 81-1515 (Ex. B), at 654-55. After further explaining that "different sections of the country are not all faced with the same problems" but that the Committee "must concern itself with laws which apply equally to all sections of the country," the Committee recommended the illegal-entry

provision with certain penalty adjustments. *Id.* at 655-56. Defendant does not cite a single legislator—or even then-contemporary commentor—who disputed the appropriateness of a crime prohibiting illegal reentry. As noted, even the INA's opponents took no issue with what became Section 1326. It follows that the provision did not require thorough debate.

Defendant's scant citations to lawmakers' use of derogatory terms unconnected to Section 1326 fall well short of establishing that animus was a motivating reason for that statute. *O'Brien*, 391 U.S. at 384. With respect to what the 82nd Congress actually did, defendant's challenge is based largely on claims that "the statute was passed hastily," "the alleged racial imagery contained in a few documents introduced into the Congressional Record," and "contemporaneous utterances of some legislators." *United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994). These "scattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress." *Id.*

## B. Defendant's Attempt to Impute the 70th Congress's Intent on the 82nd and Later Congresses Is Inconsistent with the Historical Record and Supreme Court Precedent.

Unable to demonstrate Congress's discriminatory intent, defendant spends much of the Motion focused on the 1920s. Mot. at 6-18. According to defendant, the rise of eugenics in that decade, the national-origin quota system (to which North Americans were not subject), agribusiness's desire for Mexican labor, border practices, and racist comments made by some lawmakers and others demonstrate that the 1929 Act was intentionally discriminatory. Those historical episodes and

comments do not speak for the majority voters in the 70th Congress, and they certainly cannot be imputed to the 82nd Congress or any later Congresses.

Defendant's depiction disregards the obvious and valid reasons for prohibiting reentry after deportation. It ignores, for example, the Senate Report preceding the 1929 Act, which provided the rationale for the new reentry law: then-existing legislation provided no penalty for reentry "other than repeated deportation" for most noncitizens, and it is "academic that no prohibitive law" can succeed without a deterrent. S. Rep. No. 70-1456 (Ex. A), at 1-2. That report further quoted James Davis of the Labor Department, who defendant describes as a eugenicist, Mot. at 14, for the proposition that "[m]any of the aliens who are required to be deported enter are seamen" who must be deported "aboard regular passenger steamers"—reflecting a concern about non-North American noncitizens, not Mexicans. *Id.* at 2; *see also* H.R. Rep. No. 70-2418. To be sure, Defendant spotlights comments ranging from troubling to vile made by a handful of legislators and others in the 1920s discussing various immigration proposals, such as quotas and deportation. The Supreme Court, however, has cautioned against this very approach to deriving motives on the part of an entire legislature. *Hunter*, 471 U.S. at 228[12]; *O'Brien*, 391 U.S. at 384. The statements and sentiments cited are insufficient to establish a motivating, invidious

---

[12] Defendant's evidence with respect to the 1929 Congress is not nearly as compelling as the evidence in *Hunter*, in which the challenger established, among other things, that the Alabama constitutional convention at issue was, according to its president, specifically aimed at "establish[ing] white supremacy in this State." 471 U.S. at 229.

purpose of the 435-member Congress's decision to pass a reentry law that had an obvious, legitimate rationale.

But the Court need not resolve that question. Courts may consider the "historical background" to challenged legislation, but the intent of the Congress that enacted the legislation at issue is the one that matters. *City of Mobile v. Bolden*, 446 U.S. 55, 74 (1980) (plurality). For that reason, proof of predecessor's intent is, standing on its own, necessarily insufficient. As the Supreme Court has put it, "past discrimination cannot, in the manner of original sin, condemn governmental action that is not itself unlawful." *Id.* What is more, even in considering such evidence, "distant instances of official discrimination in other cases are of limited help," *id.*, and its probative value decreases with time and by context, *see Dept't of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891, 1916 (2020); *McCleskey v. Kemp*, 481 U.S. 279, 298 n.20 (1987), or when it is attributable to a legislature with "a substantially different composition," *Brnovich v. DNC*, 141 S. Ct. 2321, 2349, n.22 (2021) (quotation marks omitted).

The Supreme Court elaborated on these principles in *Abbott v. Perez*, 138 S. Ct. 2305, 2324 (2018). *Abbott* involved a 2013 districting plan enacted by the Texas legislature after its original 2011 plan was challenged in two courts. *Id.* at 2316-17. Although the legislature adopted the 2013 plan from a version preliminarily approved by a three-judge court, that same court later invalidated the 2013 plan on the ground that it was tainted by the legislature's discriminatory intent in passing the predecessor 2011 plan. *Id.* at 2318. The Supreme Court reversed. In so doing, the

Court reaffirmed that discriminatory purpose must be shown as to the actual law being challenged, not the predecessor; the legislature that enacted the successor statute is generally afforded a presumption of good faith; a finding of past discrimination does not "flip[ ] the evidentiary burden" to the government to prove that the successor statute is free from discriminatory intent, *id*. at 2324-25; and a successor legislature does not have a "duty to expiate its predecessor's bad intent." *Id*. at 2325; *see id*. at 2326 n.18.

