# Exhibit C

## STATEMENT OF PEYTON FORD, DEPUTY ATTORNEY GENERAL

DEPARTMENT OF JUSTICE,
OFFICE OF THE DEPUTY ATTORNEY GENERAL,
*Washington, May 14, 1951.*

Hon. PAT McCARRAN,
*Chairman, Committee on the Judiciary,*
*United States Senate, Washington, D. C.*

MY DEAR SENATOR: This is in response to your request for the views of the Department of Justice relative to the bill (S. 716) to revise the laws relating to immigration, naturalization, and nationality; and for other purposes.

The bill would codify and in many particulars revise existing laws relating to immigration, naturalization, and nationality. The principal statutes to which the bill relates are the Immigration Act of 1917; the act of October 16, 1918, as amended, known as the Anarchist Act; the Immigration Act of 1924; the Nationality Act of 1940, as amended; and the Alien Registration Act of 1940.

In view of the request from your committee to submit a report as soon as possible, a detailed analysis and comment on each section of the bill has not been possible. This report will deal only with some of the more important phases of the measure and does not necessarily imply approval or disapproval of all other sections of the bill.

Section 103: This section describes the authority, powers, and duties of the Attorney General as well as the Commissioner in relation to the administration of the bill. It is suggested that the language be amended so that the Attorney General's power to delegate his authority will not necessarily be limited to members of the Immigration and Naturalization Service but may include other members of the Department, including those of the Board of Immigration Appeals. This may be accomplished by inserting after the word "them" on page 23, line 17 of the bill, the following, "or to any officer or employee of the Department of Justice." Similarly in line 20, on the same page, after the word "Service" insert the term "or the Department." On line 18 of the same page the word "other" should be made to read "of the."

Sections 103 (b) and 104 (a): These subsections provide that the Commissioner of Immigration and Naturalization and the administrator of the Bureau of Passports, Visas, Security, and Consular Affairs of the Department of State, respectively, shall be native-born citizens of the United States. The Department of Justice is opposed to these provisions of the bill because they place an unwarranted restriction upon the right of a citizen to hold those public offices. Furthermore, the President should not be precluded from appointing qualified persons merely because they are not native-born citizens of the United States. In the case of the Commissioner the appointment would also have to be confirmed by the Senate which thus would have an opportunity to pass upon the appointee's qualifications.

Section 106: Section 19 of the Immigration Act of February 5, 1917 (8 U. S. C. 155), provided that an alien falling within certain deportable classes should be taken into custody and deported on the warrant of Attorney General and that his decision should be final. In exclusion cases (secs. 16 and 17, act of February 5, 1917) a somewhat fuller provision was made whereby an alien who was not found clearly entitled to land by an examining inspector would be held for a Board of Special Inquiry whose decision would be final unless appealed to the Attorney General. So far as judicial review is concerned, the immigration statutes were silent. Over some three-quarters of a century there developed a process of judicial review through the writ of habeas corpus. The main effect of section 106 is to spell out for the first time the power of judicial review of the administrative process. The administrative process is detailed with reference to exclusion in section 236, and with reference to deportation in section 242 of the bill. The provisions of sections 236, 242, and 106 taken together express in statutory terms what has been developed over the course of years as the means of administering the laws and having that administration reviewed through judicial process. It differs from the Administrative Procedure Act, which the Department believed to be inapplicable to immigration processes prior to the Supreme Court decision in *Wong Yang Sung* v. *McGrath* (339 U. S. 88), decided February 20, 1950. The result of that decision was a provision in the Supplemental Appropriations Act for the fiscal year 1951, approved September 27, 1950, providing that administrative hearings under the immigration processes should not adhere to the adjudicative provisions of the Administrative Procedure Act. Section 106 of this bill undertakes to state what has been the traditional

provision for judicial review, i. e., habeas corpus. That writ affords the expeditious consideration so necessary if the immigration statutes are to be effectively enforced. The provisions of sections 106, 236, and 242 afford a time-tested and efficient procedure for the administration of this bill.

If deportation hearings under the bill were to be subjected to the requirements of the Administrative Procedure Act it is estimated, according to a study made last year by the Immigration and Naturalization Service in conjunction with the Bureau of the Budget, that the cost of conducting such hearings, together with incidental expenses, would be approximately an additional $4,400,000 for the first year and probably more for subsequent years.

Sections 201 and 202: These sections provide for revised quotas for all areas of the world, with certain limitations resulting in a total quota approximating that existing under present laws. They remove racial ineligibility, as such, to admission under the quotas and provide a maximum quota for colonial possessions so that such colonial possessions can no longer utilize the unused quotas of the mother country. A separate quota is provided for any person who, although born outside the Asia-Pacific triangle area, is nonetheless attributable by as much as one-half of his ancestry to a people or peoples indigenous to the Asia-Pacific triangle. The Department of Justice favors the removal of racial bars to immigration.

Section 203: This section sets up a basis for selective quota immigration. Whereas under present law a limited number of the quotas for each nationality are available to near relatives of citizens or domiciled aliens, the remainder of the quota of each nationality is available to new seed, self-initiated immigration on the basis of "first come, first served." This proposal is a departure from that program. It undertakes to fix definite percentages for the utilization of the full quota of each country. Fifty percent would be available only upon application made to the Attorney General by persons who can show that they are urgently in need of specialized services of an individual alien and upon a finding by the Attorney General that such services would contribute to the critical, economic, and national welfare of the United States. Thirty percent would be available to the parents of citizens of the United States and 20 percent would be available to the spouses and children of alien residents of the United States. While this theoretically consumes the annual quota, should applications be insufficient to consume such quota, 10 percent of the unused residue would be available for the issuance of visas to other qualified immigrants, and one-half of this 10 percent would first be offered to the brothers and sisters of citizens of the United States.

