No.21 CR 665

## IN THE UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

vs.

ALFREDO VIVEROS-CHAVEZ,

        Defendant.

## HON. MATTHEW F. KENNELLY

## DEFENDANT'S REPLY IN SUPPORT OF HIS
## MOTION TO DISMISS

**CARLA I. ESPINOZA**
Attorney for Defendant
Chicago Immigration Advocates Law Offices
208 Sout LaSalle Street, Ste. 1602
Chicago, Illinois 60604
(312) 704-8000

## **TABLE OF CONTENTS**

TABLE OF CONTENTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  iii

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

The Strict Scrutiny of *Arlington Heights* Applies to Defendant's Challenge of the Illegal Reentry Statute Because the Claim is Based on Racial Discrimination And Relates to a Criminal Statute Which Sole Purpose is to Punish . . . . . . . . . . . . . . . . . . . . . . . 1

Centuries of Precedent Dictate That Strict Scrutiny Applies to An Equal Protection Challenge of a Criminal Statute Based on Racial Discrimination. . . . . . . . . . . . . . . . . 1

None of the Cases Relied Upon by The Government Support Its Contention that Rational-Basis Review Applies to an Equal Protection Challenge of a Criminal Statute. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

The Illegal Reentry Statute Fails Under the *Arlington Heights* Standard . . . . . . . . . . . . . . . 10

The *Arlington Heights* Factors Demonstrate The Illegal Reentry Statute's Racially Discriminatory Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Supreme Court Precedent Dictates That the Discriminatory Intent Behind the Act of 1929 is Imputed Upon Section 1326 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Section 1326 Continues to Have a Disparate Impact on Mexican and Latinx Defendants . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

The Government Has Not Shown That The Illegal Reentry Statute Would Have Been Enacted Absent Discriminatory Intent. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

LIST OF DEFENDANT'S EXHIBITS (CONT.). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

i

## **TABLE OF AUTHORITIES**

**Cases**

*Abbott v. Perez*, 138 S. Ct. 2305, 2318 (2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20, 22, 25

*Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Apodaca v. Oregon*, U.S. 406 U.S. 404 (1972) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Arthur v. Nyquist*, 573 F. 2d 134, 144-45 (2nd Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

*Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954) . . . . . . . . . . . . . . . . . . . . . . 1

*Briscoe v. United States*, 181 A.3d 651, 658 (D.C. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985) . . . . . . . . . . . . . . . . . 4

*Cook Cty., Illinois v. Wolf*, 461 F. Supp. 3d 779, 788 (N.D. Ill. 2020) . . . . . . . . . . . . . . . . . . . 5, 11

*Craig v. Boren*, 429 U.S. 190, 197(1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020) . . . . . . 5, 23

*Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2273 (2020) . . . . . . . . . . . . . . . . . . . 22

*Fiallo v. Bell*, 430 U.S. 787 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Gomillion v. Lightfoot*, 364 U.S. 339 (1960) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Hunter v. Underwood*, 471 U.S. 222 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

*Loving v. Virginia*, 388 U.S. 1, 11(1967) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Matthews v. Diaz*, 426 U.S. 67 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964) . . . . . . . . . . . . . . 2, 4

*Ramos v. Louisiana*, 140 S. Ct. 1390 (2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21, 22

*Robledo-Gonzales v. Ashcroft*, 342 F.3d 667 (7th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Smith v. Town of Clarkton*, 682 F.2d 1055, 1064, 1066 (4th Cir. 1982) . . . . . . . . . . . . . . . . . . 11

*Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 970 (7th Cir. 2012) . . . . . . . . . . . . . . . . . . . . . 10

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1007 (D. Nev. 2021) . . . . . . . 12, 14, 17, 18

*United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1072 (D. Or. 2021). . . . . . . . . . . . . . . . . . 14

*United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000). . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Van Straaten v. Shell Oil Products Co. LLC*, 678 F.3d 486, 490 (7th Cir. 2012) . . . . . . . . . . . . . 10

*Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977) . . 1, Passim

*Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040, 2047, 48 L. Ed. 2d 597 (1976) . . . . . 1, 2

*Wong Wing v. United States*, 163 U.S. 228, 238,(1896). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

*Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S. Ct. 1064, 1070, 30 L. Ed. 220 (1886) . . 1, 2, 3, 4, 19

**Statutes and Regulations**

8 U.S.C. §1326 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, Passim

8 U.S.C. §1182 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

8 U.S.C. §1227 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

**Miscellaneous**

The McCarran-Walter Act (INA) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, passim

Miriam-Webster ([https://www.merriam-webster. com/dictionary/wetback](https://www.merriam-webster.com/dictionary/wetback))

     (Last visited April 28, 2022). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

## INTRODUCTION

The government raises three main arguments in support of the illegal reentry statute, none of which have merit. First, the government erroneously argues that this Court should not apply the strict scrutiny test, but the rational-basis test, to Mr. Viveros-Chavez's motion because the illegal reentry statute relates to immigration. However, that argument is meritless because it would require this Court to ignore over one-hundred years of binding precedent as well as the punitive nature of the illegal reentry statute. Second, the government asks this Court to ignore the historical background, sequence of events, and legislative comments leading up to the conception and original enactment of the illegal reentry statute. However, under *Arlington Heights* the Court must consider, at the very least, the (1) the historical background surrounding the law, (2) the law's legislative history, (3) the specific sequence of events leading to the challenged law as well as departures from the normal procedure, and (4) whether the law bears more heavily on one race than another. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977). Section 1326 fails under *Arlington Heights*. Lastly, the government fails to point at any legitimate evidence demonstrating that the illegal reentry statute would have been enacted absent a discriminatory intent. We address each of these arguments in turn.

## ARGUMENT

I.  **The Strict Scrutiny of *Arlington Heights* Applies to Defendant's Challenge of the Illegal Reentry Statute Because the Claim is Based on Racial Discrimination And Relates to a Criminal Statute Which Sole Purpose is to Punish.**

The government erroneously argues that this Court should not apply the strict scrutiny test as

set forth in *Arlington Heights*, but the rational-basis test, to Mr. Viveros-Chavez's motion because the illegal reentry statute relates to "alienage" or what is now referred to as immigration status. The government's argument is wrong because it asks the Court to ignore over one-hundred years of constitutional precedent as well as the punitive and racially motivated nature of the illegal reentry statute as further explained below.

