# EXHIBIT W

70 Congressional Record - House,
March 3, 1929

**YEAS—39**

| | | |
|---|---|---|
| Barkley | Glass | Nye | Smoot |
| Bayard | Goff | Overman | Steiwer |
| Black | Hale | Pine | Stephens |
| Blease | Harris | Reed, Pa. | Swanson |
| Bratton | Hastings | Robinson, Ark. | Thomas, Okla. |
| Capper | Hayden | Robinson, Ind. | Trammell |
| Caraway | Heflin | Sackett | Tyson |
| Dale | McKellar | Sheppard | Waterman |
| Fletcher | Mayfield | Simmons | Watson |
| George | Moses | Smith | |

**NAYS—36**

| | | |
|---|---|---|
| Bingham | Deneen | Jones | Phipps |
| Blaine | Dill | Kendrick | Ransdell |
| Borah | Edge | Keyes | Schall |
| Brookhart | Fess | King | Shortridge |
| Broussard | Frazier | McMaster | Steck |
| Bruce | Gerry | McNary | Thomas, Idaho |
| Burton | Glenn | Metcalf | Vandenberg |
| Copeland | Greene | Norris | Wagner |
| Couzens | Hawes | Oddie | Walsh, Mass. |

**NOT VOTING—20**

| | | |
|---|---|---|
| Ashurst | Harrison | McLean | Shipstead |
| Curtis | Howell | Neely | Tydings |
| Edwards | Johnson | Norbeck | Walsh, Mont. |
| Gillett | La Follette | Pittman | Warren |
| Gould | Larrazolo | Reed, Mo. | Wheeler |

**RECESS**

The VICE PRESIDENT. On this question the yeas are 39, the nays are 36. The Senate will take a recess until 11 o'clock to-morrow.

Mr. NYE. Mr. President——

Mr. ROBINSON of Arkansas. A point of order. The Senate is in recess.

The VICE PRESIDENT. The Chair declared the Senate in recess until 11 o'clock to-morrow.

Thereupon, at 11 o'clock and 40 minutes a. m., the Senate took a recess until to-morrow, Monday, March 4, 1929, at 11 o'clock a. m.

---

# HOUSE OF REPRESENTATIVES

## SUNDAY, March 3, 1929

### (Legislative day of Saturday, March 2, 1929)

The House met at 10 o'clock a. m., at the expiration of the recess.

**COMMITTEE TO ATTEND THE FUNERAL OF THE LATE HON. ROYAL H. WELLER**

The SPEAKER. The Chair announces the following Members as the committee to attend the funeral of the late Hon. ROYAL H. WELLER:

Hon. JOHN F. CAREW, Hon. GEORGE S. GRAHAM, Hon. HATTON W. SUMNERS, Hon. THOMAS H. CULLEN, Hon. HAMILTON FISH, Jr., Hon. CARROLL L. BEEDY, Hon. MARY T. NORTON, Hon. JAMES M. FITZPATRICK, Hon. J. MAYHEW WAINWRIGHT, Hon. GEORGE H. COMBS, Jr., Hon. CHRISTOPHER D. SULLIVAN, Hon. DAVID J. O'CONNELL, Hon. ANNING S. PRALL, Hon. ANTHONY J. GRIFFIN, Hon. JAMES M. MEAD, Hon. SAMUEL DICKSTEIN, Hon. JOHN J. O'CONNOR, and Hon. PARKER CORNING.

**MESSAGE FROM THE SENATE**

A message from the Senate, by Mr. Craven, its principal clerk, announced that the Senate had passed without amendment bills of the House of the following titles:

H. R. 3047. An act for the relief of J. Edward Burke;

H. R. 10817. An act for the relief of the Merrill Engineering Co.;

H. R. 12502. An act for the relief of John H. and Avie D. Mathison, parents of Charles W. Mathison, deceased;

H. R. 17208. An act to extend the times for commencing and completing the construction of a bridge across the Missouri River at or near Niobrara, Nebr.;

H. R. 17218. An act authorizing the State highway commission, Commonwealth of Kentucky, to construct, maintain, and operate a bridge across the Ohio River at or near Maysville, Ky.;

H. R. 17237. An act to extend the times for commencing and completing the construction of a bridge across the Calumet River at or near One hundred and thirtieth Street, Chicago, Cook County, Ill.;

H. R. 17262. An act authorizing H. L. Cloud, his heirs, legal representatives, and assigns, to construct, maintain, and operate a bridge across the Canadian River, at or near Francis, Okla.;

H. R. 17311. An act to extend the time for completing the construction of a bridge across the Mississippi River at or near Cairo, Ill.;

H. R. 17322. An act to amend the act approved June 22, 1926, entitled "An act to amend that part of the act approved August 29, 1916, relative to the retirement of captains, commanders, and lieutenant commanders in the line of the Navy";

H. J. Res. 355. Joint resolution authorizing the appropriation of the sum of $50,000 to enable the Secretary of State to cooperate with the several Governments, members of the Pan American Union in the undertaking of financing and building an inter-American highway or highways; and

H. J. Res. 434. Joint resolution to appoint HOMER W. HALL a member of the subcommittee of the Committee on the Judiciary, established under House Joint Resolution 431, to inquire into the official conduct of Grover M. Moscowitz, United States district judge for the eastern district of New York.

The message also announced that the Senate had passed bills of the following titles, in which the concurrence of the House is requested:

S. 2127. An act for the relief of William S. Welch, trustee of the estate of the Joliet Forge Co., Joliet, Ill., bankrupt;

S. 5614. An act creating the positions of Undersecretary and two Assistant Secretaries in the Department of Labor; and

S. 5722. An act to provide for the purchase of the use of the Harriman Geographic Code System.

The message also announced that the Senate agrees to the reports of the committees of conference on the disagreeing votes of the two Houses on bills of the following titles:

H. R. 9285. An act to provide for the settlement of claims against the United States on account of property damage, personal injury, or death;

H. R. 15848. An act making appropriations to supply urgent deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide urgent supplemental appropriations for the fiscal year ending June 30, 1929, and for other purposes;

H. R. 17223. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide supplemental appropriations for the fiscal years ending June 30, 1929, and June 30, 1930, and for other purposes;

S. 4385. An act to establish the Teton National Park in the State of South Dakota, and for other purposes; and

S. 4848. An act for the relief of T. L. Young and C. T. Cole.

The message also announced that the Senate agrees to the amendments of the House to bills of the following titles:

S. 4721. An act to extend the times for commencing and completing the construction of a bridge across the Potomac River at or near Great Falls, and to authorize the use of certain Government land;

S. 5598. An act authorizing the acquisition of land in the District of Columbia and the construction thereon of two modern, high-temperature incinerators for the destruction of combustible refuse, and for other purposes; and

S. 5717. An act for the relief of the State of Nevada.

**DECLARATIONS OF INTENTION IN NATURALIZATION PROCEEDINGS**

Mr. JOHNSON of Washington. Mr. Speaker, I call up H. R. 16440, relating to declarations of intention in naturalization proceedings, which has been passed by the Senate with amendments, and move to concur in the Senate amendments.

The SPEAKER. The gentleman from Washington asks unanimous consent to call up H. R. 16440, with Senate amendments. The Clerk will report the bill and the Senate amendments.

The Clerk read the title of the bill.

The Clerk read the Senate amendments.

The SPEAKER. Is there objection?

There was no objection.

The Senate amendments were agreed to.

**J. H. B. WILDER**

Mr. IRWIN. Mr. Speaker, I call up Senate bill 5715, for the relief of J. H. B. Wilder, and ask for its immediate consideration.

The SPEAKER. The gentleman from Illinois asks unanimous consent for the present consideration of Senate bill 5715, which the Clerk will report.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That the Secretary of the Treasury is hereby authorized and directed to pay to J. H. B. Wilder, of Macon, Ga., or his legal representatives, out of any money in the Treasury not otherwise appropriated, such sum as in the judgment of the Secretary of the Treasury, and not in excess of $7,106.96, would represent the approximate interest cost to said J. H. B. Wilder, based upon changed conditions due to the World War, of completing his contract for the construction of the Federal building at Forsyth, Ga.

The SPEAKER. Is there objection?

There was no objection.

Mr. IRWIN. Mr. Speaker, there is an error on page 1, line 8. The word "interest" should be "increased."


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

**5172** CONGRESSIONAL RECORD—HOUSE MARCH 3

The SPEAKER. The gentleman from Illinois offers an amendment, which the Clerk will report.

The Clerk read as follows:

Amendment offered by Mr. IRWIN: On page 1, line 8, strike out the word "interest" and insert in lieu thereof the word "increased."

The amendment was agreed to.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### JOSEPH F. THORPE

Mr. IRWIN. Mr. Speaker, I ask unanimous consent for the present consideration of Senate bill 382, for the relief of Joseph F. Thorpe.

The SPEAKER. The gentleman from Illinois asks unanimous consent for the present consideration of Senate bill 382, which the Clerk will report.

The Clerk read the bill, as follows:

*Be it enacted, etc.*, That there is appropriated, out of any money in the Treasury not otherwise appropriated, the sum of $1,300 to reimburse Joseph F. Thorpe, formerly clerk at the American Legation at Athens, for expenditures incurred in accompanying Garrett Droppers, formerly United States minister to Greece, then under physical disability, to the United States, pursuant to instructions of the State Department.

The SPEAKER. Is there objection?

There was no objection.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### JOHN B. MEISINGER AND NANNIE BELLE MEISINGER

Mr. IRWIN. Mr. Speaker, I ask unanimous consent for the present consideration of Senate bill 4809, for the relief of John B. Meisinger and Annie Belle Meisinger.

The SPEAKER. The gentleman from Illinois asks unanimous consent for the present consideration of Senate bill 4809, which the Clerk will report.

The Clerk read the bill, as follows:

*Be it enacted, etc.*, That sections 17 and 20 of the act entitled "An act to provide compensation for employees of the United States suffering injuries while in the performance of their duties and for other purposes," approved September 7, 1916, as amended, are hereby waived in favor of John B. Meisinger and Nannie Belle Meisinger; that in the administration of the aforesaid act John B. Meisinger and Nannie Belle Meisinger shall be held and considered to be the dependent parents of Dr. Clarence L. Meisinger, who was killed June 2, 1924, by the explosion of a balloon in which he was making a series of upper air observations for the United States Weather Bureau.

The SPEAKER. Is there objection?

There was no objection.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### IMMIGRATION AND NATURALIZATION

Mr. SCHNEIDER. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD on H. R. 349, a bill to amend the naturalization laws.

The SPEAKER. Is there objection to the request of the gentleman from Wisconsin?

There was no objection.

Mr. SCHNEIDER. Mr. Speaker, seldom are we called upon to deal with a measure which affects the assimilation of our alien peoples as directly and as positively as the provisions of the bill we are now considering. This measure, H. R. 349, concerns principally that very large group of persons in the United States who unfortunately have constituted a permanently alien group—who have been compelled by the operation of the naturalization laws to remain alien—not by reason of any desire on their part or because of circumstances within their power to change but simply because of the inflexibility of the naturalization laws.

The naturalization act of 1906 established the system of recording the name of every individual who entered the United States at the port at which he entered. In 1911 the requirement that a certificate of arrival be filed with every petition for naturalization was added. This certificate is to be based upon the records made by immigration officials at the alien's port of entry. It is at this point that thousands of persons experienced difficulty. No official record of their entry could be found. In many cases there had been no record made; many were children when they entered and could not remember the name of the vessel or the port by which they entered. Some, of course, entered improperly; but the fact remains that, regardless of how they entered, they are here and can not be deported. The fact that no official record of their entry could be found prevented the issuance of a certificate of entry to them, and they were consequently barred from final naturalization process.

During the years 1906 to 1911 no record was made of those persons who entered across the Canadian border. A great many people came in that way. These as well as those who have come in since, and, for some reason or other, were not registered at the time they entered, find themselves in the predicament of being barred from citizenship. To remedy that situation I introduced the measure, H. R. 13793. The provisions of my bill enable these people to legalize their status in the United States, and to obtain certificates of entry so as to comply with the naturalization requirements. The measure which we are now considering, however—H. R. 349—passed the House last winter, and in the Senate Committee on Immigration and Naturalization was amended so as to include the substance of my bill H. R. 13793. H. R. 349, as amended, then passed the Senate and has now been returned to the House for concurrence in the amendment. The bill was then placed in the hands of conferees. I was designated as one of the Members of the House to serve on this committee, and it is the report of the managers of the conference that we are now considering.

The process involved in bringing about the situation I have outlined above requires the alien to show that he entered the United States before June 3, 1921; that he has lived in the United States continuously since such entry; that he is a person of good moral character, and that he is not subject to deportation. The certificate which is then issued upon such showing is known as a nunc pro tunc certificate. Its operation is such as to give the person who receives it the status of an immigrant who is legally here. It enables him to fulfill the provisions of the naturalization laws requiring that a certificate of entry be filed with the petition for naturalization.

The alien who applies for such registration of his entry must pay a fee of $20 therefor. The conduct of hearings to determine the eligibility of an alien for registration of his entry entail expense to the Bureau of Immigration; furthermore, many of these aliens obtained admittance to the United States without the payment of head tax. The fee of $20 is therefore considered fair.

### GENERAL ASPECTS OF IMMIGRATION AND NATURALIZATION LEGISLATION

The problem of dealing with this large group of persons who were barred from citizenship has existed for a long time, and is an example of just one of the numerous distressing phases of immigration and naturalization legislation with which Congress must deal from time to time. New aspects of this problem keep coming to the surface continually and each time seem to be larger and more difficult to cope with.

The fact that these laws operate very harshly in many instances can be testified to from the personal experience of a great many of our more recent arrivals. Ellis Island with its attendant horrors is not easily forgotten, but lingers in the minds of most of those who arrived before July, 1924, as a very unpleasant experience. Even before Ellis Island entered into their experience some contact was had with these laws in arranging for passage upon the vessels plying between the homelands and this great land of opportunity.

The process of immigrating to the United States and becoming a citizen is to the minds of most people so complicated and interwoven with detail that few have any very comprehensive idea of the steps which an alien must take to get here, and after he is here, the steps he must take to become a citizen. At this point it is also well to warn persons who have entered the United States as aliens to be certain before leaving the United States to have the proper papers with which to reenter. Should they fail to have proper documents it may be necessary for them to return to the country of their origin and go through a process of years of waiting before they can be readmitted.

### ORDINARY PROCEDURE OF IMMIGRATION

Because the process of immigrating and becoming naturalized is so little understood I am going to state in as brief and clear a way as possible just what steps must be taken by one wishing to come to the United States and join us in citizenship.

In the past—that is, before 1924—the alien went to the steamship company and applied for passage. Before 1921 he had little difficulty in getting it, and making the trip to the United States. Only the limitations in size and number of steamships restrained him. After 1921 the steamship companies were permitted to

bring only a certain number of any nationality to our shores, and in the event they brought more they were obliged to return those in excess at their own expense. Until the immigration act of 1924 went into effect the steamship companies were the only agents who exercised any restraining influence upon immigrants abroad. However, in this discussion it will be best to consider only what is at present the case and not attempt to outline any history of this subject. Suffice it to say, that the present process, which has been in operation since 1924, is very much different from that which was in force before that time and with which most recent arrivals are familiar.

The immigration act of 1924 limits the total number of persons who may come to the United States in a single year to about 164,000 persons, and it establishes a particular number who may come from each individual country. Thus, Germany may send to the United States 51,227 persons each year, Great Britain 34,007, Ireland 28,567, Norway 6,453, and Sweden 9,561. For each of the countries of Europe such a numerical quota was established. That number was arrived at by assigning a quota equal to 2 per cent of the number of foreign-born persons of a particular nationality in the United States at the time of the census of 1890.

To-day the immigrant who does not have a husband, wife, or parent in the United States must, first of all, appear before the American consular officer nearest his home town. From him he receives information as to when he may be able to leave for the United States. There are immense waiting lists in all of the European countries. The lists are so long in certain countries that it will take 30 years before persons who are applying at the present time can be admitted.

The American consul gives each person who applies a place on this list in the order of his application. Within a reasonable time before the turn of a particular person arrives he is notified that his turn has been reached. He must then apply for a visa. Before granting the visa the consul makes a thorough investigation of the applicant's record and orders a physical examination. If the applicant is found physically and mentally qualified and his character appears to be desirable the consul issues a visa to him. From this it will be seen that the consular officer has very large discretionary powers as to whether or not he will admit an individual. Such is the case, and while there have been complaints, it appears on the whole to be working out very well.

The charge for this visa is $10, which must be paid to the American consul. This visa is the only document which the alien requires for admittance to the United States, though the laws of the country from which he comes frequently refuse to permit his departure without a passport. That passport may cost another $10. The charges are not similar for all countries, and as said before not all require them.

After the applicant for admission to the United States has obtained his visa from the American consul there is very little more for him to worry about. He must then obtain transportation, which is readily obtained when he shows his visa to the steamship agents. Armed with the visa given him by the consul he arrives in New York or some other port of arrival, pays his head tax of $8, and proceeds to his destination in the United States uninterrupted by a long wait at Ellis Island, as was the case in years passed.

That, in a very rough way, indeed, outlines the steps one must take in his home country before he can gain admission to the United States. There are numerous other phases which present themselves in many cases, but they are too numerous even to attempt to outline. One of these which I will go into is the distinction between the quota and nonquota visa. All of the discussion above refers exclusively to the quota visa.

NONQUOTA PROCEDURE

A man or woman who has entered the United States and has become an American citizen may, by petitioning the Bureau of Immigration, Department of Labor, Washington, D. C., bring his wife or husband and unmarried children under 21 years of age into the United States without obliging them to wait their turn on the long lists in Europe. After filing his petition with the Bureau of Immigration, if it is approved, that office directs the Department of State to inform the appropriate American consular officer that nonquota status has been allowed to the persons named. However, even in these cases, the consuls are vested with authority to reject such individuals. If they are physically or mentally deficient or have criminal records the consul may refuse to issue visas to them notwithstanding the fact that he is authorized to give them nonquota status.

THE PATH TO CITIZENSHIP

An individual who has undergone these trying experiences in connection with his admission now faces the question of becoming a citizen. To begin the process of naturalization he must first of all be 18 years of age. His first step is to appear before the clerk of any court of record near his established place of residence and declare upon oath his bona fide intention to become a citizen of the United States and to renounce forever all allegiance and fidelity to any foreign country, and particularly to the country of which he is at the time a citizen or subject. He files with the clerk at this time the papers usually referred to as first papers. He must then wait until he has resided in the United States for a period of five years from the time of his arrival and at least two years after he has declared his intention to become a citizen and filed his first papers, after which time he shall make and file in duplicate a petition for naturalization. He must not, however, permit a greater period than seven years to elapse between the declaration of intention and filing of the petition. He must have lived in the vicinity of the court in which he brings his petition for at least six months prior to the time of filing his petition. After filing his petition with the clerk of the court that officer sets a date for hearing the petition.

The fee of $5 must be paid to the clerk of the court at the time of filing the declaration of intention. At the time of filing his petition for naturalization he must pay a fee of $10, in addition to a further fee of $5, for the issuance of a certificate of arrival. Thus the entire cost of procuring naturalization in the regular manner is now $20.

As to those persons who must depend upon the provisions of the bill I have introduced, the costs of naturalization will be greater. They are required to pay the $20 fee for registration of their entry in order to establish their legal status in the United States.

That outlines in a very general way the procedure of obtaining citizenship.

POSSIBILITIES OF EXPATRIATION

Those who have gone over the tedious road to citizenship should be well informed as to the dangers of losing their privileges by returning to the country of their origin or to other foreign countries. Present laws provide that any naturalized citizen who shall reside for two years in the foreign state from which he came, or for five years in any other foreign state, shall be presumed to have ceased to be an American citizen.

TEMPORARY ABSENCES AND PROVISIONS FOR REENTRY

Another point concerning the operation of our immigration laws is that citizens born here or naturalized must have proper documents when traveling to foreign countries. They should always, upon leaving the United States, carry with them a birth certificate or their certificate of naturalization. An alien who wishes to leave the country temporarily to travel abroad or even to cross the border into Canada or Mexico must be especially cautious about having proper documents for his reentry. An alien who is lawfully domiciled in the United States should apply to the Commissioner of Immigration, Department of Labor, Washington, D. C., for a reentry permit. This will be issued to him upon proof of his legal status in the United States and the payment of a fee of $3.

PASSPORTS AND VISAS

Practically the first thing of importance to be considered when contemplating a trip abroad is sufficient and proper identification. No American citizen, natural born or naturalized, should attempt to leave the United States for countries other than Canada, Mexico, or Cuba without a passport. If he wishes to visit England, France, or Poland, and a number of other European and South American countries, he must submit his passport to diplomatic or consular officers of these countries stationed in the United States for visas. The charge for such visas is $10 each. Much objection has been raised to the payment of such visa fees, but these countries hold that while the United States charges a $10 fee to all immigrants who seek admission to the United States, they will reciprocate by charging such a fee to American tourists. The United States has entered reciprocal arrangements with a number of countries for a waiver of visa fees as to tourist traffic.

One might go into much detail in enlarging upon each phase of the above discussion, but I have only attempted to outline in a rough way of dependable manner the steps which must be followed in immigrating and obtaining citizenship, and also to give some warning to those who wish to travel, that they be armed with proper identification for travel purposes as well as to facilitate their readmission to this country. Should anyone at any time wish information in greater detail on any phase of the above, I will be very glad to assist him in procuring such information.

**5174**      CONGRESSIONAL RECORD—HOUSE      MARCH 3

### NATIONAL ORIGINS

An attempt to enter into any discussion of the subject of immigration and naturalization at this time would not be complete without some reference to the question of "national origins." The term has come to the attention of most everyone in the country, I presume, yet I dare say only a very few have any accurate idea of what it implies. When one considers the uncertainties and indefiniteness involved, it is surprising that anyone is able to explain its application or agree with it.

The "national-origins" clause was placed in the immigration act of 1924, section 11, in an attempt to provide a system more equitable than that which was made the immediate basis of computing the quotas in 1924. The crying need for limiting the inflow of immigrants who besieged our ports of entry immediately after the war made necessary that some system be established whereby the number of persons to be admitted from any particular country could be determined. The system placed in effect in 1924 was based upon the census of 1890. It permits the annual admission of aliens of a particular nationality for permanent residence in an amount equal to 2 per cent of the number of foreign-born persons of that nationality in the United States in 1890. The statistics collected in that year showed the number of persons in the United States of all nationalities who had been born abroad. This system of limitation permits the arrival here of 164,667 persons each year.

The legislative history of the "national-origins" provision is very interesting inasmuch as it has been very stormy. From the outset it met a great deal of opposition. The provision was presented to the House by Representative ROGERS, of Massachusetts, as an amendment to the immigration measures being considered in 1924. The House rejected this amendment. The same provision, in slightly different language, however, was presented to the Senate by Senator REED of Pennsylvania, and was adopted by the Senate. Having been accepted by the Senate and rejected by the House it became a subject for consideration by conferees of the two Houses. The Senate refused to yield and the House, in order to get some restrictive legislation, finally agreed to the Senate amendments, with the provision that the "national-origins" clause should not become effective until July 1, 1927.

I have opposed this provision from the outset, and during the first session of the Seventieth Congress presented a resolution for delay of its operation. The measure was reported by committee and placed upon the calendar, but before it was reached a similar measure passed the Senate and was concurred in by the House.

Under the terms of the national-origins provision the total number of persons of foreign birth who might be admitted as quota immigrants would be approximately 150,000 each year. This number would then be allocated to the various nationalities upon the basis of the proportionate numerical strength of each nationality in the United States in 1920. In other words, the law provides that if one-half of all persons in the United States in 1920 are of English extraction the quota allotted to Great Britain would be one-half of 150,000, or 75,000 persons. However, the question then arises as to how the percentage of any particular nationality in the United States in 1920 can be determined. There are no statistics indicating the origin of the people of the country. The law provides that the Secretaries of State, Commerce, and Labor, with the help of experts from the Bureau of the Census, should arrive at this determination. Now, anyone who will reflect for just a moment can appreciate what an impossible job it is to determine with any degree of accuracy the numbers of any particular nationality in the United States in 1920. Names themselves are no accurate index, and intermarriage of these nationalities has made for such homogeneity as to defy placing a great mass of the American populace in any distinct category. An attempt has been made by those representing this committee to ascertain the national origins of all people in the country by a so-called scientific mathematical method. This clearly has proven to be a failure, for the reason that each succeeding time this method is applied different figures are arrived at. The following table is the best proof of that. The three varying reports of this commission indicate that there is no way of determining with any degree of accuracy the number that should be allocated to the respective nations. It is clear that the national-origins quota system would directly favor England and southern European countries, while it would take from the quota of Ireland and northern European countries. It is frequently charged, and I believe justly, that national origins is the creation of pro-English propagandists.

*Immigration quotas*

[Printed for the use of the Committee on Immigration and Naturalization, House of Representatives, February 28, 1929]

| 1<br>National-origin quotas submitted Feb. 21, 1929 | Country or area | 2<br>National-origin quotas submitted Feb. 27, 1928 | 3<br>National-origin quotas submitted Jan. 7, 1927 | 4<br>National origin quotas estimated in 1924 | 5<br>Present quotas based on 1890 foreign-born population |
|---|---|---|---|---|---|
| 100 | Armenia | 100 | | 100 | 124 |
| 100 | Australia, including Papua, etc. | 100 | 100 | 100 | 121 |
| 1,413 | Austria | 1,659 | 1,486 | 2,171 | 785 |
| 1,304 | Belgium | 1,328 | 410 | 281 | 512 |
| 2,874 | Czechoslovakia | 2,726 | 2,248 | 1,359 | 3,073 |
| 100 | Danzig, Free City of | 137 | 122 | 100 | 228 |
| 1,181 | Denmark | 1,234 | 1,044 | 945 | 2,789 |
| 116 | Estonia | 100 | 109 | 325 | 124 |
| 569 | Finland | 568 | 559 | 517 | 471 |
| 3,086 | France | 3,308 | 3,837 | 1,772 | 3,954 |
| 25,957 | Germany | 24,908 | 23,428 | 20,028 | 51,227 |
| 65,721 | Great Britain, Northern Ireland | 65,894 | 73,039 | 85,135 | 34,007 |
| 307 | Greece | 312 | 367 | 384 | 100 |
| 869 | Hungary | 1,181 | 967 | 1,521 | 473 |
| 17,853 | Irish Free State | 17,427 | 13,862 | 8,330 | 28,567 |
| 5,802 | Italy, including Rhodes, etc. | 5,989 | 6,091 | 5,716 | 3,845 |
| 296 | Latvia | 243 | 184 | 384 | 142 |
| 386 | Lithuania | 492 | 494 | 458 | 344 |
| 3,153 | Netherlands | 3,083 | 2,421 | 2,762 | 1,648 |
| 2,377 | Norway | 2,403 | 2,267 | 2,053 | 6,453 |
| 6,524 | Poland | 6,090 | 4,978 | 4,535 | 5,982 |
| 440 | Portugal | 457 | 290 | 236 | 503 |
| 295 | Rumania | 311 | 516 | 222 | 603 |
| 2,784 | Russia, European and Asiatic | 3,540 | 4,781 | 4,002 | 2,248 |
| 252 | Spain | 305 | 674 | 148 | 131 |
| 3,314 | Sweden | 3,399 | 3,259 | 3,072 | 9,561 |
| 1,707 | Switzerland | 1,614 | 1,198 | 783 | 2,081 |
| 123 | Syria and the Lebanon (French) | 125 | 100 | 100 | 100 |
| 226 | Turkey | 233 | 233 | 100 | 100 |
| 845 | Yugoslavia | 739 | 777 | 591 | 671 |
| [1] 153,714 | Total | [1] 153,685 | [1] 153,541 | [1] 150,000 | [1] 164,647 |

[1] Including 37 minimum quotas of 100 each.
[2] Includes 16 minimum quotas of 100 each.

The commission itself in presenting the result of its efforts in 1927 stated:

In our opinion the statistical and historical information available raises grave doubts as to the whole value of these computations as a basis for the purposes intended. We, therefore, can not assume responsibility for such conclusions under these circumstances.

President Hoover, who was at that time a member of the commission as Secretary of Commerce, stated in his speech accepting the presidential nomination of the Republican Party in 1928:

No man will say that any immigration or tariff law is perfect. We welcome our new immigrant citizens and their great contribution to our Nation; we seek only to protect them equally with those already here. We shall amend the immigration laws to relieve unnecessary hardships upon families. As a member of the commission whose duty it is to determine the quota basis under the national origins law, I have found it impossible to do so accurately and without hardship. The basis now in effect carries out the essential principle of the law, and I favor repeal of that part of the act calling for a new basis of quotas.

Better authority as to the impracticability of national origins can not be found.

I am strongly opposed to the national-origins arrangement and shall continue my efforts to effect its repeal. The special session of Congress should deal effectively with this problem in order to prevent this legislative monstrosity from becoming operative.

### ADDRESS OF HON. EDWARD MARTIN, OF PENNSYLVANIA

Mr. LEECH. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by including an address delivered by Hon. Edward Martin, the auditor general of Pennsylvania, on the history of Pennsylvania before the Pennsylvania Society on Friday, March 1, 1929.

The SPEAKER. The gentleman from Pennsylvania asks unanimous consent to extend his remarks by printing an address delivered by the auditor general of the State of Pennsylvania on the history of Pennsylvania. Is there objection?

There was no objection.

Mr. LEECH. Mr. Speaker, under the leave to extend my remarks in the RECORD I include the following address delivered

by Hon. Edward Martin, the auditor general of Pennsylvania, on the History of Pennsylvania before the Pennsylvania Society on Friday, March 1, 1929:

#### PENNSYLVANIA

Mr. Toastmaster and fellow Pennsylvanians, a great honor came to me in the invitation to address the Pennsylvania Society. Your distinguished president has suggested that I speak upon Pennsylvania. In complying with that request, however, I appreciate my inability to do full justice to the subject.

Pennsylvania is an empire within a nation. With almost 10,000,000 people, it is exceeded in population by only 20 nations and provinces of the entire world, one of which is a State in our own Federal Union.

Its population is greater than that of all Canada and its commerce exceeds that of many of the great world powers. Its location among the colonies caused it to be designated the "Keystone State." It merits that proud distinction, however, more from its illustrious history than from its geographical position. Its noblest heritage is a great and tolerant people. In the beginning we were taught to respect the rights of others. Two and a half centuries of advancement have done nothing to change that view. Its institutions, its laws, its customs, and its people have received frequent criticism but we have been undisturbed. Many of Pennsylvania's sons and daughters know little of its traditions, power, wealth, and contributions to mankind. Pride should cause every one of them to learn these things.

In this brief address no reference will be made to the romantic story of the State, although it is rich in lore and tradition. Our forefathers linked the coming of the white man to the age of the Indians by retaining Indian names. Counties, villages, streams, and mountains recall the days when the red man was supreme.

William Penn arrived at Uplands, now Chester, October 27, 1682. He was a man of peace and practiced justice. The doors of his great domain were flung open to all people. They accepted his invitation. Scattered over the rich expanse of Pennsylvania may be found the descendants of every nationality.

#### EARLY SETTLERS

Pennsylvania was settled by groups having conflicting ideas of religion and forms of government. The molding of these different ideas into a united and powerful people was our first great achievement. None of the other colonies had a population of such diversified forms of religion, industry, and government, nor one whose ideals were so divergent. Every creed and nationality was not only tolerated in Pennsylvania but welcomed. The leading men who have directed our destinies since the beginning of the State have demanded that every act of governmental bodies be consistent with that early ideal. William Penn, the founder, believed in religious tolerance for people of his own belief and exacted the same for those of other beliefs. He believed in keeping contracts, and no treaty with his State was broken in three-quarters of a century. That plan has continued. Compacts and agreements in Pennsylvania mean something.

Three distinct groups formed the early history of the colony.

The pious Quaker, under the noble Penn, occupied the territory surrounding Philadelphia, now composed of Chester, Montgomery, Bucks, Delaware, and adjacent counties, and developed the ideas of peace and frugality. He was conservative, yet gave himself to the vigorous pursuits of commerce.

Farther west, in the fertile counties of Berks, Lancaster, Cumberland, York, and others, the patient German introduced and practiced a civilization whose striking characteristic was simplicity in living. This, combined with industry, added remarkably to the strength of the Commonwealth. He devoted his time to the tilling of the soil and developed agriculture to such a high standard of efficiency that his beautiful farms are recognized as unexcelled. He has made his land the garden spot of the world.

Beyond in the mountain valleys the sturdy Scotch-Irish pushed civilization into the wilderness and contributed to the colony a combative and aggressive spirit. These naturally robust pioneers had the spirit of restlessness and courage developed by this rugged country and the constant repelling of the Indian attacks. The red man was driven back, schools and churches established, and a form of government instituted. Thus to those people more than any other race is due the credit of developing the western part of the Commonwealth and the States beyond our border.

With such distinct and different ideals prevailing it was natural that controversy should arise. There was constant strife between the conservative Quakers, contented with the natural increase of their commerce, and the irrepressible Scotch-Irish, not satisfied without rapid and constant growth. The Germans, occupying the central portion of the State, held the balance of political power, which was at first given to the Quakers, but during the Revolution was shifted to the Scotch-Irish, and this combination formulated the government for the State during that important period.

The development of transportation facilities, the operation of mines and quarries, the increased agricultural pursuits, the construction of furnaces, forges, foundries, machine shops and factories, the felling of the forests, and the general expansion of all commerce and industries brought about a natural increase of population, not only from other States but also from the nations of Europe. The molding of these peoples of different languages, traditions, and religions into a unified race without coercion required the most careful enactment of laws and their strictly impartial enforcement.

History shows that the descendants of those early groups have served the State in every capacity. Our fathers' plan of harmonizing opposing interests has been utilized in all our history. Our people have been happy, contented, and prosperous. They have been united in their demands for orderly government and have seldom been leaders in new and untried movements. Early these people in combating common dangers learned the necessity of compromise. This was their first school in democracy. In no other way may men reach a common ground. Thus they became proper subjects for a republican or democratic form of government.

#### RESOURCES

In addition to a great and powerful people, the State has been blessed with resources of untold wealth and an area of unsurpassed natural beauty. Pennsylvania abounds in mountains and valleys, farms and cities, beautiful rivers and woodlands, and through utilization of its natural resources, wonderful industrial developments and a network of railroads, trolleys, and public highways; mines and quarries; wires of communication and pipe lines; and everything that an all-provident Creator could give to make a happy and contented people.

#### THINGS IN WHICH WE LEAD

Pennsylvania at the present time leads all of the States in the Union in the production of steam railroad cars, clay products, coke, cement products, glass, ice cream, cotton, lace, iron, steel, knit goods, leather goods, earthenwares, plumbers' supplies, wrought iron, anthracite coal, and wool yarn; in the smelting and refining of zinc; in structural and ornamental ironwork; in the manufacture of silk and charcoal; and in the use of natural gas.

Our State contains the world's largest plants for the production of aluminum cooking utensils, brick, bridges, buttons, carpets, cement, chains, coke, confectionery, cork products, hats, horseshoes, hosiery, ice-making machinery, lace, linoleum, locomotives, matches, paper, pipe, pipe organs, plate glass, safes, saws, ships, silks, tank cars, teeth, turbine wheels, umbrellas, wrought iron, and zinc.

We generate daily almost 5,400,000 horsepower, which is 2,000,000 more than our nearest competitor, our sister State, New York.

#### AGRICULTURE

We are not known as a great agricultural State, and possess only 1.2 per cent of the area of the Nation for farming purposes, yet our products amount to 3.2 per cent. This shows the progressiveness of our farmers and the productiveness of our soil.

The total value of our crops in 1927 was estimated at about $250,-000,000, or more than the combined total of all New England and New Jersey. Pennsylvania is now fourteenth among the States of the Union in the value of its agricultural products, and is steadily increasing each year. In 1925 we ranked fourth among the States in the value of dairy products.

#### MANUFACTURING

The steel and iron industry alone would make Pennsylvania great commercially. We have 33⅓ per cent of the pig-iron tonnage of the entire Nation. Our steel mills produce classified products amounting to 37⅓ per cent of the steel tonnage of America. The finished steel products of the Pittsburgh district were found on every allied front during the World War and contributed inestimably to the victory of our armies.

We are not considered a large manufacturer of textiles, yet we produced in 1926, 15 per cent of the entire amount manufactured in the country, with a monetary value of more than $1,000,000,000.

It is interesting to know that in 1927 Pennsylvania refined over 800,-000,000 gallons of gasoline.

Pennsylvania in 1925 had 17,298 industrial establishments and practically 1,000,000 wage earners. The wages paid totaled over $1,300,-000,000, the cost of the raw materials was almost $4,000,000,000, and the value of the finished products almost $7,000,000,000.

#### NATURAL RESOURCES

Statistics show us that 25 per cent of the mines and quarries in the United States are found in Pennsylvania.

Clay mining is also another great Pennsylvania industry. In addition, we quarry 60 per cent of the slate of the Nation.

All of the hard coal is produced in this State, and in 1927 over one-fourth of the bituminous. We furnished during the same period nearly 80 per cent of the coke from beehive ovens and 25 per cent of the coke from by-products ovens.

In 1926 Pennsylvania produced 151,000,000 tons of bituminous coal and West Virginia 147,000,000. In 1927 West Virginia forged ahead. We have lost the prestige of being first in the production of bituminous

coal through discriminatory **rates** and unsatisfactory labor conditions. This industry, however, is regaining some of its lost prestige through Pennsylvania pluck and perseverance.

During the year 1926 we ranked sixth among the States in the production of natural gas. Pennsylvania is the largest consumer of natural gas in the Union. A large part of the production in the neighboring States of West Virginia and Ohio is piped to our mills and workshops.

While Pennsylvania sands no longer yield a great volume of crude oil, yet in 1927 they produced 9,533,000 barrels. When we consider that it commands the highest price of any oil in the world, Pennsylvania's oil industry is still of great value to America. We have 76,800 producing wells, which is 26 per cent of the number in the entire country.

A map of the pipe lines transporting oil, natural gas, and by-products is most interesting and in Pennsylvania represents an outlay of millions of dollars, but assures the commercial supremacy of our State for years to come in the manufacture of clay products, glass, steel, tin, and iron.

We are the first in the production of Portland cement. In 1925 we produced 42,346,830 barrels, which is one-fourth of the entire amount produced by the Nation.

#### TRANSPORTATION

During the period mentioned the steam railroads of Pennsylvania had 31 per cent of the total number of locomotives in use, 30 per cent of the passenger cars, and 33 per cent of the freight cars. These are necessary to move the products of our factories, our mines, our farms, and our various other industries. One-fifth of the shipping of the United States originates in Pennsylvania.

Credit for the invention of the steamboat, whether it belongs to John Fitch or Robert Fulton, goes to Pennsylvania. Oliver Evans, of Philadelphia, built the first high-pressure steam engine, but Henry Matthias Baldwin built the first practical locomotive in America, and the great locomotive works so long identified with Philadelphia still bear his name. Sunbury was the first town in the entire world to be lighted by electricity. Edison perfected his first lighting plant there July 4, 1883.

The first macadam road in America was constructed between Lancaster and Philadelphia in 1792. It was a part of the great westward highway, taking a position similar to that of the old National Road. It to-day forms an important part of the Lincoln Highway.

The first canal in America was built connecting the Schuylkill and the Susquehanna, from Middletown to Reading, and was opened November 22, 1797.

#### OTHER RESOURCES

Many additional figures could be given to show the position of Pennsylvania products and industries, such as tobacco, fruit, wool, shipbuilding, explosives, etc., but that seems unnecessary, as the ones given show the remarkable supremacy of the State. Most States, and even many nations, depend upon a single industry. We in Pennsylvania are most fortunate, as our natural resources and industries are diversified. For half a century our resources have been so great, and the demand for our products so universal, that we frequently forget the necessity for the frugality exercised by our fathers. In passing let us remember that industrial and political progress of any community depends upon the individuals who compose it. There is no golden rule by which these objectives may be reached. It can only be done by effort, conservation, and frugality. Our fathers showed the way. We must not drift too far from the approved moorings.

#### CENTERS OF POPULATION

The official census of 1920 shows that Pennsylvania has 165 cities and boroughs and 79 first-class townships of a population of 5,000 or more. The present population would probably show several others coming under this head. This gives Pennsylvania more large centers of population than any other State in the Union and is a result of our diversified industries. It shows the wisdom of our financiers in placing industries in small communities where a more satisfactory labor market is found.

#### EDUCATION

Pennsylvania does not devote its entire attention to commerce. Art, science, and literature have had their proper place in the consideration of our people. Our educational system has been criticized, but from the days of the founders great attention has been given to that subject and enormous sums of money have been contributed for that purpose. In the school year of 1926–27 Pennsylvania had 53 accredited colleges and universities, with a total enrollment of 72,727 students. This does not include a large number of schools and academies of long and honorable servitive Quaker, contented with the natural increase of their correspondence schools, and normal institutions. The 53 accredited colleges represent the various religious views of the people of the State, and to a large extent are maintained by public subscription and endowment funds which have been created by benevolent men of the Commonwealth. Our townships, boroughs, and cities, by large tax levies which have been paid without complaint for three-fourths of a century, have maintained a public-school system. From year to year the State has also contributed to this worthy purpose. The free-school system of Pennsylvania was started in 1834. In 1928 the cities, boroughs, and townships raised $135,924,854, and the Commonwealth added to this amount than $26,-

000,000. This does not include almost $10,000,000 expended by the State for vocational training, universities, etc.

The State maintains 14 normal schools, many of which are the finest in the Nation. Our State college has kept apace with the times, but the Commonwealth has not contributed sufficiently for its needs. This has been an error and is now being corrected. It has more than 5,000 students, and in addition maintains a summer school which is performing a fine service. The extension courses throughout the various counties of the State are encouraging agricultural interests and are doing much to increase the value of our products. The commanding position taken by Pennsylvania in law, literature, science, and commerce completely refutes criticism of our educational system.

The average attendance in the public schools of Pennsylvania is greater than that of any other State. The State also leads all other Commonwealths in the number of church structures and church attendance.

The first public school in America was opened in Philadelphia February 12, 1698. The first normal school established in America was organized in Pennsylvania.

Early Pennsylvanians took a prominent part in science and other things advancing our people individually. Franklin was the great scientist of the early times. Thomas Godfrey invented the quadrant. David Rittenhouse was the great astronomer and first accurately measured the distance to the sun; he surveyed our first canal and he built the first observatory in this country. In later days the late John D. Brashear, of the Monongahela Valley, carried forward this great work. John Bartram, of Philadelphia, was the first great American botanist.

#### MEN PRODUCED FOR NATION AND OTHER STATES

Hon. Frederic A. Godcharles, our enthusiastic and efficient State librarian, is authority for the statement that Pennsylvania has produced for the United States and other States 2 Presidents prior to the Constitution and 1 since the Constitution; 1 Vice President; 5 Secretaries of the Treasury; 7 Secretaries of War; 3 Secretaries of the Navy; 2 Secretaries of the Interior; 2 Secretaries of Labor; 4 Postmasters General; 10 Attorneys General; 5 Associate Justices of the Supreme Court of the United States; 3 Presidents pro tempore of the Senate; 6 Speakers of the House; 7 ambassadors to France, 6 to Great Britain, 12 to Russia, 3 to Germany, 3 to Turkey, 1 to Austria, 2 to Mexico, 3 to Japan; and 74 governors of 34 of the States. Many others, leaders in science, art, and literature, might be mentioned to show the results of our educational system, but time forbids.

#### PROGRESSIVE LAWS

The laws governing the Commonwealth have always been most progressive. Those relating to health, labor, morals, care of the unfortunate, sanitation, and kindred subjects, have been far in advance of our sister States and have frequently been copied by them. The law governing our public service commission, the commission's rulings, regulations governing workmen's compensation, child labor laws, and similar laws and regulations are cited by other States. Almost daily requests for information concerning our governmental plans are received by the State officials. Wise banking laws have encouraged thrift and economy. One-tenth of the savings of the Nation are held by Pennsylvania banks.

#### PENNSYLVANIA PROPERTY

The property owned by the Commonwealth of Pennsylvania shows the great diversity of our activities. We have—

Over 8,000 miles of hard-surfaced roads, costing $324,000,000.

The most beautiful capitol group in the world, conservatively valued at $25,000,000.

One million three hundred thousand acres of forest reserves, valued at $14,500,000.

One-fourth of the Delaware River Bridge, costing us $10,000,000.

Armories in 60 towns, the State arsenal, and the reservation at Mount Gretna, having a total value of $7,000,000.

Mental hospitals valued at $11,000,000.

Homes and schools for feeble-minded valued at $5,000,000.

Medical and surgical hospitals valued at $3,000,000.

Penal and corrective institutions valued at $8,000,000.

Sanitariums having a total valuation of $1,000,000.

Normal schools with a total value of $5,000,000.

Training schools valued at $1,000,000.

Soldiers and sailors' home valued at $700,000.

There are many smaller activities but this shows the great extent of Pennsylvania's work. By adhering closely to the "pay-as-you-go" plan, Pennsylvania has amassed in less than 25 years property of a value of more than $422,000,000 above its liabilities.

#### COST OF GOVERNMENT

There has been much talk in recent years about the increased cost of State and local government. This applies to Pennsylvania as well as to its sister Commonwealths. It has been brought about by the continued expansion of governmental activities.

The government of the State in 1800 cost $250,000. In 1900 this had increased to $15,000,000, and in 1925, to $157,000,000. Education cost the State in 1900, $6,800,000, which in 25 years had increased fivefold. Health activities in 1900 cost the State less than $50,000, while in

1925 their cost had increased to $2,400,000. Welfare in 1900 was $2,500,000 and was increased four times that amount 25 years later. All commissions in Pennsylvania in 1900 cost less than $50,000, but in 25 years they had increased to $4,000,000. Departments like forests and waters, the State police, the public-service commission, and the highway department were unknown in 1900, but in 25 years were costing more than $50,000,000 a year.

County and all local expenditures have also greatly expanded. In 1910 the total taxes collected for county purposes was a little more than $30,000,000. In 15 years it was multiplied by three. Boroughs in 1910 collected a little more than $10,000,000, which had increased to more than $20,000,000 in 1925. Cities in 1910 collected $36,000,000, which had increased to more than $84,000,000 in 1925. Townships in 1910 collected less than $6,000,000, which had increased threefold in 15 years. School districts in 1910 collected less than $30,000,000, and in 15 years the amount had increased to almost $130,000,000.

While for the entire year of 1800 the cost of State government was $250,000 it now costs more than $350,000 for each working day.

In addition to the enormous amount of taxes collected bond issues have greatly increased. Pennsylvania had outstanding December 31, 1928, $93,221,000, and on January 1, 1927, cities, boroughs, townships, school districts, and poor districts had outstanding $838,437,500, which had since 1913 increased from $245,979,000.

We can not expect to lower taxes as long as the demand for more service continues. The plea for larger expenditures is highly organized. Few take a stand in opposition to greater expenditures for public welfare, schools, roads, etc. Many of these things are urged by organizations having a highly paid salary list. The practical politician does not seem to have the courage to oppose them. The average citizen seems to be willing to go along. High taxes are already damaging industry in several States. Pennsylvania must avoid this peril. Long-term bond issues are of the most dangerous obligations. The people of the State at large showed their sound judgment in the last general election by their disapproval of the several proposals.

#### USE OF TAXES

What is done with the money?

A study of the expenditures for the last few years shows that 80 per cent of our revenue was used for roads, education, and public welfare. From the remaining 20 per cent is deducted the sums devoted for agriculture, commissions, forests, banking, insurance, military, and other departments of general service. This leaves a very small amount for the administration of the government. The expenditures of governmental departments will compare very favorably with the cost of management of a corporation involving activities of equal magnitude and organized for profit. In 1856 the State's expenditures for schools and charities was less than 5 per cent of the taxes collected. Forty per cent of the taxes was used for the payment of interest and liquidation of indebtedness. The total State indebtedness at that time was $39,906,577.97, and this was not completely liquidated until 1909.

#### PENNSYLVANIA'S FEDERAL TAX

Pennsylvania has contributed largely in assisting the Federal Government. The Statistical Abstract of the United States published by the United States Department of Commerce shows that for 1925 we paid in Federal taxes $246,592,155.56. We received in Federal aid from the Government $4,631,318.82, or we received 1.88 per cent of the amount paid in by us. Five States of the Union received more from the Government than they paid in taxes. Pennsylvania paid as much as 29 other States combined.

#### POLITICAL

In the consideration of Pennsylvania or any other political subdivision of the United States the subject of politics should be mentioned. I do not mean wholly in a partisan sense, although all good and loyal citizens should be proud of their political effort. In our own Nation good or bad government depends upon politics. With few exceptions great strides forward have been made through the vehicle of political parties. In the future, by reason of the increase of population and power of the various States, this will be more apparent. Militant political organizations must, therefore, be encouraged. The importance of Pennsylvania should cause its citizens to continue their interest in the selection of their officials. Pennsylvania has 29 counties with a population greater than the State of Nevada. Philadelphia County is greater in population than any one of 27 States, Allegheny than 17, Luzerne than 6, Lackawanna and Westmoreland than 3, Schuylkill than 2, and on down the line.

When the Constitution was adopted each State was given two Senators, and representation in the lower House in accordance with population. This was a compromise. It has worked to the great disadvantage of Pennsylvania and other large industrial Commonwealths. Our Representatives must be men and women imbued with Pennsylvania ideals and adhering firmly to those time-honored policies which have brought honor to the Commonwealth. This is not a political statement. However, I believe it expresses the position which Pennsylvania must assume if our State is to maintain its high prestige.

Since the founding of the Republican Party in 1856 all Governors of Pennsylvania except two have been affiliated with that party. During that long period, of almost three-quarters of a century, nearly every department of Government has been in the control of the Republicans. With the exception of 1856, when the vote of the State went to our own son, President Buchanan, and in 1912, when it went to Roosevelt, it has always been in the Republican column. It is a glorious record. We believe in party government. We have attained splendid results by this plan.

#### PENNSYLVANIA IN NATIONAL FINANCE

Men of Pennsylvania have taken a most active part in the wars in which our Nation has been engaged. These stirring events have been properly recorded in history. In addition to our men who have rallied to the colors, Pennsylvania's men of finance have taken a more prominent part in the affairs of the Nation than those of any other Commonwealth. Little has been written of this important work. From the dark days of the Revolution, when Morris gave of his private means and went from house to house soliciting funds for Washington's Army, American wars have been financed by Pennsylvanians. Albert Gallatin, Secretary of the Treasury from Pennsylvania, laid before the people the plan of financing wars by future generations. This was the beginning of bond issues in America. Stephen Girard was largely responsible for raising funds for the War of 1812. The banking firm of E. W. Clark & Co. furnished the money for the Mexican War. Jay Cooke, of Philadelphia, was the single individual who stood out most prominently in selling bonds for financing the Civil War. While no individual may be pointed out as the financier of the World War, yet Pennsylvanians may consider with wonderful pride the work of the great captains of industry who so efficiently organized our various activities and placed in the hands of our soldiers the means by which victory was attained. After the war had closed, however, and our finances were in a muddled condition, and Victory bonds were begging a market at many points below par, with little hope of improvement, all faces turned to that quiet little Pennsylvanian to lead us out of our financial difficulties. The manner in which Hon. A. W. Mellon has solved these great problems is a new Pennsylvania glory.

With such a long line of distinguished men who have aided our Government in its fiscal affairs and who have given similar service to our State, the marvelous financial condition of our Commonwealth is to be expected. If we are to maintain this high standard in governmental efficiency these men must be encouraged to continue in public life.

#### PENNSYLVANIA IN WAR

Pennsylvania's contribution to the military history of our country constitutes a large place in the martial story of America. The people have been haters of conflict, yet they have tasted most bitterly of the results of war. The State was founded to perpetuate the principles of peace, yet it has been the great battle front of the wars waged that liberty and civilization might survive. The spirit of patriotism which dominated the sturdy people of a great Commonwealth from the beginning and which has been transmitted to us as their children, prepared the material which our State has contributed to the Nation in every national calamity.

Our contribution in war started with the struggle for independence. Wayne was the illustrious Pennsylvanian taking part. Independence Hall, Valley Forge, Brandywine, and Germantown are Pennsylvania names sacred to the Nation. Philadelphia, by reason of its shrines and traditions, is the mecca of patriotic American people. Each year come pilgrimages from every State of the Union to the City of Brotherly Love. Valley Forge is sacred soil, as here was developed the great-heartedness of the man who was destined to formulate the early ideals of the Nation. Washington, with religious fervor of heart, was never too big to acknowledge the necessity of supreme guidance, and the manner in which his officers and men bore suffering and hardship during that period will always be an inspiration to the American Army.

The first troops to reach Washington's headquarters near Boston were Pennsylvania German farmers from York County, and these were soon followed by other Pennsylvania troops from the southern tier of counties, although Boston was further removed from that section then than Europe is from America now.

The number of soldiers taking part in the Revolutionary War from Pennsylvania is unknown. It is estimated, however, that there were 50,000 in the Pennsylvania Militia and 6,000 Pennsylvanians in the Continental line. From this estimate the Quaker colony contributed more than one-fifth of the man power of the whole American Army.

Neither do we exactly know the number taking part in the War of 1812. That war has its unpleasant memories, but, as in the Revolution, the people of Pennsylvania contributed largely in means and also gave more soldiers than any other State of the Union. On Lake Erie was fought a battle, the result of which added great luster to the American Navy.

In the Mexican War we contributed nine regiments, two of which saw the hardest of campaigns, and were at the front when the colors were carried to the walls of the capital city of our neighboring Republic.

Beginning with Governor Curtin and continuing with such illustrious leaders as Meade, Hancock, and Reynolds, followed by legions of trained men whose devotion to duty and bravery under fire have never been excelled, Pennsylvania's part in the war for the Union completely crowned it the Keystone State. At Gettysburg, under Meade, a worthy son, Pennsylvania rallied around the standards and while the fertile valleys trembled under the shocks of war, and countless thousands breathlessly awaited the issue, they fought it to a glorious finish. The cluster of trees near the Pennsylvania monument and Meade's headquarters on Cemetery Ridge at Gettysburg mark the high-water mark of the rebellion. It is sacred American soil. Pennsylvania troops made it such.

In the war for the preservation of the Union Pennsylvania produced 48 general officers, and of these 14 commanded armies and corps.

The Spanish-American War came and it showed Pennsylvania taking a gallant part. Many of its units were sent to enemy foreign lands, where American troops were crossing swords with the enemy. Seventeen thousand four hundred and forty-eight Pennsylvanians took part in this war.

The World War, the most gigantic task ever attempted by any nation, saw this Commonwealth contribute almost 400,000 men. Three divisions were organized from men of Pennsylvania, and many other units of special troops were entirely recruited from our State. It will be years before the exact work of this enormous struggle is fully appreciated, but all three of the Pennsylvania combat divisions were on the front lines in France, and each was commended at least once in orders. Every tenth man in the service of the Nation was from the Keystone State. The row upon row of white crosses in France silently attest the valor of those descendants of fathers of peace. The records of the War Department disclose hundreds of Pennsylvania sons performing service beyond duty, and a grateful Republic rewards them with its decorations for gallantry.

Certain organizations of Pennsylvania have stood out preeminently among the outfits of the Nation. The First City Troop of Philadelphia was formed preceding the Revolution and has taken a part in every conflict in which the Nation has been engaged. The One hundred and seventy-sixth Field Artillery, formerly the Duquesne Grays, has been in existence for almost 100 years, and, starting with the Mexican War, has taken a gallant part in every national calamity. The One hundred and third Engineers has seen more than a century of honored existence and has taken part in all of the wars during this eventful period. The One hundred and eighth Field Artillery is another organization of long and honorable standing. The One hundred and tenth Infantry, with service in both the Philippines and France, has the distinction of having traveled, to defend the colors of its Nation, farther than any other volunteer organization in the word. Many other distinguished military organizations could be mentioned which are indelibly stamped upon the life of their various communities.

No one can doubt the patriotism of Pennsylvania, whether it be in time of war or time of peace. Our past is glorious. The present is the pride of chivalrous men and beautiful women. The future is what we make it. The past has given us the Declaration of Independence; the Articles of Confederation; the Constitution; sacred battle fields; magnificent shrines; men and women leaders in science, letters, politics, and war; the first flag; and, most of all, brave and patriotic fathers and devoted and loving mothers. In the name of these great men and women of the past, who through thrift, economy, and perseverance, made us a State renowned, let us like good soldiers face the front and see that our column moves grandly forward. In the past there was the rumbling of great marshaling forces. The discipline instilled in us by the example of powerful forefathers makes it possible for us to move forward in perfect unison with less seculism. To-night, as we meet in the most wonderful capital city of the world, we pray that our Nation, through the aid of the omnipotent God, may solve all the great problems in accordance with the right; but, "right or wrong, always our country." May the hearts of Pennsylvanians beat true to the purposes of Old Glory, the red in the flag meaning industry and power, each citizen deeming it a privilege by effort to strengthen the Nation; the blue, truth and loyalty, to apply to those with whom we serve, as well as to the Government; and the white, peace and purity, meaning that contentment of service necessary in a democracy; and the stars the light that shall guide us in our relations to mankind.

## ADDRESS OF HON. TOM C. YONT, OF FLORIDA

Mr. GREEN. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing an able and eloquent address recently delivered in the city of Washington by my colleague from Florida [Mr. YON] before the J. E. B. Stuart Chapter, United Daughters of the Confederacy.

The SPEAKER. Is there objection to the request of the gentleman from Florida?

There was no objection.

Mr. GREEN. Mr. Speaker, under the leave to extend my remarks in the RECORD I include the following address of Representative TOM YON, of the third Florida district, before J. E. B. Stuart Chapter, United Daughters of Confederacy, at Confederate Memorial Home in the city of Washington, February 16, on the occasion of anniversary month of birth of General Stuart:

### GEN. J. E. B. STUART

President and daughters and guests of Jeb Stuart Chapter, United Daughters of the Confederacy, I esteem it a privilege and also a high honor that I should be invited to address you for a few minutes this evening on the occasion of your anniversary meeting in memory of the birth of the daring soldier and Christian leader, Gen. J. E. B. Stuart, in whose honor I understand that this chapter is named.

It is of peculiar significance, too, that this chapter should bear his name, for it was around this, the Capital of now a reunited Nation, that the wonderful traits of his character and daring feats of leadership were most largely displayed. In addressing you, if I were an orator, I would not be at a loss for something to say, either in paying a personal tribute to General Stuart and enumerating to you an account of his deeds of valor, but still, on the other hand, I can not express to you in words a tribute to the men and women of the Southland that would be sufficiently strong, so as to impress on you my estimate of their devotion to what they religiously thought their right and duty. For four long years of a terrible conflict the women of the South joined with their husbands, brothers, sons, and sweethearts to live or die, enduring privations and displaying deeds of heroism.

We people of to-day can not visualize the bitter sectional feeling existing between the people of the North and of the South leading up to the booming of Fort Sumter's cannon and the terrible conflict that ensued from the firing of that fateful shot down to the surrender of General Lee at Appomattox.

There never has been in the annals of warfare more military skill shown than was shown in the handling of the poorly paid, half-fed, and raggedly equipped armies of Lee, Jackson, Stuart, and other illustrious leaders of the Confederate armies; and when the enlisted strength of the southern armies was so much inferior to those of the North, as to enlistment totals, for they show that of about 600,000 for the South as against about 2,600,000 for the North. So it was with wonder, and how could it have been, that the armies of the Confederacy could fight a war on an offensive and defensive scale for four long years with the markets of the world closed to them, on account of an impassable blockade, and as it was then no land of manufacture, only a land of plantations and of happy and cultured home life, when at the coming of the evening tide the curling of the smoke from the thousand and more chimneys gave evidence of a happy, contented servant class, who were singing the old familiar southern melodies in their own familiar dialect, such as Massa's in the Cold, Cold Groun', Swing Low, Sweet Chariot, and others alike familiar, sung by the darkies, as evidence of their happiness.

With these conditions, what or by what reason could such a prolonged conflict have taken place? Only by the consecrated and daring leadership of the Confederate officers, as it inspired confidence in their men and the righteousness of their cause.

Our hero, General Stuart, the "plumed knight-errant," "the eyes and ears of General Lee," he of such daring skill, unequaled initiative, loyalty to his men and superior officers, cheerful disposition, and infinite faith in his Maker, all qualities for leadership; he the man whose memory you honor on this occasion in this the ninety-sixth year of his birth, for on February 6, 1933, you can celebrate the hundredth anniversary of his coming into the world.

He who at the early age of 31 years had achieved a world-wide reputation as a cavalry leader, and at that age was mortally wounded in the defense of the capital city of the country he loved on the 11th day of May, 1864, died the next day. In the years of his young life he had served the Union as loyally as he was serving the Confederate States when he died. His exploits in going around the army of McClellan in the penisular campaign in three days, in reading an account of this, is like reading fiction. His exploits in Maryland and late in conjunction with Lee's invasion of Pennsylvania that precipitated the Battle of Gettysburg and the guarding of the retreat of Lee back to Virginia after this, the greatest battle of the war, all display his qualities as a leader of men and the genius of his leadership.

We, the children, sons and daughters of the "Old South," are none the less loyal to our common country's flag, but we would not be true to the traditions of those that have gone on before, and those that gave their nves and their all in defense of their honest convictions, if we did neglect these anniversaries, and failed to pause and pay tribute to the brave departed heroes of our Southland, and as each succeeding generation takes the place of these departed ones, may these fires be kept aflame on the altar, in loving memory for the deeds of valor of our departed heroes, and in doing this it will make no less a devoted patriot to a great united Nation than if we did not these things.

And as the years come and go, as they have since the dark days of the sixties, we have marveled at the development in the South, as great cities have sprung from the ashes of war. The hum of industry, and the honest toil of descendants of a brave people, that till the soil and have made the waste places blossom like the rose, and the Southern people are providing their quota of consecration to "American" ideals,

as to be willing at all times to rush to the defense of the flag of a united Nation, one flag, one people, inseparable, and as such we go forward, to provide greater opportunities for a free and liberty-loving people of the United States of America.

#### NAVAL STORES AND PINE TIMBER INDUSTRIES

Mr. LANKFORD. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD on an item in the agricultural appropriation bill and to include therein three extracts from letters in support of the item.

The SPEAKER. The gentleman from Georgia asks unanimous consent to extend his remarks in the RECORD on the agricultural appropriation bill and to include therein portions of three letters. Is there objection?

There was no objection.

Mr. LANKFORD. Mr. Speaker, during the consideration of the agricultural appropriation bill I received several splendid letters from constituents of mine who were very anxious that certain items be retained in the bill. I feel that extracts from at least three of these letters should become a part of the permanent record of this Congress. The items referred to were retained in the bill, and these letters show the necessity for this appropriation and the vital importance of the naval stores and pine timber industries.

From a letter written me by Hon. H. Langdale, a prominent naval-stores operator and attorney of Valdosta, Ga., I quote as follows:

I notice from the papers that Senator W. J. HARRIS has introduced a bill for the appropriation of $10,000, to be used to promote the making of light-colored strong paper from southern pine.

This, in my opinion, is very important to the turpentine operators and landowners in south Georgia, and more especially in the eleventh congressional district, and I trust that you will cooperate with him in every way you can to get this bill passed. There is now much money being spent by turpentine operators and other landowners to protect the forests and in the growing of timber. According to the best information available, the southern parts of Georgia not only is the best reproducing timber section in the United States but in most parts produces a superior grade of timber, especially for naval stores. In the growing of timber it has long been a problem with landowners as to what disposition could be made of the trees that had been worked for turpentine and trees no longer suitable for turpentine purposes, being too small, as a general rule, to be manufactured into lumber. If these trees could be utilized in the making of paper, a great problem would be solved for the landowners.

From a letter written me by Dr. E. P. Rose, a prominent physician, naval-stores operator, and banker of Valdosta, I quote the following:

We also are in need of additional appropriations to defray the expense of chemists in extending the uses of gum spirits of turpentine and rosin. This is very important to the State of Georgia, for the reason that the State of Georgia now is by far the largest producer of turpentine and rosin of any other section of the United States or elsewhere.

For your information, the turpentine season ending March 31, 1928, showed that for the previous year the States of Alabama, Louisiana, Texas, Mississippi, North Carolina, and South Carolina produced, in round numbers 6,000,000 gallons of turpentine. The State of Florida produced ten million and the State of Georgia produced fifteen million, the above States being the only States that produce any turpentine. You can see that Georgia is now producing approximately 50 per cent of the turpentine and rosin that is being manufactured in the United States, and I have no statistics available, but it is my opinion that your district, the eleventh congressional district, is producing approximately 50 per cent of the turpentine and rosin that is being produced in the State of Georgia. Much money and effort is being put forth in this district to grow timber. There is probably being more money spent in that direction in your district than any other section of the country.

From a letter written me by Mrs. Ruby Wilson Berrie, assistant secretary of the Brunswick Board of Trade, and in behalf of that trade body, I quote as follows:

The Agricultural appropriation bill which has passed the Senate and which we understand is now before the House committee for study and consideration carries an increase for Dr. F. P. Veitch's work and appropriation of $10,000 for an investigation of production of pulp from slash pine and increases for the Forest Service, which is to be used for naval-stores studies.

We are greatly interested in having these items included in the Agricultural appropriation bill, as the naval-stores industry is probably the most important industry in this entire section, and our people are realizing more and more each year the importance of reforestation and forest conservation.

In connection with the proposed appropriation of $10,000 for the investigation of paper and pulp manufacture from slash pine we wish to say that there are practically unlimited quantities of this and other pines in southeast Georgia, and paper and pulp mills are already looking toward this section for this reason. We feel, therefore, that a study of the possibilities of slash pine for paper making would be of great value not only to this section but to the manufacturers in other sections of the country, who on account of the depletion of raw materials in their present territory are seeking new fields for their business. The utilization of these vast resources, which have so long been idle, will mean employment for thousands of people and will be of great benefit in many other ways.

We thank you for your careful consideration of these matters and trust that the House committee will find it possible to recommend that these appropriations be included in the Agricultural appropriation bill.

#### THE ROCKY MOUNTAIN NATIONAL PARK

Mr. TAYLOR of Colorado. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD and to insert therewith a certified copy of the law of the Colorado Legislature ceding to the Federal Government jurisdiction over the Rocky Mountain National Park and also the act we passed the other day accepting the cession of the park.

The SPEAKER. Is there objection to the request of the gentleman from Colorado?

There was no objection.

Mr. TAYLOR of Colorado. Mr. Speaker, under the express leave to extend my remarks in the RECORD, I include a certified copy of the act of the General Assembly of the State of Colorado, "To cede to the United States of America exclusive jurisdiction over the Rocky Mountain National Park in the State of Colorado," which was duly passed and approved by Governor Adams, of my State, on February 19, 1929, and is now a State law, as follows:

STATE OF COLORADO,
OFFICE OF THE SECRETARY OF STATE.

UNITED STATES OF AMERICA,
*State of Colorado, ss:*

Certificate

I, Chas. M. Armstrong, secretary of state of the State of Colorado, do hereby certify that the annexed is a full, true, and complete copy of house bill 44, which was filed in this office on the 20th day of February, A. D. 1929, at 2 o'clock p. m.

In testimony whereof I have hereunto set my hand and affixed the great seal of the State of Colorado at the city of Denver this 20th day of February, A. D. 1929.

[SEAL.]

CHAS. M. ARMSTRONG,
*Secretary of State.*
By A. G. SNEDEKER, *Deputy.*

House bill 44 (by Representatives Burchfield, Johnson (Moffat), and Beggs) to cede to the United States of America exclusive jurisdiction over the Rocky Mountain National Park in the State of Colorado

*Be it enacted by the General Assembly of the State of Colorado:*

SECTION 1. Exclusive jurisdiction shall be, and the same is hereby, ceded to the United States of America over and within all of the territory which is now included in that tract of land in the State of Colorado set aside and dedicated for park purposes by the United States, known as the Rocky Mountain National Park, saving, however, to the State of Colorado the right to serve civil or criminal process within the limits of the aforesaid park in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed outside of said park, and saving further to the said State the right to tax persons and corporations, their franchises, and property on the lands included in said tracts, and saving also to the persons residing in said park now or hereafter the right to vote at all elections held within the county or counties in which said tracts are situated; and saving to all persons residing within said park upon lands now privately owned within said park access to and from such lands, and all rights and privileges as citizens of the United States, and saving to the people of Colorado all vested, appropriated, and existing water rights and rights of way connected therewith, including all existing irrigation conduits and ditches: *Provided, however,* That jurisdiction shall not vest in the United States now or hereafter over any lands included within said park until the United States, through its proper officers, notifies the State of Colorado through its governor that the United States assumes police jurisdiction over the respective tracts involved.

ROYAL W. CALKINS,
*Speaker of the House of Representatives.*
GEORGE M. CORLETT,
*President of the Senate.*

Approved February 19, 1929, 2.30 p. m.

WM. H. ADAMS,
*Governor of the State of Colorado.*

I also include herewith a copy of H. R. 17101, which I prepared with the approval of the Interior Department, and introduced on behalf of the State of Colorado. It is practically the same as the act accepting the Mesa Verde National Park. It was duly passed in this form and approved by the President on yesterday, March 2, 1929, and is Public Law No. 1009, as follows:

An act to accept the cession by the State of Colorado of exclusive jurisdiction over the lands embraced within the Rocky Mountain National Park, and for other purposes

*Be it enacted, etc.,* That the provisions of the act of the Legislature of the State of Colorado, approved February 19, 1929, ceding to the United States exclusive jurisdiction over the territory embraced and included within the Rocky Mountain National Park, are hereby accepted, and sole and exclusive jurisdiction is hereby assumed by the United States over such territory, saving, however, to the State of Colorado the right to serve civil or criminal process within the limits of the aforesaid park in suits or prosecutions for or on account of rights acquired, obligations incurred, or crimes committed outside of said park; and saving further to the said State the right to tax persons and corporations, their franchises and property on the lands included in said tract; and saving also to the persons residing in said park now or hereafter the right to vote at all elections held within the county or counties in which said tracts are situated; and saving to all persons residing within said park upon lands now privately owned within said park access to and from such lands, and all rights and privileges as citizens of the State of Colorado; and saving to the people of Colorado all vested, appropriated, and existing water rights and rights of way connected therewith, including all existing irrigation conduits and ditches. All the laws applicable to places under the sole and exclusive jurisdiction of the United States shall have force and effect in said park. All fugitives from justice taking refuge in said park shall be subject to the same laws as refugees from justice found in the State of Colorado.

SEC. 2. That said park shall constitute a part of the United States judicial district for the State of Colorado, and the district court of the United States in and for said district shall have jurisdiction of all offenses committed within said boundaries.

SEC. 3. That if any offense shall be committed in the Rocky Mountain National Park, which offense is not prohibited or the punishment for which is not specifically provided for by any law of the United States, the offender shall be subject to the same punishment as the laws of the State of Colorado in force at the time of the commission of the offense may provide for a like offense in said State; and no subsequent repeal of any such law of the State of Colorado shall affect any prosecution for said offense committed within said park.

SEC. 4. That all hunting or the killing, wounding, or capturing at any time of any wild bird or animal, except dangerous animals when it is necessary to prevent them from destroying human lives or inflicting personal injury, is prohibited within the limits of said park; nor shall any fish be taken out of the waters of the park in any other way than by hook and line, and then only at such seasons and in such times and manner as may be directed by the Secretary of the Interior. That the Secretary of the Interior shall make and publish such general rules and regulations as he may deem necessary and proper for the management and care of the park and for the protection of the property therein, especially for the preservation from injury or spoliation of all timber, natural curiosities, or wonderful objects within said park, and for the protection of the animals and birds in the park from capture or destruction, and to prevent their being frightened or driven from the park; and he shall make rules and regulations governing the taking of fish from the streams or lakes in the park. Possession within said park of the dead bodies, or any part thereof, of any wild bird or animal shall be prima facie evidence that the person or persons having the same are guilty of violating this act. Any person or persons, or stage or express company, or railway company, who knows or has reason to believe that they were taken or killed contrary to the provisions of this act and who receives for transportation any of said animals, birds, or fish so killed, caught, or taken, or who shall violate any of the provisions of this act or any rule or regulation that may be promulgated by the Secretary of the Interior with reference to the management and care of the park or for the protection of the property therein, for the preservation from injury or spoliation of timber, natural curiosities, or wonderful objects within said park, or for the protection of the animals, birds, or fish in the park, or who shall within said park commit any damage, injury, or spoliation to or upon any building, fence, hedge, gate, guidepost, tree, wood, underwood, timber, garden, crops, vegetables, plants, land, springs, natural curiosities, or other matter or thing growing or being thereon or situated therein, shall be deemed guilty of a misdemeanor and shall be subject to a fine of not more than $500 or imprisonment not exceeding six months, or both, and be adjudged to pay all costs of the proceedings.

SEC. 5. That all guns, traps, teams, horses, or means of transportation of every nature or description used by any person or persons within said park limits when engaged in killing, trapping, ensnaring, or capturing such wild beasts, birds, or animals shall be forfeited to the United States and may be seized by the officers in said park and held pending the prosecution of any person or persons arrested under charge of violating the provisions of this act, and upon conviction under this act of such person or persons using said guns, traps, teams, horses, or other means of transportation, such forfeiture shall be adjudicated as a penalty in addition to the other punishment provided in this act. Such forfeited property shall be disposed of and accounted for by and under the authority of the Secretary of the Interior.

SEC. 6. That the United States District Court for the State of Colorado shall appoint a commissioner who shall reside in the park and who shall have jurisdiction to hear and act upon all complaints made of any violations of law or of the rules and regulations made by the Secretary of the Interior for the government of the park and for the protection of the animals, birds, and fish, and objects of interest therein, and for other purposes authorized by this act.

Such commissioner shall have power, upon sworn information, to issue process in the name of the United States for the arrest of any person charged with the commission of any misdemeanor, or charged with a violation of the rules and regulations, or with a violation of any of the provisions of this act prescribed for the government of said park and for the protection of the animals, birds, and fish in said park, and to try the person so charged, and, if found guilty, to impose punishment and to adjudge the forfeiture prescribed.

In all cases of conviction an appeal shall lie from the judgment of said commissioner to the United States District Court for the State of Colorado, and the United States district court in said district shall prescribe the rules of procedure and practice for said commissioner in the trial of cases and for appeal to said United States district court.

SEC. 7. That such commissioner shall also have power to issue process as hereinbefore provided for the arrest of any person charged with the commission within said boundaries of any criminal offense not covered by the provisions of section 4 of this act to hear the evidence introduced, and if he is of opinion that probable cause is shown for holding the person so charged for trial shall cause such person to be safely conveyed to a secure place of confinement within the jurisdiction of the United States District Court for the State of Colorado, and certify a transcript of the record of his proceedings and the testimony in the case to said court, which court shall have jurisdiction of the case: *Provided,* That the said commissioner shall grant bail in all cases bailable under the laws of the United States or of said State.

SEC. 8. That all process issued by the commissioner shall be directed to the marshal of the United States for the district of Colorado, but nothing herein contained shall be so construed as to prevent the arrest by any officer or employee of the Government or any person employed by the United States in the policing of said reservation within said boundaries without process of any person taken in the act of violating the law or this act or the regulations prescribed by the said Secretary as aforesaid.

SEC. 9. That the commissioner provided for in this act shall be paid an annual salary as appropriated for by Congress, payable quarterly: *Provided,* That the said commissioner shall reside within the exterior boundaries of said Rocky Mountain National Park, at a place to be designated by the court making such appointment: *And provided further,* That all fees, costs, and expenses collected by the commissioner shall be disposed of as provided in section 11 of this act.

SEC. 10. That all fees, costs, and expenses arising in cases under this act and properly chargeable to the United States shall be certified, approved, and paid as are like fees, costs, and expenses in the courts of the United States.

SEC. 11. That all fines and costs imposed and collected shall be deposited by said commissioner of the United States, or the marshal of the United States collecting the same, with the clerk of the United States District Court for the State of Colorado.

SEC. 12. That the Secretary of the Interior shall notify, in writing, the Governor of the State of Colorado, of the passage and approval of this act.

Approved, March 2, 1929.

That act of the Colorado Legislature and this act of Congress terminates, I trust, a misunderstanding that has existed between some of the people of the State and the officials of the Interior Department for the past 14 years. And as I have been an active advocate of the creation and supporter of this park for nearly 20 years, I hope it may not be inappropriate to also include as a part of the early background of this matter, a brief statement to show that Colorado has now fully complied with her obligations to the Federal Government, as follows:

A STATEMENT ABOUT ROCKY MOUNTAIN NATIONAL PARK

By Congressman EDWARD T. TAYLOR, as prepared by him for the Middle Park Times, Hot Sulphur Springs, Colo.

In January, 1915, I reported out of the Public Lands Committee and passed through the House of Representatives the bill creating that park. Both the committee and the House were at that time very strongly opposed to the creation of any more national parks. The only way I could induce that committee, of which I was a member, to permit me to favorably report the bill was by presenting a most overwhelming de-

mand from Colorado for it. Governors Ammons and Carlson, Senators Thomas and Shafroth, Enos Mills, and many others appeared before the committee and urged the passage of the bill, and we all very positively promised and guaranteed that the State of Colorado would convey to the Federal Government the same jurisdiction that the other States conveyed to the national parks within their borders.

Practically all the newspapers of the State vigorously supported the bill.

No Colorado bill before Congress has ever had a more unanimous and hearty approval of the entire State than that duplicate bill of Senator Thomas and myself establishing that park.

The committee would not have considered the bill for a minute if there had been the slightest question about that matter.

I also presented resolutions from business men's organizations all over Colorado and a memorial from the Colorado Legislature, all appealing to Congress to pass that bill and faithfully promising to promptly comply with all the requirements of Congress and the Federal Government.

All these hearings and appeals were printed and make a pamphlet of some 50 pages.

There was no equivocation about it. Our pledges to the Federal Government were plain and emphatic. We had the authority to do so and we officially spoke for the State of Colorado and all her citizens, and we did so, and the committee and Congress relied upon that written and official promise and guaranty.

When I called the bill up on the floor of the House a great many Members attacked it and we had a running-fire debate for some two or three hours, and under the rules of the House I had to obtain the unanimous consent of the House to pass the bill at all. So I was absolutely compelled to not only renew all the pledges we had all made to the Public Lands Committee, but had to further agree that Colorado and the counties would build the Fall River Road and that we would never ask for more than $10,000 a year for the park unless Congress thereafter permitted us to do so. The bill would have been killed in a minute many different times if I had not promptly agreed to and guaranteed that Colorado would comply with every one of these promises, and I did so and passed the bill upon those definite and positive assurances.

The whole State was delighted when the bill passed. Practically everybody knew the conditions upon which I secured the passage, and for 10 years thereafter no one disputed my authority to pledge the State of Colorado to comply with those conditions.

Now, it is nearly 14 years since those definite official pledges were made. Colorado can not afford to be held out to the world as repudiating her own agreements.

Colorado should either comply with the express conditions upon which she obtained that park, or she should at once memorialize Congress by our legislature to repeal that law and revert that land back to the forest reserve from which it was taken.

   *      *      *      *      *      *

This Coolidge administration and the Interior Department and the Bureau of the Budget and Congress and the Appropriations Committees of both House and Senate have all emphatically determined that not a dollar more money will be spent on any road in any national park unless and until the Federal Government has jurisdiction over it.  *  *  *

   *      *      *

When President Wilson on January 26, 1915, signed that bill officially creating that park and presented me the pen he used, I said to him:

"Mr. President, that park is situated on top of the great Continental Divide of the Western Hemisphere, and when it becomes properly improved and the great traveling public can stand upon the very crest of this great Republic and look as far as human vision can see toward both the Atlantic and Pacific Oceans it will become one of the most scenic and popular parks in the world."

President Wilson said: "I hope, Mr. TAYLOR, your prophecy will come true." And I have ever since hoped that every loyal son and daughter of this Centennial State would help bring about the realization of that prophecy. (Reprinted from Magazine Denver, official publication of the Denver Chamber of Commerce, November 1, 1928.)

## SETTLEMENT OF CLAIMS AGAINST THE UNITED STATES

Mr. UNDERHILL. Mr. Speaker, I call up the conference report on the bill (H. R. 9285) to provide for the settlement of claims against the United States on account of property damage, personal injury, or death.

The SPEAKER. The gentleman from Massachusetts calls up the conference report on the bill H. R. 9285, which the Clerk will report.

The Clerk read the conference report.

The conference report and statement are as follows:

### CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 9285) entitled "An act to provide for the settlement of claims against the United States on account of property damage, per-

sonal injury, or death" having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its amendment numbered 7.

That the House recede from its disagreement to the amendments of the Senate numbered 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, and 25, and agree to the same with two related amendments, as follows:

On page 8, line 25, and page 9, line 1, strike out the following: "if the claim accrued after April 6, 1925."

On page 19, strike out in lines 19, 20, and 21 the following: ", and except that any claim accrued after April 6, 1925, but prior to the passage of this act, may be filed within one year after the passage of this act."

And the Senate agree to the same.

CHARLES L. UNDERHILL,
ED. M. IRWIN,
*Managers on the part of the House.*
W. H. McMASTER,
THOMAS F. BAYARD,
*Managers on the part of the Senate.*

### STATEMENT

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill H. R. 9285 submit the following written statement explaining the effect of the action agreed on by the conference committee and submitted in the accompanying conference report.

CHARLES L. UNDERHILL,
ED. M. IRWIN,
*Managers on the part of the House.*

The conference report was agreed to.

### CONDITION OF INDIAN SCHOOLS

Mr. COLTON. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing a brief statement on the condition of the Indian schools in my home county.

The SPEAKER. Without objection, it is so ordered.

There was no objection.

Mr. COLTON. Mr. Speaker, under the leave to extend my remarks in the RECORD, I include the following statement on the condition of Indian schools in my home country:

VERNAL, UTAH, *February 11, 1929.*

Congressman DON B. COLTON,
*House of Representatives, Washington, D. C.*

DEAR SIR : We, the undersigned, have this day made an inspection of the various departments of the Indian school at Whiterocks, Utah, and beg to report as follows:

The schoolrooms were well lighted, ventilated, heated, and equipped for carrying on good school work. The large lecture room and the gymnasium provide ample opportunity for wholesome recreation and physical development.

The health charts of the Indian children were examined while school was in session, thereby giving an opportunity to observe each child while the charts were being studied, and we are pleased to report that the children were making very satisfactory progress. Not only did the charts prove that the children were making satisfactory gains, but the children themselves appeared bright, robust, and healthy.

The dining rooms were very sanitary and convenient. The large kitchen and bakery adjoining gave evidence that an abundance of clean, wholesome food was being supplied.

Each child was well dressed in clean, well-fitting, comfortable clothing, and a visit to the clothing rooms gave evidence that they were amply supplied with everything that a child could expect in the way of clothing.

A visit to the commissaries showed that good judgment has been used in purchasing supplies both as to quality and quantity. It was clean, well housed, and protected.

The laundry and sewing rooms showed that proper consideration was being given the children's clothing, as they were being washed and mended, and best of all, the children themselves were helping with this work.

We found the dormitories clean, well ventilated, and provided with plenty of beds and bedding for the comfort of the children.

We found the workshop for the boys decidedly lacking in modern conveniences and equipment, and it is our opinion that this phase of the Indians' education should receive next consideration.

While the superintendent's office and the employees' buildings showed no signs of luxury, they were comfortable and well kept.

It was a delightful sight to see the Indian children during the time they were out of class work. Some of the girls were busy in the kitchen, others in the dining room, sewing room, or bakery, while

others were lounging about reading magazines, listening to music, or playing games. The boys, likewise, were helping with the milking, feeding pigs, chopping wood, getting coal, or doing some other worthwhile work, while others were enjoying peaceful recreation, knowing full well that their turn at the chores would soon come, for we were advised that each child was detailed periodically to some one of the tasks about the school.

In general, we found conditions at the Whiterocks Indian Boarding School very good.

Very respectfully,

ROBERT L. PIXTON,
*Principal of Uintah High School.*
W. B. WALLACE,
*Manager of Vernal Express.*
BEATRICE BAILEY,
*Primary Supervisor of Uintah Schools.*
ALICE E. PEDERSEN,
*District Home Demonstration Agent.*
E. PETERSON,
*County Agricultural Agent.*

REPEAL OF THE EIGHTEENTH AMENDMENT

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent to extend my own remarks on a memorial passed by the Massachusetts Legislature and also to incorporate therein a copy of the memorial.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

Mr. McCORMACK. Mr. Speaker, under the laws of the Commonwealth of Massachusetts are provisions permitting questions of public concern to be submitted, upon petition of a certain number of registered voters, to the voters of a representative or senatorial district for an expression of public opinion thereon. The purposes of this law are twofold:

First. To secure an expression of public opinion.

Second. To instruct their members of the State legislature, whether of the lower or upper branch, as the case may be, as to the views of the people of his district on this question.

The objects of such a wise law is apparent; in addition to informing their legislators of the prevailing opinion, it tends to keep government close to the people, which is one of the fundamental principles of the Democratic Party and of democratic government. The frequent use by the voters of Massachusetts of this so-called public opinion law has clearly evidenced its usefulness and effectiveness.

The provisions of this law not only require, as a condition precedent, the securing of a certain number of signatures of registered voters, but it also provides for the submission of the proposed question to the attorney general of the Commonwealth, an elective official, for determination as to whether or not it is a proper subject to be submitted as provided in said law, if it is in such form as to be clearly understood by the average voter, and also if in every other respect it conforms with the general provisions of the public opinion act. The duty is strictly a legal one. Thereafter the question to be submitted is placed upon the ballot in the districts in which the necessary names are secured, or in the districts that it is desired to have the question presented to the voters for their expression.

In accordance with the provisions of the public opinion law, which I have briefly referred to, there was submitted at the last general election held in Massachusetts in November, 1928, to the voters of 36 out of the 40 senatorial districts the following question, viz:

Shall the senator from this district be instructed to vote for a resolution requesting Congress to take action for the repeal of the eighteenth amendment to the Constitution of the United States, known as the prohibition amendment?

Upon this question 1,130,007 voters in the 36 districts voted thereon, the results being as follows, namely:

Affirmative vote ------------------------------------ 707, 352
Negative vote -------------------------------------- 422, 655

Majority in favor of senators voting for resolution memorializing Congress in favor of repeal of eighteenth amendment-------------------------------------- 284, 697

The above vote clearly shows the decisive manner in which the voters of Massachusetts expressed themselves on this important national issue. The issue was plain, clearly understood, expressed in a manner incapable of misunderstanding, and the voters went to the polls after an intensive campaign, particularly on the part of those who espoused the cause of prohibition. The people of Massachusetts believe in our dual system of government; they realize the dangers of a highly centralized federalized government. They also realize the other conditions that have naturally resulted from the eighteenth amendment and the passage of the national prohibition act and which are not

conducive to the best interests of American society and institutions. It is not my intention to discuss this aspect in detail at this time; simply to make brief reference to it.

Following the decisive and unmistakable action of the voters there was introduced in the Massachusetts Legislature a resolution to carry out the instructions of the voters. The Massachusetts Senate comprises a membership of 40, among which are included 31 Republicans and 9 Democrats. On February 6, 1928, by a standing vote of 26 to 6, of which membership voting in the affirmative 19 were Republicans, the following resolution was adopted, namely:

THE COMMONWEALTH OF MASSACHUSETTS,
SENATE CHAMBER, STATE HOUSE,
*Boston, Mass., February 8, 1929.*

Hon. JOHN W. McCORMACK,
*House of Representatives, Washington, D. C.*

SIR: I have the honor to transmit herewith a copy of resolutions adopted by the Massachusetts Senate on Wednesday, February 6, 1929.

Yours very sincerely,

WILLIAM H. SANGER, *Clerk.*

Senate No. 256

THE COMMONWEALTH OF MASSACHUSETTS,
*In the year 1929.*

Resolutions requesting Congress to take action for the repeal of the eighteenth amendment to the Federal Constitution, known as the prohibition amendment

Whereas there was placed on the official ballot used in 36 of the 40 senatorial districts of the Commonwealth at the State election in November, 1928, under the provisions of sections 19 to 22, inclusive, of chapter 53 of the general laws, the following question:

"Shall the senator from this district be instructed to vote for a resolution requesting Congress to take action for the repeal of the eighteenth amendment to the Constitution of the United States, known as the prohibition amendment?"; and

Whereas a plurality of the votes cast in 34 of said 36 districts was in favor of such instruction; and

Whereas the total affirmative vote on said question in said 36 districts was 707,352, the total negative vote on said question in said districts was 422,655, and the total number of persons voting at said election in said districts who did not vote on said question was 310,244: Accordingly be it

*Resolved,* That the Senate of the Commonwealth of Massachusetts, in view of the vote taken as aforesaid under the statutes of the Commonwealth and the results of said vote, respectfully requests Congress to take action for the repeal of the eighteenth amendment to the Constitution of the United States, known as the prohibition amendment; and be it further

*Resolved,* That the clerk of the senate be directed to transmit to the presiding officers of both branches of the Congress of the United States and to the Massachusetts Members thereof duly certified copies of these resolutions.

WILLIAM H. SANGER, *Clerk.*

A true copy. Attest:

WILLIAM H. SANGER, *Clerk.*

The above resolution, without further comment at this time, speaks for itself.

DEFICIENCY APPROPRIATIONS

Mr. WOOD. Mr. Speaker, I call up conference report on the bill (H. R. 15848) making appropriations to supply urgent deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide urgent supplemental appropriations for the fiscal year ending June 30, 1929, and for other purposes.

The SPEAKER. The gentleman from Indiana calls up a conference report, which the Clerk will report.

The Clerk read the conference report.

The conference report and statement are as follows:

CONFERENCE REPORT

The committee of conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 15848) making appropriations to supply urgent deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide urgent supplemental appropriations for the fiscal year ending June 30, 1929, and for other purposes, having met, after full and free conference have agreed to recommend and do recommend to their respective Houses as follows:

That the Senate recede from its amendments numbered 12 and 13.

That the House recede from its disagreement to the amendments of the Senate numbered 1, 2, 3, 4, 5, 6, 8, 9, 10, 11, 14, 18,

Case: 1:21-cr-00665 Document #: 30-2 Filed: 05/02/22 Page 14 of 50 PageID #:603

19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, and 30, and agree to the same.

Amendment numbered 7: That the House recede from its disagreement to the amendment of the Senate numbered 7, and agree to the same with an amendment as follows: In lieu of the matter inserted by said amendment insert the following:

"House Office Building: Toward carrying out the provisions of the act entitled 'An act to provide for the acquisition of a site and the construction thereon of a fireproof office building or buildings for the House of Representatives,' approved January 10, 1929, including not to exceed $900,000 for acquisition of a site, expenses of removal of buildings, and other structures located upon the site acquired, printing and binding, and miscellaneous expenses, $2,100,000, to remain available until expended."

And the Senate agree to the same.

Amendment numbered 15: That the House recede from its disagreement to the amendment of the Senate numbered 15, and agree to the same with an amendment, as follows: In lieu of the matter inserted by said amendment, insert the following: ": *Provided*, That no part of the foregoing appropriation shall be used to pay any refund of an income or profits tax pursuant to a claim allowed after the enactment of this act in excess of $20,000 (other than payments in cases in which a suit in court or a proceeding before the Board of Tax Appeals has been or shall be instituted or payments in cases determined upon precedents established in decisions of courts or the Board of Tax Appeals) unless a hearing has been held before a committee or official of the Bureau of Internal Revenue; and the decision of the Commissioner of Internal ˙Revenue in any such refund allowance in excess of $20,000 shall be a public record"; and the Senate agree to the same.

Amendment numbered 16: That the House recede from its disagreement to the amendment of the Senate numbered 16, and agree to the same with an amendment as follows: In lieu of the matter inserted by said amendment insert the following:

"BUREAU OF PROHIBITION

"For an additional amount for enforcement of the national prohibition act, including the same objects specified under this head in the act making appropriations for the Treasury Department for the fiscal year 1930, fiscal years 1929 and 1930, $1,719,-654, of which not exceeding $50,000 may be expended for the collection and dissemination of information and appeal for law observance and law enforcement, including cost of printing and other necessary expenses in connection therewith."

And the Senate agree to the same.

Amendment numbered 17: That the House recede from its disagreement to the amendment of the Senate numbered 17, and agree to the same with an amendment as follows: In lieu of the matter inserted by said amendment insert the following:

"For the purposes of a thorough inquiry into the problem of the enforcement of prohibition under the provisions of the eighteenth amendment of the Constitution and laws enacted in pursuance thereof, together with the enforcement of other laws, $250,000, or as much thereof as may be required, to be expended under authority and by direction of the President of the United States, who shall report the result of such investigation to the Congress, together with his recommendations with respect thereto. Said sum to be available for the fiscal years of 1929 and 1930 for each and every object of expenditure connected with such purposes notwithstanding the provisions of any other act."

And the Senate agree to the same.

> WILL R. WOOD,
> LOUIS C. CRAMTON,
> JOSEPH W. BYRNS,
> *Managers on the part of the House.*
> F. E. WARREN,
> CHARLES CURTIS,
> HENRY W. KEYES,
> LEE S. OVERMAN,
> CARTER GLASS,
> *Managers on the part of the Senate.*

## STATEMENT

The managers on the part of the House at the conference on the disagreeing votes of the two Houses on the amendments of the Senate to the bill (H. R. 15848) making appropriations to supply urgent deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide urgent supplemental appropriations for the fiscal year ending June 30, 1929, and for other purposes, submit the following written statement explaining the effect of the action agreed on by the conference committee and submitted in the accompanying conference report:

On Nos. 1 to 5, both inclusive, relating to the Senate: Appropriates $10,000 for payment to the widow of the late Senator Frank R. Gooding; appropriates $2,500 for payment to Ingham G. Mack for services rendered the Committee on Public Lands and Surveys; appropriates $5,000 for an automobile for the Vice President; and appropriates $3,500 for stationery, all as proposed by the Senate.

On Nos. 6 and 7, relating to the Architect of the Capitol: Appropriates $8,400 for maintenance, Senate Office Building, as proposed by the Senate, and appropriates $2,100,000 on account of a new House Office Building instead of $8,400,000, as proposed by the Senate.

On No. 8: Appropriates on account of the United States Supreme Court Building Commission, $25,000, including the procurement of models, as proposed by the Senate, instead of $10,000, as proposed by the House.

On No. 9: Appropriates $7,130,000 on account of the Porto Rican Hurricane Relief Commission, as proposed by the Senate.

On No. 10: Appropriates $10,000, as proposed by the Senate, for customs statistics, Bureau of Foreign and Domestic Commerce.

On No. 11: Appropriates $9,000, as proposed by the Senate, for effecting repairs at Haskell Institute, Lawrence, Kans.

On Nos. 12 and 13, relating to the Navy Department: Strikes out the appropriations proposed by the Senate for the relief of Lucy B. Knox and Vincentia V. Irwin.

On No. 14: Appropriates $700,000, as proposed by the Senate, for carrying into effect the provisions of the Foreign Service buildings act, 1926.

On No. 15: Inserts, in lieu of the Senate provision with respect to publicity in connection with tax-refund claims in excess of $10,000, a provision requiring a hearing before a committee or official of the Bureau of Internal Revenue in all cases except those in which a suit in court or a proceeding before the Board of Tax Appeals has been or shall be instituted or cases determined upon precedents established in decisions of courts or the Board of Tax Appeals, and, as to the unexcepted class of cases, requiring the decision of the Commissioner of Internal Revenue to be a public record where the amount of refund is in excess of $20,000.

On No. 16: Appropriates $1,719,654 under the Treasury ˙Department for the enforcement of the national prohibition act, instead of $24,000,000 as proposed by the Senate, to be allocated by the President to spending agencies, and makes $50,000 of the amount first named available for the collection and dissemination of information and appeal for law observance and law enforcement.

On No. 17: Appropriates $250,000 for an inquiry into the problem of the enforcement of prohibition under the provision of the eighteenth amendment of the Constitution and laws enacted in pursuance thereof, together with the enforcement of other laws, including all objects of expenditure connected with such purposes, instead of an appropriation of a corresponding sum for the purposes of a thorough inquiry into the problem of prohibition under the eighteenth amendment of the Constitution and laws enacted in pursuance thereof, as proposed by the Senate.

On No. 18: Authorizes the payment out of appropriations for salaries, office of the Treasurer of the United States, for the fiscal years 1928 and 1929, such sum as may be necessary to pay H. Theodore Tate the salary as Treasurer of the United States at the rate of $8,000 per annum from June 1, 1928, to January 17, 1929, both dates inclusive, as proposed by the Senate.

On Nos. 19, 20, and 21, relating to judgments, United States courts: Appropriates $377,566.23, as proposed by the Senate, instead of $11,566.60, as proposed by the House, for the payment of judgments rendered by the United States District Court for the Northern District of California, and appropriates $49,756.71, as proposed by the Senate, for the payment of judgments, including costs of suits, rendered by United States district courts under the provisions of certain acts.

On Nos. 22 to 26, both inclusive: Appropriates $1,818,335.86, as proposed by the Senate, instead of $897,096.09, as proposed by the House, for the payment of judgments rendered by the Court of Claims.

On No. 27: Appropriates $180,371.43, as proposed by the Senate, for the payment of claims certified to be due by the General Accounting Office.

On No. 28: Corrects a section number, as proposed by the Senate.

On No. 29: Appropriates $3,000, as proposed by the Senate, for the payment of claim allowed by the General Accounting Office under the provisions of Private Act No. 279, approved May 29, 1928.

Case: 1:21-cr-00665 Document #: 30-2 Filed: 05/02/22 Page 15 of 50 PageID #:604

On No. 30: Changes a section number, as proposed by the Senate.

WILL R. WOOD,
LOUIS C. CRAMTON,
JOSEPH W. BYRNS,
*Managers on the part of the House.*

Mr. WOOD. Mr. Speaker, I yield five minutes to the gentleman from Tennessee [Mr. BYRNS].

Mr. BYRNS. Mr. Speaker, I signed this conference report as one of the conferees of the House, and also the conference report on the second deficiency bill, which was passed by the House on yesterday.

There are a number of amendments in this bill and also in the preceding bill which I personally did not wholly favor, but a conference carries with it the idea of compromise between the two Houses, and it was extremely important, of course, that these bills should be passed, since they carry certain appropriations that are vital to the running of the Government; and it would have been not necessarily a disaster, but rather unfortunate if some of them were not made before the Congress adjourns.

I have asked for this time simply to explain my position with reference to one particular matter which appears in this bill and in the other bill.

This bill carries the sum of $1,719,000 in round numbers for the enforcement of prohibition. This bill, together with the second deficiency bill, carries the sum, in round numbers, of $3,227,000 as an additional sum for various law agencies in the enforcement of the prohibition and narcotic laws.

As gentlemen of the House know, I very vigorously and earnestly supported an amendment providing for $24,000,000 in addition, and I have not abandoned my views as to the advisability of appropriating that amount; but the House by a very large majority voted otherwise, and as your conferee, of course, it was my duty to cheerfully accept the instructions of the House, and I did so. But I am gratified that the fight that has been made for additional appropriations has brought to the attention of the Congress and the country the fact that something additional is needed in order to enable the Government to make an earnest and honest effort to enforce the prohibition laws and that the administration and Treasury Department were forced by public sentiment to submit additional estimates for appropriations, which it is admitted have been needed but which heretofore have not been asked for. I am hopeful that the sum which has been appropriated will aid greatly in that effort, and I hope that the incoming President, when he takes his place as President of the United States and has an opportunity to make the survey which is provided in one of these bills, will come before the Congress and tell the Congress exactly what is needed, both as to additional funds and additional legislation, if the result of his survey and his study causes him to believe that either or both is needed.

There are other amendments in this bill and in the preceding bill that I would like to refer to, but this Congress is about to adjourn, there is much business on the Speaker's table, and I shall refrain from doing so and content myself with this explanation of my position in signing this conference report in view of the previous action taken by me as an individual Member of the House. [Applause.]

Mr. WOOD. Mr. Speaker, I yield five minutes to the gentleman from Michigan [Mr. CRAMTON].

Mr. CRAMTON. Mr. Speaker, Congress exercises no more important function than the appropriation of money. The way it exercises that function determines the extent of Federal taxation.

The House has just won a notable victory for the cause of good government. Through the action of the House, it has been reaffirmed that when we are treating of the people's money and the Treasury of the United States, we are going to act in a businesslike way rather than to be carried away by ill-considered enthusiasm or hysteria. The controversy that has just been referred to by my friend from Tennessee [Mr. BYRNS] with reference to the Senate to appropriate $24,000,000 for prohibition enforcement without department request or program has attracted the attention of the country. The position of the House has been clearly expressed, that whatever money the administration requires and requests from Congress for the enforcement of national prohibition or any other function of the Government will be granted, but we must have before us evidence of their desire for the money and evidence of how they propose to use it. [Applause.]

The conference reports that have been brought in and have been accepted by the other body, appropriate every penny of increase for any arm of prohibition enforcement that is asked for by any branch of the Government and not one penny more.

The appropriations made are on a business basis and not on the basis of personal enthusiasm, and I am saying this not in any partisan way; and this is to the credit of the House of Representatives. This body always has been and is now the conservative, sane legislative body that protects the Treasury of the United States and is at the call of the cause of good government at any time. [Applause.]

Mr. WOOD. Mr. Speaker, I yield three minutes to the gentleman from New York [Mr. LAGUARDIA].

Mr. LAGUARDIA. Mr. Speaker, I can not permit the gentleman from Michigan to close this controversy without at least having my say. The gentleman from Michigan works up to a climax and talks about economy and protecting the Treasury. Protecting the Treasury and prohibition are inconsistent. You can not have both. The minute you have law enforcement and prohibition—and we must all necessarily be for law enforcement as long as it is on the statute books—you must abandon all hope for protecting the Treasury.

Gentlemen, as I have said so many times before, this is a national law and you can not commence to enforce it in 48 States of the Union among 120,000,000 people with a paltry $19,000,000. It seems that all the dry leaders care about is enforcement in New York City. Why, it will cost that much to stop the gap at the great port of entry, the fair city of Detroit, in the State which the gentleman represents.

Let us be perfectly frank about it. It behooves the drys of the House to stand up courageously and demand the hundreds of millions of dollars it will require to enforce prohibition, and as they fail to do it, demonstrating the impossibility of enforcement, it is our right to seek through proper, constitutional, and legislative channels a change in the law.

Mr. CRAMTON. Will the gentleman yield?

Mr. LAGUARDIA. I yield.

Mr. CRAMTON. I hope the time will come when the State of New York and the city of New York will share their proper responsibility in that matter.

Mr. LAGUARDIA. Let enforcement and prohibition, like charity, begin at home.

Mr. DENISON. When the gentleman gets to be mayor of New York, is he going to take the same position? [Laughter.]

Mr. LAGUARDIA. Mr. Speaker, I yield back the balance of my time. [Laughter.]

Mr. WOOD. Mr. Speaker, I move the previous question on the conference report.

The previous question was ordered.

The SPEAKER. The question is on agreeing to the conference report.

The conference report was agreed to.

Mr. SNELL. Mr. Speaker, I send to the Clerk's desk Senate Joint Resolution 9, and ask for its immediate consideration.

The Clerk read the Senate joint resolution, as follows:

Senate joint resolution (S. J. Res. 9) to establish a joint commission on insular reorganization

*Resolved, etc.,* That there is hereby established a joint congressional commission to be known as the joint commission on insular reorganization and to be composed of five Senators appointed by the President of the Senate, and five Members elect of the House of Representatives for the Seventy-first Congress, appointed by the Speaker of the House of Representatives. The commission is authorized and directed to make a careful study and examination of the various executive agencies of the Government engaged in the administration, supervision, and direction of matters pertaining to the insular possessions of the United States with a view to determining (1) the advisability of placing all such matters under the administration, supervision, and direction of one bureau or department of the Government, (2) the necessary and advisable transfers of executive functions to such bureau or department, and (3) a plan of organization for such bureau or department. The heads of the several executive departments and independent establishments shall, upon the request of the commission, detail representatives from their respective departments and establishments to assist the commission in such study and examination. The commission shall make a report in writing to the Congress, on or before December 16, 1929, which shall contain a complete statement of the results of such study and examination and recommendations for appropriate legislative or other action.

SEC. 2. The commission shall cease to exist upon the submission of its report to the Congress in accordance with the provisions of this resolution.

Mr. SNELL. Mr. Speaker, this resolution provides for a commission of Members of the Senate and House to study the conditions that exist in our insular possessions. At the present time they are under three different departments—the Army, the Navy, and the Interior Department. For that reason there is considerable confusion, duplication, and unnecessary expense. It is hoped as a result of the study by this commission they

may make some recommendations to the House and Senate that will be of advantage and that we will have greater economy and efficiency in running the insular possessions.

Mr. DENISON. Will the gentleman yield?

Mr. SNELL. Yes.

Mr. DENISON. What is included in the term "insular possessions"?

Mr. SNELL. I suppose all of our island possessions.

Mr. DENISON. That does not include the Canal Zone?

Mr. SNELL. I would not think it did; I do not understand so.

Mr. DENISON. Does it take in Alaska?

Mr. SNELL. The Territories are not included.

Mr. RANKIN. Will the gentleman yield?

Mr. SNELL. I yield.

Mr. RANKIN. I could not hear the question asked by the gentleman from Illinois: Does this resolution take in the Territories?

Mr. SNELL. It does not.

Mr. RANKIN. I wanted to know if it took in the Territories of Hawaii and Alaska?

Mr. SNELL. It does not take in the Canal Zone nor does it take in Hawaii or Alaska.

Mr. HOUSTON of Hawaii. Hawaii and Alaska are not possessions, they are Territories.

Mr. LaGUARDIA. Mr. Speaker, the gentleman from Hawaii is right. Hawaii and Alaska are not possessions, they are Territories.

Mr. RANKIN. Alaska and Hawaii are classed as Territories and not as insular possessions.

Mr. SNELL. I have just been informed by the Member who is the sponsor of the resolution that it does not include Territories.

Mr. RANKIN. That is the point I want to get at. The same conditions seem to prevail to a large extent in Alaska and in Hawaii as do in the Philippines and in Porto Rico with reference to the matters covered by this resolution, and while going into this proposition, if we are going to attempt to correct evils, why not correct those evils also in the Territories?

Mr. SNELL. I have no objection to that, but this is the resolution that has been passed by the Senate, and that has been passed by the House one or two other times. I have no objection to the Territories being included at some other time, but they are not included in this resolution.

Mr. GARRETT of Tennessee. Mr. Speaker, will the gentleman yield?

Mr. SNELL. Yes.

Mr. GARRETT of Tennessee. I do not think Territories ought to be included.

Mr. SNELL. They are not included.

Mr. GARRETT of Tennessee. I understood the gentleman from Mississippi [Mr. RANKIN] to suggest that the Territories might properly be included.

Mr. RANKIN. Yes.

Mr. GARRETT of Tennessee. I think upon reflection the gentleman will believe the Territories ought not to be included. There is no bureau here now that has anything to do with Territories; that is, not in the way that the Bureau of Insular Affairs, for instance, deals with Porto Rico and with the Philippine Islands, and the way the Navy Department deals with the Virgin Islands, and so on. The gentleman would not want to bring the Territories under any sort of an administration, or control or bureau in the way that those possessions are now under the control of the bureau.

Mr. RANKIN. Mr. Speaker, let me say to the gentleman from Tennessee [Mr. GARRETT] in that connection, that we have various departments in control of certain activities in Alaska, and we have a situation there that is not satisfactory in that regard. I say that advisedly, because I have been on the Committee on Territories ever since I have been here.

Mr. GARRETT of Tennessee. Quite likely that is correct, but that ought to be remedied in some other way than by bringing the Territories under the control of the bureau such as the Bureau of Insular Affairs.

Mr. TILSON. Mr. Speaker, if the gentleman will yield, there are many matters that would apply in the case of Territories that would not apply at all in connection with the insular possessions. If the gentleman desires a study made of Territorial conditions, he should have a separate resolution. It should not be combined with the study of the insular possessions, because they do not relate to the same sort of things.

Mr. RANKIN. I understand that this is merely a commission to study the proposition. We have had more trouble with various bureaus and their activities in Alaska than we have had in the insular possessions.

Mr. TILSON. That may be an argument for a study of the situation in the Territories, but not to combine the two in one resolution.

Mr. SNELL. Mr. Speaker, this resolution has the unanimous approval of the House Committee on Insular Affairs. I move the previous question.

Mr. HOUSTON of Hawaii. Mr. Speaker, will the gentleman yield?

Mr. SNELL. Mr. Speaker, I can not yield any more. I move the previous question.

The previous question was ordered.

The SPEAKER. The question is on the third reading of the joint resolution.

The joint resolution was ordered to be read a third time, was read the third time, and passed.

COMPACTS OR AGREEMENTS BETWEEN COLORADO AND UTAH RESPECTING THE WATERS OF THE COLORADO AND OTHER RIVERS

Mr. TAYLOR of Colorado. Mr. Speaker, I ask unanimous consent to take from the Speaker's table the bill H. R. 7028, granting the consent of Congress to compacts or agreements between the States of Colorado and Utah with respect to the division and apportionment of the waters of the Colorado, Green, Bear and Yampa, the White, San Juan, and Dolores Rivers and all other streams in which such States are jointly interested, with Senate amendments thereto, and disagree to the Senate amendments.

The SPEAKER. The gentleman from Colorado asks unanimous consent to take from the Speaker's table the bill H. R. 7028, with Senate amendments thereto, and disagree to the Senate amendments.

The Clerk will report the title of the bill and the Senate amendments.

The Clerk reported the title of the bill and the Senate amendment.

The SPEAKER. Is there objection?

There was no objection.

The SPEAKER. The question is on disagreeing to the Senate amendments.

The Senate amendments were disagreed to.

REPORTS BY CITIZENS' COMMITTEES ON INDIAN AFFAIRS

Mr. LEAVITT. Mr. Speaker, I ask unanimous consent to include in my remarks on Indian Affairs various communications that I have received from various reservations.

The SPEAKER. Is there objection?

There was no objection.

Mr. LEAVITT. Mr. Speaker, under leave granted I submit for the RECORD the reports of various committees of citizens of Montana regarding the conditions, particularly in schools where Indian children of that State are being educated. These reports cover matters on the Blackfeet, Fort Peck, Fort Belknap, Tongue River, Rocky Boy, and Crow Reservations in the second congressional district of Montana, and they are submitted by men of high standing with whom I am acquainted and for whose integrity I vouch.

The report for the Crow Reservation is submitted by A. H. Roush, Dr. S. H. Labbitt, and Carl Rankin, of Hardin, Mont. It is as follows:

HARDIN, MONT., *March 5, 1929.*

Supt. C. H. ASBURY,

*Crow Agency, Mont.*

DEAR SIR: Pursuant to your letter of February 23, with which you inclosed a copy of Circular No. 2551 from the Indian Bureau, we respectfully submit the following report based upon rather long familiarity with the Crow Reservation and upon investigation and inquiry that we have just made. You will realize that it has been impossible for this committee to visit various parts of the reservation owing to the impassable condition of the roads.

SCHOOLS

There are no boarding schools on the Crow Indian Reservation. The Indian children attend the public schools together with the white children. They have the same teachers, are in the same classes, are subject to the same discipline, enjoying the same privileges, are transported to and from school in the same busses, and are in all ways subject to the same care and attention as the white children are. Except three small parochial day schools conducted by Jesuit priests and taught by their teachers, they are all required to attend public school regularly. They are examined periodically by the school physician or nurse, and conditions regarding trachoma, tuberculosis, contagious diseases, tonsillar affections, defects in hearing and eyesight are noted and reported to the proper authorities for treatment and correction.

The superintendent, Mr. Asbury, is, and has been for the past nine years, a member of the board of trustees for the school district 17–H, which comprises a considerable portion of the reservation. A member

of your committee is also serving on the same board of trustees and he can truthfully say that the school interests of the Crow children in this district are very well cared for.

### FINANCES

In 1921 there was set aside from the tribal moneys a sum of $50,000 as a revolving reimbursable fund, which is loaned to the individual Indian for the purchase of livestock, implements, seed grain, and for farm improvements such as fences, barns, and other items necessary to carry on their farming projects. The individual Indian gets the use of this fund at an initial cost of 5 per cent, which is the only charge. It can be drawn upon with the recommendation of the district farmer and the approval of the superintendent. It is reimbursed from the income from the sale of crops and the rentals accruing to the Indian who borrowed from it. The high points in the operation of this fund occurred in 1921, during which year there was $40,883.78 expended and $11.50 collected, and in 1924 when there was $6,140.40 expended and $26,306.34 collected. This fund is deposited in the Treasury at Washington and drawn upon by United States Treasury checks.

The moneys belonging to the individual Indians are deposited in local banks where time deposits bear interest at the rate of 3½ per cent and checking accounts 3 per cent. Any Indian can obtain knowledge of the amount of money deposited to his credit upon application to the agency office and draw on his account at the request of the district farmer in his district with the approval of the superintendent. The aged, decrepit, or crippled Indians are cared for from their individual funds, from which they receive a stated sum paid each month, usually $25.

### FARMING

The Crow Reservation is divided into six farm districts, each one of which is supervised by a district farmer who has passed a civil-service examination. His duties are to supervise the farming operations of the Indians in his district; to advise in the selection and purchase of livestock, implements, and seed; to assist in leasing the farm lands and to see that the lessees comply with the terms of their contracts; to assist and supervise in the division of crops where farms are leased for crop shares. The Indians who are adjudged competent attend to the management of their own allotments, also the lands of their minor children. The records show a steady increase in the acreage farmed, improvement in methods, and ability to manage their farming operations. The members of your committee are personally acquainted with the district farmers and believe them to be competent and intelligent men who attend to their business and are interested in the progress of the Indians in their line of work.

### HOMES

There are three field matrons employed whose duties are to advise and assist in the management of homes; to teach canning, cooking, sewing, and the care of infants. The Indian women are appreciative and responsive to this instruction and have made great improvement in the management of their homes. Their exhibits of canned vegetables, preserved fruits, jellies, and sewing at the county fairs are worthy of note.

There have been many 2 to 4 room cottages built on the Indian farms in the past few years, probably aggregating around 100; and good drilled wells have been provided at many of these homes and there has been an increased interest in the proper furnishing of the homes.

The management of the reservation has contributed part of the salary of the county club agent of Big Horn County, who has organized 4–H Clubs among the Indian boys and sewing clubs among the girls. The girls are especially appreciative and have shown great aptitude in this work.

### HEALTH

Three physicians and one field nurse are employed who are at all times available when their services are required. There is a 30-bed hospital located at Crow Agency. The management pays for X ray and surgical work required when the physicians who are regularly employed can not take care of the cases. The Indians very much appreciate this service and gladly avail themselves of it. They use the hospital freely for maternity and surgical cases, and the death rate compares very favorably with other institutions of this size.

Recently a survey of this reservation has been made for trachoma and all cases have been encouraged to come in for operation, which operations have been approved and recommended by the United States Public Health Service for trachoma and its complications. A great many have availed themselves of this opportunity. An Indian is superstitious as to death and formerly would desert his house and abandon the premises where one of their number had died; whereas now their frequent use of the hospital is eloquent testimony of their treatment and good results.

### LEASES

All leasing operation on this reservation is on a competitive basis, with the right of the original lessee to meet the high bid if he so desires and is competent and desirable. Individual Indians who have leased their lands may obtain their rent money as soon as the same is paid, and the district farmer then distributes the checks to the various Indians immediately. The revenue from the tribal-land lease is dis-

tributed annually to all members of the tribe. The committee upon further investigation finds the interest of the Indian owner very carefully and fully protected to derive the most revenue possible.

### CONCLUSION

The time given your committee to make this survey would be inadequate were it not that each member has been living on the reservation for years and has had opportunity to observe conditions and note changes. One member has lived on or near the reservation since 1891; has served as county assessor for eight years, as county commissioner for two years, worked in a bank at Lodge Grass, and managed a bank at St. Xavier.

One member has been a resident physician and surgeon in Hardin for nine years and consulting surgeon on this reservation and United States employees' designated physician for United States Compensation Commission.

One member has served as county clerk for 10 years and resided on the reservation at Crow Agency for 6 years prior to this time.

In conclusion, your committee finds that the management of the Crow Reservation is economically managed in the interest of the Indian at all times, with very small cost to the Indians as a tribe. Educational advantages are the same as for the white people. The finances of the tribe as a whole and of the individual Indian are safeguarded and protected carefully with the view to educate them as fast as possible to assume financial responsibility. Actual farming by the Indians shows a great improvement over a period of years. Home life and living conditions show the most marked improvement due to the interest taken by them in the educational plans in operation on the reservation, which for years past have been followed by the white population and copied by a large percentage of the tribe. Their health is carefully protected and supervised, being on a par with the white people. The managing authorities of the reservation have been in full cooperation with the county authorities in all matters pertaining to public improvements, with the full consent and approval of the Indians.

Your committee desires to acknowledge the courtesy of employees and the help of clerks in the office in connection with this investigation.

Respectfully submitted this 5th day of March, 1929.

A. H. ROUSH.
CARL RANKIN.
S. H. LABBETT.

The Tongue River Reservation is the home of the Northern Cheyennes. The report is made by Edw. T. Cahill, E. E. Hynchman, and D. T. Deverill, and reads:

BUSBY, MONT., *February 11, 1929.*

Mr. C. B. LOHMILLER,
    *Superintendent Tongue River Agency, Lame Deer, Mont.*

DEAR MR. LOHMILLER: We, the undersigned, in compliance with your request, have this 11th day of February, 1929, made a thorough investigation of the Tongue River Boarding School, and respectfully submit the following as our report on conditions as found by us at said school:

### FOOD

We visited the dining room at noon and the following menu was on the table: Boiled beef, boiled potatoes, gravy, sweet corn, bread, peaches for dessert, and milk to drink. Apparently there was plenty of food on each table and it was well cooked.

The children appeared to be well nourished. We found the kitchen nice and clean and the cook appeared to be efficient.

Inspection was made of the warehouse or commissary, and an abundant supply of food was found, which was in excellent condition and stored in a good building. These supplies consisted of the following: Beef, 8 or 10 freshly slaughtered hogs, beans, dried peas, hominy, rolled oats, corn flakes, flour, dried and canned fruit, sugar, lard, sirup, cocoa, etc. The quality of all food appeared to be of the best.

### CLOTHING

The individual lockers in the building contained each child's clothing, which consisted of extraheavy underwear for both girls and boys, work and school dresses for the girls, and heavy corduroy suits for the boys. The girls each have a woolen cape and a warm, blue serge Sunday uniform. The boys each have a wool uniform for Sunday and a heavy mackinaw. Each child is provided with two pairs of overshoes during the school year. All these items of clothing were in the lockers. The clothing was of good quality and the children appeared neat and contented. An abundant supply of clothing was also found in the commissary, same consisting of shoes, boys' uniforms, underwear, dress goods, etc.

### HOUSING CONDITIONS

Inspection was made of both the girls' and boys' dormitories, and same were found to be well ventilated, steam heated, clean linen was on each bed, and each bed was provided with four blankets. The matron informed us that the linen was changed once a week. All dormitories were apparently well kept and sanitary.

The schoolrooms were well heated, but one of the two of them were very crowded. The basement of the building is used as playrooms

for the children. The need of a gymnasium or large recreation room is very evident.

Both boys and girls have a bathroom, wash room, and toilet facilities. Your attention is invited to the fact that a combination gymnasium and school building should be constructed, as the classrooms are now in the dormitory building, and studies are more or less interrupted by the noise and other activities of those out of the classrooms.

The school plant is lighted by a Delco light system, which is old and worn out and at times, we are told, breaks down and the plant is unlighted. This condition prevailed at the time the investigation was being made.

### MEDICAL ATTENTION

A supply of medicine and emergency equipment is kept at the school. The matron is a practical nurse. The agency physician is located at Lame Deer, 22 miles distant from the school, and is connected by telephone and can be called when wanted.

Individual toothbrushes, towels, combs, and brushes were found in both the boys' and girls' wash rooms.

The children appeared to be healthy and contented. The principal informed us that only 14 cases of sickness occurred during the school year, and these consisted of light cases of the flu.

### CRUELTY

A number of the students were personally interviewed, and they stated they were not whipped nor punished. They also stated they had plenty to eat and were well treated.

The employees appeared to be polite and kind-hearted.

We found 89 boys and girls at this school, and they appeared to be happy and contented, well fed and clothed, and housed, and the Tongue River Boarding School created a more favorable impression than other State institutions we have visited in the past.

In conclusion, the committee would state that the above has been arrived at after a conscientious and thorough investigation of conditions at this school.

Very truly yours,

EDW. T. CAHILL,
*Postmaster, Busby, Mont.*
E. E. HYNCHMAN,
*Stockman, Big Horn County, Mont.*
D. T. DEVEBILL,
*Sheepman, Big Horn County, Mont.*

The Blackfeet Indians occupy the reservation named for them. There now follows the statement of Frank Bossout, Dr. J. H. Crouch, and Douglas Gold:

BROWNING, MONT., *February 8, 1929.*

Mr. FORREST R. STONE,
*Acting Superintendent Blackfeet Agency,*
*Browning, Mont.*

DEAR SIR: In compliance with Indian Office Circular No. 2546, we, the undersigned committee of citizens, who were requested by you to make a detailed inspection of the Government boarding school on the Blackfeet Reservation; this inspection to cover the plant, equipment, and condition of the children, particularly as to whether or not they are properly fed, clothed, and housed, as to medical attention, and severity of various punishments; you are advised that we have made such an inspection and transmit herewith our findings.

Very truly yours,

FRANK BOSSOUT,
*Architect, Havre, Mont.*
J. H. CROUCH, M. D.,
*Epidemiologist and Deputy Public Health Officer,*
*Montana State Board of Health, Helena, Mont.*
DOUGLAS GOLD,
*Superintendent of Public Schools, District No. 9,*
*Glacier County, Browning, Mont.*

INSPECTION MADE BY CITIZEN'S COMMITTEE OF THE BLACKFEET BOARDING SCHOOL ON FEBRUARY 8, 1929

### GENERAL PLANT AND GROUPING OF BUILDINGS

The general arrangement of the buildings at the boarding school is in the nature of a square, the various buildings being grouped around an open court, which is about 150 yards in each direction. At the south end of this square are situated the hospital and physician's living quarters. On the east side are the school building and the boys' dormitory. On the north side are the employees' quarters and the principal's residence and office. On the west side is the girls' dormitory, which also contains the general dining room and kitchen. Behind the girls' dormitory is the bakery, the laundry, and the commissary building. To the southeast of the square at a distance of about 100 yards is the dairy barn and hog lot. Near the dairy barn is the residence of the farmer (incomplete). The hospital, of course, is not included in the actual school plant, but on account of its proximity it is mentioned because it has a definite bearing on the health of the children.

We found 136 children in the school, 54 being housed in the boys' dormitory, 71 in the girls' dormitory, and 11 in the hospital. Two of

these last are confined to the hospital, one with frozen feet and the other with a severe case of impetigo. Four girls and four boys, who are classed as arrested pulmonary-tuberculosis cases, and one boy, with a rather severe heart condition, are housed and fed in the hospital, and go from there to attend classes in the school, but are not allowed to mingle with the other children or do any work.

### DETAILED DESCRIPTION OF THE PHYSICAL PLANT, INCLUDING CONSTRUCTION AND EQUIPMENT

Dairy barn: We found that the dairy barn is a frame building of recent construction, and modern in every respect, and very adequate and plenty large for the use of this institution.

School building: We find the school building consists of a 4-room brick building, three rooms and the auditorium having been built a number of years ago and in not a good condition. There is a recent addition of one schoolroom to the school building, which in itself is good, but not complete. We find that the steam-heating system has not been carried to this new room, and that the same is heated with a stove, which leaves a part of the room very cold. In going over the heating system, we find an old obsolete boiler, wholly inadequate for the heating of the school building. We also find the system of heating mains in a very poor condition. We also find that there is very poor equipment in the new schoolroom, being composed of old desks that are broken and not at all substantial, together with tables and chairs to complete the seating of this room. We find that the basement windows are broken and out and frames filled with temporary boards for weatherproofing. The three schoolrooms and auditorium we find neatly painted, and general sanitary conditions equal to the average school, except that there are no toilet facilities in the school at all in the way of toilets, drinking fountains, or washing facilities. We find that the boy pupils from this school have to go to their dormitory for toilet facilities, there being only one toilet in the general toilet room, and one toilet on the second floor, for approximately 55 pupils. This by all means should be corrected and proper toilet facilities given the boys attending the school. These facilities apply as well to the girls, who have to go to the girls' dormitory for toilet facilities, approximately 200 yards.

Boys' dormitory: The boys' dormitory is an old brick building in very bad condition. We find the heating plant for this building in the same condition as that of the school, being totally inadequate for the heating of this building, the plumbing and heating mains leaking, and needing immediate work on same to make the building reasonably habitable. We find that the floors in this building, outside of the main hall on the first floor, are badly worn and very rough. The doors and windows badly fitted and not at all weatherproof. The plastering broken in many places. It is evident that the superintendent in charge has done everything possible within his means to make the building as sanitary as possible. As previously mentioned, there are not sufficient toilet facilities for the number of boy pupils, there being two stools on the first floor, one of which was out of order, and one stool on the second floor. Washing facilities with soap and hot water are provided in the wash room adjacent to the toilet on the first floor, but towels are provided only just previous to each meal. For this reason it is impossible for the pupils to wash their hands after casual visits to the toilet, as they are instructed to do. In the dormitory rooms the only equipment present are the beds themselves. There being no chairs, dressers, or other furniture at all. There were not even nails in the wall on which to hang the children's clothes; when they undressed they must lay their clothing across the foot of the bed. There were four of these bedrooms, and in some of them the beds were only 9 inches apart. The air space per pupil varied from 325 feet to 462 feet. Window space for lighting and ventilation is adequate in all rooms. Quite a few of the beds are occupied by two boys. There are sufficient beds to allot one to each pupil, but the doubling up is necessary because of the lack of blankets. The playrooms were entirely without equipment, except for three or four benches arranged around the walls. Not a single chair was seen in the whole boys' dormitory. Just off the boys' playroom is a room equipped with cupboards for the boys to keep their personal belongings. These cupboards being entirely without locks, and no provision made for the security of their belongings.

Girls' dormitory: We find that the girls' dormitory is a large brick building that has been built some years ago and in better condition than the two buildings previously mentioned. This building, aside from the flooring in the second-story hall, is in fairly good condition, considering the age of the building. In this building is the general dining room for all pupils and a kitchen, the same being equipped with a meat room, with ice storage adjacent thereto, which keeps the food in satisfactory condition. The plumbing in this building is old, obsolete plumbing and sadly in need of replacement. The heating seems to be adequate, but the same conditions prevail in regard to furniture for the girls' dormitory as previously set forth in the boys' dormitory, there being the same lack of towels in the basement toilet, the same lack of chairs and other equipment in the bedrooms and the playroom, and a serious deficiency of blankets, which necessitates quite a few of the girls sleeping two in a bed. The dining room arrangements are a number of tables seating eight children. Stools are used for seats and the dishes are aluminum.

Laundry: The laundry building is situated in the rear of the girls' dormitory, is an old brick building with obsolete laundry equipment. Included in this building is also the bakery, with equipment not much better than that in the laundry. In the lean-to to the rear of this building is the boiler room, furnishing the steam for the laundry and operation of the water-supply system. We find that the reservoir on the south end of the grounds, on the high bank, only provides 35 pounds water pressure, which is not sufficient for proper fire protection for the buildings at this plant. The laundry equipment, as before stated, being obsolete, is also dangerous, inasmuch as the mangle is not protected by proper guards for same; also there are not sufficient guards on belting running this machinery, which makes it dangerous for operation.

We also find that these buildings are served by sewer connected to a septic tank which is inadequate for the buildings.

### PHYSICAL CONDITION OF CHILDREN

The storage of the food supply consists of the commissary building, which is rat and mouse proof, and the food is in very good condition, being free from contamination or insect infestation. The root cellar or pit for storage of green vegetables, while crude, is apparently efficient.

The children were found to be cheerful, reasonably clean, and well behaved. The weight charts in the various schoolrooms show that 26 out of the 136 children were 10 per cent or more underweight; none, however, were as much as 15 per cent underweight. This compares very favorably with the average public-school group. The children are weighed monthly, and the general average of gaining during the past five months is approximately 6 pounds per child. The children receive a regular weekly medical inspection besides frequent irregular inspections by the physician, and the teachers are instructed to constantly observe the condition of the pupils and to be particularly on the lookout for evidence of incipient sickness. Quite a few of the children show evidence of trachoma, which is under regular treatment of the physician in charge, and few show some evidence of impetigo, which is also being treated. No head lice were observed.

Food: Weekly menus are prepared by the matron and approved by the principal. The supply is apparently abundant and variety is adequate. Two green vegetables are usually furnished at the noon meal, besides the meat and potato ration. Butter is served at two meals daily. The dairy furnishes an average of about 250 pounds of milk a day, and this is used up entirely by the pupils and hospital patients. Each child receives at least a pint of milk a day, and sometimes more than this, as either raw milk or in cocoa.

Clothing: Each child is supplied with three union suits of winter underwear of sufficient weight. The boys have corduroy suits and caps, and the girls plain dresses and sweaters. All are provided with shoes and stockings, which seem to be in fair condition. In general, the clothing seems to be reasonably adequate and in good condition. Each child receives clean clothing and bed clothing once each week, and each child receives a shower bath under supervision each Saturday. Those who are in active work or athletics also bath at irregular intervals.

Instruction: The pupils are divided into seven grades for instruction, one teacher having the first grade and beginners, one the second and third grades, one the fourth, and one the fifth, sixth, and seventh grades. The teaching appears to be of an average order, being handicapped somewhat by shortages in equipment already mentioned. The expenditure of a very little in the schoolrooms would very materially increase the possibility of high-grade work on the part of the teachers. The school bell is broken and as a result there is considerable irregularity in the time of assembling and recess periods. The records of attendance are scarcely adequate or satisfactory. It is noted that all children are in school for a full school day, the work details and other assignments being assigned to them outside of regular school hours. A good-sized assembly hall is included in the school building, but the absence of any seating facilities makes its value doubtful. The hall is not large enough for indoor games, although some attempt has been made to play basketball in it.

Work details: Several of the larger boys assist in the farming operations and some slight shop work, and a number of the larger girls serve details in the laundry, general dining room, and kitchen and employees' mess. Girls also serve a detail in the sewing room, and all pupils apparently participate in the cleaning of the buildings. Work details, according to the best information available, are limited to not more than two or three hours daily, which does not seem to be at all excessive.

Recreation: The school seems sadly lacking in equipment for either organized or unorganized play. The rooms designated for indoor play are entirely bare of any equipment, and the one attempt at playground apparatus is useless, because the rings and swings are missing from the frames. A very creditable band is organized among the students, and in favorable weather Sunday walks are encouraged and participated in by pupils, teachers, and employees.

General treatment: Within the schoolrooms the discipline seems to be free and satisfactory. The teachers report that occasional disciplinary problems arise, but there was no apparent sullenness, fear, or unsatisfactory relations between the teacher and pupil. At recess time the children walked freely from the buildings, but at meal times a more formal order is maintained. Smaller children are given some assistance in the dining room in serving their food. The children appear to be cheerful and reasonably affectionate toward those in charge of them. According to the testimony of Principal Sellars, corporal punishment, which was always very limited, has been eliminated entirely as a means of correction. The only punishment which appears available for the use of the teachers is added duty and work details.

FRANK BOSSOUT,
*Architect, Havre, Mont.*
J. H. CROUCH, M. D.,
*Epidemiologist and Deputy State Health Officer,*
*Montana State Board of Health, Helena, Mont.*
DOUGLAS GOLD,
*Superintendent of Public Schools,*
*District No. 9, Browning, Mont.*

The Fort Belknap Reservation is inhabited by Assiniboines and Gros Ventres. I place here the report of C. H. Wilhaun, G. C. Braudvold, and Rev. F. B. LaFavre:

HARLEM, MONT., *February 11, 1929.*

The COMMISSIONER OF INDIAN AFFAIRS,
*Washington, D. C.:*

Survey of Indian Boarding Schools by Citizen Committee.

Your committee wishes to state that it made a careful investigation of all portions of the plant at the Fort Belknap Agency and we find the conditions of each practically as follows:

### BOARDING SCHOOL

We found the buildings kept very neat and clean, everything was sanitary, and we found the food that was being fed the children abundant as to quantity and better as to quality and preparation than one could reasonably expect from an institution of this kind. The children were being well cared for and we are certain that the most commendable methods are being used in the administration of this institution.

We visited the school and found three departments with an approximate enrollment of 118. The teachers were as modern as any of the teachers of schools outside of the reservation. The children were busy in their work and we could see no evidence of cruelty or partiality in the matter of discipline of the children. The equipment appeared to be adequate and on the whole your committee left with a favorable impression as to the management of this school.

We found that the health education was, in our opinion, superior to that of the public schools of our county. The doctor at the agency has charge of the health work and the data that he showed us regarding the improvement in regard to the children in the matter of health after two or three months' residence at the school was in itself sufficient testimony as to the character of the food and care given the children.

We inspected the barns and other outbuildings and found that those who had them in charge were caring for them in approved and modern ways. The dairy barn being especially noticeable because of its neatness and the splendid condition of the stock.

The hospital plant, while small, was taking care of severe cases of illness in a manner that met with the hearty approval of the committee. If we were to offer any criticism of this plant, whatsoever, it would be to simply say that the buildings are old and when constructed made no provision for ventilation and other modern arrangements for accommodating and caring for the health of all concerned. While we do not consider this a serious matter because of the efficient way in which the attendants were caring for the proposition with the means at hand, we believe that the schoolroom is crowded and that at least two more rooms should be provided to accommodate and properly care for the children that are now enrolled in the school. In so far as the children themselves are concerned, your committee believes that they are being cared for as to food, clothing, and instruction, better than the average of the white children of our county or surrounding counties.

G. H. WILHAUN,
*County Superintendent of Schools Blaine County,*
*Chairman of Committee.*
G. O. BRAUDVOLD,
*Cashier of First National Bank, Harlem, Mont.,*
*Member of Committee.*
F. B. LAFAVRE,
*Pastor of U. B. Church, Harlem, Mont.,*
*Member of Committee.*

On the Fort Peck Reservation are Indians of the Assiniboine and Yankton Sioux Tribes. The investigating committee there consisted of A. T. Listug, Frank H. Livingston, and Dr. C. B. Larson. It is as follows:

POPLAR, MONT., *February 11, 1929.*

Mr. CHARLES EGGERS,
*Superintendent Fort Peck Indian Agency, Poplar, Mont.:*

This is to certify that we, the undersigned members of the investigation committee, have on this 11th day of February, 1929, completed a

1929        CONGRESSIONAL RECORD—HOUSE        5189

thorough and detailed investigation of the conditions and affairs and local supervision of the Indian schools.

First. We find the foods to consist of fresh and cured meats, fresh and canned vegetables, cereals, bread, butter, cocoa, milk, and desserts, all well prepared by trained cooks in clean and sanitary kitchens. Meats and other perishable foods are kept in coolers. An inventory of the food-supply warehouse indicates a full and complete line necessary for cooking and kitchen service. All the children get as much food as they want, as it is served in home style and they can have as many helpings as they may wish. (Bread is served—all they want—at each meal.)

Second. We find the children all well clothed. The boys have woolen uniforms (of the United States Army grade, O. D.), other heavy and serviceable grades for work clothes, good mittens, overshoes, and underwear. In addition some Indian children who have the means are also permitted to buy fancy shoes or clothing if they so wish.

The girls are provided with heavy blue-serge dresses, heavy sweaters, and overshoes, also house dresses of usual practical materials. In fact, they are completely and well dressed for all ordinary needs, and in addition many of the girls provide coats of such kind and styles as they may want.

We find the buildings to be of rather old construction, but in excellent state of repair. The girls' and boys' sleeping quarters are well heated and ventilated, with steel stairway fire escape that seems ample and safe. The individual beds are clean and well kept. The heat is kept at a suitable and even temperature night and day.

The boys and girls are housed in separate buildings. These are both well kept and supervised. The lavatories, bathing and toilet facilities, while not of the most modern types, appear to be ample.

The classrooms are clean and orderly and seem to be in charge of competent teachers. The work done in the respective grades by the students reflects progress and discipline. If we make a recommendation here, it is in regard to the lighting of the schoolrooms. There are cross lights which are hard on the eyes of the children. Windows can be put on one side of each room at little expense. The reading library is limited. A small amount of money would easily remedy these minor defects.

A new, modern hospital of 28 beds, equipped with X-ray instrument and dressing sterilizers, large operating room, well lighted; dressing room; complete stock of hospital and medical supplies; very complete and sanitary cooking and kitchen service. The ventilation, sun parlors, beds, and linens are among the best in this section. This hospital is under the direct supervision of Dr. C. D. Fulkerson, assisted by two trained nurses, Mrs. Dale and Miss Haan. Both the doctor and the nurses are careful and doing excellent work in their line. This is evidenced by the records and the results at this hospital. Doctor Fulkerson, of the hospital staff, makes a thorough medical examination of all the school children twice each year, and more often in cases of epidemics or other emergencies. Weight charts, where monthly records of weights are kept, show healthy and normal increase of weights from time to time.

We find that proper supervision is given to all the details, such as regular hours for rising, for meals, for play and recreation, retiring, etc. Our observations are that the children at the Fort Peck Indian Boarding School are fully as well cared for in all matters as any average class of white children in our public schools.

We find no evidence, either from inquiring or otherwise, where any corporal or unusual punishment is used, and any report to the contrary, in our opinion, does not state the facts.

We are especially impressed to find that the Fort Peck Agency officials are anxious to furnish all detailed information and the actual facts to this committee.

They further state that the Indian Department at Washington, D. C., has never once turned down any request they have made pertaining to things needed for this school. If there is anything lacking, it is because some official in charge has neglected or omitted to place the proposition properly before the Indian Department at Washington.

In making this report we have made personal investigation of the various items involved and also supplemented this information with inquiries from first-hand sources, and our findings are made accordingly. Respectfully submitted.

A. T. LISTUG,
*Vice President First National Bank, Wolf Point, Mont.*
FRANK H. LIVINGSTON,
*Superintendent Wolf Point Consolidated Schools.*
C. B. LARSON, M. D.,
*Health Physician, Roosevelt County, Mont.*

The Rocky Boy Reservation Indians are Crees and Chippewas. A committee consisting of Robert R. Lucke, R. C. Timmons, and E. C. Carruth made the study there, and reported as follows:

REPLY TO CIRCULAR NO. 2546, DATED FEBRUARY 2, 1929

Mr. E. B. MERITT,
*Commissioner Indian Affairs, Washington, D. O.*

DEAR SIR: Your circular No. 2546, dated February 2, 1929, addressed to the Indian superintendents, has been handed to us for

reply for Government Agent Shotwell, of the Rocky Boy Indian Agency situated in Hill and Choteau Counties, Mont.

We, your committee, Robert Lucke, chairman of the Havre Chamber of Commerce; R. C. Timmons, sheriff of Hill County and representative of the Kiwanis Club of Havre, Mont., beg leave to report to you as follows:

We have visited the agency and the schools and are thoroughly acquainted with conditions and the Rocky Boy Band of Indians.

FOOD

We investigated the menus for the pupils in the schools, of which there are two in the Rocky Boy Agency, and at random selected two days' rations. Hot cocoa is served at 10.30 every forenoon. Monday, February 4, 1929, was as follows: At noon they served macaroni and tomatoes, mashed potatoes, beef extract with gravy, butter, hot baking-powder biscuits, and sirup. Tuesday, February 5, 1929, they served escalloped potatoes, creamed peas, stewed peaches, whole-wheat bread, butter, and sirup. The children told us that they were amply supplied with food. We found no complaint on this whatever.

CLOTHING

The schools open in September and in the fall the boys are given two suits of underwear, shirts, overalls, and mittens, and when these are worn out they are given others. The girls are given underwear, dresses, and mittens, and in asking those who could talk English and from observation, we figured that they were well clothed and have no complaint from them whatever.

HOUSED

The Rocky Boy day school is at the agency proper. It is a large log building, lined with beaver board; has a kitchen, a wash room, a dining room, and two schoolrooms, 24 by 24 with an 8-foot ceiling. One schoolroom has 169 cubic feet of air space and 163 cubic feet of air space in the primary room. The advance schoolroom has over 50 square feet of window glass, while the primary room has over 64 square feet. They have regular school desks.

The building is an old one, somewhat hard to heat, rather poorly lighted, and, if possible, we would recommend that a new and larger building be constructed as this school takes care of, at this time, 48 pupils, equally divided, 24 boys and 24 girls, coming from about 27 or 28 families in the agency neighborhood. The second school building is approximately 3½ miles northwest of the agency on what is known as Little Box Elder Creek, near where the Sun Dances are held. This building is new, has very good light, and is well heated. At this school they have over 18 pupils and it is constantly growing. We would estimate, from discussion, that there will be 25 more pupils in the next year or so. These people will need another school and from discussion with the agency authorities we would figure it should be placed about 4 miles toward what is known as Beaver Creek and should be established for the primary grades.

MEDICAL ATTENTION

The agency doctor is Dr. D. S. McKenzie, of Havre, Mont., located at a distance of approximately 35 miles from the agency buildings. Doctor McKenzie is a graduate from the Rush Medical College and has practiced medicine in Havre since 1900. He is one of the very prominent public men in northern Montana and gives the service very close attention. It is impossible to give a report from Doctor McKenzie at this time, on account of his absence from the city, as he is at Rochester, Minn., attending the clinic there and won't be back home until after the 20th of February.

I think we have taken up the items in rotation as requested in your circular but we will add some more information in case it is desired.

There are approximately 26 Indian log and frame houses at the agency proper. Nearly all of the Indians move to the agency in the winter on account of its severity. We find that there is an English Lutheran Church at the agency—Reverend Gable the minister. There is also a Catholic mission there, with the priest taking care of the services from Havre. The postmaster is Reverend Gable, who is married and has three children living in the agency. They teach up to the fifth grade in the advance school. The younger children are rapidly learning to talk English, and after about two years can get along very nicely. Nearly all bands can either talk English or make themselves understood. The tribe languages, or the languages that they talk, are Cree, Chippewa, Piegan, Blackfeet, and other languages tributary to Montana. They have a very good school nurse at the agency. Her name is Ruth Riss, aged 32, a graduate from a Pennsylvania college and has very good control over the children.

The farmers (Indian) grow wheat, oats, and hay. They don't take care of their lands and will not summer fallow; therefore they are pestered with fan weed and other weed pests. They have cayuses and small horses, but no large or good stock.

The agency should have a hospital and a resident physician on account of the large number of children in and about there. We understand from Agent Shotwell that it has been under consideration. We recommend consideration.

In discussing the matter of the opening of the school in September we ascertained from the school-teachers that nearly all of the boys and girls were underweight, due to the fact of the outside Indian

life during the spring and summer and not having regular meals, which, of course, is not the fault of those in charge at the agency. For example: Fred Alexander weighed 90 pounds in September, 1928 (9 pounds underweight); gained 4 pounds by February 1, 1929. Edward Belcourt weighed 68 pounds in September, 1928 (15 pounds overweight); gained 4 pounds by February 1, 1929. The school nurse informed us that all of the children showed a gain of from 4 to 10 pounds between September 1 and February 1, occasioned by the regular meals and wholesome diet.

From observation and consultation with the authorities, we would figure that they are short of money to handle the rapidly growing agency school work.

At the school at the agency proper there are two teachers, a man and his wife, about 28 years of age, named Norman E. Howes. They both teach and have two children—a boy of 11 and a girl of 5.

At what is called the new school, 3½ miles from the agency, they have a man teacher named Willard Howland, aged 31, married and has a baby. The wife helps get the lunch, make the cocoa, etc.

The winter in northern Montana has been very severe this year, at least since January 15, the thermometer ranging from zero to 46 below at the agency. However, the Indians have fared very well, and there has been very little suffering; but at a time like this they really need a local hospital and a resident physician.

In the past and during the time that Agent Shotwell has been in charge of the affairs at the Rocky Boy Agency the people in Havre and Box Elder, near-by towns—Box Elder being 12 miles from the agency and Havre 35 to 40 miles from the agency—have become well acquainted with him and with the work that he is doing, and we have always found him a very capable, efficient, and energetic worker. The sheriff, R. C. Timmons, comes in contact with the people in Hill County and, naturally, quite frequently with the Indians and with Agent Shotwell, and he compliments him very highly on the efficient work that he is doing. Bob Lucke, a merchant in Havre and chairman of the chamber of commerce, comes in contact with many of the Indians who trade and often visit Havre, and he is in a position to know the conditions here; and E. C. Carruth, operating the Havre Hotel for the past 25 years, and representing the Rotary Club of Havre, considers himself very well acquainted with the Bearpaw Mountains, with the Cree Indian conditions, with Agent Shotwell's work, with the agency physician, Dr. D. S. McKenzie, and his work, having made many trips to the agency during the past few years, and also acquainted with the farming operations and many of the older Indians at the agency, as he has been one of the Havre people who have been interested in the welfare of the Indians before they secured that part of the Fort Assinniboine Reservation as an Indian agency.

Finally, we, your committee, desire to say that there is absolutely no complaint from the Indians in the Rocky Boy Agency on their manner of treatment, either as to food, clothing, housing, medical attention, or general welfare.

ROBERT R. LUCKE,
*President of Chamber of Commerce, Havre, Mont.*
R. C. TIMMONS,
*Sheriff of Hill County, Mont., and Representing the Kiwanis Club of Havre, Mont.*
E. C. CARRUTH,
*Representing the Rotary Club of Havre, Mont.*

As chairman of the Committee on Indian Affairs, I have had sent to me copies of similar reports from all of the States in which Indian administration is important. Many of them have been placed in the RECORD by Representatives from those States. All are well worthy of study and consideration. They point constructively the way to some needed reforms, and they also set forth encouraging progress which has been achieved.

NATIONAL ORIGINS

Mr. SNELL. Mr. Speaker, by direction of the Committee on Rules I present a privileged resolution, which I send to the desk and ask to have read.

The Clerk read as follows:

House Resolution 349

*Resolved,* That upon the adoption of this resolution it shall be in order to move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of House Joint Resolution 402, to amend subdivisions (b) and (e) of section 11 of the immigration act of 1924, as amended. That after general debate, which shall be confined to the House joint resolution and shall continue not to exceed 30 minutes, to be equally divided and controlled by those favoring and opposing the House joint resolution, the House joint resolution shall be read for amendment under the 5-minute rule. At the conclusion of the reading of the House joint resoution for amendment the committee shall rise and report the House joint resolution to the House with such amendments as may have been adopted, and the previous question shall be considered as ordered on the House joint resolution and the amendments thereto to final passage without intervening motion except one motion to recommit.

Mr. SNELL. Mr. Speaker, I yield 20 minutes to the gentleman from Tennessee [Mr. GARRETT].

Mr. GARRETT of Tennessee. Mr. Speaker, I yield 10 minutes of that time to the gentleman from Ohio [Mr. JENKINS].

Mr. JENKINS. Mr. Speaker, ladies and gentlemen of the House, according to this morning's paper, we see the announcement that the principal reason for our convocation to-day is to pass this resolution. For one, I can not see for the life of me why we should desecrate the Sabbath in order to attempt to pass a matter that is of such little importance as is the matter contained in this resolution. What does the resolution propose to do? It proposes to postpone the law of 1924 which was passed with all the formality and solemnity of the passage of any other law. I refer to that provision of the immigration bill of 1924 which has to do with the establishment of the quotas under which immigrants come to this country. That law provided two methods by which the quota might be established. One was the census of 1890 and the other was what was called a national-origins provision.

Why was the census of 1890 selected? Purely as a matter of expediency at the time. The immigration act of 1924 marked a real epoch in the enactment of immigration legislation. It was a real turning point. It was the establishment of a quota law. No one can claim that the figures we had at that period were of sufficient accuracy to establish a permanent quota. They accepted the 1890 census in the act of 1924.

Mr. MICHENER. Mr. Speaker, will the gentleman yield there?

Mr. JENKINS. Yes.

Mr. MICHENER. Was not that the first census taken in which nationalities were developed?

Mr. JENKINS. I can not answer that question accurately because the successive censuses as developed have been taken along different lines.

Mr. MICHENER. I understand the census of 1890 was the first one that was taken in that way, and I understand that is the reason why it was adopted as the basis in the act of 1924.

Mr. JENKINS. That was not the reason. I can tell you the reason. We all know the policy of restriction is aimed to restrict immigration from southern and eastern Europe. If the 1920 census had been accepted, the result would have been that there would have been more immigrants out of Italy than out of England. The immigration, as we all know, has come from different countries in different periods. In the immigration from England, Scotland, North Ireland, and Wales were many of the real pioneers and builders of this Nation.

Mr. CONNERY. Right there, what does the gentleman mean by "the real pioneers"?

Mr. JENKINS. I mean that is what they were. That is the fact.

Mr. CONNERY. The gentleman said "northern Ireland." If he had said "southern Ireland," there would be something to it. [Laughter.]

Mr. JENKINS. I will digress a moment to answer the gentleman's question. If you were to take the census of those who framed the Constitution of the United States, you would find that 80 per cent of them were from the countries I named. You would find where they came from, and you would find that they came from those countries.

Now, take the immigration from other countries. We have had, in our history, immigration from all the countries of the world; a splendid immigration. Take the immigration from Germany, for example. Who wants to say a word against the immigration from that country? But they came within a certain period, largely from 1850 to 1870. The immigration from southern Europe came, as I told you before, in the last three or four decades. Now, if you had accepted the 1920 census, you would have found more immigrants from Italy than from Great Britain, Scotland, and North Ireland. That is the real reason. The policy of the Congress was to restrict immigration from southern Europe.

Now, they say in opposition to the national-origins proposition and in justification of this resolution that this provision ought to be postponed again. Why? We want to answer that question. Why should this provision be postponed again?

Mr. JACOBSTEIN. I will answer it.

Mr. JENKINS. The gentleman can do that in his own time. My time is speeding. I want to ask who are opposed to the national-origins proposition? Who are they? I will tell you who they are principally. The people who are opposed to the national-origins proposition are those who have opposed every restrictive measure from the beginning. They have always opposed restrictive legislation and they are favoring this resolution for that reason.

Case: 1:21-cr-00665 Document #: 30-2 Filed: 05/02/22 Page 22 of 50 PageID #:611

Mr. COCHRAN of Missouri. Is the gentleman opposed to the national-origins proposition?

Mr. JENKINS. No.

Mr. CHINDBLOM. Mr. Speaker, will the gentleman yield for a question?

Mr. JENKINS. No; I must decline to yield. I think I know what the gentleman is going to ask. I know what the question is that the gentleman wants to ask, and I can answer the question without his putting it. Who else is against the national-origins proposition? They are a fine group of people. They are people who have a constituency who have quotas from those respective nations increased by the unfairness of the 1890 census. They are people from northern Europe. But if you are going to establish a quota of immigration, why not establish it scientifically? Why accept any particular census, either the census of 1890 or 1920? Why not accept a real scientific basis? How are you going to get a scientific basis? You would have to consult scientists. You can not safely consult guessers. You do not want to consult people who want to have Congress vote according to the color of their constituencies.

Whom do you want to consult? The people who know something about the censuses of this country. Who are they? I answer, our own Government departments. What do they say? If you gentlemen remember the hearings had before the Senate committee, you will see that the greatest expert in the United States on this subject, a man against whom no one points the finger of suspicion, is Doctor Hill. What does he say? He says that after years of investigation they have arrived at what they think is the most accurate basis. If our Census Department has done that, why postpone? There is absolutely no reason except that of expediency.

Well, some one says to you and some one says to me, "It will not work." Why will it not work? Who said why it would not work? None! What is wrong with it? If you establish a quota on one basis, can you not enforce the law just as effectively on that basis as if you had established it on another basis? Who is the authority on these things? Go down to the department and consult the people who know. What does Mr. White say? He says in effect that the national-origins provision can be put in effect as easily as the 1890 census plan. In substantiation of this I refer you to the hearings before the Senate committee.

Now, ladies and gentlemen, in the one minute remaining to me I want to call your attention, and especially the attention of those of you who have been restrictionists, to this one proposition, that this is a momentous day in the history of restriction of immigration. Two days ago we took a long step backward when we gave our sanction to the first steps in a program of blanketing into citizenship probably 500,000 aliens. If this resolution passes to-day it means the death knell of this proposition, and another long step backward. It is the entering wedge against restriction.

Who favor this proposition? Some one asked me that question a while ago. Let me tell you who favor it. The great American Legion. Who else? The Sons of the American Revolution, the Daughters of the American Revolution, and the Junior Order of United American Mechanics. Let me sum up in one word and say this, that this resolution is opposed to-day by every patriotic organization in America, every one of them. [Applause.]

The SPEAKER pro tempore. The time of the gentleman from Ohio has expired.

Mr. SNELL. Mr. Speaker, I yield five minutes to the gentleman from Minnesota [Mr. NEWTON]. [Applause.]

Mr. NEWTON. Mr. Speaker, the distinguished gentleman who has just closed has referred to a number of leading organizations of the country who, he says, favor the national-origins provisions and oppose its repeal. Among them he named the Sons of the American Revolution. I have been a member of that organization for many years. So far as I can recall I have never received one word from any national officer asking for my opinion as a Member as to the merits of the national-origins provision as distinguished from the 1890 census provisions of existing law. So far as I can recall, the Sons of the American Revolution have never taken any action in favor of one as against the other. Possibly some member of that organization with no right whatever to speak for it has assumed the right to speak for it. What is true of them is undoubtedly true of a good many other organizations whose names have appeared in the papers of late as supporting the national-origins provision. Furthermore, the responsibility of legislating rests upon each individual Member. That responsibility we have no authority to delegate to any individual or association of individuals no matter how large that organization may be.

Mr. Speaker, this is not a contest to-day between the definite acceptance or rejection of the national-origins provision as distinguished from the 1890 census provisions. All this resolution attempts to do is to extend the time of the taking effect of the national-origins provisions for one year. Why should we do this? I shall briefly summarize the reasons prefacing those reasons with a brief résumé of the history and development of numerical-restriction legislation.

Gentlemen, you know that I am a firm believer in numerical restriction. Notwithstanding what the gentleman from Ohio had to say as to those who are opposing national origins, I am here to say that I am a numerical restrictionist. I believe the 1924 numerical restriction act is one of the greatest pieces of constructive legislation that has been passed during my 10 years of service here. It is because I am a numerical restrictionist and want to see that principle of legislation prevail that I favor the adoption of this resolution.

As a member of the Committee on Foreign Affairs in my first term of service here it was my privilege to support and, if my memory is correct, to report out a resolution continuing wartime visas as a temporary method of immigration restriction. In 1921 I supported the first numerical restriction act. This was based on the 1910 census. The quota percentage was 3 per cent.

In 1924 I stood with the distinguished chairman of the Committee on Immigration and fought the substitution of the theoretical national-origins plan for the 1890 census basis. That fight was successful. The bill went over to the Senate with the 1890 census as the base of the quota provisions. It was in the Senate that the national-origins provisions were inserted into the 1924 act. We in the House had to accept or else see the entire legislation defeated. We did so reluctantly and because a provision was included postponing the going into effect of these provisions for three years. This would enable investigation, study, and report as to the plan which sounded all right in theory but which most of us felt could not be successfully applied in practice.

The question has been asked why was the 1890 census used as a base instead of the current census. The current census would have been a discrimination against racial stocks and nationalities coming over to this country early in our history and who furnished the bulk of the people who settled up America. That was the fault with the 1921 act which used the 1910 census as a base. It was found that the 1890 census was that census which most nearly and fairly represented these various racial stocks that had settled America from the early days up to 1920.

Mr. Speaker, the first report was made two years ago. The experts who compiled the figures and drafted the report frankly said they did not know where they were at and either asked or intimated that they should be given further time to study and investigate. It is enough to say that their initial report varied substantially from the estimates that were submitted by the so-called experts who submitted estimates at the time the national-origins provisions were inserted in the bill.

In 1928 the committee of experts submitted another report. This report as to a number of the racial stocks varied substantially from the report submitted in 1927. For example: The Belgian quota was jumped from 410 to 1,328; France was reduced from 3,837 to 3,308; Great Britain was reduced from 73,000 to 65,000; Russia was reduced from 4,700 to 3,500, and so forth.

The other day this commission of experts submitted a further report to Congress. As compared with the 1928 report, we find, for example, Austria reduced from 1,639 to 1,413; Belgium from 1,328 to 1,304; France from 3,308 to 3,084; Germany is increased about 1,000; Great Britain remains about the same; Poland is increased from 6,000 to 6,524; Russia is reduced from 3,540 to 2,784. There are slight reductions in the quotas from Denmark, Norway, and Sweden.

Mr. Speaker, the gentleman from Ohio talks about "guessers." Why, guessing is the very basis of the national-origins provisions. The experts—I do not mean the propagandists—admitted it. It can not be otherwise. There is no stable foundation upon which to start. In the report submitted February 25, 1928 (S. Doc. No. 65), the committee in referring to the classification used pointed out that it involved "a considerable element of uncertainty," because, as they said, "partly because many family names undergo changes as times go by, and partly because many names are common to two or possibly more countries." The next President of the United States, a member of the commission, said it was impossible to ascertain the national origins accurately and favored its repeal.

Here you have, then, the experts revising and varying their figures from year to year. Under those circumstances should we not then seek further light before permitting this new basis of finding quotas for numerical restriction to go into effect?

One of the great faults of the national-origins provisions, as I see them, is the uncertainty involved in arriving at the fig-

ures. One man's guess is just as good as another's. All of this tends to develop racial and group consciousness. The purpose of immigration restriction was to accomplish eventually its elimination. The very uncertain features of the national-origins provisions promote group and racial consciousness. This is the very thing which Washington and other great leaders in the early history of our country warned us against.

Another reason for postponement: We will be taking a census late this fall or early this coming year. Why not, then, wait the outcome of that census before putting into effect this theoretical quota basis?

Let me say this to some of the advocates of numerical restriction. Your insistence upon a theoretical, uncertain, strife-promotion plan will tend to drive out of your ranks a large number of people who have consistently supported numerical restriction. During all of the discussion leading up to the passage of numerical-restriction legislation in 1921 and its perfecting in 1924, the principle of numerical restriction had the support of that portion of our citizenry who had been born in or whose ancestors had originally come from northern and western Europe. I do not recall receiving a single letter against the principle of numerical restriction from any such individual. On the contrary, I have received many advocating that principle. Let us, therefore, continue as we have been with the 1890 census as a base. It is fairly representative. It is absolutely fixed and certain and its continuance will avoid the promotion of racial feeling and group consciousness. The reasonable thing to do, the American position to take, is to adopt this resolution and postpone action until we can have further light, and that is the only question that is before us for action now. [Applause.]

The SPEAKER pro tempore. The time of the gentleman from Minnesota has expired.

Mr. GARRETT of Tennessee. Mr. Speaker, I yield seven minutes to the gentleman from Tennessee [Mr. McREYNOLDS]. [Applause.]

Mr. McREYNOLDS. Mr. Speaker, ladies and gentlemen of the House, when the immigration act was passed in 1924 we went back to the census of 1890 because we felt that a quota on that basis would come nearer giving the people of the United States of America a correct representation in reference to nationalities than any other census. When this bill went over to the Senate an amendment was offered by Senator REED of Pennsylvania, providing for a national origins act. That was added to this bill and was to go into effect after 1927. A commission was appointed to make the investigation and make a report. Twice since that time has this matter been postponed. The distinguished gentleman who has just preceded me states that a postponement does not mean that he is in opposition to the national-origins plan but that he wants further light and further investigation. A recent report made by a commission of experts, whose duty it was to make this report, and this report is dated February 21, 1929, uses this language.

We are of the opinion that further study would not appreciably modify these results.

I take the position, ladies and gentlemen of the House, that those of you who vote for this resolution vote against the national-origins plan. The position we have always taken is not that the alien or the foreigner of this country is entitled to representation, but it is the American citizen who is entitled to say who shall come to this country, how many, and under what conditions. [Applause.]

Why postpone when the commission of experts has made its final report? The reason of the postponement is because it affects some different nationalities.

I am not supporting this bill because it will lower the percentage of certain nationals who come to this country, neither am I opposing it on that account; but I am supporting it because I feel that if the national-origins matter is put in action it will give a greater representation to the American people.

The national-origins provision provides that the immigration coming to this country shall not exceed one hundred and fifty thousand odd. Under the present bill it is 164,000.

So I say to those of you who are in favor of strict immigration, who are in favor of keeping our people as they are, who are in favor of leaving to the American people who are to come to this country, under a limited number, you should not support this resolution to extend.

If you will put the national-origins proposition into effect you cut down the amount of immigrants who come and you give representation to the various nationalities that have been responsible for the upbuilding of this country. If you want to be fair to all nations, if you want to avoid racial discrimination, if you want to keep the blood of the United States of America

in proportion as it is now, you will vote against this resolution. [Applause.]

I yield back the balance of my time, Mr. Speaker.

Mr. SNELL. Mr. Speaker, I yield two minutes to the lady from California [Mrs. KAHN]. [Applause.]

Mrs. KAHN. Mr. Speaker and gentlemen of the House, we have heard so much to-day as to what the founders of our Government thought and did about immigration, I thought it would be not only opportune but interesting to read a set of resolutions passed by the Continental Congress on August 14, 1776.

These resolutions were prepared by Thomas Jefferson; Richard Stockton, of New Jersey; James Wilson, of Pennsylvania, appointed later by Washington to the Supreme Court of the United States; and Benjamin Franklin, added later to the committee. The resolutions are as follows:

Whereas it has been the wise policy of these States to extend the protection of their laws to all those who should settle among them, of whatever nation or religion they might be, and to admit them to a participation of the benefits of civil and religious freedom; and the benevolence of this practice, as well as its salutary effects, have rendered it worthy of being continued in future times; and

Whereas His Britannic Majesty, in order to destroy our freedom and happiness, has commenced against us a cruel and unprovoked war and, unable to engage Britons sufficient to execute his sanguinary measures, has applied for aid to foreign princes who are in the habit of selling the blood of their people for money, and from them has procured and transported hither considerable numbers of foreigners. And it is conceived that such foreigners, if apprised of the practice of these States, would choose to accept of lands, liberty, safety, and a communion of good laws and mild government in a country where many of their friends and relations are already happily settled, rather than continue exposed to the toils and dangers of a long and bloody war, waged against a people guilty of no other crime than that of refusing to exchange freedom for slavery; and that they will do this the more especially when they reflect that after they have violated every Christian and moral precept by invading and attempting to destroy those who have never injured them or their country, their only reward, if they escape death and captivity, will be a return to the despotism of their prince, to be by him again sold to do the drudgery of some other enemy to the rights of mankind; and

Whereas the Parliament of Great Britain have thought fit by a late act not only to invite our troops to desert our service but to direct a compulsion of our people taken at sea to serve against their country: Therefore

*Resolved*, That these States will receive all such foreigners who shall leave the armies of His Britannic Majesty in America and shall choose to become members of any of these States; and they shall be protected in the free exercise of their respective religions and be invested with the rights, privileges, and immunities of natives, as established by the laws of these States; and, moreover, that this Congress will provide for every such person 50 acres of unappropriated lands in some of these States, to be held by him and his heirs in absolute property.

*Resolved*, That the foregoing resolution be committed to the committee who brought in the report, and that they be directed to have it translated into German and to take proper measures to have it communicated to the foreign troops.

*Resolved*, That Doctor Franklin be added to the said committee.

Mr. SNELL. Mr. Chairman, I yield three minutes to the gentleman from New York [Mr. JACOBSTEIN]. [Applause.]

Mr. JACOBSTEIN. Mr. Speaker and Members of the House, one day while the committee of experts were working on the national-origins proposition I happened to be at the Census Bureau. The commission was to report to the President of the United States what figures he should use as a basis for the national-origins provision. To my surprise I found the man in charge of the statistics was juggling them around to meet certain preconceived notions or objectives. I said, "Why do you do that," and he replied, "Because we have no scientific basis for the national-origins proposition and we have to manipulate it so as to satisfy all the national elements."

Now, mind you, geneltmen——

Mr. BOX. Will the gentleman yield?

Mr. JACOBSTEIN. I am sorry. I can not yield, as I have only three minutes.

Think of it. We pass a law to allocate immigration into the United States and then ask experts in the Census Bureau to get up figures which at best are sheer guesses.

Now, why do they have to juggle them there? I will tell you why. Anyone who knows anything about American history knows that in the census of 1790 the census enumerators never asked a man where he came from, what his nationality was, or what his racial stock was. We simply took his surname, "Jones," "Smith," "Barker," and so forth. On the basis of the name we later derived or deduced or guessed his national

origin. Now, how can you determine a man's national origin from his name? It can not be done.

We know that people change their names. George Washington's name was not always "Washington." His forefathers bore the name of Wyssington. People often change their names. The people who settled America were no exception. The census of 1790 is no sensible, scientific basis for determining immigration, and that is why the commission which was appointed to figure this out never was able to arrive at any just conclusion. While I was opposed to the 1890 basis, I claim it was much fairer, much more scientific, and much more workable than this hodgepodge, this monstrosity known as the "national-origins" proposition.

I can understand why some people should want to perpetuate the so-called "colonial stock," even though I do not accept the principle. But in allocating immigration quotas to nationalities to-day it is impossible to use the census of 1790, which did not collect or publish such data. The contest between the use of the national origins and the 1890 census is a contest between the English on the one side and the Germanic-Scandinavian stock on the other. I maintain you can not settle this contest by using the 1790 census.

I can not understand how anyone who knows American history, who knows how the early censuses were taken, can advocate the national-origins proposition. It is ridiculous. [Applause.]

The SPEAKER. The time of the gentleman from New York has expired.

Mr. GARRETT of Tennessee. Mr. Speaker, I yield myself one minute.

Mr. Speaker, it seems to me, if I am correctly informed as to the situation in the other body, that independent of the merits or demerits of this proposition, we are about to do a very futile thing; that is to say, we are about to spend a half hour or more in discussion and then in the passage of a proposition that in all probability is not going to pass the other body. I may be misinformed about that; at any rate, I do not think it ought to pass.

Mr. TILSON. Will the gentleman yield?

Mr. GARRETT of Tennessee. Yes.

Mr. TILSON. Has the gentleman any information from the other end of the Capitol on the subject? My understanding does not coincide with that of the gentleman.

Mr. GARRETT of Tennessee. Well, I may be misinformed concerning the matter, but if they do pass it they ought not to, and I hope this body will stop it here. [Applause.]

Mr. McCORMACK. The gentleman is speaking as the minority leader or individually?

Mr. GARRETT of Tennessee. Oh, I speak individually, of course.

Mr. DOUGLASS of Massachusetts. Will the gentleman yield?

Mr. GARRETT of Tennessee. I yield.

The SPEAKER. The time of the gentleman from Tennessee has expired.

Mr. GARRETT of Tennessee. Then, Mr. Speaker, I yield the three minutes I have remaining to the gentleman from Illinois [Mr. HOLADAY].

Mr. DOUGLASS of Massachusetts. Mr. Speaker, I ask unanimous consent that the time of the gentleman from Tennessee may be extended one minute.

Mr. GARRETT of Tennessee. The time has been fixed. I would gladly yield to—

Mr. DOUGLASS of Massachusetts. I just want you to know you do not represent the northern Democracy in your position as a southern Democrat to-day.

Mr. GARRETT of Tennessee. Mr. Speaker, I hope the gentleman from Massachusetts will note that I did not claim to. [Laughter and applause.]

Mr. DOUGLASS of Massachusetts. And you never will have the right to claim it, either.

Mr. HOLADAY. Mr. Speaker and Members of the House, five years ago, when the restricted immigration law was passed, the House committee and this House, for reasons they thought were for the best interests of our country, fixed upon the 1890 census. In the Senate the national-origins amendment was added. The House conferees were opposed to that amendment; but as the gentleman from Tennessee [Mr. BYRNS] said this morning in speaking of another bill, a conference report is in the nature of a compromise.

At that time I was opposed to the national-origins provision, not because I was opposed to the result, but because I could foresee this very day. In my opinion the final result between

the national-origins provision and the 1890 census basis is not especially material to the future of this country.

The national-origins clause reduces the number of immigrants some 14,000 and shifts a few thousand from one country to another. In my opinion, it is not especially material whether a thousand is taken from Sweden and added to Great Britain or a thousand from Great Britain and added to Sweden.

The trouble we have found in the national-origins proposition, and its inclusion in the 1924 immigration bill was from the day of the passage until this day it has been a cause of unrest on the part of certain foreign groups. Here is one foreign group that gets less under the national-origins proposition, than under the 1890 basis, and so they are opposed to its going into effect. The nationalities that would gain 200 or 1,000 are in favor of it. The result is that the national-origins clause has been hanging in the balance during the past five years that we have had a state of unrest.

If we postpone the operation of the national-origins clause for another year we continue the uncertainty and the unrest for another year. The thing that the House should do, the sensible thing for Congress to do, the thing that is best for this country is to repeal the national-origins clause, or to defeat this resolution and allow the national-origins clause to go into effect at once. [Applause.]

Mr. SNELL. Mr. Chairman, I yield five minutes to the gentleman from Michigan [Mr. VINCENT].

Mr. VINCENT of Michigan. Mr. Speaker, the statement was made on the floor by the gentleman from Ohio [Mr. JENKINS] that all persons who are in favor of the suspension of the national-origins clause are against restriction of immigration. I have been a member of the Committee on Immigration since the beginning of my service in Congress. I have been a strong restrictionist in respect to every action that has been taken on this subject. I helped prepare the 1924 immigration law. I believe in numerical restriction. I voted to make the total number less than was provided in the original bill introduced by the chairman of the committee, and as it was carried in the law the total was less than proposed in the bill as introduced.

Gentlemen have asked why suspend the national-origin clause again? I want to tell you one reason why, if you believe in scientific, accurate legislation. Because the so-called committee of experts have figured, under this complicated provision, the quotas of the various countries three different times and have given a different answer for the quotas of the various countries every time they have figured. They have never given out the quotas twice alike. If this committee of experts get a different answer to the quotas of foreign countries every time they act, what can be said of a Member of Congress who has to go to his district and tell his constituents how the matter is determined. Take the case of the British quota. This is just one example among many. At first, the experts said it would be 73,000; and they say now it will be 65,000 in round numbers per year. That is 8,000 people different from the quota of the former figures. They testified before the committee that it takes 600 mistakes in the allocation of the people of this country to the stock of a foreign country in order to make one mistake in the incoming immigrant number or quota. Six hundred times 8,000, gentlemen, makes 4,800,000 that they themselves testify that they had erroneously allotted to the British stock.

If such enormous errors as that can result under this provision—as indeed have resulted under it—and every time they figure the quotas from different countries under this provision they come to different results, I ask you whether this is legislation that the Congress of the United States desires to have the immigration to this country based upon? It is indefensible, because even the experts can not give the same answer twice.

Mr. BURTNESS. Will the gentleman yield?

Mr. VINCENT of Michigan. Yes.

Mr. BURTNESS. Assuming the national-origin provision would go into effect, would not the department always be under pressure to change their figures from year to year?

Mr. VINCENT of Michigan. Certainly. Every person in this country interested in some nationality, under this provision of law, if it goes into effect, will feel that such nationality has been cheated in the figures, and will constantly be carrying on propaganda for a change, thus preventing the law from ever being regarded as stabilized and satisfactory.

The SPEAKER. The time of the gentleman from Michigan has expired.

Mr. SNELL. Mr. Speaker, I move the previous question on the resolution.

The previous question was ordered.

The SPEAKER. The question is on agreeing to the resolution.

The question was taken; and on a division (demanded by Mr. GARRETT of Tennessee) there were—ayes 185, noes 78.

So the resolution was agreed to.

Mr. JOHNSON of Washington. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of House Joint Resolution 402, to amend subdivisions (b) and (e) of section 11 of the immigration act of 1924, as amended. Pending that, I ask unanimous consent that one-half the time be controlled by myself and one-half by the gentleman from Texas [Mr. BOX].

The SPEAKER. The gentleman from Washington moves that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of the House Joint Resolution 402. Pending that he asks unanimous consent that the time be equally divided, one-half to be controlled by himself and one-half by the gentleman from Texas, Mr. Box. Is there objection?

Mr. SABATH. Mr. Speaker, reserving the right to object, I would like to know whether I can have five minutes.

Mr. JOHNSON of Washington. I have had 50 requests for from 1 to 15 minutes. I have only 15 minutes at my disposal. I can not make any such promise.

The SPEAKER. Is there objection?

There was no objection.

The SPEAKER. The question is on the motion of the gentleman from Washington that the House resolve itself into the Committee of the Whole House on the state of the Union for the consideration of the House Joint Resolution 402.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the state of the Union for the consideration of House Joint Resolution 402, with Mr. HOOPER in the chair.

The CHAIRMAN. The Clerk will report the resolution.

The Clerk read as follows:

House Joint Resolution (H. J. Res. 402) to amend subdivisions (b) and (e) of section 11 of the immigration act of 1924, as amended

*Resolved, etc.,* That subdivisions (b) and (e) of section 11 of the immigration act of 1924, as amended are amended by striking out the figures " 1929," and inserting in lieu thereof the figures " 1930."

Mr. JOHNSON of Washington. Mr. Chairman and members of the committee, your chairman of the House Committee on Immigration and Naturalization has been embarrassed many times and in many ways, not only at home but elsewhere, as well as in the deliberations of the committee, by this national-origins clause of the 1924 act. The plan is not easily understood. It is true that the House committee, in passing the 1924 restrictive immigration act, resisted the insertion of the national-origins clause, which was a Senate proposal. Gentlemen will remember while we were driving for the permanent law in 1924, to replace the temporary quota law of 1921, which was to expire on June 30, 1924, we had to work with considerable speed. Some 20 days were spent in conference between Senate and House. Oriental exclusion and other serious matters held the boards. Some things had to be done in haste. One of these was the national-origins paragraph. After numerous amendments, it was agreed to in conference. It has caused misunderstanding ever since.

Each postponement by Congress has developed changes in the origin, or blood stock, of the earliest people in the Colonies. Each such change has altered the figures showing the blood stock in the population as shown by the census of 1920.

It so happens that my paternal and maternal ancestors were of colonial stock. I have the honor to be a member of the Sons of the American Revolution; also of the Spanish War Veterans, the American Legion, and other similar organizations which are reported as having indorsed the national-origins plan. Nevertheless, I am opposed to aristocracies of blood, and I am opposed to aristocracies of every kind in the United States of America. I am opposed to organized alien groups in the United States. I am opposed to the demands made by these groups for political power. I am opposed to their activities through the foreign-language press. It makes it harder to assimilate those who really desire to be assimilated and affects the second generation.

The public demands more restriction of immigration, and I am in hopes that a bill can be prepared which will more effectively restrict. Quotas should be issued for whole families and not for individuals of a family.

In my opinion, both the 2 per cent of 1890 and the national-origins proposal are merely yardsticks for getting a measure that will cut quotas and keep us within our treaty obligations. Whichever plan prevails, the total quota for new seed immigrants should be much less.

We suffer now from much blood-stock animosity because we were fully 25 years too late in the restriction of immigration.

These charges of prejudice and discrimination will continue, no matter which plan finally prevails. It persists because of the stock from which any one of us sprung in a population of 120,000,000 souls. Pride of ancestry is a noble attribute; just as noble in an Irishman as in a Welshman. A Roman can be as proud as a Dane, and in the United States it takes several generations to wear away the hyphen.

In my opinion the putting into effect of the national-origins provision will result in a new charge of discrimination, new schemes for the allocation of quotas, and new demands for the use of the 1930 census.

The 1921 quota law was the first positive step toward restriction to numbers certain. It was Public Act No. 5 of the administration of President Harding. The permanent quota act was signed by President Coolidge, and is certain to stand out as one of the great acts of his administration. [Applause.]

I yield five minutes to the gentleman from Illinois [Mr. CHINDBLOM].

Mr. CHINDBLOM. Mr. Chairman, I presume I disclose no secret when I tell the Members of this House that, while myself native born, I am one of those of rather recent European origin who both here and elsewhere have been labeled as likely to be less patriotic than some others. I resent any such imputation, and I ask both sides of this discussion to refrain from any further reference to such a preposterous and slanderous suggestion. Patriotism and loyalty are attributes of the heart and mind and are not proven by ancestry or genealogy.

We are here to determine the one question, whether the national-origins provision shall go into effect immediately or be postponed for another year. I am a restrictionist and have supported every measure for the restriction of immigration that has come up for action during my membership in the House. I voted for the immigration act of 1921 as well as the immigration act of 1924, although in the latter case I opposed the national-origins provision, as I do now.

When the immigration act of 1924 was passed the House based future immigration quotas entirely upon the census of 1890, providing that 2 per cent of the number of persons born in each foreign country then resident in the United States should constitute the immigration quota from that country. The Senate amended the bill by inserting the national-origins provision. The House twice rejected this amendment, but eventually, the session drawing to a close, we were advised that if there was to be any restriction of immigration at all the conference report containing the present national-origins provision would have to be accepted. Even then the Congress realized that the national-origins basis was not immediately definite or workable and therefore postponed the operation of that provision until July 1, 1927, and also provided that the determination of the quotas on the basis of national origins should be made by the Secretary of State, the Secretary of Commerce, and the Secretary of Labor jointly. On January 3, 1927, these Secretaries submitted to the President a tabulation of quotas as prepared by employees in their departments, and in their report they said:

The report of the subcommittee is self-explanatory and is stated to be a preliminary report, yet, in the judgment of that committee, further investigation will not substantially alter this presentation.

Although this is the best information we have been able to secure, we wish to call attention to the reservations made by the committee and to state that in our opinion the statistical and historical information available raises grave doubts as to the whole value of these computations as a basis for the purposes intended. We therefore can not assume responsibility for such conclusions under these circumstances.

The Senate on February 1, 1927, passed a resolution postponing the operation of the national-origins provision until 1928. The House Committee on Immigration and Naturalization amended this joint resolution so as to provide for the repeal of the national-origins provision. Since the Congress was about to expire on March 4, the joint resolution was recommitted to the committee which subsequently reported a resolution for postponement, and on March 3, 1927, the resolution for postponement passed the House by an overwhelming vote—234 to 111.

The committee of Secretaries made a second report to the President on February 25, 1928, and their subcommittee then stated that they had made a further investigation of the subject matter and had secured the result of the investigations made by research experts, employed by the American Council of Learned Societies, which indicated that the English element, as given in the Century of Population Growth, published by the Bureau of the Census about 20 years ago, was too large and that on the basis of data which they had submitted and of information derived from other sources the subcommittee had come " to the conclusion that the English element, as there given, should be reduced by a little over 10 per cent and the

amount of the reduction distributed among the other nationalities represented in the population of the United States in 1790." The subcommittee also stated that it had revised its estimates for territory not covered in the census of 1790 and had also made " estimates " of the " unrecorded immigration which came to this country between 1790 and 1820." This report was so unsatisfactory that both the Senate and the House with practical unanimity passed another postponing resolution which became effective on March 31, 1928.

The changes which had been made during the year by the subcommittee, acting for the committee of Secretaries, affected about 10,000,000 of the present white population of the United States. This year the committee of experts has again reported to the President on February 21, 1929, that they have made further investigation, and that the processes followed in utilizing census and immigration statistics, as explained in their previous reports, have been reviewed and somewhat improved. The committee stated, however, that "as a result of the very considerable amount of effort thus expended, the figures previously submitted have been slightly revised." No claim is made that the figures are more trustworthy or reliable than they were in previous reports.

In the presidential campaign last fall both of the candidates for President, of the Republican and Democratic Parties, declared their opposition to the national-origins provision. President-elect Hoover said in his speech of acceptance at Stanford University, California, on August 11, 1928:

No man will say that any immigration or tariff law is perfect. We welcome our new immigrant citizens and their great contribution to our Nation; we seek only to protect them equally with those already here. We shall amend the immigration laws to relieve unnecessary hardships upon families. As a member of the commission whose duty it is to determine the quota basis under the national origins law I have found it impossible to do so accurately and without hardship. The basis now in effect carries out the essential principle of the law, and I favor repeal of that part of the act calling for a new basis of quotas.

Mr. Hoover, as Secretary of Commerce, with the Secretary of State, Mr. Kellogg, and the Secretary of Labor, Mr. Davis, was charged specifically with the duty of determining the figures or numerical calculations which were to form the basis for immigration quotas upon the theory of national origins. In fact, the Bureau of the Census in his own department performed the greater part of the work and necessarily conferred with him in reaching its conclusions. No better authority on the subject can be conceived than Mr. Hoover himself.

The fundamental difficulty about this matter is that the census of 1790 gave no information whatever as to the national origins of the inhabitants of the Colonies, and therefore advocates of the national-origins plan have been forced to try to determine the origins of those inhabitants by the names of the people at that time. Did you ever know that Nobel, the man who founded the Nobel Foundation, was a Swedish citizen? Do you know that De Laval, the man who invented the cream separator, was a native of Sweden? Who would guess that the names of Hamilton, Douglas, Dickson, Wachtmeister, and Wallenberg are Swedish names; and still they represent some of the leading families of Sweden. As is well known, one of the 13 Colonies (now the State of Delaware) was of Swedish origin and bore the name of New Sweden in its early history.

The CHAIRMAN. The time of the gentleman from Illinois has expired.

Mr. CHINDBLOM. Mr. Speaker, I wish to express, under the leave to extend my remarks, my appreciation of the attitude in this matter of the chairman, the gentleman from Washington [Mr. JOHNSON], and the other members of the Committee on Immigration and Naturalization. They originally reported a bill to repeal the national-origins provision, when this matter was first presented in 1927.

They realized the futility of the attempt to reach a fair and accurate conclusion upon the available historical and statistical data. The members of the committee, like other members of the House, have been flooded with telegrams, letters, and communications, which have tried to place the issue of this numerical computation upon the plane of patriotism and devotion to true Americanism. The fact is that many of those who so persistently have advocated the national-origins plan are not themselves free from the influences which they impute to those who differ with them. They speak of their "own national stock" and of their "own ancestry," in many cases so remote that they certainly can not trace them except through tradition or hearsay. It is unfortunate to raise such distinctions and classifications of our citizenship at a time when we particularly should be solicitous in securing national unity. The immigration, frequently designated as postcolonial, which has been the subject of these aspersions, has rendered valuable contributions to the growth and progress of our Republic, and in our national emergencies it has borne its full share of sacrifice of life, limb, and treasure for the preservation and welfare of our common country. Happily, these views have the approval of the great mass of our citizenship, without reference to their own national origin.

Mr. JOHNSON of Washington. Mr. Chairman, will the gentleman from Texas use some of his time?

Mr. BOX. Mr. Chairman, I yield two minutes to the gentleman from Alabama [Mr. OLIVER].

Mr. OLIVER of Alabama. Mr. Chairman, I wish to register at this time an emphatic protest against three actions on the part of the majority party in the closing days of this Congress: First, the deliberate decision yesterday afternoon to hold no session last night and to take a recess until 10 o'clock this Sunday morning. I challenge the majority leader to show any justifying reason for holding a business session of Congress on this the Sabbath day; next I protest against the action taken Friday at the urgent insistence of the Republican leaders, whereby you legalized all unlawful entries in this country of aliens prior to the year 1921, and armed them with the right to become American citizens, and later bring to our country millions of their foreign relatives; and next I protest against the effort now being made on this Sunday morning to defeat what is known as the national origins law, and which in the absence of further legislation will become effective on July 1 next, and reduce thereafter the number of aliens who can annually enter by approximately fourteen thousand.

Mr. BOX. Mr. Chairman, I yield four minutes to the gentleman from Florida [Mr. GREEN].

The CHAIRMAN. The gentleman from Florida is recognized for four minutes.

Mr. GREEN. Mr. Chairman, I shall ask not to be interrupted by questions.

In the legislation which is now before us, gentlemen, you have an opportunity to vote to directly express yourselves in favor of the alien bloc of America or in favor of the national patriotic organizations and American institutions. You have a chance of expressing yourselves here by your vote to-day for those original colonists who came here and founded the country and show the country that the alien blood shall now devour us. You have your chance to stand for the supremacy of native Americans. If you will notice, the gentlemen who are to-day advocating a delay and putting off the application of the national origins are 9 out of 10 of them for open immigration, not for restriction. They work against restrictions because they represent alien districts.

Mr. KVALE. Mr. Chairman, will the gentleman yield?

Mr. GREEN. No; I can not yield; I am sorry. However, I do blame the chairman of the Committee on Immigration when he says he is a restrictionist and yet knows that putting off the national origins will admit thousands more aliens into the United States; I blame him when he comes here and poses as a restrictionist and yet calls upon the members of his party to put off once more the operation of the national-origins clause.

Mr. SCHAFER. Mr. Chairman, will the gentleman yield?

Mr. GREEN. No; I can not yield.

I hope those who have behind them the courageous and patriotic Sons of the American Revolution and the other allied patriotic organizations of this Nation will heed these requests and vote against putting off the application of the national origins.

A large number of alien organizations have petitioned your Committee on Immigration to put off the national-origins provisions. On the other hand, every organization I know of in America which stands for the perpetuity of our national institutions and American ideals have called upon you to vote against putting it off. Now, which are you going to do? You had just as well face the facts. Are you going to join the alien blocs and organizations and refuse to heed the request of 90 per cent of the American people to have restriction or are you going to vote for restriction? It is a matter of voting against restriction or a matter of voting for restriction. I shall vote for restriction of immigration. [Applause.]

The CHAIRMAN. The time of the gentleman from Florida has expired.

Mr. JOHNSON of Washington. Mr. Chairman, I yield two minutes to the gentleman from New York [Mr. JACOBSTEIN].

Mr. JACOBSTEIN. Mr. Chairman and members of the committee, in order that you may know what the basis of the national-origins provision means you must know what the 1790 census was, since that is the basis for working out this plan. I have here in my hand the 1790 census. Only the male heads of families were enumerated. Women did not count. Their blood does not count in allocating the quotas under the national-

origins provision of the immigration act of 1924. The census of 1790 does not directly give us any information regarding racial or national lineage. To determine this we assume that certain surnames indicate racial or national origins. This is pure guesswork.

I ask you, gentlemen, where would you classify Johnson, Johnstone, Jonson, Johnston, Jensen? Is it Irish, is it Scotch, or is it English? What are you, Mr. JOHNSON? "Johnsons" may be Swedes or Scotch or English. How can the experts decide? They guess at it. How do they know where to place him? I will ask you, Mr. GARRETT, how the experts are going to decide whether you are Irish, Scotch, French, or English? "Garrett" is spelled with variations in many ways.

There is nothing in the records to indicate whether Garrett is or was originally "Garrett" or "Gerot." Take the name of the gentleman from Ohio [Mr. JENKINS], who defends the national-origins plan. Is it English? Why, no. It probably is Welsh. I asked the distinguished Speaker of the House [Mr. LONGWORTH] why his name is not in the 1790 census. Why is not his name here? His ancestors were here. The census takers just overlooked them. There are many such omissions. They fought in the Revolutionary War, but their names are not in this original census list.

Gentlemen, the 1790 census is the most ridiculous basis for allocating immigration quotas that can be proposed. The military records of the patriots of the Revolutionary War are the best proof of the inadequacy of the 1790 census. The confusion in the spelling of names by the enumerators is undoubtedly responsible for many errors. Folks changed their names then as they do now. A man's name to-day is no proof of his ancestors' origin. [Applause.]

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. BOX. Mr. Chairman, how does the time stand?

The CHAIRMAN. The gentleman has nine minutes remaining.

Mr. BOX. Mr. Chairman, I ask unanimous consent to revise and extend my remarks and to include some brief quotations.

The CHAIRMAN. Without objection, it is so ordered.

There was no objection.

Mr. BOX. Mr. Chairman, ladies and gentlemen of the House, the very fact that this proposition is pending is unfortunate. If the national-origins provisions of the immigration law are bad, they should be repealed. If they are sound, we should let them alone. It is a pity to see certain alien blocs and politicians holding Uncle Sam astride the fence. Being unable to completely control him, they pull him back every time when he desires to go on his own American way.

Mr. McREYNOLDS. Will the gentleman yield?

Mr. BOX. Yes.

Mr. McREYNOLDS. Is the gentleman advised that the Senate has recessed until 11 o'clock to-morrow, and that they do not intend to take up this matter?

Mr. BOX. I think it would make this more popular if it were understood that it did not mean anything.

Mr. GARRETT of Tennessee. Will the gentleman yield?

Mr. BOX. Certainly.

Mr. GARRETT of Tennessee. The gentleman from Connecticut [Mr. TILSON] asked me a few minutes ago if I had any recent information from the Senate. I have now. The Senate has recessed until 11 o'clock to-morrow.

Mr. TILSON. That does not change the situation so far as we are concerned. We should do our duty regardless of what another body may do. [Applause.]

Mr. BOX. I must pause here long enough to deal with some of the quibbling statements made during this debate by those who are trying to destroy these salutary provisions of the law. The gentleman from New York [Mr. JACOBSTEIN] undertook to interpret to this House the findings or views of the Census Bureau on the sufficiency of the data on which the national-origins quota is to be based. In view of what I know to be the attitude of Doctor Hill, Assistant Director of the Census and chairman of the board of experts, and the view of at least some of his responsible associates on that board, I am driven to the conclusion that the gentleman from New York [Mr. JACOBSTEIN] either talked with some politician in the bureau or thereabouts who, like some gentlemen here, wants to see this law destroyed, or that he talked with some mouthy, irresponsible clerk. The idea of having such a personal conversation presented here as information on which this House should act is itself ridiculous. This is still more pitiful in view of the fact that there are abundant official sources from which explicit information on this point can be obtained.

On January 18, 1927—committee hearings of that date, pages 7 to 25—concerning the work of that board under the provisions of the law, Dr. Joseph A. Hill, Assistant Director of the Bureau of the Census and chairman of that board, among other things, said:

> The CHAIRMAN. But, on the contrary, errors one way would be balanced by errors the other.
>
> Mr. HILL. That is true. We must remember with regard to most nationalities that that portion which came from 1790 stock forms only a relatively small part of the total quota, and you might have a considerable margin of error in that part without affecting the total very much.
>
> The CHAIRMAN. It was suggested to me at one time that if the committee of which you were chairman had had authority to take all the population up to 1790 and then double the minority of the population, admitting the greater part of it is British, even that doubling would not greatly affect the total reached?
>
> Mr. HILL. It would not make a very great difference.
>
> Mr. DOUGLASS. How extensive was that first census of 1790?
>
> Mr. HILL. It covered all the United States, then.
>
> Mr. DOUGLASS. By comparison, if you have an opinion on the matter, how does it stand as to later censuses as to accuracy, if you have an opinion? In other words, are not the facilities of to-day more comprehensive and more liable to give us exactness than in 1790, when there was not the same means of arriving at accuracy?
>
> Mr. HILL. My opinion would be the contrary in view of the fact that at the present time our great difficulties in these censuses come from the big cities where we have congested population, and we had nothing of that kind then. The communities were smaller. The enumerator would have a better personal knowledge of the people he enumerated. My belief is it would be easier to take an accurate census in those days than now. They did not hurry, but took their time, went from house to house. There were no big cities with a mixed, congested population at that time, and, consequently, I feel it is more accurate.
>
> *　　*　　*　　*　　*　　*　　*
>
> The CHAIRMAN. We had a small population, mostly from certain principal countries, and as he said, it is not so much of a guess; an estimate of a few at that time makes very little difference to the computation, and that is an answer to the question of Mr. DOUGLASS.
>
> Mr. BOX. You do not say that it is unsafe or do not argue about its safety or the policy, but you say that such a research as might be made might add somewhat to the accuracy of it?
>
> Mr. HILL. Yes; that is correct.
>
> *　　*　　*　　*　　*　　*　　*
>
> Mr. JENKINS. What would be your judgment as to whether or not the population of these increases of territory, the Louisiana purchase, the Florida purchase, and the acquisition of Texas, would affect your figure?
>
> Mr. HILL. It would have some effect. We took that into account. It is rather a small element, perhaps 150,000 or 156,000; we took such figures as we found available.
>
> Mr. BOX. So all those that were here in 1790 were considered as native stock?
>
> Mr. HILL. We called them native stock, and only those that have come in since immigrant stock.
>
> Mr. BOX. As to these elements outside of the thirteen Colonies, you had access to different records you found in history and otherwise, as to whether the Spaniards settled Texas or Florida, the French Louisiana, etc., and you figured those elements as factors in this computation?
>
> Mr. HILL. Quite right.

At the 1928 hearings by the Senate, Senator DAVID A. REED asked the following question of Doctor Hill:

> Senator REED. I would like to ask Doctor Hill, who is a census expert, what, in his opinion, is the fairest way to all of the nationalities involved of calculating the distribution of the aggregate quota of immigration that Congress sees fit to admit?
>
> Doctor HILL. I am not sure that my qualifications as a census expert make my judgment on that question of more value than other people's. I will say, however, that no proposition has been brought to my attention that seems to me fairer than this one of national origins. There seems, indeed, to me to be a rather marked absence of alternative proposals, except the 1890 basis; that is about the only alternative I have had brought to my attention as against the national-origin plan. (Hearing, 1928, p. 17.)

Moreover, we have the recent official report, dated February 25, 1929, Senate Document No. 259, in which the three Secretaries show that they have been able to make these computations. On page 2 of that report the language is:

> In compliance with the directions of this statute we have appointed a departmental committee to study this subject and to make calculations of what the quotas should be under the provisions of the law; and after consideration of and based upon the report of that committee, we, in the discharge of the duty laid upon us by the statute, have made the determination provided in subdivision (c) of section 11 of the act and jointly submit herewith the quota of each nationality determined as provided in subdivision (b) of the act. We also transmit the report, with its two inclosed tables, of the departmental

Case: 1:21-cr-00665 Document #: 30-2 Filed: 05/02/22 Page 28 of 50 PageID #:617

committee appointed by us to study this subject and make calculations of what the quotas should be under the foregoing provisions of the act.

The committee appointed by the three Secretaries to make and report this ascertainment had, on February 21, 1929, made a report to them in which, among other things, they said:

Sirs: The committee which you appointed to determine immigration quotas on the basis of national origin as prescribed by the immigration act of 1924 respectfully submit the following report:

As a result of careful search carried on during the year that has elapsed since the previous report of February 25, 1928, was submitted, a limited amount of additional data, principally in the field of foreign statistics of emigration to the United States, has been obtained and utilized. At the same time the processes followed in utilizing census and immigration statistics, as explained in our previous report, have been reviewed and somewhat improved. As a result of the very considerable amount of effort thus expended, the figures previously submitted have been slightly revised. We are of the opinion that further study would not appreciably modify these results.

That report was signed by Richard W. Flournoy, jr., and S. W. Boggs, representing the Secretary of State; Joseph A. Hill, chairman, and Leon E. Truesdell, representing the Secretary of Commerce; and W. W. Husband and Ethelbert Stewart, representing the Secretary of Labor.

The answer to the unfortunate statements made here to the effect that such an ascertainment can not be made is that it has been made, and that the experts were so well satisfied with it that they felt justified in saying that "further study would not appreciably modify these results."

Inquiry was made of Doctor Hill about the accuracy of the showing of the foreign-born population in the country by the 1890 census as to its proportions to our entire population. I give the questions and answers:

Senator REED. Does the distribution of quotas based on the 1890 census reflect with any accuracy the proportion of nationalities that now exists in the United States?

Mr. HILL. No, indeed; it does not.

Senator REED. It gives the German quota, for example, 51,000 out of a total of 164,000.

Doctor HILL. Yes.

Senator REED. Is the German element in the American population 51 to 164, namely, 31 per cent?

Doctor HILL. No, sir; it is not. I do not see how anyone could be surprised at the fact that the German element forms a smaller portion of our total population in 1920 than it did of the foreign-born population in 1890; and in the same way with some of the other nationalities. Everyone must know, I suppose, that the English formed a larger proportion of the original stock in 1790 than any other nationality, and that they must form a larger proportion of the present population than they did in the foreign born in 1890. That seems to me almost self-evident without regard to whether our figures are accurate or not. That is a general fact that must result from the shifting from the 1890 to the national-origins basis. (Senate hearings, 1928, p. 17.)

Doctor Hill further testified as to the lack of accuracy of the 1890 census figures showing the foreign born merely as statistical records of such foreign born by countries of birth, with the following result:

Senator REED. If the question be raised of the element of uncertainty due to changes in political boundaries of Europe, it is true, is it not, that the element of uncertainty pertains as much to the 1890 basis as to national origins?

Doctor HILL. Quite true.

Senator REED. There is a necessary factor of guesswork there?

Doctor HILL. Or of estimate; yes.

Senator REED. In the effort to determine what portion of German immigration, let us say, came from German Poland?

Doctor HILL. Yes; I think there is perhaps a somewhat erroneous impression about that. Most people, I believe, have the idea that the 1890 basis rests upon exact figures, but that is rather far from being the case, because the 1890 census does not show how many people there were in the United States in 1890 who were born in that portion of Europe which is now Czechoslovakia. That had to be estimated. It does not show how many people there were in the United States in 1890 who were born in that portion of Europe which is now Yugoslavia; that had to be estimated. It does not show how many people there were from that portion of Europe which constitutes the present Germany or the present France, or the present Irish Free State; all through that had to be estimated. The law contemplates that. It provides that where there have been transfers of territory the number of people born in the transferred territory shall be estimated. So there is a pretty large element of estimate in the 1890 basis.

Senator REED. Of course, that is true of all the new countries created by the war; for example, Poland, Lithuania, Latvia, Estonia, Finland.

Senator WILLIS. That is practically a matter of guesswork?

Doctor HILL. We worked it out as carefully as we could. In making the 1890 allocation, as there was not very much time for careful study, the committee adopted rather arbitrarily the assumption that the immigration from the original country had been spread evenly through the parent country—say that 10 per cent of the population had been transferred from one country to another, it was assumed that the transfer took with it 10 per cent of the immigration. That was the assumption we made in arriving at the quotas on the 1890 basis. (Senate hearings, 1928, pp. 11 and 12.)

I call your attention to the statement of Doctor Hill, last above quoted, as to the estimates and uncertainties involved in the computation of the quotas based on the census of 1890. It may be that the suggestion of Senator Willis that, because of the elements mentioned, and, I may add, others not mentioned, the making of quotas based on the census of 1890 was "practically a matter of guesswork" is not quite justified. But I am justified in saying that there are many assumptions and uncertainties in computing quotas based on the census of 1890 as there would be in reckoning from the figures of any other one census. We have a right to make assumptions necessary to the maintenance of our restrictive policy. I will stand by the basis which the country fixes. If we are left nothing but the census of 1890, I will stand by that. But the national origins is more logical, more scientific, sounder, and would probably be more enduring than would the census of 1890, which was adopted only as a temporary basis. No part of the population of Europe and no bloc of people here, with or without strong foreign attachments, has any vested right in any temporary or permanent quotas which the country has found it convenient to use.

Another group of unjustified assertions were made in this debate in the desperate effort to discredit the support which the American Legion is giving to national origins and their great interest in its application. It was said that if anybody had spoken for the American Legion in support of national origins it was done without authority by some one who took upon himself that function and properly represented no one but himself in making such statements. Now, compare that statement with the facts. Mr. John Thomas Taylor is vice chairman of the legislative committee of the American Legion, appointed by the national executive committee and the national commander of the Legion to represent the Legion in legislative and other matters at Washington.

Mr. Taylor has held that important place for some 10 years. He appeared before the Senate committee during the early days of February, 1929, in behalf of the Legion and made an extensive and very strong statement before the Senate committee in opposition to just such a proposition as this one. Moreover, his authority to speak for the American Legion on this question does not result from his position alone. At its national convention, held in San Antonio, Tex., during 1928, its last preceding national convention, the American Legion specifically indorsed the national origins provision of the immigration law. That was done by a formal resolution. I now quote the language which their official spokesman used before the Senate committee of this Congress on February 9 in indorsing national origins, as follows:

(1) The Legion believes firmly in restrictive immigration. We believe that this is our country, and that we are entitled to be the judge of whether we shall allow people to come here from foreign countries to make their home with us, or to say to them, " We now have sufficient persons of other races within our shores."

(2) As we favor restrictive immigration, the question of how the immigrants should be chosen is of paramount importance. The selection of immigrants upon the basis of the foreign-born population resident in America at any selected date is manifestly unjust, and opens such a basis to the charge of discrimination. This discrimination must inevitably exist, regardless of the census upon which it may be based.

(3) The theory of the national origins of the entire population of the United States is therefore the fairest basis upon which immigration quotas may be based.

It is probable that this very language is largely a quotation from the resolution passed by the Legion in its national convention.

The groundless assertions that no one had any authority to speak for the American Legion on this question is an example of the desperate straits of those who are advocating this resolution and are on a parity with Mr. JACOBSTEIN's repetition of gossip with some clerk or politician in the Census Bureau whose findings and conclusions have been so clearly stated by Doctor Hill.

An effort has been repeatedly and continuously made to create in this House the belief that the national-origins quota is based solely on the census of 1790 and that is followed by quibbles about names appearing on that census roll and the changes through which they have gone since. The census of 1790 is but

one factor, and a relatively small factor, in the computation of the quotas under the national-origins plan. In his testimony before the House committee on the 18th day of January, 1927, Doctor Hill showed the fact just stated. I quote:

The CHAIRMAN. But, on the contrary, errors one way would be balanced by errors the other.

Mr. HILL. That is true. We must remember with regard to most nationalities that that portion which came from 1790 stock forms only a relatively small part of the total quota, and you might have a considerable margin of error in that part without affecting the total very much.

The CHAIRMAN. It was suggested to me at one time that if the committee of which you were chairman had had authority to take all the population up to 1790 and then double the minority of the population, admitting the greater part of it is British, even that doubling would not greatly affect the total reached?

Mr. HILL. It would not make a very great difference.

Note that Doctor Hill says that—

that portion which came from the 1790 stock forms only a relatively small part of the total quota—

And that we—

might have a considerable margin of error in that part without affecting the total very much.

The report of each census following 1890, the history of emigration from the countries contributing to our population stock, the history of the elements of population in Louisiana, in Florida, in Texas, and all information from all sources constitute the basis of the national-origins quota ascertainment. The purpose is to proportion our immigration to the racial stocks in America, computing native born along with all the rest, as the basis of our quotas as distinguished from a foreign-born basis. It is distinctively American in character. That is one of the chief causes of objection to it.

Everyone who is opposed to the restrictive features of the immigration law is opposing national origins and supporting this proposition, not because the proposition will not work, but because it will work.

Informed supporters of the immigration laws have from the first known the difficulty of maintaining the quota system with the census of 1890 as a permanent basis. That date is receding and will recede too far into the past. Because that and other weaknesses in that basis were recognized when the act of 1924 was written, the national-origins provisions were made the permanent basis and the keystone of the arch of the quota system. When you remove it you imperil the whole structure. Some of us will try to hold the pieces together, but there will be difficulty.

This attack does not result from sound reasoning in the interest of the law; it comes from bloc consciousness, bloc selfishness, and want of Americanism in certain foreign-born and hyphenated groups. Chief among these is the Steuben Society, which is the successor of the disloyal German-American Alliance. I quote from an article in the issue of the Progressive of February 15, 1927. The Progressive seems to be the main organ of the Steuben Society. The article from which I read is entitled "The Genesis of the Steuben Society of America." It begins with this sentence:

The fact that the German element in the United States did not make its influence felt to prevent President Wilson from dragging the country into war has been both a puzzle and a reproach. * * *

Of efforts to organize German forces in America, this article further says:

Efforts were not lacking to gather the clans. A meeting attended by representatives of all the German societies throughout the United States and attended by prominent Irish leaders—who proved steadfast during the war and were in intimate touch with Sir Roger Casement later—was held at the Willard Hotel in Washington in January, 1915.

Boasting of the loyalty of this type of German-Americans to the German Empire during the World War, this article says:

But still the German-American middle-class citizens did not waver; and hardly a shopkeeper or home owner among them but scraped his till to subscribe to the German war-loans.

I shall show that this act, which you are asked to pass here to-day, is a part of the program these men have marked out for you. Continuing, and showing how these German elements, representing the old German-American Alliance and similar societies, merged into the Steuben Society, this article says:

A number of these stout-hearted men in New York resolved to form a secret society to which only American citizens of German blood, how-

ever remote their ancestry, should be admitted, hoping in this manner to supply a rallying point for all of their kindred who have suffered such shocking disappointment of faith in a government, * * * [meaning the Government of the United States].

He continues, and engages in a vicious and slanderous attack on the American Legion, saying:

The movement was inaugurated with great secrecy. The armistice had been signed, the war was at an end, but the air was still charged with high explosives. The American Legion, an organization of ex-service men, made some notorious attempts to continue the war in the United States.

Continuing to refer to the American Legion, he says:

In various localities they invaded German-American women's bazaars, held to raise money for the starving women and children of Germany.

Still venting disloyal German spleen on American war veterans as organized in the American Legion, this article continues:

In North Dakota a gang of rowdies, under the Legion banners in automobiles, armed with rifles and revolvers, stampeded a valuable herd of milch cows that had been collected at great financial sacrifice to be entrained for the East for shipment to Germany to relieve the milk famine.

But for the activity of that group some other good people whom they have stirred up would never have found occasion for complaint.

Our late lamented colleague, Hon. William N. Vaile, a thoughtful, diligent Member of this House and of its Committee on Immigration and Naturalization, on the 16th day of November said in this Chamber:

Mr. Speaker, an organization composed of American citizens of German birth or descent, known as the Steuben Society of America, is waging a vigorous campaign for the amendment of the immigration act of 1924.

Their opposition is based on the fact that these provisions are American and not pro-German. That group has grossly assailed one of our Presidents, now dead, and the President now living. I shall insert here what they said about President Coolidge in the very organ which they have used to attack these laws. That attack was made because he is an American and not a pro-German President.

In the June 15, 1927, issue of the organ of the Steuben Society is an article entitled "Sacred Hypocrisy," from which I quote:

Regarding President Coolidge's Memorial Day address, we readily concur in a good part of the criticisms which have been made upon it, notably with the opinions expressed by the German press with regard to his professions of principles, rendered little short of ridiculous in the light of our share in the making of the Versailles treaty.

* * * * * * *

The United States can afford to be above hypocrisy, but as long as Coolidge and his school of political leaders are in and about the White House the United States will never know the truth from official sources; the archives will never be opened that the motives why we entered the war may be revealed to the light of day.

In the same connection I shall insert, not all, nor a considerable part of their vile slandering of Mr. Hoover, but enough of their expression to show how they formerly hated him and when and how their attitude toward him changed.

In the June, 1928, number of their organ, the Progressive, which is a considerable magazine, published at Chicago and New York, on page 14, Frederick F. Schrader, editor of the Progressive, said:

The United States discovered Mr. Hoover during the late war. The great corporations and syndicates of England and Asia which specialize in the exploitation of natural resources of the undeveloped areas of the world knew him well before that time.

That and former issues of the Progressive are filled with matter about Mr. Hoover which I shall not disseminate and perpetuate by including in my remarks.

On page 4 of the August number of the same magazine is an article entitled "We Admit Our Error in Our Fight Against Herbert Hoover," by George W. Angerstein, president of the Progressive magazine.

In the same issue of the same magazine is an article to the same effect by the editor, Mr. Frederick F. Schrader.

Why this sudden change of attitude by the organ of the Steuben Society between June, 1928, and August, 1928? In the New York Times of July 13, 1928, with a Washington date line of July 12, the following appears:

GERMANS WILL VOTE LARGELY FOR HOOVER, WORK IS ASSURED—SIX SPOKESMEN IN WASHINGTON COUNT 95 PER CENT FOR REPUBLICAN TICKET

* * * * * *

(Special to the New York Times)

WASHINGTON, July 12.—While Secretary Hoover was conferring to-day with callers on plans for the campaign, Chairman Work, of the Republican National Committee, received representatives of several German-American organizations, who told him he could expect not less than 95 per cent of the citizens of German blood to vote for Hoover and Curtis.

* * * * * *

LEADERS HAIL GERMAN REPORT

The report on the German-American vote information was considered of such importance that the national committee this afternoon made the facts of the conference the subject of an official statement, as follows:

" Six representatives of German-American groups pledged their support to Secretary Hoover at a conference with Chairman Work to-day.

" The delegation was composed of George W. Angerstein, organizer of the Steuben Club of Chicago and president of the Progressive magazine; Frederick F. Schrader, of New York City, editor of the Progressive, former secretary of the National Congressional Committee, and author of the first Republican textbook in the campaign in 1896; Thomas C. Angerstein, president of the National Historical Society; and Walter Miller, vice president of the Steuben Club of Chicago; Walter H. Brandenburg, vice president of the Board of Education of Chicago; and John J. Gorman, former Member of Congress from Illinois, and attorney for the Steuben Club.

" In deciding to support Mr. Hoover, members of the delegation admitted they were reversing their former position in opposition to him. The members of the delegation predicted that 95 per cent of the so-called German vote would go to the Republican nominee.

" Voters of German ancestry in the United States are interested especially in the national origins act, members of the delegation told Doctor Work, because they feel it is a reflection upon the quality of their citizenship. The delegation which visited the chairman was chosen at a general conference in New York City, which was attended by German-American publishers and representatives of German-American groups in New York, New Jersey, Illinois, Missouri, Nebraska, and Wisconsin."

* * * * * *

The American Legion is another American institution which they hate bitterly and have widely slandered, because our boys, from the humblest privates to the officers in high command, were the opposite, very opposite, of pro-German. The American Legion is one of the leading organizations opposing this pending measure, which is a cowardly cringing to pro-German demands. I have already quoted several of their attacks upon the Legion and could quote many more, but I desist.

The American Legion was strongly represented before the Senate committee in support of national origins as an American provision of these laws. Along with the Legion are the Sons of the American Revolution, the Daughters of the Revolution, Daughters of the Union Veterans of the Civil War, Ladies of the Grand Army of the Republic, United Spanish War Veterans, Sons of the Confederacy, Daughters of the Confederacy, Disabled American Veterans of the World War, the National Women's Relief Corps, and some seventy other patriotic groups of the very best of our people, moved by devotion to dear American ideals—not catering to political machines and alien blocs—not running for office or pursuing any selfish design, but loving and working for good America, as their fathers and mothers did, without money and without price.

All these, led by the American Legion, are asking you not to do this thing.

This Chamber is the battle ground between two lines of opponents. The American Legion and their associates, blessed by the good wishes of a vast majority of America's millions, are on one side, while the Steuben Society leads certain politicians, hyphenated blocs, and kindred associate groups on the other side. I wonder who will win the contest—the American Legion and their associates and friends or the Steuben Society and their allies? The result will be a victory for one and a defeat for the other. If it were an open fight, I would expect the Legion, the Sons of the Revolution, and their fellow patriots to win. But they do not know all the wiles and camouflages of politics and politicians. I shall feel deeply humiliated if, in this devious arena, Uncle Sam's own boys and girls get lost in the maze and suffer defeat. If the long, loud roll of ayes repudiates the position of the American Legion on this question and proves that the pro-German and alien forces are the stronger, it will constitute a sad tattoo, a retreat, temporary, I hope, of heroes and patriots.

If our votes sustain the Sons and Daughters of the Revolution and all like them, headed by the American Legion, the flag will look still more distinctively American and the future brighter.

Mr. JOHNSON of Washington. Mr. Chairman, we are about to conclude the debate on this distressful subject. The debates on this and other bills from the Committee on Immigration and Naturalization will give you some idea of the labor and stress that goes on in the committee. That strain is great. You can well imagine. I desire now to thank my colleagues on the committee for long hours of faithful work. We get along nicely in spite of our violent differences. We all desire to serve the country and to do what is best for the future of the country. I thank the gentleman from Texas, Judge Box, for his energy and fidelity and his earnest study of these problems. I owe thanks to the gentleman from Illinois, Judge SABATH, for his detailed knowledge of many laws on the subject, he being the ranking member in point of service on the committee. I thank Mr. VINCENT, Mr. FREE, Mr. JENKINS, and all of the others, for their efforts to hold our own committee debates to reason and to sane law.

I regret that it has been necessary so often to change the membership of the committee. Strong men here who have been on the committee two or three terms have moved to other committees—" moved up," as the saying goes. Perhaps some other committees are of higher rank and with greater privileges on the floor, but, my colleagues, this overworked Committee on Immigration and Naturalization holds the key, I firmly believe, to more of the problems of the United States, present and future, than any other committee. One member who left our committee to " move up " to a place on the quiet, dignified Committee on Foreign Affairs told me afterwards that he imagined that he felt like a man who had divorced his wife when he should not have done so. [Laughter.]

But our Committee on Immigration moves on. By the very nature of things we become extremists, and yet we progress by compromise. The mail from every congressional district to the committee is heavy. We have not enough clerks. Imagine the requests for informative documents about " national origins." Just how is the plan worked out? What is the mathematical progression? How solid is the colonial stock base? We have few public documents covering these questions in the language of the layman. We have population tables and national-origins figures as of 1924, as of 1927, 1928, and 1920—enough to supply Einstein with all the statistics his " relativity " theory will ever need. Our figures, however, deal with native stock, colonial stock, immigrant stock, and great grandparents, grandparents, parents, and their progeny—the " relatives " problem—which is harder of solution than Einstein's " relativity." I shall put some statements on national origins from all viewpoints and from the best authorities into the CONGRESSIONAL RECORD as an extension of this speech. Postponement is the problem before you now. Whatever your vote, however the President elect acts, national origins will continue to be a problem.

My colleagues, all phases of immigration are problems—even harder now than before restriction—the great act of nearly closing the doors. I had hoped that this Congress might act on a suggestion from our committee, name a congressional commission of Senators and Members of the House to study the laws, the evasions, to revise the naturalization code, to bring out in book form the " origins " studies, and to report to the Seventy-first Congress in December. Perhaps it is too late for us to act, but I sincerely hope that the incoming President may appoint a commission on which there will be Senators, Representatives, and prominent citizens, with authority to study and analyze these problems and recommend to Congress some legislation that will take the kinks out of one of the most important, certainly the most necessary, law we have on our books. [Applause.]

We hear it said and see it printed, " If they will not become naturalized, deport them." And you can not do it that way. We hear the cry from the orphan, from the stepchild, from the wife. We want to cure the hyphenated portions of our population, but you can not do it with a meat ax or a club. Keep your eye on the second generation—their children and our children. Make way! They are here!

Devise plans to get them out of the crowded and crooked cities. Get up something in place of the old homestead laws. Reclaim the waste lands, irrigate, develop, open the Columbia Basin, dike the overflowed lands, stop the erosions in the South. Assist the people to the land. That will help the farmer and not hurt him. It may cost something, but it will save millions. Be as far-sighted as were the fathers.

As the gentleman from Kentucky [Mr. ROBSION] said here in an informative speech two or three days ago—

The 30,000,000 children in the schools of the United States to-day are the Republic of to-morrow.

It is true. A generation has grown up during the time I have served in Congress.

Macaulay, in his letter on American Institutions, said that our danger was from within, not without. But we did something that Macaulay could not forsee. We brought too many too fast from "without" to add to our problems from within.

Nearly all of each foreign-born first generation have done their best. But too often these days we find too many of the second generation piled up by thousands on thousands in the congested places. Starvation will drive them out some day, but only after much travail, disorder, gang government, and decline of city authority. We must all see that. For fear that some one will declare that I am assailing the foreign blood, I will hasten to say that we are all of alien ancestry, and that our own posterity is getting caught in the metropolitan maelstrom.

My colleagues, I desire to pay a tribute and recall to your memory our good old farmer friend from Kansas, Hon. HAYS B. WHITE [applause], who is ending five terms in Congress and who is contemplating this fight from a quiet, vine-covered homestead in far-away Kansas. Homely philosopher, corn-fed farmer, patriot, and poet, and always a sane legislator. Broken in health, he was not a candidate for a seat in the Seventy-first Congress. He lost his health, I believe, from slaving on the Committee on Immigration through the strenuous battle for the 1924 restrictive immigration act. His colleagues on the committee join in this tribute, as do you all, I am sure. [Applause.]

I also remind you that Judge Raker, of California, broke down as a result of his work on the committee, which hastened his death; and Vaile, of Colorado, overstrained himself, weakened his heart, and died suddenly. And may I say to my good friend Judge Box, of Texas, that while he throws so much energy and so much strength into the work of this committee and works equally as hard on other committees, I am afraid he will pay the penalty in health and strength all too soon, just as others of us have.

Try as we will, we can not make the immigration laws perfect. We hear the cries of those on the hustings, "Keep the good immigrants; throw out the bad ones." It can not be done just that way.

My colleagues, we have turned the corner in behalf of immigration restriction. Never again will the bars be down. Tighter and tighter will be the demand. People who were against restriction 15, 10, and even but 5 years ago are restrictionists now. Labor-saving machinery is increasing. In spite of prosperity there is more hand-to-mouth living than ever.

The next great problem must be the checking of immigration from countries of this hemisphere, and more particularly from Mexico.

Economic pressure pushes the peon people out from that Republic; economic suction draws them into this Republic. Slave and serf never sustained any Republic, never created any real prosperity. Unless we stop them right soon we will have in 15 or 20 years a great race problem in all of the southwestern part of the United States.

The Mexican peon will fill the fertile valleys of California and Arizona and the rich plains of Texas, crawling farther north every year. We must stop it. I will help Box, of Texas, in that fight. [Applause.]

In conclusion, let me impress on you that the census of next year, 1930, will show us to be more than 123,000,000. Also that, as President Coolidge himself put it, we are all in the same boat. Whether one was born of slave ancestry, or descended from the Montezumas, or came from the loins of the Bourbons of France, or from the vikings of the northland, or from the Hapsburgs of Austria, or from the Lombards of Italy, or from Moses, Alexander, or the Cæsars we have carried on the Republic for more than 150 years, and are still carrying it on—the United States of America, which is not a democracy but a republic. We overworked the melting pot. In truth, I am afraid that we can not unscramble it now, but we can finish the job of restriction. We can strive on to amalgamate our 123,000,000 people. We are all here under this flag.

For a brief moment we do our part in sailing the ship of state. Another generation comes on. I thank you for your attention. [Applause.]

The CHAIRMAN. The time for general debate has expired. The Clerk will read the resolution for amendment.

The Clerk read as follows:

Joint resolution (H. J. Res. 402) to amend subdivisions (b) and (e) of section 11 of the immigration act of 1924, as amended

Resolved, etc., That subdivisions (b) and (e) of section 11 of the immigration act of 1924, as amended, are amended by striking out the figures "1929" and inserting in lieu thereof the figures "1930."

Mr. SABATH. Mr. Chairman, I offer the following amendment.

The Clerk read as follows:

Strike out, in line 6, the figures "1930" and insert the figures "1932."

Mr. SABATH. Mr. Chairman and gentlemen of the House, the amendment which I have offered, if adopted, will postpone the national origin law, which I have always designated as a scheme, and which is a scheme, going into effect for three years instead of one year provided for in the resolution. I offer the amendment not so much for the purpose of having it adopted as for the purpose of enabling me to answer statements made by the gentleman from Texas [Mr. BOX] and the gentleman from Florida [Mr. GREEN].

It is to be deplored and regretted that it is permissible for Members from time to time to make statements and charges for which there is no warrant or justification and which are made solely for the purpose of creating prejudice and resentment in our country against the immigrants—yes, and against the foreign born.

The gentleman from Texas made a charge on this floor, and many times heretofore, that the proposed resolution is being brought in here at the behest and command of the so-called foreign bloc. I say without fear of successful contradiction that the statements are not only unwarranted but untrue, as there is no such thing as a foreign bloc, and no one knows it better than the gentleman from Texas. But, as I have said, these charges are being made deliberately and without any foundation. There is a bloc, and everybody knows there is, but it is a bloc of restrictionists who in to-day's and yesterday's newspapers served notice upon the membership of this House that the resolution must not pass. The gentleman from Texas has called attention to the many patriotic orders and organizations whose names are attached, but he has failed to state the name of the main organization responsible for this contemptible, threatening proclamation which is not signed by this main organization, namely, the Ku-Klux organization, whose chiefs utilize the names of many of these organizations without their consent, and in some instances without their knowledge, relative to this legislation, but whose few officers abuse their official position and permit the organizations' names to be attached without reference to the desires of the membership. This unheard-of and unprecedented coercion in to-day's and yesterday's expensive advertisements should be resented and condemned by all self-respecting Members. The gentleman from New York, Mr. LAGUARDIA, the gentleman from Massachusetts, and other officers and ex-service men have positively stated that their great organization has never sanctioned the use of its name for this purpose, and this, I am sure, applies to a majority of the other organizations outside of the professional and restrictionist groups. The gentleman from Florida, as usual, tries to outdo the gentleman from Texas in wild, unfounded statements. The only thing that is pleasing to me is that neither the gentleman from Texas nor the gentleman from Florida speak for the Democratic Party or even for their respective States.

I do not like to abridge the privileges of Members, but I feel that in the near future in the interest of the dignity of the House some action will be necessary to preclude and prevent speeches and charges that have no foundation and are made only, as I have stated, to create prejudice and resentment against millions of our foreign-born people who are being maligned in that way without having any opportunity to answer these scurrilous charges and accusations.

For years these professional prohibitionists and paid lobbyists and under-cover Ku-Klux dictators have had a free hand in distributing falsehoods by their lying propaganda so as to close the doors of the United States to immigration, and anyone who has dared to oppose their program of discrimination was charged with favoring the open-door policy so that millions, as they charge, of undesirable immigrants could swarm into the United States, and this notwithstanding that they know that there are no such efforts being contemplated on the part of anyone.

I, who for 22 years have been a member of the Immigration Committee, have always opposed harsh and discriminatory immigration legislation, but have not been, and am not now, for the open-door policy. I have stated many times on this floor that I recognize the present policy of this Nation to restrict immigration which will remain the policy of our Nation for many years to come, but I opposed, and still do oppose, the willful and deliberate discrimination which keeps the doors wide open to Great Britain, Canada, the British possessions, and Mexico, and deliberately and willfully cuts down immigration from all the other nations of Europe to an unwarranted, negligible number on the false theory of these peoples' inferiority. Anyone who has studied conditions in Washington on the question of immigration, and is not blind to the facts, can not help but know that

we are pursuing a British immigration policy, and this is what I am opposed to. I favor an American immigration policy—a policy which would be fair and just to all. Anyone who is familiar with the history of America and its development must recognize that the German, Irish, Bohemian, Polish, Lithuanian, Swedish, Scandinavian, yes, and many of the other nationalistic groups, have, by their genius and ability, aided in the progress and development of our Nation in all lines of endeavor and that they are as loyal and as patriotic as those who come from Great Britain. The last World War, and before it the Spanish-American, Civil, and Revolutionary Wars, proved that.

Instead of calling this law which is going into effect the national origin law it should be properly designated as the British origin law, as everyone who has been advocating it, I am absolutely certain, is of British leaning or of British stock, and has had the support of the British under-cover, subway diplomacy, and subsidy.

The three varying reports of the commission show that there is no way of ascertaining with any degree of accuracy the number that should be allocated to the respective nations according to origin. I herewith insert a compilation of these reports showing the glaring discrepancies in them.

*Immigration quotas*

[Printed for the use of the Committee on Immigration and Naturalization, House of Representatives, February 28, 1929]

| 1 | 2 | 3 | 4 | 5 |
|---|---|---|---|---|
| National-origin quotas submitted Feb. 21, 1929 | Country or area | National-origin quotas submitted Feb. 27, 1928 | National-origin quotas submitted Jan. 7, 1927 | National-origin quotas estimated in 1924 | Present quotas based on 1890 foreign-born population |
| 100 | Armenia | 100 | | 100 | 124 |
| 100 | Australia, including Papua, etc. | 100 | 100 | 100 | 121 |
| 1,413 | Austria | 1,639 | 1,486 | 2,171 | 785 |
| 1,304 | Belgium | 1,328 | 410 | 351 | 512 |
| 2,874 | Czechoslovakia | 2,726 | 2,248 | 1,359 | 3,073 |
| 100 | Danzig, Free City of | 137 | 122 | 100 | 228 |
| 1,181 | Denmark | 1,284 | 1,044 | 945 | 2,789 |
| 116 | Estonia | 100 | 109 | 325 | 124 |
| 569 | Finland | 568 | 559 | 517 | 471 |
| 3,086 | France | 3,308 | 3,837 | 1,772 | 3,954 |
| 25,957 | Germany | 24,908 | 23,428 | 20,028 | 51,227 |
| 65,721 | Great Britain, Northern Ireland | 65,894 | 73,039 | 85,135 | 34,007 |
| 307 | Greece | 312 | 367 | 384 | 100 |
| 869 | Hungary | 1,181 | 967 | 1,521 | 473 |
| 17,853 | Irish Free State | 17,427 | 13,862 | 8,330 | 28,567 |
| 5,802 | Italy, including Rhodes, etc. | 5,989 | 6,091 | 5,716 | 3,845 |
| 236 | Latvia | 243 | 184 | 384 | 142 |
| 386 | Lithuania | 492 | 494 | 458 | 344 |
| 3,153 | Netherlands | 3,083 | 2,421 | 2,762 | 1,648 |
| 2,377 | Norway | 2,403 | 2,267 | 2,053 | 6,453 |
| 6,524 | Poland | 6,090 | 4,978 | 4,535 | 5,982 |
| 440 | Portugal | 457 | 290 | 336 | 503 |
| 295 | Rumania | 311 | 516 | 222 | 603 |
| 2,784 | Russia, European and Asiatic | 3,540 | 4,781 | 4,002 | 2,248 |
| 252 | Spain | 305 | 674 | 148 | 131 |
| 3,314 | Sweden | 3,399 | 3,259 | 3,672 | 9,561 |
| 1,707 | Switzerland | 1,614 | 1,198 | 783 | 2,081 |
| 123 | Syria and the Lebanon (French) | 125 | 100 | 100 | 100 |
| 226 | Turkey | 233 | 233 | 100 | 100 |
| 845 | Yugoslavia | 739 | 777 | 591 | 671 |
| ¹ 153,714 | Total | ¹ 153,685 | ¹ 153,541 | ¹ 150,000 | ¹ 164,647 |

¹ Including 37 minimum quotas of 100 each.
² Includes 16 minimum quotas of 100 each.

With all due respect to Mr. Hill and the commission, composed of distinguished Secretaries Hoover, Kellogg, and Davis, these reports clearly demonstrate that they are merely guesswork plus a few ameliorating changes brought about by pressure and given as a balm to some of the peoples most discriminated against.

If the restrictionists are so determined to cut down immigration from certain countries as is being done by the national origin law, why not do it openly and aboveboard instead of camouflaging the issue.

If the proponents of this legislation favor actual restriction to protect American labor, why have they failed to place Canada, Cuba, Mexico, South and Central America, and the West Indies on a quota basis which will reduce immigration by 150,000 annually?

Mr. JOHNSON of Washington, Mr. LaGUARDIA, Mr. DICKSTEIN, and several other Members rose.

Mr. LaGUARDIA. Mr. Chairman, I rise in opposition to the amendment.

Mr. JOHNSON of Washington. Mr. Chairman, I rise in opposition to the amendment.

The CHAIRMAN. The Chair recognizes the gentleman from Washington.

Mr. JOHNSON of Washington. Mr. Chairman, I rise in opposition to the amendment, but doubt if it is necessary to carry on the debate any further. Therefore, I ask for a vote.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Illinois.

Mr. JOHNSON of Washington. Mr. Chairman, I move that all debate on the resolution and all amendments thereto close in five minutes.

Mr. DICKSTEIN rose.

The CHAIRMAN. The question is on the motion of the gentleman from Washington that all debate on the resolution and all amendments thereto be closed in five minutes.

The question was taken, and the motion was agreed to.

The CHAIRMAN. The Chair recognizes the gentleman from New York [Mr. LaGUARDIA] in opposition to the amendment.

Mr. DICKSTEIN. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. DICKSTEIN. I have filed an amendment to one of the provisions of this joint resolution.

The CHAIRMAN. The gentleman has not yet offered his amendment.

Mr. DICKSTEIN. I asked for recognition.

The CHAIRMAN. The Chair promised recognition to the gentleman from New York, but his promise was foreclosed by the motion just agreed to to close debate. The Chair would be glad to recognize the gentleman, but it is impossible under the circumstances. The Chair recognizes the gentleman from New York [Mr. LaGUARDIA].

Mr. LaGUARDIA. Mr. Chairman, much has been said this morning on the floor, in the press, and in paid advertisements as to the standing of the American Legion on the question of the national-origins plan. I now state definitely that the American Legion, of which I am a member, has never taken any official stand on this question. [Applause.] I state further that the American Legion has a legislative committee, and only matters that are taken up by this legislative committee may speak for that great organization.

Mr. JENKINS. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. I warn the American Legion that if any of their paid employees around Washington commence to interfere and speak for the Legion on matters on which they are not authorized to do so we will take this matter up in the convention of the Legion. [Applause.]

I say further to the American Legion that it must necessarily restrict its efforts to matters in which the Legion is peculiarly and particularly interested; otherwise if employees or minor local officers are permitted to lend the name of the organization to all sorts of legislation, the Legion will soon find that its influence has been dissipated.

Mr. SIMMONS. Why use the word "commence"? We know that one man claiming to represent the American Legion has been doing that around Washington for years.

Mr. LaGUARDIA. And for that reason he has weakened his standing in Congress and before committees of Congress, and I submit that to every member of the American Legion who is a Member of this House. The name of the Legion should not be peddled around. The Legion's indorsement should not be given unless specifically authorized by the national convention.

Mr. CONNERY. Mr. Chairman, will the gentleman yield?

Mr. LaGUARDIA. Yes.

Mr. CONNERY. In order that the matter may be clear in the RECORD, I ask the gentleman this question: At the last convention of the American Legion did the committee on resolutions of the Legion report any resolution in favor of this national-origins provision, and did the convention adopt such a resolution?

Mr. LaGUARDIA. It did not and it would not, and our legionnaire colleagues all know that.

Mr. CONNERY. I just wanted to be clear in the RECORD.

Mr. LEHLBACH. Would not the amendment now pending before the House compel the President of the United States to open this question in April of the year of the presidential election, just at the time when the primaries throughout the country are being held?

Mr. LaGUARDIA. The dates speak for themselves.

The CHAIRMAN. The time of the gentleman from New York has expired. The question is on the amendment offered by the gentleman from Illinois [Mr. SABATH].

The amendment was rejected.

Mr. DICKSTEIN. Mr. Chairman, a parliamentary inquiry. Do I understand that debate is closed on this whole resolution?

The CHAIRMAN. Debate is closed on the resolution and all amendments thereto.

Mr. DICKSTEIN. Mr. Chairman, I ask unanimous consent to address the committee on this question for three minutes.

The CHAIRMAN. The gentleman from New York asks unanimous consent to address the committee for three minutes. Is there objection?

Mr. JOHNSON of Washington. I object.

Mr. LEHLBACH. Mr. Chairman, I submit that we are sitting under the direction of the House itself, and the House limited the time. We in committee can not change that.

The CHAIRMAN. The committee has limited the time itself and has closed all debate.

Mr. LAGUARDIA. But the committee can extend that time.

Mr. JOHNSON of Washington. Mr. Chairman, I move that the committee do now rise and report the resolution back to the House with the recommendation that it do pass.

Mr. GARRETT of Tennessee. Mr. Chairman, I have a preferential motion. In view of the fact that this is dead and in order that we may get to something that may have a chance of passing, I move to strike out the enacting clause.

The CHAIRMAN. Does the gentleman care to be heard on that?

Mr. TILSON. Mr. Chairman, debate is closed.

The CHAIRMAN. The question is on the motion of the gentleman from Tennessee to strike out the enacting clause.

The question was taken, and the motion was rejected.

The CHAIRMAN. If no further amendments are proposed, the committee will rise automatically under the rule.

Accordingly the committee rose; and the Speaker having resumed the chair, Mr. HOOPER, Chairman of the Committee of the Whole House on the state of the Union, reported that that committee had had under consideration House Joint Resolution 402 and, pursuant to the rule, he reported the same back to the House.

The SPEAKER. Under the rule the previous question is ordered. The question is on the engrossment and third reading of the House joint resolution.

The joint resolution was ordered to be engrossed and read a third time, and was read the third time.

The SPEAKER. The question is, Shall the joint resolution pass?

Mr. BOX. Mr. Speaker, on that I demand the yeas and nays. The yeas and nays were ordered.

The question was taken; and there were—yeas 192, nays 152, not voting 83, as follows:

[Roll No. 36]

YEAS—192

| | | | |
|---|---|---|---|
| Ackerman | Dickinson, Iowa | Johnson, Wash. | Ramseyer |
| Allen | Dickstein | Kading | Ransley |
| Andresen | Douglass, Mass. | Kahn | Reed, N. Y. |
| Andrew | Dyer | Kendall | Reid, Ill. |
| Anthony | Elliott | Ketcham | Robinson, Iowa |
| Arnold | Englebright | Knutson | Rogers |
| Ayres | Estep | Kopp | Sabath |
| Bacharach | Fenn | Korell | Sanders, N. Y. |
| Bachmann | Fish | Kvale | Schafer |
| Bacon | Fitzgerald, W. T. | LaGuardia | Schneider |
| Barbour | Fitzpatrick | Lampert | Sears, Nebr. |
| Beedy | Fort | Lea | Seger |
| Begg | Foss | Leavitt | Selvig |
| Black, N. Y. | Frear | Lehlbach | Shallenberger |
| Bloom | Free | Letts | Simmons |
| Bohn | Freeman | Lindsay | Sinclair |
| Boylan | French | Luce | Strovich |
| Brand, Ohio | Furlow | McCormack | Snell |
| Brigham | Gibson | McLaughlin | Somers, N. Y. |
| Browne | Gifford | McLeod | Spearing |
| Buckbee | Glynn | Major, Ill. | Sproul, Kans. |
| Burtness | Golder | Mansfield | Stalker |
| Campbell | Goodwin | Mapes | Stobbs |
| Carew | Griffin | Martin, Mass. | Strong, Kans. |
| Carss | Guyer | Mead | Summers, Wash. |
| Carter | Hadley | Menges | Swing |
| Celler | Hale | Michaelson | Taber |
| Chalmers | Hall, Ind. | Michener | Thurston |
| Chindblom | Hall, N. Dak. | Miller | Tilson |
| Christopherson | Hancock | Monast | Timberlake |
| Clague | Hardy | Morehead | Treadway |
| Clarke | Haugen | Nelson, Me. | Underhill |
| Cochran, Mo. | Hawley | Nelson, Mo. | Updike |
| Cohen | Hersey | Nelson, Wis. | Vestal |
| Cole, Iowa | Hickey | Newton | Vincent, Mich. |
| Colton | Hill, Wash. | Niedringhaus | Wason |
| Combs | Hoch | Norton, Nebr. | Watres |
| Connery | Hoffman | O'Brien | Welch, Calif. |
| Cooper, Ohio | Hooper | O'Connell | Welsh, Pa. |
| Cooper, Wis. | Hope | O'Connor, N. Y. | White, Colo. |
| Corning | Hopkins | Oliver, N. Y. | Wigglesworth |
| Cramton | Houston, Del. | Palmisano | Williams, Ill. |
| Crosser | Howard, Nebr. | Parker | Williamson |
| Culkin | Hull, Wm. E. | Prall | Wood |
| Cullen | Igoe | Pratt | Woodruff |
| Darrow | Irwin | Purnell | Wolverton |
| Davenport | Jacobstein | Quayle | Wurzbach |
| Dempsey | Johnson, S. Dak. | Rainey | Zihlman |

NAYS—152

| | | | |
|---|---|---|---|
| Abernethy | Eaton | Kincheloe | Rayburn |
| Adkins | Edwards | Langley | Reece |
| Allgood | England | Lanham | Robsion, Ky. |
| Almon | Eslick | Lankford | Romjue |
| Arentz | Evans, Calif. | Larsen | Rowbottom |
| Aswell | Evans, Mont. | Leatherwood | Rutherford |
| Beers | Fisher | Leech | Sanders, Tex. |
| Bell | Fulmer | Linthicum | Sandlin |
| Black, Tex. | Gambrill | Lowrey | Speaks |
| Bland | Gardner, Ind. | Loxier | Steagall |
| Bowman | Garrett, Tenn. | Lyon | Steele |
| Box | Garrett, Tex. | McDuffie | Strong, Pa. |
| Brand, Ga. | Gasque | McKeown | Summers, Tex. |
| Briggs | Goldsborough | McMillan | Swank |
| Browning | Green | McReynolds | Swick |
| Bulwinkle | Greenwood | McSweeney | Tarver |
| Busby | Hall, Ill. | Magrady | Taylor, Colo. |
| Byrns | Hare | Major, Mo. | Taylor, Tenn. |
| Canfield | Hastings | Manlove | Temple |
| Cartwright | Hill, Ala. | Martin, La. | Thatcher |
| Chapman | Hogg | Milligan | Thompson |
| Chase | Holaday | Montague | Tucker |
| Cochran, Pa. | Howard, Okla. | Moore, Ky. | Vinson, Ga. |
| Cole, Md. | Huddleston | Moore, Ohio | Vinson, Ky. |
| Collier | Hughes | Moore, Va. | Ware |
| Collins | Hull, Morton D. | Moorman | Warren |
| Connally, Tex. | Hull, Tenn. | Morgan | Watson |
| Cox | Jeffers | Morrow | Whitehead |
| Crail | Jenkins | Oldfield | Whittington |
| Crisp | Johnson, Ind. | Oliver, Ala. | Williams, Mo. |
| Davis | Johnson, Okla. | Parks | Wilson, La. |
| Deal | Johnson, Tex. | Patterson | Wilson, Miss. |
| Dominick | Jones | Peery | Wingo |
| Doughton | Kearns | Perkins | Wolfenden |
| Douglas, Ariz. | Kelly | Pou | Woodrum |
| Dowell | Kemp | Quin | Wright |
| Drane | Kent | Ragon | Wyant |
| Driver | Kiess | Rankin | Yon |

NOT VOTING—83

| | | | |
|---|---|---|---|
| Aldrich | Dallinger | James | Sears, Fla. |
| Auf der Heide | Davey | Johnson, Ill. | Shreve |
| Bankhead | Denison | Kerr | Smith |
| Beck, Pa. | DeRouen | Kindred | Sproul, Ill. |
| Beck, Wis. | Dickinson, Mo. | Kunz | Stedman |
| Berger | Doutrich | Kurtz | Stevenson |
| Blanton | Doyle | McClintic | Strother |
| Boies | Drewry | McFadden | Sullivan |
| Bowles | Fitzgerald, Roy G. | McSwain | Tatgenhorst |
| Britten | Fletcher | Maas | Tillman |
| Buchanan | Fulbright | Merritt | Tinkham |
| Burdick | Garber | Mooney | Underwood |
| Bushong | Garner, Tex. | Moore, N. J. | Vincent, Iowa |
| Butler | Gilbert | Morin | Wainwright |
| Cannon | Graham | Murphy | Weaver |
| Carley | Gregory | Norton, N. J. | White, Kans. |
| Casey | Griest | O'Connor, La. | White, Me. |
| Clancy | Hammer | Palmer | Williams, Tex. |
| Connolly, Pa. | Harrison | Peavey | Winter |
| Crowther | Hudson | Porter | Yates |
| Curry | Hudspeth | Reed, Ark. | |

So the resolution was agreed to.

The Clerk announced the following pairs:

On this vote:

Mr. Doyle (for) with Mr. Kerr (against).
Mr. Kunz (for) with Mr. Hammer (against).
Mr. Mooney (for) with Mr. Weaver (against).
Mr. Sullivan (for) with Mr. Stedman (against).
Mr. Curley (for) with Mr. Berger (against).
Mr. Auf der Heide (for) with Mr. Maas (against).
Mrs. Norton of New Jersey (for) with Mr. Drewry (against).
Mr. Kindred (for) with Mr. McClintic (against).
Mr. Moore of New Jersey (for) with Mr. Bankhead (against).

Until further notice:

Mr. Graham with Mr. Garner of Texas.
Mr. Yates with Mr. Casey.
Mr. Denison with Mr. Hudspeth.
Mr. Connolly of Pennsylvania with Mr. McSwain.
Mr. Beck of Pennsylvania with Mr. O'Connor of Louisiana.
Mr. Shreve with Mr. Cannon.
Mr. Griest with Mr. Hammer.
Mr. Murphy with Mr. Underwood.
Mr. McFadden with Mr. Buchanan.
Mr. James with Mr. Dickinson of Missouri.
Mr. Dallinger with Mr. Sears of Florida.
Mr. Crowther with Mr. Blanton.
Mr. Britten with Mr. DeRouen.
Mr. Porter with Mr. Gilbert.
Mr. Smith with Mr. Fletcher.
Mr. White of Maine with Mr. Williams of Texas.
Mr. Wolverton with Mr. Davey.
Mr. Sproul of Illinois with Mr. Gregory.
Mr. Burdick with Mr. Fulbright.
Mr. Hudson with Mr. Harrison.
Mr. Merritt with Mr. Reed of Arkansas.
Mr. Tinkham with Mr. Tillman.
Mr. Doutrich with Mr. White of Kansas.
Mr. Bushong with Mr. Johnson of Illinois.
Mr. Bowles with Mr. Palmer.
Mr. Garber with Mr. Kurtz.
Mr. Winter with Mr. Clancy.
Mr. Aldrich with Mr. Peavey.
Mr. Beck of Wisconsin with Mr. Butler.
Mr. Curry with Mr. Wainwright.
Mr. Boies with Mr. Tatgenhorst.
Mr. Roy G. Fitzgerald with Mr. Vincent of Iowa.

Mr. O'CONNELL. Mr. Speaker, the lady from New Jersey, Mrs. NORTON, is unavoidably absent on account of a death in

her family. She has authorized me to state that if she were present she would vote "aye."

Mr. McSWAIN. Mr. Speaker, I desire to vote "no." I was present in the hall during the roll call, but my attention was diverted at the time my name was called.

The SPEAKER. The Chair thinks it is too late.

The result of the vote was announced as above recorded.

#### MEYER JACOBSTEIN AND FINIS J. GARRETT

Mr. CELLER. Mr. Speaker, I ask unanimous consent to put in the RECORD a portion of an article in the Woman's Journal on the subject of our colleagues, the gentleman from Tennessee [Mr. GARRETT] and the gentleman from New York [Mr. JACOBSTEIN].

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

Mr. CELLER. Mr. Speaker, I am pleased to insert in the RECORD a portion of an article appearing in the March issue of the Woman's Journal concerning our distinguished colleagues, MEYER JACOBSTEIN and FINIS J. GARRETT, which is as follows:

The gallery gods of Congress have looked their last upon several prominent Members who did not run, or ran behind. Senator JAMES REED, of Missouri, goes, singing his swan song to his favorite tune: "The war councils of every great nation have prepared plans for the sinking of the American Fleet, the bombardment of American cities, and they have laid out the roads over which the armies are to travel in case of war with the United States." The dwindling ranks of the wets are losing three of their mainstays in Senators EDWARDS, of New Jersey, BRUCE, of Maryland, and GERRY, of Rhode Island. Over on the House side, the outstanding losses are FINIS J. GARRETT, of Tennessee, and MEYER JACOBSTEIN, of New York, both Democrats of high principles and clear thinking.

Mr. JACOBSTEIN, a Representative who showed a disconcerting tendency to think in terms of economics rather than party policies, is one of the most generally liked men on the House floor, a rare example of the economic student in politics. It should be remembered to his credit that he presented to Congress one of the most complete and logical plans yet advanced for solution of the many problems in the unstable bituminous coal industry, which still sticks out like a sore thumb in the economic structure of the Nation. His name is attached to no important acts of Congress, and few pages of the CONGRESSIONAL RECORD were required by him for "extension of remarks." But to a good many people who heard his reasoned, polite, beautifully phrased statements to congressional committees considering his bills, Mr. JACOBSTEIN will stand for some time as pretty nearly the ideal Congressman.

#### NATIONAL INSTITUTE OF HEALTH

Mr. SIROVICH. Mr. Speaker, I move to suspend the rules and pass Senate bill 4518, to establish and operate a national institute of health, to create a system of fellowships in said institute, and to authorize the Government to accept donations for use in ascertaining the cause, prevention, and cure of disease affecting human beings, and for other purposes.

The SPEAKER. The gentleman from New York moves to suspend the rules and pass a bill, which the Clerk will report.

The Clerk read the bill, as follows:

Be it enacted, etc., That the Secretary of the Treasury is authorized and directed to establish and operate a national institute of health under the jurisdiction of his department and the administrative control of the Surgeon General of the Public Health Service, which shall be devoted to scientific research in the problems of the diseases of man and matters pertaining to health. The Hygienic Laboratory shall hereafter be known as the National Institute of Health. The Secretary of the Treasury is authorized to utilize the site now occupied by the Hygienic Laboratory, and the land adjacent thereto owned by the Government and available for this purpose, or when appropriations have been made therefor, to acquire by purchase, condemnation, or otherwise, in or near the District of Columbia, and to erect thereon suitable and adequate buildings, including furniture and equipment for the use of such institute. In the administration and operation of this institute the Surgeon General shall select persons who show unusual aptitude in science. The Surgeon General, with approval of the Secretary of the Treasury, may make such rules and regulations for the government and administration of such institute as he deems advisable. The Secretary of the Treasury is authorized and directed to submit to Congress not later than December 2, 1929, plans and estimates of appropriations necessary to carry out adequately the provisions of this act.

SEC. 2. The Secretary of the Treasury is authorized to accept, unconditionally, on behalf of the United States, gifts by will or otherwise for study, investigation, and research in all problems of the diseases of man and matters pertaining thereto. Any such gifts shall be held in trusts and shall be invested by the Secretary of the Treasury in securities of the United States, and the income thereof shall be administered by the Surgeon General, with the approval of the Secretary of the Treasury, for the purposes indicated in this act. The Surgeon General is authorized to establish fellowships in the national institute of health, and utilize the proceeds thereof in aid of individual scientists who have demonstrated or give promise of marked proficiency in research and investigations relating to the diseases of man. Donations of $500,000 or over in aid of research will be acknowledged permanently by the establishment within the institute of suitable memorials to the donors.

SEC. 3. Individual scientists designated by the Surgeon General to receive fellowships may be appointed for duty in the national institute of health established by this act. During the period of such fellowship these appointees shall hold appointments under regulations promulgated by the Secretary of the Treasury, and shall be subject to administrative regulations for the conduct of the Public Health Service. Scientists so selected may likewise be designated for the prosecution of investigations in other localities and institutions in this and other countries during the term of their fellowships.

SEC. 4. The Secretary of the Treasury, upon the recommendation of the Surgeon General, is authorized (1) without regard to the classification act of 1923, to designate the titles and fix the compensation of the necessary scientific personnel; (2) in accordance with the civil service laws to appoint, and in accordance with the classification act of 1923, fix the compensation of such clerical and other assistants; and (3) to make such expenditures (including expenditures for personal services and rent at the seat of government, for books of reference, periodicals, and exhibits, and for printing and binding) as he deems necessary for the proper administration of such institution.

SEC. 5. The facilities of the institute shall from time to time be made available to bona fide health authorities of States, counties, or municipalities for purposes of instruction and investigation.

The SPEAKER. Is a second demanded?

Mr. MAPES. Mr. Speaker, I demand a second.

Mr. SIROVICH. Mr. Speaker, I ask unanimous consent that a second may be considered as ordered.

The SPEAKER. Is there objection?

There was no objection.

The SPEAKER. The gentleman from New York [Mr. SIROVICH] is recognized for 20 minutes, and the gentleman from Michigan [Mr. MAPES] is recognized for 20 minutes.

Mr. SIROVICH. Mr. Speaker, ladies and gentlemen, in 1826 a very distinguished Englishman gave the sum of $550,000 to the Congress of the United States for the purpose of diffusing knowledge, education, and culture to the citizens of the United States. The gentleman who gave this money was a man by the name of Smithson, and the Smithsonian Institution has been named to commemorate his name and his fame.

To-day we have before the House what I consider one of the most important bills that has ever been presented to the Congress of the United States. It is a bill that, if passed by the Seventieth Congress, will make America, this great country of ours, the most scientific nation in the field of medicine throughout the civilized world.

This bill of mine that passed the Senate the other day is designed to establish and operate in our country a "national institute of health." It creates a system of fellowships to deserving students that have been graduated from American universities and authorizes the Government to accept donations from philanthropic citizens to be utilized in ascertaining the cause, prevention, and cure of all the unknown diseases that afflict humanity.

All the great advances that have been made in preventive, scientific, and therapeutic medicine during the last half century have emanated with very few exceptions from the laboratories of Germany, supported by its government. Robert Koch was the pioneer in the field of tuberculosis, and his findings are to-day being utilized in the treatment of tuberculosis. The cause of diphtheria, as well as its toxin and antitoxin, was discovered by Von Behring in these German institutes. The French contributed somewhat to its development. The world to-day is utilizing the genius of German intellectuality when it treats lockjaw as well as cholera. The ravages of typhoid fever were eliminated by German savants in the discovery of the bacillus typhosus and the Widal reaction which recognizes the disease. This discovery helped England to eliminate typhoid fever in the Boer War, the Japanese in the Russo-Japan War, while the Americans used it to great advantage in the World War. A decade ago the cause of syphilis was as unknown and as mysterious as that of cancer to-day, yet German laboratories utilized the microscope of science and forced it to yield its secret. The result was the discovery of spirochaete pallida, the cause of syphilis, the Wassermann reaction, and above all its cure by Ehrlich's salvarsan, or 606, treatment, all the result of Germany's laboratories supported by the government.

Mr. CRAMTON. Has this bill ever been reported by any committee of the House?

Mr. SIROVICH. This bill passed the Senate only two days ago. The House Committee on Interstate and Foreign Commerce has had no hearings on this measure. That is why I requested the Speaker to suspend the rules of the House, to bring this measure immediately before this historic body, and try to see if we can not have it passed before Congress adjourns to-morrow.

What a glorious contribution the Seventieth Congress of the United States would give to the world in helping to organize, perfect, and develop this national institute of health. To you distinguished gentlemen who come from the South—you realize how malaria has plagued your forbears, yet some of the finest work done in the field of malaria came from the English in India and Africa until American genius, under the supervision of Walter Reed and his associates, blotted it out from the civilized frontiers and outskirts of the world. [Applause.]

Mr. O'CONNELL. Will the gentleman yield?

Mr. SIROVICH. Yes; I yield to my distinguished friend.

Mr. O'CONNELL. It is reported that this bill is going to cost a lot of money. Will the gentleman state approximately what the cost will be?

Mr. SIROVICH. This bill, as amended by the Senate, carries no appropriation for the present whatsoever. It authorizes the Secretary of the Treasury to make all the necessary formal plans and specifications, so that when Congress convenes in December, 1929, the necessary costs will already have been determined. Then appropriations will be asked for to carry into realization all the principles and ideals that belong to an American national institute of health.

Mr. Speaker, ladies and gentlemen, in 1892 Japan established a national institute for the study of tropical diseases to safeguard and protect its citizens. In that institution they discovered the cause and treatment of bubonic plague, as well as the shiga bacillus that is responsible for various forms of dysentery that has caused the death of millions of people throughout the world.

What would humanity do to-day without the use of the X ray? Yet that extraordinary discovery comes to us from the laboratories of Germany.

Cancer, next to heart disease, is killing millions of men and women throughout the world. Yet, outside of the surgeon's scalpel, the only available treatment for that terrible disease is the utilization of radium, which has been discovered by Madame Curie, working in French laboratories, supported by the Government. Have you forgotten Pasteur and Metchnikoff, working in the Pasteur Institute and bringing distinction and fame to the tricolor of France?

To-day the cause of cancer is unknown, yet it is no more mysterious than syphilis, yellow fever, malaria, and meningitis were a few years ago. If you establish a national institute of health to ferret out the causative factor of unknown diseases, you may be instrumental in saving the lives of millions who are destined in the future to die from pneumonia, kidney and heart disease, and diseases of hardened blood vessels, the four conditions that cause most of the deaths in the world.

Mr. Speaker, ladies, and gentlemen, this bill of mine in the House, and of my associate, Senator RANSDELL, in the Senate, has the indorsement of the American Medical Association, the American Chemical Society, the American Public Health Association, the American College of Surgeons, the American Institute of the City of New York, the American Association for the Advancement of Science, the American Dental Association, and countless others. It has the personal approval of two of the greatest surgeons in the world, Drs. William and Charles Mayo. It has the indorsement of America's greatest pathologist, Doctor Welch, of Johns Hopkins. Prof. Reid Hunt, the most eminent authority on pharmacology in the United States and professor at Harvard, has come to Washington to urge its approval. George Vincent, president of the Rockefeller Foundation, has sent his personal approval of the measure. Prof. Lewellys F. Barker, the successor to Professor Osler at Johns Hopkins University, the most distinguished clinician in America, is for this bill.

President Coolidge has signified his intention to sign it if passed. Secretary Mellon, of the Treasury Department, has written enthusiastically in its support, and last, but not least, Surg. Gen. Hugh S. Cummings, Chief of the Public Health Service of the Government of the United States, the foremost and outstanding genius in public-health work, is for this bill. Should we hesitate to pass it? Mr. Speaker, ladies and gentlemen, at West Point and Annapolis we have the greatest military and naval institutes in the world. Here the flower of American youth is trained to love our country in time of peace and to patriotically fight for its preservation in times of war! There is not one of us in this House that would not gladly bare his breast to shot and shell that our country may

continue to prosper, flourish, and grow, yet no greater monument could be erected in times of peace to perpetuate the name and fame of those whose life blood hallows the military and naval cemeteries of our Republic than through the erection of a national institute for public health that will serve all the people of our Republic, irrespective of race, creed, or color. [Applause.]

Mr. CRAMTON. Will it interrupt the gentleman to ask a question?

Mr. SIROVICH. I will yield to the distinguished gentleman from Michigan.

Mr. CRAMTON. It is just a question of proper legislative methods. The House is one of the two bodies charged with the responsibility, and the proper committee—and it is a very able committee—has not seen fit for some reason to report this bill. It carries authority for unlimited charges on the Federal Treasury. The bill provides:

There is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such sums as may be adequate to carry out the provisions of this act.

There is no limit whatever on the appropriation.

Mr. SIROVICH. That has been amended by the Senate, and I sent up the amended Senate bill which takes out the money appropriation.

Mr. CRAMTON. That is another illustration of the fact that the House has not even the bill in printed form.

Mr. SIROVICH. It is just to allow the Secretary of the Treasury to make formal plans and specifications so that we may know when we come back here on December 2, 1929, how much money will be necessary to carry the ideals of the national institute of health into fruition.

Mr. CRAMTON. But the bill does establish the institute.

Mr. SIROVICH. Exactly.

Mr. CRAMTON. And calls on the Secretary to make plans and specifications, and so forth.

Mr. SIROVICH. And report back to the House at the next session, on December 2, as to what we shall do. It gives us a year's time in which to work.

Mr. CRAMTON. But it gives the membership of the House no time whatever to examine the provisions of the bill that is before us. If the House wants to abdicate its functions and let the Senate do the legislating and the House act as a rubber stamp, this would seem the proper course, but I can not understand it on any other basis.

Mr. SIMMONS. Will the gentleman yield?

Mr. SIROVICH. I yield to the gentleman from Nebraska.

Mr. SIMMONS. I find on page 3, line 2, of the bill a misspelled word. The word "established" is misspelled, so that it means nothing. How is the gentleman going to correct that by this procedure?

Mr. SIROVICH. That is a typographical technicality which can be taken care of. I am not worrying about that.

Mr. SIMMONS. The establishment of it is the important part, I should presume.

Mr. O'CONNOR of New York. Will the gentleman yield?

Mr. SIROVICH. Yes.

Mr. O'CONNOR of New York. May I say to the gentleman from Michigan [Mr. CRAMTON] that the situation about which he complains is as usual in this House that within the past few days I believe that in at least 20 instances we have passed a Senate bill which was never reported by any House committee and never considered before in the House.

Mr. LAGUARDIA. Twenty? About 100 instances.

Mr. O'CONNOR of New York. Perhaps nearer 100 instances.

Mr. SIROVICH. Mr. Speaker, I reserve the balance of my time to reply after others have spoken.

Mr. MAPES. Mr. Speaker, I think the membership of the House ought to understand the legislative situation before acting upon this motion to suspend the rules and to pass this very important piece of legislation. The Committee on Interstate and Foreign Commerce has jurisdiction of the legislation. The bill has been pending in the Senate for several months. The gentleman from New York [Mr. SIROVICH] says it has been before the Committee on Interstate and Foreign Commerce. If it has been, as one member of that committee, it was not called to my attention. No hearings have been had upon it, and no request for any has been made that I know of, and I think the chairman of the committee will bear me out in that statement.

It was pending in the Senate for a great many months. It passed the Senate on Friday night, about 10 o'clock, and was messaged to the House of Representatives yesterday. A great many members of the Committee on Interstate and Foreign Commerce have been requested to make this motion to suspend the rules and to pass the bill, which the gentleman from New

York now makes. The members of the committee have refused to make the motion. The chairman of the committee was asked to make it, and he said he could not do so because the committee had not considered the legislation and had had no opportunity to pass on its merits. Under such conditions he was unwilling to take the responsibility of asking the House to pass it.

Mr. ABERNETHY. Will the gentleman yield?

Mr. MAPES. Yes.

Mr. ABERNETHY. This is an unusual circumstance. We are legislating on Sunday, and how could we do better than to legislate in the interest of humanity? [Applause.] Why can not we do it?

Mr. MAPES. If the gentleman from North Carolina wants to take the responsibility of passing legislation without having it considered by any committee of the House of Representatives, that is his business. I, for one, do not care to do so.

I have been looking over the RECORD of the proceedings in the Senate for the last week with a little more care than usual, and the Senators have taken the high and mighty position, or some of them have, that the House itself was to blame for not getting House bills over to the Senate in time for them to be considered by the committees of the Senate. That was in reference to minor matters of legislation. Here is a piece of legislation of major importance that has come to this body within the last 24 hours. There has been no opportunity for any committee of the House of Representatives to consider it. It is a poor rule that does not work both ways.

Mr. SIROVICH. Will the gentleman yield?

Mr. MAPES. No, I can not yield; I have not the time. As the House knows, the Committee on Interstate and Foreign Commerce reported some public-health legislation at the last session of Congress. This bill, in its present form at least, was not a part of that legislation. The details of this bill have never been considered by any committee of the House. The gentleman from New York says the bill was amended in the Senate in some respects. We have not had an opportunity even to see a copy of the bill as it finally passed in the Senate. I supposed the copy that has been handed us was the same as it came from the Senate until the statement just made by the gentleman from New York. He says that it does not require any appropriation, does not "ask for an appropriation of a dollar," to quote his language. Let us see what the Senate had before it until 10 o'clock Friday night. The bill says:

The Secretary of the Treasury is authorized * * * to acquire by purchase, condemnation, or otherwise in or near the District of Columbia, and to erect thereon suitable and adequate buildings, including furniture and equipment for the use of such institute.

The bill also carries this further provision:

There is hereby authorized to be appropriated, out of any money in the Treasury not otherwise appropriated, such funds as may be adequate as to carry out the provisions of this act.

The gentleman from New York says that the bill does not ask for a dollar out of the Treasury. It does not actually make the appropriation, but it authorizes—

the Secretary of the Treasury to make such expenditures (including expenditure for personal services and rent at the seat of government for books of reference, periodicals and exhibits, and for printing and binding) as he deems necessary for the proper administration of such institution.

Yet the gentleman says that it does not ask for a dollar!

Mr. CRAMTON. Mr. Speaker, will the gentleman yield?

Mr. MAPES. Yes.

Mr. CRAMTON. I have in my hand the bill as it comes from the Senate. The amendment makes no real change. There is a change of language, but not of effect. Appropriations without limit are authorized by this bill. It provides:

That the Secretary is authorized and directed to submit plans and estimates of appropriations necessary to carry out adequately the provisions of this act.

That is unlimited authority for appropriations. Those estimates will go to the Appropriations Committee and not to any legislative committee.

Mr. MAPES. Mr. Speaker, because of the fact that a subcommittee was appointed to consider public-health legislation in the last Congress, of which I was chairman, I am making this statement; and in doing so I am speaking, as far as I know, the sentiment of the members of the committee.

The committee takes no responsibility for this legislation; it has no knowledge of its merits or demerits except what has been said here on the floor; it has had no opportunity to consider it, and it feels that it is an important piece of legislation, too important to be put through in the closing hours of this session of Congress without consideration by a committee. We

are going to be in session again in the near future, and this legislation can be taken up at that time. It ought not to pass without the recommendation of some committee of this House.

Mr. HUDDLESTON. Mr. Speaker, will the gentleman yield?

Mr. MAPES. Yes.

Mr. HUDDLESTON. I call the gentleman's attention to the fact that as shown by page 45 of the Senate committee report this bill is without the approval of the Director of the Budget, and there is no recommendation in its behalf by any department or any responsible governmental office. Furthermore, as I am informed, every Member, both Democratic and Republican, of the Committee on Interstate and Foreign Commerce has been invited to make the motion to suspend the rules, and all of us have been unwilling to do so. Also, it is my information, may I say to my Democratic friends, that every Democrat on the committee is opposed to having the bill passed under this procedure without having been considered by the committee.

Mr. MAPES. Mr. Speaker, the gentleman from Nebraska [Mr. SIMMONS] has just called my attention to another fact. The bill authorizes the Secretary of the Treasury, upon the recommendation of the Surgeon General, without regard to the classification act, to designate titles and fix the compensation of the necessary scientific personnel or such as he deems necessary to administer the act. Mr. Speaker, there could be no broader language used to give the Surgeon General of the Public Health Service through the Secretary of the Treasury unlimited authority to go ahead and conduct this institute and to spend money as he sees fit than is used in this bill.

Mr. CRAMTON. Mr. Speaker, will the gentleman yield?

Mr. MAPES. Yes.

Mr. CRAMTON. And if this House establishes this precedent and allows one bureau to fix its salaries without regard to the compensation act, it will have opened the doors for every scientific bureau in the Government to do the same thing.

Mr. VINSON of Georgia. Mr. Speaker, will the gentleman yield?

Mr. MAPES. I think the gentleman ought to get his time from the other side. In brief, the position of our committee is this: This legislation may be all that the gentleman from New York says for it. We do not know. The House does not know. No committee of the House has passed upon it and it is altogether too important to act upon without the recommendation of some committee of the House. I reserve the remainder of my time.

Mr. SIROVICH rose.

Mr. VINSON of Georgia. Mr. Speaker, before the gentleman from New York begins, will he yield to me for a question?

Mr. SIROVICH. Yes.

Mr. VINSON of Georgia. The gentleman from Alabama [Mr. HUDDLESTON] stated that this bill did not have the approval of the Director of the Budget. I state to the House that this bill has the approval of the Director of the Budget and the Secretary of the Treasury, and the bill is simply carrying out the provisions written in the Democratic platform with reference to public health. Respecting the statement made by the gentleman from Michigan [Mr. MAPES], it is a matter of fact that the Interstate and Foreign Commerce Committee did not even have any hearings when it asked the House to pass a bill providing for a survey of the Nicaraguan route for the canal.

Mr. HUDDLESTON. Mr. Speaker, will the gentleman yield?

Mr. SIROVICH. I think the gentleman from Alabama should get his time from the gentleman from Michigan.

The SPEAKER pro tempore. The gentleman declines to yield.

Mr. SIROVICH. Mr. Speaker, ladies, and gentlemen, the pioneer of medicine is the research worker. In the battle with bacteria, he is invariably the martyr and pays the penalty with his life. To this soldier of science, the national institute of health would be a veritable paradise. Here would be his home. Here would be the Mecca to which the scientific youth of America would gravitate, and from here, the Capital of this great Nation, he would be sent as a messenger of "peace and good will" to carry and bring back as an American fellow the labor and fruit of scientific genius wherever it is found. To the philanthropist, who is anxious to bequeath of his monetary wealth, this bill is a godsend. Because it enables a man by his contribution to immortalize his name and perpetuate his fame by endowing the mind of genius to unravel nature's mysteries in the realm of disease. [Applause.]

Science knows no barriers, no races, no classes. It has no boundary lines. Its services are universal. Behold America's four great geniuses: Alexis Carrel, the winner of the Nobel prize; Simon Flexner, the distinguished director of the Rockefeller Institute and the discoverer of the cure of epidemic meningitis; Hideyo Noguchi, Nippon's favorite yet America's adopted son, whose great contribution to scientific medicine has not been equaled in this the twentieth century of civilization, and who

died at Gold Coast in Africa, a martyr to science; and last but not least, the great medical soldier from my district on the east side of New York, Dr. Louis Goldberger, whose heroic and wonderful research work in the South in pellagra, hookworm, and yellow fever will forever perpetuate his name in the hall of fame of America's immortals. [Applause.]

For the fiscal year 1928 the Government of the United States has spent about $600,000 for the utilization of the Surgeon General to investigate sickness and disease in our country.

Mr. VINSON of Georgia. Will the distinguished gentleman from New York yield?

Mr. SIROVICH. I yield to the honorable gentleman from Georgia.

Mr. VINSON of Georgia. I call the gentleman's attention to the fact that within the last five years this House has appropriated $54,000,000 for the eradication of diseases in plants and animals, but only $3,000,000 for the preservation of the life of the Nation.

The gentleman from Michigan [Mr. CRAMTON] is a member of the Committee on Appropriations, and if any money is asked for to carry out the provisions of this bill it would necessarily have to come before his scrutinizing eye, and unless there is merit to it, of course not one dollar would be appropriated.

Mr. CRAMTON. Mr. Speaker, will the gentleman yield?

Mr. SIROVICH. In a minute. My distinguished friend, Mr. CRAMTON, who always champions the principle of prohibition as its leader and is always happy to spend the public's money to enforce prohibition, should certainly welcome the opportunity to conserve and preserve the health of the people of the United States by the establishment of a national institute of health.

Mr. LaGUARDIA. Mr. Speaker, will the gentleman yield there?

Mr. SIROVICH. Yes.

Mr. LAGUARDIA. Is not the public health just as necessary as education, and ought it not to be on a par with it?

Mr. SIROVICH. Yes; and on a par with public morals. [Applause.] Mr. Speaker, I reserve the balance of my time.

Mr. MAPES. Mr. Speaker, how much time remains?

The SPEAKER pro tempore. Does the gentleman from New York desire to use more of his time?

Mr. SIROVICH. If the gentleman from Michigan does not, I do not.

The SPEAKER pro tempore. The gentleman from New York has two minutes remaining and the gentleman from Michigan six minutes.

Mr. MAPES. I yield three minutes to the gentleman from Illinois [Mr. DENISON].

Mr. DENISON. Mr. Speaker, of course any of us could mention the names of many great doctors who have made great sacrifices in the study of diseases. But that is purely a question of sentiment. That is not the question to be decided here. There is no time left this near the close of Congress to pass a very important and far-reaching bill as this is. I do not think it ought to be done.

Mr. SIROVICH. You did the same thing with the Nicaragua resolution.

Mr. DENISON. No; we did not. There is no use in making such a statement. Our committee considered carefully and reported the bill concerning Nicaragua. The bills that have been considered without consideration of a committee have been private bills, not bills of any great importance or bills of a general character.

I do not think we ought to take up and pass this bill at this time, because none of us knows what it contains. I confess I do not know what is in the bill. I may be in favor of it after I have had a chance to study it and know something about it. Why should we legislate in the dark? We ought not to do that. Congress is going to convene early in April and——

Mr. ABERNETHY. But we are to be restricted in the subjects that will be considered then.

Mr. DENISON. No. The Speaker might recognize anyone to suspend the rules and pass such legislation in the extra session of Congress. The Speaker can recognize the gentleman from New York to suspend the rules and pass this bill in the extra session of Congress. I say if we are going to legislate on this matter we can do it at the extra session of Congress as well as now, and in the meantime we can have an opportunity to find out what is in the bill.

Mr. LINTHICUM. We did not have any hearings on the Jones bill even when 43 Members asked for a hearing.

Mr. MAPES. Mr. Speaker, I yield three minutes to the gentleman from New York [Mr. PARKER].

The SPEAKER pro tempore. The gentleman from New York is recognized for three minutes.

Mr. PARKER. Mr. Speaker, I simply want to state that the position of the committee of which I have the honor to be chair-

man is not so much in opposition to the bill as in opposition to the method of procedure. We are not discussing the merits of this bill, because we know nothing about the bill itself.

I was requested yesterday to ask for a suspension of the rules and take this bill from the Speaker's table and pass it, but I refused to do it, not because I was opposed to the bill but because I do not know anything in the world about it. I could not stand here on this floor and commend it.

Mr. JOHNSON of Oklahoma. Has not the gentleman voted for a hundred or more bills that have been passed in the House in the last few days without full and serious consideration?

Mr. PARKER. No. This is the only bill that I know of that has been brought up in this way.

Mr. VINSON of Georgia. Mr. Speaker, will the gentleman yield for a question?

Mr. PARKER. Yes.

Mr. VINSON of Georgia. Is there anything unusual about the procedure of considering a bill that has passed the Senate and when the House is asked to consider it?

Mr. PARKER. I did not yield for a speech; only for a question. I think it is decidedly unusual to bring up a bill of this character in this way.

Mr. VINSON of Georgia. But if the subject is important, would not that be all right?

Mr. PARKER. It is somewhat unusual, I repeat, to bring up a bill of this kind without the consent of the committee to which this character of bill should be referred.

Mr. CROSSER. Was not the gentleman's attention called to the bill the other day, when its advocates sent around to each member of the gentleman's committee a copy of it, with a request for its consideration over their signatures?

Mr. PARKER. I think so.

Mr. WATRES. Has anything been urged as an emergency that could show the necessity for the consideration of this bill under the circumstances?

Mr. PARKER. No. A request was handed to me only yesterday, asking that the rules be suspended and the bill passed.

Mr. CRAMTON. Mr. Speaker, so far as I know, I do not know of the House passing even a private bill unless an identical bill has been considered and been reported by a committee. I know of no exception to that.

The SPEAKER. The question is, Shall the rules be suspended and the bill passed?

The question was taken; and two-thirds having failed to vote in favor thereof, the motion to suspend the rules and pass the bill was rejected.

CHARLES N. NEAL

Mr. GLYNN. Mr. Speaker, I ask unanimous consent for the present consideration of Senate bill 5679 for the relief of Charles N. Neal.

The SPEAKER. The gentleman from Connecticut asks unanimous consent for the present consideration of Senate bill 5679, which the Clerk will report.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That any disability occurred in line of duty by Charles N. Neal while serving as an officer of the Army of the United States during the World War from March 26, 1917, to December 11, 1918, inclusive, shall be deemed and considered to have been so incurred while serving as an officer of the Army of the United States other than as an officer of the Regular Army, so as to entitle said Neal to the benefits and privileges of the emergency officers' retirement act (Public, No. 506, 70th Cong.) : *Provided,* That such disability rating is sufficient and said Neal is otherwise eligible for retirement under the terms and conditions of said act: *And provided further,* That said Neal shall not be entitled to any back pay or allowances by the passage of this act.

The SPEAKER. Is there objection?

Mr. SCHAFER. Mr. Speaker, reserving the right to object, has a similar House bill been reported by the Committee on Military Affairs?

Mr. GLYNN. It has, and I have a copy of the report here.

Mr. SCHAFER. By unanimous vote?

Mr. GLYNN. Yes; by unanimous vote.

Mr. SCHAFER. I shall not object.

Mr. HUDDLESTON. Mr. Speaker, reserving the right to object, I think the gentleman should give us some explanation as to why this bill is brought forward in this way. It is my understanding there is no precedent for passing a private bill for the benefit of a World War soldier, and that we have heretofore remitted such cases to the Veterans' Bureau for the payment of compensation under the general statutes.

Mr. GLYNN. I think a great many such private bills are put in. This is the case of a man who was an emergency officer and who was discharged in 1920 suffering from tuber-

culosis. Later his disability was arrested, and he was appointed a captain in the Quartermaster Corps of the Regular Army. Then later he was discharged as a captain. If he had continued as an emergency officer, or if he had been discharged originally as an emergency officer, he would have been entitled to the benefit of the provisions of the emergency officers' retirement law; but having accepted a commission, and holding it for about two years, in the Regular Army, in the Quartermaster Corps, he is barred from the provisions of the emergency officers' retirement act.

Mr. HUDDLESTON. How much disability compensation is this veteran now receiving under the compensation laws?

Mr. GLYNN. I think he is receiving none.

Mr. HUDDLESTON. Why is he not receiving it? He is certainly eligible to receive it. Is his tuberculosis arrested?

Mr. GLYNN. Yes; it was an arrested case; but it is no longer arrested.

Mr. HUDDLESTON. Is it active?

Mr. GLYNN. Yes.

Mr. HUDDLESTON. Then he is entitled to receive compensation from the Veterans' Bureau at the full rate. Let me ask the gentleman whether this veteran was retired for disability?

Mr. GLYNN. I think not; I think his case was arrested.

Mr. HUDDLESTON. As I understand, he became disabled by reason of tuberculosis while holding a Regular Army commission?

Mr. GLYNN. No; while holding an emergency officer's commission.

Mr. HUDDLESTON. Then why is he not eligible for retirement as an emergency officer?

Mr. GLYNN. Because when his case was arrested he accepted a commission in the Quartermaster Corps.

Mr. HUDDLESTON. In the Regular Army?

Mr. GLYNN. Yes.

Mr. HUDDLESTON. And then when his case became active again he was retired for disability from the Regular Army; is that right?

Mr. GLYNN. I think he was retired as an emergency officer, but having been a Regular Army officer he is not entitled to the benefit of the provisions of the emergency officers' retirement act.

Mr. HUDDLESTON. I will say to the gentleman that it is quite beyond all possibility, as I see it, that a Regular Army officer would be retired for disability as an emergency officer. I do not understand how that could happen.

Mr. GLYNN. I understand there are two or three cases——

Mr. HUDDLESTON. I see present here several members of the Committee on World War Veterans' Legislation——

Mr. RANKIN. I am just waiting for the gentleman to conclude in order to take that question up with the gentleman from Connecticut.

Mr. HUDDLESTON. The responsibility is theirs, but I want to know whether we are to start in on a system of giving benefits by private legislation to veterans of the World War or are we going to adhere to our previous policy of requiring them to seek relief under the general law. It is time for us to make that decision now.

Mr. TILSON. Is it the purpose of either of the gentlemen to object to the consideration of this bill?

Mr. RANKIN. I am going to try to get some information about it.

Mr. TILSON. The gentleman has not made up his mind whether he is going to object or not. If he has, I wish he would let me know.

Mr. RANKIN. I am trying to find out whether or not this bill has been referred to the Committee on World War Veterans' Legislation.

Mr. GLYNN. It has not. This bill was reported favorably by the Senate Committee on Military Affairs.

Mr. RANKIN. I understand that.

Mr. GLYNN. And was passed by the Senate, and a similar bill is reported here.

Mr. RANKIN. I understand that, but has a similar bill been reported by the Committee on World War Veterans' Legislation of the House?

Mr. GLYNN. Not that I know of.

Mr. RANKIN. Or by any other committee?

Mr. GLYNN. Yes; by the Military Affairs Committee.

Mr. RANKIN. I understand that, but this legislation comes primarily within the jurisdiction of the Committee on World War Veterans' Legislation.

Mr. Speaker, this is a very important proposition. The Chairman of the Committee on World War Veterans' Legislation has consistently refused to permit legislation of this kind to come from his committee. I do not think it would be the proper policy to begin now to permit breaking around the rules of the House and start doing by indirection what we are not permitted to do by direction and I hope the gentleman will withdraw his request and let this bill go to the Committee on World War Veterans' Legislation for further consideration.

Mr. GLYNN. This is not my bill, I will say to the gentleman from Mississippi, and if the gentleman wants to block a worthy measure he must take the responsibility.

Mr. RANKIN. The gentleman from Mississippi does not mind taking responsibility whenever it becomes necessary to do so.

The SPEAKER. Is there objection?

Mr. RANKIN. Mr. Speaker, in the absence of the chairman of the Committee on World War Veterans' Legislation, who is opposed to legislation of this kind, and in view of the fact that it has not been considered by the committee, I must object for the time being.

### JOHN J. HELMS

Mr. GLYNN. Mr. Speaker, I ask unanimous consent for the present consideration of the bill (S. 5386) extending benefits of the World War adjusted compensation act, as amended, to John J. Helms.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in administration of the World War adjusted compensation act, as amended, John J. Helms, formerly private, Supply Company, One hundred and twenty-third Regiment United States Infantry, World War, shall be held to be entitled to the benefits thereof in the same manner and with the same effect as if a separation from the military forces of the United States on October 24, 1918, had been honorable.

The SPEAKER. Is there objection?

Mr. RANKIN. Mr. Speaker, reserving the right to object, this bill has not been referred to the Committee on World War Veterans' Legislation has it?

Mr. GLYNN. In reply I want to say that this bill was referred to the Committee on World War Veterans' Legislation on February 4, 1929, and on February 19, 1929, was referred to the Committee on Military Affairs.

Mr. RANKIN. Is this a question of adjusted compensation?

Mr. GLYNN. It is a question of discharge.

Mr. RANKIN. It should go to the Ways and Means Committee and not to the Committee on World War Veterans' Legislation. This is a matter that does not come to our committee.

Mr. MICHENER. Regular order.

Mr. SIMMONS. Reserving the right to object——

The SPEAKER. The regular order has been demanded. Is there objection?

Mr. SIMMONS. I shall object if we can not have an explanation of the bill.

The SPEAKER. Objection is heard.

### HON. FINIS J. GARRETT

Mr. SNELL. Mr. Speaker, I ask unanimous consent to proceed for two minutes.

The SPEAKER. Without objection, the gentleman from New York is recognized for two minutes.

There was no objection.

Mr. SNELL. Mr. Speaker, as I shall be unavoidably detained from the Chamber to-morrow, I desire to say a few words regarding the retiring leader of the minority.

Probably no man on the Republican side of the House has been more intimately associated with the gentleman from Tennessee, Mr. Garrett, for the last 14 years than I have. We have occupied places on opposite sides of the table in the Committee on Rules during this entire period. Notwithstanding the many controversial and political questions that have come before that committee during all that time, during the World War, during the reconstruction period, and down to the present time, if my memory serves me correctly, and I think it does, there has never been one unkind word or one moment of unfriendly feeling. [Applause.]

During the time I have had the honor of being chairman of that committee I have consulted Mr. Garrett a great many times on account of his long experience and intimate knowledge relative to matters of parliamentary procedure and precedents of the House. He has always given me freely of the best advice and counsel in his power to give, notwithstanding the fact he belonged on the opposite side of the Chamber.

Now, Mr. Speaker, during my service in this House there have been very few men, in my judgment, who have combined more qualities to make them ideal legislators than has the gentleman from Tennessee, Mr. Garrett. [Applause.] He is a student,

Case: 1:21-cr-00665 Document #: 30-2 Filed: 05/02/22 Page 39 of 50 PageID #:628

able and energetic. He is forceful and eloquent in debate, and, above all, he has the courage of his convictions [applause], and, in my judgment, that is a mighty essential quality for any legislator to possess.

His retirement from the House at this time is not only a loss to his district, a loss to his State, to the House, but also to the entire American people. [Applause.] We need men of his type and character in the American Congress.

I know that I speak the wish and the desire of every man on the Republican side, as well as on the Democratic side, when I say that I wish for him in his new position of public activity as long, as successful, and distinguished career as he has had in the House of Representatives. [Applause.]

Mr. GARRETT, our good wishes, our respect, our admiration go with you. [Applause.]

Mr. GARRETT of Tennessee. Mr. Speaker, I am profoundly grateful to the gentleman from New York, chairman of the important Committee on Rules of the House, with whom I have served so long and so agreeably, for the very generous words which he has used with reference to myself. It is touching to my heart; it is a matter of profound gratification to know that I have the respect of the chairman of this important committee with whom I have served so many ins and outs in the life of the House. I thank you, Mr. SNELL, most cordially. [Applause.]

### HARRIMAN GEOGRAPHIC CODE SYSTEM

Mr. TEMPLE. Mr. Speaker, I ask unanimous consent for the present consideration of the bill (S. 5722) to provide for the purchase of the use of the Harriman Geographic Code System, an identical House bill being on the calendar (H. R. 16953).

The SPEAKER. The Clerk will report the bill.

The Clerk began the reading of the bill.

Mr. JEFFERS. Mr. Speaker, it is my intention to object to the bill.

The SPEAKER. The bill is objected to.

### RESTORATION OF THE LEE MANSION

Mr. LOWREY. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD on the bill passed yesterday.

The SPEAKER. Is there objection?

There was no objection.

Mr. LOWREY. Mr. Speaker and gentlemen of the House, in the deficiency bill which has just passed there occurs an item of peculiar interest to many generous people North and South. I refer to the appropriation of $90,000 for the restoration of the Lee mansion as authorized in Public Resolution 74.

That this is in full accord with the spirit of our country and our times has again been demonstrated. This Congress has recently broadened the scope and increased the appropriation in the matter of placing markers at the graves of Confederate soldiers. Furthermore, the commander of the United Confederate Veterans with his organization has entered fully into the plan for the pending inaugural ceremony. From my own State come a score of veterans in gray who are occupants of the Confederate Soldiers' Home. These heroic old men come bearing large placards with sentiments of loyalty like these: "Hoover is our President, too"; "No more war, please"; "We are for the Union now"; "Kill sectional strife."

In the face of such fraternal demonstrations, God pity the souls of people, North or South, who would still stand for the spirit of hate, and prefer disunion to a genuine reunion.

But at this point I simply ask to repeat in the RECORD some of the remarks which I made a year ago when the Congress had passed a smaller appropriation for this same purpose.

For years there has been a growing and a commendable feeling that Arlington should in some way be marked and remembered as the home of the heroic leader of the Confederate Army. John Ball Osborne, Military Order of the Loyal Legion, says in his book, The Story of Arlington:

"Arlington will always remain closely associated with the name of Gen. Robert E. Lee, the leading military figure of the Southern Confederacy, for it was his home during 30 years and the place where his happiest days were spent."

Thirty years ago I came to Washington, as people occasionally do, with a party of sightseers, about a hundred people, all of them southerners. Most of them were on their first visit to the National Capital. I noted with grief, and yet with approval, their expressions that in and around the splendid residence of Robert E. Lee there was not one thing to remind us by atmosphere that this was once his home. There mingled into our party a stalwart New Englander, who had come to visit the grave of his father. As he heard these expressions from my southern friends, he quitely remarked, " I don't blame them; I should feel that way myself."

From that day to this I have had a growing conviction that this thing ought to be changed, and that one day it would be changed. " His enemies themselves being judges," Lee stands as one of the purest and gentlest and at the same time one of the most brilliant and heroic men in American history.

An editor of a great New York magazine referred to him recently as the most splendid and heroic character of the Civil War, and said, " I am glad to have the columns of this magazine used to honor his name." When I spoke from this floor on this subject some years ago, the lamented Congressman Osborne, from California, was the only Union veteran in the House. He wrote me a letter of cordial appreciation and assured me he considered it a privilege to join in such a cause.

Seven years ago, within two months after I began my service in the Congress, I began my advocacy of this measure with a speech in which I urged that the home of Lee should be restored, should be kept in its original form and beauty, and, like the home of Washington, should be held sacred in the hearts of our people. It has taken seven years for this to come to pass, but I remember the patriarch of old who served seven years, and then another seven, before he got the full desire of his heart.

During these years I have often discussed this matter publicly and have urged it through personal appeals and private interviews enough perhaps, to gain the reputation of a nuisance and a crank with people who were not interested in the subject. But I have found all along some happy surprises as to people who showed a vital interest in the matter. One of the most ardent advocates of the cause has been that brilliant penwoman, Mrs. Frances Parkinson Keyes, of New Hampshire, who was born in Virginia and maintains a spirit of loyalty and devotion to the Old Dominion and its people. Again, Public Resolution 74 was brought before the House and sponsored by Representative CRAMTON, of Michigan, son of a Union soldier, who has said to me that he received his high opinion of Robert E. Lee from his good father, who went south and fought against Lee for four years.

    *    *    *    *    *    *

We of the South have been called on to pay tribute to the valor of the North, and gladly we have paid it. As worthy foemen we have honored the soldiers in blue; as honest foemen we have respected them; as reunited brethren we have worked with them; as comrades in arms our sons have shed blood under a common flag with theirs through two wars in a common cause. For more than half a century our money has been added to theirs to pension the veterans of the Grand Army, against which we fought; to buy, beautify, and maintain Federal cemeteries from Gettysburg to Vicksburg; to erect monuments to Federal leaders.

The loyalty of the South is established, sealed with the blood of her sons. Before the secession she had given largely to the building of the Nation. Since the reunion she has given just as generously. I would not say that she has come back to the Union conquered, because in her attitude toward the Government she has exhibited none of the animus of defeat.

The South has come back with head erect and eyes unafraid, having fought to her last energy for a principle which she considered vital, but accepting the issue of battle with good grace and honest courage.

In true southern and true American spirit we now accept this national tribute to Robert E. Lee, not as an expression of sympathy or mercy to an unworthy cause or a recreant people, but as an expression of a Nation's honor to one of that Nation's greatest heroes, who deserves every tribute that may be paid to his high character, his great ability, and his splendid achievements. [Applause.]

### ADDRESS OF HON. PAT HARRISON

Mr. WILSON of Mississippi. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing a speech by the senior Senator from Mississippi, PAT HARRISON, on the life and character of one of our great benefactors.

The SPEAKER. Is there objection?

There was no objection.

The speech is as follows:

SPEECH DELIVERED BY SENATOR PAT HARRISON ON SUNDAY AFTERNOON, JANUARY 6, 1929, IN THE CITY OF GULFPORT, MISS., AT THE UNVEILING OF A BRONZE BUST OF CAPT. WILLIAM H. HARDY, GIVEN TO THE CITY OF GULFPORT BY HIS SON, HON. LAMAR HARDY, OF NEW YORK CITY

Amid the false trimmings of this new and modern day it is refreshing to know that gratitude still abides in the hearts of men. Monuments are indicative of the character of a people. Truly the poet was right when he said:

" Ill fares the land, to hastening ills a prey,
Where wealth accumulates and men decay."

No greater disaster can befall a civilized people than for them to be untouched by sentiment or unmoved by tradition. It is to the credit of the finest traditions of old New England that in the populous city of Boston, cemeteries wherein lay heroes of the Revolution and historic

landmarks of that imperishable period have been maintained and preserved against the assaults of progress. No commercial or industrial emergency has ever been able to supplant those hallowed places. A nation's glories are but the accomplishments of her citizenship. The finest inspiration to posterity is found in the priceless legacies of glorious achievements. The Greek youth of old represented the highest type of physical perfection. At the Olympic games he joined in the applause which greeted the victor and returned home determined that some day he would wear the crown of wild olive.

The child of Italy, beneath the golden splendor of Italian skies, looks with rapture upon the paintings of Angelo and lies down at night to dream of the days when his own work, chiseled in marble or painted upon canvas, may rival that of his great master. The little French peasant boy is stirred by the Marseillaise because he has read in the strong lines of his Napoleon the military glories of his country. No Englishman ever visited London without a fixed resolve to wind his way up to Trafalgar Square, where he might look upon the towering monument to England's mighty hero. No greater compliment has ever been paid the Capital City of this Nation than when it was referred to as the "City of Monuments." In that city of beauty, rich in lore and history, upon every square and in every circle enduring testimonials of a grateful people rise to many of our country's illustrious dead. Throughout our State, in hamlet, town, and village, towering shafts and costly monuments have been erected to her distinguished dead, whose services in peace or war have added to the glory and progress of our Commonwealth. It is in keeping with that fine custom that this memorial is erected in this magic city by the sea to our illustrious friend and pioneer citizen, William H. Hardy. He was a remarkable character, endowed by the Creator with a grace and dignity and personality that was striking. It was impossible for his commanding figure to be lost in any crowd. His fine native ability, his studious nature, his analytical mind, his constant search for truth embellished his character and endowed him as a leader of men. As a philosopher he ranked high; as a lawyer among the best of his profession; as a statesman he left his imprint upon the pages of constructive legislation; as an orator he was most eloquent; as a jurist he was discerning, just, and able; as a citizen he was progressive and unselfish; as a Christian he was tolerant of the views of others but steadfast in his devotion to the high purposes and calling of his church; as a family man he was tender and true; as a friend he was loyal; as a soldier he was brave. As successful as he was in the many high positions of honor and trust which he held, from member of the State senate to judge of this circuit district, from codifier of our laws to counselor and advisor of governors and high dignitaries, it is not of these services that I desire to speak to-day, but of those things that I know if he were living and in this presence he would desire more to be known to posterity than all others. Coming to Mississippi immediately following his college training at the Cumberland University and before he had reached his majority, he saw the wonderful opportunities for future development that lay in the piney-woods section of Mississippi. Amid the environments of the little town of Paulding, in Jasper County, with a prophet's eye he visioned the then three great commercial metropolises of the Nation—New York in the East, New Orleans in the South, and San Francisco in the West—connected by great trunk lines of railroad. He visualized the virgin forests, the rich agricultural lands, and the fine opportunities for a great port on the Mississippi coast. The future development of this section to him was dependent only upon transportation. To carry through only capital was to be obtained and mobilized. He was the first Mississippian to conceive the necessity of a railroad connecting New Orleans with the ports along the Atlantic seaboard through the construction of a railroad running out of New Orleans in a northeasterly direction through Meridian. It was in those circumstances that he began to lay plans that meant so much to the future of Mississippi and this section.

In 1868 he wrote an article for the press that was given wide publicity, calling attention to the opportunities of south Mississippi, the possibility, as well as the necessity, of building a trunk line through the shortest route between New York and New Orleans over Lake Pontchartrain. The idea with him was not a financial dream, but a project to which he had dedicated his talents, and was as fixed in his purpose to achieve as the stars in heaven. It was in the early seventies that he mobilized all his talents and concentrated all his efforts toward arousing interest in and winning favor for his plan. It was no little task in the early seventies to finance a great railroad construction, and yet, at that time this young piney-woods pioneer and lawyer not only gave to the country his conception, but sold the bonds that the survey might be made, and later traveled to the hard-boiled centers of financial New York to gain further financial assistance.

For one from our State in this day of high finance and fictitious values to interest New York or French or English capital in the purchase of $2,500,000 worth of bonds is no easy task, but when we think of the difficulties that confronted one without means of affluence in the late seventies or early eighties to have been able to negotiate such a loan for the construction of a railroad, we can appreciate the very efforts the more. For more than a decade this pioneer citizen kept con-

stantly at his task, and not until 1884, nearly 16 years after he had first advocated the project, did he behold that this dream had come true. Often have I heard him describe the thrill that came to him following the completion of that railroad:

"When I first began to agitate the building of this road across this immense body of water and marsh land," said he, "I was ridiculed and charged with being a dreamer, but I had an abiding faith in the project and was given a thrill of joy as I traveled as one of the first passengers in palace Pullman cars across this 21-mile bridge at the rate of 40 miles an hour." What James J. Hill, as a builder, did for the great Northwest, Captain Hardy did as a pioneer builder for south Mississippi.

With all the self-satisfaction and glory attained from such an achievement, his indomitable energy and consuming interest in the development of this section, called him to another great effort. In 1880, while lunching near the intersection of Bowie and Leaf Rivers, along the line of his almost completed New Orleans & Northeastern Railroad, he visualized another road connecting a great port on the Mississippi coast with metropolises along the Great Lakes region and crossing his own railroad at a point where he was then sitting. He then and under these circumstances laid out the city of Hattiesburg, named it after his beloved and devoted wife, and began an agitation for the construction of the Gulf & Ship Island Railroad. It was not until 1886 or 1887 when he took active charge of the construction and financing this project, revising and amending charters, entering public lands, battling and confirming those interests in the high tribunals at Washington, and laying the plan for a network of railroads in south Mississippi that was to give it a prominence and position second to no other section of the State. He did not carry to full completion the construction of the Gulf & Ship Island Railroad—general financial depression hampered and disturbed railroad construction throughout the country, but the ground work that he laid, the project he started, became a reality, and to-day our section is so linked in the arterial railroad system of the Nation that we play our part in the trade and commerce of the world.

Few lessons are found in the career of this remarkable man that more illustrate his broad wisdom and keen perception than his dream of this great harbor and the plat and plans for the building of this magic city by the sea.

Forty years ago wide boulevards and unnecessary parking spaces were ridiculed as public extravagance, and yet this seer and philosopher reckoned with prophetic accuracy the coming of such new modes of transportation as would require greater space for transportation and greater convenience for parking. It was his foresight and his genius that gave us these wide streets, constructed as though he knew more than 40 years ago that the automobile in time must be parked and space and convenience provided therefor. Great as were the many achievements of this pioneer citizen in laying out the many cities and towns in south Mississippi, bringing new industries to the section and giving its development an impetus never dreamed of before, through his railroad conception and construction, I like to think, too, of the fine patriotic qualities that blessed and endowed his manly character. He loved his country with consuming devotion. The deeds and services of the Nation's mighty dead were an inspiration to him; but the South to him was a song—it was a story—it was a sentiment.

There was no apology in his heart for the men and women of this section who sacrificed or died for principles in which they believed. His greatest oratorical efforts were manifested when describing the hardships and suffering of the Confederate soldier or the fine virtues of his vicarious leader. One of the finest incidents marking the career of this pioneer patriot was when in 1861 he formed his company of farmer boys, and, leading them to the battle front, he was tendered the commission as major. He declined it because he said: "I had promised the mothers and fathers of my country boys that I would take care of them, and I thought I could do that better as their captain than as major of their regiment."

It was the fine associations there formed and the many hardships then incurred that caused him until the day of his death to prefer being called Capt. W. H. Hardy to that of any other name.

It is so fitting that this memorial should be placed in this, as he styled it, "the town of my dreams," where in his closing days he expressed the desire that "my remains be placed in its sacred soil."

There it stands, given to us by a devoted son, who, although for many years a resident of New York City, he has never allowed that fine love of sentiment and southern tradition to be remolded in a colder caste of city environment.

There it stands, the work of one who comes from the same foreign country from which financial assistance was obtained that made possible the crowning success of our illustrious citizen's greatest effort.

There it stands, a masterpiece, the workmanship of which will not detract from the international reputation of the artist who molded it.

There it stands, mounted upon its pedestal of granite taken from the heart of his own beloved South; yes, from the hard sides of historic Stone Mountain, upon whose face is to be carved the mightiest heroes of our departed friend.

There he is in sight of the harbor of which he dreamed. There he is, with his face turned toward the cities he planned, the section he loved, and the people whom he labored to help.

May you remain there, illustrious citizen, through the years to come; and as this city grows in importance, and as this section develops, as it will, and the chariots of commerce charge by, may your spirit know that your dreams have come true. And as the girls and boys of the future gaze upon your likeness, may they with Longfellow say:

> "Lives of great men all remind us,
> We can make our lives sublime,
> And departing, leave behind us,
> Footprints on the sands of time."

### NATIONAL-ORIGINS PLAN

Mr. SCHAFER. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD by printing an article by my colleague from New York [Mr. LAGUARDIA] in the current issue of a magazine, on the national-origins plan.

The SPEAKER. Is there objection?

There was no objection.

Mr. SCHAFER. Mr. Speaker, under permission granted to extend my remarks, I desire to read an article written by our colleague, the Hon. FIORELLO H. LAGUARDIA, of New York, on an national-origins plan, which appeared in the November, 1928, issue of Current History. The article, I am sure, will be informative to all interested in this subject.

Mr. David A. Orebaugh in his article on the immigration act of 1924 works up to the startling climax that "selfish and insincere alien groups have twice succeeded in postponing presidential proclamations putting into effect the national-origins plan." He states and charges specifically that "at the last session of the Sixty-ninth Congress alien influence procured the passage of a resolution postponing the proclamation for one year, or until April 1, 1928, at the first session of the Seventieth Congress the same influences succeeded in postponing presidential action for another year." Let us examine the "influences" and the real reasons for postponement. The President's message of January 7, 1927, is known as Senate Document No. 193, Sixty-ninth Congress. The law required that the determination of the number allowed to the various races under the so-called national-origins plan should be made by the Secretary of State, the Secretary of Commerce, and the Secretary of Labor. Here is what these officials stated in suggesting a postponement of the law:

"Although this is the best information we have been able to secure, we wish to call attention to the reservations made by the committee and to state that in our opinion the statistical and historical information available raises grave doubts as to the whole value of these computations as a basis for the purposes intended. We therefore can not assume responsibility for such conclusions under these circumstances.

> "FRANK B. KELLOGG,
> "Secretary of State.
> "HERBERT HOOVER,
> "Secretary of Commerce.
> "JAMES J. DAVIS,
> "Secretary of Labor."

Surely three Cabinet officers designated by the law itself to work out the plan can not be properly classified as a "selfish and insincere alien group."

It so happens that even one of Mr. Orebaugh's "own group" joined in the resolution postponing the plan—none other than the "100 per center THOMAS HEFLIN." When the resolution was before the Senate on March 20, 1928, the Senator made this statement, which may be found on page 5242 of the CONGRESSIONAL RECORD of March 20, 1928:

"Mr. HEFLIN. Mr. President, in view of the fact that this [resolution to postpone national-origins plan] in no way changes the immigration law, I shall not insist on my objection at this time. I have worked for 20 years in the two Houses to strengthen the immigration law, to restrict immigration, and I do not want any loopholes made in the law by any separate enactments from time to time. Since I am assured that the committee, composed of Democrats and Republicans and Progressives, all agree that this measure should pass at this time, I will not object."

So, after all, the alleged "victory for the enemies of the restricted principle the sinister import of which should not be underestimated," again quoting from Mr. Orebaugh, is the direct result of the recommendation of three members of the President's Cabinet, after a vain attempt for two years to determine the figures, and they were joined by the most rabid restrictionists in and out of Congress. The record is entirely bare of any other influence.

Then, again, Mr. Orebaugh, sounding the clarion call to "gird our loins for battle here and now," complains bitterly that a horde of aliens appeared before the committee at the hearings held on January 18, 19, and 26, 1927, and protested vehemently. Of the 82 pages composing the record, 64 pages are devoted entirely to the statements of the Government representative and to friends of the national-origins plan and

18 pages to the representatives of organizations in opposition thereto. (Hearing No. 69.2.1) A reading of the hearings will disclose the attitude of the committee toward the various persons who appeared before it.

### THE PRESENT QUOTA

Just what the national-origins plan may really mean, notwithstanding the description contained in Mr. Orebaugh's article, may best be gleaned by simply quoting the estimated figures thereof. Under the present law the total number of quota immigrants allowed in one calendar year is 164,647. Under the estimated figure submitted by the commission in 1924 the number permitted under the national-origins plan was 150,000, and, according to the estimate submitted on February 27, 1928, it is 153,685. Neither Mr. Orebaugh nor the few individuals supporting the national-origins plan hide the fact that its sole purpose is to increase the quotas from certain countries and decrease the allowance from other countries. They describe it more eloquently and by with more high-sounding names; but, stripped of all insincerity and cant, it is simply writing into the law part of the program of the discredited and disappearing order of the Ku-Klux Klan in its intolerant and bigoted program against certain races and certain religions.

The whole plan is the creation of a narrow mind nurtured by a hating heart. The first figures submitted with this novel and far-fetched plan betray the real purpose of its bigoted authors. Of the 150,000 in the original estimate submitted to Congress in 1924, 85,135 were allotted to Great Britain and North Ireland. This left less than half, or, to be specific, 74,865, to be allotted to the rest of the world, comprising 29 different countries. It allotted to Germany 20,028, which left but 54,000 to be divided among the 28 remaining countries of the world. Such allowance permitted of the boast that Jews and Catholics were practically shut off from entering the country. To prove this point it was gleefully pointed out that instead of taking Great Britain and Ireland as one or taking Great Britain and Ireland separately Great Britain was taken together with the north of Ireland, or, as the klansmen emphasized, "Protestant Ireland." This juggling naturally reduced the quota from the Irish Free State, where the emigration is mostly Catholic. The Irish Free State's quota is reduced from 28,567 to 17,427. The figures speak for themselves.

On January 7, 1927, the first official figures were submitted to Congress. The number determined for Great Britain was within a thousand of the original estimate above given; to Germany within 3,000 of the original estimate. Much to the embarrassment and confusion of the sponsors who sought in certain quarters to disguise the real mathematics of the scheme by creating the so-called Nordic idea, the figures determined by the committee did not go far enough. All arguments, estimates, and promises that the Nordic countries besides Great Britain would have a corresponding increase over the southern and eastern European countries went to pieces. Denmark, which is allowed 2,789 immigrants under the 1890 census basis, was reduced to 945 under the original estimate; Norway from 6,453 to 2,053, though pegged up later (1927) to 2,403; Mohammedan Turkey jumped from 100 to 233; Sweden from 9,561 under the present act decreased to 3,072, with a promise of about 300 more under the estimated figures of 1928. It was this predicament which first caused panic in 1927 among the sponsors of the national-origins plan. In the hope of being able to juggle figures again or to determine quotas by synthetic statistics the "study" of the problem was continued another year. The figures were so confused and, as frankly stated in the statement submitted by the President of the United States, so uncertain and unsatisfactory that it was simply impossible to put the plan in operation.

Every time consideration is given to the plan there is such variance of figures as to make the report entirely irreconcilable with its predecessor.

The whole plan is uncertain and inaccurate.

It can be figured out any way, according to who does the figuring, which proves its unscientific basis. Mr. Orebaugh would make one believe that it is very simple. He states boldly, in the face of the statements submitted by the President, that it would be possible to proclaim the determination and put the law into effect. But let the expert from the Census Bureau who worked out these figures speak. To Joseph A. Hill, assistant to the Director of the Census, was assigned the task of working out the mathematics of this strange proposition. The committee did the best they could under the circumstances and here is how it worked out. Mr. Hill says:

"Now, we realize, and I think everyone realizes, that you can not classify the population of the United States into so many distinct classes and say there are so many people here who are of English descent and so many here who are of Scotch descent, so many of Irish descent, etc., because the population through intermarriage has become very much mixed as regards national origin * * * that being the case we had to assume at the outset that by number of inhabitants of English origin, for instance, is meant the amount of English stock in the United States expressed as equivalent to so many inhabitants."

### PROBLEM OF RACIAL MIXTURE

In other words, the committee which labored with this plan had the task of not only ascertaining the number of various races in the United

Case: 1:21-cr-00665 Document #: 30-2 Filed: 05/02/22 Page 42 of 50 PageID #:631

States from 1790 to 1920, but also to ascertain the proportionate racial mixtures in each individual and credit that particular country with so many fractions of each human being. To quote again from Mr. Hill's testimony:

" For instance, if you had four people, each of whom had one German grandparent and three English grandparents, so that each of them was three-fourths English and one-fourth German, we can say that we have the equivalent here of three English persons and one German person. In other words, we had to take the inhabitants as a unit of measure in which to express the amount of English blood or Irish blood, etc., that is found in the American people of the present day."

And yet the plan is called simple, logical, scientific, and necessary. Here are just a few of the things the committee was required to do to obtain even a semblance of a report in compliance with the requirements of the law. The committee first analyzed the number of immigrants from the records of immigration from 1820 to date; second, the decennial census from 1850 to 1900; third, a classification was made of the racial stock of the white population enumerated in the census of 1790; fourth, the white population of the United States was divided into two main portions or divisions—(a) one representing the population which is the descent of the inhabitants enumerated at the first census of 1790, which was called "original native stock"; (b) the other comprising the population which is descended from and consists of immigrants who have come into this country since 1790, including immigrants themselves, children, grandchildren, and great grandchildren. A perfectly simple matter, says Mr. Orebaugh.

Lest it be said that the scheme is purposely made intricate, involved, or even senseless by the writer, it is best to quote the statement made by the expert as to just how the proposed figures were reached. Continuing Mr. Hill's testimony, which, by the way, may be found in the hearings referred to by Mr. Orebaugh held by the Committee on Immigration on January 18, 1927 (p. 7) :

CENSUS EXPERT'S TESTIMONY

" Mr. HILL. Let me explain, if you have this table before you, just what it means and how it is to be read. Suppose we take for illustration age group 35–40. Those persons who were from 35 to 40 in 1920 were born between 1880 and 1885. That generation, born between 1880 and 1885, has been enumerated four times in the censuses of the United States. It was enumerated for the first time in 1890, when it was between 5 and 10 years of age, and at that time the census showed that 76.17 per cent of these native children between 5 and 10 years of age were the children of native parents. This same generation was enumerated for the second time in 1900, when it was between 15 and 20 years of age, and, according to the census at that time, the percentage having native parents was 75.84. It was enumerated again in 1910, at the age of 25 to 30, when the percentage was 77.15, and again in 1920, when it was from 35 to 40 years of age, and 77.65 per cent were reported as having native parents.

" There is an average of those four percentages, 76.70. The percentages change a little at every census, but that might be expected. One stock may die off faster than the other, so that there is a change in the proportions.

" The result of this computation is that we have figures showing what percentage of the children born in each 5-year period had native parents.

"Again using for illustration the population that was between 35 and 40 years of age in 1920, and therefore was born between 1880 and 1885, the table shows that 76 per cent (leaving out the hundredths of per cent) of the children born in that period were the children of native parents. Then we can ask ourselves this question : What proportion of the parents of these children were themselves the children of native parents? Now, the parents of these children born between 1880 and 1885, we will assume for the purpose of simplifying the illustration, were between 20 and 35 years of age in 1880 and, therefore, between 25 and 40 years of age in 1885. Now, a parent who was between 20 and 35 years of age in 1880 was born when? Between 1845 and 1860. We find that of the population born between 1845 and 1850, 87 per cent had native parents, and of the population born between 1850 and 1855, 82 per cent had native parents, and of those born between 1855 and 1860, 76 per cent who had native parents.

" Suppose we take the middle one of these three percentages as an average, and say that 82 per cent of the parents of the children born between 1880 and 1885 were themselves the children of native parents. See how far we have got. We started with population between 35 and 40 years of age in 1920 and we found that 76 per cent of them had native parents and that 82 per cent of the parents of those children also had native parents.

" Now, a parent of a parent is, of course, a grandparent. So we can say that of the population that was between 35 and 40 years of age in 1920, and therefore born between 1880 and 1885, 76 per cent had native parents and of those that had native parents 82 per cent had native grandparents. Eighty-two per cent of 76 per cent is 62 per cent. So of the population between 35 and 40 years of age in 1920, 62 per cent had native grandparents."

Very simple, is it not? Mr. Orebaugh implies that only illiterate, low foreigners, alien groups, and politicians fail to grasp or understand the proposition. He also charges that " the average business and professional man of American ancestry has but a vague conception of the meaning and importance of the national-origins plan." To these " groups " Mr. Orebaugh in all fairness should have added the President of the United States, the Secretary of State, the Secretary of Commerce, the Secretary of Labor, the unanimous vote of the Senate, and the majority of the House of Representatives.

THE INFLUX OF MEXICANS

As to the total number of immigrants, the difference between the present law and the national-origins plan is 14,647. That difference, with a population of 120,000,000, certainly can not produce the terrible danger so fearfully described by Mr. Orebaugh.

The sincerity of the extreme restrictionists and of the sponsors of the national-origins plan must be necessarily questioned when they seek to base their proposition on an economic necessity and a desire to keep up the American standard of living. While the doors were shut, and the wisdom is not necessarily questioned here, to the countries producing the people who built up this country, the doors were left open and are now wide open to the cheapest kind of peon labor. The advocates of the national-origins plan were conspicuously silent when the Committee on Immigration was holding hearings to prevent the importation of cheap contract labor from Mexico. The testimony before the House Committee on Immigration is voluminous. It was there disclosed that Mexicans are imported and working on sugar-beet fields at wages that American labor refuses to accept. Railroad executives appeared before the committee in opposition to the restriction of Mexican labor on the ground that they wanted that very kind of cheap labor. A conservative estimate fixed the number of Mexicans illegally in this country at 1,500,000. They are coming in at the rate of 350,000 a year. That, in comparison with the total number of 164,647 sound, clean, healthy immigrants who must undergo no less than three physical examinations, two literacy tests, and produce documentary proof of good character. Relatives who understand conditions here are able to advise the newcomer of American wages and the American standard of living. The European immigrant can no longer be exploited. The Mexican peon is preferred because he is willing to work for starvation wages and live under the most degrading and unsanitary conditions. So, is it really a desire to continue the so-called Nordic stock or is it, after all, the wish to get the cheapest kind of labor at the lowest possible wage and bring down the American standard?

In closing, no better description of the national-origins plan can be given than that offered by Mr. Orebaugh himself : " It has become a sort of ' homeless Hector ' repudiated by the leaders of both the great parties." Surely everybody can not be wrong.

ANALYSIS OF APPROPRIATIONS FOR AGRICULTURE

Mr. ANDRESEN. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD and to print an article from the Minneapolis Tribune of February 17, 1929, by George F. Authier on funds appropriated for the Department of Agriculture.

The SPEAKER. Is there objection?

There was no objection.

Mr. ANDRESEN. Mr. Speaker, under leave to extend my remarks in the RECORD, I include an article written by George F. Authier, of Washington, D. C., which was published in the Minneapolis Sunday Tribune, of Minneapolis, Minn., on February 17, 1929.

The article sets forth a comprehensive analysis of appropriations for agriculture.

UNITED STATES FARM AID TOTAL PADDED, FIGURES SHOW—FUNDS APPROPRIATED DIRECTLY FOR AGRICULTURE ARE ONLY THIRD—MUCH OF DEPARTMENT'S ALLOTMENT GOES TO ROAD BUILDING

By George F. Authier, the Tribune's Washington correspondent

WASHINGTON, February 16.—Agriculture, laboring under the mistaken apprehension it is having appropriated exclusively for it, through the Department of Agriculture, the annual sum of $155,000,000, will find upon examination the figures are padded to the extent of about three times the real amount.

Instead of an annual $155,000,000 appropriated for agriculture through the department there really is being allocated for direct benefit to agriculture $34,150,000, only a small percentage of the total appropriation for agriculture, usually described as about 4 per cent of the entire amount of governmental funds expended.

But even of the $34,150,000 appropriated seemingly for the direct benefit of agriculture, further analysis discloses that even this sum is not devoted entirely to the benefits of agriculture, much of it being used for the general public good. A conservative estimate would place the total amount expended for the direct benefit of agriculture, through its department at Washington, at approximately $20,000,000. Even with this comparatively small sum, great benefits are derived and probably there is no governmental investment which returns such practical returns or in such huge figures.

### FUNDS DIVIDED

This diversion of the funds presumably devoted to the benefits of agriculture was touched upon at the recent gathering in Washington when the congressional delegations of Minnesota, North and South Dakota, and Montana met here in a conference to consider direct means of aiding agriculture by means of increased development of the county-agent system for better dairy and beef-cattle breeding. Closer scrutiny shows the extent of this diversion was not known. Here is something that such men as Representative ANDRESEN, Minnesota's member of the Committee on Agriculture; GILBERT N. HAUGEN and L. J. DICKINSON, of Iowa; the Northwest Agricultural Foundation; the various land-grant colleges of the Northwest; and others may consider with profit and interest. The figures which will be used to substantiate the startling claim made above are authenticated by the officials of the Department of Agriculture.

Let us start with the annual appropriation of $155,000,000 for the Department of Agriculture. Analysis will show the major portion spent for the "general good of the public," as Secretary Jardine describes it in his annual report, undoubtedly worthy purposes, but purposes which should not be checked up against direct benefit to agriculture as an argument for denying more funds for that great industry.

While this fund is 4 per cent of the total Government expenditures, we can wipe out at the start $90,000,000 devoted to Federal aid to States in road building and for the construction of forest roads and trails. This sum alone, certainly not devoted to the exclusive benefit of agriculture, makes up nearly 59 per cent of the total appropriation devoted to the department as a whole and reduces the percentage for agriculture of the total Government expenditures to about 1¾ per cent instead of the 4 per cent with which we started.

### FARMER'S BENEFIT SMALL

Of course the farmer benefits from good roads, but certainly no one looking over the post-office addresses of automobile owners, including foreign touring cars, passing through this State, will have the temerity to say that the farmer is the sole beneficiary or even the chief beneficiary. This is especially true of forest roads and trails. So much for this item.

Let us take up some others. For example: The Bureau of Animal Industry spent last year $13,000,000, or 8½ per cent of the total of the department appropriation.

That sounds like direct benefit to the farmer and agriculture in general. But—let us see! Of this sum, $5,000,000 was for the Government meat inspection service in the packing houses throughout the United States and $6,000,000 was for cooperation with the States for the eradication of tuberculosis from the dairy herds and other cattle, and most of it went for the Federal Government's share of indemnities paid to owners of tuberculous cattle slaughtered as part of the campaign for healthy herds and pure milk supply.

Now, this work was not done for an altruistic interest in the welfare of the cow. It was done to preserve the health of the community and the resident of Hennepin Avenue, Minneapolis, or Woodward Avenue, Detroit, or Fifth Avenue, New York, was as much a beneficiary as the farmer. Tuberculosis is no respecter of persons, or occupation, or residence.

### ANOTHER CUT

Again the Forest Service spent $12,500,000, or 8 per cent, of the department's total for 1928. Presumably trees are products of the soil and might be classed as coming under the head of agriculture. They might come under the jurisdiction of the Department of the Interior with as much justice. The bulk of this large fund went for the management and supervision for the general public use of the 159,000,000 acres of the national forests owned by the Federal Government for the benefit of the entire public. More than 20,000,000 people are visiting these forests each year in search of recreation and health. The number is increasing by leaps and bounds. All this is very fine, but how much does it benefit the milkman in Omaha, the corn raiser in Iowa, the wheat growers in North Dakota, or the fruit grower in Michigan?

The Forest Service cooperates also with States and private timberland owners in promoting scientific utilization and the best practices for the protection and conservation of all our forests and conducts research in tree growing, and of processes of vital interest to the wood-using industries of the country. This is all to the good, but of just what superior advantage is this to the farmer?

Suppose we take a look at the weather—concerning which Mark Twain remarked much was said about it, but little done. They do about $2,600,000 worth of it in the Weather Bureau. Some one had the happy thought once that there must be an essential relationship between weather and crops. No weather, no crops. Hence, with irresistible logic, the Weather Bureau was put in the Department of Agriculture.

### WEATHER BUREAU'S SHARE

Of course the farmer benefits by weather forecasts, although how much is a matter of speculation. Everyone is familiar with the general local weather forecasts issued by the department, but how many farmers know that his Weather Bureau is at work with its valuable meteorologists giving storm warnings to ships at sea, forecasting weather conditions in forest areas as part of the campaign against fires, and forecasts of upper-air meteorological conditions as an aid to aviation, just

to mention a few of the major purposes to which it is put. Certainly no one will deny these activities, valuable as they are, are for the benefit of the general public and might well be paid for directly out of the Public Treasury.

Take the food, drug, and insecticide administration for which the department spent last year $1,300,000. This law is better known as the "pure food law." Also for the enforcement of the tea act, the milk import act, the caustic poison act, and other laws which the general public has come to regard as indispensable as health-protective measures. This administration enforces also the naval stores act (greatly to the benefit of agriculture, no doubt) providing for the handling of rosin and turpentine products used so extensively in the paint and varnish trades, and the insecticide act, which regulates traffic in preparations entering into interstate commerce used for killing bugs, whether on the farm or in the city home, together with disinfectants and similar products.

The Biological Survey spent over $1,000,000 in protecting and conserving the birds and wild life of the United States, including such species as elk and bison. The open and closed seasons on migratory game birds are also supervised in this bureau. Something like more than half of its funds were spent for these purposes, and the remainder was used for cooperative campaign to control and exterminate wild animals, such as wolves, coyotes, and the like, which prey on the herds of stockmen, and injurious rodents, including rats and mice, the latter operating in city homes as well as those in the country.

The Bureau of Home Economics spent over $100,000 for research work on food, clothing, and household equipment, designed to make city homes as well as farm homes happier and better places in which to live.

### FARM BENEFITS

This brings us to the items which more correctly may be described as being devoted directly to the benefit of agriculture. They are—

| | |
|---|---|
| Bureau of Plant Industry | $4,000,000 |
| Bureau of Animal Industry (exclusive of $5,000,000 for meat inspection) | 8,000,000 |
| Extension Service | 1,600,000 |
| Payments to States for agricultural extension work | 6,000,000 |
| Office of Experiment Stations | 350,000 |
| Payments to States for State experiment stations | 3,350,000 |
| Bureau of Entomology | 3,170,000 |
| Bureau of Chemistry and Soils | 1,100,000 |
| Plant Quarantine Board | 1,000,000 |
| Bureau of Dairy Industry | 550,000 |
| Grain Futures Administration | 100,000 |
| Bureau of Agricultural Economics | 5,000,000 |
| | |
| Total | 34,150,000 |

Secretary of Agriculture Jardine has pointed out in his report that it is not correct to assume that these expenditures, totaling $34,150,000, are all for direct help for the farmer. On the contrary, practically every one of these bureaus just listed, seemingly designed for the exclusive benefit of the farmer, are carrying on activities of direct interest to the general public.

### OTHER DEPARTMENTS

Look into the administration of the Bureau of Entomology, for example. While primarily it works out methods for control of insect pests injurious to crops, it is as vitally interested in controlling or eliminating those injurious to man and animals. House moths are not exclusively the luxury of the farm home nor are their operations on last winter's overcoat or the new davenport confined to the farm area. Yet this is a pest against which the bureau is at war. House ants too humble for the eagle-eyed entomologist to seek out, as, for instance, the humble bed bug, concerning which the entomologists know a lot. He may be taboo in polite society, but certainly no one will assert he thrives better in the country than in the city.

Consider the Bureau of Farm Plant Industry. This has a tang of the soil about it. But one of its chief activities is the development of drug plants which can be grown in this country in place of menthol imported from the Orient. It will be admitted this is of as much value to industry as to agriculture.

Again some of the department's money is being spent in searching the world over for species of trees that can be grown here in place of the chestnut tree, rapidly approaching extinction. Presumably the farmer could get along without chestnut trees or their substitutes, but the chestnut happens to be the chief source of supply of the tanning materials for the leather industry. If a domestic supply can not be obtained, we will have to depend upon foreign countries. This would not be so good for industry.

The Bureau of Agricultural Economics is spending more than $5,000,000 a year, but the greater part of this goes for service activities in connection with the marketing of farm products and the enforcement of laws to regulate and promote the orderly marketing of these crops.

These include the grain standards act, the cotton standards act, the cotton futures act, the United States warehouse act, that vitally touch the conduct by the public of everyday business. Also the extensive market news and inspection services of this bureau are of the same direct benefit to the shippers and handlers of farm commodities as they are to the farmers. The relationship of the department's activities to the

nonfarming population permeates practically every one of the so-called farming bureaus.

The point of it all is that agriculture will be denied its share of Government funds so long as activities that are not essentially part of agriculture are charged up against it.

CHAMP CLARK

Mr. ROMJUE. Mr. Speaker, I ask unanimous consent to address the House for one minute.

The SPEAKER. Is there objection?

There was no objection.

Mr. ROMJUE. Mr. Speaker and gentlemen, in the closing hours of this session, however important the business may be, I can not let this opportunity go by without calling the attention of Members of this House to the fact that this is the eighth anniversary of the death of one of the greatest men that ever sat in this body. Eight years ago on the 7th of this month there was laid to rest in the beautiful cemetery in Bowling Green, Mo., that great statesman, great Missourian, great American, whom many of you knew and loved. I want to take this opportunity to call our minds back to him and to the great service and the good that he has been to the country, the Hon. Champ Clark. May his rugged honesty, his sterling democracy, and his great character be an inspiration to the youth of our land. [Applause.]

THE BLUE AND THE GRAY

Mr. HOWARD of Nebraska. Mr. Speaker, I ask unanimous consent to address the House for two or three minutes.

The SPEAKER. Is there objection?

There was no objection.

The SPEAKER. The gentleman from Nebraska is recognized for two and one-half minutes. [Laughter.]

Mr. HOWARD of Nebraska. Mr. Speaker, I have secured this time for the express purpose of calling the attention of this body to a very odd situation. One year ago I introduced a bill to provide for a joint reunion, here in Washington, of the survivors of the mighty armies of the Blue and the Gray. Instantly kindly sentiment developed in favor of the legislation. It was referred to our Committee on the Judiciary, and there it met much favor. Hearings were held, and when the printed hearings were distributed they brought back to the author of the bill a flood of commendation from the veterans of both the Blue and the Gray. But the Judiciary Committee in its wisdom declined to report the bill, and now it is inevitable that the joint reunion planned for 1929 must go over until 1930. The refusal of the committee to report the bill was based solely upon the absence of indorsements by the Grand Army of the Republic and the United Confederate Veterans. We hope to get those indorsements when the two great organizations of veterans shall hold their reunions during the present year. I do not like to see the joint reunion go over for another year because the best estimates agree that between this day and the autumn of 1930 more than 25,000 of the aged veterans of the two armies will have "gone away to meet Grant and Lee." My chief purpose in this moment is to direct the attention of my every colleague toward effort to procure, during the present year, the official indorsements of the Grand Army of the Republic and the United Confederate Veterans, and thus brush away the only obstacle confronting a favorable report on the bill by the committee.

SUNDAY OBSERVANCE

Mr. LANKFORD. Mr. Speaker, I ask unanimous consent to extend my remarks in the RECORD upon the question of Sunday observance.

The SPEAKER. Is there objection.

Mr. KNUTSON. Mr. Speaker, I object.

Mr. TILSON. The gentleman has the right to do that, and an objection will not prevent it.

Mr. LANKFORD. Mr. Speaker, I wish to thank Mr. TILSON, the majority leader, for the many, many courtesies he has shown me from the time I came as a Member of Congress to the present moment. Mr. TILSON has always been most considerate not only of me but of every Member, without regard to party, section, or the merit of their contention.

When I first came to Congress Mr. TILSON, a leading legislator, came to me, a halting, timid, ignorant new Member, and stated he would help me whenever opportunity presented itself. These words, though few, were golden to me. He has not only kept his promise to me but has helped every Member whenever opportunity presented itself. I shall not forget, and Congress and the country can not forget, the unselfish, patriotic, magnificent service of Mr. TILSON.

But, as indicated, I wish to say a few words about Sunday observance. There are many throughout the Nation who will attempt to construe this Sunday session of Congress as a deliberate desecration of the Christian Sabbath of the American people.

In behalf of the great majority of Congress and the overwhelming majority of the very best people of America, I deny this vicious imputation. A round of applause came from the galleries as this morning's session convened. In 10 years' service this is the first applause I have seen or heard from the gallery upon the convening of Congress. Evidently the enemies of the Christian Sabbath were rejoicing at what they thought was a desecration of the Sabbath and a further destruction of the faith of our people in the Bible and its teachings.

Oh, what a mockery of all that is highest and best in our civilization is sought by this gloating over everything that can be distorted into a thrust at Sunday observance, the Bible, and the faith of our fathers.

Our honored and beloved Speaker, those in charge of legislation here, and the majority of Congress did not determine to hold a session of Congress on Sunday as an affront to the great Christian masses of the American people who believe Sunday is a day to be kept holy.

Congress is about to adjourn. A situation has arisen which our leaders feel constitutes such an emergency as authorizes a meeting of Congress for a short time on Sunday. The majority of the Members of Congress are neither atheists nor Sunday haters. The Senate, I understand, has just adjourned on a direct vote on whether that body should remain in session or not on Sunday. I have been assured by those in control here that a recess until Monday will be moved in a few minutes in order to allow the fullest recognition of Sunday compatible with the dispatch of urgent, important business which would not be transacted if left over until to-morrow.

This occasion demonstrates more fully than ever before the favorable sentiment of the Congress in behalf of Sunday observance. I am now convinced more than ever that a reasonable Sunday bill will pass both Houses of Congress whenever presented. Members of Congress represent the American people and the people favor at least some sort of a Sunday law for the Capital of the greatest Christian Nation on earth.

I know there are a few Members of Congress that do not associate with the Christian people of their districts or do not ascertain their views who say their people believe in rampant, notorious desecration of the Christian Sunday in the Nation's Capital. I wish these Members would find out just what their people want, in order that they may represent the good as well as the bad.

Hundreds of petitions in favor of Sunday observance have come to my office for presentation to Members for filing. These petitions were signed by many, many thousands, and came from almost every congressional district in the Union. In each case the petitions were sent to the Members of the districts from which they came with the request that they be filed, but stating in each case if the Member did not wish to file them, that I would be glad to call for them and file them myself. With only a few exceptions each Member expressed himself as being glad to file the petitions for their constituents, and have since filed them. A number were courteous, but stated they did not wish to file the petitions, but would be glad for me to do so. This I have done.

Less than a dozen out of the entire membership was discourteous to my clerk when presenting the petitions, ignored and disregarded the express desires and wishes of their constituents and not only refused to file the petitions, but destroyed them in order to keep me from filing them.

It matters not how many petitions I receive in future from the constituents of these Members, I shall never present any more to them for filing. I shall make proper acknowledgment of the petitions and file them myself. I have never refused to file any petition presented by my people, regardless of whether is was contrary to my view or not.

At this time I do not propose arguing the merits of a reasonable Sunday law for the District of Columbia. I have done this heretofore and hope to do so again. I only wish to make this statement, and to predict that as soon as Congress senses the true sentiment of our people a Sunday observance law for the Nation's Capital will be passed by an overwhelming majority.

JOHN J. HELMS

Mr. SIMMONS. Mr. Speaker, I objected to the consideration of the bill (S. 5386) extending benefits of the World War adjusted compensation act, as amended, to John J. Helms. I have since had an opportunity to read the report and find that compensation is now being paid by the Veterans' Bureau to the heirs of this service man, that he had a dishonorable discharge due to insanity, and, in my judgment, the probability is that the bill is a fair one. I wish to withdraw that objection, and I ask unanimous consent that it may be taken up now and considered.

**5214**       CONGRESSIONAL RECORD—HOUSE       MARCH 3

The SPEAKER. The gentleman from Nebraksa asks unanimous consent for the present consideration of the Senate bill 5386, which the Clerk will report.

The Clerk read the bill, as follows:

*Be it enacted, etc.,* That in administration of the World War adjusted compensation act, as amended, John J. Helms, formerly private, Supply Company, One hundred and twenty-third Regiment United States Infantry, World War, shall be held to be entitled to the benefits thereof in the same manner and with the same effect as if a separation from the military forces of the United States on October 24, 1918, had been honorable.

The SPEAKER. Is there objection?

There was no objection.

The bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the vote by which the bill was passed was laid on the table.

### NATIONAL FOREST RESERVATION COMMISSION

The SPEAKER laid before the House the following communication which was read:

WASHINGTON, D. C., *February 26, 1929.*

Hon. NICHOLAS LONGWORTH,

*Speaker of the House of Representatives.*

MY DEAR MR. SPEAKER: I hereby tender my resignation as a member of the National Forest Reservation Commission.

Most respectfully,

SAM D. MCREYNOLDS, M. C.

The SPEAKER. Without objection, the resignation will be accepted. To fill the vacancy the Chair appoints the gentleman from Louisiana [Mr. ASWELL].

### CELEBRATION AT NEW BERN, N. C.

The SPEAKER. Pursuant to House Concurrent Resolution 60, the Chair appoints the following committee on the part of the House to participate in the celebration of certain historical events at New Bern, N. C.: Mr. WILLIAMS of Illinois, Mr. ANDRESEN, and Mr. ABERNETHY.

### MIGRATORY BIRD REFUGE COMMISSION

The SPEAKER. Pursuant to Senate bill 1271 (Public Act 770, 70th Cong.), the migratory bird refuge bill, the Chair appoints on the part of the House the following committee: Mr. ACKERMAN and Mr. McREYNOLDS.

### A. ROY KNABENSHUE

Mr. STRONG of Kansas. Mr. Speaker, I ask unanimous consent to take from the Speaker's table and consider the bill (S. 3800) conferring jurisdiction upon the Court of Claims of the United States or the district courts of the United States to hear, adjudicate, and enter judgment on the claim of A. Roy Knabenshue against the United States for the use or manufacture of an invention of A. Roy Knabenshue, covered by Letters Patent No. 858875, issued by the Patent Office of the United States under date of July 2, 1907, and consider the same.

The SPEAKER. The gentleman from Kansas asks unanimous consent to take from the Speaker's table the bill S. 3809, and consider the same. Is there objection?

Mr. SCHAFER. Mr. Speaker, I reserve the right to object. What is it about?

Mr. STRONG of Kansas. Mr. Speaker, a similar bill passed the House, being H. R. 11764.

Mr. TILSON. As I understand it, Mr. Speaker, the Senate and the House have each passed identical bills.

Mr. STRONG of Kansas. Exactly.

Mr. TILSON. And it is necessary that the House pass the Senate bill or both will be lost.

Mr. SCHAFER. Mr. Speaker, will the gentleman yield?

Mr. STRONG of Kansas. Yes.

Mr. SCHAFER. We are about to pass the Senate bill to-day?

Mr. STRONG of Kansas. Yes.

Mr. SCHAFER. Mr. Speaker, this House worked until 11 o'clock on several evenings passing House bills, while the Senate announced that they had no time to call meetings of their committees to consider House bills. Why should we be called upon to pass the Senate bill, when they will not consider House bills?

Mr. STRONG of Kansas. If you want the bill to become a law you must now pass the Senate bill.

Mr. SCHAFER. In view of the fact that we might show the Senate, by passing this bill, what the proper procedure is, I shall not object.

Mr. CRAMTON. Reserving the right to object, Mr. Speaker, our calendar states that House bill 11764, which is said to be identical with this, has passed and become Private Law No. 10. I think if we pass these House bills once that is sufficient.

If the gentleman can show that that record is wrong I will withdraw my suggestion.

Mr. STRONG of Kansas. The House did pass an identical bill, but the Senate did not pass it. Now, the Senate passed this bill.

Mr. CRAMTON. But the calendar says that House bill 11764 was approved by the President on May 3, 1928, and became Private Law No. 10. The gentleman may have had the number wrong or something of that kind. I am taking the number that has been given.

Mr. STRONG of Kansas. Senate bill 3809 is on the Speaker's table now.

Mr. CRAMTON. That is Private Law No. 110.

### C. C. SPILLER, DECEASED

Mr. STRONG of Kansas. Mr. Speaker, I desire to call up the bill S. 5787, which is identical with a House bill which passed the House and has not passed the Senate.

The SPEAKER. The Clerk will report the Senate bill.

The Clerk read as follow:

A bill (S. 5787) for the relief of the estate of C. C. Spiller, deceased

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, to the estate of C. C. Spiller, deceased, late of Hamilton County, Tenn., the sum of $8,000, found to be due him by the Court of Claims, in congressional case No. 10549, as appears by Senate Document No. 173, Fifty-ninth Congress, second session, being his share of the reasonable charter value, together with the destruction thereof, of a small steamboat, known as the *Paint Rock*, taken and used by the United States, and while in their possession accidentally destroyed and never paid for, all while the said C. C. Spiller, deceased, was a loyal citizen of the United States, as evidenced by the findings or report, dated June 27, 1864, of a board of claims designated by the commanding officer of the Department of the Cumberland, by Special Field Orders, No. 104, dated April 12, 1864, still of record in the War Department.

The SPEAKER. Is there objection to the present consideration of this bill?

Mr. CRAMTON. Reserving the right to object, Mr. Speaker, the House Calendar says H. R. 11339, for the relief of the estate of Mr. C. C. Spiller, passed the Senate.

Mr. BYRNS. The Senate bill passed the Senate, but since that time the Senate passed the House bill.

Mr. CRAMTON. Then you do not want this passed?

Mr. STRONG of Kansas. No, sir.

Mr. BYRNS. I am very much obliged, however, to the gentleman from Kansas for calling it up.

### LEAVE OF ABSENCE

Mr. WAINWRIGHT, by unanimous consent, was granted leave of absence on account of serious illness in his family.

### NATIONAL ORIGINS

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent to extend my remarks on the national-origins resolution.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

Mr. McCORMACK. Mr. Speaker, the resolution reported by the House Committee on Immigration and Naturalization deferring the operation of the national-origins clause should be adopted. The time is too short to give proper consideration to the repeal of this unfair and discriminatory provision. To defer its operation for another year is the only safe step to take at the present time. Necessity compels those who believe in its repeal or who are seeking further information on this subject to adopt this course. To permit it to go into operation will mean that its repeal will be less possible than if it is deferred at this time.

Furthermore, this action is the keeping of faith with the American people on the part of the Representatives in Congress of both parties. The reporting by the committee of the resolution delaying its operation is an effort on the part of the majority party to keep the promises that its standard bearer made during the campaign. On February 14, 1929, in discussing this subject before the House, on page 3477 of the CONGRESSIONAL RECORD I said:

Both parties through their standard bearers in the recent campaign went on record as favoring the repeal of the national-origins clause. Between now and March 4 action will have to be taken in order to prevent its operation. While both parties have responsibilities the party in the majority will be directly responsible for this iniquitous, discriminatory law unless proper action is taken to repeal or defer its operation.

On February 14 my purpose in addressing the House on this important subject was to call to your attention the necessity for action; the brief time remaining, and whether or not the promises made during the campaign were, like many others in the past, to be thrown into the wastebasket. Members of both parties owe it to the American people to keep faith. During the course of my remarks of February 14, I presented evidence showing the practical impossibility of the basis of determination for national origins, and that it depended upon guesswork to determine the quotas in the main. The absence of records of any definite kind prior to 1850, with no official record prior to 1790, were called to your attention on the question of uncertainty. The fact that President-elect Hoover looked upon this clause with such disfavor as to unreservedly favor its repeal and to advocate it, was also called to your attention. The differences in the reports of the President's commission in 1927 and 1928 were also referred to. Another year has gone by and another report has been made showing further changes. Every year that a report has been made changes have been recommended. This clearly shows the uncertainty of the basis of determination and therefore its unfairness.

It must be borne in mind that the controversy over the national-origins clause does not involve the question of restrictive immigration. We already have a restrictive policy existing in America. Under our present policy 164,000 immigrants are the maximum number admissible to the United States each year from quota countries, while under the national-origins clause about 154,000 will be admissible each year from the same countries. There is no restrictive policy with reference to the Western Hemisphere. People should not be deceived in this respect. The real issue should be understood.

The permitting of this clause to go into operation results in many of our important elements being affronted. Such a condition will bring about dissatisfaction, all of which is unnecessary upon careful consideration of the facts. Those of Scandinavian, French, German, Swiss, and Irish birth and descent will be affected by the provisions of this clause. While none of our racial elements, which term is merely used descriptively, should receive any marked benefits under any law, on the other hand none of them should be discriminated against by the operation of an unwise, impracticable, un-American law.

Under this law each and every one of us must ask ourselves, "What is my national origin?" It compels every one of us, no matter how far back our ancestry in this country goes, to ask ourselves that question. Under it we must ask ourselves, "What am I? Irish, German, French, English, Scot, Italian, Swedish, Norwegian, Armenian, and so forth?" But under no interpretation of this clause can any American ask himself or herself the question, "Am I an American?" For the purposes of determining the quotas established by this law the American type of citizen, the product of generations of intermarriage by citizens of different births and descents, is destroyed. To anyone who prides himself on his American citizenship this must be distasteful, and such a situation must bring to the rational mind the realization of its inadvisability and dangers. This is particularly true when the uncertainty of determination is appreciated and considered. This uncomfortable and un-American situation should be avoided. The only way that it can be avoided is by passing this resolution deferring the operation of this law, and during the first session of the Seventy-first Congress it should be removed from our law and the necessity of further consideration by the people by Congress repealing its provisions.

PRESIDENT COOLIDGE

Mr. TILSON. Mr. Speaker, I ask unanimous consent to proceed out of order.

The SPEAKER. Is there objection?

There was no objection.

Mr. TILSON. Mr. Speaker, whether the President of the United States and the Congress get along well together is always a matter of the greatest interest to the whole country. Theoretically, our Government is divided into three separate branches, the legislative, the executive, and the judicial, and this separation has been regarded as one of the strong points of our Government making for progress as well as stability. The separation of the judicial branch from the other two is quite clear and complete, and this is generally recognized as one of the very wise and fortunate features in our system.

In the very nature of things the legislative and executive branches can not be so distinctly separated. The system of checks and balances established between the two has in a measure made them interdependent, but on the whole has worked well. The veto power, for instance, is essentially a legislative function, making the executive to this extent a vital part of the legislative machinery. Making appropriations for the conduct of the executive branch of the Government is a legislative function, but by reason of the fact that funds thus appropriated are disbursed under the law by the executive department, these two branches of the Government are closely tied together. While the legislative branch makes the laws, it is the function of the executive to enforce them, and this again connects most vitally these two branches of the Government. It will thus be seen that the entire country is deeply interested in having the relations between Congress and the President of the most satisfactory character, because it is not only important, it is vitally necessary, that Congress and the President shall cooperate.

Different Presidents have used widely differing methods in dealing with Congress, with varying degrees of success. President Cleveland failed to command through much of his administration the support of even his own party in Congress, and both he and the country suffered from it. McKinley, by reason of the fact that he had served for many years in Congress, was able to influence legislation very largely through his personal knowledge of the workings of Congress and personal contact with the Members, many of whom he had known intimately during his service in Congress. During the Roosevelt administration that dynamic individual used such persuasive powers as he had, and in addition he used the "big stick," a large part of the press, and a very considerable degree of support from the people to help work his will. President Taft, most amiable of men, lacked much of being successful in securing the full cooperation of his Congress. President Wilson ruled at first very largely through a wholesome fear inspired by him in his own party, but in the stress of war had the good fortune to receive the support of his political opponents in all matters necessary for the conduct of the war. President Harding, fresh from a term in the Senate, where he had established many close friendships, had less vital contact with the House than most Presidents, but always listened most courteously to all Members of the House, while maintaining the most intimate relations with his former colleagues of the Senate, but he did not live to thoroughly test out how effective his policy of working with Congress would prove to be.

President Coolidge's relationship with Congress has been different from that of all his predecessors. Quite often disagreeing with Congress on matters of legislation, there never developed any rancor or bitterness over the differences. He has impressed everyone with the feeling that he acts at all times conscientiously, without the slightest influence from fear or favor, and with an eye single to the general good as he sees it. He seems to have proceeded upon the theory that others will do their duty in the same spirit, and, therefore, has not attempted unduly to sway others toward his own point of view. Who has been in the right, and who in the wrong when differences of opinion have arisen, culminating in a veto, can never be settled, because in the last analysis they are, and must remain, simply differences of opinion; but in the light of what has since transpired, including the high degree of abiding confidence which the President has inspired and continues to hold throughout the country, he can safely leave to the judgment of his countrymen the final decision as to whether he or Congress has been right in the greater number of individual instances. It would depend somewhat upon the score keeper, of course, but the President would probably have nothing to fear on this score in a fair reckoning at the bar of public opinion.

The point I now rise to make and to emphasize is that during the entire period of the Coolidge administration the President has been a quiet, though mighty, force in legislative matters. Without ostentation, without threatening or wheedling, but in a straightforward, dignified, and strictly constitutional manner, he has used the power and influence of his great office effectively in the advancement of wise legislation, as well as in opposition to unwise, unnecessary, and expensive legislation.

President Coolidge has earned and retained the highest personal regard of the individual Members of Congress, not only by the firmness and consistency of his attitude toward public matters, but by always bearing with patience such Members as came to him, and by doing whatever he could properly do to aid them in solving their problems. In fact, I recall no instance where the President has failed to meet Congress halfway in trying to work out difficult legislative problems, as, for instance, in the complicated flood-control problem, or where he has ever failed in showing the respect and consideration due the elected Representatives of the people, so that he retires from the Presidency with the highest personal regard of all Members of Congress. The result is that although the President at times has not been found in agreement with Congress, as shown by his vetoes, I recall no period during my long service in the House when there has been such universal confidence

among its Members in the soundness, patriotism, good faith, and good judgment of the Chief Executive as in the period now drawing to a close. [Applause.]

A personal word will be excused in my own case. As majority leader of the House, it has been my duty and my privilege to confer frequently with President Coolidge. These conferences have always been helpful to me and of the most satisfactory character so far as a thorough understanding is concerned. It would be an intolerable, if not disastrous, situation if the President and the responsible leaders of his party in Congress were not able to work together in substantial cooperation. President Coolidge has at all times shown a desire to work with Congress, and, in cases where he could properly do so, to make every effort to so adjust matters as to reach substantial agreement. In endeavoring to work toward this end I have found, as everyone else has found who has come in contact with the President, that while he is ready to yield in nonessentials, he stands firm and unwavering in what appears to him to be matters of principle.

It is well known that President Coolidge is in all cases most careful in making promises, being at all times slow to commit himself, but having arrived at a decision, and having committed himself to it, there is no need for fear that he will deviate or swerve one hair's breadth from the path he has indicated. One fortunate enough to receive from him an assurance as to any matter whatsoever may safely go home, go to bed, and sleep soundly, not dreading to greet the new day lest it bring the disturbing tidings that the President has changed his mind over night.

The people of the United States are most fortunate in having as their President at this period in our history a man of the soundness, firmness, high purpose, and fine practical common sense of President Coolidge. It is not eulogy, but in my judgment only a plain statement of fact, to say that no one could have filled the position with greater resulting good to the entire country, or while filling it would have inspired greater confidence in the minds of all the people during the period in which he has served the Nation as its Chief Executive than has President Coolidge. [Applause.] As he now, by his own choice, lays down the cares and responsibilities of the greatest office in all the world, I am sure that I voice the universal sentiment of this House in wishing him the fullest enjoyment and benefits of a well-earned vacation in whatever manner he may choose to spend it, and the most abundant success, with long life, health, happiness, and prosperity in whatever field of activity he may choose to enter. [Applause.]

### WILLIAM S. WELCH

Mr. STRONG of Kansas. Mr. Speaker, I wish to call up Senate bill 2127, an identical bill with one passed by the House, and ask for its consideration.

The SPEAKER. The Clerk will report it.

The Clerk read as follows:

A bill (S. 2127) for the relief of William S. Welch, trustee of the estate of the Joliet Forge Co., Joliet, Ill., bankrupt

*Be it enacted, etc.,* That the Secretary of the Treasury be, and he is hereby, authorized and directed to pay, out of any money in the Treasury not otherwise appropriated, the sum of $25,000 to the Joliet National Bank, $15,000 to the Commercial Trust & Savings Bank of Joliet, and $10,000 to the Sharpe family, consisting of H. William, John J., Edward F., and Ellen C. Sharpe, of Joliet, Ill.

The SPEAKER. Is there objection?

There was no objection.

The Senate bill was ordered to be read a third time, was read the third time, and passed.

A motion to reconsider the last vote was laid on the table.

A similar House bill was laid on the table.

### EXTENSION OF REMARKS—THE FORTHCOMING TARIFF REVISION

Mr. TILSON. Mr. Speaker, as the floor leader in the House of Representatives of the party again placed in power upon a protectionist platform, and after a campaign in which no subject was more frequently referred to, it is appropriate that I should say something on the subject of the proposed tariff revision. It is not my purpose to make a tariff speech. The result of the last campaign would seem to make this unnecessary. It is fitting, however, that I say something in regard to how the subject of revision is to be approached and to what extent the revision will probably go or ought to go. I shall undertake to speak for no one but myself, although I shall do my best to impress members of the Ways and Means Committee and others with the wisdom of my views on the subject.

In order to have something in the way of a proper background for what I am about to say I wish to refer briefly to

the origin of the present demand for tariff revision and the circumstances leading up to it. During the last three Congresses the question of farm relief in one form or another has been acute. A bill for relief bearing the names of its coauthors, Senator McNARY, of Oregon, and Mr. HAUGEN, of Iowa, was finally formulated and submitted to Congress, but was defeated. A little later it came up again in a slightly different form and passed both Houses, but failed to receive Executive approval. At the first session of the Seventieth Congress another McNary-Haugen bill, like the previous one, again passed both Houses of Congress and was again vetoed by President Coolidge.

During the long period covered by the discussion of the farm relief bill in three Congresses quite naturally some feeling was developed on the part of the proponents of the bill and reprisals by way of reduction in the tariff were more or less openly threatened in order to punish the industrial but recalcitrant East for its supposed hostile attitude on farm-relief legislation. Finally Senator McMASTER, of South Dakota, introduced in the Senate a resolution calling for the immediate revision of the excessive rates of the present tariff, the obvious inference being a drastic downward revision of duties on manufactured articles. In the floundering attitude in which many found themselves this straw was grasped and the resolution came near to being adopted. It did pass the Senate by almost a 2 to 1 majority.

The Members of the House were in the same desperate straits as were the Senators, as they faced the approaching election without farm-relief legislation, and some were disposed to vote for this measure as a last-resort remedy for helping the farmer. Finally, by the narrow margin of only 8 votes in the House, a motion to refer the resolution to the Committee on Ways and Means—the committee having charge of tariff revision—was laid on the table.

During the agitation caused by the McMaster resolution there grew up a kind of understanding, and it helped to defeat the resolution—that an early revision of the tariff with special reference to farm relief would be undertaken. Certain industries other than farming, which were suffering for lack of adequate protection, also joined in the demand for tariff revision. It had become apparent that in their desperation some of those earnest in their espousal of the farmers' cause were ready to accept almost any remedy offered, and so were willing to go the length of demanding a drastic downward revision of the tariff on manufactured articles upon the theory that the farmer would be indirectly benefited. Better counsels prevailed, however, and the false theory upon which this proposal was based failed of acceptance.

In reaching the very wise conclusion to reject the method of hostile attack upon the tariff it was in effect agreed that the better course to pursue was for the friends of the tariff to beat its enemies to a revision, by sponsoring a revision by its friends along protective lines instead of the opposite plan proposed in the McMaster resolution. I then believed that if we, the friends of protection, were not willing to undertake such a revision, the McMaster resolution, or something worse, would prevail.

At the Kansas City convention I was one of those to go before the resolutions committee and urge that the Republican Party, the traditional friend of the protective tariff, should stand sponsor for such a revision of the tariff as recent developments and changed conditions would warrant. A plank to this effect was inserted in the platform adopted by that convention, as follows:

We reaffirm our belief in the protective tariff as a fundamental and essential principle of the economic life of this Nation. While certain provisions of the present law require revision in the light of changes in the world competitive situation since its enactment, the record of the United States since 1922 clearly shows that the fundamental protective principle of the law has been fully justified.

The campaign was carried on with this as one of the major planks of the platform, and on the stump was more often referred to than any other plank in it.

Farm relief and the tariff were inseparably connected from the beginning of the agitation for a revision, and they remained so throughout the campaign. Before the end of the campaign the conclusion was reached that unless something definite were done in connection with farm relief at the short session it would be wise to call Congress into early extraordinary session for the consideration of these two subjects, and with the decisive Republican victory came the obligation to take prompt steps in this direction.

It will be seen by reference to the protection plank in the platform from which I have quoted, that it declares the tariff law as it has stood since 1922 to be on the whole satisfactory; and that only such changes are promised as will readjust and

bring into line any portions of the act which by reason of new developments or changed conditions need readjustment. We stand upon this promise and assume whatever responsibility may be necessary for redeeming it. The House of Representatives took this view of the situation and began promptly the necessary preliminary preparation for carrying out its obligation in the premises.

In order to make ready for an early and prompt tariff revision general hearings by the Ways and Means Committee of the House were begun on January 7 and continued until the last of February just passed. The entire field of the tariff act was necessarily covered, because it is impracticable to attempt to revise one portion of the act without at the same time considering all parts of it. If this were not done, the action upon those portions revised might throw other related or interdependent portions of the act out of line, making the last state of the law worse than the first. Therefore, the entire field covered by the act was included in the hearings, and the information thus gathered is now undergoing a thorough study by subcommittees of the Committee on Ways and Means.

While it is necessary to consider the entire tariff act as a complete whole, it is hoped and expected that it will not be necessary to make material changes in a very large proportion of the very great number of items covered by the law. A test of seven years' actual experience has demonstrated that the present law is basically sound, and this makes it possible within the shortest time and with the least amount of difficulty to ascertain and readjust such rates as changed conditions or new developments have made necessary.

In the tariff hearings recently closed the majority of those who appeared, whether they so intended or not, made it evident that a very large share of the myriads of articles produced in this country are already reasonably protected and do not need additional duties. On the other hand, many cases were clearly shown to the committee where changed conditions have made changes necessary, and to the making of such changes the committee will now address itself.

A thorough study of the vast mass of information brought out during the hearings is to be made and may prove all demands well founded, but meanwhile it is feared that some of those presenting their case before the committee took counsel of their fears rather than of their necessities, and in so doing asked for too much in order that they might the more surely receive enough, or at least that they might not have taken away from them a portion of that which they already have. I believe in being careful and in taking reasonable precautions. Coming from Connecticut, the land of steady habits, it is but natural that I should be favorably inclined toward proper safeguards for the future. Some of those who appeared before the Committee on Ways and Means, however, went beyond what I consider reasonable caution and attempted to enter the realm of sure things even beyond what a Connecticut conservative could justify.

The overcautious ones to whom I have referred remind me of a Connecticut friend who, I think, is making for himself a record in taking care for the future. He was a little over 60 years of age when prohibition came, and seeing it coming he laid by an ample store. Being over 60 years of age, as I have said, he knew something of his imbibing capacity, and stocked his cellar accordingly. Almost 10 years have passed, during which he has kept careful statistics. He is now threescore years and ten. I met him the other day, and he is still going strong, but was worrying. I asked him what was the trouble and he told me his story. He said that the statistics carefully kept by him show that at the same rate at which he has been drinking, the normal rate for a gentleman, his supply of liquor will last for only 37 years longer, and he is now worrying about what he will do for liquor after that. Some of those who appeared before the Committee on Ways and Means have sufficient protection for the immediate present, but by their testimony are evidently beginning to worry about what is going to happen to them some time in the future. I believe that if we can secure the protection now needed we may with assurance trust future Congresses to continue the same sound policy of providing protection as the need for it shall be made to clearly appear.

As I said in the beginning, I speak only for myself when I say that in my judgment reasonably adequate protection as appears from the facts will be given in the coming tariff revision to every article and every industry making its case. On the other hand, I feel quite certain in my own mind that those who are asking rates of duty not shown by the facts to be necessary for proper protection are doomed to disappointment. If I sense aright the spirit and purpose of those who are charged with the writing of the new tariff bill, a very sincere and earnest effort will be made to find as nearly as humanly possible the line which accurately measures the need for protection, as shown by the facts to exist, and having found it will stick to this line.

It is my hope and, I may say, my ambition that the action of the present Congress, with its comfortable protectionist majority, may demonstrate that the protective policy is not only correct, but that it is capable of being so carried out that revisions of the tariff may be made at comparatively frequent intervals; in fact, I believe that this can be done whenever the need may appear without alarming business and without producing any substantial disturbance in our industrial life. The present revision will be the test. If it can not be done promptly and without business disturbance at this time and under present conditions, it can not be done at any time. If my hopes and ambitions in this direction are realized in the coming revision, I shall be not only content, but shall be proud of having been a Member of the Congress that has brought it to pass.

ENROLLED BILLS SIGNED

Mr. CAMPBELL, from the Committee on Enrolled Bills, reported that that committee had examined and found truly enrolled bills of the House of the following titles, which were thereupon signed by the Speaker:

H. R. 3047. An act for the relief of J. Edward Burke;

H. R. 9285. An act to provide for the settlement of claims against the United States on account of property damage, personal injury, or death;

H. R. 10817. An act for the relief of the Merrill Engineering Co.;

H. R. 12106. An act to erect a national monument at Cowpens battle ground;

H. R. 12502. An act for the relief of John H. and Avie D. Mathison, parents of Charles W. Mathison, deceased;

H. R. 13936. An act to amend the second paragraph of section 4 of the Federal farm loan act, as amended;

H. R. 15089. An act making appropriations for the Department of the Interior for the fiscal year ending June 30, 1930, and for other purposes;

H. R. 15430. An act continuing the powers and authority of the Federal Radio Commission under the radio act of 1927, and for other purposes;

H. R. 15848. An act making appropriations to supply urgent deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide urgent supplemental appropriations for the fiscal year ending June 30, 1929, and for other purposes;

H. R. 16395. An act to amend the World War adjusted compensation act, as amended, by reducing the rates of interest on loans made by the Veterans' Bureau upon the security of adjusted service certificates, and for other purposes;

H. R. 16440. An act relating to declarations of intention in naturalization proceedings;

H. R. 16878. An act granting pensions and increase of pensions to certain soldiers and sailors of the Regular Army and Navy, etc., and certain soldiers and sailors of wars other than the Civil War, and to widows of such soldiers and sailors;

H. R. 17122. An act to extend the times for commencing and completing the construction of a bridge across the Columbia River at Entiat, Wash.;

H. R. 17208. An act to extend the times for commencing and completing the construction of a bridge across the Missouri River at or near Niobrara, Nebr.;

H. R. 17218. An act authorizing the State Highway Commission, Commonwealth of Kentucky, to construct, maintain, and operate a bridge across the Ohio River at or near Maysville, Ky.;

H. R. 17223. An act making appropriations to supply deficiencies in certain appropriations for the fiscal year ending June 30, 1929, and prior fiscal years, to provide supplemental appropriations for the fiscal years ending June 30, 1929, June 30, 1930, and for other purposes;

H. R. 17262. An act authorizing H. L. Cloud, his heirs, legal representatives, and assigns, to construct, maintain, and operate a bridge across the Canadian River at or near Francis, Okla.;

H. R. 17237. An act to extend the times for commencing and completing the construction of a bridge across the Calumet River at or near One hundred and thirtieth Street, Chicago, Cook County, Ill.;

H. R. 17311. An act to extend the time for completing the construction of a bridge across the Mississippi River at or near Cairo, Ill.;

H. R. 17322. An act to amend the act approved June 22, 1926, entitled "An act to amend that part of the act approved August 29, 1916, relative to the retirement of captains, commanders, and lieutenant commanders in the line of the Navy";

H. J. Res. 355. Joint resolution authorizing the appropriation of the sum of $50,000 to enable the Secretary of State to cooperate with the several Governments, members of the Pan American Union, furthering the building of an inter-American highway or highways; and

H. J. Res. 434. Joint resolution to appoint HOMER W. HALL a member of the subcommittee of the Committee on the Judiciary established under House Joint Resolution 431 to inquire into the official conduct of Grover M. Moscowitz, United States district judge for the eastern district of New York.

The SPEAKER announced his signature to enrolled bills of the Senate of the following titles:

S. 150. An act for the relief of former officers of the United States Naval Reserve Force and the United States Marine Corps Reserve who were released from active duty and disenrolled at places other than their homes or places of enrollment;

S. 264. An act for the relief of Margaret I. Varnum;

S. 382. An act for the relief of Joseph F. Thorpe;

S. 2594. An act transferring a portion of the lighthouse reservation, Ship Island, Miss., to the jurisdiction and control of the War Department;

S. 4237. An act for the relief of Antoine Laporte, alias Frank Lear;

S. 4354. An act for the relief of Atlantic Refining Co., a corporation of the State of Pennsylvania, owner of the American steamship *H. C. Folger*, against U. S. S. *Connecticut*;

S. 4385. An act to establish the Teton National Park in the State of South Dakota, and for other purposes;

S. 4566. An act authorizing the New York Development Association (Inc.), its successors and assigns, to construct, maintain, and operate a bridge across the St. Lawrence River near Alexandria Bay, N. Y.;

S. 4721. An act to extend the times for commencing and completing the construction of a bridge across the Potomac River at or near the Great Falls, and to authorize the use of certain Government land;

S. 4809. An act for the relief of John B. Meisinger and Nannie Belle Meisinger;

S. 4848. An act for the relief of T. L. Young and C. T. Cole;

S. 5094. An act making it a felony with penalty for certain aliens to enter the United States of America under certain conditions in violation of law;

S. 5127. An act to carry into effect the twelfth article of the treaty between the United States and the Loyal Shawnee Indians proclaimed October 14, 1868;

S. 5386. An act extending benefits of the World War adjusted compensation act, as amended, to John J. Helms;

S. 5512. An act to provide recognition for meritorious service by members of the Police and Fire Departments of the District of Columbia;

S. 5598. An act authorizing the acquisition of land in the District of Columbia and the construction thereon of two modern, high-temperature incinerators for the destruction of combustible refuse, and for other purposes;

S. 5717. An act for the relief of the State of Nevada;

S. 5843. An act to provide for the relocation of Michigan Avenue adjacent to the southerly boundary of the United States Soldiers' Home grounds, and for other purposes;

S. 5875. An act to extend the times for commencing and completing the construction of a bridge across the Missouri River at or near Niobrara, Nebr.;

S. J. Res. 9. Joint resolution to establish a joint commission on insular reorganization;

S. J. Res. 132. Joint resolution to create a commission to secure plans and designs for and to erect a memorial building for the National Memorial Association (Inc.) in the city of Washington as a tribute to the negro's contribution to the achievements of America;

S. J. Res. 216. Joint resolution to establish a joint commission on airports; and

S. J. Res. 223. Joint resolution to amend the act entitled "An act to provide for the submission to the Congress of preliminary plans and estimates of costs for the construction of a building for the Supreme Court of the United States," approved December 21, 1928.

BILLS PRESENTED TO THE PRESIDENT

Mr. CAMPBELL, from the Committee on Enrolled Bills, reported that that committee did on this day present to the President, for his approval, bills of the House of the following titles:

H. R. 349. An act to supplement the naturalization laws, and for other purposes;

H. R. 2425. An act for the relief of Annie McColgan;

H. R. 4244. An act for the relief of Joseph Lee;

H. R. 4265. An act for the relief of certain officers and former officers of the Army of the United States, and for other individual claims approved by the War Department;

H. R. 6705. An act for the relief of Clotilda Freund;

H. R. 6698. An act for the relief of William C. Schmitt;

H. R. 7174. An act granting compensation to William T. Ring;

H. R. 8401. An act for the relief of Jack Mattson;

H. R. 8691. An act for the relief of Helen Gray;

H. R. 10274. An act for the relief of Commander Francis James Cleary, United States Navy;

H. R. 10321. An act for the relief of B. P. Stricklin;

H. R. 10431. An act to amend section 101 of the Judicial Code, as amended.

H. R. 10912. An act to reimburse or compensate Capt. John W. Elkins, jr., for part of salary retained by War Department and money turned over to same by him;

H. R. 11339. An act for the relief of the estate of C. C. Spiller, deceased;

H. R. 12255. An act for the relief of Martha C. Booker, administratrix of the estate of Hunter R. Booker, deceased; H. H. Holt; and Annie V. Groome, administratrix of the estate of Nelson S. Groome, deceased;

H. R. 12475. An act for the relief of Alfred L. Diebolt, sr., and Alfred L. Diebolt, jr.;

H. R. 13801. An act for the relief of John Bowie;

H. R. 14022. An act for the relief of Felix Cole for losses incurred by him arising out of the performance of his duties in the American Consular Service;

H. R. 14089. An act for the relief of Dale S. Rice;

H. R. 14588. An act for the relief of A. Brizard (Inc.);

H. R. 14728. An act for the relief of J. A. Smith;

H. R. 15387. An act to amend the act of February 9, 1907, entitled "An act to define the term 'registered nurse' and to provide for the registration of nurses in the District of Columbia";

H. R. 16082. An act to authorize the disposition of unplatted portions of Government town sites on irrigation projects under the reclamation act of June 17, 1902, and for other purposes;

H. R. 16089. An act for the relief of Elizabeth Quinerly Cummings;

H. R. 16090. An act for the relief of Hugh Dortch;

H. R. 16122. An act for the relief of E. Schaaf-Regelman;

H. R. 16209. An act to enable the Rock Creek and Potomac Parkway Commission, established by act of March 4, 1913, to make slight changes in the boundaries of said parkway by excluding therefrom and selling certain small areas, and including other limited areas, the net cost not to exceed the total sum already authorized for the entire project;

H. R. 16535. An act authorizing the Secretary of War to execute a satisfaction of a certain mortgage given by the Twin City Forge & Foundry Co. to the United States of America;

H. R. 16666. An act for the relief of Katherine Elizabeth Kerrigan Callaghan;

H. R. 16839. An act to provide for investigation of sites suitable for the establishment of a naval airship base;

H. R. 16982. An act authorizing J. E. Robinson, his heirs, legal representatives, and assigns, to construct, maintain, and operate a bridge across the Tombigbee River at or near Coffeeville, Ala.;

H. R. 17007. An act to extend the times for commencing and completing the construction of a bridge across the Mississippi River at or near Hickman, Ky.;

H. R. 17026. An act granting a part of the Federal building site at Savannah, Ga., to the city of Savannah for street purposes;

H. R. 17060. An act to readjust the commissioned personnel of the Coast Guard, and for other purposes;

H. R. 17075. An act to extend the times for commencing and completing the construction of a bridge across the Red River of the North at or near Fargo, N. Dak.;

H. R. 17101. An act to accept the cession by the State of Colorado of exclusive jurisdiction over the lands embraced within the Rocky Mountain National Park, and for other purposes;

H. R. 17127. An act to extend the times for commencing and completing the construction of a bridge across the Des Moines River at or near Croton, Iowa;

H. R. 17140. An act to extend the times for commencing and completing the construction of a bridge across the Mahoning River at or near Warren, Trumbull County, Ohio;

H. R. 17141. An act to extend the times for commencing and completing the construction of an overhead viaduct across the Mahoning River at or near Niles, Trumbull County, Ohio;

H. R. 17185. An act to extend the times for commencing and completing the construction of a bridge across the Ohio River at or near Cairo, Ill.;

H. R. 5995. An act for the relief of John F. O'Neil;

H. R. 9396. An act to compensate Eugenia Edwards, of Saluda, S. C., for allowances due and unpaid during the World War;
H. R. 13734. An act for the relief of James McGourty; and
H. R. 13440. An act for the relief of Howard P. Milligan.

RECESS UNTIL 10 A. M. TO-MORROW

Mr. TILSON. Mr. Speaker, I move that the House now take a recess until 10 o'clock to-morrow morning.

The motion was agreed to; accordingly (at 1 o'clock and 58 minutes p. m.) the House stood in recess until to-morrow, Monday, March 4, 1929, at 10 o'clock a. m.

REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of Rules XIII,

Mr. LETTS: Committee on the Public Lands. H. R. 12780. A bill to promote the better protection and highest public use of the lands of the United States and adjacent lands and waters in northern Minnesota for the production of forest products, the development and extension of recreational uses, the preservation of wild life, and other purposes not inconsistent therewith; and to protect more effectively the streams and lakes dedicated to public use under the terms and spirit of clause 2 of the Webster-Ashburton treaty of 1842 between Great Britain and the United States; and looking toward the joint development of indispensable international recreational and economic assets; with amendment (Rept. No. 2814). Referred to the Committee of the Whole House on the state of the Union.

Mr. WASON: Committee on the Disposition of Useless Executive Papers. A report on the disposition of useless papers in the Interior Department (Rept. No. 2815). Ordered to be printed.

PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of Rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. DRIVER: A bill (H. R. 17333) to provide for the aiding of farmers on wet lands in any State by the making of loans to drainage districts, levee districts, levee and drainage districts, counties, boards of supervisors, and/or other political subdivisions and legal entities, and for other purposes; to the Committee on Irrigation and Reclamation.

By Mr. JOHNSON of Washington: Joint resolution (H. J. Res. 435) to create a commission to study the immigration and naturalization laws; to the Committee on Immigration and Naturalization.

Also, resolution (H. Res. 348) providing for the appointment of a committee to investigate conditions concerning the illegal entry of aliens into the United States, and for other purposes; to the Committee on Rules.

PETITIONS, ETC.

Under clause 1 of Rule XXII, petitions and papers were laid on the Clerk's desk and referred as follows:

13610. By Mr. DEAL: Petition of the Granby Street Baptist Church, of Norfolk, Va., with a membership of 2,000, urging the enactment of legislation to protect the people of the Nation's Capital in their enjoyment of Sunday as a day of rest in seven, as provided in the Lankford bill (H. R. 78), or similar measures; to the Committee on the District of Columbia.

13611. By Mr. HOWARD of Oklahoma: Resolution of the Chamber of Commerce, of Miami, Okla., relative to operation of Seneca Indian School, Wyandotte, Okla.; to the Committee on Indian Affairs.

13612. By Mr. LINDSAY: Petition of Consolidated Lithographing Corporation, Brooklyn, N. Y., urging Ways and Means Committee to decide upon American valuation rather than foreign valuation for fixing duties in tariff bill; to the Committee on Ways and Means.

13613. Also, petition of Amalgamated Paper Co. (Inc.), 79 Washington Street, Brooklyn, N. Y., urging support of House bill 10287, known as national stolen property act; to the Committee on the Judiciary.

13614. Also, petition of J. H. Werbelovsky's Son, Brooklyn, N. Y., urging passage of national stolen property act; to the Committee on the Judiciary.

13615. Also, petition of 37 citizens of Brooklyn, N. Y., urging against any change in the present tariff on hides and leather used in the manufacture of shoes; to the Committee on Ways and Means.

13616. By Mr. MEAD: Petition of Geo. Laub's Sons et al., re tariff duty on sole and belting leather; to the Committee on Ways and Means.

SENATE

MONDAY, March 4, 1929

(Legislative day of Monday, February 25, 1929)

The Senate met at 11 o'clock a. m., on the expiration of the recess.

ENLARGEMENT OF THE CAPITOL GROUNDS

The VICE PRESIDENT. The Chair lays before the Senate the unfinished business, House bill 13929.

The Senate resumed the consideration of the bill (H. R. 13929) to provide for the enlarging of the Capitol grounds.

The VICE PRESIDENT. The bill is in the Senate and open to amendment.

Mr. KEYES. Mr. President, I dislike very much to take even a moment of this closing hour of the Seventieth Congress, but I do want to appeal to the Senate to allow the pending bill to come to a vote. It is an extremely important measure. It will have to go back to the House because of very slight amendments, but I am sure that action on the amendments will be taken in the House.

I ask the Senator from Wisconsin [Mr. BLAINE] if he will not be willing to forego action upon his amendment at the present time?

Mr. BLAINE. Mr. President, I understand it is contemplated that the war section of the Government hotels will be undisturbed for at least two more years. I am also convinced that the amendment which I have proposed, if agreed to by the Senate, could not receive the approval of the House of Representatives at the present session of Congress. I have no desire to retard the progress of the bill providing for the improvement of the plaza and I therefore ask unanimous consent to withdraw the amendment which I have offered.

The VICE PRESIDENT. Is there objection? The Chair hears none and it is so ordered. The bill is in the Senate and the question is on concurring in the amendments made as in Committee of the Whole.

The amendments were concurred in.

The amendments were ordered to be engrossed, and the bill to be read a third time.

The bill was read the third time, and passed.

J. H. B. WILDER

The VICE PRESIDENT laid before the Senate the amendment of the House of Representatives to the bill (S. 5715) for the relief of J. H. B. Wilder, which was, on page 1, line 8, to strike out the word "interest" and insert "increased."

Mr. HARRIS. I move that the Senate concur in the amendment of the House.

The motion was agreed to.

MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Haltigan, one of its clerks, announced that the House had passed the following bills of the Senate:

S. 2127. An act for the relief of William S. Welch, trustee of the estate of the Joliet Forge Co., Joliet, Ill., bankrupt; and

S. 5386. An act extending benefits of the World War adjusted compensation act, as amended, to John J. Helms.

The message also announced that the House had passed a joint resolution (H. J. Res. 402) to amend subdivisions (b) and (e) of section 11 of the immigration act of 1924, as amended, in which it requested the concurrence of the Senate.

The message further announced that the House had concurred in the concurrent resolution (S. Con. Res. 11) to investigate the problem of the control of aircraft for seacoast defense.

The message also announced that the House had passed the following resolution (H. Res. 350):

*Resolved,* That a committee of three Members be appointed by the Speaker to join a similar committee appointed by the Senate to wait upon the President of the United States and inform him that the two Houses have completed the business of the present session and are ready to adjourn unless the President has some other communication to make to them.

And that pursuant to the foregoing resolution the Speaker had appointed Mr. TILSON, Mr. HAWLEY, and Mr. GARRETT of Tennessee members of the committee on the part of the House.

ENROLLED BILLS AND JOINT RESOLUTIONS SIGNED

The message further announced that the Speaker had affixed his signature to the following enrolled bills and joint resolutions, and they were signed by the Vice President:

S. 150. An act for the relief of former officers of the United States Naval Reserve Force and the United States Marine