# EXHIBIT X

Senate Report 81-1515

81ST CONGRESS }     SENATE     { REPORT
2d Session   }        { No. 1515

# THE IMMIGRATION AND NATURALIZATION SYSTEMS OF THE UNITED STATES

## REPORT

### OF THE

## COMMITTEE ON THE JUDICIARY

PURSUANT TO

## S. Res. 137

(80th Congress, 1st Session, as amended)

### A RESOLUTION TO MAKE AN INVESTIGATION OF THE IMMIGRATION SYSTEM



APRIL 20 (legislative day, MARCH 29), 1950.—Ordered to be printed with illustrations

UNITED STATES
GOVERNMENT PRINTING OFFICE
WASHINGTON : 1950

69143°


PROVIDED BY
*The leading immigration law publisher*
ILW.COM
http://www.ilw.com

COMMITTEE ON THE JUDICIARY

PAT McCARRAN, Nevada, *Chairman*

HARLEY M. KILGORE, West Virginia     ALEXANDER WILEY, Wisconsin
JAMES O. EASTLAND, Mississippi     WILLIAM LANGER, North Dakota
HERBERT R. O'CONOR, Maryland     HOMER FERGUSON, Michigan
FRANK P. GRAHAM, North Carolina     FORREST C. DONNELL, Missouri
ESTES KEFAUVER, Tennessee     WILLIAM E. JENNER, Indiana
GARRETT L. WITHERS, Kentucky

J. G. SOURWINE, *Counsel*

SPECIAL SUBCOMMITTEE TO INVESTIGATE IMMIGRATION AND NATURALIZATION

PAT McCARRAN, Nevada, *Chairman*

JAMES O. EASTLAND, Mississippi     WILLIAM LANGER, North Dakota
HERBERT R. O'CONOR, Maryland     FORREST C. DONNELL, Missouri

RICHARD ARENS, *Staff Director*

II

# CONTENTS

| | Page |
|---|---|
| Foreword | 1 |

## PART 1

### THE IMMIGRATION SYSTEM

#### CHAPTER 1—BACKGROUND

| | |
|---|---|
| A. Races and peoples of the world | 7 |
| 1. Introduction | 7 |
| 2. Classification of races | 7 |
| 3. Location and number | 7 |
| 4. The white race | 8 |
| 5. The yellow race | 9 |
| 6. The black race | 10 |
| 7. The brown race | 11 |
| 8. The red race | 11 |
| 9. World problems of population and natural resources | 12 |
| B. International migrations | 14 |
| 1. Introduction | 14 |
| 2. Migration defined | 14 |
| 3. Types of population movements | 14 |
| 4. Causes of migration | 15 |
| 5. Early migrations of history | 16 |
| 6. Modern international migrations | 16 |
| 7. Immigrant receiving countries | 23 |
| 8. Present and prospective migratory trends | 24 |
| 9. Conclusion | 25 |
| C. Immigration policies of other countries | 26 |
| 1. Basic factors affecting policy | 26 |
| 2. Great Britain | 28 |
| 3. Canada | 30 |
| 4. Australia | 32 |
| 5. France | 36 |
| 6. Brazil | 37 |
| 7. Argentina | 40 |
| D. History of the immigration policy of the United States | 43 |
| 1. Authority for control of immigration | 43 |
| 2. Colonial policy | 45 |
| 3. Early congressional enactments | 44 |
| 4. Native American and Know-Nothing movements | 65 |
| 5. First restrictions | 49 |
| 6. Congressional investigations | 51 |
| 7. Volume of immigration continues | 53 |
| 8. The Immigration Act of 1907 | 53 |
| 9. The Immigration Act of 1917 | 54 |
| 10. The quota law of 1921 | 55 |
| 11. The quota law of 1924 | 57 |
| 12. Summation of our immigration policy | 65 |
| 13. Recent legislation | 65 |
| E. Summary of the immigration laws | 66 |
| 1. Introduction | 66 |
| 2. Excludable aliens | 66 |
| 3. Admissible aliens | 68 |
| 4. Documentary requirements | 70 |
| 5. Deportable aliens | 71 |
| 6. Discretionary action | 71 |

CHAPTER I—BACKGROUND—continued

|  | Page |
|---|---|
| F. Migrations to and from the United States | 72 |
|   1. Area and population | 72 |
|   2. Extent of migrations | 73 |
|   3. Immigrant admissions | 75 |
|   4. Admissions and departures | 75 |

CHAPTER II—CHARACTERISTICS OF THE POPULATION OF THE
UNITED STATES

| A. Historical composition of the population | 80 |
|---|---|
|   1. Introduction | 80 |
|   2. Changes in nationality ratios | 80 |
|   3. Foreign-born population: percentages | 80 |
|   4. National origins study | 81 |
| B. Races, peoples, and elements in the United States | 82 |
|   1. Introduction | 82 |
|   2. Europeans | 82 |
|   3. Asiatics | 140 |
|   4. The Americas | 147 |
|   5. Australians and New Zealanders | 152 |
|   6. Jews | 154 |
|   7. Negroes | 155 |
| C. Age distribution of the population | 156 |
|   1. Age statistics on the population as a whole | 156 |
|   2. Age statistics on immigrants (1899–1948) | 157 |
|   3. Alien population | 158 |
| D. Sex distribution of the population | 158 |
|   1. Sex distribution of the population as a whole | 158 |
|   2. Sex distribution by race | 159 |
|   3. Sex distribution of immigrants | 160 |
|   4. Sex distribution by areas | 162 |
|   5. Sex ratio in naturalization | 163 |
|   6. Sex ratio in education | 164 |
| E. Marital status | 165 |
|   1. Introduction | 165 |
|   2. Population as a whole | 165 |
|   3. Immigrants | 165 |
|   4. Nonimmigrants | 166 |
|   5. Emigrant aliens | 166 |
|   6. GI brides and fiancées | 166 |
|   7. Registered aliens | 167 |
|   8. Naturalized persons | 167 |
|   9. Intermarriage between immigrants and natives | 167 |
| F. Birth and death rates | 168 |
|   1. Introduction | 168 |
|   2. Birth rate | 169 |
|   3. Comparison of birth rates between foreign-born and native-born | 170 |
|   4. Comparison of death rates between foreign-born and native-born | 171 |
|   5. Comparison of birth rates among races | 172 |
|   6. Comparison of death rates among races | 172 |
|   7. Future population trends in the United States | 173 |
| G. Relief | 173 |
|   1. Administration of public relief programs | 173 |
|   2. Economic cycles in immigration | 174 |
|   3. The United States as a whole | 175 |
|   4. State relief programs | 177 |
|   5. Summary | 178 |
| H. Crime | 179 |
|   1. Introduction | 179 |
|   2. Applicable law | 179 |
|   3. Reliability of available statistics | 179 |

CHAPTER II—CHARACTERISTICS OF THE POPULATION OF THE
UNITED STATES—continued

| H. Crime—Continued | Page |
|---|---|
|   4. Criminality and the immigrant | 180 |
|   5. Criminality by nationality | 184 |
|   6. Types of offenses | 186 |
|   7. Criminality by areas of origin | 189 |
|   8. Summary | 193 |
| I. Mental afflictions | 193 |
|   1. Introduction | 193 |
|   2. Exclusion and expulsion of aliens with mental defects | 194 |
|   3. Persons deported to the United States because of mental or physical defects | 195 |
|   4. Resident patients in permanent-care hospitals, 1937–46 | 195 |
|   5. First admissions to all permanent-care hospitals | 195 |
|   6. Geographical differences of hospitalized mental patients | 196 |
|   7. Mental disease in the United States according to nativity and parentage | 196 |
|   8. Citizenship of patients in mental institutions (1940) | 199 |
|   9. Color and nativity | 199 |
|   10. Sex, age, and marital status of persons confined to mental institutions | 200 |
|   11. Education of persons confined to mental institutions | 201 |
|   12. Public and private residential and special schools, and classes, for mentally deficient | 201 |
|   13. Discharges and deaths in all permanent-care hospitals | 201 |
| J. Education, literacy, and language | 202 |
|   1. Educational requirements for admission and naturalization | 202 |
|   2. Language characteristics of the population | 208 |
|   3. Foreign-language press | 210 |
|   4. Foreign-language radio broadcasts | 213 |
|   5. Communist propaganda | 215 |
|   6. Educational training of aliens for citizenship | 215 |
|   7. Summary | 229 |
| K. Religion | 229 |
|   1. Introduction | 229 |
|   2. Religion as a factor in immigration | 230 |
|   3. Religious composition of the "old immigration" | 231 |
|   4. Religious composition of the "new immigration" | 235 |
|   5. Religious composition of Asiatic immigration | 242 |
|   6. Religious composition of Western Hemisphere immigration | 245 |
|   7. The American Negro in religion | 246 |
|   8. The situation today | 246 |
|   9. Church as a factor in assimilation | 251 |
| L. Internal migration and settlement | 252 |
|   1. Introduction | 252 |
|   2. Rural and urban population | 253 |
|   3. Movement to and from farms | 253 |
|   4. Race and nativity of urban and rural population | 256 |
|   5. Settlement of aliens and foreign-born | 256 |
|   6. Internal migration | 259 |
|   7. Migration of agricultural workers | 269 |
| M. Occupation and employment | 274 |
|   1. Definitions and limitations | 274 |
|   2. Population present | 275 |
|   3. The immigrant and economics | 279 |
|   4. Summary | 282 |
|   5. Recommendations | 282 |
| N. Population and natural resources | 283 |
|   1. Introduction | 283 |
|   2. Population prospective of the United States | 284 |
|   3. Use and abuse of natural resources | 287 |
|   4. Theories concerning population, productivity, and natural resources | 289 |

CHAPTER III—ENFORCEMENT AGENCIES

Page
A. Introduction_____ 290
B. Immigration and Naturalization Service_____ 290
  1. History_____ 290
  2. Organization and function_____ 291
  3. Personnel_____ 301
  4. Physical facilities_____ 306
  5. Work load and manpower_____ 310
C. Board of Immigration Appeals_____ 317
  1. History_____ 317
  2. Jurisdiction_____ 317
  3. Organization_____ 318
  4. Personnel_____ 318
D. Visa Division_____ 319
  1. History of the Visa Division_____ 319
  2. Organization of the Visa Division_____ 320
E. The consular offices_____ 321
  1. Authority_____ 321
  2. Number and location_____ 322
F. United States Public Health Service_____ 323
  1. Authority and historical background_____ 323
  2. Organization_____ 323
G. Appropriations, costs, and receipts_____ 324
  1. Immigration and Naturalization Service_____ 324
  2. Visa Division_____ 325
  3. Consular Section_____ 325
  4. Public Health Service_____ 325
  5. Board of Immigration Appeals_____ 326
  6. Displaced Persons Commission_____ 326
  7. Costs of agencies dealing with immigration and naturalization_ 326
H. Relationship between Immigration and Naturalization Service and other agencies_____ 327
  1. Relationship to Visa Division_____ 327
  2. Relationship to Public Health Service_____ 328
  3. Relationship to Customs Bureau_____ 328
  4. Relationship to Social Security Agency_____ 330
I. Passport and Visa Division_____ 331
  1. General_____ 331
  2. Coordination and operation_____ 331
J. Conclusions and recommendation_____ 332
  1. General_____ 332
  2. Immigration Service and the Visa Division___ 333
  3. The Immigration Service and the Public Health Service__ 333
  4. The Immigration Service and the Customs Bureau___ 333
  5. The Immigration Service and other agencies__ 333
  6. Central index file_____ 334
  7. Visa and Passport Division_____ 334

CHAPTER IV—EXCLUDABLE AND DEPORTABLE CLASSES

A. Excludable classes_____ 335
  1. Summary of early legislation_____ 335
  2. Court decisions_____ 336
  3. Statistics_____ 336
  4. Medical exclusions_____ 337
  5. Paupers, professional beggars, and vagrants___ 345
  6. Persons likely to become public charges_____ 346
  7. Crimes involving moral turpitude_____ 350
  8. Draft evaders or avoiders_____ 354
  9. Immoral aliens_____ 355
  10. Contract laborers_____ 358
  11. Assisted aliens_____ 363
  12. Previously deported or excluded aliens_____ 364
  13. Stowaways_____ 365
  14. Racial exclusions_____ 368
  15. Illiterate aliens_____ 373
  16. Additional classes of excludables_____ 375

CHAPTER IV—EXCLUDABLE AND DEPORTABLE CLASSES—continued

Page
B. Exceptions to the excludable classes_____ 376
  1. Introduction_____ 376
  2. First proviso_____ 376
  3. Second proviso_____ 376
  4. Third proviso_____ 377
  5. Fourth proviso_____ 377
  6. Fifth proviso_____ 379
  7. Sixth proviso_____ 380
  8. Seventh proviso_____ 381
  9. Eighth proviso_____ 384
  10. Ninth proviso_____ 384
  11. Tenth proviso_____ 387
C. Deportable classes of aliens_____ 388
  1. Existing law_____ 388
  2. Deportation of persons excludable at time of entry_ 389
  3. Deportation of persons who become public charges_ 390
  4. Deportation for commission of crimes involving moral turpitude_ 390
D. Alien enemies_____ 393
  1. Introduction_____ 393
  2. The Enemy Alien Act_____ 393
  3. The alien enemy situation during the First World War__ 393
  4. Legislative and executive procedure during World War II___ 396
  5. Hearing and reviews of alien enemy cases____ 398
  6. Removal procedure_____ 400
  7. Court decisions pertaining to alien enemies___ 401
  8. The Japanese situation during the last war___ 403
  9. Statistics_____ 405
  10. Conclusion_____ 407
E. Deportation of aliens who traffic in narcotic drugs__ 407
  1. The law today and its historical background___ 407
  2. Court decisions_____ 408
  3. Statistics_____ 409
  4. Conclusions and recommendations_____ 410
F. Exclusion and deportation of aliens with improper documents_ 411
  1. The law today_____ 411
  2. Statistics_____ 411
  3. Conclusions and recommendations_____ 412
G. General conclusions and recommendations_____ 412

CHAPTER V—ADMISSIBLE ALIENS

A. Introduction: General classes of admissible aliens___ 414
  1. Inequality of the sexes under the immigration laws__ 414
B. Quota immigrants_____ 417
  1. Background_____ 417
  2. Existing laws and regulations on quota classes__ 420
  3. Quotas and their uses_____ 428
  4. The quota system in operation_____ 433
  5. Summary of comment on policies for controlling immigration_ 441
  6. Racial barriers under the quota system_____ 453
  7. Conclusions and recommendations_____ 454
C. Nonquota immigrants_____ 458
  1. Introduction_____ 458
  2. Statistics_____ 459
  3. Nonquota classification based on relationship to citizens_ 461
  4. Nonquota classification of returning alien residents_ 470
  5. Nonquota classification of natives of Western Hemisphere countries_ 472
  6. Nonquota classification of ministers and professors_ 474
  7. Nonquota classification of expatriated citizens_ 476
  8. Nonquota classification under the Philippine Trade Act_ 477
  9. Other classes of immigrants not chargeable to quotas_ 477
  10. Miscellaneous suggestions for expansion of nonquota classes_ 479
  11. Nonquota classification of foreign students___ 479
  12. General conclusions and recommendations___ 510

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 5 of 101 PageID #:644

CHAPTER V—ADMISSIBLE ALIENS—continued

Page
D. Nonimmigrants_____ 510
  1. Introduction_____ 510
  2. Foreign government officials and representatives and personnel of international organizations_____ 511
  3. Visitors_____ 525
  4. Transits_____ 539
  5. Seamen_____ 545
  6. Airmen_____ 558
  7. Treaty traders_____ 562
  8. Trainees_____ 567
  9. Temporary agricultural workers_____ 573
  10. Fiancée Act_____ 586
  11. Additional classes of nonimmigrants_____ 587
F. Recommendations_____ 588
  1. Quota classes of immigrants_____ 588
  2. Nonquota classes of immigrants_____ 589
  3. Nonimmigrant classes_____ 590

CHAPTER VI—ADJUSTMENT OF STATUS

A. Introduction_____ 591
B. Administrative procedure_____ 591
  1. Cases arising prior to July 1, 1924_____ 591
  2. Seventh proviso_____ 592
  3. Lawful permanent resident_____ 593
  4. Alien who entered as a citizen_____ 593
  5. No existing record_____ 593
  6. Failure to surrender documents_____ 593
  7. Waiver of documents_____ 593
C. Adjustment by treaty_____ 594
D. Registry proceedings_____ 594
  1. Application_____ 595
  2. Procedure_____ 595
E. Suspension of deportation_____ 595
  1. History and background_____ 595
  2. Eligibility_____ 596
  3. Procedure_____ 598
  4. Statistics_____ 599
  5. Criticism of suspension of deportation_____ 600
F. Preexamination_____ 603
G. Change of status_____ 606
H. Displaced persons_____ 607
I. Private immigration and naturalization bills_____ 607
J. Conclusions and recommendations_____ 609
  1. Administrative procedure_____ 609
  2. Registry proceedings_____ 609
  3. Suspension of deportation_____ 609
  4. Preexamination_____ 611
  5. Change of status_____ 611

CHAPTER VII—PROCEDURES

A. Admission and exclusion_____ 612
  1. Introduction_____ 612
  2. Requirements_____ 612
  3. Inspection procedure_____ 617
  4. Appraisal and recommendations_____ 622
B. Expulsion of aliens_____ 624
  1. General considerations_____ 624
  2. Procedures_____ 624
  3. Deportation problems_____ 629
C. Immigration bonds_____ 640
  1. General_____ 640
  2. Bond requirements_____ 640

CHAPTER VII—PROCEDURES—continued

Page
D. Immigration offenses_____ 644
  1. Purpose and classification_____ 644
  2. Penalties imposed judicially for the commission of crimes___ 644
  3. Civil penalties imposed judicially_____ 650
  4. Administrative penalties_____ 650
  5. Commentary_____ 654
  6. Recommendations_____ 656

CHAPTER VIII—TERRITORIES AND POSSESSIONS

A. Territorial status_____ 657
B. Definitions_____ 657
  1. Alien_____ 657
  2. National_____ 657
  3. Entry into the United States_____ 657
C. General application of immigration provisions_____ 658
  1. Alaska_____ 659
  2. Hawaii_____ 659
  3. Puerto Rico_____ 660
  4. Virgin Islands_____ 661
  5. Guam and American Samoa_____ 663
  6. The Canal Zone_____ 664
D. Population composition_____ 665
  1. General_____ 665
  2. Alaska_____ 666
  3. Hawaii_____ 666
  4. Puerto Rico_____ 667
  5. Virgin Islands of the United States_____ 667
  6. Guam_____ 668
  7. Samoa_____ 669
  8. Canal Zone_____ 669
E. Migrations_____ 669
  1. Immigration and emigration_____ 669
  2. Alien intrainsular travel_____ 669
  3. Citizen intrainsular travel_____ 670
F. Control problems_____ 671
  1. Alaska_____ 671
  2. Hawaii_____ 671
  3. Puerto Rico_____ 673
  4. The Virgin Islands_____ 673
  5. Guam_____ 673
G. Recommendations_____ 673

## PART 2

### The Naturalization System

#### CHAPTER I—HISTORY AND SUMMARY OF THE NATURALIZATION LAWS

| | Page |
|---|---|
| A. Constitutional provision | 675 |
| B. Acts of Congress | 675 |
| C. The law today | 675 |
| 1. Who are citizens; nationals | 676 |
| 2. Who may not become a citizen | 677 |
| 3. How to become a citizen | 677 |
| 4. How citizenship may be lost | 678 |
| 5. How citizenship may be regained | 679 |
| 6. Registry of aliens | 679 |
| 7. Penalties | 679 |

#### CHAPTER II—SUMMARY OF STATISTICS ON NATURALIZATION

| | |
|---|---|
| A. General | 680 |
| B. By country of origin | 680 |
| C. By age groups | 681 |
| D. Judgments of naturalization revoked | 682 |
| E. Loss of nationality | 682 |
| F. Denial of naturalization | 682 |
| G. Naturalization of special classes | 683 |
| H. Derivative citizenship | 683 |
| I. Citizenship training | 683 |

#### CHAPTER III—WHO ARE CITIZENS

| | |
|---|---|
| A. By birth in the United States | 685 |
| B. By birth in the Territories and possessions | 686 |
| 1. Treaties and laws governing | 686 |
| 2. Statistics | 688 |
| C. By birth outside the United States | 690 |
| 1. Provisions of existing law | 690 |
| 2. Special legislation | 691 |
| 3. Illegitimate children | 692 |
| D. By naturalization—qualifications for | 695 |
| 1. Racial eligibility | 695 |
| 2. Residence | 697 |
| 3. Good moral character, attachment to the Constitution | 699 |
| 4. Literacy | 701 |
| E. By naturalization—special classes | 702 |
| 1. Spouses of American citizens | 702 |
| 2. Armed services personnel | 703 |
| 3. Seamen | 704 |
| F. By derivation | 706 |
| 1. Adopted children | 707 |
| 2. Stepchildren | 707 |
| 3. Illegitimate children | 708 |
| 4. Derivation through naturalization of both parents | 708 |
| 5. Derivation through naturalization of alien parent | 708 |
| 6. Derivation through naturalization of surviving parent | 708 |
| 7. Marriage to an alien—doctrine of fictional resumption | 709 |
| G. Conclusions and recommendations | 709 |

#### CHAPTER IV—WHO ARE NONCITIZEN NATIONALS

| | |
|---|---|
| A. Existing law and statistics | 714 |
| B. Conclusions and recommendations | 715 |

#### CHAPTER V—WHO MAY NOT BECOME CITIZENS

| | Page |
|---|---|
| A. Subversives | 716 |
| 1. Denial of naturalization | 716 |
| 2. Denaturalization | 723 |
| B. Deserters and draft evaders | 724 |
| C. Applicants for exemption from training and service | 725 |
| D. Alien enemies | 725 |
| 1. Procedure of an alien enemy in obtaining citizenship | 726 |
| 2. Investigation of alien enemies | 727 |
| 3. Court decision | 728 |
| 4. Statistics | 728 |
| E. Conclusions and recommendations | 729 |
| 1. Subversives | 729 |
| 2. Deserters and draft evaders | 730 |
| 3. Applicants for exemption from training and service | 731 |
| 4. Alien enemies | 731 |

#### CHAPTER VI—HOW TO BECOME A CITIZEN

| | |
|---|---|
| A. Declaration of intention | 732 |
| 1. Filing of declaration of intention | 733 |
| B. Petition for naturalization | 734 |
| 1. Residence | 734 |
| 2. Form of the petition | 734 |
| 3. Hearings | 735 |
| 4. Witnesses | 736 |
| 5. Investigations | 736 |
| 6. Final hearing | 737 |
| 7. Renunciation of hereditary title or order of nobility | 737 |
| 8. Certificate of naturalization | 738 |
| C. Proposals for changes in procedures | 738 |
| 1. Declaration of intention | 738 |
| 2. Witnesses | 738 |
| 3. Investigations | 739 |
| 4. Designated examiner system | 739 |
| 5. Final hearing | 741 |
| 6. Oath of allegiance | 741 |
| D. Conclusions and recommendations | 744 |

#### CHAPTER VII—HOW CITIZENSHIP MAY BE LOST

| | |
|---|---|
| A. By native-born and naturalized citizens | 747 |
| 1. Obtaining citizenship in a foreign state | 747 |
| 2. Taking an oath of allegiance to a foreign state | 748 |
| 3. Serving in foreign military forces | 749 |
| 4. Civilian employment in foreign state | 749 |
| 5. Voting in foreign elections | 750 |
| 6. Formal renunciation while in a foreign state | 750 |
| 7. Deserting armed forces in wartime | 751 |
| 8. Committing treason | 751 |
| 9. Making a formal written renunciation in the United States in time of war | 751 |
| 10. Departing from and remaining outside United States to avoid military service | 752 |
| 11. Presumptions | 752 |
| B. By naturalized citizens only | 753 |
| 1. Residence abroad | 753 |
| 2. Fraud or illegality in obtaining naturalization | 754 |
| C. Conclusions and recommendations | 766 |

CHAPTER VIII—HOW CITIZENSHIP MAY BE REGAINED

|  | Page |
|---|---|
| A. Women married to aliens | 770 |
| B. Children who have lost their nationality because of the loss of nationality of their parents | 771 |
| C. Children who have lost their nationality because of the denaturalization of their parents for reasons other than actual or presumptive fraud | 772 |
| D. Persons serving in foreign military service | 772 |
| E. Deserters from our armed forces in time of war | 773 |
| F. Statistics on persons regaining citizenship | 773 |
| G. Conclusions and recommendations | 773 |

CHAPTER IX—MISCELLANEOUS

| A. Miscellaneous provisions for establishing status of citizenship | 776 |
|---|---|
| 1. Loss of nationality in a foreign state | 776 |
| 2. Certificates of nationality issued by Secretary of State | 776 |
| B. Judicial proceedings for declaration of United States nationality under under certain conditions | 776 |
| C. Crimes and penalties | 777 |
| D. Fees | 780 |

PART 3

SUBVERSIVES

CHAPTER I—COMMUNISM AS AN ALIEN FORCE

|  | Page |
|---|---|
| A. Immigration problems | 781 |
| B. Alien control | 782 |

CHAPTER II—THE LAW

| A. Introduction | 788 |
|---|---|
| B. The exclusion of alien subversives | 789 |
| C. Deportation of subversive aliens | 781 |
| D. Exceptions to the immigration controls over subversive aliens | 791 |
| E. Additional controls over the alien subversives | 794 |
| F. Appraisal of existing law | 795 |
| G. Conclusions and recommendations | 798 |

## PART 4

### APPENDIXES

| | Page |
|---|---|
| Appendix I. Resolutions authorizing the Senate Committee on the Judiciary to investigate the immigration and naturalization systems of the United States | 803 |
| Appendix II. Synopsis of the principal recommendations for changes in the immigration and naturalization laws | 805 |
| Appendix III. Statistics on international migrations | 811 |
| Table 1. Estimated world Jewish population | 811 |
| Table 2. Number of Chinese residing abroad, 1922 | 811 |
| Table 3. Emigration from Japan by destination, 1885 to 1924 | 811 |
| Table 4. Asiatic Indians resident abroad, 1921 or later years | 812 |
| Table 5. Percentage composition of immigration to principal immigrant-receiving countries | 812 |
| Table 6. Immigrant arrivals in Canada, 1881 to 1946 | 812 |
| Table 7. Overseas migration to Australia, 1901 to 1930 | 813 |
| Table 8. Immigration to Brazil, by nationalities, 1884 to 1941 | 813 |
| Table 9. Overseas immigrants to Argentina, by nationality, number, and percent, 1857 to 1926 | 813 |
| Table 10. Argentina: Overseas immigrants and emigrants, and balance, by decades, 1857 to 1926 | 813 |
| Appendix IV. Sources of United States population | 814 |
| Table 1. Immigration to United States by selected countries, 1820 to 1947 | 814 |
| Table 2. Immigration by country, for decades, 1820 to 1949 | 814, 815, 816 |
| Table 3. Immigration to the United States by country, 1820 to 1947 | 817 |
| Table 4. Sources of immigration to the United States, distribution by percentages, 1820 to 1949 | 818 |
| Table 5. Immigration from northern and western Europe compared to immigration from southern and eastern Europe | 818 |
| Table 6. Quota immigrants admitted, fiscal year 1948 | 818 |
| Table 7. Quota immigrants admitted | 819, 820 |
| Table 8A. Immigration and foreign-born from all countries and from Western Hemisphere | 821 |
| Table 8B. Immigrants from the Western Hemisphere, by region of origin, fiscal years 1901 to 1949 | 821 |
| Table 9A. Nonquota immigration by class of admission, years ended June 30, 1925–48 | 821 |
| Table 9B. Comparison of quota and nonquota immigrants admitted from quota countries, years ended June 30, 1925–48 | 822 |
| Table 10. Arriving nonimmigrants, departing nonemigrants, and their relative numbers | 822 |
| Table 11. Nonimmigrant aliens admitted in years ended June 30, 1941, to June 30, 1948 | 822 |
| Table 12. Nonimmigrant aliens admitted under section 3 (1) and section 3 (7) of the Immigration Act of 1924, as amended, 1938 to 1949 | 823 |
| Table 13. Nonimmigrant aliens admitted as government officials, their families, attendants, servants, and employees under section 3 (1) of the Immigration Act of 1924, as amended, by country of last permanent residence, fiscal years 1938 to 1949 | 824 |
| Table 14. Nonimmigrant aliens admitted as members of international organizations under section 3 (7) of the Immigration Act of 1924, as amended, by country of last permanent residence, fiscal years 1946 to 1949 | 826 |
| Table 15. Alien crewmen arrived in and departed from the United States and United States citizens serving as crewmen on vessels boarded, fiscal years 1938 to 1949 | 826 |
| Table 16 Specified immigration activities at the land borders of United States, fiscal years 1938 to 1949 | 827 |

### APPENDIXES—Continued

| | Page |
|---|---|
| Appendix IV. Sources of United States population—Continued | |
| Table 17. Citizen passenger travel between continental United States (mainland) and outlying or insular possessions and between insular possessions, fiscal years 1938 to 1949 | 828 |
| Table 18. Alien passenger travel between continental United States (mainland) and outlying or insular possessions and between insular possessions, fiscal years 1938 to 1949 | 829 |
| Table 19. United States citizens admitted to and departed from the United States, fiscal years 1938 to 1949 | 830 |
| Table 20. Native-born United States citizens departed from the United States, by country of future permanent residence, fiscal years 1939 to 1948 | 830 |
| Table 21. Naturalized citizens permanently departed from the United States, by country of future permanent residence, fiscal years 1939 to 1948 | 831 |
| Table 22. Number of agricultural laborers in the United States on June 30, 1944 to 1949 | 831 |
| Appendix V. Statistics on commitments to prisons and jails | 832 |
| Table 1. Commitments, 1923 and 1910 | 832 |
| Table 2. Aliens received from the courts into Federal institutions by offense, fiscal years 1946 to 1948 | 832 |
| Table 3. Citizenship status of prisoners received from the courts into Federal institutions, fiscal years 1946 to 1948 | 833 |
| Table 4. Number of foreign-born white prisoners and juvenile delinquents committed in 1910 | 834 |
| Table 5. Commitments of foreign-born white prisoners, January 1–June 30, 1923 | 835 |
| Table 6. Foreign-born white prisoners received, by country of birth, for the United States | 836 |
| Table 7. Prisoners of foreign white stock received from courts, by country of origin and offense, 1933 | 837 |
| Table 8. Foreign-born white felony prisoners received from court, by country of birth, 1940, 1945, and 1946 | 838 |
| Table 9. Population, commitments, and ratio of commitments to population of foreign-born, by area, 1910, 1923, and 1933 | 838 |
| Appendix VI. Statistics on insanity and mental deficiency | 839 |
| Table 1. Aliens excluded from the United States, by principal causes, fiscal years 1939 to 1948 | 839 |
| Table 2. Number of aliens deported in 1948 because of mental and physical defects, by areas | 839 |
| Table 3. Resident patients at end of year in hospitals for permanent care of psychiatric patients, by type of control of hospital for the United States, 1937 to 1946 | 840 |
| Table 4. First admissions, with rates, historical, to hospitals for permanent care of psychiatric patients by type of control of hospital, for the United States, 1937 to 1946 | 840 |
| Table 5. Relative incidence of institutionalized mental patients in various European countries | 841 |
| Table 6. Rate of admissions to mental institutions in various European countries of the general population, age 15 and over, 1920 to 1934 | 841 |
| Table 7. Relative incidence of mental disease in various European countries as indicated by the rejection from military service because of nervous or mental disease | 841 |
| Appendix VII. Statistics on religious affiliation | 842 |
| Table 1A. World religion | 842 |
| Table 1B. World religion | 842 |
| Table 2. Religious bodies—denominations, by number of churches and by membership, 1926 and 1936 | 842, 843 |
| Table 3. Religious bodies—number of churches and membership | 844, 845 |
| Table 4. Religious bodies—value of church edifices, expenditures, and number and membership of Sunday schools, 1936 | 845, 846 |
| Table 5. Protestant religious bodies with memberships above 50,000 | 847 |

# CONTENTS

APPENDIXES—Continued

Appendix VII. Statistics on religious affiliation—Continued
Table 6. Protestant religious bodies with membership 10,000 to 50,000 — Page — 848
Table 7. Membership non-Protestant religious bodies in the United States — 849
Appendix VIII. Statistics on rural and urban population — 850
Table 1. Rural and urban population of the United States, 1790 to 1940 — 850
Table 2. Movement to and from farms, 1920 to 1939 — 850
Table 3. Total immigrant aliens admitted to the United States by State of intended future residence, fiscal years 1937 to 1946 — 851
Table 4. Immigrant aliens admitted by State of intended future residence, 1948 and 1949 — 851
Table 5. Immigrant aliens admitted to the United States, by specified classes by rural and urban area and city, fiscal year 1948 — 852
Table 6. Migration status and type of migration of the population, by urban-rural residence, color, and sex for the United States, civilian population, April 1947 — 853
Table 7. Migration status of the civilian population and type of last civilian move of the migrant, by veteran status, age, and sex, for the United States, August 1945 to October 1946 — 854
Pattern of migration — 855
Appendix IX. Statistics on occupation and employment — 856
Table 1. Persons 14 years old and over, by employment status, 1940 — 856
Table 2. Nonwhite population 14 years old and over, by employment status and race, 1940 — 856
Table 2A. Foreign-born persons 14 years and over, by occupations group, by States, 1940 — 857
Table 3. Percentage per occupation — 858
Table 4. Percentage of employment divisions by race and citizenship — 858
Table 5. Number and percent of total immigration of persons in selected occupational groupings by nationality, 1945, 1946, 1947 — 858
Appendix X. Enforcement agencies — 859
Table 1. Appropriations and authorized permanent positions, Immigration and Naturalization Service, fiscal years 1938 to 1950 — 859, 860
Table 2. Immigration and Naturalization Service authorized force, by employee groups and by location, fiscal year 1950 — 861
Table 3. Mobile equipment, Immigration and Naturalization Service — 862
Table 4. Radio-communications equipment, Immigration and Naturalization Service — 862
Table 5A. Comparative statistics on specified immigration and naturalization activities — 862, 863
Table 5B. Force and work-load inspection for admission into the United States — 863
Table 6. Force and work load, detention and deportation — 864
Table 7. Force and work load, investigating alien's status — 864
Table 8. Force and work load, naturalization — 865
Table 9. Force and work load, patrol for prevention and detection of illegal entry — 865
Table 10. Work load of the Board of Immigration Appeals, years 1943 to 1948 — 866
Table 11A. List of consular offices where visas are being issued on a full-time basis — 866, 867
Table 11B. List of consular offices where visa work is on a part-time basis — 867
Table 12. Income and sources thereof—of the Immigration and Naturalization Service, fiscal years 1939 to 1949 — 868
Table 13. Summary of the financial statement of the Immigration and Naturalization Service, fiscal years 1938 to 1949 — 869
Table 14. Allocation of funds of the Immigration and Naturalization Service, fiscal years 1949–51 — 869
Table 15. Estimates of annual rate cost for personal services of the Visa Division, fiscal years 1938 to 1949 — 869

APPENDIXES—Continued

Appendix XI. Excludable and deportable classes of aliens — Page — 870
Table 1. Aliens debarred and deported, fiscal years 1900 to 1947 — 870
Table 2. Writs of habeas corpus in exclusion and deportation cases, fiscal years 1940–49 — 870
Table 3. Aliens excluded from the United States, by cause, fiscal years 1940–49 — 871
Table 4. Aliens (statistical) debarred from entering the United States, by races or peoples, and sex, fiscal years 1935 to 1944 — 872
Table 5. Aliens deported from the United States, by cause, fiscal years 1908 to 1948 — 873, 874
Table 6. Aliens deported, by country, fiscal years 1924–49 — 875, 876
Table 7. Aliens deported from the United States, by country to which deported and cause, fiscal years 1939–48 — 877, 878, 879
Table 8. Aliens deported, by cause and country to which deported, fiscal year 1949 — 880
Table 9. Action under the seventh proviso to section 3 of the Immigration Act of 1917 — 880, 881, 882, 883
Table 10. Nonimmigrant aliens admitted under the Immigration Act of 1924, as amended, as government officials by country of last permanent residence, fiscal years 1946 to 1948 — 883
Table 11. Nonimmigrant aliens admitted under the Immigration Act of 1924, as amended, as international officials by country of last permanent residence, fiscal years 1946 to 1948 — 884
Table 12. Estimated number of registered alien enemies, classified by State of residence and country of citizenship, February 11, 1942, to January 31, 1944 — 885
Appendix XII. Admissible aliens and quotas — 886
Table 1. Apportionment of the white population of the United States by country of origin, 1920 — 886
Table 2. Quotas of countries under the various laws — 886, 887
Table 3. Quota and nonquota immigrants admitted to United States, fiscal years 1925–49 — 889
Table 4. Immigration and quotas — 889
Table 5. Used and unused quotas, 1930–49 — 890
Table 6. Percent of quotas used, by areas of origin, 1925–49 — 890
Table 7. Quotas assigned to certain areas, 1925–47 — 890
Table 8. Oversubscribed quotas — 891
Table 9. Demand for quota immigration visas, 1946–49 — 892
Table 10. Quota allocations under present and the recommended formulas — 893
Table 11. Number of nonquota immigrants admitted from quota countries, fiscal years 1925–49 — 894
Table 12. Aliens admitted by classes under the Immigration Act of 1924, as amended, fiscal years 1946–48 — 894
Table 13. Immigrant aliens admitted by classes under the immigration laws and country or region of birth, year ended June 30, 1949 — 895
Table 14. Aliens admitted as students under section 4 (e) of the Immigration Act of 1924, by countries of birth, fiscal years 1925–48 — 896, 897
Table 15. Comparison of foreign students in the United States from selected geographic areas, 1929–30 1939–40, and 1948–49 — 898
Table 16. Number of students referred for investigation for failure to depart from the United States, March 1, 1948, to February 28, 1949 — 898
Table 17. Nonimmigrant aliens admitted under section 3 (1) and section 3 (7) of the Immigration Act of 1924, as amended, fiscal years 1938 to 1948 — 898
Table 18. Nonimmigrant visas issued under certain sections of the Immigration Act of 1924, as amended, fiscal year 1948 (July 1947 through May 1948) — 899
Table 19. Nonimmigrant aliens admitted, by classes, under the Immigration Act of 1924, as amended, and country of birth, fiscal year 1948 and 1949 — 900
Table 20. Total visitors admitted, fiscal years 1926 to 1949 — 901

CONTENTS

APPENDIXES—Continued

| | Page |
|---|---|
| Appendix XII. Admissible aliens and quotas—Continued | |
| Table 21. Aliens admitted to the United States as temporary visitors under section 3 (2) of the Immigration Act of 1924, whose country of last permanent residence was Cuba, fiscal years ended June 30, 1942 to 1948 | 901 |
| Table 22. Transit aliens admitted to United States, fiscal years 1934–48 | 901 |
| Table 23. Transits admitted, by country of birth and by country of last permanent residence, fiscal year 1946–47 | 902 |
| Table 24. Transits admitted to and departed from the United States, July 1948 to March 1949 | 902 |
| Table 25. Number and status of transits in the United States, February and March 1949 | 903 |
| Table 26. List and history of the treaties of commerce and navigation at present in force | 903, 904 |
| Table 27. Nonimmigrant aliens admitted to the United States to carry on trade under treaty, by country of last permanent residence, fiscal years 1935–48 | 904, 905 |
| Table 28. Aliens deported on the ground that they remained in the United States after failing to maintain the status of treaty traders, fiscal years 1930–44 and November 1, 1947, to June 30, 1948 | 905 |
| Table 29. Nonimmigrant aliens admitted to the United States to carry on trade under treaty, fiscal years 1945–48 | 905 |
| Appendix XIII. Procedures and adjustments | 906 |
| Table 1. Cases legalized under section 19 (c) AR–670, approved June 28, 1940, Seventy-sixth Congress, fiscal years 1942–49 | 906 |
| Table 2. The number of preexamination cases processed, fiscal years 1935–48 | 907 |
| Table 3. Private immigration and naturalization bills introduced, January 3, 1939, to May 31, 1949 | 907, 908, 909, 910, 911, 912, 913, 914 |
| Table 4. Private immigration and naturalization bills introduced from January 3, 1939, to May 31, 1949 | 914 |
| Table 5. Private immigration and naturalization bills | 914 |
| Table 6. Man-days detention | 914 |
| Table 7. Comparative per capita costs of maintenance and detention, fiscal year 1949 | 915 |
| Table 8. Apprehensions, fiscal years 1940–49 | 915 |
| Appendix XIV. Nationality statistics | 916 |
| Table 1. Persons naturalized, by country of former allegiance, fiscal years 1939–48 | 916, 917 |
| Table 2. Persons naturalized, by country or region of birth and year of entry, fiscal year 1948 | 918 |
| Table 3. Percent of foreign-born white population of all ages naturalized and rank by country of origin, 1920–40 | 919 |
| Table 4. Number of aliens registered by country of birth, December 31, 1940; decrease through naturalization, January 1, 1941, to June 30, 1944 | 920 |
| Table 5. Aliens of enemy nationalities during World War II who have been naturalized, fiscal years January 1, 1941, to June 30, 1948 | 921 |
| Table 6. Persons naturalized, by sex and age, fiscal years 1940–48 | 921 |
| Table 7. Judgments of naturalization revoked, by grounds for revocation, fiscal years 1937–46 | 922 |
| Table 8. Cancellation of naturalization, fiscal years 1942–48 | 922 |
| Table 9. Number of persons losing nationality in the United States, by cause, fiscal years 1945–48 | 923 |
| Table 10. Petitions for naturalization denied, by reasons for denial, fiscal years 1944–48 | 923 |
| Table 11. Persons naturalized, classified by statutory provisions for naturalization, fiscal years 1945–48 | 924 |
| Table 12. Number of petitions for derivative certification, by year, and action taken on certificates, fiscal years 1941–48 | 924 |
| Table 13. Number of persons naturalized who had attended citizenship classes or who had been enrolled in home-study courses, fiscal years 1946–48 and June 1948–May 1949 | 924 |
| Table 14. Applications completed under section 326 (d) of the Nationality Code | 925 |
| Table 15. Expatriated persons, by grounds for expatriation, fiscal year 1948 | 925 |

| 81ST CONGRESS | SENATE | REPORT |
|---|---|---|
| 2d Session | | No. 1515 |

# THE IMMIGRATION AND NATURALIZATION SYSTEMS OF THE UNITED STATES

APRIL 20 (legislative day, MARCH 29). 1950.—Ordered to be printed with illustrations

Mr. McCARRAN, from the Committee on the Judiciary, submitted the following

# REPORT

[Pursuant to S. Res. 137]

## FOREWORD

### THE LAST INVESTIGATION

The last general investigation of our immigration system was made by the Congress beginning in 1907 and continuing until 1911. This investigation cost a little over $800,000 and necessitated the employment of over 200 persons. The executive and clerical force in Washington numbered 82 persons; 2 clerks were employed in New York, 2 in San Francisco; 92 agents were engaged in field work and 23 agents were employed in connection with various special lines of inquiry.

### SENATE RESOLUTION 137

On July 26, 1947, the Senate passed Senate Resolution 137 which directed "the Senate Committee on the Judiciary, or any duly authorized subcommittee thereof" to make a full and complete investigation of our entire immigration system. The resolution also provided for a specific study of the situation with respect to displaced persons in Europe and all aspects of the displaced persons problem.

Pursuant to subsequent resolutions of the Senate, the authority of the Committee on the Judiciary to conduct the general immigration investigation and to make the report was continued until March 1, 1950.[1] There was appropriated an aggregate expenditure of $235,000.

Pursuant to Senate Resolution 137, a special subcommittee of the Senate Committee on the Judiciary was appointed and a staff was organized.

[1] The text of S. Res. 137 of the 80th Cong., 1st sess., and its subsequent amendments appear in appendix 1, p. 803.

1

### DISPLACED-PERSONS INVESTIGATION

Before undertaking the study and investigation of the displaced-persons problem, for which priority was provided under the terms of Senate Resolution 137, the subcommittee staff began the task of assembling such background material as was readily available from Government agencies, reports, and other publications. This material consisted not only of information respecting displaced persons and our general immigration system, but also information with reference to the situation in the United States, insofar as the same should be pertinent to admission of displaced persons into the country. It was, however, deemed necessary to acquire first-hand information regarding the entire problem of immigration at the source, including the administrative processes abroad, such as the consular-office activities in processing applications for visas to enter the United States. The displaced-persons problem was considered to be of such magnitude as to render personal investigation of the various camps and centers in Europe advisable. Moreover, such a European investigation was urged by several Senators on the floor of the Senate. Accordingly, in the fall of 1947, three members of the subcommittee and four staff members made a European trip to obtain on-the-scene facts.

The subcommittee conducted investigations and took testimony in Paris, Frankfurt, Stuttgart, Berlin, Munich, Berchtesgaden, Vienna, Rome, Geneva, and London. The consular officials in Paris, Frankfurt, Stuttgart, Berlin, Munich, Vienna, and Rome were interviewed for information concerning the phases of immigration administered by them, including the special problems connected with resettlement of displaced persons. Displaced-persons camps and centers were visited and inspected, and testimony of camp officials and displaced persons was taken. Military government officials in Germany and Austria were interviewed, as were the officials of the Preparatory Commission for the International Refugee Organization at its headquarters in Geneva. A mass of documentary information was acquired.

### DISPLACED PERSONS ACT

On March 2, 1948, the Senate Committee on the Judiciary filed with the Senate its report (S. Rept. No. 950) on displaced persons in Europe, together with its proposed bill (S. 2242) for the admission of displaced persons into this country.

S. 2242, with amendments, was passed by the Senate on June 2, 1948. The House of Representatives passed a substitute measure on June 11, 1948, and thereafter the bill was sent to conference. The conference report was agreed to by the House of Representatives on June 18, 1948, and by the Senate on June 19, 1948. The bill, entitled "The Displaced Persons Act of 1948," was signed by the President on June 25, 1948, and became Public Law 774 of the Eightieth Congress.

During the first session of the Eighty-first Congress, there were referred to the Senate Committee on the Judiciary numerous bills to amend the Displaced Persons Act of 1948. These bills presented several complicated and controversial issues. A special subcommittee was appointed to consider displaced-persons legislation and many hearings were held in which testimony was received on the various

issues. In addition, during the fall of 1949, the chairman of the subcommittee made a European trip to investigate the administration of the displaced-persons program and to acquire additional factual material bearing on the issues which had been presented by the proposed amendments to the Displaced Persons Act of 1948.

### WORK OF STANDING SUBCOMMITTEE

It was apparent that extensive investigation with regard to the general immigration system was not feasible during the initial subcommittee work for the following reasons: (1) The priority which was given to the study and investigation of the displaced-persons problem, (2) the need to develop background material before undertaking such investigation, and (3) the unprecedented volume of immigration and naturalization work which was assigned to the standing immigration subcommittee and which required the use of the staff members of the investigating subcommittee.

### GENERAL INVESTIGATIONS

Beginning July 7, 1948, pursuant to direction of the special subcommittee, extensive transcribed inquiries were held both in Washington and during the course of various field trips made by staff members. The inquiries in Washington consisted of three series which were conducted simultaneously. The first series consisted of an examination of the officials and employees of the various divisions of the Immigration and Naturalization Service. The second series consisted of an examination of the officials and employees of the Visa Division of the Department of State and other governmental agencies whose activities relate to the immigration and naturalization systems. The third series consisted of the statements of representatives of various interested nongovernmental organizations. In addition, there was acquired a great volume of reports, exhibits, and statistical data.

### FIELD INVESTIGATIONS

A great deal of information was also acquired as a result of the field investigations made by the subcommittee and staff members. Field investigations were made in Europe and in the following areas in the Western Hemisphere: (1) West coast; (2) Mexican border; (3) New Orleans, La., Miami, Fla., and Habana, Cuba; (4) New York area; and (5) Canadian border (Montreal, Quebec, Windsor, and Detroit). Staff members who investigated the west coast and Mexican border areas also made stops at intervals throughout the Middle West, where statements were taken at district offices of the Immigration and Naturalization Service. Between 300 and 400 persons, representatives of private organizations and officials of the Immigration and Naturalization Service field offices, appeared and made statements which were taken down and transcribed into a written record.

To assist the subcommittee in its coverage of the various facets of the immigration and naturalization systems, the Immigration and Naturalization Service was requested to ask all field officers to submit appraisals of and suggestions for improving our present immigration and naturalization laws and procedures. As a result, memoranda

were received by the subcommittee from more than 100 field officers of the Immigration and Naturalization Service. The appraisals and suggestions contained in these memoranda cover a broad area and contain much factual material.

The Visa Division of the Department of State was, in like manner, requested to secure from its various consular officers an appraisal of, and suggestions for, improvements in our immigration and naturalization laws and procedures. Much valuable information and well-considered suggestions have also come from this source.

### OMNIBUS BILL

The pattern of our present immigration system is established not only by 2 comprehensive immigration laws which are still in effect, but by over 200 additional legislative enactments. In addition, there have been a number of treaties, Executive orders, proclamations, and a great many rules, regulations, and operations instructions. The immigration laws are, moreover, so closely intertwined with the naturalization laws that it is essential for the two sets of laws to be considered together.

The subcommittee concluded early in its study that it would be unwise and impracticable to submit the proposed changes in the form of numerous amendments to the patchwork of our present immigration and naturalization laws. It was, therefore, decided to draft one complete omnibus bill which would embody all of the immigration and naturalization laws. A summary of the proposed changes in the immigration and naturalization laws appears in appendix II, p. 805.

PART 1

# THE IMMIGRATION SYSTEM

# CHAPTER I

## BACKGROUND

### A. RACES AND PEOPLES OF THE WORLD

#### 1. INTRODUCTION

This section deals primarily with the principal races and peoples of the world today—their background, location, numbers, characteristics, and customs. Consideration will also be given to the questions of natural resources and population problems in their relationship to the various races and peoples to be discussed. A detailed study of races and peoples in the United States appears in chapter II, page 80.

#### 2. CLASSIFICATION OF RACES

Any discussion of race is handicapped by four points of obscurity.[1] In the first place, there exists no very clear idea in the minds of many as to what constitutes race. Furthermore, the marks of differentiation which serve to set off one race from another are often vaguely presented. In the third place, there seems to be little, if any, reliable knowledge concerning the number and origin of races. And, finally, geographical location of races is not always clearly defined.

The oldest grouping of mankind, still in popular use, is that of skin color.[2] It is supposed that the various degrees in pigmentation of the human skin are due to the effects of environment, either to sunlight or to humidity, or to a combination of the two. As a general rule, the darkest skins are found in tropical regions, while the fairest occur in the temperate climate of western Europe.

Blumenbach, writing in 1775, coined the word "Caucasian," and established a fivefold classification of races: (1) Caucasian or white race, (2) Mongolian or yellow race, (3) Ethiopian or black race, (4) American Indian or red race, and (5) Malayan or brown race.[3] Blumenbach's classification is quite commonly used in studies dealing with the subject of races and peoples and will be so employed here.

#### 3. LOCATION AND NUMBERS

Total world population as of 1949 is shown as approximately 2,265,000,000. Of this total, Asia contains nearly 1,200,000,000, Europe over 380,000,000, North America over 192,000,000, Africa over 175,000,000, South America over 101,000,000, and Oceania over 23,000,000. The totals for Asia and Europe do not include the population for the U. S. S. R., which is over 211,000,000.[4]

Maurice S. White, writing in 1942, essayed a racial division of the world's population. Using the figure of 2,000,000,000 for the total population of the world, he indicated a racial distribution as follows: White race, 1,020,000,000, yellow race, 740,000,000, black race, 160,000,000, brown race, 50,000,000, and red race, 30,000,000.[5]

[1] See Encyclopedia Americana, 1937, vol. 23, p. 107.
[2] See Encyclopedia Britannica, 14th Ed. (1929), vol. 18, p. 165.
[3] H. G. Duncan, Race and Population Problems (1929), p. 49.
[4] World Almanac, 1949, p. 544.
[5] Maurice S. White, The Races of Mankind (1942), p. 25.

Geographically, the various races may be located as follows: White race, principally in Europe, the Americas, and Australia, with substantial numbers in southern Asia and northern Africa; yellow race, chiefly in Asia; black race, largely in Africa; brown race, Malay Peninsula and Archipelago; and red race, North America and South America.

### 4. THE WHITE RACE

#### a. Location

The Continent of Europe may be considered as the center of population for the Caucasian or white race. Virtually all of Europe's people, except the Finns, Magyars, and Turks, are Caucasian. Large areas outlying and partially surrounding the Continent also contain great numbers of the white race. Over 200,000,000 of India's population are white, as are substantial numbers of the population of southwestern Asiatic countries and the countries of northern Africa bordering the Mediterranean. Across the Atlantic, are the white populations of North and South America, while in the Pacific, is the continent of Australia with its population of European white stock.

#### b. Divisions

The three principal divisions of the white race are the Teutonic, the Latin, and the Slavic. Other groups include the Iranic, Celtic, Hellenic, Arabic, Illyric, Lettic, Chaldaic, Caucasic, Armenic, and Euskaric. There is some degree of overlapping among the different groupings. Also, some of the minor groups are frequently included under one of the larger divisions.[6]

##### (1) The Teutonic group

The chief peoples embraced in the Teutonic group are the English, German, Scandinavian, Austrian, Dutch, and Flemish. These peoples are found chiefly in the countries of northwestern Europe, North America, and Australia. As a group, they tend toward fair and blond coloring.

##### (2) The Latin group

The Latin group embraces principally the people living in the vicinity of the Mediterranean Sea, including the French, Italians, Spanish, Portuguese, and Rumanians. The majority of the settlers of Mexico, Central America, and South America are also of the Latin group. The Greeks are sometimes included in this group, although the designation *Hellenic* is used specifically with reference to them. As a whole, the Latin group tends toward darker and brunette coloring.

##### (3) The Slavic group

The Slavic group is located chiefly in eastern Europe, in southeastern Europe, and in the Balkan area. The two principal elements in this group are the Russians and the Poles. The Czechs, Slovaks, Yugoslavs, and Bulgarians (in part) are other component parts of the Slavic group. As to physical characteristics, there is a wide degree of variation in this group.

##### (4) Other groups

The Celtic group consists mainly of the people of Ireland, Scotland, and Wales. The Arabic and Chaldaic groups consist of Semitic peoples, while the Iranic group embraces the white population of India.

[6] See H. G. Duncan, Immigration and Assimilation (1933), pp. 25 ff.

#### c. Language

The principal language family of the white race is the Aryan, which embraces the Indic, Slavic, Germanic, Romance, English, Iranic, Baltic, Celtic, and other tongues. Of these various languages, English has become widespread and is used quite extensively throughout the world. It is today the principal language of world communications.

#### d. Religion

More members of the white race adhere to the Christian religion, either to Protestantism or Catholicism, than adhere to any other religion. Substantial numbers, however, embrace other religious faiths, such as Mohammedanism, Hinduism, and Judaism.

Of those who adhere to Christianity, the majority are found in Europe, North America, and South America. North America has a predominance of Protestants, while South America is largely Catholic. Europe contains large numbers of both Catholics and Protestants, with roughly, a 4 to 1 ratio in favor of the Catholics. Australia is largely Protestant.

The major portion of the Jewish group is located in Europe, Israel, and North America. Those in North America are found principally in the United States. Smaller numbers of Jews are found in Asia and Africa.[7]

The Moslems are located chiefly in Asia and Africa, with a relatively small number in southeastern Europe, while practically all the Hindus are found in India.

### 5. THE YELLOW RACE

#### a. Location

The Mongolian or yellow race is the second most numerous of the five great races of the world, numbering approximately 750,000,000 persons. The great majority of the members of this race are to be found on the continent of Asia and on various adjacent islands, although substantial numbers are located elsewhere. China contains the bulk of the Mongolian race, while Japan, India, Indochina, Burma, and other contiguous areas contain most of the remainder.

#### b. Divisions

The two principal divisions of the Mongolian race are the Sinitic and the Sibiric. The Sinitic branch includes the people of China and Indochina, and contains between 500,000,000 and 600,000,000 persons.

The Sibiric branch is centered in Japan and Korea, with offshoots in such countries as Finland, Hungary, Turkey, and Bulgaria. It must be remembered, however, that, although some of the ancestors of peoples such as the Hungarian and Bulgarian were of Mongol origin, the present population has undergone drastic changes by the assimilation and merger with the natives and with successive waves of invaders and conquerors. Thus, actually, these have acquired, in general, European and Caucasian characteristics and the Mongol racial component has frequently disappeared.

Physical characteristics of the Mongolian race are the yellowish skin, slanting eyes, straight black hair, and prominent cheek bones.

#### c. Language

Numerous dialects and tongues are spoken by peoples of the yellow race, ranging from the monosyllabic dialects of the Sinitic branch to

[7] For detailed statistics on world Jewish population, see ch. II, p. 154.

the agglutinative speech of the Sibiric peoples. The speech of the Turks, Magyars, and Finns is more closely related to the Japanese than to the Chinese.[8]

### d. Religion

A number of religious beliefs and practices are embraced by the yellow race. Among the faiths which have a wide following are Buddhism, Taoism, Mohammedanism, Confucianism, and Shintoism. More recently, through the efforts of missionaries, the Christian religion has been introduced to the Mongolian peoples and has had some degree of acceptance.

### 6. THE BLACK RACE

### a. Location

Ranking next to the Caucasian and Mongolian races numerically is the Ethiopian or black race, which contains an estimated 160,000,000 persons. The black race is located principally within the continent of Africa, although substantial numbers are to be found in other areas, such as equatorial South America, the United States, and in the East and West Indies. Most of the basic stock of American Negroes came originally from west Africa. As of 1940, approximately 13,000,000 Negroes were living in the United States. Most of these are the descendants of Negro slaves brought to this country during the seventeenth, eighteenth, and nineteenth centuries, although there is today a small amount of Negro immigration, principally from the West Indies.

### b. Tribal divisions

The Negroes of Africa are divided into numerous tribes, each of which has differentiating physical characteristics. The principal tribes are the Bantas, Pygmies, Bushmen, Hottentots, Kaffirs, Sudanese, and Zulus. The Negro has also mixed with other races and peoples, thereby creating crossed racial types.

### c. Language

The various primitive tribes in Africa have developed their own individual dialects. Virtually all the Negroes in the United States speak the English language. West Indian Negroes speak a mixed dialect formed partially from the language of the European settlers of that area.

### d. Religion

Most of the native African blacks practice their pagan rituals and ceremonies, which have been modified to some degree by contact with Caucasian peoples. Some Negroes have taken upon themselves the religion of peoples living in the northern sections of Africa where Mohammedanism prevails. Protestant, Catholic, and Jewish faiths also have numerous adherents, especially in those areas which have been in direct contact with European nations over a long period of time. In the United States the Negro has adopted the various religious beliefs of his white countrymen.

[8] U. S. Immigration Commission, Dictionary of Races or Peoples (1911), p. 98

### 7. THE BROWN RACE

### a. Location

The Malayan or brown race is, with the exception of the red race, numerically the smallest of the major races. Numbering perhaps 50,000,000 or more, it is located chiefly in the Malay Peninsula and Archipelago and in certain areas of Indochina.

### b. Language

While many consider the Malayan group to be a branch of the Mongolian race, it bears numerous divergences from the latter. Much different from the yellow race culturally, the Malays are physically closer to the Mongolians than to any other of the major races. Linguistically, however, they have their own native dialects and tongues. Contacts with western nations have resulted in alterations in the original language. French and Spanish influence is especially obvious.

### c. Religion

Many of the native tribes still cling to primitive rituals and ceremonies. In certain areas, Buddhism and Mohammedanism have numerous adherents and, within comparatively recent times, through missionary activities, Christianity has made headway, especially in the Philippines. The vast majority of the Filipinos are Christian, chiefly Roman Catholic.

### 8. THE RED RACE

### a. Location

The Indian or red race is the smallest of the major races of the world. This race consists almost entirely of the native peoples of North, Central, and South America. While accurate statistics as to numbers are difficult to obtain, there are probably at least 30,000,000 members of the race, most of whom live in South and Central America. The number in the United States at the present time probably does not exceed 400,000, although the total was doubtless much greater before the coming of the European colonists and settlers. A large percentage of the Indians in the United States now lives on Government reservations.

### b. Divisions

The United States Census indicates numerous divisions of the Indian population in this country, such as Algonquin, Athapaskan, Iroquois, Muskhogees, Shoshones, and Sioux. Each of these larger divisions contains numerous smaller groups or tribes. The Mayas, Incas, and Aztecs initially inhabited areas in Mexico and South America.

The languages and dialects of the various divisions are numerous, although there is some degree of similarity among the different tribal dialects within a single division.

Intermarriage between the Indian and other racial groups has produced a variety of crossed racial types, especially in Mexico and South America. Intermixture is so far advanced in South America that classification of individuals by race is difficult. Many of the tribal Indians live in the interior in isolated and inaccessible groups, so that accurate enumeration is practically impossible. Cook states that in the United States and Canada, "the red men are rapidly approaching total amalgamation with the numerically preponderant

white race," except for certain tribes artificially segregated on reservations.[9]

## 9. WORLD PROBLEMS OF POPULATION AND NATURAL RESOURCES [10]

### a. Population growth

World population has had its most rapid rate of growth since the time of the industrial revolution. The impact of the technological changes of the industrial revolution was global in scope.[11]

Between 1650 and 1750 the rate of growth of the world's population was 0.29 percent per year. From 1750 to 1800 the annual rate increased to 0.44 percent. This progressive increase has continued throughout the entire period from 1650 to the present time. In the most recent period it has been at 0.75 percent, a rate that would double the population every 92 years.[12] Should there be a corresponding rate of increase in global population such as that rate of increase which prevailed between 1900 and 1940, the earth would contain over 21,000,000,000 inhabitants by the year 2240.

Of the two factors of population growth, fertility, and mortality, the decreasing mortality rate appears to be by far the more important factor in the unprecedented growth of modern times. In countries where industrial development and population growth have been most rapid, birth rates show a tendency to decline, especially in more recent times. In the more primitive societies, where modern civilization has penetrated but slightly, birth rates are generally high.[13]

Thompson divides the world's population into three groups: Group I, consisting of 21 percent, has natality and mortality under control; group II, comprising 21 percent, is in the process of bringing natality and mortality under control; group III, containing 58 percent, has neither natality nor mortality under "reasonably sure control."[14]

Crude birth rates tend to be especially low in the industrialized countries of northwestern and central Europe and only a little higher in the United States, Canada, Australia, and New Zealand. Considerably higher but rapidly declining rates are found in southeastern Europe, the Union of Soviet Socialist Republics, and Japan. Exceedingly high and as yet unchanging birth rates are found in the less industrialized, agrarian countries of the Orient.[15]

Thompson states that it is quite probable that southeastern Asia and China will go on increasing for some time after practically all European peoples, except in the Soviet Union and those in certain parts of Central and South America and Africa, have ceased to grow.[16]

### b. Population age

The population of western civilization is aging and has been for the past 100 years. In all the major European nations and in the United

[9] S. F. Cook, European Contact With Primitive Peoples, Annals, American Academy of Political and Social Science, January 1945, p. 110.
[10] For detailed study of problems of population and natural resources in the United States, see ch. II, p. 80.
[11] Kingsley Davis, The World Demographic Transition, Annals, American Academy of Political and Social Science, January 1945, p. 1.
[12] Ibid., p. 3.
[13] Warren S. Thompson, Population Problems (1942), pp. 151–156.
[14] Joseph J. Spengler, Population and Per Capita Income, Annals, American Academy of Political and Social Science, January 1945, p. 182.
[15] P. K. Whelpton and Clyde V. Kiser, Trends, Determinants, and Control in Human Fertility, Annals, American Academy of Political and Social Science, January 1945, p. 112.
[16] Warren S. Thompson, Population Prospects for China and Southeastern Asia, Annals, American Academy of Political and Social Science, January 1945, p. 79.

States, this situation apparently is to prevail for some time to come. If the present trend in this country continues during the next 30 years, the proportion of children under 15 will drop from 25 to 21 percent, while the percentage of men and women over 65 will rise from 7 to 10 percent. The Office of Population Research estimates that the proportion of children under 15 years old in Europe and the Soviet Union will fall from 29 percent in 1940 to 21 percent in 1970, while the percentage of adults 65 years old and over will increase from 6 to almost 10 percent.

Other areas of the world which show a trend toward an older population are the British dominions of Canada, Union of South Africa, and Australia.[17]

In Asia, Central and South America, and Africa, however, a much younger population is indicated. Inability to secure complete and accurate census data in these areas makes definite predictions difficult, but any future trend similar to the present trend in Europe and the United States will depend in part, at least, upon economic developments and social and cultural changes.

### c. Population and natural resources

Up to a certain point, population growth serves to provide a larger market for goods and services, and to make possible a greater degree of division of labor and specialization. While it is impossible to state definitely what the optimum population should be for a particular country or area, it is clear that, from the standpoint of the economic well being of their inhabitants, certain nations of the world have already exceeded their optimum population. Such a situation tends to reduce per capita income and endangers future income by hastening the depletion of natural resources.

If man were able to free his productive activities from the restraints imposed by land and most natural resources, he would be free of a considerable part of the depressive effect of population growth upon per capita income and living standard.[18] Increased technology and inventiveness have, to some extent, provided a counterbalance, but nature still plays the principal role in the determining of man's economic status.

Spengler[19] suggests that per capita income can be increased by gradual redistribution of the working population of the world with regard to employment by removing a percentage of those now engaged in primary industry (agriculture) and placing them in other industries. Technological knowledge, equipment, and proper organization would provide the same agricultural output with the decreased number of persons in the industry. However, even this shift would be of little, if any, benefit unless population growth is brought under control.

It cannot be denied that the existence of an inequitable population distribution in relation to natural resources is a poignant and perplexing problem and one which will continue to engage the faculties of mankind in the future as it has in the past. Effecting a greater equalization of the distribution of the world's population in proportion to economic resources by means of migration would appear to be

[17] John D. Durand, The Trend Toward an Older Population, Annals, American Academy of Political and Social Science, January 1945, pp. 144–145.
[18] Joseph J. Spengler, Population and Per Capita Income, Annals, American Academy of Political and Social Science, January 1945, p. 191.
[19] Ibid., p. 191.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 18 of 101 PageID #:657

practically impossible as long as the most seriously overpopulated areas are characterized by high and generally rising rates of natural increase.[20]

Recently there has been an increasing trend toward creating new opportunities in undeveloped and underdeveloped areas within various nations. This policy tends to bring about the spontaneous and free movement of individuals in response to new economic opportunities and thus assists in the promoting of sound redistribution of population. Many highly overpopulated countries have vast areas available for such development and reclamation—areas which can be made to contain and support substantial increases in population.

## B. International Migrations

### 1. introduction

This section is principally an examination of the chief modern migratory movements—that is, international migrations of the nineteenth and twentieth centuries. Some prefatory statements are made by way of supplying a brief background for the main thesis. These include a summation of the types and causes of migration, as well as a listing of some of the early migratory periods.

### 2. migration defined

The term "migration" is much broader in scope than are the related terms "immigration" and "emigration." Whereas the latter terms are used exclusively with reference to the movements of *peop'e* from one geographic location to another, migration may be applied to the movement, not only of man, but also of birds, fishes, and other lower forms of animal life. Moreover, whereas migration denotes any change of abode, immigration and emigration imply the movement of human beings *from one country to another, with the end in view of a permanent change of residence.*[21]

For the purpose of this section, the term "migration" will be used in connection with *human population movements only.*

### 3. types of population movements

In his book Immigration, H. P. Fairchild[22] classifies "migration" as follows:

1. *Invasion* or the mass movement of a more primitive group or tribe into territory occupied by a more highly developed group. Examples of this type of population movement are the invasions of the Goths, Vandals, and Huns from Asia into Europe. (Donald R. Taft concludes that, whereas invasion ordinarily involves warfare, immigration, though sometimes producing friction, is peaceful.)[23]

2. *Conquest* may be considered as the opposite of invasion, that is, the movement of a more highly cultured group into the territory occupied by a more primitive type of people. After completion of the conquest, the culture of the conquering group may be imposed upon or voluntarily adopted by the conquered people.

3. *Colonization*, while a peaceful movement, may follow conquest. In colonization, we usually find a movement of individuals from a well-established nation to territory under its political control. The settlement of the Thirteen American Colonies is a typical example of colonization.

4. *Immigration* is the voluntary movement of individuals, or groups of individuals, from one country to another, with the intention of residing there permanently. But, whereas colonization is ordinarily a sponsored state enterprise, immigration is the result of the decision of the individual, without official support from the state.

### 4. causes of migration

The causes of migration have been variously treated by different authorities. The following classification is as appropriate as any for the purpose of analysis of the problem.

*a. Economic*

This is undoubtedly the chief reason for the various migrations of history. When a tribe of people is economically stable, when its standard of living is adequate, then migration is of little consequence. But with economic adversity, overpopulation, and related conditions occasioned by and accompanying these situations, migration becomes a paramount issue. This is true not only with regard to international migration but to internal migration as well.

Fairchild[24] states that the countries which have sent out large contingents of emigrants or have allowed them to leave, have been those which were or seemed to be overpopulated. These groups are ordinarily received by countries of "underpopulation." While countries which are underpopulated may be able to absorb migrant groups for a period of time, the situation may at last arise wherein the economic condition of the receiving countries will not warrant further immigration or will, at least, require a greatly reduced or restricted immigration.

*b. Religious*

The desire to escape religious persecution or discrimination has been another factor in causing population movements. The early settlement of America was in part the result of the migration of dissenting religious groups from Europe. Various Jewish migrations have been occasioned by religious harassment.

*c. Political*

Dissatisfaction of individuals or groups with the prevailing political conditions may be sufficient to induce them to migrate elsewhere in the hope of securing a greater degree of political freedom, and fewer infringements by the governing body.

*d. Social*

Frequently there exist within a country social conditions which operate to the detriment of a particular class or group. This situation often creates such a feeling of desperation as to bring about a general desire on the part of the group or of segments of the group to migrate to a state where the social conditions are more equitable.

---

20 Frank Lorimer, Issues of Population Policy, Annals, American Academy of Political and Social Science, January 1945, p. 195.
21 Maurice R. Davie, World Immigration (1936), pp. 7 ff.
22 H. P. Fairchild, Immigration (1933), pp. 13–29.
23 Donald R. Taft, Human Migration (1936), p. 51.

24 H. P. Fairchild, Internal Migration, Annals, American Academy of Political and Social Science, November 1936, p. 291.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 19 of 101 PageID #:658

In any actual case of migration it is probable that the motives therefor will be due to a combination of causes, rather than to one single cause.

##### 5. EARLY MIGRATIONS OF HISTORY

Ellsworth Huntington and J. C. Curry[25] list six principal periods of early migration. A prior consideration of these early wanderings of man is not essential to an intelligent appraisal of the more recent international migrations ushered in by the voyages of discovery of the fifteenth and sixteenth centuries, especially of those migrations of the post Napoleonic Wars era, but merely serves to keep the historical record in order. Chronologically, the six early periods are:

First period: Just preceding 2000 B. C.
Second period: 2000 to 1000 B. C.
Third period: 1000 to 600 B. C.
Fourth period: Just after 200 B. C.
Fifth period: 250 to 650 A. D.
Sixth period: Eleventh, twelfth, and thirteenth centuries.

These early periods of population movement were largely group or tribal movements. In this respect, they differed decidedly from modern migrations, which have been for the most part, individual or family movements. Whereas the early movements were principally overland or across land-locked seas, the modern migratory era has been characterized by trans-oceanic movements.

##### 6. MODERN INTERNATIONAL MIGRATIONS

The voyages of discovery in the fifteenth and sixteenth centuries ushered in the so-called "modern" era of international migrations. Oceans, which heretofore had acted as barriers, now became highways of world travel. The chief source of the migratory movements of this period was the Continent of Europe. As an indication of the tremendous size and scope of migrations from Europe during this era, Willcox stated in 1931 that—

today one-eleventh of the earth's population consists of Europeans by blood who are living outside of that Continent. There are between one and a half and two times as many such European folk living elsewhere as there were living in Europe in the seventeenth century.

He further commented that—

of all the Europeans now living elsewhere, three-fifths are in the United States.[26]

A more recent authority remarked that approximately one-fifth of the world's population in 1650 was European, whereas, in 1948—

if people of European descent in the New World are included, Europeans * * * are one-third of the world's population, which is almost twice as great a proportion as in 1650.[27]

The principal European nations to engage in the early voyages of exploration and discovery during the fifteenth and sixteenth centuries were the English, French, Spanish, and Portuguese. The greatest population movements have, however, been those of the Anglo-Saxons and Germans.

The new form of movement following the period of discovery may be treated in two phases: Colonization and immigration.

Colonization is characterized by a *movement of population* and an *extension of political power*.[28] The colonizing nation sends its people into new lands for the purpose of settlement. The most important period of colonial expansion was during the seventeenth and eighteenth centuries. Australia, the Americas, and portions of other continents, as well as many island bodies, underwent varying degrees of transformation at the hands of the European colonists.

Immigration is the most recent of the modern migratory movements, and "is mainly intercontinental and a phenomenon of the nineteenth and twentieth centuries."[29] It has been of much greater significance, as far as numbers are concerned, than the colonization of the sixteenth, seventeenth, and eighteenth centuries.

The great migrations of 1820 to 1925 included the colonization of Australia and New Zealand, the strengthening of European dominion over South Africa, South America, and India, the settlement of western United States and Canada, the establishment of European colonies in tropical Africa, and the founding of commercial settlements in the Orient.[30]

The principal sources of intercontinental migration during this period by country have been British Isles, 33.7 percent; Italy, 18.8 percent; Austria-Hungary, 9.8 percent; Germany, 9.2 percent; Spain, 8.6 percent; Russia, 4.2 percent; Portugal, 3.4 percent; Sweden, 2.2 percent; India, 2.2 percent; and others 7.9 percent.[31]

*a. European migration: Intercontinental*

As has been previously mentioned, the chief source of modern migration has been the continent of Europe. As a result, the populations of three of the more recently settled continents—North America, South America, and Australia—are largely of European origin.

It is estimated that there was a total recorded European migration of some 63.5 million persons during the period 1820 to 1931, or an average of some 575,000 annually.[32] A large percentage of those migrants entered the United States. Of a total immigration to the United States of over 38.5 million persons since 1820, nearly 33 million were from European countries. Other important countries of reception of European emigrants are Canada, Argentina, Brazil, Australia, New Zealand, and South Africa.

In the first half of the nineteenth century, the greatest emigration from European countries was from the British Isles, Germany, Scandinavia, and France. During this period, European migrants were predominantly Teutonic and Protestant. Emigration from this section of Europe reached a peak about 1880, after which a general decline set in.

Following 1880, the principal emigrant countries of Europe were those of the southern and eastern sections of the Continent. Such countries as Italy, Russia, and Austria-Hungary became the chief contributors to Europe's migrant stream. The large majority of these emigrants were Latin, Slavic, and Semitic, rather than Teutonic; and Catholic, Orthodox, and Jewish, rather than Protestant. The United States continued to be the principal country of destination. A combination of causes, principally economic, was responsible for the great exodus from this part of Europe. Total immigration to the United

25 H. G. Duncan, Immigration and Assimilation (1933), pp. 17 ff.
26 Walter F. Willcox, International Migrations, vol. II (1931), p. 30.
27 National Committee on Immigration Policy, International Migration and One World (1948), p. 8.

28 See M. R. Davie, World Immigration (1936), pp. 3 ff.
29 Ibid., p. 8.
30 J. W. Gregory, Human Migration and the Future (1928), p. 18.
31 National Committee on Immigration Policy, International Migration and One World (1948), p. 32.
32 D. R. Taft, Human Migration (1936), p. 55

States from this area, during the period 1820 to 1930, was 13,944,454. Probably 200,000 additional from this area have entered the United States since 1930.

### (1) British Isles

Some 24,000,000 people emigrated from the British Isles between 1815 and 1930, of whom about 9,000,000 came to the United States. Approximately 3,000,000 went to Canada, while Australia, New Zealand, and South Africa received substantial numbers. A listing of nationalities emigrating from the British Isles, by numerical importance, finds the Irish first, followed by the English, Scotch, and Welsh.

Various motives for this emigration may be mentioned, such as the industrial revolution, agricultural depression (in particular, the Irish potato famine), and government advocacy and encouragement of emigration. The factor of religious discontent should also not be overlooked.

### (2) Germany

Between 1820 and 1930, approximately 90 percent of all overseas migration from Germany was destined to the United States. A total of nearly 6,000,000 persons migrated from Germany to the United States during this period, while Canada, Brazil, Argentina, Australia, and Africa received small percentages of German emigrants. The factors chiefly responsible for German emigration are quite similar in nature to those mentioned above with respect to the British Isles—economic, political, social, and religious. In fact, these motives, either singly or in combination, may usually be found to underlie emigration from all of the various countries to be examined.

### (3) Scandinavia

Of the Scandinavian countries, Sweden supplied over 50 percent of the total of some 2,500,000 emigrants from this area during the period 1820 to 1930. Approximately one-third of the total number of Scandinavian emigrants came from Norway, while Denmark supplied less than one-sixth of the total. It is estimated that—

almost 98 percent of the Swedish emigrants, about 96 percent of the Norwegians, and 88 percent of the Danes have had the United States as their destination.[33]

Canada has been the second choice of emigrants from these countries.

### (4) France

Emigration from France is not nor has it generally been regarded as an economic necessity. In fact, in comparatively recent times, France became an immigrant receiving country rather than an emigrant country. Fairly stable economic conditions plus a very low birth rate have been largely responsible for this fact. Of the somewhat more than a million total French emigrants during the period from 1820 to 1930, the majority (582,375) came to the United States.[34] Argentina, Brazil, Canada, Australia, Uruguay, Cuba, and Mexico have received lesser numbers of French migrants.

### (5) Switzerland, Netherlands, and Belgium

Emigration from these three countries has been relatively slight. A combined total of slightly more than 700,000 emigrants of Swiss, Dutch, and Belgian origin have come to the United States since 1820,

[33] M. R. Davie, World Immigration (1936), p. 73.
[34] Ibid., pp. 75–76.

with decidedly smaller numbers going to Canada, South America, Australia, and Africa.

### (6) Italy

European migration following 1880 shifted to southern and eastern Europe.

The principal emigrant country from this area was Italy. Between 1820 and 1930 some 4.75 million Italians emigrated to the United States, while substantial numbers went to Argentina, Brazil, and other countries. Recent restrictive immigration policies by the United States have caused increasing numbers of Italian emigrants to look toward South America as a place of location and settlement.

### (7) Austria-Hungary

Emigration from Austria-Hungary illustrates vividly the heterogeneity of the population of this former dual monarchy.[35] Of the more than 4,000,000 persons admitted to the United States from this area since 1820, the following ethnic groups comprise component parts: German-Austrians, Czechoslovaks, Poles, Magyars, Ukrainians, Yugoslavs, Rumanians, and Jews. Smaller numbers of these nationality groups have also emigrated to Canada, Argentina, and Brazil.

### (8) Russia

Russian migration, like that of Austria-Hungary, must take into account numerous nationality groups which have been subject to Russian control. A significant fact about Russian emigration is that it has been chiefly non-Russian. Among the more important of these emigrant groups are the Jews, Poles, Russians, Lithuanians, Finns, and Germans. The estimated percentage of each group is as follows: Jews, 44 percent; Poles, 25 percent; and between 6 and 9 percent each for the Russians, Lithuanians, Finns, and Germans.[36] These percentages are practically equivalent to the estimates on Russian immigration into the United States and Canada from 1908 to 1913.[37] While accurate figures on Russian migration have been difficult to obtain, the following data may be considered as the most nearly correct and acceptable.[38]

*Russian emigration, 1891–1910*

| | |
|---|---:|
| To United States | 1,774,000 |
| To Canada | 97,000 |
| To Argentina | 68,000 |
| To Brazil | 21,000 |
| To South Africa | 10,000 |
| To Australia | 3,000 |

Over 90 percent of those migrating to American countries settled in the United States. Statistics indicate a total Russian immigration to the United States since 1820 of approximately 3,345,000.

It should be mentioned that there has been a great degree of restriction, and even of prohibition, of emigration from Russia during the past several decades. The Czars objected to emigration because they wanted the surplus people to settle in Siberia.[39] The desire to recruit men for military service was another reason for the adoption of this type of emigration policy. The U. S. S. R. has continued to maintain this point of view with respect to emigration from Russia.

[35] M. R. Davie, World Immigration (1936), p. 116.
[36] Ibid., p. 135.
[37] Walter F. Willcox, International Migrations, vol. II (1931), p. 530.
[38] Ibid., p. 527.
[39] J. W. Gregory, Human Migration and the Future (1928), p. 56.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 21 of 101 PageID #:660

*(9) Balkan migration (including Turkey)*

The principal country of this section of Europe, from the standpoint of migration, is Greece. Since 1820 nearly 450,000 persons have come into the United States from this source, while goodly numbers of Greeks have come in from other countries, such as Italy, Turkey, and Yugoslavia. Small numbers of Greeks have also gone to Canada, Australia, and Brazil.

Bulgaria and Albania have been sources of some Greek immigration but not nearly to the extent that Greece has been. The combined total of immigrants from Bulgaria and Albania to the United States since 1820 is fewer than 75,000, with the vast majority of these being from Bulgaria. A small number of Bulgarians have gone to other countries, chiefly to Canada, Brazil, and Cuba.

Turkish migration has consisted more of other ethnic groups resident in Turkey than it has of the Turks themselves. Among these nationality groups, the Armenians, Syrians, Greeks, and Jews are of greatest significance from an immigration standpoint. While the vast majority of these immigrants has gone to the United States, small percentages have also gone to other areas.

*(10) Spain and Portugal*

Unlike groups previously considered, Spanish immigrants have gone chiefly to Argentina. Brazil ranks second as a point of destination, followed by the United States. Approximately 2,000,000 Spaniards were admitted as immigrants to Argentina from 1857 to 1926. Brazil admitted 574,000 from 1820 to 1930, while the United States, during the same period, admitted 166,865.[40]

The chief point of destination for Portuguese immigrants has been Brazil, over 1¼ million Portuguese having been admitted between 1820 and 1930. During the same period the United States admitted 252,715.[41]

*b. European migration: Intracontinental*

In addition to European migration to the New World and to other areas outside the Continent, there has been a certain degree of population movement between the countries of Europe themselves. France, in particular, has been a point of destination for large numbers of persons from other European countries, such as Italy, Poland, Belgium, Spain, Russia, and Czechoslovakia.[42]

Russia has also received, from time to time, varying numbers of immigrants from such countries as Germany, Austria, Rumania, Greece, and Bulgaria.

The migrant inflow to Russia between 1828 and 1915 was practically equivalent to the outflow for the same period (inflow, 4,200,000; outflow, 4,500,000).[43]

An internal population movement within Russia itself has also been of significance. Duncan[44] remarks that—

the greatest volunteer population movement in all history occurred in Russia in 1908, when in the first 10 months of that year approximately 720,000 people left European Russia for Siberia.

40 M. R. Davie, World Immigration (1936), p. 177.
41 Ibid., p. 178.
42 Ibid., p. 77.
43 Walter F. Willcox, International Migrations, vol. II (1931), pp. 576–577.
44 H. G. Duncan, Immigration and Assimilation (1933), pp. 275–276.

Walter F. Willcox[45] states that between the opening of the nineteenth century and the beginning of World War I over 6,000,000 migrants from European Russia settled in Asiatic Russia.

*c. Jewish migration*

While detailed statistics are not available, it is estimated that at least 500,000 Jews entered the United States before 1899. Between 1899 and 1924, over 1,800,000 came into the United States, 1,500,000 of whom entered between 1899 and 1914. This was over one-tenth of the total immigration into the United States during this period. They were exceeded in numbers only by the Italians.[46]

Immigration of Jews to this country has also been more permanent than has that of other groups. The repatriation rate for Jews is one-half that of the Irish and Scotch, one-third that of the Germans, and one-fourth that of the English or Scandinavians.[47]

Chief sources of Jewish migrants to the United States (1899–1924) have been Russia and Poland, Austria-Hungary, Rumania, United Kingdom, Turkey, Germany, and Canada. At least three-fourths of the Jewish immigrants during this period came from Russia or Poland.

Other countries besides the United States which have received substantial numbers of Jews are Canada, Argentina, and South Africa.

There has also been a somewhat constant movement of Jews to and from Palestine, which became numerically significant after 1880.

The first Jewish immigrants to arrive in the United States were the Spanish Jews, who entered this country about 1654. German Jews began migrating about 1815, and a peak movement was reached in the 1880's. A third migration, beginning in the 1880's, resulted in a great influx of east European Jews to this country. Between 1899–1914, of every 1,000 Jews in the Russian Empire, an average of 15.6 emigrated annually, 13 of whom came to the United States.[48]

The American Jewish Joint Distribution Committee estimates that the Jewish population of the world decreased from 16,000,000 in 1939 to about 11,000,000 in 1946, as a result of maltreatment during the period of World War II.[49] Statistics indicate that over 50 percent of the world Jewish population is now residing in the Western Hemisphere. Over 5,000,000 Jews are located in the United States, while some three-fourths of a million are distributed through Canada, Argentina, Brazil, Chile, Uruguay, Mexico, Cuba, and other countries of the Western Hemisphere.

Europe had approximately 4,000,000 Jews in 1948, located chiefly in Russia, Rumania, France, Hungary, Germany, and Great Britain. Asia had approximately 1,000,000 Jews, most of whom were in Israel. Africa had nearly 750,000 Jews, who were found principally in the north African countries bordering the Mediterranean Sea, especially French Morocco, Algeria, Egypt, and Tunisia. The continent of Australia had approximately 40,000 Jews in 1948.[50]

*d. Asiatic migration*

Next to Europe, the continent of Asia has been the principal source of modern migratory movement. Unlike Europe, however, Asiatic

45 Willcox, op. cit., p. 556.
46 Ibid., p. 473.
47 Ibid., p. 478.
48 M. R. Davie, World Immigration (1936), p. 145.
49 See appendix III, table 1, p. 511.
50 American Jewish Yearbook, 1948–49, pp. 692 ff.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 22 of 101 PageID #:661

migration has been largely intracontinental, including the islands adjacent to the continent. The principal Asiatic countries involved in this population movement are the most populous countries—namely, China, India, and Japan

### (1) China

Economic distress occasioned by overpopulation, drought, flood, and famine has been the chief cause of emigration from China. Originally much of China's emigrant population went to such southeastern Asiatic countries as Siam, Straits Settlements, Federated Malay States, Indochina, and to the East Indies, Formosa, the Philippines, and Hawaii. The United States, Peru, Cuba, Australia, Brazil, and Canada have been among the principal receiving countries for those Chinese emigrants who have gone to continents other than Asia.[51] Approximately 400,000 immigrants have come into the United States from China since 1820.[52]

Before World War II, much of the emigration from China proper went to the outlying provinces of Mongolia and Manchuria.

### (2) Japan

Due to the fact that until 1868 Japanese citizens were generally forbidden to go abroad, emigration from Japan is of comparatively recent origin. Legalization of emigration of Japanese subjects did not take place until 1885.[53] Approximately 280,000 have immigrated into the United States since 1861. Under the present law, persons of the Japanese race are inadmissible to the United States for permanent residence. Large numbers have gone to Asiatic Russia and Hawaii. Between 1885 and 1924 some 302,946 persons emigrated from Japan to Asiatic Russia, while Hawaii received 238,758 during the same period. Other countries which have received substantial numbers of Japanese immigrants are China, Korea, Canada, Brazil, Philippines, and Peru. Small numbers have also gone to Europe, particularly to England, Germany, and France.

Japanese international migration has not been extensive.[54] The majority of the laboring class of emigrants have gone to the United States or to Hawaii, with the remainder going to Brazil, Canada, Philippines, Peru, and Asiatic Russia.[55]

In comparatively recent times a number of the countries to which the Japanese have tended to migrate have adopted highly restrictive immigration policies, and those countries which have not adopted such policies have been less attractive to the migrants.

### (3) India

Despite India's great population, its migratory movements have not been on a great scale. Much of its emigration has been of the "indentured workers" type. Many laborers, both skilled and unskilled, were transferred to areas needing their services, under a form of contract labor. During the early part of the twentieth century. certain reforms in this system were adopted by the Government of India.

Statistics with regard to Indians living abroad indicate that the great majority are in colonies under British dominion, largely due to the fact that there was in operation, for a time, a system of organized emigration to the British colonies, as well as to certain colonies of France and other countries.[56] The British colonies of Ceylon and Malaya have large numbers of Indians residing therein. Mauritius, South Africa, West Indies, British Guiana, and East Africa are other colonies having substantial numbers of migrants from India. "Immigration receiving countries" such as the United States, Canada. and Australia show little Indian immigration. Slightly more than 10,000 persons have migrated to this country from India since 1820 and most of these have arrived since 1900.

### e. Inter-American migration

While many of the other American countries have themselves been countries of immigration, the United States has received not only more people from Europe than the rest of the Americas combined, but has also received a substantial number of people from the other American countries.[57] Nearly one-eighth of all immigrants to the United States since 1820 have come from North and South American countries and from neighboring islands.

By far the greatest percentage of Western Hemisphere migration to this country has come from Canada and Newfoundland. Of a total of 4,662,745 Western Hemisphere admitted immigrants since 1820, Canada and Newfoundland have supplied 3,130,405, or between 65 and 70 percent of the total. Mexico ranks next to Canada and Newfoundland as a source of American migration, while the West Indies rank third.

The bulk of Latin-American migrants have come from Mexico, while most of our Negro foreign-born since 1900 have come from the West Indies.

Puerto Ricans who migrate to the United States are not included statistically among the "immigrants," inasmuch as Puerto Rico is an unincorporated Territory of the United States. This group has, however, recently shown a rapid increase in migratory movement.[58]

### 7. IMMIGRANT RECEIVING COUNTRIES [59]

At least 60 percent of total world immigration from early in the nineteenth century to 1930 has come to the United States. Canada, which has ranked next to the United States as a receiving country, has received approximately 11.5 percent of total world immigration, or less than one-fifth as much as the United States. Argentina has received about 10 percent of total immigration, while Brazil has been the place of destination for 7 to 8 percent of world immigration. Australia, New Zealand, and South Africa have received most of the remainder.

A comparison of the different immigrant-receiving countries, with respect to the nationality composition of the immigration, is quite revealing. The United States shows a much more heterogeneous immigrant composition than do the other countries of reception.[60] British, Irish, German, Scandinavian, Austro-Hungarian, Russian, Italian, Canadian, and other nationality groups constitute substantial

[51] See appendix III, table 2, p. 811.
[52] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[53] M. R. Davie, World Immigration (1936), p. 318.
[54] Walter F. Willcox, International Migrations, vol. II (1931), p. 636.
[55] See appendix III, table 3, p. 811.

[56] See appendix III, table 4, p. 812.
[57] Kingsley Davis and Clarence Senior, Immigration from the Western Hemisphere, Annals, American Academy of Political and Social Science, March 1949, p. 72.
[58] Ibid., pp. 77 ff.
[59] For discussion of policies of Principal Immigrant Receiving Countries, see sec. C of this chapter, p. 156.
[60] See appendix III, table 5, p. 812.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 23 of 101 PageID #:662

percentages of the immigrants to the United States. Canada and Australia receive a great preponderance of British immigrants. The two predominant sources of immigration to Argentina are Italy and Spain. Italy, Portugal, and Spain supply most of the immigration to Brazil.

### 8. PRESENT AND PROSPECTIVE MIGRATORY TRENDS

A large percentage of present-day migratory problems have arisen as a result of events occurring since the beginning of World War II. The end of the war found millions of persons uprooted and dislocated and, of these, a great number were unable or unwilling to return to their former homes. In addition, large numbers of persons have been uprooted from their homes as a result of events subsequent to the end of World War II. It is estimated that the total number of refugees, displaced persons, and expellees in the world today would run into 20,000,000.

These refugees, displaced persons, expellees, and other restless Europeans comprise a vast source of supply for overseas migration from Europe during the course of the next several years. It is estimated that over 250,000 refugees were admitted into the United States for permanent residence during the war years.

A Presidential directive of December 22, 1945, set aside 90 percent of the nonpreference portion of the quotas of certain European countries for exclusive use of displaced persons then in Germany, Austria, and Italy. Pursuant to this Presidential directive, approximately 44,000 displaced persons were admitted into the United States for permanent residence for a period ending June 30, 1948.

The Displaced Persons Act of 1948 provides for the admission into the United States for permanent residence of 205,000 displaced persons over a 2-year period, beginning July 1, 1948, and ending June 30, 1950. The act also provides for the adjustment of status of a number, not to exceed 15,000 displaced persons, who have been admitted into the United States on a temporary basis.

Special temporary legislation has also made possible the admission of thousands of spouses and fiancées of members or former members of our armed forces. Through June 30, 1948, a total of 95,785 alien wives, husbands, and children of American military or naval personnel had been admitted to the United States under this special legislation.

The manpower shortage during the war years necessitated the recruiting of thousands of workers from adjacent American countries in order to maintain our agricultural and industrial production. There have since been continued immigration pressures from these countries, especially from Mexico and the West Indies. Puerto Ricans, who are not subject to our immigration laws, have been migrating in great numbers, and have posed an in-migration problem of their own.

Recent legislation has, moreover, made provision for the admission of persons formerly racially ineligible for permanent residence. The Chinese, Filipinos, and natives of India are the principal racial groups affected by this legislation.

A further evidence of the present rising tide of immigration is the increased flow of regular-quota immigrants. During the war years the volume of quota immigration dropped precipitously, reaching its lowest mark in 1943, when only 9,045 quota immigrants were ad-

mitted.[61] In the fiscal year 1948, however, a total of 92,526 quota immigrants were admitted; in addition, 78,044 nonquota immigrants were admitted for permanent residence. Moreover, a total of 476,006 nonimmigrants—visitors, transits, and others—were admitted temporarily from overseas during the same year.[62] Many of these persons have overstayed their periods of admission and are here in an illegal status. Certain individual quotas are heavily oversubscribed; the Greek quota, for example, is subscribed for the next 50 years. There is presently a registered demand of over 1,000,000 against available quota numbers.

Illegal entrants pose an increasingly difficult immigration problem. Stowaways, deserting alien seamen, illegal border crossers, and others who make unlawful entry, give evidence of an increasing tide of migrants. Several thousand illegal Mexican-border crossers are being apprehended in the United States each week and returned to their homes.

Any appraisal of long-range prospective trends in international migration should take into account the related problem of trends in population. The general consensus of demographic authorities indicates that European nations, especially those of northern and western Europe, are now in, or approaching, a stage of stationary population growth, and gradual decline.

Hugh Carter[63] states that "the long-term trend of birth rates, especially in western Europe, has been downward." France, in particular, has had a very low birth rate for a number of years. The United States Census Bureau in 1946 predicted a population trend in this country similar to that just considered with respect to European nations.[64]

Another factor which may affect Europe's migration potential is its industrial and economic development. The growth of cities and of industries is absorbing some of the surplus rural population in those countries that furnish the largest immigration potential.[65] In Italy, however, an existing unemployment situation has caused that country to maintain an interest in exporting excess workers. Many of these workers may be absorbed by other European countries, especially by France.

The marked increase in birth rates in both Europe and the United States following World War II is considered to be not an indication of a general long-time trend but rather a situation caused by the war, and temporary in nature. Demographers point to a similar situation immediately following the First World War.

### 9. CONCLUSION

The greatest phenomenon of international migration has been the movement of Old World peoples to the Western Hemisphere, and especially of European peoples to the United States, during the nineteenth and twentieth centuries. There have been other contem-

[61] Watson B. Miller, Administering Our Immigration Laws, Annals, American Academy of Political and Social Science, March 1949, p. 183.
[62] Ibid., p. 183.
[63] Perspective, Annals, American Academy of Political and Social Science, March 1949, p. 2.
[64] U. S. Bureau of Census, special report, September 15, 1946.
[65] Dudley Kirk, Demographic Trends in Europe, Annals, American Academy of Political and Social Science, March 1949, p. 55.

Case: 1:21-cv-00665 Document #: 30-3 Filed: 05/02/22 Page 24 of 101 PageID #:663

porary population movements, such as the migrations of the Chinese, Japanese, and Indians, as well as international movements between American countries. European and Asiatic countries have had their intracontinental migrations. But none of these latter movements can compare in size and scope with the Europe-to-United States migration.

Since the period of World War I, a growing tendency to limit such population movements has been evidenced. Legislation, both selective and restrictive in purpose, has been adopted with respect to immigration. Moreover, some nations have placed certain restrictions on emigration, in order to limit the outflow of their citizenry.

Other factors have influenced the recent trends in migration. The depression of the 1930's, with its great amount of unemployment, reduced to a marked degree the number of persons immigrating to the United States and other receiving countries.

In recent years, due in large part to conditions resulting from the late war, pressure to emigrate from Europe has been great.[66] If not limited by problems of transportation and by immigration restrictions in countries of reception, migration might well again attain the proportion of the early years of the 20th century.

In strictly demographic terms Europe is, however, no longer producing population surpluses of sufficient size to feed the streams of overseas migration. According to Kirk:

economic and demographic factors have joined in undermining the migration potential which gave rise to the great sustained and spontaneous overseas migrations of the past.[67]

Long-term immigration pressures may possibly be expected from Western Hemisphere countries. Particularly in Latin America, the pressures of a rapidly growing population on undeveloped resources will tend to stimulate the desire to emigrate.[68]

The United States, with a population not growing fast but retaining a remarkably high standard of living, will continue to seem a haven to our southern neighbors.[69]

Increased immigration pressures from oriental countries are already in evidence. As previously mentioned, the Chinese, Filipinos, and natives of India have recently been made racially admissible, and quotas have been assigned to them. Consideration of proposed legislation which would grant quotas to the Japanese and other nationality groups still racially inadmissible is given elsewhere in this report.[70]

## C. IMMIGRATION POLICIES OF OTHER COUNTRIES

### 1. BASIC FACTORS AFFECTING POLICY

As was noted above, at least 60 percent of total world immigration from early in the nineteenth century to 1930 came to the United States.[71] This is the only period in which comparable figures are available on immigration to other major immigrant-receiving countries, such as Canada, Argentina, Brazil, and Australia.

[66] Dudley Kirk, Demographic Trends in Europe, *Annals, American Academy of Political and Social Science*, March 1949, p. 55.
[67] Ibid., p. 55.
[68] Kingsley Davis and Clarence Senior, Immigration from the Western Hemisphere, *Annals, American Academy of Political and Social Science*, March 1949, p. 81.
[69] Ibid., p. 81.
[70] See ch. V, p. 458.
[71] See p. 23.

The immigration policies of the five major immigrant-receiving countries vary considerably. In fact, no two of the five nations have identical attitudes on immigration and attendant problems. This appears to be the result of seven basic factors which dominate the patterns of such policies. None of the five major nations receiving immigrants has a policy that is based solely on one of these seven factors. Some countries have employed only two factors, while others have embodied in their policy as many as five or more. Although the immigration policies of France and Great Britain are dealt with in this section, these countries are not regarded as major immigrant-receiving countries.

The following are the seven basic factors on which immigration policies are established: (1) The quota system, (2) selective system, (3) exclusion system, (4) preferential system, (5) financial-assistance system, (6) contract-labor system, and (7) work-guaranty system.

#### a. Quota system

The quota system fixes numerical limitations on the number of persons who are permitted to immigrate into the country adhering to such a system, and allocates the quota numbers to natives of certain countries throughout the world. Only the United States, the Philippine Republic, and Brazil employ a quota system. The quotas under the system employed by the United States and the Philippine Republic are allocated to national groups on the ratio of the composition of such nationality groups in the population according to the census of 1920, while the quotas under the system employed by Brazil are allocated on the basis of the nationality groups which immigrated to that country between 1883 and 1934.

#### b. Selective system

The selective system provides for the selecting of aliens to fill depleted ranks of certain types of workers in the country employing such a system. This selection is carried out either by appointed commissions who examine groups of aliens claiming to be skilled in the work that is expected of them, or through inter-governmental agreements or treaties. Argentina and Brazil employ this system.

#### c. Exclusion system

This system sets up absolute barriers on the basis of race or on the basis of physical, mental, or moral afflictions. Argentina officially does not maintain racial exclusion policies, but does, nevertheless, permit no persons of any colored race to settle in the country, even though they are admitted sporadically as visitors. Australia, Brazil, Canada, and the United States have general exclusionary provisions in their immigration policies.

#### d. Preferential system

Preferential systems are designed to maintain designated racial characteristics of the population of the countries employing such systems. This system is employed by all of the major immigrant-receiving countries. Canada, officially, has discontinued all immigration with the exception of persons from the United Kingdom and from France, and of certain "skilled worker" classes of other nationalities. Argentina's preference includes the nationalities of the early settlers of that country, namely, the Spanish, Italian, Portuguese, German, and Swiss. Australian preference is predominantly for people of

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 25 of 101 PageID #:664

British stock, with a tolerance toward citizens of the United States, while Brazil chiefly favors the Portuguese and, to a lesser degree, the Italians and Spanish. While the United States expressed a form of preference through the establishment of the national origins system in 1924, the flow of immigrants to the United States has not been in the proportion in which quotas are allocated because some countries with large quotas have used a relatively small percentage of their quotas.

### e. Financial-assistance system

An economic outgrowth of immigration has been the material inducement offered to prospective immigrants by immigrant-receiving countries. This has been done in several ways. It has been done through direct financial assistance in the way of passage money, as well as through direct personal loans for purchase of land and farm implements. It has also been done by offering a guaranty of employment under contract for a certain period of time.

The financial-assistance system has been used by Argentina, Australia, and Brazil. All three have made conditional provisions for repayment, in whole or in part, of transportation expenses by aliens to the respective countries, but who are unable to defray such expenses themselves. In addition, Argentina and Brazil have provided for loans and direct grants to prospective farming people and others who will assist in further developing the vast resources of those countries.

### f. Contract-labor system

Contract labor was, with minor exceptions, outlawed by the United States, as far as immigrants were concerned, in 1882. Argentina and Brazil, however, still employ this system. The immigrant is simply under contract to perform certain work. In these work contracts, there are usually stipulations pertaining to wages, working conditions, and housing.

### g. Work-guaranty system

The work-guaranty system has operated as a rather effective check in England against permanent settlers whose occupations were overcrowded. In order for any alien to receive a visa for permanent immigration, he must produce a work guaranty and a labor permit which his prospective employer must obtain from the Minister of Labor. Before the permit is issued, the Minister of Labor must be satisfied that the prospective employer cannot find an equally qualified prospective employee in England.

The only major immigrant-receiving country employing this system is Brazil, which has a work-guaranty provision for isolated individuals who do not fall in the class of "group importation of needed workers" but who, because of their particular qualifications, are needed in some areas in Brazil's industrial scheme.

## 2. GREAT BRITAIN

### a. Introduction

Although actual immigration to Great Britain on a permanent basis is relatively small as compared to the immigration into the United States and Canada, there is a constant influx of transit visitors en route either to Canada, the United States, or South American countries.

### b. Visa and passport requirements

An American desiring to visit Great Britain does not require a visa. In 1948 an agreement was reached between Great Britain and European countries cooperating in the Marshall plan, dispensing with visas for international travel to and from the countries to the agreement by their subjects or citizens. All the traveler needs is a valid passport issued to him by the department of foreign affairs of his government. Subjects or citizens of countries other than those cooperating in the Marshall plan must, however, not only have a valid passport, but a visa as well. The possession of such a visa is, nevertheless, no guaranty that the traveler will be permitted to land. Final decision rests with the immigration authorities at the port of entry.

Consular officers of Great Britain, like those of Canada, do not make an extensive investigation of applicants for visas as is done by American consular officers abroad. All applications for visas for permanent residence, as well as applications for a change of status from visitor to permanent resident, are thoroughly investigated and handled by and through the home office.

### c. Excludables: Registry of aliens

Generally speaking, immigration is barred to such persons as idiots, persons with contagious diseases, criminals, and similar classes. Once aliens have landed in England, they are required to conform to rigid rules concerning their whereabouts. Within 2 months they must register with the police or constabulary and must report at regular intervals or face deportation.[72]

### d. Employment restrictions

A worker residing in continental Europe who desires to migrate to England for the purpose of obtaining employment must first be guaranteed work. The employer who wishes to guarantee an immigrant permanent employment must first secure a permit from the Minister of Labor. Unless a worker has unusual qualifications and the prospective British employer has difficulty finding a suitable native worker for a certain job, chances of securing such a labor permit are comparatively slight.

At the close of World War II there existed a considerable manpower shortage in the British Isles. It was then decided that prisoners of war who wished to remain on a temporary basis to work on the farms and on other projects in England could do so. Thereafter several groups of miners, agricultural workers, and other specific classes of workers were imported into the country. That procedure has now come almost to a standstill, since most of the labor requirements have been met.[72]

### e. Emigration

No attempt has been made by the British Government to discourage emigration, even during the 2 years immediately following the close of World War II. The outgo between the summer of 1947 and that of 1948 alone totaled over 72,000, namely, 40,015 to Canada,[72] 26,403 to the United States, and some 6,000 to Australia. Since the close of the war, over 80,000 persons from Great Britain have come to the

---

[72] Information from British Embassy, August 5, 1949.
[72] Information from Canadian Embassy, August 1, 1949.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 26 of 101 PageID #:665

United States as immigrants. The statistics for the past three fiscal years are as follows: [74]

| | |
|---|---|
| 1946 | 33,552 |
| 1947 | 23,788 |
| 1948 | 26,403 |

### f. Nationality Act of 1948

Following the close of World War II there was considerable confusion about the status of various British subjects in the home country and in the various dominions and territories. To correct this situation, England, as well as the dominions, passed necessary legislation clearly defining the status of all subjects owing allegiance to the Crown.

Under the terms of the British Nationality Act of 1948, a person may file an application to become a British subject after 12 months of residence in the country. One of the pertinent requirements for prospective naturalized subjects is acceptable knowledge of the English language, including the ability to read and write. The residence requirement is 7 years in the United Kingdom.

### 3. CANADA

#### a. Introduction

The immigration policy of Canada is one of selection rather than one of restriction. There is no numerical limitation, since Canada has no quota system such as that in force in the United States. Privy Council Order No. 2745, issued June 2, 1949, states that—

from and after the date hereof and until such time as otherwise ordered, the landing in Canada of immigrants of all classes and occupations is prohibited, except as hereinafter provided.

Those who may be permitted to enter at the discretion of the immigration officer in charge are: British subjects, Irish citizens, citizens of the United States and France, as well as their husbands, wives, sons, daughters, brothers, sisters, together with husband or wife and unmarried children, their fathers or mothers, the orphan nephew or niece under 21 years of age of any person legally resident in Canada who is in a position to care for such relatives. Also permitted to enter are certain agriculturists and farm laborers, persons experienced in mining, lumbering, or logging, persons intending to marry a legal resident, and persons who, having entered Canada as nonimmigrants, enlisted in the Canadian forces and were honorably discharged.

There is one interesting proviso which is applicable to immigrants from the United States and France, as well as to agricultural workers, miners and lumbermen. It stipulates that such immigrants must be destined for settlement in a province which has not signified its disapproval of such immigration.

#### b. Immigration statistics: Visa issuance

Canadian immigration policy favors persons of British origin. In fact, of the 125,603 immigrants who entered Canada during the fiscal year ended March 31, 1948, 40,015, or 31.9 percent, were British. Other large nationality groups entering during that period were: Polish, 15,420, Ruthenian, 10,498, Dutch, 9,866, Hebrew, 8,447, Italian, 5,207, and German, 4,785. [75]

Since 1880, over 6,000,000 immigrants have come to Canada. [76] Of that total, over 2,300,000 were from the United Kingdom. Exclusive of the British-born, the number of foreign-born in Canada is about equal to the number of Canadian-born in the United States. [77] Unlike the procedure prescribed for aliens desiring to migrate to the United States, applicants for visas permitting entry into Canada cannot receive a visa as such; the only type of visas issued by Canadian consular officers abroad are visitors' visas, allowing the alien to remain in the Dominion for a specified time. If, upon arriving, the alien declares his desire to settle, he may file an application for a permanent visa.

#### c. Excludable classes

Section 3 of the Canadian Immigration Act specifically puts into the "prohibited classes" persons who believe in or advocate the overthrow by force or violence of the Government of Canada or of constituted law and authority; persons who disbelieve in, or are opposed to, organized government; persons who advocate the assassination of public officials or who advocate or teach the unlawful destruction of property. In addition, the Canadian act excludes persons such as idiots, criminals, procurers, illiterates, and similar classes. Immigration of all Asiatics is prohibited.

#### d. Naturalization and citizenship

##### (1) Statutes—Historical development

On July 1, 1946, a proclamation was issued providing that the Canadian Citizenship Act, which was passed during the previous session of Parliament, would become effective on January 1, 1947. The act, for the first time, provided a definition of a Canadian citizen. Prior to the passage of this act there were three Canadian statutes which dealt with certain aspects of the questions of nationality and citizenship. The existence of these three statutes was due in part to the existence of the common status of British subjects. In the early days of the older Provinces, which became part of Canada in 1867, naturalization could be conferred only by private act of the Legislature.

The first general Federal act dealing with the subject of naturalization was passed in the early 1880's and, with minor amendments, this remained in force until the Naturalization Act of 1914. Naturalization under the general acts prior to the act of 1914 conferred the status of a British subject within Canada. This status was not recognized beyond the Canadian boundaries. The act of 1914 provided for naturalization which conferred the status of a British subject who would be recognized as such in the United Kingdom and other dominions. The act of 1914 did not, however, provide any definition of persons who might be regarded as Canadians or Canadian citizens.

The new legislation, the Canadian Citizenship Act, defines as Canadian citizens persons: (1) Who were born in Canada or on a Canadian ship and (2) who were born to Canadian parents outside Canada before the passage of the act, except where the parents had become aliens or, if not born in Canada or on a Canadian ship, had Canadian domicile at the time the birth took place.

A declaration of intention to become naturalized must be made before application is made for Canadian citizenship. This declaration

[74] U. S. Immigration and Naturalization Service, Annual Report, 1948, table 13.
[75] For statistics on immigrant arrivals to Canada from 1881 to 1946, see appendix III, table 6, p. 812.

[76] National Committee on Immigration Policy, International Migration and One World, (1948), p. 39.
[77] Maurice R. Davie, World Immigration (1936), p. 420.

has to be made at least 1 year and not more than 5 years before naturalization takes place. Such declarations are necessary for aliens desirous of becoming naturalized, but not for wives or husbands of Canadians or for non-Canadian British subjects. The residence requirement, even for British subjects, is 5 years.

### (2) Loss of citizenship

A Canadian by birth may lose his citizenship by the acquisition of a foreign nationality, while naturalized persons may lose their citizenship under prescribed conditions. Under the old law a naturalized Canadian would lose his status if he were absent from Canada for 1 year. Under the new act a naturalized Canadian citizen will not lose his citizenship unless he is outside the country for six consecutive years. Through various actions, including service in the armed forces of an enemy country, citizenship may be forfeited.

### (3) Citizenship education

Starting in 1947, Canadian authorities have instituted an educational program to assist aliens in learning to understand the rights, duties, and privileges of Canadian citizenship. Through literature about Canadian institutions and classes, the new arrivals are helped in the steps they need to take to become citizens.

Since 1917, over 1,300,000 people have been naturalized in Canada. Canadian officials believe that with resumption of substantial immigration there will be hundreds of thousands of new citizens to be initiated.[78]

## 4. AUSTRALIA

### a. Introduction

The immigration policy of Australia, as well as the enforcement procedures, is radically different from the immigration policy and the enforcement procedures of the United States. In the first place, although the Australian Immigration Act does not contain racial exclusion provisions, all races other than white are administratively barred from immigration into Australia.[79] Australian policy is based on the conception that the homogeneous character of the population which settled and developed the country shall substantially be maintained.

### b. Prohibited immigrants: Enforcement regulations

Persons other than white are permitted in Australia only as visitors, students, temporary traders or merchants. Thus, all such persons traveling or temporarily residing in Australia are classed as "prohibited immigrants." They can never attain permanent residence and must leave at the expiration date specified on their visa. Exceedingly strong enforcement provisions are written in the law. For instance, every officer may, without warrant, arrest any person reasonably supposed to be a prohibited immigrant offending against the act and no person may resist or prevent such arrest.[80] Any officer may stop and search any vessel or vehicle in which he has reason to suspect any prohibited immigrant to be.[81] Any officer may, at any reasonable hour in the daytime, enter any building, premises, or place in which he has reasonable cause to believe any prohibited immigrants to be, and search the building, premises, or place to

---

[78] Frank Flaherty, He's Going To Be a Citizen, Canadian Immigration Service, No. 13 (1946), p. 4.
[79] Information from Australian Embassy, August 9, 1949.
[80] Australian Immigration Act, 1901–40, p. 18, sec. 14 (aa).
[81] Ibid., sec. 14 b (1).

ascertain whether any prohibited immigrant is therein.[82] In addition, any officer may, without warrant, arrest any person presumed to be a person whose deportation has been ordered by the Minister of Immigration and no person may resist or prevent such arrest.[83]

Besides the excludables previously mentioned, there are certain other groups which are classed as "prohibited immigrants." An effective check on illiterates is the so-called "dictation test." Any person who, when an officer or person duly authorized in writing by an officer, dictates to him not less than 50 words in any prescribed language, fails to write them out in that language in the presence of an officer or authorized person, is a "prohibited immigrant." [84]

In addition, there are the usual classes of excludables, such as imbeciles, prostitutes, criminals, and those likely to become a public charge, as well as "any person declared by the Minister to be, in his opinion, undesirable as an inhabitant of, or visitor to, the Commonwealth." [85] An official order also limits the number of Hebrews permitted to enter Australia, either as immigrants or as visitors, to 25 percent of the total number of passengers arriving on any and all vessels and aircraft.[86]

### c. Assisted immigration

Although Australia has no quota system, the immigration of persons who are native to any portion of the United Kingdom is encouraged. Just prior to World War II, 92 percent of the total stock of Australia was British or of British origin; of that number, 86 percent was native-born.[87] Recognizing the urgent need for a larger population, the Australian Government has embarked on an expansionist immigration policy.[88] In fact, the Government offers free passage to medically fit and suitable ex-servicemen from any part of the United Kingdom; it will also pay 40 percent of the passage of any American ex-serviceman and his wife who wish to emigrate to Australia. The Government, although anxious to have as many as 70,000 persons a year immigrate, still, however, enforces rigidly the qualification provisions for all immigrants.

### d. Check on seamen

Excepted from the prohibited class are—

the master and crew of any vessel landing during the stay of the vessel in any port in the Commonwealth—

provided that the master shall, upon being so required by any officer, and before being permitted to clear from or leave the port, muster the crew in the presence of an officer; and if it is found that any person is not present who according to the vessel's articles was one of the crew when the vessel arrived at the port and who would, in the opinion of the officer, be a prohibited immigrant, then such person, until the contrary is proved, shall be deemed to be a prohibited immigrant.[89]

Another provision is that—

identification cards bearing the full name, thumbprint, photograph, and prescribed description of each member of the crew, and indorsed by the master—

must be produced to any officer on demand.[89]

---

[82] Ibid., sec. 14 b (2).
[83] Ibid., p. 18, sec. 14 c.
[84] Ibid., p. 2, sec. 3, par. a.
[85] Ibid., p. 4, sec. 3, par. gh.
[86] Information from Australian Embassy, August 9, 1949.
[87] Information from Australian Embassy, August 9, 1949.
[88] National Committee on Immigration Policy, International Migration and One World (1948), p. 56
[89] Australian Immigration Act, 1901–40, sec. 3, par k, p. 2.

*e. Consular procedure*

Australian consular officers abroad, like those of the United States, conduct an investigation when an alien files an application for a visa. Once the alien seeking permanent residence in Australia has been determined to be a desirable person, he is issued a so-called "landing permit." Visitors do not receive such permits. In the case of persons applying for visitors' visas, of course, the screening process is also used to prevent the entering of subversives.

Australian consular officers in the United States have authority to deal only with applications filed by American citizens. In other words, they cannot issue a visa of any kind to subjects or citizens of any other nationality residing temporarily or permanently in the United States.[90] They cannot even initiate the procedure. Instead, they must refer the case to their home office. Consular officers of the United States are permitted to handle applications of aliens of virtually all nationalities.

*f. Naturalization and citizenship*

(1) *Nationality and Citizenship Act*

On December 21, 1948, a new Australian Nationality and Citizenship Act was approved. The act is similar to the Canadian Citizenship Act and defines the status of Australians in the realm of the United Kingdom. The new act provides for the automatic right to Australian citizenship by birth. There are, however, two exceptions: A person shall not be an Australian citizen by virtue of birth if his father was an envoy of a foreign country accredited to His Majesty or if his father was an enemy alien and the birth occurred in a place then under occupation by the enemy.[91]

Under the terms of the same act, certain classes who had resided in Australia but who had not become naturalized were permitted to claim citizenship under certain conditions through a registration procedure. An alien may now apply for citizenship after first making a declaration of intention.[92] He must have resided in Australia or New Guinea for at least 1 year before he may file such a declaration of intention. An applicant for a certificate of registration or a certificate of naturalization must advertise his intention to apply in two newspapers published and circulated in the district in which he resides.

(2) *Loss of citizenship*

There are several ways by which a naturalized Australian citizen may lose his citizenship automatically. A naturalized citizen who has resided outside Australia and New Guinea for a continuous period of 7 years ceases to be an Australian citizen. He may, however, retain his citizenship status if he gives the prescribed notice to an Australian consulate at least once during the second and each subsequent year of his absence of his intention to retain his Australian citizenship.[93]

Such acts as bearing arms in the service of an enemy country or obtaining citizenship through fraudulent statements and false representations will also bring about loss of Australian citizenship. An-

[90] Information from Australian Embassy, August 9, 1949.
[91] Australian Citizenship Act, pt. III, division 1, pp. 4-5.
[92] Australian Citizenship Act, pt. III, division 3, p. 6; The Schedules, Schedule 2, p. 19.
[93] Australian Citizenship Act, sec. 20, p. 9.

other cause for loss of citizenship is showing oneself by act or speech to be disloyal or disaffected toward His Majesty.[94]

The Minister of Immigration may, by order, deprive of his Australian citizenship a person who is a citizen by registration or by naturalization if, within 5 years after becoming a citizen, he has been sentenced in any country to imprisonment for a term of 12 months or more.[95] Moreover, the Minister of Immigration may grant or refuse an application for citizenship without assigning any reason.[96] When an order is issued depriving a person of his Australian citizenship, that person must surrender his certificate for cancellation. Failure to do so is punishable by a fine of £100.[97] The making of false statements in connection with an application for citizenship is punishable by imprisonment for 3 months.[98]

*g. Immigration statistics* [99]

More than 115,000 travelers arrived in Australia during 1948. Of that number, 65,731 were bona fide immigrants or returning nationals, all intending permanent residence. This represents a substantial increase over 1947 and 1946, when arrivals for permanent residence amounted to 31,731 and 18,217, respectively.[1] Of the 65,731 permanent new arrivals during 1948, 43,502, or 66 percent, were of British nationality, and 22,229, or 34 percent, were non-British. The entire group consisted of 36,451 males and 29,280 females.

For all practical purposes, immigration was discontinued during World War II. During the 3 years prior to the outbreak of hostilities, immigration into Australia was considerably below normal. Total permanent immigration was as follows: [2]

| | |
|---|---|
| 1937 | 16, 291 |
| 1938 | 19, 548 |
| 1939 | 24, 068 |

Classification according to nationality of immigrants was started in Australia in July 1948. During the last quarter of 1948, 8,530 non-British immigrants were admitted into the Commonwealth. The nationalities leading in immigration into Australia during the last quarter of 1948 were nationalities whose annual immigration quotas for the United States had been oversubscribed; they were chiefly eastern and southern European nationalities. The following nationality groups had the heaviest representation:

| | | | |
|---|---|---|---|
| Polish | 1, 527 | Russian | 565 |
| Italian | 1, 329 | Estonian | 484 |
| Latvian | 1, 002 | Greek | 422 |
| Yugoslav | 817 | Czech | 316 |
| Lithuanian | 651 | | |

For that same 3-month period, ending December 31, 1948, a total of 198 United States citizens immigrated into Australia, while immigrants from northern European countries were relatively few. Danes numbered 27, Swedes 19, and Norwegians 17.[2]

The main occupations of permanent arrivals into the Commonwealth during 1948 were stated to be as follows: [2]

[94] Ibid., sec. 21, p. 9.
[95] Australian Citizenship Act, sec. 21, p. 9.
[96] Ibid, sec. 40, p. 16.
[97] Ibid, sec. 48, p. 18.
[98] Ibid, sec. 50, p. 18.
[99] For statistics on overseas immigration to Australia from 1901 to 1930, see appendix III, table 7, p. 813.
[1] Commonwealth Bureau of Census and Statistics, P. N. 2623, May 17, 1949.
[2] Commonwealth Bureau of Census and Statistics, P. N. 2623, May 17, 1949.

| Males | | Females | |
|---|---|---|---|
| Craftsmen | 7,826 | Clerks, etc | 2,190 |
| Rural, fishermen, etc | 3,859 | Domestics, etc | 2,029 |
| Operatives | 3,542 | Professional | 1,870 |
| Clerks, commercial, etc | 3,351 | Operatives | 1,227 |
| Laborers | 3,126 | | |

Persons not gainfully employed (mainly housewives, students and children) . 29,494

### 5. FRANCE

#### a. Introduction

During the latter part of the seventeenth century and during the eighteenth century, France was probably the most densely populated country in Europe. Thereafter, her birth rate commenced to decline, causing a drop in population density.[3]

Because of an acute manpower shortage immediately following the close of World War II, France, for a while, actively encouraged immigration, especially of farm laborers and skilled and semiskilled workmen. In fact, it was announced that the restoration of the French economy would require the importation of 1½ million foreign workers by 1950 in order to achieve France's economic goals.[3]

In the strict sense of the word, there exists no separate immigration law in France. The entire group of provisions governing immigration as well as naturalization are part of the National Civil Code of the Republic of France, adopted in 1945. These provisions contain no stipulations for "favorite groups" such as exist in the immigration laws of Canada, Australia, Argentina, and Brazil.

#### b. Treaty immigration

To cope with the reconstruction program following World War I, France imported foreign labor on a large scale. Nevertheless, immigration into France, unlike that into the United States, has scarcely ever been a movement of individuals acting on their own initiative and responsibility. Instead, France has championed group immigration, regulated by treaties or agreements between the sending and receiving countries, including stipulations pertaining to recruiting procedure, work conditions, and wages.[4] This is in contrast to the policy employed by the United States, which has, since 1882, with the exception of a brief period during World War II, when workers from the Western Hemisphere were imported into the country, provided for the exclusion of immigrants who have entered into contracts for employment before their arrival in this country.[5]

For a considerable time after World War II, France employed almost 700,000 Germans who were prisoners of war. The United States transferred custody to France of some 440,000 of these prisoners of war on a temporary basis, according to an agreement entered into by the United States and France. These Germans, however, had to be repatriated by October 1, 1947.[6] They were offered the privilege of permanent settlement in France or French territory, under work contract and with certain rights almost identical to those accorded to other alien workers. It has been reported that about 10 percent of these German prisoners of war accepted this offer.[7]

[3] National Committee on Immigration Policy, International Migration and One World (1948), pp. 61 ff.
[3] National Committee on Immigration Policy, op. cit., pp. 61 ff.
[3] Ibid., p. 18.
[5] State Department Bulletin, March 23, 1947.
[6] National Committee on Immigration Policy, op. cit., pp. 62 ff.

In 1947, the then Foreign Minister of France, George Bidault, proposed at the Moscow Conference the formation of a program through which large-scale emigration from Germany would be made possible. He is reputed to have defended his opinion by asserting that a systematic and gradual reduction of the German population would assist in averting another war. Had such emigration avenues been available to Germans after World War I, the Second World War, Bidault asserted, might well have been prevented.[8]

Italy and France concluded a treaty for the importation of 200,000 Italian workers. The rate of reception was about 17,000 per month, and the laborers were permitted to bring their families or send for them later. The resultant total estimated addition to France's population was about 500,000. Similar treaties by France with Poland and Austria have also been consummated. As a result of the treaty entered into with Poland, France since the close of the war has received over 380,000 Poles.

#### c. Visa regulations: Exclusion and deportation

France has for years counted on a substantial tourist trade as part of her national economic scheme. Statistics show that tourists and visitors always greatly outnumber permanent immigrants to France. Visitors' visas issued by French consular officers are valid for 3 months. Student visas are valid for the duration of the school or college terms. All aliens, whether visitors or students, are given identification cards under the provisions of a law similar to the United States alien registration law of 1940. Settling in France on a permanent basis is prohibited unless permission is first obtained from the Minister of Labor. Visitors and students are generally not allowed to be gainfully employed. All applications for permits to settle permanently in the country are investigated thoroughly by the French secret police.

French policy, like that of most countries, precludes admission to mentally unbalanced persons, persons with incurable and loathsome contagious diseases, criminals, known prostitutes, and similar classes. French immigration policy, on the other hand, does not, per se, exclude from immigration persons because of their race.[9]

#### d. Naturalization

Aliens may apply to become French citizens after a residence of 5 years. The number of Frenchmen becoming American citizens is fairly small. Over a 10-year period, ending June 30, 1948, only 22,223 persons claiming France as their country of origin had become naturalized citizens of the United States.[10]

### 6. BRAZIL

#### a. Introduction

The current immigration policy of Brazil is a rather flexible one. The number of immigrants permitted to enter varies from one year to another even though, ostensibly, Brazil maintains a quota immigration system for all nationalities but the Portuguese.[11]

[8] Christian Science Monitor, March 21, 1947.
[9] Information from French Embassy Chancery, September 7, 1949.
[10] U. S. Immigration and Naturalization Service, Annual Report (1948), table 39
[11] Information from Brazilian Embassy, August 17, 1949.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 30 of 101 PageID #:669

*b. Colonization and settlement*

Although discovered in 1500 and colonized since 1532, Brazil in 1820 had a population of only about 4,000,000, despite the constant influx of Portuguese. Brazil was first a royal colony. Later attempts by France and Holland to colonize Brazil were defeated by the Portuguese. Between 1820 and 1940, some 5,342,000 immigrants entered the country.[12] On the basis of the percentage of its population, Brazil ranks third as an immigrant-receiving country.[13]

While most of the southern European colonists drifted all over the country, the early German and Swiss colonists settled chiefly in the states of Rio de Janeiro, Parana, Santa Catarina, and Rio Grande do Sul. Only the hardy people of the soil stayed in the rural areas; small merchants, traders, and unskilled workers flocked to coastal cities.

*c. Immigration restriction: Quota system*

In 1930, the Government of Brazil began to tighten up on immigration. At first, this move was aimed chiefly at curtailing the inflow of "steerage" immigrants; eventually it was extended to all classes. Then, in 1934, the Government established a quota system patterned somewhat after the quota system then in force in the United States. The Brazilian Government determined henceforth to allow immigration of all nationalities on the basis of 2 percent of the cumulative total average such nationalities represented in the country between 1883 and 1934. This system proved to be beneficial to the Japanese, who had for some time previously been immigrating into Brazil in substantial numbers. While Japanese immigration between 1901 and 1910 amounted to only about 1800, the succeeding decades saw first 27,500, then 71,500, and finally 86,500 Japanese enter Brazil. In fact, the recent immigration of Japanese has greatly exceeded that of the desired German immigration.[14] In order to solve the problem of Japanese immigration, it was ordered that all unskilled laborers be limited to a bare minimum. Since this limitation was also applicable to other nationalities it resulted in a drop in over-all immigration, which, between 1931 and 1940, amounted to over 288,000, making an aggregate total between 1921 and 1940 of around 840,000, the smallest number for such a 20-year period since 1871.

*d. Assisted immigration*

Prior to the second decade of the current century, the Brazilian Government encouraged immigration by extending financial assistance to certain prospective newcomers. After the discontinuance of free or assisted passage to settlers, immigration into Brazil dropped sharply. Between the years 1911 and 1920 only about 303,000 immigrants were admitted. World War I and the consequent lack of shipping facilities also contributed greatly to this decrease. Following World War II, it was deemed advisable to resume the furnishing of financial assistance to immigrants and in 1947 another system, somewhat similar to the system inaugurated in 1934, was put into operation. This was known as the 2-percent system. Under the new arrangement, quota immigrants were permitted entry on a selective basis, rather than on a numerical basis. As a result unskilled

workers, who heretofore had made up the bulk of the immigrants, were generally not admissible.

*e. Recent immigration policy*

(1) *Council on Immigration and Colonization*

Under the terms of the Constitution of Brazil, adopted September 12, 1946, there was established a Council on Immigration and Colonization, composed of representatives of each of the 12 Ministers of the Cabinet. They meet at specified times to report on the aspects of immigration as regards their respective departments. For example, the representative of the Minister of Finance reports on the effects of current immigration on the nation's finances and the representative of the Minister of Labor reports on the effects of such immigration on the internal labor situation.[15]

Under the provisions of this constitutional set-up, the Minister of Foreign Relations is required to supervise immigration into Brazil. It was, for instance, through his department that a substantial group of Dutch farmers, along with their equipment and livestock, were imported into Brazil at the expense of the Brazilian Government.[15]

(2) *Advantages to immigrants*

Many advantages are offered to immigrants who intend to settle in Brazil permanently. Besides defraying complete or partial transportation expenses, the Brazilian Government guarantees the immigrants financial assistance in the form of loans during the first 3 years after they have landed in one of the state colonization areas.

(3) *Restrictions on nationality settlements*

The forming of "colonies" or large group settlements by any one nationality is forbidden. In every new "nucleus" settlement, 30 percent of the land must be reserved for Brazilian nationals and not more than 25 percent of the land may be occupied by immigrants of any one nationality.[16]

(4) *Housing*

Although Brazil definitely wants to increase her population through immigration, she is still somewhat hampered by a housing shortage. There still are not adequate facilities to accommodate the objective of the Government of 100,000 immigrants a year, the figure set as Brazil's goal for annual immigration.[17]

*f. Consular procedure: Deportation*

As previously mentioned, the Minister of Immigration is required by law to direct a program of selective immigration. A sizable portion of this program is carried out by agreements between the Minister and the representatives of friendly governments. Between them it is arranged for certain groups of aliens to immigrate. These groups are made up chiefly of skilled workers who are needed in Brazil. In such cases consular procedure is fairly simple because the cooperating government vouches for the immigrants. In cases of individual or isolated applications for immigration visas, the Brazilian consular officers abroad make a thorough check on the applicants, similar to the procedure followed by American consular officers.

---

[12] For statistics on immigration to Brazil from 1884 to 1941, by nationalities, see appendix III, table 8, p. 813.
[13] Das Heutige Brasilien (1949), p. 64.
[14] National Committee on Immigration Policy, International Migration and One World (1948), p. 44.

[15] Information from Brazilian Embassy, August 17, 1949.
[16] National Committee on Immigration Policy, op. cit., p. 55.
[17] Ibid., p. 55.

Such checks are not, however, made on applicants for visitors' visas. On the other hand, a fairly close check is kept on visitors. Visitors who, upon or after arrival, are found to be undesirable are promptly deported. In fact, all persons advocating the overthrow of the Government by violence, Communists, and other unwanted types are subject to deportation even though they be naturalized Brazilian citizens.[17a]

### g. Naturalization

Immigrants are eligible to apply for citizenship after 5 years' residence, except Portuguese immigrants, who are eligible after 2 years' residence.

### 7. ARGENTINA

### a. Introduction

Argentine immigration policy is based purely on selection. There are no national quotas and, as far as the Argentine Government is concerned, immigration is strictly a question of filling the need for certain types of workers in various industries.[18]

### b. Immigration and settlement

Argentina was originally settled largely by Spaniards. Thereafter, and until about 1879, about 70 percent of the immigrants entering Argentina were Italians. As time passed, the percentage of Italian immigrants decreased to about 40 percent. Just prior to World War I, Spanish immigrants into the Argentine Republic increased in numbers until such immigrants constituted almost 50 percent of the total immigration.[19] Consequently, the major portion of the population of Argentina is of Italian and Spanish origin. While at first non-Latin immigration into Argentina was insignificant, it increased in volume in the 1920's, and in 1926 it was approximately 30 percent of the total immigration.[20] Major nationality groups among the non-Latins were Russians, Turks, and Germans. The influx in the 1920's was, it is believed, largely due to the fact that the United States had inaugurated its quota-immigration system and the potential flow into the United States was diverted to Argentina and Brazil.

### c. Comparative immigration statistics by nationality

For the 70-year period from 1857 to 1926, inclusive, overseas immigration tabulations showed that of the total immigration to Argentina, 2,718,000 immigrants, or 47.4 percent, were Italians, while 1,853,000, or 32.3 percent, were Spaniards. No other nationality group came even close to rivaling such percentages. The nearest were the French, with 229,000 or 4 percent; followed by the Russians, with 172,000 or 3 percent, and the Turks, with 169,000 or 2.9 percent. The Germans, with 111,000, constituted but 1.9 percent of all the immigrants during this 70-year period. The Germans while in the minority, generally, however, remained in Argentina. During the period from 1904 to 1913, although there was heavy immigration into Argentina, there was at the same time a tremendous emigration from Argentina. Toward the end of that period such emigration exceeded 120,000 annually.[21] This was the so-called birds of passage movement,

[17a] Information from Brazilian Embassy, August 17, 1949.
[18] Information from Argentine Embassy, August 30, 1949.
[19] National Committee on Immigration Policy International Migration and One World, p. 42.
[20] For statistics on overseas immigrants to Argentina from 1857 to 1926 see appendix III, table 10, p. 813.
[21] National Committee on Immigration Policy, op. cit., p. 43.

composed chiefly of Italians who would come to Argentina in October or November, work in the fields until May or June, and return to their home country with their savings.[22] They could easily do this at that time, because of the then cheap steamship rates. Subsequent higher rates of ocean travel have prevented general recurrence of this practice. Many of these workers have since found a market for their labor nearer home, in France and other countries.[23]

### d. Current immigration program

#### (1) Five-year plan

At present, Argentina is operating under a so-called 5-year program, which is aimed at selective immigration of persons needed in certain industries. There is no definite annual quota at which the Government aims. While at first the plan was to import workers at the rate of 50,000 per year,[24] that goal has been expanded considerably. In fact, Italian immigrants have been boosting the Argentine labor supply by approximately 2,000 weekly,[25] or at a rate of well over 100,000 annually. For a while, at least, this volume is expected to be maintained.[26] The majority of these Italians are being channeled into rural areas to increase farm labor. As a result of the influx of Italians into Argentina, Government authorities contend that the Italian influence in the country is becoming more important than the Spanish influence. British influence is gradually disappearing, especially since the nationalization of the British-owned railroads and other industries.[27]

#### (2) Selection commissions

The Argentine Government maintains two selection commissions in Europe, one in Geneva, Switzerland; and one in Genoa, Italy. Since Argentina needs rural workers mainly, one of the instructions to the commissions is that in general no urbanites are acceptable. The professional classes are also generally not acceptable. With a population of about 17,000,000, Argentina has over 27,000 doctors. On a pro rata basis this is equivalent to 1 doctor for each 630 inhabitants. Available doctors in the United States are, pro rata, 1 for each 800 persons. Colored persons who seek to enter Argentina for permanent residence are generally barred administratively. They are, however, permitted to enter the country as visitors.[26]

#### (3) Assisted immigration

Permanent immigrants who are in a position to pay for their passage are required to do so. Many who cannot do so, but who appear to be desirable immigrants, are financed by the Argentine Government. All immigrants travel on Argentine vessels. Upon arrival, they are examined again and temporarily housed in a Government immigration hotel, prior to being shipped to their assigned final destination. The Government furnishes these immigrants a plot of land for which they pay over a specified span of years. The price differs according to the size of the plot. Illiterates are taught the language and history of

[22] For statistics on overseas immigrants to Argentina from 1857 to 1926, see appendix III, table 9, p. 813.
[23] National Committee on Immigration Policy, op. cit., p. 43.
[24] International Labor Office, Memorandum on Immigration Policy, March 1947.
[25] Evening Star, Washington, D. C., August 25, 1949.
[26] Information from Argentine Embassy, August 30, 1949.
[27] Information from Argentine Embassy, August 30, 1949. Evening Star, Washington, D. C., Sept. 25, 1949.

Argentina and are given instructions in writing, etc. Generally speaking, skilled laborers, farmers, and certain skilled technicians are the three principal classes desired by Argentina.

*e. Consular procedure*

Argentine consular officers abroad do very little in the way of "screening" of applicants for immigration visas. Most of that work is done by the two Selection Commissions in Europe. The consuls and consular officers do pass on applicants for visitors' visas. These visas are valid for 1 year. All visitors, regardless of their destination, must report to the local police or constabulary within 48 hours after arriving in Argentina. Failure to do so results in a fine or deportation. Change of temporary address also must be recorded with the police.[25]

*f. Excludable classes*

From the close of World War II to August 30, 1949, over 243,000 regular immigrants have entered Argentina. This is exclusive of some 57,000 displaced persons who have also been received by Argentina. The major portion of these regular immigrants were Italians and Spaniards. Very few were northern or western European immigrants. Because of careful selections, there are few deportations. With respect to excludables, Argentina maintains a rigid policy similar to that employed by the United States. Criminals, imbeciles, prostitutes, persons who have committed crimes involving moral turpitude, and similar classes are excludable. Likewise, individuals who, after arriving in Argentina, are found to be undesirable or who advocate policies contrary to the interests of the Government are apprehended and are returned to their native country or incarcerated.[25]

*g. Naturalization*

Immigrants become eligible for Argentine citizenship after 2 years' residence. The applicant must show that he is well versed in Spanish; he must be in good health, and must produce references of reputable citizens testifying to his good moral character.[26] Upon naturalization the new citizen receives what is called his "military book," which he must take to the military authorities within 6 months. After that, he must present the book every time he votes and he is, by law, required to vote. Failure to do so draws a fine of 100 pesos.[26] The book also explains that he is liable to fulfill possible military obligations within a period of 10 years. The age limit for acquitting oneself of such military obligations is 55.[26] The oath which a new citizen is required to take does not specifically mention a willingness to bear arms for the Argentine Republic but the oath is so worded that compliance with all the laws automatically includes military service if called upon.[26]

Generally speaking, few Argentinians come to the United States on a permanent basis. During the fiscal year ended June 30, 1948, only 65 who gave Argentina as their country of origin were naturalized in the United States. During that same period, 17 Argentine seamen deserted their vessels in the United States.[28]

---

[25] Information from Argentine Embassy, August 30, 1949.
[28] Immigration and Naturalization Service, Annual Report, 1948, table 22.

## D. History of the Immigration Policy of the United States

### 1. AUTHORITY FOR CONTROL OF IMMIGRATION

The power of Congress to control immigration stems from the sovereign authority of the United States as a nation and from the constitutional power of Congress to regulate commerce with foreign nations.[29]

This sovereign authority has its root in colonial America. Before the Revolution, the control of immigration and naturalization was a function of the sovereign authority which governed the individual colonies. The Declaration of Independence refers to immigration and naturalization problems then existing. In the list of indictments against the King of Great Britain for his "injuries and usurpations" in the government of the colonies, item 7 charges that "he has endeavored to prevent the population of these States; for that purpose obstructing the Laws for Naturalization of Foreigners; refusing to pass others to encourage their migrations hither, and raising the conditions of new Appropriations of Lands."

The Articles of Confederation were adopted in 1778. Article 4 made the citizens of each State citizens of every other State, but every State had its own naturalization laws and every State legally controlled immigration. In those days the control of immigration was practically equivalent to its encouragement. Although the citizenship provision of the Confederation was an advance over the colonial conditions, much confusion still existed in regard to citizenship, principally because each State had its own naturalization standard.

In 1789, 13 years after the Declaration of Independence, the preamble declared one of the objects of the newly adopted Constitution to be to "secure the blessings of liberty to ourselves and our posterity."

The powers of Congress to regulate the immigration of persons are contained in article I of the Constitution.

Article I, section 8, clause 3 of the Constitution provides that Congress shall have the power

to regulate Commerce with foreign nations, and among the several States, and with the Indian tribes.

Section 9 refers to the slave trade without mentioning the word slavery as follows:

The Migration or Importation of such Persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the Year one thousand eight hundred and eight, but a Tax or duty may be imposed on such Importation, not exceeding ten dollars for each Person.

The several States controlled immigration according to their own desires until about 1824, when the constitutionality of a New York law was tested. In 1849, the Supreme Court ruled unconstitutional statutes of New York and Massachusetts imposing taxes in incoming aliens.[30] Beginning in 1829, court decisions began to indicate the unsatisfactory status of migration control, and in 1882, the first Federal law was passed.

---

[29] *Chae Chan Ping v. United States,* 130 U. S. 581 (1889); *Edye v. Robertson, Collector,* 112 U. S. 580 (1884).
[30] *Passenger cases—Smith v. Turner. Norris v. The City of Boston,* 48 U. S. 283 (1849).

Regulation of naturalization is vested in the Congress by article 1, section 8, clause 4, of the Constitution which states that—

Congress shall have Power  *  *  *  to establish an uniform Rule of Naturalization.

Every sovereign nation has power, as inherent in sovereignty and essential to self-preservation, to forbid entrance of foreigners within its dominions, or to admit them only in such cases and upon such conditions as it may see fit to prescribe.[31]  Congress may exclude aliens altogether or prescribe terms and conditions upon which they may come into or remain in this country.[32]

The power and authority of the United States, as an attribute of sovereignty, either to prohibit or regulate immigration of aliens are plenary and Congress may choose such agencies as it pleases to carry out whatever policy or rule of exclusion it may adopt, and, so long as such agencies do not transcend limits of authority or abuse discretion reposed in them, their judgment is not open to challenge or review by courts.[33]

It has been settled by repeated decision that Congress has power to exclude any and all aliens from the United States, to prescribe the terms and conditions on which they may come in or on which they remain after having been admitted, to establish the regulations for deporting such aliens as have entered in violation of law or who are here in violation of law, and to commit the enforcing of such laws and regulations to executive officers.[34]

It has been repeatedly held that the right to exclude or to expel all aliens or any class of aliens, absolutely or upon certain conditions, in war or in peace, is an inherent and inalienable right of every sovereign and independent nation, essential to its safety, its independence, and its welfare; that this power to exclude and to expel aliens, being a power affecting international relations, is vested in the political departments of the Government, and is to be regulated by treaty or by act of Congress and to be executed by the executive authority according to the regulations so established, except so far as the judicial department has been authorized by treaty or by statute, or is required by the paramount law of the Constitution to intervene.[35]

The United States may exclude any alien for any reason whatsoever, such as the Government's dislike of the alien's political or social ideas, or because he belongs to groups which are likely to become public charges, or for other similar reasons.[36]

Expulsion of aliens is a sovereign power necessary to the safety of the country, to be regulated by the legislative department.[37]

The right of Congress to provide for elimination of undesirable aliens is not limited by the fact that such aliens may have become entangled by other prohibitions of law, and deportation proceedings are entirely apart from criminal proceedings and must proceed according to laws regulating them.[38]

Although an alien who had acquired residence in this country was entitled to the same protection of life, liberty, and property as a citizen,

[31] *Nishimura Ekiu* v. *United States*, 142 U. S. 651, 659 (1892).
[32] *Fok Young Yo* v. *United States*, 185 U. S. 296 (1902).
[33] *Kaoru Yamataya* v. *Fisher*, 189 U. S. 86 (1903).
[34] *In re Kaoripud et al.*, 272 F. 530 (1920).
[35] *Colyer* v. *Skeffington*, 265 F. 17 (1920).
[36] *United States* v. *Parson*, 22 F. Supp. 149 (1938).
[37] *United States ex rel. Zapp et al.* v. *District Director of Immigration and Naturalization*, 120 F. 2d 762 (1941).
[38] *Id.*

he acquired no vested right to remain and the Government has power to deport him if, in the judgment of Congress, public interests so required, and such power is not dependent upon the existence of statutory conditions as to his right to remain at the time he became a resident.[39]  An alien resident in the United States may be deported for any reason which Congress has determined will make his residence here inimical to the best interests of our Government.[40]

## 2. COLONIAL POLICY

The official immigration policy during the early part of our history was not well defined.  The colonists had hardly set foot in America when they sought to prevent the admission of certain types of additional immigrants.  Policies varied among the colonies with respect to selection of immigrants on the basis of religious beliefs, and their physical, mental, moral, and economic fitness.

In general, however, immigration was encouraged.  Communities welcomed an increase in population, because it increased safety of life and property.  Owners of large grants of land wanted their holdings occupied to increase their value and local governments often provided land free or at low prices to those who would settle and work it.

There were those, however, who advocated restrictive immigration controls.  Benjamin Franklin commented on the large number of Germans in Pennsylvania and the possibility of needing interpreters in the State assembly.  Thomas Jefferson thought it unwise to encourage immigration from monarchial governments.  George Washington viewed unrestricted immigration cautiously.[41]

## 3. EARLY CONGRESSIONAL ENACTMENTS

The chaotic life of the young Nation and the attempts of France and England to take advantage of its weakness led to considerable antialien sentiment.  The Federalists, hoping to establish themselves in power and disorganize the opposition which had a readier support at the polls from the foreign-born, pushed through the first enactment of Congress affecting immigration.  This was the Alien Act of 1798,[42] adopted as part of the alien and sedition laws, which enabled the President to order the departure from the United States of any alien whom he deemed dangerous to the country.  This legislation proved very unpopular, however, and it was not renewed at the expiration of its 2-year term.  (This law must not be confused with the Alien Enemy Act of 1798, which is still in effect.)  It might be said, therefore, that immigration flowed into this country untrammeled, with no legislative restraint until 1819.

John Quincy Adams, then Secretary of State, said in 1819 that the Government had never officially encouraged immigration from Europe, but in that same year, Congress passed a law which tended to encourage immigration, chiefly by improving transportation conditions on vessels.[43]  This was the beginning of the so-called steerage legislation, which lasted from 1819 to 1908.  The immediate causes were

[39] *United States* v. *Sui Joy*, 240 F. 392 (1917).
[40] *Skeffington* v. *Katzeff*, 277 F. 129 (1922).
[41] Immigration and Naturalization Service. Our Immigration, p. 2.
[42] 1 Stat. 570.
[43] 3 Stat. 488.

the reports of sufferings and privations to which immigrants had been subjected on board ship during the years following the War of 1812, especially during 1817 and 1818. In presenting the bill which resulted in the first of these laws to the House, Representative Newton, of Virginia, said (as reported in the digest of his remarks, 3 Annals of Congress, p. 414):

> In consequence of the anxiety to emigrate from Europe to this country, the captains, sure of a freight, were careless of taking the necessary quantity of provisions or of restricting the number of passengers to the convenience which their ships afforded. * * * In the year 1817, 5,000 had sailed for this country from Antwerp of whom 1,000 died on the voyage. On this voyage a captain had sailed from a European port with 1,267 passengers, On his voyage he put into the Texel, previous to doing which 400 had died. After being on the passage to our shores, before the vessel arrived at Philadelphia, 300 more had died. The remainder, when the vessel reached Newcastle, were in a very emaciated state from the want of water and food, from which many of them afterward died.

Representative Newton stated the purpose of the bill was "to give to those who go and come in passenger vessels a security of comfort and convenience."

The bill contained provisions intended to regulate the number of passengers to be carried on each vessel and to provide for the sufficient and proper victualing of each vessel leaving a port in the United States for any port on the Continent of Europe. Each ship was limited to carry only two passengers to every 5 tons "of such ship or vessel's weight," but the ship's crew was not included in this count. Every ship or vessel leaving an American port was required to have on board for each passenger 60 gallons of water, 1 gallon of vinegar, 100 pounds of salted provisions, and 100 pounds of wholesome ship bread. The master of a ship was required to deliver to the collector of customs at the port of arrival a list or manifest of all passengers taken on board at a foreign port, showing the age, sex, and occupation of the passengers, the country to which they belonged, and the country of which they intended to become inhabitants. This marked the beginning of statistics on immigration to the United States.

From 1819 until 1835, no particular attention was paid to immigration, the plan of the Government evidently being neither to encourage it by special inducements nor to discourage it by legislation. The only departure from this rule was occasionally to furnish assistance to immigrants who, having arrived here with a view of forming settlements, had special need of assistance to carry their plans into effect. An example is the act of June 30, 1834,[44] which granted 36 sections of land in Illinois and Michigan to Polish exiles, providing they inhabited, cultivated, and paid the minimum price per acre for it. In this particular case, the Senate wanted to give them the land outright, but the House objected, claiming that it would be a discrimination against natives.

#### 4. NATIVE AMERICAN AND KNOW-NOTHING MOVEMENTS

The thirties of the nineteenth century witnessed increased immigration to the United States from Ireland; with it the fire of racial and religious intolerance was rekindled. It was at that time that the Native American movement, followed by the Know-Nothing Party

[44] 4 Stat. 743.

and the American Protective Association was born. A large percentage of immigration during that period was Catholic and catholicism was in disfavor at the time. Anti-catholicism was the moving element in the antiforeign agitation. In several States, legislation against Catholics had been enacted. The Carolinas had a law preventing a Catholic from holding office and New Hampshire had a similar provision in her constitution.

The first anti-Catholic outbreak occurred in 1834, when the Ursuline Convent at Charlestown near Boston was burned. This hostility next took the form of a political movement, and in 1835, there was a Nativist candidate for Congress in New York City. In 1837, Nativist societies were formed in Germantown, Pa., and Washington, D. C.; and in Louisiana in 1839, where 2 years later a State convention was held at which the party was established as the American Republican Party. By 1845, the movement claimed 110,000 members, mostly in New York, Pennsylvania, and Massachusetts and had 6 representatives in Congress from New York and 2 from Pennsylvania.

The first national convention of Native Americans was held in Philadelphia in 1845, where 141 delegates adopted a national platform. The chief demands of the convention were a repeal of the naturalization laws and the appointment of only native Americans to office.

While these societies were stronger in local than in national politics and were organized chiefly to aid in controlling local affairs, their representatives in Congress attempted to make nativism a national question. As a result of their efforts, the Senate in 1836 agreed to a resolution directing the Secretary of State to collect certain information respecting the immigration of paupers and criminals.

In 1838 the House of Representatives agreed to a resolution which provided that the House Judiciary Committee consider the expediency and propriety of providing by law against the introduction into the United States of vagabonds and paupers deported from foreign countries. This resulted in the first congressional investigation of any question bearing on immigration. The committee reported to Congress and recommended immediate legislative action, not only by Congress, but also by many of the States, so that alleged evils could be remedied and impending calamities averted. No legislation was, however, enacted, and during the next 10 years, little attempt was made to secure legislation against the foreigner.

In a message to Congress in 1841, President Tyler referred to immigration, in part, as follows:

> We hold out to the people of other countries an invitation to come and settle among us as members of our rapidly growing family; and for the blessings which we offer them, we require of them to look upon our country as their country, and unite with us in the great task of preserving our institutions and thereby perpetuating our liberties.

As a consequence of the sudden and great increase of immigration from Europe between 1848 and 1850, the old dread of the foreigner was revived and the Native Americans again became active. This movement, like the earlier one, was closely associated with the anti-Catholic sentiment. The new organization assumed the form of a secret society. It was organized about 1850 in New York City and increased in membership in 1852 by drawing largely from the old estab-

lished Order of United Americans. Its meetings were secret, its endorsements were never made openly, and even its name and purpose were said to be known only to those who reached the highest degree. Consequently, the rank and file, when questioned about their party, were obliged to answer, "I don't know." They came, therefore, to be called the Know Nothings.

By 1854 much of the organization's secret character had been discarded. Its name, Order of the Star Spangled Banner, and its meeting places were known, and it openly endorsed candidates for office and nominated candidates of its own. By 1855 it had become quite successful in local and State politics. It is recorded that the legislatures and governors of seven of the States were Know Nothings.

Encouraged by its success in local affairs, the party began to make plans for the presidential election. It held a national council in Philadelphia in 1855 and adopted a platform which called for a change in existing naturalization laws, the repeal of several State laws which allowed unnaturalized foreigners to vote, as well as repeal by Congress of all acts making grants of land to unnaturalized foreigners and allowing them to vote in the Territories.

The following year, a national convention of the party was held in Philadelphia, where 27 States were represented by 227 delegates. The principles of the platform adopted were that Americans must rule America and to this end native-born citizens should be selected for all State, Federal, and municipal government offices and given employment in preference to all others. When a motion was made to nominate a candidate for President, nearly all of the delegates from New England, Ohio, Pennsylvania, Illinois, and Iowa withdrew. The withdrawing minority wanted an antislavery plank. Those remaining nominated Millard Fillmore who was also nominated by the Whig Party the following September. The Whigs did not, however, adopt the platform of the Know Nothings, but rather referred to its "peculiar doctrines." At the following election, Mr. Fillmore carried only one State.

The Know Nothing strength in Congress was greatest in the Thirty-fourth Congress (1855-57). Being a minority, however, the party had little influence on national legislation. It has been said that the Know Nothings disappeared without having accomplished anything against immigration, adopted citizens, or Catholics. As a matter of fact, there had been some national legislation favorable to foreigners passed during the period of their agitation. In 1847,[45] 1848,[46] and 1855,[47] the Passenger Act of 1819[48] was amended further to protect immigrants from dangers incident to travel of that day. The Native Americans and Know Nothings were opposed to the amendments.[49]

In 1862 the Coolie Act,[50] prohibiting Americans from carrying on trade in coolies between China and the West Indies, and the Homestead Act,[51] permitting aliens who had filed their declarations of intentions to become naturalized to become eligible for homesteads, were passed.

[45] 9 Stat. 127-149.
[46] 9 Stat. 220.
[47] 10 Stat. 715.
[48] 3 Stat. 488.
[49] U. S. Immigration Commission, Report, 1911.
[50] 12 Stat. 340.
[51] 12 Stat. 392.

The principal immigration legislation of the period following the Know Nothing movement was the law of 1864.[52] This was the first time the Federal Government attempted to encourage immigration by direct legislation, although the States had frequently done so. It provided principally for the enforcement of contracts in which immigrants pledged the wages of their labor to repay expenses of emigration. In recommending the bill, the House committee said the vast number of laboring men, estimated at nearly 1.25 million, who had left their peaceful pursuits and gone forth in defense of the Government, had created a vacuum which was becoming seriously felt in every portion of the country.

Following enactment of this law, there were several companies established to deal in immigrant contract labor. The act was, however, repealed the same year by a clause in the Consular and Diplomatic Act.[53]

During the period between 1820 and 1880, more than 10,000,000 immigrants arrived in this country. From time to time, especially during periods of economic depression, there were movements to put some control on the enormous influx of immigrants. Some of the States passed local laws regulating the admission of aliens. The Supreme Court of the United States consistently held, however, that such laws were invalid as unconstitutional attempts to regulate foreign commerce.

## 5. FIRST RESTRICTIONS

The first restrictive legislation to be passed by Congress thereafter was the act of March 3, 1875,[54] which provided for inquiry by consular officers as to contracts of immigrants from China or Japan for service for lewd or immoral purposes; penalties for citizens of the United States transporting subjects of China or Japan without free consent for a term of service and made contracts for such service void; and penalties for contracting to supply coolie labor. The immigration of convicts and of women for purposes of prostitution was forbidden. The act required the inspection of vessels under the direction of the collector of the port and the issuance of a certificate of inspection, which specified whether or not any persons whose entry was forbidden were aboard.

The fight to control immigration continued. An act was passed in 1882[55] to exclude paupers and criminals. It also provided for a duty of 50 cents to be levied on each alien passenger who arrived on boats sailing from foreign ports to the United States. The duty was to be paid to the collector of the port and deposited into the Treasury to the credit of the "immigration fund," which was to be used to defray the expenses of examination of passengers on arrival for the purpose of excluding any convict, lunatic, idiot, or any person unable to take care of himself without becoming a public charge. Expense of return of any such person was to be borne by the owners of the vessels.

Although political relations of the United States with China date back to 1844, the first treaty in which the emigration of the inhabi-

[52] 13 Stat. 385.
[53] 15 Stat. 56.
[54] 18 Stat. 477.
[55] 22 Stat. 214.

tants from one country to another was considered was the Burlingame Treaty, proclaimed July 28, 1868. The pact recognized the inherent and inalienable right of man to change his home and allegiance, as well as the mutual advantage to both countries of the free migration and emigration of their citizens and subjects for the purposes of curiosity, trade, or becoming permanent residents. Any other than an entirely "voluntary emigration" was prohibited.

Because of the tremendous influx of Chinese immigrants (200,000 from 1850 to 1880) following the discovery of gold in California, Congress, in 1882, enacted the first of the Chinese Exclusion Acts.[56] The act executed certain stipulations of a treaty with China dated November 17, 1880, and provided for suspension of immigration of Chinese laborers to the United States for a period of 10 years. However, Chinese laborers who were in the United States on November 17, 1880, were given the privilege of departure and reentry into the country. Chinese found not to be lawfully entitled to be or remain in the United States were ordered deported. The act also barred Chinese from being admitted to citizenship.

In 1884, Congress passed another act affecting the Chinese. The act of May 16, 1882, was amended by extending the suspension of immigration of Chinese laborers an additional 10-year period, and extended the application of the law to all subjects of China and Chinese, whether subjects of China or of any other foreign power.

The next restrictive immigration measure was the alien contract labor law,[57] which became effective February 26, 1885, and was aimed at the practice of certain employers importing cheap labor from abroad. This importation practice began in 1869. Advertisements were printed offering inducements to immigrants to proceed to this country, particularly to the coal fields, for employment. Many advertisements asserted that several hundred men were needed in places where there were actually no vacancies. The object was to oversupply the demand for labor so that the domestic laborers would be forced to work at reduced wages.

These abuses came to the attention of Congress about 1884. The House Committee on Labor found that the evils complained of by labor organizations existed to an alarming extent.

The alien contract labor law made it unlawful to import aliens or assist in importation or migration of aliens into the United States, its Territories, or the District of Columbia under contract, made previous to the importation or migration, for the performance of labor or service of any kind in the United States. The law made such contracts void and provided certain penalties. Exception was made of foreigners temporarily residing in the United States, skilled workmen for any new industry not established in the United States and artists, lecturers, and servants. The act was amended in 1887[58] by charging the Secretary of the Treasury with the duty of execution of the law and by providing changes in the procedure for enforcement, and again in 1888[59] to provide for return of immigrants illegally landed and to provide for allowances to informers of violation of immigration laws.

On March 12, 1888, another act was passed affecting Chinese, executing certain stipulations of a later treaty with China (dated

[56] 22 Stat. 58.
[57] 23 Stat. 332.
[58] 24 Stat. 414.
[59] 25 Stat. 566.

March 12, 1888). This act prohibited any Chinese, whether a subject of China or of any other power, from entering the United States. Chinese officials, teachers, students, merchants, and travelers for pleasure or curiosity were excepted. Reentry of Chinese laborers who had left the United States was, with minor exceptions, prohibited. Chinese or persons of Chinese descent found unlawfully in the United States or its Territories were to be deported to the country from whence they came. The acts of 1882 and 1884 were repealed effective upon the ratification of the pending treaty. Legislation of October 1, 1888,[60] took away from Chinese laborers the right of reentry to the United States, unless they had reentered prior to the effective date of the Act.

The Chinese exclusion law was extended again in 1892[61] and 1902,[62] and in 1904[63] it was extended without limitation.

On December 17, 1943, all the Chinese exclusion laws were repealed and the Chinese made eligible for immigration and naturalization. A quota for Chinese persons, which is now 105, was established.[64]

In 1891, an act was passed[65] which added to the list of excludables, idiots, insane persons, paupers or persons likely to become public charges, persons suffering from a loathsome or dangerous contagious disease, felons, persons convicted of other infamous crimes or misdemeanors involving moral turpitude, polygamists, aliens assisted by others by payment for passage, and contract laborers who had been embraced by the act of February 26, 1885.[66] Persons convicted of political offenses were excepted from the provisions excluding criminals. Transportation companies were prohibited from soliciting immigration. The act provided penalties for persons aiding in the landing or bringing into the United States of illegal aliens. It created the office of Superintendent of Immigration and provided for inspection of immigrants on arrival, medical examination, and return of unlawful immigrants.

The law of 1891 followed the heavy flow of immigration during the eighties which resulted in a general sentiment throughout the country that something should be done to check foreigners from coming in such numbers.

### 6. CONGRESSIONAL INVESTIGATIONS

On July 12, 1888, the House of Representatives passed a resolution authorizing the appointment of a select committee to investigate the immigration situation. The committee, known as the Ford committee, reported that there were thousands of alien paupers, insane persons, and idiots landing in this country annually who became a burden upon the States, and that many of them were assisted in emigration by the officials of the country from whence they came. The committee also reported that the laws of 1882 excluding convicts had been and was being repeatedly violated to such an extent that remedial legislation was imperative.

On December 12, 1889, a standing Committee on Immigration was established in the Senate, and on December 20 a Select Committee on

[60] 25 Stat. 504.
[61] 27 Stat. 25.
[62] 32 Stat. 176.
[63] 33 Stat. 394, 428.
[64] 57 Stat. 600.
[65] 26 Stat. 1084.
[66] 23 Stat. 332.

Immigration and Naturalization was established in the House of Representatives.

In March 1890, the House concurred in a resolution authorizing an investigation of the laws on immigration. The committee which made the investigation filed reports showing that large numbers of aliens were being landed every year in violation of the act of 1882, that the contract-labor law was found to be generally evaded, that agents were sent to Europe to arouse interest in America by circulating glowing descriptions of wages paid here, that steamship companies had large numbers of agents soliciting passengers in Europe, and that immigration through Canada was a problem since 50,000 Europeans had gained entrance to the United States by this route. The committee presented a bill which became the act of 1891.[67]

The industrial depression following shortly after the passage of this act brought renewed efforts to restrict immigration. Both the Republican and Democratic Parties adopted planks favoring further restriction of immigration in their 1892 conventions.

In 1892 the Congress again created a joint committee to investigate the immigration laws. Bills embodying the recommendations of the committee were introduced and, although the Senate bill was passed without debate, the House took no action.

The Senate thereupon passed a resolution authorizing another investigation, the result of which was reported to the next session with two accompanying bills, one of which proposed the first educational test as a means of restriction. The investigation resulted in passage of the act of 1893,[68] which required manifests on incoming passengers and more detailed checking procedure on inspection and on boards.

Less than 5 weeks after the approval of the act of 1893, the Senate passed another resolution providing for an investigation into the condition and character of alien immigrants coming into the United States to supply labor to the mines of the country and an inquiry as to whether the laws against the admission of laborers under contract were effectually enforced. No legislation resulted from this investigation.

About this time, the "native Americanism" philosophy arose again in the form of the American Protective Association, a phase of the old "Know Nothing" movement. It was a secret organization, and like the earlier one, was formed for the purpose of creating pressure in elections. The reasons for its formation were stated by its president as follows:

1. That the spirit of the National Constitution was being violated in various ways by certain persons and bodies in the United States.
2. That certain members and sections of the National Government were in connivance with the said violators.
3. That the conditions governing our national immigration were such as to weaken our democratic institutions and form of government and to substitute therefor a system of government not in harmony therewith.
4. That the immigrant vote, under the direction of certain ecclesiastical institutions, had become so dominant a factor in politics as to virtually control it.
5. That this domination had resulted in political prostitution, corruption, and favoritism of the worst kind.
6. That the great majority of the American people, while painfully cognizant of the sinister and debasing results of these conditions, and desirous of amending

67 26 Stat. 1084.
68 27 Stat. 569.

them, were either ignorant of any efficient means of counterorganization, or fearful of their personal interests at the hands of their powerful and organized opponents.

Until 1893, the membership of the APA, as it was commonly known, never exceeded 70,000, but in the two following years it became firmly established and, according to its president, was instrumental in overturning the entire political machinery in about 15 States. In 1896 the association claimed a membership of nearly two and a half million and it seemed probable that the organization would grow in influence and power. In reality, however, it never went beyond the agitational stage.

### 7. VOLUME OF IMMIGRATION CONTINUES

Though ways of controlling the volume of immigration were discussed and restrictive legislation passed, the volume of immigration remained consistently high. From 1875 to 1903 immigration totaled 11,383,731 persons.

On March 3, 1903, another act, designed primarily to codify existing law, was passed.[69] It also contained some restrictive provisions, providing for an increase in head tax to $2 on all passengers upon arrival at United States ports who were not citizens of the United States, Canada, Cuba, or Mexico and adding to the excludable classes epileptics; persons who had been insane within 5 years prior to application for admission; persons who had had two or more attacks of insanity; professional beggars; anarchists; persons who believed in or advocated the overthrow, by force and violence, of our Government, or of all government or forms of law, or the assassination of public officials; and prostitutes and procurers. Advertising to encourage immigration of alien labor was prohibited. The act further provided for inspection by immigration officers on shipboard; deportation, within 2 years after arrival, of ineligible aliens, and return of illegally entered aliens in 3 years. It also contained lengthy provisions for administration and enforcement.

### 8. THE IMMIGRATION ACT OF 1907

Immigration grew rapidly in the early part of the twentieth century. In 1905 alone, over 1,026,000 aliens were admitted to the United States. Demands for restrictive and selective legislation were increased. The increase in Japanese immigration aroused resentment and exclusion bills were introduced in Congress. These bills led to vigorous protests from Japan and strenuous opposition from President Theodore Roosevelt, who recommended the passage of an act providing for naturalization of the Japanese.

The Immigration Act of 1907 followed, authorizing the President to enter into international agreements to regulate immigration.[70] Pursuant to this act, the President, Theodore Roosevelt, concluded with Japan a "gentlemen's agreement" in 1907 which limited the volume of entries of Japanese laborers.

The Immigration Act of 1907 also increased the head tax on passengers to $4 and added to the excludables imbeciles, feeble-minded persons, persons with physical or mental defects which may affect their ability to earn a living, persons afflicted with tuberculosis, children un-

69 32 Stat. 1213.
70 34 Stat. 898.

accompanied by their parents, persons who admitted commission of a crime involving moral turpitude, and women coming to the United States for immoral purposes. The act also created a Joint Commission on Immigration to make full inquiry, examination, and investigation into immigration. The Commission's reports, published in 1911, paved the way for the Immigration Act of 1917 which, with amendments, is still in force.

On March 26, 1910, an act was passed amending the 1907 law to provide wider latitude for the exclusion of idiots, insane persons, criminals, polygamists, anarchists, prostitutes, contract laborers, immigrants assisted by others to come to this country, and unaccompanied children under 16 years of age.[71]

On June 25, 1910, an act, known as the White Slave Traffic Act, was passed for the suppression of such traffic in interstate and foreign transportations.[72] The act designated the Commissioner General of Immigration as the authority of the United States to receive and centralize information concerning the procuration of alien women and girls with a view to their debauchery.

#### 9. THE IMMIGRATION ACT OF 1917

During World War I opposition to free immigration gained momentum. There was particular hostility to immigration from the south and east of Europe, which had been progressively increasing, on the ground that this influx of new immigrants consisted of illiterates and racially unassimilables who would lower American standards.

Congress, on February 5, 1917, passed the basic existing immigration act,[73] which codified all the previous provisions excluding aliens; repealed all inconsistent prior acts and added to the inadmissible classes aliens who are illiterate, persons of constitutional psychopathic inferiority, men, as well as women, entering for immoral purposes, chronic alcoholics, stowaways, vagrants, and persons who had one previous attack of insanity.

One of the most controversial provisions of the 1917 act was the exclusion of aliens over 16 years of age who are unable to read. It raised a storm of protest and the debates in Congress centered on the literacy provision, a subject which had been a controversial question for a number of years.

Since 1896 there had been several bills introduced for a literacy test. President Cleveland and President Taft each vetoed a bill and President Wilson vetoed two. However, the strong feeling for restriction led to passage of the final bill over President Wilson's second veto.

Another part of the 1917 act laid down further restrictions by declaring inadmissible natives of parts of China, all of India, Burma, Siam, the Malay States, a part of Russia, part of Arabia, part of Afghanistan, most of the Polynesian Islands, and the East Indian Islands. The act defined a geographical section called the barred zone, described by degrees of latitude and longitude. Excepted by a box cut out of the area were natives of Persia, and natives of part of Afghanistan and of part of Russia. The purpose of the "barred zone" provision was primarily to exclude Hindus and make exclusion of Asiatics more complete. The act also made radical changes in re-

71 36 Stat. 263.
72 36 Stat. 825.
73 39 Stat. 874.

quiring the deportation after entry in an extensive class of cases and in permitting deportation without time limitation in certain cases.

There were two acts passed in 1918 as war measures. The act of May 22, 1918,[74] authorized the President to control the departure from and entry into the United States, in time of war or national emergency, of any persons whose presence was deemed contrary to public safety. The act of October 16, 1918,[75] related to the exclusion and expulsion of anarchists and other radical aliens.

On May 10, 1920,[76] an act was passed for deportation of alien enemies and aliens convicted of violation or conspiracy to violate various enumerated war acts. The act provided that deportations be made upon warrant of the Secretary of Labor, in accordance with the Immigration Act of 1917. At that time, the Immigration and Naturalization Service was under the jurisdiction of the Secretary of Labor. On June 5, 1920,[77] the act of 1917 was amended to provide for admission of some illiterates on request of citizens having served in the armed forces during World War I.

#### 10. THE QUOTA LAW OF 1921

Immediately after World War I, the Sixty-fifth Congress, third session (December 1, 1918, to March 4, 1919), gave considerable attention to the question of immigration restriction. Many bills were introduced and several hearings were held. A bill was reported favorably out of the House Committee on Immigration to prohibit immigration for 4 years. The House Calendar was so congested, however, that the bill was not debated and failed of enactment.

During the Sixty-sixth Congress (May 19, 1919, to June 5, 1920), a number of bills to prohibit immigration for various periods were introduced. The House passed one (H. R. 14461) to prohibit immigration for 2 years. Blood relatives of citizens were excepted.

The Senate Committee on Immigration, after extensive hearings, substituted a bill (S. 4627) which restricted immigration to 3 percent of the foreign-born population in the United States in 1910. The House and Senate finally accepted that bill, with some amendments, by overwhelming votes of 62 to 2 in the Senate and 295 to 41 in the House. On February 26, 1921, it went to President Wilson, who killed it by pocket veto.

Reports of congressional committees during the years 1918 to 1924 show a succession of conditions very similar to the conditions facing the Congress during the present postwar period.

There were many thousands of victims of the ravages of war in Europe. There were poverty, distress, hunger, and disease everywhere, as well as disturbances and confusions among the populations of the new governments created within the territory of the old nations. It was estimated that between 2,000,000 and 8,000,000 persons in Germany alone wanted to come to the United States. A congressional committee confirmed a published statement of a commissioner of the Hebrew Sheltering and Aid Society of America that—

If there were in existence a ship that could hold 3,000,000 human beings, the 3,000,000 Jews of Poland would board it to escape to America.

74 40 Stat. 559.
75 8 U. S. C. 137.
76 41 Stat. 593.
77 41 Stat. 981.

Fraudulent passports were being issued and fraudulent entry documents were sold. Even fraudulent steamship tickets were sold to the desperate population of many countries in Europe.

The United States was faced with the problems of unemployment and housing. Labor had left the farms during the war for industrial centers and had not returned, and an estimated shortage of 4,000,000 farm laborers existed.

The House Committee on Immigration pointed out that immigrants from Europe to this country were not going to the farms. Only 2.8 percent of the immigration in 1920 purported to be "farmer." Past experience had shown that the immigrants inevitably flocked to centers where their compatriots had already congregated. Furthermore, the American farmers did not want this immigration. At a national congress of farmers in Ohio in November 1920, a resolution was unanimously adopted stating that the organization was unalterably opposed to the proposed diversion and distribution of aliens over the farming districts until immigration was rigidly restricted.

According to the House committee, the economic aspects of immigration alone called for the passage of restrictive legislation. It was also said that to allow great portions of the discontented to enter our country would cause discontent here and that it also would not aid in the reconstruction of Europe.

The House Committee on Immigration, in its report on the bill that later became the quota law of 1921, reported:

There is a limit to our power of assimilation. A speaking and reading knowledge of English is the key to assimilation. The processes of assimilation and amalgamation are slow and difficult. With the populations of the broken parts of Europe headed this way in ever-increasing numbers why not peremptorily check the stream with this temporary measure, and in the meantime try the unique and novel experiment of enforcing all of the immigration laws on our statutes?

There was the usual opposition to the quota law of 1921 and the House committee minority stated its views in the report. The minority minimized claims made by the majority with regard to housing, disease, unemployment, and business conditions and claimed that most of the immigration at the time was made up of persons coming to join relatives who had preceded them.

The Sixty-seventh Congress passed the first quota law, which was approved on May 19, 1921,[78] limiting the number of any nationality entering the United States to 3 percent of foreign-born persons of that nationality who lived here in 1910. Under this law, approximately 350,000 aliens were permitted to enter each year, mostly from northern and western Europe. The law expired by limitation on June 30, 1922, but was extended for 2 years by the act of May 11, 1922.[79]

During the time this law was in effect, the move to curtail immigration was gaining momentum and consideration was given to legislation to be put into effect upon its expiration in 1924.

According to the House committee's report of February 9, 1924:

There is an immediate and urgent need for enactment of immigration legislation. This need arises by reason of the fact that the act of May 19, 1921, as amended and extended by the act of May 11, 1922, popularly known as the "3-percent law", expires June 30, 1924.
The committee is advised that the number of aliens desiring to enter the United States is very large. It is reasonable to assume that, despite unfavorable

[78] 42 Stat. 5.
[79] 42 Stat. 540.

exchange rates, high steamship tariffs, and other untoward factors, an immigration of between 1,500,000 and 2,000,000 would have entered the United States during each of the past 2 years if the 3-percent law had not barred the way.
If the 3-percent law is permitted to expire, and if no other legislation is enacted, the movement to our shores of the largest migration of peoples in the history of the world may be expected to begin on July 1, 1924. The exclusion clauses of the act of February 5, 1917, will be powerless to stay the tide.
Such a situation should not be permitted to arise. The country demands a restriction of immigration. The public demand is not only for restriction but for more rigid and more effective restriction than that imposed at present under the temporary 3-percent law.

The minority filed a report submitted by Representative Sabath. It contained a blistering condemnation of the bill as reported, particularly that part which took the foreign-born residents of 1890 as a basis for the quota, rather than the latter census of 1910 or the census of 1920.

The tone of the minority report is reflected in the following statement:

It is curious to note that, taking the census of 1890 as a basis, Germany would be comparatively in the most favorable position, and Belgium, Bohemia (Czechoslovakia), Yugoslavia, Poland, and Russia, with whom we were allied during the late conflict, in the most unfavorable.
The obvious purpose of this discrimination is the adoption of an unfounded anthropological theory that the nations which are favored are the progeny of fictitious and hitherto unsuspected Nordic ancestors, while those discriminated against are not classified as belonging to that mythical ancestral stock. No scientific evidence worthy of consideration was introduced to substantiate this pseudoscientific proposition. It is pure fiction and the creation of a journalistic imagination. * * *
The majority report insinuates that some of those who have come from foreign countries are nonassimilable or slow of assimilation. No facts are offered in support of such a statement. The preponderance of testimony adduced before the committee is to the contrary. What is meant by assimilation is difficult of definition.

## 11. THE QUOTA LAW OF 1924

The House Committee on Immigration favorably reported a bill (H. R. 6540) and recommended its passage on February 9, 1924. Secretary of State Hughes transmitted to the committee a letter making suggestions, chiefly with respect to provisions for the protection of treaties affecting immigration and particularly with reference to agreements with Japan. This letter was followed by an exchange of correspondence between the Secretary of State and the committee resulting in so many changes that a new bill was introduced (H. R. 7995), which, with amendments, became law on May 26, 1924.[80]

The background of the issues presented by the Secretary of State are as follows:

The Immigration Act of 1907 enabled the President to refuse immigration to certain persons when he was satisfied that such immigration was detrimental to labor conditions here. This act was a result of the growing alarm, particularly on the Pacific coast and in States adjacent to Canada and Mexico, that labor conditions would be seriously affected by a continuation of the then existing rate of increase in admission of Japanese laborers.

The Japanese Government opposed the emigration to the continental United States of its subjects, but it had been found that pass-

[80] 43 Stat. 153.

ports entitling them to go to Hawaii, Mexico, or Canada were being used to gain entry into the United States.

On the basis of the 1907 law, the President on March 14, 1907, issued a proclamation excluding from the continental United States "Japanese or Korean laborers, skilled or unskilled, who had received passports to go to Mexico, Canada, or Hawaii come therefrom."

The House committee reported that a "gentlemen's agreement" with Japan existed in the form of a series of correspondence in 1907 and 1908. It was believed that the only published departmental statement on the agreement was in the annual report of the Commissioner General of Immigration for 1908:

Department circular No. 147, dated March 20, 1907, which has been continued in force as rule 21 of the immigration regulations of July 1, 1907, outlined the policy and procedure to be followed by the immigration officials in giving effect to the law and proclamation.

In order that the best results might follow from an enforcement of the regulations, an understanding was reached with Japan that the existing policy of discouraging emigration of its subjects of the laboring classes to continental United States should be continued, and should, by cooperation of the Governments, be made as effective as possible. This understanding contemplates that the Japanese Government shall issue passports to continental United States only to such of its laborers as are * * * "former residents," "parents, wives, or children of residents" and "settled agriculturists."

The "agreement" was given some strength later by the Ambassador from Japan who attached to the 1911 commercial treaty with Japan the following note:

In proceeding this day to the signature to the treaty of commerce and navigation between Japan and the United States the undersigned, Japanese Ambassador in Washington, duly authorized by his Government, * * * are fully prepared to maintain with equal effectiveness the limitation and control which they have for the past 3 years exercised in regulation of the emigration of laborers to the United States.

The committee felt justified in offering a provision that persons ineligible to citizenship, including the Japanese, shall not be admitted as "immigrants."

Considerable opposition was expressed by Japan but no other nation affected thereby made any protest. The Secretary of State objected that it was in conflict with the "gentlemen's agreement" and with the treaty of 1911. The committee felt that the modifications of the law making exception to those coming solely for trade purposes was satisfactory so far as conflict with the "gentlemen's agreement" was concerned. The committee said it was handicapped in reaching a conclusion because a lack of information on the exact provisions of the agreement since the correspondence between Japan and the United States had not been made public or made available to the committee without permission of Japan.

The committee reported that it was a curious fact that the Department of Labor, having charge of immigration "is not in possession of the 'gentlemen's agreement' and never has been supplied with the same:"

The committee pointed out that the "gentlemen's agreement" was made with the real intent of restricting Japanese immigration. Japan was to prevent the coming of her people to the continental United States so that the Japanese population here would not increase. President Roosevelt had explained that an increase of Japanese in this country, with their advantages in economic competition and

general unassimilability, would be certain to lead to racial strife and possible trouble between the United States and Japan.

The committee stated, however, that the purposes of the agreement had not been accomplished but that the Japanese population of the continental United States had materially increased during the operation of the agreement, partly by direct immigration, partly by birth, and doubtless also by surreptitious entry.

Information received by the committee showed that thousands of Japanese women came into the United States as laborers and had performed the double duty of field laborers and mothers of families which averaged five children. Thousands more leaving Japan with passports for South America had worked their way through Mexico and the Imperial Valley in California.

The United States had acquired more Japanese than any other English-speaking country in the world during the life of the "gentlemen's agreement" and the committee concluded that a continuation of this increase would be contrary to the interests of both nations.

It was suggested that Japan should be placed under quota rule, since the census of 1890 would reduce Japanese immigration to a minimum. Although it was believed that this solution would be acceptable to Japan, the committee objected vigorously to this plan, because it would at once place Japan's nationals in the United States in conflict with our naturalization laws and would discriminate in favor of the Japanese as against all other Asiatic races ineligible to citizenship.

The committee stated that in considering this feature of the bill (exclusion of aliens ineligible for citizenship) and Japan's protests, it should be borne in mind that, while we seek only to protect our citizens in this matter against the influx of unassimilable aliens ineligible to citizenship and are not discriminating against Japan in the matter, Japan herself, in the exercise of similarly wise protection for her own people, excluded the Chinese and Koreans and thereby discriminated against people of her own color in both cases, and against the people of one of her Provinces in one case.[81]

The committee reported that it would appear from these facts that the United States has been grossly lax in permitting the increase in her territory of an unassimilable population ineligible for citizenship and that she has deferred too long the adoption of remedial measures. Accordingly, the section excluding citizens ineligible for citizenship (with certain exceptions) was retained in the bill.

In addition to the exclusion of those ineligible to citizenship, the bill established the requirement for immigration visas issued by American consuls abroad, changed the quota basis from 1910 to 1890, reduced the quotas from 3 to 2 percent, provided for the establishment of permanent quotas on the basis of national origin, and placed the burden of proof on the alien with regard to his admissibility and the legality of his residence in the United States. It also preserved the

81 It might be pointed out also that the problem of Japanese immigration was also faced by the British Empire. Great Britain many years earlier had made a treaty with her ally, Japan, whereby the nationals of Japan were to have favored consideration for residence and citizenship in all the dominions of the Empire, but with the proviso that any dominion could reject this arrangement by notice before the treaty became effective. South Africa, Australia, and New Zealand promptly gave the necessary notice and provided by various methods for absolute exclusion of Japanese immigration, an action which Japan has never protested. Canada failed to take similar action but later sought to remedy the omission by a "gentlemen's agreement" with Japan, limiting yearly admissions from Japan to 400. This agreement did not work satisfactorily and the Dominion Parliament in May 1922, requested the Government to take immediate action to exclude further oriental immigration.

Immigration Act of 1917, which was primarily an act setting forth grounds for exclusion.

There was considerable objection to basing the quotas on the 1890 census, which had the effect of reducing immigration from southern and eastern Europe from 44.6 to 15.3 percent of the total. Secretary of State Hughes stated that this would be likely to offend Italy, Rumania, and other countries which considered the legislation "as an unjust discrimination, *de facto* if not *de jure*, enacted to the detriment of a friendly nation."

In the hearings preceding the debates in Congress, feeling had rather well crystalized that immigration should be restricted by some sort of quota system. The arguments were centered around the census year upon which a quota should be based. Those who wished to restrict immigration from southern and eastern Europe favored taking the census of 1890, since most immigration from southern and eastern Europe came in after that date. Those favoring immigration from southern and eastern Europe wanted the 1920 census as a basis, so that the quotas would reflect the increased numbers of foreign-born from that area. It should be kept in mind that all during the hearings on immigration bills—during the winter and early spring of 1923–24—the quota system then under discussion contemplated basing the quotas on a percentage of foreign-born in the United States on a given date, say, 1890, 1910, or 1920.

The House Committee on Immigration and Naturalization, in reporting the decision by the committee to limit admission of "quota immigrants" to 2 percent based on census of 1890, instead of 3 percent based on the census of 1910, stated that it was necessary to the successful future of our Nation to preserve the basic strain of our population (report to accompany H. R. 7995, 68th Cong., pp. 13–14):

Since it is the axiom of political science that a government not imposed by external force is the visible expression of the ideals, standards, and social viewpoint of the people over which it rules, it is obvious that a change in the character or composition of the population must inevitably result in the evolution of a form of government consonant with the base upon which it rests. If, therefore, the principles of individual liberty, guarded by a constitutional government created on this continent nearly a century and a half ago, is to endure, the basic strain of our population must be maintained and our economic standards preserved.

With the full recognition of the material progress which we owe to the races from southern and eastern Europe, we are conscious that the continued arrival of great numbers tends to upset our balance of population, to depress our standard of living, and to unduly charge our institutions for the care of the socially inadequate.

If immigration from southern and eastern Europe may enter the United States on a basis of substantial equality with that admitted from the older sources of supply, it is clear that if any appreciable number of immigrants are to be allowed to land upon our shores the balance of racial preponderance must in time pass to those elements of the population who reproduce more rapidly on a lower standard of living than those possessing other ideals.

We owe impartial justice to all those who have established themselves in our midst. They are entitled to share in our prosperity. The contribution of their genius to the advancement of our national welfare is recognized. On the other hand, the American people do not concede the right of any foreign group in the United States, or government abroad, to demand a participation in our possessions, tangible or intangible, or to dictate the character of our legislation.

How can we frame a restrictive immigration law to meet these conditions?

The adoption of the 1890 census will accomplish an equitable apportionment between the emigration originating in northwestern Europe and in southern and eastern Europe, respectively. This principle has been embodied in the bill

presented by your committee. Late arrivals are in all fairness not entitled to special privilege over those who have arrived at an earlier date and thereby contributed more to the advancement of the Nation.

The issue was carried to the floor of Congress. The national origins system was first proposed by Representative John Jacob Rogers, of Massachusetts, on April 11, 1924, as an amendment to the immigration bill then under consideration by the House.[82] The system was to be based not on the number of foreign-born residents in the country but on the "national origins" of the people comprising the entire United States population in a given year. The year proposed was 1920 and this date was retained when the national origins system was finally enacted into the act of May 26, 1924. However, the proposal was voted down several times in the House of Representatives without a record vote and the bill passed that body without the national origins provision. It was inserted in the Senate and retained in conference. The House finally accepted the bill with the national origins feature.

The second time Representative Rogers offered his amendment to incorporate the national origins system in the pending legislation, on April 12, 1924, he made a statement on the basic philosophy underlying his proposals to base immigration quotas on a percentage of national origins. On the floor of the House, Mr. Rogers stated (65 Congressional Record, p. 6226):

My objection both to the committee proposal carried in section 10 and to the minority proposal advanced as a substitute for section 10, as well as to the proposal advanced by the gentleman from New York [Mr. Jacobstein], yesterday on the chart which was furnished us all, is that they all base quotas on foreign-born in the United States and upon no one else. There are about 80,000,000 American-born in the United States, as I recall, and about 20,000,000 or 25,000,000 foreign-born. Why in the world in a matter of this moment we should establish our immigration policy upon the basis of the foreign-born alone I cannot for the life of me understand. I am not suggesting that we should not with propriety consider the foreign-born here as one element in determining the quotas. I do mean to insist that we are entitled to consider those of us who were born here as another element in determining the quotas. But no plan except the "national origins" plan recognizes this elementary point. I do not know how many men of foreign birth there are in this House. However many there are, I am sure they are as patriotic and efficient citizens as those of us who are American born, but no more so. Let us assume there are 10 men of foreign birth in this House. Is there any reason that occurs to any man here why the other 425 of us should be excluded altogether in making up a quota? Why the quotas of immigration and why those born here in this country should be superciliously disregarded is altogether beyond me. I simply cannot understand the reasoning.

Continuing, Representative Rogers stated:

The national origins plan vaults completely over the controversy as to whether the admission quota should be based on the census of 1890 or on that of 1910 and lands upon broader grounds where larger considerations come into play. My plan, based on the foreign-born population as disclosed by any census, is indefensible. The same argument must be urged against the proposal that we take all four of the most recent censuses, average the foreign-born, and base the quota upon the average. The general principle is fallacious. It is certainly an attractive proposition that we should instead proportion our admission of immigrants, not to the numbers of racial or national representatives composing the alien colonies or foreign groups now in the country but to the quantities of the various racial and national elements which have passed the refining test of the melting pot and have become amalgamated in the structure of the American Nation.

Debate in the Senate on the immigration bill began on April 2, 1924. Amendments were proposed on the floor (the national-origins feature among them) and the general debate went on intermittently for several weeks.

On April 3, 1924, Senator Reed of Pennsylvania, speaking in the Senate, stated (65 Congressional Record, p. 5460):

It is not possible to understand the immigration problem without having some understanding of the immigration that has come to this country since the discovery of America. Most of us have the impression that the flow of immigrants into the United States was very considerable prior to the American Revolution, but that impression is clearly wrong. There were only 80,000 immigrants into the present area of the United States within the first two centuries and a half after America was known. Yet that was a very sturdy stock. These 80,000 immigrants grew by natural processes to 1,000,000 persons in 1740. There was not much immigration from then on until 1790, although we did receive a considerable number of so-called Scotch-Irish, who were mostly border Scotchmen and Englishmen who had temporarily settled in Ireland, and then came to the United States. Prior to the Revolution there was a considerable immigration of those people. When the first census was taken in 1790 there were then in the United States 3,929,214 persons. Most of them were the descendants of those original 80,000 immigrants, and the remainder of them were immigrants who had come in, almost entirely from Great Britain, in the two or three decades before the War of the Revolution. So that the 3,900,000 persons living in the United States in 1790 were almost entirely of British or Irish origin. There were a few from the Rhenish provinces of Germany, there were a few French, and a very few Spanish, but practically speaking, our population in 1790 was British and Irish. It was almost exclusively Nordic, as that term is used today in speaking of the division of the European peoples.

From that original group of 3,900,000 persons, who were here in 1790, there was developed about half of our present population. The Census Bureau has estimated recently that there are in the United States today the descendants of those original inhabitants at the time of the Revolution to the number of 45,000,000 persons. * * *

We know that our population in 1790, by the excess of births over deaths, was doubling every 22 years. We have that factor of certainty on which we may work. We know that some of the late comers among our immigrants have increased more rapidly than that, but all that has been worked out by the Census Bureau. That Bureau has made a very complete study of the question, and the figures which I have given, showing 47,000,000 of our present white population as being the descendants of that original native stock, are accurate within 1 or 2 percent, anyway.

On the same day, Senator Reed made these further observations (ibid., p. 5461):

Of the whole population of the United States, according to the last census, it is estimated that, including Negroes, 74 percent is of northwestern European origin. Excluding the Negroes, the percentage would be about 80. Of the present population 13 percent of the whole number, including Negroes, came from southern and eastern Europe; that is, from Russia, Poland, the Balkan countries, Turkey in Europe, Italy, and Spain. Thirteen percent of our whole 105,000,000 had a national origin in southern and eastern Europe, and 3 percent, the remainder, have an origin that is either Asiatic or white African, or from some other source. That, I think, is important to be borne in mind when we come to consider the distribution of the quotas and the matter of fairness to one nationality over another.

In discussing the working of the temporary quota law of 1921, Senator Reed stated (ibid., p. 5464):

When that quota law was enacted immigration was coming in a tremendous volume from southern and eastern Europe, and the quotas assigned to the southern and eastern European nations were immediately taken. They sent their full quota in the first two years that the law was in force. The northern and western European countries did not. The German quota was not half taken in the first year, and the British quota was not taken. It looked as though the effect of the

quota law was going to be to shut off the southern and eastern European countries, while northern and western Europe was shut off by its own disinclination to come. Then began to have their effect these motives and forces leading to emigration from all the European countries. In the fiscal year that ended July 1, 1923, the British quota was completely taken. In the present fiscal year the British quota was taken in the first 5 months of the year, which is as rapidly as we permit it to be used up.

In discussing the basis on which the 1921 quota law was laid, Senator Reed stated (ibid., p. 5467):

It seems to me that the method we adopted in our law of 1921 of basing the quotas on the foreign-born who were here in 1910 has this element of unfairness of it: That it disregards entirely those of us who are most interested in keeping American stock up to the highest standard—that is, the people who were born here. Surely it is fair to say that we who are native citizens of America are at least as much interested in America's welfare as our recent arrivals. Yet our present quota law disregards us entirely in making up the quotas. I wonder if I make that clear, because it seems to me it is the fundamental idea which it is necessary to have in judging this whole quota dispute. The present quotas are made up on the basis of the foreign-born residents of the United States, and they disregard entirely the 80 percent of us who were born in this country. Nobody considers the American-born in determining what the quota shall be, and that is where the trouble comes in.

If you take the figures of our foreign-born in 1910, you find that one in every seven was either a Russian or a Pole, and therefore, of course, the result is that one-seventh of our whole immigration quota goes to Russia and Poland. But that is obviously unfair to the American-born, because one-seventh of our whole population is not Russian or Polish. You see that the discrimination comes not in the proposed changes in the quota law but the discrimination was made when the original quota law of 1921 disregarded all the American-born in fixing the amounts of the quotas. What we want to do is to correct that discrimination and make a quota law that is nondiscriminatory. We do not want to discriminate against some nation, but we do want to end the discrimination that now obtains.

On that same day, Senator Reed inserted as a part of his remarks a speech by Henry H. Curran, Commissioner of Immigration at Ellis Island, before the Economic Club, March 25, 1924, in which Mr. Curran had made this observation (ibid., p. 5475):

The third outstanding feature of the law will center about the question of whether we shall take more immigrants from northwestern Europe and fewer from southern and eastern Europe, or vice versa. As to this there is a hot fight on. The present quotas are based on the number of foreign-born in the United States according to the census of 1910. The Senate committee proposes to continue the 1910 basis, while the House committee takes for its basis the number of foreign-born who were here in 1890. If the Senate committee's proposal is adopted, the immigrants from Russia, Poland, the Balkans, and the Mediterranean countries will form just as big a part of a year's immigration as they do now, whereas if the House committee's proposal becomes law there will be a smaller proportion from those parts of Europe and a greater proportion from northwestern Europe and the British Isles. The natives of the southern and eastern countries of Europe charge that assent to the 1890 measure will work a discrimination against them, and they have put forth a very powerful propaganda to that effect. We have not heard very much from the natives of the northwest of Europe and the British Isles.

For my own part, I do not see why—whichever year we use—we should measure the immigrants wholly by the foreign-born in America. Why not pay some attention to the American born in America? Have you, who are American born, no say in this? Must we always measure the future of our own country by the numbers of foreigners who are here? Is it true that the United States is already a collection of foreign colonies, rather than a nation of native Americans? * * *

The first essential is to resolve our 100,000,000 of Americans into more of a national unit, and the best way to help this, through immigration, is to admit from each European country the same fraction of the annual total number of immigrants that the natives and descendants of that country already here bear to our present total of 100,000,000 of Americans.

Representative Vinson in the House on April 11, 1924 (ibid., p. 6118), stated:

Those favoring unrestricted immigration are wont to hearken back to the days of the discovery, colonization, and settlement of our country. In respect of this argument, I want to be thoroughly understood. Were the immigrants now flooding our shores possessed of the same traits, characteristics, and blood of our forefathers, I would have no concern upon this problem confronting us, because, in the main, they belonged to the same branch of the Aryan race. Americans and their forebears, the English, Irish, Scotch, and Welsh, are the same people.

These ancestors of the real American people were related one to the other and possessed, to a large degree, similar tastes, traits, and characteristics. And in the amalgamation of these people and their transition into Americans, we find the persons who created and now maintain the greatest Nation on the globe.

But it is the "new" immigrant who is restricted in emigrating to this country. The emigrants affected by this bill are those from Italy, Greece, Russia, Poland, Bulgaria, Armenia, Czechoslovakia, Yugoslavia, and Turkey. I respectfully submit, with all the power within me, that the people from these countries do not yield their national characteristics, but retain them practically unimpaired by contact with others.

The chairman of the House Committee on Immigration and Naturalization, Representative Albert Johnson of Washington, opposed the national-origins plan when it was offered as an amendment by Representative Rogers of Massachusetts. On April 12, Congressman Johnson spoke as follows (ibid., p. 6227):

I rise in opposition to the amendment submitted by the gentleman from Massachusetts. This plan receives the name of "National origins" plan. To use plain, blunt words, it appears to be a stalling plan. It is a postponement.

The plan was also attacked as being discriminatory. Whatever the true appraisal of the plan was, it was defeated in the House a second time without a record vote, and the bill as passed by that body did not contain the national-origins provision.

The national-origins feature was several times presented to the Senate as an amendment to the bill and it was finally approved. The bill went to conference with the national-origins provision included. The House agreed to the conference report. The bill, as amended, became law on May 26, 1924.

With respect to the national-origins system the effective date was, however, extended on two occasions by Joint Resolutions of Congress, first to July 1, 1928,[83] and then to July 1, 1929.[84] The act provided that during any fiscal year thereafter, the quota of any nationality shall be a number which bears the same ratio to 150,000 as the number of inhabitants in continental United States in 1920, having that national origin, bears to the number of inhabitants in continental United States in 1920, but the minimum quota of any nationality shall be 100.

The 1924 act had been hailed as the most far-reaching change that occurred in America during the course of that quarter century, in that it arrested the tendency toward a change in the fundamental composition of the American stock. It has been denounced as radically biased, statistically incorrect, and a clumsy instrument of selection which bars individuals by discrimination against nations instead of considering personal qualifications of immigrants. It is said to overlook the innate differences of individuals among members of a group

83 44 Stat. 1455.
84 45 Stat. 400.

and to confuse racial traits and cultural attainments by identifying both physical and mental developments with country of birth.

On behalf of the law, it is said that the national-origins basis for immigration gives every national group as many immigrants to this country as that national-origins group has contributed to the population of the United States, and that it is founded, not on a foreign-born basis or on a native-born basis, but on all-American basis as far as the countries of the Old World are concerned.

## 12. SUMMATION OF OUR IMMIGRATION POLICY

There are two justifications for the national-origins plan of immigration restriction. One is that it gives scientific effect to our immigration policy as it has been developed from the time of the founding of our country; the other is that it does this without discrimination against either foreigners or Americans.

The policy of immigration restriction has gradually developed from colonial days. Having the quotas proportioned according to the make-up of the American stock seems to be generally accepted as the best method of allotment. Regardless of the argument used by the opponents of the various plans, the fundamental objection is always that the quota of a particular nationality has been cut. The opposition to using the census of 1910 was based on the argument that it did not give sufficient representation to the countries of northern Europe. The people from southern Europe were loud in their protest against the use of the 1890 census. It is evident that no apportionment could be made which would be favored by all.

The United States can only be an asset to the world if she keeps her institutions intact. Only by the preservation of our unity can we be a factor for good in world affairs. "The country will not be a haven or a beacon light for native or immigrant if it is not maintained a country." [85]

## 13. RECENT LEGISLATION

The Alien Registration Act [86] was passed in 1940 to combat sedition and subversion. It provided for the registration and fingerprinting of all aliens and amended the act of 1917 by prescribing additional deportation clauses, including aliens convicted of smuggling and those assisting in illegal entry of other aliens. The act further amended the 1917 law by providing for voluntary departure in lieu of deportation and for suspension of deportation in certain cases.

In 1943, the Chinese Exclusion Act was repealed.[87] In 1946, the Filipinos [88] and persons belonging to races native of India [89] were granted the privilege of admission to the United States and were declared eligible for naturalization.

Immigration increased after World War II. The first big movement was that of war brides, who were granted special entry permission by Congress in an act passed in 1945.[90] Nearly 96,000 wives, husbands,

85 Martha Ragsdale, The National Origins Plan of Immigration Restriction, p. 59.
86 54 Stat. 670.
87 57 Stat. 600.
88 60 Stat. 1353.
89 60 Stat. 416.
90 59 Stat. 659.

and minor children of service personnel entered the United States during the fiscal years 1946, 1947, and 1948.[91]

Following this was the GI Fiancées Act of 1946 [92] which was extended to December 31, 1948. Under this act there have been over 5,000 alien fiancés and fiancées admitted through June 30, 1948.[13]

The Displaced Persons Act of 1948 [94] permits the immigration of 205,000 displaced persons over a period of 2 years. This is in addition to the forty-odd-thousand who were admitted under the President's directive of December 22, 1945. This act also makes provision for the adjustment of the immigration status of 15,000 displaced persons residing in the United States.

## E. SUMMARY OF THE IMMIGRATION LAWS

### 1. INTRODUCTION

Beginning in 1798 and continuing to the present time, numerous statutes have been enacted for the regulation and control of aliens. These statutes are implemented by a myriad of executive orders, rules, regulations, and operations instructions. In addition, the immigration system is closely intertwined with the naturalization system. This résumé is a synopsis of some of the principal features of the immigration system.

In considering the immigration system of the United States, it must be borne in mind that the United States is primarily a receiving nation; i. e., it is one of the few countries of the world to which aliens are constantly coming and from which relatively few depart permanently. The earlier statutes on immigration were primarily qualitative in nature, while later statutes added quantitative restrictions.

The two basic acts upon which the immigration system of the United States is built are the Immigration Act of February 5, 1917, and the Immigration Act of May 26, 1924. The 1917 act was designed primarily to exclude aliens with physical, mental, or moral disqualifications, whereas the 1924 act was designed primarily to limit the number of immigrants who can be admitted and to prescribe the documents required for entry.

### 2. EXCLUDABLE ALIENS

The immigration laws provide for the exclusion of certain classes of aliens from admission to the United States. A number of the most important grounds for exclusion may be listed as follows:

*a. Physical defects*

Persons with tuberculosis in any form or with a loathsome or dangerous contagious disease are excluded.

*b. Mental defects*

Persons in this group include idiots, imbeciles, insane persons, epileptics, persons of constitutional pyschopathic inferiority, feebleminded and other mental defectives, and chronic alcoholics.·

[91] See p. 461.
[93] 60 Stat. 339.
[92] See p. 587.
[94] Public Law 774, 80th Cong., 2d sess. 62 Stat. 1009.

*c. Moral defects*

Included in this group are persons who have been convicted, or admit the commission of a crime involving moral turpitude; persons who believe in, practice, or advocate polygamy; prostitutes, and persons who share the earnings of prostitutes.

*d. Political disqualification*

Included in this group are persons who believe in overthrowing the Government by force, or the assassination of public officials, or the unlawful destruction of property.

*e. Economic disqualification*

Included in this group are paupers, vagrants, professional beggars, persons likely to become public charges because of physical or mental defect which might impair their ability to earn a living, and children under 16 years of age unaccompanied by or not coming to a parent. Also in this group are contract laborers, including aliens who are induced, assisted, encouraged, or solicited to migrate to the United States by offers or promises of employment, whether such promises are true or false, to perform labor in the United States of any kind, skilled or unskilled; aliens migrating to this country as a result of agreements, oral, written or printed, expressed or implied, to perform labor of any kind, skilled or unskilled; and aliens coming as a result of advertisements for laborers, printed, published, or distributed in a foreign country. Professional artists, singers, actors, lecturers, persons belonging to any recognized learned profession, domestic servants, and certain instrumental musicians are excepted from exclusion as contract laborers.

*f. Miscellaneous disqualifications*

This group includes illiterates who are over 16 years of age and are physically capable of reading; aliens who are not in possession of a valid, unexpired immigration visa and a valid passport; aliens previously excluded from the United States; aliens previously deported from the United States; aliens who are ineligible to naturalization in the United States; stowaways; and aliens who departed from the United States in time of war or period of national emergency to avoid service in our armed forces.

Since 1790, when the first naturalization law was enacted, Congress has limited eligibility for naturalization to members of designated racial groups. The term "ineligible to naturalization" includes:

1. An alien who is debarred on racial grounds from becoming a citizen of the United States.

2. An alien disqualified for naturalization because of desertion or similar proscribed conduct with reference to our armed forces.

3. An alien who filed for exemption from the draft as a neutral alien.

Furthermore, a native of the so-called Asiatic barred zone is excludable from the United States. The barred zone includes the East Indies, western China, French Indochina, Siam, Burma, India, Bhutan, Nepal, eastern Afghanistan, Turkestan, the Kirghiz Steppe, and the southeastern portion of the Arabian Peninsula. This bar does not apply to white persons born in the zone, nor does it apply to aliens who are coming to the United States in some category other than the permanent-resident class.

### 3. ADMISSIBLE ALIENS

#### a. Introduction

All aliens entering the United States are classed either as immigrants or nonimmigrants. In general, an immigrant is one coming to the United States with the intention of residing here permanently, while a nonimmigrant is one coming for a temporary stay only. Specifically, an immigrant is any alien departing from any place outside the United States destined for the United States who is not within one of the categories set forth in the classes of nonimmigrants.

Immigrants are classified as quota or nonquota immigrants depending upon whether they come in under the quota or outside the quota. Under the quota law, only a maximum number of immigrants may enter each year from European countries and from certain Asiatic and African countries. Generally speaking, there is no quota for independent countries of the Western Hemisphere.

#### b. Quota classes

The annual quota of any eligible nationality for each fiscal year, published by Presidential proclamation, is a number which bears the same ratio to 150,000 as the number of inhabitants in continental United States in 1920 having that national origin bears to the number of inhabitants in continental United States in 1920, but the minimum quota of any eligible nationality is 100. For instance, in 1920 the number of inhabitants of British origin in the United States was 48,195,400. The population of the United States was 110,000,000. The ratio therefore is: $X$ is to 150,000 as 48,195,400 is to 110,000,000. $X$ is equal to 65,721, the present British quota. Generally speaking, not more than 10 percent of the annual quota can be admitted in any one month.

Only persons born in a country may be admitted under the quota of that country, with certain exceptions relating to wives and children. In other words, with the exceptions noted, an alien's place of birth and not his citizenship or where he resides determines the quota to which he may be charged.

Quota immigrants are made up of the following classes:

##### (1) Preference quota immigrants

Quota immigrants receiving preferential status under the present immigration laws are:

1. Parents of adult citizens of the United States and husbands of United States citizens, where the marriage occurred on or after January 1, 1948.

2. Persons skilled in agriculture of a nationality whose quota is 300 or more and their wives and children under 18 years of age.

3. Wives, and unmarried children under 21 years of age, of alien residents of the United States, who are lawfully admitted for permanent residence.

Fifty percent of the quota of each nationality is available for the first two classes without priority between them; hence the designation first preference. The remaining 50 percent, plus any unused portion of the first preference, is available for the second-preference group. Any portion of the quotas not used for these three classes is available for other quota immigrants. Chinese persons are not entitled to preference under these classes.

##### (2) Nonpreference quota immigrants

These are the regular quota immigrants not entitled to preference under any of the preceding classes. However, regulations provide for priorities as follows:

###### (a) First-preference quota immigrants

1. In relative cases, the priority is determined by the date of the approval of the petition form by the Immigration and Naturalization Service.

2. In skilled agriculturist cases, the priority is determined as of the date when the alien submits the registration form to the consulate by mail.

It must be noted that categories (a) and (b) have no priority over each other. The two classes must be considered as though they were merged.

###### (b) Second-preference quota immigrants:

The priority of this group is determined by the date the immigrant submits a registration form by mail to the consular office.

###### (c) Nonpreference quota immigrants

i. Top priority.—The following classes are entitled to top priority:

1. Certain alien children over 18 years of age but less than 21, born in a quota country, accompanying a parent entitled to nonquota status.

2. The alien wife or unmarried minor child born in a quota country accompanying an immigrant Spanish national returning to Puerto Rico under the provisions of the act of May 26, 1926.

3. The alien wife or unmarried minor child born in a quota country accompanying an alien, native of Puerto Rico, Guam, or American Samoa, who is immigrating to the United States.

ii. First priority.—After all first-preference and second-preference classes have been considered and in the absence of nonpreference quota immigrants of the "top priority" class, the following classes of aliens are considered for visas:

1. Aliens who have served honorably in the United States armed forces and the alien widows, parents, unmarried minor children, unmarried minor step-children of United States citizens (including deceased citizens) who have so served and aliens who have served honorably as seamen for at least 1 year on vessels of countries of the United Nations engaged in sailing from ports in the United States.

2. Aliens who have been recommended by the Joint Chiefs of Staff as persons whose admission is highly desirable in the national interest, provided that such cases have been approved by certain Government agencies.

3. Displaced persons covered by the President's directive of December 22, 1945, and his directive of October 31, 1946.

iii. Second priority.—This class includes those aliens who applied for visas between July 1, 1941, and July 1, 1945, during which time certain wartime regulations were in effect whereby applications for visas were reviewed in Washington. Applications in this group are considered after applicants of all the preceding preference or priority groups have been considered

*iv. Nonpriority.*—This class includes all quota immigrants not falling within one of the preference or priority classes. They have the last call on quota numbers.

*c. Nonquota classes*

There is no statutory limit on the number of nonquota immigrants except insofar as the number is limited by the excluding provisions of the law or the status required in order to qualify as a nonquota immigrant. Nonquota immigrants are made up of the following classes:

1. Wives and unmarried minor children of American citizens, and husbands of American citizens where the marriage occurred prior to January 1, 1948.   (See Public Law 538, 80th Cong.)
2. Returning residents; i. e., aliens who were previously lawfully admitted and are returning to the United States after a temporary visit abroad.
3. Aliens born in other American countries, their wives and unmarried children under 18 years of age.
4. Ministers and professors, their wives and unmarried children under 18 years of age.
5. Students who are at least 15 years of age.
6. American women who lost citizenship because of marriage to an alien prior to September 22, 1922.   (After that date a woman United States citizen did not lose citizenship by marriage to an alien.)
7. American citizens who lost citizenship through foreign military service on or after January 13, 1941, and who are returning to the United States to regain their citizenship.

*d. Nonimmigrant classes*

Nonimmigrants are made up of the following classes:
1. Government officials, their families, attendants, servants, and employees.
2. Temporary visitors for business or pleasure.
3. Aliens in transit (for instance, from Canada to Mexico).
4. Lawfully admitted aliens who travel from one part of the United States to another through foreign contiguous territory.   (For instance, an alien traveling from Buffalo, N. Y., to Detroit, Mich., may pass through Canada.)
5. Alien seamen and airmen.
6. Treaty traders, their wives, and unmarried children.
7. Representatives to official international organizations, their families, attendants, servants, and employees.

#### 4. DOCUMENTARY REQUIREMENTS

An immigrant or nonimmigrant, with certain exceptions, when applying for admission into the United States, must present a valid passport showing identity or nationality, or a document in lieu of a passport.  Also, with certain exceptions, an immigrant must present—
1. An immigration visa, either quota or nonquota;
2. A resident alien's border crossing card; or
3. A reentry permit as a returning resident.

A nonimmigrant must present—
1. A passport visa;
2. A limited entry certificate;

3. A transit visa or transit certificate; or
4. A nonresident alien's border crossing card.

The chief exceptions to these documentary requirements relate to certain border crossers and so-called 29-day visitors.  Canadian citizens and British subjects domiciled in Canada may enter the United States without documents for a period or periods up to 6 months.  Native-born Cubans may be admitted to the United States up to 29 days without a visa, but must be in possession of a Cuban passport.

#### 5. DEPORTABLE ALIENS

Certain aliens are subject to deportation from the United States, either from causes arising prior to entry or from causes arising subsequent to entry.  Time limitations are imposed in certain cases, whereas in other cases there is no time limitation.  Among the more important grounds for deportation are the following:

1. Violation of status or terms of conditional entry.  This includes all of the nonimmigrant categories as well as the student who is designated as a nonquota immigrant.  Nonquota immigrants (other than students) and quota immigrants are not required to maintain any specific status.
2. Entering without inspection or by fraud.
3. Causes existing at time of entry.  This includes aliens excluded by emergency or wartime restrictions, aliens with fraudulent or no documents, aliens convicted or admitting the commission, prior to entry, of a crime involving moral turpitude, immoral aliens, anarchistic or other subversive aliens, and aliens with mental, physical, economic, or educational disqualifications.
4. Causes arising after entry.  This includes alien smugglers of aliens, aliens convicted of crime, immoral aliens, anarchistic or other subversive aliens, and aliens who become public charges.

#### 6. DISCRETIONARY ACTION

*a. Preexamination*

By regulation, an alien who is in the United States and for whom a quota number will soon be available, may be examined in the United States to determine whether or not he would be admissible if he were in possession of a visa and applying for admission at a port of entry. If it is determined that he is admissible, he proceeds to Canada where he appears before an American Consul and applies for a visa.  This relief may be granted regardless of whether or not the alien is under deportation proceedings.

*b. Suspension of deportation*

The Attorney General may suspend the deportation of certain classes of aliens.  If this action is approved by the Congress the aliens affected have their status adjusted to permanent residents.

*c. Seventh proviso*

Under the Immigration Act of 1917, the Attorney General is vested with discretionary power to admit aliens who are in an excludable class but who are returning to the United States to an unrelinquished domicile of seven consecutive years.  This power may be used to waive any bar to admission except as to aliens who are ineligible to citizenship, aliens who were brought by nonsignatory lines to contig-

uous territory, aliens with improper, fraudulent, or no documents, and aliens whose entry would be prejudicial to the interests of the United States.

It is pertinent to note that to qualify an alien for relief under the seventh proviso, his 7 years' domicile in the United States need not have had its inception in a legal entry.

### d. Ninth proviso

Under the Immigration Act of 1917, the Attorney General is vested with discretionary power to admit *for a temporary period* any alien who is inadmissible or excludable for any reason. The Attorney General has adopted a policy of not granting ninth proviso relief in cases of:

1. Aliens who are not bona fide nonimmigrants.
2. Aliens who have previously been deported or removed from the United States and have not been granted permission to reapply for admission to the United States.
3. Aliens whose admission would be contrary to the public safety.

### e. Returning resident aliens

Under the Immigration Act of 1924, the Attorney General is vested with discretionary power to admit returning resident aliens who do not meet certain documentary requirements.

## F. MIGRATIONS TO AND FROM THE UNITED STATES

### 1. AREA AND POPULATION

The area of continental United States has increased from 892,135 square miles in 1790 to 3,022,387 square miles in 1940, the date of the last available census, while the population has increased from 4.5 persons per square mile of land area in 1790 to 44.2 persons in 1940.

Immigration from Europe, which began in the early part of the seventeenth century, was the beginning of a population growth in this country that has been the most rapid in recorded history. The country, inhabited then by a few thousand Indians, has grown to its present population of approximately 150,000,000 in a little over 300 years.

Although early immigration was made up of small groups numbering not more than 100 to each group, our immigration swelled and our population increased rapidly as a result. The population by 1650 was about 52,000. In the next 50 years, it had risen to 275,000 and by 1750, 100 years later, it had reached 1,000,000. The first census was taken in 1790, which showed a population of 3,227,000. Studies based upon this census indicate that more than 75 percent of the population at that time had originated in the British Isles. Eight percent came from Germany and smaller percentages originated in the Netherlands, France, Sweden, and Spain.

The number of immigrants who came here from the close of the Revolutionary War up to 1820 is generally placed at 250,000. There is no official record of persons arriving in the United States up to that time. During the War of 1812, there was a falling off in immigration, but in 1817, some 20,000 persons came to this country. Selection was limited chiefly to the rugged in body and spirit, since, generally, only they could survive the rigors of the voyages at that time.

From 1790 through 1860, the increase in population over the preceding census ranged from 32.7 to 36.4 percent. In each census period from 1870 through 1900, the increase in population was slightly over 25 percent. There was a 21-percent increase in 1910, a 14.9-percent increase in 1920, and a 16.1-percent increase in 1930. The 1940 census showed a 7.2-percent increase in population over the preceding census.

From 1820 to 1947, almost 39,000,000 people had been added to our population by immigration, a growth by immigration which has been called the most rapid in recorded history. The number of immigrants who came here from the close of the Revolutionary War until 1820 is generally placed at 250,000. There is no official record of persons arriving in the United States up to that time. It is said that during the War of 1812, there was a falling off of immigration, but in 1817, some 20,000 persons came to this country. Beginning in 1820, there was a record kept of immigration to this country in accordance with a law passed in 1819.

From 1790 to 1820, when the increase in population in each census period was running over 35 percent, there is no official record of immigration. From 1820 to 1830, however, when the increase in population was 33.5 percent, immigration was known to be a significant factor contributing to the increase.

Immigration increased from a little over 9,000 in 1821 to over 23,000 in 1830. From 1870 to 1900, when the population increase in each census period was running from 20 to 26 percent over the preceding census period, our immigration was increasing still more rapidly.

Immigration increased from 2,314,824 during the decade ending in 1870 to 5,246,613 during the decade ending in 1890 and receded to 3,687,564 during the decade ending in 1900. During the three decades from 1870 to 1900, immigration to this country was close to 12,000,000 persons or an average of over 390,000 per year.

In the decade from 1901 to 1910, immigration was almost three times the immigration of the preceding decade. During the decade from 1901 to 1910, there were close to 9,000,000 immigrants admitted to this country, and during the decade ending 1910 to 1920, almost 6,000,000 immigrants were admitted into this country. The flow of immigration began to fall off in 1922, after the first quota act was passed. During the decade from 1920 to 1930, immigration was slightly over 4,000,000, and during the decade from 1930 to 1940, it dropped to slightly over 500,000. During the period from 1941 to 1947, our immigration was less than 500,000. Until the close of the fiscal year 1948, our total immigration was close to 39,000,000 persons.[95]

### 2. EXTENT OF MIGRATIONS

There were more than 81,000,000 legal admissions of aliens and citizens into the United States during the fiscal year ending June 30, 1948. Of this number, 96 percent were commuters or others who go back and forth across the borders frequently. The remaining 4 percent (3,240,000 admissions), were chiefly quota immigrants, non-quota immigrants, nonimmigrants, seamen, agricultural laborers, displaced persons, and reentrants.

[95] See appendix IV, table 1, p. 814.

There were almost 500,000 aliens (exclusive of border crossers, Mexican agricultural laborers, and crewmen) who departed from the United States during the fiscal year ending June 30, 1948.

During the fiscal year 1948, there were 92,526 quota immigrants admitted for permanent residence and 78,044 nonquota immigrants admitted for permanent residence. Over the years, quota immigration and nonquota immigration have been substantially the same in number. During the 22-year period from July 1, 1924, to June 30, 1946, there were 1,321,434 quota immigrants and 1,249,280 nonquota immigrants.

During the fiscal year 1948, there were over 476,000 overseas nonimmigrants admitted into the United States. During the fiscal year 1946, there were slightly more than 203,000 overseas nonimmigrants admitted, and during the fiscal year 1947 there were over 366,000 overseas nonimmigrants admitted.[96]

There were 1,937,874 seamen arriving in this country during the fiscal year 1948. Over 900,000 of this group were aliens and there were 4,353 who deserted. Thus an average of over 5,000 seamen arrived in this country per day.[97]

Since June 1944, there were a total of 358,112 agricultural laborers admitted into the United States, chiefly from Jamaica, Mexico, and the Bahamas. This was an average of over 71,000 per year.[98]

In addition to all the other admissions into the United States, there are thousands who enter each year illegally. There have been several estimates made of the numbers of illegal aliens in this country. There is, however, no way of knowing just how many such entries take place, since an illegal entry cannot be claimed or recorded until the alien is apprehended. During the fiscal year 1948, there were 217,555 aliens deported or given voluntary departure in lieu of deportation.

In addition to immigration, there is another class of migrations which, although not strictly immigration, must be taken into consideration in appraising the flow of persons into this country. This is the migration of persons from the insular and island possessions of the United States, the majority of whom come from Puerto Rico.

Since the Foraker Act of 1900 made Puerto Rico a nonincorporated territory of the United States, Puerto Ricans have enjoyed the privilege of free entry into continental United States.

Migrations between the continental United States and the island possessions, during the period from 1938 to 1948, totaled 880,322 arrivals. Of this number, over 386,000 were from Puerto Rico and 365,463 from Hawaii. There was a net in-migration from Puerto Rico of 162,725 and a net in-migration of 73,316 from Hawaii during this 10-year period.

While migrations from Puerto Rico to the continental United States have accelerated from slightly over 19,000 in 1944 to over 93,000 in 1948, during the same period migrations from the Virgin Islands into Puerto Rico also increased considerably. These migrations from the Virgin Islands into Puerto Rico increased from over 7,000 in 1944 to over 17,500 in 1948.[99]

[96] See appendix IV, table 10, p. 822.
[97] See appendix IV, table 15, p. 826.
[98] See appendix IV, table 22, p. 831.
[99] See appendix IV, table 22, p. 831.

### 3. IMMIGRANT ADMISSIONS

The number of immigrants who came to this country from the close of the Revolutionary War up to 1820 is generally placed at 250,000. From 1820, when the first record of immigration was made in accordance with an act of 1819, until the end of the fiscal year 1948, our immigration totaled 38,887,978. In the decade from 1820 to 1830, immigration was slightly over 140,000 and in the decade from 1830 to 1840, our immigration had increased more than 400 percent. Immigration during the next decade, from 1840 to 1850, passed the 1.5-million mark and, thereafter, increased to an average of over 4.75 million for each of the next eight decades.

Immigration reached its peak in the decade from 1901 to 1910, when it passed the million mark 4 years out of the 10. During this decade, there were almost 9,000,000 immigrants.

Beginning in the decade from 1910 to 1920, immigration began to fall off. Although in 1913 and again in 1914, it passed the million mark, the total for the decade declined to 5,735,811. The chief reason for this decline in immigration was due to the passage of the Immigration Act of 1917, which required a literacy test and had other restrictive measures for the purpose of decreasing immigration. World War I was also a factor in this decline. In the decade from 1920 to 1930, immigration fell off still more as a result of the first quota act in 1921, which was later followed by the quota act of 1924. Immigration in this decade declined to 4,107,209. In the decade from 1930 to 1940, immigration was slightly more than a half million. In the 8-year period from 1940 to 1948, immigration was approximately 600,000.

Some writers on immigration consider the subject from the standpoint of three periods. The first, called the free period, is the 61-year period from 1820 to 1880. The second, called the selective period, was the 40-year period from 1880 to 1920. The third, called the restrictive period, was the period from 1920 to 1948.

During the free period, when there were no immigration laws except those that had been passed with the intent of assisting immigration, such as the passenger acts and steerage laws, our immigration amounted to 10,189,429. During the selective period, when a series of laws had been passed, beginning with the first General Immigration Act of 1882 and followed by the Chinese Exclusion Acts passed during this period, our immigration totaled 23,465,374. In the restrictive period, from 1920 to 1948, a period of 28 years, immigration amounted to 5,233,175.[1]

### 4. ADMISSIONS AND DEPARTURES

*a. Immigrants in general*

The first official recording of aliens departing from this country began in 1908. From 1908 to the end of fiscal year 1948, the number of immigrant aliens admitted exceeded the number of emigrant aliens departed by 8,965,878. From 1911 to 1920, the excess was 3,588,817, and from 1921 to 1930, 3,062,133.

From 1931 to 1940, during which period this country suffered a depression and the administration enforced more restrictive immigra-

[1] See appendix IV, tables 3, 4, and 5, pp. 817, 818.

tion legislation, namely, the National Origins Quota Act of 1924, the number of immigrant aliens admitted exceeded those departed by only 68,693.[2]

From 1941 to 1948, the number of immigrant aliens admitted exceeded the number of emigrant aliens departed by 343,625.

### b. Quota immigrant admissions

From 1925 to 1929, when the Nation was operating under an experimental quota law based upon 2 percent of the foreign born in the Nation, according to the 1890 census, there were 761,622 quota immigrants admitted into the United States. From 1930 to 1934, following the effective date of the National Origins Act, 229,301 quota immigrants were admitted.

In the periods from 1935 to 1939 and from 1940 to 1944, the totals for quota immigrants admitted were 168,540 and 121,253, respectively. In 1945, there was a decided drop in the number of quota immigrants admitted, a total of only 11,623. In 1946, a total of 29,095 were admitted, in 1947, 70,701, and in 1948, 92,526.[3]

### c. Sources of immigration

Immigration from northern and western European countries had increased from 68 percent of total immigration in the decade from 1820 to 1830 to 93.6 percent from 1851 to 1860. This source of immigration decreased every decade until it reached 17.4 percent in the decade from 1911 to 1920. On the other hand, immigration from southern and eastern European countries increased from 2.2 percent of total immigration from 1821 to 1830 to 7.2 percent from 1871 to 1880. It increased to 18.3 percent in the decade from 1881 to 1890 and to 70.8 percent from 1901 to 1910. Thereafter it dropped to 59 percent from 1911 to 1920.

From 1924 to 1946, there was a shift in the source of immigration, with only 18.9 percent coming from southern and eastern Europe and 43.1 percent coming from northern and western Europe. It was during this period that our Nation enacted the first real restrictive laws on immigration by establishing restrictive quotas.

Immigration from southern and eastern Europe constituted 16.2 percent of total immigration in 1947 and 17.9 percent in 1948. Immigration from northern and western Europe was 40.6 percent in 1947 and 42.9 percent in 1948.

During the years from 1925 to 1929, when the so-called 2 percent quota law was in effect, quota immigration to this country from all sources totaled 761,622. Of these, 755,387 came from Europe: 656,832 from northern and western Europe and 98,555 from southern and eastern Europe.

Following July 1, 1929, the effective date of the national-origins section of the 1924 act which reduced immigration to approximately 150,000 per year, there was a sharp reduction in quota immigration. From 1930 to 1934 immigration from all quota countries totaled 229,301. Of this total 225,725 came from Europe: 171,806 from northern and western Europe and 53,919 from southern and eastern Europe. In the 5-year period from 1935 to 1939, total immigration from all quota countries was 168,540. Of this total 165,471 came

[2] Immigration and Naturalization, Annual Report (1947), table 11.
[3] See appendix IV, tables 6 and 7, pp. 818, 819.

from Europe: 101,950 from northern and western Europe, and 63,521 from southern and eastern Europe.

From 1940 to 1944, quota immigration from all countries decreased to 121,253, 118,301 coming from Europe. Immigration from northern and western Europe decreased to 76,396, while immigration from southern and eastern Europe decreased to 41,905. In 1945, quota immigration decreased to 11,623 from all quota countries. In 1946, it rose to 29,095, and in 1947, the total was 70,701. Quota immigration from northern and western Europe for these 3 years was 7,305, 16,416, and 47,056, respectively; from southern and eastern Europe it was 3,737, 11,423, and 22,081, respectively.[4]

### d. Nonquota admissions

Prior to 1924, there was no nonquota class of immigration. Although the Nation had its first Immigration Quota Act in 1921 which had permitted some exceptions to the quotas, it was not until 1924 that the nonquota class was established.

From 1925 to 1948, almost 1.5 million nonquota immigrants have been admitted into the country. From 1925 to 1929, when the quotas were based on 3 percent of the foreign-born in this country according to the census of 1897, there were almost 800,000 nonquota immigrants admitted. From 1930 to 1948, following the effective date of the national-origins section of the law which reduced quota immigration to approximately 150,000 per year, there was a total of over 600,000 nonquota immigrants admitted.

From 1925 to 1929, when the Nation was operating under the so-called 2-percent immigration law, out of a total of 111,178 nonquota immigrants, 14,227 came from northern and western Europe and 96,951 came from southern and eastern Europe. One of the chief purposes of the National Origins Act, which limited immigration to this country to approximately 150,000 quota immigrants per year, was to reduce the proportion of immigration from southern and eastern Europe. From 1930 to 1948, however, of the 239,099 European nonquota immigrants who were admitted, 150,967 were, however, from southern and eastern Europe and 88,132 from northern and western Europe.

Generally speaking, immigrants from countries of the Western Hemisphere are nonquota. From 1925 to 1948, out of the total of almost one and one-half million nonquota immigrants, slightly over 1,015,000 came from countries of the Western Hemisphere.

From 1925 to 1929, there were 639,420 immigrants admitted from nonquota countries, and from 1930 to 1948 there were slightly over 375,000.

Of the 1,403,915 nonquota immigrants admitted between 1925 and 1948, the largest portion (70.8 percent) were natives of countries of the Western Hemisphere. The next largest portion (16.5 percent) were the wives of United States citizens and third largest portion (7.5 percent) were children of citizens.

From 1925 to 1948, there were 388,818 nonquota immigrants admitted from quota countries. This amounted to 20.8 percent of the total immigration from those countries for that period. During the same period, nonquota immigration from northern and western Europe amounted to 102,359 or 8.2 percent of the total, and nonquota immi-

[4] See appendix IV, table 7, p. 819.

gration from southern and eastern Europe was 247,918, or 43.8 percent of the total immigration from such countries.

From 1921 to 1930, 36.9 percent of our total immigration from all countries was from the Western Hemisphere. From 1931 to 1940, it dropped to 30.3 percent; and from 1941 to 1947, immigration from the Western Hemisphere was 48.8 percent of the total.

In the periods from 1921 to 1930, 1931 to 1940, and 1941 to 1947, immigration from Canada and Newfoundland was 925,000, 109,000, and 99,000, respectively, or 61 percent, 67.8 percent, and 47.6 percent, respectively, of the total Western Hemisphere immigration.

The source of the next largest portion of the total immigration from the Western Hemisphere is Mexico with 459,300 (30.3 percent) in the period from 1921 to 1930, 22,300 (13.9 percent), from 1931 to 1940, and 53,800 (15.2 percent) from 1941 to 1949.[5]

### e. Nonimmigrant admissions.

Prior to the act of 1924, which instituted numerical limitation on immigration to this country, there was no class specifically known as a nonimmigrant class. The act of 1917, in specifying the various prohibitions and exclusions of the act, uses the term "alien" generally.

Although the act of 1924 does not specifically define a nonimmigrant, it defines a nonimmigrant by exception, by defining an immigrant in section 3. Section 3 of the Immigration Act of 1924 provides that—

When used in this Act, the term "immigrant" means any alien departing from any place outside the United States destined for the United States, except (1) an accredited official of a foreign government recognized by the Government of the United States, his family, attendants, servants, and employees, (2) an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure, (3) an alien in continuous transit through the United States, (4) an alien lawfully admitted to the United States who later goes in transit from one part of the United States to another through foreign contiguous territory, (5) a bona fide alien seaman serving as such on a vessel arriving at a port of the United States and seeking to enter temporarily the United States solely in the pursuit of his calling as a seaman, and (6) an alien entitled to enter the United States solely to carry on trade between the United States and the foreign state of which he is a national under and in pursuance of the provisions of a treaty of commerce and navigation, and his wife, and his unmarried children under twenty-one years of age, if accompanying or following to join him, and (7) a representative of a foreign government in or to an international organization entitled to enjoy privileges, exemptions, and immunities as an international organization under the International Organizations Immunities Act, or an alien officer or employee of such an international organization, and the family, attendants, servants, and employees of such a representative, officer, or employee.

Between July 1, 1925, and June 30, 1948, there was a total of 4,317,425 nonimmigrant aliens admitted into this country, and 4,077,201 departed.

During each fiscal year from 1930 to 1938, inclusive, the number of departing nonimmigrants exceeded the number of arriving nonimmigrants. During the fiscal year 1939, the excess was 10,575, and during the fiscal year 1940, 6,671. Thereafter, for each fiscal year to 1948, the number of arriving nonimmigrants has exceeded the number of departing nonemigrants. This excess was 78,327 in 1945, 17,259 in 1946, 65,384 in 1947, and 48,663 in 1948.

The number of admissions of temporary visitors for pleasure has increased from slightly over 24,000 in 1941 to over 200,000 in 1948.

The number of aliens in transit has increased from slightly over 18,000 in 1941 to over 124,000 in 1948.

[5] See appendix IV, table 8B, p. 821.

Another class of nonimmigrants which is not included in the regular statistics on nonimmigrants by the Immigration and Naturalization Service is alien crewmen. During the fiscal year 1947, 1,763,995 crewmen were examined, and during the fiscal year 1948 there were 1,937,874, an increase of 9.2 percent.

From 1938 to 1948, there were over 16,500,000 arriving crewmen, 8,470,083 aliens, and 8,260,022 citizens. During this period, 8,418,262 alien crewmen departed the country, 51,821 fewer than the total.[6]

### f. Migrations of citizens

During the fiscal year 1948 more than a half million United States citizens arrived at our ports. The number of United States citizens returning to this country has never dropped below 100,000 per year from 1938 to 1948. In the 10-year period there have been almost 3,000,000 United States citizens who have returned to this country.

During the same 10-year period, however, more than 2½ million United States citizens departed this country presumably for permanent residence abroad.[7]

### g. Migration between continental United States and Territories and possessions

During the period from 1938 through 1948 there were over 700,000 citizens admitted into continental United States from territories and possessions.

The two largest contributors to this migration were Hawaii and Puerto Rico. Citizen migrations from Puerto Rico for the 10-year period totaled 386,312 compared to a total of 365,463 from Hawaii. The next largest contributor was Guam with a total of 12,804 for the 10-year period.

During the 10-year period a little more than 500,000 citizens departed the mainland for insular destinations. However, this leaves a net, possibly permanent, influx of citizens from the possessions to the United States of approximately 200,000.

In addition to the citizen travel between the insular possessions and the continental United States there is also some alien travel. During the period from 1938 through 1948 there was a total of 32,864 aliens arrived on the mainland from the possessions and a total of 26,853 aliens departed from the mainland to the insular possessions. This leaves a net of 6,011 admissions of aliens to the continental United States from the possessions.[8]

[6] See appendix IV, tables 10, 11, 12, 13, and 14, pp. 822-826.
[7] See appendix IV, tables 17, 19, 20, and 21, pp. 828-831.
[8] See appendix IV, tables 16 and 18, pp. 827, 829.

## CHAPTER II

## CHARACTERISTICS OF THE POPULATION OF THE UNITED STATES

### A. Historical Composition of the Population

#### 1. INTRODUCTION

At the time the first United States census was taken in 1790, little attention was paid to the nationality of those being counted and it was not until later that any attempt was made to ascertain what nationality groups comprised the young Nation. An analysis of the white population by nationality, as indicated by the names of families reported at the first census, was made in 1900 by the Bureau of the Census. While not entirely accurate, the analysis was, nevertheless, considered to be a fair indication of the nationality percentages in 1790.[1]

That analysis by nationality showed that 83.5 percent of the total white population at that time was composed of persons of English stock. This percentage, plus that for Scotch (6.7 percent) and Irish (1.6 percent) stock, represented a little over 90 percent of the total. Germans constituted slightly less than 6 percent and Dutch 2 percent. The over-all nationality percentages were:

| | | | |
|---|---|---|---|
| English | 83.5 | French | 0.5 |
| Scotch | 6.7 | Others | .1 |
| Germans | 5.6 | Hebrews (1,243) | (¹) |
| Dutch | 2.0 | | |
| Irish | 1.6 | Total | 100.0 |

¹ Less than one-tenth of 1 percent.

During the century and a half which has elapsed since the taking of the first census, there have occurred many changes in the composition of our population. While in 1790 there were but six nationalities represented in the complexion of the Nation, today approximately 30 white nationality groups are component parts of our population.

#### 2. CHANGES IN NATIONALITY RATIOS

It was not until the inauguration of the quota system that an effective check was put on the number of those seeking to emigrate to the United States. There had been exclusion acts which barred certain races but, generally, until the inauguration of the quota immigration system, hardly any European who had passage money was barred from entering the country unless physical or mental defects excluded him. During one decade alone, from 1901 to 1910, over 2,000,000 Italians were admitted into the country.[2] During that

[1] U. S. Bureau of the Census, A Century of Population Growth (1909), pp. 116 ff.
[2] Francis J. Brown and Joseph S. Roucek, One America (1945), p. 632.

10-year period, the country's population increased by 15,977,691 persons, 8,795,386 of whom were immigrants. In other words, immigration exceeded the normal increase through births by 1,613,081. If this flow of immigration had continued, almost 40,000,000 immigrants would have entered the country between 1940 and the present time.

There has been, moreover, a marked change in the nationality composition of the foreign-born, as shown by census figures. For instance, in 1850, the foreign-born Irish in the country constituted 4.14 percent of the total population, while the Germans ranked second with 2.5 percent, and the English ranked third with 1.6 percent. In 1880, on the other hand, the German foreign born led all nationality groups with 1,996,742 or 3.9 percent, while the Irish were second with 1,854,571 or 3.6 percent of the total population. In 1910, after the greatest mass immigration in the country's history, the Germans still were in the lead with 2,311,085 foreign-born or 2.5 percent of the total population of the country; the Irish were second with 1.47 percent; the Italians were third with 1.46 percent; the Russians were fourth with 1.42 percent; and the Scandinavians were fifth with 1.36 percent. At the time of the last census, the most numerous of the foreign-born in the United States were the Italians, having 1,623,580 or 1.23 percent of the total population.[3]

#### 3. FOREIGN-BORN POPULATION: PERCENTAGES

The census of 1850 marked the first time that the task of enumerating the foreign-born population of the United States was undertaken. Comparative tables below show actual and percentage changes of the foreign-born at intervals of 30 years.[4]

| Nationality | Number | Percent | Nationality | Number | Percent |
|---|---|---|---|---|---|
| **1880** [1] | | | **1910** | | |
| Irish | 961,719 | 4.1 | Italians | 1,343,070 | 1.46 |
| Germans | 583,774 | 2.5 | Russians | 1,314,051 | 1.42 |
| English | 379,093 | 1.6 | Scandinavians | 1,250,662 | 1.36 |
| Canadian | 147,711 | .6 | English | 1,219,968 | 1.32 |
| | | | Polish | 937,884 | 1.02 |
| **1880** | | | | | |
| Germans | 1,966,742 | 3.9 | **1940** [1] | | |
| Irish | 1,854,571 | 3.6 | Italians | 1,623,580 | 1.23 |
| English | 917,598 | 1.8 | Russians | 1,346,679 | 1.02 |
| Canadian | 717,157 | 1.4 | Central Europe | 1,251,980 | .95 |
| | | | Germans | 1,237,772 | .94 |
| **1910** [3] | | | Canadians | 1,065,480 | .75 |
| Germans | 2,311,085 | 2.50 | Polish | 993,479 | .71 |
| Irish | 1,352,155 | 1.46 | | | |

[1] Total foreign-born 2,244,602 or 9.6 percent of total population of 23,191,876.
[2] Total foreign-born 5,744,311 or 11.4 percent of total population of 50,155,783.
[3] Total foreign-born 13,345,545 or 14.5 percent of a total population of 91,972,266.
[4] Total foreign-born 11,419,138 or 8.67 percent of a total population of 131,669,275.

#### 4. NATIONAL ORIGINS STUDY

Pursuant to the provisions of the Immigration Act of 1924, a thorough study was conducted to determine the composition on the basis of national origin of the white population of the United States.

[1] U. S. Bureau of the Census, Historical Statistics of the United States, Series B–279–303, p. 32.
[4] Ibid.

That study, based on the census of 1920, established how many people were direct descendants of the colonial stock which entered the country prior to the first census in 1790 and how many were descendants of the postcolonial stock which came after 1790.[5]

## B. RACES, PEOPLES, AND ELEMENTS IN THE UNITED STATES

### 1. INTRODUCTION

This is a concise study of the various racial and nationality groups which are component parts of the population of the United States today. These groups are discussed under the following classifications of geographic origin or racial groups: (1) Europe, (2) Asia, (3) Australia and New Zealand, (4) the Americas, (5) Jews, (6) Negroes.

### 2. EUROPE

*a. Albanians*

*(1) Background of immigration*

The Albanians were not enumerated separately in the census of 1940. Reliable estimates place the number of foreign-born Albanians in the United States at about 30,000 in 1944.[6] The fact that many Albanians who entered the country prior to World War I traveled on Greek or Turkish passports has made it somewhat difficult to secure accurate figures on the total number.

In general, Albanian immigration prior to World War I was composed of two distinct groups, those who decided to leave their country because of political reasons and others who emigrated because of economic conditions. Large numbers of these immigrants returned to their native country during the first decade after World War I.

The major portion of Albanian immigrants entered the United States between 1900 and 1920. Probably as many as 50,000 out of a total of 80,000 of these immigrants returned to Albania between 1919 and 1925.[7]

*(2) Distribution of population*

A large percentage of the Albanians in this country are located in Massachusetts, with Boston the center of population. Smaller groups are located in New York City, Philadelphia, Detroit, Chicago, Milwaukee, St. Louis, and Seattle. Estimated figures, based on the results of the 1940 census, show their distribution as follows:

| State: | Number |
|---|---|
| Massachusetts | 4,600 |
| New York | 1,800 |
| Pennsylvania | 1,300 |
| Michigan | 1,000 |
| Ohio | 900 |
| Connecticut | 800 |
| Missouri | 500 |

*(3) Naturalization and assimilation*

Only since 1924 have the Albanians been enumerated separately by the United States Immigration and Naturalization Service. Since

[5] The results o. the 1920 national origins study are given in appendix XII, table 1, p. 886. The allocation of quotas is given in table 2, p. 886.
[6] Brown and Roucek, One America (1945), p. 235.
[7] Brown and Roucek, op. cit., p. 235.

that time, immigration from Albania has totaled 3,764 (through fiscal year 1948).[8] The annual quota is 100.

The Immigration and Naturalization Service's Annual Report for the fiscal year 1948 showed no enumeration of Albanian immigrants. However, between March 31, 1946, and June 30, 1948, 5 Albanians entered this country as displaced persons, under the terms of the Presidential directive of December 22, 1945.[9]

Between 1937 and the end of fiscal year 1948, 3,485 persons owing former allegiance to Albania were naturalized.[10]

*(4) Employment*

An interesting fact about Albanian immigration is that nearly all immigrants have come from the southern part of Albania and that almost all of them have given up their former pursuits as soldiers, sheepherders, livestock keepers, and farmers. In this country, many are employed in factories or industrial plants of various types. A few Albanian farmers are scattered through Worcester County in Massachusetts. Probably half of the Albanian population in America supports itself as tradespeople in restaurants, lunchrooms, grocery stores, and other business establishments.[11][12]

*(5) Religion—social organizations*

Nearly all the Albanians in the United States are Christians, adhering chiefly to the Albanian Autocephalous Orthodox Church. A few are Roman Catholics. Moslems, who are in an overwhelming majority in the home country, are represented by a very small number among the Albanian-Americans.

Besides the Albanian Relief Fund, there are two sizable organizations, Free Albania, founded in 1941, and Vatra, a pan-Albanian federation, established in 1913, both of which are in Boston. There are also a number of small local societies such as the Dharda Bleta and the Panariti Shquiponja. Two weekly publications, The Sun (Dielli) and Liberty (Liria), are printed in Boston.[13]

*(6) Crime*

Probably because of their small numbers, there are no statistics available on the crime rate of the Albanians in this country.[14]

*b. Austrians*

*(1) Background of immigration*

The Austrians are a nationality group in the United States on whom statistics are not entirely complete. Prior to World War I, many Slav and other immigrants who arrived in the United States from what was then the Austro-Hungarian Empire were labeled "Austrian."

Austrians were first officially enumerated in this country in the census of 1870.[15] The causes of their immigration have been chiefly political and economic in nature.[16] No accurate data are available

[8] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[9] Ibid., table 6B.
[10] Immigration and Naturalization Service, Annual Reports, 1945, 1946, 1947, and 1948.
[11] Brown and Roucek, op. cit., p. 235.
[12] For a study of occupation and employment in the United States, with particular reference to various alien and foreign-born groups, see sec. M, below, p. 274.
[13] Brown and Roucek, op. cit., p. 237-239; for a detailed study of religion in the United States, including various immigrant groups, see sec. K, below, p. 229.
[14] For a comprehensive comparative study of criminality among aliens and foreign-born groups, see section H, below, p. 180.
[15] Brown and Roucek, op. cit., p. 632.
[16] Maurice R. Davie, World Immigration (1936), pp. 116–122.

with respect to the first Austrian arrivals and their settlement in the United States. Since a large portion of the Austrians speak German, it is possible that many of them sought already established German communities and became assimilated there.

After 1880, Austria became increasingly important as a source of immigration to this country. The greatest influx was during the decade 1901 to 1910, when about 2,000,000 "Austrians" arrived, many of whom were really Slavs, and other groups. Shortly after World War I, Austria became a homogeneous republic. After the annexation of Austria by Germany in 1937, Austrian immigrants were counted as Germans (from 1938 through 1945).[17]

### (2) Distribution of population

At the time of the 1940 census, there were 1,261,246 persons in this country who were classed as Austrian, 781,340 of whom were native-born and 479,906 of whom were foreign-born.[18]

The foreign-born group consisted of 248,304 males and 231,602 females.

Of the foreign-born Austrians, 80 percent (383,209) lived in urban areas; 193,325 were males and 189,884 females. Only 13.6 percent (65,069) of the foreign-born were located in rural nonfarm areas; 37,108 were males and 27,961 females. The remainder—31,628, or 6.4 percent—were situated in rural farm areas; 17,871 were males and 13,757 females.[19] Of the foreign-born group, 434,003, or 90.8 percent, were located in the North, while 30,579, or 6.1 percent were in the West, and 15,324, or 3.1 percent, were in the South. In 1940, a total of 172,347 Austrian foreign-born were in the State of New York.

### (3) Naturalization and assimilation

Since the first enumeration of immigrants from Austria and Hungary in 1861, 4,150,252 immigrants have been legally admitted from this area, through June 30, 1948. Approximately 494,000 were Austrians who had been admitted since 1910. The number admitted during the fiscal year 1947 was 1,997.[20] During the fiscal year 1948, Austrian immigrants totaled 2,782, divided as follows: [21]

| Class: | Number |
|---|---|
| Quota immigrants | [1]1, 692 |
| Husbands of citizens | 10 |
| Wives of citizens | 953 |
| Unwed children of citizens | 99 |
| Wives, children of natives, nonquota countries | 2 |
| Ministers, wives, children | 9 |
| Professors, wives, children | 17 |
| Total | 2, 782 |

[1] Includes DP's.

The total number of displaced persons born in Austria who entered this country between May 20, 1946, and June 30, 1948, under the provisions of the Presidential directive of December 1945, totaled 2,040.[22]

[17] Brown and Roucek, op. cit., p. 210.
[18] New York World-Telegram, World Almanac (1949), p. 202.
[19] U. S. Bureau of the Census, Census of 1940, Population (1940) vol. II, pt. 1, table 14, p. 42: table 36, p. 88.
[20] Immigration and Naturalization Service, Annual Report, 1947, table 6.
[21] Immigration and Naturalization Service, Annual Report, 1948, table 6.
[22] Immigration and Naturalization Service, Annual Report, 1948, table 6 B.

In addition to the 2,782 Austrians admitted during the fiscal year 1948, 178 students were admitted under the terms of section 4 (e) of the Immigration Act of 1924. Since 1908, when the Immigration and Naturalization Service first began to enumerate emigrant aliens, nearly 300,000 aliens from Austria have returned to their native country from the United States.

In 1920 only 37.7 percent of the foreign-born Austrians were naturalized. By 1930 63 percent were naturalized, and by 1940, 66.2 percent. The average naturalization rate for all foreign-born in 1940 was 64.6 percent.[23] Naturalization of those claiming Austria as their place of nativity was, for recent years, as follows: 1946, 6,357; 1947, 1,930; 1948, 1,357. From 1938 to 1946 Austrians being naturalized were counted with German nationals.

In recent years, scarcely any Austrians have returned to their native country. The annual reports of the Immigration and Naturalization Service for the years 1947 and 1948 fail to show any Austrian immigrants leaving the United States.

### (4) Crime

A Nation-wide census of Federal and State penitentiaries and reformatories, and county and city jails, covering persons 15 years of age and over, shows a commitment to State and Federal penal institutions ratio of 0.45 per 1,000 population for Austrian-born.[24] The over-all crime ratio for foreign-born Austrians, including commitments to State, Federal, and local penal institutions, was 5.1 per 1,000.

## c. Belgians

### (1) Background of immigration

The Belgians were among the earliest of the Europeans who settled this country, a small group having arrived in the vicinity of what is now New York around 1623.

Although Belgium is the most densely populated country in Europe, it has never furnished a great volume of immigration, due largely to the fact that it has been a comparatively prosperous country.[25] What emigration there has been has come mainly to the United States, admissions totaling 164,610 from 1820 to 1947. The great majority came after 1880, particularly in the first decade of the twentieth century. Entries from Belgium for 1947 were 5,852—1,306 quota immigrants, 902 nonquota immigrants, and 3,644 nonimmigrants. An estimated 75 percent of the Belgians in this country are Flemish; the remainder are Walloons.[26] The present annual quota for Belgium is 1,304.

Belgium, like France, has more immigrants than emigrants. While most of the emigrants come to the United States, other countries (other than European) offer some attraction, Canada, Brazil, Argentina, and South Africa receiving small numbers of Belgians from time to time.

Between 1908 and 1947, some 19,310 persons of Belgian origin emigrated from the United States.

[23] Brown and Roucek, op. cit., p. 657.
[24] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories 1933 (1935), table 25, p. 29; ibid., Prisoners in Jails and Other Penal Institutions Under County or Municipal Jurisdiction 1933 (1935), table 25, p. 37.
[25] Brown and Roucek, op. cit., p. 90.
[26] Brown and Roucek, op. cit., p. 90.

*(2) Distribution of population*

Total foreign white stock of Belgian origin in the United States in 1940 was 130,358, of whom 53,958 were foreign-born.[27] They live chiefly in Michigan, Illinois, and New York. Substantial numbers can also be found in Wisconsin, Pennsylvania, California, Indiana, Minnesota, New Jersey, Ohio, Massachusetts, Washington, Kansas, Iowa, and Missouri. The chief urban areas of Belgian settlement in this country are Detroit, Chicago, New York, Los Angeles, San Francisco, and St. Louis.

A post-World-War-I migration of Flemings settled in the industrial centers at the head of the Great Lakes. The immigrants who composed this group were mainly skilled machine workers and craftsmen.

In 1940, 29,279 of the foreign-born Belgians were males and 24,679 were females. Urban areas contained 39,333, of whom 20,682 were males and 18,651 females. A total of 6,911 were living in rural nonfarm areas—3,895 males and 3,016 females. Rural farm areas had 7,714 (4,702 males and 3,012 females).[28]

As of 1940, some 46,070 Belgians were located in the northern and eastern section of the country, whereas the South had only 2,176 and the West only 5,712.[29]

*(3) Naturalization and assimilation*

The Belgians assimilate readily into our way of life, and the majority are rapidly Americanized. As of 1940, nearly 70 percent had become American citizens.[30] Of 476 naturalized in 1947, over 50 percent (246) had been admitted into this country since 1940, while about one-sixth of those naturalized in 1947 had been here for 30 years or more.[31]

Flemish, English, and French are among the languages and dialects spoken by the Belgians. In 1940, a total of 54,340 persons in the United States listed Flemish, a variant of the Dutch language, as the mother tongue.[32] The Walloons are a French-speaking group.

The Belgian-American newspapers, De Gazette van Moline (Moline, Ill.) and De Gazette van Detroit (Detroit, Mich.) are printed in Flemish.[33]

Among Belgian organizations in this country, the following may be mentioned: Belgian-American Associates (New York), Belgian Information Center (New York), Belgian American Educational Foundation, Inc. (New York), and United Belgian Societies (Chicago). The Belgian Press Association, Inc. issues a monthly magazine, Belgium.

*(4) Employment*

Many Belgian-Americans are engaged in agricultural and related pursuits, such as truck farming; others are adapted to various arts and crafts: weaving, leather and woodworking, pottery making, gem cutting, and textile and metalwork; many are found in mills and factories. Some are architects, masons, glass blowers, cooks, and bakers.[34]

*(5) Education—Religion*

The illiteracy percentage for Belgium (in 1930) was, for males, 5.46 percent, and, for females, 6.38 percent.[35] Although Belgium reduced its percentage of illiteracy from 30.26 percent in 1880 to 9.3 percent in 1920, only a small percentage of the pupils attended school beyond the minimum requirement of law (13 years).[36] The present system provides free and universal education between the ages of 6 and 14.

The percentage of illiteracy for foreign born Belgians 10 years of age and over in the United States was 6.4 percent in 1930.[37]

The existence of both Flemish and French as national languages in Belgium has, perhaps, been a handicap to its educational progress. Although a majority of the people speak Flemish, it was not introduced into the schools until 1883.[38]

By and large, the Belgians are adherents of the Catholic Church, which is frequently their social as well as their religious center.[39] In the old country, religious instruction is required in elementary schools; the children are not, however, required to remain in class while religious instruction is being given.[40]

*(6) Crime*

Few statistics are available with regard to the crime rate of Belgian-Americans. Figures for 1923 showed a foreign-born commitment ratio, for all types of offenses, of 183.5 per 100,000 population (for the period January 1 to June 30).[41]

### d. Bulgarians

*(1) Background of immigration*

The beginning of Bulgarian immigration to the United States dates back to the latter half of the nineteenth century. Later immigration of Bulgarians has been encouraged by letters from the first immigrants.[42]

When the Balkan War broke out in 1912, thousands of Macedonian volunteers gathered in New York on their way to Macedonia, where they joined the Macedonian Legion of the Bulgarian Army. Not many Bulgarian-Americans, however, returned to their native country at the outbreak of World War I in 1914. By 1918, there were only a few Bulgarian colonies in America, and most of these were in Central and Eastern States.[43]

The number of Bulgarians and Bulgarian-Macedonians in the United States today is a matter of conjecture. Before 1913, Macedonian-Bulgars arrived in this country as Turks. After the division of Macedonia they entered as Greeks, Yugoslavians, or Bulgarians.[44] The total white Bulgarian stock in this country in 1940 was 15,688 [45] (8,888 were foreign-born); yet 66,009 gave Bulgarian as their native tongue. It has been stated that many Bulgars came here illegally,

[27] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. I, p. 42.
[28] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. I, p. 42.
[29] Ibid., p. 88.
[30] Brown and Roucek, op. cit., pp. 91-92.
[31] Immigration and Naturalization Service, Annual Report (1947), table 46.
[32] U. S. Bureau of the Census, Statistical Abstract of the United States (1948), p. 37.
[33] Brown and Roucek, Op. cit., pp. 91-92.
[34] Ibid., pp. 90-91.

[35] Warren S. Thompson, Population Problems (1942), p. 122.
[36] H. G. Duncan, Immigration and Assimilation (1933), p. 87.
[37] Maurice R. Davie, World Immigration (1936), p. 265.
[38] H. G. Duncan, op. cit., p. 87.
[39] Brown and Roucek, op. cit., p. 91.
[40] H. G. Duncan, op. cit., p. 88.
[41] U. S. Bureau of the Census, Prisoners, 1923 (1926), p. 94.
[42] Brown and Roucek, op. cit., p. 168.
[43] Ibid., p. 170.
[44] Ibid., p. 168.
[45] Ibid., p. 639.

while others were registered according to their passports, which might have been issued by Serbia, Greece, Turkey, or Rumania. Bulgarian authorities estimate the real number of Bulgarian Americans, including Macedonians after World War I, to be about double the census figures.[46]

### (2) Distribution of the population

Of the 8,888 foreign-born Bulgarians in the United States in 1940 (6,858 males and 2,030 females), 6,901 or 77.6 percent were in urban areas (5,169 males and 1,732 females), 1,262 or 14.2 percent were in rural nonfarm areas (1,093 males and 169 females), and 725 or 8.2 percent were in rural farm areas (596 males and 129 females).[47]

Like most of the other immigrant groups, the Bulgarians are located chiefly in the northern section of this country. Of the foreign-born Bulgarians, 6,910 or over 77.7 percent lived in the North, 1,555 or 17.7 percent in the West, and 423 or 4.6 percent in the South in 1940. Ohio, with 1,461, and Michigan, with 1,425, led all other States in total foreign-born Bulgars.[48]

The Bulgarian-Americans are now chiefly located in Michigan, Pennsylvania, Ohio, California, New York, and Illinois. They have settled principally in cities like Detroit, Rochester, Gary, Toledo, Akron, Cleveland, Columbus, and Chicago.

### (3) Naturalization and assimilation

At least 66,077 Bulgarians had entered this country legally through the fiscal year 1947. Bulgaria, Serbia, and Montenegro were first reported for immigration statistics in 1899. Since 1920, Bulgaria has been reported separately. During the fiscal year 1948, 132 Bulgarian immigrants were admitted into the United States, divided as follows:[49]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 81 |
| Wives of citizens | 37 |
| Unwed children of citizens | 10 |
| Wives, children of natives from nonquota countries | 1 |
| Ministers, wives, children | 3 |
| Total | 132 |

[1] Includes 32 DP's.

In addition, during the fiscal year 1948, 16 Bulgarian students entered the United States under section 4 (e) of the Immigration Act of 1924. The annual Bulgarian quota is 100.

No statistical information is available with regard to the total number of Bulgarians naturalized in this country. Figures for recent years are as follows:[50]

| | Number | | | Number |
|---|---|---|---|---|
| 1944 | 542 | | 1947 | 137 |
| 1945 | 293 | | 1948 | 92 |
| 1946 | 247 | | | |

During the fiscal year ending June 30, 1948, 12 Bulgarians, Serbians, and Montenegrins were excluded from the country.[51]

Of the Bulgarian and Macedonian publications in this country, the Macedonian Tribune and the National Herald are typical.

[46] Ibid., p. 170.
[47] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. I, table 14, p. 42.
[48] Ibid., table 36, pp. 88–89.
[49] Immigration and Naturalization Service, Annual Report, 1948, tables 4 and 6.
[50] Ibid., table 39
[51] Ibid., table 21

### (4) Education—Religion

Statistics on the degree of education of Bulgarians in this country are not available.

In Bulgaria itself, more than 80 percent of the people belong to the Eastern Orthodox Church, and this is the principal religious affiliation of Bulgarians in the United States.

### (5) Crime

Bulgarians were not enumerated separately when the last Nation-wide census of prisons and jails was made, and no figures are available by which to ascertain the crime ratio of the Bulgarians. As of December 31, 1931, when the foreign-born Bulgarians in the United States numbered 9,399, 30 deportable Bulgars were in State and Federal prisons and reformatories; 8 were in Michigan institutions, and 6 in Ohio.

## e. Czechoslovaks

### (1) Background of immigration

Czech immigrants began coming to the United States in the Seventeenth century in small numbers. Religious differences at home were largely responsible for this early Czech migration. A colony of Moravians settled in Bethlehem, Pa., where they founded the Moravian seminary in 1742, and in Salem, where they established Salem College in 1771.[52]

Slovak immigration exceeded in numbers Czech immigration, although the Czechs began migrating at an earlier date. For the period 1809–1910, the number of Slovaks entering the country was 377,527, while the number of Czechs totaled 100,189.[53] The annual quota for Czechoslovakia is 2,874.

As in the case of several other groups whose countries of origin attained independence after World War I, accurate statistics on some phases of Czechoslovak immigration are lacking. In 1940, there were nearly 1,000,000 Czechs, both native-born and foreign-born, in the United States. The decade 1921–30 witnessed an influx of 102,194 Czechoslovaks, the peak year being 1921. During the fiscal year 1948, 3,865 were legally admitted to the United States,[54] an increase of 1,812 over the 2,053 legally admitted in 1947.[55] The 1948 group was divided as follows:

| Class: | Number |
|---|---|
| Quota immigrants | [1] 2,831 |
| Husbands of citizens | 18 |
| Wives of citizens | 626 |
| Unwed children of citizens | 197 |
| Wives, children of natives, nonquota countries | 2 |
| Ministers, wives, children | 141 |
| Professors, wives, children | 48 |
| Other classes | 2 |
| Total | 3,865 |

[1] Includes DP's

There were also 266 Czechoslovak students admitted during the fiscal year 1948, under section 4 (e) of the Immigration Act of 1924.

[52] H. G. Duncan, Immigration and Assimilation (1933), p. 300.
[53] Id.
[54] Immigration and Naturalization Service, Annual Report, 1948, table 6.
[55] Ibid., 1947, table 6.

Between March 30, 1946, and June 30, 1948, a total of 2,266 displaced persons from Czechoslovakia entered the United States under the President's directive of December 22, 1945.

A total of 12 Czechs and 26 Slovaks were excluded at various ports of entry during the fiscal year 1948.[56] Only 64 Czechs returned to their native country during that year; 39 were male, and 25 female. Only 5 were below the age of 20, while 47 were between 35 and 70.[57]

### (2) Distribution of population

There were 984,591 Czechoslovaks in this country[58] in 1940; 664,620 were native-born and 319,971 were foreign-born. The foreign-born included 161,838 males and 158,133 females.[59]

The major portion of the foreign-born Czechs, 227,546, or 72.6 percent, were located in urban areas; 112,380 were male and 115,166 female. Of a total of 49,858 foreign-born Czechs living in rural nonfarm areas, 26,319 were males and 23,539 females. Of 42,567 in rural farm areas, 23,139 were males and 19,428 females. Of the 319,971 Czechoslovaks in the United States in 1940, 291,493, or 91.1 percent, lived in the North, 17,722, or 5.5 percent, lived in the South, and 10,756 or 3.4 percent lived in the West. Every State in the Union had some, Pennsylvania and Illinois leading with 59,394 and 54,914, respectively;[60] Texas had 9,171, or nearly 3 percent of the total.

### (3) Naturalization and assimilation

The Czechs stand fairly high in percentage naturalized. In 1940, 68 percent had been granted citizenship, while naturalization for all foreign stock averaged 64.6 percent.[61] Naturalization in recent years of those claiming Czechoslovakia as their place of nativity was as follows:[62]

| | |
|---|---|
| 1944 | 12,899 |
| 1945 | 5,878 |
| 1946 | 4,165 |
| 1947 | 2,239 |
| 1948 | 1,459 |

Over 8 percent of those naturalized in 1948 were professional and semiprofessional workers.

The process of Americanization has been least effective among the Czech-Americans of Texas, where many of them, although of the third American-born generation, can still speak Czech.[63] There are approximately 300,000 Czechs in Texas, perhaps equally divided between Bohemians and Moravians, with less than 1 percent Slovaks. It is estimated that 95 percent of these Texan Czechs are home owners.

In 1940, 520,440 people in the United States claimed the Czech language as their mother tongue.[64] Czech is taught as a regular subject in two public schools of Illinois (Chicago and Cicero), as well as in a number of Texas public schools. The Council of Higher Education of Chicago, founded in 1902, helps students of Czechoslovak

[56] Ibid., 1948, table 21.
[57] Ibid., table 14.
[58] World Almanac, 1949, p. 202.
[59] U. S. Bureau of the Census Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[60] Ibid., table 36, pp. 88-89.
[61] Brown and Roucek, One America (1945), p. 657.
[62] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[63] Brown and Roucek, op. cit., p. 150.
[64] U. S. Bureau of the Census, Statistical Abstract of the United States, 1948 (69th ed.) (1948), table 37, p. 37.

origin finish their college and university studies by lending them money without interest.[65]

Over 50 Czech publications have a known circulation of more than 394,000, and 31 Slovak publications have over 215,000 circulation.[66] The Slovak press is concentrated in the East, with 24 periodicals (chiefly in Pennsylvania), while the Czech press exists largely in the Middle West.

### (4) Education—Religion

Our early Czech immigrants were a mixture of educated people, peasants, agricultural and domestic laborers. Many of the laborers had had extremely limited opportunities. Those who have come here in recent years have been better trained, as shown by the fact that they have the lowest percentage of illiteracy and highest percentage of skilled labor among our immigrant groups. The Slovaks, coming from a different environment, have had a higher percentage of illiteracy.[67]

Upon their arrival in America, many Czechs and, to a lesser extent, Slovaks drifted into a kind of philosophy known as free thought, and some 480,000 Czechs are freethinkers today. Approximately 300,000 Slovaks are Catholic, 57,000 Protestant, 60,000 Greek Orthodox, and 160,000 freethinkers.[68] Altogether, catholicism claims at least 50 percent of all Czechoslovaks in America.

### (5) Crime

In the last Nation-wide census of Federal and State penitentiaries and reformatories, county and city jails, of persons 15 years old and over, the general commitment ratio of foreign-born Czechoslovaks was only 0.15 per 1,000 population, and only 0.0107 for major crimes, distributed as follows:[69]

| Crime: | Number | Crime—Continued | Number |
|---|---|---|---|
| Homicide | 11 | Rape | 3 |
| Robbery | 4 | Other sex offenses | 5 |
| Aggravated assault | 2 | Forgery | 3 |
| Other assault | 1 | Violation of liquor laws | 3 |
| Burglary | 7 | Other offenses | 3 |
| Larceny | 5 | | |
| Auto theft | 1 | Total | 52 |
| Fraud, embezzlement | 4 | | |

### f. Danes

#### (1) Background of immigration

The earliest authenticated arrival of Danes occurred in 1611. There were subsequent arrivals, and in 1639 Jonas Bronck, Jochim Petersen, and their families and friends settled along the Harlem River. As this colony grew, it became known as Bronck's Land, the origin of the name "Bronx." A number of Danes blended with the Dutch settlers in New Amsterdam; others joined the Swedish colony of New Sweden in Maryland and Pennsylvania, while still others, who belonged to the Moravian Church, found their way to the Moravian Brethren's colonies in Pennsylvania and North Carolina.[70]

[65] Brown and Roucek, op. cit., p. 153.
[66] Common Council on American Unity, Interpreter Release, vol. XXIV, No. 26, June 12, 1947, p. 199.
[67] H. G. Duncan, Immigration and Assimilation (1933), p. 301.
[68] Brown and Roucek, op. cit., p. 152.
[69] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories 1933 (1935), table 25, p. 29.
[70] Brown and Roucek, op. cit., p. 77 ff.

From 1820 through June 30, 1948, there was a total immigration of 338,085 persons from Denmark to the United States. The annual quota for Denmark is 1,181. Those admitted during the fiscal year 1948 were divided into the following classes: [71]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 1,172 |
| Husbands of citizens | 5 |
| Wives of citizens | 122 |
| Unwed children of citizens | 12 |
| Wives, children of natives | 5 |
| Nonquota countries | 5 |
| Ministers, wives, children | 8 |
| Professors, wives, children | 4 |
| Total | 1, 328 |

[1] Includes DP's.

Between March 31, 1946, and July 1, 1948, only one Danish DP entered the country under the terms of the Presidential directive of December 22, 1945.[72] During the fiscal year 1948, 38 Danish students were admitted under section 4 (e) of the Immigration Act of 1924.

While there is no indication that any Danes were excluded from entry during the fiscal year 1948, available figures show that 29 aliens were deported to Denmark for the following reasons: [73]

| Cause: | Number |
|---|---|
| Criminal | 5 |
| Immorality | 1 |
| Mental, physical defects | 1 |
| Overstay | 8 |
| Improper documents | 7 |
| Abandoned status | 3 |
| False statements, etc | 4 |
| Total | 29 |

During the 1948 fiscal year, of 151 Danish seamen who deserted their vessels while in American ports, 94 deserted from Danish ships, 36 from Swedish ships, and 13 from Norwegian ships.[74]

Since 1908, 17,207 immigrants from Denmark have returned to their country of origin from this country.[75] During the fiscal year 1948, 285 aliens emigrated to Denmark.[76]

### (2) Distribution of population

Of the 443,815 Danes in this country in 1940, 305,640 were native-born and 138,175 foreign-born. Of the foreign-born, 83,825 were male and 54,350 female; 83,881, or 60.7 percent, were living in urban areas (49,515 males and 34,366 females); 29,017, or 21 percent, lived in rural farm areas (18,844 males and 10,173 females); and 25,277, or 18.3 percent, were in rural nonfarm areas (15,466 males and 9,811 females).[77]

Only 3.3 percent of the foreign-born Danes were located in the South at the time of the 1940 census.[78] States having relatively large numbers of Danish foreign-born were California, with 19,726 or 14.3

[71] Immigration and Naturalization Service, Annual Report, 1948, tables 4, 6, and 7.
[72] Visa Division, State Department, Final Report, October 5, 1948.
[73] Immigration and Naturalization Service, Annual Report, 1948, table 24.
[74] Immigration and Naturalization Service, Annual Report, 1948, table 22.
[75] Brown and Roucek, op. cit., p. 636; Immigration and Naturalization Service, Annual Report, 1948, table 13.
[76] Immigration and Naturalization Service, Annual Report, 1948, table 13.
[77] U. S. Bureau of the Census, Census of 1940, Population, 1940, vol. II, pt. 1, table 14, p. 42.
[78] Ibid., table 36, pp. 88-89.

percent of the total; New York, with 14,304; Illinois, with 13,869; and Iowa and Minnesota, with over 10,000 each. There were foreign-born Danes in every State of the Union. Their general geographical distribution was:

| Area | Number | Percent |
|---|---|---|
| North | 95, 567 | 69.2 |
| West | 38, 056 | 27.5 |
| South | 4, 552 | 3.3 |

### (3) Naturalization and assimilation

Between 1939 and 1948, 17,429 Danes or persons claiming Denmark as their country of origin became naturalized citizens, 446 in the fiscal year 1948.[79] It appears that naturalization of Danes has been higher than that of any other nationality group.[80] In 1940, while the percentage of all foreign-born naturalized was 64.6 percent, the percentage of Danes naturalized stood at 78.1 percent. Following are the number of Danes naturalized during the past five fiscal years: [81]

| | | | |
|---|---|---|---|
| 1944 | 2, 733 | 1947 | 577 |
| 1945 | 1, 337 | 1948 | 446 |
| 1946 | 894 | | |

The Danes have several social and fraternal organizations in this country. The Danish Brotherhood of America, founded in 1882, has well over 300 lodges and a membership of approximately 17,000. The Danish Sisterhood of America was organized 3 years later and has about 150 lodges. Smaller groups are the United Danish Societies, the Danske Forening Dania of California and Nevada, and others of purely social character. The Danish People's Society has as its purpose the preservation of the social heritage of the Danish immigrants. The Danish American Association has established a national park in the moorlands of Jutland, Denmark, where the Fourth of July is celebrated each year under the Danish flag and the Stars and Stripes.[82]

Of the Danish newspapers established in the past, few have survived. The Pioneer, published in Omaha, Nebr., since 1872, is one of the oldest and was for many years the leading Danish paper in the country. The Dannevirke, published in Cedar Falls, Iowa, has been the official publication of the Danish Lutheran Church since 1880. Others are the Nordlyset of New York and the Ugeblad of Tyler, Minn.[83]

### (4) Employment

About 50 percent of the Danes in the United States own farms, and nearly 60 percent are in agricultural pursuits. The first really permanent settlement of Danish farmers immigrating to this country after 1800 was founded in 1845 in Waukesha County, not far from Milwaukee. Later Racine was settled, and soon several Danish communities were growing in that area. After saving money, a number of these families went further west to build larger settlements in Minnesota, Iowa, Nebraska, Kansas, and the Dakotas.[84]

[79] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[80] Brown and Roucek, op. cit., p. 636; Immigration and Naturalization Service, Annual Report, 1948, table 13.
[81] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[82] Brown and Roucek, op. cit., p. 73 ff.
[83] Ibid.
[84] Ibid.

#### (5) Education—Religion

The Danes are a literate group, and many speak more than one language fluently. The major portion of the Danes, as well as of the Danish-Americans, are Lutherans. Because of early religious differences at home, many Danes emigrated during the Nineteenth century. The number of Danes who migrated to America for political reasons comprised only a minor part of the total immigration.

#### 6) Crime

The last census of prisons and jails showed a felony crime rate for Danes of 0.1 per 1,000 foreign-born population, while the ratio for all crimes, including misdemeanors and minor offenses, was 0.2 per 1,000. The major crimes for which Danes were incarcerated were:[85]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Aggravated assault | 1 | Forgery | 3 |
| Robbery | 3 | Auto theft | 1 |
| Burglary | 5 | Other offenses | 2 |
| Larceny | 2 | | |
| Fraud, embezzlement | 3 | Total | 20 |

### g. Dutch

#### (1) Background of immigration

The first Dutch settlement in America was at New Amsterdam (New York) in 1621. Only a few Dutch settlers came to this country during the seventeenth century and when New Amsterdam was taken by the English in 1664 not over a third of the inhabitants were Hollanders.[86]

The nucleus of the Dutch population in New York State was the settlement west of the lower Hudson. Until 1800, Dutch was the prevalent speech of northern New Jersey. It should not, however, be inferred that the entire population there was of Dutch stock. German and French settlers, by adopting the speech of the majority, had become identified with the Dutch. By 1790 a total of 106,750 Dutch were living in the territory covered by the United States.[87]

Religious differences were the primary and fundamental causes of the emigration of the Dutch to Michigan in 1847.[88] Desire to better their economic status was also a powerful influence.[89]

Emigration from the Netherlands in the nineteenth century was similar to that of the German and Scandinavian. From 1841 to 1902 more than 135,000 people arrived in the United States from the Netherlands; between 1880 and 1890 there were at least 53,000; and in the next 5 years about 25,000 came. The numbers declined sharply thereafter.[90] Total Dutch immigration for the period 1820 to 1948 was 262,209. The present annual quota is 3,153. Over 16,000 aliens emigrated from this country to Holland between 1908 and 1947.

#### (2) Distribution of population

Census figures for 1940 show a total Dutch population in this country of 372,384, of whom 261,320 were native-born of foreign or mixed

[85] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
[86] H. G. Duncan, Immigration and Assimilation (1933), p. 90.
[87] Brown and Roucek, op. cit., pp. 82-83.
[88] W. C. Smith, Americans in the Making (1939), p. 5.
[89] Ibid., p. 25.
[90] G. M. Stephenson, A History of American Immigration (1926), pp. 54-55.

parentage and 111,064 were foreign-born. Of the foreign-born, 64,777 were males and 46,287 females. Moreover, 67,586, or approximately two-thirds, were located in urban areas (38,724 males and 28,862 females); 18,940 were situated in rural nonfarm areas (11,014 males and 7,926 females); and 24,538 were in rural farm areas (15,039 males and 9,499 females).[91]

Of the Dutch foreign-born in this country in 1940, 89,937, or approximately 80 percent, were in the North. The South had only 3,076, while the West had 18,051.[92] Those who arrived from 1880 to 1930 tended to settle in the Middle West, but a substantial number remained in the East, particularly in the Passaic and Paterson areas of New Jersey.

The chief places of residence of persons of Dutch origin in the United States (1940) were as follows: Michigan, Illinois, New York, New Jersey, Iowa, California, Wisconsin, Minnesota, Washington, South Dakota, and Indiana. The cities of Grand Rapids, Mich.; Chicago; New York; Paterson, N. J.; Los Angeles; Detroit; Cleveland; San Francisco; Milwaukee; and St. Louis had substantial numbers of persons of Dutch stock.

A few isolated attempts of the Dutch to colonize Colorado, Texas, and Florida failed because of their unfamiliarity with the soil and because of weather conditions foreign to the temperate climate of Holland.[93]

#### (3) Naturalization and assimilation

It has been said that religious conservatives among the Dutch cling to the Dutch language and customs.[94] Pieters commented that the Dutch immigrants in Michigan apparently felt "that the settlers should come to America but not be of it. They should maintain a little 'Holland,' retaining their own language, customs, and religion."[95] As the Hollanders came in large numbers and lived together in the settlement, the process of assimilation was slow.

Long after the Dutch language ceased to be used in business and in religious services, it continued to be used in the home, in some homes until the middle of the nineteenth century. In 1940, 267,140 persons in this country listed Dutch as the mother tongue.[96]

Only three Dutch papers in this country, Knickerbocker Weekly, Standard Bulletin, and Missionary Monthly Reformed Review, have a circulation above 3,500, and each of these prints articles in both English and Dutch.[97] Other Dutch publications in this country are The Banner (Grand Rapids), Netherlands News (New York), Pella's Weekblad (Pella, Iowa), Hollandische Amerikaan (Kalamazoo, Mich.).

Among the Dutch organizations in this country are the following: Netherlands Information Bureau, Dutch Jewish Representative Committee, Netherlands Jewish Society, Union of Netherlands Societies.

In 1948, 716 persons of Dutch birth were naturalized, 10 of whom had entered 50 to 60 years prior to naturalization.[98] As of 1940,

[91] U. S. Bureau of the Census, Census of 1940, Population, 1940, vol. II, pt. I, table 14, p. 42
[92] Ibid., table 26, pp. 88-89.
[93] Brown and Roucek, op. cit., p. 84.
[94] Ibid., p. 87.
[95] A. J. Pieters, The Dutch in Michigan (1923), p. 130.
[96] U. S. Bureau of the Census, Statistical Abstract of the United States, 1948, p. 37.
[97] Brown and Roucek, op. cit., pp. 86-87.
[98] Immigration and Naturalization Service, Annual Report, 1948, table 46.

71.8 percent of the Dutch immigrants in this country had become naturalized, placing them ninth in rank among foreign groups.[99]

### (4) Employment

The Dutch, like numerous other nationality groups in the United States, are engaged in a variety of occupations, based largely on the background and interests of the individual. A large number are in agricultural and related pursuits. The rural Dutch immigrants made pronounced efforts to locate land and climate in America similar to that in the old country. The Dutch may also be found in industry and science, and a large number of native Netherlanders are on the faculties of our colleges and universities.[1]

### (5) Education—Religion

Education in the Netherlands is free and compulsory between the ages of 6 and 13, both in public and denominational schools. Thus, Holland has a very low rate of illiteracy, which is reflected in the Dutch immigrants who have come to America. Only 0.6 percent of the adult population of Holland is illiterate.[2]

Today, the chief religious faith of the Dutch in America is the Dutch and Calvinist Reformed Church. There is a minority of other denominations, including Roman Catholic, a Dutch Roman Catholic migration to the United States having occurred about the middle of the nineteenth century.[3] Mission work and charity are prominent activities.

### (6) Crime

A total of 20 foreign-born white felony prisoners of Netherland birth were received in State and Federal prisons and reformatories during 1940,[4] a felony commitment ratio of 18 per 100,000 population.

The crimes for which foreign-born Dutch were most frequently committed, according to the 1933 prisons and jails census, were burglary, sex offenses (except rape), homicide, larceny, and forgery. The offenses most frequently committed by the native white of foreign or mixed Dutch parentage were substantially the same as for the foreign-born. Of a total of 3,163 foreign-born white prisoners received by State and Federal prisons and reformatories, 21 were of Netherland birth. Of a total of 8,829 native white prisoners of foreign or mixed parentage received by State and Federal prisons and reformatories, 71 were of Netherland parentage.[5]

## h. Estonians

### (1) Background of immigration

The first Estonian immigrants landed in this country about 1870. The largest number arrived between 1905 and 1908, although the flow of immigration remained fairly steady until 1914.[6] During the fiscal year 1948, 225 Estonians were legally admitted into the United States[7] as follows:

---

| Class: | Number |
|---|---|
| Quota immigrants | [1] 127 |
| Husbands of citizens | 1 |
| Wives of citizens | 80 |
| Wives, children of natives, nonquota countries | 1 |
| Ministers, wives, children | 15 |
| Professors, wives, children | 1 |
| Total | 225 |

[1] Includes DP's.

Between March 31, 1946, and June 30, 1948, 98 Estonians were admitted to the United States as displaced persons under the Presidential directive of December 22, 1945.[8] The annual immigration quota for Esthonia is 116.[9]

### (2) Distribution of population

According to figures of the Census Bureau, there were only 6,658 Estonians in the United States in 1940, of whom 4,178 were foreign-born and 1,480 were native-born. Some Estonian leaders believe, however, that there were at least 60,000 Estonians here in 1940.[10]

The first arrivals settled in seaports such as New York and San Francisco. Some have, however, gone into farming, and have settled in the vicinity of Irma and Gleason, Wis., and Tacoma and Spokane, Wash. As a rule Estonian-Americans tend to stay in larger cities near the coast. Some 2,000 are located in Massachusetts, Connecticut, and Rhode Island, in addition to about 1,000 in Vermont, New Hampshire, and Maine. Bureau of the Census figures for the distribution of the foreign-born Esthonians show that this group resides mainly in the Middle Atlantic States and in California. Over 50 percent reportedly live in New York City.[11]

### (3) Naturalization and assimilation

During the 10-year period ending June 30, 1948, a total of 1,359 Estonians had been naturalized, 63 during the fiscal year 1948.[12] Naturalization for recent years was as follows:

| | Number | | Number |
|---|---|---|---|
| 1944 | 261 | 1947 | 107 |
| 1945 | 138 | 1948 | 63 |
| 1946 | 105 | | |

The principal tie which Estonian immigrants have with their homeland is the Esthonian press, which has, however, been ineffectual, because few have subscribed. Two Estonian newspapers were started before World War I and soon went out of existence. The only Estonian periodical in this country in 1945 was the Meie Tee (Our Path), published monthly in New York City by the Estonian Educational Society. There are no Esthonian church schools.[13]

### (4) Employment

In industrial cities of the Great Lakes area, numerous Esthonians are employed as sailors on lake ships. In small cities, they are often locksmiths and mechanics. Quite a number have gone into farming and related pursuits.

---

[99] Brown and Roucek, Op. cit., p. 657.
[1] Ibid., p. 89.
[2] H. G. Duncan, Immigration and Assimilation (1933), p. 87.
[3] Brown and Roucek, op. cit., pp. 83–85.
[4] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories, 1940 (1943), table 27, p. 36.
[5] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories, 1930 (1933) table 25, p. 39.
[6] Brown and Roucek, One America (1945), p. 195.
[7] Immigration and Naturalization Service, Annual Report, 1948, table 6.

. Department of State, Visa Division, Final Report, October 5, 1948.
[8] Immigration and Naturalization Service, Annual Report, 1948, table 7.
[9] Brown and Roucek. One America (1945), p. 196
[11] Ibid.
[12] Immigration and Naturalization Service, Annual Report, 194., table 39.
[13] Brown and Roucek, op. cit., pp. 196–199.

### (5) Religion

In their native land, nearly 80 percent of the Esthonians are Lutherans, and 19 percent are Greek Orthodox.[14] This affords an indication of the religious composition of the Esthonians in America.

### (6) Crime

No statistics are available on the crime rate of Esthonians in this country.

### i. The Finns

#### (1) Background of immigration

Inasmuch as Finland was an integral part of the Kingdom of Sweden from the Viking period to the eighteenth century, independent Finland inherited a large Swedish-speaking population, especially in the coastal areas. Over 10 percent of the population of Finland spoke Swedish before 1939 and the Swedish-Finnish element is represented in American immigration. The first Finns to come to America appear to have accompanied a group of Swedes who established a colony in what is now Delaware during the seventeenth century.[15]

After the first period of Finnish colonization, there was a long time during which no Finnish immigrants are known to have come to America. For some time prior to 1867, there was a notable immigration of Finns to Alaska. Many Finns who arrived there as seamen remained as settlers.[16] Practically all other Finnish emigrants have gone to the United States.[17]

The Finnish population in the United States totaled 284,290 in 1940. A total of 19,930 Finns were admitted between 1910 and 1943.[18] The annual quota for Finland is 569. During the fiscal year 1948, 693 Finnish immigrants were admitted into the United States, in the following classes:[19]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 516 |
| Husbands of citizens | 4 |
| Wives of citizens | 92 |
| Unwed children of citizens | 54 |
| Wives, children of natives nonquota countries | 1 |
| Ministers, wives, children | 13 |
| Professors, wives, children | 10 |
| Other classes | 3 |
| Total | 693 |

[1] Includes DP's.

Between March 31, 1946, and June 30, 1948, 16 Finnish displaced persons were admitted into the United States. In addition, 40 Finnish students were admitted during the fiscal year 1948. During that same period, 16 Finns were excluded from the United States at various ports of entry,[20] while 48 aliens were deported to Finland, for the following reasons:[21]

---

[14] World Almanac (1949), p. 512.
[15] Brown and Roucek, op. cit., pp. 199–200.
[16] Ibid., p. 200.
[17] H. G. Duncan, Immigration and Assimilation (1933), p. 347.
[18] Brown and Roucek, op. cit., p. 632.
[19] Immigration and Naturalization Service, Annual Report, 1948, tables 6 and 7.
[20] Immigration and Naturalization Service, Annual Report, 1948, table 21.
[21] Ibid., table 24.

---

| Cause: | Number |
|---|---|
| Criminal | 11 |
| Mental, physical defects | 5 |
| Overstay | 17 |
| Improper documents | 11 |
| Abandoned status | 2 |
| False statements, etc | 1 |
| Apt to become public charge | 1 |

During the fiscal year 1948, 95 Finnish seamen deserted their ships while in American ports, most of them from Swedish and Norwegian vessels.[22]

Since 1908, when the Immigration and Naturalization Service first began enumerating aliens returning to their native countries, more than 12,000 aliens have returned to Finland; 119 emigrated in 1948.[23]

#### (2) Distribution of population

Of the 284,290 Finns in the United States in 1940, 167,080 were native-born and 117,210 foreign-born (60,770 males and 56,440 females). A total of 63,759, or 54.4 percent, were living in urban areas (31,104 of these males and 32,655 females); 21,167, or 18.1 percent, in rural nonfarm areas (11,919 males and 9,248 females); and 32,284, or 27.5 percent, in rural farm areas (17,747 males and 14,537 females).[24]

The major portion of the foreign-born Finns in the United States in 1940 had settled in the Northern States, 21,151 in Michigan and 20,152 in Minnesota. Their general geographical distribution was:[25]

| Area | Number | Percent |
|---|---|---|
| North | 89,851 | 76.6 |
| West | 25,596 | 21.9 |
| South | 1,763 | 1.5 |

While there are Finns in every State, they are most numerous in Michigan, Minnesota, New York, Massachusetts, Washington, Ohio, California, and Wisconsin.[26]

#### (3) Naturalization and assimilation

Between 1939 and 1948, 21,433 persons owing former allegiance to Finland were naturalized. The following are Finnish naturalization figures for the past five fiscal years:[27]

| | Number | | Number |
|---|---|---|---|
| 1944 | 3,153 | 1947 | 753 |
| 1945 | 1,931 | 1948 | 574 |
| 1946 | 1,220 | | |

The fact that English is an especially difficult language for Finns to learn has to some degree retarded their assimilation. Although in 1940, 60.8 percent of the foreign-born Finns were naturalized, they are slow in absorbing American ways and customs.

The Finns have several fraternal organizations, largely social and educational, and membership is restricted to persons of Finnish origin. The first Finnish newspaper in the United States was founded in 1876

---

[22] Ibid., table 22.
[23] Ibid., table 13.
[24] U. S. Bureau of the Census, Census of 1940, Population, 1940, vol. II, pt. 1, table 14, p. 42.
[25] Ibid., table 36, pp. 88–99.
[26] Brown and Roucek, op. cit., p. 203.
[27] Immigration and Naturalization Service, Annual Report, 1948, table 39.

under the title "The Finnish Newspaper of America." Only 11 numbers were printed. Since then about 100 other periodicals have appeared, but few survived long. Among those still existing are the New Yorkin Uutiset (New York News), published three times a week; the daily Paivalehti, in Duluth; and the weekly American Sanomat (Tidings of America).[28]

### (4) Religion

Under the influence of Sweden, the Finns first became Roman Catholics and remained so for 400 years. When the Swedes abandoned Catholicism and switched to Lutheranism, the Finns accepted the latter also.[29] Nearly all Finns in the United States today are Lutherans. Educational work is extensively carried on by the Finnish Lutheran churches in America.

### (5) Crime

The last Nation-wide census of Federal and State penitentiaries and reformatories, and county and city jails, covering a population 15 years old and over, showed a felony commitment rate of 0.2 per 1,000 for foreign-born Finns in this country and an over-all rate, including both felonies and misdemeanors, of 9.64 per 1,000 population. The major crimes for which Finns were committed were as follows:[30]

| Crime: | Number committed |
|---|---|
| Homicide | 3 |
| Robbery | 2 |
| Aggravated assault | 1 |
| Other assault | 1 |
| Burglary | 4 |
| Larceny | 3 |
| Violation of the liquor laws | 2 |
| Other offenses | 11 |
| Total | 27 |

### j. French

#### (1) Background of immigration

The French are not a migrating people. They do not even migrate to their own colonies in large numbers. In the whole period covered by immigration statistics, not many more than a million French have emigrated; over half of these have come to the United States. The movement, although small, has been constant.[31]

It has been pointed out that "France's incessant involvement in wars made her manpower too valuable for a generous policy of voluntary migration. She even placed so many restrictions upon the dispatch of colonists to New France that settlement was retarded; and the colony itself, intent on retaining its sparse inhabitants, inflicted the death penalty on deserters from its soil."[32] The Edinburgh Journal commented in 1846 that "France has not for the last century been an emigrating country."[33] According to Levasseur (in 1887), France may be considered as a country of immigration, rather than

of emigration, for two reasons: First, the exceedingly low birth-rate and second, relatively abundant wealth.[34]

The first Frenchmen came to the New World during the early periods of exploration and colonization, settling in territory now incorporated in Canada and the United States. Their role in the history of the American continent, their exploration and colonization, and their contribution to American culture are well known.

While the French have been coming to the United States since early colonial days, the numbers coming in have been comparatively small; total French immigration from 1820 to 1948 amounted to only 624,561.[35] During the fiscal year 1948, a total of 2,805 quota immigrants and 1,892 nonquota immigrants were admitted from France. The annual French quota is 3,086.

A small number of French have also emigrated to other countries of the Western Hemisphere, chiefly to Argentina, Brazil, Canada, and Morocco. Although 199,868 persons emigrated from France between 1910 and 1924, nearly that number of Italians settled in France in 1 year.[36] Between 1908 and 1947, over 76,000 aliens in the United States emigrated to France.

#### (2) Distribution of population

Many of the early French settled in Louisiana and the Middle West. In 1790, persons of French origin comprised 0.6 percent of the United States population.[37] Today, French immigrants and their children are located principally in the Middle Atlantic States of New York, New Jersey, and Pennsylvania, and in California and Illinois. Other States with a substantial French population are Ohio, Michigan, and Massachusetts.

New York City is the chief urban center for French in this country. Chicago, San Francisco, Los Angeles, Philadelphia, Detroit, St. Louis, Buffalo, Pittsburgh, Boston, Cleveland, Baltimore, and New Orleans are other urban areas with considerable numbers of persons of French stock. The French colony in New York City forms a definite cultural group, with its own churches, school, hospital, theater, newspapers, and magazines.[38]

The total French population of the United States in 1940 was 349,050—246,120 native-born and 102,930 foreign-born. Of the foreign-born, a total of 79,940 (35,509 males and 44,431 females) were located in urban areas. Rural nonfarm areas had 7,437 males and 7,882 females; rural farm areas, 4,441 males and 3,230 females.[39]

Geographically, 71,339 or 70 percent of the foreign-born were in the North and East, 8,643 in the South, and 22,948 in the West.[40]

#### (3) Naturalization and assimilation

The French assimilate readily into American life.[41] Their rate of naturalization is high and they experience few special problems in social adjustment. In 1940, 68.6 percent of the foreign-born French

28 Brown and Roucek, op. cit., p. 206.
29 H. G. Duncan, Immigration and Assimilation (1933), p. 345.
30 U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
31 Maurice R. Davie, Immigrants from Axis-Conquered Countries, The Annals, American Academy of Political and Social Science, September 1942, p. 116.
32 M. L. Hansen, The Atlantic Migration (1940), p. 7.
33 Chambers' Edinburgh Journal (New Series) V, June 13, 1846, pp. 387-389.

34 Edith Abbott, Historical Aspects of the Immigration Problem (1926), p. 395.
35 Immigration and Naturalization Service, Annual Report, 1948, tables 4, 6, and 7.
36 H. G. Duncan, Immigration and Assimilation (1933), p. 146.
37 Clyde V. Kiser, Cultural Pluralism, The Annals, American Academy of Political and Social Science, March 1949, p. 119.
38 Maurice R. Davie, Immigrants from Axis-Conquered Countries, The Annals, American Academy of Political and Social Science, September 1942, p. 116.
39 U. S. Bureau of the Census, Census of 1940, Population 1940, vol. II, pt. I, table 14, p. 42.
40 Ibid., p. 88.
41 Maurice R. Davie, op. cit., p. 116.

in this country had been naturalized; they were twelfth in rank among foreign-born nationality groups with respect to percent naturalized.[42]

In 1940, 1,412,060 persons or 1.2 percent of the white population of the United States, reported French as mother tongue.[43]  Only 16 percent of this number was from France proper, while 76 percent was of Canadian-French origin.

Of the 349,050 total foreign white French stock in the United States in 1940, 159,240 reported French, and 144,720 reported French, and 29,020 reported German as their mother tongue.[44]

There are a number of French organizations in this country which serve to assist and inform the French and to preserve some of the traditional elements of French culture.  As of January 1, 1944, there were 4 French fraternal organizations with headquarters in this country, containing 667 branches, 106,913 members, and assets of $12,489,119.[45]

Among French publications, the following may be mentioned: Le Courrier du Pacifique (San Francisco), France-Amerique (New York), Le Messager (Lewiston, Maine), Le Travailleur (Worcester, Mass.), and L'Etoile (Lowell, Mass).

### (4) Employment

The great majority of French in this country are in trades in which their skill is traditional.  Many are employed as domestic servants, cooks, and hairdressers; others are prominent in the perfume, silk, cosmetic, jewelry, and wine businesses.[46]  They may also be found on the faculties of our schools and universities.  Recent immigration has brought numerous individuals of social and intellectual distinction.

### (5) Education—Religion

Primary education is free and compulsory in France.  Educational development has been hindered to some degree by the numerous dialects which exist there.  Some of the inhabitants speak Celtic, some speak Flemish, and others speak Iberian.[47]

Fewer than 4 percent of our foreign-born French are illiterate, while approximately the same percentage are unable to speak English.[48]

Although some Protestant settlements were founded here by the early French, notably the Huguenots, the vast majority of French in the United States are Roman Catholics.  The Jesuit missionaries were largely responsible for spreading the Catholic faith throughout the St. Lawrence and Great Lakes regions, down the Mississippi, and throughout the Louisiana Territory.  Only one attempt has been made to establish a Protestant ministry to French-Canadians.[49]  Among the Protestant French groups, the Waldensians settled in New York and Delaware in 1656,[50] while the Huguenots have left evidences of their language and customs in New England and South Carolina.[51]

[42] Brown and Roucek, One America (1945), p. 657.
[43] Clyde V. Kiser, Cultural Pluralism, The Annals, American Academy of P~litical and Social Science March 1949, p. 123.
[44] U. S. Bureau of the Census, Census of 1940, Population, 1940. Nativity and Parentage of the White Population, Mother Tongue, p. 56.
[45] Brown and Roucek, op cit., p. 650.
[46] Maurice R. Davie, Immigrants From Axis-Conquered Countries.  The Annals, American Academy of Political and Social Science, September 1942, p. 116.
[47] H. G. Duncan, Immigration and Assimilation (1933), p. 142.
[48] Maurice R. Davie, Immigrants from Axis-Conquered Countries, Annals, American Academy of Political and Social Science, September 1942, p. 116.
[49] K. D. Miller, We Who Are America (1943), p. 146.
[50] Brown and Roucek, op. cit., p. 98.
[51] Carl Wittke, Immigration Policy Prior to World War I, Annals, American Academy of Political and Social Science, March 1949, p. 5.

### (6) Crime

Census Bureau figures for 1940 show a total of 17 felony commitments of foreign-born French out of a total foreign-born French population of 102,930,[52] a rate of 16.5 per 100,000 population.  The most common types of felonies committed by the foreign-born French were (in 1933) violation of drug laws, forgery, and larceny (except auto theft).  The most numerous felonies committed by the native-born of French parentage were violation of drug laws, larceny (except auto theft), burglary, robbery, and forgery.[53]

### k. Germans

#### (1) Background of immigration

While there were Germans among the early colonists of this country, the first typically German settlement was made in 1683 in Germantown, near Philadelphia.[54]  It became the distributing center for the large and continuous stream of German immigrants, many of whom crossed the Potomac and pressed farther south.  Nine years after the settling of Bethlehem, in 1741, German settlements appeared in North Carolina.

The most northerly German settlement was at Waldoboro, Maine, in 1751, while the most southerly was at Ebenezer, Ga., in 1734.  Many German tradesmen remained in the coastal cities of Philadelphia, New York, Baltimore, and Charleston Pennsylvania continued to be the State most thickly settled by the Germans, who at one time numbered one-third of its population.  The Germans constituted about one-tenth of the white population in the Thirteen Colonies in 1775.  They were, for the most part, agricultural workers.[55]

German immigration passed the hundred thousand mark between 1831 and 1840, when 152,454 were admitted.  The peak German influx was from 1881 to 1890, with 1,542,970 admissions; from 1820 to 1948, 6,064,653 entered.[56]  During World War II, immigration from Germany was, of course, stopped.

By Presidential directive of December 22, 1945, 90 percent of the German quota was set aside for displaced persons, and 17,229 entered the country by the time the Displaced Persons Act of 1948 superseded the Presidential order in June 1948.  Of those who entered under the directive, the overwhelming majority, 14,496, were Jews.[57]

During the fiscal year 1948, a total of 21,365 Germans were legally admitted into the United States.  They were divided as follows:[58]

| Class: | Number |
| --- | --- |
| Quota immigrants | [1] 17, 229 |
| Husbands of citizens | 68 |
| Wives of citizens | 3, 638 |
| Unwed children of citizens | 351 |
| Wives, children of natives from nonquota countries | 8 |
| Ministers, wives, children | 41 |
| Professors, wives, children | 25 |
| Women who had been citizens | 2 |
| Other classes | 3 |
| Total | 21, 365 |

[1] Includes DP's.

[52] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories, 1940 (1943), p. 36.
[53] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories, 1933 (1935), p. 29.
[54] Brown and Roucek, op. cit., p. 102.
[55] Ibid., p. 103.
[56] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[57] Visa Division, Department of State, Final Report, October 5, 1948.
[58] Immigration and Naturalization Service, Annual Report, 1948, table 6.

In addition, 178 German (and Austrian) students entered under section 4 (e) of the Immigration Act of 1924.

During the fiscal year 1948, a total of 73 Germans were deported for the following reasons: [59]

| Cause: | Number |
|---|---|
| Criminal reasons | 20 |
| Overstay | 16 |
| Mental, physical defects | 1 |
| Entered without proper papers | 18 |
| False entry statements | 4 |
| Abandoned status of admission | 13 |
| Miscellaneous | 1 |
| Total | 73 |

During the fiscal year 1948, 165 Germans were excluded.[60] Emigrant aliens from the United States to Germany between 1908 and 1947 totaled 126,087, about 2 percent of the total admitted since 1820.

### (2) Distribution of population

Persons of German stock in this country in 1940 numbered 5,236,612.[61] Of this number, 1,237,772 were foreign-born (638,022 males and 599,750 females).[62] Of the foreign-born, 919,580, or 74.3 percent, were living in urban areas (462,330 males and 457,250 females); 169,300, or 13.7 percent, in rural nonfarm areas (89,670 males and 79,630 females); and 148,892, or 12 percent, in rural farm areas (86,022 males and 62,870 females).[63]

Of the total number of foreign-born Germans in this country in 1940, 1,050,998 or 84.9 percent were situated in the North; 118,439 or 9.3 percent in the West; and 68,335 or 5.8 percent in the South. Every State of the Union contained some German foreign-born. New York, with 316,844, and Illinois, with 138,023, were the two leaders.[64]

### (3) Naturalization and assimilation

In 1930, 70.5 percent of the German population in the country had been naturalized and 73.6 percent by 1940.[65] Naturalization of Germans (and Austrians) for recent years was as follows:

| | | | |
|---|---|---|---|
| 1944 | 62,274 | 1947 | 12,633 |
| 1945 | 45,336 | 1948 | 8,771 |
| 1946 | 23,821 | | |

In 1940, 4,949,780 persons in this country listed the German language as their mother tongue,[66] of whom 3,360,740 were native-born and 1,589,040 foreign-born. Some 52 German newspapers and periodicals in this country have a total circulation of nearly 600,000.

### (4) Education—Religion

The German educational system is excellent and German universities have been widely recognized for a long time. Elementary education is compulsory. As a result, German immigrants have generally been highly literate, many of them having a knowledge of English before coming to America. The time it has taken them to acquire a com-

mand of the language here has, therefore, been less than that of other groups. It might also be pointed out that there are many basic similarities between the German and English languages, thus further aiding in the process of linguistic education.

The Germans founded three major churches in the United States early in the eighteenth century—the Lutheran, German Reformed, and United Brethren or Moravian Church. The latter were successful Indian missionaries and were noted for their schools. Many German sects were transplanted to America; the Mennonites, the Amish, and others have survived to the present day. German Catholics also came in large numbers during the nineteenth century and formed a strong organization.[67]

### (5) Crime

At the last Nation-wide census of prisons and jails, the commitment rate for both felonies and misdemeanors of the German-born was 1.76 per 1,000 population. Those committed for felonies numbered 218, a rate of 0.13 per 1,000, as follows: [66]

| Crime: | Number | Crime—Continued | Number |
|---|---|---|---|
| Homicide | 10 | Rape | 8 |
| Robbery | 24 | Other sex offenses | 15 |
| Aggravated assault | 2 | Forgery | 22 |
| Other assault | 4 | Violation of drug laws | 3 |
| Burglary | 36 | Violation of liquor laws | 16 |
| Larceny | 32 | Other offenses | 23 |
| Auto theft | 8 | | |
| Fraud, embezzlement | 15 | Total | 218 |

### l. Greeks

#### (1) Background of immigration

The first actual settlement of Greeks in the United States occurred in 1768.[69] Greek immigration, however, was of slight significance until after 1890.

Following wholesale crop failures in 1891, especially of currant crops, Greeks began to emigrate to the United States in large numbers. From 1891 to 1900, 15,979 Greeks arrived. The peak decades of immigration were between 1901 and 1910, when 167,519 entered, and between 1911 and 1920, when 184,201 were admitted.

Many, however, returned to Greece without having brought their wives or children to this country. Between 1908 and 1943, 195,768 Greeks went back to their native country.[70]

Since 1820, some 434,418 Greek immigrants have entered legally. The annual quota for Greece is 307. For the fiscal year 1948, a total of 1,964 Greeks were legally admitted, as follows: [71]

| Class: | Number |
|---|---|
| Quota immigrants | 213 |
| Husbands of citizens | 28 |
| Wives of citizens | 1,391 |
| Unmarried children of citizens | 297 |
| Ministers, wives, etc | 29 |
| Professors, wives, etc | 5 |
| Minor from nonquota country | 1 |
| Total | 1,964 |

59 Ibid., table 24.
60 Immigration and Naturalization Service, Annual Report, 1948, table 21.
61 World Almanac (1949), p. 202.
62 U. S. Bureau of the Census, Census of 1940, Population, 1940, vol. II, pt. 1, table 14, p. 42.
63 Ibid.
64 Ibid., pp. 88–89.
65 Brown and Roucek, One America, (1945), p. 657.
66 Ibid., p. 644.

67 Brown and Roucek, One America (1945), p. 112.
68 U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
69 Brown & Roucek, One America (1945), p. 243.
70 Ibid., p. 637.
71 Immigration and Naturalization Service, Annual Report, 1948, table 6.

In addition, 172 Greek students entered the United States under section 4 (e) of the Immigration Act of 1924. A total of 60 aliens were deported to Greece during the same period, for the following reasons: [72]

| Cause: | Number |
|---|---|
| Criminals | 7 |
| Immoral classes | 1 |
| Narcotics violation | 1 |
| Mental or physical defectives | 1 |
| Previously excluded or deported | 1 |
| Overstay | 29 |
| Entered without proper papers | 11 |
| False entry statements | 2 |
| Abandoned status of admission | 7 |
| Total | 60 |

Forty Greeks were excluded at various ports of entry, while 210 Greek seamen deserted their vessels and effected illegal entry.[73]

*(2) Distribution of population*

There were 326,672 Greeks and traceable Greek descendants in the United States at the time of the 1940 census, 163,252 of whom were foreign-born (117,324 males and 45,928 females). Of these foreign-born, 149,463 lived in urban areas (106,162 males and 43,301 females); 10,798 in rural nonfarm areas (8,730 males and 2,068 females), and 2,991 in farm areas (2,432 males and 559 females). [74]

Of the foreign-born Greeks, 76.4 percent were located in the North, 13.49 percent in the West, and 10.08 percent in the South. Of the 21,921 foreign-born Greeks in the West, 12,421 or 56.7 percent were in California. Other States with more than 10,000 were Massachusetts, New York, Pennsylvania, Ohio, and Illinois. The distribution of foreign-born Greeks was: [75]

| Region: | Number |
|---|---|
| North | 124,747 |
| West | 21,921 |
| South | 16,584 |
| Total | 163,252 |

*(3) Naturalization and assimilation*

The major Greek-American societies are: the AHEPA, GAPA, Pan-Arcadian Society, Pan-Cretan Association, Dodecanese National Council, Pan-Epirotic Federation of America, and the Pan-Micrasiatic Society.[76] Greek newspapers and other publications help Greek-Americans keep in touch with the homeland.

Although there has been a notable increase in the percentage of naturalization, many Greeks never become naturalized but, rather, remain in the country until they feel financially secure, and then return to their homeland. In 1920, 16.8 percent of the Greeks in the country were naturalized; in 1930, 44.7 percent; and in 1940, 58.4 percent.[77] Naturalization of persons owing former allegiance to Greece was as follows in recent years:[78]

[72] Immigration and Naturalization Service, Annual Report, 1948, table 24.
[73] Ibid., tables 21, 22.
[74] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[75] Ibid., table 36, pp. 88–89.
[76] Brown and Roucek, One America (1945), pp. 251, 252.
[77] Ibid., p. 657.
[78] Immigration and Naturalization Service, Annual Report, 1948, table 39.

| | |
|---|---|
| 1944 | 7,549 |
| 1945 | 4,305 |
| 1946 | 3,313 |
| 1947 | 1,847 |
| 1948 | 1,683 |

*(4) Education—Religion*

There are no available statistics to show the degree of education of Greeks. In Greece itself there is a fair system of schools and attendance is compulsory for children from 5 to 12 but education is somewhat handicapped by the existence of two dialects, high Greek (Ellenika) and low Greek (Roumaika). The uneducated cannot understand high Greek, while the educated understand both.[79]

The major portion of Greeks—approximately 97 percent—are members of the Greek Orthodox or Eastern Orthodox Church, to which they adhere in this country.

*(5) Crime*

The rate of commitments of foreign-born Greeks to State and Federal prisons and reformatories for crimes and misdemeanors (1933) was 8.38 per 1,000 population, while the commitment rate for felonies was 0.7 per 1,000, distributed as follows:[80]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Homicide | 7 | Other sex offenses | 12 |
| Robbery | 13 | Forgery | 17 |
| Aggravated assault | 10 | Stolen property | 1 |
| Other assault | 2 | Violation drug laws | 7 |
| Burglary | 7 | Violation liquor laws | 17 |
| Larceny | 8 | Other offenses | 9 |
| Auto theft | 2 | | |
| Fraud and embezzlement | 3 | Total | 120 |
| Rape | 5 | | |

*m. Hungarians*

*(1) Background of immigration*

Between 1911 and 1948, Hungarian immigration to this country totaled 483,765. The annual quota for Hungary is now 869. During the fiscal year 1947, 1,277 Hungarians were admitted legally.[81] During the fiscal year 1948, there were 1,471 admissions, as follows:[82]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 882 |
| Husbands of citizens | 10 |
| Wives of citizens | 284 |
| Unwed children of citizens | 72 |
| Wives, children of natives, nonquota countries | 3 |
| Ministers, wives, children | 151 |
| Professors, wives, children | 69 |
| Total | 1,471 |

[1] Includes DP's.

Between March 30, 1946, and June 30, 1948, 613 Hungarian displaced persons were admitted under the Presidential directive of December 22, 1945. In addition, during the fiscal year 1948, 220

[79] H. G. Duncan, Immigration and Assimilation (1933), p. 198.
[80] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories—1933 (1935) table 25, p. 29.
[81] Immigration and Naturalization Service, Annual Report, 1947, table 6.
[82] Immigration and Naturalization Service, Annual Report, 1948, table 6.

Hungarian students entered the country under section 4 (e) of the Immigration Act of 1924. During that same period, 21 were excluded from the United States at various ports of entry.[83]

Since 1908, when the Immigration and Naturalization Service first began to enumerate aliens returning to their native lands, over 307,000 have gone back to Hungary,[84] the major portion (173,593) leaving in the decade 1911–20.

### (2) Distribution of population

Of the 662,068 Hungarians in the United States in 1940, 371,840 were native-born, while 290,228 (144,354 males and 145,874 females) were foreign-born.[85] Of the foreign-born, 238,689, or 82.2 percent, lived in urban areas (116,570 males and 122,119 females); 32,367 or 11.1 percent lived in rural nonfarm areas (17,286 males and 15,081 females); the smallest group, 19,172, or 6.7 percent, lived in rural farm areas (10,498 males and 8,674 females).[86]

Foreign-born Hungarians in 1940 were represented in every State, New York leading with 75,254. New Jersey, Illinois, Pennsylvania, Ohio, and Michigan each had 20,000 or more. Of the foreign-born Hungarians, 269,188, or 92.7 percent, were located in the North, 11,181, or 3.8 percent, in the West, and 9,859, or 3.5 percent, in the South.[87]

### (3) Naturalization and assimilation

Before 1915, there were about three times as many Hungarian men as women in the United States. Wives and children frequently were left at home, while the men came over with the intention of staying just long enough to make money to become financially stable. The recent tendency for whole families to remain here permanently is reflected in the speed with which the Hungarians are being assimilated. In 1910, when most of them expected their residence to be temporary, only 15 percent were naturalized. In 1920, 21.1 percent had become citizens, and by 1940, 64.3 percent were naturalized.[88]

In recent years, naturalization of those claiming Hungary as their place of nativity was as follows:[89]

| Year | Number | Year | Number |
|------|--------|------|--------|
| 1944 | 13,964 | 1947 | 1,595 |
| 1945 | 6,320 | 1948 | 1,271 |
| 1946 | 3,385 | | |

As of 1945, there was only one typically Hungarian settlement in this country, namely, Beauty, Ky., formerly called Himlerville. It is located in Martin County and is an all-Magyar mining town founded after World War I.[90]

A number of mutual-benefit societies aid in keeping the Hungarians together. The Verhovay of Pittsburgh, with a membership of 32,000 is the largest Hungarian sick-benefit and insurance organization in this country. Next in size is the American Federation of Hungarian Sick Benefit Societies at Bridgeport, Conn. The Hungarian Reformed Federation is also a large insurance society and is the only Hungarian

organization that has a national charter granted by the United States Congress.[91]

The largest Hungarian newspaper in America is the Amerikai Magyar Népszava (Hungarian People's Voice). It started as a weekly in New York in 1900 and became a daily 4 years later. Today it has four editions, New York, New Jersey, Connecticut, and a general edition. From 1884 to 1920, 67 Magyar papers were started and 41 expired. Some 25 appear regularly; their editorial policies reflect the groups they represent. In 1940 some 453,000 people listed Magyar as their mother tongue.

### (4) Employment

Many Hungarians have become famous, Joseph Pulitzer being an outstanding example. Others who have become well known in their professions are Adolph Zukor, William Fox, and Marcus Loew in the motion-picture industry. Many musicians and composers, like Eugene Ormandy, Erno Rapee, Victor Jacobi, and numerous professors are Hungarians or of Hungarian descent.

Magyar immigrant laborers are found in greatest numbers in iron and steel manufacturing, bituminous-coal mining, manufacture of agricultural implements, silk dyeing, and sugar refining.[92] A considerable number are employed in the coal mines of West Virginia and Pennsylvania. While a majority of the Magyars generally first work in industry, many later drift into agriculture. Hungarian viniculturists are employed rather extensively by grape growers in Ohio and California.[93]

### (5) Education—religion

Public education in Hungary is compulsory and free for 9 years. A considerable number of Hungary's immigrants to this country have been of the intellectual and professional classes.

The first Hungarian congregation was organized in 1852 in New York City by the Reverend Gideon Acs, a Calvinist minister. The Free Magyar Church in America was established in December 1924, at Duquesne.[94] It has been estimated that, since 1891, the Hungarians have established some 190 churches and mission centers throughout the country.

### (6) Crime

Foreign-born Hungarians had a crime rate, according to the number of commitments for felonies and misdemeanors, of 0.43 per 1,000 population in the 1933 enumeration. The felony rate was 0.023 per 1,000, distributed as follows:[95]

| Crime: | Number of commitments | Crime—Continued | Number of commitments |
|--------|-----------------------|-----------------|-----------------------|
| Homicide | 8 | Rape | 0 |
| Robbery | 11 | Other sex offenses | 5 |
| Aggravated assault | 5 | Forgery | 1 |
| Other assault | 1 | Violation of drug laws | 1 |
| Burglary | 4 | Violation of liquor laws | 2 |
| Larceny | 7 | Other offenses | 13 |
| Auto theft | 0 | | |
| Fraud, embezzlement | 4 | Total | 62 |

83 Ibid., table 21.
84 Brown and Roucek, One America (1945), p. 637; Immigration and Naturalization Service, Immigration and Naturalization Reports, 1945, 1946, 1947, and 1948.
85 U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, part 1, table 14, p. 42.
86 Ibid., table 36, pp. 88–89.
87 U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, Pt. 1, table 36, pp. 88–89.
88 Brown and Roucek, op cit., p. 215.
89 Immigration and Naturalization Service, Annual Report, 1948, table 39.
90 Brown and Roucek, op cit., p. 216.

91 Ibid., pp. 218–219.
92 Brown and Roucek, op. cit. (1945), p. 215.
93 Ibid, Brown and Roucek, One America (1945), p. 215.
94 Ibid., p. 216.
95 U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories—1933 (1935), table 25, p. 29.

*n. Irish*

*(1) Background of immigration*

The first recorded Irish settlement in America was in 1621, on the site of the present city of Newport News, Va. Large-scale Irish immigration began about the middle of the seventeenth century. In 1649, a single vessel embarked with 170 Irish persons for the plantations in America, but between 1652 and 1655, approximately 6,500 Irish immigrants were landed at various American ports, and, by 1660, 10,000 were scattered among the Thirteen Colonies.[96]

Irish immigration increased substantially during the eighteenth century. In 1728, the Irish in Philadelphia alone were estimated at 5,000. By 1790, the Irish comprised 1.9 percent of our population.[97]

In 1821, Ireland had the greatest population density of any European country.[98] With limited industrial opportunities, Ireland had become a one-crop country in which the potato was the staple article of food. Frequent crop failure served to add to the hardships of life and stimulated mass emigration.

Immigrants from Ireland totaled 4,597,429 from 1820 to 1947,[99] the greater part of whom came during the middle decades of the nineteenth century.[1] Approximately 54,000 returned to their native country between 1908 and 1947.

*(2) Distribution of population*

The Irish originally settled along the Atlantic seaboard, especially in New York and Boston, but gradually pushed into the interior.[2] While they are rather generally distributed throughout the country today, the great majority are still in the northern and eastern sections of the country. In 1940, there were in this country a total of 572,031 foreign-born Irish; 515,876—over 90 percent—were located in the North, 15,539 in the South, and 40,616 in the West.

The sex ratio among foreign-born Irish in the United States in 1940 was 57 females to every 43 males (327,939 females and 244,092 males). A great proportion of the Irish are urban dwellers. As of 1940, approximately 90 percent (513,926) were in cities, 43,672 in rural nonfarm areas, and 14,433 in rural farm areas.[3] Only rural nonfarm areas showed a greater number of males than females. Urban areas had 217,023 males and 296,903 females, rural nonfarm areas, 19,443 males and 24,229 females, and rural farm areas, 7,626 males and 6,807 females.[4]

*(3) Naturalization and assimilation*

The Irish have become naturalized much more readily than the English or Scotch. As of 1940, 72.5 percent of the Irish foreign-born were naturalized. They ranked sixth among all nationality groups[5] in this regard, whereas the English ranked eighth and the Scotch fourteenth. During the fiscal year 1947, 2,263 Irish were naturalized;

[96] Brown and Roucek, op. cit., pp. 43–44.
[97] H. G. Duncan, Immigration and Assimilation (1933), p. 479.
[98] W. F. Adams, Ireland and Irish Emigration to the New World From 1815 to the Famine (1932), p. 4.
[99] H. G. Duncan, op. cit., p. 20.
[1] Brown and Roucek, op. cit., p. 632; National Committee on Immigration Policy, International Migration and One World, 1948, p. 34.
[2] H. G. Duncan, op. cit., p. 485.
[3] U. S. Bureau of the Census. Census of 1940, vol. II, part I, tables 14 and 36, pp. 42 and 88.
[4] Id.
[5] Brown and Roucek, op. cit., p. 657.

over 75 percent of whom had been admitted into this country at least 20 to 25 years prior to naturalization.[6]

*(4) Employment*

The field of vocations and professions into which the Irish in America have entered is quite large. Inasmuch as the great majority of the Irish are concentrated in our urban areas, they are largely engaged in industrial and commercial occupations.

*(5) Education—Religion*

Elementary education in Ireland is free and compulsory. This fact has been of benefit to the Irish immigrant, as far as his literacy is concerned. Of 416,640 Irish immigrants over 14 years of age admitted between 1899 to 1910, only 10,721 or 2.6 percent were unable to read or write.[7] Only the English, Finnish, Scotch, Welsh, Scandinavian, and Bohemian immigrants ranked above the Irish in the literacy rate.

Irish immigrants are predominantly Roman Catholic. They have been a mainstay of the Catholic Church in America, furnishing a high percentage of the Catholic congregations and clergy, and fostering many Catholic schools, colleges, and universities.

*(6) Crime*

The Irish foreign-born have a low rate of major criminal offenses, but a high rate for misdemeanors.[8] In 1940, 44 felony prisoners received by State and Federal prisons and reformatories were Irish foreign-born, a felony rate for this group of 7.7 per 100,000.[9] The most numerous offenses shown in 1933 statistics were burglary, larceny (except auto theft), sex offenses (except rape), and robbery.[10]

*o. Italians*

*(1) Background of immigration*

In 1850, when the United States had a population of 23,000,000, less than 4,000 were Italians. It was not until after 1880 that Italian immigrants began to arrive in sizable numbers.[11] Coming largely from the fairly industrial areas of northern Italy, the first immigrants consisted of importers, musicians, singers, and artisans. Between 1901 and 1910, 1,911,933 immigrants from southern Italy and 372,668 from northern Italy entered the United States. Some Italian towns lost as much as 20 percent of their population.

The bulk of the Italians, upon entering this country, settled with friends and relatives. Most of them took laboring jobs. According to 1940 census figures, the number of Italians living on farms and in farm communities of less than 2,500 was exceedingly small, especially in view of the fact that 66 percent of them had been agricultural workers in their native country.[12]

Between 1820 and 1948, immigration from Italy to the United States totaled 4,752,735.[13] During the fiscal year, 1948, 16,075 immigrants of Italian birth were admitted, as follows:[14]

[6] Immigration and Naturalization Service, Annual Report, 1947, table 46.
[7] U. S. Immigration Commission, Abstracts of Reports (1911), vol. I, p. 99.
[8] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories in the United States, 1910 (1918), table 141, p. 131.
[9] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories, 1940 (1943), p. 36.
[10] Ibid., 1933 (1935), p. 25.
[11] Brown and Roucek, op. cit., p. 258.
[12] Ibid., p. 263.
[13] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[14] Ibid., tables 6 and 7.

| Class: | Number |
|---|---|
| Quota immigrants | 5,624 |
| Husbands of citizens | 239 |
| Wives of citizens | 6,385 |
| Unwed children of citizens | 3,350 |
| Wives, children of natives from nonquota countries | 63 |
| Ministers, wives, children | 66 |
| Professors, wives, children | 31 |
| Women previously citizens | 1 |
| Other classes | 42 |
| Total | 15,801 |

During the fiscal year 1948, 155 Italian displaced persons were admitted, as well as 145 Italian students. The annual Italian quota is 5,802.

During fiscal year 1948, 172 aliens were deported to Italy for these causes:[15]

| Cause: | Number |
|---|---|
| Criminal reasons | 30 |
| Immorality | 2 |
| Violating narcotic laws | 8 |
| Mental or physical defects | 3 |
| Previously deported | 4 |
| Overstay | 40 |
| Entered without proper papers | 56 |
| False entry statements | 13 |
| Apt to become public charge | 1 |
| Abandoned status of admission | 13 |
| Miscellaneous | 2 |
| Total | 172 |

In addition, 218 Italians were excluded from the United States, while 934 Italian seamen entered illegally by deserting their vessels.[16] Between 1908 and 1947, 1,248,895 Italians returned to Italy. This was equal to 26.3 percent of the total number of Italian immigrants admitted from 1820 to 1947. Of the 1,485 who returned in 1948, 965 were males and 520 females.[17]

### (2) Distribution of population

In 1940, the Italian foreign-born population in the United States was 1,623,580, or 14.2 percent of the total foreign-born population of 11,419,138;[18] native-born of Italian or mixed parentage totaled 2,971,200.[19]

Of the foreign-born, 935,139 were males and 688,441 females. The preponderance, 1,429,898, or 88.6 percent, lived in urban areas (814,893 males and 615,005 females); 147,546, or 9.7 percent of the total, were in rural nonfarm areas (91,667 males and 55,879 females); and 46,136, or 2.7 percent of the total, were in rural farm areas (28,579 males and 17,557 females).[20]

In 1940, the majority of Italian foreign-born (1,430,452, or 88.1 percent) were in the North; 132,881, or 8.1 percent were in the West; and 60,247, or 3.7 percent were in the South.

[15] Ibid., table 24.
[16] Ibid., tables 21 and 22.
[17] Ibid., table 14.
[18] U. S. Bureau of the Census, Census of 1940, Population, 1940, vol. II, pt. 1, table 14, p. 42.
[19] World Almanac, 1949, p. 202.
[20] U. S. Bureau of the Census, Census of 1940, Population, 1940, vol. II, pt. 1, table 14, p. 42.

Nearly 37 percent (584,075) of the national total were in New York; New Jersey, Massachusetts, Pennsylvania, and California each had over 100,000, while Illinois, Connecticut, and Ohio each had well over 50,000.[21]

### (3) Naturalization and assimilation

There has been a notable increase in the percentage of naturalization among the Italians. In 1920 only 28.1 percent were naturalized; in 1930, 50 percent; and, in 1940, 62.5 percent.[22] Although nearly 600,000 foreign-born and unnaturalized Italians were classed as "enemy aliens" during World War II, very few of them were interned.[23] The numbers of persons owing former allegiance to Italy naturalized for the fiscal years 1944 to 1948 were as follows:[24]

| Year | Number |
|---|---|
| 1944 | 106,626 |
| 1945 | 41,643 |
| 1946 | 23,099 |
| 1947 | 11,516 |
| 1948 | 9,452 |

In 1940, the ratio of Italian foreign-born males per 100 females was 135.8. A total of 3.7 million claimed Italian as their mother tongue. In 1943, there were 117 Italian newspapers and periodicals in the United States, the leader of which—Il Progresso Italo-Americano—was established in 1888. Others include Il Corriere d'America and La Stampa Libera.[25]

### (4) Education—Religion

Statistics on the education of Italians, whether native-born or foreign-born, are not available. Generally speaking, a large number of the Italian immigrants who entered the United States during the early part of the present century were illiterate.

Italy itself is largely a Catholic country. There are relatively few Protestants, Jews, or members of other religious sects. H. G. Duncan states: "According to both Catholic and Protestant estimates, between 60 and 75 percent of the Italians in the United States maintain no connection with the church."[26] Many have joined one or more of the several Italian fraternal or civic organizations in this country. The most important is the Order of the Sons of Italy, organized about 1900, which now has hundreds of branches throughout the country and several hundred thousand members.[27] Italian Protestants have shown some tendency to affiliate with churches of their own denomination having a mixed national congregation.

### (5) Crime

In 1933, 4.09 per 1,000 of the foreign-born Italian population were committed to prisons and jails for both crimes and misdemeanors. The felony rate was 0.39 per thousand, for the following was offenses:[28]

[21] Ibid., table 36, pp. 88–89.
[22] Brown and Roucek, One America (1945), p. 657.
[23] Ibid., p. 267.
[24] U. S. Bureau of the Census, Statistical Abstract of the United States (1948), table 130, p. 114.
[25] Brown and Roucek, One America (1945), pp. 265–266.
[26] H. G. Duncan, Immigration and Assimilation (1933), p. 184.
[27] Brown and Roucek, op. cit., p. 265.
[28] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 67 of 101 PageID #:706

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Homicide | 53 | Other sex offenses | 39 |
| Robbery | 96 | Forgery | 87 |
| Aggravated assault | 31 | Stolen property | 6 |
| Other assault | 39 | Drug violations | 23 |
| Burglary | 58 | Liquor | 60 |
| Larceny | 41 | Other offenses | 57 |
| Auto theft | 8 | | |
| Fraud, embezzlement | 18 | Total | 675 |
| Rape | 29 | | |

*p. Latvians*

(1) *Background of immigration*

It has been stated that the first Latvians came to America with the early Swedes. Official immigration figures on Latvians have been available only since 1924. It is difficult to arrive at any accurate estimate of Latvian immigrants prior to World War I, because they came here on German, Russian, and other passports. Some estimates place the number in the United States at 50,000.[29]

In 1940, almost 35,000 individuals in this country claimed to be either native-born or foreign-born Latvians. Only 4,925 immigrants were legally admitted from Latvia between 1921 and June 30, 1948.[30] The annual quota for Latvians is 236.[31] During the fiscal year 1948, 427 immigrant aliens were admitted whose country of birth was Latvia, divided as follows:[32]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 300 |
| Husbands of citizens | 3 |
| Wives of citizens | 84 |
| Unwed children of citizens | 8 |
| Ministers, wives, children | 20 |
| Professors, wives, children | 12 |
| Total | 427 |

[1] Includes DP's.

Between March 31, 1946, and June 30, 1948, 390 Latvians were admitted as displaced persons.[33]

In addition, five Latvian students were admitted during the fiscal year 1948 under section 4 (e) of the Immigration Act of 1924.

(2) *Distribution of population*

In 1940 there were 34,656 Latvians in the United States, 12,020 native-born and 18,636 foreign-born. Of the foreign-born, 9,897 were males and 8,739 were females. They were located as follows: 16,698, or 89.8 percent, were living in urban areas (8,784 males and 7,914 females); 1,242, or 6.6 percent, in rural nonfarm areas (736 males and 506 females); and 696, or 3.6 percent, in rural farm areas (377 males and 319 females).[34]

Over 80 percent of the foreign-born Latvians in this country in 1940 were living in the North. New York, with 6,058, led all other States; Illinois was second, with 2,351; and Pennsylvania and Cali-

[29] Brown and Roucek, One America (1945), p. 179.
[30] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[31] Ibid., table 7.
[32] Ibid., table 6.
[33] Visa Division, State Department, Repor on Displaced Persons, October 5, 1948.
[34] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.

fornia had 1,311 and 1,296, respectively. The general geographic distribution was as follows:[35]

| Area | Number | Percent |
|---|---|---|
| North | 15,262 | 82.0 |
| South | 1,537 | 8.2 |
| West | 1,837 | 9.8 |

(3) *Naturalization and assimilation*

The Latvians assimilate readily, although they do retain some of their traditions and customs. Ordinarily they do not attempt to form settlements but rather tend to scatter throughout the country. As a result, the time required for them to learn English is somewhat less than it otherwise would be.[36]

Among Latvian organizations are the American National Latvian League of Boston, Joint Latvian Committee in New York City, Society of Free Latvians in Philadelphia, Latvian Club of Chicago, and the Latvian Mutual Aid Society of Chicago.

Between 1939 and 1948, 5,614 aliens owing former allegiance to Latvia became naturalized citizens, 194 during the fiscal year 1948. Following are naturalizations during the fiscal years 1944 to 1948:[37]

| | | | |
|---|---|---|---|
| 1944 | 1,017 | 1947 | 210 |
| 1945 | 540 | 1948 | 194 |
| 1946 | 387 | | |

Comparatively few Latvians have returned to their native country; only 302 immigrants from Latvia returned between 1921 and 1930, and 364 between 1931 and 1940.[38] In the fiscal year 1948, only two Latvian immigrants departed from the United States.[39]

(4) *Education—Religion*

The major portion of the Latvians are Lutherans. Among the other denominations and sects are Catholics, Bohemian Brothers, Baptists, Jews, and a few Greek Orthodox.[40] There are no Latvian schools, and, although some Latvian churches attempt to teach the language, the results are not effective, because of rapid assimilation. Latvians rank higher than most of the immigrants from other countries of central and southern Europe in literacy.[41] In 1910, only 3.2 percent of the Latvians were illiterate.

(5) *Crime*

Latvians are not mentioned in the reports of crime surveys made by the Census Bureau.

*q. Lithuanians*

(1) *Background of immigration*

The first recorded migration of Lithuanians to the New World appears to have been in the year 1850, although claims have been

[35] Ibid., table 36, pp. 88–89.
[36] Brown and Roucek, One America (1945), p. 189 ff.
[37] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[38] Brown and Roucek, op. cit., p. 637.
[39] Immigration and Naturalization Service, Annual Report, 1948, table 13.
[40] Brown and Roucek, One America (1945), p. 182.
[41] Ibid.

made that some came as early as the seventeenth century. In 1868 a group of Lithuanians settled in Shamokin, Pa., and were soon followed by others. They spread to mining towns in the State and were scattered throughout the whole anthracite region. Between 1898 and 1914, some 252,294 Lithuanians entered the country.[42]

Chief Lithuanian settlements were originally in the anthracite belt of Pennsylvania and West Virginia, but great numbers also settled in the eastern seaboard States. The 1940 census showed Lithuanian foreign-born in every State of the Union.[43]

Approximately 10,000 Lithuanians have been recorded as legally admitted into the United States.[44] Prior to World War I, they came as Russian or Polish immigrants and were, of course, enumerated as such. The annual quota for Lithuania is 386. During the fiscal year 1948, 631 immigrants from Lithuania were admitted, as follows:[45]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 458 |
| Husbands of citizens | 5 |
| Wives of citizens | 82 |
| Unwed children of citizens | 26 |
| Ministers, wives, children | 30 |
| Professors, wives, children | 30 |
| Total | 631 |

Includes DP's

Between March 31, 1946, and June 30, 1948, 798 Lithuanians displaced persons were admitted.[46] Twelve students from Lithuania entered this country during the fiscal year 1948, under section 4 (e) of the Immigration Act of 1924.

During the fiscal year 1948, six Lithuanians were excluded at American ports of entry for various reasons.[47] No Lithuanians were, however, listed as deported, or as alien seamen deserted from vessels. Since 1908, 3,987 immigrant aliens from Lithuania have returned from the United States to their native country.[48]

### (2) Distribution of population

At the time of the census of 1940, there were 394,811 Lithuanians in the United States, of whom 229,040 were native-born and 165,771 were foreign-born. Of the foreign-born group, 91,601 were males and 74,170 were females.[49]

Of the foreign-born Lithuanians 141,852 or 85.5 percent lived in urban areas (76,990 males and 64,862 females); 15,088 or 9.1 percent in rural nonfarm areas (9,180 males and 5,908 females); and 8,831 or 5.4 percent in rural farm areas (5,431 males and 3,400 females).[50] Nearly all foreign-born Lithuanians (155,160 or 93.6 percent) were living in the North. Pennsylvania had 27,948, New York State 22,455, and Massachusetts 20,730.[51] The South contained 6,955, or 4.13 percent, and the West 3,756, or 2.27 percent.

[42] Ibid., p. 184.
[43] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 36, pp. 88-89.
[44] Brown and Roucek, One America (1945), p. 632.
[45] Immigration and Naturalization Service, Annual Report, 1948, table 6
[46] Ibid., table 6B.
[47] Ibid., table 21.
[48] Ibid., table 13.
[49] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[50] Id.
[51] Ibid., table 36, pp. 88-89.

### (3) Naturalization and assimilation

Lithuanians do not assimilate easily nor rapidly, as reflected in the low rate of naturalization, only 55.8 percent in 1940, the lowest among European immigrants. The rate of illiteracy is rather high, surpassed only by immigrants from Italy, Syria, Portugal, and the Azores. Before 1914 there were no Lithuanian schools in their native country.[52]

The Lithuanian press plays an important part in the life of the Lithuanian-Americans. The first Lithuanian newspaper in pure text was the Vienybe Lietuvivninku (Lithuanian Unity), which appeared in Plymouth, Pa., in 1884, but was later transferred to Brooklyn; it is now published as the Vienybe (Unity). In 1885, the Lietuvos Balsas (Lithuanian Voice) appeared in New York City. In all, 31 Lithuanian periodicals were published in the United States in 1940.

Some 37,849 Lithuanians were naturalized between 1939 and June 30, 1948, including 771 during the fiscal year 1948. The following are the numbers naturalized during the past 5 fiscal years:[53]

| | Number | | Number |
|---|---|---|---|
| 1944 | 6,624 | 1947 | 1,061 |
| 1945 | 3,581 | 1948 | 771 |
| 1946 | 2,250 | | |

### (4) Employment

Few Lithuanians have turned to farming in the United States. They are found mainly in Pennsylvania, Michigan, Illinois, Connecticut, and New Jersey. Generally, they have gone into industrial pursuits but the second generation is entering the professional classes.[54]

### (5) Religion

The majority of the Lithuanians are Roman Catholic. The first Lithuanian National Catholic Church was founded in 1944, in Scranton, Pa. In 1944 there were about 120 Lithuanian parishes throughout the country. The liturgy is Lithuanian.

### (6) Crime

In the 1933 Nation-wide census of prisons and jails, covering the population 15 years old and over, the foreign-born Lithuanians had a felony rate of 0.2 per 1,000 population and an over-all crime rate of 5.0 per 1,000. The major crimes for which Lithuanians were committed were:[55]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Homicide | 3 | Larceny, except auto theft | 4 |
| Aggravated assault | 4 | Stolen property | 1 |
| Other assault | 2 | Forgery | 2 |
| Robbery | 3 | Violation of liquor laws | 3 |
| Burglary | 4 | Other offenses | 9 |
| Fraud, embezzlement | 1 | | |
| Sex offenses | 1 | Total | [1] 37 |

[1] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories 1933 (1935), table 25, p. 29.

[52] Brown and Roucek, op. cit., p. 190.
[53] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[54] Brown and Roucek, One America (1945), p. 186 ff.
[55] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.

### r. Luxemburgers

#### (1) Background of immigration

For many years, Luxemburg was part of the Netherlands. During the French Revolution, the French-speaking part became a portion of Belgium and the German-speaking part became independent.

The first year in which Luxemburgers were officially enumerated as such by the Immigration and Naturalization Service was 1921.[55] From 1921 to 1948, 1,930 immigrants from Luxemburg were admitted. Yet, in 1940, almost 7,000 persons gave Luxemburg as the country of their origin.

#### (2) Distribution of population

At the time of the 1940 census, there were only 6,886 foreign-born natives of the Duchy of Luxemburg in the United States[57]—4,041 males and 2,845 females. Of the foreign-born group 4,460 or 64.5 percent lived in urban territory (2,447 males and 2,013 females); 1,094 or 16 percent in rural nonfarm areas (686 males and 408 females); and 1,332 or 19.5 percent in rural-farm areas (908 males and 424 females).[58]

Despite their small number, there were some Luxemburgers in every State of the Union. Illinois, with 2,034, or 29.5 percent, was the only State with more than 1,000.

The geographical distribution of the foreign-born Luxemburgers in 1940 was as follows:[59]

| Area: | Number |
|---|---|
| North | 5,757 |
| South | 225 |
| West | 904 |

#### (3) Naturalization and assimilation

The Luxemburgers are much like the Belgians in appearance, in mannerism, personal habits, and in speech. During the 10 years ending June 30, 1948, only 917 were naturalized, including 40 naturalized during the fiscal year 1948. The numbers naturalized during the fiscal years 1944–48 were:[60]

| | Number | | Number |
|---|---|---|---|
| 1944 | 147 | 1947 | 42 |
| 1945 | 64 | 1948 | 40 |
| 1946 | 43 | | |

### s. Norwegians

#### (1) Background of immigration

Norwegian immigration to this country dates from 1825, when the first organized company of Norwegians arrived in New York. Eleven years later, another group pushed westward into La Salle County, Ill. The first settlements in New York and Illinois did not, however, attract many subsequent arrivals. Wisconsin, where the first Norwegian pioneers established a colony at Muskego, near Milwaukee, in 1839, became the goal of most Norwegians prior to 1850.[61]

[55] Brown and Roucek, op. cit., p. 632.
[57] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[58] Ibid.
[58] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. I, table 36, pp. 88–89.
[59] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[60] Brown and Roucek, op. cit., pp. 51 ff.

Since 1820, immigration from Norway totaled over 800,000.[62] The annual quota for Norway under existing law is 2,377 per year.[63] During the fiscal year ended June 30, 1948, 2,687 immigrants of Norwegian birth were admitted into the United States, distributed into the following classes:[64]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 2,460 |
| Husbands of citizens | 3 |
| Wives of citizens | 136 |
| Unwed children of citizens | 32 |
| Nonquota countries | 6 |
| Ministers, wives, children | 17 |
| Professors, wives, children | 30 |
| Other classes | 3 |
| Total | 2,687 |

[1] Includes DP's.

Between March 31, 1946, and July 1, 1948, four Norwegian displaced persons were admitted. A total of 239 Norwegian students were admitted during the fiscal year 1948 under section 4 (e) of the Immigration Act of 1924. During the same fiscal year, 377 Norwegian seamen deserted their ships and made illegal entry.[65]

#### (2) Distribution of population

Since 1908, 49,583 immigrants have returned to Norway, the greatest number (19,124) between 1911 and 1920. In recent years emigration has been exceedingly light. In the fiscal year 1948, for example, only 577 Norwegian immigrants returned to their homeland.[66] Of a total of 924,688 Norwegians in the country in 1940, 662,600 were native-born and 262,088 were foreign-born (145,621 males and 116,467 females). Of the foreign-born, 61,737 or 23.5 percent were located in rural farm areas (36,659 males and 25,080 females); 153,434 or 58.5 percent in urban areas (82,098 males and 71,336 females); and 46,917 or 18 percent in rural nonfarm areas (26,866 males and 20,051 females).[67]

In 1940, 52,025 or 22.7 percent of the foreign-born Norwegians were located in Minnesota. New York had 37,169, Wisconsin 23,211, and North Dakota 21,637. The foreign-born Norwegians were geographically distributed as follows:[68]

| Area | Number | Percent |
|---|---|---|
| North | 197,765 | 75.3 |
| South | 4,732 | 1.9 |
| West | 59,591 | 22.8 |

#### (3) Naturalization and assimilation

The Norwegians assimilate readily and have a relatively high naturalization rate, 75.2 percent in 1940, as compared with 64.6 percent for

[62] Brown and Roucek, op. cit., p. 632.
[63] Immigration and Naturalization Service, Annual Report, 1948, table 7.
[64] Ibid., table 6.
[65] Ibid., table 22.
[66] Ibid., table 13.
[67] United States Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[68] Ibid., table 36, pp. 88–89.

all nationalities.[69] Between 1939 and June 30, 1948, 35,064 Norwegians or those claiming Norway as their country of origin were naturalized. Following are the numbers naturalized during recent fiscal years:[70]

| 1944 | 6, 631 | 1947 | 1, 099 |
| 1945 | 2, 838 | 1948 | 919 |
| 1946 | 1, 819 | | |

The first Norwegian newspaper in America was the Nordlyset (Northern Lights) published in Muskego, Wis., from 1847 to 1849. While nearly 500 Norwegian papers were established from time to time, most of them lasted but a few years. The two leading papers still appearing are the Decorah Posten (Decorah, Iowa) and the Skandinaven (Chicago, Ill.). Both were founded in 1866 and thus span the period of heaviest Norwegian immigration. The Sons of Norway and the Daughters of Norway are fraternal orders which flourish almost exclusively in the cities.[71]

*(4) Education—Religion*

As a whole, Norwegian immigrants have been a literate group, since education in Norway is compulsory from 7 to 14 years and the school system is highly organized.[72] Norwegians in America have founded almost every kind of school. Day schools were maintained by many congregations almost from the first but the second generation has generally given them up in favor of the public schools. A few normal schools and "ladies' seminaries" were maintained for a number of years, only to become extinct along with the academies in the 1920's. The only important remaining Norwegian institution is the Luther Seminary in St. Paul, Minn.[73]

*(5) Crime*

The last Nation-wide census of prisons and jails (1933) showed a Norwegian felony crime ratio of 0.1 per 1,000 population. The overall crime ratio, including misdemeanors and felonies, was 3.8 per 1,000 population (for Norwegian foreign-born 15 years of age and over).

The major crimes for which Norwegians were incarcerated:[74]

| Crime: | Number committed | Crime—Continued | Number committed |
| Robbery | 3 | Other sex offenses | 4 |
| Aggravated assault | 2 | Forgery | 7 |
| Other assault | 3 | Fraud, embezzlement | 3 |
| Burglary | 2 | Violation of liquor laws | 2 |
| Larceny | 7 | Other offenses | 3 |
| Auto theft | 2 | | |
| Rape | 2 | Total | 40 |

*t. Poles*

*(1) Background of immigration*

Poles were among the group of settlers at Jamestown, Va., in 1607. John Sadowski set up a trading post in 1735 which was the forerunner of Sandusky, Ohio. The first exclusively Polish colonies were estab-

[69] Brown and Roucek, One America (1945), p. 657.
[70] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[71] Brown and Roucek, op. cit. pp. 56, ff.
[72] World Almanac (1949), p. 535.
[73] Brown and Roucek, op. cit., pp. 56, ff.
[74] U. S. Bureau of the Census, Prisoners in State and Federal Reformatories and Penitentiaries 1933 (1935), table 25, p. 29.

lished in Texas in 1854, when such towns as Panna Maria and Czechstochowa were founded.[75]

For the period between 1899 and 1919, the Poles were counted in with the Germans, Austrians, and Hungarians, or with the Russians. Thus, while statistics of the Immigration and Naturalization Service show that only 419,957 immigrants from Poland were legally admitted between 1820 and 1948, nearly 1,000,000 foreign-born Poles were enumerated in 1940. The annual Polish quota is 6,494. During the fiscal year ending June 30, 1948, 8,020 Polish immigrants were admitted, as follows:[76]

| Class: | Number |
| Quota immigrants | [1] 6, 143 |
| Husbands of citizens | 58 |
| Wives of citizens | 972 |
| Unwed children of citizens | 180 |
| Wives, children of natives, nonquota countries | 36 |
| Ministers, wives, children | 413 |
| Professors, wives, children | 218 |
| Total | 8, 02 |

[1] Includes displaced persons.

Between March 30, 1946, and June 30, 1948, 10,776 Polish displaced persons were admitted under the Presidential directive of December 22, 1945.[77] During the fiscal year 1948, 490 Polish students entered the United States under section 4 (e) of the Immigration Act of 1924. During the same period, 62 Polish seamen entered the country illegally by deserting their vessels in American ports.[78] In addition, 159 Poles were excluded at various ports,[79] while 206 aliens emigrated from this country (122 males and 84 females).[80]

*(2) Distribution of population*

In 1940, there were 2,905,859 Poles in this country, of whom 993,497 were foreign-born[81] (529,543 males and 469,936 females). Of the foreign-born Poles, 854,450, or 86 percent, were living in urban areas (444,194 males and 410,256 females); 81,712, or 8.2 percent, in rural nonwhite areas (46,623 males and 35,089 feamles); and 65,166, or 5.8 percent, in rural farm areas (32,726 males and 24,591 females). Of the foreign-born Poles, 939,416, or 94.5 percent, were living in the North, 30,962 or 3.1 percent in the South, and 23,101, or 2.4 percent, in the West. New York State had 281,080, Pennsylvania 117,319, Illinois 138,700, and Michigan 96,826.[82]

*(3) Naturalization and assimilation*

The Poles have been able to retain their cultural pattern within the American civilization to an unusual degree, due to the persistence with which the Polish immigrant clings to memories of his nationality and to the many Polish-American institutions in America.[83]

The Poles are exceedingly gregarious. They have some 10,000 dramatic, literary, social, singing, religious, and athletic societies, such

[75] Brown and Roucek, op. cit., p. 136.
[76] Immigration and Naturalization Service, Annual Report, 1948, table 6.
[77] Visa Division, State Department, final report, October 5, 1948.
[78] Immigration and Naturalization Service, Annual Report, 1948, table 22.
[79] Ibid., table 14.
[80] Ibid., table 14.
[81] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[82] Ibid., table 35, pp. 88-89.
[83] Brown and Roucek, op. cit., p. 142.

as the Alliance of Polish Literary and Dramatic Circles of America, Polish Veterans' Association, Pulaski Legion of America, and Polish Associated Federal Employees.[84]   Their Polish organizations have a membership estimated at 1,000,000.   The Polish National Alliance, organized in 1879, has approximately 300,000 members, with 2,300 branches in 26 States.

At the time of the 1940 census, 2,416,320 people claimed Polish as their mother tongue.[85]   In 1930, there were 15 Polish daily news-papers, 64 weeklies, 4 biweeklies, 41 monthly publications, and 3 quarterlies.   During the depression, the number of dailies dropped to 11.   The oldest is the Kurjer Polski, founded in 1888 in Mil-waukee.   Nearly all the periodicals and newspapers contain material in English for the younger generation.   According to a 1946 survey, there were 18 Polish publications in New York, 14 in Pennsylvania, 10 in Illinois, 7 in Michigan, and 6 in Wisconsin.[86]

The Poles have never ranked high in naturalization.   In 1920, of all the foreign-born Poles in the United States, only 28 percent were naturalized.   By 1930 the percentage had risen to 50.5, and by 1940 to 59.7.   Naturalization of those claiming Poland as their place of nativity was, for recent years:[87]

| | | | |
|---|---|---|---|
| 1944 | 42, 758 | 1947 | 6, 495 |
| 1945 | 20, 812 | 1948 | 5, 136 |
| 1946 | 12, 907 | | |

#### (4) Education—religion

The major portion of the Poles are Roman Catholic.   Some 400,000 of them are members of the so-called Polish National Catholic Church.   The Poles support a rather large number of educational institutions.   The Polish National Alliance maintains a nonsectarian college.[88]

#### (5) Crime

The prison and jail commitment rate for foreign-born Poles in 1933 was 6.1 per 1,000 population.   For felonies, the rate was 0.22 per 1,000.   The crimes for which they were committed were:[89]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Homicide | 21 | Rape | 7 |
| Robbery | 24 | Other sex offenses | 14 |
| Aggravated assault | 13 | Forgery | 16 |
| Other assault | 18 | Violation drug laws | 1 |
| Burglary | 54 | Violation liquor laws | 12 |
| Larceny | 35 | Other offenses | 37 |
| Auto theft | 4 | | |
| Fraud, embezzlement | 6 | Total | 262 |

### u. Portuguese

#### (1) Background of immigration

The earliest recorded settlement of Portuguese in this country was in 1765 in the coastal towns of Massachusetts.   The New England whaling industry attracted Portuguese from time to time.[90]   A number migrated to California during the gold rush of 1849.   The Homestead Act of 1865 and the subsequent population movement westward

84 Ibid., p. 138.
85 Ibid., p. 644.
86 Common Council for American Unity, Interpreter Release, vol. XXIV, No. 26, June 12, 1947, p. 205.
87 Immigration and Naturalization Service, Annual Report, 1948, table 39.
88 Brown and Roucek, One America, p. 139.
89 U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
90 Brown and Roucek, op. cit., p. 277.

brought others, especially around the turn of the twentieth century.

By 1899, the Portuguese were one of the dominant labor groups in the cotton mills of New Bedford.   In California, many became farmers after abandoning the fishing industry.   By 1920, the Portuguese ranked third highest in land ownership and fourth highest in farm values in California.   In addition, they were said to control about 75 percent of the cattle in the State.[91]

As early as 1820, 120 foreign-born Portuguese were enumerated in this country.   Total immigration from Portugal between 1820 and 1948 was 261,079.   From 1911 to 1920, 89,732 were legally admitted; 890 arrived during the fiscal year 1948, as follows:[92]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 443 |
| Husbands of citizens | 18 |
| Wives of citizens | 237 |
| Unwed children of citizens | 177 |
| Wives, children of natives of nonquota countries | 8 |
| Ministers, wives, children | 2 |
| Professors, wives, children | 4 |
| Other classes | 1 |
| Total | 890 |

[1] Includes DP's.

Between March 31, 1946, and June 30, 1948, nine Portuguese displaced persons were admitted.

During the fiscal year 1948, 59 aliens were deported to Portugal from the United States, for the following causes:[93]

| Cause: | Number |
|---|---|
| Criminals | 2 |
| Mental or physical defective | 4 |
| Previously deported | 1 |
| Overstayed | 14 |
| Improper documents | 16 |
| Abandoned status | 11 |
| False statements | 11 |

In addition, 35 Portuguese were excluded, while 166 Portuguese seamen deserted their vessels while in American ports.[94]   Since 1908, 73,824 immigrant aliens have returned to Portugal from the United States, 394 during the fiscal year 1948.[95]

#### (2) Distribution of population

Of the 176,407 Portuguese in this country in 1940, 114,060 were native-born and 62,347 foreign-born.   Eighty percent of the foreign-born lived in three States—Massachusetts, California, and Rhode Island.[96]   The largest settlements of Portuguese are in Boston, Cam-bridge, Lowell, Fall River, and New Bedford, Mass.; Providence, R. I.; and in Oakland, Calif.[97]

Almost 31 percent of the Portuguese foreign-born are in the West, according to the 1940 census, 68 percent in the North, and less than

91 Ibid.
92 Immigration and Naturalization Service, Annual Report, 1948, table 6.
93 Ibid., table 24.
94 Ibid., tables 21 and 22.
95 Brown and Roucek, op. cit., p. 637; Immigration and Naturalization Service, Annual Report, 1948, table 13.
96 United States Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
97 Brown and Roucek, op. cit., p. 279.

1 percent in the South.  The geographical distribution of the foreign-born Portuguese was:[98]

| Area: | Number |
|---|---|
| North | 42, 567 |
| West | 19, 247 |
| South | 533 |

Of the foreign-born Portuguese, 36,143 were males and 26,204 were females.  There were 47,111, or 75.6 percent, in urban areas (26,821 males and 20,290 females); 8,249, or 13.2 percent, in rural farm areas (5,113 males and 3,136 females); and 6,987, or 11.2 percent, in rural nonfarm areas (4,209 males and 2,778 females).[99]

### (3) Naturalization and assimilation

The Portuguese-Americans have numerous societies and organizations.  Sick and death benefit organizations include the Azoreana, St. Michael's Portuguese Benefit Society, and St. Pedro Portuguese Society.  There are at least four active Portuguese fraternal organizations in California, two of which have women's auxiliaries, as well as five newspapers printed in Portuguese.  About 50 percent of the Portuguese children in California are bilingual.  Two radio stations, in Long Beach and Oakland, broadcast programs in Portuguese each week.  The Portuguese do not easily assimilate because of cultural, social, and language differences.  They have tended to segregate themselves from other groups.[1]

From 1939 to 1948, 28,677 Portuguese were naturalized.  Figures for those naturalized in recent years are:[2]

| | | | |
|---|---|---|---|
| 1944 | 4, 589 | 1947 | 1, 286 |
| 1945 | 3, 330 | 1948 | 1, 011 |
| 1946 | 2, 237 | | |

### (4) Religion

With only minor exceptions, the Portuguese are Roman Catholic.  In the 1850's, about 500 Protestant Portuguese from Madeira were induced to come to the United States by the American Protestant Society, eventually settling near Springfield and Jacksonville, Ill.[3]

### (5) Crime

There are no statistics available on the recent crime rate of the foreign-born Portuguese.  A report of the Special Committee on Immigration of the State of New York, based on the foreign-born population of 1930, showed a crime rate of 1.3 per 1,000 population for Portuguese in Federal and State penitentiaries and reformatories.[4]

### v. Rumanians

#### (1) Background of immigration

While more than 240,000 persons gave Rumania as the country of their origin in 1940, only 65,520 listed Rumanian as their mother tongue.  From 1880 to 1948, immigration from Rumania totaled 158,208.[5]  The annual quota is 295.  Those arriving in 1948 were divided as follows:[6]

---

| Class: | Number |
|---|---|
| Quota immigrants | [1]400 |
| Husbands of citizens | 22 |
| Wives of citizens | 158 |
| Unwed children of citizens | 29 |
| Wives, children of natives from nonquota countries | 4 |
| Ministers, wives, children | 124 |
| Professors, wives, children | 33 |
| Total | 770 |

[1] Includes 266 D P.'s.

In addition, 155 Rumanian students entered the United States under section 4 (e) of the Immigration Act of 1924.

#### (2) Distribution of population

Of the 247,400 Rumanians in this country in 1940, 115,940 were foreign-born (61,596 males and 54,344 females).  Those in urban areas numbered 104,324, or 89.9 percent (54,722 males and 49,602 females); in rural nonfarm areas, 6,325 or 5.5 percent (3,754 males and 2,571 females); and in rural farm areas, 5,291, or 4.6 percent (3,120 males and 2,171 females).[7]

Of the foreign-born Rumanians, 104,269, or 89.9 percent, were located in the North, 7,810, or 6.7 percent, in the West, and 3,861, or 3.4 percent, in the South.  New York State had 43,850, or 38.85 percent, of the total.  Other States with more than 10,000 foreign-born Rumanians were Ohio, with 13,747 and Pennsylvania, with 10,652.[8]

#### (3) Naturalization and assimilation

Since nearly 50 percent of the population of Rumania was illiterate at the time most of the Rumanian immigrants came to the United States, they required many years to become culturally acclimated.  Until the 1920's, approximately 90 percent of the Rumanian immigrants were single males and association together retarded their Americanization, even their learning of the English language.[9]

Although their number in the United States is relatively small, the Rumanians have several newspapers and periodicals in their own language.  Among these are America, Foia Poporului (The People's News), Viata Noua (The New Life), and Solia (The Herald).[10]

The percentage of Rumanians becoming citizens has increased considerably during the past few decades.  In 1920, their rate of naturalization was only 41.1 percent.  By 1930, this had risen to 60.3 percent, and by 1940, to 68.9 percent.[11]  The most recent data available on the naturalization of aliens owing former allegiance to Rumania are as follows:[12]

| | | | |
|---|---|---|---|
| 1944 | 8, 137 | 1947 | 929 |
| 1945 | 3, 730 | 1948 | 832 |
| 1946 | 1, 829 | | |

#### (4) Employment

Although most of the Rumanian immigrants were originally agricultural workers, many have found work in mills, factories, and mines.

---

[98] United States Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 36, pp. 88–89.
[99] U. S. Bureau of the Census, census of 1940, population (1940), vol. II, part I, table 36, p. 88.
[1] Brown and Roucek, One America (1945), p. 279.
[2] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[3] Brown and Roucek, Op. Cit., p. 278.
[4] Harry H. Laughlin, Immigration Control, 1934, p. 31.
[5] Immigration and Naturalization Service, Annual Report (1948) table 4.
[6] Ibid., table 6

[7] U. S. Bureau of the Census, Census cf 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[8] Ibid., table 36, pp. 88–89.
[9] Brown and Roucek, op. cit., p. 226.
[10] Ibid., p. 230.
[11] Ibid., p. 657.
[12] Immigration and Naturalization Service, Annual Report (1948), table 39.

A number have continued in their native trade of farming or sheep-herding.

### (5) Education—Religion

Statistics on education of Rumanians are not available. It has already been pointed out that the major proportion of the Rumanian immigrants were illiterate.

Approximately 70 percent of the Rumanians are of the Greek Orthodox faith, nearly 20 percent are members of the Greek Catholic Church, about 7 percent are Jews, and the balance is scattered among Protestant groups, chiefly Baptists.[13]

### (6) Crime

The 1933 Nation-wide census of prisons and jails, covering persons 15 years and older, showed for foreign-born Rumanians, an over-all crime rate of 0.17 per 1,000 population. The felony rate was 0.016 per 1,000, and commitments were as follows:[14]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Homicide | 1 | Rape | 1 |
| Robbery | 4 | Forgery | 1 |
| Aggravated assault | 1 | Stolen property | 2 |
| Other assault | 0 | Violation of liquor laws | 1 |
| Burglary | 3 | Other offenses | 3 |
| Larceny | 5 | | |
| Fraud, embezzlement | 2 | Total | 24 |

### w. Spaniards

#### (1) Background of immigration

Only small numbers of Spanish immigrants migrated to the United States from 1820 to 1890, the largest influx coming between 1851 and 1860, when 9,298 were admitted. Between 1890 and 1900, 28,000 immigrants from Spain entered, and 68,500 between 1900 and 1910.[15] Since 1820, immigration from Spain to the United States has totaled over 170,000. At present, their annual quota is 252.[16] During the fiscal year 1948, a total of 509 immigrants from Spain entered this country, as follows:[17]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 189 |
| Husbands of citizens | 5 |
| Wives of citizens | 151 |
| Unwed children of citizens | 82 |
| Wives, children of natives non-quota countries | 12 |
| Ministers, wives, children | 18 |
| Professors, wives, children | 52 |
| Total | 509 |

[1] Includes D P.'s.

In addition, 83 Spanish students were admitted during the fiscal year 1948. A total of 103 Spanish seamen deserted their vessels while in American ports,[18] 223 aliens were excluded, and 33 aliens were deported to Spain. The causes for deportation were:[19]

[13] Brown and Roucek, op. cit., p. 227.
[14] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
[15] Brown and Roucek. One America (1945), p. 271.
[16] Immigration and Naturalization Service, Annual Report, 1948, table 7.
[17] Ibid., table 6.
[18] Ibid., table 22.
[19] Ibid., table 24.

| | Number |
|---|---|
| Criminal | 4 |
| Violation drug laws | 1 |
| Previously deported | 2 |
| Overstay | 10 |
| Improper papers | 10 |
| Abandoned status of admission | 2 |
| False papers, etc | 4 |
| Total | 33 |

Between 1908 and 1948, 73,450 emigrant aliens returned to Spain from the United States; 29,291 returned from 1921 to 1930.[20]

#### (2) Distribution of population

Of a total Spanish population of 109,407 in the United States in 1940, 47,707 were foreign-born (32,770 males and 14,937 females).[21]

Of the foreign-born, 37,693, or 79 percent, resided in urban areas (25,686 males and 12,007 females); 6,622, or 13.9 percent, lived in rural nonfarm areas (4,624 males and 2,778 females); and 3,392, or 7.1 percent, in rural farm areas (2,460 males and 932 females). Of the foreign-born, 26,703, or 56 percent, were located in the North, 14,596, or slightly over 30 percent, in the West, and 6,408, or 13.4 percent, in the South.[22] Over 23 percent were in California; Florida had 3,248, and New York, the leader, 16,147.

#### (3) Naturalization and assimilation

It is estimated that between 2.5 and 3 million people in the United States use Spanish as their native language, although only 1,861,400 listed Spanish as their mother tongue in 1940. The major portion, approximately 85 percent, were of Mexican origin, a substantial number were of other Latin-American stock.

The Spanish foreign-born tend to settle in or create new Spanish communities in which their language, customs, and institutions are perpetuated. They have their own social and fraternal organizations, as well as mutual benefit societies, which care for the sick, provide death benefits, furnish legal advice, and carry on social and some educational activities.[23]

The Spanish newspapers have a twofold problem of serving the older element, whose interests are chiefly in the homeland, and the younger people, who are bilingual and whose interests reach beyond their minority groups. The press is further confronted with the problem of serving diverse Spanish-speaking interests.[24] The paper with the largest circulation and with the most inclusive coverage is La Prensa in New York City.

During the 10-year period ending June 30, 1948, a total of 21,095 Spaniards were naturalized in the United States; included in that number are the 749 naturalized during the fiscal year 1948.[25]

#### (4) Religion

The church and the family are the two important ties which bind the Spaniards together.[26] Dominantly Catholic, much of their cultural life centers around the church. In Los Angeles alone, there are 17 Spanish Catholic Churches. Religious and other customs brought

[20] Brown and Roucek, op. cit., p. 637.
[21] U. S. Bureau of the Census, Census of 1940, Population (1940), vo., II, pt. 1. table 14, p. 42.
[22] Ibid., table 36, pp. 88–89.
[23] Brown and Roucek, One America (1945), p. 274.
[24] Ibid.
[25] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[26] Brown and Roucek, op. cit., p. 273.

from Spain or Mexico by the early pioneers still flourish, especially in the Southwest.

### (5) Crime

The over-all commitment rate for both felonies and misdemeanors of the foreign-born Spanish population was 7.3 per 1,000 in 1933, while the felony rate was 0.6 per 1,000.

The major crimes for which they were sentenced were: [27]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Robbery | 3 | Other sex offenses | 1 |
| Burglary | 6 | Violation drug laws | 5 |
| Larceny | 10 | Violation liquor laws | 1 |
| Auto theft | 1 | Other offenses | 2 |
| Forgery | 2 | | |
| Rape | 1 | Total | 32 |

### x. Swedes

#### (1) Background of immigration

Swedish immigration dates from 1638, when a group of settlers founded New Sweden on the Delaware River. In 1655, New Sweden became a part of the Dutch domain in America, and for nearly two centuries the number of Swedes coming to America was insignificant.

The Swedes were overwhelmingly agricultural workers. In the 1850's, for example, industrial workers among the Swedish immigrants amounted to only one-fifth of their total. By 1880, the pattern began to show a new trend, along with the growing industrialization of the country, with one-third of the Swedes in industrial pursuits. During the first decade of the twentieth century the proportion rose to one-half.[28]

Between 1820 and 1948, over 1,200,000 Swedes were legally admitted into the United States.[29] The heaviest influx was between 1881 and 1890, when 391,776 arrived; the second largest between 1901 and 1910, when 249,534 entered. The annual quota for Sweden was 3,314.[30]

During the fiscal year 1948, 2,022 immigrants from Sweden were admitted, as follows: [31]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 1, 965 |
| Husbands of citizens | 2 |
| Wives of citizens | 32 |
| Unwed children of citizens | 1 |
| Wives, children of natives, nonquota countries | 1 |
| Ministers, wives, children | 5 |
| Professors, wives, children | 13 |
| Women who had been citizens | 2 |
| Other classes | 1 |
| Total | 2, 022 |

[1] Includes DP's.

In addition, 80 Swedish students were admitted under section 4 (e) of the Immigration Act of 1924, while 272 Swedish seamen deserted their vessels and entered the country illegally.[32]

[27] U. S. Bureau of the Census, *Prisoners in State and Federal Penitentiaries and Reformatories, 1933* (1935), table 25, p. 29.
[28] Brown and Roucek, op. cit., p. 61.
[29] Ibid., p. 632.
[30] Immigration and Naturalization Service, Annual Report, 1948, table 7.
[31] Ibid., table 6.
[32] Immigration and Naturalization Service, Annual Report, 1948, table 22.

During the same period, 59 aliens were deported to Sweden, for these reasons.[33]

| Class: | Number |
|---|---|
| Criminal | 4 |
| Mental, physical defects | 3 |
| Overstay | 33 |
| Improper documents | 9 |
| Abandoned status | 7 |
| False statements, etc | 1 |
| Apt to become public charge | 2 |
| Total | 59 |

Between 1908 and 1948, 165,346 immigrant aliens returned to Sweden.[34]

#### (2) Distribution of population

Of the 1,301,390 Swedes in the United States in 1940, 856,320 were native-born while 445,070 were foreign-born (245,469 males and 199,601 females). Of the foreign-born, 69,956, or 15.71 percent, lived in rural areas (43,080 males and 26,876 females); 305,934, or 68.7 percent, in urban areas (162,229 males and 143,705 females); and 69,180, or 15.59 percent, in rural nonfarm areas (40,160 males and 29,020 females).[35]

Of the foreign-born Swedes, 10,096, or 2.3 percent, were in the South; 346,424, or 77.8 percent, were in the North (79,348 in Illinois and 67,161 in Minnesota); and 88,550, or 19.9 percent, were in the West (34,899 in California and 26,899 in Washington).[36]

#### (3) Naturalization and assimilation

The great majority of Swedish-Americans are thoroughly assimilated in the general population of the United States. They have had no important foreign political factions or organizations. Their political activities have been confined largely to American politics, in which they have played a considerable part.

Although some 1,200 Swedish newspapers and periodicals were established during the past 100 years, only a handful survived. The Nordstjernan (The North Star), founded in 1871, and published weekly in New York City, is one of the oldest existing Swedish-American papers in the country. It occasionally carries editorials on world affairs. The Swedish-American Tribune, published in Chicago, is a family paper, with a circulation of about 51,000. Another influential weekly, published in Worcester, Mass., is the Svea (Sweden), with a circulation of over 34,000.

Between 1939 and June 30, 1948, 34,306 Swedes, or those claiming Sweden as their country of birth, were naturalized. The following are the number of aliens owing former allegiance to Sweden who have been naturalized during the past five fiscal years: [37]

| | Number | | Number |
|---|---|---|---|
| 1944 | 8, 106 | 1947 | 1, 405 |
| 1945 | 3, 809 | 1948 | 1, 199 |
| 1946 | 2, 482 | | |

[33] Ibid., table 24.
[34] Brown and Roucek, op. cit., p. 637; Immigration and Naturalization Service, Annual Report, 1944-48, table 13.
[35] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[36] Ibid., table 36, pp. 88-89.
[37] Immigration and Naturalization Service, Annual Report, 1948, table 39.

By 1940, 77.1 percent of the foreign-born Swedes in this country had become naturalized citizens.

### (4) Employment

Swedish-Americans have cleared and cultivated more than 10,000,000 acres of land in the United States. They are excellent horticulturalists, landscape gardeners, fruit growers, and nurserymen.

### (5) Education—Religion

The Swedes are literate, and many of them speak two or three languages fluently. The majority of Swedish-Americans are members of the Lutheran Augustana Synod. In the early days of the synod, the Swedish language was used. Today about 75 percent of its members are either native-born or have been in America since early childhood. The English language is used almost exclusively in the work among the children and young people. A number of Swedish Baptists have come to America and a number of Swedish Mormons settled in Utah.[38]

### (6) Crime

At the time of the last Nation-wide census of prisons and jails, the over-all crime rate for foreign-born Swedes was 3.8 per 1,000 population, and the felony crime rate was 0.1 per 1,000 population. The major crimes for which Swedes were committed were:[39]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Homicide | 2 | Rape | 2 |
| Aggravated assault | 2 | Other sex offenses | 3 |
| Other assault | 2 | Forgery | 7 |
| Robbery | 5 | Violation drug laws | 1 |
| Burglary | 8 | Violation liquor laws | 4 |
| Larceny | 8 | Other offenses | 8 |
| Fraudulent embezzlement | 3 | | |
| Auto theft | 2 | Total | 58 |
| Stolen property | 1 | | |

### y. Swiss

#### (1) Background of immigration

The first distinctly Swiss settlement is reported to have been established in 1670 in the vicinity of Charleston, S. C. Some 13 years later, another Swiss group founded New Bern, N. C.[40] After 1710, several waves of Swiss Mennonites reached Pennsylvania and the Carolinas. Since 1820, about 300,000 Swiss immigrants have come to the United States.[41] The annual quota for Switzerland is 1,707.[42] During the fiscal year 1948, 1,426 Swiss immigrants were admitted into the country, divided into the following classes:[43]

[38] Brown and Roucek, One America (1945), p. 64 ff.
[39] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
[40] Brown and Roucek, op. cit., pp. 113 ff.
[41] Ibid., p. 632.
[42] Immigration and Naturalization Service, Annual Report, 1948, table 7.
[43] Ibid., table 6.

| Class: | Number |
|---|---|
| Quota immigrants | [1] 1, 331 |
| Husbands of citizens | 1 |
| Wives of citizens | 67 |
| Unwed children of citizens | 9 |
| Wives, children of natives, nonquota countries | 3 |
| Ministers, wives, children | 3 |
| Professors, wives, children | 8 |
| Women who had been citizens | 1 |
| Other classes | 3 |
| Total | 1, 426 |

[1] Includes DP's.

In addition 58 Swiss students were admitted under section 4 (e) of the Immigration Act of 1924. Between March 31, 1946, and July 1, 1948, a total of 12 Swiss displaced persons were admitted. Since 1908, 16,835 immigrants have gone back to Switzerland,[44] 318 departing during the fiscal year 1948.

#### (2) Distribution of population

Almost 20 percent of the Swiss foreign-born population in the United States in 1940 was located in California.[45] At that time, the total Swiss-American population numbered 293,973, of whom 205,680 were native-born and 88,293 were foreign-born (49,612 males and 38,681 females). There were 53,697 foreign-born Swiss living in urban areas (28,543 males and 25,154 females); 15,637 in rural nonfarm areas (9,030 males and 6,607 females); and 18,959 in rural farm areas (12,039 males and 6,920 females).[46]

Over 30 percent of the foreign-born Swiss was in the West. California, with 16,888, led all other States; Oregon had 3,172 and Washington 2,858. New York State ranked second to California with 14,120. The geographical distribution was as follows:[47]

| Area | Number | Percent |
|---|---|---|
| North | 55, 904 | 63. 3 |
| West | 27, 138 | 30. 7 |
| South | 5, 251 | 6. 0 |

#### (3) Naturalization and assimilation

Like other immigrant groups, the Swiss have their benevolent, social, and other organizations. The most notable one is the Nordamerikanische Schweizer Bund, with headquarters in St. Louis. It has a membership of nearly 10,000 and almost 90 lodges. Other national groups are the Saengerbund (a singing society), Helvetia Association of North America (a Swiss hotel employees' mutual benefit society), Swiss American Historical Society, and the Helvetia Mannerchor (another singing group organized as early as 1858). In addition, there are numerous clubs of a strictly local character, as well as charitable organizations, one of the oldest being the Swiss Charitable Institution of New York, founded in 1832.[48]

[44] Brown and Roucek, One America (1945), p. 637; Immigration and Naturalization Service, Annual Report, 1948, table 13.
[45] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 36, pp. 88–89.
[46] Ibid., table 14, p. 42.
[47] Ibid., table 36, pp. 88–89.
[48] Brown and Roucek, op. cit., pp. 115 ff.

Because of the original differences in Swiss language, their newspapers and periodicals are printed in German, French, or Italian. The Amerikanischer Schweizerzeitung has been published since 1868 in New York City. The Colonia Svizzera, of San Francisco, is for the Italo-Swiss, while the French-Swiss in the eastern part of the country read the Courrier des États Unis, a weekly. Other publications are the Schweizer Journal of San Francisco, the Green County Herald, Monroe, Wis., and the Swiss-American News of Detroit.[49]

In the 10-year period ending June 30, 1948, a total of 13,799 Swiss were naturalized.[50] As of 1940, the Swiss naturalization rate was 73.6 percent.[51] Naturalization figures for the fiscal years 1944–48 are:[52]

| | | | |
|---|---|---|---|
| 1944 | 3,891 | 1947 | 585 |
| 1945 | 1,040 | 1948 | 493 |
| 1946 | 841 | | |

#### (4) Employment

Because of the advantages of language studies which they have had in the old country, a number of Swiss-Americans have become teachers of modern languages in American high schools and colleges. Many are found in the following trades and industries: Grape wine, poultry, hotel and restaurant, dairy and cheese, silk, jewelry and watches, and embroidery and laces. It is particularly in the silk industry that the Swiss have attained a place of high importance, their holdings being valued at millions of dollars.[53]

#### (5) Religion

The Swiss in the United States are divided into three linguistic groups: German-Swiss, French-Swiss, and Italian-Swiss. The first constitutes about 80 percent of the total and many of these are Mennonites, residing chiefly in Lancaster County, Pa., where they have retained the customs, traditions, and manners of their forebears. Some have become members of other churches such as Lutheran, Calvinist, and Catholic.[54]

#### (6) Crime

A report on commitments to State and Federal prisons indicated a Swiss crime rate of 0.055 per 1,000 population in the United States.[55]

### z. Turks

#### (1) Background of immigration

In 1820, there were 21 Turks in the United States. Since then over 361,000 Turks, both from European and Asiatic Turkey, have been legally admitted. The peak decades were 1901 to 1910, when 157,369 arrived, and 1910 to 1920, when 134,057 entered.[56]

From 1941 through fiscal year 1948 only 1,052 Turks entered the country. During the fiscal year ended June 30, 1948, 188 were admitted. The annual quota is 226. Between March 31, 1946, and July 1, 1948, 16 displaced persons of Turkish birth were admitted. No aliens were deported to Turkey during the 1948 fiscal year.[57]

#### (2) Distribution of population

In 1940, there were 104,201 Turks in the United States, of whom 47,310 were native-born and 56,891 were foreign-born. Of the foreign-born, 33,478 were males and 23,413 were females. The major portion, 52,950, or 93.05 percent, lived in urban areas (30,885 males and 22,065 females); 2,603, or 4.6 percent, in rural nonfarm areas (1,764 males and 839 females); and 1,338, or 2.35 percent, in rural farm areas (829 males and 509 females).[58]

In 1940 82.6 percent (47,011) of the foreign-born Turks were living in the North, 20,817 of them in the State of New York. Their geographical distribution was as follows:[59]

| Area | Number | Percent |
|---|---|---|
| North | 47,011 | 82.6 |
| South | 2,952 | 5.2 |
| West | 6,928 | 12.2 |

#### (3) Naturalization and assimilation

During the 10-year period ending June 30, 1948, 19,164 persons claiming Turkey as their country of origin, were naturalized. The total naturalized during the fiscal years 1944–48 was:[60]

| | | | |
|---|---|---|---|
| 1944 | 3,115 | 1947 | 522 |
| 1945 | 1,571 | 1948 | 481 |
| 1946 | 1,039 | | |

Chief among the Christian groups who have emigrated from Turkey are the Greeks, Syrians, Armenians, Bulgars, Serbs, and Montenegrins. In addition there has been emigration from Turkey of Jews and Turks, the latter group being principally Mohammedan.[61]

The Turks in the United States are almost without exception of the laboring class. They have not established organizations or publications comparable to those of other nationality groups.

#### (4) Crime

Although detailed accounts are lacking, it has been established that the over-all crime ratio of the Turks, including both felonies and misdemeanors, was 1.45 per 1,000 population in 1930.[62]

### aa. United Kingdom

#### (1) Background of immigration

Despite the heterogeneous elements that streamed to America during its early colonization, Anglo-Saxon culture and traditions and, above all, the English language, early became so dominant as to give cohesion to the Colonies and eventual unity to the Nation. In 1790, the English comprised 82.1 percent of our population, while the Scotch accounted for 7.0 percent.[63]

From 1820 to 1880, a great volume of immigration came from England, Scotland, Wales, and Northern Ireland, amounting to approximately 2.5 million persons.[64] The great majority spoke Eng-

49 Ibid.
50 Immigration and Naturalization Service, Annual Report, 1948, table 39.
51 Brown and Roucek, op. cit., p. 657.
52 Immigration and Naturalization Service, Annual Report, 1948, table 39.
53 Brown and Roucek, op. cit., pp. 115 ff.
54 Ibid.
55 Harry H. Laughlin, Immigration Control (1934), p. 31.
56 Brown and Roucek, One America (1945), p. 632.
57 Immigration and Naturalization Service, Annual Report, 1948, table 24.

58 U.S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
59 Ibid., table 36, pp. 88, 89.
60 Immigration and Naturalization Service, Annual Report, 1948, table 39.
61 Maurice R. Davie, World Immigration (1936), pp. 173–174.
62 Harry H. Laughlin, Immigration Control (1934), p. 31.
63 H. G. Duncan, Immigration and Assimilation (1933), p. 479.
64 K. D. Miller, We Who Are America (1943), p. 48.

lish and tended to scatter among the older residents of the country. Many of the English and Scots came to the United States by way of Canada.

Between 1820 and 1947, immigration to this country from England, Scotland, and Wales totaled 4,326,385 (including 739,027 "not specified"). England contributed 2,705,361; Scotland, 739,027; and Wales, 88,256. The present annual quota for the United Kingdom is 65,721.

Between 1908 and 1947, 231,838 English, Scotch, and Welsh emigrated from the United States.[65] It has been estimated that over one-third of the immigrants from the United Kingdom returned home.[66]

### (2) Distribution of population

Of 1,043,072 (515,837 males and 527,235 females) foreign-born from the United Kingdom in the United States in 1940, 657,335 were from England and Wales, 279,321 from Scotland, and 106,416 from Northern Ireland. Of 837,037 in urban areas, 407,480 were males and 429,557 were females. Rural nonfarm areas had 79,549 males and 75,403 females and rural farm areas had 28,808 males and 22,275 females.[67]

This group is concentrated largely in the Northeast and Middle West. In 1940, 813,852 were located in the North, 52,914 in the South, and 176,306 in the West.[68] Approximately 120,000 English and Welsh were living in New York, and substantial numbers were in Massachusetts, Pennsylvania, Michigan, Illinois, California, Ohio, Rhode Island, and Connecticut. Of 279,321 foreign-born Scotch, some 50,000 were living in New York, with lesser numbers in Pennsylvania, Michigan, Massachusetts, Illinois, and California.[69]

### (3) Naturalization and assimilation

The Welsh in this country tend to become rapidly naturalized. As of 1940, approximately 75 percent had been naturalized, the highest rate of any nationality group.[70]

The Scots have been somewhat slower in naturalization. As of 1940, about 67.4 percent of the Scotch foreign-born and approximately 68.8 percent of the English foreign-born had been naturalized.[71] During the fiscal year 1947, 4,964 persons from the United Kingdom were naturalized, of whom 2,810 were born in England, 1,666 in Scotland, 170 in Wales, and 318 in Northern Ireland. Approximately 52 percent (2,573) had come to this country 20 to 25 years previously.[72]

Immigrants from the United Kingdom assimilate readily in the United States, largely because of a common language and cultural background. The Welsh immigrant came to this country with a somewhat distinctive culture, which has been to a degree maintained through the use of the Welsh language in church services and singing societies. This factor of language, plus that of greater local and occupational unity, has caused the Welsh to retain a larger degree of distinctiveness than the English or Scotch.[73]

[65] Brown and Roucek, One America (1945), p. 637; U. S. Immigration and Naturalization Service, Annual Report, 1947, table 13.
[66] H. G. Duncan, op. cit., p. 42.
[67] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[68] Ibid., table 36, p. 88.
[69] Brown and Roucek, op. cit., pp. 36-39.
[70] Ibid., p. 42.
[71] Ibid., p. 657.
[72] Immigration and Naturalization Service, Annual Report, 1947, table 46.
[73] Brown and Roucek, op. cit., op. 42.

Various English, Scotch, and Welsh organizations and societies have been created through the years, and have tended to preserve the customs and traditions of the old country, as well as to maintain the links between the Old World and the New.

### (4) Employment

The English, Scotch, and Welsh have entered a wide variety of vocations and professions in this country, depending largely upon the type and degree of education of the individual, as well as his background and interests. "Academic overproduction abroad helped to stock America with ready-made professional men whose more theoretical knowledge supplemented the rough-and-ready skill of the native-born. The history of almost every community includes an account of some Irish or Scotch schoolmaster, who between terms mastered the intricacies of American law and eventually rose to wealth and prominence. The English and Scots were numerous in medicine and in institutions of higher learning. By the same token, nearly every religious denomination was well provided with Welsh clergymen."[74] The Welsh have also contributed a great deal toward the building up of the coal and iron industries in the United States.[75]

### (5) Education—Religion

While immigrants from the United Kingdom have represented varying degrees of literacy and educational training, this group constituted one of the higher educational levels among immigrants, due to the general character and cultural heritage of the people, as well as to the system of free, compulsory education maintained in the United Kingdom.

The English, Welsh, and Scotch are largely Protestant. A great majority of the Scotch and Welsh are Presbyterian, while the English are affiliated with the Episcopal, Methodist, Baptist, and other Protestant sects. There is also a small minority of Roman Catholics.

### (6) Crime

Of 2,717 foreign-born white felony prisoners received by State and Federal prisons and reformatories in 1940, a total of 96 were born in England, Scotland, or Wales,[76] a felony rate of 10.25 per 100,000 population present. Of 3,163 foreign-born white felony prisoners received by State and Federal prisons in 1933, 142 were born in England, Scotland, or Wales. The most numerous offenses were robbery, forgery, embezzlement and fraud, burglary, larceny (except auto theft), and sex offenses (except rape).[77]

### bb. Russians

#### (1) Background of immigration

While virtually all of the European immigrant groups first set foot on American soil along the eastern coast, the Russians first landed on the northwestern coast of the American Continent in 1741. For many years thereafter, the Aleutian Islands and the shores of Alaska were explored by Russian adventurers. In 1867, the United States bought the Territory from the Tsar for $7,200,000.

[74] M. L. Hansen, The Immigrant in American History (1940), p. 130.
[75] Brown and Roucek, op. cit., p. 42.
[76] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories, 1940, (1943), p. 36.
[77] U. S. Bureau of the Census, Prisoners in State and Federal Prisons and Reformatories, 1933, (1935), p. 29.

The beginning of sizable Russian immigration through the ports of the eastern part of the United States occurred in the decade 1871–80, when 38,284 Russians entered. Fewer than 4,000 Russians had immigrated into the United States between 1820 and 1870.[78]

Immigration to the United States from the Union of Soviet Socialist Republics is today relatively insignificant, due largely to the fact that the U. S. S. R. restricts the emigration of its residents.[79]

Since 1820, over 3,300,000 Russian immigrants have been legally admitted into the United States.[80] The annual Russian quota is 2,712. During the fiscal year 1948, 2,317 were admitted, divided into the following classes:[81]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 1,956 |
| Husbands of citizens | 5 |
| Wives of citizens | 274 |
| Unwed children of citizens | 6 |
| Wives, children of natives, nonquota countries | 19 |
| Ministers, wives, children | 34 |
| Professors, wives, children | 23 |
| Total | 2,317 |

[1] Includes DP's.

In addition, 49 Russian students were admitted under section 4 (e) of the Immigration Act of 1924.

During that same period, 93 Russians and 23 Ruthenians were excluded from the United States.[82] In addition, 15 Russian seamen deserted their ships while in American ports and made illegal entries.[83] Between March 31, 1946, and July 1, 1948, 2,978 displaced persons of Russian birth were admitted.

Since 1908, some 280,000 aliens have returned to Russia from the United States, the major portion of them during the decade 1911–20, when 174,359 departed.

### (2) Distribution of population

Of a total of 2,610,244 Russians in the United States in 1940, 1,569,360 were native-born and 1,040,884 were foreign-born (548,216 males and 492,668 females). Foreign-born Russians in urban areas totaled 938,516 or 90.16 percent (488,618 males and 449,898 females); 53,086 or 5.1 percent lived in rural nonfarm areas (31,055 males and 22,031 females); and 49,383 or 4.74 percent in rural farm areas (28,543 males and 20,739 females).[84]

In 1940, 436,028 or 42 percent of all the foreign-born Russians in the country were in New York State. Pennsylvania had 95,803, Illinois 74,454, Massachusetts 64,454, New Jersey 51,758, and California 51,407. Geographically, their distribution was as follows:[85]

| Area | Number | Percent |
|---|---|---|
| North | 905,676 | 87.0 |
| West | 85,310 | 8.2 |
| South | 49,898 | 4.8 |

[78] Brown and Roucek, op. cit., p. 122.
[79] Common Council, on American unity, Interpreter Release, vol. XXIII, No. 49, December 23, 1946.
[80] Brown and Roucek, op. cit., p. 632.
[81] Immigration and Naturalization Service, Annual Report, 1948, table 6.
[82] Immigration and Naturalization Service, Annual Report, 1948, table 21.
[83] Ibid., table 22.
[84] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[85] Ibid., table 36, pp. 88–89.

### (3) Naturalization and assimilation

The Russians, especially prior to World War II, have not shown a great inclination for organized social life. Many of their associations, as well as numerous Russian publications, have been short-lived.

Some 34 Russian publications were established between 1910 and 1918; in 1946, however, only 5 dailies and 12 others were being published.[86] One outstanding reason why Russians generally do not seek gregarious associations with each other is that Russia's "family" includes some 130 tongues, 64 racial or tribal divisions, and 169 smaller ethnic groups.

By 1940, 69.6 percent of the Russian immigrants had been naturalized.[87] In the 10-year period ending June 30, 1948, a total of 151,141 were naturalized. Naturalization of persons claiming Russia as the country of their nativity was in recent years as follows:[88]

| | | | |
|---|---|---|---|
| 1944 | 25,533 | 1947 | 3,562 |
| 1945 | 12,164 | 1948 | 3,143 |
| 1946 | 7,404 | | |

### (4) Employment

In 1940, only 30,000 Russian-Americans were on farms. The majority of them were occupied in industry in New York, Detroit, Chicago, San Francisco, and other industrial centers. Many were employed in the mines and steel mills in Pennsylvania, Ohio, and West Virginia.[89]

It has been estimated that 65 percent of the total "Russian stock" in this country are Russian Jews who live primarily as merchants and small-trades people in metropolitan centers in the East and Middle West and who regard themselves as Jews rather than Russians.

### (5) Religion

The largest number of Russian-Americans are members of the Russian Orthodox Church. Many Russian immigrants belong to various Protestant denominations, the most numerous being the so-called Molokans, several thousand of whom settled in California. The members of another Russian sect, the Doukhobors, emigrated at the end of the nineteenth century to Canada, and during the following years many moved to California and to such cities as Chicago and Detroit.[90]

### (6) Crime

The last Nation-wide census of prisons and jails showed a gross commitment rate of 5.1 per thousand population for foreign-born Russians and a felony rate of 0.22 per 1,000. The major crimes for which foreign-born Russians were committed were:[91]

| Crime: | Number committed | Crime—Continued | Number committed |
|---|---|---|---|
| Homicide | 10 | Rape | 7 |
| Aggravated assault | 5 | Other sex offenses | 7 |
| Other assault | 9 | Forgery | 27 |
| Robbery | 38 | Stolen property | 3 |
| Burglary | 24 | Violating drug act | 5 |
| Larceny | 32 | Violating liquor laws | 14 |
| Fraud, embezzlement | 29 | Other offenses | 42 |
| Auto theft | 5 | | |
| | | Total | 256 |

[86] Common Council for American Unity, Interpreter Release, Vol. XXIV, No. 26, June 12, 1947, p. 203.
[87] Brown and Roucek, op. cit., p. 657.
[88] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[89] Brown and Roucek, op. cit., p. 123.
[90] Ibid.
[91] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935) table 25, p. 29.

### cc. *Yugoslavs*

#### (1) *Background of immigration*

The first recorded mass movement of Yugoslavs to America was in the early part of the eighteenth century, when a group of some 1,200 settled in Georgia. The settlement there was abandoned, however, shortly after the Civil War. Another early settlement was established in California.

According to Yugoslav authorities, there were in 1944 no fewer than 700,000 Yugoslavs in the United States who were either born in Yugoslavia or were of the second generation.[92] Since separate enumeration of Yugoslavs by the Immigration Service, only about 60,000 are shown as having been admitted. In the fiscal year 1948, 1,190 Yugoslav immigrants entered, as follows:[93]

| Class: | Number |
|---|---|
| Quota immigrants | [1] 794 |
| Husbands of citizens | 13 |
| Wives of citizens | 228 |
| Unwed children of citizens | 112 |
| Wives, children of natives, nonquota countries | 1 |
| Ministers, wives, children | 32 |
| Professors, wives, children | 10 |
| Total | 1, 190 |

[1] Includes DP's.

In addition, 17 Yugoslav students were admitted under section 4 (e) of the Immigration Act of 1924. Between March 30, 1946, and July 1, 1948, 736 Yugoslav displaced persons were admitted. During the fiscal year 1948, 17 Yugoslav seamen deserted their vessels in American ports and effected illegal entry.

During the same fiscal year, 27 aliens were deported to Yugoslavia for these reasons:[94]

| Cause: | Number |
|---|---|
| Previously excluded or deported | 1 |
| Mentally or physically defective | 1 |
| Criminal | 7 |
| Overstay | 6 |
| Entered without proper documents | 9 |
| False statements | 1 |
| Abandoned status of admission | 1 |
| Likely to become a public charge | 1 |
| Total | 27 |

#### (2) *Naturalization and assimilation*

In 1940, there were 383,393 Yugoslavs in the United States; 222,300 were native-born, and 161,093 were foreign-born (97,781 males and 63,312 females). Of the foreign-born Yugoslavs, 119,455 or 74.1 percent were located in urban areas (71,437 males and 48,018 females); 29,408 or 18.2 percent in rural nonfarm areas (18,918 males and 10,490 females); and 12,230 or 7.7 percent in rural farm areas (7,426 males and 4,804 females).[95]

Over 133,000 (82.6 percent) of the foreign-born Yugoslavs were located in the North, 23,985 (14.9 percent) in the West, and 4,071 (2.5 percent) in the South.

States with largest numbers of foreign-born Yugoslavs were Ohio, with 31,264; Pennsylvania, with 26,495; and Michigan, with 12,517. Several thousand were in California, Minnesota, and Wisconsin. Distribution figures for the foreign-born Yugoslavs (1940) were:[96]

| Area: | Number |
|---|---|
| North | 133, 037 |
| West | 23, 985 |
| South | 4, 071 |

Today, about 250,000 Yugoslavs are members of 15 national fraternal and insurance organizations, about 80,000 of them in junior branches composed chiefly of American-born Yugoslavs. Several hundred independent benefit organizations exist locally, in addition to approximately 2,700 branches of national organizations.

A number of Yugoslav newspapers are now being published in the United States, the largest of which are organs of organizations, such as the Srbobran, organ of the Serb National Federation, and Zajednicar, left-wing organ of the Croatian Fraternal Union. In 1946, approximately 30 Serbian, Croatian, and Slovenian periodicals were published in the United States. Communist periodicals are particularly prevalent in the Yugoslav field, including such Communist Party publications as Narodni Glasnik (Croatian), Slobodna Rec (Serb), and others.[97]

In 1920, only 25.2 percent of the Yugoslavs had been naturalized, but by 1940 the percentage had increased to 61.3.[98] They ranked eighteenth in this respect among nationality groups. Naturalization of those claiming Yugoslavia as the place of their nativity was for recent years as follows:[99]

| | | | |
|---|---|---|---|
| 1944 | 7, 409 | 1947 | 1, 258 |
| 1945 | 3, 849 | 1948 | 858 |
| 1946 | 2, 524 | | |

#### (3) *Education—religion*

Because of religious differences (the Croats and Slovenes being Roman Catholics, the Serbs Eastern Orthodox) and because of differences in the spoken language, each of the Yugoslav groups leads its own independent social and cultural existence.[1] The first Yugoslav church was founded in Brockway, Minn., in 1871, by Slovene farmers. At present there are about 70 Roman Catholic and 35 Serbian Orthodox churches and parishes maintained by Yugoslavs in America. The Slovene group has invested an estimated $3,500,000 in approximately 45 churches and the attached homes for sisters, priests, and schools.[2]

A Croatian school is affiliated with the church on West Fiftieth Street, New York, and others are supported by New York Yugoslav societies, which number more than 100, and sponsor cultural, political, and mutual aid programs. Altogether, there are some 38 full-time parochial schools in the United States, half of them belonging to the Croatians and half to the Slovenes. Instruction is entirely in English, but the national language is an obligatory subject.

#### (4) *Crime*

The 1933 Nation-wide census of prisons and jails showed an over-all commitment rate of 0.32 per 1,000 population for foreign-born

[92] Brown and Roucek, op. cit., p. 161.
[93] Immigration and Naturalization Service, Annual Report, 1948, table 6.
[94] Immigration and Naturalization Service, Annual Report, 1948, table 24.
[95] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.

[96] Ibid., table 36, pp. 88-89.
[97] U. S. Senate Committee on the Judiciary, Communist Activities Among Aliens and National Groups, hearings, p. 603 et seq.
[98] Brown and Roucek, op. cit., 657.
[99] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[1] Brown and Roucek, op. cit., p. 161 ff.
[2] Id.

Yugoslavs and a felony rate of 0.03. The crimes for which they were committed were: [3]

| Crime: | Number Committed | Crime—Continued | Number Committed |
|---|---|---|---|
| Homicide | 9 | Forgery | 14 |
| Aggravated assault | 3 | Auto theft | 2 |
| Other assault | 5 | Stolen property | 3 |
| Robbery | 4 | Violating drug laws | 4 |
| Burglary | 4 | Violating liquor laws | 7 |
| Larceny | 4 | Other offenses | 6 |
| Fraud, embezzlement | 4 | | |
| Rape | 1 | Total | 70 |

### 3. ASIA

#### a. Chinese

##### (1) Background of immigration

Statistics of the Immigration and Naturalization Service show one Chinese in the United States in 1820. Up to 1852, fewer than 100 entered the country. Approximately 20,000 Chinese arrived in 1852 and 13,000 in 1854. At one time, on the construction of the Central Pacific Railroad, building eastward through the mountains, 9 out of every 10 workers were Chinese. From 1882 until 1943, the Chinese were not permitted to enter as regular immigrants, nor were they permitted to be naturalized at any time prior to 1943. In 1943, the Chinese exclusion law was repealed, and a quota of 105 was assigned to Chinese. In addition, the Chinese were made racially eligible for citizenship.[4]

Since 1820, immigration from China to the United States has totaled over 394,000.[5] During the fiscal year 1948, 3,987 Chinese and persons giving China as their country of origin were admitted, divided into the following classes: [6]

| Class: | Number |
|---|---|
| Quota immigrants | [1]452 |
| Husbands of citizens | 2 |
| Wives of citizens | 3,192 |
| Unwed children of citizens | 232 |
| Wives, children of natives, nonquota countries | 3 |
| Ministers, wives, children | 29 |
| Professors, wives, children | 74 |
| Other classes | 3 |
| Total | 3,987 |

[1] Includes DP's.

During fiscal year 1948, 1,618 Chinese students were admitted under section 4 (e) of the Immigration Act of 1924. During the same period, 221 Chinese seamen deserted their vessels while in American ports, and entered illegally.[7] As of June 30, 1948, 287 DP's from China had entered this country under the President's directive of December 22, 1945.[8]

During fiscal year 1948, a total of 128 aliens were deported to China, as follows: [9]

[3] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
[4] Brown and Roucek, One America (1945), p. 316 ff.
[5] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[6] Ibid., table 6.
[7] Ibid., table 22.
[8] Ibid., table 6B.
[9] Ibid., table 34.

| Cause: | Number |
|---|---|
| Immorality | 2 |
| Violating narcotic laws | 20 |
| Mental, physical defects | 1 |
| Previously deported | 3 |
| Overstay | 56 |
| No proper documents | 24 |
| Abandoned status | 16 |
| False statements, etc. | 6 |
| Total | 128 |

During the same period, 19 Chinese aliens seeking entry for 30 days or longer were excluded at various American ports.[10]

Since 1908, 101,504 aliens have returned to China from the United States, 41,416 of whom returned during the decade 1921 to 1930.[11] Of the 2,287 who returned during the fiscal year 1948, over 2,000 were males.

##### (2) Distribution of population

There were 77,504 Chinese in the United States in 1940, of whom 40,262 were native-born and 37,242 were foreign-born. Males outnumbered females by almost 3 to 1, there being 57,389 males and 20,115 females. Urban areas contained 70,226, and rural areas contained 7,278.[12] California, with 39,556, or 51 percent of the national total in 1940, led all other States; New York ranked second with 13,731. The geographical distribution of Chinese in 1940 was as follows: [13]

| Area: | Number |
|---|---|
| North | 25,738 |
| South | 4,926 |
| West | 46,840 |

##### (3) Naturalization and assimilation

Some of the Chinese tongs act as private courts to settle disputes and also serve as insurance or mutual benefit associations. The On Leong Tong in Chicago was once housed in a palatial building, with a court, committee rooms, a shrine, and a school for 150 children.[14]

In the 10 years ending June 30, 1948, 4,312 aliens owing former allegiance to China were naturalized, including 763 during fiscal year 1948.[15] Since passage of legislation permitting Chinese to acquire citizenship, they have done so at the rate of about 700 a year.

##### (4) Employment

After the Chinese found themselves crowded out of the mines in California, they sought jobs ordinarily suited to women so as not to compete with the white man. Laundry work attracted a great number. In 1870, out of 2,069 laundrymen in San Francisco, 1,333 were Chinese. They have also entered cooking and household service which vocations have led many of them into the restaurant business.[16]

[10] Ibid., table 21.
[11] Brown and Roucek, One America, 1945, p. 637; Immigration and Naturalization Service, Annual Report, 1945, table 13.
[12] U. S. Bureau of the Census, Census of 1940, Population (1949), vol. II, pt. 1, table 6, p. 21.
[13] Ibid., table 22, p. 52.
[14] Albert W. Palmer, Orientals in American Life (1934), pp. 29 ff.
[15] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[16] Albert W. Palmer, Orientals in American Life (1934), pp. 13 ff.

### (5) Crime

Crime among the Chinese has been confined rather largely to petty offenses. A 1934 survey showed a crime rate of 3.5 per 1,000 population for all Chinese; 4.0 for foreign-born; and 3.16 for native-born.[17]

### b. Filipinos

#### (1) Background of immigration

It was not until after the close of World War I that Filipinos began to migrate to the United States in appreciable numbers.[18] With the invasion and capture of the islands in 1941 and 1942 by the Japanese, immigration of Filipinos to the United States ceased. Following the liberation of the islands, immigration was resumed. During the fiscal year 1947, 622 Filipinos were admitted, including 20 professional people. During the fiscal year 1948 the total admitted was 1,055, including 33 professional workers, 3 farmers or farm managers, and 10 clerical and kindred workers.[19] In addition, 29 Filipino seamen deserted their vessels while in American ports and entered illegally.[20] During the same period, 30 aliens were deported to the Philippines, for these reasons:[21]

| Cause: | Number |
|---|---|
| Criminal | 10 |
| Immorality | 2 |
| Overstay | 7 |
| Improper documents | 4 |
| Abandoned status | 3 |
| False statements | 2 |
| Apt to become public charge | 1 |
| Miscellaneous | 1 |
| Total | 30 |

Besides those deported in 1948, three Filipinos were excluded at various ports of entry.[22] While, during World War II, very few aliens returned to the Philippines (none in 1944 and eight in 1945), many have done so since the cessation of hostilities. In the fiscal year 1946 there were 264 returnees, in 1947, 1,685, and in 1948, 615.[23]

#### (2) Distribution of population

Although the Bureau of the Census enumerated 45,563 Filipinos in 1940, no statistics were made available to indicate the number of native-born and foreign-born.[24] The vast majority were males.[25]

Perhaps two-thirds of the young Filipinos who have come to the United States have sought work in rural areas. At the time of the 1940 census, it was shown that there were some of them in every State of the Union. California had the greatest number, with 31,408, or 68.8 percent, while New York State ranked second, with 2,978. The Nation-wide geographic distribution of the Filipinos was as follows:[26]

| Area | Number | Percent |
|---|---|---|
| North | 8,126 | 17.8 |
| South | 2,351 | 5.2 |
| West | 35,086 | 77.0 |

#### (3) Naturalization and assimilation

Most of the Filipinos have come to this country with the idea of some day returning to the islands.[27] Their lack of home life here and the absence of Filipino women account largely for the scarcity of permanent settlements. In cities they live in boarding houses and rooming establishments. In the larger centers—Los Angeles, for example, where as many as 6,000 have resided—they develop a "little Manila," which is largely a center with a few Filipino stores and club-rooms as a nucleus.[28] The ratio between sexes is an important factor in the life of the Filipino-American. Population figures show that the males outnumber the females by about 14 to 1. This unbalanced condition creates numerous social problems.

The Filipino press in the United States consists of a comparatively large number of publications in relation to the small population served. The combined newspaper-magazine has been the most common type of Filipino publication. It contains news items, editorials, signed articles, writings of columnists, photographs, and advertising.

During World War II, large numbers of Filipinos joined our armed forces. Many of this group have since come to the United States after being given the opportunity to become citizens by virtue of such military service. In the 10 years ending June 30, 1948, 28,086 Filipinos became naturalized citizens, including 5,768 during the fiscal year 1948. Filipino naturalization figures for the fiscal years 1944–48 are as follows:[29]

| | | | |
|---|---|---|---|
| 1944 | 2,646 | 1947 | 10,764 |
| 1945 | 1,563 | 1948 | 5,768 |
| 1946 | 2,644 | | |

#### (4) Employment

A large number of the Filipinos in this country are employed as cooks, houseboys, bellhops, and elevator operators. Many have gone into agriculture, especially in California and Washington.

#### (5) Education—Religion

The Filipinos are principally Roman Catholic. Due to the migratory life that many of them live, it is often difficult for them to maintain close contact with the church. Several religious groups, Protestant as well as Catholic, offer the Filipinos activity programs and club-rooms. They have a number of social clubs and related organizations.

Many Filipinos attend evening classes for educational instruction. At times they may drop out of school in order to earn sufficient money to pay their bills and to finance the continuation of their studies.[30]

---

[17] Harry H. Laughlin, Immigration Control (1934), p. 31.
[18] Brown and Roucek, op. cit., 1945, p. 354.
[19] Immigration and Naturalization Service, Annual Report, 1948, table 8.
[20] Ibid., table 22.
[21] Ibid., table 24.
[22] Immigration and Naturalization Service, Annual Report, 1948, table 21.
[23] Ibid., table 18.
[24] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 22, p. 52.
[25] Albert W. Palmer, Orientals in American Life (1934), p. 198.
[26] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 22, p. 52.

[27] Brown and Roucek, One America (1945), p. 355.
[28] Brown and Roucek, One America (1945), p. 356.
[29] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[30] Brown and Roucek, One America (1945), pp. 358 ff.

*(6) Crime*

The crime ratio of the Filipinos in this country is relatively low. Although no details of crimes committed are available, a survey of all Federal and State penitentiaries and reformatories conducted some years ago showed the Filipino over-all crime ratio per 1,000 population to be 3.55.[31]

*c. Japanese*

*(1) Background of immigration*

From 1636 to 1866, the Japanese Government made emigration of its subjects a capital offense. In 1870 there were only 55 Japanese in the United States and 2,039 in 1890. After that, the number of Japanese immigrants increased rapidly: 12,628 entered in 1900, 20,941 in 1903, and 30,824 in 1907. Many Japanese also went to the Hawaiian Islands. For the 12-year period ending in 1910, over 77,000 went to Hawaii, 32,273 to California, 25,912 to Washington, and 4,485 to Oregon.[32]

Total Japanese immigration between 1861 and 1948 was 278,517. The peak decade was from 1901 to 1910, when 129,797 were admitted.[33] For the fiscal year 1948, 423 immigrants from Japan were admitted. During the same period, four Japanese were excluded at various ports of entry, while six aliens were deported to Japan, three for overstaying and three for entering without proper documents.[34]

*(2) Distribution of population*

In 1940, there were 126,947 Japanese in the United States, of whom 79,642 were native-born and 47,305 were foreign-born. Of the native-born, 42,316 were males and 37,326 females; of the foreign-born, 29,651 were males and 17,654 were females. Rural areas had 57,274 Japanese, or 45.1 percent of the total, of whom 37,237 were native-born (20,396 males and 16,841 females), and 20,037 were foreign-born (12,650 males and 7,387 females). Urban areas had 69,673, or 54.9 percent of the total, of whom 38,921 were males and 30,752 were females.[35]

The Japanese have settled chiefly on the west coast, California being the leading center of population, with 93,917 in 1940. Their general geographical distribution in 1940 was:[36]

| Area | Number | Percent |
|---|---|---|
| North | 4,971 | 3.9 |
| South | 1,049 | .8 |
| West | 120,927 | 95.3 |

*(3) Naturalization*

Japanese aliens are racially ineligible for citizenship and are, therefore, ineligible for admission as regular immigrants. Of some 90,000 persons in the United States and Hawaii racially ineligible for citizenship, nearly all are of Japanese or Korean ancestry. In 1940, besides

[31] Harry H. Laughlin, Immigration Control (1934), p. 31.
[32] H. G. Duncan, Immigration and Assimilation (1933), pp. 409 ff.
[33] Maurice R. Davie, World Immigration (1936), p. 320.
[34] Immigration and Naturalization Service, Annual Report (1948), tables 13, 21, and 24.
[35] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 6, p. 21.
[36] Ibid., table 22, p. 52.

the 47,305 Japanese aliens residing in the United States there were 749 Korean aliens. The median age of the Japanese aliens was 49.7 years.[37]

*(4) Employment*

The Japanese who first came to the United States had been farmers in their own country and, while some of them found employment here as domestic servants or in railroad construction, the majority turned to agriculture, first as migratory groups of seasonal workers and later, when family life developed, as renters or owners of farm land. They appeared to fit best into the agricultural life of the Pacific coast, in vegetable gardening and floriculture. Many followed the sugar-beet industry in Utah, Idaho, Colorado, and Nebraska.[38] In the cities the Japanese became small merchants, domestic servants, laundrymen, and restaurant operators.

*(5) Education—Religion*

Statistics for 1940 showed that persons of Japanese descent have, on the average, completed more school years than the general population of the United States. The median of school years completed by persons 25 years of age and over was 12.2 for American-born Japanese, 8.3 for foreign-born Japanese, and 8.4 for the total population.[39]

The bulk of the Japanese-Americans are Buddhists. In 1942, over 48 percent of American citizens of Japanese descent were Buddhists and over 32 percent belonged to various Protestant denominations. Of Japanese aliens, more than 68 percent were Buddhists and 22 percent were distributed among various Protestant groups, principally Methodist, Baptist, Presbyterian, and Congregational.[40]

*(6) Crime*

A comparison of the commitment rates for major crimes by persons of Japanese descent with other sections of the population, for the period 1935 to 1939, is as follows:[41]

| Class: | Crime rate per 100,000 |
|---|---|
| Japanese descent | 88.0 |
| Native white | 203.3 |
| Foreign-born white | 85.5 |
| Negro | 670.1 |

*d. Syrians*

*(1) Background of immigration*

Syrian immigration to the United States began during the latter part of the nineteenth century. New York and Detroit have the largest colonies of Syrians, estimated at 40,000 and 15,000, respectively. Other, but much smaller colonies are in Boston, Cleveland, Toledo, Akron, Los Angeles, and Houston.[42]

The quota for Syria and Lebanon is 123 annually. During the fiscal year 1948, 314 Syrians were legally admitted into the United

[37] U. S. House of Representatives, Subcommittee on Immigration and Naturalization, hearings, 80th Cong., 2d sess., serial 18, April 19 and 21, 1948, pp. 92, 97–98.
[38] Albert W. Palmer, Orientals in American Life (1934), p. 43.
[39] U. S. House of Representatives, Subcommittee on Immigration and Naturalization, hearings, 80th Cong., 2d sess., serial 18, April 19 and 21, 1948, pp. 102–103.
[40] Ibid., pp. 103–104.
[41] U. S. House of Representatives, Subcommittee on Immigration and Naturalization, hearings, 80th Cong., 2d sess., serial 18, April 19 and 21, 1948, p. 105.
[42] Brown and Roucek, One America (1945), p. 293.

States, including 23 professionals and semiprofessionals, 35 proprietors, managers, and officials, and 128 clerks and office workers.[43] In addition, 99 Syrian students were admitted under section 4 (e) of the Immigration Act of 1924. During the same year, 18 Syrians were excluded at various ports of entry.[44]

### (2) Distribution of population

Accurate statistical material on the number of Syrians in the United States is not available. Estimates of authorities on the Syrians range from 200,000 to 500,000. According to the Census of 1940, there were only 57,906 foreign-born Syrians, Lebanese, and Palestinians combined in the United States.[45]

Of the 57,906, 52,569, or 90.8 percent, lived in urban areas, 4,218, or 7.3 percent, in rural nonfarm areas, and 1,119, or 1.9 percent, in rural farm areas.[46]

In 1940, there were foreign-born Syrians, Lebanese, and Palestinians in every State of the Union, New York, Massachusetts, Pennsylvania, and Michigan containing the largest numbers. Geographically, they were distributed as follows:[47]

| Area | Number | Percent |
|------|--------|---------|
| North | 44,054 | 76.1 |
| South | 9,660 | 16.6 |
| West | 4,192 | 7.3 |

### (3) Naturalization and assimilation

Proportionately, there are more societies and clubs among the Syrians in the United States than among most of the other minority groups. None of them, however, are very powerful. The eastern, midwestern, and southern federations of Syrian and Lebanese societies are a belated attempt to "get the Syrians together." The major portion of the membership consists of second-generation Syrians.

Syria was for a number of years a protectorate of France and for the fiscal years 1945, 1946, and 1947, data pertaining to Syrian naturalization were included with the French. During the 10-year period ending June 30, 1948 (exclusive of the 3 years mentioned), 7,421 Syrians were naturalized, 400 during the fiscal year 1948.[48]

### (4) Employment

The first Syrian immigrants were largely peddlers. After some years, many opened stores of their own. In New York, the embroidered linen, lace, negligee, and lingerie industry flourishes among the Syrians. After World War I, many Syrians entered the grocery, wholesale and retail fruit, restaurant, and drygoods businesses.[49] Gradually, they have become associated in a wide variety of industrial enterprises.

[43] Immigration and Naturalization Service, Annual Report, 1948, table 8.
[44] Ibid., table 21.
[45] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 36, pp. 88–89.
[46] Ibid., table 14, p. 42.
[47] Ibid., table 36, pp. 88–89.
[48] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[49] Brown and Roucek op. cit., p. 292.

### 4. THE AMERICAS

#### a. Canadians

##### (1) Background of immigration

The migration of French-Canadians to the United States dates back as far as 1623. The earliest groups settled on Manhattan Island, as well as in Rhode Island, Massachusetts, Virginia, and Maryland. The greatest influx took place between 1860 and 1890.

As late as 1775, the population of Canada was largely French, but the nineteenth century saw extensive immigration from the British Isles. There are no accurate records of just when the first British-Canadians entered United States territory. It is perhaps because the English-speaking Canadians have a marked tendency to merge with the people of the United States that any early "group" settlement passed unnoticed.

During the fiscal year 1948, 24,788 immigrants from Canada were admitted; 9,821 were admitted in 1944, 11,079 in 1945, 20,434 in 1946, and 23,467 in 1947. Canadian students admitted during 1948 totaled 1,702. Emigrant aliens returning to Canada in 1948 totaled 1,055.[50]

For the same fiscal year, 903 aliens were deported to Canada and Newfoundland, for these reasons:[51]

| Cause: | Number | Cause—Continued | Number |
|--------|--------|-----------------|--------|
| Criminal | 242 | Abandoned status | 130 |
| Immorality | 23 | False statements, etc | 141 |
| Narcotics violations | 1 | Apt to become public charge | 2 |
| Mental, physical defects | 22 | Subversive, anarchistic | 2 |
| Previously deported | 59 | Miscellaneous | 1 |
| Overstay | 161 | | |
| Improper documents | 119 | Total | 903 |

##### (2) Distribution of population

In 1940, the French-Canadians in this country numbered 908,386 (635,020 native-born, and 273,366 foreign-born). Of the foreign-born, 133,576 were males and 139,790 were females. The majority were in urban areas (214,962, or 78.6 percent, of whom 102,436 were males and 112,526 were females); 41,026 lived in rural nonfarm areas (21,223 males and 19,803 females); and 17,378 in rural farm areas (9,917 males and 7,461 females).[52]

Although there were French-Canadians in every State of the Union in 1940, the bulk of them had settled in New England. Massachusetts led, with 81,411 foreign-born, followed by Maine, with 30,794, New Hampshire, with 29,442, and New York, with 20,536. The Nation-wide geographical distribution was as follows:[53]

| Area | Number | Percent |
|------|--------|---------|
| North | 256,121 | 93.7 |
| South | 2,961 | 1.1 |
| West | 14,284 | 5.2 |

[50] Immigration and Naturalization Service, Annual Report, 1948, table 13.
[51] Ibid., table 24.
[52] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[53] Ibid., table 36, pp. 88–89.

British-Canadians in the United States in 1940 totaled 2,001,773. Of these, 1,231,020 were native-born, and 770,753 foreign-born (351,730 males and 419,023 females). Of the foreign-born, 581,104 were located in urban areas (256,764 males and 324,340 females); 126,439 in rural nonfarm areas (61,269 males and 65,170 females); and 63,210 in rural farm areas (33,697 males and 29,513 females).[54] In 1940, Massachusetts had 142,462 British-Canadians; New York, 103,201; Michigan, 137,735; Oregon, 88,165; and Washington, 39,329. The Nation-wide geographical distribution was as follows:[55]

| Area | Number | Percent |
|------|--------|---------|
| North | 581,652 | 75.4 |
| South | 26,660 | 8.6 |
| West | 162,441 | 21.0 |

### (3) Naturalization and assimilation

The life of the French-Canadians centers largely around the parish and home. Schools have had a unifying effect, and language and culture have been carried forward by French parochial schools, colleges, and other educational institutions. There are also societies and organizations which bind the French-Canadians together, both here and in their country of origin. French-Canadian newspapers and books are read by Franco-Americans. Lecturers from French Canada are invited to the United States. Many send their children to the colleges and convents of Quebec. There are indications, however, that French-Canadians will find it harder with the passing of time to maintain their cultural unity in this country.[56]

For the most part, the British-Canadians mingle directly with the communities into which they have moved, especially where there are large groups of Anglo-Saxon origin, and thus attract little attention. Since their institutional and cultural background is similar to that which predominates in this country, there is little distinction between them and the people among whom they settle.[57] During the fiscal year 1948, 3,860 aliens owing former allegiance to Canada were naturalized.[58]

### (4) Employment

Over 35 percent of our immigrant French-Canadians are classed as semiskilled workers today. Some continue to farm, some enter the professions, while others are wholesale and retail dealers, but for the most part the latter belong to second and third generations.[59] The English-speaking Canadians seek employment largely as skilled workmen, foremen, and clerks. A large group have become farmers.

### (5) Education

Canadian education is largely in the hands of the Provinces and each Province has its permanent department of education, controlled in details of administration by permanent officials.[60] Elementary education is compulsory, and the illiteracy rate is very low.

---

[54] Id., table 14, p. 42.
[55] Ibid., table 36, pp. 88-89.
[56] Brown and Roucek, One America (1945), pp. 344-345.
[57] Ibid., p. 343.
[58] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[59] Leon E. Truesdell, The Canadian-Born in the United States (1943), p. 203.
[60] H. G. Duncan, Immigration and Assimilation (1933), p. 116.

### (6) Crime

In 1933, the commitment rate of Canadian-born persons for all offenses was 3.04 per 1,000 population and 0.4 for felonies, as follows:[61]

| Crime | Number committed | Crime—Continued | Number committed |
|-------|-----------------|-----------------|-----------------|
| Homicide | 13 | Other sex offenses | 41 |
| Aggravated assault | 4 | Forgery | 19 |
| Other assault | 9 | Stolen property | 2 |
| Robbery | 68 | Violation drug laws | 8 |
| Burglary | 77 | Violation liquor laws | 15 |
| Larceny | 45 | Other offenses | 56 |
| Fraud, embezzlement | 81 | | |
| Auto theft | 16 | Total | 469 |
| Rape | 15 | | |

### b. Mexicans

#### (1) Background of immigration

In 1820 there were 4,818 Mexicans in the United States. Since that date, over 800,000 immigrants have legally entered.[62] Moreover, it has been reliably estimated that Mexican aliens are coming into the United States illegally at a rate of 20,000 per month.

Between 1901 and 1947, Mexico contributed 788,000 recorded immigrants—23.2 percent of the total registered entries from the Western Hemisphere, and 75 percent of all the immigrants from Latin America.[63] During the fiscal year 1948, 8,384 immigrants were admitted from Mexico.[64] In addition, 319 Mexican students were admitted under section 4 (e) of the Immigration Act of 1924. During the same fiscal year, a total of 17,235 Mexicans were deported for the following reasons:[65]

| Cause | Number |
|-------|--------|
| Criminal | 416 |
| Immorality | 44 |
| Violation narcotic laws | 27 |
| Mental, physical defects | 41 |
| Previously deported | 3,314 |
| Overstay | 2,852 |
| Improper documents | 612 |
| Abandoned status | 502 |
| False statements, etc. | 9,395 |
| Apt to become public charge | 1 |
| Miscellaneous | 31 |
| Total | 17,235 |

#### (2) Distribution of population

Total Mexican stock in the United States in 1940 numbered 1,076,653, of whom 699,220 were native-born and 377,433 were foreign-born (197,965 males and 179,468 females). Of the foreign-born, 237,985 or 63 percent were in urban areas (117,977 males and 120,008 females); approximately 21 percent (79,834) in rural nonfarm areas (44,723 males and 35,111 females); and approximately 16 percent (59,614) in rural farm areas (35,265 males and 24,349 females).[66]

---

[61] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
[62] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[63] Kingsley Davis and Clarence Senior, "Immigration from the Western Hemisphere," The Annals, American Academy of Political and Social Science, March 1949, p. 76.
[64] Immigration and Naturalization Service, Annual Report, 1948, table 13.
[65] Ibid., table 24.
[66] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.

While there were foreign-born Mexicans in every State of the Union, Texas had the greatest number, 159,266, and California ranked second with 134,312. The geographical distribution of the foreign-born Mexicans in 1940 was as follows: [67]

| Area | Number | Percent |
|---|---|---|
| North | 34,947 | 9.3 |
| South | 163,207 | 43.2 |
| West | 179,279 | 47.5 |

### (3) Naturalization and assimilation

During the 10-year period ending June 30, 1948, 43,360 Mexican aliens were naturalized, including 1,895 in 1948. Numbers naturalized during recent fiscal years were: [68]

| | Number | | | Number |
|---|---|---|---|---|
| 1944 | 7,474 | | 1947 | 3,336 |
| 1945 | 6,352 | | 1948 | 1,895 |
| 1946 | 5,135 | | | |

As a group, Mexicans have been slow to assimilate. They differ from the Anglo-Americans in language and religion. In 1940, only 7 percent of the native white persons giving their parental origin as Mexico recorded their mother tongue as English. This was by far the lowest percentage recorded by any immigrant stock. [69]

### (4) Employment

The typical Mexican immigrant is a seasonal laborer. Much of the Mexican labor in California migrates up and down the State the year round, following crops, such as grapes, oranges, cotton, lettuce, melons, grapefruit, tomatoes, and asparagus. Others extend their migrations in search of employment over a much wider area, working the harvests, doing railroad maintenance, or other jobs. [70]

### (5) Crime

The 1933 census of prisons and jails showed a commitment rate of 20 per 1,000 population for foreign-born Mexicans, and a felony rate of 1.56 per 1,000 population. The major crimes for which Mexicans were incarcerated were: [71]

| Crime | Number | Crime—Continued | Number |
|---|---|---|---|
| Homicide | 4 | Forgery | 1 |
| Aggravated assault | 3 | Fraud, embezzlement | 4 |
| Robbery | 2 | Violation, narcotics laws | 1 |
| Burglary | 2 | Violation, liquor laws | 2 |
| Larceny | 9 | Other offenses | 3 |
| Auto theft | 1 | | |
| Rape | 2 | Total | 34 |

### c. Other Latin Americans

#### (1) Background of immigration

It is difficult to determine exactly when the first South or Latin Americans arrived in the United States to settle permanently. Fur-

67 U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt 1, table 36, pp. 88–89.
68 Immigration and Naturalization Service, Annual Report, 1948, table 39.
69 Kingsley Davis and Clarence Senior, "Immigration From the Western Hemisphere," The Annals, American Academy of Political and Social Science, March 1949, p. 76.
70 B. Schrieke, Alien Americans (1936), pp. 48 ff.
71 U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.

ther confusion arises from the fact that little distinction has been made between Latin Americans and Spaniards who came to this country, inasmuch as both spoke Spanish.

The most important source of Latin American immigration, next to Mexico, has been the West Indies, which have contributed almost 10 percent of Western Hemisphere immigration. Between 1901 and 1947, there were 351,000 entries from the West Indies, and in 1940, an estimated 104,000 foreign-born in the United States were from this area. [72]

It has been estimated that, from 1820 to 1948, over 685,000 immigrants from Latin America, exclusive of Mexico, have been admitted into the United States. [73] A large proportion have returned home—over 180,000 since 1908.

During the fiscal year 1948, 12,649 Latin American immigrants entered the United States and 3,275 returned to their countries of origin, [74] a net gain to the United States of 9,374. During 1948, 2,960 Latin American students were admitted under section 4 (e) of the Immigration Act of 1924. [75]

In addition, a total of 103 Latin American seamen, chiefly from Cuba, Panama, Argentina, Brazil, and Peru, deserted their ships and entered the United States illegally [76] while 77 Latin Americans were excluded at various ports of entry [77] and 567 were deported (333 to the West Indies, 108 to Central America, and 126 to South America) for the following reasons: [78]

| Cause: | Number |
|---|---|
| Criminals | 39 |
| Immorality | 2 |
| Violation, narcotics law | 5 |
| Mental, physical defects | 10 |
| Previously deported | 37 |
| Overstay | 221 |
| Improper documents | 95 |
| Abandoned status | 85 |
| False statements | 67 |
| Apt to become public charge | 3 |
| Miscellaneous | 3 |
| Total | 567 |

#### (2) Distribution of population

There were 66,942 foreign-born Latin Americans (including Cubans, West Indians, and natives of Central and South America) in the United States in 1940 (35,847 males and 31,095 females). Of this total, 59,567, or 88.9 percent, lived in urban areas (31,750 males and 27,817 females); 5,642, or 8.4 percent, in rural nonfarm areas (3,106 males and 2,536 females); and 1,733, or 2.7 percent, in rural farm areas (991 males and 742 females). [79]

In 1940, 44,914 foreign-born Latin Americans (67.04 percent of the total) were in the North. New York, with 29,308, or 43.7 percent of the national total, led all other States. Latin Americans were situated

72 Kingsley Davis and Clarence Senior, "Immigration From the Western Hemisphere," The Annals, American Academy of Political and Social Science, March 1949, pp. 79–81.
73 Immigration and Naturalization Service, Annual Report, 1948, table 4.
74 Ibid., table 13.
75 Ibid., table 16.
76 Ibid., table 22.
77 Ibid., table 21.
78 Ibid., table 24.
79 U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.

in every State of the Union, and their national geographic distribution was as follows: [80]

| Area | Number | Percent |
|------|--------|---------|
| North | 44,914 | 67.04 |
| South | 12,276 | 18.30 |
| West | 9,752 | 14.66 |

### (3) Naturalization and assimilation

Latin Americans in this country find great solidarity in their families and religion, a cohesion that constitutes a stumbling block in the process of assimilation. There are many difficulties in educating the members of this minority group to full participation in the affairs of the Nation. Their children, taught to speak Spanish from the cradle, do not progress rapidly in school where the medium of instruction is English. They find themselves as much as 3 years behind English-speaking pupils in comprehension and achievement.[81]

Most of the West Indian immigrants, except those from Cuba and Puerto Rico, are nonwhite. In fact, the West Indies are today virtually our only source of Negro immigration. West Indians are mainly Protestant and English-speaking, and to this extent are perhaps more easily assimilated than the Catholic, Spanish-speaking immigrants from Latin America.[82]

During the 10-year period ending June 30, 1948, 19,333 aliens from Latin-American countries (exclusive of Mexico) were naturalized, including 1,288 in 1948.[83]

### (4) Crime

The 1933 commitment ratio of foreign-born Latin Americans for all offenses was 8.0 per 1,000 population, and for felonies 1.7 per 1,000, as follows: [84]

| Crime: | Number | Crime—Continued | Number |
|--------|--------|-----------------|--------|
| Homicide | 3 | Other sex offenses | 4 |
| Aggravated assault | 1 | Violation, drug laws | 2 |
| Robbery | 10 | Violation, liquor laws | 1 |
| Burglary | 7 | Other offenses | 3 |
| Larceny | 6 | | |
| Forgery | 8 | Total | 47 |
| Rape | 2 | | |

## 5. AUSTRALIANS AND NEW ZEALANDERS

### a. Background of immigration

The first recorded immigration from Australia and New Zealand occurred between 1861 and 1870, when 36 persons entered.[85] From 1871 to 1930, immigration from Australia and New Zealand totaled 52,265, of whom 12,348 were admitted between 1911 and 1920.[86] By 1948, 67,216 immigrants from Australia and New Zealand had been

[80] Ibid., table 36, pp. 88–89.
[81] Brown an'1 Roucek, op. cit., pp. 350 ff.
[82] Kingsley Davis and Clarence Senior, Immigration from the Western Hemisphere, The Annals, American Academy of Political and Social Science, March 1949, pp. 79–80.
[83] Immigration and Naturalization Service, Annual Report, 1948, table 39.
[84] U. S. Bureau of the Census, Prisoners in State and Federal Penitentiaries and Reformatories, 1933 (1935), table 25, p. 29.
[85] Brown and Roucek, Op. Cit., p. 632.
[86] H. G. Duncan, Immigration and Assimilation, (1933), p. 125.

admitted,[87] including 1,218 during fiscal year 1948. Those who entered in 1948 were divided as follows: [88]

| Class: | Number |
|--------|--------|
| Quota immigrants | 342 |
| Husbands of citizens | 2 |
| Wives of citizens | 830 |
| Unwed children of citizens | 18 |
| Natives of nonquota countries | 4 |
| Wives, children of citizens of nonquota countries | 3 |
| Professors, wives, children | 18 |
| Women who had been citizens | 1 |
| Total | 1,218 |

In addition, 67 students from Australia and New Zealand were admitted. During the fiscal year 1948, 16 Australians were excluded at various ports of entry in the United States, while 20 persons were deported to Australia and 2 to New Zealand.[89] Since 1908, 13,964 immigrant aliens have returned to Australia and New Zealand.

### b. Distribution of population

Of the 26,868 Australians and New Zealanders in the United States in 1940, 15,870 were native-born and 10,998 were foreign-born (5,522 males and 5,476 females). Most of the foreign-born—8,600, or 78.1 percent—lived in urban areas (4,199 males and 4,401 females); 1,648 in rural nonfarm areas (890 males and 758 females); and 750 in rural farm areas (433 males and 317 females).[90]

Nearly 40 percent (4,344) of the foreign-born Australians and New Zealanders were living in California in 1940. New York ranked second, with 1,433. Their Nation-wide distribution was as follows: [91]

| Area | Number | Percent |
|------|--------|---------|
| North | 4,673 | 42.5 |
| South | 839 | 7.6 |
| West | 5,486 | 49.9 |

### c. Naturalization and assimilation

Australians and New Zealanders in this country present no special problems of adjustment, inasmuch as their social and cultural background is similar to ours. As a result, they readily merge into the American way of life. During the fiscal year 1948, 280 persons born in Australia or New Zealand were naturalized.[92]

### d. Education—Religion

Australians and New Zealanders are much like Americans in education and religion. Education is both free and compulsory, and freedom of religion prevails. In Australia the principal religious affiliations are: Church of England (45 percent), Roman Catholic (21 percent), Methodist and Presbyterian (12 percent each). In New Zealand the chief religious affiliations are: Church of England (41 percent), Presbyterian (24 percent), and Roman Catholic (13 percent).[93]

[87] Immigration and Naturalization Service, Annual Report, 1948, table 4.
[88] Ibid., table 6A.
[89] Direct information from Immigration and Naturalization Service, July 11, 1948.
[90] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 14, p. 42.
[91] Ibid., table 36, pp. 88–89.
[92] Immigration and Naturalization Service, annual report, 1948, table 46A.
[93] H. G. Duncan, Immigration and Assimilation (1933), op. cit., pp. 123–124.

## 6. JEWS

### a. Background of immigration

Jewish immigrants came to America as early as the 1650's. The first Jewish congregation was recorded in New York City in 1656.[94] The early Jews were chiefly Spanish and Portuguese.[95] The number of Jews in the United States at the outbreak of the Revolutionary War has been estimated at 2,000. The largest wave of Jewish immigration came from eastern Europe, beginning about 1881. During the period from 1881 to 1943, the net increase in Jewish immigration, admissions minus departures, was, 2,499,154.

Since 1943, the term "Hebrew" has been eliminated by the Immigration and Naturalization Service in the classification of immigrants by race or people, and the race designation of persons formerly regarded as Hebrew has since been governed by the country of origin. As a result, no official statistics are available regarding the number of Jewish immigrants after June 30, 1943.[96]

### b. Distribution of population

The present Jewish population in the United States totals over 5,000,000, a large percentage of whom are in New York City. The States having the largest numbers of Jews are New York, Pennsylvania, Illinois, New Jersey, Massachusetts, Ohio, California, and Michigan.[97]

### c. Assimilation

Generally speaking, the Jews appear to have more closely-knit social, cultural, and religious organizations than other immigrant groups. All three of the main Jewish religious groups, the Orthodox, Reform, and Conservative, comprising nearly 4,000 congregations in the United States, have such societies. One of the principal fraternal orders is the B'nai B'rith. Many local organizations support charitable institutions; others, such as the Jewish Board of Guardians, deal with problems of delinquency and maladjustment.

There are five Yiddish daily newspapers, with a combined circulation of 250,000. In addition, there are numerous weekly and monthly publications in the larger centers of Jewish population.[98]

### d. Employment

During the past 150 years, the Jews in this country have established themselves in various occupations. They are most heavily represented in trade, manufacturing, and several mechanical industries. They are also numerous in the professions, especially in law, medicine, and dentistry, and are quite influential in the arts, theater, and entertainment world.[99]

### e. Education

Jews maintain and support numerous elementary and secondary schools. In 1947, New York City alone had 58 all-day schools. Throughout the country, an estimated 116,541 persons were attending Jewish week-day schools, while 117,817 were enrolled in Sunday schools.[1]

[94] Information Please Almanac, 1948, p. 763.
[95] Brown and Roucek, op. cit., p. 281.
[96] American-Jewish Committee, American-Jewish Yearbook, 1947–48, pp. 745–746.
[97] American-Jewish Committee, American-Jewish Yearbook, 1947–48 (1947), p. 185.
[98] Ibid., pp. 185–6.
[99] Brown and Roucek, op. cit., p. 282 ff.
[1] American-Jewish Committee, American-Jewish Yearbook, 1947–48 (1947), p. 161 ff.

## 7. NEGROES

### a. Background of immigration

The first recorded landing of Negro slaves on the American mainland was in 1619 when a Dutch trader brought 19 to Jamestown. The last cargo arrived at Mobile, Ala., in 1859. At the time of the first census in 1790, there were 757,208 Negroes in the United States.

For the period 1927 to 1948, an estimated 13,000 Negroes from the West Indies entered this country.[2] In addition, several hundred Negro aliens are admitted each year as students under section 4 (e) of the Immigration Act of 1924.

### b. Distribution of population

There were 12,865,518 Negroes in the United States at the time of the 1940 census (6,269,038 males and 6,596,480 females); 83,941 were foreign-born (44,488 males and 39,453 females).[3]

Because of its relatively high rate of natural increase, the Negro population in the United States at the time of the 1950 census is expected to number at least 15,000,000. In the Territories and possessions there are additional Negro groups, as follows:

| Area: | Number |
| --- | --- |
| Puerto Rico | 500,000 |
| Virgin Islands | 20,000 |
| Panama Canal Zone | 5,000 |
| Hawaiian Islands | 200 |

The median age of the Negroes increased from 23.6 in 1920 to 25.6 in 1940.

After their emancipation, particularly after 1880, the Negroes of the South began to move north. In 1880 the Negroes comprised about 34 percent of the population in the South, but less than 25 percent in 1940.[4] The 1940 census showed that 9,904,170 Negroes were in the South, 2,790,193 in the North, and 170,706 in the West.[5]

Despite the movement to cities following the Civil War and the urban movement during the present century, over two-thirds of the Negroes in the South continued to live in rural areas. The urban Negro population totaled 6,253,588; rural farm, 4,502,300; and rural nonfarm, 2,109,630.

The urbanization of the Negro population during the present century has followed two courses. In the South, over a million have drifted from the farms and plantations to nearly 800 towns and cities. The movement to northern cities has been directed chiefly to four cities—New York, Chicago, Detroit, and Philadelphia.

### c. Employment

Many Negro women have found employment as domestic workers, and, while a large percentage of the men have been restricted to unskilled jobs, there has been greater occupational differentiation of the Negro population in the large cities. Particularly in New York, Chicago, Detroit, and Philadelphia, with Negro populations of from a quarter to a half million, occupational differentiation has shown the greatest development.[6] According to the 1940 census, of the 9,253,444

[2] Direct Information, Immigration and Naturalization Service, April 18, 1949.
[3] U. S. Bureau of the Census, Census of 1940, Population (1940), vol. II, pt. 1, table 4, p. 19.
[4] Brown and Roucek, One America (1945), p. 454.
[5] U. S. Bureau of the Census, Census of 1940, population (1940), vol. II, pt. 1, table 25, p. 55.
[6] Brown and Roucek, op. cit., p. 435.

Negroes 14 years old and over, 5,389,191 were gainfully employed in the country's labor force (3,582,005 males and 1,807,186 females).[7]

#### d. Education—Religion

In 1940, of the 5,073,642 Negroes between the ages of 5 and 24, 2,501,639, or 49.3 percent, were attending school (1,205,679 males and 1,295,960 females). The median for school years completed by Negroes 25 years old or over in 1940 was 5.7. The national median was 8.4 years.[8] The rate of illiteracy for Negroes was 16.3 percent (1930).[9]

Almost 6,000,000 Negroes worship in nearly 38,000 churches of their own. Their chief affiliations are Baptist (4,000,000), Methodist (1,500,000), Roman Catholic (150,000), and Church of God (70,000).

#### e. Crime

The relative felony commitment rate of Negroes for recent years is shown in the following table:[10]

*Felony prisoners received from court in Federal and State institutions in the United States from 1942 to 1946*

|           | 1942   | 1943   | 1944   | 1945   | 1946   |
|-----------|--------|--------|--------|--------|--------|
| All       | 47,761 | 40,273 | 41,058 | 43,281 | 56,432 |
| Negro     | 14,660 | 12,131 | 12,165 | 13,207 | 18,655 |
| Percent   | 30.7   | 30.1   | 29.6   | 30.5   | 33.1   |

### C. Age Distribution of the Population

#### 1. AGE STATISTICS ON THE POPULATION AS A WHOLE

The median age of the population of the United States, both the native-born and foreign-born, is increasing. In 1940, the median age of all classes of persons in the United States was 29 years, as compared with 26.5 years in 1930. At the same time, the median age for native-born whites was 26.9 years, while that for foreign-born whites was 51 years.[11] In 1930 the median ages for native-born whites and foreign-born whites were 23.7 and 43.9 years, respectively.[12] Thus, it may be seen that, for both native-born white and foreign-born white, the median age was greater in 1940 than in 1930.

It should be pointed out that the percentage of foreign-born in lower-age groups (14 years and under) is much smaller than the percentage of native-born in corresponding age groups, while the percentage of foreign-born in higher-age groups (45 years and over) is much greater than the percentage of native-born in corresponding age groups. This situation is due to the fact that a high percentage of the immigrants admitted to this country are adults, while a relatively low percentage of those admitted are children or infants.

[7] Statistical Abstract of the United States, 1948, p. 173.
[8] Ibid., p. 125.
[9] World Almanac, 1949, p. 375.
[10] U. S. Bureau of the Census, Prisoners in Federal Prisons and Reformatories, 1946 (1948), p. 27.
[11] U. S. Bureau of the Census, Census of 1940, population, vol. IV, Characteristics by Age, pt. I, table 46, p. 157.
[12] U. S. Bureau of the Census, Census of 1930, Population, vol. II, pt. I, table 7.

The following table shows comparative percentages of the foreign-born white population and the total white population, by age groups, for the years 1930 and 1940:[13]

| Age group | Total white population | | Foreign-born white population | |
|-----------|---------|---------|---------|---------|
|           | 1940 | 1930 | 1940 | 1930 |
|           | *Percent* | *Percent* | *Percent* | *Percent* |
| 14 years and under | 24.5 | 29.0 | 0.8 | 2.5 |
| 15 to 45 years | 48.1 | 47.4 | 33.4 | 50.1 |
| 45 years and over | 27.5 | 23.6 | 65.8 | 47.3 |

#### 2. AGE STATISTICS ON IMMIGRANTS (1899–1948)

The number of immigrants admitted from 1899 to 1948 totaled 20,524,659. During the peak decade from 1901 to 1910, 8,795,386 immigrants came to this country, as contrasted with 528,431 admissions in the decade from 1931 to 1940, when the quotas under the national origins system first were in operation.

From 1899 to 1948, the percentage of immigrants in each age group was as follows:

| | |
|---|---|
| Under 16 years | 13.9 |
| 16 to 44 years | 79.0 |
| 45 years and over | 7.1 |

The percentage under 16 years of age remained fairly stable during the period between 1899 and 1948, while the percentage in the 16 to 44 years age group decreased and the percentage in the group 45 years and over increased, as is shown by the following table:

| Age group | 1899 | 1900 | 1901–10 | 1911–20 | 1921–30 |
|-----------|------|------|---------|---------|---------|
|           | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* |
| Under 16 years | 14.1 | 13.2 | 12.0 | 14.2 | 17.6 |
| 16 to 44 years | 79.6 | 82.6 | 83.0 | 78.8 | 73.2 |
| 45 years and over | 6.3 | 5.2 | 5.0 | 7.0 | 9.2 |

| Age group | 1931–40 | 1941–45 | 1946 | 1947 | 1948 |
|-----------|---------|---------|------|------|------|
|           | *Percent* | *Percent* | *Percent* | *Percent* | *Percent* |
| Under 16 years | 16.8 | 14.4 | 10.2 | 12.8 | 14.1 |
| 16 to 44 years | 66.3 | 62.9 | 78.9 | 68.9 | 66.0 |
| 45 years and over | 17.1 | 22.7 | 10.9 | 18.3 | 19.9 |

Statistics for the population as a whole show a more equal percentage distribution among the different age groups than exists for the immigrant population. In 1940, for example, 25 percent of the population as a whole were in the age group of 14 years and under, 48.3 percent were in the 15 to 44 age group, and 26.7 percent were in the age groups of 45 years and over.[14] Statistics for the year 1900 are as follows: 14 years and under, 34.4 percent, 15 to 44 years, 47.6 percent, and 45 years and over, 18.1 percent.

[13] U. S. Bureau of the Census, Census of 1940, Population, Nativity and Parentage of the White Population—General Characteristics, table IV, p. 2.
[14] U. S. Bureau of the Census, Census of 1940, Population, Characteristics by Age, vol. IV, pt. I, table V, p. 3.

Since the middle-age group is the productive group, it is to be expected that a relatively high percentage of the immigrants admitted would be from that group, inasmuch as they would probably be physically and economically more able to migrate and to qualify for admission under the immigration laws of this country than would the extremely young or the extremely old. During the period of World War II, it was, however, the very young and the very old who were permitted to leave Europe, while those who were needed for military service or for war industry, that is, the middle-age groups, were not permitted to migrate.

### 3. ALIEN POPULATION

Of a total of 5,009,857 aliens registered in this country as of December 26, 1940, roughly 1 percent (49,443) were in the age group 14 years or under, 41.08 percent (2,058,419) were in the age group of 15 to 44 years, and 57.92 percent (2,901,995) were in the age group of 45 years and over.[15]

Ernest Rubin, of the Immigration and Naturalization Service, observed that—

The age distribution of the alien population is unusual. In January 1941 the median age was 48 years, while that of the total population was only 29 years. As of July 1, 1945, it is estimated that the median age was 52.9 years, an increase of almost 5 years, while that of the total population was 29.7 years, an increase of only 0.7 years. * * *

The rapid rise in the median age indicates the aging trend of the alien population as a whole. Significant changes have also occurred in particular age groups. In January 1941, 70.5 percent of the alien population was 40 years of age and over, approximately 60 percent was 50 years of age and over, and more than 30 percent was 60 years of age and over * * *.[16]

Naturalization is probably the primary factor in the aging of our alien population. Aliens in the younger groups, who can usually satisfy the educational requirements for naturalization more readily than can the older ones, tend to become naturalized more rapidly. Furthermore, older persons frequently do not feel as great a need for becoming naturalized as do the younger ones.[17]

### D. SEX DISTRIBUTION OF THE POPULATION

#### 1. SEX DISTRIBUTION OF THE POPULATION AS A WHOLE

Numerous studies have been made with respect to the distribution of the population of this country on the basis of sex. Of particular interest are the significant changes which have occurred in the sex distribution of the alien population since January 1941. These changes are treated in subsection 3 of this section.

Certain observations should first be made with regard to the sex ratio of the population as a whole. This ratio was almost even in 1940, 100.7 males for every 100 females. This figure is not, however, completely illustrative, as there is relatively little intermarriage among races or between new arrivals and the native-born population.[18]

The native-born far outnumbered the foreign-born in 1940, the totals being 120,074,379 and 11,594,896, respectively. The sex ratio of the native-born was nearly even, 99.7 males per 100 females,

[15] U. S. Bureau of the Census, Statistical Abstract of the U. S., 1947, table 135, p. 116.
[16] U. S. Immigration and Naturalization Service, Monthly Review, November 1946, p. 57.
[17] Ibid., p. 62.
[18] Francis J. Brown and Joseph S. Roucek, One America (1945), pp. 481–482.

whereas the ratio for the foreign-born, 111.8 males per 100 females, showed a much greater disproportion.[19]

For the total United States population, the ratio between the two sexes has changed since 1850, although not uniformly, as follows:[20]

| | Males per 100 females | | Males per 100 females |
|---|---|---|---|
| 1850 | 104. 3 | 1900 | 104. 4 |
| 1860 | 104. 7 | 1910 | 106. 0 |
| 1870 | 102. 2 | 1920 | 104. 0 |
| 1880 | 103. 6 | 1930 | 102. 5 |
| 1890 | 105. 0 | 1940 | 100. 7 |

#### 2. SEX DISTRIBUTION BY RACE

##### a. White race

Members of the white race far outnumbered those of other races in the United States in 1940. The total figures by sex were 59,448,548 males and 58,766,322 females, with a ratio of 101.2 males per 100 females. The sex ratio for the foreign-born element was somewhat larger—111.1 males per hundred females—than it was for the native population, 100.1 males per 100 females.[21]

##### b. Negro race

The second largest racial group in the United States in 1940 was the Negro, with a total of 6,269,038 males and 6,596,480 females, a ratio of 95.0 males per 100 females. The number of native-born females exceeded the number of native-born males, the totals being 6,557,027 and 6,224,550 respectively, the ratio being 94.9 males per 100 females, which was slightly below the over-all ratio for the race. Among foreign-born Negroes the males outnumbered the females, 44,488 and 39,453 respectively, making the sex ratio 112.8 males per 100 females.[22]

##### c. Other races

The total number of persons of other races in the United States in 1940 was relatively small and the over-all sex ratio showed the greatest divergence, 140.5 males per 100 females. The total number of males of these other races was 344,006, with 277,862 native-born and 66,144 foreign-born; the total number of females was 244,881, of whom 219,208 were native-born and 25,673 were foreign-born. The ratio between the sexes was 126.8 males per 100 females for the native-born, and 257.6 males per 100 females for the foreign-born.[23]

The oriental races in particular show a great disproportion in the sex ratio. In 1940, for example, there were 57,389 Chinese males in this country but only 20,115 Chinese females. Of the total number of males, 25,702 were native-born, while a larger number, 31,687, were foreign-born. On the other hand, the number of native-born Chinese women, 14,560, far outnumbered the foreign-born, who totaled 5,555. While the ratio between the two sexes is becoming smaller—285.3 males per 100 females in 1940 as compared to 1,858.1 males per 100 females in 1860—it is still large.[24]

The other oriental race in which the ratio between the sexes is large is the Japanese. In 1940, there were 71,967 Japanese males and 54,980 Japanese females in this country. Of the total number of

[19] U. S. Bureau of the Census, Census of 1940, Population, vol. II, p. 19.
[20] U. S. Bureau of the Census, Statistical Abstract of the United States, 1947, p. 18.
[21] U. S. Bureau of the Census, Census of 1940, Population, vol. II, p. 19.
[22] Id.
[23] Id.
[24] Id.

males, 42,316 were native-born and 29,651 were foreign-born, while 37,326 of the females were native-born and 17,654 were foreign-born. The ratio in 1940 was 130.9 males per 100 females, as compared to 687.3 males per 100 females in 1890, the first year for which the figures are available.[25]

It should also be noted that sex ratios vary according to age. This fact can best be illustrated by the following set of figures.[26]

*Number of males per 100 females*

| Age | White | Negro |
|---|---|---|
| Total United States | 101.2 | 95.0 |
| 0 to 9 | 103.7 | 99.0 |
| 10 to 19 | 102.2 | 96.1 |
| 20 to 29 | 97.7 | 85.7 |
| 30 to 39 | 99.2 | 88.8 |
| 40 to 49 | 102.7 | 98.6 |
| 50 to 59 | 106.4 | 107.2 |
| 60 and over | 97.4 | 103.2 |

It can be seen that males of the white race outnumber females during the first 20 years of age and again during the 40-to-60-year span. The Negro race has, however, an excess of females until the 50-or-over age group is reached.

### 3. SEX DISTRIBUTION OF IMMIGRANTS

Many factors affect migration to the United States, economic pressure, war, and marriage being, perhaps, the major ones. For this reason admissions to this country have shown no uniform trend over the years nor has the sex ratio of the immigrants been balanced.

As pointed out by Rubin, a preponderance of male immigrants is "one of the principal characteristics of international or long distance migration."[27] Yet, during the past 13 years, there has been a preponderance of female immigration, the sex ratios being as follows:[28]

| | Males per 1000 females immigrating to United States |
|---|---|
| 1935–39 | 785 |
| 1940–44 | 796 |
| 1945 | 541 |
| 1946 | 335 |
| 1947 | 575 |

According to Rubin, the sex ratio of immigrants from 1830 to 1914 was 177 males for every 100 females. From 1915 to 1945 the ratio declined to 121.8 males for every 100 females.[29]

Until the decade from 1931 to 1940, the number of male immigrants exceeded female immigrants. Statistics for the period from 1931 to 1940 show, however, a total of 229,150 (43.4 percent) males and 299,281 (56.6 percent) females. In the next decade, 41 percent were males and 59 percent were females. For the fiscal years 1946, 1947, and 1948, the percentage of female immigrants rose to 74.9, 63.5 and 60.5, respectively.[30]

[25] U. S. Bureau of the Census, Census of 1940, Population, vol. II, p. 19.
[26] Warren S. Thompson, Population Problems (1942), p. 136.
[27] U. S. Immigration and Naturalization Service, Monthly Review, May 1945, p. 143.
[28] U. S. Immigration and Naturalization Service, Annual Report, 1947, table 10A, p. 70.
[29] U. S. Immigration and Naturalization Service, Monthly Review, November 1946.
[30] Special Statistics from U. S. Immigration and Naturalization Service.

This growth resulted largely from the post World War II immigration of wives of servicemen which totaled 92,465 or 33 percent of the total female immigration of 278,217 for the fiscal years 1946–48. There are relatively few husbands or children of service personnel who have entered this country under the War Brides Act,[31] the total figures for both sexes through June 30, 1948, being:[32]

| Year ended June 30— | Total | Husbands | Wives | Alien children |
|---|---|---|---|---|
| Total | 95,785 | 256 | 92,465 | 3,064 |
| 1948 | 23,016 | 94 | 21,954 | 968 |
| 1947 | 27,212 | 101 | 25,736 | 1,375 |
| 1946 | 45,557 | 61 | 44,775 | 721 |

Another significant immigration factor is the large number of displaced persons who are presently entering the country. As of June 30, 1948, a total of 41,379 persons had entered under the President's directive of December 1945, but these people made no appreciable change in the over-all sex ratio of immigrants, as there were 20,923 males and 20,456 females.[33]

A large group of immigrants has also been admitted under the Displaced Persons Act of 1948. As of September 30, 1949, admissions totaled 45,866 males and 38,783 females, 54 percent and 46 percent, respectively.[34]

While the ratio of male to female immigrants was declining, the same trend was noticeable in native-born and foreign-born groups. The census of 1940 gives the following figures for males per 100 females in the years listed:[35]

| Year | Males per 100 females | | |
|---|---|---|---|
| | All | Native | Foreign-born |
| 1900 | 104.4 | 102.2 | 119.5 |
| 1910 | 106.0 | 102.2 | 131.1 |
| 1920 | 104.0 | 101.4 | 122.9 |
| 1930 | 102.5 | 100.8 | 116.6 |
| 1940 | 100.7 | 99.7 | 111.8 |

Admissions cannot, however, be considered alone, for each year there is a fairly large group of persons who emigrate from the United States. Thus the sex ratio for aliens admitted to and departed from the United States for the fiscal years 1935 to 1947 is as follows:[36]

| Year | Aliens admitted, males per 1,000 females | Aliens departed, males per 1,000 females |
|---|---|---|
| 1935–39 | 785 | 1,614 |
| 1940–44 | 796 | 1,616 |
| 1945 | 541 | 1,013 |
| 1946 | 335 | 1,297 |
| 1947 | 575 | 1,775 |

[31] Public Law 271, 79th Cong., 59 Stat. 659.
[32] U. S. Immigration and Naturalization Service, Annual Report, 1948, p. 15.
[33] U. S. Immigration and Naturalization Service, Monthly Review, September 1948, p. 34.
[34] Special Statistics from U. S. Department of State, Nov. 23, 1949.
[35] U. S. Bureau of the Census, Census of 1940, Population, vol. II, table 4, p. 19.
[36] U. S. Immigration and Naturalization Service, Annual Report, 1947, table 10A, p. 70.

Wars have always tended to throw the immigrant sex ratio out of balance, usually causing a preponderance of female immigration. This being an unnatural situation, it is to be expected that the present preponderance of female immigration will not continue, but rather that the immigration sex ratio will tend to become more balanced.

### 4. SEX DISTRIBUTION BY AREAS

The sex ratio of the population in urban areas is different from that in rural areas. In 1940 there were more white males in the rural districts of the country than females, the over-all ratio being 112 males per 100 females.[37]  This difference can be explained by studying the nature of the two districts.  Farm work is essentially a man's job, and requires more men than women, whereas women can more easily find employment for themselves in the city.

In cities, the sex ratios of the foreign-born and native-born white population are disproportionate.  The foreign born have 106.8 males for every 100 females, whereas the native-born have but 91.1 males for every 100 females.  These figures are particularly significant in view of the fact that first generation foreign born in this country do not tend to intermarry.[38]

The rural districts are characterized by a preponderance of males in both the native and foreign-born white elements.  As in the case of the urban districts, there is a greater disproportion among the foreign-born whites than among the native-born, the ratios being 140.3 and 103.4 males per 100 females, respectively.[39]

These ratios are indicative of the general makeup of the future population of the United States, as rural families tend to be larger than urban families [40] and the average life span for women is longer than it is for men.[41]

The group constituting the largest percentage of foreign-born whites in rural areas is the German, which in 1940 composed 16.3 percent of the total foreign-born whites on farms, whereas Italians composed 15.7 percent of the total foreign-born white population in urban areas.  The ratio between the sexes in these foreign-born groups does not seem to be indicative of any general trend.  The total number in each group and its percentage of the whole is as follows: [41a]

[37] U. S. Bureau of the Census, Census of 1940, Population, Special Studies, table 3, p. 15.
[38] Francis J. Brown and Joseph S. Roucek, One America (1945), pp. 481–482.
[39] U. S. Bureau of the Census, Census of 1940, Population, Special Studies, table 3, p. 15.
[40] Warren S. Thompson, Population Problems (1942), pp. 168ff.
[41] Ibid, pp. 227ff.
[41a] U. S. Bureau of the Census, Census of 1940, Population, vol. II, pt. 1, table 14, p. 42.

*Distribution of foreign-born white population*

| Country of birth | Urban | | | Rural-Farm | | |
| --- | --- | --- | --- | --- | --- | --- |
| | Percent of total | Male | Female | Percent of total | Male | Female |
| England | 5.4 | 240,000 | 249,000 | 3.6 | 19,000 | 14,000 |
| Scotland | 2.5 | 113,000 | 117,000 | 1.2 | 6,000 | 5,000 |
| Eire | 5.6 | 217,000 | 297,000 | 1.6 | 8,000 | 7,000 |
| Norway | 1.7 | 82,000 | 71,000 | 6.8 | 37,000 | 25,000 |
| Sweden | 3.3 | 162,000 | 144,000 | 7.7 | 43,000 | 27,000 |
| France | 0.9 | 36,000 | 44,000 | 0.8 | 4,000 | 3,000 |
| Germany | 10.1 | 462,000 | 457,000 | 16.3 | 86,000 | 63,000 |
| Poland | 9.4 | 444,000 | 410,000 | 6.3 | 33,000 | 25,000 |
| Czechoslovakia | 2.5 | 112,000 | 115,000 | 4.7 | 25,000 | 19,000 |
| Austria | 4.2 | 193,000 | 190,000 | 3.5 | 18,000 | 14,000 |
| Hungary | 2.6 | 117,000 | 122,000 | 2.1 | 10,000 | 9,000 |
| Russia | 10.3 | 489,000 | 450,000 | 5.4 | 26,000 | 21,000 |
| Italy | 15.7 | 815,000 | 615,000 | 5.0 | 29,000 | 18,000 |
| Canada (French) | 2.4 | 102,000 | 113,000 | 1.9 | 10,000 | 7,000 |
| Canada (other) | 6.4 | 257,000 | 334,000 | 6.9 | 34,000 | 30,000 |
| Mexico | 2.6 | 118,000 | 120,000 | 2.6 | 35,000 | 24,000 |

There is also a variation in the sex ratio in different localities and this ratio, too, has changed over the years, as can be seen by the following table: [41b]

*Sex ratios by area*

| Area | Males per 100 females | |
| --- | --- | --- |
| | 1940 | 1880 |
| United States | 100.7 | 103.6 |
| Vermont | 102.9 | 100.9 |
| Massachusetts | 95.0 | 92.8 |
| Ohio | 100.4 | 101.9 |
| Kansas | 101.3 | 116.8 |
| North Carolina | 98.6 | 96.6 |
| White | 99.7 | 96.1 |
| Negro | 95.7 | 97.6 |
| Texas | 100.9 | 111.1 |
| White | 101.8 | 115.0 |
| Negro | 95.3 | 100.1 |
| Washington | 109.1 | 157.7 |
| California | 103.7 | 149.5 |

These figures show that in the great westward movement of the population and in the settlement of the Western States, the original settlers were primarily males but, as the areas have become populated, the sex ratio has become more balanced.

### 5. THE SEX RATIO IN NATURALIZATION

There were only 70,150 persons naturalized in this country during the fiscal year of 1948, the lowest number since 1911.  This figure is in contrast to the great number who were naturalized during the war years, both in this country and overseas.[42]

The sex ratio of those persons who were naturalized during the past several years has been rather evenly balanced, the percentages

[41b] Warren S. Thompson, op. cit., p. 99.
[42] U. S. Immigration and Naturalization Service, Annual Report, 1948, p. 33.

of the total number for the fiscal years 1938 to 1946 being as follows: [43]

| Year | 1938 | 1939 | 1940 | 1941 | 1942 | 1943 | 1944 | 1945 | 1946 |
|---|---|---|---|---|---|---|---|---|---|
| Male | 56.8 | 60.3 | 56.3 | 49.2 | 41.4 | 49.2 | 45.1 | 49.2 | 50.2 |
| Female | 43.2 | 39.7 | 43.7 | 50.8 | 58.6 | 50.8 | 54.9 | 50.8 | 49.8 |

These percentages, however, do not include those members of the armed services who were naturalized overseas.

Of the total foreign-born white population in the United States in 1940, 64.6 percent were naturalized citizens; the total number naturalized consisted of 69.7 percent of the foreign-born white males and 59.0 percent of the foreign-born white females.

Again, the percentages vary according to the locality, as shown in the following table: [44]

| Location | Percent naturalized | |
|---|---|---|
| | Male | Female |
| Northeastern States | 70.3 | 56.8 |
| North Central States | 74.5 | 65.5 |
| Southern States | 56.0 | 48.3 |
| Western States | 61.5 | 57.7 |

### 6. THE SEX RATIO IN EDUCATION

Not only does the amount of education vary as between the sexes, but it also varies in different localities, and between native and foreign-born persons.

In 1940, 4.9 percent of the total white population over 25 years of age had completed four or more years of college. The percentage was higher for the native-born than for the foreign-born whites.

The percentages for both native-born and foreign-born white males over 25 years of age who had completed four or more years of college in 1940 were higher than for the females in the same two groups; 6.3 percent of the native-born males and 3.2 percent of the foreign-born males had completed four or more years of college, while only 4.5 percent of the native-born females and 1.3 percent of the foreign-born had done so.

The variance between the percentage of native-born white males and native-born white females having no education was small, 1.6 percent of the males and 1.3 percent of the females—whereas, in the foreign-born group, 13.1 percent of the females and 11.2 percent of the males had had no schooling. [45]

A higher percentage of the urban population 25 years of age and over had completed four or more years of college than had the rural population, 6.1 percent and 1.5 percent respectively. Males, on the whole, had completed more years of schooling than had the females, both among the native-born and foreign-born groups.

[43] U. S. Immigration and Naturalization Service, Annual Report, 1946, p. 115.
[44] U. S. Bureau of the Census, Census of 1940, Population, Special Study—Country of Origin of the White Population, table 9, p. 80.
[45] U. S. Bureau of the Census, Census of 1940, Population, Special Study—General Characteristics, table 26, p. 194.

### E. MARITAL STATUS

#### 1. INTRODUCTION

The earliest Federal census figures available on the marital status of the population are those for 1890. Although the first inquiry on the subject was made in the census of 1880, the results were never tabulated. [46] In 1890, there were 105.4 white males to every 100 white females, and in 1930, the ratio was 102.9 white males to 100 females. The census of 1940 shows 101.2 white males per 100 females, these numbers being more nearly equal than at any other period in census history. [47]

In 1940, 66.9 percent of the white males and 73.8 percent of the white females 15 years of age or over were or had been married. In the native white population of foreign or mixed parentage, 58.2 percent of the males and 65.7 percent of the females were found to have been married, widowed, or divorced. The highest rates were found in the foreign-born white population 15 years of age or over, with 83.8 percent of the males and 90 percent of the females being listed as married, widowed, or divorced.

The higher incidence of marriage among the foreign-born is due to the fact that this segment of the population is concentrated in the upper age levels. If these figures are compared on an age-for-age basis, the percentage of married, widowed, or divorced in the foreign-born population is slightly less than that of the native. The marriage rate in the case of native whites of foreign or mixed parents is less than of the other two groups, both by actual comparison and by an age-level comparison. It has been found that native whites of native parentage marry at significantly lower ages than either the first or second generation of foreign white stock. [48]

#### 2. POPULATION AS A WHOLE

The census of 1940 shows the following distribution, by marital status, of the total population 15 years of age or over. [49]

| Sex | Single | | Married | | Widowed | | Divorced | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Male | 16,376,595 | 33.2 | 30,191,087 | 61.2 | 2,143,552 | 4.3 | 624,398 | 1.8 |
| Female | 12,751,772 | 25.8 | 30,057,135 | 61.0 | 5,700,092 | 11.5 | 882,563 | 1.7 |

#### 3. IMMIGRANTS

Statistics on the marital status of immigrants admitted into the United States are not as adequate as those for other segments of the population. According to the Immigration and Naturalization Service, the marital status of approximately 150,000 alien immigrants who were admitted during the fiscal year 1947 is as follows: [50]

[46] U. S. Bureau of the Census, Census of 1940, Population, vol. IV, pt. 3, p. 3.
[47] U. S. Bureau of the Census, Census of 1940, Population, Nativity and Parentage of the White Population, table 3, p. 2.
[48] Ibid.
[49] U. S. Bureau of the Census, Statistical Abstract of the United States, 1948, table 42, p. 42.
[50] U. S. Immigration and Naturalization Service, Annual Report, 1947, table 10.

| Marital status | Number admitted |
|---|---|
| Single | 61, 152 |
| Married | 75, 506 |
| Widowed | 8, 346 |
| Divorced | 2, 286 |
| Unknown | 2 |

There are no published figures available to show the sex ratios within these categories.

The total number of single persons admitted is considerably smaller than those who are married, widowed, or divorced.

### 4. NONIMMIGRANTS

Of the 366,305 nonimmigrant aliens admitted during the fiscal year 1947, the Immigration and Naturalization Service showed the following break-down with respect to marital status:[51]

| Marital status | Number admitted |
|---|---|
| Single | 140, 872 |
| Married | 196, 790 |
| Widowed | 16, 310 |
| Divorced | 4, 255 |
| Unknown | 8, 078 |

### 5. EMIGRANT ALIENS

During the fiscal year 1947, the 22,501 emigrant aliens departing showed the following distribution with regard to marital status:[52]

| Marital status | Number admitted |
|---|---|
| Single | 8, 322 |
| Married | 11, 726 |
| Widowed | 1, 047 |
| Divorced | 126 |
| Unknown | 1, 280 |

### 6. GI BRIDES AND FIANCÉES

The GI Brides Act of December 28, 1945, as amended,[53] provided that alien spouses and children of citizen members of the United States armed forces be admitted on a nonquota basis. Entries under this act, from the effective date to its expiration on December 28, 1948, were approximately 112,000, distributed as follows:

| Period | Total | Husbands | Wives | Children |
|---|---|---|---|---|
| Dec. 28, 1945, to June 30, 1946 | 45, 557 | 61 | 44, 775 | 721 |
| July 1, 1946, to June 30, 1947 | 27, 212 | 101 | 25, 736 | 1, 375 |
| July 1, 1947, to June 30, 1948 | 23, 016 | 94 | 21, 954 | 968 |
| Totals | 95, 785 | 256 | 92, 465 | 3, 064 |

Source: U. S. Immigration and Naturalization Service, Annual Reports, 1946, 1947, 1948, table 9.

The Immigration and Naturalization Service estimated that an additional 16,400 wives, husbands, and minor children entered from July 1 to December 28, 1948.

[51] Ibid., table 18.
[52] Ibid., table 14.
[53] Public Law 271, 79th Cong.; Public Law 213, 80th Cong.

The so-called Fiancée Act of June 29, 1946,[54] provided for the admission of fiancés and fiancées of citizen members of the United States armed forces as temporary visitors. Approximately 5,400 persons had entered the United States under the provisions of this act, through June 30, 1948.

### 7. REGISTERED ALIENS

As of December 26, 1940, 5,009,857 aliens were registered in the United States, with fewer than 50,000 listed as single persons under 14 years of age. The distribution by marital status, of registered aliens, is as follows:

| Sex | Single | Married | Widowed, divorced, unknown |
|---|---|---|---|
| Male | 699, 008 | 1, 385, 994 | 255, 768 |
| Female | 345, 434 | 1, 858, 850 | 464, 803 |
| Total | 1, 044, 442 | 3, 244, 844 | 720, 571 |

Source: U. S. Bureau of the Census Statistical Abstract of the United States, 1948, table 132, p. 115.

The marital status, classified by age groups, is as follows:

| Sex | Single | Married | Widowed, divorced, unknown |
|---|---|---|---|
| 14 to 44 years of age: | | | |
| Male | 377, 670 | 507, 662 | 34, 258 |
| Female | 205, 063 | 878, 453 | 55, 363 |
| 45 years and over: | | | |
| Male | 296, 646 | 878, 332 | 221, 510 |
| Female | 115, 620 | 980, 447 | 409, 440 |

Source: Ibid.

### 8. NATURALIZED PERSONS

From the fiscal year 1939 to June 30, 1948, 2,262,520 persons were naturalized and their marital status was as follows:

| Marital status | Number naturalized |
|---|---|
| Single | 340, 947 |
| Married | 1, 743, 852 |
| Widowed | 138, 258 |
| Divorced | 39, 463 |

In addition, there were 15,641 members of the armed forces naturalized overseas from 1943 to 1946.[55]

### 9. INTERMARRIAGE BETWEEN IMMIGRANTS AND NATIVES

Professor Drachsler made an analysis of more than 100,000 original marriage records in New York from 1908 to 1912. He found that the second generation of immigrant stock intermarried with other races three times as often as first-generation immigrants.[56]

[54] Public Law 471, 79th Cong.
[55] U. S. Immigration and Naturalization Service Annual Report, 1947, 1948, table 42.
[56] Prof. J. Drachsler, Democracy and Assimilation (1920), pt. II.

Case: 1:21-cr-00665 Document #: 30-3 Filed: 05/02/22 Page 94 of 101 PageID #:733

A study of intermarriage among parents of public school children in Woonsocket, R. I., showed that in 4,978 cases, 9.6 percent of the first generation, 20.9 percent of the second generation, and 40.4 percent of the third generation of the parents married outside their original racial group.[57]

The proportion of native-born whites of mixed native and foreign-born parentage of the total United States population, as shown in the censuses from 1870 to 1930, is as follows:[58]

| Year | Percent | Year | Percent |
|------|---------|------|---------|
| 1870 | 4. 1 | 1900 | 8. 7 |
| 1880 | 5. 2 | 1920 | 8. 6 |
| 1890 | 7. 4 | 1930 | 8. 8 |

It might be pointed out that nowhere in the United States is there any statutory restriction on the intermarriage of persons of the white race either with native- or foreign-born.[59] There are, however, legal restrictions in a number of states against interracial marriages which go beyond the primary distinction, such as intermarriages between whites and blacks or between whites and members of the oriental races.

### F. BIRTH AND DEATH RATES

#### 1. INTRODUCTION

The natural growth of the population of the United States falls into two general periods. From the time permanent settlements were established in the Colonies to about 1810, there was a relatively high birth rate in comparison to the mortality rate. After 1810, the birth rate began a decline lasting to this day. The result of this change has been a decrease in the rate of the natural growth, which is expected to result in an eventual decline of the population size, with a concomitant rise in its average age.

##### a. Early period

It has been estimated that the white population of the United States in 1650 was approximately 52,000. By the time the first national census was taken in 1790—140 years later—the population had increased seventy-five-fold, to nearly 4,000,000 (including 800,000 Negroes). On the basis of the available data, it is estimated that a substantial portion of this growth was due to the high birth rate rather than to immigration alone.

A comparison of the ratio of children to women of child-bearing age shows that, as late as 1805, the annual birth rate was 55 per thousand, while the death rate was only 25, a growth which would double the population every 23 years.[60]

##### b. After 1810

The rate of natural increase, which had stood at 30 per thousand from 1790 to 1830, dropped to 15 per thousand from 1830 to 1860, and to 12 per thousand from 1910 to 1930.[61]

[57] Prof. Bessie Bloom Wessel, An Ethnic Survey of Woonsocket, R. I. (1931), p. 290.
[58] U. S. Federal Security Agency, Provisional Marriage and Divorce Statistics (1947), table 1.
[59] Maurice R. Davie, World Immigration (1936), p. 289.
[60] Warren S. Thompson, The Demographic Revolution in the United States, The Annals, American Academy of Political and Social Science, March 1949, p. 62.
[61] Warren S. Thompson, Population Problems (1942), p. 230, 251.

The age distribution of the population in 1820 showed a large proportion of young people as a result of the high natural increase. About 18.5 percent of the population was under 5 years of age and 39.4 percent was 5 to 19 years of age, while only 30 percent was between 20 and 44 and 12.2 percent was 45 or over. By the end of the century, the population under 5 had dropped to 12.1 percent and that 5 to 19 was only 32.3 percent while the 20 to 44 group had risen to almost 38 percent, and those 45 or over to 17.8 percent of the total population. The median age had risen from 16 to 22.9, an increase of about 7 years.

By 1940, only 8 percent of the American population was under 5; 26.4 percent was 5 to 19; 38.9 percent was between 20 and 44; and 26.7 percent was 45 or over. There has been an increase in the birth rate since 1940 as a result of war-wrought changes, but this rise is not expected to be permanent. It has been estimated that the probable age distribution by 1975 will be 6.8 percent for persons under 5 years of age; 26.4 percent for those 5 to 19; 36.5 percent for the 20 to 44 group, and 35.3 percent for those 45 and over. An important increase is expected particularly in the age group over 65.[62]

#### 2. BIRTH RATES

A marked characteristic of the declining birth rate is the unequal rate of growth among different groups, classes, and regions in the country.

The rural population has furnished a higher proportion of the population in the past and continues to furnish a higher proportion of the next generation than other segments. In the period 1935–40, the rural-farm population had a net reproduction rate over twice as high (166) as the urban population (73); the rural nonfarm population was about halfway between (115).[63]

The higher-income classes and persons of higher education levels have much lower birth rates than poorer classes and those with less education. A study made by Bernard D. Karpinos and Clyde V. Kiser in 1935 and 1936 covering more than 2,000,000 persons in 18 cities showed that families receiving $3,000 and more per year had 60 percent of the average number of children, whereas families on relief had 164 percent of the average number of children.

In this same report, with the general average net reproduction as 100 percent, the offspring of various educational groups were as follows:

| | |
|---|---|
| College | 74 |
| High school | 97 |
| Seventh or eighth grade | 123 |
| Under seventh grade | 139 |

A similar study by P. K. Whelpton and Clyde V. Kiser in Indianapolis in 1941 showed an inverse relationship between education and the number of children. For women 40 to 44 the number of children per wife for various educational levels was:

| Education: | Number of children |
|---|---|
| 4 or more years of college | 1. 70 |
| 3 years of college | 1. 83 |
| 2 years of college | 1. 63 |
| 1 year of college | 1. 79 |
| 4 years of high school | 1. 71 |
| 3 years of high school | 2. 10 |
| 2 years of high school | 2. 01 |
| 1 year of high school | 2. 36 |
| 8 years of grade school | 2. 50 |
| 7 years of grade school | 4. 11 |

The Census Bureau has classified according to occupations of the father those wives of ages 35 to 39 to whom a child was born in 1929. The total numbers of living children per family in illustrative occupations were as follows:

| Occupation: | Number of children |
|---|---|
| Coal-mine workers | 6. 4 |
| Farmers | 6. 1 |
| General laborers | 5. 6 |
| Bootblacks | 5. 2 |
| Semiskilled workers | 4. 9 |
| Photographers | 3. 5 |
| Designers, draftsmen, inventors | 3. 4 |
| Physicians and surgeons | 3. 0 |
| Architects | 2. 7 |

Thompson summarizes the findings of various studies regarding the differential birth rate in the United States in the statement:

The most fertile group of any considerable size in this country is that engaged in the extraction of minerals. Although information on this point is not wholly satisfactory, the coal counties in the Appalachians show extremely high ratios of children to women. Next in order comes the group engaged in agriculture, and since this is 10 times as large as the mining group and has a high rate of increase, a considerable part of the total national increase of the United States is coming from this group. Nearly all the rest is coming from hand workers—unskilled, semiskilled, and skilled—in descending order of importance. Finally the white-collar workers—tradesmen, professional workers, and others—have a very low fertility and are failing to reproduce themselves by a large margin.

### 3. COMPARISON OF BIRTH RATES BETWEEN FOREIGN-BORN AND NATIVE-BORN

Vital statistics for aliens have never been kept separately. The white population of the United States is classified by the Bureau of the Census into two groups: Native white and foreign-born white.

The proportion of the foreign-born persons reached a maximum in 1910, with 14.5 percent of the total population. By 1940 this proportion had fallen to 8.7 percent, and it will continue to decline in the future unless present quotas are raised.[64]

Birth rates show that, while the foreign-born white mothers had higher birth rates in 1920 (101.2 per thousand) and 1930 (59.2) than did native white mothers in 1920 (66.3) and in 1930 (55.5), the birth rate in 1940 was higher for native white mothers (53.0) than for foreign-born white mothers (31.7).[65] Birth rates furnished by the National Office of Vital Statistics for 1945 are 59.2 for native-born white women and 32.9 for foreign-born white women.

[64] Warren S. Thompson, op. cit.
[65] U. S. Bureau of the Census, Vital Statistics Rates in the United States, table 48, p. 681.

It is not to be expected that this trend will continue, since the majority of the foreign-born white women are aging past the reproductive period and their ranks are not being replenished by a sufficient inflow of young women to raise the average.

Over the period in which statistical material is available, the size of the families of native-born parents has been smaller than families of foreign-born parents. Although the Census Bureau uses the classification "household" rather than "family," a study of the number of children of foreign-born and native parents was made in 1935–36 by statistics students of Mount Holyoke College.[66] Based on the family history over three generations of the 691 families of the student body, this investigation showed that the decrease in the proportion of foreign-born parents brought with it a decrease in the average number of children.

In the present generation, for example, families with two foreign-born parents had an average of 3.9 children, while native-born parents had only 2.5. The greatest difference was found in the second generation, with 6.3 children for foreign-born parents and 4.0 for natives.

It is interesting to observe that in the first generation, 39 percent of the families had both parents born in foreign countries and 56 percent had both parents native-born, whereas the third generation showed 85 percent native-born parents.

A distinct downward trend was evidenced in the three generations studied. The size of family decreased from 5.5 in the grandmothers' generation to 2.8 in the students'—a drop of 54 percent. This decline in size was associated with three important factors: (1) The percentage of native-born mothers increased from 57 percent in the grandmothers' generation to 89 percent in the students', (2) the average age of mothers at time of marriage increased 7 years from the grandmothers' generation to the students' generation, (3) the mothers of the student generation had three more years of education than the great-grandmothers of the students.

The decline of the number and proportion of the foreign-born in the population is unequal among the different nationalities comprising the foreign-born part of the population, but specific birth rates by nationalities are not available.

### 4. COMPARISON OF DEATH RATES BETWEEN FOREIGN-BORN AND NATIVE-BORN

Since citizenship is not reported on death certificates, there is no direct source of information on death rates for aliens. It is established, however, that the foreign-born, among whom the aliens are included, have higher death rates than the native-born.

The death rates per thousand of the population by nativity of white from 1900 to 1940 are: [67]

| Year | Native white | Foreign-born white |
|---|---|---|
| 1900 | 16. 6 | 18. 6 |
| 1910 | 13. 9 | 17. 0 |
| 1920 | 11. 7 | 17. 6 |
| 1930 | 9. 7 | 18. 3 |
| 1940 | 9. 1 | 20. 1 |

[66] Ruth O. Truax in American Sociological Review, vol. I (1936), No. 4, pp. 581, 587.
[67] F. E. Linder and R. D. Grove, Vital Statistics Rates in the United States, 1900–40, U. S. Government Printing Office (1943), table 46, p. 669.

The generally accepted reason for higher death rates among the foreign-born white population than among the native white population is the less favorable occupational and economic status of the former.

### 5. COMPARISON OF BIRTH RATES AMONG RACES

Because of the lack of exact information, evaluation of birth and death rates among races in this country is difficult. The classifications most frequently used in vital statistic reports for the United States are "White," "Negro," and "Other races" or simply, "White" and "All other."

Birth rates for "White" and "All other races" from 1920 to 1940 show higher rates for "All other" in each year: [68]

*Birth rates*

| Year | White | All other races | Year | White | All other races |
|---|---|---|---|---|---|
| 1920 | 71.4 | 78.8 | 1930 | 55.4 | 60.5 |
| 1921 | 72.5 | 79.9 | 1931 | 52.4 | 58.6 |
| 1922 | 66.5 | 73.0 | 1932 | 49.8 | 63.5 |
| 1923 | 65.9 | 72.9 | 1933 | 46.9 | 62.4 |
| 1924 | 63.9 | 75.4 | 1934 | 48.4 | 65.2 |
| 1925 | 63.3 | 72.9 | 1935 | 48.5 | 57.3 |
| 1926 | 61.0 | 71.6 | 1936 | 47.9 | 55.9 |
| 1927 | 60.9 | 67.1 | 1937 | 48.7 | 58.1 |
| 1928 | 58.2 | 62.6 | 1938 | 50.3 | 58.9 |
| 1929 | 55.5 | 60.2 | 1940 | 51.0 | 60.4 |

Of the total United States population in 1940, 9.8 percent was Negro and constituted the bulk (over 90 percent) of the group classified as "All other." It is obvious, therefore, that Negroes have always had higher birth rates than whites.

Although the Negroes have always had higher birth rates than whites, the Negro population, contrary to widespread belief, has not always increased more rapidly than the white population. Until 1930 the rate of natural increase of whites exceeded that of the Negroes, the increase of Negroes averaging about three-fourths the rate of increase for whites. The explanation, of course, is the higher death rate among Negroes. Since 1930, it appears, however, that the Negroes have had a somewhat higher natural increase than whites. [69]

### 6. COMPARISON OF DEATH RATES AMONG RACES

It has long been known that Negroes have higher death rates than whites. Death rates in this country for "White" and "All other races" for the census years 1900 to 1940 are: [70]

| Year | White | All other races |
|---|---|---|
| 1900 | 17.0 | 25.0 |
| 1910 | 14.5 | 21.7 |
| 1920 | 12.6 | 17.7 |
| 1930 | 10.8 | 16.3 |
| 1940 | 10.4 | 13.8 |

[68] Id.
[69] Warren S. Thompson, Population Problems, (1942), p. 128.
[70] F. E. Linder and R. D. Grove, Vital Statistics Rates in the United States, 1900–40, U. S. Government Printing Office (1943), table 4, p. 150.

Since Negroes constitute over 90 percent of the nonwhites, these rates may be regarded as showing substantially the mortality differences between whites and Negroes.

### 7. FUTURE POPULATION TRENDS IN THE UNITED STATES

The declining death rate which has prevailed for so long cannot continue unless the life span of a great number of people should grow considerably longer. Control of the epidemic germ diseases has been responsible for the declining death rate, but the degenerative diseases are claiming a larger share of lives as the average age of the population increases.

The declining birth date, on the other hand, is expected to continue and the increase in births since 1940 is likely to be only temporary. In the near future, the United States may, therefore, be faced with the problem of a static or declining population.

Any considerable immigration of young immigrants from areas having high birth rates would tend immediately to lower the average age of the population and to increase the birth rate, but only temporarily.

In the past, the influx of large numbers of immigrants also helped to maintain a higher birth rate because the greater part of the immigrants, even those going to the cities, came from rural populations where high birth rates were the rule. At the present time, however, a larger proportion of immigrants will almost certainly come from cities where birth rates are low. Besides, the birth rates in most of the rural areas from which immigrants might come are no longer as high as in the past. Thus, in spite of the fact that immigrants consist predominantly of young adults who would have low crude death rates and high crude birth rates, a net in-movement of 100,000 immigrants a year would not raise our population more than about 500,000 above the net immigration in 20 years; that is, the immigrants surviving at the end of 20 years, plus their children, would total about 2,500,000. [71]

Immigration from northern and western European countries cannot be the solution for a declining population, for in those countries also the declining birth rate is expected to continue after a temporary increase in the immediate postwar years. The European population today is older and short of young men who formed the bulk of previous migrations.

In strictly demographic terms, Europe is no longer producing surpluses of population to feed the streams of overseas migration. At the same time, the growth of cities and of industry is absorbing the surplus rural population in those countries that previously furnished the largest immigration potential. [72]

### G. RELIEF

### 1. ADMINISTRATION OF PUBLIC RELIEF PROGRAMS

Public relief in the United States is provided through four major programs, all administered by the State and local governments. Payments to three groups of needy persons—aged, blind, and dependent children—are financed in part from Federal funds granted to the

[71] Warren S. Thompson, The Demographic Revolution in the United States, the Annals of the American Academy of Political and Social Sciences, March 1949.
[72] Dudley Kirk, Demographic Trends in Europe, the Annals of the American Academy of Political and Social Sciences, March 1949, p. 55.

States under the Social Security Act. Aid to other needy persons is furnished through general assistance toward which the Federal Government makes no contribution.[73]

*a. Legal restrictions*

The only restriction imposed on the individual States receiving Federal money for public assistance as to the citizenship of individuals eligible for relief is that they **cannot** cut off any United States citizen.[74] Citizenship is not, however, generally a requirement for social security benefits. Section 1 of the Annual Report of the Federal Security Agency for 1947, pp. 114–115, reads: [75]

*Citizenship requirements.*—The Social Security Act permits a State to require citizenship as a condition of eligibility for public assistance, although the State may, if it wishes, use Federal funds to help pay the cost of assistance to noncitizens. Only 1 State now requires citizenship as a condition of eligibility for aid to dependent children, but it is required for recipients of old-age assistance in 24 States and of aid to the blind in 6 States. It is the opinion of the Social Security Administration that assistance should be available to noncitizens who are needy and otherwise eligible for help, and that the Social Security Act should prohibit a State from including citizenship as a condition of eligibility for assistance in its State plan. The States, as well as the noncitizens, would benefit from this change since those who are needy must be cared for through general assistance, which is financed wholly by the States and localities. Often such aid is meager in comparison with categorical assistance.

The fact that citizenship is not a general requirement for social security benefits is probably the reason that there are no statistics available on aliens who are beneficiaries.

Nor was citizenship a requirement for assistance under the original WPA program. No distinction of any kind was made between aliens and citizens. In 1936, however, Congress wrote into the Emergency Relief Appropriation Act, a provision denying employment to those aliens illegally within the United States. By 1939, the law had been amended so that aliens were ineligible for relief under WPA, employment having been restricted to United States citizens, Indians, and others (such as Filipinos) owing allegiance to the United States. Nevertheless, aliens continued on relief rolls, but only estimates are available on the number.

2. ECONOMIC CYCLES AND IMMIGRATION

There is an apparent relation between economic cycles and the volume of immigration: In immigrant-receiving countries recent periods of depression were followed by a decrease in immigration.[76]

It is important to this study to attempt to evaluate the number of American citizens who are forced onto relief rolls as a result of being displaced by immigrants. According to a survey made in October 1935, by the International Labor Office at Geneva, there were 50 percent more persons out of work in America than in all Europe, while the number of jobless in Europe had declined from 8,400,000 to 7,400,000 in that year.[77] Laughlin [78] concluded that—

It would seem that European countries, by encouraging their surplus population to emigrate, tend to shift their burden and responsibility to other countries.

[73] U. S. Federal Security Agency, Annual Report, 1946, sec. 6, p. 488.
[74] Social Security Act, as amended, March 1, 1947, sec. 2 (b).
[75] U. S. Federal Security Agency, Annual Report, 1947, sec. 1, pp. 114–115.
[76] Harry H. Laughlin, Conquest by Immigration, Chamber of Commerce of the State of New York (1939), p. 77.
[77] Harry H. Laughlin, op. cit., p. 83.
[78] Ibid.

According to the International Labor Office figures, unemployment reduction overseas balances immigrant influx into the United States. For instance, in 1934, Germany reduced unemployment by 671,897—Germans entering the United States since the close of the World War numbered 568,884. Similarly, Italy, in 1934, reemployed only 238,235 of her citizens, while from 1919 to 1935, 604,613 Italians arrived in the United States. In Great Britain, 188,614 persons were put back to work in 1934–35; since armistice, 171,801 immigrants from England, Scotland, Wales, and Northern Ireland entered the United States and 413,390 more came from Canada, Australia, and other British Dominions.

Now, though many aliens have become public charges here, their respective home countries in many cases refuse to readmit them because they have meanwhile expatriated themselves. Many countries deprive their nationals of citizenship when they emigrate with the intention of settling abroad. Such countries usually refuse to take them back, unless they are needed for military duty.

The burden of support of these persons is therefore thrown upon the individual States and localities.

3. THE UNITED STATES AS A WHOLE

During the fiscal year 1937–38, there were 585,877 recipients of old-age assistance accepted in all States (exclusive of Alaska and Hawaii, and of Virginia, which had no plan for old-age assistance in 1937–38, and including 152 recipients for whom information concerning nativity was unknown, which cases were omitted in computing the averages) of which 97.1 were listed as citizens and 2.9 were specified aliens.[79]

Of the nearly 600,000 recipients of old-age assistance, 491,-403 (84.1 percent) were native-born and 92,823 (15.9 percent) were foreign-born white. The percentage of the total population 65 years and over was 74.6 native-born and 25.4 foreign-born white in 1930 and 77.2 percent native-born and 22.8 percent foreign-born white in 1940.[80]

Raymond G. Carroll, writing in the Saturday Evening Post of January 11, 1936, estimated that the United States had up to that time supported 3,000,000 aliens during the depression, at an annual cost of $400,000,000. During 1937 and 1938, this annual total was even greater.[81]

The grand total of 3,000,000 aliens on relief was based on information from various relief stations in the principal cities: New York, Detroit, Los Angeles, Cleveland, Pittsburgh, Seattle, Baltimore, Philadelphia, Minneapolis, Milwaukee, and others, plus estimates from State relief headquarters. According to the estimates, between 250,000 and 300,000 aliens have been (and still were in 1936) public charges in New York City. Detroit reported that in Wayne County, the relief rolls carried 63 percent native-born, 17 percent naturalized aliens, 10 percent foreign-born, and 10 percent aliens with first papers—approximately 25,000 aliens on relief, with an additional 75,000 dependent foreigners throughout the State of Michigan.

In Los Angeles, a survey made September 1935, showed that there were 12,808 alien charges, of whom 7,769 were Mexican alien families. Cleveland was caring for approximately 12,000 alien families (47,000 individuals). In Chicago, about 75,000 aliens were direct relief cases, plus members of alien families who were helped individually,

[79] Special Memorandum and Statistics, Immigration and Naturalization Service, November 9, 1948, table C.
[80] Ibid, table B.
[81] Harry H. Laughlin, Conquest by Immigration (1939), pp. 82 et seq.

a total of 300,000. It is estimated that in Detroit, Cleveland, and New York, one out of every five charges was of alien stock and, along the Mexican border, one out of two.[82]

Of the 66,000 employable persons being granted home relief in New York City in February 1941, approximately 25,000 were said to be aliens. In Massachusetts in March 1940, among a total of 37,566 employable workers granted relief and not employed by the WPA, 27.7 percent were reported aliens. In Los Angeles County, Calif., almost 28,000 presumably employable cases granted unemployment relief early in 1938 were estimated to include some 5,000 employable aliens.[83]

An official of the United States Immigration and Naturalization Service, speaking in favor of the erection of a boundary fence, along the California-Mexican border, made the statement:

In justifying the expense of erecting this barricade, I think we should very strongly take into consideration the fact that such an enormous proportion of Mexicans become charitable cases within a short time or they end up in penitentiaries or jails. The tax burden is tremendous in this part of the country—way out of proportion to the minority from a population standpoint.

While the number of Mexicans on relief is relatively high, the number of alien Japanese on relief appears to be relatively low.

The census of 1940 showed that more than 7,600,000 persons of a total labor force of 52,800,000 were on emergency work or seeking work. This was 14.4 percent of the labor force. But only 0.08 percent of the alien Japanese labor force was in emergency relief work; only 936 or 2.8 percent were unemployed, compared with 9.6 percent of the total population. These figures are important, in view of the greater proportion of Japanese aliens in the labor force and the differences in the median ages of the two groups.[84]

Any over-all comparison of aliens, foreign-born and native-born, on relief cannot be made from available data. Statistics available on foreign-born on relief by nationalities and races and on relief cases confined to institutions, as well as statistics on other types of relief, are so meager and scattered as not to admit any conclusions.

The total institutional population of the United States 14 years old and over in 1940 was 1,176,993. Of this number, 991,457 (84.2 percent of total) were native-born citizens, while 185,536 (15.8 percent) foreign-born, 71,350 were naturalized citizens, 5,377 aliens having first papers, and 42,592 whose citizenship was unreported.[85]

In 1940, there were 245,026 persons in homes for the aged, infirm, or needy. Of this number 189,366 were native-born (77.3 percent of total) and 55,660 (22.7 percent) were foreign born; 28,163 were naturalized citizens, 1,697 aliens having first papers, 18,766 aliens having no papers; and 7,034 whose citizenship was unreported.[86]

In the same year, out of a total United States population of 131,669,275, there were 120,074,379 native-born (91.2 percent of total), and 7,280,265 foreign-born (8.8 percent). Thus it can be seen that while the foreign-born constituted only 8.8 percent of the total

[82] Ibid.
[83] Donald S. Howard, The WPA and Federal Relief Policy, p. 311.
[84] Hearings before House Subcommittee on Immigration and Naturalization on H. R. 6004, 80th Cong., 2d sess., Serial 13, p. 102.
[85] U. S. Bureau of the Census, Census of 1940, Population, 1940, Special Report on Institutions Population.
[86] Ibid., table VI.

population in 1940, they constituted 15.8 percent of the institutional population and 22.7 percent of the population in homes for the aged, infirm, and needy.

At least for the year 1940, a greater proportion of the foreign-born was in institutions in the United States, and a greater proportion was in homes for the aged, infirm, and needy than were native-born. According to the 1940 census figures, the total of 11,594,896 aliens having no papers and foreign-born whose citizenship status was unknown or not reported, constituted the largest groups in the foreign-born institutional population and of the foreign-born in homes for the aged, infirm, and needy in comparison with their proportion to the whole population:

1. Naturalized citizens constituted 5.2 percent of the total United States population, 38.5 percent of the foreign-born institutional population, and 50.6 percent of the foreign-born population in homes for the aged, infirm, or needy.

2. Aliens having first papers constituted 0.7 percent of the total United States population, 2.9 percent of the foreign-born institutional population, and 3.0 percent of the foreign-born population in homes for the aged, infirm, and needy.

3. While, although aliens having no papers constituted only 1.9 percent of the total United States population, they constituted 35.7 percent of the foreign-born institutional population, and 33.7 of the foreign-born population in homes for the aged, infirm, and needy.

4. The group of foreign-born whose citizenship status was unknown or not reported made up 0.6 percent of the total United States population, 23.0 of the foreign-born institutional population, and 12.6 percent of the population in homes for the aged, infirm, and needy.

This is significant because this group of foreign-born (834,979) whose citizenship was unknown or not reported in the 1940 census may be presumed to be made up largely of aliens having no papers.

#### 4. STATE RELIEF PROGRAMS

Because of the dearth of data on the subject, a comprehensive analysis of State relief programs with relation to nativity of persons on relief rolls cannot be made. The small amount of data available can give only a general impression of the situation in some of the States.

*a. Connecticut*

A survey was made by the State of Connecticut in 1935–36 of the inmates of 17 State institutions for defective, dependent, delinquent, and handicapped persons. Among the 9,715 inmates of these 17 State institutions, 5,107 or 52.57 percent were foreign-born or of foreign parentage and 994 were of mixed parentage. Thus, approximately one-half of the total expenditures for that purpose were spent for the care, maintenance, treatment, or punishment of foreign-born persons or persons of foreign-born parentage.[87]

*b. Pennsylvania*

Of a total number of 773,050 persons receiving general assistance in Pennsylvania on March 25, 1939, there were 729,919 (94.4 percent of

[87] Harry H. Laughlin, Conquest by Immigration, Chamber of Commerce of the State of New York (1939), p. 75.

total) citizens and 43,131 (5.6 percent) aliens. Of these, 23,607 were in families having alien heads, 14,200 were heads of families, and 9,407 were other members of families. There were 16,001 one-person cases, and 3,523 cases in families with a citizen head. There was a total number of 86,654 recipients of old-age assistance, 82,995 (95.8 percent) were citizens, while 3,659 (4.2 percent) were aliens.[88]

Of 1,310 aliens receiving general assistance in Pennsylvania in January 1947, 1 was under 35 years old, 31 were in the 35 to 44 age group, 215 were in the 45 to 54 age group, 1,053 were in the 55 to 64 age group, and 10 were 65 years old and over.[89]

#### c. California

In California, February 11, 1939, the percentage distribution of general assistance cases by citizenship was:[90]

| Citizenship status | All persons | Heads of cases | Dependents in cases |
|---|---|---|---|
| Total [1] | 100.0 | 100.0 | 100.0 |
| Citizen | 90.4 | 81.7 | 93.7 |
| Alien | 9.6 | 18.3 | 6.3 |

[1] Includes nationals of the United States. These constituted less than 0.5 percent.

#### d. New Jersey

The monthly average of persons receiving assistance in New Jersey from 1943 to 1946 is shown in the following table:[91]

| Citizenship status | 1943 | | 1944 | | 1945 | | 1946 | |
|---|---|---|---|---|---|---|---|---|
| | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Total | 16,038 | 100.0 | 9,174 | 100.0 | 7,976 | 100.0 | 10,126 | 100.0 |
| Citizens | 13,013 | 81.1 | 8,110 | 88.4 | 7,357 | 92.2 | 9,611 | 94.9 |
| Aliens | 3,025 | 18.9 | 1,064 | 11.6 | 619 | 7.8 | 515 | 5.1 |

Source: Adapted from Summaries of General Assistance Activity for years 1943, 1944, 1945, and manuscript tables for 1946. New Jersey Department of Economic Development.

#### 5. SUMMARY

In summary, it must be stated again that no over-all comparison of aliens, foreign-born, and native-born on relief can be made from available data. The reasons for more data not being available probably are—

1. Citizenship was not a requirement for relief under the original WPA program and many of the records and forms used made no provision for reporting the citizenship of workers and applicants; after 1939 when citizenship was a requirement for relief, there still was no thorough checking of citizenship status.

2. Citizenship is not now a general requirement for social-security benefits; the Federal legislation is permissive, allowing the individual

[88] Special Memorandum and Statistics from Immigration and Naturalization Service, November 9, 1948, tables E, G, and D.
[89] Ibid., table F.
[90] Ibid., table I.
[91] Ibid., table H.

States to determine who should come under it. Although all Federal social-security legislation includes the alien within its benefits, there are no statistics available as to how many aliens are beneficiaries.

### H. CRIME

#### 1. INTRODUCTION

The question of the relationship between crime and immigration is, as an eminent sociologist stated, "a problem of first-rate importance from the point of view of a theory of criminality and of legislative and administrative policies."[92]

Evidences of concern over this aspect of immigration was apparent at the national convention of the Native American Party in 1845, at which certain immigrants were described as "utterly divested by ignorance or crime of the moral and intellectual requisites for political self-government."[93]

In this connection it is interesting to note a statement appearing in D. R. Taft's book on criminology that "perhaps no explanation of the apparent excess of crime in the United States has been more popular that that which attributes it to 'the damn' foreigner."[94]

In view of the prejudices involved and in view of the importance of the problem, it becomes necessary to examine the compiled statistics and the statements of authorities and (2) to assess the values of these statistics and expressions objectively.

#### 2. APPLICABLE LAW

It is not surprising that several laws have been enacted to exclude those aliens who are considered most apt by their records to commit crimes after their establishment in this country. Generally, these laws provide for the exclusion of aliens who have been convicted of or admit the commission of crimes classified as felonies or those involving moral turpitude, aliens who are polygamists, anarchists, or who advocate the overthrow by force of the United States Government or of all forms of law, or those who advocate the assassination of public officials or the unlawful destruction of property. Aliens who are involved in prostitution or importing women for that purpose and violators of narcotic laws are likewise excludible. Those offenses for which an alien may be excluded are also generally the offenses for which an alien may be deported. Thus, the United States maintains a continuing interest in the immigrant's behavior after his arrival in this country. If an immigrant is convicted of certain offenses within 5 years after entry or if he is convicted more than once of certain offenses at any time between entry and naturalization, he is subject to deportation.

#### 3. RELIABILITY OF AVAILABLE STATISTICS

Before proceeding with the subject of crime and the immigrant, it is well to take note of the inherent limitations in the statistics available

[92] Sutherland, Edwin H., Principles of Criminology (1939), p. 123.
[93] Address of the Delegates of the Native American National Convention assembled at Philadelphia, July 4, 1845, to the citizens of the United States (pamphlet).
[94] D. R. Taft, Criminology (1942), p. 102.

and of the resultant opinion which has been drawn from those statistics.

Due to the varying criminal laws of the several States and to the varying degrees in the severity of the penalties imposed for the violation of those laws, it is necessary in a general appraisal to establish some standard which might be used to differentiate between a "felony" and a "misdemeanor." The statistics of the Bureau of the Census referred to in this section, on prisoners in State and Federal prisons and reformatories are based partly upon a standard of length of sentence (any crime, the sentence for which was under 6 months, was considered a misdemeanor) and partly on the nature of the offense, such as disorderly conduct, drunkenness, or vagrancy.

Moreover, not all of the prisons, reformatories, and jails in the United States are included in the reports of the Bureau of the Census since some of them did not report, nor are the statistical periods of the same duration in all instances. For example, the enumeration of prison commitments in 1910 was for the year 1910, while the enumeration for 1923 was for the 6-month period from January 1, 1923, to June 30, 1923.

A controlled, completely accurate compilation of statistics on crime and the immigrant at the present cannot be made. This fact does not, however, preclude using the best evidence available, as long as the limitations are specified.

D. R. Taft noted the inadequacy of the figures on the immigrant and his participation in crime.[93] He pointed out that "if any reader feels such comparisons as are presented below are for these reasons invalid, the writer would not defend them except to say that the Census Bureau uses them, that reputable students have used them with caution, that they are presumably somewhat less faulty when corrected as we attempt to correct them." In this section an attempt has been made to correct commitment figures on the basis of age. A need for such a correction was pointed out as far back as 1923 by the Bureau of the Census: "The population of all ages would be decidedly misleading as a basis of comparison, in connection with statistics of color or race and nativity, because the foreign-born population comprises a much higher percentage of adults than the native population." [94]

There has been no attempt in this section to correct any commitment figure based on nationality or nativity for the relative urbanity of each classification. It has been pointed out in some articles on the subject that urbanity is a factor which contributes to crime. If immigrants of certain nationalities tend to settle in crowded urban areas where crime rates are higher this may be reason for the limitation of the quota allotted to such nationalities.

#### 4. CRIMINALITY AND THE IMMIGRANT

*a. Criminality of the foreign-born*

In this section, data from the Bureau of the Census are presented on the criminality of the foreign-born for the years of the enumeration of prisoners and commitments for the years 1910, 1923, 1933, and 1940. These four enumerations were chosen to give a broader basis

---

[93] D. R. Taft, Nationality and Crime. American Sociological Review, 1:724-736, October 1936.
[94] U. S. Bureau of the Census, Prisoners: 1923 (1926), p. 57.

for the conclusions formed on the strength of the census figures. Data will be presented on the basis of commitments.

The population census of 1910 showed 91,972,266 persons in the United States of whom 13,515,886 were of foreign birth.[97] The native-born white population numbered 68,386,412 and the foreign-born whites 13,345,545, a ratio of about 5.1 to 1.

According to the Bureau of the Census, there were 493,934 commitments of prisoners and juvenile delinquents in 1910. Of these, 382,052 persons were classified as white, 253,929 native-born and 99,639 foreign-born. The remainder were white persons for whom no nativity was reported. Percentagewise, the native-born white population represented 74.4 percent and the foreign-born white 14.5 percent of the total population. Of the total commitments of prisoners and juvenile delinquents for the year 1910, 51.4 percent were native-born whites and 20.1 percent were foreign-born whites. While the native-born white outnumbered the foreign-born white 5.1 to 1 in total population in 1910, the ratio of commitments for that year was only 2.5 to 1. These figures are uncorrected for age.

The age bias in the uncorrected statistics is due to the fact that the ratio of young persons is considerably greater among the native-born than among the foreign-born. To correct for this factor, the under-15-age group was eliminated in the corrected figures.

The population of the United States over the age of 14 numbered 62,473,130 in 1910. Of these, 12,586,199 or 20.1 percent were foreign-born white and 43,429,263 or 69.5 percent were native-born white. Statistics show that 98,925 foreign-born white persons and 247,206 native-born white persons aged 15 or over were committed in 1910.[98] The native-born whites constituted 51 percent of the total while the foreign-born whites comprised 20.4 percent. The age-corrected population ratio is about 3.5 to 1 and the age-corrected commitment ratio remains unchanged at 2.5 to 1. Thus, while there were 3.5 native-born whites to 1 foreign-born white among the total population, only 2.5 native-born whites were committed to 1 foreign-born white, after correction has been made for age.

In a study of the criminal statistics of 1923, two things should be kept in mind. First, the comparison with population statistics is made on the basis of the census of 1920. Second, the commitments for 1923 were fully enumerated only for the first 6 months; the statistics for the rest of the year were estimates, or in some instances, were obtained with the aid of some reporting units that sent in additional statistics to cover the full year.

The total population of the United States in 1920 was 105,710,620. The total population 15 years of age and over was 72,098,178. The total white population in 1920 was 94,820,915 of whom 81,108,161 were native-born white and 13,712,754 were foreign-born white.[99] There were 51,823,903 native-born whites 15 years and over (71.8 percent of the total population 15 years and over) and 13,166,524

---

[97] U. S. Bureau of the Census, Census of 1910, Population, Characteristics of the Population, vol. II, pt. 1, table 4, p. 19.
[98] Bureau of the Census, Prisoners and Juvenile Delinquents in the United States: 1910 (1918), table 125, p. 119.
[99] U. S. Bureau of the Census, Census of 1910, Population Characteristics of the Population, vol. II, pt. 1, table 4, p. 19.