# EXHIBIT Y

## 82 Congressional Record - House, April 25, 1952

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. McCORMACK:

H. R. 7571. A bill to permit and assist Federal personnel, including members of the Armed Forces, and their families, to exercise their voting franchise; to the Committee on House Administration.

By Mr. DAVIS of Georgia:

H. R. 7572. A bill to make it unlawful for any officer in the executive branch of the Government to take or maintain possession and control of any private property except pursuant to statutory authority for such action; to the Committee on the Judiciary.

By Mr. BROWNSON:

H. R. 7573. A bill to provide for the conveyance to the State of Indiana of certain surplus real property situated in Marion County, Ind.; to the Committee on Expenditures in the Executive Departments.

By Mr. CLEMENTE:

H. R. 7574. A bill to amend title 28, United States Code, to require Federal grand and petit jurors to take an oath of allegiance and subscribe to an affidavit, and for other purposes; to the Committee on the Judiciary.

By Mr. HEFFERNAN:

H. R. 7575. A bill to amend the joint resolution of June 22, 1942, as amended, to provide that no flag or pennant of any foreign nation or of any international organization shall be publicly displayed unless displayed with the flag of the United States in the appropriate position of honor; to the Committee on the Judiciary.

By Mr. ROGERS of Colorado:

H. R. 7576. A bill to authorize and direct the Civil Service Commission to make a study of the classification of, and rates of basic compensation payable with respect to, engineering positions in the classified civil service; to the Committee on Post Office and Civil Service.

By Mr. TEAGUE:

H. R. 7577. A bill to regulate the election of delegates representing the District of Columbia to national political conventions, and for other purposes; to the Committee on the District of Columbia.

By Mr. KEOGH:

H. R. 7578. A bill to make the United States Merchant Marine Academy library a public depository for Government publications; to the Committee on House Administration.

By Mr. BETTS:

H. R. 7579. A bill to prohibit the seizure of any private business, professional, commercial, or industrial enterprise by any member of the executive branch of the Government and to provide for equitable remedy for violation of the act; to the Committee on the Judiciary.

By Mr. LOVRE:

H. R. 7580. A bill to modify the general comprehensive plan for flood control in the Missouri River Basin, approved by the act of June 28, 1938, so as to include certain additional projects therein, and for other purposes; to the Committee on Public Works.

By Mr. SITTLER:

H. R. 7581. A bill to regulate the election of delegates representing the District of Columbia to national political conventions, and for other purposes; to the Committee on the District of Columbia.

By Mr. ROSS:

H. J. Res. 433. Joint resolution proposing an amendment to the Constitution of the United States limiting the powers of seizure of the President; to the Committee on the Judiciary.

By Mr. BENNETT of Florida:

H. J. Res. 434. Joint resolution proposing an amendment to the Constitution of the United States providing for nomination of candidates for President and Vice President by popular vote; to the Committee on the Judiciary.

By Mr. COUDERT:

H. J. Res. 435. Joint resolution proposing an amendment to the Constitution of the United States to provide that Federal expenditures shall not exceed Federal revenues, except in time of war or grave national emergency declared by the Congress; to the Committee on the Judiciary.

By Mr. COUDERT (by request):

H. J. Res. 436. Joint resolution declaring the 14th day of June 1952, the one hundred and seventy-fifth anniversary of the adoption of the flag of the United States, to be a legal public holiday, and authorizing the President to issue a proclamation in commemoration thereof; to the Committee on the Judiciary.

By Mr. HALE:

H. J. Res. 437. Joint resolution to authorize the erection of a memorial to Sarah Louisa Rittenhouse in Montrose Park, District of Columbia; to the Committee on House Administration.

By Mr. ELLSWORTH:

H. Res. 609. Resolution requesting the President to furnish to the House full and complete information as to why he did not use his powers under sections 206, 207, 208, 209, and 210 of the Labor Management Relations Act, 1947, for the purpose of bringing about a settlement of the controversy between certain steel companies and certain of their employees; to the Committee on Education and Labor.

By Mr. MILLER of New York:

H. Res. 610. Resolution to investigate the seizure of the steel industry; to the Committee on Rules.

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. ALLEN of California (by request):

H. R. 7582. A bill for the relief of Chuan Hua Lowe and Slen-ung Lowe; to the Committee on the Judiciary.

By Mr. ANDERSON of California:

H. R. 7583. A bill for the relief of certain Pakistani seamen; to the Committee on the Judiciary.

By Mr. BRYSON:

H. R. 7584. A bill for the relief of John Franklin Chandler; to the Committee on the Judiciary.

By Mr. FINE:

H. R. 7585. A bill for the relief of Dr. Matilda Adata and Mrs. Suhula Adata; to the Committee on the Judiciary.

By Mr. LEONARD W. HALL:

H. R. 7586. A bill for the relief of Giovanni Michael Marra; to the Committee on the Judiciary.

By Mr. HOLMES (by request):

H. R. 7587. A bill authorizing the Secretary of the Interior to issue a patent in fee to Joseph Peters and Marie Peters; to the Committee on Interior and Insular Affairs.

By Mr. RAMSAY:

H. R. 7588. A bill for the relief of Chiyoko Miura; to the Committee on the Judiciary.

By Mr. ROGERS of Colorado:

H. R. 7589. A bill for the relief of the Denver Live Stock Exchange; to the Committee on the Judiciary.

By Mr. SADLAK:

H. R. 7590. A bill for the relief of Miwa Sugaya and her daughter; to the Committee on the Judiciary.

By Mr. SHAFER:

H. R. 7591. A bill for the relief of Michel J. Constantinidis; to the Committee on the Judiciary.

## PETITIONS, ETC.

Under clause 1 of rule XXII,

684. Mr. COLE of New York presented a petition of Mrs. Rose W. Baker, and other citizens, of Canisteo and Hornell, N. Y., and Mrs. T. B. Wheeler and citizens of Waverly, N. Y., to report H. R. 2188 out of the Interstate and Foreign Commerce Committee, which was referred to the Committee on Interstate and Foreign Commerce.

---

# HOUSE OF REPRESENTATIVES

Friday, April 25, 1952

The House met at 12 o'clock noon.

The Chaplain, Rev. Bernard Braskamp, D. D., offered the following prayer:

O Thou whose infinite grace is sufficient for all our temporal needs and eternal longings, we pray that we may have a greater sense of Thy divine providence and loving kindness.

God forbid that we should ever be numbered among those who are cynically saying that Thou hast forsaken humanity and art not good enough to care and not great enough to prevent the world's tragedies and tribulations.

Help us to see more clearly that when these ills and troubles occur in the social order it is because man, in his selfishness, stupidity, and shortsightedness is the guilty party.

Grant that we may never murmur or complain, but may we understand that Thou hast placed at our disposal every needed blessing.

May it be the goal of all our aspirations to enshrine and enthrone the Christlike spirit in our minds and hearts and to obey Thy holy will gladly and faithfully.

Hear us in His name. Amen.

The Journal of the proceedings of yesterday was read and approved.

## MESSAGE FROM THE SENATE

A message from the Senate, by Mr. Landers, its enrolling clerk, announced that the Senate had passed a bill of the following title, in which the concurrence of the House is requested:

S. 2639. An act to amend the Railroad Unemployment Insurance Act.

## SPECIAL ORDERS GRANTED

Mr. HOFFMAN of Michigan asked and was given permission to address the House for 10 minutes today, following any other special orders heretofore entered.

Mr. AUGUST H. ANDRESEN asked and was given permission to address the House for 15 minutes today, following the special orders heretofore entered.

## PROGRAM FOR WEEK OF APRIL 28

Mr. MARTIN of Massachusetts. Mr. Speaker, I ask unanimous consent to proceed for 1 minute to inquire of the majority leader as to the program for next week.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Case: 1:21-cr-00665 Document #: 30-4 Filed: 05/02/22 Page 3 of 27 PageID #:743

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

Mr. McCORMACK. After the disposition of the immigration bill, which I assume will be disposed of today, the program for next week is as follows:

Monday: H. R. 6839, the postal service property lease-purchase bill; and H. R. 4323, Federal Property and Administrative Services Act, lease-purchase agreements. I understand they are trying to work out a couple of amendments in connection with those bills.

Tuesday is primary day in Massachusetts. On Tuesday, Wednesday, Thursday, and Friday the following bills will be considered: The agricultural appropriation bill, to be followed by the legislative appropriation bill; then if there is any time left next week for general debate, H. R. 5767, to amend the law relating to Fair Trade Practices, will be considered.

Mr. MARTIN of Massachusetts. I understand there will be general debate on the agricultural appropriation bill next week?

Mr. McCORMACK. Yes. A committee appointed by the Speaker to visit the Coast Guard Academy will make their visit on Friday next. This is the matter I discussed with the gentleman from Massachusetts over the telephone. There will be no roll calls on that day, but I would not expect any on that particular day because I assume that the agricultural appropriation bill and the legislative bill will be completed by Thursday or Friday of next week.

Mr. HALLECK. Mr. Speaker, will the gentleman yield?

Mr. MARTIN of Massachusetts. I yield to the gentleman from Indiana.

Mr. HALLECK. Of course, week after next is quite a ways off.

Mr. McCORMACK. The gentleman and I had a discussion yesterday on that and I made a memorandum of the discussion. I have that distinctly in mind because there are primaries on both May 5 and 6.

Mr. HALLECK. There will be primaries on May 5 and 6. Now, it takes a little while to get back from out there. The gentleman made reference to general debate on the fair-trade bill the latter part of the coming week. That could result in action on that bill coming early the following week. It is a very important measure.

Mr. McCORMACK. I am sure that the Members can rely on the gentleman from Massachusetts [Mr. MARTIN], the gentleman from Massachusetts [Mr. McCORMACK], and also the gentleman from Indiana [Mr. HALLECK] to protect the rights of Members who are away in connection with primary activities in their own States.

Mr. CELLER. Mr. Speaker, will the gentleman yield?

Mr. MARTIN of Massachusetts. I yield to the gentleman from New York.

Mr. CELLER. May I say to the gentleman that the so-called fair-trade bill, if it comes up the latter part of next week, might find a great many absentees. That bill is a very intricate one although it may not be a bill of great length. I think it needs very mature explaining and general debate would be of paramount interest for the membership to hear. I wonder whether the gentleman could not change his plans so that that bill could be called up the following week.

Mr. McCORMACK. The gentleman from Massachusetts is in a position, with all due respect to my friend from New York and to some of my other good friends, where some people interested in this legislation are improperly but honestly of the impression that there is a deliberate attempt to withhold programing the bill. Certainly, there is no such intent at all and I am programing it just as quickly as I can. Let me also remind the gentleman that the problems of the leadership in programing these things are not very easy. I try to please as far as is humanly possible everyone, but back of this bill I may say there is the Marine Corps bill that many Members are anxious to bring up. That is not being withheld either. It is a question of either the Marine Corps bill or this bill. The Marine Corps bill will come up just as soon as possible, probably week after next, just as soon as is humanly possible. This bill is programed and I feel that under the circumstances there is nothing else that can be done.

Mr. CELLER. I want to make one observation. I am sure the gentleman will not be cowed by any accusations that might be made in reference to a particular bill. The gentleman is not that type.

Mr. McCORMACK. Well, I am human, you know.

Mr. CELLER. Secondly, I want to state that the Committee on the Judiciary this week has been engaged on two important bills. Now you are scheduling another very important bill for next week. This means that we have to get all the members of the committee present and on the floor, and I do hope that the gentleman will keep that in mind.

Mr. MARTIN of Massachusetts. I thought the Judiciary Committee members were always on the floor.

Mr. CELLER. We hope that that will be the case, but that is not always the case.

Mr. McCORMACK. Might I say that I know of no chairman who cooperates more effectively and courageously than the gentleman from New York [Mr. CELLER], and I know, having expressed himself, that he will cooperate with the program announced by the leadership.

The SPEAKER. The time of the gentleman from Massachusetts has expired.

## CALENDAR WEDNESDAY

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent that the business in order on Calendar Wednesday of next week be dispensed with.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

## REVISION OF LAWS RELATING TO IMMIGRATION, NATURALIZATION, AND NATIONALITY

Mr. CELLER. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H. R. 5678) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill H. R. 5678, with Mr. HOLIFIELD in the chair.

The Clerk read the title of the bill.

Mr. WALTER. Mr. Chairman, there are three committee amendments undisposed of which have to do with correcting typographical errors. I ask unanimous consent that they be considered en bloc.

The CHAIRMAN. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

The CHAIRMAN. The Clerk will report the committee amendments.

The Clerk read as follows:

Committee amendments:
Page 10, strike out "Swain" and insert "Swains."
Page 63, line 22, strike out "or" and insert "(12), (14), (15), or (16)."
Page 63, line 23, after (a) insert "or under the act of May 10, 1920, as amended."
Page 65, line 8, strike out "or" and insert "(12), (14), (15), or (16)."
Page 65, line 9, after (a) insert "or under the act of May 10, 1920, as amended."

The committee amendments were agreed to.

Mr. GRAHAM. Mr. Chairman, I move to strike out the last word for the purpose of inquiring of the gentleman from Pennsylvania, the chairman of the subcommittee [Mr. WALTER], relative to the following subject:

Several religious groups have approached me regarding section 337 (a) of the bill—page 133—which has to do with the oath of allegiance to be taken in open court by aliens who apply to be admitted to United States citizenship.

These groups are concerned with the wording of the oath regarding the pledge to bear arms on behalf of the United States and they want to be assured that a bona fide conscientious objector would not be forced to violate his convictions by agreeing to bear arms and that he might be permitted to perform noncombatant service or to perform work of national importance under civilian direction when required by the law.

Is the gentleman from Pennsylvania [Mr. WALTER] satisfied that the wording of the oath would permit conscientious objectors to take that citizenship oath without mental reservation or without violation of their religious beliefs?

Mr. WALTER. Yes. There is no question about that. If the gentleman will examine the language in section 337 (a) (5) he will find that in the oath the disjunctive "or" is used, so that the oath

provides, "to bear arms on behalf of the United States when required by the law, or to perform noncombatant service in the Armed Forces of the United States when required by the law, or to perform work of national importance under civilian direction when required by the law."

In other words, the naturalized alien is subject to the same requirements as the native-born citizen is under the Selective Service Act. In this the language differs from that of the Senate bill, where the conjunctive "and" is used instead of "or."

Mr. GRAHAM. With that exception, it is the same as the Senate bill in that respect?

Mr. WALTER. It is not the same, because the Senate bill uses the conjunctive "and."

Mr. GRAHAM. I say, with that exception.

Mr. WALTER. With that exception the language is the same. I discussed this section with representatives of the Quakers and the Mennonites, and I am certain they are satisfied with the language in the House bill.

Mr. GRAHAM. May I say that they are the same group that approached me, the Amish, the Mennonites, and the Quakers.

The CHAIRMAN. Are there further amendments at this time?

Mr. MULTER. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. MULTER:
On page 36, in subsection 212 (e), strike out "Whenever" and insert in lieu thereof: "When the United States is at war or during the existence of a national emergency proclaimed by the President and."
Add at the end of section 212 a new subsection as follows:
"(f) When the United States is at war or during the existence of a national emergency proclaimed by the President, and the President finds that the entry of any aliens or of any class of aliens into the United States would promote the interests of the United States, or is necessary to provide sanctuary to persecuted aliens or any class of aliens and would not be contrary to the best interests of the United States, he may by proclamation, and for such period as he shall deem desirable, suspend such restrictions on the entry of aliens for temporary residence as he may deem appropriate."

Mr. CELLER. Mr. Chairman, I wonder if we can get some agreement by unanimous consent for the ensuing legislative period of the time that there be 10 minutes allotted to each amendment, 5 minutes on a side.

Mr. WALTER. Reserving the right to object, Mr. Chairman, how many amendments are on the Clerk's desk?

The CHAIRMAN. The Chair is informed that there are 16 amendments now at the Clerk's desk.

Mr. WALTER. Mr. Chairman, I ask unanimous consent that all debate on the bill and all amendments thereto close at 1:30, with the last 10 minutes to be reserved to the committee.

Mr. HOFFMAN of Michigan. I object, Mr. Chairman.

Mr. WALTER. I withdraw the request, Mr. Chairman.

Mr. MULTER. Mr. Chairman, I hope the distinguished Committee on the Judiciary can see its way clear to accept this amendment. It is quite simple in its terms and in what it seeks to effectuate.

As the bill is presented, we find a provision at page 36, section 212, subdivision (e) which provides that at any time the President finds the entry of any aliens or class of aliens would be detrimental to the interests of the United States he may by proclamation suspend the entry of those aliens. The first part of my amendment simply provides that instead of being able to do that at any time, the President may make a proclamation and effectuate such a suspension only in the event of a national emergency, or a state of war. That is the first part. The second part of the amendment provides again when the United States is at war, or during the existence of a national emergency as proclaimed by the President, when the President finds the entry of any alien or class of aliens would promote the interest of the United States, or is necessary to provide sanctuary to persecuted aliens or a class of aliens, and would not be contrary to the best interests of the United States, he may by proclamation, and for such period as he shall deem desirable, suspend such restrictions on the entry of aliens for temporary residence as he may deem appropriate. You will note it refers to the entry of aliens for temporary residence and not for permanent residence. That, I think is in accordance with the best traditions of this country to afford sanctuary and a place of refuge to persons being persecuted for political reasons, or during time of war when people that we would be able to use in the best interest of the security of this country should be let in for temporary residence.

Mr. HALLECK. Mr. Chairman, will the gentleman yield?

Mr. MULTER. I yield.

Mr. HALLECK. Of course, the gentleman knows that I voted for the Displaced Persons Act.

Mr. MULTER. Yes.

Mr. HALLECK. But, would not the effect of an amendment, if adopted, vest in the President and put into operation a direct counterpart of the Displaced Persons Act without any action by the Congress?

Mr. MULTER. It would, but only at certain times for limited periods.

Mr. HALLECK. Yes, it would, even though at certain times.

Mr. MULTER. One is during wartime, and two if there is a national emergency, and then only for limited periods of time, and then again only for temporary residence. It would not be for permanent residence nor would he be permitted to do it for too long a time. If it is too long, the Congress can always step in and say no, and let it run for not more than 30 or 60 days or whatever the period may be. We, in the Congress, can decide what is an appropriate time. Mr. Chairman, I urge the adoption of the amendment.

Mr. WALTER. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, I think the argument advanced by the gentleman from New York is as inconsistent as it can possibly be. In the first place, he argues that the President should not have the power to exclude; then in the same breath he urges that we give the President the power to admit. We believe that this language "whenever the President finds that the entry of any aliens or class of aliens in the United States would be detrimental to the interests of the United States" is absolutely essential because when there is an outbreak of an epidemic in some country, whence these people are coming, it is impossible for Congress to act. People might conceivably in large numbers come to the United States and bring all sorts of communicable diseases with them. More than that, suppose we have a period of great unemployment? In the judgment of the committee, it is advisable at such times to permit the President to say that for a certain time we are not going to aggravate that situation.

Mr. JENKINS. Mr. Chairman, will the gentleman yield?

Mr. WALTER. I yield.

Mr. JENKINS. This is the same provision in principle, which found itself before the Committee on Ways and Means 10 years ago under the guise of allowing people to come in on a limited head tax, the idea being to let the President have the power to bring in whomever he pleases and put out whomever he pleases, but nobody ever went out. If we fall for it, we will be just gullible.

Mr. WALTER. Mr. Chairman, I hope that the amendment is rejected.

Mr. CELLER. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, I rise simply to give an expression of opinion as to the first part of this amendment. Under the bill, as proposed, the President is given an untrammeled right, an uninhibited right to suspend immigration entirely. That is very broad power. There is no restriction upon his power. There is no statement that as a condition precedent for the exercise of such power there has to be a state of national emergency, either declared by the Congress or by the President himself. A state of war is not needed. He can simply, by flat, by a stroke of the pen, say, "There shall be no immigration into this land of ours." That is what I call, and our founding fathers have always called, government by man, not government by law.

I am firmly of the conviction, despite my high regard for the office of President of the United States, despite my high regard for the present incumbent of that high office, that the President of the United States should not have such tremendous power, summarily to cut off immigration on any kind of grounds that might actuate him. I think the first part of the amendment is a worth-while amendment and warrants favorable action by this committee.

Mr. HALLECK. Mr. Chairman, will the gentleman yield?

Mr. CELLER. I yield to the gentleman from Indiana.

Mr. HALLECK. I take it that the gentleman would not be concerned if he were sure he would always have a President that could not do any wrong.

Mr. CELLER. I should like to have a situation develop where we would have a President who could not do any wrong anytime regardless of his party affiliation. However, I think the gentleman from Indiana has been greatly concerned about the actions of the present incumbent at the White House because of what the gentleman did recently. I am sure he would want some curbs placed upon his power as that power was recently exercised. If those curbs were placed upon his power, then the gentleman would not have vociferously argued against certain actions of the President. I think the point of view of the gentleman from Indiana is very inconsistent. I am on his side, as it were, on the principle, when I say that there should be some limitation upon the President's power to exercise the right, summarily, to say, "No immigrants shall hereafter enter the country," for any period that he may see fit. If I remember correctly, there is no limitation upon his power. He may do it for his entire tenure of office. That is, he may do it for 4 years or for 8 years. I think you are giving to the President a blank check, and he can fill in the details as he will.

I am particularly appealing to those ladies and gentlemen on the other side not to do what you have said the President should not be permitted to do; that is, to exercise unlimited power on any subject.

The CHAIRMAN. The time of the gentleman from New York has expired.

Mr. HOFFMAN of Michigan. Mr. Chairman, I rise in opposition to the amendment, and I ask unanimous consent to revise and extend my remarks and to include certain newspaper articles which I secured permission in the House to include.

The CHAIRMAN. Is there objection to the request of the gentleman from Michigan?

There was no objection.

Mr. HOFFMAN of Michigan. Mr. Chairman, I would like very much to go along with this amendment, but it gives altogether too wide power to the President. If I could get through this House and the Senate a bill and through the House a resolution both of which I am introducing today, I would not be quite so fearful.

The bill reads as follows:

A bill to promote confidence in Presidential statements

*Be it enacted, etc.—*

FINDINGS

SECTION 1. The Congress hereby finds that there is a lack of confidence in the accuracy of some important statements made by the President of the United States.

The Congress further finds that, in addition to other statements, the accuracy of which are open to question, the President recently made a statement which, in substance, was to the effect that if the Congress did not make appropriation of the sums named by him and which he deemed necessary for the public welfare and for national defense, he would, if Congress adjourned without making such appropriation, recall it and keep it in session until it did appro-

priate the funds he deemed necessary for those purposes.

