# EXHIBIT Z

82 Congressional Record - Senate,
May 22, 1952

actual expenses only. Salary and certain expenses paid by the National Electrical Contractors' Association.

---

A. J. H. Rose Truck Line, Inc., 3804 Jensen Drive, Houston, Tex.

C. (2) General interest extends to any amendment of Interstate Commerce Act; specific interest in (a) "A bill to amend the Interstate Commerce Act by establishing certain rules for the operation of irregular common carriers by motor vehicle"; (b) S. 2358; (d) against the bill; (e) for the confirmation of Hon. Charles D. Mahaffie as member of the Interstate Commerce Commission. (4) Annual compensation to attorney, $6,000 for all services, legislative and nonlegislative.

---

A. William H. Ryan, Room 303, Machinists Building, Washington, D. C.

B. District Lodge No. 44, International Association of Machinists, Room 303, Machinists Building, Washington, D. C.

C. (4) Approximately 5 percent of my time, but not more than 10 percent, will be spent on legislative work. My monthly salary is $499.98.

---

A. Ed. D. Schorr, 33 North High Street, Columbus, Ohio.

B. Ohio Coal Association, 1615 NBC Building, Cleveland, Ohio.

C. (2) Legislation pertaining to mine safety. (4) Office and travel expenses. Compensation not determined.

---

A. Salvage & Lee, 1 East Forty-third Street, New York, N. Y.

B. National Association of Margarine Manufacturers, Munsey Building, Washington, D. C.

(C). (2) H. R. 5012, Navy bill—For. (4) Anticipated expenditures of minor nature. No specific fee involved as this is but a small part of our work for association as public relations council.

---

A. Salvage & Lee, 1 East Forty-third Street, New York, N. Y.

B. (1) National Association of Retail Grocers, Washington, D. C.; (2) National Association of Food Chains, Washington, D. C.; (3) Cooperative Food Distributors of America, Chicago, Ill.; (4) Super Market Institute, Chicago, Ill.

C. (2) Principals interested in amendments as yet unformulated to Public Law 96, Eighty-second Congress; Defense Production Act Amendments of 1951. (4) $4,000 per month.

---

A. Harry L. Senger, 1539 Larry Avenue, Cincinnati, Ohio.

B. National Retired Teachers Association.

C. (2) H. R. 2764.

---

A. Stratton Shartel, 4635 Wyandotte, Kansas City, Mo.

B. Safeway Stores, P. O. Box 660, Oakland, Calif.

C. (2) Defense Production Act of 1950, as amended in 1951. (4) $10,000 retainer, no additional compenation while here. Traveling expenses only.

---

A. Leander I. Shelley, 111 Eighth Avenue, New York, N. Y.

B. The Port of New York Authority, 111 Eighth Avenue, New York, N. Y.

C. (2) For S. 2722 (KNOWLAND) to amend Defense Production Act; for S. 2815 (McCARRAN) to amend Federal Airports Act; for H. R. 4484 (WALTER) with respect to submerged lands; against S. J. Res. 20 (O'MAHONEY) with respect to submerged lands. (4) Total annual compensation $15,-000. Legislative activities minor, but compensation cannot be allocated.

---

A. Lloyd Vernon Stover, 1424 Sixteenth Street NW., Washington, D. C.

B. American Trucking Associations, Inc., 1424 Sixteenth Street NW., Washington, D. C.

C. (2) General legislative interests of American Trucking Association, Inc., include all bills, resolutions, and investigations affecting the trucking industry. (3) Special legislative bulletins; Transport Topics; Truck Beat. (4) Anticipated expenses: nominal, taxi fares, etc. Annual compensation, $3,600 per annum.

---

A. Russell J. Taylor, 9170 Fifteenth Street, NW., Washington, D. C.

B. United Shoe Workers of America, CIO, 917 Fifteenth Street NW., Washington, D. C.

C. (2) All labor legislation. In favor of all bills for the betterment of working conditions and opposed to all that are not in favor of the general welfare of the workers. (4) $484.

---

A. G. D. Tilghman, 1604 K Street NW., Washington, D. C.

B. Disabled Emergency Officers of the World Wars, 1604 K Street NW., Washington, D. C.

C. (2) All legislation affecting disabled veterans and their dependents, and survivors of deceased veterans. (4) Salary $10,000 per year, paid semimonthly, as chief administrative officer. Only a small portion of my time will be devoted to legislation. Anticipated expenses $10 per month.

---

A. George Thomas Underwood, 402 Albee Building, Washington, D. C.

B. American Institute of Wholesale Plumbing and Heating Supply Associations, Inc.

C. (2) Defense production controls, taxation, all other legislation affecting the business of members of the American Institute of Wholesale Plumbing and Heating Supply Associations, Inc. (3) National Affairs Bulletin. (4) Annual compensation $15,000 plus $5,000 expenses.

---

A. United Cerebral Palsy Associations, 50 West Fifty-seventh Street, New York City.

C. (2) Appropriations for public health. (4) Fee of $4,000 per annum, plus direct expenses of travel and incidentals.

---

A. U. S. Airlines, Inc., 500 Fifth Avenue, New York, N. Y.

C. (2) For legislation affecting favorably freight air carriers and against legislation that would adversely affect them. For certain amendments to S. 436. (4) To J. Hardin Peterson $5,000 per year, payable monthly. This covers legal services as well as legislative. Impossible to estimate exact legislative, probably one-fourth; only other expenses are traveling, hotel, and meals; small amount for postage, telegraph, and telephone; estimated $600.

---

A. U. S. Wood Screw Service Bureau, 53 Park Place, New York, N. Y.

C. (2) There are no bills, statutes, etc., yet introduced in which we have any interest. (4) No special funds are set aside for this work.

---

A. F. L. Waggoner, 9541 South Seeley Avenue, Chicago, Ill.

B. Aldens, Inc., Chicago, Ill.

C. (2) Current postal-rate bills and any other legislation relating to the postal service. (4) No compensation other than regular salary and reimbursement for expenses, if any.

---

A. Henry B. Weaver, Jr., Henry H. Glassie, and Thomas M. Cooley II, Tower Building, Washington, D. C.

B. The Liaison Committee for the Mechanical Specialty Contracting Industries, 610 Ring Building, Washington, D. C.

C. (2) Legislation forbidding unqualified and inexperienced contractors from undertaking mechanical specialty work on a cost-plus basis and forbidding bid-shopping after award of fixed-price contracts unless the net saving therefrom accrues to the Government. (4) A retainer fee of $4,250; a monthly retainer of $750 commencing March 1, 1952, plus such additional payments as may be mutually agreed upon from time to time in the future.

---

A. Charles F. West, Jr., Machinists Building, Washington, D. C.

B. International Association of Machinists, Machinists Building, Washington, D. C.

C. (2) Interested in substantially all legislation affecting the socio-economic and political interests of the American workingman, including all pending legislation dealing with social security, national health, aid to physically handicapped, labor relations, displaced persons, etc.

---

A. Julius M. Westheimer, Julius Gutman & Co., Inc., Park Avenue and Lexington Street, Baltimore, Md.

C. (2) Against: Fair-trade bills to revive nonsigner clauses, specifically: H. R. 4592, H. R. 4662, H. R. 6925, revised H. R. 6367; for: H. R. 4365, to repeal Fair Trade Enabling Act.

---

A. Adam Yarmolinsky, 224 Southern Building, Washington, D. C.

B. Comite Franc Dollar, 31, Avenue Pierre 4er de Serbie Paris 16e, France.

C. (2) General interest in all matters affecting imports into the United States—tariffs, quotas, etc. Specific interest in supporting S. 2104, bill to repeal section 104 of the Defense Production Act, and in opposing Ives amendment to S. 2645, to extend section 104. (4) Estimated expenses: See separate registration of Cleary, Gottlieb, Friendly & Ball.[1]

---

# SENATE

## THURSDAY, MAY 22, 1952

*(Legislative day of Monday, May 12, 1952)*

The Senate met at 12 o'clock meridian, on the expiration of the recess.

The Chaplain, Rev. Frederick Brown Harris, D. D., offered the following prayer:

Our Father God, mid all the traffic of life's ways, bowing at this daily altar of devotion we would lift our souls into the light of Thy presence. From the framing of laws and the forming of policies holding in their reach the woe or weal of our Nation and of the world, we would turn to an inner sanctuary where the world's angry voices die and Thou alone art real. In these times that try our souls and as we gird the might of the Nation to defend our threatened liberties, and even as we say to aggressive tyranny "Thus far shalt thou go, and no farther," we pray that we may take care to strengthen the spiritual foundations of our democracy, knowing that without

---

[1] Not printed. Filed with Clerk and Secretary.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

Thee we build on sinking sand. O hear us when we cry to Thee to make us fit to set men free. We ask it in the Redeemer's name. Amen.

## THE JOURNAL

On request of Mr. McFARLAND, and by unanimous consent, the reading of the Journal of the proceedings of Wednesday, May 21, 1952, was dispensed with.

## MESSAGE FROM THE HOUSE—ENROLLED BILLS SIGNED

A message from the House of Representatives, by Mr. Chaffee, one of its reading clerks, announced that the Speaker had affixed his signature to the following enrolled bills, and they were signed by the Vice President:

S. 148. An act for the relief of Gerdina Josephina Van Delft;

S. 420. An act for the relief of Gloria Wilson;

S. 603. An act for the relief of Wanda Charwat, and her daughter, Wanda Aino Charwat;

S. 695. An act for the relief of William Greville Birkett;

S. 794. An act for the relief of Mrs. Shu-Ting Liu Hsia and her daughter, Lucia;

S. 869. An act for the relief of Marie Cafcalaki;

S. 992. An act for the relief of Daniel Wolkonsky and his wife, Zenia Wolkonsky;

S. 1189. An act for the relief of Anthony Lombardo;

S. 1192. An act for the relief of Demetrius Alexander Jordan;

S. 1420. An act for the relief of Pinfang Hsia;

S. 1494. An act for the relief of George Georgacopoulos;

S. 1517. An act to amend the act of June 4, 1897, entitled "An act making appropriations for sundry civil expenses of the Government for the fiscal year ending June 30, 1898, and for other purposes," as amended, to enable the Secretary of Agriculture to sell without advertisement forest timber in amounts not exceeding $2,000 in appraised value;

S. 1565. An act for the relief of Andy Duzsik;

S. 1765. An act for the relief of Harumi Kamiaka;

S. 1766. An act for the relief of Frederic James Mercado;

S. 1879. An act for the relief of Ernest Nanpei Ihrig;

S. 2033. An act for the relief of Giuseppa S. Boyd;

S. 2034. An act for the relief of Charlotte Elizabeth Cason;

S. 2051. An act for the relief of Naomi Saito;

S. 2145. An act for the relief of certain displaced persons;

S. 2220. An act for the relief of Theresa Hatcher;

S. 2588. An act for the relief of Dulcie Ann Steinhardt Sherlock; and

S. 2770. An act for the relief of Matheos Alafouzos.

## LEAVES OF ABSENCE

On his own request, and by unanimous consent, Mr. IVES was excused from attendance on the sessions of the Senate for the remainder of the week, following the close of the session today.

On his own request, and by unanimous consent, Mr. McCLELLAN was excused from attendance on the sessions of the Senate from today until next Thursday.

## TRANSACTION OF ROUTINE BUSINESS

Mr. McFARLAND. Mr. President, I ask unanimous consent that Senators be permitted to transact routine business, without debate.

The VICE PRESIDENT. Without objection, it is so ordered.

## FREEDOM OF EMPLOYMENT—PETITION

Mr. SCHOEPPEL. Mr. President, a few days ago I received a petition signed by 144 members of the Cessna Aircraft Co., one of the large airplane manufacturing companies in the city of Wichita, Kans., requesting my help in retaining for themselves and other citizens of this Nation the right to decide for themselves whether or not they will join a union in order to obtain and/or maintain employment.

I believe this to be their right and privilege, and ask that unanimous consent be granted for this document to be printed in the RECORD, and appropriately referred.

There being no objection, the petition was referred to the Committee on Labor and Public Welfare, and ordered to be printed in the RECORD, as follows:

APRIL 30, 1952.

UNITED STATES SENATORS FROM KANSAS.

DEAR SIRS: Because we believe your influence can turn the tide of forced membership in an organization in order for citizens of the United States to earn a living for themselves and their families, we hereby petition you to do everything possible to maintain a constitutional freedom for us all—that of individually deciding for ourselves whether we join or do not join a union in order to obtain and/or maintain employment.

We, the undersigned, are a group of employees at the Cessna Aircraft Co., Wichita 1, Kans.

RAY R. GRANTZ,
JOSEPH M. STEELE
(And 142 other employees of the Cessna Aircraft Co.).

## EXTENSION OF CERTAIN STATUTORY PROVISIONS UNTIL JUNE 15, 1952—REPORT OF A COMMITTEE

Mr. McCARRAN. Mr. President, from the Committee on the Judiciary, I report an original joint resolution continuing the effectiveness of certain statutory provisions until June 15, 1952, and I submit a report (No. 1595) thereon.

The VICE PRESIDENT. The report will be received, and the joint resolution will be placed on the calendar.

The joint resolution (S. J. Res. 156) continuing the effectiveness of certain statutory provisions until June 15, 1952, reported by Mr. McCARRAN, from the Committee on the Judiciary, was read twice by its title, and placed on the calendar.

## ENROLLED BILLS PRESENTED

The Secretary of the Senate reported that on today, May 22, 1952, he presented to the President of the United States the following enrolled bills:

S. 148. An act for the relief of Gerdina Josephina Van Delft;

3. 420. An act for the relief of Gloria Wilson;

S. 603. An act for the relief of Wanda Charwat, and her daughter, Wanda Aino Charwat;

S. 695. An act for the relief of William Greville Birkett;

S. 794. An act for the relief of Mrs. Shu-Ting Liu Hsia, and her daughter, Lucia;

S. 869. An act for the relief of Marie Cafcalaki;

S. 992. An act for the relief of Daniel Wolkonsky and his wife, Zenia Wolkonsky;

S. 1189. An act for the relief of Anthony Lombardo;

S. 1192. An act for the relief of Demetrius Alexander Jordan;

S. 1420. An act for the relief of Pinfang Hsia;

S. 1494. An act for the relief of George Georgacopoulos;

S. 1517. An act to amend the act of June 4, 1897, entitled "An act making appropriations for sundry civil expenses of the Government for the fiscal year ending June 30, 1898, and for other purposes," as amended, to enable the Secretary of Agriculture to sell without advertisement forest timber in amounts not exceeding $2,000 in appraised value;

S. 1565. An act for the relief of Andy Duzsik;

S. 1765. An act for the relief of Harumi Kamiaka;

S. 1766. An act for the relief of Frederic James Mercado;

S. 1879. An act for the relief of Ernest Nanpei Ihrig;

S. 2033. An act for the relief of Giuseppa S. Boyd;

S. 2034. An act for the relief of Charlotte Elizabeth Cason;

S. 2051. An act for the relief of Naomi Saito;

S. 2145. An act for the relief of certain displaced persons;

S. 2220. An act for the relief of Theresa Hatcher;

S. 2588. An act for the relief of Dulcie Ann Steinhardt Sherlock; and

S. 2770. An act for the relief of Matheos Alafouzos.

## BILLS AND JOINT RESOLUTION INTRODUCED

Bills and a joint resolution were introduced, read the first time, and, by unanimous consent, the second time, and referred as follows:

By Mr. CASE:

S. 3217. A bill to facilitate the management of certain land and recreational resources of reclamation projects in or adjacent to the national forests of South Dakota, and for other purposes; to the Committee on Interior and Insular Affairs.

By Mr. CASE (for himself and Mr. MUNDT):

S. 3218. A bill to provide for the conveyance of a tract of land in Custer County, S. Dak. to the Crazy Horse Memorial Foundation, and for the reversion thereof to the United States; to the Committee on Agriculture and Forestry.

By Mr. SMATHERS:

S. 3219. A bill to provide for the disposal of certain lands in Florida; to the Committee on Interior and Insular Affairs.

By Mr. McMAHON:

S. 3220. A bill to authorize the advance on the retired list of First Lieutenant Nicholas Mainiero, United States Marine Corps Reserve (retired), to the grade of captain; to the Committee on Armed Services.

By Mr. McCARRAN:

S. J. Res. 156. Joint resolution continuing the effectiveness of certain statutory provisions until June 15, 1952, reported by Mr. McCARRAN from the Committee on the Judiciary; ordered to be placed on the Calendar.

(See the remarks of Mr. McCARRAN when he reported the above joint resolution, which appear under a separate heading.)

## EXECUTIVE REPORTS OF A COMMITTEE

The following favorable reports of nominations were submitted:

By Mr. STENNIS, from the Committee on Armed Services:

Brig. Gen. John States Seybold, United States Army, for appointment as Governor of the Canal Zone, vice Brig. Gen. Francis K. Newcomer, United States Army;

Vice Adm. Charles T. Joy, United States Navy, to have the grade, rank, pay, and allowances of a vice admiral while serving as Superintendent, United States Naval Academy;

Vice Adm. Robert P. Briscoe, United States Navy, to have the grade, rank, pay, and allowances of a vice admiral while serving as commander, Naval Forces, Far East;

Rear Adm. Ralph A. Ofstie, United States Navy, to have the grade, rank, pay, and allowances of a vice admiral while serving as a fleet commander; and

Capt. Ira H. Nunn, United States Navy, to be Judge Advocate General of the Navy, with the rank of rear admiral (Ex. Rept. No. 9).

## ADDRESSES, EDITORIALS, ARTICLES, ETC., PRINTED IN THE APPENDIX

On request, and by unanimous consent, addresses, editorials, articles, etc., were ordered to be printed in the Appendix, as follows:

By Mr. AIKEN:

Article entitled "Voluntary Procedures and Processes in Labor-Management Relations," written by Senator IVES, and published by the Industry Council Association, Inc., of New York City.

By Mr. MARTIN:

Excerpts from an address delivered by him on May 21, 1952, to Property Owners' Association of Philadelphia.

Editorial entitled "Bring Back the Cavalry?" published in the Harrisburg (Pa.) Evening News of May 20, 1952.

By Mr. CLEMENTS:

Article prepared by Mr. Thomas E. Williams, a member of the Senate library staff, concerning the Old Senate Rostrum.

By Mr. KILGORE:

Statement entitled "Government Workers: A Dozen Fables and Facts."

By Mr. FREAR:

Article by David Lawrence entitled "Editor's Nine Questions to RUSSELL, With the Senator's Answers," published in the New York Herald Tribune of May 8, 1952.

By Mr. FERGUSON:

Editorial entitled "New Attorney General," published in the Washington Post of May 22, 1952; and editorial entitled "Enter McGranery," published in the New York Herald Tribune of May 22, 1952.

By Mr. SCHOEPPEL:

Article entitled "Farm as a Time Bridge," published in the Kansas City Star of May 11, 1952.

By Mr. BENTON:

Article entitled "Time To Help India Is Now," written by Marquis Childs, and published in the Washington Post of May 20, 1952.

By Mr. MORSE:

Editorial entitled "Are Profits More Important To Steel Industry Than Greater Production?" published in the St. Charles (Mo.) Daily Banner of May 12, 1952.

Editorial entitled "Control Over Government Spending Becomes Essential," published in the Seaside (Oreg.) Signal of March 13, 1952.

Memorandum entitled "The Ascendancy of the Military in American Life," by E. Raymond Wilson, which appears in the Appendix.

## JACKASS AS UNITED STATES SYMBOL IN IRAN—ARTICLE FROM THE WASHINGTON POST

Mr. BRIDGES. Mr. President, I hold in my hand an Associated Press article published in the Washington Post this morning entitled "Jackass Becoming United States Symbol in Iran." The article starts with the statement:

A floppy-eared, bug-eyed jackass is fast supplanting the familiar figure of Uncle Sam in Iran as the symbol of the United States.

Mr. President, I knew we had gone pretty far in this country, but I did not know that the Democratic administration had come to the point of trying to supplant Uncle Sam, who has been with us since the founding of the country, and carried us through many stormy eras, with the jackass. I presume there must be some reason for this, and perhaps the jackass as a symbol might typify some of the blunders and mistakes which have been made by the administration in some aspects of its foreign policy.

I merely wish to call the attention of the Senate to this attempt to select a new symbol for our country. I knew the jackass was the symbol of the Democratic Party, but I did not know it had become the symbol of the United States. So far as I am concerned, I am willing to go along with Uncle Sam for a while longer. Perhaps, after January 20, 1953, Uncle Sam may come into his own once again and the jackass put out to pasture.

The VICE PRESIDENT. Is the Senator asking that the jackass be printed in the RECORD?

Mr. BRIDGES. I ask that the article about the jackass be printed in the RECORD.

Mr. McFARLAND. Mr. President, we have to have something to carry our Republican friends through, whether it be a jackass or something else.

The VICE PRESIDENT. If there is no objection, the article will be printed in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

JACKASS IS BECOMING UNITED STATES SYMBOL IN IRAN

TEHRAN, IRAN, May 21.—A floppy-eared, bug-eyed jackass is fast supplanting the familiar figure of Uncle Sam in Iran as the symbol of the United States.

Not a day passes but one newspaper or another carries a front-page cartoon showing the jackass in varying moods—sometimes plotting against Iran's independence, sometimes offering the country needed help, avaricious, surly—depending on the paper's political affiliation.

It all began several months ago when point 4 officials handled the shipment of a load of jackasses from Cyprus to Iran in a program to improve the local breed.

Iranian papers, forgetting all the good that point 4 was doing in the country, immediately seized on the "pore crittur."

"What's wrong with Iranian jackasses?" was heard everywhere around Tehran.

Whenever the newspapers thought they spotted something wrong in the point 4 program, they trotted out the floppy-eared, bug-eyed jackass.

When an antigovernment newspaper wanted to lampoon Premier Mohammed Mossadegh for agreeing last month to resumption of United States military aid, it showed him astride a donkey going off to fight America's battles.

The influential Keyham set the tone for the jackass controversy. Its editorial writer said:

"I have looked over the list of aid from the United States to Britain, Turkey, Italy, and Greece and have failed to see any mention of asses. Are we unique in the world in needing donkeys?

"What promises they made and what hopes they raised; and what is the result?—asses."

## NEWS COVERAGE OF THE STEEL DISPUTE

Mr. MORSE. Mr. President, I wish to make a very brief explanation of certain material which I shall ask to have printed in the body of the RECORD.

The VICE PRESIDENT. Without objection, the Senator from Oregon may proceed.

Mr. MORSE. A few days ago I expressed some criticism of the fourth estate, many of the members of which I think suffer from a psychological complex of infallibility. The American press, particularly its editors, has failed miserably in presenting an adequate, accurate and fair account of the facts in the Steel case. There have been some exceptions but not many. I reaffirm this morning the criticism I made of the press.

I repeat that the press generally failed to adequately and accurately to present the facts of the steel controversy. By and large, it presented a very slanted report of the facts of the steel controversy. Particularly there was a general failure of the press to point out the contentions of the Lovett affidavit and the Lovett testimony before the Committee on Labor and Public Welfare, to the effect that if the steel mills had been allowed to go down to the point that the furnaces would have cooled which would have taken from 48 to 52 hours, they could not have been placed in operation again for some 2 to 3 weeks, on the average. The loss of that amount of steel production, in case of a war with Russia within the next year, would have been translated into a loss of thousands of American lives. That was the emergency which faced the President of the United States at the eleventh hour of the steel crisis.

Mr. President, let me say that when the American people understand the real situation, then their attitude will be quite different as to the nature of the emergency. Then they will come to understand that the President sought to protect the security of this Nation in a dark hour of crisis.

I asked the Library of Congress to prepare for me a tabulation of the space treatment of the Steel case, including space treatment of the Lovett testimony, on the part of some typical newspapers.

My reply to the editorial in the Washington Star last night—and the editors of the Star I have always found, Mr. President, can dish it out, but, like so many newspapermen, they cannot take it—my reply to the Washington Star is that even the Washington Star, in spite of its protestations in its editorial columns last night, gave inadequate space to a discussion of what I consider to be

some of the most vital testimony in the steel case. The Washington Star gave inadequate space to the testimony of the Secretary of Defense, on whose shoulders rests the whole defense program of this country. His testimony was the most important fact on which the President based his action. The real emergency in the steel crisis was the threat of the shut-down of the steel furnaces to the point that they could not have been placed in operation again for some 2 or 3 weeks, in case of war, would have been translated into the loss of American blood.

So a part of my answer to the Washington Star, Mr. President, is a request now that there be printed in the RECORD a compilation of the space treatment of the Steel case by representative newspapers of the United States.

There being no objection, the compilation was ordered to be printed in the RECORD, as follows:

*News coverage of the steel dispute by 5 papers: Selected statistics*

**WASHINGTON STAR**

| Date and page on which item appeared | Number of columns | Total number inches all columns |
|---|---|---|
| **JUDGE PINE'S DECISION** | | |
| Apr. 30, 1952: | | |
| Headline (1 inch high), page 1 | | |
| Comment 1 | 2 | 30 |
| Comment 4 | 5 | 68 |
| Decision 3 | 6 | 85 |
| Comment 6 | 3 | 5 |
| Comment 14 | 1 | 11 |
| Total columns and inches | 17 | 199 |
| **UNITED STATES COURT OF APPEALS DECISION** | | |
| May 1, 1952: | | |
| Headline (1 inch high), page 1 | 1 | 10 |
| Comment 5 | 3 | 23 |
| Decision 4 | 7 | 71 |
| Comment 22 | 1 | 7 |
| Total columns and inches | 12 | 111 |
| **SECRETARY LOVETT'S TESTIMONY ON NEED FOR STEEL** | | |
| Apr. 25, 1952: | | |
| Comment 1 | 1 | [1] 10½ |
| Quote Lovett 3 | 1 | 2 |
| Total columns and inches | 2 | 2 |

**NEW YORK WORLD-TELEGRAM**

| Date and page on which item appeared | Number of columns | Total number inches all columns |
|---|---|---|
| **JUDGE PINE'S DECISION** | | |
| Apr. 30, 1952: | | |
| Headline, page 1 | | |
| Decision 1 | 1 | 8 |
| Decision 22 | 5 | 22 |
| Comment 13 | 4 | 15 |
| Comment 13 | 3 | 35 |
| Comment 26 | 1 | 11 |
| Total columns and inches | 14 | 91 |
| **U. S. COURT OF APPEALS DECISION** | | |
| May 1, 1952: | | |
| Headline, page 1 | | |
| Comment 1 | 1 | 9 |
| Comment 2 | 6 | 16 |
| Comment 22 | 1 | 10 |
| Total columns and inches | 8 | 35 |
| **SECRETARY LOVETT'S TESTIMONY ON NEED FOR STEEL** | | |
| None. | | |

[1] In story on wage stabilization with brief passing reference was made to Lovett testimony.

*News coverage of the steel dispute by 5 papers: Selected statistics—Continued*

**WASHINGTON POST**

| Date and page on which item appeared | Number of columns | Total number inches all columns |
|---|---|---|
| **JUDGE PINE'S DECISION** | | |
| Apr. 30, 1952: | | |
| Headline (2 inches high), page 1 | | |
| Decision 1 | 2 | 26 |
| Decision 9 | 7 | 86 |
| Comment 1 | 2 | 24½ |
| Comment 8 | 7 | 44 |
| Comment 16 | 1 | 11 |
| Total columns and inches | 19 | 191½ |
| **U. S. COURT OF APPEALS DECISION** | | |
| May 1, 1952: | | |
| Headline (1 inch high), page 1 | | |
| Comment 1 | 2 | 27½ |
| Comment 2 | 8 | 52 |
| Comment 3 | 2 | 22 |
| Comment 11 | 1 | 13 |
| Total columns and inches | 13 | 114½ |
| **SECRETARY LOVETT'S TESTIMONY ON NEED FOR STEEL** | | |
| None. | | |

**NEW YORK HERALD TRIBUNE**

| Date and page on which item appeared | Number of columns | Total number inches all columns |
|---|---|---|
| **JUDGE PINE'S DECISION** | | |
| April 30, 1952: | | |
| Headline, page 1 | | [2] (3½) |
| Decision 1 | 3 | 23 |
| Comment 1 | 1 | 9 |
| Decision 12 | 8 | 140 |
| Comment 13 | 1 | 45½ |
| Do | 1 | 13 |
| Do | 2 | 15 |
| Comment 18 | 1 | 6 |
| Comment 19 | 2 | 24 |
| Total columns and inches | 19 | 235½ |
| **U. S. COURT OF APPEALS DECISION** | | |
| May 1, 1952: | | |
| Headline, page 1 | | [2] (3½) |
| 1 | 2 | 23 |
| 10 | 3 | 24 |
| 37 | 2 | 13 |
| Comment 18 | 1 | 10½ |
| 19 | 2 | 21 |
| Total columns and inches | 10 | 91½ |
| **SECRETARY LOVETT'S TESTIMONY ON NEED FOR STEEL** [2] | | |
| April 25, 1952: 13 | 1 | 1½ |

**NEW YORK TIMES**

| Date and page on which item appeared | Number of columns | Total number inches all columns |
|---|---|---|
| **JUDGE PINE'S DECISION** | | |
| Apr. 30, 1952: | | |
| Headline (2 inches high), page 1 | 1 | 14 |
| Comment 1 | 2 | 12 |
| Do | 1 | 11 |
| Comment 20 | 7 | 73 |
| Decision 19 | 3 | 28 |
| Comment 19 | 3 | 16 |
| Decision 18 | 5 | 98 |
| Comment 26 | 1 | 10 |
| Total columns and inches | 23 | 262 |
| **U. S. COURT OF APPEALS DECISION** | | |
| May 1, 1952: | | |
| Headline (2 inches high), page 1 | | |
| 1 | 2 | 29 |
| 23 | 2 | 21 |
| 25 | 5 | 24 |
| 28 | 2 | 15 |
| 28 | 1 | 21½ |
| Total columns and inches | 14 | 110½ |

[2] Mentioned in article beginning on p. 1 entitled "Investigation of WSB Steel Wage Proposals Voted in House, 255-88."

*News coverage of the steel dispute by 5 papers: Selected statistics—Continued*

**NEW YORK TIMES—continued**

| Date and page on which item appeared | Number of columns | Total number inches all columns |
|---|---|---|
| **SECRETARY LOVETT'S TESTIMONY ON NEED FOR STEEL** [3] | | |
| Apr. 25, 1952: 11 | 1 | 1½ |

**Summary**

| | Judge Pine's columns | Decision inches | United States court columns | Appeals inches | Secretary Lovett's testimony |
|---|---|---|---|---|---|
| New York Times | 23 | 262 | 14 | 110½ | 1½ |
| New York Herald Tribune | 19 | 235½ | 10 | 91½ | 1½ |
| World Telegram | 14 | 91 | 8 | 35 | 0 |
| Washington Post | 19 | 191½ | 13 | 114½ | 0 |
| Washington Star | 17 | 199 | 12 | 111 | 2 |
| Grand total | 92 | 979 | 57 | 462½ | 5 |

[3] Mentioned in an article beginning on p. 1 entitled "Court Is Uncertain of Truman's Power to Take Over Steel."

NOTE.—Statistics are for the day following the occurrence of the item indicated.

Mr. HUMPHREY. Mr. President, I wish to associate myself with the remarks of the Senator from Oregon concerning the editorial comment in the Washington Star. I believe that the only mistake which the junior Senator from Minnesota made in his comments was to have included radio and television, because it is my honest opinion that radio and television did a very good job. They certainly covered our hearings, and they afforded an opportunity for both sides of the question to be heard. I think the Senator from Oregon has well documented his position so far as concerns the space treatment in the columns of the press.

## CALL OF THE ROLL

Mr. McFARLAND. Mr. President, when the Senate returns from the House I shall try to find a few extra minutes for Senators to make insertions in the RECORD. At this time I suggest the absence of a quorum.

The VICE PRESIDENT. The Secretary will call the roll.

The Chief Clerk proceeded to call the roll.

Mr. McFARLAND. Mr. President, I ask unanimous consent that the order for the quorum call be vacated, and that further proceedings under the call be dispensed with.

The VICE PRESIDENT. Without objection, it is so ordered.

## JOINT MEETING OF THE TWO HOUSES—ADDRESS BY GENERAL RIDGWAY

Mr. McFARLAND. Mr. President, if there be no further business at this time, I ask unanimous consent that the Senate stand in recess, that it assemble in the Hall of the House of Representatives

to hear an address to be delivered by Gen. Matthew B. Ridgway, and that it reconvene upon the call of the Chair.

The VICE PRESIDENT. Without objection, it is so ordered.

Thereupon (at 12 o'clock and 14 minutes p. m.), the Senate took a recess subject to the call of the Chair.

The Senate, preceded by the Secretary, Leslie L. Biffle, the Sergeant at Arms, Joseph C. Duke, and the Vice President, proceeded to the Hall of the House of Representatives to listen to an address to be delivered by Gen. Matthew B. Ridgway.

(For the address delivered by Gen. Ridgway, see House proceedings, pp. 5813–5815.)

At 1 o'clock and 1 minute p. m., the Senate returned to its Chamber, and reassembled when called to order by the Vice President.

---

## REVISION OF LAWS RELATING TO IMMIGRATION, NATURALIZATION, AND NATIONALITY

The Senate resumed the consideration of the bill (S. 2550) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes.

The VICE PRESIDENT. The Senate is now operating under a unanimous-consent agreement for a limitation of 1 hour to a side on as many as eight amendments, if offered, and 10 minutes to a side on any other amendments which may be offered. There is now no amendment pending.

Mr. McCARRAN. Mr. President, I do not see the Senator from Minnesota [Mr. HUMPHREY] on the floor, but I may say that yesterday the Senator from Minnesota and I had a conference, at which I agreed to go over the 153 or 157 amendments which are on the desk, and to accept those which I could accept with safety to the policy of the bill.

My recollection is that as to approximately 20 or 21 amendments it is agreeable to the chairman of the Committee on the Judiciary that they may go to conference. Those amendments were selected yesterday, and I tried to make it clear at that time that I desired to have them acted on immediately, if possible. I thought we could clear the atmosphere to that extent. I would be willing to accept those amendments en bloc, if that is agreeable.

The VICE PRESIDENT. That would have to be done by unanimous consent.

Mr. McCARRAN. That is correct.

The VICE PRESIDENT. The agreement was that eight amendments would be taken up first, but the proposal of the Senator from Nevada can be acted upon by unanimous consent.

Mr. McCARRAN. There are two committee amendments I should like to offer, to which I believe there would be no objection. However, I do not know whether we can proceed with them under the unanimous consent agreement.

The VICE PRESIDENT. Under the unanimous-consent agreement, the eight amendments referred to are to be taken up first. However, the agreement can be modified by unanimous consent.

Mr. McFARLAND. Mr. President, I ask unanimous consent that the amendments which the Senator from Nevada has agreed to accept may be taken up and disposed of first.

The VICE PRESIDENT. Is there objection?

Mr. LEHMAN. Mr. President, do I understand correctly that the amendments referred to by the Senator from Nevada will displace the eight amendments as to which it has been agreed that each side may speak for an hour?

The VICE PRESIDENT. Their position would be transposed, so that the amendments referred to by the Senator from Nevada would be disposed of first, and when they are disposed of, the original order with respect to eight amendments, and the time to be allotted to them, would still be in effect.

Mr. McCARRAN. If there is objection to the two amendments I offer, I will withdraw them and reoffer them later. I merely wanted to utilize the time.

Mr. LEHMAN. Mr. President, are these amendments being offered by the distinguished Senator from Nevada?

Mr. McCARRAN. Yes. The first one is designated "FFFF."

The VICE PRESIDENT. The Chair is advised that this amendment provides for a number of technical changes in the bill.

Mr. McCARRAN. That is correct. I wish to make a brief statement, if I may.

The VICE PRESIDENT. Does the Senator from Nevada wish to have the amendment read in detail?

Mr. McCARRAN. I think that will not be necessary if I may explain it. The purpose of this amendment is merely to make certain technical corrections in the bill for the purpose of clarification, and to eliminate certain errors in punctuation, grammar, and spelling. The amendment does not make any substantive change in the bill.

The VICE PRESIDENT. The amendment seems largely to be comprised of technical corrections.

Mr. HUMPHREY. I have no objection.

The VICE PRESIDENT. The question is on agreeing to the amendment offered by the Senator from Nevada [Mr. McCARRAN].

The amendment was agreed to.

The amendment as agreed to is as follows:

On page 17, line 11, delete the word "Swain's" and substitute in lieu thereof the word "Swains."

On page 21, line 11, insert a comma after the word "Bermuda."

On page 21, line 15, change the word "Carribean" to "Caribbean."

On page 32, line 3, strike the letter "o" at the end of the line and insert in lieu thereof the word "of."

On page 38, line 21, delete the word "such."

On page 38, line 22, preceding the word "in," insert the words "of such area."

On page 42, line 12, insert after the word "entitled" the word "to."

On page 47, line 17, delete the semicolon and substitute in lieu thereof a comma, and after the word "and," insert "(5)."

On page 47, line 18, delete the words "Not withstanding" and insert in lieu thereof "Notwithstanding."

On page 54, line 11, delete the word "or" at the beginning of the line and substitute in lieu thereof the word "and."

On page 75, line 5, change the word "anv" to "any."

On page 79, line 23, delete the word "naturalization" and substitute in lieu thereof the word "nationality."

On page 88, line 22, delete the word "act" and substitute in lieu thereof the word "Act."

On page 98, line 25, delete the word "and" and insert in lieu thereof the word "or."

On page 99, line 12, delete the word "and" and insert in lieu thereof the word "or."

On page 131, line 2, insert a comma after the word "child."

On page 131, line 23, insert a comma after the word "child."

On page 132, line 20, insert a comma after the word "child."

On page 133, line 18, insert a comma after the word "child."

On page 173, line 1, delete "215 (c)" and insert in lieu thereof the number "214 (c)."

On page 186, line 4, delete the words "armed forces" and insert in lieu thereof the words "Armed Forces."

On page 221, line 22, change the words "armed services" to "Armed Forces."

On page 223, line 8, delete the word "Swain's" and substitute in lieu thereof the word "Swains."

On page 242, line 17, after the word "States" insert the word "citizen."

On page 260, line 19, delete "$10" and insert in lieu thereof "$5."

On page 276, line 10, delete the word "specilized" and substitute in lieu thereof the word "specialized."

On page 281, line 16, delete the word "office" and insert in lieu thereof the word "officer."

On page 288, line 13, delete the word "Swain's" and substitute in lieu thereof the word "Swains."

Mr. McCARRAN. Mr. President, the next amendment I wish to offer is designated as "EEEE"; and provides for a number of changes in the bill.

The VICE PRESIDENT. The clerk will state the amendment.

The LEGISLATIVE CLERK. On page 167, beginning with line 17 and extending through line 12 on page 168, it is proposed to strike out all of section 274 and substitute in lieu thereof a new section 274 to read as follows:

SEC. 274. (a) Any person, including the owner, operator, pilot, master, commanding officer, agent, or consignee of any means of transportation who—

(1) brings into or lands in the United States, by any means of transportation or otherwise, or attempts, by himself or through another, to bring into or land in the United States, by any means of transportation or otherwise;

(2) knowing that he is in the United States in violation of law, and knowing or having reasonable grounds to believe that his last entry into the United States occurred less than 3 years prior thereto, transports, or moves, or attempts to transport or move, within the United States by means of transportation or otherwise, in furtherance of such violation of law;

(3) wilfully or knowingly conceals, harbors, or shields from detection, or attempts to conceal, harbor, or shield from detection, in any place, including any building or any means of transportation; or

(4) wilfully or knowingly encourages or induces, or attempts to encourage or induce,

either directly or indirectly, the entry into the United States of

any alien, including an alien crewman, not duly admitted by an immigration officer or not lawfully entitled to enter or reside within the United States under the terms of this act or any other law relating to the immigration or expulsion of aliens, shall be guilty of a felony, and upon conviction thereof shall be punished by a fine not exceeding $2,000 or by imprisonment for a term not exceeding 5 years, or both, for each alien in respect to whom any violation of this subsection occurs: *Provided, however,* That for the purposes of this section, employment (including the usual and normal practices incident to employment) shall not be deemed to constitute harboring.

(b) No officer or person shall have authority to make any arrest for a violation of any provision of this section except officers and employees of the United States Immigration and Naturalization Service designated by the Attorney General, either individually or as a member of a class, and all other officers whose duty it is to enforce criminal laws.

On page 179, beginning with line 1, and continuing through line 5, strike out paragraph (3) and insert in lieu thereof a new paragraph (3) to read as follows:

(3) within a reasonable distance from any external boundary of the United States, to board and search for aliens any vessel within the territorial waters of the United States and any railway car, aircraft, conveyance, or vehicle, and within a distance of 25 miles from any such external boundary to have access to private lands, but not dwellings, for the purpose of patrolling the border to prevent the illegal entry of aliens into the United States; and.

The VICE PRESIDENT. This is one of the amendments upon which there is a limitation of 10 minutes on a side. Is there objection to agreeing to the amendment?

Mr. HUMPHREY. Mr. President, I should like to interrogate the Senator from Nevada for a moment.

I understand the amendment designated "EEEE" brings the Senator's bill into conformity with the action of the Senate in connection with the wetback provision heretofore agreed to?

Mr. McCARRAN. That is correct.

Mr. HUMPHREY. Does it conform verbatim with the original proposal?

Mr. McCARRAN. It does.

Mr. HUMPHREY. I have no objection.

The VICE PRESIDENT. The question is on agreeing to the amendment.

The amendment was agreed to.

The VICE PRESIDENT. The bill is open to further amendment.

Mr. LEHMAN. Mr. President, I suggest the absence of a quorum.

The VICE PRESIDENT. The Secretary will call the roll.

The legislative clerk proceeded to call the roll.

Mr. LEHMAN. Mr. President, I ask unanimous consent that the order for the quorum call be rescinded and that further proceedings under the call be dispensed with.

The PRESIDING OFFICER (Mr. STENNIS in the chair). Is there objection?

Mr. DWORSHAK. I object.

The PRESIDING OFFICER. Objection is heard. The clerk will continue the call of the roll.

The legislative clerk resumed and concluded the call of the roll, and the following Senators answered to their names:

| | | |
|---|---|---|
| Aiken | Hennings | Moody |
| Anderson | Hickenlooper | Morse |
| Bennett | Hill | Mundt |
| Benton | Holland | Murray |
| Bricker | Humphrey | Neely |
| Bridges | Hunt | Nixon |
| Butler, Nebr. | Ives | O'Conor |
| Byrd | Johnson, Colo. | O'Mahoney |
| Case | Johnson, Tex. | Pastore |
| Chavez | Johnston, S. C. | Robertson |
| Clements | Kem | Saltonstall |
| Connally | Kerr | Schoeppel |
| Cordon | Kilgore | Smathers |
| Douglas | Lehman | Smith, Maine |
| Duff | Lodge | Smith, N. J. |
| Dworshak | Long | Sparkman |
| Eastland | Malone | Stennis |
| Ellender | Martin | Thye |
| Ferguson | Maybank | Tobey |
| Frear | McCarran | Underwood |
| Fulbright | McCarthy | Watkins |
| George | McClellan | Welker |
| Gillette | McFarland | Williams |
| Green | McKellar | Young |
| Hayden | McMahon | |
| Hendrickson | Millikin | |

Mr. JOHNSON of Texas. I announce that the Senators from North Carolina [Mr. HOEY and Mr. SMITH] and the Senator from Oklahoma [Mr. MONRONEY] are absent on official business.

The Senator from Tennessee [Mr. KEFAUVER] and the Senator from Georgia [Mr. RUSSELL] are absent by leave of the Senate.

Mr. SALTONSTALL. I announce that the Senator from Maine [Mr. BREWSTER], the Senator from Illinois [Mr. DIRKSEN], the Senator from Indiana [Mr. JENNER], the Senator from Nebraska [Mr. SEATON], and the Senator from Ohio [Mr. TAFT] are necessarily absent.

The Senator from Maryland [Mr. BUTLER], the Senator from Indiana [Mr. CAPEHART], the Senator from Montana [Mr. ECTON], and the Senator from North Dakota [Mr. LANGER] are absent on official business.

The Senator from Washington [Mr. CAIN] and the Senator from California [Mr. KNOWLAND] are absent by leave of the Senate.

The Senator from Kansas [Mr. CARLSON], the Senator from Vermont [Mr. FLANDERS] and the Senator from Wisconsin [Mr. WILEY] are absent by leave of the Senate for the purpose of attending the Conference of the International Council for Christian Leadership at The Hague.

The PRESIDING OFFICER. A quorum is present.

Mr. HUMPHREY. Mr. President, the Senator from Nevada [Mr. McCARRAN] and myself and other sponsors of amendments who are associated with me have agreed upon a bloc of amendments, 21 in number. These amendments have been carefully checked by the respective staffs, as well as by the Senators who are particularly concerned.

The amendments are technical in nature. They do not go to the substance of the measure before us or, as I believe the Senator from Nevada put it, the general purpose and objective of the bill.

The amendments are minor, technical ones. We have agreed upon them, and I offer them en bloc. They are numbered. Many of these amendments, with the exception of one or two, now lie at the desk.

I do not believe it will be necessary for the clerk to read each of the amendments, but I should like to have each one of them printed separately in the RECORD.

The PRESIDING OFFICER. Without objection——

Mr. HUMPHREY. Perhaps the Senator from Nevada would like to make some comment in reference to the amendments.

Mr. McCARRAN. Mr. President, I do not know that I have any comment to make. What the Senator from Minnesota has stated is the case.

On yesterday the Senator from Minnesota and the Senator from Nevada had a conference. I said we would accept certain amendments which had been offered and which did not change the policy or the theme of the bill.

The amendments the Senator from Minnesota now is holding in his hand are the ones we have accepted. I am advised by my staff representative who is here that these amendments are in the same condition as when they were offered. They are satisfactory, and are to be accepted. They may be printed in the RECORD separately.

I wish to be frank with the Senator from Minnesota. When the bill goes to conference the conferees may determine that the amendments he offers may not fit into the places where he has them designated. The worth of the amendments will be considered carefully. They may fit in at some place in the bill. It will be my purpose to try to work out a bill in the conference.

Mr. HUMPHREY. The Senator from Nevada informed me of this reservation, in our private conversations, and I recognize that that may be the case. We offer the amendments, however, as technical refinements, and as what I consider to be minor adjustments of the bill.

The PRESIDING OFFICER. Is there objection to the present consideration of the 21 amendments en bloc?

Mr. SALTONSTALL. Reserving the right to object, do I correctly understand that these amendments were all agreed upon as between the committee and the Senator from Minnesota?

Mr. HUMPHREY. That is correct—and my associate in this matter, who has worked so valiantly, the Senator from New York [Mr. LEHMAN], and other Senators who have sponsored amendments.

Mr. SALTONSTALL. I have no objection.

The PRESIDING OFFICER. Without objection, the 21 amendments are agreed to en bloc.

Mr. HUMPHREY. Mr. President, do I correctly understand that each amendment will be printed separately with proper designation in the CONGRESSIONAL RECORD?

The PRESIDING OFFICER. Each amendment will be printed separately in

the CONGRESSIONAL RECORD at the proper place.

The amendments agreed to en bloc are as follows:

On page 20, line 9, strike out "sixteen" and in lieu thereof insert "eighteen".

On page 20, line 15, strike out "sixteen" and in lieu thereof insert "eighteen".

On page 21, line 24, and page 22, line 1, strike out "sixteen" and in lieu thereof insert "eighteen."

On page 32, strike out line 25, and in lieu thereof insert the following: "10 percent of the quota for such year; except that during the last 2 months of any fiscal year immigrant visas may be issued without regard to the 10-percent limitation contained herein."

On page 63, line 3, after "(b)" add the following: "The provisions of paragraph (25) of subsection (a) shall not be applicable to any alien who (1) is the parent, grandparent, spouse, daughter, or son of an admissible alien, or any alien lawfully admitted for permanent residence, or any citizen of the United States, if accompanying such admissible alien, or coming to join such citizen or alien lawfully admitted, and if otherwise admissible, or (2) proves that he is seeking admission to the United States to avoid religious persecution in the country of his last permanent residence, whether such persecution be evidenced by overt acts or by laws or governmental regulations that discriminate against such alien or any group to which he belongs because of his religious faith."

On page 67, line 14, in subsection 212 (e) strike out "Whenever" and insert in lieu thereof: "When the United States is at war or during the existence of a national emergency proclaimed by the President and."

On page 111, lines 4–6, strike out the words, "or hereafter and at any time after entry shall be or shall have been."

On page 75, line 19, insert a new sentence to read as follows:

"An immigrant visa may be replaced under the original quota number during the quota year in which the original visa was issued for a quota immigrant who establishes to the satisfaction of the consular officer that he was unable to use the original immigrant visa during the period of its validity because of reasons beyond his control and for which he was not responsible: *Provided,* The consular officer is in possession of the duplicate signed copy of the original visa and the immigrant is found by the consular officer to be eligible for an immigrant visa."

On page 79, line 8, amend section 222 (a) by striking the word "and" in the phrase "such relative and friend" and substitute the word "or."

On page 109, strike paragraph (4) and insert in lieu thereof the following:

"(4) is convicted of a crime involving moral turpitude committed within 5 years after entry and either sentenced to confinement or confined therefor in a prison or correctional institution for a year or more, or who at any time after entry is convicted of 2 crimes involving moral turpitude, not arising out of a single scheme of criminal misconduct, regardless of whether confined therefor and regardless of whether the convictions were in a single trial."

On page 112, line 18, strike the word "or."

On page 112, line 23, change the period to a semicolon and add the following:

"(14) at any time after entry, shall have been convicted of possessing or carrying in violation of any law any weapon which shoots or is designed to shoot automatically or semiautomatically more than one shot without manual reloading, by a single function of the trigger, or a weapon commonly called a sawed-off shotgun."

"(15) at any time within 5 years after entry, shall have been convicted of violat-

ing the provisions of title I of the Alien Registration Act, 1940;

"(16) at any time after entry, shall have been convicted more than once of violating the provisions of title I of the Alien Registration Act, 1940;

"(17) the Attorney General finds to be an undesirable resident of the United States by reason of any of the following, to wit: is now interned under section 4067 of the revised statutes of the United States and the proclamations issued by the President in pursuance of said section under dates of April 6, 1917, November 16, 1917, December 11, 1917, and April 9, 1918, respectively; since August 1, 1914, has been or may hereafter be convicted of any violation or conspiracy to violate any of the following acts or parts of acts the judgment and such conviction having become final, namely, an act entitled 'An act to punish acts of interference with the foreign relations, the neutrality, and the foreign commerce of the United States, to punish espionage, and better to enforce the criminal laws of the United States, and for other purposes,' approved June 15, 1917, or the amendment thereof approved May 16, 1918; an act entitled 'An act to prohibit the manufacture, distribution, storage, use, and possession in time of war of explosives, providing regulations for the safe manufacture, distribution, storage, use, and possession of the same, and for other purposes,' approved October 6, 1917; an act entitled 'An act to prevent in time of war departure from and entry into the United States contrary to the public safety,' approved May 22, 1918; an act entitled 'An act to punish the willful injury or destruction of war material or of war premises or utilities used in connection with war material, and for other purposes,' approved April 20, 1918; an act entitled 'An act to authorize the President to increase temporarily the Military Establishment of the United States,' approved May 18, 1917, or any amendment thereof or supplement thereto: an act entitled 'An act to punish persons who make threats against the President of the United States,' approved February 14, 1917; an act entitled 'An act to define, regulate, and punish trading with the enemy, and for other purposes,' approved October 6, 1917, or any amendment thereof; section 6 of the Penal Code of the United States; has been or may hereafter be convicted of any offense against section 13 of the said Penal Code committed during the period of August 1, 1914, to April 6, 1917, or of a conspiracy occurring within said period to commit an offense under said section 13 or of any offense committed during said period against the act entitled 'An act to protect trade and commerce against unlawful restraints and monopolies,' approved July 2, 1890, in aid of a belligerent in the European war, or

"(18) has been convicted under section 278 of this act or under section 4 of the Immigration Act of February 5, 1917."

On page 157, in lines 11 and 22, change the word "ten" to "thirty" and in line 17, change the word "five" to "ten."

On page 150, line 20, amend section 254 (c) by inserting after the words "shall be paid by" the words "the owner or owners of."

On page 123, line 21, strike out the period and insert the following: "*Provided,* That no alien may be deported pursuant to the provisions of this subsection (f) unless a hearing has been granted to determine (a) the identity of the person, (b) the ground for deportation, and (c) the illegal return of the alien."

On page 203, line 12, amend section 316 (b) by inserting after the word "of" the following: "more than 6 months but."

On page 208, line 24, by changing "three years" in two places to "two years" in each case.

On page 211, line 24, amend section 322 (a) by inserting after the word "one" the following words: "or both."

On page 217, line 16, strike from the heading the word "Filipinos" and substitute in lieu thereof the words: "Philippine citizens."

On page 227, line 5, amend section 330 (a) by striking the words "on or before September 23, 1952," and by substituting in lieu thereof the following words: "within 1 year from the effective date of this act."

On page 243, line 25, amend section 336 (c) by inserting after the word "within" the words "a period of."

On page 244, lines 2–3, amend section 336 (c) by deleting the words "of 30 days."

On page 247, line 18, amend section 338 by inserting after the words "United States,", the following: "except in cases falling within the provisions of section 334 (a) of this title."

On page 260, line 19, strike out "$10" and insert "$5."

On page 281, line 12, amend section 358 by inserting the words "as amended," after the word "1940."

The PRESIDING OFFICER. The bill is open to further amendment.

Mr. BENTON. Mr. President——

The PRESIDING OFFICER. Does the Senator from Minnesota yield the floor?

Mr. HUMPHREY. Mr. President, if the Senator from Connecticut desires to make some remarks, I presume that what we shall have to do, under the unanimous-consent agreement, is to take up one of the amendments on which we have an hour's debate. I seek the ruling of the Chair.

The PRESIDING OFFICER. The procedure would be more orderly if an amendment were offered and stated by the clerk.

Mr. PASTORE. Mr. President, I shall be perfectly willing to submit an amendment or to call up an amendment, and then yield the time to my colleague from Connecticut.

Mr. BENTON. I would appreciate the Senator's doing so, in view of the fact that I do not have an amendment at the moment.

Mr. PASTORE. Mr. President, I send to the desk an amendment.

The PRESIDING OFFICER. Is this one of the eight amendments on which there is an agreement regarding the debate?

Mr. PASTORE. Yes, this is one of the eight.

The PRESIDING OFFICER. According to the unanimous-consent agreement, those amendments would be presented by the Senator from Minnesota.

Mr. HUMPHREY. Mr. President, the purpose of the inquiry of the junior Senator from Minnesota was to clarify the situation with respect to the unanimous-consent agreement. It is my understanding that, under the agreement, no Senator may speak unless an amendment is before the Senate. Therefore, since the Senator from Connecticut has an amendment, I suggest that the Chair permit him to present it. He may then make his speech, whether he speaks to the amendment or not.

The PRESIDING OFFICER. Does the Senator from Connecticut offer an amendment on behalf of the Senator from Minnesota?

Mr. HUMPHREY. That is correct.

Mr. BENTON. Mr. President, for the Senator from Minnesota [Mr. HUM-

PHREY], I send to the desk an amendment which I ask to have stated.

Mr. McCARRAN. Mr. President, do I correctly understand that this is one of the eight amendments?

The PRESIDING OFFICER. It is one of the eight, as the Chair understands. The clerk will state the amendment.

The Chief Clerk read the amendment, as follows:

On page 35, lines 9 and 10, strike out "; and" and insert a period.

On page 35, beginning with line 11, strike out all through line 15 on page 37.

On page 37, line 16, strike out "(c)" and insert "(b)."

On page 38, line 1, beginning with the word "and", strike out all through the word "section" in line 4.

On page 38, line 5 strike out "(d)" and insert "(c)."

On page 38, line 10, strike out "(e)" and insert "(d)."

On page 38, beginning with the comma in line 19, strike out all through "thousand" in line 23.

On page 32, line 20, strike out "(e)" and insert "(d)."

The PRESIDING OFFICER. The Senator from Connecticut is recognized, and he is speaking in the time of the Senator from Minnesota.

Mr. McCARRAN. Mr. President, I should like to have an identification of the amendment.

The Chief Clerk. The amendment is identified as "5–9–52–GGG."

The PRESIDING OFFICER. The Senator from Connecticut.

Mr. BENTON. Mr. President, I shall first speak on the subject upon which I desire to address the Senate briefly, and then I shall conclude with a few remarks about the amendment which I have sent to the desk.

Mr. President, I have asked for this opportunity to speak in order to call the attention of the Senate to an event of great importance to the free world, which will take place in Italy next Sunday, May 25. On that day important municipal elections will take place in central and southern Italy. Reports have it that some of the key cities may go communistic. The democratic parties of the center may lose considerable strength not only to the left but especially to a fast-growing neofascism on the right.

Mr. President, when I was in Italy 2 years ago attending the UNESCO conference in the great Province of Tuscanny, more than 90 percent of the cities had Communist mayors. Milan, the greatest industrial city in Italy, had cast 62 percent of its vote in the previous election for the Communist candidate for mayor. Now there is evidence of the same influence of Communist propaganda in the turn toward communism in central Italy and in southern Italy.

Mr. President, I ask, Why has this danger come about? Italy seems in theory to be stabilized. When I was in Rome last November I discovered it had one of the hardest currencies in Western Europe. In foreign trade it is a creditor to many of the richest countries. Inflation and budget deficits in Italy have been less than in other countries. Pro-

duction is about 40 percent higher than before the war, where population has gone up but 10 percent. These all are the traditional indications of a healthy economy. Then why are its people dissatisfied? Why are they listening to the siren song, the false song of the promised land of the Kremlin?

The key to the answer to this question is understanding that the Italian economy has been stabilized at far too low a level. There are 2,000,000 unemployed, and at least another 2,000,000 underemployed. The standard of living even of the employed is far too low. In the year 1950–51 consumption expenditures per person in the United States were $1,327. In Italy they were but 18 percent of that amount, or $241 per person.

Mr. President, I ask unanimous consent to have printed in the RECORD at the conclusion of my remarks tables 2 and 3 of a report prepared by the MSA, which has just reached me from Europe, and which shows that two-thirds of all the workers studied in this particular survey have incomes of less than 20,000 lire annually.

The PRESIDING OFFICER. Without objection, it is so ordered.

(See exhibit 1.)

Mr. BENTON. Admittedly, stabilization of an economy at that level is a mixed blessing even for the wealthy few, for they live constantly on a powder keg of danger as the mass of the people search first in one direction, then in another, for the solution of their desperation.

Admittedly things in Italy are not so good today for the average man. But why does he not have hope for better things to come? Prior to 1924, he used to be able to hope he might some day emigrate to the United States, but the bill we seem about to pass will give a final stab to any faint, lingering hope of escape to this land of the free and the not so brave.

Mr. CASE. Mr. President, will the Senator yield?

Mr. BENTON. Mr. President, I am speaking on limited time given me by the Senator from Minnesota, and I fear I cannot yield for that reason.

The PRESIDING OFFICER. The Senator from Connecticut declines to yield.

Mr. BENTON. More recently, in elections since 1948, the Marshall plan has been a bulwark of the democratic center. This great concept in the operation of our foreign policy was dedicated to · the principle that the future could be better; it offered the prospect of a rising standard of living as it dedicated itself to assistance in the solution of Italy's economic problems. The people believed in the Marshall plan; they voted democratic; they were willing to wait with hope. ECA has thus been a great and powerful political asset to the forces within Italy fighting communism.

Now the Economic Cooperation Administration is being buried. Its job is supposedly finished. The Mutual Security Agency has taken its place, with its emphasis on rearmament. I am told that the best that can be said for MSA,

on the political front, is that it is not a liability. Its promise of jobs through our off-shore procurement program may counterbalance the Communist propaganda which says that MSA is designed to bring war to a weary and discouraged people.

I have taken the view over a period of years that it is not necessary for the Italians to choose between the obvious necessity of rearmament against the threat of communism and a rising standard of living. I have insisted that, through the introduction into Italian industry and agriculture of well-known improvements in the techniques of production, hope can be returned to the people of Italy. With such hope, they have a future and a freedom well worth defending from dictators either of the left or of the right.

In a few days the Senate, during its consideration of the Mutual Security Act of 1952, will have presented to it an amendment earmarking a substantial amount of counterpart funds for the implementation of the Benton amendment and of MSA's Production Assistance Drive. These seek to eliminate restrictive business practices, to raise productivity in Italy, and to assure the sharing of the benefits thereof among consumers, workers, and owners.

Mr. President, I should say that this amendment will not cost anything in direct levy against the Treasury or against the taxpayers, because the funds involved come from the counterpart funds which are turned over to us by Western European countries in return for aid granted and voted them under the MSA.

I hope the Senate will support and vote for this proposal which can help so greatly to bring back to the Mutual Security Act the idealism and hope which made the Marshall plan so appealing to the people of Western Europe.

The techniques to raise productivity and the standard of living in Italy and Western Europe are well known and in daily practices in the United States. There is no technical reason why productivity in the United States is three times as high as that of Western Europe. The people there and here come from the same stock. The people of Europe work harder and longer than we do here and with as much individual skill. The difference in natural resources cannot explain the great divergence. The existence of national boundaries is only a partial explanation, one which is greatly exaggerated. I believe the Benton amendment of last year to the MSA Act pointed up the difficulty. The trouble is historical and psychological, not physical. It is the restrictive mentality which dominates business and industry in Europe, the philosophy to produce little for a small market at a high profit per unit; the failure of political and business leaders to understand and to implement the great principle that the workers of each country could be the best customers for its industries if only they were enabled to work efficiently and share in the benefits of such efficiency.

Let me give a few figures which demonstrate how unreasonable the difference is between the earnings of an Italian worker in Italy and his brother or cousin who migrated to the United States.

It takes 33 minutes of work for an Italian worker to earn enough to pay for a loaf of bread. It takes an American worker but 13 minutes. Similarly, the Italian worker must give 48½ hours of work to buy a pair of overalls; his American counterpart needs only 2 hours against 48½ hours. A pound of butter requires one-half hour of work in the United States; in Italy, 3 hours. A pair of shoes costs the American worker 7 hours of work; an Italian worker must give 55 hours.

These differences are wholly unjustifiable. However, they cannot be solved by speeches or even by laws—though speeches and laws can help. I wish we had more of both. But these differences must be largely solved at the plant level and in the actual market place.

Undoubtedly, the tax burden in Italy can and should be more equitably divided according to ability to pay, and the United States should urge continuously such corrections on the Italian Government.

The tax system of Italy bears principally on the working people and the middle classes. It is very restrictive. A good illustration of the tax structure in Italy is that there are 43 different taxes on a cup of coffee. That is a perfect illustration to show the repressive nature of the Italian tax structure when contrasted with our own.

Income should be more equitably divided among those who contribute to production, and unions should press for a larger share of the joint product for the workers. The efforts to bring about more equitable distribution must continue.

Unfortunately, the unions in Italy are Communist-dominated and Communistled, are identified with the big cartels and rich industrialists, and will sell out the workers at the drop of a hat if it be in the interest of communism. However, the greatest hope is not in better and more equitable sharing of the existing pie. It lies in greatly increasing the size of the pie. This can come only through cooperation of owner and workers in increasing productivity to the mutual benefit of themselves, and in cutting prices on their products so as to benefit the whole community of consumers.

To aid in that effort the MSA should dedicate a substantial portion of its remaining counterpart resources.

Many of the economists and Government officials of Italy are convinced that the basic problem of their country is demographic—overpopulation. I believe that is wrong. It is the traditional approach, but modern technology has made it obsolete. I agree that Italy is today overpopulated, in ratio to her resources, and I regret deeply the forthcoming Senate action which will fasten upon us an immigration bill which grossly discriminates against the Italians and prevents us from admitting hundreds of thousands of these valuable citizens to the United States. But 10 or 20 years

from now, with sound industrial labor and governmental policies, Italy can so step up her productivity that she can support her population.

Italy has too many people today only because of the low state of its industrial, agricultural, and distributive techniques. Much of its economy is still back in the middle 1800's. Italy has now 47 million people. Were Italy to reduce the gap between its own efficiency and that of the United States by only a third, it could support a population 20 percent greater than its present population at a standard of living double what it is now. Here is the key to the future not only of Italy but of Western Europe. Here is the road down which Western Europe and the United States must travel together if we are successfully to resist the evil pressures of communism and to build a free and prosperous world.

Italy needs more job opportunities for its workers in factories and on farms. They must work efficiently, according to modern techniques. Each must share in the benefits of the increased production. The problem is not so much the need for new industries or even for great investment in equipment per worker. The need is largely for the introduction of modern techniques of production into existing plants and of modern distribution methods.

The truth is it would do Italy more good today for half a million trained American technicians to leave the United States and migrate to Italy than it would for us to receive half a million Italians into the United States. I am not talking of sending Italy remittance men who bring or receive American dollars. I mean only sending technically trained men who would bring to Italy the skills learned here—as well as the faith in competition, productivity and free enterprise. The effect of such men on Italy would be so stimulating, I suspect, that no surplus of population would long continue in Italy. They would see to it that Italy shed her Old-World fears and ideas of restricted opportunity for a realistic attitude based on hope and confidence. How to bring that spirit to the people of Western Europe is the basic economic issue of our time. When we can resolve this issue, the economic problems of these countries will solve themselves through the expansion of their economies. I am assuming, of course, that American policy will succeed and that we shall be successful in averting a third world war.

All groups in Western Europe must partake of the new philosophy which is an old philosophy with us. Especially must the business community change its attitude. As the Senate knows, there is a psychological gap between the attitude of the American businessman and that of the Italian businessman, far wider than are the oceans which divide us. When we talk about competition to an Italian industrial leader he does not understand the effect of competition on productivity. There is no Sherman Act in Italy, and there is no Clayton Act; there is no antitrust legislation. The technique of conspiring at the expense of the public to hold back productivity, to raise prices, to produce as little as

possible and to sell for as much as is possible, is deeply ingrained in the traditions and habits of the cartels which dominate Italian industry.

From among the ranks of European industry must come progressive leadership to break the bonds which bind the economies to low levels of production and low standards of living.

There are many such progressive industrialists and businessmen in Italy. They will lead the way if only they are given the necessary support and the necessary protection from unfair attacks by the cartels and reactionary interests. The Italian Government and the Mutual Security Agency should give this necessary encouragement and assistance to that new and fresh leadership. Democratic trade unionism should be strengthened to play its role in his movement. In the hands of progressive industry and free trade unionism lies the future of democracy and freedom in Italy and in the rest of Western Europe.

Mr. President, we should watch the Italian elections on Sunday very closely. I fear Communist gains, and the reasons for them are implicit in much that I have said today. The size of the Communist vote, however, will again indicate the urgent need for the approach I have outlined. That approach can be enormously strengthened by the adoption of the forthcoming amendment to the Mutual Security Act, which will provide substantial counterpart funds to implement the MSA program of industrial development.

### IMMIGRATION AMENDMENT

Mr. President, I shall speak now on the amendment I have sent to the desk. The present law excludes the immigration of all orientals except Chinese, Indians, and Filipinos. Even Chinese and Indians do not have status equal to that of other immigrants. While other immigrants may qualify for visas on the quota of the country of their birth, persons of Chinese or Indian stock are classified by race, and are counted on the minimum quotas for India irrespective of their place of birth. Thus, an Indian born in South Africa would be charged against the Indian quota, not against the South African quota. However, Filipinos are not discriminated against in this way, under the present law.

The McCarran bill, which we are discussing today, opens the door slightly to some orientals who are at present not admissible, and to that extent is a step forward. It assigns minimum or near minimum quotas to all independent countries in the Orient. However, it retains the discriminatory features of the present law by extending to the entire Orient the principle now governing the admission of Indians and Chinese.

Thus, under the McCarran bill, prospective immigrants will qualify for visas on the basis of their country of birth unless they are orientals. If they are orientals, or even half-orientals, they come under the minimum or near minimum quotas of the Asia-Pacific area. Thus, the child of a British father and an Indian mother, born in London, would qualify under the small Indian quota, while other natives of London would qualify under the British quota.

The amendment sponsored by my associates and myself abolishes all inequality based on race. All persons could qualify for immigration to the United States under the quota of the country in which they were born.

I have spoken on this subject at length previously. With the further brief allusion I have made today, I urge upon the Senate the adoption of this amendment.

Mr. LEHMAN. Mr. President, will the Senator yield?

Mr. BENTON. I am delighted to yield to the distinguished Senator from New York.

EXHIBIT 1

TABLE 2.—*Doza study: Distribution of incomes in Italy by sizes, 1948*

| Income class (lire per week) | Number of families | Percent of families | Percent of total income |
|---|---|---|---|
| Less than 2,500 | 305 | 2.8 | 0.5 |
| 2,500 to 5,000 | 1,704 | 15.9 | 5.1 |
| 5,000 to 7,500 | 2,480 | 23.1 | 12.2 |
| 7,500 to 10,000 | 1,906 | 17.8 | 13.1 |
| 10,000 to 12,500 | 1,441 | 13.4 | 12.7 |
| 12,500 to 15,000 | 845 | 7.9 | 9.1 |
| 15,000 to 17,500 | 566 | 5.3 | 7.2 |
| 17,500 to 20,000 | 357 | 3.3 | 5.2 |
| 20,000 to 22,500 | 211 | 2.0 | 3.5 |
| 22,500 to 25,000 | 269 | 2.5 | 5.0 |
| 25,000 to 31,250 | 230 | 2.1 | 5.0 |
| 31,250 to 37,500 | 158 | 1.5 | 4.2 |
| 37,500 and over | 260 | 2.4 | 17.2 |
| Total | 10,732 | 100.0 | 100.0 |

Source: Mutual Security Agency, special mission to Italy for Economic Cooperation, Program Division. Family Incomes and Expenditures in Italy, Feb. 20, 1952, p. 5.

TABLE 3.—*Doza study: Distribution of expenditures by type and region (for 10,732 sample families in 1948)*

[In percentage]

| Expenditure by category | Region | | | | All Italy |
|---|---|---|---|---|---|
| | North | Central | South | Islands | |
| Food | 54.0 | 58.8 | 60.5 | 61.2 | 56.1 |
| Housing | 12.0 | 9.2 | 8.2 | 12.4 | 11.2 |
| Clothing | 11.0 | 11.4 | 10.3 | 8.3 | 10.9 |
| Miscellaneous | 23.0 | 20.6 | 21.0 | 17.6 | 21.8 |
| Total | 100.0 | 100.0 | 100.0 | 100.0 | 100.0 |

Source: Same as for table 2, p. 8.

The PRESIDING OFFICER. Does the Senator from New York desire to be recognized?

Mr. LEHMAN. Yes, Mr. President, I desire to speak very briefly on this subject. It seems to me that the McCarran bill, instead of letting down the bars and recognizing the rights of people of Asiatic birth, slams the door on them to a great degree.

The question of place of birth is a serious one. We know that a great many people of Indian, Chinese, Japanese, or Filipino stock have lived for generations in England, Brazil, Belgium, France, and Ireland. But under the McCarran bill those people, if they have as much as 50 percent of so-called oriental blood, would not be charged against the quota of the country of their birth, but would be charged against the quota, the very small quota—about 100—of the country in which an ancestor lived, perhaps generations ago.

I believe all my colleagues in the Senate were in the Chamber of the House of Representatives about an hour ago, when that great soldier and statesman, Gen. Matthew B. Ridgway, spoke to a joint meeting of Congress. He emphasized the importance of building up and maintaining friendly relationships with Japan and with the Japanese people. He did not go into the whole question of relationships with Asiatic peoples generally, because, after all, that situation had been outside his jurisdiction, and to a great extent, obviously, that is a matter of diplomacy. But I was deeply impressed by what General Ridgway said about the importance of maintaining not only friendly relations with Japan and its people, but relations of mutual trust, confidence, and respect in the battle which we are waging for the minds and hearts of men, a battle which we are waging, not for self-interest but in order to preserve the peace and security of the world.

Mr. President, we need the good will, confidence, and trust of all freedomloving peoples. A large proportion of the people of the world live in Asia and the countries of the Pacific. Yet we are deliberately slapping them in the face and taking away from them the selfrespect and dignity to which they are entitled by saying, "No; we are not going to allow you to come to the United States except to the extent of a hundred a year."

The people of the Philippines were our allies, our friends, and our stanch supporters. We were very proud to be called friends of the Filipinos and to have their friendship just a few years ago. To Filipinos, also, we are saying, "Even though you may have been born in England or France and may have lived there, or even though your family may have lived there for generations, if you have 50 percent so-called oriental blood"—and I do not know what is meant by oriental blood—"you cannot come to the United States unless you can be charged against the niggardly quota of 100 allotted to your country."

Mr. President, I do not believe that is the way to gain the confidence, trust, affection, and support of that great mass of people, who are human beings just as we are, and who are and can be not only potential but actual allies of ours in the fight to maintain peace and security in the world.

Mr. BENTON. Mr. President, will the Senator yield?

Mr. LEHMAN. I yield.

Mr. BENTON. I am very happy the Senator mentioned the address by General Ridgway, to which we all listened. If I recall correctly, in describing the Japanese people he used the adjectives: "Proud, sensitive, diligent, and homogeneous." I recall those words very distinctly; they made a very great impression on me, especially the adjectives "proud" and "sensitive."

I have previously told the Senate, when there were very few Senators on the floor, my experience in Japan in 1937, when by accident I was in Tokyo on the anniversary of the date of the passage by Congress of the Japanese Exclusion Act. On that day the black flags broke out all over Tokyo. As an American, I walked through Tokyo looking at the black flags on the buildings. When I asked why the black flags were flying I was told, "This is Japan's national day of mourning. This is the day on which we go into mourning because of the insult to us involved in your United States Oriental Exclusion Act."

Every student of this subject knows that our Oriental Exclusion Act played a large part in creating the climate of opinion in Japan which led to the attack on Pearl Harbor. The only question is, how large a part. Every student has asked the question, Would there have been an attack on Pearl Harbor if it had not been for our Oriental Exclusion Act?

Does not the Senator agree that these questions involve the peace and security of the United States as we look ahead, and that they are not merely domestic questions involving problems of our domestic economy? Does not the Senator agree that the risk and danger in insulting the great peoples of the east is infinitely too great a price to pay for the kind of discrimination written into this bill, which my amendment proposes to correct?

Mr. LEHMAN. I fully agree with the distinguished Senator from Connecticut. It does not make sense to me that, on the one hand, we talk about the friendship of Japan, the friendship of India, the friendship of the Philippines, and the friendship of Indonesia, and, on the other hand, we slap them in the face and say, "You are an inferior people. We cannot permit more than 100 of you to come into this country each year, regardless of any other conditions."

How can we expect to gain the respect, confidence, and trust of those people? I cannot emphasize too strongly that if we are to succeed in the fight against communism and all the evils of communism we must have the trust, the good will, and the confidence of decent peoples all over the world.

Mr. BENTON. Mr. President, will the Senator from New York yield for another question?

Mr. LEHMAN. I am very glad to yield.

Mr. BENTON. Does not the Senator agree that it is folly to have spent billions upon billions of dollars on Japan since the end of the war in the effort to rehabilitate the Japanese economy, and then at one blow, in a bill which I am sure not a dozen Members of the Senate have read, a bill containing 302 long, complicated, and difficult pages, to risk throwing overboard the good will we have been developing in Japan, and needlessly to insult that proud and sensitive people? I have no estimate of the amount we have spent. I suppose it has averaged at least $1,000,000,000 a year since 1945.

Mr. LEHMAN. I fully agree with the Senator. However, the argument can be carried much farther than Japan. The Senator from Connecticut and I know of the fine work which has been done in India by our Ambassador, Chester Bowles. We know how eager the great mass of the American people is to have the good will and friendship of the people of India. We passed a bill

providing a large quantity of grain for India, to relieve her starving people, and I hope we shall pass other financial measures which will afford either grants or loans or other forms of relief and help, but then we say to her, "We think your friendship does not amount to much. We do not care. We do not particularly want it. We do not consider you to be good enough to play in our front yard. Only 100 of you may come to the United States, and that is all." It does not make sense to me.

The PRESIDING OFFICER. Does the Senator from New York yield the floor?

Mr. McCARRAN. Mr. President, does that conclude the hour? We have an agreement for an hour to a side.

Mr. HUMPHREY. Mr. President, I thought the Senator from Nevada might wish to make reply at this time.

Mr. McCARRAN. I wish to make a brief statement at the conclusion of the presentation of the other side.

Mr. BENTON. Mr. President, I have concluded my presentation with respect to this particular amendment.

Mr. McCARRAN. The Senator's colleagues may wish to make a statement.

Mr. HUMPHREY. Mr. President, I should like to say a few words in reference to this subject, and in support of the amendment offered by the Senator from Connecticut [Mr. BENTON].

We have gone over this material at considerable length, and I do not believe that we should unduly prolong the debate. The record will speak for itself. The record shows that this amendment is of vital, imperative importance to the national security. The Senator from New York has documented the argument in favor of this amendment, as has the Senator from Connecticut.

In my presentation in opposition to Senate bill 2550 I concentrated the early part of my remarks upon what we call the Asiatic-Pacific triangle, which is involved in the amendment to which we now lend our attention. I stated what is obviously a fact, that the most critical point in our international relations is that of an understanding among the various peoples, and a working relationship on the basis of equality. I pointed out that the people of the countries which lie within the Asiatic-Pacific triangle are highly sensitive. I refer to the Malay States, Pakistan, Ceylon, Burma, Thailand, Indonesia, the islands of the East Indies, and, of course, the great Republic of India. I hope the Senate realizes that in the acceptance of the Tehran proposal, while we provided a minimum quota for those countries, a pooled quota, so to speak, we have, in fact, not provided for the people who may reside in other areas of the world.

The Senator from New York pointed out the aspect of "50 percent oriental blood." That is positively impossible to ascertain. It is always well to have specific provisions in a bill, but in view of the limited birth records, in view of the limited history of families which exists in many of these areas, I say that it is literally and scientifically impossible to ascertain what is 50 percent oriental blood. I also think it is a direct insult to a citizen of Great Britain who may have 50 percent of oriental blood, but who was born in Great Britain, a child of English parentage on the one side, and, let us say, Indian parentage on the other side, to say that if he comes to the United States, he cannot be charged against the British quota, but must be charged against the pooled quota in what we call the Asiatic-Pacific triangle. What justification is there for according different treatment to a British citizen in Great Britain who may be of a different racial or religious background than is accorded to an Anglo-Saxon citizen of Great Britain? It makes no sense.

I was moved today by General Ridgway's address. First of all, it was a factual address. It did not embody polemics or politics. He confined himself, as generals should, to military matters and military policy. He did not wander all over the political arena. That is the prerogative of those in civilian authority.

In that respect General Ridgway performed a monumental service, in view of developments within the past year in American political life. He also pointed out that the Asiatic area was a critical area. He pointed out in particular that Japan was vital to our security. It is vital to our security. Japan, in the hands of an unfriendly government, or in the hands of a hostile power, or in the hands of Communist conspirators, would be a dagger pointed at our heart. Make no mistake about it—the Communists have been making hay throughout the world. They have been making great progress by preaching the doctrine that for some reason or other we do not like their kind of people. The actual public policy of our country substantiates their criticism of it.

The Benton amendment is directed toward the relief of that situation. It is directed in the same manner as we direct mutual security aid. It is directed as the point 4 program is directed, and as the Voice of America program is directed to supply truth and information. It is directed at the hearts of the people of other nations. No amount of money the American Government might spend would buy the friendship of those people. Friendship does not arise from gifts. It arises from mutual respect and understanding.

Mr. President, sometimes you can make enemies with gifts, particularly if you are the only one capable of extending gifts to a poverty stricken and depressed people. In that case they turn against you. How does one build a sound bond of friendship? He builds it through mutual respect, mutual affection, mutual understanding, and mutual recognition of equality. There is seldom any friendship between the rich and the poor on the basis of philanthropy or on the basis of charity. There is seldom any real friendship between the powerful and the weak on the basis of noblesse oblige or on the basis of a paternalistic attitude. Friendship evolves from the recognition of equality of status and by an appreciation of human dignity, of individual souls, spirits, and bodies.

That is what we are seeking by this amendment. What is wrong with the McCarran bill. It is that it does not get to the real heart of the problem when it comes to the treatment of people. We should be legislating on the basis of equality. We should be legislating on the basis of treatment of people, and on the basis of our reaction to and our understanding of them, as well as on our willingness to accept them. We should be legislating in terms of the basic and fundamental policy of democracy, predicated on the principle of human equality.

Mr. President, I must say that the McCarran bill violates that predicate, or at least seriously damages it. The bill adulterates the principle which is at the key and the heart of the democratic philosophy. The key and the heart of the democratic philosophy is recognition of the dignity of the human kind, and of the brotherhood and fraternity of mankind. The least we can do is to treat other peoples on an equal basis. We may not treat them completely in that way, and give them only certain small benefits, but the principle of equality should be present, whether it be with respect to a citizen of Norway or of Great Britain, or of Sweden, or of England, or of Italy, or of Greece, or of Turkey, or whether it be any one from Japan, Indonesia, Burma, India, or Pakistan.

I remind the Members of this august body that the future of the world may well be in the hands and in the hearts and in the bodies and in the minds of a billion and a half people who live in what we call this great area of underdeveloped and underprivileged people. We can be mighty and proud and strong in our economic system and military power, but I remind Members of the Senate that a billion and a half people who have hatred in their hearts, and a feeling of resentment because of inequitable treatment can wreck the United States of America in the long pull. We are legislating in the field of foreign policy, not merely in the field of domestic policy.

Those who want to economize on the budget should realize that the way to economize on dollars is to be generous with the human spirit. Mr. President, we can save money if we are generous with spirit, compassion, understanding, and humanitarianism. However, if we assume a negative attitude toward other people and negate every aspiration they have for equal status in this world, no amount of money the people of the United States can provide will bring us security. Security will not come from a flow of dollars alone. It will come from a flow from the heart of understanding and appreciation for other people's place in this world.

Unfortunately and tragically—and I say it with a real sense of depression and grief for my country—this bill embodies basic principles which make it difficult, if not impossible, to obtain what we need so desperately today, namely, a feeling that all the people of the world stand together and are equal partners.

Mr. President, if we do not accept other peoples as equal partners on the principle of equality, no financial or military power will be able to save us. We

Case: 1:21-cr-00665 Document #: 30-5 Filed: 05/02/22 Page 13 of 55 PageID #:780

may be safe for a few years, but the events in Korea should serve as a warning. There we see the relentless flow of the hordes of Asiatic manpower upon our Eighth Army. There we see the hundreds of thousands of a vast manpower from the insatiable pool which supplies more and more men. They should have in their hearts a sense of affection for us, as we would justly deserve if we act properly today. On the other hand, they can well have a sense of bitterness in their hearts.

Mr. President, we have history on our side on this subject. The eminent Senator from Connecticut [Mr. BENTON] is 100 percent historically correct when he says it is fair to say that the Japanese Exclusion Act did as much to bring down upon America the vengeful wrath of the Japanese people as did anything else. We literally wrote the declaration of war in Congress. It was inevitable that war should come. Our Exclusion Act promoted militarism in Japan. Those who wanted peace and brotherhood found no place to turn. The great American brother had rebuked them and called them second-class citizens. They were the little people of the yellow race. Those little people of the yellow race can be very powerful indeed if they have the tools of destruction in their hands. I want them on my side. At least I want to have a chance to work with them on the basis of freedom, equity, and equality.

All we have to do is to announce the principle. We do not have to accept millions of them. We do not have to have the floodgates of America opened up wide. Whatever gate there is, let it be opened equally to all. Let us treat all peoples equitably.

Mr. BENTON. Mr. President, will the Senator from Minnesota yield?

Mr. HUMPHREY. I am glad to yield.

Mr. BENTON. Does the Senator from Minnesota recall that if the Japanese had been permitted to come to our country during the 1920's and 1930's on the terms on which quotas applied to other countries, it would have meant only approximately 143 a year?

Mr. HUMPHREY. That is correct.

Mr. BENTON. Thus, for the sake of keeping out only 143 Japanese a year we insulted this proud and sensitive people, as described by General Ridgway. Is it not a dramatic example of the folly of passing laws of this kind, which affect our foreign policy, on the mistaken belief that this is domestic legislation instead of legislation involving the peace and security of the world?

Mr. HUMPHREY. The Senator from Connecticut is correct. I may say, with all due deference to the Senator from Nevada [Mr. McCARRAN], that there is a provision in the McCarran bill which provides a quota for the people of Japan. I think it is a quota of 100 a year. That ostensibly removes the discriminatory future. However, it treats a person of Japanese blood any place else in the world on an inequitable basis as compared with other people. Let us put it this way. If a man of Norwegian ancestry, born in Canada, wants to migrate to the United States, he can come into the United States as a nonquota Ca-

nadian. He can be as Norwegian as any Norwegian who comes from Oslo, but nevertheless he can come here as a Canadian. Yet one who was born in Great Britain, with the parentage of nobility on the paternal side and a finished educated background of Indian blood on the maternal side, cannot come into the United States as a British subject, even though he is a British subject and a British citizen, but is allocated to the quota for the Asia-Pacific triangle.

Mr. President, no one is going to be "kidded" about this matter, because, whether we like it or not, the people of the Pacific area have educated and intellectual leadership. They are educated people. How terrible it would be again to place in the hands of the vicious and unscrupulous propagandists of the Kremlin this weapon, which General Ridgway discussed when he spoke of the maliciousness of their lies, their falsehoods, and their exaggerations. Why do we give them that kind of basis on which to build their lies? We can take away from the Kremlin the club with which they have been hitting us on the head, and at the same time protect our national interest. There would be no flood of immigration into the United States.

Mr. LEHMAN. Mr. President, will the Senator from Minnesota yield?

Mr. HUMPHREY. I yield.

Mr. LEHMAN. I should like to draw attention to the fact that the McCarran bill not only fixes a quota of 100 but it goes further and sets up the new-fangled idea of the Pacific-Asiatic triangle. The bill limits immigration from countries within that triangle, which I understand extends all the way from India down to Australia. I believe it includes a part of Australia. The bill limits the total number of men and women from that area who can come into the United States to 2,000.

Mr. HUMPHREY. That is correct.

Mr. LEHMAN. Yet we are really dealing, as the Senator has pointed out, with 1,500,000,000 people in the Asiatic area.

Mr. HUMPHREY. Mr. President, I think the case has been made. We have made it again and again. However, this is a process of education. I had a wonderful experience last evening when I traveled to the city of Newark following the debate on the floor of the Senate. I addressed a housing conference in Newark. Present were several hundred people, and our meeting was concluded at approximately a quarter to eleven.

I spent the next hour visiting with those who came up to talk to me about the immigration bill. I did not realize that the American people were so well informed about what we in the Senate are doing. Those persons included school teachers, businessmen, professional men, civic workers, State employees, city employees, and others. We met in the Civic Auditorium at Newark. The mayor of that city, a fine, civic-minded man, had made the auditorium available for that meeting. By the way, Mr. President, the mayor of Newark is of Italian background. One of the Commissioners, Mr. Moran, I gather to be of Irish background. That meeting was attended by

persons of various creeds and nationalities. All of them were deeply concerned with what the Senate is going to do about this immigration bill. They want us to defer the rewriting of our immigration laws, until we have an opportunity to rewrite it in terms of our present position in the world and of the needs of the Republic.

Mr. President, at this time I suggest that the opposition be heard from.

Mr. LEHMAN. Mr. President, I should like to say a word at this time, if I may.

The PRESIDING OFFICER (Mr. CLEMENTS in the chair). Does the Senator from Minnesota yield to the Senator from New York; and, if so, for how long a time?

Mr. HUMPHREY. Mr. President, I yield to the Senator from New York whatever time he wishes to use.

Mr. LEHMAN. Mr. President, I desire to make a brief comment about a statement made by the distinguished Senator from Nevada. He said, in effect, "I should like to close the argument on this amendment."

I do not know whether we shall wish to answer him. However, simply for the sake of the RECORD on this amendment and on other amendments which may be offered, I desire to say that we cannot agree in advance to give up any unused portion of our time under the unanimous-consent agreement. In other words, if we have any time left, and if the other side presents an argument which we believe needs to be replied to, we do not care to agree in advance to give up any unused time which may be available to us.

Mr. CASE addressed the Chair.

The PRESIDING OFFICER. Does either side yield time to the Senator from South Dakota?

Mr. LEHMAN. I shall be very glad to yield to the Senator from South Dakota.

Mr. HUMPHREY. Mr. President, let me inquire about the purpose of the Senator from South Dakota in addressing the Chair at this time.

Mr. CASE. Mr. President, a few moments ago the distinguished Senator from Minnesota said he thought the opposition should be heard from. If either of the Senators who are in charge of time under the unanimous-consent agreement will yield a little time to me, I wish to speak in opposition to the amendment.

Mr. HUMPHREY. I shall be delighted to have the opposition use time at this point, Mr. President.

The PRESIDING OFFICER. The Senator from Nevada [Mr. McCARRAN] is in control of the time in opposition to the amendment. Does he yield any time to the Senator from South Dakota?

Mr. McCARRAN. First, Mr. President, I must ask whether the hour available to us has been entirely used.

The PRESIDING OFFICER. The opponents of the amendment have used 50 minutes, and have 10 minutes remaining.

Mr. McCARRAN. Then I yield to the Senator from South Dakota at this time. Let me inquire how much time he wishes to have.

Mr. CASE. I should like to have about 5 minutes.

Mr. McCARRAN. Very well; let the Senator from South Dakota take 10 minutes, if he wishes to do so.

The PRESIDING OFFICER. The Senator from South Dakota [Mr. CASE] is recognized for 10 minutes.

Mr. CASE. Mr. President, although I have not heard all the argument on the pending bill, I have heard much of it. The argument which has been presented in favor of the pending amendment should not rest without an answer, I believe, even though the amendment seems likely to be rejected.

I listened with special interest to the argument advanced a few minutes ago by the distinguished Senator from Connecticut [Mr. BENTON]. Mr. President, if ever there was an argument which did not justify the conclusions advanced in connection with it, it seems to me that would be the argument presented by the Senator from Connecticut.

I heard him say that a great number of Italian cities already have or are likely to elect Communist mayors. The implication of that argument on the part of the Senator from Connecticut was that in Italy, communism is on the increase. By means of that argument, the Senator from Connecticut sought to justify a conclusion that we should open our doors to more immigrants from Italy.

Mr. President, there may be some reason for us to invite more immigrants from Italy, and perhaps their quota should be changed. But the argument that, because it is believed that some Italian cities are likely to elect Communist mayors, we should open our doors to more immigrants from Italy, does not appeal to me; and I do not believe it appeals to the American people.

In the second place, I heard the Senator from Connecticut say that the Japanese exclusion policies of the United States were largely responsible for the attack on Pearl Harbor. Mr. President, it should not be necessary to challenge such a statement in this body; but I do not want the RECORD to seem to show that such a statement goes unchallenged. I daresay that on other occasions the Senator who uttered those words has given some other reason for the attack by the Japanese on Pearl Harbor. Many people believe it was provoked by the policies followed by President Roosevelt and Secretary of State Hull; or at least that they precipitated the attack, at the time when it came. Others think it was an integral part of a policy originating in Berlin. Others may say it was due to economic pressures. Others, that it was because we told Japan she must not move south, but certainly one cannot say with correctness that it was due to the policy on Japanese immigration which our country has had.

Today I heard General Ridgway speak at the joint session, and I noted his statement that those who wish to see a strong Japan must sit down at a conference table with some understanding of the problems involved and with some desire to reach a solution which will make it possible for Japan to have access to raw materials and markets for the products of those raw materials when processed in order to provide a viable Japanese economy—to use General Ridgway's term. He did not say, however, that we should increase the quota of Japanese to be allowed to enter our country, as a means of avoiding another Pearl Harbor.

The final argument which I believe should be challenged is the suggestion that by our national immigration policy or by continuing a policy of basing immigration on the historic percentages of nationalities in the United States, we shall be playing into the hands of the Kremlin; that if we continue to pursue this policy it will give communism an effective weapon in the cold war.

Mr. President, if that argument were true, it should not be advanced by an American. Do we not have the right to determine who may enter our country?

And, what is the policy of the Kremlin with regard to immigration? Does Russia invite these people to share her resources? I do not know what policies Russia has for all immigration matters, but I have witnessed the result of one of her policies with respect to peoples. She was the instigator of the policy by which 11,000,000 persons were expelled from some of the territories she put behind the iron curtain at the conclusion of World War II. I think it is to the shame of the allies who were associated with Russia in World War II that they sanctioned the movement to uproot millions of persons who, up to that time, had spent all their lives in those countries, and whose forebears had lived there in some instances for 200 years. It is a matter of tragic fact that some 11,000,000 persons were expelled from Czechoslovakia, Poland, and the other territory which was put behind the iron curtain following World War II; and were crowded into what remains of Germany.

Russia has no policy for inviting the immigration of peoples from other parts of the world. If she maintains an iron border against outside nationalities even to the extent of expelling these millions, it is ridiculous to say that because we have a policy of maintaining the historic proportions in this country, we are playing into the hands of the Kremlin.

Mr. President, the suggestion that such a thing could be true should not be made on the floor of the Senate, for if we here are to counter the Kremlin's propaganda, we should be pointing out the expeller policy which the apostles of communism carried out. So far from inviting people of diverse origins, Russia kicked out these millions of people of German ethnic origins who had been living in those lands for 200 years.

Mr. President, I took the floor merely to challenge these three or four points, because although I believe that the amendment will be rejected, I do not like to see such arguments go unchallenged on the floor of the Senate.

Mr. HUMPHREY. Mr. President, the Senator from Nevada seems not to wish to speak at the moment. If he does not, I should like to reply to the remarks just made by the Senator from South Dakota [Mr. CASE].

I appreciate the willingness of the Senator from South Dakota to join in the debate. That is what we have been hoping for during the past 10 days.

However, Mr. President, the Senator from South Dakota is dead wrong in reference to some of his conclusions in regard to the argument which has been made here.

Mr. President, the argument which has been presented to the Senate is not one for opening the gates; neither is the argument which has been presented based on the idea that Communist mayors may be elected in Italy. The argument which has been presented is that the United States, if she wishes to obtain the maximum amount of cooperation from the rest of the world, must treat all the other countries in the world on the basis of equity and equality.

It is candidly admitted that the McCarran bill, as proposed, will give the Japanese a quota. Such a provision is, indeed, an improvement; and it is for that very reason that the Japanese Citizens League of this country is supporting the McCarran bill, because at long last it will do away with what is known as Japanese exclusion. There is no doubt about that, Mr. President. Let us have the record perfectly clear.

However, the Senator from South Dakota does not seem to understand the implications of the section of the bill beginning on page 35, about which we have been speaking. That section of the bill would do away with the entire system of national origins, insofar as it applies to orientals. In other words, it would require that if a person of 50 percent Indian blood, let us say, was born in England—thus obviously being a citizen of Great Britain—that person, whether man, woman, or child, could not enter the United States as an immigrant under the quota for Great Britain, as allowed under the quota system. Yet if a man or woman of whole English blood, 100 percent Anglo-Saxon, were born in Spain, that man or woman could come in as a Spaniard, regardless of the blood, so to speak.

The Senator from Minnesota was pointing out that no member of this body is wise enough to ascertain whether a person has 50 percent of oriental blood, and I doubt whether it would be possible to find very many doctors who would be able to prove it scientifically. In view of the fact that the people in many of these areas keep no proper record, it is going to be a matter of having someone look into their eyes and at their skin.

Mr. CASE. Mr. President, if the Senator from Minnesota will yield for another question, if he feels that it would be impossible for a doctor or any other person to determine the percentage of blood, why does he object to the provision of the bill?

Mr. HUMPHREY. I may say to my friend, the Senator from South Dakota, that I want to be most charitable with him, and I want to proceed now cautiously and slowly. I say to the Senator that the bill includes what I have just been talking about. I say that, insofar as persons who are within the so-called Asiatic triangle and persons of oriental blood are concerned, the bill provides that they shall not be treated on the basis of a quota system from a particu-

lar country, but that they shall be treated on the basis of what their bloodstream seems to reveal. Scientifically, there is no difference between the blood of a person from Japan and the blood of a person from Sweden. But somehow or other our consular officers are supposed to possess some sort of medical prophetic insight and vision which will reveal things that modern science has never been able to determine. All I am saying is that the provisions of this bill, first of all, are scientifically unsound. Second, they are tragic in terms of their implications to our foreign relations.

Mr. CASE. Mr. President, will the Senator yield for a question?

Mr. HUMPHREY. I am delighted to yield.

Mr. CASE. If the Senator will permit me to make the suggestion it seems to me that what he wants to do is to establish a legal way of evading the provisions of the quota system.

Mr. HUMPHREY. Not at all. What the Senator from Minnesota wants to do is to have a quota system applied equally, not in terms of actual numbers, but in terms of equity of principle. The Senator from Minnesota is simply saying that if a person were born in Great Britain and were now a citizen of France, or if he were born in France and were now a citizen of Great Britain, he should come under the British or the French quota. That is the way Frenchmen are to be treated, if by blood one may speak of them as such. However, if there is anyone who can find any pure races, I should like to know where they are, after the many wars and the migrations of peoples. There are supposed to be some left, I imagine.

Mr. PASTORE. Mr. President, will the Senator yield?

Mr. HUMPHREY. I yield.

Mr. PASTORE. To quote a very significant phrase from the Constitution of the United States—"regardless of race, color, or creed."

Mr. HUMPHREY. That is correct. I wish it were more generally applied.

Mr. President, I am going to conclude my argument by saying to the Senator from South Dakota that I know his intentions are right. I know there 's no fundamental disagreement as to the objective. All I am saying is that we do not remove racial discrimination in immigration laws when we literally place a premium or a handicap upon an individual because of his ancestral background. I repeat my example: Let us assume that a person of Indonesian extraction has been living in Holland, which, of course, would not be unusual, since Holland at one time was the colonial power which governed Indonesia. Let us assume that there is a child in Indonesia who speaks the Dutch language, who goes to the Dutch Church; that the father of the child is a Dutchman; and that the mother happens to be Indonesian. That has happened. If the child wanted to emigrate to the United States the child could not come in under the Dutch quota, but would have to come in under the so-called Asiatic-Pacific quota, with its maximum pool of 2,000. A child born in Indonesia of Dutch parentage and Indo-nesian parentage could come in only under the Indonesian quota. How may that sort of thing be justified in the terms of the relationships we want to establish in this world?

Mr. PASTORE. Mr. President, will the Senator yield for a question?

Mr. HUMPHREY. I yield.

Mr. PASTORE. If the same child were born in America he would be an American.

Mr. HUMPHREY. That is correct; there can be no doubt about it whatever. In other words, if a child were born in the United States of a Polish father and of a mother who came from India the child would be an American and would have all the prerogatives of American citizenship. But if the child were born in Great Britain of a Polish father and of an Indian mother and was educated at one of the finest colleges or schools he could not come into the United States as a British immigrant, even though mother and father and child were British subjects and British citizens; he would have to come in as an immigrant under the Asiatic-Pacific triangle quota or be charged back to the other country. I say that is unfair. I do not think we need belabor the point, except that the Senator from South Dakota must know what the facts are, and I have given him the facts.

Mr. PASTORE. Mr. President, will the Senator yield?

Mr. HUMPHREY. I yield.

Mr. PASTORE. Again to accentuate the inequity of that provision, under the McCarran bill, the child referred to by the Senator from Minnesota would have to register in India, though he never had a residence in India and never lived in India, but was born in Holland. Therefore that child, under no stretch of the imagination, could ever emigrate to America.

Mr. HUMPHREY. The registry of residence could be in Holland, too, so far as being able to be charged to a particular quota.

Mr. PASTORE. But that child would not be able to come in under the Holland quota.

Mr. HUMPHREY. That is correct.

Mr. PASTORE. And there could not be a clearance from the Indonesian Government.

Mr. HUMPHREY. The Senator is correct.

Mr. President, I yield the floor.

Mr. McCARRAN. Mr. President, the effect of this amendment is to remove from Senate bill 2550 those provisions relating to the Asia-Pacific triangle which provide for special treatment of certain Asiatics and natives of Pacific islands under the quotas. Briefly, under those provisions an area described by longitudes and latitudes encompassing generally those Asiatic and Pacific areas from which immigration is presently barred, is established. People attributable by as much as one-half of their ancestry to races indigenous to the Asia-Pacific triangle are chargeable to the quotas for the quota areas within the triangle or to a special over-all Asia-Pacific quota.

Those who advocate the deletion of this provision charge that it introduces new racial discriminations in our immigration laws.

In answer to that argument, I should like to point out to the Members of the Senate that under existing law, the Asiatics and natives of the Pacific islands in question are absolutely barred from admission to the United States as immigrants with the exception of natives of China, India, and the Philippines. It is to be observed that when the racial exclusions were removed in the case of Chinese and Indians, the requirement was inserted in the law—which is the law today—that persons attributable by as much as one-half their ancestry to races indigenous to China or India are chargeable to the quotas of those countries. The theory behind this realistic treatment of orientals, therefore, is not new. Under the provisions of S. 2550, no one will be inadmissible to the United States solely because of race and since the bill is removing discriminations from the law in this regard, it cannot be said that new racial discriminations are being introduced.

The Japanese-American Citizens League, a representative of the race most concerned with the removal of the discriminations, has given this legislation its wholehearted support as has the Filipino Federation of America, Inc. Thus those people most directly affected by the provisions of the bill in question are not the ones who are complaining about the alleged discriminatory treatment.

Mr. LEHMAN. Mr. President, will the Senator from Nevada yield for a question?

Mr. McCARRAN. I yield for a question.

Mr. LEHMAN. I wonder whether the Senator——

Mr. McCARRAN. Right there I stop the Senator, because it is evidently not a question. I am not going to answer the Senator's wonderment.

Mr. LEHMAN. I shall reword my question.

Does the Senator know that the Philippine Government has protested that part of the bill which affects Philippine citizens?

Mr. McCARRAN. I read from a telegram which I inserted in the RECORD, in which the supreme president of the Philippine Federation of America——

Mr. LEHMAN. I am talking about the Philippine Government.

Mr. McCARRAN. I do not know about the Philippine Government. I am talking about the people.

Mr. LEHMAN. The Philippine Government represents a great many Filipino people.

Mr. McCARRAN. Mr. President, I should like to point out to the Members of the Senate that if this amendment is adopted, there are approximately 600,000 orientals who are natives of nonquota countries in the Western Hemisphere who would immediately become eligible for a nonquota immigrant status under our immigration laws. Coupled with the orientals born in quota countries outside the Asia-Pacific triangle, it is reliably estimated that approximately 2,000,000 aliens of oriental ancestry would become eligible to enter

the country, either as quota or non-quota immigrants.

Mr. HUMPHREY. Mr. President, will the Senator from Nevada yield for a question at that point?

Mr. McCARRAN. In a moment.

Mr. President, there is no quota now for Japan. The bill would give Japan a quota of 185 a year.

I now yield to the Senator from Minnesota for a question.

Mr. HUMPHREY. Is it not true that the figure of 2,000,000 which the Senator has used is, of course, subject to all the many standards and qualifications which are applied for the admissibility of immigrants into the United States?

Mr. McCARRAN. Yes.

Mr. HUMPHREY. In other words, the standards of health and economic ability are standards which would apply to any immigrant?

Mr. McCARRAN. Yes.

Mr. HUMPHREY. So the figure would be tremendously reduced because of those standards?

Mr. McCARRAN. Not tremendously reduced.

Mr. HUMPHREY. The standard of literacy is applicable, is it not?

Mr. McCARRAN. Yes.

Mr. HUMPHREY. Is it not true that these persons are likely to be illiterate?

Mr. McCARRAN. That is true.

Mr. HUMPHREY. Would they not have to show that they will have a job? They would have to give assurance of their ability to take care of themselves economically, would they not?

Mr. McCARRAN. Yes; that they would not become public charges.

Mr. HUMPHREY. So the figure of 2,000,000 is a theoretical figure. In fact, there are 150,000,000 in the Western Hemisphere who are eligible for migration to the United States.

Mr. McCARRAN. They are coming across the border by thousands.

Mr. HUMPHREY. One hundred and fifty million persons in South America, Mexico, and Canada are eligible for citizenship in the United States.

Mr. McCARRAN. That is true.

Mr. HUMPHREY. How many persons migrated from Brazil?

Mr. McCARRAN. I cannot tell the Senator at the moment.

Mr. HUMPHREY. It was a very limited number, was it not?

Mr. McCARRAN. Yes.

Mr. HUMPHREY. We have the competition of wetbacks from across the Rio Grande. Is there anything to lead us to believe that there is a wetback invasion?

Mr. McCARRAN. The term "wetback" is applied to labor from across the Rio Grande. Orientals are competing in the market.

Mr. HUMPHREY. They cannot swim the Pacific Ocean.

Mr. McCARRAN. They reach here somehow. There are approximately 600,000 oriental natives of countries in the Western Hemisphere who would be eligible.

Mr. HUMPHREY. They would be technically eligible if they could meet the immigration standards.

Mr. McCARRAN. That is correct.

Mr. HUMPHREY. But those 600,000 persons could not meet the standards, any more than could the Indians.

Mr. McCARRAN. I cannot agree with the Senator, because many of them have had education in the Western World.

Mr. HUMPHREY. Is there any indications that citizens of Chile, even the native stock, have wanted to come to the United States? They could come here in hordes, could they not?

Mr. McCARRAN. They can come in now.

Mr. HUMPHREY. But they must first have the necessary money.

Mr. McCARRAN. They usually get it from here and come to the United States on American money.

Mr. HUMPHREY. When we talk about these figures, is it not correct to say that while the theoretical possibility is that under the present law there could be a migration of 150,000,000 persons, the immigration has been but a trickle from South America, Latin America, and Canada?

Mr. McCARRAN. It has been a substantial trickle. There are from 3,000,-000 to 5,000,000 people illegally in the country. That has been established.

Mr. HUMPHREY. Is it not true that most of them are wetbacks?

Mr. McCARRAN. Oh, no.

Mr. HUMPHREY. Is not the number approximately 2,000,000?

Mr. McCARRAN. I'o; I do not agree with that. It would run less than a million.

Mr. President, I ask for a vote on the amendment.

The PRESIDING OFFICER. The question is on agreeing to the amendment offered by the Senator from Connecticut [Mr. BENTON] for the Senator from Minnesota [Mr. HUMPHREY] and other Senators.

The amendment was rejected.

Mr. PASTORE. Mr. President, I call up amendment P as in "PASTORE," and ask that it be stated.

The PRESIDING OFFICER. The clerk will state the amendment offered by the Senator from Rhode Island for the Senator from Minnesota [Mr. HUMPHREY] and other Senators.

The LEGISLATIVE CLERK. On page 42, after line 7, it is proposed to insert a new section, as follows:

POOLING OF UNISSUED AND UNUSED QUOTA NUMBERS

SEC. 203A. All quota numbers available during any fiscal year which are not actually issued during such fiscal year, and all quota numbers which were issued in such fiscal year or in a previous year and expired during such fiscal year without being utilized, shall be assigned to a general quota pool and shall be available, without reference to national origins, for issuance at any time during the fiscal year following such assignment as follows:

(a) Family reunion preferences: Twenty-five percent of such pooled quota numbers or such smaller percentage as shall be found by the Secretary of State to be sufficient properly to care for pending applications, shall be available, in such order as may be determined by the Secretary of State, to adult children, brothers and sisters, and other blood relatives (within the third degree of consanguinity computed according to the rules of the common law) of citizens, and to spouses, children (including those over 21 years of age), parents, brothers and sisters, and other blood relatives (within the third degree of consanguinity computed according to the rules of the common law) of alien residents of the United States who have been lawfully admitted for permanent residence.

(b) National need preferences: Twenty-five percent of such pooled quota numbers, or such smaller percentage as shall be found by the Secretary of State to be sufficient properly to care for pending applications, shall be available for persons who because of their high education, technical training, specialized experience, or exceptional ability, are urgently needed in the United States (so far as such needs have not been met within the original quotas), or are likely to be of special benefit to the national economy, cultural interests, or welfare of the United States as determined by the Secretary of State, on the basis of recommendations made by the Secretary of Defense and the Secretary of Labor, or by such advisory committees, representing industry and labor, as the Secretary of Defense and the Secretary of Labor may establish.

(c) Persecutee preferences: Twenty-five percent of such pooled quota numbers, or such smaller percentages as shall be considered by the Secretary of State to be sufficient properly to care for pending applications, shall be available, in such order as may be determined by the Secretary of State, to persons (including persons temporarily within the jurisdiction of the United States) who have been persecuted abroad in the country of their national origin or in the place of their last residence on religious or racial grounds or because of their adherence to democratic beliefs or because of their opposition to totalitarianism or dictatorship, or who have reason to fear such persecution, and who have been classified as "persecutees" or "possible persecutees" in accordance with such procedures and after such investigations as the Secretary of State shall order.

(d) Nonpreference cases: Pooled quota numbers not required for issuance under the foregoing preferences shall be available, on application to the Secretary of State by an American citizen or a reputable American organization, to other immigrants, whose cases because of special circumstances or hardship merit special consideration, in the order of their registration.

Mr. PASTORE. Mr. President, this amendment is a very simple one. While I believe that it affects the policy of the McCarran bill, as enunciated by the distinguished chairman of the Judiciary Committee, I think it represents a policy that should be adopted by the United States in the establishment of its permanent procedure regarding immigration. The amendment does not affect the usage of the 1920 census as a basis for the formula. Nor does it affect the percentage of one-sixth of 1 percent as a basis. Therefore, it means that the over-all number of immigrants entering this country will still be in the neighborhood of 150,000.

I wish to make that abundantly clear at the outset, because yesterday we debated an amendment in the nature of a substitute. While that substitue included the substance of the amendment together with other features which might have been somewhat obnoxious to some Members of the Senate, the purpose of this amendment is to lift out of the substitute amendment the pooling provision and consider it on its own.

Explained in very simple terms, this is all the amendment does. It leaves quotas as they are presently designated

under the McCarran bill. It does not take away from the number who may enter from any particular nation. All it provides is that in the event any nation does not use all its quota in any one year, the number left over will go into a pool. From that pool, within the discretion of the Secretary of State, under four designated classifications, not exceeding in any one classification more than 25 percent of the pool, certain people can come here from countries that have already oversubscribed their quotas.

To be sure, this is a very simple amendment. I myself concede that it does not do complete equity. I have always maintained, and I now contend, that if we are to revise our immigration law on a permanent basis, and if we are to modernize that law and bring it up to date, in order truly to effectuate the statement made by the distinguished Senator from South Dakota, it should be done in a more democratic fashion. We should adopt the census of 1950, because the census of 1950 truly reflects the nationality pattern of our American society.

I dare say that if we take the census of 1950, it pretty well matches, so far as races are concerned, the American boys who served in the last World War, but if we take the census of 1920, I think the disparity will be amazing. However, I shall not go into that feature. That argument has been made by me before.

This is a very simple amendment, which creates a pool under four distinct classifications. It does not mean that one more person can come to America above the over-all number that would be permitted to come in under the McCarran bill. It means only that when an invitation is extended to a nation to have some of its citizens migrate to the United States, if that nation does not accept the invitation in full, then within classifications protecting the interest of the United States of America, because these categories are pretty well defined, we are extending the invitation to other people who are eligible, who would be willing to come, or who would be willing to accept the invitation, and who can only come, in large part, because of their skills or other reasons for the benefit of the United States.

My reason for citing this is that subsection (b) provides that 25 percent of such pooled quota numbers, or such smaller percentage as shall be found by the Secretary of State to be sufficient to care for pending applications, shall be available for persons who, because of their high education, technical training, specialized experience, or exceptional ability, are urgently needed in the United States.

It might well be that a time will come when the quota from Portugal might be oversubscribed; a time may come when the quota from Greece will be oversubscribed; there may come a time when the quota from Armenia will be oversubscribed. Yet in one of those countries there might be an individual who has high skills that will be of tremendous benefit to the United States. Yet under the McCarran bill that person could not come into this country as a permanent resident.

If there is a pool system, if there are a number of people from other countries who might have come, but do not come, they can be placed in the pool, and we can bring into the United States that person who might mean so much to our country's security.

Mr. CASE. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. CASE. Would the Senator's amendment extend an unused quota beyond the immediately succeeding year?

Mr. PASTORE. That is all it would provide for.

Mr. CASE. It would make the unused number available for the year immediately succeeding, but would not be cumulative over a period of years?

Mr. PASTORE. No, it would not.

Mr. LEHMAN. Mr. President, I did not hear the question asked by the Senator from South Dakota.

Mr. PASTORE. My understanding of the amendment is that it would include only the unused quota for the preceding year.

Mr. LEHMAN. Two changes would be made. May I explain?

The PRESIDING OFFICER. Does the Senator from Rhode Island yield to the Senator from New York?

Mr. PASTORE. I asked the Senator from New York the question because he rose at that time. I wish to make it abundantly clear that all that is proposed by the amendment is to take the preceding year's unused quota and carry it over into the pool.

Mr. LEHMAN. Also, it eliminates the 10-percent monthly provision.

Mr. CASE. I do not think that it is perfectly clear as to what is intended. It seems to me that the Senator's amendment might serve a very useful purpose. I recognize the fact that people of special skills might make special contributions. I know of an instance when a Chinese doctor was badly needed because he was a specialist in the field of tuberculosis. We had to work quite a while to find a way to make his skill available. There was a shortage of doctors and he was a specialist whose services were badly needed. There may be many other such cases. I think there might be some question, however, if the unused quotas were to be cumulative and were to be made available not only in 1952, but also in 1953 and 1954 and succeeding years.

Mr. PASTORE. If the language of this amendment does not connote that specifically, I am perfectly willing to have it amended to carry out that thought. As the amendment is written, and as I read it, it means to cover only the preceding year. If it does not carry out that thought, I am perfectly agreeable to having it amended to provide what the Senator from South Dakota has suggested.

Mr. CASE. I have one further question, if the Senator will yield.

Mr. PASTORE. Certainly; I yield.

Mr. CASE. The Senator used the term "25 percent." Does that place 25 percent of the unused quota into a pool, or is it that 25 percent of the total of unused quotas may be assigned to a particular category of skills?

Mr. PASTORE. No; the 25 percent applies to the pool. In other words, if there were a pool of 100,000—which, of course, there would not be—it would mean that not to exceed 25,000 could be brought here for purposes of family reunion. That would be the first category. The second category would be that of special skills of benefit to the United States. The next category of 25 percent would be the persecutees. Then, of course, the last 25 percent would be the regular immigration.

Mr. CASE. Does the Senator know what the unused quota is at the present time, or what it has averaged over a period of years?

Mr. PASTORE. I think it is safe to say that over a period of years only about 47 percent of the entire quota has been used. That is for the reason that under the present law, and under the McCarran bill, 44 percent of the entire quota is assigned to Great Britain. The countries of southern and eastern Europe have all oversubscribed their quotas. The figure is remarkable, when we realize that 44 percent of the quota of those eligible to come to this country is assigned to Great Britain, and that only 47 percent of the entire quota have actually immigrated to this country. When the quotas of so many nations are oversubscribed, the inequity of the entire bill is pointed up. That has been my argument all along.

Mr. CASE. Mr. President, will the Senator further yield?

Mr. PASTORE. I yield.

Mr. CASE. The Senator from Rhode Island may be opposed to the bill in toto. However, if he wishes to improve the bill, it seems to me that he might make a contribution with an amendment which would make some of the unused quota available for bringing in persons with special skills, or who should be admitted for particular humanitarian reasons. But if the Senator wishes to debate the entire question of national origins, he gets away from the terms of this particular amendment. I was not seeking to open the issues of the whole bill by my questions. I was trying only to see if the amendment was so stated that I could support it, for I feel that if limited in extent it might well be adopted.

What I was trying to determine by my second question was how many people would be affected, that is, what would be the unused quota carried over. Would a relief provision which would permit 5,000 or 10,000 to come in because of special skills or for humanitarian reasons meet the Senator's desire?

Mr. PASTORE. Using the percentage figure which I gave, and not counting displaced persons for whom future quotas are mortgaged, we must have an unused quota, on the average, of 75,000, which would go into the pool, if we are using only 47 percent of the quota over an average period. If we can take into the country only 150,000, those who would go into the pool each year would be about 75,000.

Mr. CASE. It seems to me that to suggest that immigration would be increased by 75,000 might strain the four

Case: 1:21-cr-00665 Document #: 30-5 Filed: 05/02/22 Page 18 of 55 PageID #:785

categories which the Senator has suggested. That would place half of the quota total into this special pool. Some people might feel that, after all, there might not be that many scientists needed, or there might not be that many hardship cases. I do not know enough about the specific immigration figures to be sure, but I think it might be reasonable to say that of the unused quota, 10,000 might be assigned to the special pools which the Senator suggests. That would be 2,500 for each of the categories. That certainly would take care of the number of urgently needed scientists, doctors, technicians, or experts in other fields, and it would take care of a great many hardship cases. It seems to me that an amendment of that sort might have considerable appeal. But when the Senator suggests 75,000, I do not know.

Mr. PASTORE. I am not suggesting the figure of 75,000. There might be no one in the pool. If tomorrow Great Britain should decide to exercise its rights and send over 66,000 out of 150,000, and if Ireland should take up its quota of 18,000 out of 150,000, there would be no pool at all. We must admit that, as a philosophy, the McCarran bill goes so far as to say that we can conveniently and comfortably absorb in this country about 150,000 immigrants a year.

Mr. CASE. Provided they come from backgrounds which we think would lend themselves to adjustment to American institutions. That is essential.

Mr. PASTORE. Does the Senator from South Dakota presume for a moment that a proper background of the American pattern of society is indicated by allowing Great Britain 66,000 and Portugal perhaps 400? I do not know where we get the background we talk about.

Mr. CASE. If we were to go back and debate the original principles involved in any immigration law whatsoever, we might get back to a discussion of that question. I see in the Senator's amendment a possible contribution to our immigration policy and laws. But it seems to me that if we are to go back and debate the entire question of national origins, we get away from the amendment. The Senator has already suggested that he would not be opposed to having his amendment clarified, if it needs clarification, by saying that this pool shall not carry over cumulatively, but only from one year to the next. If the Senator would go further and say that of the unused quotas not to exceed 10,000 might be placed in a pool, 25 percent of which could be assigned to the various categories, I think the Senator might have an amendment which would command considerable support.

Mr. PASTORE. Something of that kind might be worked out in conference, but I do not think it is fair to ask me to take what I consider a very restrictive compromise and restrict it still further. As I have previously said, there is nothing in the amendment which takes away any rights from anyone. All it does is to create the pool system, whereby, in cases where the interest of the United States was concerned, we could go to a pool system in the event certain countries did not exercise their full rights.

Mr. LEHMAN. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. LEHMAN. I do not know how the Senator from Rhode Island was impressed, or how my other colleagues were impressed, by one statement made by the distinguished Senator from South Dakota, but I thought it was most illuminating when he said that he had no objection to 150,000 immigrants coming into the country provided they had the proper background. Is not that exactly the thing which we are fighting at this time, in the philosophy of the McCarran bill? What makes an immigrant from Great Britain, Ireland, or certain other countries which have unused quotas any more desirable than an immigrant from some other country? What constitutes in him a better background than that of an immigrant from Italy, Austria, Greece, or some other country? It seems to me that the statement made by the distinguished Senator from South Dakota discloses the whole philosophy of the McCarran bill. We recognize the people of so-called Nordic strain. We are going to turn thumbs down on people from southern or eastern Europe.

Mr. PASTORE. I completely agree with the Senator from New York. I have said this so often that it has become rather stale. It strikes me that if we are talking about the pattern of racial strains in this country in the year of 1952, after two cataclysmic wars, we should take the roster of the American Army in World War II and look at the racial strains and, upon the basis of those racial strains, judge our immigration law.

But that is not good enough. We go back to 1920, when the situation was so rigged that certain people were considered undesirable immigrants to this country. Where would we all have been—where would the McCarrans and the Pastores have been—if it had not been for the liberal immigration which was permitted in the case of Ireland, Italy, Portugal, and Greece? Where would the boys have come from who wore the American uniform and won the war in 1945 if it had not been for the sons of immigrants who fought and died for the United States? Now, in this day and age, we hear about the proper racial background. What is so sacred about the census of 1920?

Mr. CASE. Mr. President, will the Senator from Rhode Island yield?

Mr. PASTORE. I yield.

Mr. CASE. The Senator from South Dakota did not use the word "racial." The Senator from South Dakota on the floor of the Senate has defended the people of Hawaii, who include many races. He would join completely with the Senator from Rhode Island in paying tribute to the people of various racial backgrounds which have made such great contributions to our Armed Forces in World War II and in other wars.

What the Senator from South Dakota was trying to do was to ascertain whether an agreement could be reached on the desirable goal in the Senator's amendment, namely, with respect to a provision for the relief of some hardship cases and to permit some people with scientific skills to come into the United States. If the Senator from Rhode Island wishes to go back and debate the original concept of the bill, he may do so, but in that way we are getting away from the issue before us.

I did not use the word "racial." I referred to background in relation to institutions and to the adaptability of persons to American customs. It may be that people can come to this country and in time be just as good citizens as the Senator from Rhode Island and the Senator from South Dakota. It may be that the digestive processes of the American system can take only so many at a time. I do not know. I did not write the 1924 act. I did not fix the quota system. That is what we are dealing with as a base.

I thought the Senator from Rhode Island was trying to improve the bill by provisions affecting some special situations. The Senator from South Dakota sought to help him. He does not like to have it suggested on the floor of the Senate that he used the word "racial." He did not use that term. He would oppose the use of the term "racial background" as much as would the Senator from Rhode Island.

Mr. PASTORE. I am not accusing the Senator of anything. The Senator did infer that the basis that we have here is the historical and traditional basis of a tested racial strain in this country, when he defended the 1920 census.

Mr. CASE. The Senator from South Dakota is not defending the 1920 census. Perhaps the 1950 census would be better. However, that is not the issue which is involved in the Senator's amendment. I thought he was trying to meet some special situations and the Senator from South Dakota sought to help him. If the Senator from Rhode Island wishes to go back to the basis of the bill, I shall not press the point.

Mr. PASTORE. If the Senator from South Dakota will read the RECORD tomorrow morning he will discover that he defended the census of 1920 as being the historical and traditional policy of our immigration law.

Mr. CASE. No. Background on the basis of sympathy or experience and understanding with constitutional government and principles of free enterprise.

Mr. PASTORE. We are in 1952.

Mr. CASE. The Senator from South Dakota stated that as a fact. He did not go into the merits.

Mr. PASTORE. What is so holy and sanctifying about the 1920 census that it must be defended in the year 1952?

Mr. CASE. Does the Senator's amendment propose that we change from the 1920 census to the 1950 census? No. I did not understand that that issue was involved.

Mr. PASTORE. We did talk about it, but it was of no avail.

Mr. CASE. That is not the pending amendment.

Mr. LEHMAN. Mr. President, will the Senator from Rhode Island yield?

Mr. PASTORE. I yield.

Mr. LEHMAN. The Senator says that he does not want to press the point. I am not quite of that mind. The Senator from South Dakota did not say racial background. He did use the word "background."

Mr. CASE. Background, as the basis of experience and understanding with constitutional government and the principles of free enterprise.

Mr. LEHMAN. Then in the most recent colloquy the Senator from South Dakota said that he would be perfectly willing to absorb a certain number of people provided that we could digest them. I wonder whether he means that we would be in any great danger of indigestion if we were to receive only 308 men and women from Greece, a country with the oldest known civilization. Does the Senator fear that we would be in any real danger of getting indigestion if we were to receive as few as 5,800 people from Italy, a country whose civilization is centuries old? Those two countries have given to the world a culture and form of government which we are very glad indeed to follow. Does he think that would bring about indigestion?

Why should people of that kind be kept out of this country merely because we have set an arbitrary limit, which cannot be deviated from in its rigid observance? I wonder whether the Senator from South Dakota knows that not only does it prevent the use of unused quotas in the succeeding year, but goes much further than that. I am speaking of the present law. The law requires that a country can use only 90 percent of its quota in any one month. The unused part of it cannot be used in the following month.

If country X uses only 5 percent of its quota in one month, that country cannot use the remaining percentage in any succeeding month or in any succeeding year, or at any other time. I wonder whether the Senator realized that when a visa is granted and a quota number assigned to an immigrant, if for one reason or another the visa cannot be honored and the immigrant is not admitted into this country, the number on that visa cannot be restored. It is lost forever. That is why in the past many years not more than 45 percent or 47 percent of the quota which was allowed even under the census of 1920 has been used.

Mr. PASTORE. Mr. President, I should like to cite some statistics which I think are of tremendous value in this debate with respect to the pending amendment.

Great Britain and Northern Ireland under their quota, were entitled to 65,-721 in 1947. They used only 19,218. In the year 1948 they used 27,774. That is 27,000 out of 65,000. In the year 1949 they used 23,543. In the year 1950 they used 17,194. In the year 1951, they used 15,369.

Mr. President, the thing that bothers me is this: The proponents of the McCarran bill state in their majority report that this is a modernization and a bringing up to date of our policy and our philosophy with respect to our immigration laws.

Nevertheless we are incorporating in the bill the same system and the same quota which we have under the present law.

I say, Mr. President, that if we grant a quota of 65,000 to Great Britain and Ireland, and if they in fact use only between 15,000 and 23,000 a year, is it not a fact that it is time for a change, if we are to modernize the law? If we are to modernize it, is it not time for us to review that feature? Is it not time for us to ask: "Why extend an invitation to people who won't accept it? Why not extend this invitation to people who really want it?"

We persist in that line of thinking because we are a little worried about background. I am not so naive as to think that when we talk about immigration law and use the word "background" that we do not in fact mean race. I am not that naive.

Mr. President, I say that while the amendment is not a complete answer to the inequities that exist and have existed for more than 30 years, now is the time and here is the place to change this inequity and now is the time to practice what we preach.

Mr. President, if we mean democracy, let us practice democracy. If we want people to come here, let us not slam the door in their faces. If people do not want to accept our invitation, and have not accepted it for 15 years, let us not keep extending this invitation. If people do not want to come to America, let us bring in those who do want to come.

Mr. President, the amendment is not a complete answer, but if we are going to find a place in our conscience and if we are going to find a place in our hearts, this is the time and this is the place to say: "Let us practice what we preach."

Mr. CASE. Mr. President, will the Senator yield?

Mr. PASTORE. I yield.

Mr. CASE. The Senator from Rhode Island may, if he wants to, when he uses the word "background" say that he means racial background. The Senator from South Dakota does not mean that. The Senator from South Dakota, when he used the word "background," had in mind sympathy or experience and understanding with such things as constitutional government and the principles of free enterprise. That is the sense in which the Senator from South Dakota uses the term "background." He does not mean racial background. Others may use it and imply racial background, but the Senator from South Dakota does not do so.

Mr. PASTORE. I will give the Senator the benefit of the doubt.

Mr. DOUGLAS addressed the Chair.

The PRESIDING OFFICER. Does the Senator from Rhode Island yield to the Senator from Illinois; and if so, for how long a time?

Mr. PASTORE. Mr. President, I yield the floor.

The PRESIDING OFFICER. The Chair understands that the Senator from Rhode Island has control of the time for the proponents of the amendment, who have 29 minutes remaining.

Mr. PASTORE. Then I yield to the Senator from Illinois as much time as he may desire to use.

The PRESIDING OFFICER. The Senator from Illinois is recognized.

Mr. DOUGLAS. Mr. President, the time has come, I believe, for us to reject or at least to limit, rather than to extend, the principle of racial exclusion which was embodied in the 1924 Immigration Act. Since we may unwittingly carry over the errors of the past, I think it is important for us to realize just what we are doing.

Prior to 1890, approximately four-fifths of the immigrants to the United States came from northern and western Europe. Beginning in that year, the tide of immigration turned toward the southern and eastern portions of Europe. So, Mr. President, in the decade from 1901 to 1910, 75 percent of the immigrants came from southern and eastern Europe. In the next decade—that from 1911 to 1920—80 percent of the immigrants came from southern and eastern Europe.

The first immigration act following World War I, namely the act of 1921, was passed in the closing months of the Wilson administration, but was vetoed by the great Woodrow Wilson. Subsequently it was passed and signed during the administration of Warren G. Harding. Its purpose was not merely to limit the total number of immigrants. A limitation of the total number of immigrants was one of the purposes of that act, and it actually reduced the total number from approximately 800,000 in 1921 to 309,000 in 1922. But, the 1921 act had another purpose, namely, to restrict the proportions of our immigration coming from southern and eastern Europe, because the basis taken for quotas in the 1921 act was 3 percent of the number of the foreign born of various racial or, perhaps I should say, nationality groups living in the United States in 1910. In itself, that provision produced a change by which the total number was to be decreased to not more than 357,000; and the total was to be apportioned between northern and western Europe, on the one hand, and southern and eastern Europe, on the other hand, in a ratio of about 60 percent for the former and 40 percent for the latter.

Italy, which had been sending to this country approximately 200,000 immigrants a year during the decade 1901-10 and more than 100,000 annually in the next decade, had its quota reduced to 42,057; Poland to 30,977; Austria, to 7,342; and Czechoslovakia, to 14,357.

That, however, was not a sufficient reduction to suit those who wished still further to restrict the immigration coming from southern and eastern Europe.

So, Mr. President, during the period following 1921, certain forces, which I do not think we now regard very highly, were at work in America attempting not only to reduce the total number of immigrants, but also to reduce still further the proportion coming from southern and eastern Europe. A plank to that effect was contained in the platforms of

a number of political organizations which were striving for power in some of the States of our Nation.

The result was that in 1924, Congress passed a still more restrictive immigration law. Again I wish to emphasize that that law was not merely restrictive in regard to the total number of immigrants to be admitted. Actually, I do not believe immigration should have been permitted to continue at the rate of 1,000,000 a year; and that law did restrict the total by reducing it from approximately 360,000 a year to approximately 164,000 a year. Even more important, however, was the added restriction which was placed upon those coming from southern and eastern Europe, because at that time, instead of using as the basis the census of 1910, the census of 1890 was used, thus going back, really, 30 years. It was provided that each nationality group would be allowed to send to the United States immigrants in the ratio of 2 percent of the foreign born who were living in the United States in 1890, a year before the big immigration from southern and eastern Europe commenced. Therefore, Mr. President, that provision was deliberately rigged—and I use the term intentionally—to discriminate grossly against persons who wished to immigrate to the United States from eastern or southern Europe.

The result was that under the 1924 act, the quota for Italy, which under the 1921 act had been 42,057, was reduced to 3,845; the quota for Poland, which under the 1921 act had been 30,977, was—under the 1924 act—reduced to 5,982; and so forth. The total effect of the 1924 act was to change to approximately 15 percent the ratio of immigrants from southern and eastern Europe, which under the 1921 act had been 40 percent. That was the great change in our immigration policy made by that act.

I desire to say deliberately that that was done in an endeavor to admit as small a proportion of immigrants as possible from southern and eastern Europe.

The policy thus provided in the 1924 interim act was to be made permanent on a so-called national-origins basis. A commission was established to make a report on the national origins of the white population in the year 1920. That commission studied the subject for approximately 5 years, and then submitted its report. Its findings became law. The commission tried to determine the proportion of our population that was English, the proportion that was Irish, the proportion that was German, the proportion that was Italian, the proportion that was Greek, and so forth. Inasmuch as the strains had been mixed, that endeavor was something like one to unscramble scrambled eggs. A great deal of difficulty was encountered in connection with that effort.

The result was that they went back to the census of 1790, in which the heads of families had been listed by name, thus beginning at a time when the population of the United States, as shown in the first decennial census, was, of course, predominantly English. Then the persons listed in the 1920 census were sorted out by name; and if a man had an English name, he was regarded as being of English stock. Of course, all of us know that a good deal of Anglicizing of names had occurred among persons of German stock, among persons coming from southern or eastern Europe, and in some instances among persons from the Scandinavian countries, who adopted English names in order to escape the social and economic disabilities attached to long, foreign-sounding names.

So, Mr. President, the national-origins system at its very beginning was really padded, because it was largely based on names, and thus overemphasized the English proportion.

Mr. HUMPHREY. Mr. President, will the Senator from Illinois yield to me?

Mr. DOUGLAS. I yield.

Mr. HUMPHREY. I am very glad the Senator from Illinois is bringing out some of the details in regard to the development of the National Origins Act, and, in particular, how names were used as a basis for the determination of national strains.

In that connection, Mr. President, let me say that the bill before the Senate, as it now stands, represents an attempt to restrict immigration by means of a determination of blood lines, which obviously is an impossible task. I make that statement for the reason that when the Government of the United States tried to determine how best it could ascertain the racial strains of the population, it came to the obvious conclusion that the only way to do so readily and with any reasonable degree of accuracy—although certainly it was still very far from being accurate—was on the basis of names.

Yet, Mr. President, the amendment which was adopted a few moments ago, about which I argued with some of my colleagues, uses as a basis of admission or refusal of admission, a determination of whether a certain person has 50-percent oriental blood. I submit that in many instances there is no way by which it can be determined scientifically that a person has 50-percent oriental blood. It was for that reason that the Government of the United States refused to use such a basis in the original immigration law; in other words, at that time the Government refused to use as a basis a determination that a person had 50 percent Norwegian blood, or 50 percent English blood, or 50 percent any other kind of blood.

Mr. DOUGLAS. Mr. President, it is my own belief that all good blood is more or less alike. Blood plasma is interchangeable, and I know of no way of differentiating between the blood which flows in the veins of an Englishman, the blood which flows in the veins of an Irishman, the blood which flows in the veins of a Pole, or the blood which flows in the veins of an Italian. There are no nationality tags on blood.

Mr. HUMPHREY. The only two categories I know of are the blue bloods and the real red bloods. I myself prefer the red-blooded ones. [Laughter.]

Mr. CHAVEZ. Mr. President, will the Senator yield to me at that point?

Mr. DOUGLAS. I am glad to yield for a question.

Mr. CHAVEZ. My question follows the line of thought of the Senator from Illinois and the Senator from Minnesota that all blood is identical. Is it not true that if one goes into any foreign military cemetery or into a military cemetery in the United States, he will find buried there persons of English blood, of Italian blood, of Irish blood, of Polish blood, of Chinese blood, and of Jewish blood, all of whom died as Americans?

Mr. DOUGLAS. Yes; and in my division there were Indians from the State of the distinguished Senator from New Mexico.

Mr. CHAVEZ. That is so.

Mr. DOUGLAS. Some of them were killed. They are buried overseas. Their blood was as good as ours.

Mr. CHAVEZ. I thank the Senator.

Mr. DOUGLAS. Mr. President, the result of the legislation enacted on the basis of national origins was to continue the discrimination against the people of southern and eastern Europe. They were allowed but 23,000 out of a total European quota of 150,000, about one-seventh of the total, or about 14 percent as compared to the 80 percent which they had formed of the immigration in the period from 1911 to 1920.

No matter how one may view the 1924 law, its purpose was not merely to limit the total number. It was also to change the proportions within that total, against southern and eastern Europe. It had within it implicit discrimination against the people from those areas. It was an injustice and, I believe, an implicit insult not only to the people of those countries, but to the American citizens from those countries.

The result has been, as the Senator from Rhode Island has said, that the British quota, which is nearly 66,000 a year, has almost never—I think never—been utilized during this period. In the past few years only between 20,000 and 23,000 of the quota numbers have been utilized, so that the unused portion of the British quota ranges between 44,000 and 46,000 a year. The Irish quota, which is 17,800, has not been utilized within recent years. The average Irish immigration has been between 5,000 and 7,000 a year, and therefore their unused quota ranges between 10,000 and 12,000. Consequently, these two countries alone have unused quotas aggregating in number from 54,000 to 58,000. The unused quotas are then canceled. There is not a great migration from these countries, particularly not to areas which do not fly the British flag.

At the same time, the pressure is enormous in Germany, where there are from 7,000,000 to 9,000,000 ethnic Germans who have been driven out of Communist-controlled countries, many of whom want to emigrate, but cannot even get in on the German quota because they were born outside Germany. They are thrown back on the quotas of the Baltic states, which are from only 100 to 400 for each of the countries; upon the quota for Czechoslovakia, which is down to a few thousand; upon the quota for Poland, which aggregates about 6,000; and so on. So there are from 7,000,000 to 9,000,000 ethnic Germans who are trapped and who cannot get overseas. This is creating grave trouble in Germany.

Mr. PASTORE. Mr. President, will the Senator yield at that point?

Mr. DOUGLAS. I yield.

Mr. PASTORE. Is that not accentuated by reason of the fact that through the Displaced Persons Act, which mortgages up to 50 percent of future quotas, only 50 percent of those people could come into the United States in any event?

Mr. DOUGLAS. That is correct; and in a future amendment we shall try to deal with that issue.

Italy has an enormous surplus population, yet she is limited to 6,000 a year. Greece has a burdensome surplus population, but only about 310 can be admitted to the United States each year. And the number of persons escaping from Communist tyranny into these free countries grows month by month. In other words, the areas which are in greatest trouble are the areas in which people are most restricted by the law in their eligibility to come to this country. At the same time, people in the areas from which substantial additional numbers could come do not want to come. The purpose of the amendment of the Senator from Rhode Island is to distribute unused quotas regardless of nationality, on two fundamental bases: first, the degree to which they can help the United States; and, second, the degree to which these people are themselves in need. In other words, we are trying to cut across the ground of racial discrimination, and to judge eligibility upon the conditions and capacities of the immigrants themselves, not by the country of their birth.

For example, let us consider the question of special skills. As has been said over and over again, the purpose of the amendment which is now being considered is to have one-quarter of the pooled, unused quotas distributed among individuals according to their special skills and the need of those skills in the United States. Thus scientists, artisans, precision workers, handicraft workers, artists, musicians—their skill, too, has a place in life—could be admitted, and the United States could be enormously enriched by distributing one-quarter of the unused quotas, say 20,000 a year, in such a way as to make it possible for 20,000 of the most able people in the world to come here. Another 20,000, or one-quarter of the total, I should say, could be admitted on the basis of special conditions.

Then another two-quarters would be apportioned according to the needs of the people themselves. One-quarter would be made available to reunite families. Every one of us knows of heart-rending cases of families which are separated—a husband in this country, a wife abroad, children separated from parents, and the like. Yet we cannot get them together. The provision for pooled quotas would make it possible to reunite families. The final quarter would be allotted to those who have been persecuted. That means those who have been persecuted by the Communists, because under the Displaced Persons Act we have now taken care of almost all of those who were persecuted by the Nazis.

Under the amendment, therefore, instead of having allotted to the British Isles quotas which are not used, such unused quotas would be made available to individuals who are in trouble and individuals whom America needs, regardless of where they were born. I think it about time we got over the idea that only people from the British Isles are worthy to become first-class citizens of the United States.

Mr. CHAVEZ. Mr. President, will the Senator yield?

Mr. DOUGLAS. I am glad to yield to the Senator from New Mexico.

Mr. CHAVEZ. Under the pending bill, would it have been possible for the thousands of people from outside this country who made Pittsburgh possible, who made Cleveland possible, who made Cincinnati possible, who made Chicago possible, and who dug the subways of New York—would it have been possible for them to come to America?

Mr. DOUGLAS. No; had this bill been the law, that would not have been possible. It is well known that first the Irish immigrants and then the Slavic immigrants did the hard manual work upon which the material structure of American civilization has been raised. Slavic peoples are in the great basic industries, generally those engaged in the manufacture and fabrication of steel. The steel industry and others have been built to a large degree by the Slavic population of the country. The clothing industry has been very largely based upon the Jews and the Italians.

These races have built up the material industries of the country. But their contribution has not been confined to that. They have not been merely hewers of wood and drawers of water. The Senator from Wyoming [Mr. O'MAHONEY] mentioned the names of numerous baseball players and other athletic figures yesterday. A perusal of the list will disclose that, instead of purely Anglo-Saxon baseball teams, with the Irish mixed in, we now have a large proportion of Italians, a large proportion of Poles and Slavs, as well as Jews; and the people of Spanish stock are now also coming to the fore in baseball.

Mr. CHAVEZ. They are getting Americanized.

Mr. DOUGLAS. There is a man by the name of Chico Carrasquel who plays on the Chicago White Sox team, and we are very happy to have him.

Mr. HUMPHREY. Do not forget Gomez, of years gone by.

Mr. CHAVEZ. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield.

Mr. CHAVEZ. I am thinking, now, of Pittsburgh, and of the Lithuanian who helps to produce steel to improve our standard of living. After a while his boy comes along and plays football—

Mr. DOUGLAS. He will probably become a member of the Notre Dame Irish football team.

Mr. CHAVEZ. That is correct. In industry, in sports, in politics, in finance, is there any one particular line of ancestry or race which dominates? I recall to this day Howard Chandler Christy's great cartoon after the First World War, containing the names of Lesinski, Gonzales, Murphy, and Butler—Americans all—who fought for this country. Why can it not be that way under our immigration laws?

Mr. DOUGLAS. I think it should be.

Mr. CHAVEZ. Let me give the Senate another example, that of Puerto Rico. Any Senator can go to Walter Reed Hospital and see a triple amputee there. He is not a Scandinavian, not a Nordic, not an Englishman, not an Irishman, but a Puerto Rican, an American, who fought for the things about which we boast and try to sermonize to the world.

Mr. DOUGLAS. Mr. President, we should be careful about the language we use. I think the United States Congress made a great mistake when it passed the 1924 bill. I think it gave American history a wrong turning.

I am sure the members of the committee had the best intentions in the world when they brought forth Senate bill 2550. They merely followed the same groove and pattern which had been set under the 1924 act, which was discriminatory against persons from southern and eastern Europe. These folks have greater difficulties with the American language than do the English and the Irish. But the children of the people from Southern and Eastern Europe learn the American language, and they contribute to America as noble and precious things as do the children of other immigrants.

My city of Chicago is really a league of nations. I know the various nationality groups very well. I am not a member of any of them, because as I said a day or two ago, I think my stock is entirely Anglo-Saxon, what is referred to as Nordic. I am proud of my ancestors, although I did not choose them. But I have mingled with the people of other nationality groups, and I know they are as fine citizens as are those of English stock. They are as kind, as generous, and as truly American. But they have been poor. As they get out of their poverty and out of the slums which we created for them, and from which in many cases Anglo-Saxon landlords derive a profit, they rise in life. The reservoir of ability beyond the seas is still full. There are still Italians with the genius of the Italian race; Jews with the genius of the Jewish race; Poles with the genius of the Polish race; and ethnic Germans with their skills and culture who are in trouble. It would be a noble deed if we in America helped them to achieve the American way of life.

Mr. President, I point out that at the most this amendment would mean that instead of admitting, as now, from 80,000 to 90,000 immigrants a year, there would be admitted approximately 150,000. That would mean an addition, at the most, of from 60,000 to 70,000 immigrants a year, a portion of whom would be the cream of the skilled persons of the world, and a portion of whom would be men and women in the greatest trouble. Self-interest and compassion would then move hand in hand. When we fuse those two qualities, when we can serve self-interest and, at the same time, show mercy and compassion, we shall have accomplished much.

I do not think those qualities are matters about which to smile. They are real qualities. They are characteristic of America throughout its history. It is the genius of America that with all our practicality, with all our ability to make money, and to produce goods, we still have mercy and compassion within our hearts, mercy and compassion not merely for people inside the United States but for people all over the world.

For these reasons, Mr. President, I feel the amendment in question is an extremely important one and I hope the Senate will adopt it.

Mr. CHAVEZ. Mr. President, will the Senator from Illinois yield?

Mr. DOUGLAS. I yield.

Mr. CHAVEZ. When the good Senator mentioned mercy and compassion it reminded me of an instance in New York City which illustrates the Senator's point, not only as regards racial background but with respect to the opportunity of getting out of the slums.

Five Senators were looking over the condition of the Puerto Ricans in New York City. We went to a small old-fashioned four-story brick school attended by practically none but Puerto Rican children. The teacher was an old lady about ready to retire. She said to us:

Gentlemen, you worry because the Puerto Rican is in the condition in which you see him, but I have seen the Irish in the same condition when they were recent immigrants. Then they commenced to do well and moved out. Then came the Jews. They suffered as did the Irish. Then they improved their condition and moved out. Then came the Italians. They commenced to do better and marched out. It happens that this is the Puerto Rican era in the making of America.

I think that bears out the Senator's statement.

One hundred and sixty-seven Puerto Rican boys and girls graduated from the John Marshall High School in New York City. That was made possible under the New Deal, after 1933. They are today in banks, grocery stores, in businesses of their own.

I think I am of an ancestry which is as old as that of anyone else. My ancestors were in this country possibly 80 years before the first Anglo-Saxon came here. I want others to have the same chance I had. That is all they are entitled to.

Mr. DOUGLAS. I thank the Senator from New Mexico for his very moving statement.

As I understand our national principle, it is that we will give to the rising generation proper opportunities and then judge them on their individual merits. We believe that virtue is not confined to northwestern Europe, but that it extends over the world as a whole, and that within the limited total which America can absorb, discrimination should not be practiced either openly or covertly on the basis of race or national origin.

Mr. President, I yield the floor.

Mr. McCARRAN. So that the record may be set straight, let me say to the Senate that in 1947 there were admitted 76,951 nonquota and 70,701 quota immigrants, a total of 147,292.

In 1948 there were admitted 78,044 nonquota and 92,526 quota immigrants, a total of 170,570.

In 1949 there were admitted 75,271 nonquota and 113,046 quota immigrants, a total 188,317.

In 1950 there were admitted 51,727 nonquota and 197,460 quota immigrants, a total of 249,187.

In 1951 there came into this country 49,170 nonquota and 156,547 quota immigrants, a total of 205,717.

Mr. President, those figures show an increase in immigration all the way.

Mr. PASTORE. Mr. President, will the Senator yield?

Mr. McCARRAN. If the Senator does not mind, I prefer not to yield. I did not disturb the proponents of the amendment.

Mr. PASTORE. I am not raising a question of disturbance; I have merely asked the Senator if he will yield.

Mr. McCARRAN. No, I will not yield now.

The PRESIDING OFFICER. The Senator from Nevada declines to yield.

Mr. McCARRAN. The Senator will have to pardon me for not yielding.

Mr. President, the adoption of this amendment to provide for the pooling of unused quota numbers for use by low-quota countries is diametrically opposed to the fundamental philosophy behind the national origins quota system, and would have the direct effect of destroying our protective system of immigration as embodied in the national origins quota system.

Let no one be misled by statements by supporters of the proposed amendment that it is hypocritical to make specific quotas available, and then not to provide for their full use each year. This position is based upon an entirely erroneous conception of our national origins quotas. The fixing of quotas is not an assurance that this country will guarantee the admission of that many immigrants each year. As a matter of fact, the establishment of the quotas is no guaranty that even one immigrant may enter this country, because the ultimate determination of whether an alien who has been issued a visa may enter the country depends upon a finding of admissibility by the immigration authorities when the alien applies for admission at a port of entry.

The quotas under the national origins system are ceilings, not floors, upon the number of visas which may be issued. In other words, it was never the intent of Congress to guarantee that a minimum of approximately 150,000 quota immigrants should enter the United States annually.

Mr. PASTORE. Mr. President, will the Senator yield at that point?

Mr. McCARRAN. I beg the Senator's pardon. I did not interrupt the Senator; I hope he will not interrupt me.

Mr. PASTORE. Does the Senator object to my asking him to yield?

Mr. McCARRAN. Yes, I do.

The PRESIDING OFFICER. The Senator from Nevada declines to yield.

Mr. McCARRAN. Let that settle the question, please.

Mr. President, rather it was clearly the intent that a maximum of approximately 150,000 aliens should be extended the opportunity to come to this country, if otherwise qualified, in proportion to the contribution of each nationality to the total population of the United States as it existed in 1920. The national origins quotas are that simple, and I cannot admit that the quota numbers are being wasted merely because quotas, for one reason or another, are not filled in any particular year. Bear in mind, if you will, that quotas were never designed for the purpose of bringing aliens to the United States, but instead they are a means by which opportunities are offered to other peoples of the world to come to this country on the basis decided upon by Congress in 1924. Whether or not quotas are used is beside the point, because the underlying theory of the quota system is that the opportunity of aliens of each nationality to immigrate to this country is offered on the basis of the proportionate contribution of each nationality to the 1920 population of this country.

I am firmly convinced that the only sane and sensible way in which to deal with our immigration problem is to continue the fundamental philosophy of the national origins system. In my opinion, to depart from that fundamental philosophy would be a tragedy of the worst sort. Much is said about the large British quota which is never fully subscribed; but would we be justified in taking away the opportunities to emigrate offered to our British allies and transferring those opportunities to other groups who, a short time ago, were our mortal enemies? I say "No," Mr. President. The world-wide quota demand is tremendous at the present time, between 18,000,000 and 19,000,000. If we depart from the fundamental philosophy of our national origins quota at this time, no one is in a position to know what will be the ultimate result, but I, for one, am sure that such a course would be the wedge for opening wide the gates to immigration.

Much has been said, and is still being said, about the sacred duty of this country to accept more immigrants as an aid to the solution of the surplus population problems of the overpopulated countries of the world. Mr. President, an immigration and nationality code is not the proper vehicle for approaching a solution of the world surplus-population problems. The roots of this problem are much deeper, and let no one be deluded by the thought that it is within our power to solve the surplus population problems of other nations. The solution or alleviation of such problems must depend primarily upon action initiated by the nations afflicted with such surplus population problems. I am strongly in favor of having the United States assist in solving the surplus population ills of some countries of the world, but this bill is not the vehicle by which it should be done.

At the present time, there is pending before the Senate Rules Committee Senate Resolution 270, which I submitted as a method of approaching the sur-

Case: 1:21-cr-00665 Document #: 30-5 Filed: 05/02/22 Page 23 of 55 PageID #:790

plus population problem. Under Senate Resolution 270, which was unanimously approved by the Committee on the Judiciary, $60,000 would be authorized to be expended for a study and investigation of the overpopulation of the countries of Western Europe. I have also introduced my bill, S. 2567, to provide for the establishment of an agency of this Government to assist in the migration of surplus population of overpopulated countries to various areas of the world considered as underpopulated areas. The approval of these two measures would constitute a step in the right direction toward alleviation of the surplus population problems of Western Europe. Even the President, in his message to the Congress with reference to the admission of displaced refugees, did not recommend that any attempt be made to incorporate such provisions in our permanent immigration laws.

Members of the Senate must also bear in mind that besides the countries of Western Europe, there are many overpopulated countries, such as China, India, and other oriental countries.

The national origins quota system has now been in effect for about a quarter of a century and there has been comparatively little difficulty in its operation as compared to the sad experience under our immigration laws prior to the adoption of a national origins formula in 1924. I would be the last one, Mr. President, to deny that the immigrants who have come to this country have made a great contribution to our Nation, but I am firmly convinced that the flow of immigrants must be strictly controlled so that we will not receive more aliens than we can assimilate. I believe it is highly desirable that we continue a policy of admitting annually a reasonable number of immigrants whom we are capable of digesting into our body of citizenry, but I also believe that it would be a great tragedy if we should cast aside the national origins quota system and permit an influx of immigrants in numbers greater than our capacity to digest them. It is most important that when we admit aliens into this country as immigrants that they ultimately become citizens and accept our way of life and join us in preserving the fundamental institutions of this country, but if we admit the aliens in excessive numbers, then our ability to absorb them becomes more difficult with the result that we have alien segments in our population which never become completely adapted to our form of government.

For these reasons, Mr. President, I strongly object to the proposed amendment and most earnestly ask the Members of the Senate to reject the amendment and preserve a sound immigration system for this country.

Mr. President, I hope that this amendment, of all amendments which are offered, it being the most dangerous of all, will be voted down.

The PRESIDING OFFICER. The question is on agreeing to the amendment offered by the Senator from Rhode Island [Mr. PASTORE] for the Senator from Minnesota [Mr. HUMPHREY].

Mr. CHAVEZ. Mr. President——

The PRESIDING OFFICER. For what purpose does the Senator rise?

Mr. CHAVEZ. Is the time exhausted?

Mr. HUMPHREY. Mr. President, how much time remains?

The PRESIDING OFFICER. The Senator from Minnesota has 2 minutes.

Mr. HUMPHREY. I yield 2 minutes to the Senator from New Mexico.

The PRESIDING OFFICER. The Senator from New Mexico is recognized.

Mr. CHAVEZ. Mr. President, we talk about immigrants. We are all immigrants.

Mr. McCARRAN. Mr. President, I yield to the Senator from Georgia [Mr. GEORGE].

Mr. GEORGE. Mr. President, I wish to say only a few words. It so happens that I was here in 1922. It so happens that I was here in 1924, and helped to frame the immigration law which is now so bitterly assaulted. It so happened then, Mr. President, and it is true now, that the great body of veterans of foreign extraction in this country, as well as the so-called native-born, appealed to the Congress to enact that law.

We cannot have an immigration law which is entirely perfect. Perhaps the ideal law would be one under which immigrants would be selected. But I have lived long enough to know how bureaucracy would operate in the selection of immigrants, and how it operates in the discharge of any other public function. The Bureau would admit the particular immigrants whose admission was demanded by those of their fellows with the loudest voices in various areas in the country who somehow believe that they have the inalienable right of running this country.

Mr. President, I hope the time has not come when one must apologize for being a hateful Anglo-Saxon. I hope the time has not come when one must apologize for being an American.

I know who brought about the enactment of the 1924 law. For fully 2 years we worked upon that bill. The men then in this body who had lately served under the flag were the strongest proponents of that measure—not that they thought it perfect, but we had to have some practical basis on which to administer the immigration laws, or we had to turn the administration over to bureaucrats, who would administer it in behalf of racial strains with the loudest voices.

There was no animosity toward people of Germanic extraction, Italian extraction, or any other extraction; but in those days, when the shots of the First World War had hardly died away, there was not much respect for any immigrant who prefixed his Americanism with "German" or "Italian" or whatever the prefix might be. I have no apology now for being an American citizen.

I know what the trouble has been. I saw the assault made, almost before we had completed writing the law, to break it down. That assault came from the great congested cities in this country.

Back of it was politics, pure and simple. That is exactly where the opposition came from then. Year after year the opposition reasserted itself, but we beat down every effort that was made to destroy the national origins basis on which the law was founded. I thought the opponents had been somewhat discouraged; but a new crop of patriots has arisen in this great land. They now lay down the doctrine which, carried to its logical conclusion—and that is where they want to carry it—would mean the abolition of restrictions on immigration. It would mean letting down the bars, and letting them all in.

There is a strange corollary to that doctrine, and that is that somehow people outside this Nation have the right to say what our immigration laws shall be.

Mr. DOUGLAS. Mr. President, is the Senator from Georgia willing to yield?

Mr. GEORGE. I will yield for a question. However, I have asked for only 5 minutes.

Mr. DOUGLAS. I know the Senator from Georgia wants to be fair.

Mr. GEORGE. I hope so. I have been here long enough to try to be fair.

Mr. DOUGLAS. I am sure of that.

Is the Senator from Georgia aware of the fact that the pending amendment does not alter the total to be admitted? It merely provides that unused quotas are to be distributed among individuals according to two standards, namely, their ability to help the industry and life of this country, and individual need. There is no alteration in the total. So I wonder if the Senator from Georgia wishes to repeat his charge that the purpose of this amendment is to eliminate all restrictions.

Mr. GEORGE. I say that is the logic of the amendment. That is the logic of the fight to break down the restrictions, to let down the bars. The Senator knows it, and I know it.

Mr. DOUGLAS. Speaking for myself, I wish to say that I know no such thing.

Mr. GEORGE. Very well. I shall try to enlighten the Senator. He enlightened me as to how we learned that there were so many English people in this country by merely examining the names in 1924. I happened to be here. That was not the method which we pursued. There may have been a scrutiny of names where there was doubt about the national origin of a person, but I repeat, Mr. President, that there has been a fight from the beginning to break down the national origins principle. Back of it is a fight to break down the immigration barriers. As a corollary to that unusual doctrine—I will not say it is un-American—we hear the strange theory that somehow people outside this Nation have a right to say what our immigration laws shall be.

Some of my ancestors came from abroad. I have the greatest respect for our citizens who have come from foreign lands. But when they come here they

should be Americans, not German-Americans, and not Italian-Americans. They should be Americans.

The strange corollary—

Mr. PASTORE. Mr. President—

Mr. GEORGE. No; I do not yield.

The strange corollary is the most remarkable doctrine, to which I have listened day after day, as to the rights of foreigners to come into the United States. Many pitiable pleas have been made to the effect that we are breaking up families, that we are doing this, that, and the other thing to people who want to come here and become one of us. I have every sympathy for those people. I try to get them in, almost day after day; and I have to go to a bureau.

Let me pause to say to my distinguished friend from Illinois that if he and his colleagues succeed in getting through the pooling arrangement, all the immigrants who will come in through the pool, under the control of bureaucrats, will be from two or three or four countries. The quotas in the pool would not be widely distributed. That is not the purpose. The purpose is to permit the bureaucrats to say how the unused quotas in the pool shall be distributed.

What is the American doctrine, and what is the doctrine of every sovereign nation on the globe? It is that a country has a right to say who shall become one of its citizens. There is no right in any foreign person, whether he comes from the race from which I sprang or from any other race, to demand entrance here. The whole question is, What is a sound policy for America? That is all.

Of course, Mr. President, we do not want to enact into law inhuman and unjust and discriminatory provisions. That is true. However, unless we have a basis for the immigration law we will have a bureaucracy, and that bureaucracy will act in accordance with every other bureuacracy I have known for the 30 years that I have been in Washington. It will act for political reasons. It will act for reasons which are not always in the interest of America. I believe in preserving our immigration laws. That is to say, I believe in restrictions upon immigration in the interest of America and in the interest of the American worker.

There are those who talk about cheap goods being imported into the United States. Yet there are others who say, "Bring in the people who can make the cheap goods. Bring them in in a constantly increasing volume." How are we going to protect American labor? How are we going to protect the American people?

Far beyond that, I do not hesitate to say that in this hour it has become unpopular to be wholly American. The real basic purpose back of the immigration act which we finally enacted in 1924 was to preserve something of the homogeneity of the American people, something of the character of the men who loved self-government, who understood it, and who had some concept of it. It was desired then to protect American labor as it is the desire now. Mr. President, break down the bars if you will; let all the aliens who desire to do so come

here, if you wish, but, in that event, American labor will suffer as American labor has never suffered before.

Side by side with the men who fought in France in every unit of our American forces in World War I, men of all national extractions, not merely one, side by side with them stood American labor.

Break down all the barriers if you wish. That is the intent and purpose and inevitable consequence of destroying the quota system.

I thank the Senator from Nevada.

Mr. PASTORE. Mr. President, how much time do I have remaining?

The PRESIDING OFFICER (Mr. CLEMENTS in the chair). Two minutes.

Mr. HUMPHREY. Mr. President, I yield 2 minutes to the Senator from Rhode Island.

Mr. PASTORE. Mr. President, I desire it to be clearly understood that not only have I been a very active but I have also been a very vociferous opponent of the so-called McCarran bill. In being such an opponent I think my position as an American is just as good as that of any other Member of this body. I was not here in 1924. Therefore, I had nothing to do with the enactment of the law of that year.

But, Mr. President, I know that there are in this country a great many people, just as good as I am and just as good as any other Member of the Senate, who feel that this is a discriminatory bill. It is discriminatory as evidenced by the very statements which have been made here and because of the experiences we have had with the existing law.

It is said that the purpose of the original formula was to preserve the characteristics of American life which all of us want to have endure.

How can they justify in this day and age the giving of a certain quota to one country, to the extent of 66,000? I am not being critical of that country. It has a perfect right to utilize that quota to the fullest extent. But over the years experience has demonstrated that it has utilized no more than 33 percent of its quota.

Do not Senators think that when we write a law at this time that it is well to review our actions of the past and to begin to ask ourselves certain intimate questions, and particularly: Why do not the people of that country come here? Why do they not utilize their quota to the fullest? Why is their quota unfilled year after year?

Can it be that they love their country so much that they do not want to migrate to the United States? That might be the primary reason. Perhaps the figure as originally set was absolutely out of kilter. Might there be other reasons? Why do we stand here in 1952 and say emphatically that what we did 30 years ago will serve us so well today?

Of course, there is a new group of Americans today. There was a new group of Americans in World War I. They are just as good as any other Americans, just as good as anyone in the Senate.

Mr. President, I say that whether a person comes from one country or from another country, he is just as good an American. Loudness of voice does not

belong to any particular race or to any particular nationality. It comes from Almighty God. All of us in the Senate seem to be endowed rather generously with a loud voice.

The time has come to do equity. The time has come to do democracy. This bill is discriminatory. Mr. President, when one class of people is favored as against another class there is discrimination.

The PRESIDING OFFICER. The time of the Senator from Rhode Island has expired. All time for debate on the amendment has expired.

SEVERAL SENATORS. Vote! Vote! Vote!

The PRESIDING OFFICER. The question is on agreeing to the amendment offered by the Senator from Rhode Island [Mr. PASTORE] on behalf of the Senator from Minnesota [Mr. HUMPHREY]. [Putting the question.]

Mr. PASTORE. Mr. President, I ask for a division.

On a division the amendment was rejected.

The PRESIDING OFFICER. The bill is open to further amendment.

Mr. FERGUSON. Mr. President, I call up my amendment 5/9/52–O.

The PRESIDING OFFICER. The clerk will state the amendment.

Mr. McFARLAND. Mr. President, a parliamentary inquiry.

The PRESIDING OFFICER. Is this one of the eight amendments covered in the unanimous-consent agreement?

Mr. McCARRAN. Mr. President—

The PRESIDING OFFICER. The Chair would like to inquire whether the amendment now being offered by the Senator from Michigan is one of the eight amendments mentioned in the unanimous-consent agreement?

Mr. McFARLAND. The Senator from Minnesota [Mr. HUMPHREY] has control over the first eight amendments.

Mr. HUMPHREY. That is correct.

Mr. McFARLAND. Is this one of the eight amendments?

Mr. HUMPHREY. It has not been cleared with me.

Mr. McFARLAND. Perhaps there are no other amendments to be offered by the Senator from Minnesota.

Mr. HUMPHREY. Yes, there are.

The PRESIDING OFFICER. Under the unanimous-consent agreement entered into, the Senator from Minnesota is recognized.

Mr. McCARRAN. Mr. President, will the Senator from Minnesota yield to me?

Mr. HUMPHREY. Certainly.

Mr. FERGUSON. Mr. President, if the Senator will give me 1 minute—

Mr. McCARRAN. Mr. President, I have had my attention drawn to the amendment which the Senator from Michigan is offering. It is an amendment of a very minor nature, merely pertaining to documentation. So far as I am concerned, I am willing to accept the amendment and take it to conference.

Mr. HUMPHREY. Does the Senator from Nevada refer to the amendment offered by the Senator from Michigan [Mr. FERGUSON]?

Mr. McCARRAN. Yes, I do.

Mr. HUMPHREY. Mr. President, I shall yield for that purpose, if it does not take too much time.

The PRESIDING OFFICER. Does any Senator request unanimous consent to that effect?

Mr. McCARRAN. Mr. President, I am willing to accept the amendment; but if it interferes with the unanimous-consent agreement, I cannot do anything about the amendment.

Mr. FERGUSON. Mr. President, I can wait. Do I correctly understand that the amendment will be in order after the eight amendments are disposed of?

Mr. HUMPHREY. Yes; it will be.

Mr. McCARRAN. Yes, the amendment of the Senator from Michigan will be in order after the eight amendments are disposed of.

Mr. FERGUSON. Then I withdraw the amendment at this time.

Mr. McFARLAND. Mr. President, will the Senator from Minnesota yield, to permit me to make an announcement?

Mr. HUMPHREY. I yield.

Mr. McFARLAND. I have been asked whether there will be a night session. I thought I had made it plain that there will be a night session if we do not dispose of this bill. Now is the time for the Senate to drive if we wish to conclude the session by the first of July or anywhere near that time. I am not announcing now that we shall conclude the session by that time, but I am saying that we must drive now if we wish to attempt to conclude the session by then.

The mutual security bill, to which I have previously referred, has been considered by two committees and is ready for disposition by the Senate. We should dispose of that bill without delay.

Mr. CHAVEZ. Mr. President, will the Senator from Minnesota yield to me?

Mr. HUMPHREY. I yield.

Mr. CHAVEZ. Mr. President, I think all of us should endeavor to cooperate with the majority leader, the distinguished junior Senator from Arizona.

However, this body should realize that although it passed the Federal security appropriations bill 3 weeks ago, and although the Senate has been requesting the House of Representatives to agree to hold a conference on the bill, we have been unable to persuade the House to agree to hold a conference and to appoint conferees on its part. So in many instances the Senate should not be blamed for delay.

Mr. McFARLAND. Mr. President, I am not blaming anyone except myself if I do not do my very best to try to push forward to completion the business of the Senate.

Mr. HUMPHREY. Mr. President, we shall do so at once.

Mr. DOUGLAS. Mr. President——

Mr. HUMPHREY. I yield at this time to the Senator from Illinois.

Mr. DOUGLAS. Mr. President, for the Senator from Minnesota [Mr. HUMPHREY], I call up the amendment identified as 5–9–52–DDD.

The PRESIDING OFFICER. The amendment will be stated.

The LEGISLATIVE CLERK. On page 33, in line 6, beginning with the word "The", it is proposed to strike out all through "number of" in line 8, and in lieu thereof insert the following: "The annual quotas of each quota area proclaimed under this act shall not be reduced by any."

Mr. DOUGLAS. Mr. President, the purpose of this amendment is to cancel the pledges or mortgages of one-half of the future quotas, as made under the Displaced Persons Act.

Under the two Displaced Persons Acts of 1948 and 1950, respectively, we have admitted into the United States 368,000 persons. We provided in those acts that the numbers admitted from each of the various countries should absorb one-half of the future quotas which otherwise would be allowed those countries under the National Origins Act, which went into effect in 1929. I shall repeat that statement, in order to make the situation clear.

The 368,000 displaced persons who were admitted under the two Displaced Persons Acts were charged, up to 50 percent, against the annual quotas fixed for the various nations.

The result is that the quotas for a number of countries have been pledged very far into the future; or, rather, the rate of flow will be restricted to one-half of what it otherwise would be under the National Origins Act; and, in general, that original number was very low for the countries affected.

For instance, in the case of Austria, one-half of the quota is absorbed until 1955; in the case of Czechoslovakia, one-half of the quota is absorbed until 1958; in the case of Danzig, until 1958 also.

Mr. President, listen particularly to some of the following figures: In the case of Estonia, half the quotas are pledged to the year 2146, or approximately 200 years in the future; in the case of Greece, to the year 2013, or more than 60 years in the future; in the case of Hungary, to the year 1985, or almost 35 years in the future; in the case of Latvia, to the year 2274, or 320 years in the future; in the case of Lithuania, to the year 2087, or approximately 140 years in the future; in the case of Poland, to the year 1999, or 47 years in the future; in the case of Rumania, to the year 2004; and so forth.

In other words, by that means one-half the already small stream of immigration from those countries is suspended until the dates I have stated; until those dates, the immigration quotas for those countries are reduced by one-half. These are countries where the current need is extremely great.

I believe certain points should be borne in mind, namely, that from 1931 to 1945, we admitted relatively few immigrants. On Monday, I placed in the CONGRESSIONAL RECORD, as appears on pages 5423 and 5424, a statistical tabulation giving the total number of immigrants from the quota countries who entered the United States during that time. If we consider those figures, we find that instead of the total of 150,000 which was theoretically permitted in the year 1931, only 54,000 were admitted; in the year 1932, only 13,000; in 1933, only 8,000—I am reading to the nearest thousand—in 1934, 12,000; in 1935, 17,000; in 1936, 19,000.

Thereafter we find there began to be an increase, as follows: In 1937, 28,000; 1938, 43,000; 1939, 62,000.

What happened during the period of the depression was that the consular officers abroad interpreted very strictly the provision that no one should be admitted if he was likely to become a public charge. In reaching their determination as to whether an applicant for admission was likely to become a public charge, those consular officers considered not only the economic condition of the man or woman who wished to be admitted to the United States, but also the economic conditions existing at that time in the United States. Therefore, the consular officers effected an administrative regulation of the migration to the United States, with the result that only a small number of immigrants entered.

Mr. President, I am not complaining about that ruling; I think it was a correct procedure to follow at that time, namely, that during a period of depression, when there are many, many unemployed persons, it is well to shut the gates more tightly than we do during a period of prosperity.

It is a fact, however, that during those years we admitted a relatively small number of immigrants, under the interpretation of the clause "likely to become a public charge."

Then the war occurred, and it became increasingly difficult for persons to migrate to the United States from other countries.

For instance, in 1940, the total number of quota immigrants admitted was 52,000; in 1941, 36,000; in 1942, when we were in the war, only 15,000; in 1943, 9,000; in 1944, 9,000; in 1945, 12,000.

At the end of the war the total number of quota immigrants admitted began to increase a little—for instance, in 1946, to 29,000. In other words, we went through 15 years during which we had very little immigration, first because of the depression; and, second, because of the war.

Then came the period of peace. The conscience of America was touched by the plight of the 2,000,000 or 3,000,000 persons who were refugees from Nazi terror, and a large proportion of whom had been locked up in the infamous concentration camps of the Nazis. Quite a struggle occurred, so I am told, on the floor of this body and throughout this Nation as a whole, in an endeavor to determine whether we would ameliorate the lot of those persons.

I am happy to say that finally Congress passed the Displaced Persons Act. One of the proudest moments of my life was when I voted for that act. I am not ashamed of that act; I am proud of it. As a result, we admitted 368,000 persons who were in need, and who, in the main, will be assets to the United States.

Mr. President, we attached a string, however, to the Displaced Persons Act— we had to do so because of the political conditions on the floor. That string was that the number of displaced persons admitted were to be charged against the already restricted quotas up to one-half of these respective quotas. The result was that this act of generosity on our part was accompanied by a partial reduction in the number who may be admitted in the future.

In view of the fact that we had very little immigration for 15 years, from 1931 to 1946; in view of the fact that there is a continuing need, and also in view of the fact that America will profit from these immigrants—and I emphasize that point—I do not see why we should keep this string tied in the bill before us any longer. The string is tied. The pledging of one-half of the quota is continued in section 201 (e), on page 33 of S. 2550. The purpose of the amendment which I have the honor of submitting is to remove this restriction, and I think it is justified both on the ground of humanity and on the ground of national interest.

Mr. LEHMAN. Mr. President, will the Senator yield?

Mr. DOUGLAS. I yield the floor.

Mr. HUMPHREY. Mr. President, I yield time to the Senator from New York.

The PRESIDING OFFICER (Mr. EASTLAND in the chair). The Senator from New York is recognized.

Mr. LEHMAN. Mr. President, I listened very attentively and with deep concern to the bitter remarks of the distinguished senior Senator from Georgia [Mr. GEORGE]. I think the statement he made was one of the most remarkable, one of the most disturbing statements I have heard on the floor of the Senate and in my long public career. I shall speak strongly on this subject, because I feel strongly. I shall not speak bitterly. I shall speak in good temper. But I am not one who takes insults lying down, nor one who is always tactful in his approach to matters which he thinks are of public interest.

The senior Senator from Georgia has charged, at least by implication, that Senate bill 2842 and the opposition of the distinguished Senator from Minnesota, the distinguished Senator from Illinois, the distinguished Senators from New York and New Jersey, 15 Senators in all, represent an effort to tear down the traditions which have been built up in this country during many years, and to open the doors to a horde of people—of foreigners. I have never thought the word "foreigner" any indication of obloquy or hatred, because after all we are a country of foreigners and immigrants. He has charged, at least by implication, that we should admit only those who, in the opinion of a certain number of people, have what they consider to be a proper background, of history and culture, and a record that coincides with the views held by others. If the implication of the bitter statement of the senior Senator from Georgia be correct, to the effect that the proposals of the opponents of the bill have been offered in order to meet the wishes and the needs of people living in the heavily populated urban centers, and that therefore they represent an un-American viewpoint, I may say to the senior Senator from Georgia that in effect he is charging that only 25 percent of the people of the great cities of New York, Chicago, Minneapolis, and Philadelphia are Americans.

Of course, after all, Mr. President, a great majority of the people living in these urban centers, and now, happily, in other sections of our country, are either immigrants or the descendants of immigrants in the first or second or third generation. I think we have the right to resent the implication of the statement of the Senator from Georgia. I believe that the people of New York City and the people of Chicago and Philadelphia are quite as loyal and quite as truly American as are the people of any other section of this country.

Mr. IVES. Mr. President, will the Senator yield?

Mr. LEHMAN. May I merely complete my thought?

Mr. IVES. The question is directly on the point of the Senator's remark.

Mr. LEHMAN. If I may complete my thought, I shall be glad indeed to yield. They are quite as American, they love their country as much, they have sacrificed for their country as much as those whom the senior Senator from Georgia would place above the rest.

Mr. President, I am the son of an immigrant. I am proud of it. My father came to this country and settled in Alabama, in the great Southland. He was a peddler, he operated a general store, and served in the Confederate Army during the Civil War. After that war he went to New York, where he became one of the leaders of the life of that city. I cannot stand idly by to allow charges such as have been made by the senior Senator from Georgia to remain unanswered. I do not boast of my record or of my career, but I do not think I show a lack of humility when I say I believe that my record is that of a good American who has served his State and his Nation with all the strength and force at his command and, I hope, with some ability, both in war and in peace.

I believe I am the only Member of the Senate who has the Distinguished Service Medal given for service in the First World War. In the Second World War, all my children, including my daughter, were in the service of their country, and one of my children did not return. All my nephews and nieces served. To hear a Member of the Senate imply that those who oppose this bill are less patriotic than he, less patriotic than anyone else in the Senate, I believe is a libel on the patriotism, good faith, and the Americanism of those who stand behind the so-called Humphrey-Lehman bill and who have fought for 2 weeks against the McCarran bill, not to satisfy the whims or wishes or desires or ambitions of politicians, or the people of any race or nationality, not to strengthen the hands of bureaucrats, but merely because we believe that our position is right, humane, liberal, and, above all things, in the interest of our country and in the interest of the peace, security, and good will of the world.

The senior Senator from Georgia—and I am deeply sorry that he is not present; I believe he is in the cloakroom—has dwelt on the harm which he says would come to labor from the passage of our bill. I do not think I am unjust or incorrect or inaccurate in stating that I believe the proponents of the Humphrey-Lehman bill and those who are opposing the McCarran bill have shown at least as great a concern for labor as has the senior Senator from Georgia. We have been fighting that battle. We have sought to protect labor, to raise the standard of living, to give labor justice and an opportunity.

I am not condemning anything the senior Senator from Georgia has done. I am merely saying that I believe I am justified in contending that our record in behalf of the interests of labor and in endeavoring to see that justice is done to labor will compare favorably with that of the Senator from Georgia.

Mr. President, I did not expect to speak so feelingly and so forcefully on this subject as I have spoken, but I have no apologies to make. I am glad I have done so. I repeat that I never expected to hear on the floor of the Senate a colleague of great ability and of great character attack fellow Members of the Senate for their support of or opposition to a bill on the ground of patriotism, loyalty, and Americanism less than his. So far as I am concerned, I am perfectly willing to submit the record of my colleagues and of myself for love of country, patriotism, and, to some degree, service, to the consideration of the American people.

I cannot help but speak of my deep concern. I had hoped I would not have to say this, even though the distinguished chairman of the Judiciary Committee in his opening remarks implied that those who fought against his bill and in behalf of the Humphrey-Lehman bill were at least pink in color. I could not help but say what I have said. I am glad I have said it. My only regret is that the distinguished senior Senator from Georgia, after completing his remarks, left the Chamber, because I would have been very happy indeed to have subjected myself to any interrogations or any other attack which that distinguished Senator might wish to level against me.

I am now very glad indeed to yield to my esteemed colleague from New York.

Mr. IVES. Mr. President, I interrupted my distinguished colleague to raise a question at a certain point in his remarks when he was referring to the inhabitants of great cities of this country, including New York and Chicago. In that connection, I should like to ask him if he does not feel that the comment he made in connection with New York and Chicago would apply also to many other cities, practically all of them of far smaller population, at least in certain areas. I do not think we can limit it to cities of great populations. Nowadays cities, regardless of population, contain Americans from all strata. Does not my colleague agree with me?

Mr. LEHMAN. I agree fully. I recall the city of Buffalo.

Mr. IVES. I had Buffalo in mind, and Syracuse, Utica, and other cities in the State of New York, and also Newark in the State of New Jersey.

My distinguished colleague from New York needs no apology made regarding his very distinguished record. We who know him, we who have served with him in New York, have a great affection and a deep respect for him. All he said of himself and his distinguished back-

ground is absolutely true, and I pay my respects to him at this time.

Mr. LEHMAN. I am very grateful to my colleague from New York.

Mr. DOUGLAS. Mr. President, will the Senator from Minnesota yield?

Mr. HUMPHREY. I yield.

Mr. DOUGLAS. Mr. President, the Senator from New York [Mr. LEHMAN] needs no defense anywhere in America. He was for many years a distinguished private citizen and an honorable financier in the city of New York. For 4 years he served with great distinction as Lieutenant Governor of New York, under Franklin D. Roosevelt, and performed a large share of the administrative work of the State of New York during that time.

Then for 10 years he was Governor of the State of New York, which is, I think, the longest record of continuous service in the history of that State. As his able and fine-spirited colleague of the opposing political party has testified, he won the respect of all New Yorkers, regardless of party. He was reelected again and again by the largest majorities ever received by any candidate for Governor of the State of New York. He was known as a man of complete integrity and of honor. He won the respect not merely of New Yorkers, but of people all over the country, including the people of Chicago.

I am as proud of being a Chicagoan as the Senator from New York is of being a New Yorker. If my city continues to be attacked on the floor, I shall at an appropriate time rise in its defense. We admire and love the Senator from New York, and I think the vast majority of Americans love him, too.

After retiring as Governor, and I may say he was undefeated in successive elections, he returned for a period to private life and then became the director of UNRRA. He did this work at great financial cost to himself and at great personal sacrifice. His record in that connection is a most distinguished one. He has twice been elected to the United States Senate and, as we all know, has served with great distinction here. I certainly regard it as an honor to serve with him.

The Senator from New York needs no defense. The people of New York and the people of the United States know, respect, and love him. When everything has been written, the verdict of history will be that the Senator from New York was a truly noble man, a humble man, a man who, having wealth, power, and great ability, was nevertheless as humble and simple in his heart as a child.

Mr. LEHMAN. Mr. President, I thank the Senator from Illinois for his encomium, as I thank also my distinguished colleague from New York for his.

The PRESIDING OFFICER. Does the Senator from Minnesota yield time to the Senator from New York?

Mr. HUMPHREY. Of course I do. I yield to the Senator from New York all the time he needs, within the limits of the time we have left.

Mr. LEHMAN. Mr. President, I am not concerned with praise. Unhappily the senior Senator from Georgia [Mr. GEORGE] was out of the Chamber at the

XCVIII—364

time, but I rose merely to reply to what I thought was an unjust attack on people living in my city and in the cities of Chicago, Philadelphia, Buffalo, Utica, Syracuse, and Detroit, many of whom—the majority of whom, I may say to my distinguished colleague from Georgia—are immigrants or descendants of immigrants within near relationship.

Mr. HUMPHREY. Mr. President, I shall yield two minutes to the Senator from Mississippi [Mr. STENNIS] who wishes to present a matter for the RECORD.

─────────

NOMINATIONS IN THE ARMED SERVICES

Mr. STENNIS. Mr. President, as in executive session from the Committee on Armed Services I report favorably the nominations for promotion or original appointment of approximately 3,200 officers in the armed services.

The highest rank to which any of these officers is being promoted is the grade of major in the Army and lieutenant—junior grade—in the Navy. These nominations have been before the Committee on Armed Services for several days, and no objections have been received to the promotion or appointment of any officers on the lists. The report of the committee is unanimous.

In order to save the expense of printing in the Executive Calendar all the individual names, I ask unanimous consent that, as in executive session, the nominations be confirmed, and the President notified. Furthermore, I may say that these names have already appeared in the RECORD, having been printed at the time when the nominations were sent to the Senate.

The only reason why I now ask that the nominations be confirmed without having the names printed in the Executive Calendar is that something like $1,600 will be saved by taking this course.

Mr. HICKENLOOPER. Mr. President, I am sorry, but I did not hear the beginning of the Senator's statement. May I ask him to repeat it?

Mr. STENNIS. This is a unanimous-consent request for confirmation of nominations of 3,200 so-called junior grade officers in the Army and Navy.

Mr. HICKENLOOPER. Officers already in the Army and Navy?

Mr. STENNIS. Perhaps some of them are graduates of the Academies.

Mr. HICKENLOOPER. Graduates this year?

Mr. STENNIS. I am not certain.

Mr. HICKENLOOPER. Does the request have to do with the assignment or commissioning of cadets or midshipmen of the June 1952 class?

Mr. STENNIS. I am under the impression that those appointments have already been confirmed.

Mr. HICKENLOOPER. I am of the same opinion, but I wish to be positive for certain reasons. If the Senator can assure me that there are none on this list who are graduating this June, from either of the Academies, I shall raise no objection; that is, if they are all presently commissioned in the Army, Navy, or Air Force.

The PRESIDING OFFICER. Is there objection?

Mr. HICKENLOOPER. I am waiting for such assurance, Mr. President.

Mr. STENNIS. Mr. President, I am sorry I cannot give the Senator that assurance.

Mr. HENDRICKSON. Mr. President, will the Senator from Mississippi yield?

Mr. STENNIS. I yield.

Mr. HENDRICKSON. Am I correct in understanding that all the officers on the list are now in temporary grades, and that these nominations are for permanent grades?

Mr. STENNIS. I do not believe they are all permanent appointments. Some of them are temporary; some are permanent. That is the general run of appointments that come before the Senate.

Mr. HICKENLOOPER. Mr. President, can the Senator from Mississippi assure me that all these persons are presently serving in commissioned grades?

Mr. STENNIS. There may be the names of a few from the Academies who have been confirmed. I know the major number of those from the Academies this year have already been confirmed.

Mr. President, if there is any question about the matter, I shall be glad to withhold the report until tomorrow, when I can be more certain in answering the Senator's question.

Mr. HICKENLOOPER. I ask only that the Senator withhold the report for a few minutes. I have no desire to object to the list as a whole.

The PRESIDING OFFICER. Is there objection?

Mr. HICKENLOOPER. Mr. President, I object temporarily, and ask that the matter be brought up again in a few minutes.

─────────

REVISION OF LAWS RELATING TO IMMIGRATION, NATURALIZATION, AND NATIONALITY

The Senate resumed the consideration of the bill (S. 2550) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes.

Mr. HUMPHREY. Mr. President, first we must vote upon the amendment which is now pending. The Senator from Michigan has another amendment which he desires to bring up following the vote.

Mr. IVES. Mr. President, before a vote is taken, I suggest the absence of a quorum.

The PRESIDING OFFICER. The absence of a quorum has been suggested. The clerk will call the roll.

The Chief Clerk proceeded to call the roll.

Mr. IVES. Mr. President, I ask unanimous consent that the order for the quorum call be vacated, and that further proceedings under the call be dispensed with.

The VICE PRESIDENT. Without objection, it is so ordered.

The question is on agreeing to the amendment offered by the Senator from Illinois [Mr. DOUGLAS] for the Senator from Minnesota [Mr. HUMPHREY].

Mr. McCARRAN. Mr. President, I rise in opposition to this amendment. The effect of the amendment is to remove the charges against quotas under Displaced Persons Act, section 19 (c) of the Immigration Act of 1917, and under private bills. All the past charges against the quotas which have been made pursuant to those laws would be forgiven with the result that the overall number of aliens entering this country would be tremendously increased.

When we passed the Displaced Persons Act we passed it with the specific understanding that the displaced persons should be charged against the quotas of the countries from which they came. To do other than that at this time would render a moral wrong, because we brought those people in under a specific understanding that they should be charged against the quotas from which they came, under the laws to which I have referred.

I am unalterably opposed to these changes for they are merely another method of increasing total immigration to this country. I urge Members of the Senate to reject this amendment.

The VICE PRESIDENT. The question is on agreeing to the amendment offered by the Senator from Illinois [Mr. DOUGLAS] for the Senator from Minnesota [Mr. HUMPHREY].

Mr. McCARRAN. I ask for the yeas and nays.

The yeas and nays were not ordered.

The amendment was rejected.

The VICE PRESIDENT. The bill is open to further amendment.

Mr. HUMPHREY. Mr. President, I yield time to the Senator from Michigan [Mr. MOODY], who has an amendment to offer.

Mr. MOODY. Mr. President, on behalf of the Senator from Minnesota [Mr. HUMPHREY], I offer the amendment which I send to the desk and ask to have stated. It is designated "5–9–52–ZZ."

The VICE PRESIDENT. The amendment offered by the Senator from Michigan will be stated.

The LEGISLATIVE CLERK. On page 26, line 14, after "President," it is proposed to insert "the Board of Immigration Appeals."

On page 30, after line 21, it is proposed to insert the following:

BOARD OF IMMIGRATION APPEALS

SEC. 105 (a) There is hereby established a Board of Immigration Appeals which shall be composed of five members to be appointed by the President by and with the advice and consent of the Senate. The Board shall be a part of the Department of Justice but, except for administrative purposes, shall not be subject to the supervision or control of any officer or employee of the Department. The President shall, at the time of appointment, designate one member to serve as Chairman. Each member of the Board shall be appointed for a term of 5 years and shall serve until his successor is appointed and qualified, except that, of the members first taking office, one shall be appointed for a term of 1 year, one for a term of 2 years, one for a term of 3 years, one for a term of 4 years, and one for a term of 5 years. Members of the Board shall receive compensation in accordance with the Classification Act of 1949.

(b) Notwithstanding any other provision of this act, the Board of Immigration Ap-peals shall have jurisdiction and authority to review, upon appeal by an alien or by the Attorney General, any decision of the Attorney General, of the Commissioner, or of any officer or employee of the Service in proceedings relating to exclusion, deportation, petitions and applications for determination or adjustment of status, applications for suspension of deportation, applications for waivers of grounds of exclusion or deportation, stays, and revocation of status previously granted. The Board shall issue such rules and regulations as may be necessary to enable it to carry out the authority conferred upon it by this subsection.

(c) A quorum of the Board shall consist of three members. The Board may appoint and fix the compensation of such technical, clerical, and other assistants as it deems necessary, in accordance with the civil-service laws and the Classification Act of 1949.

(d) The Board shall have authority to promulgate rules of practice governing the proceedings before it. Except in the case of proceedings under section 235 (c), the provisions of the Administrative Procedure Act shall apply to all proceedings of the Board.

Mr. MOODY. Mr. President, the hour is growing late. I do not wish to take up any great amount of the time of the Senate on this amendment. I should like to call the attention of the distinguished chairman of the Committee on the Judiciary [Mr. McCARRAN] to the fact that this amendment would merely place in the statute the present procedure, which is now voluntarily followed by the Department of Justice. The amendment would create a Board of Immigration Appeals. It seems to me that the final authority on immigration cases should not rest with any one man. However fine a man the Attorney General may be, it seems to me that no one man should want to have dictatorial power, without appeal, over the lives of others. I should like to inquire whether the chairman of the committee would be willing to accept the amendment and take it to conference.

Mr. McCARRAN. Mr. President, has the Senator from Michigan concluded his remarks?

Mr. MOODY. Yes. I was wondering whether the Senator would be willing to take the amendment to conference.

Mr. McCARRAN. I cannot take the amendment to conference. I must oppose it.

Mr. MOODY. I should like to point out to the Senate that the amendment would merely put into the law what is obviously equitable, namely, a provision assuring anyone who may have been done an injustice the right of appeal.

How in the world can we write into the law a provision which puts into the hands of one man power over the life of another man? One man should not have the power of life and death over human beings in this way. I cannot see any reason why the amendment should be rejected. I believe the amendment speaks for itself, and I hope it will be adopted.

Mr. McCARRAN. Mr. President, I rise in opposition to this amendment. The effect of this amendment is to provide for the creation by statute of a Board of Immigration Appeals with jurisdiction to review all decisions made by the Attorney General, the Commissioner, or any officer or employee of the Service. Except in cases of proceedings

under section 235 (c), relating to security cases, the provisions of the Administrative Procedure Act are made applicable to all proceedings before the Board of Immigration Appeals, thereby providing judicial review in exclusion cases.

Mr. MOODY. Mr. President, will the Senator from Nevada yield?

Mr. McCARRAN. I yield.

Mr. MOODY. Will the chairman kindly explain to me why he feels that such power should be placed in the hands of one man? Why should he be given the power to decide cases like this without appeal?

Mr. McCARRAN. It is not placed in the hands of one man. If the Senator from Michigan will listen, I shall meet that very point in what I have to say.

Mr. MOODY. I shall be glad to hear it.

Mr. McCARRAN. Mr. President, I am unalterably opposed to this amendment. The provisions in my bill, S. 2550, do not disturb the present authority of the Attorney General to continue the existence of the Board of Immigration Appeals if he so desires. On the other hand, the bill does not require the continuance of a Board of Immigration Appeals. The determination of whether or not the Board of Immigration Appeals is necessary is left within the discretion of the Attorney General. This has been done, Mr. President, because I have previously introduced a bill, S. 14, to improve the administration of justice by the creation of an administrative court of the United States. Since my bill, S. 14, contemplates an administrative court of appeals to review admissions by administrative agencies, it would, in my opinion, be very unwise to require the establishment of a Board of Immigration Appeals by statute at this time.

I, therefore, request that the Members of the Senate reject this amendment.

Mr. President, let me say to the Senator from Michigan that the creation of a Board of Immigration Appeals would only encourage hundreds of thousands of appeals. The result would be to bring about conditions worse than those today, and they are bad enough.

Mr. President, the creation of a board of appeals should be left to the discretion of the Attorney General. The Attorney General has control over the entry of immigrants.

Mr. MOODY. Mr. President, will the Senator from Nevada yield?

Mr. McCARRAN. Yes.

Mr. MOODY. We have heard a great deal of criticism with respect to the delegation of power, and some Senators who support the pending bill have demanded that certain provisions be spelled out in the law. It seems to me that certainly the right of appeal, even if it exists, can be withdrawn tomorrow. I believe that is a correct statement. It seems to me the provision should be spelled out in the law.

Mr. McCARRAN. The Administrative Procedure Act is made applicable to the bill. The Administrative Procedure Act prevails now. The Senator need not worry about its not being in the law, because the Administrative Procedure Act covers the very point which the Senator is attempting to reach.

Mr. HUMPHREY. Mr. President, will the Senator yield?

Mr. MOODY. I yield.

The VICE PRESIDENT. The Senator from Nevada has the floor.

Mr. HUMPHREY. I understood that the Senator from Michigan had the floor.

Mr. McCARRAN. I understood that the Senator from Michigan yielded the floor.

Mr. MOODY. That is correct.

Mr. McCARRAN. I have answered the question.

The VICE PRESIDENT. The question is on the amendment offered by the Senator from Michigan [Mr. MOODY] on behalf of the Senator from Minnesota [Mr. HUMPHREY].

Mr. HUMPHREY. Mr. President, do we have some time remaining?

The VICE PRESIDENT. The Senator has time remaining.

Mr. HUMPHREY. Mr. President, I merely want to say, with reference to the amendment offered by the Senator from Michigan, that the amendment is very fundamental to our immigration policy. There is considerable controversy between many Members of the Senate with relation to the application of the Administrative Procedure Act to the proposed immigration law. As a matter of fact, the point was gone into in great detail by the senior Senator from Illinois [Mr. DOUGLAS], and will be gone into subsequently by the Senator from Oregon [Mr. MORSE].

It is my considered judgment that the Administrative Procedure Act is substantially altered and limited by the provisions of the pending bill. It is also my understanding that under an appropriation act passed in the Eighty-first Congress, a rider attached to the appropriation act exempts for all practical purposes the Immigration Service and the Justice Department from the provisions of the Administrative Procedure Act. So the Senator from Michigan, in proposing the establishment of a Board of Appeals, is suggesting the granting of basic justice. •

The Senator from Nevada has suggested that there would be a great number of appeals. Of course there would be a great number of appeals. That is what a Board of Appeals is designed to handle. Where does the power rest today? The power rests with consular officers, men who very frequently are unskilled. They have complete and total authority in the issuance of visas. The final discretionary power lies in the Attorney General.

I believe the argument of the Senator from Michigan is apropos and very significant with reference to what has been heard in debate in the Senate on many occasions, namely, that we are always hearing Senators argue that we ought not to vest in appointive officers who serve at the will of the President discretionary authority, but should pin the authority down. The amendment would pin down the authority.

Mr. MOODY. Mr. President, will the Senator yield?

Mr. HUMPHREY. I yield.

Mr. MOODY. Mr. President, the distinguished chairman of the committee says on the one hand that the reason the amendment is not necessary is because he has pending an amendment to create a court.

Mr. McCARRAN. It is not an amendment.

Mr. MOODY. A bill, I should say. He has pending a bill to create a court. We cannot foretell whether the Senate will pass the bill. On the other hand he seems to imply that what I have in mind is already taken care of in the Administrative Procedure Act. If it is already taken care of why is it necessary to establish a court? If the distinguished chairman has introduced a bill to establish a court it seems to me that it shows some flickering doubt in his mind that perhaps new machinery is needed. Therefore, it appears to me the time to take care of the matter is when the Senate is acting on the issue which is before it today.

Mr. McCARRAN. I do not have the floor, but—

Mr. HUMPHREY. I am glad to yield to the Senator from Nevada so that he may make reply.

Mr. McCARRAN. I will say that the rider referred to was attached to the appropriation bill because the statement was made before the Appropriations Committee that it would cost a considerable sum of money to apply the Administrative Procedure Act to immigration matters. I discussed the subject at length yesterday. I shall touch on it just a little if I may at this time. The bill would set aside the rider which was attached to the appropriation bill. The bill provides for administrative procedures and makes the Administrative Procedure Act applicable insofar as the administration of the bill is concerned. I made mention of a bill that I introduced. It has nothing to do whatever with the pending bill. I merely made mention of it in passing.

Mr. MOODY. Mr. President, will the Senator yield?

Mr. HUMPHREY. I yield.

Mr. MOODY. My question was: If it is taken care of in the bill which is pending, why should it be necessary at some other time to pass a bill establishing such a court?

Mr. McCARRAN. It is an entirely different matter. It has nothing to do with the pending bill. The Administrative Procedure Act is the law. The administrative court would have nothing to do with the pending bill. It might touch upon immigration, but it would have nothing to do with the pending bill. The administrative board proposed to be established under the provisions of the amendment would pass on admissions, and also on appeals. Such a provision is not at all in keeping with the policy of this bill.

Mr. MOODY. Of course, Mr. President, I am not in agreement with all of the policy of the bill.

Mr. McCARRAN. I realize that.

Mr. HOLLAND. Mr. President, will the Senator from Minnesota yield, to permit me to ask him a question?

Mr. HUMPHREY. I yield.

Mr. HOLLAND. I should like to ascertain if I correctly understand the situation with reference to the separate court proposed to be created by means of the bill of the Senator from Nevada. I understand that the court would not at all be a part of the Department of Justice, but would be a separate court to handle administrative procedures.

Mr. McCARRAN. That is correct. I merely mention that in passing.

Mr. HOLLAND. Mr. President, will the Senator from Minnesota yield further to me?

Mr. HUMPHREY. I yield.

Mr. HOLLAND. As contrasted with the situation suggested by the separate bill of the Senator from Nevada, is it not true that this amendment proposes to establish a Board of Immigration Appeals which would exist in and be a part of the Department of Justice, and would have authority, by vote of a majority of the Board—namely, by a vote of 3 of the 5 members, to overrule and set aside decisions of the head of that department, namely, the Attorney General?

Mr. McCARRAN. That is correct.

Mr. HOLLAND. Is it a fact that the Senator from Nevada disapproves of the amendment because, in effect, it would set up within the Department of Justice a group of employees of that department who would have authority to set aside and overrule the decisions of the Attorney General himself?

Mr. McCARRAN. Yes. It would handcuff the Attorney General entirely, in that respect.

Mr. FERGUSON. Mr. President, will the Senator from Minnesota yield, to permit me to ask a question of the Senator from Nevada?

Mr. HUMPHREY. I yield.

Mr. FERGUSON. I wish to inquire whether it would be possible to obtain an appeal through a writ of habeas corpus, in connection with which the application of the rule of substantial evidence would be determined.

Mr. McCARRAN. That is correct, and it is done right along.

Mr. DOUGLAS. Mr. President, will the Senator from Minnesota yield to me, in order that I may ask a question of the Senator from Michigan? I ask unanimous consent to that effect if the Senator from Minnesota will yield for that purpose.

Mr. HUMPHREY. I yield.

The VICE PRESIDENT. Is there objection? The Chair hears none, and the Senator from Illinois may proceed.

Mr. DOUGLAS. Let me ask at whose expense the appeal for habeas corpus would be made?

Mr. FERGUSON. I assume the writ itself would not cost any money.

Mr. DOUGLAS. The legal representation and the cost of legal proceedings would be at the expense of the immigrant; and immigrants generally are rather poor.

Mr. FERGUSON. I take it for granted that the same procedure would be had before the proposed Board.

Mr. DOUGLAS. One of the purposes of providing for administrative boards of appeal is to reduce both the time required and the expense—in other words, to reduce the delay and to reduce the cost.

Mr. HOLLAND. Mr. President, will the Senator from Minnesota yield to me for a moment?

Mr. HUMPHREY. I yield.

Mr. HOLLAND. I would have no objection at all to the creation of a separate court. In fact, I rather approve of that idea, which, as I understand, the Senator from Nevada is suggesting in another bill.

On the other hand, to have vested in subordinates within a certain department authority to set aside the deliberate decisions of the head of the department, who is charged with the enforcement of a particular law, would, it seems to me, be the height of disorganization and would be exactly the wrong thing to do.

So, Mr. President, unless I hear something to the contrary, on that ground alone I shall have to oppose this particular amendment.

Mr. HUMPHREY. Mr. President, I am indeed delighted to hear the Senator from Florida make that statement, because in view of the provisions of the amendment, I know he will soon vote for it.

The amendment provides:

The Board shall be a part of the Department of Justice but, except for administrative purposes, shall not be subject to the supervision or control of any officer or any employee of the Department.

Mr. HOLLAND. That means that except for administrative purposes or matters of administration, the members of the proposed Board would have authority greater than that of the head of the Department in which they would serve.

Mr. HUMPHREY. However, the argument of the Senator from Florida is that he does not wish to have such a Board dominated or in any way interfered with. On the other hand, the bill now provides that the hearing officers, who, in the case of an individual appeal, would be subject to the supervision of the Attorney General, would live by sufferance of the Attorney General; their salaries would be determined by the Department of Justice; their demotions or promotions would be determined by the Department of Justice, and so forth.

Mr. HOLLAND. Mr. President, will the Senator from Minnesota yield further to me?

Mr. HUMPHREY. I yield.

Mr. HOLLAND. The Senator from Minnesota has entirely misunderstood my position.

In order to make my position perfectly clear, let me say that I believe it to be the height of absurdity to have subordinate officers within a department clothed with authority to upset or set aside decisions made by the head of the department; I further believe that unless this function were vested in a separate court there would be, under the terms of the amendment, a completely disorganized department.

Mr. DOUGLAS. Mr. President, will the Senator from Minnesota yield to me?

Mr. HUMPHREY. I yield.

Mr. DOUGLAS. If the Senator from Florida takes the position just stated by him, then, of course, he disagrees with the fundamental theory of the Administrative Procedure Act, because the

principle of the amendment of the Senator from Michigan is precisely the one embodied in the Administrative Procedure Act of 1946. I read now from subsection (c) of section 5 of the Administrative Procedure Act, wherein there refers to hearing officers or examiners:

nor shall such officer be responsible to or subject to the supervision or direction of any officer, employee, or agent engaged in the performance of investigative or prosecuting functions for any agency.

Then, in section 11, we find the following:

EXAMINERS

SEC. 11. Subject to the civil-service and other laws to the extent not inconsistent with this act, there shall be appointed by and for each agency as many qualified and competent examiners as may be necessary for proceedings pursuant to sections 7 and 8, who shall be assigned to cases in rotation so far as practicable and shall perform no duties inconsistent with their duties and responsibilities as examiners.

Then I ask the Senator to notice the following provision:

Examiners shall be removable by the agency in which they are employed only for good cause established and determined by the Civil Service Commission * * * after opportunity for hearing and upon the record thereof.

Then the act proceeds to provide— and I ask the Senator to note particularly this point—that the examiners shall not be disciplined, promoted, or demoted by their superiors, but shall be independent, and shall be removed only by the Civil Service Commission itself.

The purpose of establishing such quasi-judicial boards and officers within administrative agencies was to provide them with independence, so that the body of administrative law would be as impartial as the ordinary body of common law under the interpretations given by the courts.

As I see the matter, that was clearly the purpose of the Administrative Procedure Act, and again and again I have paid tribute to the distinguished Senator from Nevada for his magnificent contribution in getting the Administrative Procedure Act passed. In fact, we like his child so well that we would like to see it embodied in this measure, for the protection of poor human beings, and not merely for the protection of persons who in other respects are fairly well able to take care of themselves.

Mr. HUMPHREY. Mr. President, I believe the Senator from Nevada wishes to make a reply.

Mr. McCARRAN. Mr. President, I wish to dwell on the language of the proposed amendment, which reads in part as follows:

(b) Notwithstanding any other provision of this act, the Board of Immigration Appeals shall have jurisdiction and authority to review, upon appeal by an alien or by the Attorney General, any decision of the Attorney General, of the Commissioner, or of any officer or employee of the Service in proceedings relating to exclusion, deportation, petitions and applications for determination or adjustment of status, applications for suspension of deportation, applications for waivers of grounds of exclusion or deportation, stays, and revocation of status previously granted.

In short, would not the amendment set up within the Department of Justice, under the Attorney General, a creature capable of destroying the head of that Department or, at least, of setting aside his actions in the case of both administrative and judicial functions?

Mr. HUMPHREY. Mr. President, the argument of the Senator from Nevada is a very persuasive one. However, of course, it would result in the destruction of section 104 of his bill. That section relates to the Secretary of State and to the powers and duties of the Secretary of State in the case of consular officers. In that instance, the bill would establish a separate board with distinct powers and functions which even would supersede those of the Secretary of State himself, insofar as consular officers are concerned.

Mr. President, it is obvious that one cannot blow both hot and cold with the same breath.

The argument against the provision for the creation of a Board of Immigration Appeals is that it would establish within the Department of Justice a board which would be able to review the decisions of even the Attorney General himself. However, the proposed Bureau of Security and Consular Affairs, to be established for the purpose of protecting us from infiltration, itself would supersede those particular functions of the Secretary of State and the consular officers, and would be an independent bureau within the Department of State.

If we are not to have the Board of Immigration Appeals, then I could say that really there ought not to be the Bureau of Security and Consular Affairs. I do not say that, but at least there is a similarity here which I think ought to be realized by the Members of this body. What we are attempting to do in immigration matters is to provide that, when rules and regulations have been issued and when the immigration officer has acted in a case involving an immigrant, the immigrant shall have a place to which to appeal. This Appeals Board is a unit within the Department of Justice, a unit which is separate and distinct, indeed, from the Attorney General's discretionary powers. It is for all practical purposes a court, so far as the Secretary of State is concerned. Concerning the Bureau of Security and Consular Affairs, let me read the following language:

SEC. 104. (a) The Secretary of State shall be charged with the administration and the enforcement of the provisions of this act and all other immigration and nationality laws relating to (1) the powers, duties, and functions of diplomatic and consular officers of the United States, except those powers, duties, and functions conferred upon the consular officers relating to the granting or refusal of visas—

And yet through this bill, we create the Bureau of Security and Consular Affairs.

Mr. MOODY and Mr. McCARRAN addressed the Chair.

The VICE PRESIDENT. Does the Senator from Minnesota yield; and if so, to whom?

Mr. HUMPHREY. I yield first to the Senator from Michigan.

Mr. MOODY. Is it not true that the distinction between having a board of

this sort as an adjunct to the Department of Justice and not having it is the distinction between whether decision of a case is to be made by one man, either by a consul or some other administrative official, up to the Attorney General, or whether a human being who may have been discriminated against for any reason—and we can not now predict what the reason might be—would have some place of appeal? I think it is a matter of fundamental justice. I do not see any reason why it should be opposed.

Mr. HUMPHREY. I may say to the Senator from Michigan that even under the present law and under the McCarran bill the person affected would still have the right to appeal; but he would appeal to an officer appointed by the Attorney General. In other words, the Attorney General would not be able to go through all these separate decisions, but would delegate this authority.

Mr. MOODY. Of course.

Mr. HUMPHREY. He would delegate this authority to someone over whom he has supervision and over whom he can exercise power and authority.

Mr. President, what are we proposing? We are proposing that there be a Board of Immigration Appeals, separate and distinct from the Attorney General, so that appeal cases—and there are still appeal cases—may be funneled into an impartial tribunal, a majority vote of which will be controlling even over the Attorney General.

Mr. MOODY. Is it not true that almost precisely this situation now obtains, and that this amendment merely writes it into the law, in order that some Attorney General in the future may not say, "I am the law; I am going to handle all the appeals myself"?

Mr. HUMPHREY. That is my understanding. I desire now to yield to the Senator from Nevada.

Mr. McCARRAN. Mr. President, I do not think the Senator from Minnesota would say there was any better source to which an appeal could be taken than to the courts of the country.

Mr. HUMPHREY. Indeed not.

Mr. McCARRAN. Any aggrieved immigrant, or any aggrieved applicant for entry into this country and can now does resort to the courts; and that is separate and apart from the Department of Justice, and in no wise under the control of the Attorney General.

Mr. HUMPHREY. But I may say that an appeal would still be available even from the Board of Immigration Appeals. We do not deny that process. But what is the purpose of an administrative tribunal? The purpose of an administrative tribunal such as this is to expedite action, and also to make it possible to arrive at decisions without all the formality which is attendant upon judicial process in a formalized court. I do not think we need debate this amendment any longer.

Mr. President, I yield the floor.

The VICE PRESIDENT. The question is on the amendment offered by the Senator from Michigan [Mr. MOODY] for the Senator from Minnesota [Mr. HUMPHREY].

The amendment was rejected.

Mr. HUMPHREY. Mr. President, I yield to the Senator from Oregon for the presentation of an amendment.

Mr. McFARLAND. Mr. President, will the Senator from Oregon yield to me for an announcement?

Mr. MORSE. I yield.

Mr. McFARLAND. Mr. President, earlier in the day I announced that there would be a Saturday session. Later, my attention was called to something I had said previously which indicated, it was claimed, that there would not be a Saturday session. I want to be fair with the Senate. I do think it important that we press forward on the pending bill, but some Senators have said they relied upon my previous statement which was:

However, in order not to lose any more time, we shall have a session on Saturday, unless we can dispose of the immigration bill at an earlier time.

We expect to remain in session tonight and to dispose of the pending bill. We shall change a little the schedule heretofore announced, take up Senate bill 3066, Calendar No. 1510, which is a bill to amend the defense housing laws, and which it is thought can be finished within a day. If we can finish the pending bill at a reasonable hour tonight, we may meet at 10 o'clock in the morning. The defense housing bill will be followed by the consideration of Senate bill 3086, Calendar No. 1505, a bill to amend the Mutual Security Act of 1951, and for other purposes.

Mr. MORSE. Mr. President, I send to the desk an amendment which I ask to have stated.

The VICE PRESIDENT. The Secretary will state the amendment.

The LEGISLATIVE CLERK. It is proposed by Mr. MORSE to strike out all after line 22 on page 115 down to and including line 21 on page 118 (being sec. 242 (b)) and in lieu thereof insert the following:

A special inquiry officer shall preside as the hearing officer in all deportation and exclusion proceedings arising under this act. Such officer shall be appointed pursuant to section 11 of the Administrative Procedure Act (5 U. S. C. 1010, 60 Stat. 244) and shall have the powers and duties, and limitations prescribed by sections 5, 6, 7, 8, and 11 of the Administrative Procedure Act (5 U. S. C. 1004, 1005, 1006, 1007, 1010; 60 Stat. 239-244). Notwithstanding any provisions to the contrary, no alien shall be denied a hearing either in exclusion or deportation proceedings and every person aggrieved by an adverse order in exclusion or deportation proceedings may obtain court review in an action for declaratory judgment pursuant to title 28, United States Code, section 2201, or upon a writ of habeas corpus. In the discretion of the Attorney General, and under such regulations as he may prescribe, deportation proceedings, including issuance of a warrant of arrest, and a finding of deportability under this section need not be required in the case of any alien who admits to belonging to a class of aliens who are deportable under section 241 if such alien voluntarily departs from the United States at his own expense, or is removed at Government expense as hereinafter authorized, unless the Attorney General has reason to believe that such alien is deportable under paragraph (4), (5), (6), (7), (11), (12), (14), (15), or (16) of section 241 (a) or under the act of May 10, 1920, as amended. If any alien who is authorized to depart voluntarily under the preceding sentence is financially unable to depart at his own ex-

pense and the Attorney General deems his removal to be in the best interest of the United States, the expense of such removal may be paid from the appropriation for the enforcement of this act.

Mr. MORSE. Mr. President, I should like to turn my attention to my amendment which seeks only to bring the procedures in the administration of the proposed immigration law under the provisions of the Administrative Procedure Act, in keeping, I may say, with the recommendation of the appropriate committee of the American Bar Association. Frankly, Mr. President, I know of no good reason why the amendment should not be automatically accepted by the sponsors of the bill. As I hope to prove before I finish my discussion, the immigration committee of the American Bar Association has given the matter very careful consideration, and testimony before committees of the Congress leaves no room for doubt as to the soundness of the position of these distinguished lawyers as to the need for such an amendment as that which I have proposed.

Mr. President, important sections of S. 2550 are opposed by a committee of the American Bar Association. A representative of the American Bar Association appeared in opposition to the version of this bill when it was numbered S. 716. The immigration committee of the administrative law section of the American Bar Association filed a list of seven objections to S. 2550 and its companion bill, H. R. 5678, with members of the Judiciary Committee. These objections are as follows:

First, that section 242 (b) of Senate bill 2550 does not provide for independent hearing examiners in deportation cases as required by the Supreme Court in *Sung* v. *McGrath* (339 U. S. 33). Senate bill 2550 provides for a special inquiry officer who may be an investigator or prosecutor for the Immigration Service one day and a hearing officer the next, provided he has not investigated the case he is hearing. In the very case that he hears, the special inquiry officer will be required to develop the case against the alien and then sit in judgment. In addition, contrary to sections 5 and 11 of the Administrative Procedure Act, the special inquiry officer will be subject to the control of district directors and assistant commissioners of the Immigration Service who engage in investigative and prosecuting functions. We all know that a man who has buried himself in one side of an issue is disabled from bringing to its decision that dispassionate judgment which Anglo-American tradition demands of officials who decide questions—see Senate Document 8, Seventy-seventh Congress, first session, page 56.

Where the same men are obliged to serve both as prosecutors and judges, administrative fairness is undermined, and public confidence in that fairness is weakened. The final report of the Attorney General's Committee on Administrative Procedure reported at page 56:

These types of commingling of functions of investigation or advocacy with the function of deciding are thus plainly undesirable. * * * Creation of independent

hearing commissioners insulated from all phases of a case other than hearing and deciding will, the Committee believes, go far toward solving this problem at the level of the initial hearing provided the proper safeguards are established to assure the insulation (S. Doc. 8, 77th Cong., 1st sess., p. 56).

And with specific reference to deportation proceedings, it was found that separation of functions was required by the rudiments of fair play and Anglo-American concepts of justice. The Secretary of Labor's Committee on Administrative Procedure reported in 1940 as follows—pages 81–82:

A genuinely impartial hearing, conducted with critical detachment, is psychologically improbable if not impossible, when the presiding officer has at once the responsibility of appraising the strength of the case and of seeking to make it as strong as possible. Nor is complete divorce between investigation and hearing possible so long as the presiding inspector has the duty himself of assembling and presenting the results of investigation (cited in Sung case opinion, p. 44).

To remedy these defects in administrative hearings we enacted in 1946 under the sponsorship of the Senator from Nevada the Administrative Procedure Act. And as noted by the Supreme Court in the Sung case, the administrative hearing in deportation cases furnished "a perfect exemplification of the practices so unanimously condemned. A deportation hearing involves issues basic to human liberty and happiness and, in the present upheavals in lands to which aliens may be returned, perhaps to life itself. It might be difficult to justify as measuring up to constitutional standards of impartiality a hearing tribunal for deportation proceedings the like of which has been condemned by Congress as unfair even where less vital matters of property rights are at stake"—page 50, opinion has further good quotable material; see page 46.

In the Administrative Procedure Act sponsored by the Senator from Nevada, and advocated by the American Bar Association, we condemned hearings held by officials subject to the control of investigating and prosecuting officials.

I may say, Mr. President, that the junior Senator from Oregon stood shoulder to shoulder with the Senator from Nevada [Mr. McCarran] in debate on the floor of the Senate for the passage of the administrative procedure bill, but I part with the Senator from Nevada in respect to the failure in the immigration bill to carry out what I think is the clear spirit and intent of the administration procedure bill which he so ably advocated not very long ago on the floor of the Senate and which was passed by the Congress and is now the law of the land.

We condemned the practice of permitting hearing officers to act as investigators one day and adjudicating officers the next—section 5 (c) of the Administrative Procedure Act. We required hearing officers who were to be truly independent under section 11 of the Administrative Procedure Act as noted by the Senator from Nevada in his outline of the bill during the Senate debates—Senate Document 248, Seventy-ninth Congress, second session, page 327.

And it is also noted in the legislative history of the bill that section 7 of the Administrative Procedure Act permitting hearings by officers specially designated pursuant to other statutes was not to be a loophole for the avoidance of the independent examiner system and that such exemption only applied to statutory hearing officers "with some special qualifications, as distinguished from examiners otherwise provided in the bill"—Senate Document No. 248, page 268.

All the fine work and effort that has gone into the Administrative Procedure Act to insure administrative justice would be disregarded or nullified in proceedings under the Immigration Act as provided in S. 2550. We were warned by the American Bar Association Journal of January 1948—page 9—that—

Care must be taken that subsequent legislation shall not repeal or whittle down the provisions of the [Administrative Procedure] Act.

That warning was well taken. First, the Immigration authorities sought to whittle down the Administrative Procedure Act by a rider to an Appropriations Act. Now, though the rider is repealed, a further step is taken to make this permanent by this omnibus immigration bill. And soon, other agencies of the Government, the National Labor Relations Board, the Interstate Commerce Commission, and every other Government agency which opposed the Administrative Procedure Act may be tempted to present omnibus bills with provisions whittling down that act. If we enact S. 2550, we are denying the protections of the APA to important cases and are setting a precedent which is in danger of leading ultimately to virtual repeal of the Administrative Procedure Act.

We should heed the objections to section 242 (b) voiced by the American Bar Association. We should heed the warning of Justice Jackson in the Sung case, that any exemption from the Administrative Procedure Act in deportation cases might be unconstitutional. We should heed the warnings that any whittling of the Administrative Procedure Act will lead to its eventual nullification.

Second, the American Bar Association opposes the provision of section 242 (a) which authorizes the Attorney General to deny bail to an alien pending determination of his deportability. This section contains a specific provision that an alien may be successful in court only "upon a conclusive showing in habeas corpus proceeding that the Attorney General is not proceeding with reasonable dispatch." This, then, is a provision to give the Attorney General absolute discretion to deny bail to persons who are held for no crime but solely in a civil deportation proceeding. The Attorney General need not show that the alien would abscond or endanger our security. He only need show that he is proceeding with reasonable dispatch and he can then detain an alien for weeks and months without bail. If the deportation case requires evidence from abroad, or investigation in Europe involving months of work, an alien may be needlessly detained at Ellis Island.

The function of bail is to secure the reappearance of an alien when deportation has been ordered and is to be effectuated. Pending determination of deportability a subversive alien may be detained if his presence at large is a danger to our national security—*Carlson* v. *Landon* (342 U. S. 524). But to make the Attorney General's denial of bail free from judicial review as to reasonableness, as is here proposed, is an infringement of the writ of habeas corpus. Section 242 (a) would permit the Attorney General to detain persons without bail and without court review—persons charged with no crime, convicted of no crime, and accused of no subversive activity—solely upon a showing that he is acting with reasonable dispatch.

I join with the American Bar Association in recommending that we return to a rule of reason, to the constitutional principle that excessive bail shall not be permitted, and to the constitutional admonition that the writ of habeas corpus should not be curtailed except in cases of actual invasion. We should, as the American Bar Association recommends, "maintain present authority of courts to review denial of bail."

Third and fourth, the American Bar Association recommends that sections 242 (f) and 252 be amended to retain the right of hearings in deportation cases to aliens previously deported and to alien seamen. We should as a matter of simple justice give all aliens a hearing before deporting them. We give criminals—even murderers and spies—a hearing before sending them to jail. We give convicted criminals on parole, hearings before revoking their parole. We give a motorist, a hotel owner, a lawyer, and a bondsman a hearing before revoking their licenses. Why should we not give an alien a hearing before revoking his license to stay in America? We have for the past 50 years granted all aliens hearings before deporting them. Is there any sound reason for denying them hearings today? But apart from the question of simple justice, we cannot under our Constitution deprive any alien—including alien seamen—of a deportation hearing. Wong Yang Sung was an alien seaman who overstayed in the United States and became deportable, and in *Sung* v. *McGrath* (339 U. S. 33), the Supreme Court held that due process not only required a hearing, but a fair hearing. Justice Jackson, speaking for the Court, said, at page 49, that under compulsion of the Constitution the Supreme Court long ago held that deportation statutes must provide a hearing for aliens including those here illegally. And that has been the law ever since the *Japanese Immigrant case* (189 U. S. 86). We cannot approve sections 242 (f) and 252 unless we shut our eyes to the Constitution and Supreme Court opinions.

Fifth, the American Bar Association opposes section 360 of S. 2550. This provision relates to declaratory judgment actions by persons claiming American citizenship. The present provisions of law are set forth in section 503 of the Nationality Act of 1940 (8 U. S. C. 903). Section 360 is designed to curtail the

judicial review provided under existing law in several respects. Section 360 denies existing declaratory judgment actions under title 28, United States Code, page 2201, to persons claiming American citizenship against whom deportation or exclusion proceedings have been brought. In exclusion cases, a claim of citizenship may only be brought in court in habeas corpus proceedings. Section 360 permits declaratory judgment actions upon a claim of American citizenship only within 5 years after a final administrative denial and only in the district of the individual's residence. Persons under age who do not know about court proceedings and let 5 years go by, or who are abroad and unable to claim residence in a particular district in the United States, would apparently be without recourse in the courts.

In an article entitled "Improving Administrative Justice," volume 32, American Bar Journal, December 1946, page 24, the Senator from Nevada explained that under the Administrative Procedure Act "every instance of legal wrong shall be subject to judicial review." He said:

It is a major premise of the statute that judicial review is not merely available but is plenary in every proper sense of the word.

Nevertheless, in S. 2550, contrary to the wise observations of the Senator from Nevada, made in 1946, and contrary to the objectives of the Administrative Procedure Act, we find a bill which will curtail judicial review for persons fighting for their American birthright. We are here dealing not with aliens but with Americans. What is the fear over judicial review of administrators who deny the claim of a native-born American to American citizenship? What is inadequate about existing law? Why should not the courts be as open as they have been in the past for judicial declarations of American citizenship? I join with the American Bar Association in opposing the curtailment of judicial review in citizenship cases.

Sixth, the American Bar Association objects to section 342, which authorizes the Attorney General to cancel certificates of citizenship or naturalization where it appears to his satisfaction that citizenship was illegally or fraudulently procured. This may be done not upon written notice to a person's last known address. In *Mullane* v. *Central Hanover Bank and Trust Co.* (339 U. S. 306) it was held that due process required personal service where the whereabouts of an individual was either known or could be ascertained. It is no wonder that the American Bar Association feels that this section contains "unconstitutionally inadequate provisions for notice."

Seventh, section 340 (b) contains the same objectionable feature. It permits denaturalization by substituted service without any showing that personal notice cannot be made. For the same reason, the American Bar Association objects on constitutional grounds to section 340 (b) of S. 2550.

Mr. President, these are the objections of the American Bar Association. They cannot be disposed of lightly. A bill with these major defects should not be enacted into law, but should be recommitted for further study and that is what should be done with S. 2550. However, the Senate has decided to the contrary. I think we ought to make the corrections which the American Bar Association has recommended through its committee on immigration.

Several Senators have laid emphasis on the unfairness of the McCarran bill in its provisions for deportation of members of the foreign-born population. Several have emphasized the injustice of the bill in excluding aliens on small pretext or no pretext. They have also emphasized on a small pretext or on no pretext, those parts of the bill which unfairly give quotas to the countries and the peoples who do not need them and do not use them. These Senators have condemned S. 2550 for its denial of the precious immigration quota numbers to the refugees and persecutees of Europe, for its denial of any help to the excess population of such countries as Holland, Denmark, Italy, Greece, Germany, and Poland, the people who need quota numbers so desperately. And finally, emphasis has been put in the debates on the provisions of the bill which deny the process and the fair hearing which are required by the Administrative Procedure Act.

As to a good many of the objections raised by the junior Senator from Oregon, those of us in opposition to the bill have already been defeated, at least in this stage of the controversy, but I say to the Senate that it is necessary to adopt an amendment which will protect, guarantee, and perpetuate the safeguards of the Administrative Procedure Act.

I agree wholeheartedly with all these criticisms of the McCarran bill. On the basis of those criticisms alone the Senate should reject the McCarran bill. It proceeds on the assumption that aliens are bad people—are suspect people. It seizes upon any pretext to exclude them when they come. It would deport them for a mental purpose, for violation of a trivial municipal ordinance. It would do all this without a fair hearing. It closes the door to refugees from Europe even further than that door is now closed. For all these things, I say, S. 2550 deserves to be rejected. Certainly if it is not rejected, we owe it to ourselves to guarantee the legal rights granted by the Administrative Procedure Act, and to adopt the amendment recommended by the American Bar Association Committee.

But S. 2550 works mischief in still another area. I am referring to the threats in S. 2550 to the rights of American citizens—American citizens at home and abroad, American citizens by birth and by naturalization, American citizens in their early life as children, and American citizens fully mature and grown.

The consequences of this bill upon the rights of citizens are so grave as to provide a separate, wholly sufficient ground in itself for the out-of-hand rejection of the McCarran bill.

Those of my colleagues who have not studied the bill carefully—and since it has 302 pages I can understand why—may not realize that it has four titles. The first consists of the definitions which are often the heart of the provisions in the rest of the act, and as well certain matters of general application. The second title is "Immigration," and it contains most of the sections you have heard so justly criticized. The third title is "Nationality and Naturalization." Only after you read the first 183 pages do you come to this third title. It has three separate chapters. The first is "Nationality at Birth." The second is "Nationality through Naturalization," and the third is "Loss of Nationality."

Senators may have heard mention of these chapters and the sections in them in connection with denaturalization proceedings or in connection with new conditions imposed on the naturalization of American citizens, and I shall refer to those before I am through. But let me point out that this third title, "Nationality and Naturalization," covers much more than naturalization proceedings and denaturalization proceedings. Chapter 1, "Nationality at Birth," will be the law governing the citizenship of all children born in the future. If it is enacted, it will determine whether the unborn children of our neighbors and friends and constituents are American citizens or not. It will determine which children born in the United States and its possessions are citizens and which are nationals. It will determine which children born outside the United States of citizen parents or of alien parents are to be citizens of the United States, when they must return here, and how and when they may lose their citizenship.

Chapter 2, Nationality Through Naturalization, will govern not only naturalization of adult aliens but also the conditions upon which the children of the foreign born will become citizens and also the conditions upon which they shall lose their citizenship.

Because of the significance of these rights and powers which the bill seeks to repose in mere men who are administrative officials, I again stress the importance of seeing to it that we guarantee that the procedures of the Administrative Procedure Act are carefully followed in the administration of this proposed act.

Chapter 3, as I have said, is entitled "Loss of Nationality." I wish to stress that this chapter covers the loss of nationality by both native-born and naturalized citizens. Again, I say to you, this will affect all of us—all of us and our children and our grandchildren and the families of every citizen of the United States, wherever born and wherever located.

I need not tell Members of this body the significance of a loss of citizenship. There is no more precious right of a human being than that of citizenship. And we can proudly say that the right of citizenship in the United States is more eagerly sought after than citizenship in any other country in the world. We who have this right would not give it up for any promise that could be made—for any benefit or for any amount of money—for anything at all. It goes

without saying that if we lose our citizenship, we may lose our job, our fortune, our economic and material advantages. We would lose much, much more. Without that right of citizenship in this country we would lose our homeland. We would lose all that makes our life worth living.

With all sincerity I want to tell you that this bill will cause American citizens to lose their citizenship unknowingly and involuntarily. It will cause them to lose their citizenship where they do not deserve to lose it. So, and I repeat, this bill will affect not only aliens in this country, but it will affect every single one of the citizens of the United States.

Let me tell you how this will happen. Perhaps the most direct injury to citizens in this bill is the opportunity it gives administrative officers to take away the rights of a citizen without proper court review. In some cases, the citizen's right to a court review is limited. In some cases his right to court review is entirely destroyed.

Let us take the case of the native-born citizen living in his home State. It may be any State—my State of Oregon, or the home State of the distinguished chairman of the Judiciary Committee. Let us call this citizen "Johnson," a name borne by two distinguished Senators and by thousands of other fine Americans. Johnson may not realize it, but his citizenship is constantly being passed on by one of the many agencies in the Federal Government. He cannot hold a job for the Federal Government; he cannot enlist in the armed services; he cannot get a grant of public lands; he cannot get a passport unless some Government agency rules that he is a citizen. At almost every step in his life some Government officer or another—high or low, important or unimportant, intelligent or unintelligent—has the right to decide that Johnson is not a citizen and to deny his application for a pension, for a job, for a passport. That Government officer may often act without a hearing and only on the evidence that he thinks is sufficient. He may write Johnson a letter saying, "I deny your application because you are not a citizen," or he may tell him face to face, over his desk.

Now what can Johnson do about this? Under the law today he has the unconditional right to sue that Agency in the Federal courts. He can sue the head of that Department either in the district of his residence or in the District of Columbia. He can ask the court for a declaratory judgment that he is a citizen of the United States. That right gives him what I believe is his unqualified right under the Constitution—his right to a hearing before a judge before anyone can take away his rights as a citizen.

Now what does the McCarran bill do to Johnson when some Government officer denies him his citizenship rights? Let me turn to section 360 (a) of this bill, which appears on page 282 of this 302-page bill. This section changes the law so that if he does not bring the suit within 5 years, he may not bring it at all. That Government officer's decision that Johnson is not a citizen will often come in the most informal manner.

Johnson's application will be denied in a conversation or in a letter or perhaps even in a mimeographed form letter. Johnson may realize the significance of the administrative decision and bring suit immediately. If he does, he will get a hearing from a judge learned in the law and completely impartial.

Johnson may, however, not realize that the decision is so vitally important to him. He may be an ignorant man. He may be an uneducated man. He may be a man who does not recognize the significance and importance of any letter or statement which he may receive from a Government official.

He may be only 16 years old—or 18—or 19. He may not know of the 5-year limitation. He may believe, as you and I would believe, that if one is a citizen, then nothing that an administrative officer can do—nothing that anybody can do—can take his rights away. He may find it unthinkable, inconceivable. that there is any restriction on his right to appeal to the courts for protection. Under the McCarran bill, he would be wrong, tragically wrong. Under the McCarran bill, if Johnson for any reason whatsoever does not sue within 5 years, he loses forever his right to sue. The result will be that for practical purposes his citizenship is gone. He was born in the United States. He is a citizen. But some petty Government officer has written a letter and if Johnson does not sue within 5 years that letter is a final, binding decision. No appeal to the court would be permitted if the bill should be enacted into law and finally sustained by the Supreme Court on constitutional grounds. Let me say that on that question I reserve judgment.

What in the world is the justification for this provision? It cuts off the judicial review of administrative decisions—contrary to the basic principles of our law. It deprives an American citizen of his right to go into the courts. Do not think that I am the first to point this out. It was strongly criticized before the Judiciary Committee by the American Bar Association. Let me read the testimony of the representative of the American Bar Association:

Finally, we are deeply concerned with the provisions of S. 716 and in particular sections 106 and 360 which seriously limit judicial review. It is our opinion that these sections give unbridled authority to administrative officers to act arbitrarily. The sense of these proposals is to oust the courts of review over factual and discretionary decisions of the immigration authorities and to grant them blank checks to do as they will. The administration of our immigration and naturalization laws will thus become an administration of men rather than of laws. There is no compelling reason for these proposals. The checks and balances exercised by the judiciary insure greater impartiality in our administrative officials. Court review is not generally denied under these circumstances to those whose property rights are affected, and we should expect no less for personal rights of life and liberty (hearings, pp. 527, 537).

The American Bar Association has since, again, criticized this section 360 in a letter which is printed in the RECORD for April 25 on page 4441.

Why should we cut off the review by a court of the denial of an American citizen's rights? Why should we allow an administrative officer to have final power over such a question? Why should we not heed the repeated criticisms of the American Bar Association? I call on the distinguished chairman of the Judiciary Committee to answer these questions—to answer the criticisms of the American Bar Association.

The report of the Judiciary Committee on S. 2550 discusses this section 360 on the next to the last page, page 50 of the committee report. Three whole paragraphs, half the printed page, are devoted to section 360. Yet no mention whatsoever is made of this limitation on the right of a native-born citizen living peacefully at home. The many experts who work for the Senate Judiciary Committee found time to write a 51-page report on this bill. They found time to give three long paragraphs to this one section. In all those explanations they did not even once mention this limitation on the right of the native-born citizen to get a hearing in court. They had plenty of notice that it was a change in the law. The American Bar Association, the Association of Immigration and Nationality Lawyers, and the Nationality Council on Naturalization and Citizenship, all opposed this new section 360. The minority report—signed by Senators KEFAUVER, MAGNUSON, KILGORE, and LANGER—consists of only 11 pages. But the minority members of the committee found time to mention this change of the law to deny rights to American citizens. In the section of the minority report on "Freedom from Administrative Abuse," on page 7, they said:

Among the primary safeguards of our American way of life is the doctrine of official responsibility, the principle that Government officials are servants and not masters, and that it is more important for the people to scrutinize the conduct of officials than it is for officials to scrutinize the lives of the people. From this it follows that some form of judicial protection shall always be open to the victims of injustice, even if the injustice is committed by persons in powerful positions.

The minority report went on to point out the many instances in which the McCarran bill made administrative abuse possible and in which the McCarran bill emasculated judicial review. Among these, they said, was section 360 and its clause cutting down the time in which the citizen can get court review.

With all this criticism of this clause, the report of the Committee on the Judiciary fails entirely even to mention the change, much less to justify it. Again I call upon the chairman of that committee to explain why any explanation is omitted from the committee report and why his committee proposes, contrary to all these criticisms, that we give administrative officers the power to deny a native-born citizen his rights as a citizen and limit a court review of such an administrative decision.

The right of that citizen named Johnson is cut down even further in some cases. It is limited as to time if the decision is made by some officer in the State Department or in the Army or

in the Interior Department, in fact any officer of the United States except the Attorney General. The Attorney General gets very special treatment. If the Attorney General challenges Johnson's citizenship in a proceeding under the McCarran bill, then Johnson is simply denied his entire right to bring a suit for a declaratory judgment. He is not allowed to bring it within a certain time or on certain conditions. He may not sue at all. He must wait upon the Attorney General, go to jail as an alien under order of deportation, and then bring habeas corpus. So the Attorney General by signing a piece of paper can deprive Johnson of the right that every other citizen has—the right to sue without first going to jail. He can deprive him of the right that you and I and every other citizen of the United States now has under the law.

I believe deeply that this is an unreasonable, unwarranted, and unconstitutional discrimination among citizens. Those whom the Attorney General allows can bring a suit. Those he does not allow cannot sue, but must first go to jail.

This can happen to any citizen of the United States—a citizen living at home, who never ventures out of the country. The citizen who goes out of the country, by this same section 360, is much worse off. He will lose the right to sue entirely, within 5 years or at any other time. Let me tell you of the unfortunate plight of Johnson if he goes abroad on business or with his wife as a tourist.

The citizen abroad whose citizenship is challenged is stranded. If he loses his passport or if he was born abroad of citizen parents and never had a passport, you would say that the American consul will issue a passport to him. But when that consul refuses and says, "I will not recognize you as a citizen because I am not convinced by your proof," what happens then?

Under the law today that citizen may hire a lawyer and bring a suit for a declaratory judgment, in the district court in this city, or in the district of his residence. And he can get a certificate from the consul to allow him to come back to the United States and to confer with his lawyers in order to prosecute that suit. All he has to do is to show that his suit is pending in court, and that it is brought in good faith and on a substantial basis. He will be deported, of course, if the judge decides he is not a citizen and the law today provides safeguards to insure that he will be deported if his claim is denied by the judge.

Now what happens if we enact the McCarran bill? The McCarran bill deprives him of the right to bring a suit and of the right to return to prosecute such a suit. If that citizen can prove to the satisfaction of the consul and the Secretary of State, that his claim is substantial, he can get a certificate to return, but not to return to prosecute a suit. He can return here only as an alien might come. He must sit in detention on Ellis Island while the Attorney General passes on his claim to citizenship and then if the Attorney General denies his claim, he can bring habeas corpus. All this while he sits in jail. All this while

others, in the United States, who claim to be citizens can bring a suit for a declaratory judgment and confer with their lawyers outside of jail.

There is even a further denial of rights. This entire procedure, miserable as it is, is open only to the person abroad who has at one time been physically present in the United States. There are children born abroad who are native-born citizens because their parents were citizens. They have never been in the United States. If the consul refuses to give them a passport they are barred completely. They cannot bring a suit for a declaratory judgment. They cannot even get a certificate to come to Ellis Island and plead their case in habeas corpus, while they sit in jail. I cannot tell you what remedy is left to this child. I call upon the chairman of the Judiciary Committee to tell you what that child can do.

Allow me to turn to another new provision in the McCarran Act which threatens the rights of American citizens. I believe it is the right of an American citizen to pass his citizenship on to his children and that a child of an American father has a right to be a citizen of the United States, wherever he is born.

Under the law when an American citizen abroad marries a girl of the citizenship of the foreign country, his children are American citizens. There is a requirement that the children must return here for a period of 5 years' residence between the ages of 13 and 21, but that requirement is not made if the American father is living abroad while employed by the Government or by a bona fide American organization. It may be necessary for children generally to return during their formative years so that they become indoctrinated with American principles. The law recognizes, however, that where the child is living in an American family where the head of the family is doing American business abroad, that child will learn the American way of life in his father's house. The McCarran bill in section 301 (b) ends this exception for children living with American families abroad. Those children must return to the United States before they are 23 and then they must stay here continuously for 5 years, sometime between the ages of 14 and 28. Even a 3-week visit to see their parents abroad will break the continuity of their stay and cause them to lose their citizenship. No exceptions are made. The parents must either return with the child, for 5 years' continuous residence, or send the child to live here for the 5 years. Otherwise, the child will lose his citizenship.

The Humphrey-Lehman bill, in its section 301 (b), makes an exception for the case of a child living abroad with a parent who is a Government employee or an officer in the Armed Forces. That family will not have to be broken up in order to preserve the citizenship of their children. I would like to see the exception broadened to include children living with their parents who are representatives of American firms and organizations. We all know that the citizen who goes abroad for an American bank or

an importing firm or a religious or charitable organization, will teach his children American ways. But whether the exception in the Humphrey-Lehman bill is broadened or not, the McCarran bill changes the law and cuts off all exceptions for these American families. Those families will have to be disrupted or the child's citizenship will be lost. Those families that cannot afford to return for 5 years or cannot afford to send the child here for 5 years will suffer a loss of citizenship. This change in the law will hurt American businessmen and representatives of charitable and religious organizations. It will end the right of such American fathers to pass their citizenship on to their children, and it will end the right of a child of an American father to be an American citizen.

A third provision in the McCarran Act will cause American citizens to lose their citizenship merely because they take a job with a foreign government. Countless Americans have taken such jobs. They are advisers in fields ranging from sanitation to finance to oil well drilling. They work as teachers and doctors and agricultural specialists.

Under the law today such an American does not lose his American citizenship when he takes such a job with a foreign government. He does lose his citizenship if he takes an oath of allegiance to that foreign government and he should lose his citizenship if he does that. But the McCarran bill goes further. In section 349 (a) (4) (B) of the McCarran bill it is provided that he will lose his citizenship when he takes that job with the foreign government, whether or not he takes an oath of allegiance, so long as an oath is required for the job. The Humphrey-Lehman bill has the same provision, but an amendment is shortly to be proposed continuing the present law and providing that the citizen is expatriated only if he takes the oath.

The McCarran bill in effect creates a conclusive, unrebuttable presumption that if an oath is required, it was taken. This conclusive presumption was severely criticized by the National Council on Naturalization and Citizenship and the Association of Immigration and Nationality Lawyers. It will have these effects. Either it will expatriate those Americans who take such jobs or, and I think this will be more likely, the net result of the McCarran bill will be that Americans will not take these jobs. No job for a foreign government is attractive if a loss of citizenship goes with it.

The citizen and the foreign government will not be the only sufferers. Perhaps the greatest sufferer will be the Government of the United States. When an American goes off to work for the Governments of Afghanistan or of Bolivia or of Egypt, as a sanitary engineer or a doctor of tropical medicine or as a teacher of agriculture, both he and that foreign government benefit. But the greatest benefit comes directly to this Government in the form of improved relations with that government. That one American doctor or engineer or teacher can do more to promote good will toward the United States **than 10 ambassadors and 100 consuls. When we** make it impossible for him to go on such

a mission of good will, we spite ourselves, and only ourselves. We say to friendly governments all over the world that we do not wish them to have the benefit of American ingenuity and training. We say to them that we do not trust our doctors and engineers to take jobs with those countries. We say to them that we are afraid that when they take such jobs, they will become bad people, disloyal to the United States and that we will expatriate them. Those foreign countries ask us almost daily for help in locating technicians. When they find the technician and he refuses the job because in the future it may be held that an oath was required and expatriation took place, the foreign country will not forget our McCarran bill and what it does to them.

Still another clause in section 349 of the McCarran bill causes an unnecessary and unreasonable loss of citizenship. Section 349 (a) (5) provides that it is an act of expatriation to vote in a political election in a foreign state. No qualifications, no exceptions. The bill ignores the fact that many dual nationals find themselves abroad in the country of their other nationality and they casually vote in the local, minor elections. The McCarran bill continues the present law which expatriates them no matter how unimportant the election. There is no need to do this. The consequence of expatriation is much too important to inflict on a man for this alone. It would be enough to provide that expatriation shall occur only if the dual national votes in a national election. There should also be an exception for voting in elections under the auspices of the United States, for example in conquered territory. Both these qualifications are to be found in the Humphrey-Lehman bill.

Next, I have in the McCarran bill an instance of loss of citizenship by a naturalized citizen. We know that he loses his citizenship if he lives for 2 or 3 years in the country of his former nationality—the country of his birth. There are many who disapprove of this provision of law, but I shall pass over it. Much less well known is the provision of the law which causes the naturalized citizen to lose his American citizenship if he lives in some other, entirely different foreign country for 5 years. There are certain exceptions for Government employees and for representatives of American organizations, and similar people, but they do not cover the case of the native of France or Bulgaria or Finland who becomes a citizen of the United States and then goes to some other country, such as Argentina, to work and live for more than 5 years. In section 352 (a) (2), the McCarran bill continues the provision of law expatriating such a man. The Humphrey-Lehman bill does not. Under the McCarran bill the native-born citizen can go to Argentina for 5 years; the naturalized citizen cannot. The evils of this kind of provision are plain. First, it makes the naturalized citizen conscious of his inferior status. We would thus be discriminating between the native-born citizen and the naturalized citizen. Second, when we expatriate this naturalized citizen we lose the benefit he confers upon us by acting as

our representative abroad. Several organizations, among them the Department of State, have pointed this out. Let me read to you the testimony on this provision given before the Senate Judiciary Committee by Mrs. Ruth B. Shipley, Chief of the Passport Division of the Department of State:

One is the loss of nationality by naturalized citizens in a third country. We would like to see that section omitted entirely from the bill, and we feel it would be to the interests of the United States to maintain the friendship of all of these people scattered all over the world who are not in the country of their origin, who hold themselves out as Americans. Many of them grew up in this country, and came here when they were very young, and they were trained here and they are known as Americans, and skilled in various things; but they are not residing in a third country for any of the reasons mentioned in the bill (hearings, p. 247).

These are some of the clauses in the McCarran bill that will invade the rights of American citizens and will expatriate them on trivial grounds.

I should like to turn briefly to the provisions of the McCarran bill which limit the process of naturalization—the method by which the foreign-born can become citizens—the method by which they become full-fledged members of the community. There is a requirement, unless the Attorney General specifically directs to the contrary, that in every case the applicant for naturalization shall be the subject of a neighborhood investigation—section 335 (a). This will only delay naturalization and waste the time of Government investigators. There is the rigid definition of good moral character which will limit the discretion of the judge in disposing of each case on its own merits—section 101 (f). Both of these would be changes in the law. There is the provision that only children under 16 become citizens when their parents are naturalized, as compared with present law, which allows children up to the age of 18 to become naturalized by their parents' naturalization—section 320 (a) (1) and section 321 (a) (4). Another section, again new in the law, will forever reject as possible citizens all conscientious objectors, though they are willing to take an oath to perform noncombatant service or to perform civilian work—section 337.

Mr. President, I think my position in regard to conscientious objectors is fairly well known. I have never been able to understand their philosophy and their point of view. Nevertheless, I have no doubt at all that some of our Quakers and some of our immigrants of Quaker faith have proved to be among our finest citizens. I do not think there should be any blanket disapproval of persons with characters so fine and principles so high as those of the Quakers.

The McCarran bill also contains a clause, first enacted in 1950, requiring that the alien be able to write in English before he can become a citizen—section 312. It is almost impossible for a middleaged man who can hardly write in his own language, to learn to write English. Under the provisions of this bill, that man must remain an alien forever. Another section, criticized by the minority views, will deny citizenship to an alien

for 10 years after he joined or gave a small contribution to "the direct predecessor or successor" of any Communist organization—section 313 (a) (2) (F). He will be barred for these 10 years even though the predecessor organization he joined was anti-Communist and he resigned when it was captured by the Communists.

All of these provisions are unreasonable and unnecessary. They can only create resentment among the people at whom they are aimed. When we force a man to remain an alien because he cannot write English, or because of his religious beliefs, or because he joined an organization which later became subversive, we are denying ourselves the strength and support of these people. These are the effects of the McCarran bill in regard to who can become a citizen.

Let me state also the effects of the bill on those who have become citizens—the effects of the bill on the law of denaturalization. Fundamental changes are made, and I believe they are unmitigatedly dangerous to the welfare and security of all naturalized citizens.

At page 45, the committee report admits that section 340 (a) proposes a major change in the law of denaturalization. Denaturalization need no longer be limited to cases of "fraud and illegal procurement." Henceforth, under the McCarran bill, it will be enough to show procurement of naturalization by "concealment of a material fact" or by "willful misrepresentation." The reason for this change is candidly stated in Senate Report 1515, Eighty-first Congress, to which the present committee report refers. At page 769 of that report, the reason given is that concealment of a material fact is "more easily proven" than fraud.

This is hardly a legitimate reason to change the law so as to threaten the citizenship of all those naturalized in the future. Almost any fact—as to age, as to a street address years ago, as to conduct and activities over many years in the past—is material under the McCarran bill. Under the new section, naturalized citizens will throughout their lives remain subject to denaturalization. We cannot make good citizens out of people who live in jeopardy of losing their citizenship because of some unwitting or technical act.

Still other changes in the law are proposed by the McCarran bill.

Some naturalized citizens will be denaturalized without a hearing and by administrative action. In cases where the alien's record of lawful admission is based on an adjustment of status, for instance, a change from the status of nonimmigrant to the status of quota immigrant, the Attorney General will be able within 5 years thereafter to revoke the adjustment if he finds to his satisfaction the alien was ineligible—section 246. No hearing will be necessary; there will be no right to be heard, there are no standards for the Attorney General's decision. The McCarran bill allows the Attorney General to revoke the status if he is satisfied that the alien was ineligible. If that alien has in the meantime been naturalized he will be subject

to denaturalization as a person who concealed a material fact, though the original error for which his adjustment was revoked was an error of law by the Attorney General himself. The Humphrey-Lehman bill requires a hearing before the Attorney General can undo the status on which the naturalization was grounded.

The McCarran bill also affects the proceedings in court for denaturalization. Those aliens who become the subject of denaturalization proceedings will not be entitled to due process. Once the denaturalization proceedings begin, the present law and the McCarran bill—section 340 (b)—provide that if he is absent from the district, service of the legal papers may be made on him by advertising, even though his actual address is known. Many naturalized citizens are abroad at the time of the denaturalization proceedings, and I submit that service by publication is a denial of due process. In the case of *Mullane* v. *Central Hanover Bank and Trust Co.* (339 U. S. 304, 306), the Supreme Court held:

An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections.

When the alien is abroad and his address is known, service by publication is not reasonably calculated to give him notice under the circumstances and I submit that this section is unconstitutional. The McCarran bill can be made constitutional, and the Humphrey-Lehman bill does this, simply by requiring that service by publication by advertisement is permitted only if personal service cannot be made. Is it too much to require that the Government send the man a letter, so that the Constitution be observed and he receive notice that his citizenship is being taken away?

I have tried to recount to you, Mr. President, the most striking among the unjust and arbitrary provisions of the McCarran bill with respect to the law of citizenship, naturalization, and denaturalization. Let me remind you also that in this omnibus bill there are provisions for search and seizure without a warrant and there are provisions creating and defining crimes. All of us—whether citizen or alien—would be subject to these provisions.

For instance, section 287 (a) of the McCarran bill, for the first time in the law, would allow any immigration officer to interrogate any person whom he believes to be an alien, as to his right to remain in the United States. Existing law and the Humphrey-Lehman bill limit to aliens this right of interrogation without warrant.

Organization after organization protested this provision to the Senate Judiciary Committee. The National Catholic Welfare Conference said:

This control, carried to excess, might well develop in our alien population a fear somewhat similar to that associated with the surprise visits of agents in totalitarian countries. It is a well-known fact that local agents of the Immigration Service sometimes become overzealous in carrying out regulations and instructions of their superior officers (hearings, p. 737).

The conference recommended that the section be changed so that it would be limited to aliens only and, as to aliens, only to those whom the officer has reason to believe have no right to be in the United States or have violated the immigration laws. The National Catholic Welfare Conference concluded by saying:

Certainly no officers should be permitted to enter the abode of an alien without being equipped with a warrant (hearings, p. 737).

Another witness, appearing on behalf of 36 Jewish organizations, said as follows:

Under this law any person suspected of being an alien may be visited at any hour of the day or night for questioning (hearings, p. 581).

Citizens have a constitutional right, under the fourth amendment, to be secure in their persons. It does not matter to me or to any other citizen that some immigration officer believes that I am an alien. If I am a citizen, I am entitled under the Constitution not to be interrogated without a warrant. The principle that any person may be interrogated by a Government official at any time and at any place prevails only in police states and in this McCarran bill.

The same section, section 287 (a) (3), allows any immigration officer to search any car within a reasonable distance of the Canadian or Mexican borders on the Atlantic or Pacific Oceans. There is no requirement of probable cause for the search. This is the existing law, and I believe it to be plainly unconstitutional. Under such a law, every city on our seacoasts, every city on our land borders, every person in a car near the borders of this country, loses the protection of the fourth amendment. Under the Constitution there must be probable cause for any search without a warrant. The McCarran bill requires none. On the other hand, the Humphrey-Lehman bill requires that there be reasonable ground for believing that an alien is in the car and is attempting to enter the United States unlawfully.

Last of all, I should like to tell you, Mr. President, of the crimes which may be committed by any citizen unknowingly and innocently under this bill, and for which the citizen may be punished by a $2,000 fine and 5 years in jail. Public Law No. 283 of this Congress, which became law on March 20, 1952, provides that any person is guilty of a felony if he "willfully or knowingly" conceals, harbors or shields from detection an alien who is unlawfully in the United States.

Section 274 (b) (2) of the McCarran bill strikes from the law the words "willfully and knowingly." Under the McCarran bill, any person who "harbors" an alien who entered without a visa or who overstayed a temporary visit is guilty of a felony, and may be punished by a fine of $2,000 and imprisonment for 5 years, although he was entirely ignorant of the fact that the alien was here illegally. Mere employment and the furnishing of housing might be construed as harboring. The rancher and the farmer who house and feed their alien farmhands, even the housewife who gives lodging to her maid, all may be guilty of harboring. I need not remind this body—which so recently debated the wetback bill—of the significance of such a change in the law as the McCarran bill attempts to make.

I have spoken of many provisions of the McCarran bill—provisions limiting the rights of citizens, making it impossible for the alien to be naturalized, making it easy to denaturalize the alien who has succeeded in becoming naturalized, making it criminal to harbor an alien. Those provisions follow a consistent pattern. I believe they follow from the premise of the McCarran bill. I believe that the premise of the McCarran bill is a fanatical bias against aliens and a belief that no matter what the cost to our self-respect and to the loyalty of the foreign born, no matter what the Constitution provides, no matter how many innocent persons may be hurt—no matter all this—the aliens and the foreign born must be limited and restricted and feared and suspected of evil intentions toward the United States.

I affirm to the contrary. I believe that the foreign-born and the naturalized citizens and the native-born citizens who travel abroad are not objects of suspicion and are not evil. They must be treated with the warmth and openness and decency that they deserve. Some of them, of course, may become public enemies, just as some of our citizens are criminals and enemies of this Government, and we must fight them constantly. But even against them, we cannot use tactics forbidden by the Constitution. Even against Communists, we cannot use the totalitarian techniques of the Communist police state; and we must guard always against harming the innocent, in our zeal against the guilty. Otherwise, we surrender the very principles of democracy which distinguish us from the Communist state.

Let us be done with imaginary fears of foreigners and foreign places. Our immigrants and their children have made incalculable contributions to our country, and they can continue to make such contributions. We can be strong if we continue to rely upon them. We shall become weak if we hedge them about with restrictions based on distrust and hatred.

Mr. President, a great many provisions of the McCarran bill would, in my judgment, unduly expand the executive powers of the Federal Government.

The McCarran omnibus immigration bill would delegate to the Executive large new powers in the field of immigration, deportation, naturalization, and denaturalization, and would correspondingly remove congressional and judicial restraints upon executive power in four ways:

First. By delegating to the President law-making powers now vested in Congress;

Second. By substituting subjective standards—the opinion or satisfaction of some official—for objective standards

of fact in establishing the tests of exclusion or deportation, thus eliminating effective judicial review;

Third. By expanding the scope of Immigration and Naturalization Service investigations in naturalization and denaturalization cases; and

Fourth. By removing traditional checks upon various executive proceedings, such as notice, the requirement of actual hearing, judicial review, statutes of limitation, rules against retroactivity, and the traditional doctrine of equality of right as between naturalized and native-born citizens.

My amendment, which now is pending, has been offered in an endeavor to prevent, at least in part, such results.

## I. PRESIDENTIAL POWER

Section 212 (e) of the McCarran omnibus immigration bill authorizes the President to set up new restrictions or absolute bars upon new immigration, in his plenary discretion, without any legislative or judicial guidance, establishing this power for peacetime, as extensively as such power has been established for wartime under earlier legislation. Among the organizations protesting this extension of Executive power are: Americans for Democratic Action; the Young Women's Christian Association; and the Common Council for American Unity.

## II. SUBSTITUTION OF SUBJECTIVE STANDARDS FOR OBJECTIVE STANDARDS

Section 241 (a) (4) authorizes, for the first time, deportation for any criminal offense, including any misdemeanor, not involving moral turpitude "if the Attorney General in his discretion concludes that the alien is an undesirable resident of the United States." No further guidance is given to the Attorney General as to standards of desirability or undesirability for residents of the United States. This provision confers absolute and unfettered discretion upon the Attorney General, or any subordinate officer acting in his behalf, to deport any individual alien who may incur the displeasure of an administrative official if the individual has been convicted of any offense, no matter how trivial. The minority views on Senate bill 2550 comment as follows:

No standard is invoked to control the personal predilections of the Attorney General. The absence of such limitations upon official decisions virtually eliminates judicial review of administrative abuse.

Section 241 (a) (8) shifts the ground for deportation of public charges from the objective test of whether a person actually is a public charge to the subjective test of whether he is a public charge, in the opinion of the Attorney General. Under existing law, the courts may review the question of whether a person is actually a public charge; and several courts have done so, and have set aside arbitrary rulings by the Attorney General or his subordinates. Under the new test, no court could do this; all it could inquire into would be whether the Attorney General honestly believed the person to be a public charge. If the court found that he had such an honest belief, it could not upset the Attorney General's action. This provision would shift the court's view from a question of

economics to a question of judicial psychology.

Similarly, section 241 (c) shifts the test of the good faith of a marital agreement and its performance from objective grounds to subjective grounds, by introducing into the law the phrases, the satisfaction of the Attorney General and the opinion of the Attorney General.

Exclusion, as well as deportation, would be made to depend upon subjective grounds in many cases. For example, section 212 (a) (15), in place of the language of existing law which bars persons likely to become a public charge, prohibits the entry of aliens who, in the opinion of the consular officer at the time of application for a visa, or in the opinion of the Attorney General at the time of application for admission, are likely at any time to become public charges. This means that the naked prediction by a State Department official or a Justice Department official concerning the future economic status of any immigrant will be sufficient to bar that immigrant from admission. So long as such a prediction is not fraudulent, a court would have no way to upset the bar. This would, in effect, eliminate judicial review in exclusion cases, overruling the Supreme Court's decision in the case of *Gegiow* v. *Uhl* (239 U. S. 3).

## III. EXPANDING THE SCOPE OF INVESTIGATIONS

Then, too Mr. President, the bill contains a provision which, in my judgment, would unduly expand the scope of investigations.

Under existing law, the proof of good character, which is a prerequisite to the grant of citizenship, is limited to the 5 years prior to filing the petition of naturalization. This limitation is expressly repealed by section 316 (e) of the McCarran omnibus bill. What this would mean in practice is that the entire life of every applicant for naturalization would be opened up to inquiry by the Immigration and Naturalization Service of the Department of Justice. Since evidence of the morality or immorality of a man's conduct becomes more difficult to secure the farther back one goes into his life's history, the practical effect of this change would be to vastly enlarge the task of the Immigration and Naturalization Service in naturalization cases, and by the same token, to make necessary a vast enlargement of the personnel of that Service, with consequent increases in salaries and appropriations.

## IV. REMOVING TRADITIONAL CHECKS ON EXECUTIVE POLICE POWER

One of the most ancient of safeguards against administrative abuse is the requirement of actual notice to a party against whom an administrative penalty is to be imposed. This requirement of actual notice is eliminated by section 340 (b) in cases where a naturalized citizen is not found in the judicial district of his residence; and the most terrible of all penalties, namely, denaturalization, is authorized by this section on the basis of notice "by publication." Earlier in my remarks I have made some reference to this point. Likewise, the requirement of notice is eliminated where the Attorney General wants to cancel any "certificate of citizenship, certificate

of naturalization, copy of a declaration of intention, or other certificates, documents, or record heretofore issued or made, if it shall appear to the Attorney General's satisfaction that such document or record was illegally or fraudulently obtained from, or was created through illegality or by fraud"—section 342.

Sections 242 (f) and 252 eliminate the requirements of hearings in various cases where hearings are required under existing law and even under the Subversive Activities Control Act of 1950.

Judicial review of deportation proceedings is limited by section 242 (a) to issues triable in habeas corpus proceedings, and even in those proceedings the court is limited to giving relief only in cases where "the Attorney General is not proceeding with such reasonable dispatch as may be warranted." Judicial review is further limited by section 360, which applies to native-born as well as to naturalized citizens. Under this section, if any official of the Federal Government hands down a decision denying the citizenship of an American citizen, and if the citizen in question does not challenge the decision within 5 years, he cannot thereafter establish his citizenship in any court, even though he has lived all his life in the United States. The same section denies certain American citizens abroad the access to the Federal courts in this country which they have under existing law for the purpose of contesting an administrative denial of citizenship. The American Bar Association, the Association of Immigration and Nationality Lawyers, and the National Council on Naturalization and Citizenship have all vigorously protested against this subordination of the most precious right of American citizenship to the convenience of administrative officials.

Section 241 of Senate bill 2550 abolishes statutes of limitations in deportation cases, even where the grounds of deportation are minor or trivial. This has been the subject of special criticism by the National Catholic Welfare Conference, the Association of Immigration and Nationality Lawyers, and many other organizations.

Section 241 (a) (7) and section 241 (d) make new grounds of deportation retroactive, so that aliens lawfully admitted to the United States and who scrupulously have obeyed every law and regulation applicable to them, may nevertheless be deported for acts which were lawful when they occurred.

Until now, the investigative activities of the Immigration and Naturalization Service have been limited to investigations into the lives of aliens. Only in the case of actual fraud in naturalization proceedings has the Immigration and Naturalization Service had authority to investigate the lives of naturalized citizens. Under section 340 all naturalized citizens are made subject to denaturalization, even where no fraud or illegality can be shown in the naturalization proceedings. This section makes concealment of a material fact a sufficient basis for denaturalization, and thus opens up the entire life of every naturalized citizen to investigation for the

purpose of determining whether any material fact undisclosed at the naturalization proceedings might be sufficient, under the greatly expanded standards of exclusion or deportation which this bill would establish, to authorize a denial of naturalization and, therefore, a withdrawal of citizenship already conferred.

The total effect of the foregoing provisions is to subject several million American voters to the possibility that they, or members of their families, or employees or business associates, may be deprived of rights of citizenship and may be deported, after denaturalization, on grounds which would not be effectively reviewable by any court. This is a threat not only to those who may be denaturalized and deported, but also to the integrity of the democratic process itself, insofar as the caliber of those who serve the American public might be affected by the existence of a substantial bloc of voters whose political independence would be circumscribed by unreviewable executive powers of life and death.

Mr. President, in my discussion of my amendment I have covered a considerable number of topics within the McCarran omnibus bill, over and above those covered by the pending amendment. Yet a single thread runs all through this discussion—and does so clearly, I hope—namely, that all persons who come within the purview of the American system of justice should be guaranteed, as my amendment seeks to do, the protection of the guaranties which have been provided in the Administrative Procedure Act. I respectfully submit that the McCarran omnibus bill in its present form, for the reasons I have set forth in the course of my remarks, would do violence to the guaranties of the Administrative Procedure Act.

Therefore, Mr. President, I sincerely hope the amendment I have offered will be adopted as at least a partial remedy for what I consider to be serious defects in the McCarran bill.

The PRESIDING OFFICER (Mr. HOLLAND in the chair). The Senator from Oregon has 9 minutes remaining.

Mr. McCARRAN. Mr. President, the particular evil of the amendment offered by the Senator from Oregon lies in the fact that it upsets a principle of law which has been unchallenged by any nation within the memory of man.

The amendment would accomplish this by granting a right of review to "every person aggrieved by an adverse order in exclusion" proceedings.

The grant of a right of review implies that there is a basic, justiciable, underlying right to be litigated. But, Mr. President, no alien has ever had a right to enter the United States. No alien to any country has ever had a right to enter that country. No country on earth today gives non-nationals any legal, moral, or equitable right, any justiciable right at all, to cross its borders as immigrants. But this amendment would have the United States grant such a right, by necessary implication of the language of the amendment with respect to review of exclusion proceedings, to any and every person anywhere in the world who may at any time in the future

desire to come to the United States as an immigrant.

From time immemorial, a sovereign nation has had the absolute right to admit or exclude aliens. If we take the step of waiving that right for this Nation, the next step is likely to be a demand that the adjudication of the alleged right of an alien to come to the United States be vested in an international tribunal set up by the United Nations.

This amendment has technical defects, Mr. President, which I shall not take up the time of the Senate to mention, since I feel sure the amendment will be defeated. For instance, the amendment provides that special inquiry officers shall "have the powers and duties and limitations prescribed by sections 5, 6, 7, 8, and 11 of the Administrative Procedure Act." But not all these sections deal with powers and duties of hearing officers, nor with limitations upon such officers. We need not go into that. To adopt this amendment would be to overturn, to the detriment of the United States, one of the basic principles of international law and national sovereignty. I urge that the amendment be defeated.

Mr. MORSE. Mr. President, my reply to the argument of the Senator from Nevada will be very brief. I respectfully submit that the argument of the Senator from Nevada is based upon the false assumption that Mr. Johnson, in the hypothetical case I have used throughout my argument was an alien, a question of fact to be determined. If in fact he happened to be an American citizen, then I say it would be most unfair to deny to him the legal safeguards which I seek to guarantee to him under my amendment, and which I thought we were guaranteeing when we passed the Administrative Procedure Act.

To the contrary, Mr. President, if we passed the McCarran bill, we should be assuming in the first instance the very question of fact to be proved, and we would deny to him the right to a review of the decision of the administrative officer by a court. Indeed, we would make the administrative determination of that officer final as to Mr. Johnson, who, as might be shown in a hearing before a court, in fact was an American citizen.

I certainly cannot go along with my good friend from Nevada in assuming that the individual in question is an alien, when the issue we are trying to determine in a specific case is the question of fact as to whether he is an alien or a citizen. If in fact he is a citizen, he certainly ought to be guaranteed the kind of procedural right which I am trying to protect, and which I thought we were trying to observe when we adopted the Administrative Procedure Act, at which time the majority in the Senate took the position that an administrative officer should not be allowed to be judge and prosecutor and jury, all in one.

The PRESIDING OFFICER. The question is on agreeing to the amendment offered by the Senator from Oregon [Mr. MORSE].

The amendment was rejected.

The PRESIDING OFFICER. The bill is open to further amendment.

Mr. SMITH of New Jersey. Mr. President, I should like to address a question to the Senator from Nevada, if I may, with regard to his construction of a provision which appears in the pending bill. Section 212 (a), found on page 49, provides:

Except as otherwise provided in this act, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States—

A list of classifications follows, in which the following appears on page 54 of the bill:

(19) Any alien who seeks to procure, or has sought to procure, or has procured a visa or other documentation, or seeks to enter the United States, by fraud, or by willfully misrepresenting a material fact.

I should like to ask the Senator from Nevada whether he would consider from the legislative record that the words "willfully misrepresenting a material fact"—

The PRESIDING OFFICER. If the Senator from New Jersey will suspend for a moment, the Chair is informed by the Parliamentarian that there is no amendment pending.

Mr. SMITH of New Jersey. I am seeking an interpretation. In the event the interpretation is not satisfactory, I propose to submit an amendment to cover the point I have in mind.

Mr. McCARRAN. Mr. President, if I have any time, I yield to the Senator from New Jersey.

The PRESIDING OFFICER. The amendment of the Senator from Oregon has been disposed of.

Mr. McCARRAN. Very well. I yield to the Senator from New Jersey, if I have any time.

The PRESIDING OFFICER. No Senator now has any time.

Mr. McCARRAN. Since there is no amendment pending, I shall submit a unanimous-consent request.

Mr. SMITH of New Jersey. Mr. President, I should be willing to submit an amendment, in order that we might discuss this subject.

Mr. McCARRAN. Mr. President, I ask unanimous consent that the Senator from New Jersey be permitted to interrogate the chairman of the Judiciary Committee.

The PRESIDING OFFICER. Without objection, it is so ordered.

Mr. SMITH of New Jersey. Mr. President, I have read to the Senator from Nevada a provision, in connection with which I desire to raise a question of interpretation. My question arises from the fact that I have had called to my attention by some friends of mine in Princeton, N. J., where I live, the case of a Russian by the name of Rodion Michael Akulshin, who came into this country through fear of persecution. For fear of being repatriated, he misrepresented his name. He gave his name as Rodion Michael Beresov, and said he was born in Poland.

He has been in this country for some time, and has worked in California where

he did odd jobs and wrote for an anti-Communist newspaper in San Francisco. He is a man who is very much opposed to the whole Russian situation. He voluntarily admitted that his birthplace was Russia, and that his name was Akulshin instead of Beresov. He was immediately arrested in San Francisco on a charge of having entered the United States fraudulently. He appealed, lost the appeal, and was released on $500 bond with orders to leave the country. I immediately introduced a private bill, which will presently be before the committee of which the distinguished Senator from Nevada is chairman. The bill was introduced for the purpose of dealing with this matter as a special case, and of setting forth the actual facts.

I am now advised that, even if this language could be construed to cover a case like this, yet under the circumstances of the case the man should not be deported, despite the words "wilfully misrepresenting a material fact," because he fled from persecution and wanted to avoid repatriation.

I ask the Senator if he can give me a ruling on that question for the RECORD, so that we can know just what the situation will be under the proposed new law as the Senator has presented it.

Mr. McCARRAN. The word "wilfully" implies freedom to act under free will. Where duress is used in any form, free will does not operate. The man to whom the Senator has referred was evidently afraid for his life, afraid that if he were repatriated and he assumed his correct name he would lose his life, and therefore he was acting under duress. Therefore he is free from the restrictions to which the Senator has referred. But I want the Senator to understand that we do not want to open the gates for fraud in any way.

Mr. SMITH of New Jersey. I agree with that, of course.

Mr. McCARRAN. But the case cited by the Senator from New Jersey seems to me to be entirely free from fraud, because when a man holds a gun to another person's head and says something to him, under that kind of duress that person is not acting with a free will.

Mr. SMITH of New Jersey. This specific case will come to the Senator's committee and the committee will deal with it. There are other cases of a similar nature, and I assume the legislative history will be that willful misrepresentation will not apply in the kind of a case which I have cited.

Mr. McCARRAN. That is the interpretation I believe would apply under the bill.

Mr. SMITH of New Jersey. Mr. President, I ask permission to have printed in the RECORD, in connection with my remarks, an article from the Newark (N. J.) Sunday News dated May 18, 1952.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

WOULD AID ANTI-RED DP's—SMITH ASKS CONGRESS TO HELP THOSE WHO FALSIFIED NAMES TO AVOID FORCED RETURN TO RUSSIA

WASHINGTON.—Senator SMITH, Republican, of New Jersey, wants Congress to do something to relieve many anti-Communist refugees from the Soviet Union in this country

who are suffering from what's called "Beresov's disease."

SMITH has already initiated a cure in one case called to his attention by Gregory P. Tschebotarioff of 21 Wescott Road, Princeton. This he did through introduction of a private bill to take care of Rodion Michael Akulshin who preferred to take his chances on entering the United States under a false name rather than be forcibly repatriated to his native Russia.

There are thousands of refugees here under similar circumstances, SMITH said, and only Congress can ease their ailment. "Legalization of the entries of DP's whose only 'crimes' were to falsify their backgrounds in an effort to save their lives should be accomplished not only in fairness to them but to protect the moral prestige of the United States," the Senator said.

SAME AS KOREAN PROBLEM

It is the same problem of forcible repatriation that has stalled the Korean truce talks at Panmunjom. Today, the United States has set its face against it, but back in 1943 at the Yalta Conference, the United States and Great Britain agreed to repatriate by force, if necessary, DP's born in what is now the Soviet Union. This policy was carried out with decreasing strictness until 1946 and, in a few cases, 1947, despite numerous suicides by DP's for whom return to the Soviet Union would have meant regimentation, imprisonment or death.

To escape such fates, many anti-Communist DP's, born in the U. S. S. R., concealed their identities by using false names or indicating they were born in areas near Russia such as Poland or the Baltic states. Many of them came to the United States. Such a man is Akulshin, an anti-Communist writer. He entered the United States under the alias of Rodion Michael Beresov and said he was born in Poland.

Akulshin went to San Francisco where he has been doing odd jobs and writing for a conservative Russian language newspaper. One day he voluntarily admitted that his birthplace was Russia. Soon after, he was arrested in San Francisco on charges of entering the United States fraudulently. He appealed, lost, and was released on $500 bail with orders to leave the country.

Meanwhile, Tschebotarioff had become interested in Akulshin's case. Two years ago, Akulshin appealed in the New York anti-Soviet Russian language paper, Novoye Russkoye Slovo, for an advance of $300 to enable him to publish a booklet of nonpolitical Russian folk ballads which he had collected in various Russian villages but which he had been unable to publish there because they did not fit the party line.

Tschebotarioff read the appeal and sent Akulshin a check. A few months later he received several copies of the booklet and liked the ballads so much he gave a copy to the Princeton University library.

Learning of Akulshin's arrest in a Russian language paper, Tschebotarioff wrote SMITH. The Senator investigated the case. At the time, the House had passed the Walter bill which provides for legalizing the entries into the United States of people like Akulshin. In the Senate, however, new immigration legislation appeared unlikely to pass before the deadline of Akulshin's departure.

Because of this, SMITH introduced his "private bill" to legalize Akulshin's entry. Akulshin's case, meanwhile, had become so celebrated in the Russian-American press that those newspapers used his alias in coining the phrase "Berezovskaya Bolyezn" or "Beresov's disease" to describe the predicament in which many such DP's find themselves.

The PRESIDING OFFICER. Has the Senator from Minnesota any other amendment to offer?

Mr. HUMPHREY. Mr. President, there are a number of amendments on the desk, but it is not my intention to call up any further amendments. I think it is perfectly obvious that they will not be agreed to unless we have the concurrence of the Judiciary Committee, and there seems to be a difference of opinion.

We have tried to argue the question of immigration legislation with vigor, with knowledge of the facts, and with intelligence.

The Senator from Rhode Island [Mr. PASTORE], who is at present presiding, knows that it is our hope that the bill will be given the most careful scrutiny after the debate to see what has been done. It is our further hope that the bill will not become law.

Mr. President, I ask unanimous consent to have a number of telegrams, letters, and resolutions inserted in the body of the RECORD, including a letter from the American Psychological Association, Inc., to which is attached a news release which makes clear the effect of the McCarran bill on the free interchange of scientific information.

There is one telegram which I should like to read, because it comes from a long time friend who has been an adviser to me since I have been a Member of the Senate. It is from a great spiritual leader, one who has dedicated a lifetime to service in behalf of underprivileged persons, especially in rural areas. It comes from Monsignor Ligutti, formerly of Des Moines, Iowa, a leading cleric in the Catholic world. Here is what he has to say:

Continue your fight in order to make our immigration laws more truly American, more democratic, more Christian.

That telegram reached me 3 or 4 days ago, Mr. President, and it has been a source of inspiration to me. I have told the distinguished churchman that I would do my level best to make the bill a better immigration bill and to fight for a more sound immigration policy.

I also wish to point out, since there has been considerable discussion as to who is for what and how various organizations stand with reference to the bill, that I have a letter from the Bureau of Catholic Charities, Inc., dated May 17, 1952, reading, in part, as follows:

I wish to congratulate you on your courageous stand taken with regard to the restrictive McCarran immigration bill. As one who has assisted with the resettlement of almost 600 displaced persons, I feel qualified to say that they prove to be an excellent risk.

I ask unanimous consent that all these documents may be printed in the body of the RECORD at this point.

There being no objection, the documents were ordered to be printed in the RECORD, as follows:

NEW YORK, N. Y., *May 18, 1952.*
Senator HUBERT HUMPHREY,
*Senate Office Building,*
*Washington, D. C.:*

Continue your fight in order to make our immigration laws more truly American, more democratic, more Christian.

Monsignor LIGUTTI.

DENVER, COLO., *May 18, 1952.*
Senator HUBERT H. HUMPHREY,
*Senate Office Building,*
*Washington, D. C.:*

We urge support of Humphrey-Lehman S. 2842. Opposed to McCarran bill S. 2550, which endangers reputation of this country. Allows for discrimination and places undue power in hands of subordinate immigration officials. Rather no legislation than passage of McCarran bill.

PUBLIC AFFAIRS COMMITTEE,
UNITARIAN CHURCH.

———

CHICAGO, ILL., *May 20, 1952.*
Senator HUBERT HUMPHREY,
*Senate Office Building,*
*Washington, D. C.:*

Congratulations on your extensive efforts to defeat McCarran-Walter bill. We are convinced that if people knew what these long bills contained, there would be tremendous expressions of public indignation to help you. Your efforts are the only hope of an informed public. Keep up the good work.
ARTHUR CUSHMAN McGIFFERT,
*Chairman, Chicago Division, American Civil Liberties Union.*

———

WOMEN'S INTERNATIONAL LEAGUE
FOR PEACE AND FREEDOM,
UNITED STATES SECTION,
*Washington, D. C., May 16, 1952.*
Hon. HUBERT HUMPHREY,
*United States Senator,*
*Senate Office Building,*
*Washington, D. C.*

DEAR SENATOR HUMPHREY: Some of our members have been listening to the debate the past 4 days on the McCarran bill (S. 2550), and observing the attempt of yourself and Senators LEHMAN, BENTON, McMAHON, and others to get a hearing for the Humphrey-Lehman substitute bill.

We are heartily in accord with your bill and would like to go on record as one of the organizations supporting it. We have already sent out newsletters and special memos to our branches urging them to give priority to the defeat of the McCarran bill.

We trust you will win the battle for a full-length hearing on both S. 2550 and the Humphrey-Lehman substitute bill. If there is anything further our organization can do to help you, we would regard it as a privilege to be called upon.

Sincerely yours,
ANNALEE STEWART,
*(Mrs. Alexander Stewart),*
*Legislative Secretary.*

P. S.—If you are reading the names of more organizations supporting your bill and against the McCarran bill, please include ours.
A. S.

———

WOMEN'S INTERNATIONAL LEAGUE
FOR PEACE AND FREEDOM,
MINNESOTA BRANCH,
*May 15, 1952.*
To Senator EDWARD THYE, with copies to Senator HUBERT HUMPHREY, Senate Majority Leader ERNEST McFARLAND, and Senator PAT McCARRAN:
Re immigration bills pending in Senate.

The Minnesota Branch of the Women's International League for Peace and Freedom, meeting May 13, 1952, at the YWCA in Minneapolis, Minn., urges support of the Humphrey-Lehman immigration bill (S. 2842). We believe that immigration bills should be designed to admit immigrants, not restrict or discriminate against them. In meeting these requirements, the Humphrey-Lehman bill would (1) modernize the quota system by basing quotas on 1950 census; (2) provide more flexibility in the operation of the quota system by allowing for the "pooling" of unused quotas; (3) provide protection against administrative abuse; (4) establish a Visa Review Board to consider appeals from arbitrary consular decisions; (5) cancel the debts placed on quotas by the Displaced Persons Act of 1948.

Among the determining factors in our support of the Humphrey-Lehman bill is the basic assumption that world recovery and friendship depends to a great extent on the free interchange of people as well as materials. Europe, for instance, is faced with the tense problem of too many people in too little space. Until problems of this nature are solved, we cannot expect any improvement in the attitudes of these countries toward the United States. The United States is much more fortunate in regard to population distribution and can more easily accommodate immigrants, including refugees or displaced persons.

It is precisely for the above reason that we denounce the McCarran immigration bill—because of its harmful effects to the friendship with other nations which is the basic foundation of strength. Similarly, we believe that the McCarran Internal Security Act should be repealed—a passport should not be denied solely on the basis of membership in an organization.

Sincerely,
(Mrs.) ANNE P. GRAVES.

———

BUREAU OF CATHOLIC CHARITIES, INC.,
*Duluth, Minn., May 17, 1952.*
Senator HUBERT HUMPHREY,
*Senate Office Building,*
*Washington, D. C.*

HONORABLE AND DEAR SENATOR HUMPHREY: I wish to congratulate you on your courageous stand taken with regard to the restrictive McCarran immigration bill. As one who has assisted with the resettlement of almost 600 displaced persons, I feel qualified to say that they prove to be an excellent risk. Miss Bessie Arnevich, executive secretary, Jewish Social Service Agency, Duluth, has also assisted with the resettlement of quite a number of displaced persons. She joins me in extending to you congratulations.

I could wish that for the sake of America's reputation in Europe and in the free countries of the world we could legislate the admission of the token 300,000 refugees requested by President Truman. That certainly would not cause us any economic indigestion. As people who have tasted the bitter fruit of communism, they would be a healthy shot in the arm for us Americans.

Very sincerely yours,
BUREAU OF CATHOLIC CHARITIES, INC.,
By (Rev.) WILLIAM D. LARKIN, *Director.*

———

LUN YEE ASSOCIATION,
*New York, N. Y., May 8, 1952.*
Senator HUBERT H. HUMPHREY,
*Senate Office Building,*
*Washington, D. C.*

DEAR SENATOR: We are writing to you with reference to the McCarran bill (S. 2550) which we understand will reach the floor of the Senate for final action within the next few days.

We urge you to speak and vote against this bill and to support the Humphrey-Lehman bill (S. 2842).

While the former bill on its face has some liberal features such as the removal of racial bars to the immigration of Asiatics, it continues the untenable theory that ancestry and not place of birth should decide the quota under which any person as much as 50 percent oriental in blood regardless of where he may have been born, shall be chargeable to the oriental country of his ancestry.

We, as persons who are loyal to the United States and believe in the American form of government, think that the United States Government will lose friends in Asia and make it easier for communism to push its way to the forefront in that continent, if the McCarran bill becomes the law.

The United States was built by immigrants who entered this country from various countries throughout the world. We are now a great Nation because of our very liberal, intelligent, and humane attitude toward aliens.

The proposed McCarran bill is, in our opinion, a step backward, reflecting a spirit of exclusion, restriction, and isolation, and is certainly inconsistent with the present theory of our Government as a world power, and our activities as one of the leading countries in the United Nations.

On the other hand, the Humphrey-Lehman bill is a step forward toward solidifying our friendship with the other nations of the world. It would definitely strengthen our foreign policy and would bring the United States to its rightful place in the forefront as a liberal and progressive country.

This organization has taken a poll of its members, and after a full consideration of the facts, we have come to the conclusion that the Humphrey-Lehman bill is much more desirable than the McCarran bill. We ask that you vote against the latter bill.

Would you be good enough, if you have the time, to write and inform us as to your reaction in this matter.

Respectfully yours,
LUN YEE ASSOCIATION,
By CHAN PAK, *President.*

———

NATIONAL CHINESE
SEAMEN'S UNION, INC.,
*New York, N. Y., May 8, 1952.*
Senator HUBERT H. HUMPHREY,
*Senate Office Building,*
*Washington, D. C.*

DEAR SENATOR: At the request and at the direction of the members of our organization, I am writing to you with reference to the McCarran bill (S. 2550), which I understand will radically change the present immigration laws.

This organization consists of many men who are citizens of the United States, all of Chinese ancestry. We are vitally interested in the immigration problems relating to orientals, as well as to those of every race, color, or creed throughout the world.

We have studied the McCarran bill and compared it with the Humphrey-Lehman bill (S. 2842). It is our considered opinion that if the McCarran bill is passed, and if it becomes the law of the land, it would be a definite step backward in the progressive march of the United States as the great leader of all the nations in the world.

We must eliminate racial bars and discriminations. Although the McCarran bill makes some little effort in that direction, it continues the racial theory that ancestry and not place of birth, as far as it relates to persons of oriental blood, shall determine under which quota he is to be charged. Only orientals are so discriminated against. The bill is completely restrictive in nature and tends to unfairly exclude many persons from the United States and cause persons to be deported in violation of every fair tradition in the United States.

Please remember that some 7,000 persons of Chinese ancestry gave their lives to the allied cause while serving on allied merchant vessels during the past war.

We consider ourselves to be loyal, decent people, and object to being treated as an inferior race.

The Humphrey-Lehman bill, on the other hand, is a step forward in the march of progress toward the liberalization of our laws and toward democracy.

I earnestly ask that you vigorously oppose Senator McCARRAN's bill and that you lend every effort toward the passage of the Humphrey-Lehman bill. This organization

**5792**　　　　　　CONGRESSIONAL RECORD — SENATE　　　　　　*May 22*

will be pleased to hear from you with reference to this matter and will make your views known at our next meeting.

Respectfully yours,

NATIONAL CHINESE SEAMEN'S UNION, INC.,

By HENRY T. CHAN, *Executive Secretary.*

CONGRESS OF INDUSTRIAL ORGANIZATIONS,

*Washington, D. C., May 14, 1952.*

DEAR SENATOR: The CIO is greatly concerned over the present move in Congress to force precipitate action on the so-called McCarran-Walter omnibus immigration bill. We are writing to urge you to call upon your colleagues to exercise moderation and wisdom in this matter, which has far-sweeping implications affecting the welfare and happiness of millions of citizens and future citizens as well as the foreign relations of the United States.

S. 2550 and its companion H. R. 5678 which has already been passed by the House after less than 3 days of extremely limited debate, under the pretense of codifying existing statutes would actually make drastic revisions in United States immigration, naturalization, and nationality laws. The McCarran bill proposes more than 100 such changes, nearly all of which have been described by competent immigration authorities as regressive and undermining fundamental democratic principles.

In these crucial times when the attitudes of this Nation toward persons of foreign birth take on new significance in view of their implications and effects in the cold war, the responsibility of Congress, and particularly of the Senate, to exercise caution and judgment in its action on immigration and naturalization matters is obvious.

Nevertheless, sponsors of the McCarran-Walter bill have attempted to rush this new legislation through Congress without adequate hearings or proper study of its effects and implications. For example, the CIO, which has a deep interest in immigration matters, has been denied an opportunity to express its views to the drafting committees of either House. Although we specifically requested time for this purpose from the joint committee a year ago, our organization was not permitted to be heard because of curtailed hearings.

We are informed, moreover, that the Senate Judiciary Committee reported the bill out without waiting for important comment from the Department of Justice on some of its proposed changes. It also took this action in full knowledge that another omnibus bill was being drafted after months of study by Senators HUMPHREY, LEHMAN and a number of other Senators and would be reported in the near future. Four members of the Senate Judiciary Committee itself have warned that S. 2550 contains unprecedented new restrictions running counter to our democratic traditions of justice and equity.

The CIO objects strongly to provisions of the McCarran-Walter bill which perpetuate racial discrimination, create many unreasonable and unnecessary new grounds for exclusion, deportation and loss of citizenship, and emasculate judicial review while authorizing arbitrary administrative practices.

These are, however, only a few of the many provisions of S. 2550 which we are anxious to have an opportunity to criticize in detail. Considering the widespread opposition to the McCarran-Walter bill which has been expressed by many organizations, including such authorities on this particular matter as the American Bar Association and the Association of Immigration and Nationality Lawyers, it seems obvious that this legislation should receive far more careful and informed consideration than it has yet been accorded.

At the same time, the Lehman-Humphrey Omnibus Immigration bill which has had no consideration with the Senate Judiciary Committee since it was introduced some time ago also deserves a hearing before precipitate action is taken. We strongly urge, therefore, that S. 2550 be referred back to the Senate Judiciary Committee for much needed adequate hearings on both it and the much more constructive substitute proposal.

Sincerely yours,

NATHAN E. COWAN,

*Director, CIO Legislative Department.*

THE FEDERATION OF CHURCHES OF ROCHESTER AND VICINITY, INC.,

*Rochester, N. Y.*

DEAR SENATOR HUMPHREY: I am grateful for your leadership and strategy on immigration. The McCarran bill would be disastrous. There is great support for what you seek to do—most of it at the moment latent but we can develop it.

Faithfully yours,

HUGH CHAMBERLIN BURR.

AMERICAN PSYCHOLOGICAL ASSOCIATION, INC.,

*Washington, D. C., May 20, 1952.*

The Honorable HUBERT H. HUMPHREY,

*Senate Office Building,*

*Washington, D. C.*

DEAR SENATOR HUMPHREY: In view of your opposition to the McCarran immigration bill I think you will be interested in the enclosed press release which illustrates the unfortunate effect of the internal security (McCarran) law on the free interchange of scientific information.

I should also like to call your attention to an editorial in this morning's Washington Post entitled "Visaphobia."

Sincerely yours,

FILLMORE H. SANFORD,

*Executive Secretary.*

FOREIGN PSYCHOLOGISTS TO MEET IN CANADA

Dr. J. McVicker Hunt, president of the American Psychological Association, announced today that the International Congress of Psychology will hold its 1954 meeting in Montreal, Canada. The American Psychological Association will join with the Canadian Psychological Association in being hosts to the 600 or more foreign scientists who will meet with Canadian and American psychologists.

The American Psychological Association had hoped to invite the Canadian group and the International Congress of Psychology to meet in New York City where the American psychologists have scheduled their own 1954 meeting. Because of the delays and embarrassments which foreign scientists experience in attempting to obtain even temporary admission to this country the association decided it could not issue the invitation.

Under the provisions of the internal security (McCarran) law any foreign person, scientist or otherwise, who wishes to enter this country must go through a long, intricate application. And practically no one who has ever had any connection with a group now regarded as subversive or totalitarian can get permission to enter the United States even for a brief visit.

Many American scientists, though in favor of reasonable and necessary security restrictions, strongly object to the law on the basis that it seriously interferes with the exchange of scientific facts and ideas.

Since Canadian procedures for granting visas appear to many scientists more flexible and realistic than those imposed by the McCarran law, the American Psychological Association has given up its hope for a New York meeting and has agreed to an earlier

suggestion from the Canadian Psychological Association that Canadian and American psychologists jointly sponsor a Montreal meeting. About 2,000 Canadian, American, and foreign psychologists can be expected to attend the 1954 congress in Canada's foremost convention city.

A number of scientific societies and many prominent individual scientists in this country have urged changes in the internal security law, which they indicate has had the effect of limiting the free interchange of scientific information, so necessary to scientific progress, by refusing visas to many distinguished scientists from abroad, or by making their entry so difficult and complicated that many of them are deterred from visiting the United States.

The board of directors of the American Psychological Association has recently voted to express its concurrence with a resolution adopted in Philadelphia last December by the council of the American Association for the Advancement of Science. The AAAS resolution, while recognizing the need for security safeguards, expressed troubled concern over the manner in which such measures as the McCarran Act are being administered, prohibiting American scientists from going abroad and foreign scientists from coming here to exchange knowledge which does not affect security. The resolution urged changes in the law and in its administration which, while retaining the objectives of necessary security, would minimize injustices and provide for maintenance of free interchange of all knowledge that has no security implications.

Dr. Fillmore H. Sanford, executive secretary of the American Psychological Association, commenting on the decision to invite the foreign psychologists to meet in Canada, said:

"I hope many American psychologists will be glad to travel the few hundred extra miles to Montreal. There they may find facts and ideas that they can use in their effort to advance the science of human behavior.

"I think what scientists object to most in the McCarran law is the fact that it uses an ax in dealing with a problem that needs a razor-sharp approach. The law causes trouble to all foreign scientists who are invited to this country. In effect it prevents a visit from any scientist, however brilliant his ideas, who has ever had any connection for any reason with any group that now is suspicious. Foreign scientists regard this indiscriminate procedure as both ludicrous and dangerous. American scientists see it as a threat to the healthy growth of American science and as a legalized attack upon freedom of communication.

"American psychologists have learned a tremendous amount in the past from foreign psychologists. The first psychological laboratory was located in Germainy. The first test of intelligence was developed by a French psychologist. Many of our present statistical techniques were first used in England. One of our most challenging clinical theories came from Austria. One of our best clinical tests came from Switzerland.

"Our current visaphobia, unless we can control it, will cut us off from ideas from abroad. In time, psychological science existing behind our paper curtain can become as impotent as psychological science has apparently become behind the iron curtain."

BACKGROUND

The International Congress of Psychology meets every 3 years. The last meeting was in Stockholm, Sweden, July 16–21, 1951. Some 700 psychologists from 31 countries heard 161 scientific papers presented.

The invitation to the International Congress has been accepted by the Executive Committee of the International Union of

Scientific Psychology. Dr. H. S. Langfeld, long-time professor of psychology at Princeton University, is secretary-general of the International Union of Scientific Psychology.

The last meeting on this continent of the International Congress of Psychology was held at Yale University in 1929.

The American Psychological Association counts as members most psychologists in this country. About half of its 10,000 members teach and do research in colleges and universities. The remainder are employed by clinics, hospitals, schools, industries, the military, State and Federal agencies, etc.

The next annual meeting of the association is to be held in Washington, D. C., September 1–6, 1952. Some 5,000 psychologists are expected to attend.

The officers of the American Psychological Association are:

President: J. McV. Hunt, University of Illinois.

President-elect: L. F. Shaffer, Teachers College, Columbia University.

Past president: R. R. Sears, Harvard University.

Recording secretary: Dorothy C. Adkins, University of North Carolina.

Treasurer: C. L. Shartle, Ohio State University.

Executive secretary: F. H. Sanford, Washington, D. C.

The board of directors includes, in addition to the above: E. L. Kelly, University of Michigan; Rensis Likert, University of Michigan; Jean Macfarlane, University of California; A. W. Melton, United States Air Force; O. H. Mowrer, University of Illinois; R. L. Thorndike, Teachers College, Columbia University.

**RESOLUTIONS ADOPTED AT AAAS COUNCIL MEETINGS, PHILADELPHIA, PA., DECEMBER 27–29, 1951**

The Council of the American Association for the Advancement of Science is profoundly disturbed over the present world conditions which so severely impede the free interchange of knowledge even among friendly nations. Danger to the future of our Nation is implicit in such restrictions.

The council recognizes the need for measures which will effectively safeguard our security, but expresses its troubled concern over the manner in which such measures, in particular the McCarran Act, are being administered, to prohibit American citizens from going abroad and citizens of other nations from coming here to interchange knowledge of science which does not affect security.

The council strongly urges that the administrative procedures under the McCarran Act be reviewed and modified so as to minimize injustices and to increase both our internal strength and our prestige abroad.

The council further urges revision and improvement of the relevant portions of the act, to retain the objectives of necessary security, but with adequate provisions to maintain free interchange of knowledge that has no security implications.

Mr. LEHMAN. Mr. President, I ask unanimous consent to have printed in the body of the RECORD certain letters, telegrams, and documents which I have received. They consist of an editorial from the New York Times of May 22, an editorial from the Des Moines Register of April 15, 1952, and various letters and statements from organizations in regard to the McCarran bill.

I wish to invite especial attention to a telegram from the Chinese Benevolent Association, which is particularly pertinent because of the statements which have been made concerning the support of the McCarran bill by organizations

XCVIII—365

of persons of oriental birth and descent in this country.

I also have a statement which I prepared concerning that section of the McCarran bill which restricts and reduces immigration from colonial dependencies in the Western Hemisphere.

I also have an article from the Polish-American Journal of May 17, 1952, and a statement by the well-known commentator, Eric Sevareid. I should like, Mr. President, to discuss a portion of the McCarran bill, but as the hour is late I simply ask that my comments appear in the body of the RECORD.

I should like, also, to read to the Senate a list and then a brief analysis of some of the major differences between present immigration law, the McCarran bill, and, for purposes of comparison, the Humphrey-Lehman bill.

The list and analysis show pretty clearly some of the vital and even unprecedented changes introduced in the present law, inadequate as that is, by the McCarran bill.

In view of the present situation, I ask only that this statement appear in the body of the RECORD.

I ask unanimous consent that all the documents to which I have referred be printed at this point in the RECORD.

There being no objection, the documents were ordered to be printed in the RECORD, as follows:

---

**[From the New York Times of May 22, 1952]**

SENATOR MCCARRAN'S BILL

If the hard-pressed Members of the United Statese Senate would only take time to familiarize themselves with the details of Mr. MCCARRAN's massive anti-immigration bill it is difficult to believe that they would accept it in its present form, or even in the slightly better version that has already swept through the House. The measure is so complex—revising and codifying our entire body of naturalization and immigration law—that the little group of opposition Senators (including LEHMAN, HUMPHREY, BENTON, MCMAHON, and DOUGLAS) should be commended instead of reviled for having thrown light on some of its more vicious features which might otherwise have escaped the attention of their colleagues.

The Senate has unfortunately rejected an attempt to recommit this unwise bill, and yesterday it refused to substitute a more liberal measure for it. A better bill would have resulted from some of the several score amendments that have been proposed, but it is unlikely that any of the really important ones will now be approved.

Grave issues are involved. As Mr. LEHMAN has said, the McCarran bill raises the question of our basic national philosophy and of our social philosophy; it poses questions of law, of justice and of civil liberty; it raises problems of foreign policy and of our internal security. The McCarran bill contains provisions that are harsh to the point of ferocity; it strengthens the racial bias of our existing law while making a gesture in the direction of nondiscrimination; it leaves far too great power in the hands of administrative officials; and so far from strengthening our country against its enemies, the net effect in our judgment would be seriously to weaken the United States in the cold war against Communist subversion and aggression. The bill should not be passed in anything like its present form; and if passed it deserves the veto which it will probably receive.

---

POLISH-AMERICAN JOURNALISTS AND POLISH IMMIGRATION COMMITTEE FIGHT FOR GOOD IMMIGRATION BILL

WASHINGTON, D. C.—Vice President of the United States ALBEN W. BARKLEY and all United States Senators with the exception of Senator McCARRAN received telegrams from the Associated Polish Language Press of America and from the Polish Immigration Committee urging them to fight the McCarran immigration bill and to support the Lehman-Humphrey bill.

The Polish American journalists stressed in their telegram that the McCarran bill represents a spirit of exclusion, restrictions, and discrimination, while the bipartisan measure S. 2842 sponsored by Senator LEHMAN and others will guarantee basic principles fostering Christian and democratic attitude toward immigration and will bring new hope to all free men and strengthen our policy in the struggle between democracy and Communist tyranny.

The Polish Immigration Committee telegram was as follows:

"The pending McCarran immigration and naturalization bill reflects a policy of exclusion and restrictions foreign to the American traditions. Thousands of freedom-loving people who survived Hitler's tyranny or have escaped from Communist oppression will be waiting for decades and face additional obstacles in seeking asylum in free and democratic America. We ask your support for bipartisan Lehman-Humphrey bill (S. 2842) providing the pooling of unused quotas, relaxing restrictive deportation conditions and reflecting the human and liberal approach to the immigration problems. The bill provides the necessary safeguards and will strengthen our position in the struggle against Communist aggression."

It is expected that other Polish American organizations will send similar telegrams to the Members of the Senate.

---

**[From the Des Moines Register of April 15, 1952]**

IMMIGRATION BILLS, BAD AND GOOD

It is significant that two rival proposals for recodifying the permanent immigration laws of the United States aim nominally at the same things—to put an end to discrimination based on race, sex, and nationality; to retain a national origin quota system, but to supplement it with priorities based on desirability; to erect additional safeguards against dope peddlers, criminals, and subversives; and in general to unify and modernize our patchwork of immigration, naturalization, and deportation laws.

Unfortunately, the bills written by the immigration subcommittees of the two Houses contain many bad features. These are the McCarran bill (S. 2550) and the Walter bill (H. R. 5678). They do repeal the old, disgraceful oriental exclusion laws (or what is left of them) and give at least nominal quotas to all countries. But they base the quotas on the obsolete census of 1920. Moreover, they bring in racism by a couple of back doors, and they keep the Displaced Persons Act "mortgages" on the quotas of the Baltic countries and Poland, from which we have gained so many valiant and valuable refugees from communism.

The McCarran-Walter bills also establish a whole group of retroactive causes for denaturalization and deportation, with no adequate provisions for review and appeal, and with deep cuts in the Attorney General's right to make exceptions in hardship cases.

Under them, a naturalized citizen could be denaturalized and deported for minor technical inaccuracies in his answers long ago to questions in naturalization proceedings.

Legal immigrants could be deported for falling into economic difficulties within 5

years after entry, and for becoming mentally ill without harming anybody and without causing any financial burden to the community.

Legal immigrants who had been Communists or in Communist-front organizations in the remote past are automatically deportable, no matter what their recent behavior or present views are.

All this is so *now* that a minority reported out different bills, the Humphrey-Lehman bill (S. 2842) and the identical Roosevelt bill (H. R. 7032).

The Humphrey-Lehman-Roosevelt bills are not starry-eyed. They include additional safeguards against dope peddlers, against immigrants who would actually displace American workers in their jobs, against subversive immigrants and subversive aliens who have been long-time legal residents.

But their provisions are not retroactive; they provide review and appeal, and a chance for the accused to demonstrate that his Communist-front membership was innocent in intent, or that they have long since made a genuine break with communism.

The immigration quotas in the Humphrey-Lehman-Roosevelt bills are based on the 1950 census, and any quotas not filled in 1 year are thrown into a pool the next year, available to relatives of United States legal residents and to specially desirable immigrants regardless of national origin.

The whole Western Hemisphere (instead of just the independent republics and Canada) is given nonquota status. So are orphans entering the country for adoption, and immigrants who have served honorably in our Armed Forces.

The Humphrey-Lehman-Roosevelt bill deserves support; the McCarran-Walter bills, in spite of their avowed aims, are confused, frightening, dangerous legislation.

SPEECH ON THE MCCARRAN BILL (S. 2550) CONCERNING ITS PROVISION ON IMMIGRATION FROM THE WEST INDIES (SEC. 202 (C))

Mr. President, I want to speak now on one particular provision of S. 2550 which seems to me to be particularly unjust, restrictive and discriminatory. I am referring to section 202 (c) and the effect it would have on immigration into this country from the area which is commonly described as the West Indies.

Under present law, immigration from this area is covered by the rule that immigrants coming from one of the colonies or dependencies in the West Indian area are without numerical limitation chargeable to the quota established for the mother country. For example, a person immigrating to this country from Jamaica or Trinidad or the Bahamas falls under the British quota. Similarly, immigrants from the French colonies of Martinique or Guadeloupe are charged to the French quota.

It is true that our present law does not treat immigration from these colonies and dependencies as generously as it does immigration from independent countries in the Western Hemisphere. Toward immigration from these countries we have adopted the principle of the open door in order to further the great idea of Western Hemisphere solidarity and cooperation. Thus, immigrants from countries such as Canada, Mexico or any other country of Central and South America are not subject to any quota restriction. It would seem that the idea of Western Hemisphere solidarity and cooperation would require the same treatment of immigrants from those areas in the Western Hemisphere which have not yet reached independence. An immigrant from Jamaica or Trinidad should not be less desirable than an immigrant from Mexico or Bolivia.

Although, as I said before, the present law does not treat immigrants from the West Indian dependencies and colonies as gener-

ously as it treats immigrants from the independent areas of the Western Hemisphere, in reality this difference is more of a theoretical than of a practical nature. Actually, immigration from the British West Indies which is, by far, the most important source of our immigration from the West Indian area is controlled by the British quota of approximately 65,000 a year. It is known that this quota which is by far the largest quota granted to any country under our immigration law is never fully utilized. That means that any inhabitant of Jamaica or Trinidad or of any of the other British West Indian colonies or dependencies who seeks to immigrate to the United States can do so provided he qualifies as an immigrant under the various provisions of our immigration law. Substantially the same is true of immigration from the French dependencies. The French quota, a little over 3,000, is, of course, much smaller than the British quota. However, this quota appears to be adequate for the immigration needs of France and French dependencies. This is shown by the fact that a person falling under the French quota can be sure to get a quota number within a very short time, in 1 or 2 months. Therefore, the fact that a would-be immigrant from Martinique or Guadeloupe falls within the French quota does not substantially restrict his chance to immigrate.

Immigration from the West Indies to the United States has been continuous for many years. The major part of this immigration comes from the British West Indies and is, therefore, charged to the British quota. A few statistical data may be of interest. The number of quota immigrants from the British West Indies and Bermuda in the 5-year period, 1946 to 1950, was 11,394. This number breaks up as follows:

| Year: | Immigrants |
| --- | --- |
| 1946 | 1,745 |
| 1947 | 2,007 |
| 1948 | 2,638 |
| 1949 | 2,395 |
| 1950 | 2,609 |

The island in the British West Indies which supplies us with more immigrants than any other of these islands is Jamaica. The approximate number of immigrants from Jamaica is 1,000 a year.

These numbers show that substantial though the present immigration from the British West Indies is, it cannot be said that it is so large that steps have to be taken to restrict this immigration. There can hardly be any doubt that the United States economy is able to absorb 2,000 English-speaking immigrants from the West Indies a year. This is proved by the fact that immigrants from the British West Indies have adapted themselves well to the life in the United States and have easily become integrated in American life.

Most of the immigrants from the British West Indies are Negroes. In fact, immigration from the West Indies is the main source of Negro immigration into the United States. Again, I would like to give you a few figures. According to Myrdal's report in his famous book, An American Dilemma, in 1940 there were about 84,000 foreign-born Negroes in the United States. Of these, three-fourths were born in the West Indies. These Negro immigrants from the West Indies settled mostly in New York, Boston, Florida, and the Carolinas. The largest part settled in the City of New York where many of them established themselves in the business and professional field. It has been estimated that one-third of the professional population of Harlem comes from the West Indies. Many of the physicians, dentists, and lawyers working in that area are natives of Jamaica, Trinidad, or the other West Indian islands.

A number of West Indian immigrants have made valuable contributions to American cultural life. By way of example, I would like to mention J. A. Rogers, author

of many books, among them Superman and Man. Another immigrant from the West Indies was A. A. Schonburg whose collection of books dealing with Negroes has become famous. The collection now forms a valuable part of the public library of New York and is located at the One Hundred and Thirty-fifth Street branch of that library of which Schonburg was a curator while alive.

One of the outstanding characteristics of the immigrants from the West Indies is their devotion to their families. This explains the fact that many immigrants from that area, after having established themselves in this country, have invited their relatives who stayed behind to join them.

Mr. President, it seems to me that the present situation with respect to immigration from the West Indies is completely satisfactory both from the point of view of the number of immigrants as well as from the point of view of their quality. They have contributed thousands of good workers and loyal citizens who now fill important positions in the national economy. If any change at all in the present law as to immigration from the West Indies is contemplated, it seems to me that the West Indian dependencies and colonies should, for purposes of immigration, be placed on the same footing as the independent countries in the Western Hemisphere. Such a change would be an important contribution to unity and cooperation in this hemisphere. We would tell those people living in the British and French colonies that the fact that they are not inhabitants of an independent country should not, in any way, lessen their chances to immigrate to this country as against the chances of citizens of independent countries in the Western Hemisphere. Granting of nonquota status to inhabitants of these dependencies would not have any appreciable practical effects since, as I pointed out before, immigration from these areas is even now pretty well dependent on the desire of an inhabitant to immigrate in view of the British and French quota situation. What such a change would accomplish would be to emphasize that if we speak of Western Hemisphere solidarity we mean the whole Western Hemisphere rather than only part of it.

A number of organizations which testified at the joint hearings in March and April of last year have come out for a change of the present law along the lines just mentioned. Mr. Lewis M. Hoskins, executive secretary of the American Friends Service Committee urged, in behalf of the Quakers, in a letter dated April 6, 1951, that "nonquota status be accorded all natives of the Western Hemisphere without discrimination." (P. 748 of the hearings.) Similarly, Rev. William J. Gibbons, S. J., in behalf of the National Catholic Rural Life Conference, stated during the hearings that "it would seem more in accord with the objective of administrative policy to accord nonquota status not only to natives of independent countries but also to natives of colonies and dependencies situated wholly within the Western Hemisphere." (P. 232 of hearings.) Mrs. Arthur Forrest Anderson, in a statement submitted by the YWCA, recommended that natives of the dependent areas of the Western Hemisphere should be treated on the same basis as natives of independent countries in that area. (P. 744 of hearings.) I am glad to note that S. 2842, the omnibus immigration bill introduced by the Senator from Minnesota for himself and for 12 other Senators has adopted these suggestions. I would define the term "nonquota immigrant" so as to include any immigrant "who was born in an independent country, colony, or dependent area situated in the Western Hemisphere and the spouse or the child of any such immigrant, if accompanying or following to join him" (sec. 101 (a) (26) (C)).

Mr. President, I now turn to S. 2550 and I note, with regret, that this bill neither leaves the law with respect to immigration

from the West Indies as it is now nor improves it in the sense which I mentioned, but, on the contrary, seeks to drastically curtail immigration from that area.

Under section 202 (c) of the bill, natives of the dependencies in the West Indies would continue to be chargeable to the quota of the mother country. However, the bill would put a ceiling of 100 immigrants from each of the dependencies and colonies. For example, at present around 1,000 Jamaicans are admitted yearly to this country as immigrants. Under S. 2550, no more than 100 Jamaicans could immigrate in a given year. Thus, immigration from Jamaica would be cut to one-tenth of its present volume.

Not only would this decrease to a mere trickle immigration from the West Indies, but it would also result in discrimination against Negroes. As I mentioned before, the West Indies at present are the main source of Negro immigration into the United States. S. 2550 would virtually cut off this source. Thus, for the first time in United States history, discrimination against Negroes would be written into our immigration law. Is it not ironic that a bill which claims credit for eliminating the ban on immigration of Asiatics at the same time seeks to change our immigration law in a way which would establish discrimination against another race, namely Negroes? I believe that what I have said so far bears out my initial remarks that the provision on immigration from the West Indies as is proposed in S. 2550 is unfair, restrictionist, and discriminatory.

How do the sponsors of S. 2550 seek to justify their proposal? The majority committee report states that the proposal "will prevent undue absorption of a governing country's quota by a colony or a dependency and will preclude colonies or dependencies from having a greater preference than the independent countries which are entitled to minimum quotas." Let us consider these two arguments. As I said before, the British quota under which by far the largest part of West Indian immigrants enter is never fully utilized. Therefore, there is always a large unused portion of the British quota available for the use of any qualified white Englishman who wishes to immigrate to the United States. The same is substantially true with respect to immigrants from France, except that it may take 1 or 2 months after their application before their quota number is reached. It follows that present law in no way works to the prejudice of Englishmen or Frenchmen who want to immigrate to the United States from their mother country. In view of this situation, how can it be claimed that immigration from the West Indies causes undue absorption of Great Britain or France's quota?

The other argument for the proposed change contained in the Senate's report is no more convincing. This argument holds that the proposed change will preclude colonies or dependencies from having greater preferences than the independent countries which are entitled to minimum quotas. In this connection, reference is usually made to Australia and New Zealand which are both members of the British Commonwealth of Nations and, at the same time, independent countries, and each has an annual immigration quota of 100.

Those who, in this context, compare Australia and New Zealand, on one hand, and West Indian dependencies, on the other hand, overlook two things. First of all, they overlook the fact that Australia and New Zealand are not countries from which many people seek to emigrate but that, on the contrary, they are countries which themselves are currently receiving many new immigrants. The West Indies, on the other hand, have been the source of a constant flow of immigrants to the United States. Therefore, the fact that under present law, Australia and New Zealand have a quota of 100 each while there

is no such limitation for the British West Indies does not work any hardship against natives of those two dominions. Should somebody be of a different opinion and believe that the quotas for Australia and New Zealand are too small, then the obvious remedy would seem to be to increase the quotas for these two countries rather than to decrease the opportunities for other countries. The argument that only few West Indian should be admitted because few Australians are admitted, reminds me of a statement by Chief Justice Vinson made in his opinion in the famous restrictive covenant case of 1948. In disposing of the claim that a restrictive covenant is not discriminatory because it may occasionally be used not only against a Negro but also against a white person, Chief Justice Vinson said "equal protection of the laws is not achieved through indiscriminate imposition of inequality."

The other point the sponsors of S. 2550 are overlooking when comparing Australia and New Zealand with the West Indian dependencies is the fact that Australia and New Zealand are not situated in the Western Hemisphere. As I pointed out earlier in my speech, our immigration policy has always been against bars to immigration from countries in the Western Hemisphere. Immigrants from Canada and Mexico and Brazil and Argentina are not subject to any quota while immigrants from Europe and Asiatic countries are limited by quotas. S. 2550 does not seek to change this method of favoring independent countries in the Western Hemisphere. It is inconsistent, on the one hand, to maintain this preference with respect to countries in the Western Hemisphere and, on the other hand, to regard the dependencies located in the Western Hemisphere as unduly favored on the ground that immigrants from them are in a better position than immigrants from countries outside the Western Hemisphere.

So it seems to me that there is no validity in either of the arguments adduced by the majority committee report in support of the proposal to set a ceiling of 100 on immigration from the colonies and dependencies in the West Indies. A further argument was put forward by Representative WALTER during the debate in the House of Representatives. He said that the ceiling on immigration from the West Indies is necessary to protect the Virgin Islands from the large immigration to them from Jamaica, and in support of this argument he quoted from a letter written by the St. Thomas Labor Union. It is significant that this argument is not supported by statistics. Nowhere is it said how many persons immigrate to the Virgin Islands from Jamaica. Thus we are left in doubt as to what is meant by "large migrations from Jamaica to the Virgin Islands." Apart from that, I do not think that the status of the labor market in the Virgin Islands, whatever it is, should govern our basic immigration policy applicable to the continental United States. Let us assume that there would be an influx of Puerto Ricans to the Virgin Islands or of citizens from Haiti or the Dominican Republic. All these three areas are much nearer to the Virgin Islands than Jamaica. Would anybody suggest that in case of such an influx, we should change our basic immigration law and pass an act depriving natives of Haiti and the Dominican Republic or Puerto Rico of their nonquota status so that they could no longer immigrate into the United States without limitation? Are we prepared to give up the wonderful principle of hemisphere solidarity because of a minor local situation in the Virgin Islands?

Mr. President, the foregoing remarks dealt only with one, though a very important one, of the many objectionable features of S. 2550. There are many more defects in S. 2550 which have been mentioned in the debate and are still going to be mentioned.

However, none of the other defects is a better illustration of the charge made against S. 2550 that it would set back the clocks on our immigration law. S. 2550 is often defended on the ground that it is nothing but a codification of the existing immigration and naturalization law. How incorrect this statement is cannot be demonstrated better than by pointing out the change S. 2550 proposes with respect to immigration from the dependencies and colonies in the West Indies. As I have shown, under the proposal immigration from these areas would be reduced to a mere fraction of its present volume. The new provision would create a new kind of de facto discrimination against Negroes, and it would be a blow to hemisphere solidarity. I hope, therefore, that the Senate by voting against S. 2550 will reaffirm its belief in a liberal, nondiscriminatory policy with respect to natives of the West Indian dependencies and colonies. As pointed out in the minority report submitted by the Senator from Tennessee, a decent attitude toward these colonies will "furnish valuable ammunition to combat the anti-American propaganda of Communist agitators among inhabitants of colonial areas throughout the world."

Senator HERBERT H. LEHMAN,
Senator IRVING IVES,
*Washington, D. C.*

DEAR SENATORS: Careful study of the two proposed immigration bills convinces us that Senate bill 2842 as introduced by Senators HUMPHREY, LANGER, LEHMAN, and 10 other Senators represents a much more farsighted statesmanlike and judicious approach as well as being a basis for a wiser strategic policy designed to advance the national interest and world-wide influence of the United States with particular reference to our present battle for minds and souls of mankind. As a patriotic national organization we sincerely pray that you choose the Humphrey bill as basis for the pending legislation.

EDWARD Y. T. LIN,
*Executive Secretary,*
*Chinese Benevolent Association.*
NEW YORK CITY.

INTERNATIONAL INSTITUTE OF BOSTON, INC.,
*Boston, Mass., May 15, 1952.*
Senator LEHMAN,
*Senate Office Building,*
*Washington, D. C.*

DEAR SIR: I am instructed by our board of directors to call to your attention the recommendations of this agency which has worked with immigrants for 28 years in Boston and which is part of a national agency that has been working to make better citizens of new immigrants for the past 40 years.

Our board of directors, as you will see, is composed of members of old American families and leaders of more recently arrived groups.

Very truly yours,
Mrs. PAULINE GARDESCU,
*Executive Director.*

YOUR PASSPORT

(Published by International Institute of Boston, Inc.)

INDIVIDUAL SERVICES

People of other national origins look forward to satisfying and productive lives in the United States but they vary in the experiences which they bring and the opportunities which they find. A newer American may be a new arrival, a repatriate, or a person who came to this country a number of years ago but is not yet settled in his new homeland.

The Individual Services Department is designed to assist the newer American toward his goals through an understanding of his past and present experiences and a knowledge of the opportunities. His questions

may be, for instance, around employment, education (including English lessons), medical care, involved immigration and naturalization matters, or getting along with himself, his family and friends. Assistance may be given directly or through referral to other agencies.

The professional social workers of the Individual Services Department have special counseling knowledge and skills. They speak a number of languages. (Experienced interpreters are available in most other languages.) They understand cultural differences—what it means psychologically to change from one way of life to another. They know American resources, particularly in greater Boston. They are officially accredited to represent individuals before the the United States Board of Immigration Appeals and the Naturalization Service. Through the institute's national office they can consult on policy and individual matters with Federal departments and international agencies.

These services are available to individuals and to social agencies from 9 a. m. to 5 p. m., Monday through Friday, or in the evening and on Saturday by special arrangement.

COMMUNITY SERVICES

The international institute is a bridge between the community at large and the widely scattered settlements of newer Americans in which much of the social and religious life is still carried on in the native tongue and in the Old World culture patterns. Adapting to another culture is a slow and gradual process.

The institute works steadily toward constructive social integration, stimulating leadership and wider participation in general community life. Invaluable aids in this work are the foreign language press, clergy, and societies.

Interpreter service is given to courts, hospitals, and social agencies, public and private, where not only language is a need but also an understanding of the delicate psychological factors involved.

Documents are translated in all languages—records of birth, marriage, death, good conduct (police), passports, and other items.

Consultation is offered on matters relating to the ethnic communities, and supervision is provided in university fieldwork studies.

Innumerable inquiries are answered on subjects within the institute field of service, such as: backgrounds, traditions and customs of people from other countries; regulations and procedures of immigration and naturalization; consular services; status of quotas; use of Government or international welfare resources to locate or to aid family or friends abroad; responsibilities and rights of aliens in the United States of America; language classes or tutors; resources either within ethnic communities or generally in greater Boston.

GROUP SERVICES

The International Institute House is a homelike center located between Dartmouth and Clarendon on Beacon Street overlooking the historic Charles River. Its varied program of social and educational activities is open to everyone. Here, people of many national origins meet and share talents and experiences to their mutual enjoyment and enrichment. The program is flexible and adapted to changing needs and interests.

In addition to weekly and monthly features, there are annual intergroup projects of wide appeal planned and carried through by volunteer committees.

A calendar of the intercultural activities, with notes describing them, follows.

The house is also a center for more than 40 self-organized ethnic clubs. Through association with the Institute, these clubs are made available for a variety of civic services and for hospitality and practical help to new arrivals from abroad.

The clubs with their meeting times are listed on page 9. Further information about their officers and membership may be obtained from the activities director.

Membership in the institute is voluntary and is open to all who take part in its activities, enjoy its services, or are in sympathy with its purposes. Subscription to the International Beacon is included in membership in the International Institute. See page 8 for particulars.

Volunteers are essential in all areas of institute work. The executive director is glad to consult with anyone who is interested in this field of community service.

———

MAY 12, 1952.

REPORT OF COMMITTEE ON IMMIGRATION LEGISLATION, INTERNATIONAL INSTITUTE OF BOSTON, INC., BOSTON, MASS.

The committee, composed of Dr. Sollmene, Mrs. Le Vin, Harry Angelus, Haig Menuelian, Paul Siu, and Mrs. Gardescu, has met three times. The committee undertook to review limited portions of the proposed immigration and naturalization legislation before Congress in the session. There is general legislation pending and one Special Migration Act of 1952, a temporary measure. The McCarran bill, S. 2550, a so-called omnibus bill, 302 pages long, is intended as an immigration and Nationality Act to revise all laws relating to immigration, naturalization, and nationality. It has been reported out favorably by the Senate Judiciary Committee, of which Senator McCARRAN is chairman. Its companion bill, though not entirely identical, is the Walter bill, H. R. 5678, which is 165 pages long and has passed the House.

GENERAL LEGISLATION

There are some improvements over present legislation which the committee approves in the McCarran-Walter bills, as well as some provisions to which the committee takes specific exception. The committee has not undertaken to review every intricate detail but confined its initial review to quota provisions, nationality, and deportations.

As the background of its discussions the basic plan and principles of an international institute were accepted as the governing policy statement; namely, international institutes hold that there should not be discrimination in immigration and naturalization laws based on race, religion, or national origins and that all categories of persons admitted to the United States of America for permanent residence should be eligible for naturalization. In other words, admission to the United States and naturalization should be on a basis of personal and individual fitness rather than country or origin or race. Representative WALTER has repeatedly submitted legislation to make eligible for naturalization all those who are permanently admitted.

The committee approves provisions of the McCarran-Walter bills which—

(1) Make all races eligible to naturalization (at present, certain Asiatics, for example, Koreans, Siamese, Japanese are not; Indian and Chinese are).

(2) Eliminate discrimination between sexes, with respect to immigration (at present, wife of any citizen may enter nonquota but some husbands of citizens must wait for quota numbers).

(3) Eliminate exclusion of Asiatic areas and assign a minimum quota of at least 100 to all independent far-eastern countries—and add a quota of 100 for non-Chinese persons born in China.

(4) Grant to Asiatics the same nonquota and preference-quota status based on relationship to American citizens and permanently admitted aliens.

(At present only the Chinese wife of an American citizen, not the child nor the Chinese husband, enjoys nonquota status, resulting in broken families).

(5) Provide selective immigration-quota preference based on occupational needs of United States of America because it moves toward a basis of personal qualification for immigration rather than racial or national origin.

One provision of the Walter bill provides that aliens be excluded who have sought or procured visas by misrepresenting facts—but exempts from the penalty aliens whose action was caused by fear of persecution because of race, religion, or political opinions and if the misrepresentation was not material. The international institute is interested particularly because of U. S. S. R. citizens who pretended to be of other nationality to escape forced repatriation from Western Europe after 1945 and have immigrated as eligible displaced persons to United States of America in guise of Latvians, Yugoslavs, Poles, etc. The International Institute of Boston is appealing three cases now under threat of deportation for fraud of this nature and otherwise eligible to remain. There may be hundreds more.

The committee opposes provisions of the McCarran-Walter bills which—

(1) Would give the President the authority to suspend the entry of all aliens or any class of aliens at any time—a right he now has only during war or any national emergency.

(2) Would charge to Asiatic-Pacific area quotas all persons with as much as one-half ancestry indigenous to the area, no matter what the country of birth; i. e., a Canadian-born citizen, half Chinese, is chargeable to the quota of China. The committee feels these galling racial discriminations are (a) not only contrary to International Institute principles but (b) detrimental to United States international relations and (c) give valid cause for Soviet anti-United States propaganda.

(3) Would limit to quotas of 100 the dependent or colonial areas of Western Hemisphere which now are unlimited within the quota of the nation to which they belong—Jamaica is part of United Kingdom—all other Western Hemisphere countries are quota-free and discrimination seems poor good-neighbor policy—Dutch and French also have colonies.

(4) Would remove statute of limitations, now 5 years, on deportation as a public charge and for other bases of deportation and denaturalization.

The committee recommends changes:

(1) Basis of quota year to be 1950 (not 1920) as quickly as census can provide statistical data required.

(2) Admission of DP's or similar refugees be divorced from quota provisions for immigrants—some small quotas are now reduced by 50 percent for a half century ahead and impede normal migration, including uniting families.

(3) Unused quotas at the end of any year be redistributed to countries which have filled quotas and in proportion to demand at consulates for visas.

(4) The committee believes the Board of Immigration Appeals should be set up by legislation and that there should be a similar board in the Department of State to review consular decisions on the granting or refusal of visas. At present there is no effective appeal structure over consular decisions. While it is recognized the present Board of Immigration Appeals in the Department of Justice has greatly contributed to fair and equitable administration of justice in immigration, nationality and naturalization cases, yet the committee believes the principle of a statutory rather than administratively established boards is sound.

(5) That in deportation hearings an alien be entitled to examine evidence against him, present evidence, and in general granted fair and impartial hearing and adequate protection of his rights.

The committee also reviewed the Humphrey-Lehman bill, S. 2343, introduced jointly by Republican and Democratic Senators.

General legislation, to amend immigration and naturalization laws, to eliminate discrimination based on race and sex, to provide for use of unused immigration quotas and provided nonquota status for parents of citizens, for orphans and alien members and former members of the Armed Forces.

The committee recommends approval of S. 2343 which, incidentally, has found conservative editorial support in Boston newspapers.

### SPECIAL TEMPORARY LEGISLATION

Finally, the committee reviewed H. R. 7376, the Celler bill, Special Migration Act of 1952, to authorize the issuance of 300,000 special nonquota immigration visas over a 3-year period to certain refugees and others, including natives of Italy, Greece, and the Netherlands, as outlined in the President's message to Congress, March 24. This gives practical force to United States of America policy, stated in the Mutual Security Act of 1951 with its commitments to take part in world-wide planning and accept a share of overpopulation and refugees now creating serious economic and political tensions in Europe.

The United States has joined with 16 countries in recommending resettlement to countries, such as Australia, Canada, New Zealand, and South America republics, seeking additional population. Commissioner Argyle R. Mackey in a speech, March 21, 1952, in New York City says "The Mutual Security Act, as well as proposed legislation, reflects a pattern of expectation for the future. While it is important that our immigration policies of the future be grounded primarily in the needs of the United States, those needs must be evaluated broadly, with due regard for our position of world leadership."

Our national office, the American Federation of International Institutes, has joined an interfaith, interethnic "American Committee on Special Migration" for joint action to pass the Celler bill, and asks that local bodies support it.

The committee recommends the passage of the Celler bill, but asks that it be amended to include some provision for Chinese political refugees to have permanent status in the United States.

### SUMMARY

The committee recommends that the board of international institute support sections of McCarran and Walter bills which eliminate racial and sex discriminations and establish selective immigration preferences and that offer relief to Soviet DP's.

It opposes sections which give the President unlimited powers over immigration, which make ancestry or colonial status a test for some, not all, immigrants, and the changes of statutes of limitation for deportation and denaturalization.

It proposes:

(1) Legislative establishment of Boards of Immigration Appeals and appeals over consular decisions on visas.

(2) That basis of quotas be revised to 1950 census as quickly as possible.

(3) Effectiveness of selective immigration be studied as a substitute for the national origin's theory.

The committee recommends the passage of the Humphrey-Lehman bill.

The committee recommends passage of the Special Migration Act of 1952, the Celler bill.

THE PROTESTANT COUNCIL
OF THE CITY OF NEW YORK,
*May 9, 1952.*

MY DEAR COUNCIL FRIEND: A short time ago I sent to you a letter concerning the immi-

gration laws which are now being presented to Congress. Time is of the essence at the present moment, because the bills are now before the Senate. The House passed the Walter bill, and the Senate is now discussing the McCarran bill.

I am sending you additional material herewith concerning the McCarran bill and also the Lehman bill, S. 2842, which is now before Congress.

The only hope that we have to get some of the humanitarian provisions of the Humphrey-Lehman bill into the new legislature is to have the Senate pass this bill, and then in the conference with the House some of the Lehman bill might be incorporated.

Will you please look at this matter very carefully, and if possible take it up with the proper committee in your organization and see that telegrams are sent immediately to your Senators concerning this matter? I feel that it is of extreme importance, and so I am sending you this additional letter.

With high personal regards and all good wishes, I am,

Cordially yours,
J. HENRY CARPENTER,
*Executive Secretary.*

P. S.—Please note the advertisement which appeared in the New York Times, and the outstanding people who signed it, such as Mrs. Anderson of the national board of the YWCA, Rabbi Goldstein of the American Jewish Congress, Clarence Pickett, and many others. This is really the nub of the question which we are all facing.

J. H. C.

### SUMMARY OF McCARRAN OMNIBUS IMMIGRATION BILL (S. 2550)

Thirteen new grounds for excluding future immigrants, more than 20 new grounds for deporting those admitted in past years, and an undetermined number of new ways of losing one's American citizenship would be written into law by the pending McCarran omnibus immigration bill (S. 2550). This 302-page bill, although advertised as a "codification" statute, would make more than a hundred changes in Federal law governing immigration, deportation, and citizenship. Of these changes, three are in the direction of liberality; (a) Asiatics are made eligible for immigration, under minimum quotas, and citizenship; (b) sex-discriminations are eliminated; (c) reformed totalitarians may be admitted. These liberalizing provisions are also contained in several other pending immigrations, including H. R. 403 (allowing quota immigration from Asia), which passed the House on February 19, 1951, and S. 2842, sponsored by Senators KEFAUVER, LEHMAN, HUMPHREY, GREEN, BENTON, KILGORE, MOODY, DOUGLAS, MURRAY, McMAHON, LANGER, MORSE, PASTORE.

### I. NEW IMMIGRATION RESTRICTIONS

Among other changes in existing law the pending bill would:

1. Limit all future immigration to the United States to immigrants of "high education, technical training, specialized experience, or exceptional ability" who are "needed urgently in the United States" (sec. 203 (a)), and to parents of adult citizens, and spouses or children of admitted immigrants, except to the degree that unused visas, if any, under these categories may be used for immigrants without such special qualifications, except that brothers, sisters, sons, or daughters of United States citizens are given preference in this last category.

2. Eliminate college and university professors from the class of quota-exempt immigrants (sec. 101 (a) (26) (F)).

3. Change immigration quotas for Jamaica and other Caribbean colonies from the never filled United Kingdom quota of 65,721 to a special quota of 100 for each such colony,

thus drastically curtailing colored immigration (sec. 202 (c)).

4. Retain as under the present law, special inferior status for any person "attributable by as much as one-half of his ancestry" to Asiatic races, regardless of the citizenship or country of birth of such person, and exclude such persons from the quotas of the countries in which they are native-born citizens (sec. 202 (b)).

5. Authorizes the executive to set up new restrictions, and even absolute bars, against immigration, without legislative or judicial review, in peacetime as well as wartime. (The President now has such power only in wartime (sec. 212 (e)).

6. Repeal the provision of the 1917 law allowing entry of victims of religious persecution who are illiterate (sec. 212 (a) (25)).

7. Repeal a similar dispensation for parents, grandparents, wives and widowed or unmarried daughters of citizens or legally admitted immigrants (sec. 212 (a) (25)).

8. Allows for judgment of courts of foreign nations to set the standards for admissibility to the United States. A conviction of even a Nazi or Communist court, except for a political crime, becomes a bar for entry, even if the offense involved no moral turpitude by American standards. (A violator of a Communist law against religious worship, if sentenced by a Communist court to a 5-year prison term (under S. 2550), becomes ineligible to enter the United States of America, sec. 212 (a) (10).

9. Bar aliens who received a document or visa (even in Communist lands) by willful misrepresentation.

### II. DEPORTATION

The broad grounds of deportation set up by the McCarran Internal Security Act of 1950 and various prior laws are considerably widened by the new McCarran omnibus bill, which would:

1. Abolish existing statutes of limitation in deportation cases, thus allowing deportation for alleged acts 50 years past, as to which no witnesses or documents are available (sec. 241).

2. Require deportation of any person who goes to a mental hospital or institution within 5 years after immigration, even if he or his family pays for such care or treatment (sec. 241 (a) (3)).

3. Increases the possibility of deportation because of having become a public charge. The present law limits such possibility to persons who have become a public charge within 5 years after entry. The Senate version modifies this law by removing the 5-year period and by having deportation apply where in the opinion of the Attorney General persons at any time after entry become public charges.

4. Require deportation of immigrants who become addicted to the use of narcotic drugs after entry (sec. 241 (a) (11)).

5. Establish numerous other grounds of deportation. Under section 241 (a) (4), the bill provides for the deportation of any alien convicted of any criminal offense, no matter how minor and no matter how long he has lived in the United States, if the Attorney General in his discretion concludes that the alien is an "undesirable resident" of the United States.

6. Make all grounds of deportation retroactive to cover all immigrants who have hitherto been admitted to the United States (sec. 241 (d)).

### III. STATUS OF IMMIGRANTS

In addition to the foregoing new grounds of exclusion and deportation of immigrants, the McCarran bill would change the status of immigrants and visitors in several important respects:

First, the bill would drastically curtail the authority of the Attorney General to (1) suspend deportation in "hardship cases" (sec. 244 (a)); (2) adjust the status of visitors,

students, and other nonimmigrants by "pre-examination" and issuance of quota visas (sec. 245); (3) extend the time during which immigrants may make visits abroad without losing the right to return to the United States (secs. 212 (c), 223 (b)).

While section 245 provides for alternative form of preexamination, it is limited to a small group of persons.

Secondly, the bill would subject the acquisition of citizenship to a series of new requirements retroactively covering the entire life of the applicant (secs. 313, 316, 318).

Finally, the bill fails to provide necessary judicial protection to the alien by omitting to make provision for a Board of Immigration Appeals and a Visa Review Board. It explicitly denies further inquiry to any alien who may appear to the examining officer to be excludable under paragraphs 27, 28, and 29 of section 212 (a), relating to subversive classes (sec. 235 (c))—a discretion that is contrary to normal democratic procedures. The bill would deprive immigrants and native-born Americans alike of the protection of court review in many cases. In general, mistakes and abuse of discretion by consuls and immigration officials would be exempted from effective judicial review by substituting subjective standards ("the satisfaction of the Attorney General," "the opinion of the Attorney General," etc.) for present objective standards.

The bill requires that every alien shall "at all times carry with him * * * any certificate of alien registration or alien registration receipt card issued him. * * *"

Any alien who fails to comply with the provisions of this subsection shall be guilty of a misdemeanor and shall, upon conviction for each offense, be fined not to exceed $100 or be imprisoned not more than 30 days, or both" (secs. 264, 266).

The bill requires an annual address report by every alien, whether permanently or temporarily admitted; a change of address report within 5 days of such change of address by the alien whether temporarily or permanently admitted; and a quarterly address report by all aliens with "lawful temporary residence status" (sec. 265).

An alien who fails to comply with any of these requirements is to be fined not more than $200 or be imprisoned not more than 30 days, or both. In addition, under the McCarran bill, any alien who fails to make these reports, is to be deported, "unless such alien established to the satisfaction of the Attorney General that such failure was reasonably excusable or was not willful" (sec. 266).

IV. IMPACT OF BILL ON AMERICAN CITIZENS

The right of American citizens to be immune from search or official interrogation without a warrant is terminated by section 287. Any car or vehicle within a "reasonable distance" of Mexico, Canada, or the Atlantic or Pacific Ocean may be searched without a warrant, under section 287 (a) (3); any citizen may be interrogated if an immigration official believes him to be an alien (sec. 287 (a) (1)).

ILLUSTRATIONS OF THE KINDS OF CASES THAT WOULD BE EXCLUDED UNDER THE PRESENT VERSION OF THE McCARRAN BILL

Section 212 A (1) provides for the exclusion of aliens who have been convicted of two or more offenses (other than purely political offenses), regardless of whether the conviction was in a single trial, or whether the offenses arose from a single scheme of misconduct, and regardless of whether the offenses involved moral turpitude for which the aggregate possible sentence to confinement under the law was more than 5 years; such a provision would serve to exclude persons who unwittingly became involved in situations which may be interpreted under this provision as a basis for inadmissibility.

The provision, as it presently exists in the current immigration laws, section 3 of the hibits the admission into the United States of persons convicted of moral turpitude, etc. This is sufficient safeguard.

The Humphrey-Lehman bill also provides for the exclusion of persons when sentenced for a crime involving moral turpitude. We submit that the McCarran interpretation of this provision would serve to exclude cases which have real merit for admission. For example:

Mr. S is an alien who was born in Poland but had lived in Vienna, Austria, most of his life. He escaped to China when the Nazis began wholesale persecution of Jews. While living in Shanghai this man applied for an America visa. His two sons had emigrated to the United States and both served honorably in World War II, one son having received the Purple Heart and battle injuries which hospitalized him for many months. Because of a technicality, it seemed as if the father could not emigrate.

Mr. S had conducted a second-hand furniture store for 30 years in Vienna, buying and selling second-hand merchandise. During the Hitler regime, stolen goods were located in his store although the applicant had no knowledge that these goods were stolen. He was arrested by the Austrian Government on three different occasions, convicted and fined after each arrest.

Apparently Austria punished persons who were found with property not belonging to them even though they had no guilty knowledge of the nature of the goods. Proof was presented to our Government that the Austrian criminal laws were different from ours. Austria did not interpret as a crime involving moral turpitude, property acquired without knowledge that it was stolen or without intent to deprive the rightful owner of its possession. This was a punishment purely for having bought such goods and having them in his possession. Therefore, this was obviously not a crime falling within the prohibition set up by Congress.

The Visa Division, after reviewing the actual instances of supposed crime, rightfully held that the father of these veterans should not be barred from admission. If the McCarran version of this section was in operation, Mr. S would have been declared inadmissible to the United States even though the fact that this was not a crime involving moral turpitude.

This provision would also serve to exclude persons who under any totalitarian regime, practiced his religion surreptitiously, attending church or synagogue. He could be convicted of crimes which would not be called "political crimes" and which in the United States would definitely not be crimes involving moral turpitude. Nevertheless, such a person could be barred from admission to the United States even though his conduct was exemplary. It is common knowledge that under the Nazi regime, and now under the Communist regime, that trials held before high tribunals for minor offenses are a mockery. Persons are forced to confess and are convicted. They would therefore be forever barred from immigration to the United States if section 212 A (1) of the McCarran Act became law.

Section 212 A (19) in the McCarran bill provides for the exclusion of any alien who seeks to procure or has procured a visa or other documentation or seeks to enter the United States by fraud or by wilfully misrepresenting a material fact, even under certain extenuating circumstances. The Humphrey-Lehman bill provides that such a person would not be rendered excludable if the origin for the misrepresentation rested in fear of religious or political persecution.

Unless a provision in the law is created to provide for an exception of those who had suffered persecution and has concealed their identity for their self-protection, this provision would serve to bar many persons who were forced to protect themselves in this manner.

The facts in the following case dramatically illustrate the need for such a person to use an identity other than her own for the very reasons provided for in the provision in the Humphrey-Lehman bill and in the present immigration laws:

The applicant was a 36-year-old unmarried female, a native and citizen of Poland who sought admission to the United States. The applicant was a Jewess. She was an educated person holding a masters degree in commerce and economy awarded by a French university which she attended for 3 years.

At the outbreak of World War II in September 1939, the applicant was residing in Warsaw, Poland. In 1941 she was forced to live in the ghetto section of that city where her activities and movements were restricted. In 1942 she escaped from the ghetto and a friend obtained false documents under which she was able to live and conceal her identity as a Jew. The false papers belonged to a deceased non-Jew. She lived in various places including a cemetery cellar and in a forest until January 1945 when she was hospitalized, Following her discharge from the hospital she was able to obtain employment with the Polish government food ministry at Warsaw under her assumed name and as a Polish gentile. She remained on government posts in Poland until she was able to obtain a visitor's visa to England. Upon arrival in England she severed her association with the Polish government since this was the first opportunity she had to escape from that country. However, in fear of reprisals, she continued the identity she assumed in Poland. She had become known almost exclusively by that name, outside of old acquaintances and confidantes who continued to advise her that she conceal her true identity.

Thus, when she sought to enter the United States under that assumed name, she was declared excludable. Her excludability was challenged under the current interpretation of the provision which sought to exclude aliens who were charged with misrepresentation. However, when it was discovered that her entry into the United States under the assumed name was not for the purpose of evading the immigration laws and that if she had been able to obtain documents in her original name she would have been admissible to the United States under the immigration law. The document she submitted disclosed her true nationality and the passport which was issued to her was by the government of her nationality. She was known and identified by that name.

In the light of these facts, our Government felt that there was no fraudulent intent in connection with her application, and that the name that she had assumed was for purposes of preventing persecution to her. Under the McCarran version, these extenuating circumstances would not be considered.

In the United States many persons have used different names and identities without any evil purpose. This has not necessarily been frowned on by our society particularly when such identities are used for purposes of protection and the failure to reveal such an identity can be justified. There have been innumerable cases where individuals fleeing from the Communists have continued to use assumed identities because of the pressure of repatriation used by the Russians to claim former nationals.

It has been accepted that as long as the assumed identity does not prevent the United States from checking the facts, then to use an identity other than the individual's real one, should not affect his ability to emigrate to the United States.

Section 212 (25) provides that aliens over 16 years of age who are physically capable

of reading, must be able to read or understand some language or dialect. It eliminates the exemption in the act of 1917, as amended, which permits the following categories of persons to enter the United States:

1. Persons of any of the following relationships to United States citizens, admissible aliens, or legally admitted aliens, when such persons are sent for or brought in by such citizens, admissible aliens or admitted aliens:

(a) Father, if over 55 years of age;
(b) Grandfather, if over 55 years of age;
(c) Wife;
(d) Mother;
(e) Grandmother;
(f) Unmarried daughter; or
(g) Widowed daughter.

2. Persons seeking admission to the United States to avoid religious persecution in the country of their last permanent residence.

One cannot deny the necessity of a father being reunited with other members of his family; one can understand the emotional needs of a family to be reunited with the grandfather and grandmother; one can recognize that a wife and mother are an essential and integral part of a family unit and our basic concepts have always accepted the need to keep a family intact wherever possible; one recognizes that an unmarried daughter or a widowed daughter would need the love and protection of her family. It is therefore inconceivable that any section of an American immigration law could be written without including as basic the requirement of reunion of close members of a family.

The Humphrey-Lehman bill as it is presently phrased and conforming to a provision presently in our immigration act which permits persons seeking admission to the United States to avoid religious persecution, is illustrated in the case of Mr. N., a DP upon whom an injustice would be perpetrated if the exemption for religious persecutees was eliminated:

Mr. N., an unmarried male, a native of and former citizen of Poland, sought to enter the United States for permanent residence as a displaced person under the DP Act of 1948. Mr. N. had been reared in a small community in Poland where he had had no opportunity for formal training. He was a simple, hardworking man whose basic learning was in religious subjects. His entire education was geared toward the learning of the Bible.

When the Nazis invaded Poland he was removed from that country to a concentration camp where he was confined for several years. He was not permitted to do anything but mend shoes while in that camp. He was afforded no opportunity for learning, but experienced such hardships that it was not humanly possible for any individual to apply himself to anything but to preserve life.

When he was freed by the American forces, Mr. N., like many other aliens, could not remain in a country where he had been so severely persecuted, nor could he return to the country of his nationality where members of his family were exterminated. Furthermore, the country of his former nationality was now dominated by the forces of communism.

Mr. N. quite naturally sought to enter the United States where he could work and live in freedom. However, with the present provision of the McCarran bill excluding all persons over 16 years of age who cannot read or write, such an individual as Mr. N. could not have entered the United States. The current immigration laws providing for the exemption of such persons who were persecuted because of their religion and race, made it possible for Mr. N. to enter the country where he is now living and making a fine economic adjustment. Since his arrival in the United States Mr. N. has required no financial help. He obtained work in a shoe factory and has continued to work there getting periodic raises in salary.

ANN RABINOWITZ,
*Case Consultant, Migration Services,
United Service for New Americans.*

---

RADIO ADDRESS OF ERIC SEVAREID, COLUMBIA BROADCASTING SYSTEM, MAY 15, 1952

The United States Senate is caught in an unusual predicament. It has before it an incredibly complicated bill, running to over 300 pages, and including 340 subsections. It is a bill prepared chiefly by Chairman McCARRAN, of the Judiciary Committee, after years of work, to recodify our infinitely diffuse immigration laws and regulations. Codification was long overdue and required an immense amount of painstaking work, a real service to the Government. But this bill goes far beyond mere codification; it changes the rules governing immigrants, aliens already here, and naturalized citizens, in a great many respects; and if approved, is going to have a drastic effect on the lives of millions of people. To a most serious degree, it would probably make second-class citizens out of Americans who did not have the fortune to be born here.

The bill is being fought by a small group of Senators, led by LEHMAN, of New York. They have a substitute bill, almost equally complex, but far more liberal in its provisions. Chairman McCARRAN, so far, has refused to hold committee hearings on their bill; indeed, as the committee minority protested, he held no hearings on his own bill in its completed form, where it could be debated, section by section. For Senators can take the time to study the McCarran bill carefully; most are up to their ears in other affairs, including politics; the McCarran bill may be driven through and in an effort to prevent that, to stall for time, opponents have presented more than 200 amendments to the bill for debate; undoubtedly, a filibuster technique, out of desperation in the effort to force new committee hearings and prevent a hasty, perhaps irrevocable act.

McCARRAN is impatient that his years of labor should now be held up; but dozens of national organizations are protesting his bill. This reporter pretends to no special knowledge at all on this matter, but it is obvious from even a quick glance at the objections that this is a matter on which all responsible Americans should try to inform themselves, on which the Senate simply must not act without the fullest debate and the most earnest searching of conscience.

Many things in the bill are approved by all, such as the naturalization of 80,000 Japanese residents here, the admission as citizens of Japanese war brides. The bill gives a legal immigration quota to all Asiatic countries for the first time—a tiny number would be allowed from each country—but there are several jokers. The bill would continue and freeze, the concept adopted by Congress 30 years ago, when immigration quotas were rigged under the popular myth of the superiority of Nordic blood stock.

The bill gives almost unlimited power to our consuls overseas with no real chance that their decisions can be reviewed. A whole new set of grounds for deportation are enumerated and made retroactive to cover immigrants already in the country, and the decisions of immigration officials which could be entirely arbitrary can be reversed only by the Attorney General himself and not by any established board of appeals.

If an alien came in at a port other than the one stated in his visa application, he could be deported; an alien found to have broken a city ordinance years ago, could be deported under this bill. An alien who enters a mental hospital because of a nervous breakdown or simple depression at any time within 5 years of his arrival, could be deported—surely as heartless a provision as has ever been proposed to the laws of the United States. An immigrant bride or bridegroom could be deported if the Attorney General doesn't like the way he or she obeys the marriage contract. And naturalized citizens could lose their citizenship for acts not held to warrant denaturalization at the time they got their papers. And that would mean a special police regime for 8,000,000 American citizens; the end of their equality under the laws, the very things that so many of them left tyrannical lands and came here to achieve. On any accounting, this is a bill requiring a long, long look by the Senate.

---

ANALYSIS OF SOME OF THE MAJOR DIFFERENCES BETWEEN THE PRESENT LAW, THE McCARRAN BILL (S. 2550) AND THE HUMPHREY-LEHMAN BILL (S. 2842) ARE AS FOLLOWS:

1. Deportation for mental illness: The McCarran bill (sec. 241 (a) (3)) makes deportable aliens who, within 5 years of entry, become institutionalized because of mental disease, defect or deficiency, though it be a nervous break-down, whether or not the alien can pay his own way and whether or not the cause existed before entry. The Humphrey-Lehman bill (sec. 241 (a) (3)) makes such persons deportable only if they are institutionalized at public expense and if the mental disease, defect, or deficiency existed prior to entry. The Humphrey-Lehman bill follows the present law.

2. Deportation on conviction of any criminal offense: The present law provides for deportation of any alien who, within 5 years after entry, is convicted of a crime involving moral turpitude and is sentenced to confinement for a year or more or who at any time after entry is convicted of 2 crimes involving moral turpitude. The Humphrey-Lehman bill (241 (a) (4)) continues this provision. S. 2550 (241 (a) (4)), however, adds a new ground for deportation. An alien who at any time after entry is or has been convicted of any criminal offense—felony, misdemeanor, or violation of an ordinance, regardless of whether or not it involves moral turpitude—is deportable if the Attorney General concludes that the alien is an "undesirable alien."

3. Limited or unlimited presidential power to suspend immigration: Since the immigration laws are enacted by Congress for execution by the President, the executive branch must carry out the immigration law, as all laws. The McCarran bill (sec. 212 (e)) gives the President plenary power to suspend immigration entirely or restrict it upon conditions, if he finds it would be detrimental to the interests of the United States. There is not even the excuse of possible need for this power in time of war or emergency; the power proposed to be handed over to the President is not limited to such periods, and no other limits are imposed. The Humphrey-Lehman bill rather proceeds on the principle that the executive branch should carry out and not make or frustrate the laws enacted by Congress, except in time of war or national emergency. Accordingly, the Humphrey-Lehman bill gives the President the power to suspend or restrict immigration, but only in time of war or declared national emergency (sec. 212 (e)). The Humphrey-Lehman bill, as well, gives the President the converse power, to suspend the restrictions on immigration and admit aliens for temporary residence, again only in time of war or declared national emergency.

4. Arbitrary denial of visas to people of a whole country: The McCarran bill would add a provision to the law, providing that when a country refuses to accept one of its nationals whom we wish to deport, our consuls shall stop issuing visas to the people of that

country (sec. 243 (g)). This senseless penalty, new in the law and not found in the Humphrey-Lehman bill, would both punish the innocent and not the guilty and give iron-curtain governments a ready opportunity to stop the flight of anti-Communists to our side. Moreover, even a friendly country might reasonably refuse to accept from us an old sick man, who left that country as a child. Since the McCarran Act abolishes the statute of limitations on deportation, such cases would occur frequently.

5. Exclusion for crimes in Communist courts: The McCarran bill, for the first time, excludes aliens who have been convicted of two offenses, except "purely political" offenses (sec. 212 (a) (10)). This will keep out those aliens convicted of trumped-up "nonpolitical" offenses by Communist and Fascist courts. Cardinal Mindszenty, for instance, was convicted of "illegal dealings in foreign currency" and "speculations" as well as for treason. The Humphrey-Lehman bill (sec. 212 (a) (11)) provides for admission of such people, but only on findings by the Attorney General which will safeguard the interests of the United States.

6. New discrimination against Filipinos: The McCarran bill draws a triangle on the earth's surface, from the North Pole, south through Russia, west of Afghanistan, through the Equator and to a point below Capricorn in the Indian Ocean, then east through Australia almost to New Zealand, then north again back to the North Pole, running east of Japan. Any alien, wherever he is born, who traces 50 percent of his ancestry to peoples from this area will henceforth be charged to an "Asia-Pacific" quota of 100. Thus the native of England whose father is Chinese, will be charged to this quota of 100, while every one of his fellow citizens will be charged to the quota of England. This triangle covers 26.5 percent of the earth's surface and the people of one-quarter of the whole earth are thus informed that they and their descendants forever are in our eyes inferior to all other peoples.

This triangle, of course, includes the Philippine Islands. Until now, and under the law today, a child of Filipino parents born in Europe or South America is treated equally with the natives of his country of birth. The McCarran bill would bar the immigration of such people of Filipino stock. The people of the Philippines, our allies and former wards, are not likely to forget the undeserved insult to them in the McCarran bill.

7. Unfair quota treatment of parents of American citizens: Under the law today, parents of American citizens are entitled to a preference up to the first 50 percent of the quota for their home country. Both the McCarran bill and the Humphrey-Lehman bill, recognizing an urgent national interest, provide for a new, first preference of 50 percent for men of unusual ability, such as scientists, especially needed for the welfare of the country. What, then, is to be done for the parents of American citizens? The Humphrey-Lehman bill, recognizing their need and the human need of their citizen children in the United States, provides that the parents are to be nonquota immigrants, free of quota restrictions (sec. 101 (a) (26) (H)). The McCarran bill rather subordinates the parents to a second preference of 30 percent (sec. 203 (a) (3)) with the result that fewer of them will be able to come to join their children, and those that do, will displace other immigrants, who might otherwise come within the quota. The tragic consequences for those countries with oversubscribed quotas, can be appreciated from the cases of Norway, Denmark, and Greece. The quotas of those countries are so crowded that parents of American citizens in those countries are now required to wait as much as 5 years before they can be admitted under the quota.

8. Exclusion on speculation that the alien may become a public charge: The law today

excludes aliens likely to become a public charge. The courts have been strict to avoid an abuse of this provision and to upset administrative exclusions on this ground based on speculation and bias against alien arrivals. The McCarran bill would amend the law to permit the exclusion of any alien who in the opinion of the Attorney General or the consul is likely at any time to become a public charge (sec. 212 (a) (15)). This double vagueness, opening up possibilities of exclusion of aliens on mere prediction unsupported by facts, betrays the bias against aliens of the McCarran bill. The Humphrey-Lehman bill continues the present law (sec. 212 (a) (15)).

9. Deportation of aliens who go on relief at any time: Further bias is revealed by the new provision in the McCarran bill for the deportation of any alien who in the opinion of the Attorney General hereafter and at any time after entry shall be a public charge from causes not affirmatively shown to have arisen after entry (sec. 241 (a) (8)). This will permit the inhuman result of deportation of a man who came 20 years ago, if 20 years from now he goes on relief, if he cannot prove to the opinion of the Attorney General that the cause arose after his entry. The Humphrey-Lehman bill merely codifies the present law (sec. 241 (a) (8)) which provides a statute of limitations of 5 years after entry for this ground of deportation and makes no mention of the opinion of administrative officers but leaves it to proof of facts.

10. Perpetuation of quota inequalities: The McCarran bill perpetuates all the iniquities of the present quota system. Quotas are now computed on the basis of the smaller, 1920 population. Quotas are now allotted to the countries that do not use them, while the people of Norway, Denmark, and countries of southern and eastern Europe need them desperately. And quotas are mortgaged, in some cases for a hundred years to come, under the Displaced Persons Act.

11. New statute of limitations on the right of a native-born citizen to sue to protect his citizenship rights: With respect to native-born citizens, the McCarran bill (sec. 360 (a)) puts a limit of 5 years on the time in which a native-born citizen can sue to upset a Government agency's determination denying him any rights as a citizen, for example, the denial of a right to a pension, a grant, or a job open only to citizens. The present law does not so limit the right of the native-born citizen and the Humphrey-Lehman bill (sec. 360 (a)) continues the present law.

12. Statute of limitations on deportation: Under existing law practically all deportable offenses are subject to a statute of limitations, and the Humphrey-Lehman bill (sec. 241 (e)) provides a statute of limitations for most deportable offenses. It further provides that in many of the offenses proceedings for deportation must commence within 5 years of entry. Section 241 (d) abolishes the general statute of limitations and will thus deport a man because of a defect in his admission 20 years ago, though he has held a job and raised a family since that time. To the contrary, the McCarran bill provides for deportation of aliens at any time after the offense, and at any time after entry, even where the offense in question was not a deportable one at the time that the alien entered the United States.

13. Literacy test for elderly immigrants: With respect to arriving immigrants, the McCarran bill for the first time in the law imposes a literacy test on elderly parents and grandparents who are sent for by their citizen children (sec. 212 (a) (25)). The Humphrey-Lehman bill (sec. 212 (b)) continues the present law granting these elderly people an exemption from the literacy test.

14. Ability to write English—a requirement for citizenship: With respect to eligibility for naturalization, the McCarran bill con-

tinues the law, hastily enacted in 1950, which requires that all aliens who came since 1932 and all who come in the future must be able to write English if they wish to be naturalized (sec. 321). The Humphrey-Lehman bill (sec. 321) omits this requirement, in order to permit the naturalization of aliens who, while they can read in English, are unable to master written English. A poorly educated man often finds it impossible to learn to write in a new language.

15. Deportation for "having a purpose" to engage in activities prejudicial to the public interest: The McCarran bill (sec. 241 (a) (7)) continues the 1950 provision which gives the Attorney General the power to deport an alien if the Attorney General finds that at any time in the past the man "had a purpose" to engage in activities prejudicial to the public interest. The Humphrey-Lehman bill limits this power of the Attorney General to cases of aliens convicted of such activities (sec. 241 (a) (7)).

16. Discrimination against Negro immigration: The McCarran bill reinstitutes discrimination against oriental races and imposes new restrictions on immigration of Negroes from the British and French island colonies in the West Indies. Those natives of colonies are under present law charged to the quotas of the mother countries, quotas, which are not oversubscribed. In fact about 3,000 Negroes emigrate each year from Jamaica, Martinique, and the other colonies in the Caribbean. Under sec. 202 (c) of the McCarran bill, a limit of 100 is imposed for the first time on immigration from each colony. The Humphrey-Lehman bill rejects such discrimination. Rather it give natives of colonies in the Western Hemisphere nonquota status, so that they will be treated equally with all the other natives of the Western Hemisphere, now entitled to nonquota status (sec. 101 (a) (26) (C)).

17. Treatment of persons who have joined political organizations: The McCarran bill (sec. 212 (a) (28) (C)) continues in the law the provision of the Subversive Activities Control Act of 1950, excluding any alien who has joined, the "direct predecessor or successor" of an organization that advocates communism. It is impossible, of course, for a member of an organization to know what its successor will advocate and, as to the predecessor, organizations often deliberately cast themselves off from their predecessors, because of conflict in views.

The McCarran bill makes no exception, moreover, for the alien who has joined a subversive organization in ignorance of its aims (sec. 212 (a) (28) (I)). The Humphrey-Lehman bill excludes all subversive or Communist aliens (sec. 212 (a) (28) (C) (I)), but does not penalize aliens who joined "the predecessor" or "the successor" of a Communist organization, or the alien who was innocent of the aims and purposes of the organization.

18. No naturalization of conscientious objectors: The McCarran bill will prevent the naturalization of those persons whose sincere religious convictions prevent them from bearing arms. The McCarran bill (sec. 337 (a)) uncompromisingly demands from all applicants an oath that they will bear arms, and perform noncombatant service and perform civilian work as required. The Humphrey-Lehman bill (sec. 337 (a)) provides that in cases where the applicant shows the court by "clear and convincing" evidence, that his religious convictions bar such an oath, he may take an oath to perform noncombatant service, or, on the same showing of evidence, to perform work of national importance when required by law.

19. Search and interrogation of citizens without warrant: For the first time in the law, the McCarran bill (sec. 287 (a) (1)) authorizes the interrogation of any person if the immigration officer "believes him to be an alien." The Humphrey-Lehman bill (sec. 287 (a) (1)) authorizes the interrogation

only of aliens. Too, the McCarran bill continues the provision authorizing the search without warrant of any car within a "reasonable distance" of Canada or Mexico or the Atlantic or Pacific Oceans (sec. 287 (a) (3)). The Humphrey-Lehman bill (sec. 287 (a) (3)) authorizes such a search only if there are reasonable grounds for believing that an alien illegally attempting to enter is in the car.

20. Deportation to a country where the alien may be subject to racial or religious persecutions: The McCarran bill (sec. 243 (a) (7) (h)) permits an alien to be deported to any country that will take him, though he has no tie of birth, citizenship or former residence with that country, so long as he will not there be subject to "physical persecution." The reference to "physical persecution" is new in the law. The Humphrey-Lehman bill (sec. 243 (h)) permits deportation only to countries with which the alien has some tie, and only if he will not there be subject to physical or racial or religious persecution or persecution because of his political opinions.

21. Loss of citizenship by voting abroad: The McCarran bill (sec. 349 (a) (5)) continues the provision of law which causes even a native-born citizen to forfeit his citizenship if he votes in a political election in a foreign state. It was under this law that thousands of Americans of Italian extraction lost their citizenship when they voted against communism in the Italian elections, in support of the Department of State. The Humphrey-Lehman bill (sec. 349 (a) (5)) attempts to further our own national interests by providing that only voting in a national political election will result in expatriation and excepting entirely cases of voting under auspices of the United States.

22. Loss of citizenship by working for a foreign government: The McCarran bill (sec. 349 (a) (4)) would add a provision to the law to expatriate even the native-born citizen when he takes a job, military or civil, with a foreign government, if an oath of allegiance is usually required for the job, even though he does not take an oath. The Humphrey-Lehman bill now provides similarly (sec. 349 (a) (4)), but an amendment is shortly to be proposed to condition expatriation only on the taking of an oath.

Mr. FERGUSON. Mr. President, I offer the amendment which I send to the desk and ask to have stated.

The VICE PRESIDENT. The clerk will state the amendment offered by the Senator from Michigan.

The LEGISLATIVE CLERK. On page 92, line 9, after the word "identify," it is proposed to insert "pursuant to section 360 (b) of this act or any other document of identity."

Mr. FERGUSON. Mr. President, this is merely a clarifying amendment to cover all alleged citizens and nationals who travel to the United States from a foreign shore with travel documents issued by a United States consular officer and who are allowed to land in the United States after detention and not merely the relatively small portion thereof whose travel documents are technically named "Certificates of Identity."

It gives immunity, as to detention expenses, in cases involving citizens and nationals who land after detention in the same manner that immunity is given in cases involving aliens.

As the bill now reads, in relation to detention expenses aliens are given preferred treatment over citizens and nationals who arrive with travel affidavits issued by a United States consular officer.

The amendment cures this technical defect and gives citizens and nationals at least equal consideration with that given aliens.

Mr. McCARRAN. Mr. President, I have considered the amendment, and while the language may have to be polished up or changed, I will accept it.

The VICE PRESIDENT. The question is on agreeing to the amendment offered by the Senator from Michigan [Mr. FERGUSON].

The amendment was agreed to.

Mr. FERGUSON. Mr. President, there was one other place in the bill in which I was very much interested. I understand, however, there has been a clarification.

Mr. McCARRAN. That is correct.

The VICE PRESIDENT. The bill is open to further amendment.

Mr. MURRAY. Mr. President, I ask unanimous consent to have printed in the RECORD at this point an article by the Right Reverend Monsignor John O'Grady entitled "Crusade for a Christian and Democratic Attitude Toward Immigration." I should like to read briefly from it:

As one observed the tide of the times during the decade following the First World War, one could not fail to be disturbed by the new nationalism, the nativism, the intolerance, the racism that were evident everywhere.

Here and there small minorities began to raise their voices against these prejudices, but it was of little avail. They did not get much encouragement from those who should have gone down the line with them. It was in this sort of atmosphere that our present immigration pattern took form.

I ask unanimous consent that the entire article be printed at this point in the RECORD.

There being no objection, the article was ordered to be printed in the RECORD, as follows:

CRUSADE FOR A CHRISTIAN AND DEMOCRATIC
ATTITUDE TOWARD IMMIGRATION
(By the Right Reverend Monsignor
John O'Grady)

Catholics in the United States are now making a new examination of conscience in regard to their attitude toward immigration. It may be that they are not ready for a complete review of their attitude over the past 35 years. As I moved around the country, I used to hear rumblings about "enough of this" and "enough of that." I have heard it said that we have had enough of certain types of immigrants. Sometimes this was not said too loudly, but the feeling was there just the same. In the early twenties some people used to tell me about their efforts to get certain leaders of the church to take a somewhat different attitude toward the immigration pattern that was then in the making, about the influence of this attitude on Catholic life and the mentality to which it gave evidence in the Catholic people. But it was all without avail. The records will indicate that most Catholic leaders were satisfied to ride along with the tide. Labor was favorable to a rigid program, and we must go along with labor.

EMERGENCE OF NATIVISM AND RACISM IN THE
UNITED STATES

As one observed the tide of the times during the decade following the First World War, one could not fail to be disturbed by the new nationalism, the nativism, the intolerance, the racism that were evident everywhere. Here and there small minorities began to raise their voices against these prejudices, but it was of little avail. They

did not get much encouragement from those who should have gone down the line with them. It was in this sort of atmosphere that our present immigration pattern took form. During this chauvinistic period it was not merely a question of restricting numbers coming to the United States; even many who felt that the United States could still benefit by a considerable flow of immigration were willing, and many times anxious, to have some limitation of numbers. They did not want to return to the liberal prewar policy, under which more than 1,000,000 immigrants were permitted to enter our country each year, but they did not want to go along with the doctrine that has set up certain nations of northern Europe as superior peoples as compared with those of southern and eastern Europe. They did not want to see the Congress of the United States establish an immigration pattern that was discriminatory against the people of southern and eastern Europe. They did not want to see anthropological and biological concepts that had no basis in fact accepted by American leaders.

Here and there one found able economists and statisticians who believed that there should not be any restrictions on the free flow of peoples except insofar as they concerned the physically or mentally handicapped, those who might become public charges or those who might threaten the American way of life. They believed that the great progress of American industries in the nineties and in the first decade of this century was due in large part to the immigration of strong, vigorous, and industrious Europeans. They believed that the volume of immigration had pretty well adjusted itself to the ups and downs of the business cycle in this country. In fact, they believed that it was very sensitive to the labor needs of the country, and that in periods of depression there was invariably a considerable emigration from the United States back to Europe.

MOVEMENT FOR RESTRICTIVE IMMIGRATION

It is not easy for one to understand the immigration discussions of the years immediately following World War I without understanding their genesis. The movement for restrictive immigration to this country began with the nineties. During this decade various efforts were made to regulate not only the quantity but also the quality of immigration. This centered largely around the so-called literacy test. During this period labor leaders became very active in the campaign for restrictive immigration. They felt that the free flow of European labor into this country was one of the great obstacles that prevented them from organizing the labor forces. How far their contentions were based on factual data has ever been and will remain a moot question.

Following a popular device of the period, a National Commission on Immigration was set up in 1907. In its 1911 report the Commission found that the "new immigrants" were not inferior to the old, but concluded that they did not assimilate as readily. It suggested the limitation of the number of each race arriving annually to a certain percentage of the average of that race arriving during a given period of years. This, of course, was far less radical than the national origins formula later adopted.

Undoubtedly the report of the National Commission on Immigration gave a strong impetus to the movement for more restrictive immigration to the United States. In every session of Congress new efforts were made to have the literacy test adopted. Legislation to impose a literacy test on immigrants was vetoed by Presidents Cleveland and Taft. Finally it was passed in 1917 over the veto of President Wilson.

EVER MORE RESTRICTIVE MEASURES DEMANDED

The crusaders for new immigration restrictions after the First World War were no longer satisfied with the literacy test of

Case: 1:21-cr-00665 Document #: 30-5 Filed: 05/02/22 Page 52 of 55 PageID #:819

1917. Many of the more extreme among them wanted to cut off immigration entirely. Finally the Quota Act, passed in 1924, introduced a new formula for computing national quotas, based on the foreign-born population of the United States in 1890 instead of 1910, and reduced the quotas from 3 percent to 2 percent of the base population. The total number of immigrants permitted to come into the United States in any one year was thus reduced to approximately 162,000. The national origins formula adopted in 1929 further reduced this number to 153,000. This formula apportioned quotas relative to the estimated national origins distribution of the white population of the United States in 1920. This is the system by which American immigration policy is governed at the present time. If anything, the system has become more and more rigid. Most of the efforts that have been made to liberalize it have ended in making it more rigid.

### DISPLACED PERSONS ACT AMENDED

The only important deviation from the legislation of 1924 has been the Displaced Persons Act of 1948 as amended in 1950. This act permitted approximately 325,000 so-called United Nations displaced persons to be brought into the country during the past 4 years. While this has been regarded as a temporary departure from our immigration policy, nevertheless it has made the displaced persons coming into this country a charge on the quotas of the countries of their origin. It has meant mortgaging the quotas of these countries for future years.

The termination of the Displaced Persons Act, and of the International Refugee Organization charged with its administration, has again brought the people of the United States face to face with their continuing responsibilities for the displaced peoples of Europe. We must again face the question as to what part we are going to play as a nation in resettling the displaced persons of German ethnic origin now in Germany, in resettling the seven-hundred-thousand-odd persons of Italian ethnic origin from Greece, Rumania, Yugoslavia, and the former Italian colonies in north Africa who for the most part are living in camps in Italy and for whom there is no place in the Italian economy.

One important move has already been made in the setting up of a new temporary international organization to continue the work of the International Refugee Organization. The Congress of the United States has made available the sum of $10,000,000 to this international organization. While the various American voluntary groups that have worked on the resettlement of displaced persons are giving thought to their continued responsibility for them, they find themselves confronted with a new effort to codify basic immigration legislation. They find themselves confronted with proposals that will make our legislation, if anything, more restrictive. They also find themselves confronted with proposals that would virtually bring to an end all efforts to settle displaced persons in this country.

### VOLUNTARY ORGANIZATIONS FACED BY NEW PROBLEMS

The new proposals for immigration legislation that are being promoted in the Congress raise questions for the voluntary organizations as to how far they can separate permanent immigration legislation from that affecting the immediate problem of displaced persons. It looks now as if there will not be much choice. We are faced with the prospects of finding ourselves saddled with a new and more rigid type of immigration legislation for the next 25 years, legislation that will make impossible any program that is in harmony with our Christian and our democratic ideals.

The United States has assumed a world-wide leadership in maintaining the Christian and democratic way of life. It is therefore interested in building up the economies of other countries and strengthening them in their fight against communism. This cannot be done by material aid alone. No amount of material aid can solve the problems of Italy, or even of Western Germany, and Greece and Holland, without an opportunity of settling some of their people in other countries. On the basis of my recent study of the south Italian situation I have come to the conclusion that these countries must have an opportunity of settling their people in other countries. We are interested in having them do so, but we cannot ask the other countries to accept Italian immigrants if we are not willing to do our fair share. The people of south Italy have studied our immigration traditions. They know very well that our present immigration legislation is discriminatory against them. They keep on asking how soon will America change its attitude and begin to open its doors to some more Italians? As I talked to the hundreds of unemployed and hungry people in south Italy, I found it difficult to answer their questions in regard to Italian immigration, and I kept on saying to myself: "What can we do to hold Italy on our side in face of the onslaught that communism is making in every city and in every town in the peninsula?" The Communists know how to play on our prejudices against the Italian people. Is there nothing we can do to liberalize our immigration policies so as to offer a token of interest to the Italian people? As I moved around the towns in south Italy, I knew with what hope they referred to the fact that from one town 20 families had left for Venezuela during the past week. In another town they told me how in recent weeks 20 families had left for Brazil. To the people of these towns even the small movement of their people to other countries offered a ray of hope for the future.

### PREJUDICIAL ASPECTS OF NATIONAL ORIGINS LEGISLATION

All the discussions preceding the enactment of the national origins legislation showed that it was definitely prejudicial to people in southern and eastern Europe. Of the total quota of 153,000 to be admitted into the United States each year under the program the Italian quota was only 5,000 while the British quota was 65,000 and the German quota 26,000. During the past 18 years, less than 44 percent of the quota numbers for northern European countries have been used. This simply means that the countries with large quotas like Great Britain, for example, and Ireland have not been using their quotas, with the net result that only about one-half of the people whose admission was contemplated under the national origins system are admitted to the United States.

A number of basic questions in regard to our immigration policy confront the Catholic people as well as other people in the United States at the present time. The first is the promotion of a Christian and democratic attitude towards immigration. How can we expect, as a people, to retain our leadership among the peoples of the Western World if we stigmatize these peoples as being inferior and unworthy of admission to our country? How can we become leaders of the democratic world if we continue an immigration policy that has all the elements of racism, of extreme nationalism, of nativism? After all, the world is small at the present time. We are called upon to associate with all peoples.

### THE HOLY FATHER PROCLAIMS THE CHRISTIAN ATTITUDE

Our Holy Father has set before us as one of the great objectives of the church in our time the promotion of a Christian international attitude toward immigration. He is constantly reminding us of the universalism of our church, of the universality of its charity, of its concern for all mankind and of the concern of all God's children for one another, no matter what their race, their nationality, or their color may be. Surely we must join with our Holy Father in promoting this basic objective of the church in our time. We must spread the gospel of an international brotherhood in our own country, among our own peoples. We must even begin to teach this gospel of universal brotherhood in our colleges, in our high schools, and even in our grade schools.

### RACIAL DISCRIMINATION MUST NOT MAR IMMIGRATION LAW

We must give consideration to how far the Christian attitude toward immigration is implemented in the bills before our Congress. We know that the omnibus bill cannot possibly be accepted, at least without far-reaching amendments, as an expression of a Christian attitude toward immigration. We feel that the legislation should at least mark a step ahead in making the unused quotas of countries like Great Britain and Ireland available to Italians and displaced persons of German stock with their grave unemployment problems. We feel that this should be a part of any Christian international policy. We feel that no legislation which regards the peoples of other nations as inferior can long remain on the statute books. It certainly is an insult to stigmatize as inferiors the people of Italy with their long cultural and Christian traditions. We know that there is no people to whom the world owes so much—insofar as Christian teaching, the arts, music, literature, archeology and even the great inventions are concerned—as it does to the Italian people. In view of present world conditions it would be a serious mistake and utterly unchristian to adopt any form of immigration legislation that would discriminate against the people of other countries, that would set them down as inferior peoples and that would even brand large numbers of our own people as second-class citizens. It is to be regretted that this appears to be the avowed purpose of the omnibus immigration bills reported out by the Senate and House Judiciary Committees.

### SPLENDID WORK OF IRO MUST BE CONTINUED

As a part of the foreign policy of our Government at the present time the Congress should adopt emergency legislation to continue the interest of the United States in displaced persons. We should endeavor to take steps to continue the splendid work of the International Refugee Organization in settling approximately 1,000,000 displaced persons from Europe in various other countries throughout the world. We must continue our interest as a country in helping displaced Italians to find homes in other countries. We must also use our efforts to help to find homes in other countries for displaced Germans, for displaced Greeks, and for displaced Dutch. We are not going to undertake this work alone. We are going to join with other countries as we have in the past in a continuing interest in the resettlement of displaced persons.

Twenty-one governments have already been committed to the new international organization for the resettlement of displaced persons. It is our hope that this organization may have the support of the people of the United States. We should recall at this time that our Holy Father has set up an International Catholic Migration Commission with headquarters in Geneva. This Commission calls for our support, as it does for the support of Catholics in other countries. It is a symbol of the international interest of our church in this field.

### UNPRECEDENTED ACHIEVEMENT OF THE CATHOLIC WAR RELIEF SERVICES

It is our hope that the campaign now under way, with the full approval of the bishops of the United States, for the promotion of a Christian doctrine of immigration

will permeate our whole Catholic life, and that it will give our Church an opportunity of taking its proper place as the strongest Church in the world at the present time. It is our hope, too, that in promoting this Christian and democratic approach to immigration on the international level we shall be able to join forces with other religious groups with which we have worked so successfully in the resettlement of displaced persons.

Every Catholic should feel proud of the great contribution of war relief services of the National Catholic Welfare Conference in the resettlement of 120,000 displaced persons in the United States. No voluntary organization in all history can register such an achievement. It is our hope that this work may be continued as an evidence of the continuing international leadership of our Church in these revolutionary times.

The VICE PRESIDENT. The bill is open to further amendment.

Mr. McCARRAN. Mr. President, if there are no further amendments to be offered, I ask unanimous consent that the Senate proceed to the consideration of Calendar No. 1416, House bill 5678.

The VICE PRESIDENT. The clerk will state the bill by title.

The LEGISLATIVE CLERK. A bill (H. R. 5678) to revise the laws relating to immigration, naturalization, and nationality, and for other purposes.

The VICE PRESIDENT. Is there objection to the request of the Senator from Nevada?

There being no objection, the Senate proceeded to consider the bill.

Mr. McCARRAN. Mr. President, I move as an amendment that all after the enacting clause of the House bill be stricken out, and that there be substituted the text of Senate bill 2550, as amended.

The amendment was agreed to.

The VICE PRESIDENT. The question is on the engrossment of the amendment and the third reading of the bill.

The amendment was ordered to be engrossed, and the bill to be read a third time.

The bill (H. R. 5678) was read the third time, and passed.

Mr. McCARRAN. Mr. President, I move that the Senate insist upon its amendment, request a conference thereon with the House of Representatives, and that the Chair appoint the conferees on the part of the Senate.

The motion was agreed to; and the Vice President appointed Mr. McCARRAN, Mr. EASTLAND, Mr. O'CONOR, Mr. SMITH of North Carolina, Mr. WILEY, Mr. FERGUSON, and Mr. JENNER conferees on the part of the Senate.

The VICE PRESIDENT. Without objection, Senate bill 2550 will be indefinitely postponed.

Mr. McCARRAN. Mr. President, I would not be true to my thoughts and my feelings at this moment were I not to give credit where credit is due. The chairman of the Committee on the Judiciary has been sitting here for days with members of his staff about him. I refer to the able and splendid assistance rendered to the chairman, in writing the bill just passed, by Mr. Drury H. Blair, who sits two from my left, Miss Ethel L. Johnson, an expert on naturalization, who has been at my command on the floor of the Senate, and last, but not least, the head of the staff having immigration in hand, who has for years worked diligently on the bill, Mr. Richard Arens, who sits next to me.

Mr. FERGUSON. Mr. President, I wish to join in the remarks of the Senator from Nevada, and to say to the Senate that on all occasions the Senator from Michigan, a member of the minority on the Senate Committee on the Judiciary, has received the cooperation of Miss Johnson, Mr. Arens, and Mr. Blair. They have worked tirelessly, and have been of great aid and assistance in perfecting the bill which has been under consideration, and which has just been passed by the Senate.

Mr. McCARRAN. Mr. President, at this time I wish to say to the Members of the Senate who have remained in attendance long hours while the bill has been under consideration, and have shown unusual interest in the bill, that I am exceedingly grateful to them, and very happy because they had sufficient confidence in the chairman of the Committee on the Judiciary and in the committee, and in the work which it has been engaged for three long years, to remain in attendance and assist in the adoption of some amendments and the rejection of others and in the passage of the bill.

Mr. LEHMAN. Mr. President, for more than a year now I have been working, studying, writing, and speaking on the subject of immigration.

Often in the past 2 weeks I have spoken often in the course of the prolonged debate we have had on the subject of the McCarran omnibus immigration bill.

I have felt that no measure of greater significance and scope has been before the Congress since I have been a Member. I felt that the passage of the McCarran bill in substantially the form in which it has passed would be a development of the gravest consequences. I have felt that, should this measure or one roughly similar to it become law, the very meaning of America, as most of us know it, would be radically affected, that hundreds of thousands of aliens in this country, and hundreds of thousands of naturalized and even native-born citizens, would be seriously affected.

I did not contest and do not now contest the fact that there are some desirable and useful provisions in the bill. I, too, would like to see those provisions enacted. But I feel more keenly now than ever that we cannot afford the price of those provisions if we must also buy the rest of the McCarran bill, with all its incipient dangers to our ideals of justice and equity, with all its built-in prejudices and suspicion of foreigners, with all its revalidation of the discredited theory of racial origins.

I do not think we can afford to pay such a price; I do not think we can afford to see enacted into law so many mischievous and trouble-making provisions just in order to get partial lifting of certain racial restrictions, however desirable that may be.

We must bear in mind that the McCarran bill, as passed, reflects a basic discrimination against peoples from eastern and southern Europe; it reflects a basic discrimination against Negroes. It has the potentialities of slamming the door shut upon all but a trickle of immigration into this country. It makes easy the deportation of thousands of people who should not be deported. It makes denaturalization an everyday possibility for naturalized citizens. It creates a great class of second-class citizens in our country.

I am proud of the part I have been able to play in helping lead the fight against this measure, in bringing the incipient evils in the bill to the attention of the Senate and of the public. I hope that we have made a record which the President can study in arriving at his decision on whether to sign or veto this iniquitous measure.

The debate has brought out a basic difference of philosophy between those who support and those who have opposed the McCarran bill. Those of us who have opposed the bill believe in America, in what it has been and in what it will be. We believe that America has become great under the leavening influence of the broad streams of freedom-loving and freedom-seeking immigrants who have come from many lands. We have no fear of and no prejudices against the foreigner as such. We believe that Amercanism is in the air here—not in the blood.

I shall not delay the Senate more. I still trust and hope that this measure will not become law. I can speak for myself, and I think for my associates in this fight, in pledging to continue our efforts to liberalize and humanize our present immigration laws as reflected in the Humphrey-Lehman bill, S. 2842. We shall never give up our fight against such proposals as the McCarran bill, with its overtones or prejudice and discrimination.

Mr. HUMPHREY. Mr. President, I wish to associate myself with the remarks of my colleague [Mr. LEHMAN] with regard to the struggle in connection with the immigration bill. I want the RECORD to be perfectly clear. On several occasions the majority leader has pointed out that a good deal of time has been spent on the bill; but the time has been well spent, and it will have been well spent for the future welfare of our country. I have that feeling as we come to the conclusion of the consideration of the bill, after two initial votes, the vote on recommittal and the vote on the substitute. Our task as opponents of the McCarran bill was precisely to point up the RECORD with a series of amendments. It was for that reason that we brought up the amendments. We resorted only to voice votes. It was obvious that we did not have a majority of votes, in terms of adopting the amendments. However, it is equally obvious that there was considerable support for the amendments, for the substitute measure, and for recommittal.

I believe that the bill should not become law. I shall do everything within my power to persuade the people to appeal to the President to veto the bill. I think it should be vetoed, in terms of our national interest and national security, and in terms of the status and respect of the American people in the eyes of the world.

I have never worked with a more wonderful group of colleagues than those who have been associated with me in this fight. We have had as our associates the distinguished Senator from New York [Mr. LEHMAN], who has poured out his heart, his brilliance, and his ever persevering energy in support of the substitute measure and of the many amendments.

I wish to pay tribute to the Senator from Connecticut [Mr. BENTON] and his senior colleague [Mr. McCARRAN] for the work they have done.

I pay tribute also the Senator from Rhode Island [Mr. PASTORE], the Senator from West Virginia [Mr. KILGORE], the Senator from Illinois [Mr. DOUGLAS], the senior Senator from Rhode Island [Mr. GREEN], the Senator from Michigan [Mr. MOODY], the Senator from Montana [Mr. MURRAY], and the Senator from Tennessee [Mr. KEFAUVER], who returned from a speaking tour to participate with us in this struggle over the immigration bill.

Last, but not least, I pay tribute to the distinguished Senator from Oregon [Mr. MORSE], who made a brilliant argument this afternoon, which went unanswered, as to the relations of the bill to the Administrative Procedure Act.

Of course, I pay tribute also to the Senator from New Mexico [Mr. CHAVEZ], who has shown great interest in the fight.

Let me say with equal candor that I was deeply disturbed by the fact that during the debate on an issue which affects the lives of millions of people, and may well affect the future welfare and policy of the country, there was such a small attendance of Senators. That is not the fault of the majority leader. The consideration of the bill could have been completed much sooner if Senators had been present in the Chamber to do the job of legislating. However, we wanted to make the argument which we did. As the editorials in leading newspapers of America bear witness, as the radio commentators during the past week have borne witness, as thousands of letters which have poured into the offices of Senators and Representatives bear witness, I am proud to say that as the debate progressed leading members of the great churches of America—Catholic, Protestant, and Jewish—as well as leading members of fraternal organizations and nationality groups, joined with the Senator from New York [Mr. LEHMAN] and his colleagues, including myself, in opposition to the bill.

I hope and pray that the President of the United States, when this measure comes back from conference and reaches his desk, will listen to the words of those who have pleaded with sincerity and great feeling that this immigration bill be vetoed. I hope it will be vetoed. I think we shall have a sufficient number of votes in this body to sustain a veto. I think that feeling is justified by the first two votes which were taken, on the subcommittee measure and on the question of recommittal. We shall have the votes to save America from entering upon a path of legislative policy which could cause us great tragedy in the days to come.

Mr. McFARLAND. Mr. President, I realize that the distinguished Senator from Minnesota, the distinguished Senator from New York, and other Senators who have been associated with them in their opposition to the bill, and their advocacy of the substitute and the amendments which have been offered, feel very deeply in regard to the issues which have been the subject of debate.

I wish to express to them my personal appreciation for their cooperation in expediting the consideration of the bill. They have not used all the time at their disposal today. We might have been here until 12 o'clock tonight and after, and still not have completed consideration of the bill.

I also express my appreciation to other Members of the Senate for their cooperation, and for helping us to dispose of the immigration bill at this hour.

Mr. President, I now desire to make a motion.

The VICE PRESIDENT. The Senator from Arizona has the floor.

---

## HOUSING ACT OF 1952

Mr. McFARLAND. Mr. President, I move that the Senate proceed to the consideration of Calendar No. 1510, Senate bill 3066, a bill to amend defense-housing laws, and for other purposes.

The VICE PRESIDENT. The question is on agreeing to the motion of the Senator from Arizona.

The motion was agreed to; and the Senate proceeded to consider the bill, which had been reported from the Committee on Banking and Currency with amendments.

Mr. MAYBANK. Mr. President, the distinguished majority leader suggested to me earlier today that perhaps the Senate might meet at 10 o'clock tomorrow morning and proceed with the consideration of the proposed housing legislation, which has been made the unfinished business.

The distinguished junior Senator from Ohio [Mr. BRICKER] is present, and I may say that I was informed that the Senator from Indiana [Mr. CAPEHART], would return to the city tonight. I have talked over the matter with the Senator from Indiana and the Senator from Ohio, and I think the Senator from Ohio will agree with me that the bill has been shortened by the committee, and that the committee is perfectly satisfied with the provisions of the bill as it is written.

Mr. President, unless extraneous matters arise, I very frankly do not think it will take more than an hour to dispose of the measure, because the only proposals are to extend certain FNMA mortgage authority, provide $1,000,000,000 for FHA, increase community facilities to some degree, help farm housing to a small extent, provide that Guam may be designated as a place where FHA may finance housing, and add a little to the revolving fund for Alaska housing.

I wish to say to the Senator from Arizona that, so far as the members of the committee are concerned, the Senate might meet at 11 o'clock. Of course, we could not bind other Senators, nor would we attempt to do so.

I have had letters from Members of the Senate who are anxious to have extended for the benefit of contractors and business people, FHA mortgage loans which have expired.

I do not think it will be necessary to meet before 11 o'clock. I hope I am not being presumptuous, but I think that if the Senate meets at 11 o'clock, unless something unforeseen arises, we shall be able to finish consideration of the bill. With the permission of the Senator from Arizona, I should like to ask the ranking Republican member of the committee what his thoughts are in this regard.

Mr. BRICKER. Mr. President, I concur in what the chairman of the committee has said. I think the bill was worked out pretty well to the satisfaction of all the members of the committee. There was no opposition vote on the part of any member of the committee.

Mr. MAYBANK. Senators wrote me letters as chairman of the committee, urging that the bill be considered.

Mr. BRICKER. That is correct. Furthermore, I think there is no amendment of any substance to the bill, except for a change in the amounts, increasing the amounts so as to take care of the increasing needs in the housing field. So I am confident, without being presumptuous, that it would not require more than an hour or two to complete consideration of the bill, unless some opposition should appear of which the committee members have no knowledge.

Mr. McFARLAND. It is perfectly agreeable to me to have the Senate meet at 11 o'clock a. m. My only purpose in suggesting that the Senate meet at an earlier hour was that I wanted to be sure that the consideration of the bill would be completed tomorrow. We can meet at 12 o'clock if Senators are sure that we can finish consideration of the bill.

Mr. MAYBANK. I can speak only for the committee, and for the Members on the Democratic side. I have talked with the Senator from Illinois [Mr. DOUGLAS], and the Senator from Delaware [Mr. FREAR], who were present in the Chamber a while ago. I am certain that there will be no difficulty about disposing of the bill. I am certain that the Senator from New Hampshire [Mr. BRIDGES], the Senator from Ohio [Mr. BRICKER], and the Senator from Indiana [Mr. CAPEHART] feel that, unless something unforeseen arises, there will be no difficulty.

Mr. McFARLAND. The two distinguished Senators almost make me feel sorry that we did not plan to complete consideration of the bill tonight.

Mr. BRICKER. I believe that if the majority leader had known what the situation would be, it could have been disposed of this evening.

Mr. ROBERTSON. Mr. President, will the Senator from Arizona yield?

Mr. McFARLAND. I yield.

Mr. ROBERTSON. The bill which we have reported from the committee is a very conservative bill. We were in substantial agreement in the committee, on both sides. I cannot imagine that there will be any real controversy over the bill.

Mr. McFARLAND. When does the Senator from South Carolina wish to have the Senate meet tomorrow?

Mr. MAYBANK. Twelve o'clock noon would suit me, in view of the fact that the Appropriations Committee is to meet at 10:30. If the Senate were to meet at 12 o'clock, I believe we could complete consideration of the bill.

Mr. McFARLAND. That is perfectly agreeable to me. If we can complete consideration of the bill in half an hour, we shall proceed to the consideration of the mutual security bill and see if we can make some progress on it.

Mr. MAYBANK. It is my judgment that we can do so.

Mr. McFARLAND. I should be glad to have the Senate make some progress on the mutual security bill tomorrow.

Mr. BRICKER. Mr. President, I should like to ask a question for the purpose of the record. I think the chairman of the committee has communicated with the Senator from Indiana [Mr. CAPEHART].

Mr. MAYBANK. My office has communicated with him. The Senator from Indiana is on his way back to the city. He will call us as soon as he reaches here. He is returning from Boston.

Mr. BRICKER. When the bill was reported from the committee, he expressed to me the same feeling which has been expressed here on the floor of the Senate.

Mr. MAYBANK. He is returning on the train from Boston. I understand that he is expected to arrive about 9 o'clock.

Mr. BRIDGES. Mr. President, will the Senator yield to me for a moment?

Mr. McFARLAND. I yield.

Mr. BRIDGES. I have talked with the minority members of the Banking and Currency Committee whom I have been able to reach. I have not been able to reach the Senator from Indiana.

Mr. MAYBANK. Let me say to the distinguished minority leader that I would never be one to bring a bill up in the absence of the ranking minority member of the committee. However, after talking with the Senator from Ohio [Mr. BRICKER], and after calling the home of the Senator from Indiana, I am satisfied that the Senator from Indiana is agreeable. He had told me that he was in agreement with what had been done in the committee, and he so voted.

Mr. BRIDGES. I assume that everything is satisfactory. I believe that if the distinguished majority leader will arrange for the Senate to meet at 12 o'clock, there will be no reason why the bill cannot be disposed of in a reasonable time.

Mr. McFARLAND. That is perfectly agreeable to me.

Mr. MAYBANK. I thank the Senator.

---

**RECESS**

Mr. McFARLAND. Mr. President, it is with a great deal of satisfaction that I note that we have completed consideration of the immigration bill this afternoon. Some Senators doubted me when I made the statement that the Senate would dispose of the bill this week. I was not sure whether it would or not.

I am happy to make the motion that the Senate stand in recess until 12 o'clock noon tomorrow.

The motion was agreed to; and (at 7 o'clock and 20 minutes p. m.) the Senate took a recess until tomorrow, Friday, May 23, 1952, at 12 o'clock meridian.

---

# HOUSE OF REPRESENTATIVES

THURSDAY, MAY 22, 1952

The House met at 10 o'clock a. m.

The Chaplain, Rev. Bernard Braskamp, D. D., offered the following prayer:

O Thou who art our refuge and strength and our help in time of trouble, we are daily beseeching Thee to bestow upon us the blessings of divine wisdom and guidance.

Thou knowest how greatly concerned and disturbed we are about the present condition and welfare of our beloved country and the problems of its defense and security.

We pray that we may be inspired with an indomitable courage and determination to save our Republic from corruption and degeneracy.

Grant that the virtues of righteousness and the fear of God may be enthroned in our national life, for history shows us very clearly and conclusively that these virtues are the only sure protection against all that is debasing and the only absolute guaranty and assurance of a nation's prosperity and perpetuity.

Wilt Thou create and stimulate in the hearts of all leaders, civilian and military, a lofty and unflinching sense of duty and responsibility in helping our democracy attain unto the highest possible standards of living and efficiency. May our democracy be rich and strong in the spirit of good will and brotherhood.

Hear us in the name of the Captain of our salvation. Amen.

The Journal of the proceedings of yesterday was read and approved.

---

SPECIAL ORDERS GRANTED

Mr. VURSELL asked and was given permission to address the House on Wednesday next for 30 minutes, following the legislative business of the day and any other special orders heretofore entered.

Mr. PERKINS asked and was given permission to address the House tomorrow for 10 minutes, following the legislative business of the day and any other special orders heretofore entered.

---

PARLIAMENTARY INQUIRY

Mr. RANKIN. Mr. Speaker, a parliamentary inquiry.

The SPEAKER. The gentleman will state it.

Mr. RANKIN. What time is the Senate invited to be here today?

The SPEAKER. Between 12 and 12:30.

Mr. RANKIN. Then, I suggest that marking these seats and depriving the Members of the use of them is nonsense, and I ask that they be removed.

The SPEAKER. There is no prohibition against Members using any seat they desire.

---

CALL OF THE HOUSE

Mr. AUGUST H. ANDRESEN. Mr. Speaker, I make the point of order that there is no quorum present.

The SPEAKER. Evidently no quorum is present.

Mr. COOPER. Mr. Speaker, I move a call of the House.

A call of the House was ordered.

The Clerk called the roll, and the following Members failed to answer to their names:

[Roll No. 81]

| | | |
|---|---|---|
| Aandahl | Engle | O'Brien, N. Y. |
| Albert | Fugate | O'Toole |
| Anderson, Calif. | Furcolo | Patterson |
| Armstrong | Gathings | Phillips |
| Baker | Gavin | Poulson |
| Bakewell | Golden | Powell |
| Barrett | Granger | Ramsay |
| Beckworth | Hall, | Redden |
| Bonner | | Edwin Arthur Robeson |
| Boykin | Hart | Rogers, Mass. |
| Brambiett | Havenner | Sabath |
| Bray | Hays, Ohio | St. George |
| Buchanan | Hébert | Sasscer |
| Buffett | Herlong | Scudder |
| Burnside | Herter | Secrest |
| Camp | Hoeven | Sheppard |
| Carlyle | Holifield | Sieminski |
| Celler | Hunter | Staggers |
| Chatham | Irving | Stockman |
| Chelf | Jackson, Calif. | Tackett |
| Combs | Johnson | Talle |
| Cooley | Jones, | Thompson, |
| Corbett | Hamilton C. | Mich. |
| Cunningham | Jones, | Van Pelt |
| Davis, Tenn. | Woodrow W. | Vinson |
| Dawson | Kearney | Walter |
| Deane | Kelley, Pa. | Welch |
| deGraffenried | Kennedy | Werdel |
| D'Ewart | Kerr | Wharton |
| Dingell | King, Calif. | Wheeler |
| Dondero | McKinnon | Wickersham |
| Donovan | Miller, Calif. | Wilson, Ind. |
| Doughton | Mitchell | Wilson, Tex. |
| Doyle | Morris | Woodruff |
| Durham | Moulder | |
| Eaton | Murphy | |

The SPEAKER. On this roll call 319 Members have answered to their names; a quorum is present.

By unanimous consent, further proceedings under the call were dispensed with.

---

MUTUAL SECURITY ACT OF 1952

Mr. RICHARDS. Mr. Speaker, I move that the House resolve itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill (H. R. 7005) to amend the Mutual Security Act of 1951, and for other purposes.

The motion was agreed to.

Accordingly the House resolved itself into the Committee of the Whole House on the State of the Union for the further consideration of the bill H. R. 7005, with Mr. COOPER in the chair.

The Clerk read the title of the bill.

The CHAIRMAN. When the Committee rose on yesterday the Clerk had read section 1 of the committee amendment.

If there are no amendments to section 1, the Clerk will read.

Mr. HINSHAW. Mr. Chairman, I move to strike out the last word.

Mr. Chairman, in considering this very important subject, I think we should