# EXHIBIT BB

Truman Veto Statement

Case: 1:21-cr-00665 Document #: 36-7 Filed: 05/03/22 Page 2 of 10 PageID #:837






MENU

# Veto of Bill To Revise the Laws Relating to Immigration, Naturalization, and Nationality

June 25, 1952

To the House of Representatives:

I return herewith, without my approval, H.R. 5678, the proposed Immigration and Nationality Act.

In outlining my objections to this bill, I want to make it clear that it contains certain provisions that meet with my approval. This is a long and complex piece of legislation. It has 164 separate sections, some with more than 40 subdivisions. It presents a difficult problem of weighing the good against the bad, and arriving at a judgment on the whole.

H.R. 5678 is an omnibus bill which would revise and codify all of our laws relating to immigration, naturalization, and nationality.

A general revision and modernization of these laws unquestionably is needed and long overdue, particularly with respect to immigration. But this bill would not provide us with an immigration policy adequate for the present world situation. Indeed, the bill, taking all its provisions together, would be a step backward and not a step forward. In view of the crying need for reform in the field of immigration, I deeply regret that I am unable to approve H.R. 5678.

In recent years, our immigration policy has become a matter of major national concern. Long dormant questions about the effect of our immigration laws now assume first rate importance. What we do in the field of immigration and naturalization is vital to the continued growth and internal development of the United States--to the economic and social strength of our country-which is the core of the defense of the free world. Our immigration policy is equally, if not more important to the conduct of our foreign relations and to

our responsibilities of moral leadership in the struggle for world peace.

In one respect, this bill recognizes the great international significance of our immigration and naturalization policy, and takes a step to improve existing laws. All racial bars to naturalization would be removed, and at least some minimum immigration quota would be afforded to each of the free nations of Asia.

I have long urged that racial or national barriers to naturalization be abolished. This was one of the recommendations in my civil rights message to the Congress on February 2, 1948. On February 19, 1951, the House of Representatives unanimously passed a bill to carry it out.

But now this most desirable provision comes before me embedded in a mass of legislation which would perpetuate injustices of long standing against many other nations of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhumane aspects of our immigration procedures. The price is too high, and in good conscience I cannot agree to pay it.

I want all our residents of Japanese ancestry, and all our friends throughout the far East, to understand this point clearly. I cannot take the step I would like to take, and strike down the bars that prejudice has erected against them, without, at the same time, establishing new discriminations against the peoples of Asia and approving harsh and repressive measures directed at all who seek a new life within our boundaries. I am sure that with a little more time and a little more discussion in this country the public conscience and the good sense of the American people will assert themselves, and we shall be in a position to enact an immigration and naturalization policy that will be fair to all.

In addition to removing racial bars to naturalization, the bill would permit American women citizens to bring their alien husbands to this country as non-quota immigrants, and enable alien husbands of resident women aliens to come in under the quota in a preferred status. These provisions would be a step toward preserving the integrity of the family under our immigration laws, and are clearly desirable.

The bill would also relieve transportation companies of some of the unjustified burdens and penalties now imposed upon them. In particular, it would put an end to the archaic requirement that carriers pay the expenses of aliens detained at the port of entry, even though such aliens have arrived with proper travel documents.

But these few improvements are heavily outweighed by other provisions of the bill which retain existing defects in our laws, and add many undesirable new features.

The bill would continue, practically without change, the national origins quota system, which was enacted, into law in 1924, and put into effect in 1929. This quota system-always based upon assumptions at variance with our American ideals--is long since out of date and more than ever unrealistic in the face of present world conditions.

This system hinders us in dealing with current immigration problems, and is a constant handicap in the conduct of our foreign relations. As I stated in my message to Congress on March 24, 1952, on the need for an emergency program of immigration from Europe, "Our present quota system is not only inadequate to most present emergency needs, it is also an obstacle to the development of an enlightened and satisfactory immigration policy for the long-run future."