Defendant repeats the error corrected in *Abbott* in arguing that Congress needed to clense the supposed animus of 1929 in enacting and amending Section 1326. Mot. at 20. By focusing on the alleged intent of the 1929 Congress, defendant attempts to "flip[ ]" the evidentiary burden on to Congress to show it was not acting discriminatorily. *Abbott* rejected that view: there is no "duty to show" that a legislature "purged the bad intent of its predecessor." *Abbott*, 138 S. Ct. at 2326 n.18.

Nor can defendant argue that *Abbott* left room for his "cleansing" theory. *Abbott* underscored that the challenger must prove animus on the *enacting* legislature's part. 138 S. Ct. at 2324-25. It disclaimed the idea that previous discrimination can act as an "original sin" against later legislatures. *Id*. (citing *Mobile*, 466 U.S at 74). And it did not suggest that challengers could bootstrap a preceding legislature's motivations onto a current one so long as the latter "reenacted" the challenged law. *Abbott*'s comment about the "reenact[ment]" concerned what the Texas legislature *could* have done in 2013 but did not do—after

28

the 2011 plan was challenged as discriminatory and reworked by the courts, reenact it as it was anyway. *Id.* ("The 2013 Texas Legislature did not reenact the plan previously passed."). Given that context, *Abbott* cannot be read to embrace the sweeping notion that a new legislature's intent can be inferred principally on a previous one's discrimination, especially absent evidence that the new legislature was even aware of the discrimination.[13]

To hold otherwise "establishes an insurmountable burden" for legislatures. *Johnson v. Governor of the State of Florida*, 405 F.3d 1214, 1225 n.21 (11th Cir. 2005) (en banc). As the Eleventh Circuit, sitting en banc, explained in *Johnson*, it would be difficult for legislatures to "extinguish" such past discrimination because, with the passage of time, it is "unlikely that the present day legislators would be aware of the past discrimination" that supposedly taints the specific law. *Id.* As a result, *Johnson*, like *Abbott*, declined to require the legislature to "demonstrate that it acknowledged" the "racial discrimination [that] tainted" the earlier law. *Id.* at 1225; *see also Johnson*, 40 F.3d at 440 (in a challenge to a 1986's law crack-cocaine disparity, dismissing as "irrelevant" the "undeniable racism" surrounding cocaine's criminalization in 1914 as an "anomalous attempt to tar the present Congress with the racist brush of a pre-World War I debate.").

---

[13] *Carrillo-Lopez* concluded that "a prior version of a statute known to be motivated by racial animus may be considered as infecting its present iteration if it was not, in fact, substantially altered." 2021 WL 3667330, at *10. That premise, whatever its accuracy under *Abbott*, says little about Section 1326. Defendant has not shown that the 82nd or subsequent Congresses were aware of any previous animus in the 1929 Act. And even if he had, Congress *did* substantially alter Section 1326. Among other things, in 1952, it created the new offense that permits defendant's prosecution, and later amendments imposed the penalties applicable to defendant.

This Court should hold the same. Unlike in *Abbott*, congressional notice of previous discrimination cannot be assumed. Twenty-three years had passed between the supposed animus in 1929 and the enactment of Section 1326, and almost 70 years passed between 1929 and Section 1326's most recent amendment. *See McCleskey*, 481 U.S. at 298 n.20. Between 1929 and 1952, there had been an over 90-percent turnover in congressional membership.[14] *Brnovich*, 141 S. Ct. at 2349 n.22. Despite the long legislative history surrounding the INA, defendant does not cite any compelling evidence that Congress was aware of the alleged discriminatory intent of the 1929 illegal-reentry law. Defendant cites President Truman's veto, but as noted, that veto did not even address Section 1326, and it prompted a supermajority of the 1952 Congress to reaffirm its intent to pass the INA. And defendant cites no animus in subsequent amendments to Section 1326. As a result, the enactors and amenders of Section 1326 cannot be cast with the alleged "original sin" of their predecessors. *Abbott*, 138 S. Ct. at 2324-25 (quoting *Mobile*, 466 U.S at 74).