The Department of Justice objects to the provisions of this section. On the basis of past experience it is virtually certain that the operation of this section will result in a substantial diminution of the actual quotas available to many countries, and will pro tanto defeat the intent of Congress in fixing such quotas for admissible aliens. It may reasonably be anticipated that only a negligible number of visas will be issued within each classification established under section 203 (a) (1) (2) (8). Since section 203 (a) (4) permits a maximum of 10 percent of the unused quotas in each class to be available to new seed, with a possibility of further reduction to 5 percent, a drastic curtailment of immigration not within the general contemplation of the bill will result. To avoid this unintended eventuality, the Department believes that the Congress may wish to revise the percentages for the quota classifications. In any event, the Department urges that this section be amended to provide that the unused residue of the quotas by the classes enumerated should be usable in each quota area for self-initiated new immigration.

Section 212: This provision sets up many grounds for exclusion of aliens not contained in the present laws. While the question as to what aliens should be excluded is in general one of legislative policy, the Department desires to call attention to section 212 (a) (14) which might be construed as excluding any alien from entering the United States as an immigrant if he is a skilled or unskilled laborer, unless unemployed persons cannot be found to perform such labor. The present law which excludes aliens of such classes has reference to those coming under contracts or prearrangements to perform such labor and is generally referred to as "contract labor" provisions of the immigration laws. No such provisions are found in this bill. Apparently it is intended that the exclusion shall not be based on any relation to prearranged or contracted employment but shall be governed by this paragraph and section 203 (a) (1) which provides for selective immigration and section 101 (a) (14). (H), which requires a previous finding of need for the services of the individual in the United States, except those classes mentioned in 101 (a) (26) (A) or (B) and

203 (a) (1) (2) or (3), or the preference category described in 203 (a) (4), which are based upon relationship to citizens or domiciled aliens in this country. It is not made clear whether an alien who is a skilled or unskilled laborer and desires to enter this country to settle here will be excluded solely because of the nature of his past employment and prospective future employment. The Department of Justice recommends that these provisions be clarified to provide that laborers desiring to enter this country will not be barred solely because their prospective employment will be as laborers.

Section 212 (a) (9) : This subsection provides, in part, that aliens who admit committing acts which constitute the essential elements of a crime involving moral turpitude other than a purely political offense, or aliens whose admissions are tantamount to a confession of guilt of such a crime, shall be ineligible to receive visas and shall be excluded from admission into the United States. Section 3 of the Immigration Act of 1917 provides for the exclusion of aliens who admit having committed a felony or crime. The Department believes that the present provisions of law are adequate to protect the interest of the United States as well as being fair to the alien.

Section 212 (a) (28) (i) : This paragraph provides a means whereby a past member or affiliate of the Communist Party or other subversive groups may enter the United States by showing that his membership was involuntary, or that it terminated prior to the age of 14 years, or that he was opposed to the principles of such an organization for the last 2 years. The latter provision is a liberalization of existing law. It is in conflict with Public Law No. 14, Eighty-second Congress, approved March 28, 1951. Public Law No. 14 gives no benefits to persons who voluntarily were or are Communists or affiliated with Communist organizations. However, it does grant benefits to persons who were involuntarily members or were members under other mentioned circumstances. This bill additionally provides for the person who, irrespective of whether he was a voluntary member, has for 2 years evidenced opposition to the tenets of communism. Since Congress has so recently considered this subject it would not seem that the law should be changed at this time at a possible risk to the internal security. Furthermore, there are at present no adequate or satisfactory means of performing the necessary investigations, some of which might lead to places far behind the iron curtain, which would be necessary to separate those who are truly repentent Communists from among those who may claim to be but are not.

Section 212 (d) (5) : There is no provision in existing law for the parole into the United States of an alien applying for admission at a port of entry. There has long been a perhaps questionable administrative practice of nevertheless paroling aliens under emergent and humanitarian circumstances. This Department has no objection to giving statutory force and effect to such practice. It does believe, however, that there might be some modification of the language of this provision which would more likely be efficacious in the administration of the law. For that reason it is suggested that on line 21, page 58 the language be changed to read as follows:

"(5) The Attorney General may in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergent reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States, but such parole of such alien shall not be regarded as an admission of the alien and when the purposes of such parole shall, in the opinion of the Attorney General, have been served the alien shall forthwith return or be returned to the custody from which he was paroled and thereafter his case shall continue to be dealt with in the same manner as that of any other applicant for admission to the United States."