A.      **Centuries of Precedent Dictate That Strict Scrutiny Applies to An Equal Protection Challenge of a Criminal Statute Based on Racial Discrimination.**

The most problematic aspect of the government's argument is that it ignores over one-hundred years of binding precedent mandating that strict scrutiny be applied to Mr. Viveros-Chavez's challenge. The Fifth Amendment to the U.S. Constitution states, in relevant part: "No person shall . . . be *deprived of life*, *liberty*, or property, without due process of law." 5th Amend. U.S. Constitution (emphasis added). Criminal statues by their very nature are aimed at depriving an individual of life or liberty as punishment for an alleged offense. The Supreme Court has noted that "the Due Process Clause of the Fifth Amendment contains an equal protection component prohibiting the United States from invidiously discriminating between individuals or groups." *Washington v. Davis*, 426 U.S. 229, 239, 96 S. Ct. 2040, 2047, 48 L. Ed. 2d 597 (1976)(relying on *Bolling v. Sharpe*, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954)). "These provisions are universal in their application, *to all persons within the territorial jurisdiction, without regard to any differences of race, of color, or of nationality*; and the equal protection of the laws is a pledge of the protection of equal laws." *Yick Wo v. Hopkins*, 118 U.S. 356, 369, 6 S. Ct. 1064, 1070, 30 L. Ed. 220 (1886). The seminal decisions on Equal Protection clarify that *"racial classifications are to be subjected to the strictest scrutiny*

-2-

and are justifiable only by the weightiest of considerations." *Washington*, 426 U.S. at 242 (emphasis added)(relying on *McLaughlin v. Florida*, 379 U.S. 184, 85 S.Ct. 283, 13 L.Ed.2d 222 (1964)); *see also Loving v. Virginia*, 388 U.S. 1, 11(1967)(". . .the Equal Protection Clause demands that racial classifications, especially suspect in criminal statutes, be subjected to 'the most rigid scrutiny.'").

The government's proposition that a different level of scrutiny should apply to criminal statutes where the defendants are immigrants is meritless. *See* Res. At 5( erroneously stating that "Defendant's challenge goes to a core immigration regulation").  The Supreme Court has repeatedly held the opposite. *Yick Wo v. Hopkins*, 118 U.S. at 368 ("The rights of the petitioners, as affected by the proceedings of which they complain, *are not less because they are aliens and subjects of the emperor of China*.")(emphasis added).  In *Yick Wo*, the Supreme Court reviewed a facially neutral San Francisco ordinance which criminalized, *inter alia*, operation of laundries in certain buildings with scaffolds. *Id*. at 356-58.  Violation of the city ordinance was considered a misdemeanor punishable by imprisonment up to six months. *Id*.  Petitioner Yick Wo was imprisoned for violating the city ordinance. *Id*.  He, joined by other petitioners, challenged the constitutionality of the ordinance under the Equal Protection guarantee of the Fifth Amendment because the ordinance was applied in a racially discriminatory manner. Specifically, Yick Wo argued the scaffolds provisions was aimed to discriminate against  laundries operated by Chinese immigrants and, further, that practically all of the Chinese violators were denied variances and prosecuted for violations while non-Chinese violators were not disturbed by the authorities. *Id*. at 362-63.  The Supreme Court reasoned as follows:

> The effect of the execution of this ordinance in the manner indicated in the record would seem to be necessarily to close up the many Chinese laundries now existing, or compel their owners to pull down their

> present buildings and reconstruct of brick or stone, or to drive them
> outside the city and county of San Francisco, to the adjoining counties,
> beyond the convenient reach of customers, either of which results
> would be little short of absolute confiscation of the large amount of
> property shown to be now, and to have been for a long time, invested
> in these occupations. If this would not be depriving such parties of their
> property without due process of law, it would be difficult to say what
> would effect that prohibited result.

*Id*. at 1068.  The Supreme Court concluded  that this ordinance, although "impartial in appearance,"

was being applied with *"hostility to the race and nationality to which the petitioners belong*, []

which, in the eye of the law, is not justified. *Id*. at 373-74 (emphasis added). Thus, the Supreme Court

held that "[t]he imprisonment of the petitioners [was] therefore illegal" and ordered them to be

"discharged."  *Id*. at 374.  The constitutional challenge of a criminal law based on racial discrimination

presented in *Yick Wo* is virtually identical to the one presented by Mr. Viveros-Chavez in this case.  A

decade after *Yick Wo*, the Supreme Court reiterated that "without regards to any differences of race, of

color, or nationality," "all persons within the territory of the United States are entitled to the protection

guarantied by [the Fifth Amendment], and that *even aliens* shall not . . .be deprived of life, liberty, or

property without due process of law."  *Wong Wing v. United States*, 163 U.S. 228, 238,(1896).  In

*Wong Wing*, the petitioners were Chinese nationals charged with the crime of having been "adjudged to

be not lawfully entitled to be or remain in the United States" for which they were subject to

"imprisonment at hard labor for a period not to exceed one year" without a jury trial.  *Id*. at 233.

Following *Yick Wo*, the Supreme Court concluded that the law violated equal protection and ordered

that the petitioners be discharged from imprisonment. *Id*. at 238. *Wong Wing*  makes it clear that the

Equal Protection guarantee of the Fifth Amendment applies equally to everyone within our jurisdiction

without regard to their race, nationality or immigration status contrary to what the government argues.

Nearly a century later, the Supreme Court has continued to subject racial, alienage, and national origin classifications to strict scrutiny, reasoning as follows:

> The general rule gives way, however, when a statute classifies *by race, alienage, or national origin*. These factors are so seldom relevant to the achievement of any legitimate state interest that laws *grounded in such considerations are deemed to reflect prejudice and antipathy*- a view that those in the burdened class are not as worthy or deserving as others. For these reasons *and because such discrimination is unlikely to be soon rectified by legislative means, these laws are subjected to strict scrutiny and will be sustained only if they are suitably tailored to serve a compelling state interest*.

*City of Cleburne, Tex. v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985)(relying on *McLaughlin*, 379 U.S. at 192)(emphasis added). The government's brief relies on Congress's authority to enact criminal laws related to immigration for the erroneous assertion that rational basis test should apply. However, *Yick Wo* and its progeny stand for the principle that a defendant's Fifth Amendment protections are not curtailed when Congress exercises that authority.  Thus, criminal laws enacted by Congress must comport with the equal protection guarantee of the Fifth Amendment even when they relate to immigration control.