The Congress further finds that it is currently reported in the press that on April 24, the President made a statement that, either in 1945 or 1946 he issued an ultimatum to Stalin which had never been published and which demanded that unless, within a certain day named, Stalin withdrew Russian troops from Iran, American troops would be moved into that country.

And the Congress further finds that the accuracy of that statement has been challenged by a White House spokesman and a former Secretary of State.

DECLARATION OF POLICY

SEC. 2. It is therefore hereby declared to be the policy of the United States to minimize and, if possible, to eliminate such lack of confidence.

SEC. 3. There is hereby created, in the Executive Department, the office of Advisory Censor to the President of the United States.

SEC. 4. Such Advisory Censor shall be appointed by the President and shall hold office during the pleasure of the President, but no longer than the existing term of office of the President; he shall be responsible only to the President and shall receive such compensation, not exceeding thirty thousand dollars ($30,000) per annum as may be fixed by the President.

SEC. 5. It shall be the duty of the Advisory Censor to consult with the President on public statements about to be made by the President which may affect the national welfare or the security of the Republic and to advise the President as to the accuracy, that is, as to the truth or the falsity, of such statements as the President may contemplate making to the public or the press.

You will note that the bill calls for the creation of the Office of Advisory Censor to the President, to be appointed by the President, to hold office at his discretion, to be paid a sum to be fixed by the President at not more than $30,000 per annum; and the duty of the Advisory Censor is to advise the President as to the accuracy or inaccuracy of statements which he may contemplate making and which, if made, may endanger the foreign policy of our country and impair the welfare of our people.

The resolution, which is being introduced, provides for the appointment of a committee by the Speaker. That resolution reads as follows:

RESOLUTION

Whereas the press has recently carried a statement to the effect that President Truman declared that unless the Congress appropriated the sums which he deemed necessary for national defense before adjournment he would recall the Congress and cause it to remain in session until it did appropriate such sums; and

Whereas the President has no authority whatever which would enable him to dictate to the individual Members of Congress what sums they should appropriate for any purpose; and

Whereas the press also carried a story to the effect that the President recently stated that in 1945 or 1946 he issued an ultimatum to Russian Premier Stalin warning Russia to get her troops out of Iran and that unless Russian troops were removed from Iran by a certain named day American troops would move into Iran; and

Whereas later the accuracy of such statement was challenged by a Presidential spokesman; and

Whereas the foregoing statements attributed to the President and some other statements which the press alleges he has

made may have affected the public welfare and our international relations; and

Whereas it is essential to the welfare of the people and the security of the Republic that the people of this country and of other nations have confidence in the accuracy of statements made by our beloved President: Now, therefore, be it

*Resolved,* That a special committee of five Members of the House of Representatives be appointed by the Speaker, and that said committee be authorized and directed to meet forthwith and to make such studies, investigations, and to hold such hearings as may be necessary to ascertain the accuracy of statements alleged by the press to have been made by the President, the reason for the making of such statements, and what, if anything the Congress may do to correct any false impression which may have been created by the making and/or the denial of the accuracy of such statements.

For the carrying out of the purposes above indicated, the said committee is hereby authorized to sit and act during the present Congress at such times and places within the District of Columbia, whether the House is in session, has recessed, or has adjourned, to hold such hearings and to require by subpena or otherwise the attendance and testimony of such witnesses and production of such books, records, correspondence, memoranda, papers, and documents as it deems necessary. Subpenas may be issued over the signature of the chairman of the committee or any member of the committee designated by him and may be served by any person designated by such chairman or member. The chairman of the committee or any member thereof may administer oaths to witnesses.

The said committee shall report to the House of Representatives prior to the 1st day of June, next, the results of their studies, investigations, and hearings, with such recommendations for legislation or otherwise as the committee deems necessary.

It will be noted that the resolution calls attention to the President's recent statement that unless the Congress appropriated the sums which he named as essential for national defense, he would keep the House in session until it complied with his will. To my mind that statement indicates either that the President has become so egotistical that he does not realize some of the facts of life, or there must be something wrong with his mentality.

If we are to continue as a republic one thing our people must have is confidence in the statements of the Chief Executive, especially when he makes statements involving the foreign policy or the integrity of the Congress itself.

Mr. HINSHAW. Mr. Chairman, will the gentleman yield?

Mr. HOFFMAN of Michigan. I yield.

Mr. HINSHAW. Has the gentleman read the news ticker out here in the last few minutes?

Mr. HOFFMAN of Michigan. I have not read the news ticker within the last 5 minutes. What has the gentleman learned?

Mr. HINSHAW. That one Mr. Baldridge is reported in his argument before the Court as asserting that the powers of the legislative and judicial branches of the Government are limited by the Constitution, but the President is not.

Mr. HOFFMAN of Michigan. Who is the gentleman who said that?

Mr. HINSHAW. Mr. Baldridge, who is arguing this steel case.

Mr. HOFFMAN of Michigan. Is he an authority?

Mr. HINSHAW. He is presenting the case before the district court for the Attorney General.

Mr. HOFFMAN of Michigan. I remember when somebody from the Attorney General's office made the statement that while it used to be the duty of the Department of Justice to interpret the laws, or to give effect to the laws as the Congress intended, that more recently it had become the purpose of the office to interpret the laws to enable the President to do the things the Executive wanted done.

Mr. HINSHAW. I recommend that the gentleman read the news ticker out there and then come back and make another speech.

Mr. HOFFMAN of Michigan. I can only add that the gentleman, whoever he may be, who is contending that the President has authority to seize the steel plants and who said—if he did say—that the Constitution, while it may restrict the powers of the legislative and judicial branch, does not in any way limit the power of the President or the executive branch, has failed either to read or to understand the Constitution. The Constitution is no more than a grant of powers to the legislative, the judicial, and executive departments. As was pointed out by me within the week and as everyone who ever read that document will insist, the President has no authority whatever except as he derives it from the Constitution.

Mr. MASON. Mr. Chairman, will the gentleman yield?

Mr. HOFFMAN of Michigan. I yield.

Mr. MASON. Do I understand that the gentleman is proposing to establish a new office to cost $25,000 or $30,000, the incumbent to advise or censor, or whatever it may be, the President?

Mr. HOFFMAN of Michigan. No, no; not to censor the President; an advisory censor to tell the President whether the statements which he intends to make and which might impair the welfare of our people or embroil us in the affairs of other nations are in accord with the facts, before he makes a statement. Then it would not be necessary for somebody in his own office to come back and tell him in the presence of the press or at another press conference that what the President said yesterday or just a few hours before was not true.

Mr. MASON. Why was not that done in the first place?

Mr. HOFFMAN of Michigan. Well, we know about the cherry tree. So it was not needed at that time.

Permit me to repeat my argument that before we admit additional millions of aliens we attempt to restore the confidence of our people in our President by adopting the bill and resolution now offered.

STATEMENT IN SUPPORT OF BILL AND RESOLUTION

In support of the bill entitled "A bill to promote confidence in Presidential statements," and of the resolution calling for the appointment of a special committee to investigate recent statements alleged to have been made by the President, both of which will be introduced today, permit me to state:

While the Declaration of Independence, the Constitution, and the Bill of Rights are the written foundation upon which our welfare, our freedom and the security of our Republic rests; of almost equal importance is the necessity of having as President a man in whose statements the people have confidence. If a President makes inaccurate statements which adversely affect the public welfare or the security of the Republic, the people lose confidence in him and our whole economic system as well as the security of the Republic are endangered.

It is currently reported by the public press that recently the President made the two statements referred to in the resolution which will now be introduced and copies of which follow the statement.

The making of the first statement, that is, the one to the effect that the President would continue the Congress in session until he obtained the legislation which he demanded, has not been denied.

It is obvious that the President has no authority, nor has he the physical power to force the Members of Congress to cast their votes for or against on any measure as he may dictate.

The making of such a statement indicates that the President was either being facetious—and there is no excuse for the making of a facetious statement referring to the constitutional duty of the people's representatives or reflecting upon the integrity of the Congress, or that his egotism renders him incapable of making accurate statements; or, that his mental faculties have become impaired.

When the President stated, in substance, that he had, either in 1945 or 1946 issued an ultimatum to Premier Joe Stalin requiring the withdrawal of Russian troops from Iran before a certain designated day and added that unless such troops were withdrawn, United States troops would be sent to Iran, the President intimated that he, without the authority of Congress, could declare war. His statement further tended to create discord in our relationship with foreign nations, and, in some degree at least, create a situation where war might be imminent.

In support of the bill and resolution to which reference has been made, I read from an article in this morning's Times-Herald, written by Laurence Burd; and also from an article published on the first page of last night's Evening Star, as well as from the News, and the recent comment of David Lawrence on the same subject of the President's lack of truthfulness:

[From the Washington Times-Herald of April 25, 1952]

AIDE RETRACTS TRUMAN TALE OF ULTIMATUM

(By Laurence Burd)

President Truman yesterday defended his seizure of the steel mills as an emergency step to back up this country's global struggle against Communist aggression.

At a news conference, where he made remarks some of which were later modified by the White House, Mr. Truman drew a parallel between the steel seizure and previous actions by his administration to meet Communist threats against Iran, Trieste, Korea, and Western Europe.

MENTIONS IRAN ULTIMATUM

The President said there has been a lot of hooey spoken about his seizure of the steel mills and about the possibility of his claiming power to seize the press and radio. He said his steel action was an emergency one, and that the thought of taking over newspapers and radio had never occurred to him.

Mr. Truman in an opening statement reviewing these past actions created a temporary sensation by saying that in 1945 he had sent a secret ultimatum to Russian Premier Stalin warning Russia to get her troops out of Iran. Under questioning the President said the ultimatum named a certain day by which the withdrawal must be made or else American troops would move into Iran.

The President told newsmen that his ultimatum to Stalin had never been published and that he would not release it at this time.

NO ULTIMATUM, SAYS AIDE

Two hours later, however, the White House said that no ultimatum as far as it knew, had been sent by Mr. Truman to Stalin.

Assistant Presidential Press Secretary Roger Tubby told newsmen that Mr. Truman had been referring to this country's leadership in 1946 (instead of 1945) in urging the withdrawal of Soviet troops from Iran.

Tubby said a "strong note" was sent by this Government to Russia through regular channels March 6, 1946, making our position "perfectly plain" as to Iran. The note, signed by State Secretary Byrnes, was published March 7. The Russians withdrew from Iran in May 1946, Tubby noted. He said there was no trace of any other note that Mr. Truman might have had in mind.

Asked about the President's reference to an ultimatum setting a deadline for Russia's withdrawal, Tubby said the President may have had in mind the March 2, 1946, date cited in the note as the time by which Russia had agreed to get out of Iran.

MORE CLARIFICATION

Tubby also clarified Mr. Truman's press conference remarks about Trieste. Mr. Truman had said that in 1946, according to his memory, Yugoslavia threatened to move into Trieste, and that he ordered the Mediterranean Fleet into that area and had General Eisenhower move three American divisions into northern Italy. After that, he said, there was no Yugoslav march on Trieste.

Tubby said the Trieste maneuver came in the spring of 1945 rather than 1946. Tubby explained that Yugoslavia had occupied Trieste for 40 days starting in April, and had withdrawn in May after the United States and Britain demanded the evacuation and American troops were alerted to move in, if necessary.

DEFENDS IGNORING TAFT-HARTLEY LAW

Under news conference questioning about his defense of the steel seizure, Mr. Truman said the move in the House to impeach him was a political proposition. He said Congress has a right to take the action if it wants to, but that he has a pretty good defense.

The President said he had twice asked Congress for advice on how to meet the steel question, but that all the advice he got was that he had done wrong and ought to be impeached.

Asked why he did not invoke the Taft-Hartley law to postpone a steel strike for 80 days, Mr. Truman replied that the union had already postponed a scheduled steel strike for 99 days at his request, and that it would have been unfair to ask them to put it off another 80 days.

He said there has been a lot of hooey the last few days about seizure of the steel mills and proposals to seize newspapers and radio stations.

Mr. Truman declared that he has been thoroughly misquoted regarding what was said about any Government action toward newspapers or radio stations.

He said that he never stated that he had any intention of seizing newspapers or radio stations, and never made even such an implication.

Furthermore, he said he had never even thought of such a thing in relation to a question asked him at last week's news conference which was attended by several hundred newspaper editors.

He declared the reason for the steel seizure was because the United States is in the midst of one of the greatest emergencies the country has ever faced.

### DENIES ULTIMATUM

UNITED NATIONS, New York, April 24.— Former Secretary of State Byrnes said today there never were any ultimatums issued either outside or inside the United Nations in dealing with Russian troops in Iran, or with Yugoslavia on Trieste.

The Governor of South Carolina made the comment by telephone when questioned about President Truman's controversial news conference earlier in the day.

Byrnes said the closest the United States ever came to an ultimatum was to warn the Russians that it would support Iran's complaint to the U. N. if the Red army remained in Iran in violation of the Tehran agreement.

The governor said:

"This action I took with the full support of the President."

---

[From the Washington Evening Star of April 24, 1952]

TRUMAN LIKENS STEEL SEIZURE TO ACTION ON IRAN—CORRECTION IS ISSUED AFTER HE TELLS OF "ULTIMATUM" TO STALIN

(By Joseph A. Fox)

President Truman said today he sent an ultimatum to Premier Stalin in 1945 or in 1946 and forced the withdrawal of Soviet forces from Iran. But the White House later issued a statement saying that the President actually had addressed no ultimatum to the Russian leader and that his comment referred to a State Department message dispatched on March 6, 1946.

In attempting to straighten out a mix-up, the White House statement also said the note had been made public at the time of its dispatch through the State Department, President Truman had told reporters at his news conference they were hearing some hitherto undisclosed history.

The news conference statement was made as he was defending his course in seizing the steel industry and as he told of other instances where he had taken action to cope with emergencies.

### TERMS STEEL TALK "HOOEY"

The President prefaced his news conference with the statement that there had been a lot of hooey in talk about the steel seizure. He said this also applied to what some members of the American Society of Newspaper Editors thought was assertion of his powers to seize press and radio at a news conference a week ago.

The later White House statement also said that the President's comment about halting a threatened march by Marshall Tito's Yugoslavian forces actually related to a demand by the United Kingdom and the United States on the Yugoslavs to terminate their occupation of Trieste in May 1945.

The President had told reporters he did not remember whether it was 1945 or 1946 that he had directed the ultimatum to Stalin. Nearly 2 hours after the press conference had ended, Roger Tubby, assistant press secretary, called reporters to his office and said a question had arisen as to the President's use of the word "ultimatum," and then he added:

"The President was using the term in a nontechnical, layman's sense, referring to United States leadership in the United Na-

tions—particularly the Security Council—and through diplomatic channels in the spring of 1946, which was a major factor in bringing about the Soviet withdrawal from Iran."

### TELLS OF 1946 ROLE

Mr. Tubby then explained a note from the United States to the Soviet Government was forwarded on March 6, 1946, "making our position perfectly plain with respect to the situation in Iran."

The trouble was occasioned by Russia's refusal to get wartime forces out of Iran and instead setting up a puppet regime in the northern part of the oil-rich country.

Mr. Tubby said that the note was published on March 7 and "as you probably recall, the Russians then withdrew their troops from Iran in May 1946."

Mr. Tubby said he thought the President had in mind, speaking of ultimatum, the note that this country had sent to Russia, plus other action taken in conjunction with our allies.

Mr. Tubby also said that the President's reference to a certain date by which Russia was told to get out of Iran or face action by the United States actually had reference to the dead line for evacuation of Iran by foreign troops which had earlier been agreed to. Under an Allied agreement to which Russia was a party, Allied forces were to be removed within 6 months after the war.

"Did the President send a personal message to Stalin asking him to get out on a certain date?" a reporter asked.

"I don't believe he did," Mr. Tubby said.

Mr. Tubby said that "as my understanding," when he was asked: "The President has not given us anything at this press conference that has not been published?"

### ARMED STRENGTH CITED

In his news conference discussion, Mr. Truman had said the Russian leader complied, because at that time the United States had Army and Navy forces on hand to back up the demand.

Mr. Truman also asserted that on one occasion Marshal Tito had been warned against a threatened march on Trieste. The President said he ordered the Mediterranean Fleet into that area and there was no march.

While he refused pointedly to deny any claim to power to seize press and radio, the President said he had never had any idea of seizing either press or radio and he conceded that would be a very difficult industry for the Government to run.

Mr. Truman also cited examples in history of other Presidents acting boldly in emergencies. He mentioned Jefferson's Louisiana Purchase, Tyler's annexation of Texas and the purchase of Alaska in the Johnson administration.

The President's dissertation on the powers of his office followed a reference to his news conference a week ago in which members of the American Society of Newspaper Editors participated.

### SAME INHERENT POWERS

At that time he was asked if the same inherent powers he said he was exercising in taking over steel, also could be used to take over press and radio.

His response left many of the audience with the impression he was claiming such power.

Starting today's news conference, he read a brief statement in which he declared that there had been a lot of hooey about Presidential seizure of press and radio after last week's conference.

He added that the President of the United States has great inherent power to meet great emergencies, but until such an emergency arises these powers cannot be defined.

Quietly then, the President continued that the threat of a steel shut-down confronted this country with one of the greatest emergencies in its history.

### OTHER EMERGENCIES RECALLED

Then he began to relate other emergencies the country has faced in his nearly 7 years in office.

In 1945, he said (later he explained it might have been 1946) he sent an ultimatum to the Soviet Union to get out of Iran—which he called Persia.

The Soviet got out, he said grimly, because this Government was in a position to enforce its demands.

A little later he amplified that we had an Army and Navy that was mobilized—and that is what we are trying to get now, not for aggression, but for peace.

Mr. Truman said the ultimatum was contained in a message directly to Premier Stalin and set a date to get his forces out of Iran.

The President was asked if he could cite some instances where Presidents exercised unusual powers in an emergency.

He responded that the reporters should read history and he commented that when these powers had been exercised the country had not been hurt.

### JEFFERSON'S PURCHASE RECALLED

Citing instances where his predecessors had taken unusual action, the President said Jefferson had spent $15,000,000 for the greatest addition ever made to this country.

Then he said Tyler agreed to the annexation of Texas.

He recalled that James K. Polk was responsible for the annexation of territory second only to the Louisiana purchase.

The annexation of California was in Polk's time.

Then Mr. Truman said there was a Secretary of State named Seward responsible for the purchase of Alaska.

Recalling that this territory was described as "Seward's ice box," Mr. Truman said that he imagines the assets there today are a thousand times the sum paid for the territory.

Lincoln, Mr. Truman said, exercised great powers to meet emergencies and so did Roosevelt.

Mr. Truman said he wasn't lecturing but he wanted to tell the reporters some of the interesting things that had happened.

### [From the Washington Daily News]
### THE PRESIDENT'S HASTY WORDS

When a President speaks on matters of grave importance, his words carry the weight of gospel. The world listens.

When a President does not, then, literally speak gospel, he creates alarm, confusion, embarrassment for himself and his country, and possibly serious international complications.

Mr. Truman told his press conference yesterday that in 1945 he had sent Stalin an ultimatum to get Russian troops out of Iran by a fixed date. And, he said, they got out. He said this news never before had been published.

Two hours later, the White House press secretaries called reporters and corrected the President's statements. They said that actually what happened was that the State Department sent a note to Russia. It was not a direct message from Mr. Truman to Stalin. They said the incident occurred in 1946, not 1945, and that the note was published the day after it was sent.

The White House press secretaries also explained that Russian troops were withdrawn from Iran under terms of an earlier Allied agreement.

Now, the White House press conference is an intelligent, useful, democratic institution—standard to American procedure. It is the American public's most direct contact with its President—something no other people in the world enjoy.

But the stature of the Presidential office is such that no occupant can afford the

luxury of off-the-cuff, snappy comments which his own staff later must water down.

World affairs are complex and delicate enough, without being inflamed by incompetent or reckless statements.

### AMERICA HAS A PUPPET PRESIDENT—TRUMAN PULLED IN EVERY DIRECTION BY RADICAL ADVISERS; SOME OF HIS STATEMENTS CAN BE PROVED UNTRUE

#### (By David Lawrence)

America today has a puppet President, a man who is pulled and hauled in every direction by radical advisers and who does not himself have the capacity to understand the fundamentals of the American industrial system.

Several of the important statements made to a Nation-wide audience by the President over the radio were misleading. His mistakes are errors of judgment, inexperience, and gullibility.

Yet some of the key statements he did make are nevertheless untrue. They are easily proved to be untrue. What's more, Mr. Truman did not tell all of the truth. He omitted some of the most essential points that have brought on the steel dispute—points which, for political reasons, may have been wise to omit but which certainly, on the basis of candor, the American people have the right to expect from their President. Not a word was said by him about the Government's official pressure on the steel companies to force workers to join unions or lose their jobs or what this has to do with the war emergency. Yet this is one of the main factors in the whole dispute.

Here are Mr. Truman's key statements and the facts about them:

Untruth No. 1: The President said the steel industry was making a profit of $19.50 a ton and that "on top of that, they can get a price increase of close to $3 a ton under the Capehart amendment." He thus adds up to a possible $22½-a-ton profit.

Truth No. 1: The steel companies are not making a profit of $19.50 per ton, because the Government takes away in taxes an average of somewhere between 60 and 70 cents out of every dollar. Profits are what companies have left after, and not before, taxes are paid.

Untruth No. 2: The President said that "If all the recommendations of the Wage Board were put into effect, they would cost the industry about $4 or $5 a ton," and "if the steel companies absorbed every penny of the wage increase, they would still be making profits of $17 or $18 a ton." This figure is obtained evidently by subtracting $4 to $5 of cost from $22 of alleged profits.

Truth No. 2: If the companies absorbed the increased costs, it would extend not only to their own wage increases but to the costs of the materials they buy—a figure far in excess of $5 a ton and close to $12 a ton—and if they absorbed all costs and these were only, as the President says, from $4 to $5 a ton, the steel companies would not be making a profit of $17 or $18 a ton, because that's before taxes. Using the 70 percent yardstick for tax rates—normal and excess profits—the profit would actually be about $5.80 per ton.

Untruth No. 3: The President said that a profit of $17 to $18 a ton is high and that in the 3 years before Korea—1947, 1948, and 1949—steel profits averaged a little better than $11 a ton, so he declares that "the companies could absorb this wage increase entirely out of profits and still be making much higher profits than they made in the three prosperous years before Korea."