The inadequacy of the present quota system has been demonstrated since the end of the war, when we were compelled to resort to emergency legislation to admit displaced persons. If the quota system remains unchanged, we shall be compelled to resort to similar emergency legislation again, in order to admit any substantial portion of the refugees from communism or the victims of overcrowding in Europe.

With the idea of quotas in general there is no quarrel. Some numerical limitation must be set, so that immigration will be within our capacity to absorb. But the overall limitation of numbers imposed by the national origins quota system is too small for our needs today, and the country by country limitations create a pattern that is insulting to large numbers of our finest citizens, irritating to our allies abroad, and foreign to our purposes and ideals.

The overall quota limitation, under the law of 1924, restricted annual immigration to approximately 150,000. This was about one-seventh of one percent of our total population in 1920. Taking into account the growth in population since 1920, the law now allows us but one-tenth of one percent of our total population. And since the largest national quotas are only partly used, the number actually coming in has been in the neighborhood of one-fifteenth of one percent. This is far less than we must have in the years ahead to keep up with the growing needs of the Nation for manpower to maintain the strength and vigor of our economy.

The greatest vice of the present quota system, however, is that it discriminates, deliberately and intentionally, against many of the peoples of the world. The purpose behind it was to cut down and virtually eliminate immigration to this country from Southern and Eastern Europe. A theory was invented to rationalize this objective. The theory was that in order to be readily assimilable, European immigrants should be admitted in proportion to the numbers of persons of their respective national stocks already here as shown by the census of 1920. Since Americans of English, Irish and German descent were most numerous, immigrants of those three nationalities got the lion's share--more than two-thirds--of the total quota. The remaining third was divided up among all the other nations given quotas.

The desired effect was obtained. Immigration from the newer sources of Southern and Eastern Europe was reduced to a trickle. The quotas allotted to England and Ireland remained largely unused, as was intended. Total quota immigration fell to a half or a third--and sometimes even less--of the annual limit of 154,000. People from such countries as Greece, or Spain, or Latvia were virtually deprived of any opportunity to come here at all, simply because Greeks or Spaniards or Latvians had not come here before 1920 in any substantial numbers.

The idea behind this discriminatory policy was, to put it baldly, that Americans with English or Irish names were better people and better citizens than Americans with Italian or Greek or Polish names. It was thought that people of West European origin made better citizens than Rumanians or Yugoslavs or Ukrainians or Hungarians or Baits or Austrians. Such a concept is utterly unworthy of our traditions and our ideals. It violates the great political doctrine of the Declaration of Independence that "all men are created equal." It denies the humanitarian creed inscribed beneath the Statue of Liberty proclaiming to all nations, "Give me your tired, your poor, your huddled masses yearning to breathe free."

It repudiates our basic religious concepts, our belief in the brotherhood of man, and in the words of St. Paul that "there is neither Jew nor Greek, there is neither bond nor free .... for ye are all one in Christ Jesus."

The basis of this quota system was false and unworthy in 1924. It is even worse now. At the present time, this quota system keeps out the very people we want to bring in. It is incredible to me that, in this year of 1952, we should again be enacting into law such a slur on the patriotism, the capacity, and the decency of a large part of our citizenry.

Today, we have entered into an alliance, the North Atlantic Treaty, with Italy, Greece, and Turkey against one of the most terrible threats mankind has ever faced. We are asking them to join with us in protecting the peace of the world. We are helping them to build their defenses, and train their men, in the common cause. But, through this bill we say to their people: You are less worthy to come to this country than Englishmen or Irishmen; you Italians, who need to find homes abroad in the hundreds of thousands--you shall have a quota of 5,645; you Greeks, struggling to assist the helpless victims of a communist civil war-you shall have a quota of 308; and you Turks, you are brave defenders of the Eastern flank, but you shall have a quota of only 225!