In arguing to the contrary, defendant relies on *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020). *See* Mot. at 5, 19. That reliance is misplaced. *Ramos* is not an equal-protection, let alone *Arlington Heights*, decision. It abrogated *Apodaca v. Oregon*, 406 U.S. 404 (1972), which upheld nonunanimous state-jury verdicts. In

---

[14] *Compare 70th Congress (1927-1929): Congress Profiles,* History, Art & Archives, United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/70th/ *with 82nd Congress (1951-1953): Congress Profiles*, History, Art & Archives, United States House of Representatives, https://history.house.gov/Congressional-Overview/Profiles/82nd/ (reflecting overlap of only twenty-six members of the 82nd Congress).

criticizing the *Apodaca*'s reasoning, the Court in *Ramos* took issue with *Apodaca*'s acceptance of the proffered benefits of nonunanimous verdicts without addressing why those states actually enacted such laws. 140 S. Ct. at 1401. *Ramos* did not, however, suggest that a successor law, unmarred itself by racial animus, remains defective legislation. *See id.* at 1401 n.44 (the states, *after* the decision in *Apodaca*, had recodified the laws "in new proceedings untainted by racism").

The same is true with *Espinoza v. Montana Department of Revenue*, 140 S. Ct. 2246 (2020). Mot. at 19. *Espinoza*, also not an equal-protection case, considered whether application of a "no-aid" provision barring religious schools from participating in a state scholarship program violated the Free Exercise Clause of the First Amendment. 140 S. Ct. at 2254. The Court held that it did, reasoning that the provision "plainly exclude[d] schools from government aid solely because of religious status." *Id.* at 2255. But the Court did not find the challenged provision unconstitutional because of any "checkered tradition," as defendant suggests. *Id.* That concept appears once in the opinion in response to the argument that a tradition arose in the second half of the 19th century against state support for religious schools. *Espinoza*, 140 S. Ct. at 2258-59. It does not stand for the notion that Congress must, "cleanse" the discriminatory intent its predecessors may have held.

The *Arlington Heights* framework already accounts for the "historical background" of a law in assessing its constitutionality, 429 U.S. at 267-68, subject to the enacting legislature's good-faith presumption and the limits described in *Abbott*, *Mobile*, and other cases. This Court should reject defendant's attempt to leverage

31

inapposite cases to expand the relevance of the 1929 Act beyond what it can be assigned under *Arlington Heights* and impose a duty to purge alleged, decades-old animus.

### C. Section 1326's Impact on Mexican and Latinx Defendants Does Not Give Rise to an Inference of Discriminatory Intent.

Defendant argues that Section 1326 has a disparate impact on Mexican and Latinx individuals. Mot. at 22-24. Even if that is true, it is not persuasive evidence that Congress[15] enacted the statute with racial animus. *Arlington Heights* requires proof that Congress enacted the law "because of" a disparate impact, not "in spite of" it. *Pers. Adm'r of Massachusetts v. Feeney*, 442 U.S. 256, 279 (1979). Defendant's motion shows no such intent.

As an initial matter, defendant fails to cite any meaningful evidence that Section 1326 has a disparate impact on Mexican and Latinx individuals. His statistics concerning border apprehensions do not support his claim that Section 1326 is disproportionately applied to Mexican and Latinx individuals. *See* Mot. at 22-23. In fact, the statistics concerning Section 1326 suggest the opposite. In 2019, more than 90 percent of all deportees hailed from countries in North and South America that were not Canada or the United States.[16] Given that reality, defendant's claim that

---

[15] Defendant's motion includes statements of then-Attorney General Jeffery Sessions and White House Advisor Stephen Miller speaking approvingly of the 1929 Act, but these statements are unavailing as to the sentiment of either the 1929 or 1952 Congress. Mot. at 23.

[16] *See* DHS, 2019 Yearbook of Immigration Statistics, Table 41, available at https://www.dhs.gov/immigration-statistics/yearbook/2019/table41 (last visited Mar. 15, 2022) (showing that, of 359,885 removals, 336,824 had a North American nationality, and

Section 1326 prosecutions "predominantly impact[] Mexican and Latinx individuals," Mot. at 23, is precisely what one would expect. In other words, the statistics suggest that Section 1326 is being applied proportionally by nationality. Yet, even assuming for the sake of argument that there is a disparate impact, the fact that Mexican and Latinx individuals make up the bulk of Section 1326 prosecutions is not evidence of discriminatory intent.

*Regents* is instructive. Eight Justices in that case addressed an argument similar to defendant's on behalf of beneficiaries of the deferred-action immigration program. The beneficiaries argued that the disparate impact of the program's rescission on "Latinos from Mexico, who represent 78% of" the program's beneficiaries, supported an inference that the rescission was driven by a discriminatory purpose. 140 S. Ct. at 1915-16 (plurality); *id*. at 1919 n.1 (Thomas, J., concurring in part and dissenting in part); *id*. at 1936 (Kavanaugh, J., concurring in part and dissenting in part). The Court's plurality opinion rejected that claim. It explained that the disparity did not, "either singly or in concert" with other factors, make out a "plausible equal protection claim." *Id*. at 1915. The opinion reasoned that "because Latinos make up a large share of the unauthorized alien population, one would expect them to make up an outsized share of recipients of any cross-cutting immigration program." *Id*. And "[w]ere this fact sufficient to state a claim, virtually

---

only 854 were from Canada; 215,205 were from Mexico; 53,180 were from Guatemala; 40,751 were from Honduras; and 18,190 were from El Salvador).

any generally applicable immigration policy could be challenged on equal protection grounds." *Id*. at 1916.