Section 233 (c) : This subsection provides a new basis upon which carriers may claim relief from the payment of detention expenses in the cases of arriving aliens. A carrier will not be responsible for such expenses if the alien was in possession of an unexpired visa or other document issued by a consular officer, and if the carrier establishes to the satisfaction of the Attorney General that the ground of detention could not have been ascertained by the exercise of due diligence prior to the alien's embarkation. Under existing law, carriers are relieved from detention expenses only if the alien had an unexpired visa issued not more than 60 days prior to his embarkation, and then only if the alien is excluded or detained on certain documentary charges. The Department calls attention to the fact that the language of the last clause of subsection (c) is obscure and will undoubtedly lead to litigation and controversy. No expression of

congressional intent is contained in the bill with respect to the meaning of the term "ground for detention." Furthermore, since an immigration officer, under the bill, has the discretionary power to remove any alien temporarily from a vessel, etc., for the purpose of conducting the necessary inspection, it is probable that controversies will ensue as to whether the carrier is liable for the detention expenses in those cases where the alien is ultimately admitted to the United States. In fact, it is probable that in every case where the alien is ultimately admitted, the carrier will seek to assert that it could not have ascertained by the exercise of due diligence the "ground of detention," and the carrier will probably claim that there was no "ground of detention." This provision is in aid of foreign transport companies as well as those that are American.

While the Department is unable to estimate accurately what the cost will be to the Government if this change is made with respect to liability for detention expenses, since future detentions cannot, of course, be known at this time, it is believed that upon the basis of past experience, the change will cost the Government at least $150,000 per year. There would appear to be no justification for further shifting this expense incident to alien traffic to the American taxpayers.

Section 237 (a) : This subsection sets up a new ground upon the basis of which carriers may claim relief from detention and deportation expenses of excluded aliens. Furthermore, it changes existing law in that it does not specify the place to which an excluded alien is to be deported. This subsection contains language similar to that contained in section 233 (c) discussed above. However, the instant section contains another exemption which would relieve the carrier from "expenses incident to deportation" of an excluded alien. Under this section, if an alien is excluded, it will be necessary for the Government to purchase his transportation back to the foreign port of embarkation or to some other foreign place. While the Department is in no position at this time to estimate the cost to the Government if the expenses of transportation in the case of excluded aliens are to be transferred to the Government, attention is called to the fact that during the fiscal year 1950 the expenses to the carriers of returning excluded aliens from ports of entry other than border ports, amounted to about $326,000. The effect of the provision is that an additional financial burden is being transferred to the Government thus providing a subsidy not only for American carriers but also for the many foreign carriers engaged in bringing passengers to the United States. Such a proposal, it is believed, is objectionable.

Closely allied to the foregoing is a change which would result if section 237 (b) is enacted, since, under the provision it would no longer be a punishable offense for a carrier to impose a charge upon a deported alien for payment of his return passage.

Section 241 (a) : This subsection sets up the deportable classes of aliens. These grounds differ in many important respects from existing grounds of deportation. Furthermore, the bill removes the time limit now applicable to certain grounds of deportation. It is to be noted that whereas section 241 (a) (1) provides for the deportation of an alien who at the time of entry was within one or more of the classes of aliens excludable by law, section 241 (d) permits the deportation of any alien found deportable under the new grounds for deportation (but not exclusion) set up in the bill, regardless of how long he has been in this country. The Department of Justice has no objection to the provisions of this subsection.

Section 241 (a) (4) (B) : This subsection provides for the deportation of an alien "who admits committing within 5 years after entry acts which constitute the essential elements of a crime involving moral turpitude, or whose admission is tantamount to a confession of guilt of such crime." Under present law it is necessary to secure the conviction of an alien before he is deportable. The provisions of present law are believed to be adequate in this respect.

Section 243 (a) : This subsection changes existing law with respect to the countries to which an alien should be deported. Section 20 (a) of the 1917 act, as amended by the Internal Security Act of 1950, contains a provision to the effect that deportation must be directed by the Attorney General to a country specified by the alien, if that country is willing to accept him. No such provision was contained in prior law. It is, however, again set forth in section 243 (a) of this bill, with the further new limitation that no alien shall be permitted to make more than one such designation. It is suggested that your committee may desire to give this proposal further consideration.

In the short time which has elapsed since the Internal Security Act was passed serious question has arisen as to whether this provision is not contrary

to the best interests of the United States. Many European aliens are specifying Mexico or Canada as the country to which they wish to be deported. It is obvious that if such countries accept the aliens, reentry from such territory in an illegal manner is easily possible. Furthermore, aliens may specify that they wish to be deported to various "iron curtain" countries. When this Government attempts to obtain consent from such countries for return of such aliens, inquiries receive no response whatsoever. The alien is protected in the majority of cases by the provision of section 243 (a) which would require that he be first ordered deported to the country of which he is a subject, national or citizen, if such country is willing to accept him, and by the provision of section 243 (h) that no alien shall be deported to any country in which the Attorney General shall in his discretion find that such alien would be subject to physical persecution.

If, however, the provision which permits the alien to designate in the first instance the country to which he is to be deported is to be retained, it is urged that this choice be restricted in two ways, i. e., (1) that no alien be allowed to designate foreign contiguous territory or islands adjacent thereto as the country to which he is to be deported, unless he is a native, subject, national, or citizen of the designated country, and (2) that if the country designated by him fails to respond to inquiries by the United States Government within a reasonable period, not to exceed 90 days, the alien's designation shall become inoperative and the Attorney General may then proceed with his deportation in the same manner as if the designated country had refused to accept him.