Moreover, the *Arlington Heights* strict scrutiny standard  has been consistently applied to claims of racial discrimination under the Fifth Amendment's Equal Protection guarantee.  This is true even in the immigration context although this case deals solely with a criminal statute.  For example, in *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 140 S. Ct. 1891 (2020), a case dealing with an equal protection challenge to the rescission of the Deferred Action for Childhood Arrivals (DACA) Program, the Supreme Court applied *Arlington Heights* stating "[t]o plead animus, a

plaintiff must raise a *plausible inference* that an "invidious discriminatory purpose was a motivating factor" in the relevant decision. *Dep't of Homeland Sec.*, 140 S. Ct. at 1915 (emphasis added). Similarly, this Court applied *Arlington Heights* to recent claims of racial discrimination relating to the public charge rule, an immigration rule aimed at changing the way in which the Department of Homeland Security (DHS) analyzed an individual's financial assets and education to determined whether that individual should be granted lawful immigration status. *See Cook Cty., Illinois v. Wolf*, 461 F. Supp. 3d 779, 788 (N.D. Ill. 2020). Applying *Arlington Heights*, this Court took into consideration statements made by presidential advisors and agency officials to find plausible that "DHS issued the Rule knowing and intending that it would have a disproportionate negative impact on nonwhite immigrants." *Id*. at 788.

Both *Regents* and *Wolf* dealt with equal protection claims in connection with immigration benefits and, yet, in both those cases the *Arlington Heights* standard was applied. This case challenges a criminal statute for which racial discrimination is particularly suspect. And, contrary to what the government argues, the illegal reentry criminal statute at issue here is solely punitive and wholly different from removal proceedings. *Compare* 8 U.S.C. §1326(criminal) to removal proceedings pursuant to 8 U.S.C. §1182 ("inadmissible aliens") and 8 U.S.C. §1227 ("deportable aliens"); *see also Regents*, 140 S. Ct. at 1896 ("claims arising from 'action[s]' or 'proceeding[s] brought to remove an alien,' is inapplicable where, as here, the parties do not challenge any removal proceedings"). Mr. Viveros-Chavez is currently incarcerated pursuant to criminal charges brought under the illegal reentry statute and, if convicted, faces imprisonment up to 20 years. (ECF No. 10). The instant criminal proceedings will not determine whether Mr. Viveros-Chavez is eligible to apply for any immigration benefits nor

whether he is ultimately removed from the United States. Thus, the government's attempt to categorize Section 1326 primarily as an "immigration regulation" rather than as a criminal statute is factually inaccurate and legally unavailing.

**B.    None of the Cases Relied Upon by The Government Support Its Contention that Rational-Basis Review Applies to an Equal Protection Challenge of a Criminal Statute.**

The cases relied upon by the government are either irrelevant or actually support Mr. Viveros-Chavez's equal protection challenge. A substantial part of the government's response relies on *Fiallo v. Bell*, 430 U.S. 787 (1977), for the erroneous proposition that a lesser level of scrutiny should apply to Mr. Viveros-Chavez's equal protection challenge. However, *Fiallo* is distinguishable from this case for two main reasons. First, the statute at issue in *Fiallo* regulated the admission or exclusion of immigrants. More specifically, the statute's sole purpose was to regulate the "admission of aliens" while declining "to provided a preferential immigration status" to some. *Fiallo*, 430 U.S. at 787, 791. In other words, the statute simply "determine[d] which classes of aliens may lawfully enter the country." *Id*. at 794. All of the quotes cited by the government regarding deference to Congress related only to the context admitting or excluding immigrants abroad. As explained above, however, the illegal reentry statute at issue here is purely a criminal, punitive law which does not regulate whether immigrants should be allowed into the United States. Second, Fiallo's challenge was not based on racial discrimination. The challenge in *Fiallo* involved a natural father of a child born out of wedlock abroad. *Id*. at 787. In fact, Fiallo simply argued that the statute should "furthe[r] [a] legitimate governmental interest." *Id*. 799. That is because gender or legitimacy classifications are only quasi-suspect and, thus, subject to intermediate scrutiny. *Craig v. Boren*, 429 U.S. 190, 197(1976).

-7-

Similarly, the government's reliance on *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), is misplaced. That case related to former President Trump's Executive Order suspending the entry of "nationals from seven countries—Iran, Iraq, Libya, Somalia, Sudan, Syria, and Yemen—that had been previously identified by Congress or prior administrations as posing heightened terrorism risks." *Trump v. Hawaii*, 138 S. Ct. at 2403. The Supreme Court simply determined that the statute, Section 1182(f), "grants the President broad discretion to suspend the entry of aliens into the United States" and that "foreign nationals seeking admission have no constitutional right to entry." *Trump v. Hawaii*, 138 S. Ct. at 2408, 2419 (although the Court recognized that a different judicial inquiry would be warranted where other interests are involved). Thus, *Trump v. Hawaii* is distinguishable from this case for two main reasons: (1) this case deals with a criminal statute which necessarily entails the deprivation of liberty as opposed to an executive order dealing solely with the entry of foreign national into the United States; and (2) unlike foreign nationals abroad, all persons within the territorial jurisdiction of the United States are entitled to the constitutional protections of the Fifth Amendment.

The government erroneously cites to *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200 (1995), for the misguided proposition that rational-basis review should apply to this case. Res. Br. 11. However, *Adarand* held exactly the opposite of what the government argues. *Adarand* involved a subcontractor who lost a bid pursuant to a federal law which incentivized contracts with socially and economically disadvantaged subcontractors; those characteristics could be presumed from the individual's race. The Supreme Court reasoned that "the standard of review under the Equal Protection Clause is not dependent on the race of those burdened or benefited by a particular classification," and that the single standard of review for racial classifications should be "strict scrutiny."

-8-

*Id*. at 222. Accordingly, the Supreme Court held "that all racial classifications, imposed by whatever federal, state, or local governmental actor, must be analyzed by a reviewing court under strict scrutiny" and remanded the case for the application of that standard. *Id*. at 227.

The government's passing references to *Matthews v. Diaz*, 426 U.S. 67 (1976), are equally unavailing. *Matthews* considered whether some residents were entitled to the benefit of "supplemental medical insurance" based on the length of their residence. *Id*. Notably, the petitioners in *Mathews* were not alleging racial animus. *Id*. 67-68. The Supreme Court determined that their lack of eligibility for a benefit did not equate to the "deprivatio[n] . . . of liberty or property in violation of the Due Process Clause of the Fifth Amendment." *Id*. at 68. The Supreme Court reiterated that "[t]he Fifth Amendment, as well as the Fourteenth Amendment, protects every one of these [non-citizens] from deprivation of life, liberty, or property without due process of law" and emphasized that "*[e]ven one whose presence in this country is unlawful*, involuntary, or transitory *is entitled to that constitutional protection*." *Id*. at 77 (emphasis added). Thus, *Matthews* underscores that non-citizens, even when undocumented, are entitled to the equal protection guarantee of the Fifth Amendment.