Truth No. 3: The $11 a ton profit was before taxes and in the 3 years before Korea the Federal corporation taxes were only about 38 percent on every profit dollar, so that 62 percent of the $11 or $6.82 a ton in those years was retained as a profit. Just how $5.20 profit per ton after Korea is better than

$6.82 a ton before Korea is hard to understand. Nor were there such inflationary prices in the items bought by the steel companies in the pre-Korean period as there are today. The purchasing power of the company's dollar has gone down. The cost of living for the investor's dollar has risen, too.

The President paid no attention whatsoever to the need for replacement money for expansion and for the need of the steel companies to complete the biggest building program of steel plants ever carried on in the history of the world. Not a word was spoken by the President about this essential requirement for profits. Nor did the President tell the American people what he was advocating was that virtualy $1,000,000,-000 of extra wage increases should be paid out to one group of citizens and the Federal revenues of 70 percent of that sum—namely, $700,000,000—should be sacrificed by using tax money to pay those wage increases. This can only mean that Mr. Truman is willing to transfer the burden of raising $700,-000,000 to all taxpayers, including workers in other industries.

The President told the American people that the Taft-Hartley Act's machinery would be of no help because the country would have to sit around a week or two while the necessary injunctions were being obtained. The act provides a waiting period of 80 days, whereas, Mr. Truman argued, the union had already waited 99 days. This is a 100 percent acceptance of the union's view, but it isn't all of the truth. Nor is it a statement of the obligation to use specific law instead of inherent powers. The fact is that, any time during these 99 days, the President could have set up a board of inquiry to get the facts. He did not have to wait till the last minute. He could have explored the question of price. He could have had an impartial board make a study of the facts about steel costs.

Then American public opinion could have settled the strike, as it can settle all strikes, by siding with the union or the companies depending on what the real facts show. As it is, Mr. Truman has succeeded in disseminating many false statements. He has destroyed confidence in the fairness of his administration. He has delivered a body blow to the cause of individual enterprise and to the financial stability of privately owned companies in America. He has demonstrated what a dictatorship can do in free America when a Chief Executive blunders recklessly and then goes from the frying pan into the fire.

The CHAIRMAN. The question is on the amendment.

Mr. MULTER. Mr. Chairman, I request that the amendment be separated; it is in two parts. I request that a separate vote be had on each part.

Mr. WALTER. I object, Mr. Chairman, because it is one amendment.

The CHAIRMAN. Objection is heard.

The question was taken; and on a division (demanded by Mr. MULTER) there were—ayes 8, noes 53.

So the amendment was rejected.

Mr. FARRINGTON. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. FARRINGTON: On page 150, strike out the period at the end of paragraph (10) of section 353 and insert in lieu thereof a colon and the following: "*Provided*, That subsections (b) and (c) of section 404 of the Nationality Act of 1940, as amended (U. S. C., 1946 ed., title 8, subsecs. (b) and (c) of sec. 804), shall not be held to have been applicable to persons defined in these subsections."

Mr. FARRINGTON. Mr. Chairman, this is the last of three amendments that

this bill that I have offered to cover problems that are unique to the Territory of Hawaii. The bill as reported provides that the provisions of the Nationality Act of 1940 relating to residence in a foreign state shall not apply to persons who acquire their American citizenship by act of Congress. This covers those individuals who received their American citizenship under the terms of the Hawaiian Organic Act of 1900.

The purpose of this amendment is to restore American citizenship to a small group of persons who originally acquired their citizenship under the terms of the Hawaiian Organic Act and are now held to have lost it by reason of having violated sections 404 (b) and (c) of the Nationality Act of 1940.

The Hawaiian Organic Act of 1900 granted American citizenship to all persons who were citizens of the Republic of Hawaii. Among these are a very small number who are now held to have lost their citizenship because they have resided continuously for more than 3 years in the country of their birth or resided continuously for more than 5 years in another foreign country.

The position of the immigration authorities is that they are naturalized rather than natural-born citizens, and therefore subject to section 404 (b) and (c) of the Nationality Act of 1940.

The injustice of applying this provision of the Nationality Act to those who have received United States citizenship by act of Congress has been recognized by the committee. Paragraph 10 on page 150 of the bill reported by the committee provides that these requirements of the Nationality Act of 1940 shall not apply to these citizens.

This provision, however, is not retroactive and therefore does not cover those individuals who have already lost their citizenship for this reason.

The number involved is extremely small. I know personally of only two such individuals, but have been told there are as many as nine.

In the two cases with which I am familiar the individuals were not aware of the fact that they were classified as naturalized citizens and required to meet the residence provisions of the Nationality Act of 1940. They have, therefore, inadvertently lost their American citizenship.

The injustice which they have suffered has already been recognized by Congress. In the last session, the House adopted a bill I introduced on January 3, 1949, to restore American citizenship to this group. The bill was amended to apply to a similar problem that had arisen in Puerto Rico. Complications resulted which caused so much delay that consideration of the legislation in the other body was not taken before adjournment of the last Congress.

In this Congress I introduced H. R. 1735 to accomplish the same objective and was informed by the chairman of the Subcommittee on Immigration and Naturalization of the House Judiciary Committee that in the omnibus immigration bill that he had introduced provision was made that persons who became citizens of Hawaii by collective naturalization would not be subject to loss of

nationality through prolonged residence abroad.

I understand, however, that unless the amendment I have proposed is adopted this provision will not be retroactive and will not cover the cases of the individuals whose problems I aim to correct. I, therefore, offer this amendment in the hope that this will provide a means for solving this problem.

Mr. WALTER. Mr. Chairman, will the gentleman yield?

Mr. FARRINGTON. I yield to the gentleman from Pennsylvania.

Mr. WALTER. If I understand the gentleman's amendment correctly—and I have just seen it for the first time—if adopted naturalized Americans would be permitted to return to the country from which they came without loss or danger of losing their citizenship; is that right?

Mr. FARRINGTON. It would restore citizenship to those individuals who derived their citizenship under the Hawaiian Organic Act and have been held to have lost it as a result of having resided in a foreign state 3 or 5 years. This is to cover a very limited group, not more than two people that I know of—who without realizing that the law applied to them remained abroad longer than they should and have in consequence of this been held by the State Department to have lost their citizenship.

Mr. CELLER. Mr. Chairman, will the gentleman yield?

Mr. FARRINGTON. I yield to the gentleman from New York.

Mr. CELLER. Would that be regardless of their activities while abroad? Would activities of certain characters be of sufficient importance to cancel citizenship and would the gentleman's amendment do away with that requirement?

Mr. FARRINGTON. No. My amendment covers only residence abroad. The Nationality Act of 1940 provides that if you are a naturalized citizen and live in a foreign state 5 years or more or in a foreign state which is the state of your origin for more than 3 years, then you lose your citizenship.

Mr. CELLER. We have other provisions that if during that period you voted in a plebiscite or in an election in a foreign land that automatically cancels your citizenship. Would the gentleman's amendment interfere with that?

Mr. FARRINGTON. It would relate only to the residential provisions. This was studied by members of the committee staff. The House in adopting a bill which I introduced in the last Congress, approved the principle of this proposition and in a letter which was addressed to me, early in this Congress, the chairman said provision would be made in the bill to take care of these people. It has done this, excepting only those who have already lost their citizenship.

Mr. MASON. Mr. Chairman, will the gentleman yield?

Mr. FARRINGTON. I yield to the gentleman from Illinois.

Mr. MASON. There are other naturalized citizens. They have secured their naturalization papers here and have gone back to Italy or to some other place and have remained for 5 years or more. They have lost their citizenship.

Mr. FARRINGTON. That is right.

Mr. MASON. Now, would the gentleman's amendment cover them?

Mr. FARRINGTON. This amendment covers only the individuals who were granted American citizenship under the Hawaiian Organic Act of 1900.

Mr. WALTER. Mr. Chairman, will the gentleman yield?

Mr. FARRINGTON. I yield to the gentleman from Pennsylvania.

Mr. WALTER. This applies only to those citizens who acquired citizenship collectively; is that the distinction?

Mr. FARRINGTON. That is right; by act of Congress.

Mr. MASON. Mr. Chairman, if the gentleman will yield further, then this would give those who acquired citizenship collectively a preference over those who acquired citizenship individually.

Mr. WALTER. That is correct.

Mr. FARRINGTON. I think that that is a situation that is not likely to occur again. The people who were citizens of the Republic of Hawaii and were given American citizenship under the Hawaiian Organic Act did not realize that their status was that of naturalized citizens rather than of natural-born citizens.

Mr. MASON. Some of our naturalized citizens did not realize that by living abroad 5 years or more, they lost their citizenship automatically. They did not know the law; they did not realize it.

Mr. FARRINGTON. That is possible.

Mr. ARMSTRONG. Mr. Chairman, will the gentleman yield?

Mr. FARRINGTON. I yield to the gentleman from Missouri.

Mr. ARMSTRONG. Can the gentleman tell us where these citizens have been living for the most part?

Mr. FARRINGTON. The two of whom I have knowledge are of the Chinese race. One of them is a physician, and he is back in Honolulu, but because he lost his citizenship he is unable to practice medicine. The other is still in China attempting to return to this country.

Mr. ARMSTRONG. It seems to me the gentleman is making a reasonable request.

Mr. MASON. Mr. Chairman, if the gentleman will yield further, I have absolutely no objection to the gentleman's amendment; I am just trying to clarify in my own mind what it means, and if it only covers 5 or 10 or a limited number, why I have no objection to it.

The CHAIRMAN. The time of the Delegate from Hawaii has expired.

Mr. McCORMACK. Mr. Chairman, I ask unanimous consent that the gentleman be permitted to proceed for two additional minutes.

The CHAIRMAN. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

Mr. FARRINGTON. Mr. Chairman, I want to take this opportunity to express to the chairman of the subcommittee, the gentleman from Pennsylvania [Mr. WALTER] and to the members of his committee, my very great appreciation for the consideration that they have shown me on all occasions. Despite the fact that they have not seen fit to approve some of the proposals I have made, they have never disapproved them without the most careful and thoughtful

consideration. I am very conscious of the fact that there is probably no Member of the House who has presented to this committee more private bills than I have. I have not done this by choice, but because it was my duty to do so. The patience with which the members of the committee have considered this legislation and the problems of immigration that are peculiar to the Pacific area is something for which we of Hawaii will always be grateful.

Mr. Chairman, I want to say also that the chairman of the subcommittee won for himself a permanent place in the hearts and in the history of the people of Hawaii by the unusually fine work he did as chairman of the subcommittee of the Un-American Activities Committee of this House that investigated the problem of communism in Hawaii in 1950. In all my years in Congress I have never seen the proceedings of a committee conducted with greater skill, in better spirit, or with more constructive results than was that of this subcommittee. I am happy indeed to have this occasion, therefore, to express to the gentleman from Pennsylvania on behalf of myself and of the people of Hawaii our appreciation for all he has done for us.

In conclusion I want to express my gratitude also to the members of the staff of the Judiciary Committee Subcommittee on Immigration. The assistance of both Mr. Besterman and Mr. Benn, as well as others on the staff, have been invaluable to my office in meeting the many problems involving the immigration and naturalization laws that are constantly arising in Hawaii. I want them to know that the appreciation we feel for their assistance is a very genuine one.

Mr. WALTER. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, I am not in opposition to the amendment offered by the Delegate from Hawaii. According to the best evidence available there will not be more than a handful of people affected. But I do take this time for the purpose of calling the attention of the House to the misstatements contained in an ad that appears in yesterday's New York Times. Somebody is trying to force me to tell what is in back of the opposition to this immigration bill. Perhaps I ought to do it, but at the moment I am going to refrain from doing so. But I do want to point out the misstatements in this ad. The first is that the bill under consideration would continue to waste these visas. Is it proper to call waste the fact that people do not avail themselves of the opportunity to come to the United States? I do not think so. The ad goes on to state that the bill itself adds new racial discriminations. It says that these bills are designed to exclude Negroes by drastically reducing immigration from colonies in the Western Hemisphere. That just is not true. Of course, the effect of giving to colonies the same quota numbers that commonwealth countries have will affect the number of Jamaicans coming to the United States, but it is not anti-Negro because the same principle is being applied to all the people who

otherwise want to come and can come, regardless of their color.

The third item in this ad states that the bill further restricts immigration by subjecting victims of religious persecution to literacy requirements.

Now let us see. I called members of the Displaced Persons Commission to ascertain how many aliens were excluded under the Displaced Persons Act, under which we had as of today received nearly 340,000 people, and found that not one single person was refused admission because of being illiterate. The provision in the original law was placed there during the period of the czarist regime when many people in Russia and in subjugated Poland were illiterate, because they were barred from schools. They could not read or write their own language. Under present-day conditions, however, there have been no rejections for many years of people because of illiteracy. They have all been able to read or write their own language. The requirement is not, as it perhaps ought to be, that they be able to read and write in the English language, but merely that they know simple words and phrases in some language or dialect.

Mr. RANKIN. Mr. Chairman, will the gentleman yield?

Mr. WALTER. In just a moment. I want to complete this thought.

Mr. RANKIN. I want to know who signed that ad.

Mr. WALTER. I will tell the gentleman who signed it. He can guess, and he would not miss by many.

The second section of that same paragraph says:

By eliminating professors from quota-exempt status and by continuing the use of the outdated census year of 1920 as a basis for immigration allocations.

Actually, wherever a professor is needed, as we said yesterday, he is put at the top, at the very top, of the priorities.

The last charge is that the bill provides many new, unreasonable, and arbitrary bases for deportation. The only new ground is aimed at Mr. Adonis, and those professional gamblers who cannot be touched under existing deportation law because they have violated but certain State laws. Those people ought to be deported.

The CHAIRMAN. The time of the gentleman from Pennsylvania has expired.

Mr. GRAHAM. Mr. Chairman, I ask unanimous consent that the gentleman from Pennsylvania be permitted to proceed for five additional minutes, in order to complete his statement.

The CHAIRMAN. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. WALTER. I have about completed my statement, except that this last paragraph goes further and says:

The bills eliminate the statute of limitations in many instances and create numerous grounds for deportation not easily subject to judicial review.

The bill creates only one new ground, not numerous grounds, and by express provision reinstates the applicability of section 10 of the Administrative Procedure Act, which gives judicial review from every administrative decision.

As far as the elimination of the statute of limitations is concerned, that, too, is not the fact, but we do make it much easier to deport those people who did not take the oath of allegiance to the United States in good faith, people who were Communists and who when they took the oath of allegiance were Communists. There are many of that sort in the United States. I hope that before very long the FBI can complete its examination of the records of certain of these people because, as many of you know, particularly those of you who were on the Subcommittee on Immigration on their trip to Berlin several years ago, the United States has in its possession the Berlin document center. In that center is a complete record of the political affiliations and activity of people who were in Germany, and who are now in the United States. It may well be that some of those people have initiated this campaign because they are afraid that at some time or another they are going to have to leave our shores and return to Germany.

Mr. HAND. Mr. Chairman, will the gentleman yield?

Mr. WALTER. I yield.

Mr. HAND. I agree most heartily with most of the things the gentleman has said. It does seem to me that the bill goes a little bit further than the gentleman has suggested in eliminating the statute of limitations.

Mr. WALTER. In what respect?

Mr. HAND. In the respect, for example, if I understand the bill, if a person comes here with a visa which is technically improper and lives here for a period of 4 or 5 years, you can under this bill, as I understand it, deport him merely because of that technicality. In other words, the statute of limitations which has been in effect under previous law has in such respect been eliminated in this bill, or at least that is my understanding of it.

Mr. WALTER. May I suggest that the gentleman read the committee report.

Mr. HAND. If the gentleman will yield further, the committee report, of course, is about as long as Gone With the Wind, and I have not had a chance to read it.

Mr. WALTER. The committee report is long because this is a very involved, technical, and long subject which we are dealing with. I think if the gentleman will examine that report, he will find no injustice can possibly be worked under the provisions of this act.

Mr. HAND. I hope to have the opportunity to suggest to the committee an amendment dealing with this question of deportation, and I would be glad if the gentleman would listen to it because I may well be mistaken about it. I would like to have his advice because I have a great deal of respect, as the gentleman knows, for his thinking on this subject.

Mr. RANKIN. Mr. Chairman, will the gentleman yield?

Mr. WALTER. I yield.

Mr. RANKIN. Did the gentleman say who signed that document?

Mr. WALTER. I have tried to find out. I was informed this morning that there is the signature of George Chintong, president of the Chinese American Citizens National Association. There is no such organization.

Mr. RANKIN. It is not signed by Joe Stalin then?

Mr. WALTER. I have not noticed that. I do not think his name is on it. But this organization just does not exist. I have checked all the sources I think would throw some light on it, and I find that many of these organizations are nonexistent. There appears the name of only one person that disturbs me and that is the name of Earl Harrison who is dean of the law school at the University of Pennsylvania. I now understand his opposition to the bill because sometime ago he testified he did not think we should have a quota at all, and that the doors should be open to any number of immigrants. So that is apparently how they are able to induce that very distinguished educator to sign this advertisement.

Mr. RANKIN. I will say to the gentleman the reason I asked that question is that the advertisement sounds like Communist propaganda, and I think that is what it is.

Mr. McCORMACK. Mr. Chairman, will the gentleman yield?

Mr. WALTER. I yield.

Mr. McCORMACK. I call my friend's attention to section 212A, subdivision 10.

Mr. WALTER. What does that section contain?

Mr. McCORMACK. I do this for the RECORD. There are some charges which I know are as far removed from my friend's mind as anything could possibly be; that under that provision it delegates authority to foreign governments to decide what immigration visas our American consuls abroad may issue on the ground that the immigrant may have served a sentence of 5 years' imprisonment for such nonpolitical functions as giving religious instruction to children. I specifically call that to the gentleman's attention, knowing his views, and my years of association with him, that there be disabused from the mind of anyone who reads the RECORD or anyone who does not read the RECORD, but if any foreign government should, for example, prosecute a minister or a rabbi or a priest or anybody else because of their religious views and they should receive a sentence of 5 years or more, that that particular subdivision would not cover it in any way.

Mr. WALTER. That is almost as silly as the charge that a man could be excluded from the United States for violating a traffic ordinance. Actually, what that section states is that an alien is excludable if he has been convicted of two crimes, the sentence for which was 5 years in jail. I do not see anything unreasonable about that. It expressly excepts the very things the gentleman is talking about.

The CHAIRMAN. The time of the gentleman from Pennsylvania has expired.

Mr. GRAHAM. Mr. Chairman, I move that all debate on this bill and all amendments thereto close at 2 o'clock.

The question was taken; and on a division (demanded by Mr. JAVITS) there were—ayes 87, noes 11.

So the motion was agreed to.

Mr. McCORMACK. Mr. Chairman, may I suggest, in order that all Members seeking recognition within the 1-hour limit may be given consideration, that by unanimous consent the Chair may, within the hour time, recognize Members for 3 minutes, the remaining 10 minutes to be reserved for the committee?

The CHAIRMAN. Is there objection to the request of the gentleman from Massachusetts, that all Members who seek recognition be recognized for 3 minutes each, 10 minutes to be retained by the committee to close debate?

Mr. HALLECK. Mr. Chairman, a parliamentary inquiry. That would be within the limitation of the 1 hour just agreed to?

The CHAIRMAN. That would be within the limitation just agreed to.

Mr. FARRINGTON. Mr. Chairman, a parliamentary inquiry. Is my amendment still pending?

The CHAIRMAN. The gentleman's amendment is still pending. The Chair will put the question very shortly.

Mr. JAVITS. Mr. Chairman, will the time taken out for voting or teller votes be taken out of the time?

The CHAIRMAN. The Chair will inform the gentleman that the time is fixed at 2 o'clock, not 1 hour. Therefore the answer would be in the affirmative.

Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

The Chair will read the names of the Members seeking recognition within the hour: Messrs. MULTER, JAVITS, GRAHAM, DOLLINGER, CHUDOFF, JUDD, CELLER, FARRINGTON, BARRETT, HAND, POWELL, JENKINS, REED of Illinois, Miss THOMPSON of Michigan, Mr. ZABLOCKI, and Mr. AUGUST H. ANDRESEN.

The Chair will recognize Members as far as possible up to 2 o'clock.

Mr. McCORMACK. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. McCORMACK. It is my recollection that 10 minutes were reserved to the committee. Is that correct?

The CHAIRMAN. That is the Chair's understanding. At this time the Chair is ready to recognize the gentleman from Minnesota [Mr. JUDD].

Mr. CHUDOFF. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. CHUDOFF. Will the Chair give preference to those Members who have amendments pending at the desk?

The CHAIRMAN. The Chair will attempt to do so if Members having amendments at the desk, when seeking recognition, state that they have an amendment at the desk.

Mr. MARTIN of Massachusetts. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. MARTIN of Massachusetts. How much time will each Member have?

The CHAIRMAN. Under the request of the gentleman from Massachusetts,

each Member will be recognized for 3 minutes up until 2 o'clock. We will try to accommodate the complete list.

Mr. CELLER. That is not quite accurate, may I say. Ten minutes were reserved to the members of the Judiciary Committee.

The CHAIRMAN. That is correct, but including that, each Member will have 3 minutes.

Is the gentleman from Minnesota [Mr. JUDD] in the Chamber?

Mr. FARRINGTON. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. FARRINGTON. Does the Chair intend to put the amendment offered by the Delegate from Hawaii?

The CHAIRMAN. The Chair will put the question.

The question is on the amendment offered by the Delegate from Hawaii.

The question was taken; and on a division (demanded by Mr. ARMSTRONG) there were—ayes 39, noes 5.

So the amendment was agreed to.

Mr. HOFFMAN of Michigan. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. HOFFMAN of Michigan. Inasmuch as it appears that most of these amendments, or practically all of them, have come from the other side and are all being voted down, is there any way by which they could all be offered at once and voted on?

The CHAIRMAN. By unanimous consent the Committee can work its will, and the Chair is but the servant of the Committee. Does the gentleman propound a consent request?

Mr. HOFFMAN of Michigan. Mr. Chairman, I ask unanimous consent that all the amendments be read and then voted on.

The CHAIRMAN. Is there objection to the request of the gentleman from Michigan?

Mr. CHUDOFF. Mr. Chairman, I object.

Mr. JAVITS. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. JAVITS: Page 154, after title III, add at the end thereof a new section, as follows:

"VISA REVIEW BOARD

"SEC. 361. (a) There is hereby established in the Department of State a Visa Review Board (hereinafter referred to as the 'Board') which shall be composed of three members to be appointed by the Secretary of State. Persons appointed to the Board shall be selected solely on the basis of their experience and qualifications, and shall be charged with no functions other than those vested in the Board. The Board shall have authority, as provided in this section, to review the case of any alien or person claiming to be a citizen of the United States who has been denied an immigration visa by any consular officer."