Today, we are "protecting" ourselves, as we were in 1924, against being flooded by immigrants from Eastern Europe. This is fantastic. The countries of Eastern Europe have fallen under the communist yoke--they are silenced, fenced off by barbed wire and minefields-- no one passes their borders but at the risk of his life. We do not need to be protected against immigrants from these countries--on the contrary we want to stretch out a helping hand, to save those who have managed to flee into Western Europe, to succor those who are brave enough to escape from barbarism, to welcome and restore them against the day when their countries will, as we hope, be free

again. But this we cannot do, as we would like to do, because the quota for Poland is only 6,500, as against the 138,000 exiled Poles, all over Europe, who are asking to come to these shores; because the quota for the now subjugated Baltic countries is little more than 700--against the 23,000 Baltic refugees imploring us to admit them to a new life here; because the quota for Rumania is only 289, and some 30,000 Rumanians, who have managed to escape the labor camps and the mass deportations of their Soviet masters, have asked our help. These are only a few examples of the absurdity, the cruelty of carrying over into this year of 1952 the isolationist limitations of our 1924 law.

In no other realm of our national life are we so hampered and stultified by the dead hand of the past, as we are in this field of immigration. We do not limit our cities to their 1920 boundaries--we do not hold our corporations to their 1920 capitalizations-we welcome progress and change to meet changing conditions in every sphere of life, except in the field of immigration.

The time to shake off this dead weight of past mistakes is now. The time to develop a decent policy of immigration--a fitting instrument for our foreign policy and a true reflection of the ideals we stand for, at home and abroad--is now. In my earlier message on immigration, I tried to explain to the Congress that the situation we face in immigration is an emergency--that it must be met promptly. I have pointed out that in the last few years, we have blazed a new trail in immigration, through our Displaced Persons Program. Through the combined efforts of the Government and private agencies, working together not to keep people out, but to bring qualified people in, we summoned our resources of good will and human feeling to meet the task. In this program, we have found better techniques to meet the immigration problems of the 1950's.

None of this fruitful experience of the last three years is reflected in this bill before me. None of the crying human needs of this time of trouble is recognized in this bill. But it is not too late. The Congress can remedy these defects, and it can adopt legislation to meet the most critical problems before adjournment.

The only consequential change in the 1924 quota system which the bill would make is to extend a small quota to each of the countries of Asia. But most of the beneficial effects of this gesture are offset by other provisions of the bill. The countries of Asia are told in one breath that they shall have quotas for their nationals, and in the next, that the nationals of the other countries, if their ancestry is as much as 50 percent Asian, shall be charged to these quotas.

It is only with respect to persons of oriental ancestry that this invidious discrimination applies. All other persons are charged to the country of their birth. But persons with Asian ancestry are charged to the countries of Asia, wherever they may have been born, or however long their ancestors have made their homes outside the land of their origin. These provisions are without justification.

I now wish to turn to the other provisions of the bill, those dealing with the qualifications of aliens and immigrants for admission, with

the administration of the laws, and with problems of naturalization and nationality. In these provisions too, I find objections that preclude my signing this bill.

The bill would make it even more difficult to enter our country. Our resident aliens would be more easily separated from homes and families under grounds of deportation, both new and old, which would specifically be made retroactive. Admission to our citizenship would be made more difficult; expulsion from our citizenship would be made easier. Certain rights of native born, first generation Americans would be limited. All our citizens returning from abroad would be subjected to serious risk of unreasonable invasions of privacy. Seldom has a bill exhibited the distrust evidenced here for citizens and aliens alike--at a time when we need unity at home, and the confidence of our friends abroad.

We have adequate and fair provisions in our present law to protect us against the entry of criminals. The changes made by the bill in those provisions would result in empowering minor immigration and consular officials to act as prosecutor, judge and jury in determining whether acts constituting a crime have been committed. Worse, we would be compelled to exclude certain people because they have been convicted by "courts" in communist countries that know no justice. Under this provision, no matter how construed, it would not be possible for us to admit many of the men and women who have stood up against totalitarian repression and have been punished for doing so. I do not approve of substituting totalitarian vengeance for democratic justice. I will not extend full faith and credit to the judgments of the communist secret police.