*Regents* reflects the sensible proposition that outsized effects on certain populations are an expected byproduct of broad-based immigration regulations, and such effects are not enough to prove discrimination. And that principle applies squarely to defendant's challenge to Section 1326. Because a majority of the individuals excluded or removed from the United States are Mexican or Latinx, it stands to reason that a high share of those prosecuted for illegally returning after removal will likewise be Latinx. That is all the more true when taking into account the proximity of the United States to Mexico and Central America, and the possibility of returning to the United States from those locations over land. *See United States v. Arenas-Ortiz*, 339 F.3d 1066, 1080 (9th Cir. 2003) (explaining, in the context of a selective prosecution claim, the "common sense" notion "that it would be substantially more difficult for an alien removed to China to return to the United States than for an alien removed to Mexico to do so").

Cases outside of the immigration context similarly conclude that uneven impact does not usually mean animus. The Seventh Circuit in *Conley v. United States*, 5 F. 4th 781 (7th Cir. 2021), for example, addressed an equal-protection challenge to convictions based on a "fake stash house" robbery sting. The Court concluded that the "awareness" that Black individuals would be subject to the sting "does not prove purposeful discrimination," absent "other evidence indicating" that the aim was to target Black people. 5 F.4th at 798. Similarly, multiple courts of

34

appeals have rejected equal-protection challenges to crack-cocaine distribution convictions under the *Arlington Heights* standard. Those decisions reason that the "disproportionate impact on African Americans" and Congress's awareness of that disparate impact was insufficient to prove discriminatory intent. *United States v. Dumas*, 64 F.3d 1427, 1429-30 (9th Cir. 1995); *see also United States v. Coleman*, 24 F.3d 37, 39 (9th Cir. 1994); *Johnson*, 40 F.3d at 440 (D.C. Cir. 1994) ("intent . . . requires more than knowledge of consequences").

Defendant cites statistics from 1928 to argue that Congress in the 1950s was aware of the reentry law's disparate impact. Mot. at 16-17. Yet even if the 1952 Congress had been aware of any purported disparate impact, defendant still would be required to show the 1952 Congress was motivated in part *because* of the reentry prohibition's adverse effect on Mexican and Latinx defendants. He has not done so.

## III. In Any Event, Congress Would Have Passed Section 1326 Absent the Alleged Animus.

Even if defendant had met his burden under *Arlington Heights* (and he has not), Section 1326 still is constitutional, because it is apparent that Congress would have passed the illegal reentry law absent any animus. First, obviously valid federal-immigration objectives are served by an illegal-reentry law. The Supreme Court has recognized that cases exist "in which—notwithstanding impact—the legitimate noninvidious purposes of a law cannot be missed." *Feeney*, 442 U.S. at 275. This is such a case. Imposing a sanction on those who repeatedly violate U.S. immigration laws (and territorial boundaries) is a basic and legitimate feature of a controlled border. *See supra* at 9-11; *cf. United States v. Flores-Montano*, 541 U.S. 149, 153

(2004) (recognizing the "inherent authority" of the government as sovereign "to protect, and [its] paramount interest in protecting, its territorial integrity"). And nothing suggests that Congress, which was aware of the need for a deterrent a century ago, *see* S. Rep. No. 70-1456 (Ex. A), would forgo such a law decades later.

Second, Congress's repeated amendments to Section 1326 make plain that Congress would have enacted an illegal reentry statute irrespective of any allegedly improper motives that existed in 1929. Congress has amended Section 1326 five times since enacting it as part of the INA's immigration overhaul in 1952, and defendant does not allege that these subsequent Congresses harbored any discriminatory intent. Moreover, these repeated amendments reflect Congress's ongoing attention to the law, and its continued judgment that the illegal-reentry statute is an appropriate part of our immigration-regulation framework. That Congress has repeatedly considered, amended, and approved the illegal reentry statute demonstrates that the law would exist in the absence of the discriminatory intent that defendant claims existed nearly a century ago. *Arlington Heights*, 429 U.S. at 270 n.21.

## CONCLUSION

For these reasons, the Court should deny defendant's motion to dismiss.

Dated: April 1, 2022

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Ann Marie E. Ursini*
Ann Marie E. Ursini
Assistant United States Attorney
219 South Dearborn Street, Room 500
Chicago, Illinois 60604
(312) 697-4092