It is also recommended that a similar time limitation be imposed upon negotiations for the return of the alien to the country of which he is a subject, national, or citizen, if such negotiations are rendered futile by refusal of the foreign government to respond at all or to state finally whether or not such government is willing to accept an alien into its territory. The bill should not place in the hands of any foreign government the power to delay or defeat deportation by reason of the failure of such foreign government to respond to inquiries by the United States. It is also recommended that if the alien is to be permitted to select a particular country to which he is to be deported, such choice will not be permitted if the Attorney General, in his discretion, on the basis of any intelligence or information satisfactory to him, concludes that deportation to such country would be prejudicial to the interests of the United States.

Accordingly, the Department of Justice recommends that the following be substituted for the opening paragraph of section 243 (a) in lieu of lines 21 to 25 on page 110 and lines 1 through 9 on page 111:

"SEC. 243 (a). The deportation of an alien in the United States provided for in this Act, or any other Act of Congress or treaty, shall be directed by the Attorney General to a country promptly designated by the alien, if that country is willing to accept him into its territory, unless the Attorney General, in his discretion, concludes that deportation to such country would be prejudicial to the interests of the United States. No alien shall be permitted to make more than one such designation, nor shall any alien designate, as the place to which he wishes to be deported, any foreign territory contiguous to the United States or any island adjacent thereto or to the United State unless such alien is a native, citizen, subject, or national of such designated foreign contiguous territory or adjacent island. If the government of the country designated by the alien fails finally to advise the Attorney General within three months following original inquiry whether that government will or will not accept such alien into its territory, such designation shall thereafter be disregarded. Thereupon deportation of such alien shall be directed to any country of which such alien is a subject, national, or citizen if such country is willing to accept him into its territory. If the government of such country fails finally to advise the Attorney General or the alien within three months following the date of original inquiry, or within such other period as the Attorney General shall deem reasonable under the circumstances in a particular case, whether that government will or will not accept such alien into its territory, then such deportation shall be directed by the Attorney General within his discretion and without necessarily giving any priority or preference because of their order as herein set forth, either."

Section 243 (a) : This subsection changes existing law by limiting to a greater extent the liability of carriers for deportation expenses of certain aliens. In this

connection attention is called to the discussions above relating to sections 233 (c) and 287 (a). Estimate of the additional expenses which will be imposed upon the Government if this subsection is enacted is not possible at this time.

Section 273 (d): This subsection denies to stowaways the right to a hearing before a special inquiry officer in connection with his exclusion from the United States. The Department favors the enactment of such provisions. The subsection also prescribes a fine for failing to discover and present alien stowaways to an immigration officer for inspection, or failure to detain such a stowaway, prior to or after inspection, if ordered to do so. These provisions are somewhat similar to legislation which the Department has sponsored for several years in connection with stowaways. If stowaways are not permitted to embark for the United States, there will be no fines and the objectives of the provision will be reached. However, the language which appears on lines 9, 10, and 11, page 150, "to discover and present any alien stowaway on board to an immigration officer for the inspection or who fails" does not appear in the legislation sponsored by the Department. Since that language might be considered to be somewhat incongruous, and since the other duties imposed upon the carrier by this subsection would appear to suffice, the Department perceives no objection to the elimination of the quoted language.

Section 273 (e): This subsection would impose a $500 fine upon a carrier who discovers and presents an alien stowaway on board to an immigration officer for inspection. The fine may be mitigated to $200 under certain conditions. This subsection is somewhat similar to that which the Department has for several years proposed as amendatory legislation. It differs from such proposals in that the fine contained in S. 716 is $500, whereas the Department has recommended a $1,000 fine.

Section 274: This section makes substantive changes in the law with regard to the offenses which will be committed in the illegal bringing of aliens to the United States. As drafted, the section should overcome the deficiencies now found in section 8 of the Immigration Act of 1917 as illustrated by the decision of the Supreme Court in *United States* v. *Evans* (333 U. S. 483). The Department has sponsored legislation of this nature for several years. In order to accomplish the purpose of protecting the United States to a fuller extent, and to assist the Government in enforcing these provisions, it is suggested that paragraph (2) be revised, and that there be added, a new paragraph (3) and paragraph (4) as follows:

"(2) conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection in any place (including any building or any means of transporttaion) ; or

(3) encourages or induces, or attempts to encourage or induce, either directly or indirectly, the entry of; or

(4) knowingly employs or offers to employ, either directly or indirectly, except as may be permitted by law or regulations promulgated pursuant to law,"

Section 276: This section is designed to replace provisions now found in existing law with respect to the criminal offenses which will be committed if a previously deported alien returns to the United States. It adds to existing law by creating a crime which will be committed if a previously deported alien is subsequently found in the United States. This change would overcome the inadequacies in existing law which have been observed in those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions against a deported alien under the 1929 act.

However, it is believed that the language of section 276 is somewhat obscure, particularly the language beginning on line 10, page 154, reading "and if such alien is at any time found in the United States, unless he shall establish that he has been lawfully admitted,". It is suggested that for clarity, paragraph (2) be revised to read as follows:

"(2) enters, attempts to enter, or is at any time found in, the United States, unless (A) prior to his reembarkation at a place outside the United States or his application for admission from foreign contiguous territory, the Attorney General has expressly consented to such alien's reapplying for admission; or (B) with respect to an alien previously excluded and deported, unless such alien shall establish that he was not required to obtain such advance consent under this or any prior act; shall be guilty of a felony, and upon conviction thereof, be punished by imprisonment of not more than two years, or by a fine of not more than $1,000 or both."