The government erroneously asserts that rational basis review should apply to "an equal-protection challenge involving a federal *criminal* statute." Res. Br. 14 (emphasis added). There is no legitimate support for this assertion. The cases cited by the government are either taken out of context or relate to instances in which racially discriminatory intent was not pleaded. *See United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000)(A challenge to a terrorism statute in which no racially discriminatory intent was pleaded); *Robledo-Gonzales v. Ashcroft*, 342 F.3d 667 (7th Cir.

2003)(*habeas corpus* collateral challenge to a non-citizen's ineligibility for a discretionary immigration benefit under repealed Section 212(c) of the INA, no racially discriminatory intent was pleaded).

It is also worth noting that most of the district courts which have considered equal protection challenges to the illegal reentry statute based on racial animus have applied the strict scrutiny standard as set forth in *Arlington Heights* contrary to what the government argues.[1] To be sure, rulings by other district courts are not binding upon this court. "Binding" authority only comes from the Supreme Court or the Court of Appeals in which a given district court sits. *United States v. Glaser*, 14 F.3d 1213, 1216 (7th Cir. 1994). Even decisions of other district courts in the same district are not "binding," although they may be persuasive to the degree they are well reasoned. *Van Straaten v. Shell Oil Products Co. LLC*, 678 F.3d 486, 490 (7th Cir. 2012); *Townsel v. DISH Network L.L.C.*, 668 F.3d 967, 970 (7th Cir. 2012). Neither the Seventh Circuit nor the Supreme Court have considered the specific issue presented by Mr. Viveros-Chavez and, thus, there is no binding authority upon this Court. In fact, as far as this district is concerned, this Court will be one of the first ones to complete

---

[1] *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1001 (D. Nev. 2021)(applied *Arlington Heights*); *United States v. Machic-Xiap*, 552 F. Supp. 3d 1055, 1072 (D. Or. 2021)(applied *Arlington Heights*); *United States v. Wence*, No. 3:20-CR-0027, 2021 WL 2463567, at *2 (D.V.I. June 16, 2021) (applied *Arlington Heights*); *United States v. Munoz-De la O*, No. 2:20-CR-134-RMP-1, 2022 WL 508892 (E.D. Wash. Feb. 18, 2022)(same); *United States v. Ponce-Galvan*, No. 21-cr-2227-H-1, 2022 WL 484990 (S.D. Cal. Feb. 16, 2022)(same); *United States v. Hernandez-Lopez*, No. H-21-440, 2022 WL 313774 (S.D. Tex. Feb. 2, 2022)(same): *United States v. Sifuentes-Felix*, No. 21-cr-337-WJM, 2022 WL 293228 (D. Colo. Feb. 1, 2022)(same); *United States v. Sanchez-Felix*, No. 21-cr-00310-PAB, 2021 WL 6125407 (D. Colo. Dec. 28, 2021)(same); *United States v. Gutierrez-Barba*, No. CR-19-01224-001-PHX-DJH, 2021 WL 2138801 (D. Ariz. May 25, 2021)(same); *United States v. Medina Zepeda*, No. CR 20-0057 FMO, 2021 WL 4998418 (C.D. Cal. Jan. 5, 2021)(same).

briefing on the motion to dismiss and to hold a status hearing. Consequently, this Court is well positioned to be the first one to decide the issue in this district.

## II. The Illegal Reentry Statute Fails Under the *Arlington Heights* Standard.

The illegal reentry statute, 8 U.S.C. §1326, fails under the *Arlington Heights* standard because of its racially discriminatory intent. The government asks this Court to ignore the historical background, events, and legislative comments leading up to the conception and original enactment of the illegal reentry statute in contravention of *Arlington Heights*. However, under *Arlington Heights* the Court must consider, at the very least, the (1) the historical background surrounding the law, (2) the law's legislative history, (3) the specific sequence of events leading to the challenged law as well as departures from the normal procedure, and (4) whether the law bears more heavily on one race than another. *Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 266-268 (1977). The Supreme Court explained that these factors are non-exhaustive and, thus, this Court is free to look at additional indicators of racial animus. *Id.*

### A. The *Arlington Heights* Factors Demonstrate The Illegal Reentry Statute's Racially Discriminatory Intent.

"As a general rule, statements of public officials bear on whether a 'discriminatory purpose was a motivating factor' for government action" when the statements were made "by members of the decisionmaking body." *Cook Cty., Illinois v. Wolf*, 461 F. Supp. 3d at 790 (citing to *Arlington Heights*, 429 U.S. at 268). Both explicitly racist statements and statements that might not be "overtly discriminatory" but represent a "camouflaged" "desire to discriminate against a racial minority" are relevant to this inquiry. *Arce v. Douglas*, 793 F.3d 968, 978 (9th Cir. 2015) (quoting *Smith v. Town*

-11-

*of Clarkton*, 682 F.2d 1055, 1064, 1066 (4th Cir. 1982). As previously discussed in Mr. Vivero-Chavez's motion pages 7 to 18, the discriminatory intent leading to the conception and enactment of the statute criminalizing illegal reentry was expressly discussed by the legislators repeatedly. For example, a sponsoring legislator expressed his intent as follows:

> Unless we stop them right soon we will have in 15 or 20 years a ***great race problem*** in all of the southwestern part of the United States. The ***Mexican peon*** will fill the fertile valleys of California and Arizona and the rich plains of Texas, crawling further north every year. ***We must stop it.***

70 Cong. Rec. 5200 (1929)(emphasis added) attached hereto as Defendant's Exhibit W. At every turn[2], the sponsoring legislators spoke of Mexican and Latinx migration as presenting a "great race problem" to white supremacy demonstrating that the purpose of the statute was racially discriminatory. *Id.*; *see also* Ex. D at H3619 (Senator Box stating that the "importation" of Mexicans was "raising a serious race question"). For years, the congressional proponents of the law perpetuated the repugnant and ludicrous notion that Mexican and Latinx laborers were racially inferior and pest like[3] resulting in the criminal statute as a way to "stop them" and the "great race problem" they were erroneously perceived to present. *Id.*

　　While the government's brief in this case glosses over the evidence demonstrating egregious racially discriminatory intent imbued in the conception and enactment of the illegal reentry statute, the

---

[2]The bill was unequivocally introduced to deal with immigrants who the legislators viewed as "undesirable aliens" due to their race. The government asserts that the original title of the Act of 1929- *Undesirable Aliens Act of 1929-* should not be considered because its name was *later* changed. But that does not change the legislative intent that the bill was to deal with the racially "undesirable aliens."