"(b) Whenever a consular officer shall deny an immigration visa to any alien on the ground of ineligibility under section 212 (a), the Board shall, as provided in this section, review the decision of such officer upon the request of any person, institution, firm, organization, or governmental agency upon whose petition a quota or nonquota immigration status or a preference was granted or accorded to such alien, made within 90

days after such alien has been notified of the denial of a visa. A consular officer shall inform any alien who has been found by him to be ineligible for a visa under section 212 (a) of his right to a review under this section. A request for review by any person, institution, firm, organization, or governmental agency in behalf of any alien who has been denied a visa shall be made in writing to the Board and shall be accompanied by an affidavit signed by such person, or an officer of such institution, firm, organization, or agency, setting forth any facts which have a bearing upon such alien's eligibility for a visa. Upon receipt of any such request the Board shall notify the consular officer with respect to whose decision a review is sought, and, upon receiving such notice, such officer shall promptly forward to the Board a concise statement of the material facts upon which he based his decision to deny a visa in the case of such alien, and which statement shall indicate whether such alien would be entitled, except for his decision with respect to ineligibility, to a nonquota immigration visa under paragraphs (A) to (G) of section 101 (a) (27).

"(c) The Board shall, upon request as provided in subsection (b), review the decision of a consular officer denying a visa to any alien who, except for such decision, would be eligible for a nonquota immigration visa under paragraphs (A) to (G) of section 101 (a) (27). The Board may upon request as provided in subsection (b), review the decision of a consular officer in the case of any other alien whenever in its sound discretion it shall determine that such review is necessary or desirable to secure uniform interpretations and applications of the provisions of this act, or to achieve a correct interpretation and application of the provisions of this act, or to achieve a correct interpretation and application of such provisions in the case of an alien. The Board may, at any time after granting a request for review, obtain from a consular officer such further information, together with certified copies of such documents, reports, records, and other data, which are available to or obtainable by such officer, as it may deem necessary to enable it to properly review the case of any alien who has been denied a visa by such officer. The Board may, at any time after receiving a request for review and the statement of a consular officer submitted as a result of such request for review, obtain from such officer such further information as it may deem necessary to enable it to decide whether to grant the request for review in the case of any alien.

"(d) In reviewing the decision of a consular officer denying a visa to an alien, the Board shall hear testimony and receive evidence from (1) any official of the Government requesting the privilege to be heard with respect to a matter pending before the Board, and (2) the person, or representatives of the institution, firm, or organization, if any, upon whose petition a quota or nonquota immigration status or a preference was granted or accorded to an alien with respect to whose case the Board has granted a review.

"(e) In reviewing the decision of any consular officer denying a visa to an alien, the Board shall consider all the information before it with respect to such alien, and shall give due consideration to the reasons set forth by such officer for his denial of a visa. The decision of the Board shall be concurred in by at least two members, and shall affirm or overrule the decision of such officer. If the Board shall override the decision of a consular officer with respect to the eligibility of an alien for a visa under this act such officer shall, upon notification by the Board, promptly cause the visa to be issued to such alien which would have been issued except for his decision that such alien was inadmissible therefor under such section."

Mr. JAVITS. Mr. Chairman, this amendment deals with a very difficult situation for many Americans, not just for aliens.

As you will see from this bill, the consular officer in every small place or large place in the world has absolute and untrammeled jurisdiction to deny any alien a visa. For example by the new section 212 (a) (27) a consular officer can deny an alien a visa if he does not think he is good for the United States, that is, solely, principally, or incidentally to engage in activities which would be prejudicial to the public interest.

It seems to me that we should have some opportunity if any American citizen or organization should sponsor an alien to review that finding by the local consular officer, who is not bound now, in my view, and I think that is clear from the bill almost in any way at all, except by his own discretion. If he thinks the fellow is good for the United States and he meets all the other requirements he says "Yes"; if not, he says "No," and that is the end of it, except possibly if a Member of Congress complains he might get the State Department to pay some attention to him.

All this amendment does is to set up a Visa Review Board of three within the State Department to which any American citizen or organization can appeal if he believes an alien he has sponsored should receive a visa. If that Visa Review Board finds that according to the law the consular officer erred, it may reverse the consular officer. That is the simplest kind of justice.

The consular officers are located in all the highways and byways of the world. They may not even be aware at a particular time of what is the latest attitude or the latest point of view of the State Department; yet their denial of a visa to an alien or even to a nonquota immigrant which they have the power to do is absolute and final. I should doubt that even they would want such final power from my personal knowledge of scores of these hard-working and distinguished public servants.

I think that is an elementary question and we ought to create some machinery to take care of it. We put in an amendment providing for an Immigration Appeals Board and I think that exactly the same reason exists to vote favorably upon this amendment for a Visa Review Board.

I wish to emphasize that it does not affect our domestic operations on visas and passports but only the visa powers abroad.

Mr. GRAHAM. Mr. Chairman, I rise in opposition to the amendment offered by the gentleman from New York [Mr. JAVITS].

Mr. Chairman, under the provisions of this amendment it would permit every alien to have his case brought to this country for final disposition. He could go before the visa review board, he could then take an appeal to the courts, and we would be clogged up for months and months with these matters. It would mean additional Federal judges.

XCVIII— 279

Mr. Chairman, I oppose the amendment and ask that it be defeated.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York [Mr. JAVITS].

The amendment was rejected.

The CHAIRMAN. The Chair recognizes the gentleman from New York [Mr. MULTER].

Mr. MULTER. Mr. Chairman, it is really unfortunate that the authors of this bill find it necessary to allow their pride of authorship to cause them to urge the defeat of every worthwhile amendment that is offered to make this a better bill.

I rise at this moment, however, to tell you who are the persons who are alleged to be the minions of Joe Stalin when they signed the advertisement referred to a few moments ago by the gentleman from Pennsylvania [Mr. WALTER]. I will add that advertisement from the New York Times to my remarks so that you can read it and compare it with the debate on this bill. You will then be in a better position to determine whether the statements made in the advertisement are correct. But let us not becloud the issue by calling names.

Every person who signed this advertisement is a decent, law-abiding American citizen, whose loyalty and patriotism will withstand any challenge.

The president of the national board, Young Women's Christian Association.

The president of the Italian-American Labor Council.

I will not take the time to read them to you. Look at them for yourself. Read the names of the organizations with which they are affiliated. None of them have been or could be called subversive or un-American.

Here you have listed as opponents of this bill representatives of Protestants, Catholics, Jews, Moslems, Italians, Greeks, Lithuanians, Czechs, Poles, Chinese, Hungarians, Ukrainians, labor, management, and letters.

I refuse to believe with the distinguished chairman of the subcommittee that they are "silly" and know not what they say.

There are about 70 names subscribed to that advertisement, and I submit there is not a person who can be accused of being a Communist or pro-Communist. Every one of them has the security and the interest of this Nation at heart, and they urge the defeat of this bill unless it is amended so as to improve it and take out of it all of the bad things that you have heard about thus far and the many other bad things you will not have time to hear about because the debate has been cut off. I know there will be persons who will go through this list and say that some of these people are talking for a minority group which they represent. Who else will speak for them?

It is time that all of us talk out in the same way for the interest of this great Nation of ours, remembering that what has made it great was its assimilation of minorities from all over the world. Let us perform our duty as imposed upon us by the Constitution and be logical and fair in our approach to this matter. That is the only way to do justice.

The advertisement which appeared in yesterday's New York Times follows:

Nations, like men, sometimes find a rare opportunity to break away from the mistakes of the past and move ahead decisively in a more rewarding course of action.

An opportunity to rectify past mistakes and provide for a liberalization of our immigration policies has now come in Washington. For the first time in 28 years the United States Congress is considering a revision of our basic immigration laws.

Decisions made today may affect our country's welfare and shape the destinies of countless human beings in the United States and abroad for generations to come.

THERE ARE TWO ALTERNATIVES BEFORE CONGRESS

One suggested course would simplify and humanize our present immigration laws and demonstrate our desire to aid the victims of dictatorship abroad. This is the intent of the Humphrey-Lehman bill (S. 2842) which has been introduced in the Senate and an identical bill introduced in the House of Representatives by Congressman ROOSEVELT (H. R. 7032).

The other course would depart from the American tradition of welcome to freedom-loving peoples, and would enact new barriers to immigration and naturalization. This is proposed in the McCarran bill (S. 2550) and the Walter bill (H. R. 5678) now being considered by the Senate and the House of Representatives.

The McCarran-Walter bills would—

Continue to waste visas. Our immigration law provides for the admission of 154,000 immigrants each year. Less than half that number have been used through the years. The McCarran-Walter bills retain our old-fashioned and inflexible quota system.

Add new racial discriminations. These bills are designed to exclude Negroes by drastically reducing immigration from colonies in the Western Hemisphere.

Further restrict immigration by subjecting victims of religious persecution to literacy requirements, by eliminating professors from quota-exempt status, and by continuing the use of the outdated census year of 1920 as a basis for immigration allocations.

Provide many new, unreasonable, and arbitrary bases for deportation. The bills eliminate the statute of limitations in many instances and create numerous grounds for deportation not easily subject to judicial review.

The Humphrey-Lehman-Roosevelt bills—

Would not waste visas, because they provide for a pooling of unused quotas, thus making our immigration system more flexible and permitting the admission of some 80,000 additional immigrants annually within the quotas of our immigration law.

Virtually eliminate racial discrimination. The bills leave untouched present immigration from Western Hemisphere colonies and do away with many objectionable racist provisions in current and projected law.

Would liberalize immigration by using the 1950 census as a basis for computing quotas. This would remove many inequities by basing quotas on current population statistics rather than the outmoded 1920 figures.

Provide for fair hearings, judicial review, and other legal protections in accordance with established American traditions of fair play.

(The bills referred to are long and technical measures which cover hundreds of pages of legal language and numerous provisions. In the interest of space, only a few of these are touched upon in this advertisement.)

The McCarran and Walter bills would surrender many of our finest traditions and retard our efforts to rally the allies of democracy against the Communist threat.

The Humphrey-Lehman-Roosevelt bills would keep flowing an invigorating stream

of fresh talent, fervor, and energy which has contributed so much to America's greatness in the past, and would advance our efforts to inspire faith in democracy the world over.

Wire your Congressman and Senators now to oppose the pending Walter and McCarran bills.

Urge your Congressman to support the Humphrey-Lehman-Roosevelt bills.

Act now—the bill is being debated as you read this ad.

Mrs. Arthur Forrest Anderson, president, National Board of the YWCA; Luigi Antonini, president, Italian-American Labor Council; Richard Balch, president, Horrocks-Ibbotson Co., Utica, N. Y.; Peter L. Bell, supreme president, Order of AHEPA; Adolf A. Berle, Jr.; Mary McLeod Bethune; Walter Bieringer, president, United Service for New Americans; Jacob Blaustein, president, American Jewish Committee; James Carey, CIO; Thomas Carey, New York Regional Director, International Association of Machinists; Mrs. Eunice Carter; Dr. Jose N. Cesteros, president, Puerto Rican-Spanish Organizations; George Chintong, president, Chinese-American Citizens National Association; Dr. Albert D. Coe, president, Massachusetts Congregational Conference; Dr. George S. Counts, director of Foundations of Education, Teacher's College, Columbia University; Frank Crosswaith, chairman, Negro Labor Committee; Morris Cukor, president, Hungarian-American Clubs; Dr. Robert Cummins, general superintendent, Universalist Church of America; Helen Gahagan Douglas; Maurice N. Eisendrath, president, Union of American Hebrew Congregations; Mrs. Katharine A. Engel, president, National Council of Jewish Women; Aloysius C. Falussy, director, American Hungarian Federation; Lloyd K. Garrison; Harold J. Gibbons, secretary-treasurer, Teamsters Local 688 (AFL); Paul Ginsburg, national commander, Jewish War Veterans of the United States of America; Frank Goldman; Dr. Israel Goldstein, president, American Jewish Congress; Lester Granger; John Grigalus, vice president, Lithuanian American Council; Prof. William Haber, University of Michigan; Oscar Handlin, professor of history, Harvard University; Earl G. Harrison; Adolph Held, chairman, Jewish Labor Committee; Dr. Clarence Holmes, president, Cosmopolitan Club, Denver, Colo.; Lewis Hoskins, executive secretary, American Friends Service Committee; Steven J. Jarema, executive director, Urkainian American Congress; Alvin Johnson, president emeritus, New School for Social Research; Horace Kallen; Irving Kane, chairman, National Community Relations Advisory Council; Prof. James B. Kelley, Hofstra College; John F. Kelley, secretary, Bartenders Union Local 70; James Kerney, Jr., editor, Trenton (N. J.) Times; Mary Kizis, director, Lithuanian Information Center; Simon G. Kramer, president, Synagogue Council of America; Prof. John J. Mahoney; George L. Mark, national commander of Polish Legion of American Veterans; Joseph Mosko; Dwight Palmer; Clarence E. Pickett, American Friends Service Committee; Fortune Pope; Alex Rose, president, United Hat, Cap and Millinery International Union (AFL); Harold Russell, former national commander, AMVETS; Arthur Schlesinger, Sr., professor of history, Harvard University; Steven S. Scopas, Order of AHEPA; Dr. D. H. Sharpe, executive director, Cleveland Baptist Association; Dr. Leonard Simutis,

president, Lithuanian American Council; George J. Spatuzza, supreme venerable, Order Sons of Italy in America; Michael Straight, national chairman, American Veterans' Committee; Anna Lord Strauss; Samuel A. Telsey, president, Hebrew Immigrant Aid Society; John S. Thompson, president, Mutual Benefit Life Insurance Co., Newark, N. J.; Andrew Valuchek, vice president, Czechoslovak National Council; Rev. O. Walter Wagner, executive director, Metropolitan Church Federation of Greater St. Louis; Ossip Walinsky, international president, International Handbag, Luggage, Belt and Novelty Workers Union (AFL); Walter White, executive secretary, National Association for the Advancement of Colored People; Roy Wilkins, administrator, National Association for the Advancement of Colored People; Rabbi Joel Zion, Temple Emanuel, Denver, Colo.

(Organizations are listed for purposes of identification only.)

Mr. POWELL. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. POWELL. How can a person not or the list get the floor in opposition to a measure, which was done previously to the Javits amendment?

The CHAIRMAN. The Chair will inform the gentleman that he is on the list.

Mr. POWELL. I know.

The CHAIRMAN. If he seeks to use his time at this time, he will be recognized.

Mr. POWELL. One of the gentlemen in opposition to the Javits amendment was not on the list.

The CHAIRMAN. The Chair will state that that was before the time was fixed.

Mr. POWELL. No; it was after the time was fixed.

The CHAIRMAN. The Chair will recognize first those Members who have amendments to offer.

Mr. DOLLINGER. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. DOLLINGER: In subsection 212 (b) immediately after "(b)" add the following: "The provisions of paragraph (25) of subsection (a) shall not be applicable to any alien who (1) is the parent, grandparent, spouse, daughter, or son of an admissible alien, or any alien lawfully admitted for permanent residence, or any citizen of the United States, or is accompanying such admissible alien, or coming to join such citizen or alien lawfully admitted, and if otherwise admissible; or (2) proves to the satisfaction of the proper immigration officer or to the Attorney General that he is seeking admission to the United States to avoid religious persecution in the country of his last permanent residence, whether such persecution be evidenced by overt acts or by laws or governmental regulations that discriminate against such alien or any group to which he belongs because of his religious faith."

Mr. DOLLINGER. Mr. Chairman, this is an amendment to section 212 (a), subdivision 25, with respect to the literacy of aliens seeking admission to our country. The purpose of this amendment is to restore the provisions of existing law which grant an exemption from literacy tests to the victims of foreign religious persecutions and to close

relatives of American citizens or resident aliens.

This section, as contained in the bill before us, would deprive the victims of religious persecution and relatives of American citizens of the exemptions from literacy requirements that they had enjoyed under the act of 1917. The gentleman from Pennsylvania [Mr. WALTER] explained this proposed amendment a few minutes ago in his remarks in which he said that maybe in 1917 there were many illiterate people who sought and who needed that protection; that recently of some 300,000 DP's that came to America, not one was illiterate. I think that the argument that was advanced proves conclusively that we need this amendment, because if there might be so few people who are illiterate; the fathers, mothers, sisters, brothers, or wive or husbands of American citizens, possibly a handful of people, I think they are entitled to literacy exemption and should not be excluded. I think we should permit them to come in; there might be some instances where these people who because of religious persecution or tyranny under Communist Russia or Nazi Germany never had the opportunity to be given an education.

I think those people are entitled to some protection, and that the exemption of 1917 should be continued at this time.

I ask that my amendment be adopted.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New York.

The amendment was rejected.

The CHAIRMAN. The Chair recognizes the gentleman from Pennsylvania [Mr. CHUDOFF].

The gentleman has three amendments at the desk. Would the gentleman like to have the three amendments read, and vote on them en bloc?

Mr. CHUDOFF. I would like to have the amendment relating to section 264 (e) covered first, Mr. Chairman.

(Mr. BARRETT asked and was given permission to yield the time allotted to him to Mr. CHUDOFF.)

The CHAIRMAN. The Clerk will report the amendment.

The Clerk read as follows:

Amendment offered by Mr. CHUDOFF: Amend section 264 (e) on page 84 by inserting the word "willfully" after the words "Any alien who" in the second sentence in the section.

Mr. CHUDOFF. Mr. Chairman, my amendment is a clarifying one. It does not affect the bill one way or the other, but I think it ought to be in the bill.

This section of the bill provides that every alien 18 years of age and over shall at all times carry with him and have in his personal possession any certificate of alien registration or alien registration receipt card issued to him.

It states further that if he does not carry it with him, if he does not have it in his personal possession, he is guilty of a crime and shall suffer the penalty of serving 30 days in jail or paying $100 fine, or both.

Mr. Chairman, this raises a rather practical problem. Alien registration cards are not new in the law, yet this

is the first time where it becomes a necessity for an alien to carry the card with him and, if he does not, it becomes a crime. The old alien registration cards that people received when they registered were put aside with their valuables. They took them home and either put them in the family strong box or hid them in some drawer so that they would not lose them. They did not carry them with them, because they were afraid if they did and were asked for them the cards might get lost. They might not be able to produce them.

If these people get these cards they might think it is the same type of card and put it away, and if so they will be committing a crime under this bill.

Then we have another practical problem. An alien may leave his card in his Sunday suit and forget to have it with him. A female alien may forget to transfer it from one handbag to another. As a matter of fact, it would be a crime for any alien to go into a shower or take a bath unless he had this card in his personal possession.

I do not think the most conservative Member of this House would object to putting the word "willfully" in this bill. We are only trying to make those aliens who are trying to get away with something carry these cards with them. I do not think anybody who inadvertently forgets the card should be guilty of a crime. This word "willfully" would make it a crime only if it were a willful act, but nothing else. I think you will all agree with me that it would be very difficult for an alien to sit in the bathtub with a piece of soap in one hand and the registration card in the other.

Mr. AUGUST H. ANDRESEN. Mr. Chairman, will the gentleman yield?

Mr. CHUDOFF. I yield to the gentleman from Minnesota.

Mr. AUGUST H. ANDRESEN. Does not the gentleman feel that it would be just as easy for an automobile driver to sit in a bathtub with a piece of soap in one hand and his license card in the other?

Mr. CHUDOFF. Everybody knows that when you drive an automobile you have to have your license with you, but under the old law you did not have to have your alien registration card with you. You took it home and put it in a safe place.

Mr. AUGUST H. ANDRESEN. I do not think it would be very difficult for the aliens to carry these cards with them. Does not the gentleman believe they should do that as a matter of identification?

Mr. CHUDOFF. My amendment does not state that they do not have to carry the cards with them. I have no objection to the carrying of the card. The point is that they must willfully refuse to carry the card to be guilty. If they forget it, I do not think they should be guilty of a crime.

Mr. AUGUST H. ANDRESEN. I should think they would be happy to carry it.

Mr. WALTER. Mr. Chairman, a parliamentary inquiry.

The CHAIRMAN. The gentleman will state it.

Mr. WALTER. Under the arrangement with respect to time, is it proper for members of the committee to use part of the 10 minutes during the course of consideration of amendments?

The CHAIRMAN. The Chair will certainly recognize any member of the committee who wishes to use part of the 10 minutes.

Mr. WALTER. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, the effect of the adoption of this amendment would be to shift the burden of proof, and make it impossible to prove that an alien was not carrying his card deliberately. All it amounts to under the present language of the bill is that, if an alien forgot his card, lost it or misplaced it, it is a matter of defense; the burden of proof is on him. I do not think the burden of proof should be shifted to the United States.

Mr. Chairman, I ask that the amendment be defeated.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Pennsylvania [Mr. CHUDOFF].

The amendment was rejected.

Mr. HAND. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. HAND: Amend section 241 by adding at the end thereof a new subsection as follows:

"(f) Notwithstanding the provisions of subsection (a), deportation shall not be ordered in the case of any alien on the grounds that he (1) entered the United States without inspection or at any time or place other than that designated by the Attorney General, or (2) was, at the time of entry (whether occurring before or after the effective date of this act), excludable by reason of a condition or status described in paragraphs (21), (24), (26) of section 212 (a), unless deportation proceedings are commenced against such alien within a period of 5 years from the date such alien was first subject to deportation on any such ground. Any period of time spent outside the United States by such alien shall not be counted in computing such period."

Mr. HAND. Mr. Chairman, the bill before us contains 165 pages of text, and the accompanying committee report to explain the bill is a 328 page book. It is almost inevitable that in a bill of such magnitude, which attempts to revise and to codify all of our laws relating to immigration and naturalization, there should be a great deal of good, and there is bound to be a good deal that is bad.

The gentleman from Pennsylvania [Mr. WALTER], his committee, and his staff have performed a monumental task, and among many accomplishments, one of the most important is that the bill makes Asiatics eligible for quota immigration and citizenship on a nondiscriminatory basis. This repairs, after too many years, the enormous damage which was done by the Japanese Exclusion Act, which was an unnecessary insult to a proud people, and in my judgment was a substantial factor in causing the recent war between Japan and the United States.

Within the last few weeks I heard Mike Massoka, the Washington representative of the Japanese American Citizens' League, make an inspiring address on this subject to a convention of Japanese-American citizens in my congressional district. It is obvious that any bill we pass must contain this good provision in the present bill removing discrimination against Japanese and other Asiatic peoples.

This and dozens of other fine provisions should be retained, but as I have said, in a bill of this character and scope, many mistakes have been made which ought to be corrected before this bill is passed.

Something must be wrong with some parts of this bill when we recall that there has been opposition testimony offered from the American Bar Association, the American Federation of Labor, the New Jersey Welfare Council, the American Friends' Service Committee, the Jewish War Veterans of the United States, the National Catholic Welfare Conference, the Young Women's Christian Association, the Order of Sons of Italy in America, and many other organizations of similar good character and reputation.