The realities of a world, only partly free, would again be ignored in the provision flatly barring entry to those who made misrepresentations in securing visas. To save their lives and the lives of loved ones still imprisoned, refugees from tyranny sometimes misstate various details of their lives. We do not want to encourage fraud. But we must recognize that conditions in some parts of the world drive our friends to desperate steps. An exception restricted to cases involving misstatement of country of birth is not sufficient. And to make refugees from oppression forever deportable on such technical grounds is shabby treatment indeed.

Some of the new grounds of deportation which the bill would provide are unnecessarily severe. Defects and mistakes in admission would serve to deport at any time because of the bill's elimination, retroactively as well as prospectively, of the present humane provision barring deportations on such grounds five years after entry. Narcotic drug addicts would be deportable at any time, whether or not the addiction was culpable, and whether or not cured. The threat of deportation would drive the addict into hiding beyond the reach of cure, and the danger to the country from drug addiction would be increased.

I am asked to approve the reenactment of highly objectionable provisions now contained in the Internal Security Act of 1950--a measure passed over my veto shortly after the invasion of South Korea. Some of these provisions would empower the Attorney General to deport any alien who has engaged or has had a purpose to engage in activities "prejudicial to the public interest" or "subversive to

Case: 1:21-cr-00665 Document #: 30-7 Filed: 05/03/22 Page 8 of 10 PageID #:843

the national security." No standards or definitions are provided to guide discretion in the exercise of powers so sweeping. To punish undefined "activities" departs from traditional American insistence on established standards of guilt. To punish an undefined "purpose" is thought control.

These provisions are worse than the infamous Alien Act of 1798, passed in a time of national fear and distrust of foreigners, which gave the President power to deport any alien deemed "dangerous to the peace and safety of the United States." Alien residents were thoroughly frightened and citizens much disturbed by that threat to liberty.

Such powers are inconsistent with our democratic ideals. Conferring powers like that upon the Attorney General is unfair to him as well as to our alien residents. Once fully informed of such vast discretionary powers vested in the Attorney General, Americans now would and should be just as alarmed as Americans were in 1798 over less drastic powers vested in the President.

Heretofore, for the most part, deportation and exclusion have rested upon findings of fact made upon evidence. Under this bill, they would rest in many instances upon the "opinion" or "satisfaction" of immigration or consular employees. The change from objective findings to subjective feelings is not compatible with our system of justice. The result would be to restrict or eliminate judicial review of unlawful administrative action.

The bill would sharply restrict the present opportunity of citizens and alien residents to save family members from deportation. Under the procedures of present law, the Attorney General can exercise his discretion to suspend deportation in meritorious cases. In each such case, at the present time, the exercise of administrative discretion is subject to the scrutiny and approval of the Congress. Nevertheless, the bill would prevent this discretion from being used in many cases where it is now available, and would narrow the circle of those who can obtain relief from the letter of the law. This is most unfortunate, because the bill, in its other provisions, would impose harsher restrictions and greatly increase the number of cases deserving equitable relief.

Native-born American citizens who are dual nationals would be subjected to loss of citizenship on grounds not applicable to other native-born American citizens. This distinction is a slap at millions of Americans whose fathers were of alien birth.

Children would be subjected to additional risk of loss of citizenship. Naturalized citizens would be subjected to the risk of denaturalization by any procedure that can be found to be permitted under any State law or practice pertaining to minor civil law suits. Judicial review of administrative denials of citizenship would be severely limited and impeded in many cases, and completely eliminated in others. I believe these provisions raise serious constitutional questions. Constitutionality aside, I see no justification in national policy for their adoption.

4/30/22, 2:03 PM
Case: 1:21-cr-00665 Document #: 36-7 Filed: 05/02/22 Page 9 of 10 PageID #:844
Veto of Bill to Revise the Laws Relating to Immigration, Naturalization, and Nationality. | Harry S. Truman

Section 401 of this bill would establish a Joint Congressional Committee on Immigration and Nationality Policy. This committee would have the customary powers to hold hearings and to subpoena witnesses, books, papers and documents. But the Committee would also be given powers over the Executive branch which are unusual and of a highly questionable nature. Specifically, section 401 would provide that "The Secretary of State and the Attorney General shall without delay submit to the Committee all regulations, instructions, and all other information as requested by the Committee relative to the administration of this Act."