Section 284: This section evidently proposes a codification of the existing law (act of March 2, 1931, and act of August 22, 1940, 8 U. S. C. 109 (a), (b) and (c)). However, it is believed that the section should be revised so as substantially to carry forward the provisions of the Act of March 2, 1931, and August 22, 1940, as construed by the United States Court of Claims in *Rennor* v. *United States* (106 C. Cls. 677) and *Taylor* v. *United States* (114 C. Cls. 59). These decisions make clear that the United States is liable to employees for overtime and Sunday and holiday extra compensation. Considerable difficulty has been experienced in administering the proviso in section 109 (b) which relates primarily to border traffic. It has never been clear under this last-mentioned proviso just what means of transportation or of travel were exempt from the reimbursement requirements. Even now, questions are pending resulting from challenges of interpretations of the existing law which would apply reimbursement provisions to busses and would prospectively likely require determination as to whether reimbursement must be demanded from taxicabs, chartered means of conveyance, etc. Though the law here amended was patterned generally after section 5 of the Customs Act of February 13, 1911, as amended in 1920 (19 U. S. C. 267), which is related to sections of the Tariff Act (19 U. S. C. 1401, 1450, 1451), the provisions respecting reimbursement with reference to the Customs and Immigration Service have never been exactly the same.

It is suggested that section 284 be amended in a manner which would bring the legislation relating to the Customs and Immigration Services more nearly in harmony. As nearly as can be estimated, section 284 would result in the exemption from reimbursement of all border carriers amounting to approximately $260,000 annually, such cost to be assumed by the appropriation of the Immigration and Naturalization Service. It should be understood, however, that much of this cost will be offset by savings in curtailing costs in administration and collections under the reimbursement provisions. It has been found most difficult to administer the existing law along the borders where partial exemptions are provided. Congress doubtless has realized that a different situation existed concerning strictly border traffic from transoceanic traffic but the recognition as expressed in partial exemptions has created an administrative problem which should be solved both in the interests of the Government and the traveling public. Accordingly, amendment of section 284 is recommended as follows:

"SEC. 284 (a). The Attorney General shall pay extra compensation to immigration officers and other employees of the Service, who are required (1) to remain on duty between the hours of five o'clock postmeridian and eight o'clock antemeridian on any day, to examine passengers, crews, or persons arriving in the United States from a foreign port by vessels, airplanes, or other means of transportation, or on foot, or (2) to perform the duties described in clause (1) on Sundays or holidays. Such compensation shall be on the following basis: for services under clause (1), one-half day's additional pay for each two hours or fraction thereof of at least one hour that the remaining on duty time extends beyond five o'clock postmeridian (but not to exceed two and one-half day's pay for the full period from five o'clock postmeridian to 8 o'clock antemeridian) ; and for services under clause (2), two additional days' pay for not to exceed eight continuous hours of such duty on any Sunday or holiday, excluding time allowed for food and rest. Such extra compensation shall be paid to such officers or employees who have been ordered to report for duty and have so reported, whether the actual inspection or examination mentioned in this subsection takes place or not. The Attorney General is authorized to regulate the hours of such employees so as to agree with the prevailing hours in said ports but nothing in this section shall be construed in any manner to effect or alter the extra compensation herein fixed.

(b) The master, owner, agent, consignee, and person in charge of any vessel, airplane, or other means of transportation by which such passengers, crewmen, or persons arrived in the United States from a foreign place shall pay to the Attorney General the extra compensation provided for in subsection (a), and they shall be jointly and severally liable for such payment and such obligation shall constitute and be collected as a debt owed to the United States: *Provided*, that this subsection shall not apply to liability arising from inspection at designated ports of entry of passengers, crewmen, or persons, when arriving (1) by airplane within regular schedules from any foreign place, or (2) from foreign contiguous territory across or over the

common land or water boundaries by any means of transportation other than by airplane as provided in clause (1), or by, through, upon or across any bridge, tunnel, or other fixed facility between such territory and the United States.

(c) Monies collected on or after July 1, 1941, as extra compensation for services of Immigration Officers and other employees of the Service, shall be deposited in the Treasury of the United States to the credit of the appropriation for the payment of salaries and expenses of the Service, and that appropriation, including the amount credited thereto under the provisions of this subsection, shall be available for the payment of such extra compensation."

Section 287: This section grants authority to officers of the Service to administer oaths and to conduct searches, under certain circumstances, of the person of applicants for admission to the United States. So far as they go the provisions of section 287 are highly desirable. However, the bill, as drafted, does not contain any specific language giving authority to immigration officers to go upon private property for the purpose of interrogating aliens or persons believed to be aliens. This authority is particularly needed in those cases in which it becomes necessary to go upon a ranch or farm having an area of thousands of acres, to interrogate an alien known to be there. For that purpose, it is suggested that a new subsection (d) be added to section 287, reading as follows:

"(d) Any employee of the Service authorized and designated under regulations prescribed by the Attorney General, whether individually or as one of a class, shall have power and authority, while engaged in the performance of his duties in the administration of the provisions of this Act, to go upon or within any private property, other than a dwelling, within or upon which he believes there are aliens, for the purpose of interrogating such aliens concerning their right to be or remain in the United States."