[3]Secretary of Labor James Davis often referred to Mexican immigrants as "rat type" or "rat men." Hans P. Vought, *The Bully Pulpit*, 174-75 (2004).

-12-

government as a party has previously conceded the existence of such an intent.  *United States v.*

*Carrillo-Lopez*, 555 F. Supp. 3d 996, 1007 (D. Nev. 2021)("The government ultimately conceded

that discriminatory intent motivated the passage of the Act of 1929")[4].  This Court should be wary of

the government's attempt to ignore the existence of racially discriminatory intent which it previously

conceded.  *See Briscoe v. United States*, 181 A.3d 651, 658 (D.C. 2018)(relying in part on "the

government's previous concession" to decide an issue).

    The government erroneously asserts that the statute's reenactment in 1952 was the result of a

lengthy study for the proposition that there was no discriminatory intent.  Res. Br. 19.  This assertion is

completely meritless.  The 1950 senate report was chaired by the Nevada Senator Pat McCarran,

known as a racist and white supremacist,  yielding a racist report. *See* Ex. A & B.  The report's

introduction categorized people based on race and was particularly disparaging to the Mexican and

Latinx individuals throughout. S. Rep. 18-1515 attached hereto as Defendant's Exhibit X. The report

sought to perpetuate the false notion that Mexican and Latinx immigrants were not intelligent enough to

assimilate to "Anglo-American" culture. Ex. X, S. Rep. 18-1515 at 150-52.  By the time the

McCarran-Walter Act[5]  was debated in 1952, the damaged was done; racists notions against Mexican

and Latinx immigrants had been perpetuated for decades.  The animus against Mexicans was so

ingrained in the system and society that for almost a decade after the original enactment of the illegal

reentry statute, authorities at all levels "targeted persons of Mexican ancestry" for removal even when

---

    [4]The court inquired – "so you agree that they've offered enough evidence to demonstrate that
the 1929 enactment stems from racial animus under *Arlington Heights*"—to which the government's
counsel responded, "Yes, your Honor." *Carrillo-Lopez*, 555 F. Supp. 3d at 1007 fn. 17.

    [5]The McCarran-Walter Act was codified as the Immigration and Nationality Act ("INA").

they were citizens or lawful permanent residents of the United States. *See* Ex. B at 13; *see also* Ex. Q. This resulted in over a million American citizens being forcibly removed to Mexico because of their race. *Ibid*. Despite knowledge of the horrors caused by white supremacy during the Holocaust, it was acceptable to be hateful and racist towards Mexicans leading up to and *during* the 1952 congressional debates. *See, e.g.,* Ex. Y, 82 Cong. Rec., Vol. 98, at 5773-74 (1952)(Sen. George stating: "Mr. President, I hope the time has not come when one must apologize for being a *hateful* Anglo-Saxon.")(emphasis added). Thus, contrary to what the government asserts, the 1950 report provides additional evidence of racial animus for the statute's reenactment.

Next, the government erroneously asserts that the legislative history leading up to the 1952 reenactment was largely free of racist "expressions." Res. Br. 19. The government's assertion is demonstrably false. The use of the racial epithet "wetback" was prevalent. "Wetback" is "used as an *insulting and contemptuous* term for a Mexican who enters the U.S. illegally" and considered "extremely disparaging and offensive." (https://www.merriam-webster. com/dictionary/wetback) (https://www.dictionary.com/browse/wetback)(Last visited April 28, 2022). The first known used of the term "wetback" dates back precisely to the 1920s when the eugenists began peddling abhorrent notions about Mexican laborers due to their race. *Ibid*. In fact, just a couple of months prior to the passage of the McCarran-Walter Act (or INA), Congress passed what it nicknamed the "Wetback Bill." "[T]he Wetback Bill evidences discriminatory motive simply in its use of the racial epithet 'wetback'"but underscored the racial animus during its 1952 congressional debate where "[t]he Mexican undocumented entrants [were] regularly referenced as wetbacks." *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1015 (D. Nev. 2021). Even the case cited out of context by

-14-

the government finds: "The nonchalance with which Congress used "wetback" near the time of the

INA's passage (even if not during debates expressly about § 1326) is further evidence that at least

some members of Congress harbored racial animus toward immigrants from Latin America." *United*

*States v. Machic-Xiap*, 552 F. Supp. 3d at 1074. Most notably, neither the Wetback Bill nor the

INA criminalized similar conduct by violators of different racial demographics such as individuals

overstaying their visas or the employers hiring the undocumented laborers. Thus, the Wetback Bill and

the INA continued to further the original objective of the illegal reentry statute which was using

Mexicans and Latinx people as disposable labor who could be easily deported and criminally

prosecuted to prevent their permanent settlement and degradation of the white racial stock of the

United States. *See* Ex. A & B. Thus, continued racial animus permeated the 1952 reenactment as

evidence by the prevalence of racial slurs in the legislative history.

The government also attempts to explain away other strong indicators of racial intent underlying

the illegal reentry statute but those attempts fail. For example, the government notes that the pre-

examination procedure which was established to favor undocumented Canadians over Mexicans due to

their race "pre-dated" the reenactment of Section 1326. Res. Br. 20. This assertion is irrelevant,

however, because *Arlington Heights* mandates for the "historical background" and "sequence of

events leading up" to the enactment of the statute to be considered. *Arlington Heights*, 429 U.S. at

266-268. A two decade long procedure under which undocumented Canadians (of mostly European

descent) were favored over Mexican ones, particularly at a time in which both groups were entering the

country in similar numbers, is certainly a relevant historical even which demonstrates a racially

discriminatory intent. The government falsely calls it the "1924 pre-examination process" but the

-15-

procedure was enacted in 1935 and used until 1959, postdating the reenactment of Section 1326. *See* Res. Br. 21 *but see* Ex. B at 22. Contrary to what the government falsely claims, "*[i]mmigrants from Mexico were explicitly excluded* from this program in 1945 and even prior to this it was never applied equally*" because the process had to be completed in Canada. Ex. B at 21-22 (emphasis added). The process could *not* be completed in Mexico. *Id*. Moreover, the assertion that the pre-examination procedure was conceived in the mid 1920s, at around the same time as the illegal reentry statute itself, further evidences that since the inception of the statute legislators were discriminatorily attempting to create a loop-hole for white undocumented entrants. *Id*. The legislators succeeded in their racially discriminatory purpose by enacting the pre-examination procedure soon after criminalizing illegal reentry. At the same time, the enforcement of the illegal reentry statute focused primarily on Mexican laborers at the southern border because of their race. Ex. B at 22.