For example, the Order of Sons of Italy in America and the Jewish War Veterans and many other organizations have signed a joint statement in which they say, among other things:

Within the next few days you will be asked to vote on a bill, H. R. 5678, which would make far-reaching and unprecedented changes in the existing law governing American citizenship and immigration. This bill would greatly affect millions of American families, subjecting their members or some of them to searches and seizures without court warrants, deprivation of citizenship by reason of foreign travel and other innocent acts, deportation without hearing, and the indefinite postponement of immigration visas on present waiting list.

Now, if this is so—and my examination of the bill indicates that it is—the situation must necessarily be corrected if we want to pass a fair law—fair not only to future American citizens but fair to present American citizens.

The American Friends' Service Committee has said:

While recognizing the tremendous job of codification embodied in the McCarran-Walter bills, and the improvements in the direction of elimination of racial and sex discrimination that they contain, we are troubled by the fact that so large a proportion of their provisions are negative, and that they place more restrictions than ever on immigration into this country and securing United States citizenship.

The merits of this bill are plain, but the objections to it are equally plain and very numerous.

Now, the amendment which I have offered is certainly not designed to correct all the evils of the bill. It will require a series of amendments to do that; nevertheless, this single amendment is, I think, of some importance. Under existing law we have applied to immigration cases and to deportation cases the familiar principle of the statute of limitation, and have provided that if the Government did not act to deport an alien within 5 years deportation proceedings should not commence thereafter. As I understand section 241, subsection A, of the bill, this familiar protection of the statute of limitation is removed in a great many cases. In some

cases I think it should be, but in others it clearly should not. The purpose of my amendment is to provide that, notwithstanding the provisions of this subsection, deportation shall not be ordered in the case of any alien on the grounds that he entered the United States without inspection, or at some improper time or place, unless deportation proceedings be commenced within 5 years, which seems to me to be reasonable.

The amendment makes the same general provisions with respect to section 212A, paragraphs 21, 24, and 26. Where aliens get into the country on a visa which perhaps contains a technical defect, or do not have just the kind of a border-crossing identification card that they should have, they are both excludable and deportable under this act, and I have no quarrel whatever with that, except that I think that they are entitled under these circumstances to the protection of the statute of limitation. If we are going to deport them at all, we should deport them within 5 years. After that period, they have a right to feel secure, it seems to me, and not to have some technical defect brought up some 10, 15, or 20 years after they have fully established themselves in this country. As I have said, this is only one of a series of amendments, which I think are required in order to make this bill fair, and while I am anxious to support a general revision of immigration laws, unless this and a series of other amendments are adopted, it occurs to me that this bill should properly be recommitted to the Committee on the Judiciary for further and more detailed study.

I cannot escape the feeling that the bill in its present form, despite some of the strides that it has made in the right direction, is unduly discriminatory and ought not to be passed without major improvements.

The CHAIRMAN. The time of the gentleman from New Jersey has expired.

Mr. WALTER. Mr. Chairman, I rise in opposition to the amendment. The effect of the adoption of this amendment would be to place a premium on the ability to hide. This amendment affects only those people who are in the United States illegally—illegal entrants.

Let me call attention to the last sentence of this amendment:

Any period of time spent outside the United States by such alien shall not be counted in computing such period.

Suppose he is in the United States illegally. Then he goes to Mexico and he hides, and after 5 years he is here and cannot be deported. It seems to me that the United States should have the authority to deport at any time an alien who is illegally in the United States.

Mr. JAVITS. Mr. Chairman, will the gentleman yield?

Mr. WALTER. I do not have time. I ask that the amendment be rejected.

The CHAIRMAN. The question is on the amendment offered by the gentleman from New Jersey [Mr. HAND].

The amendment was rejected.

The CHAIRMAN. The Chair recognizes the gentleman from Wisconsin

[Mr. ZABLOCKI], who has an amendment at the desk.

The Clerk will report the amendment.

The Clerk read as follows:

Amendment offered by Mr. ZABLOCKI: Page 34, strike out section 212 (c) and insert:

"(c) Aliens who temporarily proceeded abroad and not under an order of deportation, who are returning to an unrelinquished United States domicile of seven consecutive years, may be admitted in the discretion of the Attorney General, and under such conditions as he may describe."

Mr. ZABLOCKI. Mr. Chairman, this particular section virtually eliminates the present discretion of the Attorney General to readmit otherwise excludable aliens returning to their homes in the United States.

The purpose of my amendment is to restore the provisions of the existing law which give the Attorney General the discretion to readmit aliens returning to their homes in this country in cases where the grounds for exclusion would not have been grounds for deportation if the alien had never left the country.

It is my conviction that there are sound and valid reasons for the retention of the particular provision embodied in our present law.

In the first place, no sound arguments have been advanced for the elimination of the existing flexibility in our law on this point, which makes possible the exercise of favorable discretion in all deserving cases. The existing practice consists of humane provisions to permit the adjustment of status to deserving aliens. Factors of hardship, good moral character, long residence, and family ties are considered in extending this relief. There is certainly no valid reason for changing the law so as to subject deserving aliens who were legal residents of this country, as well as their families, to severe hardships.

Further, the adoption of my amendment would in no way open the door for the admission of undesirable aliens. Such aliens who could receive favorable consideration would have to have been residents of the United States for 7 years, during which time they have committed no acts which would have given grounds for their deportation. Further, aliens applying for consideration under this provision would have to show that they have not relinquished United States domicile, but merely left for a temporary stay abroad. Finally, the Attorney General would have the power to prescribe the conditions under which they would be readmissible to this country. Only the deserving aliens, as I stated earlier, could receive favorable consideration under this provision.

Mr. Chairman, I feel very strongly that the present discretion of the Attorney General with respect to the readmission of certain otherwise excludable aliens returning to their homes in the United States should be retained. I hope that the membership of this House will concur in this view, and support the amendment which I had proposed.

Mr. WALTER. Mr. Chairman, the language contained on page 34 which

the gentleman attempts to amend, is entirely adequate to carry out the purposes in bona fide cases. This is a modified restatement of the old so-called seventh proviso. I think it would be dangerous to adopt an amendment without anybody having given it proper consideration, but right now I am sure that what the gentleman seeks to do has been done under the language in the bill, and I ask that the amendment be rejected.

The CHAIRMAN. The question is on the amendment offered by the gentleman from Wisconsin [Mr. ZABLOCKI].

The amendment was rejected.

The CHAIRMAN. The Chair recognizes the gentleman from Pennsylvania [Mr. CHUDOFF], who has an amendment at the desk.

The gentleman has 2½ minutes of his allotted time left. Does he wish to have the amendments considered together or separately?

Mr. CHUDOFF. Mr. Chairman, the amendments both relate to the same subject matter.

The CHAIRMAN. Without objection, both amendments will be read by the Clerk and on conclusion they will be voted on en bloc.

Mr. WALTER. Mr. Chairman, reserving the right to object, I do not know whether or not the amendments are related.

The CHAIRMAN. The Clerk will report the amendments and the gentleman's reservation will stand until he has heard the amendments read. I was assured by the gentleman from Pennsylvania that they were related amendments.

The Clerk read as follows:

Amendment offered by Mr. CHUDOFF: Amend section 340 (b), page 136, by inserting after the word "or" in the eighth line thereof the following: "if personal service cannot be obtained."

Amendment offered by Mr. CHUDOFF: Amend section 342, page 139, by striking out of lines 9 and 10 of said sections "at said person's last known place of address."

The CHAIRMAN. Is there objection to considering the amendments en bloc?

There was no objection.

Mr. CHUDOFF. Mr. Chairman, these amendments are also clarifying amendments. They do not affect the bill one way or the other; they apply in denaturalization proceedings under this bill if there is just cause shown for denaturalization. The Attorney General of the United States or district attorneys in the various districts have the right to file a petition, a show-cause order against the person naturalized, to show cause why his naturalization should not be revoked.

In these amendments it appears that notice of these petitions can be given in the alternative, that is by personal service upon the alien that is the person complained against, or by publication. Mr. Chairman, I think that the due-process clause of the Constitution comes into the question here, and I think the Supreme Court has held many times that it is necessary to make personal service wherever possible, although they do recognize service by publication.

My amendments would simply do this: They would provide that the alien can-

not be served by publication unless every possibility of personal service has been exhausted. I believe a recent Supreme Court decision interpreted the phrase "personal service" to mean that that is the only way in which it can be done and comply with "due process." These amendments just clarify the situation. They do not give the Attorney General the alternative but state that he must make personal service wherever he can.

Mr. WALTER. Mr. Chairman, will the gentleman yield?

Mr. CHUDOFF. I yield.

Mr. WALTER. I just saw the amendment a moment ago. Is that amendment No. 37 of the series of amendments prepared by Jack Wasserman?

Mr. CHUDOFF. Yes. Amendment No. 37.

Mr. WALTER. Mr. Chairman, I rise in opposition to the amendment.

Mr. Chairman, the amendments that we are now considering and have been for the last few minutes are of a series prepared by the lawyer who was retained to try to prevent action on this bill. The gentleman from Pennsylvania [Mr. CHUDOFF] has stated that this was amendment No. 37 of that series. I happen to have the entire group of amendments that was parceled out among various Members.

The effect of this amendment would be to make it impossible to denaturalize somebody if he could avoid service. Under the language of this act we follow the provisions of existing law, law that exists in practically all of the States. There must be a return on the service of papers before there can be advertising. Certainly it seems to me we ought not to depart from the usual rules respecting service, and that is what this amendment would do.

I ask that the amendments be defeated.

The CHAIRMAN. The question is on the amendments offered by the gentleman from Pennsylvania [Mr. CHUDOFF].

The amendments were rejected.

The CHAIRMAN. The Chair recognizes the gentleman from New York [Mr. POWELL].

Mr. POWELL. Mr. Chairman, I did not intend to speak on this bill because I can see by the temper of the House it is going to roll through preponderantly, but some things have been said here this afternoon which are not quite correct and I rise to put the record straight, even though the voting will not be straight.

M'CARRAN-WALTER BILLS; SOME MAJOR FAULTS OF OMISSION AND COMMISSION

First. Quotas:
(a) An anachronistic base census year.
(b) Asia-Pacific triangle.
(c) Quotas to which natives of dependent areas are chargeable.
(d) Proposal for utilizing unused quotas.

Second. Exclusion:
(a) Criminal classes.
(b) Visas secured by willful misrepresentation.
(c) Literacy requirements—exclusion.
(d) Definition of "good moral character."

Third. Deportation:
(a) Statute of limitations.
(b) Deportation for public charge.
(c) Mental condition.
(d) Criminals and "undesirable residents of the United States."
(e) Countries to which an alien shall be deported.

Fourth. Review process.

Fifth. Naturalization:
(a) Requirements as to reading and writing English.
(b) Prohibition of naturalization of persons favoring a totalitarian ideology.
(c) Revocation of naturalization.

Sixth. Alien registration:
(a) Penalty for failure to carry registration card.
(b) Notice of change of address and penalty.

First. Quotas:
(a) An anachronistic base census year:

Both in existing law and in the McCarran and Walter bills quotas are based on the 1920 census. Since the quota base is now 30 years old, we suggest that it would be more equitable to use instead the data of the latest available census year, 1950. Thus quotas would be based on the present composition of our population rather than its structure three decades ago. It would provide an opportunity to apply more scientifically sound statistical techniques than those in use a quarter of a century ago.

The result would be to adjust the quotas of many nationality groups, especially those from southern and eastern Europe, whose proportional contributions to United States population have increased during the last 30 years. This would minimize the great waste of quotas we are now experiencing.

(b) The Asia-Pacific triangle:

This section establishes an Asia-Pacific triangle and assigns it an annual quota of 100, in addition to separate quotas for independent countries, self-governing dominions and territories under the international trusteeship system of the United Nations, situated within the Asia-Pacific triangle. This section provides, however—as is the case in existing law with respect to Chinese, Filipinos, and persons indigenous to India—that an alien born outside this triangle, but attributable by as much as one-half of his ancestry to a people or peoples indigenous to the triangle, is chargeable not to the quota of his country of birth but to the quota of the country of his ancestry, or, if no such quota exists, to the Asia-Pacific triangle quota of 100. Thus a person born in England of an English father and an Indian mother is categorized as an Indian, and must apply for admission not under the British quota of 65,000—even though he may be a British citizen—but under the Indian quota of 100.

While this section takes a forward step by making all peoples, regardless of race, eligible to immigration, it nevertheless perpetuates certain objectionable racist features. The ancestry test smacks closely of the infamous Nuremberg laws of Hitler Germany. For the United States not to apply the country of birth formula uniformly is to discriminate against certain native citizens of other countries on the grounds of their ancestry. This will be offensive to such countries—as it would be to us—and will be resented throughout the world by the peoples discriminated against. It is therefore recommended that the principle that an alien be chargeable to the quota of his country of birth apply universally, regardless of the racial ancestry of the alien. Adoption of this principle in our immigration law will enhance our country's moral leadership in the world and, in particular, strengthen our prestige in the critical areas of Asia where the struggle between democracy and communism rages most fiercely in the minds of men—sections 202 (a) (4) and 202 (b).

(c) Quotas to which natives of dependent areas are chargeable:

This section provides that immigrants born in a colony or other dependent area for which no separate quota has been established shall be chargeable to the quota of the governing country up to the limit of 100 per year. This section, in its impact, discriminates especially against would-be immigrants from Jamaica, Trinidad, and other colonies of the West Indies, most of whom are Negroes.

There seems to be no reason to establish such a new restriction. It is recommended instead that the natives of colonies and dependent areas located in the Western Hemisphere be accorded non-quota status, just as are natives of all other countries in the Western Hemisphere. Furthermore, in the interest of utilizing fully such quota numbers as are available, it is recommended that the present law be retained—section 202 (c).

(d) Proposal for utilizing unused quotas:

Annual quotas of 150,000—in addition to provision for nonquota immigration—were adopted in the Immigration Act of 1924 as an approximation of the number of immigrants which this country could readily assimilate and which would meet its needs and obligations. It is well known, however, that due to the rigidity of the quota system, a large part of the quotas have never been used. During the 26 years the present quota law has been in effect, only 44 percent of the possible quota immigrants have actually been admitted. This has prevented many persons anxious to come to the United States from doing so, and has deprived our country of those who could have added to our strength, productivity, and varied culture.

To correct this situation, it is recommended that the present bills be amended to provide that the unused quotas in any fiscal year be available during the following fiscal year to immigrants, regardless of country of birth, who qualify within certain specified categories, and that these categories include, first, immigrants who, because of their high education, technical training, specialized experience or exceptional ability, **are**

urgently needed in the United States—so far as such needs have not been met within the original quotas—or are likely to be of special benefit to the national economy, cultural interests, or welfare of the United States; second, close relatives of American citizens or resident aliens, so far as this need is not met under nonquota or original quota provisions; third, refugees from persecution or threat of persecution for religious or racial reasons, or because of adherence to democratic principles or opposition to communism, totalitarianism, or dictatorship; fourth, immigrants, on application by an American citizen, a reputable American organization, or an American official, whose cases, because of special circumstances or hardship, merit special treatment; that is, cases which at present can be dealt with only by private bills.

It is further suggested that unused quotas might be used to relieve, to some extent, the heavy drain on future quotas created by the admission of aliens under the Displaced Persons Act of 1948, as amended, particularly in the case of countries which, like the Baltic States, have quotas which are notoriously small and have been reduced by half for years to come, in some instances for periods exceeding 50 years.

The adoption of this proposal for utilizing unused quotas would make our quota system more flexible, far less discriminatory, and much more responsive to human and national needs. It would also greatly strengthen the moral leadership which the United States is endeavoring to exercise in the world at a time when the struggle for men's minds is at a critical stage.

Second. Exclusion:

(a) Criminal classes:

Both bills provide for the exclusion of aliens who admit committing acts which constitute the essential elements of a crime involving moral turpitude, other than a purely political offense. In contrast, existing law provides for the exclusion of aliens who admit having committed a felony or other crime or misdemeanor involving moral turpitude. The bills would thus place in the hands of administrative officials, such as consuls or immigration inspectors, the authority to determine what acts constitute a crime. It is noted that what may be considered a crime in a foreign country may not be so considered in the United States. Shall consular and immigration officials be expected to become so expert in foreign laws as to be equipped to determine whether crimes committed under such laws involve moral turpitude pursuant to American standards of justice? It is considered that the standard of existing law is adequate in this respect to protect the interests of the United States.

The McCarran bill provides for the exclusion of aliens who have been convicted of two or more offenses, other than purely political offenses, regardless of whether the offenses involved moral turpitude, if the aggregate possible sentence to confinement was 5 years. The Walter bill would require the 5-year sentence to have been actually imposed. These provisions, and particularly that in the McCarran bill, could easily have

the effect of making foreign criminal laws determinative of the decisions of United States officials. Thus, if the aggregate possible confinement for a violation of a foreign sanitary code and the failure to register under some totalitarian law is 5 years, an alien would be excluded even though such crimes do not constitute moral turpitude, and even though the alien never spent a day in jail, but was merely compelled to pay fines for such a violation. This provision should be eliminated—section 212 (a) (9), (10).

(b) Visas secured by willful misrepresentation:

The McCarran bill provides for the exclusion of an alien who has secured a visa or other documentation by fraud or by willfully misrepresenting a material fact. The Walter version makes an exception for those persons who misrepresented a material fact because of fear of persecution and when the misrepresentation is found by the Attorney General not to have been material to the issue in the proceeding in question. Such exception is not contained in the McCarran bill. Under the provisions of the latter bill, therefore, a person who made a misrepresentation to a foreign government, for example, in order to obtain a travel document so that he might escape from a totalitarian country, could be held excludable. Although the Walter bill version of this provision is considered preferable, it is suggested that this too is deficient in not specifying that willful misrepresentation of a material fact, to be grounds for exclusion, must be made to an official charged with the administration of the United States immigration laws and that the alien have obtained a benefit by such a misrepresentation—section 212 (a) (19).

(c) Literacy requirements: Both bills provide for the exclusion of aliens over 16 years of age who cannot read or understand some language, and eliminate exemptions made under existing law in favor of close relatives of American citizens and permanent resident aliens, as well as to victims of religious or racial persecution. The omission of these exemptions run counter to one of the claimed purposes of the bill—the reuniting of families—and their restoration is strongly urged—section 212 (a) (25).

(d) Definition of good moral character: The McCarran bill undertakes to define in detail the concept of "good moral character" which is used in various sections of the bill. We consider this inadvisable, and recommend that, in the interest of flexibility, the rigid criteria of the McCarran bill be eliminated, as they have been in the Walter bill. It is our considered view that good moral character is a matter to be determined on the particular facts of each individual case, since it is a changing concept which varies from period to period and, indeed, from region to region. To define rigid categories, without regard for the usual flexible judgment on character, can only do harm and injustice to candidates for admission—section 101 (f).

Third. Deportation:

(a) Statute of limitations:

Section 241 (a) (1) directs the deportation of any alien who at the time of entry was within one or more of the

classes of aliens excludable by the law existing at the time of such entry. It thus makes forever deportable any alien who entered the United States illegally, no matter how innocently, and irrespective of the grounds for exclusion. This would require the deportation of aliens, for example, who were admitted, but should have been excluded, either for technical reasons not detected at time of entry, or because incorrectly charged to a particular quota, or because mistakenly classified as nonquota instead of quota immigrants. The offense of crossing our borders without the required documents is to be prevented if possible, and punished if detected within a reasonable time, but surely one to be forgiven in time.

That a person should not be forever in jeopardy for a minor and long-past offense, is a principle almost universally accepted in law and morality. It is, therefore, recommended that a reasonable statute of limitations, such as exists in our present immigration law, be included and applied to cases not involving either the security of the United States or serious criminal offenses.

In addition, deportability is made retroactive by section 241 (d), which thereby may reach aliens who have lived in the United States for many years, who have family and business connections, who could not get naturalized because of some deficiency in their status and who for that reason now become deportable although the deficiency may be a minor technical one.

(b) Deportation for public charge:

The McCarran bill provides for the deportation of an alien who, in the opinion of the Attorney General, has heretofore within 5 years after entry become or hereafter and at any time after entry shall be or shall have been a public charge from causes not affirmatively shown to have arisen after entry.

The Walter bill provides for the deportation of an alien who, in the opinion of the Attorney General, has within 5 years after entry become a public charge from causes not affirmatively shown to have arisen after entry.

The McCarran bill would thus require the deportation of aliens who became at any time public charges, no matter how long ago this occurred, and for how short a time they were public charges, and regardless of how prosperous their present circumstances may be. Moreover, the determination as to circumstances which led to the alien's becoming a public charge is left—in both bills—to the subjective opinion of the Attorney General, which in practice usually means to subordinate immigration officials. Under McCarran's proposed change, it would be a serious hardship for an alien to bear the burden of proof long after his admission, that he became a public charge for reasons that did not exist prior to his entry. The new provision seems to serve little purpose except to harass aliens in need of public relief.

The standards of existing law, it is felt, adequately protect the country and should be retained—section 241 (a) (8).

(c) Mental condition:

The McCarran bill would require the deportation of any person who is institutionalized in a mental hospital within

5 years after entry regardless of whether or not at public expense. The Walter bill limits deportation to aliens institutionalized at public expense.

These provisions would treat more harshly persons suffering from mental condition than from physical, a differentiation which has no validity in this era of enlightened medicine. The Senate version, in particular, is objectionable, in that the mere hospitalization, even though not at public expense, makes the alien deportable. Neither bill would limit deportation where the condition arose because of circumstances that developed after entry—241 (a) (3).

(d) Criminals and undesirable residents of the United States:

The McCarran bill provides for the deportation of any alien convicted of any criminal offense, no matter how minor and no matter how long he has lived in the United States, if the Attorney General in his discretion concludes that the alien is an "undesirable resident" of the United States. Such sweeping discretion is contrary to normal democratic procedure, especially since normal sanctions for criminal action seem adequate. Deportation is surely an unnecessary additional penalty. In addition, the term "undesirable resident" lacks precision—section 241 (a) (4).

(e) Countries to which an alien shall be deported:

Both the McCarran and Walter bills include the Internal Security Act provision enumerating the various countries to which an alien may be deported; these range from a country designated by the alien, to countries of which he is a subject, national or citizen, or in which he was born or has ever resided, or from which he entered the United States, or which has sovereignty over his birthplace. If, however, deportation to any of these countries is found impracticable, then the alien may be deported to any country which is willing to accept such alien into its territory, except to one in which the Attorney General shall in his discretion find that such alien would be subjected to physical persecution.