This section appears to be another attempt to require the Executive branch to make available to the Congress administrative documents, communications between the President and his subordinates, confidential files, and other records of that character. It also seems to imply that the Committee would undertake to supervise or approve regulations. Such proposals are not consistent with the Constitutional doctrine of the separation of powers.
In these and many other respects, the bill raises basic questions as to our fundamental immigration and naturalization policy, and the laws and practices for putting that policy into effect.

Many of the aspects of the bill which have been most widely criticized in the public debate are reaffirmations or elaborations of existing statutes or administrative procedures. Time and again, examination discloses that the revisions of existing law that would be made by the bill are intended to solidify some restrictive practice of our immigration authorities, or to overrule or modify some ameliorative decision of the Supreme Court or other Federal courts. By and large, the changes that would be made by the bill do not depart from the basically restrictive spirit of our existing laws--but intensify and reinforce it.

These conclusions point to an underlying condition which deserves the most careful study. Should we not undertake a reassessment of our immigration policies and practices in the light of the conditions that face us in the second half of the twentieth century? The great popular interest which this bill has created, and the criticism which it has stirred up, demand an affirmative answer. I hope the Congress will agree to a careful reexamination of this entire matter.

To assist in this complex task, I suggest the creation of a representative commission of outstanding Americans to examine the basic assumptions of our immigration policy, the quota system and all that goes with it, the effect of our present immigration and nationality laws, their administration, and the ways in which they can be brought in line with our national ideals and our foreign policy.

Such a commission should, I believe, be established by the Congress. Its membership should be bi-partisan and divided equally among persons from private life and persons from public life. I suggest that four members be appointed by the President, four by the President of the Senate, and four by the Speaker of the House of Representatives. The commission should be given sufficient funds to employ a staff and it should have adequate powers to hold hearings, take testimony, and obtain information. It should make a report to the President and to the Congress within a year from the time of its creation.

Pending the completion of studies by such a commission, and the consideration of its recommendations by the Congress, there are certain steps which I believe it is most important for the Congress to take this year.

first, I urge the Congress to enact legislation removing racial barriers against Asians from our laws. Failure to take this step profits us nothing and can only have serious consequences for our relations with the peoples of the far East. A major contribution to this end would be the prompt enactment by the Senate of H.R. 403. That bill, already passed by the House of Representatives, would remove the racial bars to the naturalization of Asians.

Second, I strongly urge the Congress to enact the temporary, emergency immigration legislation which I recommended three months ago. In my message of March 24, 1952, I advised the Congress that one of the gravest problems arising from the present world crisis is created by the overpopulation in parts of Western Europe. That condition is aggravated by the flight and expulsion of people from behind the iron curtain. In view of these serious problems, I asked the Congress to authorize the admission of 300,000 additional immigrants to the United States over a three year period. These immigrants would include Greek nationals, Dutch nationals, Italians from Italy and Trieste, Germans and persons of German ethnic origin, and religious and political refugees from communism in Eastern Europe. This temporary program is urgently needed. It is very important that the Congress act upon it this year. I urge the Congress to give prompt and favorable consideration to the bills introduced by Senator Hendrickson and Representative Celler (S. 3109 and H.R. 7376), which will implement the recommendations contained in my message of March 24.

I very much hope that the Congress will take early action on these recommendations. Legislation to carry them out will correct some of the unjust provisions of our laws, will strengthen us at home and abroad, and will serve to relieve a great deal of the suffering and tension existing in the world today.

HARRY S. TRUMAN

NOTE: On June 27 the Congress passed the bill over the President's veto. As enacted, H.R. 5678 is Public Law 414, 82d Congress (66 Stat. 163).

On June 30, the President signed Proclamation 2980 (3 CFR, 1949-1953 Comp., p. 161) revising the immigration quota list.

For the President's message to Congress on civil rights, dated February 2, 1948, see 1948 volume, this series, Item 20.

For the President's message to Congress on aid for refugees and displaced persons, dated March 24, see Item 65, this volume.