In connection with the above suggestion the report of the President's Commission on Migratory Labor, Migratory Labor in American Agriculture, March 26, 1951, states:

"The authority is clear for an immigration officer to enter private property if he has a warrant; without a warrant he may enter if a deportable alien is known to be on the property who is likely to escape. The authority is not clear, however, for immigration officers to enter upon farms, ranches, or other enclosed lands to inspect or search for illegal aliens.

"It must be noted that farms employing workers in significant numbers are places of employment and therefore affected with a public interest. Should they not be open to inspection for the enforcement of law? Under safety and accident prevention laws, it was long ago acknowledged that factory inspectors had the right to enter places of employment. Likewise, Government officials inspect places of employment to administer child labor, minimum wage, maximum hours, sanitation and other laws. The farmer's home, whether on his farm or elsewhere, is a different thing from the farm property on which employment occurs. Perhaps it is time we modernize our concept of the farm employing several workers, recognizing it (apart from the farmer's home) as not a personal castle but rather a place of employment affected with a public interest and on which inspections may be made in the enforcement of law.

"Statutory clarification on the above points will aid in taking action against the conveyors and receivers of the wetback. These clarifications of the statute, together with increased funds and personnel for enforcement, are possibly all that are needed to deal effectively with the smuggler and the intermediary."

The Department of Justice recommends that a provision be added to the bill to exempt alien members of the Armed Forces of the United States from the requirements of the bill relating to immigration. Particularly in view of the present international situation, it becomes frequently necessary for the Armed Forces of the United States to bring into or take out of the United States members of the Armed Forces. Such persons may be aliens. Upon a literal reading of the bill it would appear that such aliens would be subject to the limitations contained in the bill as to the right to depart from the United States during the time of war or national emergency. In view of the duties imposed upon the Attorney General and the Immigration and Naturalization Service with respect to the immigration of aliens, it becomes of even more importance to consider the effect of this bill upon the entry or arrival in the United States of such aliens who are coming to this country under military orders. It appears

that so long as an alien is a member of the Armed Forces of the United States, and is coming to or departing from the United States under military orders, the provisions of title II with respect to the arrival and departure of aliens should not be applicable to him. Otherwise, unless administratively determined to the contrary, it would be necessary to delay and impede the activities of the Armed Forces until each requirement of this title is complied with. It is recommended that such matters ought not to be left to administrative interpretations, but rather, that Congress should express its policy in this bill. A recommendation of similar nature was made by the Department in a letter dated February 19, 1951, to the chairman of the Senate Committee on Armed Services in connection with a report on S. 237, a bill to amend the act of June 30, 1950 (Public Law 597, 81st Cong.), relating to the enlistment of aliens in the Regular Army. Accordingly, it is suggested that a new section, 293, be added to the bill at the end of title II, reading as follows:

### MEMBERS OF THE ARMED FORCES

Section 293:
"Nothing contained in title II of this Act shall be construed so as to limit, restrict, deny, or affect the coming into or departure from the United States of an alien member of the Armed Forces of the United States who is in the uniform of, or who bears documents identifying him as a member of, such armed forces, and who is coming to or departing from the United States under official orders or permit of such armed forces: *Provided*, That nothing contained in this section shall be construed to give to or confer upon any such alien any other privileges, rights, benefits, exemptions, or immunities under this Act, which are not otherwise specifically granted by this Act."

Section 311: This section changes existing law by removing all racial bars to naturalization, thus giving effect to one phase of the legislative program which the President and this Department have recommended for several years.

Section 324 (d) : This subsection provides that any woman who was "eligible to regain citizenship" under section 317 (b) of the Nationality Act of 1940, or under the provisions of the act of June 25, 1936, as amended July 2, 1940 (49 Stat. 1917, 54 Stat. 715), who failed to take the oath of allegiance prescribed under those laws before the effective date of this bill may regain citizenship by taking an oath of allegiance within 2 years after that date. Upon taking such oath, in the case of a woman whose marriage has terminated, she will be deemed to be a citizen of the United States as of June 25, 1936, or as of the date of termination of marriage, whichever is later. In the case of a woman whose marriage has not terminated, she shall be deemed to be a citizen as of July 2, 1940. Any woman who fails to take the oath within 2 years shall be deemed to have remained an alien from and after the date of her marriage. This subsection contains a proviso that nothing contained therein shall be deemed to affect the claim to citizenship under the act of June 25, 1936, or citizenship rights flowing therefrom, of any woman who died prior to the effective date of this act.

If this subsection is enacted many serious administrative problems will be presented. That is true because it has been the administrative view of the Immigration and Naturalization Service since the enactment of the 1936 act that under that act, as well as its amendment in 1940, former women citizens are restored automatically to citizenship, although they were not to have or claim any rights as citizens until they took the oath of allegiance. In many such cases these women have never taken the oath of allegiance, but nevertheless they may have been advised by the Service that they are regarded as having been restored to United States citizenship. In many cases the children of such women have been adjudicated to be citizens of the United States through the mother's citizenship status. Many husbands of such women have filed petitions for citizenship and have been admitted to that status upon the basis of the wife's status.