The government also erroneously argues that the few changes made to Section 1326 in 1952 demonstrate that it was reenacted with tailored "attention." Res. Br. 22. This would only support Mr. Viveros-Chavez's argument because the main change to Section 1326- adding the language "found in"- was meant to simplify the prosecution of Mexican laborers pejoratively called wetbacks who were "found in" the United States. Again, the government tries to explain away the use of the racial slur "wetbacks" in a letter by Deputy Attorney General Peyton Ford expressing support for the addition of the language "found in" to Section 1326. Of course the government does not actually quote the letter but simply argues the slur was "wholly unrelated." Res. Br. 22 fn. 11. The letter was addressed to Pat McCarran, who was the chairman of the judiciary committee and the sponsor of the INA. Ex. AA. The overall purpose of the letter was to provide McCarran with analysis on whether certain provisions

-16-

within the INA would enhance the inadmissibility, deportation, and prosecution of undesirable "aliens," most notably "wetbacks." *Ibid*. Regarding the addition of the language "found in," Ford stated: "This change would overcome the inadequacies of the existing law which have been observed in the prosecution of those cases in which it is not possible for the Immigration and Naturalization Service to establish the place of reentry, and hence the proper venue, arising in prosecutions of deported aliens under the 1929 act." *See* Ex. AA at 7. Then, after quoting a report from President Truman's Commission on Migratory Labor, Ford states that "[s]tatutory clarification on the above points *will aid in taking action against the conveyors and receivers of the wetback*s." *Id*. at 9 (emphasis added). The intent of these statements is clearly to take action against the "wetbacks" (not their undocumented Canadian counterparts or other white immigrants). The use of the racist slur "wetback" "evidences the racial environment and rhetoric in 1952, even among high-ranking government officials and committees, specifically with regard to Mexican and Latinx people" and " it is also significant considering that Ford's recommendation was the only recommendation adopted by Congress as to Section 1326." *United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996, 1014 (D. Nev. 2021). "Not only does Ford's letter employ racially derogatory language, but it advises Congress to expand the grounds for deportation." *Id*. Moreover, Pat McCarran had expressed the intent behind the change stating "[w]e changed the language a little *to meet the wetback situation*, which applies to the *southern section of the country*." Ex. Y, 82 Cong. Rec. Vol. 98, at 5320. Thus, the "attention" given to change was intended to enhance the statute's discriminatory purpose against Mexican immigrants.

      The government's reliance on the passage of time and the assertion that it was a new Congress which reenacted the illegal reentry statute in 1952 is misplaced. In fact, thirty (30) congressman from

the 1929 Congress remained in office in 1952, many of them holding positions of authority. Ex. X. For example, Alben Barkley who was a Senator for Kentucky in the 1929 Congress was now Vice President and, thus, President of the Senate. Senator Walter George reminded his congressional colleagues that when he voted for the 1920s immigration laws was with the intent to "preserve something of homogeneity of the American people." Ex. Y, 82 Cong. Rec., Vol. 98, at 5774 (1952). Similarly, Representative Jenkins praised colleagues for maintaining the 1920s immigration laws he promulgated by stating that the House debate "ha[d] been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirable *just as it is their wish now.*" Ex Z, 82 Cong. Rec., Vol. 98, at 4442 (emphasis added). Thus, the racially discriminatory intent of the 1952 Congress remained the same.

Lastly, the government erroneously argues that President Truman vetoing the INA as a racist law is inconsequential because he did not specifically cite to Section 1326. However, Truman's veto is further evidence that Congress *chose* to perpetuate the racial animus imbued in the INA, particularly the provisions conceived in the 1920s such as Section 1326. Truman's veto statement discussed two types of provisions broadly; the provisions he found permissible and the ones he found reprehensible. *See* President Truman's 1952 Veto Statement, attached hereto as Exhibit BB. When discussing the reprehensible provisions, Truman focused on the limits imposed to immigration from certain countries, the broadening of the grounds for deportation, the curbing of discretionary relief, and the excessive punitiveness of the law. Ex. BB. In doing so, "President Truman expressed dismay that so much of the INA 'would continue, practically without change' discriminatory practices first enacted in 1924 and 1929." *Carrillo-Lopez*, 555 F. Supp. at 1012. President Truman expressed the influence of the

-18-

1920s over the INA as follows:

> In no other realm of our national life are *we so hampered and
> stultified by the dead hand of the past*, as we are in this field of
> immigration. *We do not limit our cities to their 1920 boundaries*--we
> do not hold our corporations to their 1920 capitalizations-we welcome
> progress and change to meet changing conditions in every sphere of life,
> except in the field of immigration. . . *The time to shake off this dead
> weight of past mistakes is now*.

Ex BB at 5 (emphasis added). Congress failed to heed President Truman's call to fix the racist

mistakes of the past including Section 1326.

In sum, the government's approach of asking this Court to ignore all of the relevant factors set

forth in *Arlington Heights* is impermissible. Each of those factors demonstrates continued racial

animus leading to the 1952 reenactment of Section 1326. As the Supreme Court stated "as to the

[racial group], it seems to us must be apparent to every citizen of [the city] who has been here long

enough to be familiar with *the course of an active and aggressive branch of public opinion and of

public notorious events. Can a court be blind to what must be necessarily known to every

intelligent person in the state?*" *Yick Wo v. Hopkins*, 118 U.S. 356 (1886). In *Yick Wo*, the

Supreme Court answered that questioned in the negative and struck down a criminal law as

unconstitutional under the equal protection guarantee of the Fifth Amendment acknowledging the racial

animus underlying it. This Court should do the same particularly because consideration of these factors

is expressly mandated by *Arlington Heights*.

**B.    Supreme Court Precedent Dictates That the Discriminatory Intent Behind the
Act of 1929 is Imputed Upon Section 1326.**

Contrary to what the government argues, the evidence of racial animus leading to the

-19-

reenactment of the illegal reentry statute need not be considered in isolation. While Mr. Viveros-

Chavez has shown that racial animus was a motivating factor for the statute's 1952 reenactment, the

racially discriminatory intent of the of the successor is also imputed upon the predecessor unless there is

a "deliberate process to remove any such taint." *Abbott v. Perez*, 138 S. Ct. 2305, 2318 (2018).