Inasmuch as deportation to a wide range of countries is possible, it is recommended that the clause permitting deportation to any country which is willing to accept such alien into its territory be omitted. It is considered inhumane to deport an alien to a country with which he may lack any ties of blood, language, custom, former residence, or other previous tie. Nor is it enough in this connection to limit deportation to a country where the alien would be subjected to physical persecution. This limitation should at the very least be broadened to include persecution in any form, including racial, religious, or political. Nor would such broadening be susceptible of abuse, since the Attorney General is given discretion to determine whether or not the alien would be subject to persecution in the country to which it is proposed to deport him—section 243.

Fourth. Review processes: Both bills fail to provide necessary judicial protection to the alien by omitting to make provision for a Board of Immigration Appeals and a Visa Review Board. They

explicitly deny further inquiry to any alien who may appear to the examining officer to be excludable under paragraphs 27, 28, and 29 of section 212 (a), relating to subversive classes—section 235 (c)—a discretion that is contrary to normal democratic procedures. It is recommended, where the exclusion is for security reasons, and it is deemed vital to protect the Government's sources of information, at least the alien be accorded an opportunity, in accordance with normal standards of American justice, to plead his side of the story and bring any witnesses he may desire.

It is further recommended that the existing nonstatutory Board of Immigration Appeals be retained and made statutory, and that the existing procedure be retained, whereby appeal may be made to the Commissioner of Immigration and Naturalization from a decision of a lower official to exclude an alien, and from the latter's decision, if adverse, to the Board of Immigration Appeals.

Under present law, consular officials have an absolute right to deny issuance of a visa, and there is virtually no means whereby an interested American citizen or organization may obtain a hearing to put in question the correctness of the action of the consul. While the Department of State may require a report of the consul, final discretion lies with the latter, the Department's participation being limited to an advisory opinion.

It is therefore further urged that a Visa Review Board be established empowered to review and reverse consular decision to issue or deny visas. Such Board should provide an opportunity for an American citizen or organization interested in bringing an alien to this country to appeal on his behalf to an administrative body in the United States.

Fifth. Naturalization:

(a) Requirements as to reading and writing English:

This section would incorporate into our permanent nationality law the requirement, recently effectuated also in the Internal Security Act of 1950, that an applicant for naturalization be able not only to speak but also to read and write English. The only requirement of the Nationality Act of 1940 was that a candidate be able to speak English, and we urge that the old requirement be readopted. The new provision is considered an unnecessarily onerous burden for older persons in particular, since they experience considerable difficulty in learning to read, let alone to write, a new language. For such persons especially, the new and harsh requirement may bar them effectively from reaching citizenship status.

Nor is the exemption for persons over 50 years of age, and in this country for 20 years, a sufficient protection against these hardships, since the exemptions would not apply to those persons who meet the age and residence requirements after the date of enactment of the bill—section 312.

(b) Prohibition of naturalization of persons favoring a totalitarian ideology:

Both the Walter and McCarran bills exclude former members of subversive organizations from the right to apply for naturalization until at least 10 years have

passed since the ending of their membership. This provision is considered inconsistent with the principle enunciated in section 212 (a) (28) (i), which allows reformed members of subversive organizations to be admitted as immigrants to this country if their membership has ceased at least 5 years before submission of their applications for immigrant visas. The more lenient period presents the view that a former totalitarian may recognize his error and become a useful member of our democratic society within 5 years. There seems to be no valid reason to double this waiting period in the case of resident aliens who wish to be citizens. It is proposed that the 5-year period be used here—section 313 (c).

(c) Revocation of naturalization:

The McCarran and Walter bills provide that where a person who has been naturalized for 5 years or less becomes affiliated with a subversive organization, such affiliation shall constitute prima facie evidence that at the time of his naturalization he was not attached to the principles of the Constitution of the United States and was not well disposed to the good order and happiness of the United States. Joining such an organization, in the absence of countervailing evidence, is made sufficient grounds for revoking a person's naturalization on the basis that it was obtained by concealment of a material fact or by willful misrepresentation. The denaturalization shall be retroactive to the original date of receipt of citizenship.

This provision would undoubtedly have the effect of seriously impeding the freedom of speech and thought of recently naturalized citizens for at least a 5-year period, if not more. While membership is well defined, affiliation is not, and most new citizens will curb any activity rather than take the risk of running afoul of an ambiguous proscription. They will be afraid to express opinions on political matters, for fear that these may be interpreted as indicating affiliation with some subversive group which happens to have expressed similar views. Indeed, not only is the concept of affiliation illdefined; there is also a general unawareness by most people of what a subversive organization is, and by what criteria such an organization is so labeled, especially since the Attorney General's list—or which many new citizens are ignorant—is only intended to serve as standard of loyalty for Government employees. The result of such a provision is that our new citizens will be frightened from engaging in any intelligent political activity, for fear that they may somehow stumble into some error which will rob them of their newly won and prized citizenship. This is the very kind of silence of fear which we criticize the totalitarian nations for.

Nor can it be said that such a requirement is necessary to insure our internal security. There is sufficient protection in the McCarran and Walter bills against persons fraudulently denying totalitarian beliefs or affiliations at the time of their naturalization; other provisions in these bills provide for denaturalization where citizenship was actually obtained

by fraud or by material misrepresentation. It is recommended that this provision be eliminated—section 340.

Sixth. Alien registration:

(a) Penalty for failure to carry registration card:

Both bills require that every alien shall at all times carry with him any certificate of alien registration or alien registration receipt card issued him. Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall, upon conviction for each offense be fined not to exceed $100 or be imprisoned not more than 30 days, or both. The necessity for such a harsh provision is questioned, and we recommend that it be eliminated. However, if it is deemed necessary, in order to protect alien residents who have been in this country for many years and who may be unaware of such a new requirement, the penal provision should be made contingent on a willful failure to comply—section 264 (e).

(b) Notice of change of address and penalty:

The bills require an annual address report by every alien, whether permanently or temporarily admitted; a change of address report within 5 days of such change of address by the alien whether temporarily or permanently admitted; and a quarterly address report by all aliens with lawful temporary residence status.

An alien who fails to comply with any of these requirements is to be fined not more than $200 or be imprisoned not more than 30 days, or both. In addition, under the McCarran though not the Walter bill, any alien who fails to make these reports is to be deported, "unless such alien established to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful."

The penalty of deportation for a failure to report address or changes of address, even when such failure is willful, appears unduly harsh and it is recommended that the penalty of deportation apply only when it is proved that the intent of the alien is only to conceal his whereabouts for criminal or subversive purposes. It is important for the Government to be currently informed regarding the whereabouts of aliens in this country, but it is felt this can be best achieved by appropriate educational and publicity devices, rather than by threat of deportation—sections 265 and 266 (b).

According to a Senate Judiciary Committee press release, all racial discrimination would be removed from the law by the pending McCarran-Walter omnibus immigration bills, S. 2550 and H. R. 5678. With regard to the admission of Negroes in particular, this statement is unqualifiedly false. Not only does the proposed legislation perpetuate the discriminatory features of the 1924 Immigration Act, which excluded the descendants of slave immigrants from the population of the United States upon which the quotas were to be based, but the measure also contains a new provision which singles out natives of the West Indies for special bars to entry. In addition, under the bills, Negroes, as well as all other minority groups, would be subject to a host of new grounds for exclusion, deportation, denaturalization, and expatriation.

The 1924 Immigration Act established annual quotas for immigration which, in theory, were fixed by the proportionate relationship of each nationality group in the United States to the total 1920 population. In determination of the total population, however, Negroes were coupled with Asiatics, who were barred from citizenship, and with American Indians, who could not be proved to be immigrants, as inhabitants of this country whose presence was to be completely ignored. Such an exclusion was not an innocent accident. The 1924 law early achieved notoriety for the racist sentiments which engendered it and the Ku Klux Klan support which insured its passage. The McCarran-Walter bills perpetuate this obvious racist discrimination, and by so doing reaffirm a bias against Negro immigration which should have been repudiated long ago.

To ensure that only a token number of colored persons may enter the United States, the proposed legislation further strikes directly at the major modern source of this population flow. Most Negro immigration to our country today comes from Jamaica, Trinidad, and other colonies of the British West Indies; on the whole, this immigration has contributed thousands of good workers, loyal citizens, and leaders who now fill important positions in the national economy. The McCarran-Walter bills, by dissociating colonial immigration from the quota of the mother country, would cut down West Indian immigration from about 1,000 to 100 immigrants annually, and would fix 100 as an iron-clad maximum limit upon every other colony. When it is recognized that the inhabitants of Canada, Mexico, or any other independent country in the Western Hemisphere may enter freely as nonquota immigrants, the racially discriminatory aspects of this provision are placed in proper perspective.

Of special interest to Negroes, and to their fellow Americans, are the new provisions of the proposed measure which represents an attack upon our basic civil liberties. Where the present law provides for the deportation of aliens who have committed serious crimes, for example, the McCarran bill would allow the deportation of any aliens who had committed a violation of a municipal ordinance—like parking at the wrong place at the wrong time or throwing trash into the street—if the Attorney General declares such aliens undesirable. As a result, infractions of the law punishable with a $5 fine in the case of a citizen would cause an immigrant to be sentenced to deportation, which in many cases means the breakup of a family. Since persons charged with petty offenses do not have a constitutional right to jury trial or representation by counsel, or to most of the other traditional safeguards of our democratic system, the proposed legislation would make aliens helpless victims of malicious neighbors, professional extortionists, and politically minded officials.

Similar in concept are the new sections set forth in the McCarran-Walter bills which would render aliens forever deportable even if there was only a minor, technical defect in their admission, or even if the incidents now held against them were not grounds for deportation at the time they occurred. The former provision runs counter to one of the most fundamental percepts of our law; the principle that a person who has committed a wrong which is not of the most serious nature and who has thereafter become a law-abiding citizen will, after a lapse of time, acquire immunity against prosecution. The latter provision is in violation of the spirit, if not the letter, of the constitutional prohibition against passage of an ex post facto law.

Not even the acquisition of American citizenship would permit an immigrant to escape from the impact of the McCarran-Walter bills. Where the present law protects the interest of the United States by providing for the denaturalization of citizens who obtained their citizenship papers through fraud or illegality, the proposed legislation substitutes for these words the terms "concealment of a material fact" and "willful misrepresentation." In combination with other sections of the measure, this provision would greatly increase the reasons for which citizenship may be lost. What may previously have been totally irrelevant for purposes of naturalization would now be a material fact. A brief absence from the United States during the period of required continuous residence, or an act committed many years before naturalization would be material facts which could form the basis of revocation proceedings. A casual contribution of 25 cents to the collection box of an organization which later fell under totalitarian control might result in the loss of citizenship. Finally, whereas under present law the revocation of the naturalization of a parent or spouse does not affect, except in the case of actual fraud, the naturalization of a child or spouse who acquired citizenship through such naturalization, such child or spouse would also lose citizenship under the McCarran-Walter bills if denaturalization occurred by reason of the parent's concealment of a material fact or willful misrepresentation.

In the final analysis not even native-born American citizens would be left unscathed by the proposed legislation. Today, for example, no Government official can come to an American citizen's place of work and cross-examine him without a court warrant based on probable cause. The McCarran-Walter bills do away with that precious American liberty. If these measures become law, then citizens as well as aliens become subject to such examination, for the test is not whether a person actually is an alien—as the law now states—but whether he is believed to be an alien for such purposes. Today a citizen can resist such invasions of his privacy and appeal to the courts; on such appeal he need show only that he is a citizen. Under the proposed legislation, however, he would have to prove further that the invading official did not believe him to be an alien. Since proof of another man's state of mind is almost im-

possible, this shift practically eliminates judicial review of administrative abuses.

Under another section of the McCarran-Walter bills, American citizens by birth may be deprived of their citizenship by failing for 5 years to secure court review of an adverse finding by an official concerning such status. Lastly, the proposed legislation provides for the expatriation of American citizens who, without receiving the permission of United States authorities, serve in the armed forces of a foreign state, regardless of whether such service was voluntary or involuntary. Additional grounds for the loss of citizenship are the performance of the duties of any office under a foreign government for which an oath of allegiance is required, regardless of whether the oath was actually taken.

I would like to say that when the author of this bill states that the ad in the New York Times yesterday might have been placed there by those who were Communists, that is not quite correct.

Mr. WALTER. I did not say that.

Mr. POWELL. I do not yield. I only have 3 minutes.

Mr. WALTER. I think in fairness he should yield.

Mr. POWELL. If the chairman will give me one additional minute of his time I will yield.

The CHAIRMAN. The gentleman will proceed in order.

Mr. POWELL. Mr. Chairman, if you will look over this ad you will find it is composed of anti-Communists, and I will later on when the Committee rises put it in the RECORD. There is not a single Communist in this list. In fact, the lawyer that has just been referred to by the author of the bill, who came before the committee with these various amendments, represented the American Bar Association. Is that a Communist organization? Is it even liberal?

This bill sets up a Cape Town-Washington, D. C., axis. That is what it does. This bill makes this no longer a land of the free, but a place only for Anglo-Saxons. It is racial discrimination, Mr. Author, because this bill removes from emigrating to the United States the only group that does come here who are Negroes, the people from the West Indies. Yes; I know it allows people from Haiti and Santo Domingo, but they do not come to America. I have 150,000 West Indians in my district alone, and they occupy the highest and best positions in the city of New York—judges, district attorneys, Federal attorneys, commissioners—and their crime rate is much lower than some of our proud Anglo-Saxon stock. This is, I regret, a Cape Town-Washington, D. C., axis we are setting up today.

We are setting up a policy that is not going to help us in our fight throughout the world. Do not think that what you do here is not going to be heard over the world. It is going to be heard in the Caribbean. It is going to be heard where there are people of the dark races. We are going to need them sometime. We are not big enough to whip this world by ourselves and I hope we do not undertake to do it by ourselves. I know you are going to rush it through, the chips

are down, but I hope to God that the other body or the President vetoes the bill so that we will not have a model T bill of the twenties but an atomic age-bill based on 1950.

If all these new provisions contained in the McCarran-Walter bills are analyzed, it is clear that they are based on a rejection of the principle stated in the Declaration of Independence that all men are created equal. The proposed legislation assumes that the only foreigners who are desirable in America are Anglo-Saxon foreigners, preferably if they got here 100 years or more ago. All others, presumably, are members of inferior breeds, who should be kept out of the United States by any means available, or deported, if possible, for the most trivial of reasons. Under these bills, if they are passed by Congress and signed by the President, the United States will itself become an iron-curtain country. We will become the western counterpart of the Union of South Africa's apartheid. Maybe that is what some of you want; but, if so, you are sowing the certain seeds for the destruction of America. The Rome-Berlin axis was defeated and the Capetown-Washington, D. C., axis cannot escape the same fate.

The CHAIRMAN. The Chair recognizes the gentleman from Illinois [Mr. REED].

Mr. REED of Illinois. Mr. Chairman, I wish to pay a deserving tribute to the chairman of our subcommittee [Mr. WALTER]. It was my privilege last year to go with the committee to the Brussels Conference as the result of which the Provisional Intergovernmental Committee for the Movement of Migrants From Europe was born. When at that Conference, composed of representatives of 28 nations of the world, he was honored by being requested to make the initial address in recognition of his known familiarity with the subject matter under consideration. His address was listened to with great interest and in the main, the suggestions he advocated were later adopted by the Conference.

Let me remind the Members that today we are passing general legislation. A bill of this character is intricate. It cannot and will not please all of us. Those who may be disappointed that the quotas for some of the overpopulated countries of Europe have not been increased can, however, take comfort in the fact that as the result of the Brussels Conference an organization has been set up which will this year bring 115,000 displaced persons to nations within the Western Hemisphere where they will have the opportunity to establish themselves anew, and, in peace and safety, provide a living for themselves and families, and that a steady migration of such persons will continue in greater numbers for at least the next 40 years.

Germany, Italy, Netherlands, Austria, and Greece, the most overpopulated of these European countries will furnish most of these emigrants and they will be settled in Canada, Australia, Brazil, Chile, and Bolivia.

The United States has contributed $10,000,000 for its share in maintaining this international organization for the

year 1952. Without doubt it will continue to support it in the years to come. We have already taken 305,000 of these displaced persons into our own midst. If the Congress so desires we may take more.

The unusual conditions that now prevail in Europe will in the years to come, steadily decrease, and then when emigration becomes normal, we may well consider readjusting our existing quotas.

In my opinion, the bill before us is the best that we could, with prudence, pass at this time. It has received months of arduous study by the subcommittee. It is sound. It is workable. It probably has some defects but time and the return to normal conditions will make them patent and they can be corrected. I urge its passage as worthy legislation.

The CHAIRMAN. The Chair recognizes the gentleman from Minnesota [Mr. JUDD].

Mr. AUGUST H. ANDRESEN. Mr. Chairman, I ask unanimous consent to yield the time allotted me to the gentleman from Minnesota [Mr. JUDD].

The CHAIRMAN. Is there objection to the request of the gentleman from Minnesota?

There was no objection.

Mr. JUDD. Mr. Chairman, I want first to pay tribute to the great Committee on the Judiciary and especially to its Subcommittee on Immigration and Naturalization for its long and arduous work on this bill which is exceedingly complicated, because it deals with so many individual cases and situations which are by their very nature complicated. I want also to express my gratitude for the long-suffering and understanding patience which its members have shown to some of us who perhaps seemed at times to have axes to grind because of the importunity with which we have pressed for certain changes in our immigration laws. It was only because we were so concerned about the inequities in this field which we felt simply must be corrected if we are to have peace in the world and security for our own country. Particular appreciation is due the chairman, the gentleman from Pennsylvania [Mr. WALTER], for his unfailing courtesy, along with his thorough mastery of this subject and his high patriotism in trying to get done the things that he believed were for the interest of all of us.

Mr. Speaker, I do not contend that this bill is a final solution to our immigration problems or that it gives perfect equity and justice in all situations. There are some things in it that I do not like. I do not suppose any single Member of this House or even on the subcommittee agrees with everything in the bill. But certainly this bill, if enacted into law, represents an enormous forward step and a great improvement over the hodgepodge of immigration legislation which has grown up since the last comprehensive revision. It does remove a good many injustices that presently exist, although one cannot say that it does perfect justice to every needy and deserving person.

One of the most important and significant advances and the one in which I

am most interested, of course, is the inclusion of the provisions of my bill to remove racial discrimination from our immigration and naturalization laws, while preserving the basic national origins principle. I have been working for 9½ years, since I first entered Congress, to get this long overdue action taken. My bill was passed twice by the House of Representatives, once in the Eightieth Congress and again in the Eighty-first Congress, but each time was stymied in the other body because of failure to get on the program or for one reason or another.

I was in Asia during the twenties and thirties and saw the devastating effects on its people and on ourselves, of the Racial Exclusion Act of 1924. I am convinced that when history is written it will be recognized that perhaps the single biggest factor causing Japan to turn away from her original desire and tendency to go along in friendship and harmony with the United States and other Western Powers, was the passage of that act. It was the wrong way to deal with the problems which admission of large numbers of cheap Oriental labor inevitably created. That act turned Japan over into the hands of the rabble-rousers and the militarists who were trying to develop a race war of the colored peoples of the earth against the white peoples as a means of gaining world power for themselves. It led to the loss of thousands of American lives and to disturbances in Asia which are still costing us and will continue to cost us dearly in blood and treasure for years to come.

During all the intervening years I have felt that no greater contribution to developing good will on a long-term basis between the east and west could be made than by removing that insult to the people of Asia because of their race—an insult which had no possible justification and no benefit to ourselves. I am certain we will not have secure relations with Asia, including the new Japan, until the stigma in our laws is removed.

I am deeply grateful that this omnibus bill today contains in one place or another all the provisions of my bill, H. R. 199, to remove racial discrimination from both our immigration laws and our naturalization laws.

Mr. JAVITS. Mr. Chairman, will the gentleman yield?

Mr. JUDD. I yield to the gentleman from New York.

Mr. JAVITS. Does not the gentleman believe it is unjust to limit the quota as we did in the Caribbean and to antagonize those colored peoples?

Mr. JUDD. No; I do not think that it is unjust in principle. I recognize it seems unfair to those individuals who might otherwise be able to enter our country from colonies under quota numbers of the mother country.

They have been able to come in through an unforeseen exception to the basic national origins principle that underlies our immigration policy. The bill is not, however, unjust to them when it extends to them the same principle that already applies to others.

When I worked here in 1943 to get a quota for the Chinese whose help and

loyalty and understanding we needed during the war, and then when we made Filipinos and natives of India eligible in about 1946, some said, "This is only a beginning. Little by little you will chip away our immigration barriers. These are the camel's nose under the tent, and one by one you will tear down our immigration laws and our country will be thrown wide open to immigration from countries with cultures and standards widely different from those on which this Nation was founded," and all that sort of thing. I said, "I will resist efforts to do that." And to remove racial discrimination from our immigration laws does not destroy them; it improves them. It does not abandon the principles on which they are based; it merely extends them to people now wholly excluded because of race.

Mr. CELLER. Mr. Chairman, will the gentleman yield?

Mr. JUDD. I have only a little time; but I must yield to the gentleman from New York, the chairman of the committee, who has been unfailingly considerate to me.

Mr. CELLER. Does not the gentleman think it is in part discriminatory, if you say you will take all the Brazilians that want to come into this country, or you will take all the Uruguayans that want to come into this country, or all the Puerto Ricans that want to come into this country, but when it come to the islanders such as those that live on Guadeloupe and Jamaica, you say, "No," and you limit the quota for all of them to 100?

Mr. JUDD. The islands you mention are not on all fours with Uruguay and Brazil which are independent countries; or with Puerto Rico which is a Territory of the United States. Jamaica is a colony of Great Britain. Why should it as a colony be in a more favored position than the Dominions? Australia and New Zealand each has only the minimum quota of 100 a year. But Jamaica now can use several thousand quota numbers a year that belong to Great Britain. This bill gives minimum quotas to colonies too and thus puts the Jamaicans on the same basis as the other peoples in the world except independent countries in the Western Hemisphere. Jamaica has had a position of special privilege because it had access to the largest quota of all, that of Great Britain. So, while there is a sense in which the bill is hard on them, and I am sure it will seem to them unfair, yet the fact is that it does not discriminate against them; rather it merely takes away a special privilege they have had as compared to other peoples. The bill does establish equity and justice in our immigration laws as far as race is concerned, which we have never had since the beginning, or at least not since the 1924 act.