The effect of the enactment of this subsection would be to declare that the previous views of the Service have been erroneous and would unquestionably cause confusion. Such women will have only two years after the effective date of the bill to take the necessary oath. There seems little doubt that many such women will not be aware of this new section and will not take such an oath within the 2-year period. The Service views regarding the interpretation of the 1936 and 1940 acts have been upheld by many courts throughout the United States (many of the decisions of which are unreported), although there have been some contrary decisions. The proviso indicates that certain women who died, even though they did not take the oath of allegiance under existing law will be

regarded as having been citizens, and the rights of children or spouses, dependent upon the rights of such a woman, will not be affected by this bill. The difficulties which will arise if this subsection is enacted are even more apparent when it is observed that the statutes referred to, that is the acts of 1936 and 1940, are no longer in existence.

Accordingly, it is recommended that a subsection, in lieu of the proposed section 324 (d) be enacted, declaring that all women who fall within the purview of the act of June 25, 1936, as amended, are and have been citizens of the United States.

Section 335 (e) : The Department calls attention to the fact that under existing law, once a petition for naturalization is filed in a particular court, it must be heard and disposed of in that court. Neither existing law, nor the bill, provides a means whereby the venue of a petition for naturalization may be changed after the petition is filed. Many times the final hearing consists of nothing more than an acceptance by the court of the designated examiner's recommendation and the taking of the oath of allegiance by the petitioner. Frequently, a petitioner moves his residence, after his petition is filed, to places far distant from the court where he filed his petition. The Department feels that much hardship could be avoided if a provision were included in title III of the bill permitting the transfer of a petition for naturalization to another court for hearing and disposition after it has been filed. However, a transfer of the petition should not be permitted unless the Attorney General has given his consent and unless the courts from and to which the petition is being moved also give their consent. By requiring the Attorney General's consent to the transfer of a petition, fraud will be prevented, and the petitioner will be restricted in any attempt to have a petition transferred for final hearing upon the basis of a fictitious change of residence made for some improper purpose. With these limitations, the Department suggests the desirability of including in the bill a provision permitting transfer of petitions for naturalization for final hearing.

Section 336 (c) : This subsection changes existing law by permitting the holding of final naturalization hearings within the 60-day period preceding the holding of a general election. However, it retains the present provisions forbidding the holding of a final hearing within 30 days after filing the petition. The Department has sponsored legislation which would amend existing law so as to eliminate the requirement that a final hearing may not be held within 60 days preceding a general election, and also to permit the Commissioner to waive the requirement that a final hearing may not be held within 30 days after filing a petition for naturalization. It is recommended that the substance of the Department's recommendation be incorporated in the bill in lieu of section 336 (c).

Section 337 : This section changes existing law by removing the privilege which was authorized under the Internal Security Act of 1950 whereby certain aliens might be permitted to select an alternate oath of allegiance in connection with their naturalization. As drafted, the bill would apparently require every alien who is petitioning for naturalization to take an oath of allegiance that, with respect to the bearing of arms, he will do whatever is required of him by law, be it the actual bearing of arms, the performance of service in a noncombatant capacity in the Armed Forces, and the rendition of work of national importance under civilian direction. Since it appears that the obligations which the alien applicant for naturalization by his oath declares a willingness to undertake are similar to those which are customarily imposed upon native-born citizens of the United States, this proposed change in existing law seems desirable.

Section 360 : This section provides for the institution of a judicial proceeding against any executive department or independent agency, for determining the nationality status of any person who is denied the right or privilege as a national of the United States by such executive agency, or any executive official thereof. The section is available only to persons who are within the United States. No such action may be instituted in any case if the issue of such person's status as a national of the United States (1) arose by reason of or in connection with any deportation or exclusion proceeding, or (2) is in issue in any such deportation or exclusion proceeding.

This section is designed to replace section 503 of the Nationality Act of 1940. That section permits individuals who are denied privileges as nationals of the United States to bring a judicial action to test the legality of such a denial. However, section 503 authorizes a person who is outside the United States to come to this country after filing such a suit in order to prosecute it to a conclusion. Provision is made for his deportation if the court finding is that he is

not a national of the United States. A certificate of identity is granted to such a person by a consular officer, and, in case of refusal to issue such a certificate, an appeal to the Secretary of State is authorized.

Section 360 is obviously intended to prevent the institution of a judicial action to review findings made in an exclusion or deportation proceeding while such proceedings are pending, or have been concluded. Under the language of the section, it would appear that even though the deportation or exclusion proceeding may have terminated, this remedy will not be available to any person for the purpose of obtaining judicial review of any issue of citizenship or nationality which may have arisen in connection with, or by reason of, such deportation or exclusion proceeding. The remedy of habeas corpus would, of course, still be available.

The Department of Justice objects to the enactment of section 360 unless it is amended to provide for the protection of persons abroad who have more than a frivolous claim to citizenship but who are unable to obtain a United States passport. To protect such persons the Department recommends adding to section 360 language which would permit the issuance to such persons of a special certificate of identity or a special "visa." That document should be described in such a manner as merely to authorize the person in question to proceed to a port in the United States and apply for admission as a national, in the usual manner. If his application for admission as a national of the United States is administratively denied, the applicant will have review through habeas corpus in the United States courts in the usual manner. However, the intent of this suggestion is that the person claiming citizenship shall be required to apply for admission to the United States at a port of entry and go through the usual screening, interrogation, and investigation, applicable in the cases of other persons seeking admission to the United States, so that the Immigration and Naturalization Service will have as complete a record as possible on each person entering this country claiming to be a national thereof.