As further argued below, this Court must take into consideration the racially discriminatory intent which

led to the illegal reentry statute's conception and original enactment as evidence of unconstitutionality.

The government fails to engage with the similarities between this case and *Hunter v.*

*Underwood*, 471 U.S. 222 (1985), a case in which the Supreme Court applied *Arlington Heights* to

hold that a facially neutral provision in Alabama's constitution violated equal protection because "[its]

original enactment was motivated by desire to discriminate against blacks on account of race and [the]

provision had had racially discriminatory impact since its adoption." *Hunter*, 471 U.S. at 222, 227.

Unable to distinguish *Hunter* on the merits, the government erroneously argues in a footnote that the

evidence presented by Mr. Viveros-Chavez "is not nearly as compelling as the evidence in *Hunter*."

Res. Br. 26 fn. 12. That argument is inaccurate. The Supreme Court noted that "[t]he evidence of

legislative intent available to the courts below consisted of the proceedings of the convention, several

historical studies, and the testimony of two expert historians. Having reviewed this evidence, we are

persuaded that the Court of Appeals was correct in its assessment." *Id*. at 229. The evidence

presented by Mr. Chavez-Viveros in support of his challenge is very similar to *Hunter*; the legislative

record, congressional debates, reports on relevant historical events, several studies regarding the

statute's impact, and the testimony of two leading experts on the subject. It is also worth noting that the

Supreme Court rejected Alabama's arguments that somehow "the succeeding 80 years had

legitimated" the provision as well as other post-hoc rationalizations for the provision. *Id.* at 233. This Court should so the same.

The government's attempt to distinguish the instant case from *Abbott v. Perez*, *supra.*, is grossly misguided. *Abbot* is relevant to this case because it acknowledges that when a law is tainted by racially discriminatory intent, the legislature has to engage in a "deliberative process to remove any such taint" if the law is to be reenacted. *Abbot*, 138 S. Ct. at 2318. In *Abbot*, the Supreme Court considered whether a 2013 Texas redistricting plan was racially discriminatory gerrymandering. *Id.* A completely different plan from 2011 had been challenged as discriminatory and never enacted. *Id.* The plan ultimately adopted in 2013 was not developed by the Legislature but by the court in an effort to avoid discrimination. *Id.* The Supreme Court held that most provisions of the 2013 plan were not discriminatory because the legislature's "plans that had been developed by the Texas court pursuant to instructions from [the Supreme] Court 'not to incorporate ... any legal defects.'" *Id.* at 2325 (internal quotations omitted). In so holding, the Supreme Court explained:

> [W]e do not suggest either that the intent of the 2011 Legislature is irrelevant or that the plans enacted in 2013 are unassailable because they were previously adopted on an interim basis by the Texas court. *Rather, both the intent of the 2011 Legislature and the court's adoption of the interim plans are relevant to the extent that they naturally give rise to—or tend to refute—inferences regarding the intent of the 2013 Legislature*. They must be weighed together with any other direct and circumstantial evidence of that Legislature's intent.

*Id.* at 2326–27 (emphasis added). Thus, *Abbot* stands for the principal that the legislature's intent for the predecessor law is relevant in two ways. If the successor law is not a reenactment, then it is relevant to the extent that it gives rise to inferences regarding the successor's intent. If the successor

law is a reenactment, then it is relevant because the successor is tainted by the previous discriminatory intent unless purged of any taint through a deliberative process. Section 1326 is a reenactment and, thus, Congress's discriminatory intent behind the Act of 1929 is relevant particularly because Congress did not engage in a deliberative process to purge the statute from any such discrimination prior to its reenactment.

The government's attempt to distinguish *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020), is equally unavailing. In *Ramos*, the Supreme Court considered the constitutionality of nonunanimous verdicts abrogating *Apodaca v. Oregon*, U.S. 406 U.S. 404 (1972). The Supreme Court rejected *Apodaca* precisely because it failed to "accoun[t] [for] the racially discriminatory reasons that Louisiana and Oregon adopted their peculiar rules in the first place." *Ramos*, 140 S. Ct. at 1401. The sentence cited by the government relates to an argument by the dissent, not to the holding by the majority. Res. Br. 31. The Supreme Court's majority explained:

> The dissent chides us for *acknowledging the racist history of Louisiana's and Oregon's laws*, and commends the *Apodaca* plurality's decision to disregard these facts. But if the Sixth Amendment calls on judges to assess the functional benefits of jury rules, as the *Apodaca* plurality suggested, *how can that analysis proceed to ignore the very functions those rules were adopted to serve?* The dissent answers that Louisiana and Oregon eventually recodified their nonunanimous jury laws in new proceedings untainted by racism. But that cannot explain *Apodaca*'s omission: The States' proceedings took place only after the Court's decision. *Nor can our shared respect for 'rational and civil discourse' supply an excuse for leaving an uncomfortable past unexamined.*

*Id.* at 1401 (internal citations omitted)(emphasis added). Thus, *Ramos* establishes that the discriminatory intent behind an original law is relevant when determining the constitutionality of a

successor law. *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246, 2273 (2020)("The provision's 'uncomfortable past' must still be 'examined.'")(quoting *Ramos*, 140 S. Ct., at 1396 n.44.).

*Abbott*, *Ramos*, and *Espinoza* provide very recent Supreme Court precedent mandating this Court review the racially discriminatory intent leading to the conception and original enactment of the illegal reentry statute as evidence of unconstitutionality under the equal protection guarantee of the Fifth Amendment.

**C.      Section 1326 Continues to Have a Disparate Impact on Mexican and Latinx Defendants.**

The government erroneously argues that the disparate impact that Section 1326 has had and continues to have on Mexican and Latinx defendants is "not persuasive evidence that Congress enacted the statute with racial animus." Res. Br. 32. But the government's argument misapprehends the *Arlington Heights* standard and defies common sense. "A racially discriminatory intent [is] *evidenced by such factors as disproportionate impact*, the historical background of the challenged decision, the specific antecedent events, departures from normal procedures, and contemporary statements of the decisionmakers." *Arlington Heights*, 429 U.S. at 253 (emphasis added). "The test for disparate impact only requires evidence that [Section 1326] *'bears more heavily on one race than another.'*" *Arlington Heights*, 429 U.S. at 265-68 (emphasis added). Thus, disparate impact is a persuasive factor which evidences a racially discriminatory intent.