The bill removes race from the naturalization laws by providing the privilege of becoming a naturalized citizen of the United States "shall not be denied or abridged because of race." Eligibility would not be on the basis of race as at present. It would be on the basis of the individual human being. If

he can qualify intellectually, physically, morally and financially and obtains a quota number which the bill makes available to each country and colony and a separate quota of 100 for the Asia-Pacific triangle to take care of the persons of mixed bloods in Asia, then he is eligible to be admitted as an immigrant and in due course to be naturalized regardless of his race. That is the way it ought to be. It makes clear that we believe in the principles of equality and democracy which we are always talking about. Yet if every quota number made available in the bill to Asian countries were used by persons of Asian ancestry, it would admit only 1,485 additional such persons in a year. What an insignificant price, if it is a price, to pay for such benefits.

Half the people of the world live in Asia. Half the potential soldiers, half the potential producers, half the potential consumers of the world, whose good will and friendship and confidence we are going to need in the years ahead. This bill begins to treat them as equal human beings. It is morally right. It is sound if regarded solely from the standpoint of our economic and our security interests in the Pacific and it takes out of the hands of the Kremlin its most powerful and effective propaganda weapon against us all 'round the world.

The CHAIRMAN. The Chair recognizes the gentlewoman from Michigan [Miss Thompson].

Miss THOMPSON of Michigan. Mr. Chairman, I am a new member of this committee, and I do not feel as well informed as the other members of the committee. However, I have worked with the chairman long enough to know that he has the confidence of every member of the committee. I believe this is a good bill, and I hope it will be passed.

Mr. MEADER. Mr. Chairman, will the gentlewoman yield?

Miss THOMPSON of Michigan. I yield to the gentleman from Michigan.

Mr. MEADER. Mr. Chairman, I would simply like to have the record complete. When we get back into the House I shall ask permission to include in my remarks a letter which will settle any doubt about the authority of the witness who appeared before the committee handling this bill to speak for the American Bar Association.

I call attention to page 4415 of the Record, which should be corrected to show the authority of Mr. Wasserman, who appeared on behalf of the administrative law section of the American Bar Association to present the bar's position on the same subject on which I addressed the House yesterday, namely, the preservation of the right of judicial review of administrative decisions.

Mr. CELLER. Will the gentleman also include the seven objections the American Bar Association addressed to the bill itself? I think that is attached to the gentleman's letter.

Mr. MEADER. Apparently a telegram was sent to each member of the Judiciary Committee.

Mr. CELLER. Will the gentleman put that in the Record at that point?

Mr. MEADER. I will put that in the RECORD also.

AMERICAN BAR ASSOCIATION, SECTION OF ADMINISTRATIVE LAW, 1950–51, *March 19, 1951.*

JACK WASSERMAN, *Chairman, Committee on Immigration and Naturalization, Washington, D. C.*

(Appearance of Jack Wasserman on behalf of the American Bar Association and its section of administrative law in opposition to certain provisions of S. 716 and H. R. 2379.)

DEAR MR. WASSERMAN: This letter will confirm that there has been delegated to you, pursuant to the delegation of the house of delegates of the American Bar Association upon the administrative law section, and by the section upon its chairman of the national committee, authority to represent the American Bar Association and its administrative law section in connection with the hearings on S. 716 and H. R. 2379, Eighty-second Congress, first session.

As you are aware, the section unanimously expressed its disapproval of the similar provisions of S. 9:55 of the Eighty-first Congress, second session, and of the rider in the Supplemental Appropriation Act, 1951 (act of September 27, 1950, c. 1052, Pub. 843), by which deportation proceedings are specifically exempted from the provisions of the Administrative Procedure Act. The section has directed its officers and the council to take all appropriate action feasible to bring about repeal of the provision.

The house of delegates of the American Bar Association has expressed its disapproval of specific exemptions of the Administrative Procedure Act at its midwinter meeting in 1950, and directed the administrative law section by all necessary and proper means, including appearances before legislative committees (1) to preserve the gains made by the adoption of the Administrative Procedure Act as the law of the land, (2) to develop and seek the adoption of improvements thereof as well as additional measures to like purposes, and (3) to procure the assistance of officers, units, and members of the association as well as the cooperation of those of State and local bar associations. Accordingly, the association is opposed to the specific or implied exemptions from the Administrative Procedure Act in any of the bills pending before the Subcommittee on Immigration and Naturalization.

To the extent you find it advisable or necessary, you are authorized to use this letter as showing your authority to represent the American Bar Association and its administrative law section in connection with its objectives herein set forth.

Very truly yours,

JOHN W. CRAGUN, *Chairman, National Committee, Administrative Law Section, American Bar Association.*

I am informed that the following message was sent to members of the Judiciary Committee with reference to H. R. 5678:

We respectfully urge the following amendments to H. R. 5678. First amend section 242b to provide for trial examiners appointed under section 11, Administrative Procedure Act, so as to restore law as settled by Supreme Court in Sung case. Second, amend 242a to maintain present authority of courts to review denial of bail. Third, amend 242f to retain present right of hearing before deportation to alien previously deported. Fourth, amend 252 so as to maintain present constitutional right of seamen to hearing before deportation. Fifth, revise 360 to preserve the present satisfactory procedure for securing declaration of nationality. Sixth, delete 343 providing for cancellation of certificates of citizenship with its unconstitutionally inadequate provisions for notice. Seventh, amend 340b insofar as it permits substituted service without any showing that personal notice cannot be made. We urge these amendments in the belief that resident aliens, naturalized citizens, and citizens generally wherever they may momentarily be are entitled to the protection of fair procedure as established by the Constitution and the Administrative Procedure Act.

IMMIGRATION COMMITTEE OF ADMINISTRATIVE LAW SECTION, AMERICAN BAR ASSOCIATION.

Mr. ROOSEVELT. I just want to correct the record also. I have received the following communication from Mr. James Carey, secretary-treasurer of the CIO, that Mr. Nathan Cowan, CIO legislative director, who testified in opposition to the McCarran-Walter bill, definitely represents the position of the CIO and of all affiliated organizations that have had an opportunity to express themselves on this misguided proposal.

The CHAIRMAN. The Chair recognizes the gentleman from Massachusetts [Mr. KENNEDY].

Mr. KENNEDY. Mr. Chairman, I am today voting for the motion to recommit the so-called Walter immigration bill, H. R. 5678.

My opposition to this bill is based on my belief that the Walter bill, in some of its provisions, restricts rather than liberalizes our immigration system. There were many amendments proposed in the past 2 days which might, had they been accepted, resulted in a sufficiently equitable bill. They were, unfortunately, rejected by the House.

Although the reasons for my opposition to the Walter bill are numerous, there are a few specific provisions of the bill which I oppose especially. They include:

First. The fact that the Walter bill bases its quota allotments on 1920 census data. Obviously, if we are to achieve the desired modernization of our immigration system, we must use as a base for quotas the 1950 census, as provided for in the Humphrey-Lehman and Roosevelt bills.

Second. The fact that the Walter bill makes no provision for the utilization by low-quota countries of the plentiful number of unused quotas of other countries like Great Britain and the Scandinavian countries.

Third. The continued restrictions of the Walter bill on immigration from the southern and eastern European countries. Italy, for example, with its entire population crowded into an area no larger than the State of California, can hope for no appreciable help from the Walter bill in solving its chief problem today.

Fourth. The fact that the Walter bill changes immigration quotas for Jamaica and other Caribbean colonies from the never-filled United Kingdom quota of 65,721, to a special quota of 100 for each such colony—thus, drastically restricting immigration from this area.

In voting for the recommittal of the Walter bill I do so in the hope that the Judiciary Committee will report back to the House a bill more in line with the Humphrey-Lehman, Roosevelt bills.

The CHAIRMAN. The Chair recognizes the gentleman from California [Mr. YORTY].

Mr. YORTY. Mr. Chairman, the subcommittee headed by the gentleman from Pennsylvania [Mr. WALTER] has done a monumental job in preparing the pending proposed codification of our laws governing immigration and naturalization. The gentleman from Pennsylvania is one of the most respected and able Members of Congress.

The subcommittee did not, as I understand it, endeavor to use this codification bill to effect a general substantive revision of our immigration and naturalization statutes. Rather it attempted to codify and clarify existing law. Because of this fact, the bill reiterates existing immigration policies decided upon by Congress in previous sessions. The bill restates some policies with which I do not agree, but it does without question contain much that is good. For instance, sections 201, 202, and 311 eliminate race as a bar to immigration and naturalization. This is one of the few important substantive changes made by the bill, and it is a very good one. In fact, I have introduced a separate bill to do this very thing. It will make citizenship possible for many loyal residents of Japanese ancestry who have contributed much to industry and agriculture in my own State of California. I fervently desire to see these residents, many of whom have American-born children, admitted to the citizenship status they have well earned and long desired.

Mr. Chairman, I believe in a liberal immigration policy. Of course, we must properly screen those whom we admit in order to keep out undesirables such as chronic malcontents, habitual criminals, hatemongers, and subversives of all types. But with proper safeguards, I believe in a liberal policy; one based upon individual evaluation instead of race or nationality characteristics. Our concept of human rights and individual dignity should bar us from judging aliens or anyone else en masse.

Discrimination based upon race or religion should find no place in our laws. Unfortunately, some unfair discrimination is contained in certain provisions of this bill. Amendments to correct or eliminate these discriminatory provisions have already been defeated with only a few of us of like mind remaining in the Chamber to vote for them. We have therefore missed an opportunity to make this bill the vehicle for much needed modernization of some of our immigration policies.

I, for one, do not like to see unused quota numbers forfeited for nonuse by eligible persons while others longing for an opportunity to escape oppression are made ineligible to use such quota numbers. If we are willing to admit a given number of immigrants, we should permit the full number to come, admitting each as an individual based upon his or her own qualifications for admittance.

Those of us whose ancestors came here long ago or recently exercise a high privilege when we say which of God's children shall be permitted to migrate to a

part of God's earth. There is no divine restriction on migration, no divine division of the earth into racial or religious areas. We, therefore, in exercising the privilege accorded to us as citizens of a sovereign nation must be very careful to be fair and just. Obviously, to preserve opportunity, freedom, and orderliness, we must regulate immigration, but we also must not be unmindful of the great values involved in bringing new people into our partnership for democracy and defense of our way of life. We need more Americans to share the great task of leading the peoples of the world out from under the threatening shadows of totalitarianism. I am disappointed that the pending bill does not change the law so as to permit us to open our doors to more persons who sincerely desire to adopt our way of life and help us defend and perpetuate it.

The CHAIRMAN. The Chair recognizes the gentleman from Ohio [Mr. JENKINS].

Mr. JENKINS. Mr. Chairman, I join most heartily with the other Members of this House in complimenting those who have been responsible for this legislation that has engrossed the attention of the House for the past two or three days. The fact that every amendment offered that was not approved by those in charge of this legislation has been defeated is a great compliment not only to the ability, but to the fairness of those in charge of the bill. The past day or two has been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirables just as it is their wish now, while there was a small group who were then as now willing to lower the bars and admit almost anybody just so more of their own kind could come in without let or hindrance.

I think the records will show that the group of people that has complained the most against our immigration laws has profited more from our immigration system than any other group.

Mr. CELLER. Mr. Chairman, will the gentleman yield?

Mr. JENKINS. I yield.

Mr. CELLER. If I may correct the gentleman, there were a number of amendments accepted. A number of amendments prevailed.

Mr. JENKINS. I meant no amendments offered were adopted by the House except those which were acceptable to the committee.

Mr. Chairman, a year or two ago one of the able Members of the Senate put out a statement which I think is very significant and very applicable to the matter under discussion. This is in substance what he said. In reference to the indiscriminate entry of aliens it should be remembered that the Attorney General of the United States recently stated that an analysis of 4,984 of the more militant members of the Communist Party in the United States showed that 91.4 percent of the total were of foreign stock or were married to persons of foreign stock.

I admit that many of our finest citizens are persons who came to our land as immigrants. But I have observed that a great percentage of our lawless and communistically inclined persons are of foreign stock.

When our country was young, immigration brought us almost exclusively Europeans whose ideals were of those of western Christian civilization; these people were instrumental in subduing and settling our frontiers; they wished to conform to rather than modify or supplant the body of traditions and ideals summed up in the word America.

From about 1880, our immigration shifted sharply to include millions of persons from southern and eastern Europe. Most of these people were less sympathetic to the ideals of the United States and a very large portion of them were non-Christians who had no intention whatever of accepting the ideals of western Christian civilization, but had purposes of their own. These purposes were accomplished by infiltration, propaganda, and electoral and financial pressure. The average American was not aware of what was going on and remained undisturbed.

One reason for large-scale Communist exploitation of the United States was our traditional lack of laws prohibiting or regulating immigration into the United States and our negligence or politics in enforcing immigration laws when they had been passed. There is ample evidence that there is an alarmingly large number of aliens in the United States in an illegal status. Under the alien registration act of 1940 some 5,000,- 000 aliens were registered. Some of these are fine persons but since we had no record of them it is safe to say that if they came in illegally they would probably always feel inclined to show little respect for our laws and might readily affiliate with subversive elements. I remember that about 20 years ago I visited a district immigration inspectors office in one of the larger cities of Texas and was advised that at that time they were holding a large number of aliens who had entered illegally but that they were going to be compelled to turn them loose because they did not have funds to deport them nor to feed them.

Those of us who believe in keeping out of our country all undesirables and in admitting only the number that we can assimilate into our body politic we should be more inclined to listen to the immigration officials who are trying to do their duty than to the people who are advocating the admission of all classes of people without regard to morals, health, patriotism, or national welfare. Likewise, we should not be too anxious to admit those groups that are constantly protesting and claiming unfair treatment while statistics show that for 7 years, from 1937 to 1943, these groups produced from 25 to 77 percent of our total immigration. Again I say we should be careful.

The CHAIRMAN. The Chair recognizes the gentleman from Wisconsin [Mr. ZABLOCKI].

Mr. ZABLOCKI. Mr. Chairman, I offer an amendment.

The Clerk read as follows:

Amendment offered by Mr. ZABLOCKI: On page 69, delete section 244 and substitute therefor the following:

"SEC. 244. (a) As hereinafter prescribed in this section, the Attorney General may, in his discretion, suspend deportation and adjust the status to that of an alien lawfully admitted for permanent residence, in the case of an alien who—

"(1) is deportable under paragraph (1) of section 241 (a) insofar as such paragraph does not relate to criminals, prostitutes or other immoral persons, subversives, violators of narcotics laws, and similar classes, proves that he has been a person of good moral character for 5 years, and (A) has been in the United States for a continuous period of 7 years and establishes that his deportation would result in serious detriment to himself, or (B) establishes that his deportation would result in serious detriment to his spouse, parent, or child who is a citizen or an alien lawfully admitted for permanent residence; or

"(2) is deportable under paragraph (1) of section 241 (a) insofar as it relates to criminals, prostitutes or other immoral persons, subversives, violators of narcotics laws and similar classes or under paragraph (2) of section 241 (a), as a person who entered the United States without inspection or at a time or place other than as designated by the Attorney General, or without the proper documents and is not within the provisions of paragraph (3) of this subsection; and (A) has been physically present in the United States for a continuous period of not less than 10 years after such entry and immediately preceding his application under this paragraph and proves that during all of such period he has been and is a person of good moral character, or (B) is a person whose deportation would result in serious detriment to the alien's spouse, parent, or child, who is a citizen or an alien lawfully admitted for permanent residence; or

"(3) is deportable under paragraph (2) of section 241 (a) as a person who has remained longer in the United States than the period for which he was admitted, or paragraph (4), (5), (6), (7), (11), or (12) of section 241 (a) for an act committed or status acquired subsequent to such entry into the United States; and (A) has been physically present in the United States for a continuous period of not less than 10 years immediately following the commission of an act, or the assumption of a status, constituting a ground for deportation, and proves that during all of such period he has been and is a person of good moral character, or (B) is a person whose deportation would result in serious detriment to the alien's spouse, parent, or child, who is a citizen or an alien lowfully admitted for permanent residence.

"(b) Upon application by any alien who is found by the Attorney General to meet the requirements of subsection (a) of this section, the Attorney General may in his discretion suspend deportation of such alien. If the deportation of any alien is suspended under the provisions of this subsection, a complete and detailed statement of the facts and pertinent provisions of law in the case shall be reported to the Congress with the reasons for such suspension. Such reports shall be submitted on the first and fifteenth day of each calendar month in which Congress is in session. If during the session of the Congress at which a case is reported, or if a case is reported less than 30 days prior to the close of the session, then during the next session of the Congress, either House passes a resolution stating in substance that such House does not favor the suspension of such deportation, the Attorney General shall thereupon deport such alien in the manner provided by law. If during the session of the Congress at which a case is reported, or

If a case is reported less than 30 days prior to the close of the session, then during the next session of the Congress, neither House passes such a resolution, the Attorney General shall cancel deportation proceedings upon the termination of such session.

"(c) Upon the cancellation of deportation in the case of any alien under this section, the Attorney General shall record the alien's lawful admission for permanent residence as of the date the cancellation of deportation of such alien is made, and the Secretary of State shall, if the alien was classifiable as a quota immigrant at the time of entry and was not charged to the appropriate quota, reduce by one the quota of the quota area to which the alien is chargeable under section 202 for the fiscal year then current at the time of cancellation or the next following year in which a quota is available. No quota shall be so reduced by more than 50 percent in any fiscal year.

"(d) The Attorney General may in his discretion permit any alien under deportation proceedings, other than an alien within the provisions of paragraph (4), (5), (6), (7), (11), or (12) of section 241 (a) (and also any alien within the purview of such paragraphs if he is also within the provisions of paragraph (2) or (3) of subsection (a) of this section), to depart voluntarily from the United States at his own expense in lieu of deportation if such alien shall establish to the satisfaction of the Attorney General that he is, and has been, a person of good moral character for at least 5 years immediately preceding his application for voluntary departure under this subsection."

Mr. ZABLOCKI. Mr. Chairman, section 244 of the bill under consideration would severely restrict the present discretion of the Attorney General to prevent hardship to American citizens by suspending deportation in particularly meritorious cases.

The purpose of my amendment is to continue, with some much-needed liberalization, the present discretion of the Attorney General in the above regard.

There are ample grounds for continuing this discretion, and for rejecting the excessively restrictive provisions of section 244. This section, as reported to the House, would make it practically impossible for aliens with long-term residence, and of proved excellent quality, to acquire a status of legal permanent residence.

The terminology contained in section 244 of the bill is so restrictive as to direct a severe blow at family unity. In pursuance of this terminology, the Attorney General would lose his discretion to suspend deportation to prevent economic hardship on citizen wives, and children, except in the very limited class of cases where the prospective deportee has resided in this country for 5, 7, or 10 years—depending on the ground of his deportability—and his deportation would result in "exceptional and extremely unusual" hardship to a member of his immediate family.

These two provisions would practically abolish the great mass of suspension cases as they exist today. An elaborate, impracticable system would be set up which would hardly ever be utilized, and Congress would be swamped with petitions for private bills.

The requirement to the effect that the applicant, in order to qualify for a suspension, would have to prove that deportation would result in exceptional

and extremely unusual hardship to his immediate family, is not only very stringent but encompasses areas which are intangible, difficult to define, and involve an evaluation of the emotional content in any family life. Its operation might result in tragic family separations. A proof that the person's deportation would result in serious detriment—rather than exceptional and extremely unusual hardship—should be sufficient.

In addition, as proposed to the House, the bill has no provision for the man who has been here 20 or more years, who has no family, but would endure personal hardship if deported. A requirement of hardship should be sufficient whether it be to the alien or to his family. Then, where an alien has a citizen child dependent upon him, or a resident spouse who is in need of his support and companionship, he should be entitled to seek relief by way of suspension regardless of the length of his stay here, if he establishes that he is a person of good moral character. Proof that his deportation would result in serious detriment to his family should, as under existing law, be in itself sufficient grounds for eligibility for suspension.

We should favor reuniting families—keeping them together rather than disrupting them. Most civilized countries do just that. The provisions of section 244 will, if enacted, create more hardship cases than they will solve.

The amendment which I am proposing would substitute humane and reasonable requirements for those which are, in my considered judgment, drastically restrictive, unworkable, and seriously detrimental to family unity and have tragic implications for familyless aliens who have established proof of their good moral character and who have become thoroughly assimilated through long-term residence.

Since the temper of the House is obvious, I ask unanimous consent to revise and extend my remarks and withdraw the amendment.

The CHAIRMAN. Is there objection to the request of the gentleman from Wisconsin?

There was no objection.

The CHAIRMAN. The balance of the time will be allotted to the committee.

The gentleman from New York [Mr. CELLER] is recognized, if he desires to use any further time.

Mr. CELLER. I yield back the remainder of the time, Mr. Chairman.

The CHAIRMAN. Are there any further amendments?

If there are no further amendments, under the rule the Committee will rise.

Accordingly the Committee rose; and the Speaker having resumed the chair, Mr. HOLIFIELD, Chairman of the Committee of the Whole House on the State of the Union, reported that that Committee, having had under consideration the bill (H. R. 5678) to revise the laws relating to immigration, naturalization, and nationality; and for other purposes, pursuant to House Resolution 554, he reported the bill back to the House with sundry amendments adopted by the Committee of the Whole.

The SPEAKER. Under the rule, the previous question is ordered.

Is a separate vote demanded on any amendment? If not, the Chair will put them en gros.

## CALL OF THE HOUSE

Mr. LANHAM. Mr. Speaker, I make the point of order that a quorum is not present.

The SPEAKER. Evidently a quorum is not present.

Mr. McCORMACK. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll, and the following Members failed to answer to their names:

[Roll No. 63]

| | | |
|---|---|---|
| Aandahl | Elston | Morrison, La. |
| Abbitt | Feighan | Morton |
| Abernethy | Fernandez | Murray, Wis. |
| Andrews | Flood | O'Brien, Mich. |
| Angell | Fogarty | O'Konski |
| Arends | Forand | Passman |
| Ayres | Fugate | Patman |
| Bates, Ky. | Furcolo | Potter |
| Battle | Gary | Rains |
| Beall | Gore | Reece, Tenn. |
| Bender | Grant | Regan |
| Betts | Hall, Edwin | Roberts |
| Blatnik | Arthur | Sabath |
| Boykin | Hall, | Sasscer |
| Bray | Leonard W. | Scott, |
| Brooks | Hart | Hugh D., Jr. |
| Brownson | Hays, Ohio | Secrest |
| Buckley | Hedrick | Sheppard |
| Burnside | Heller | Sieminski |
| Butler | Herter | Sikes |
| Canfield | Hill | Stockman |
| Carlyle | Irving | Taber |
| Case | Jones, Mo. | Tackett |
| Chenoweth | Kearns | Teague |
| Clemente | Kerr | Watts |
| Combs | Kersten, Wis. | Welch |
| Cooley | Kirwan | Wheeler |
| Coudert | Larcade | Wickersham |
| Crosser | McGrath | Widnall |
| Davis, Ga. | McKinnon | Williams, Miss. |
| Deane | Machrowicz | Wilson, Ind. |
| DeGraffenried | Madden | Withrow |
| Dingell | Miller, Calif. | Wood, Ga. |
| Dondero | Mitchell | |
| Doyle | Morris | |

The SPEAKER. On this roll call 332 Members have answered to their names, a quorum.