Section 401 (1): This subsection amends section 202 of the act of June 5, 1950 (Public Law 535, 81st Cong., 2d sess.), known as the China Area Aid Act of 1950. The last proviso of section 202 makes available moneys to the Secretary of State, to be expended under such regulations as he may prescribe, for certain expenses of selected citizens of China for study, teaching, research, and related academic and technical activities in the United States. The proviso further authorizes and directs the Attorney General to promulgate regulations providing that such selected citizens of China who have been admitted to the United States for the purpose of study shall be granted permission to accept employment upon application filed with the Commissioner of Immigration and Naturalization. Such regulations have recently been issued. Section 401 (1) would delete that portion of the proviso which authorizes and directs the Attorney General to promulgate regulations governing the employment of students admitted under the act. The effect would be to defeat one of the purposes of the China Area Aid Act which was to benefit as many students as possible by conservation of the fund allocated for such use, the conservation to be effected, of course, by permitting the students to earn part, at least, of the cost of their maintenance. Therefore, the Department favors the elimination of subsection 401 (1).

Section 402 (a): In connection with this provision, the Department wishes to call attention to section 8 (a) (2) of the Philippine Independence Act (47 Stat. 767; 48 Stat. 462). That section provides that citizens of the Philippine Islands who are not citizens of the United States shall not be admitted to the continental United States from the Territory of Hawaii, unless they are included in the nonimmigrant classes described in section 3 of the 1924 act, or the classes of nonquota immigrants described in section 4 of that act (other than subdivision (c) thereof), or unless they were admitted to Hawaii under an immigration visa. Notwithstanding the independence of the Philippine Islands on July 4, 1946, this section has been administratively interpreted as remaining in effect. It has never been specifically repealed. It is known that many thousands of Philippine citizens were admitted to Hawaii without immigrant visas and without inspection under the immigration laws in view of the fact that they were nationals of the United States when admitted. Section 8 (a) (2), referred to above, was undoubtedly intended to prevent an influx of such aliens into the continental United States to compete with American labor.

A question of legislative policy to be determined by the Congress is whether such aliens shall become admissible to the continental United States merely because they can comply with the provisions of section 212 (d) (7) of this bill, or whether the limitations contained in section 8 (a) (2) of the Philippine

Independence Act shall be carried forward. If the latter policy is decided upon, it is suggested that a change in the bill should be made so as to indicate clearly this purpose. If section 8 (a) (2) is not to remain in effect, it is recommended that it be listed in section 402 (a) with other statutes specifically repealed.

Section 404: This section permits the Secretary of State to make regulations for the performance of duties under this legislation by diplomatic and consular officers abroad without a recommendation from the Attorney General. Under the acts of May 26, 1924, and June 14, 1940, such a recommendation has been required. According to records of the Immigration and Naturalization Service, when the Immigration Act of 1924 was under consideration by the Congress, the then Secretary of State, Charles Evans Hughes, in a letter to the committee which was considering the proposed act, suggested that in his opinion the rules and regulations, so far as they related to consular officers, should be prescribed by the Secretary of State upon the recommendation of the Commissioner General (of Immigration). The Department believes that when a single body of law is to be administered by two branches of the executive department, the interest of good administration and coordinated action is best served by concurrence in those regulations which govern the application of the law by consular officers abroad, since the primary responsibility for the enforcement of the law will lie with the Immigration and Naturalization Service in this country. It is recommended, therefore, that the present law on this subject be retained. (See sec. 24, act of May 26, 1924.)

Section 405 (a): This subsection contains a general savings clause designed to save and preserve the validity of various documents and proceedings, including declarations of intention, petitions for naturalization, certificates of naturalization and of citizenship, warrants of arrest or of deportation, and orders of deportation or of exclusion. It is further provided here that nothing contained in the bill shall affect any proceedings or actions, etc., which may be pending on the effective date of the bill. As to any such proceedings, actions, etc., the repealed statutes are continued in force and effect unless otherwise specifically provided.

The Department calls attention to the fact that under section 284 (b) of the bill, certain monies are to be paid by designated carriers to the Attorney General. Subsection (c) of section 284 refers to the crediting of the appropriation of the Immigration and Naturalization Service for monies collected on or after July 1, 1941. It is apparent, therefore, that certain carriers may have an obligation to pay various amounts to the Government which will not be enforceable unless a specific mention thereof is made in the savings clause. There are other liabilities and obligations, such as, for example, liability to fines or other penalties under existing law, which should be saved specifically in this section. Accordingly, it is suggested that on page 277, line 20, immediately following the word "thing," there be inserted "liability, obligation,". Similarly, on line 23, page 277, following the word "things," there should be inserted "liabilities, obligations,".

Section 407: This section provides that the bill shall take effect 90 days following the date of its enactment. Considering that this bill codifies all and revises many of the provisions of laws relating to immigration, naturalization and nationality, the Department believes that a 90-day deferred effective date does not provide sufficient time for the Government departments concerned to prepare the forms, instructions, and regulations which will be necessary for the administration and enforcement of the act. Consequently, it is recommended that the bill provide for a 6-month delayed effective date.

The Director of the Bureau of the Budget has advised that while the amendments suggested herein, if adopted, would result in much improvement in the legislation, in view of the complexity of many of the provisions of the bill, he is unable, at this time, to advise whether the measure, even if amended as suggested by the Department of Justice, would be in accord with the program of the President.

Yours sincerely,

PEYTON FORD,
*Deputy Attorney General.*