The government erroneously relies on *Regents*, *supra.*, for the proposition that disparate impact is irrelevant. In *Regents*, however, the Supreme Court's plurality opinion noted that "[p]ossible evidence" of a racially discriminatory intent can be shown through "disparate impact on a particular

-23-

group" among the other factors set forth in *Arlington Heights*.[6]  *Regents of the Univ. of California*,

140 S. Ct. at 1915.

The government does not and cannot dispute that nearly everyone prosecuted under Section

1326 is Mexican or Latinx.[7] However, the government erroneously asserts that since a large percentage

of all "deportees" come from Latin America, the disparate impact is to be expected.  Res. Br. 32. That

is circular logic.  Congress's concern was the large number of Mexican immigrants crossing the

southern border and, thus,  created a law precisely to target them. *See Arthur v. Nyquist,* 573 F. 2d

134, 144-45 (2nd Cir. 1979)(finding discriminatory intent when "plan resulted in the school's having a

student population of over 99% black was selected"); *see also Gomillion v. Lightfoot*, 364 U.S. 339

(1960)(Alabama law affecting 99% of black voters unconstitutional based on disparate impact alone).

Moreover, the fact that most "deportees" are from Latin America does not tell us anything about the

immigrants who are not being targeted for deportation.  There are thousands of individuals hailing from

Europe, Asia, and Africa who overstay their visas but are not being targeted for deportation in the same

manner as Mexican or Latinx immigrants.

Moreover, the government ignores evidence of the disparate impact the illegal reentry statute

---

[6]While *Regents* determined  the "disparate impact of the rescission on Latinos from Mexico, who represent 78% of DACA recipients" was alone insufficient to prove discriminatory intent in that case, it acknowledged its relevance in the *Arlington Heights* analysis. *Id*. at 1915-16. Unlike in this case, the petitioners in *Regents* did not have access to the legislative record  and other crucial pieces of evidence. Nonetheless, the Supreme Court held that manner in which DACA was rescinded was arbitrary and capricious.

[7]Recent statistics show that approximately 99.1% of all defendants prosecuted under Section 1326 are Mexican or Latinx. *See* Quick Facts: Illegal Reentry Offenses attached hereto as Defendant's Exhibit CC (also available at https://www.ussc.gov/sites/default/files/pdf/research-and-publications/quick-facts/Illegal_Reentry_FY20.pdf)(last visited May 2, 2022).

has had on Mexican and Latinx individuals such as the disparate way in which the statute was applied between Mexicans and Canadians or the forced removal from the United States to Mexico of over one million U.S. citizens solely because of their race. *See* Ex B at 22, *see also* Ex Q.

It is important to note that Section 1326 remains a tool for racial discrimination even today. For example, former President Trump incited racial animus and fear against Mexican immigrants by peddling the false generalization that they were "bringing drugs. They're bringing crime. They're rapists"[8] as a campaign strategy. Thereafter his administration created the zero-tolerance policy toward illegal entry and reentry which caused the number of Section 1326 prosecutions to rise by nearly 40% to 22,077. *See* Ex. P & CC. Of those prosecuted 99.1% were Mexican or Latinx individuals.

### III. The Government Has Not Shown That The Illegal Reentry Statute Would Have Been Enacted Absent Discriminatory Intent.

The government has not met its burden to show that the illegal reentry statute would have enacted absent a discriminatory intent. Because Mr. Viveros-Chavez has shown that the illegal reentry statute was enacted with a discriminatory intent and that it continues to have a disparate racial impact, the government has the burden to show that the statute would have been passed "even had the impermissible purpose not been considered." *Arlington Heights*, 429 U.S. at 266-68.

The government erroneously argues it can meet its burden for two reasons: (1) valid immigration objectives exist for the law; and (2) that minor amendments have somehow cured the law from racial animus. First, solely because Congress has continued to punish illegal reentry since 1929

---

[8](https://www.washingtonpost.com/news/the-fix/wp/2017/06/16/theyre-rapists-presidents-trump-campaign-launch-speech-two-years-later-annotated/)(Last visited May 2, 2022).

does not mean the law would have been conceived, much less enacted, without racially discriminatory intent. The government states that Congress has the "authority" to enact laws but has not pointed at a single piece of evidence demonstrating Congress would have chosen to exercise that authority in the same manner absent racist considerations. In fact, there are many other immigration violations such as overstaying a visa (which is more common than illegal reentry) but are not subject to criminal prosecution.

Second, as previously discussed, neither reenactment much less the grammatical or placement amendments referenced by the government cure Section 1326 from racially discriminatory intent absent a deliberative process which never occurred. *Abbot*, 138 S. Ct. at 2318. There is no legitimate argument that every comma or period changed in a statute reformulates the intent behind it. Minor grammatical or placement changes tell us nothing about whether Congress would have conceived much less enacted Section 1326 absent racism.

## CONCLUSION

Mr. Viveros-Chavez has presented substantial evidence demonstrating that racial discrimination was a motivating factor behind the illegal reentry statute as well as a continued disparate racial impact from the statute's inception until today. However, the Defendant believes an evidentiary hearing would allow the record as a whole to be further developed. In light of the foregoing, the Court should hold that Section 1326 violates the equal protection guarantee of the Fifth Amendment and is, therefore, unconstitutional.

Dated:   Chicago, Illinois
        March 2, 2022

Respectfully submitted,


*/s/Carla I. Espinoza*_____
**CARLA I. ESPINOZA**
*Attorney for Defendant*
**ALFREDO VIVEROS-CHAVEZ**


**CARLA I. ESPINOZA**
Attorney at Law
Chicago Immigration Advocates Law Offices
208 South LaSalle Street, Suite 1602
Chicago, Illinois 60604
(312)704-8000
Ill. Atty. Reg. No. 6308967

**CERTIFICATE OF SERVICE**

I hereby certify that on March 2, 2022, I electronically filed the foregoing document with the Clerk of

the Court for the United States District Court for the Northern District of Illinois, Eastern Division, by using

the CM/ECF system. All parties to this case are registered CM/ECF users and will be served through the

CM/ECF system.

Dated: March 2, 2022                       Respectfully submitted,
       Chicago, Illinois


                                       /s/ Carla I. Espinoza
                                  **CARLA I. ESPINOZA**
                                  *Attorney for Defendant*
                                  **ALFREDO VIVEROS-CHAVEZ**

**CARLA I. ESPINOZA**
Attorney at Law
Chicago Immigration Advocates Law Offices
208 South LaSalle Street, Suite 1602
Chicago, Illinois 60604
(312) 704-8000
Ill. Atty. No. 6308967