By unanimous consent, further proceedings under the call were dispensed with.

---

## REVISION OF LAWS RELATING TO IMMIGRATION, NATURALIZATION, AND NATIONALITY

The SPEAKER. The question is on the amendments.

The amendments were agreed to.

The SPEAKER. The question is on the engrossment and third reading of the bill.

The bill was ordered to be engrossed and read a third time, and was read the third time.

Mr. KEATING. Mr. Speaker, I offer a motion to recommit.

The SPEAKER. Is the gentleman opposed to the bill?

Mr. KEATING. Yes, Mr. Speaker.

The SPEAKER. The gentleman qualifies.

The Clerk will report the motion to recommit.

The Clerk read as follows:

Mr. KEATING moves to recommit the bill H. R. 5678 to the Committee on the Judiciary for further study.

Mr. WALTER. Mr. Speaker, I move the previous question on the motion to recommit.

The SPEAKER. Without objection, the previous question is ordered.

Mr. ROOSEVELT. I object, Mr. Speaker.

The SPEAKER. The question is on ordering the previous question.

The previous question was ordered.

The SPEAKER. The question is on the motion to recommit.

Mr. JAVITS. Mr. Speaker, I demand the yeas and nays on the motion to recommit.

The yeas and nays were refused.

Mr. POWELL. Mr. Speaker, a parliamentary inquiry.

The SPEAKER. The gentleman will state it.

Mr. POWELL. If a Member desires to demand a reading of the engrossed copy, that means we will have to stay over until tomorrow?

The SPEAKER. It is too late for that now. The previous question has already been ordered on the motion to recommit.

The question was taken; and on a division (demanded by Mr. JAVITS) there were—ayes 62, noes 195.

So the motion to recommit was rejected.

The SPEAKER. The question is on the passage of the bill.

Mr. JAVITS. On that, Mr. Speaker, I demand the yeas and nays.

The yeas and nays were refused.

The question was taken; and on a division (demanded by Mr. POWELL) there were—ayes 206, noes 68.

So the bill was passed.

A motion to reconsider was laid on the table.

## GENERAL LEAVE TO EXTEND

Mr. CELLER. Mr. Speaker, I ask unanimous consent that Members may have five legislative days to extend their remarks in the RECORD on the bill just passed.

The SPEAKER. Is there objection to the request of the gentleman from New York?

There was no objection.

## SPECIAL ORDER GRANTED

Mr. SMITH of Mississippi asked and was given permission to address the House for 30 minutes on Tuesday next, following any special orders heretofore entered.

## ADJOURNMENT OVER

Mr. McCORMACK. Mr. Speaker, I ask unanimous consent that when the House adjourns today it adjourn to meet on Monday next.

The SPEAKER. Is there objection to the request of the gentleman from Massachusetts?

There was no objection.

## CHEESE IMPORT RESTRICTIONS THWART AMERICAN CONSUMERS AND IMPEDE FIGHT AGAINST COMMUNISM

Mr. EBERHARTER. Mr. Speaker, I ask unanimous consent to address the House and to revise and extend my remarks at this point in the RECORD.

The SPEAKER. Is there objection to the request of the gentleman from Pennsylvania?

There was no objection.

Mr. EBERHARTER. Mr. Speaker, one of the ironical aspects of section 104 of the Defense Production Act is the fact that by its language it tries to justify cheese restrictions in the name of our national defense. As a matter of fact, there is a relation between our national defense and these cheese restrictions. Let me point out the relation.

In southern Italy widespread poverty and unemployment have created easy pickings for Communist organizers. Before section 104 was enacted, one of the bright spots in the economy of southern Italy was a growing export trade in cheese. Pecorino, romano, and the other pungent cheeses of the area were coming to the United States in growing volume, giving employment to southern Italy, giving dollars to the Italian economy, and giving some new taste sensations to the American consumer. Section 104 put the lid on this development and handed the local Communist agonizers the finest propaganda plum of the year. They have not been slow in seizing this opportunity. Furthermore, as we have been closing our market, the Soviets have been purchasing, with obvious propaganda efforts, substantial quantities of products such as lemons, oranges, and almonds which are produced in this same area.

Politically and economically, Italy has been weakened as a result of section 104 and our collective security, of which Italy is an important link, has been badly damaged.

The SPEAKER. Under previous order of the House, the gentleman from Minnesota [Mr. AUGUST H. ANDRESEN] is recognized for 10 minutes.

## DR. FRANCES DENSMORE

Mr. AUGUST H. ANDRESEN. Mr. Speaker, it is with considerable pride that I am addressing my colleagues in the House of Representatives today and for a few moments to honor a famous living American. I refer to Dr. Frances Densmore, from my home city of Red Wing, Minn. I know that you will be interested in the life work of this great woman and distinguished scholar and to learn of her outstanding contribution to the culture and history of the western world.

Dr. Densmore is the greatest living authority on the music of the American Indian, and has devoted a lifetime to the collection and study of the songs of Indian tribes throughout the United States, and in British Columbia. She is a collaborator of the Bureau of American Ethnology of the Smithsonian Institution and an associate in ethnology of Southwest Museum, Los Angeles, Calif. She received the honorary degree of master of arts from Oberlin College in 1924 and was recently given the honorary degree of doctor of letters by Macalester College, St. Paul, Minn. Her work has attracted not only national but international attention. Scholarly papers of hers on Indian music have been published in South America, a full bibliography of her work will shortly be issued in Mexico City, and her correspondence has included scientists in Cuba and Japan as well as in the principal countries of Europe. Her career is one which deserves to be reviewed and placed permanently in the CONGRESSIONAL RECORD, particularly since so much of her work has been done in connection with our national institutions—the Smithsonian Institution, the National Archives, and the Library of Congress.

Dr. Densmore was born in Red Wing, Minn. As a young woman she studied music intensively at the Oberlin Conservatory of Music, also working under such teachers as Carl Baermann, of Boston; Prof. John K. Paine, of Harvard; and Leopold Godowsky, in the field of piano and counterpoint. With this solid and basic foundation in the music field, she taught music for many years, then turned—not to further study of European or foreign music, which would have been easy—but to the intensive study of indigenous American music, that of the American Indian. From 1893 to the present time, a period of nearly 60 years, she has pursued this study with unflagging interest. This is a devotion to a single subject of scholarship which merits recognition on the basis alone of the time given to it.

But beyond the matter of the 60-year span of time is the greater matter of Dr. Densmore's contribution to our knowledge of the American Indian's music. Let me cite some details of her work: Dr. Densmore's first field trip was to the Chippewa Indians at Grand Portage, Minn., on the north shore of Lake Superior, in 1905. Other trips were made to Indians in Minnesota at her own expense, and in 1907 the Bureau of American Ethnology alloted a small sum for the furtherance of her work. This sum was used primarily for recording equipment with which Dr. Densmore returned to the Indians to record their songs. As the result of her first succeful field recording trip, added funds were allotted and her work for the Bureau developed.

From the north woodland area it was extended to the northern and southern plains, the high plateau of Utah, the low desert of Arizona, the region of the Colorado River, the northwest coast of Washington and thence into British Columbia. Then she sought the Indians of Texas, Louisiana, and Mississippi, with three trips to the Seminole in Florida.

All her recording of Indian songs was done with a portable cylinder equipment, at first having a spring motor and later with storage electric battery. The result of her work for the Bureau of American Ethnology is designated as the Smithsonian-Densmore Collection of Indian Song Recordings. The catalog of this collection contains about 2,400 scngs, all of which have been transcribed in musical notation. Several hundred other transcribed recordings are preserved elsewhere, and she has recorded a large number of songs which have been studied but not transcribed. The songs include those of ceremonies, war, games, dances, and other customs. Special attention has been given to songs used in the treatment of the sick, and to songs of the Sun dance, the Ghost dance and the Peyote Cult. Some of the recorded songs are known to be about 200 years old.

Throughout this work the singers have been carefully selected and only the most reliable informants and interpreters have been employed.

This achievement of field collecting is increased in importance when we pause to think that without her effort the great majority of these songs would have passed into total oblivion. Many are forgotten among the Indians themselves, and the older singers are in most cases, long since dead. But these songs still live as part of the American heritage, preserved in sound on disks to which they have been transferred from the cylinders at the Library of Congress. For this work alone Dr. Densmore deserves to be honored.

Having gathered the songs in the field, however, Dr. Densmore then worked to prepare the material for permanent preservation in book form. Her monographs issued by the Bureau of American Ethnology are, to date, the definitive works in the field. They include the transcription of the words and music from the original cylinders, as well as careful studies of the customs and traditions surrounding the use of the music. They are, in other words, a record of Indian life and a notable aid to our understanding of the American Indian.

In addition to recording songs, Dr. Densmore has collected hundreds of specimens of musical instruments and other articles connected with the native life. Her largest collection is in the National Museum, but a notable collecton is also in the Museum of the American Indian in New York, which published her brochure on A Collection of Specimens From the Teton Sioux.

Mention should also be made of her expert photography in protraits of Indians as well as pictures of their environment.

Dr. Densmore's monographs include the following: Two volumes on Chippewa Music; Teton Sioux Music; Northern Ute Music; Mandan and Hidatsa Music; Papago Music; Pawnee Music; Menominee Music; Yuman and Yaqui Music; Cheyenne and Arapaho Music; Music of Santo Domingo Pueblo, New Mexico; Nootka and Quileute Music; and Choctaw Music. Others await publication. Outside of our own country, as stated, Dr. Densmore made a study of the music of the Indians of British Columbia. She also, apart from these specialized tribal studies, issued a general volume dealing with The American Indians and Their Music, as well as a book on Indian Action Songs. Beyond these studies of American Indian music, Dr. Densmore also issued volumes on Chippewa Customs; the Uses of Plants by the Chippewa Indians; Poems From Sioux and Chippewa Songs; and A Handbook of the Collection of Musical Instruments in the United States National Museum. Her scholarly and popular magazine articles are too numerous to list here, but I call attention to the fact that they are all included in a bibliography of Dr. Densmore's writings to 1946 which was published by the Journal of Musicology.

During the period of this activity for the Bureau of Ethnology Dr. Densmore undertook special projects which included a survey of the music of the Indians in the Gulf States for the National

Research Council in 1932 and 1933; research on Indian music for the Southwest Museum from 1935 to 1937; and a survey of the Indians in Michigan for the University of Michigan in 1945.

Her work for the Southwest Museum in 1935–37 comprised the recording of Cheyenne and Arapaho songs in Oklahoma, and the recording of songs of Santo Domingo Pueblo, New Mexico, by an Indian from that Pueblo, living in Los Angeles. Both these books were published by the museum. Under the same auspices she studied the music of the Maidu in northern California, the result still awaiting publication. During this period various honors quite naturally came to her, and I cite some of them which are indicative of her position.

Dr. Densmore was elected a fellow of the American Association for the Advancement of Science, and a fellow of the Washington Academy of Sciences. She has served as secretary of the Anthropological Society of Washington and the Society of Woman Geographers, and her memberships have included numerous other scientific societies. She is an honorary member of Sigma Alpha Iota, a national musical society; also the Minnesota Archaeological Society, the Thursday Musical of Minneapolis, and other organizations. She is a life member of the Minnesota Historical Society. In 1941 she received an award from the National Association of American Composers and Conductors for her service to American music.

All this would seem more than enough to round out a great career. And it would be for most persons, but not for Dr. Densmore, with her boundless and untiring energy. I come now to the work which Dr. Densmore has just completed for the Library of Congress, work which fittingly caps a lifetime of study of American Indian music. Let me describe this work for the historical record.

In 1941, through the generosity of Mrs. Eleanor S. Reese, a gift of $30,000 was presented to the Government of the United States for the preservation of Indian music. Specifically, this money was to be used to preserve in more lasting form the extraordinarily valuable cylinders of Indian music recorded by Dr. Densmore. The law which authorized the Government's acceptance of this gift was sponsored by me and supported by my colleagues. I am happy now to report on the near completion of that project, and at the same time to honor Dr. Densmore for her work in connection with it.

At the time of acceptance of the gift it seemed logical that the National Archives would be the most fitting place for the work to be undertaken. Accordingly, the great collection of cylinders, known as the Smithsonian-Densmore Collection of Indian Song Recordings, was transferred from the Smithsonian Institution to the National Archives. Dr. Densmore wrote a handbook of this collection while connected with the Archives. The recording and duplicating facilities of the National Archives proved to be inadequate to the very large task of preservation and the cylinders were, after considerable study, transferred to

the Music Division and Recording Laboratory of the Library of Congress. Dr. Densmore, as the logical authority on the subject of the music, was retained by the Music Division of the Library of Congress, but carried out her consultative work from her home in Red Wing, Minn.

In order to duplicate the vast collection the Recording Laboratory needed not only to purchase new equipment but had as well to construct special machines for playing both cylinders and disks. Once the equipment was ready the cylinders were copied onto two sets of 16-inch disks, one set being forwarded to Dr. Densmore and the second set retained at the Library of Congress. From her set Dr. Densmore has selected the most representative songs in each tribe and arranged them in a series of 10 units. For each she wrote a descriptive pamphlet, the order of these units being practically the same as that of the publication of the songs by the Bureau of Ethnology. These are to be available to the public, and four of them have already been issued by the Library of Congress in the form of long-playing records. The four which have been issued are Songs of the Chippewa; Songs of the Sioux; Songs of the Yuma, Cocopa, and Yaqui; and Songs of the Pawnee and Northern Ute.

The reception which these records have had in musicological and anthropological circles indicates clearly that the time and effort expended upon their initial preservation and subsequent manufacture has been well worth while. Favorable reviews of them have appeared in the Saturday Review of Literature, the New York Times, and American Heritage, also in the San Francisco Chronicle and other magazines and newspapers, as well as journals in the fields of anthropology and folklore. Dr. Willard Rhodes, of the music department of Columbia University, himself an authority on Indian music, describes the recordings as an extraordinarily valuable collection per se and for purposes of comparative study in the field of musicology. Dr. Duncan Emrich, Chief of the Folklore Section of the Library of Congress, states that there is no way of measuring the historical value of these recording; they are unique and irreplaceable. Dr. Harold Spivacke, Chief of the Music Division of the Library of Congress, indicates that they are one of the great treasures in the recorded collection of the Library of Congress, constituting a most important addition to our knowledge of musical America.

There can be no question that Dr. Frances Densmore's work belongs to the ages. And fortunately for the ages to come, her work has culminated in these very fine and wonderful sound recordings which will make it possible for students in the generations ahead to hear and to know the traditional music of the American Indian. It gives me great pride and pleasure at this time to honor here in the Halls of Congress this great American and eminent scholar, Dr. Frances Densmore, of Red Wing, Minn.

EXTENSION OF REMARKS

By unanimous consent, permission to extend remarks in the Appendix of the

RECORD, or to revise and extend remarks, was granted to:

Mr. FALLON.

Mr. SMITH of Wisconsin and to include a letter.

Mr. SADLAK and to include a resolution.

Mr. AUCHINCLOSS and to include a speech and a newspaper editorial.

Mr. MULTER and to include extraneous matter in the remarks made by him in Committee of the Whole.

Mr. POWELL and to include extraneous matter in remarks made by him in Committee of the Whole.

Mr. COLE of New York and to include a letter.

Mr. WIGGLESWORTH with reference to the public debt and to include certain tabular matter received from the Bureau of the Budget.

Mrs. ROGERS of Massachusetts and to include a speech made by General Vandenberg at Lexington on April 19.

Mr. HUNTER.

Mr. SCUDDER and to include an editorial.

Mr. BUDGE and to include extraneous matter.

Mr. VAN ZANDT in two instances.

Mr. POAGE.

Mr. ELLIOTT in two instances and to include extraneous matter.

Mr. PRICE and to include extraneous matter.

Mr. RANKIN and to insert in the remarks made today in Committee of the Whole excerpts from the RECORD.

Mr. ROONEY and to include an editorial.

Mr. MOULDER and to include an editorial from the Kansas City Star.

---

## SENATE ENROLLED BILL SIGNED

The SPEAKER announced his signature to an enrolled bill of the Senate of the following title:

S. J. Res. 144. Joint resolution to give the Secretary of Commerce the authority to extend further certain charters of vessels to citizens of the Republic of the Philippines, and for other purposes.

---

## ADJOURNMENT

Mr. McCORMACK. Mr. Speaker, I move that the House do now adjourn.

The motion was agreed to; accordingly (at 2 o'clock and 27 minutes p. m.), under its previous order, the House adjourned until Monday, April 28, 1952, at 12 o'clock noon.

---

## REPORTS OF COMMITTEES ON PUBLIC BILLS AND RESOLUTIONS

Under clause 2 of rule XIII, reports of committees were delivered to the Clerk for printing and reference to the proper calendar, as follows:

Mr. HOLMES: Committee on Ways and Means. House Joint Resolution 422. Joint resolution to permit articles imported from foreign countries for the purpose of exhibition at the Washington State-Far East International Trade Fair, Seattle, Wash., to be admitted without payment of tariff, and for other purposes; without amendment (Rept. No. 1810). Referred to the Committee of the Whole House on the State of the Union.

Mr. DAWSON: Committee on Expenditures in the Executive Departments fifteenth in-termediate report of the Committee on Expenditures in the Executive Departments, an inquiry into the procurement of automotive spare parts by the United States Government (Rept. No. 1811). Referred to the Committee of the Whole House on the State of the Union.

Mr. GARMATZ: Joint Committee on the Disposition of Executive Papers, House Report No. 1812. Report on the disposition of certain papers of sundry executive departments. Ordered to be printed.

---

## PUBLIC BILLS AND RESOLUTIONS

Under clause 3 of rule XXII, public bills and resolutions were introduced and severally referred as follows:

By Mr. BERRY:

H. R. 7592. A bill to authorize the negotiation and ratification of separate settlement contracts with the Sioux Indians of Lower Brule Reservation and Crow Creek Reservation in South Dakota for Indian lands and rights acquired by the United States for the Fort Randall Dam and Reservoir, Missouri River development, and for other related purposes; to the Committee on Interior and Insular Affairs.

By Mr. DINGELL:

H. R. 7593. A bill to amend paragraph 1774, section 201, title II, of the Tariff Act of 1930; to the Committee on Ways and Means.

H. R. 7594. A bill to amend the Tariff Act of 1930 with respect to the importation of the feathers of wild birds, and for other purposes; to the Committee on Ways and Means.

By Mr. HAVENNER:

H. R. 7595. A bill to authorize additional appropriations for the lower San Joaquin River project; to the Committee on Public Works.

By Mr. HOFFMAN of Michigan:

H. R. 7596. A bill to promote confidence in Presidential statements; to the Committee on Expenditures in the Executive Departments.

By Mr. JOHNSON:

H. R. 7597. A bill to authorize additional appropriations for the lower San Joaquin River project; to the Committee on Public Works.

By Mrs. KEE:

H. R. 7598. A bill to amend section 25 (b) (3) of the Internal Revenue Code, relating to the definition of dependent; to the Committee on Ways and Means.

By Mr. SIMPSON of Pennsylvania:

H. R. 7599. A bill to amend the Internal Revenue Code with respect to the time for filing individual income-tax returns and for other purposes; to the Committee on Ways and Means.

By Mr. ANFUSO:

H. R. 7600. A bill to amend the Federal Alcohol Administration Act, as amended; to the Committee on Interstate and Foreign Commerce.

By Mr. MORANO:

H. Con. Res. 212. Concurrent resolution to express the sense of the Congress with respect to the holding of a plebiscite in the Free Territory of Trieste; to the Committee on Foreign Affairs.

By Mr. HOFFMAN of Michigan:

H. Res. 612. Resolution to ascertain the reason for the making of inaccurate statements by the President of the United States; to the Committee on Rules.

---

## PRIVATE BILLS AND RESOLUTIONS

Under clause 1 of rule XXII, private bills and resolutions were introduced and severally referred as follows:

By Mr. FARRINGTON:

H. R. 7601. A bill for the relief of Gustav Peter Su'a, Ottile Gertrude Su'a, and Christoph Su'a; to the Committee on the Judiciary.

H. R. 7602. A bill for the relief of the estate of L. L. McCandless, deceased; to the Committee on the Judiciary.

H. R. 7603. A bill for the relief of Paul Chun, Jr.; to the Committee on the Judiciary.

By Mr. KING of California:

H. R. 7604. A bill for the relief of Michio Sasaki; to the Committee on the Judiciary.

By Mr. SADLAK:

H. R. 7605. A bill for the relief of Mrs. Rose Kaczmarczyk; to the Committee on the Judiciary.

By Mr. WALTER:

H. R. 7606. A bill for the relief of Alex Harfenist; to the Committee on the Judiciary.

---

# SENATE

## MONDAY, APRIL 28, 1952

*(Legislative day of Thursday, April 24, 1952)*

The Senate met at 12 o'clock meridian, on the expiration of the recess.

The Chaplain, Rev. Frederick Brown Harris, D. D., offered the following prayer:

God our Father, whom we seek in all our need and through all the mystery and perplexity of life; without whom we cannot live bravely or well: Show us Thy will for our individual lives in all the maze of paths our uncertain feet may take. And, as we draw nearer to Thee now in prayer, do Thou graciously draw near unto us until, at the beginning of another week's demanding tasks, we become more sure of Thee than of midday light. Come to us in the common life that entangles us, meet us in the thorny questions which confront us, and, though the hope of world-wide brotherhood often seems forlorn, may we be found ready to lead it. Without stumbling and without stain may we follow the gleam until the day is ended and our work is done. In the dear Redeemer's name. Amen.

---

## THE JOURNAL

On request of Mr. McFARLAND, and by unanimous consent, the reading of the Journal of the proceedings of Thursday, April 24, 1952, was dispensed with.

---

## MESSAGES FROM THE PRESIDENT

Messages in writing from the President of the United States submitting nominations were communicated to the Senate by Mr. Miller, one of his secretaries.

---

## MESSAGE FROM THE HOUSE

A message from the House of Representatives, by Mr. Maurer, one of its reading clerks, announced that the House had passed a bill (H. R. 5678) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes, in which it requested the concurrence of the Senate.