# DEFENDANT'S EXHIBIT DD

## TRANSCRIPT OF *USA v. CARRILLO-LOPEZ* EXPERT TESTIMONY

**IN UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 21 CR 665 |
| | ) | Judge Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| ALFREDO VIVEROS-CHAVEZ | ) | |
| Defendant. | ) | |

**DECLARATION OF PROFESSOR KELLY LYTLE HERNANDEZ**

1.      I, Kelly Lytle Hernandez, am an associate professor of history at the University of California at Los Angeles (UCLA).  My curriculum vitae has been previously filed as Defendant's Exhibit S.

2.      I prepared a declaration regarding the racial animus leading to the criminalization of illegal reentry which was previously filed as Defendant's Exhibit A.

3.      On February 2, 2021, I testified on this topic at an evidentiary hearing in *United States v. Gustavo Carrillo-Lopez*, Case No. 3:20-CR-026-MMD-WGC (D. Nev.), and was qualified as an expert.  More specifically, the Court qualified me as an expert in history with particular expertise in race, immigration, and policing.

4.      I reaffirm the testimony I provided in *Carrillo-Lopez* and, if called to testify before this Court, I would testify consistently with my declaration and prior testimony.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  May 18, 2022

*Kathleen A. Lytle Hernandez*
_____
**Professor Kelly Lytle Hernandez**

**IN UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 21 CR 665 |
| | ) | Judge Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| ALFREDO VIVEROS-CHAVEZ | ) | |
| Defendant. | ) | |

**DECLARATION OF PROFESSOR BENJAMIN GONZALEZ O'BRIEN**

1.      I, Benjamin Gonzalez O'Brien, am an associate professor of Political Science at San

Diego State University.  My curriculum vitae has been previously filed as Defendant's Exhibit T.

2.      I prepared a declaration regarding the racial animus and disparate impact of 8 U.S.C.

§1326 which has been previously submitted as Defendant's Exhibit B.

3.      On February 2, 2021, I testified on this topic at an evidentiary hearing in *United States*

*v. Gustavo Carrillo-Lopez*, Case No. 3:20-CR-026-MMD-WGC (D. Nev.), and was qualified as an

expert.  More specifically, the Court qualified me as an expert in political science with particular

expertise in immigration policy, race, and public policy.

4.      I reaffirm the testimony I provided in *Carrillo-Lopez* and, if called to testify before this

Court, I would testify consistently with my declaration and prior testimony.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 18, 2022

*Benjamin Gonzalez O'Brien*
**Professor Benjamin Gonzalez O'Brien**

```
 1                  UNITED STATES DISTRICT COURT
                        DISTRICT OF NEVADA
 2      BEFORE THE HONORABLE MIRANDA M. DU, CHIEF DISTRICT JUDGE
                          ---o0o---
 3

 4      United States of           :
        America,                   : No. 3:20-cr-026-MMD-WGC
 5                                 :
                 Plaintiff,        : February 2, 2021
 6                                 :
            -vs-                   :
 7                                 : United States District Court
        Gustavo Carrillo-Lopez,    : 400 S. Virginia Street
 8                                 : Reno, Nevada  89501
                 Defendant.        :
 9      _____:

10

11

12                           TRANSCRIPT OF
                         EVIDENTIARY HEARING

13

14      A P P E A R A N C E S:

15      FOR THE GOVERNMENT:        Peter Walkingshaw
                                   Assist. United States Attorney
16

17      FOR THE DEFENDANT:         Lauren Gorman
                                   Assist. Federal Public Defender
18

19

20      Proceedings recorded by mechanical stenography produced
        by computer-aided transcript
21

22

23      Reported by:               KATHRYN M. FRENCH, RPR, CCR
                                   NEVADA LICENSE NO. 392
24                                 CALIFORNIA LICENSE NO. 8536

25
```

```
 1          Reno, Nevada, Tuesday, February 2, 2021, 9:00 a.m.

 2                           ---OoO---

 3

 4          THE COURT:  Good morning.

 5          Are you ready to proceed?

 6          THE CLERK:  This is the date and

 7   time set for evidentiary hearing in case number

 8   3:20criminal-026-MMD-WGC, United States of America

 9   versus Gustavo Carrillo-Lopez.

10          Present via video conference for the

11   government is Peter Walkingshaw.

12          Present via video conference for the

13   defendant is Lauren Gorman.

14          Defendant is not present.  Ms. Gorman

15   will place on the record the reasons why he is not

16   present.

17          The Spanish interpreters, Judy Jenner and

18   Olivia Reinshagen-Hernandez, have been released for

19   the day.

20          THE COURT:  Thank you, Miss Clerk.

21          Ms. Gorman, I understand there was an issue

22   with the transportation of Mr. Carrillo-Lopez, and that

23   he is waiving his appearance at this evidentiary hearing

24   this morning.

25          Is that correct?
```

1           MS. GORMAN:  That's correct, Your Honor.

2           I'll also note that a waiver is not even

3   formally required under Rule 43, uh, because it's not

4   one of those hearings where he is actually required to

5   be present.

6           THE COURT:  Even assuming that, he has a

7   right to appear and that a waiver is required, are you

8   representing that he is waiving his right to appear?

9           MS. GORMAN:  I am, Your Honor.

10          THE COURT:  All right.  Thank you,

11  Ms. Gorman.

12          And I agree, given that this is an

13  evidentiary hearing where I'm expecting to hear expert

14  testimony, I think that Mr. Carrillo-Lopez's appearance

15  is not required.  And assuming it is, I will accept the

16  waiver and we'll proceed.

17          MS. GORMAN:  Thank you, Your Honor.

18          And Your Honor, possibly, can I just make

19  some sort of preliminary remarks to kind of streamline

20  this presentation?

21          THE COURT:  What preliminary remarks do you

22  have to offer?

23          MS. GORMAN:  One, I understand that there

24  were multiple motions and supplements filed.  I would

25  just ask for the purpose of a streamlined presentation,

1  for those to be incorporated into the record, rather

2  than admitted independently as exhibits.

3            And then with respect to the two experts

4  testifying, I understand that the government would

5  like to invoke the Rule of Exclusion.  While that is

6  entirely within this Court's discretion, the Rule of

7  Exclusion does not necessarily apply to experts; and

8  particularly in this case, where I think it would

9  avoid duplication of testimony.  And where these are

10  experts who generally rely upon each other and in

11  their respective fields and draw on each other's

12  scholarship, just in general, I don't think the Rule

13  of Exclusion is necessary and I think it could

14  streamline the proceeding not to have it, whereas one

15  expert could comment on another's and, et cetera.

16            THE COURT:  Well, I would note that for

17  purposes of the motion, counsel, you know -- both of

18  you know -- that the Local Rules provide for a motion, a

19  response, and a reply.  And in this case, there's been

20  multiple notices supplementing what's been filed.

21  I've allowed it without any party requesting leave,

22  primarily, because some of the filings, I think are --

23  would have been allowed anyway, given the reason --

24  the case law that's been developing.  And given the

25  importance of the issue here, I want to make sure that

 1    the record is thorough, which is another reason why I

 2    haven't intervened to let you know that you shouldn't

 3    continue to keep filing notices of supplementation.

 4              It's not easy for me, or my law clerk,

 5    when I am reviewing the filings and then discover, the

 6    next morning or the next evening, that there's a new

 7    supplement.  I hope that this hasn't happened before I

 8    issued the order.  Regardless, I'm going to accept the

 9    filings.  It's part of the record.  If you want to

10    refer to the ECF number for the filing as part of the

11    evidentiary hearing today, I don't have an issue with

12    that.

13              With respect to the Rule of Exclusion, I'll

14    let Mr. Walkingshaw respond as to why he believes that

15    the Court should permit the rule to be invoked for the

16    two expert witnesses.

17              MR. WALKINGSHAW:  Thank you, Your Honor.

18              And if I can also briefly be heard on the

19    supplementation issue as well.  But to answer the

20    Court's first question, the two experts are both going

21    to be testifying, in large part, to historical facts.

22    They rely on similar methods and methodologies.  The

23    purpose of the Rule of Exclusion is to avoid having one

24    witness tailor their testimony based on what they've

25    heard other witnesses say.  While experts are sometimes

1    allowed -- or exempt from the rule of exclusion, I

2    believe the case cited by Ms. Gorman, in correspondence

3    with Ms. Vannozzi, refers to experts that are essential

4    to the management of litigation, which doesn't appear

5    to be applicable in this case.  And I believe there's

6    representation as to some ambivalence as to whether or

7    not the rule is invoked.

8              So for those reasons, I think this is

9    a fairly classic instance in which I think the rules

10   should be observed, given the historical facts that we

11   expect to have entered into the record today.

12             THE COURT:  So is there a concern that

13   somehow the -- I want to understand the argument that

14   the "experts may tailor their testimony."  So generally

15   with fact witnesses, there's concern that one's

16   recollection may be influenced by hearing what

17   another's recollection is.  But, here, the witnesses

18   are offering their testimony as to their expertise.  So,

19   I'm trying to understand how they would tailor their

20   testimony that would present a concern that one would

21   normally find with fact witnesses.

22             MR. WALKINGSHAW:  Well, Your Honor, I

23   believe that not only will the witnesses be testifying

24   to historical facts, but also will be commenting on

25   scholarship associated with the history of immigration.

```
1    I believe Mae Ngai is cited by both of them fairly
2    extensively.  And to the extent that those discussions,
3    either on direct or on cross, you know, may influence
4    the way that that scholarship is framed or presented, I
5    really think that the expert should be testifying from
6    their own expertise, as opposed to what they've heard in
7    prior testimony.
8                   THE COURT:  All right.
9                   I'm going do deny the government's request
10   to invoke the Rule of Exclusion.  This is an evidentiary
11   hearing.  The evidentiary rules are more relaxed.  In
12   addition, I'm hearing testimony from expert witnesses
13   who I would expect to testify and present their own
14   expertise.  So to the extent that they their testimony
15   reveals that they're influenced by each other's
16   testimony, I will take that into account and consider
17   the weight of the testimony.  But in terms of concern
18   that they may be somehow tailoring their testimony
19   and adopting each other's testimony, I don't think
20   that's a concern here, at least as -- based on just my
21   general understanding as to how experts present their
22   testimony.  For those reasons, I'm going to deny the
23   request.
24                   And so if the other expert is in the waiting
25   room and wants to sign into the video conference, he
```

```
1    may do so.
2              THE CLERK:  Your Honor, I'm admitting them
3    into the main conference right now.
4              THE COURT:  And Mr. Walkingshaw, you wanted
5    to be heard on the issue of supplementation.
6              MR. WALKINGSHAW:  Thank you, Your Honor.
7              THE COURT:  Is there something else you want
8    to add other than what you indicated in the response
9    that's filed as -- which is the last document filed as
10   ECF 46?
11             MR. WALKINGSHAW:  Yes, Your Honor.
12             I do believe, in terms of the notices
13   filed, there is fairly substantial substantive
14   difference.  The notice that I filed on Thursday was
15   case law that's developed since briefing ended.  And
16   appears based on the two notices filed on Friday,
17   that the defendant is coming to the hearing with a
18   substantially different theory of an equal protection
19   claim than what was fairly presented in the briefs.
20             The briefs refer, entirely, to a failure
21   to reckon with the 1929 law.  It appears, now, that a
22   theory is being put forward that the 1952 law was
23   independently motivated by racial animus.  Your Honor,
24   I would ask for post-hearing briefing hearing on that
25   issue, to the extent the Court is going to consider it.
```

 1  I believe the Court's comments were entirely correct

 2  that the record here should be fulsome so the Court

 3  should be given as much opportunity as possible to fully

 4  deliberate on the issues.  I think post-hearing briefing

 5  would properly frame and present them.

 6              I'll also note that the pretrial motion

 7  deadline has been extended until June of this year.

 8  Trial is not until August.  So I think in order to,

 9  you know, promote a fulsome record, I think post-hearing

10  briefing is really the appropriate course in this

11  case.

12              MS. GORMAN:  Your Honor, may I respond?

13              THE COURT:  Yes.

14              MS. GORMAN:  Your Honor, to be very

15  clear, my position is that the legislative body that

16  deliberated about this law is the legislator whose

17  intent matters.  But based on the government's response,

18  and particularly based on the supplementation in

19  addition, sort of calling the Court's attention that

20  the judges who have ruled on 1326, specifically have

21  done two things:  Both refused to allow having an

22  evidentiary hearing which witnesses could testify on,

23  and then rely upon the codification of this law in 1952,

24  without allowing evidence that there's no evidence of

25  animus.  So, I think this record should be as complete

1    as possible.

2              It's not a deviation from the original

3    position.  But in the event that this court finds

4    that the legislative intent regarding, particularly,

5    1952 is relevant -- which is the government's,

6    essentially, exclusive position, is that the Court

7    should not rely on 1929 when eugenics was, I think,

8    undisputedly a motivating factor in the passage of

9    illegal re-entry, then, you know, testimony regarding

10   1952 is certainly appropriate.

11             And going forward, I just want to be

12   very clear that this law was passed in 1929.  It was

13   recodified in 1952.  And subsequently, there's been

14   various amendments.  So I don't think the amendments,

15   necessarily, have the legislative intent regarding these

16   amendments, and I don't think are necessarily legally

17   relevant.  But, I do think what's very important is for

18   this court to have a full a record as possible, going

19   from the events leading up to 1929, up until the last

20   amendment, though our original position remains the

21   same.  And if this court intends to rely on 1952, it

22   should have an evidentiary record and history to support

23   that, and that has, historically, been the government's

24   position, that we should just ignore 1929, even though

25   the law has been in continual effect since 1929.  And

1  so I guess -- I have no opposition to post-hearing

2  briefing if the Court should find it appropriate,

3  but these supplements, and particularly testimony

4  regarding 1952, and even beyond, are in response to

5  the government's position that that is sort of the

6  relevant legislative context.

7          THE COURT:  But, to be fair, the government

8  took that position in its response to the initial motion

9  and you did not offer these additional supplementations

10  in the reply.  It was after briefing closed and after

11  the last hearing that the supplementations were filed.

12          Is that correct?

13          MS. GORMAN:  I mean --

14          THE COURT:  So, in other words, the

15  government's position has not been a mystery.  It

16  stated its position in its response to the motion,

17  that the Court should focus on the 1952 codification.

18          MS. GORMAN:  So we intend to present

19  evidence that both addresses the government's

20  position, which I think is perfectly permissible in

21  any litigation, but, particularly --

22          THE COURT:  But Mr. Walkingshaw's point

23  is that you didn't do that in the reply brief.  That

24  was the opportunity to respond to the government's

25  position, in the reply brief.  Instead, you waited

1  until after briefing closed, after the hearing, to

2  provide these additional supplemental authorities.

3  That's his point.

4       MS. GORMAN:  Yes, Your Honor.  And I, as

5  I said before, our original position is the same; that

6  it's the legislative body that initially deliberated

7  about and then passed this law, that is the legislator

8  that matters.

9       The government's supplements, in

10  particular, call attention to cases where the Court

11  says, okay, Arlington Heights applies, but you've

12  shown no legislative animus with regard to 1952,

13  so we're going to deny on that basis.  Hence, the

14  supplementation.  So it's not a concession that

15  1952's legislative intent is the legislative intent

16  that matters, but I do think for the Court to consider,

17  fairly, the government's position, and our position,

18  the Court should have as full an evidentiary record

19  as possible.

20       So while we're not conceding that point,

21  these are a historian and a political scientist who

22  are both eminent scholars that can speak to the

23  government's position as well as the defense's position.

24  And I think -- we are not afraid of this legislative

25  history or this historical context, and the Court can,

1   essentially, use the expertise to evaluate the

2   government's position and the defense's position.  And

3   whichever way the Court rules, I think that these

4   experts -- in particular Professor Lytle Hernandez,

5   is going to focus on the events leading up to 1929.

6   Professor Gonzalez O'Brien can speak to that, but also,

7   sort of, his expertise is more contemporary as well,

8   and I think the Court should have as complete a record

9   as possible.

10              THE COURT:  Ms. Gorman, that's the reason

11  why I granted the evidentiary hearing request.  I

12  just made an observation that the government stated

13  its position in its response, not just in the

14  supplementation that was filed, and so I believe --

15  and I find that Mr. Walkingshaw's point is a fair

16  one; and that is, that defendant did not offer these

17  additional authorities in its reply brief.  It's only

18  after briefing closed, and after the hearing, that these

19  additional authorities were offered -- this additional

20  evidence of the legislative history from the 1952

21  codification was offered.

22              I'm just making a note that I agree with

23  him, and so I'm going to grant -- because -- well, I

24  start with the premise that the issue is important

25  enough, but I want the parties to have the full

1  opportunity to present briefing and any expert

2  testimony.  So to the extent that the government

3  requests additional briefing after the hearing, I'm

4  going to grant it because, as I said, I find the

5  defendant could have offered these additional

6  authorities in the reply brief, in response to the

7  government's position in its response brief.

8          I would have to say that I'm not going to

9  take any additional evidence after today's hearing.

10 The post-hearing brief will be for you to present legal

11 arguments so that -- I do need to close the briefing

12 period so I can decide the motion, which has to be

13 decided at some point.  I'm not going to keep leaving

14 the briefing period open.

15         With that, I'll hear from the expert

16 testimony.

17         MR. WALKINGSHAW:  Your Honor --

18         MS. GORMAN:  And Your Honor, just to --

19 okay.  Pardon me.

20         Just to be clear, you know, some of

21 the expert testimony, particularly Professor Gonzalez

22 O'Brien, I think then should particularly speak to 1952,

23 et cetera, and there's, obviously, been no opposition

24 to the scope of his testimony and it was filed with the

25 Court.

```
 1                  THE COURT:  I'm going to permit it.

 2                  Mr. Walkingshaw, what's your point?

 3                  MR. WALKINGSHAW:  Your Honor, just before

 4     testimony gets underway, I do want to make sure that

 5     the government's position is clear -- and there was a

 6     bit of an exchange between the Court and Ms. Gorman.

 7                  The government's position is not that 1952

 8     is the exclusive determination that the Court should

 9     consider.  The government's position is that the, the

10     history of this law begins with 1952, but it continues

11     through the amended versions that were subsequently

12     passed.

13                  I bring this only up so that there's no

14     confusion when the experts present testimony, such

15     that -- I just don't -- I believe this is more than

16     fairly presented in our briefs, but I don't want there

17     to be any claim of unfair surprise as to what our

18     position actually is.  Ms. Gorman said that she believes

19     that the amendments are not legally relevant.  We don't

20     agree.  We think they are.  So I just thought I would

21     put that on the record before testimony commences.

22                  THE COURT:  At the last hearing, the

23     government conceded that the passage of the 1929

24     law was made -- motivated, was motivated by racial

25     animus, at least to satisfy the Arlington Hill (sic.)
```

1    factors, is that right -- Arlington Heights factors.

2              MR. WALKINGSHAW:  The Arlington Heights.

3    Motivated in part-

4              THE COURT:  Arlington Heights.  I say

5    Arlington Heights in my mind so often, I only think of

6    Arlington.  But, Arlington Heights.

7              MR. WALKINGSHAW:  Yes, Your Honor.

8              But as the Court may recall, the government

9    also put forth the position that Congress gets a clean

10   slate when it passes new legislation or recodifies or

11   re-adopts legislation in the absence of racial animus.

12             THE COURT:  And given the government's

13   concession, I had initially thought that an evidentiary

14   hearing was not required.  But after hearing additional

15   arguments, I granted Ms. Gorman's request to offer

16   testimony to provide context.

17             And so with that, Ms. Gorman, I don't

18   think that the experts need to necessarily focus too

19   many details on the legislative history in 1929, except

20   to the extent that -- I know what you're trying to do.

21   You're trying to present this additional testimony to

22   show that there should not be a -- that that history

23   and that environment permeated and led to the 1952

24   codification, and Congress should not be able to just

25   distance itself from the prior history.  I know that's

1    the defendant's position.  Nevertheless, I don't think

2    that the experts needs to spend an exhaustive amount

3    of their testimony relating to the history in 1929.

4    But, I'll give you enough leave to present testimony.

5              MS. GORMAN:  Thank you, Your Honor.

6              We expect Professor Lytle Hernandez's

7    testimony to be briefer, particularly in light of that

8    previous concession.  But, thank you, Your Honor.

9              THE COURT:  All right.

10             Let's proceed then.

11             THE CLERK:  Will the witness, Professor

12   Lytle Hernandez -- thank you very much.

13

                     **KELLY LYTLE HERNANDEZ,**
14        called as a witness on behalf of the Defendant,
               was sworn and testified as follows:
15

16             THE CLERK:  Please state for the record your

17   full name and spell your last name.

18             THE WITNESS:  Kelly Lytle Hernandez.

19   It's two last names:  L-y-t, as in Tom, l-e.

20   H-e-r-n-a-n-d-e-z.

21             THE COURT:  And please spell your first name

22   as well.

23             THE WITNESS:  K-e-l-l-y.

24             THE CLERK:  Thank you.

25             MS. GORMAN:  May I proceed, Your Honor?

```
1              THE COURT:  Yes.
2                     DIRECT EXAMINATION
3   BY MS. GORMAN:
4       Q.  Thank you for coming, Professor Hernandez.
5              And I want to just jump right in by talking
6   about your expertise and your qualifications by
7   training.  So can you please describe your knowledge,
8   training, and education, and as it relates to the
9   history of the criminalization of immigration
10  enforcement in particular.
11      A.  Sure.
12             Well, I have my Ph.D in U.S. History from UCLA,
13  with, really, areas of specialization in policing and
14  immigration.  And I've written two books on this
15  subject:  Migra!:, A History of the U.S. Border Patrol,
16  which is focused on the story of how the U.S. Border
17  Patrol became the focus on the -- Mexican -- U.S.
18  southern border.  That was published by the University
19  of --
20             (Zoom audio interruption.)
21             THE CLERK:  Professor Hernandez, you are
22  cutting in and out.  Please make sure you're close to
23  your microphone.
24             THE COURT:  And it seems like you trail at
25  the end of your sentences, so -- I don't know if it's
```

1  because of the mic or because you are not sitting as

2  close to the mic.

3           THE WITNESS:  I'll move closer.

4           Does that help?

5           MS. GORMAN:  Yes.  We'll try it.

6           THE WITNESS:  Should I resume?

7           THE COURT:  Yes.

8           THE WITNESS:  Okay.

9           So, Migra was published by University of

10 California Press, an academic peer review press.

11          My second book, City of Inmates:  Conquest,

12 Rebellion, and the Rise of Human Caging in Los Angeles,

13 is the book that really has a chapter that focuses on

14 the criminalization of unlawful entry and re-entry into

15 the United States.  That, too, was published by a peer

16 reviewed academic press, University of North Carolina.

17 And it won multiple prizes, which is you can think of

18 that as another form of peer review.

19 BY MS. GORMAN:

20    Q.  So, and to be specific, you hold an endowed chair

21 currently at UCLA, is that correct?

22    A.  Sure.  I hold the Tom Lifka Endowed Chair in

23 history at UCLA.  I was also awarded a MacArthur Genius

24 Fellowship for my historical and contemporary work.

25 And I sit on the Pulitzer Prize Board as the historian.

1    Q.   Thank you, Professor Hernandez.

2         And Professor Hernandez, I know this is probably

3    an obvious question, but are you familiar with the

4    Declaration that was drafted in connection with this

5    case by you?

6    A.   Yes.  That Declaration is based on my work from

7    Migra and City of Inmates.

8    Q.   And can you, additionally, and to the best of

9    your knowledge, is everything that you presented in

10   that Declaration true and correct, to the best of your

11   knowledge?

12   A.   To the best of my knowledge, yes.

13   Q.   And in terms of additional, sort of, credentials,

14   do you attend any academic conferences, present

15   comments, chair panels, and -- in the department of

16   history or regarding immigration law enforcement?

17   A.   Sure.  I'm quite active in the scholarly circles

18   around immigration, so I attend the Western Historical

19   Association meeting regularly, the Organization of

20   American Historians' annual meeting regularly.  I'm an

21   elected member of the Society of American Historians.

22   I've been a member of the Immigration and Ethnic History

23   Society.  I regularly present at universities across the

24   country on this topic and subject, and regularly engage

25   with my colleagues across the country, and in Mexico

1    and around the world, on immigration and policing.

2       Q.   Thank you, Professor Lytle Hernandez.

3            And then just sort of briefly -- I will focus

4    your testimony on the events leading up to 1929 -- but

5    can you explain to the Court your understanding how

6    the 1929 Act is connected to the Section 1326 offense

7    at issue in this case?

8       A.   Sure.

9            So it's my understanding that the 1929 Act

10   is the very first time that Congress criminalized

11   unauthorized entry and re-entry, post-deportation, into

12   the United States.  And, that the basic framework of

13   that statute carries forward into 1952 and beyond.

14      Q.   Thank you.

15           And I just want to get into the historical

16   sweep leading up to this 1929 piece of legislation,

17   so can you give me just a summary timeline of the

18   developments in U.S. Mexico relation, just the

19   historical developments in immigration policy in

20   the late 19th and early 20th century preceding the

21   1929 Act?

22               THE COURT:  I'm going to intervene for

23   a moment, Ms. Gorman.

24               Because you're presenting Professor

25   Hernandez as an expert witness, do you want the Court

1    to certify her as an expert in any particular area?

2              MS. GORMAN:  Oh.  Sorry.  Yes, Your Honor.

3    And I skipped over that part.

4              Would this court certify Professor Lytle

5    Hernandez specifically as a historian, but as an

6    expert in history, with particular expertise in

7    criminalization, and the criminalization of migration?

8              THE COURT:  Does the government have any

9    objection?

10             MR. WALKINGSHAW:  Your Honor, we have no

11   objection to Professor Hernandez being certified as an

12   expert in the history of immigration or the history of

13   border -- border immigration enforcement.

14             If I recall correctly, I believe there

15   was, uh -- she said a chapter in her book City of

16   Inmates dealt with the criminalization of immigration.

17   And I believe the Court is the expert in the law and its

18   history, so we would ask that the Court sort of -- I

19   think that designation would not be appropriate, but

20   that a slightly different one would be.

21             THE COURT:  I'm sorry.  I'm trying to

22   understand what is the objection to Professor

23   Hernandez's expertise.

24             So Ms. Gorman asked the Court certify

25   Professor Hernandez as an expert in history, with a

```
 1    particular emphasis on criminalization of immigration
 2    and -- well, I think that's where she ended it.
 3                THE WALKINGSHAW:  Yes.
 4                THE COURT:  And what's your objection?  Do
 5    you object that Professor Hernandez does not have this
 6    expertise?
 7                MR. WALKINGSHAW:  I believe it would be
 8    more appropriately characterized as an expertise in
 9    the history of border enforcements, immigration
10    enforcements, immigration.  But criminal -- I didn't
11    really catch criminalization of immigration in the
12    discussion that was had.
13                MS. GORMAN:  Your Honor, it may be easier to
14    ask Professor Hernandez where -- where are your areas of
15    expertise, particularly as a historian?  Where have you
16    emphasized your work?
17                THE WITNESS:  Sure.
18                So I often describe myself as a historian
19    of race, immigration, and police and incarceration in
20    the United States.  More broadly, I have spent most
21    of my 15, 20 years as a professional scholar looking
22    really deeply at the intersection between immigration
23    control and the criminal justice system.
24                MS. GORMAN:  So, Your Honor, I think
25    that maybe Professor Lytle Hernandez description of
```

1    her own expertise might be a more appropriate basis

2    for the Court to certify Professor Lytle Hernandez as

3    an expert, rather than my characterization.

4              THE COURT:  Well, for the purposes of

5    the hearing that's going to be presented -- so, of

6    course, Professor Hernandez seems to have a wide area

7    of expertise.  I want to focus on the area at issue

8    here.

9              So, which of her characterizations as to

10   her expertise would you want the Court to certify,

11   Ms. Gorman?

12             MS. GORMAN:  And I think Professor Lytle

13   Hernandez said it perfectly, when she talked about the

14   history in terms of race, policing, and immigration

15   because those are the three facets that are at issue

16   in this case.  And immigration, of course, I think would

17   have to include migration, and so -- but I think that

18   is encompassed, at least, by the word "immigration."

19             MR. WALKINGSHAW:  Yeah, that's fine with the

20   government, Your Honor.

21             THE COURT:  All right.

22             What's the request again, Ms. Gorman?

23             MS. GORMAN:  I think the Court can tether

24   the expertise of Professor Lytle Hernandez to her

25   areas of expertise, specifically with respect to

1   race, policing, and immigration.  And that would

2   encompass border enforcement.  I'm using "policing"

3   very broadly.

4            THE COURT:  So is the request that the

5   Court certify Professor Hernandez as an expert in the

6   history -- in history, with a particular emphasis

7   between the intersection between race, policing, and

8   immigration?

9            MS. GORMAN:  Correct, Your Honor.

10           THE COURT:  All right.  The request is

11  granted and the Court will so certify.

12  BY MS. GORMAN:

13    Q.  Professor Lytle Hernandez, can you give this

14  court just a historical sweep leading up to this

15  legislative enactment in 1929?  So, a summary of

16  the timeline and developments in immigration and

17  immigration policy between the late 19th and early

18  20th century preceding the Act?

19    A.  Sure.  I'd be happy to.  That's a massive

20  question.  I will try --

21    Q.  Sorry.

22    A.  -- to keep my answer here around the issues of

23  how racial animus motivated the passes of immigration

24  law in the late 19th and early 20th century, leading up

25  to the 1924 Act in particular.

1      So, the federal government first began to take

2 the reigns of immigration control in the 1870s and there

3 were a variety of pressures at play during that time.

4 One of the most important ones was coming out of the

5 American west and California, with a concern about

6 the large number of Chinese immigrants who had arrived

7 in California during the Gold Rush and during the

8 construction of the transcontinental railroad.

9      White workers, white settlers in California

10 opposed the arrival of Chinese immigrants; and, more

11 important, the notion that Chinese immigrants would

12 remain permanently in the state and become Chinese

13 Americans.  And so it's really California that pushes

14 for the first set of racially targeted and explicit

15 immigration laws, which is the infamous Chinese

16 Exclusion Act of 1882, which banned the arrival of

17 Chinese laborers into the United States for 10 years.

18      That same year, Congress passes a series of

19 other restrictions that are, you know, much more

20 around contractors or prostitution.  And moving out

21 of the Chinese Exclusion Act, Congress passes a series

22 of exclusions targeting multiple populations; um,

23 epileptics, illiterates, people likely to become a

24 public charge, anarchists and so on.  But this

25 racial animus component remains a driving force in the

1    construction and implementation of immigration law, and

2    it hits a high fever pitch in 1917, around World War I,

3    where we passed the 1917 Immigration Act.  And that's

4    an important piece because it introduces the Asiatic Bar

5    Zone, which bans all persons of Asian origins from

6    entering the United States, and institutes a literacy

7    test for all people entering the United States.

8           Now, this is a nice comparison because the

9    Asiatic Bar Zone clearly racialized.  It's explicitly

10   racialized and it's born out of the Chinese exclusion

11   period.  But, the literacy test is inexplicitly

12   racialized.  It is developed and intended to keep

13   out southeastern -- southern and eastern Europeans,

14   in particular, who are presumed to be unable to pass

15   the literacy test.  So, there are two examples there

16   that are kind of implicit and explicit forms of

17   racialized control.

18          Then we head into the 1920s, where it becomes

19   even more intense, the racial animus.  The 1920s, in

20   the Declaration, is a moment in the United States that

21   people often refer to as the "Tribal Twenties;" that

22   Arianism is really at a high pitch.  Eugenics is a

23   very popular science of, quote, racial betterment.  And

24   this broader cultural environment pushes toward the

25   passage of the 1924 Immigration Act, which affirmed the

1   Asiatic Bar Zone, which introduces a new set of
2   quotas, national quotas, that effectively restrict
3   immigration to the United States from southern and
4   eastern Europe.
5          The thing that's interesting about the
6   national quotas is that they only apply to the Eastern
7   Hemisphere, and that an exemption was written in for
8   the Western Hemisphere immigrants.  And where that
9   exemption comes from is this debate that's happening
10  in the world of white supremacy in the United States;
11  that there are some folks who believe in, sort of, a
12  more ethno-racial for of white supremacy, that we only
13  want to have, sort of, a "whites only" nation.  And
14  those are the nativists.
15         And there's another set of folks who say, well,
16  we certainly want to have a white dominant society,
17  but we need marginalized non-white workers to come and
18  to go, to do the things that we don't want to do.
19         So scholars, like, Lisa Low, and others, talk
20  about this as there's the dualing sides of White
21  Supremacy, between the more capitalist and cultural
22  emphases of that initiative.
23         And so, um, after you get the passage of the
24  1924 legislation with restrictions on southern, eastern
25  Europe -- it's called a Nordic victory -- with the

1    Western Hemisphere exemption, you see a pretty rapid

2    turn to focusing on getting Mexican immigrants included

3    on the quota that system, or somehow restricted from

4    entering the United States.

5         And this is sort of the debate in the 1920s

6    that's circulating around Mexican immigration in

7    particular, that something leads us into the 1929

8    legislation.

9    Q.   Then talk to me about -- so the Western

10   Hemisphere is then exempted from this quota, and

11   you talked about the, sort of, American corporate

12   interests -- talk to me more about, I guess, how that

13   animated the legislative history that ultimately

14   resulted in illegal re-entry in 1929, or how that

15   tension manifested itself in that legislative history.

16   A.   Sure.

17        So after the passage of the 1924 law,

18   immediately, nativists and Congress begin to lobby

19   and to forward legislation to get Mexican immigrants,

20   in particular -- the Western Hemisphere in general,

21   but Mexican immigrants in particular -- added to the

22   national quota system.  There's two major pieces

23   of legislation, one in 1926 and one in 1928, that

24   proposed to do just this.  The debates in Congress are

25   intense.  Major employers and industries across the

1   person west go to Congress, hold hearings in protest

2   to adding Mexican immigrants to the quota.

3           Why?

4           At this moment, they're concerned that they

5   will be cut off from access to Mexican workers.  And

6   they want Mexican workers, yes, as laborers, but they

7   want Mexican workers as a particularly racialized

8   and marginalized and, understood, as a controllable

9   form, temporary form of labor.

10          And in the end, that lobby wins out and the

11  nativists are furious in Congress.  And Albert Johnson,

12  who is one of the leading members of Congress pushing

13  for immigration control and adding Mexicans to the quota

14  system, you know, by 1928, he just said, look, we're

15  not going to be able to get Mexicans added to the quota

16  system.  The debates have been too intense.  So, we're

17  going to have to pursue this through other means.  And

18  the next year you get the 1929 Act, which criminalizes

19  unauthorized entry and re-entry into the United States.

20          Now, I want to add something here.  This is

21  really important about how this scheme was developed

22  with Mexican immigrants, sort of, in mind as being the

23  primary targets of that legislation.  There were a

24  series of studies conducted by the Immigration Service

25  in the 1920s, which found or asserted that about half

1   of the Mexican immigrants who enter the United States

2   entered without authorization, if not more.

3        In 1928, the Department of State discourages

4   counselor officials, U.S. counselor officials in

5   the United States from issuing visas to Mexican

6   immigrants, so it becomes extraordinarily difficult

7   for Mexican immigrants, in particular workers, to get

8   a visa into the United States, around 1928 and 1929.

9        And by the late 1920s, the U.S. Border Patrol,

10  which had been established in 1924, had really recast

11  the popular image of the so-called, quote, illegal

12  immigrant.  In the late 19th century, that iconic

13  illegal was a Chinese immigrant.  Border Patrol

14  practice -- which if you want to get into, we can

15  certainly do -- shifted that notion.  So the people,

16  when they sort of conjured up the image of who was

17  undocumented, by the late 1920s, they would conjure

18  up an image of a Mexican immigrant.

19       All this comes together to create a logic of

20  the moment that, if we criminalized unauthorized entry

21  into the United States, we could be assured that the

22  bodies that are going to be delivered up are going

23  to be Mexican immigrants in particular, as opposed to

24  unauthorized immigrants in general.

25       Q.  When you talk about the desire to have a

1   temporary labor force, what is it about Mexican

2   migrants that makes them desirable as workers?  What

3   is -- I mean, is it there vulnerability?  Their -- I

4   mean, what -- is it stereotypes?  What is it about the

5   migrants from south of the border that makes them such

6   a desirable labor force, that you have such intense

7   tension between, I guess, the eugenics and corporate

8   interests?

9       A.   That's a good question.

10           I would say that there's nothing about them

11  in particular as human beings.  It's about the social

12  structure into which they're entering.  So by the

13  1920s you have, across the southwest, a social system

14  in place, a racialized subjugation system in place

15  that mirrors what's happening in the American South.

16           So what we know in the American south as the

17  Jim Crow system is becoming, in the southwest, what we

18  call the Juan Crow system, where Mexican children are

19  separated in the public school system; where Mexican

20  immigrants are unwelcome, and sometimes in explicit

21  forms, especially in Texas, not allowed to sit in

22  the restaurant, right, police systems across the

23  southwest disparately target Mexican immigrants, or

24  policing Mexican Americans as well.

25           So this Juan Crow regime, and you read it, I

 1  believe, in the Declaration -- let me find the page

 2  number for you -- uh, was something that the employers

 3  believed in across the southwest as their mechanism for,

 4  quote, we can and do control them.  So, it's the forms

 5  of racialized subjugation that Mexican immigrants

 6  enter into that makes them the desirable laboring

 7  population.

 8      Q.  So were Mexican immigrants, did they have any

 9  sort of protections; or, did they have less protections

10  then, let's say, American citizens?

11      A.  Do you mean as sort of labor protections, formal

12  labor protection or -- could you clarify yourself.

13      Q.  Yes.

14      A.  Yeah.  Uh, no, they don't have any more

15  protections.  I mean, I would say that they are more

16  vulnerable to policing, whether it be local policing,

17  border patrol policing in particular.  Uh, that -- you

18  know, I think that would be my answer.

19      Q.  So you started talking about, I think, two

20  things.  One is, like, the ability to exclude.  And

21  one is the ability to control.  Is that, like, a fair,

22  accurate -- or sort of a fair representation of at least

23  your understanding?

24      A.  Yeah.  I like the way you put that.

25          So the nativists are looking to exclude.  The

1  agribusiness, the railroad, the employers across the

2  southwest, they're looking to control.  And they really

3  kind of -- they come to a compromise.  And one of the

4  things that's really interesting that happens in

5  the 1920s, is the employers are learning the power of

6  deportability.  And they say this expressly in the

7  Congressional Record, when they go to Congress, like,

8  uh, they're saying -- it's in the Declaration -- one

9  of the things we like about Mexican workers is that

10  they're, quote, deportable.  They won't stick around.

11  If we have trouble with them, we can always, you know,

12  pick them up and kick them out.

13        Agribusinees flips that and says, well, what

14  do you want us to do, invite African Americans or black

15  Puerto Ricans in the U.S. to do this work?  Well,

16  they're not deportable, and that's not the kind of

17  labor that we want.  They're not even -- we want to

18  make sure that they can be removed.

19        So there's, absolutely, an explicit dynamic of

20  racialized labor control that is happening during this

21  time period.

22    Q.  Then is it your opinion that the illegal re-entry

23  provision of the 1929 law was intended to target

24  Latinos?

25    A.  That is my professional opinion.  Yes.

1    Q.   And I know that I -- I don't want to go -- you

2    know, I understand your expertise is largely 1929, but

3    I also want to talk about did they have to accommodate

4    illegal re-entry or the criminalization of this

5    migration?  Do they have do anything, like build prisons

6    or jails or places to hold people?

7    A.   Well, the impact of this new legislation was

8    immediate.  And I write about this in my book City of

9    Inmates.  The number of prosecutions increase.  The

10   number of Mexican immigrants in particular being

11   imprisoned on this charge.  And that's in the Bureau

12   of Prisons annual reports, the attorney general annual

13   reports.  But, it's also in the Bureau of Prisons

14   internal correspondence records, where a lot of this

15   material is available.

16        And so they build three new prisons, largely to

17   accommodate the number of Mexican immigrants being

18   incarcerated on what would become 1326.

19        You know, it's really interesting -- and I

20   believe it's the Attorney General's annual report of

21   1930 -- they take a moment and pause and say, you know,

22   prior to 1929, we just had about a 1,000 prosecutions

23   per year.  Post-1929, immediately, we've got about 7,000

24   prosecutions this year.  And they write that is due to

25   the passage of the Immigration Act of March 4th, 1929.

```
 1           And so they build a Latino prison, the Tucson
 2    Prison Camp, which is outside of Tucson, and,
 3    eventually, Terminal Island, outside of Los Angeles.
 4    Largely motivated by the need to incarcerate people
 5    on immigrations offenses.
 6                THE COURT:  Ms. Gorman, would you -- I'm
 7    going to intervene for one moment.  Give me one moment
 8    to take a short break here.  I need to repair or to
 9    fix a problem.
10                MS. GORMAN:  I'm going to stop my video
11    for a second because I'm getting sounds from my son's
12    room.
13                THE COURT:  All right.  Thank you, counsel.
14                MS. GORMAN:  Sorry, Your Honor.  I don't
15    know if anyone could hear, but I could hear my son.
16    He's in school.
17                THE COURT:  I'm ready to resume then, if
18    you are.
19                MS. GORMAN:  Well, unless this court has
20    specific questions for Professor Lytle Hernandez, you
21    know, I can pass this witness.
22                THE COURT:  I'm sorry.  What was the
23    question?
24                MS. GORMAN:  I said unless the Court -- and
25    I wanted -- and I meant to say this at the beginning,
```

1   that the Court should feel free to interrupt me because

2   I think what's relevant is also what the Court wants

3   to consider in this hearing.  But unless the Court has

4   additional questions for Professor Lytle Hernandez, I

5   would pass the witness.

6               THE COURT:  All right.  Thank you.  I do

7   not.

8               Mr. Walkingshaw.

9               MR. WALKINGSHAW:  May I proceed?

10              THE COURT:  Yes.

11              MR. WALKINGSHAW:  Thank you, Your Honor.

12                    **CROSS-EXAMINATION**

13  BY MR. WALKINGSHAW:

14     Q.  Good morning, Professor.

15     A.  Good morning.

16     Q.  And I apologize, I've heard it both ways.  Do you

17  prefer Professor Lytle Hernandez or Professor Hernandez?

18     A.  Lytle Hernandez, please.

19     Q.  It's not everyday that I get to speak with a

20  MacArthur Genius, so I want to make sure I get it

21  right.

22          So are you familiar with the motion that's been

23  filed in this case?

24     A.  Yes.

25     Q.  And it cites your work in a number of places,

1  correct?

2      A.  I believe so.

3      Q.  Both Migra, and your book, City of Inmates.

4      A.  I believe so.

5      Q.  Yeah.  So -- and you referenced a little bit

6  ago the Attorney General reports regarding enforcement

7  post-1929, correct?

8      A.  Correct.

9      Q.  Okay.

10         So I'd like to ask you about a few things related

11  to that.  In -- in the motion, it quotes your work as

12  saying:  "Within a year of the 1929 law's passage, the

13  government had prosecuted 7,001 border crossing crimes.

14  By 1939, that number rose to over 44,000."

15         You were speaking about that a bit ago, correct?

16      A.  Correct.

17      Q.  So that statistic you cite, what does "border

18  crossing crimes" mean?  Is there a particular statute?

19  Is it divided up?  Uh --

20      A.  Yeah.  It's described in the record, especially

21  in the annual reports, as Immigration Act crimes.

22  That's sort of the quote.  When you look more deeply

23  into the narrative of the annual reports -- for example,

24  I cited the 1930 annual report in which it's attributed

25  -- that rise is attributed to the enforcement of the

1    Immigration Act of March 4, 1929.

2         And then also when you look really closely to the

3    Bureau of Prisons' records, it's clear that they're

4    talking about people who are arrested in prison for

5    unlawful re-entry in particular.

6    Q.   Okay.

7         And the decade between 1929 and 1939 largely

8    corresponds to the Great Depression, correct?

9    A.   That's correct.

10   Q.   And jobs in the United States were largely

11   understood to be scarce in this period, correct?

12   A.   Very correct.

13   Q.   And you've written in your book Migra, that:

14   "Mexican labor immigration surged with the massive

15   expansion of southwestern agribusiness in this period,"

16   correct?

17   A.   The surge happened during the 1920s.

18   Q.   Okay.  So -- and you've cited statistics in

19   that period suggesting that "border crossings undertaken

20   by Mexican nationals skyrocketed to over a million in

21   that decade."

22        Yes?

23   A.   During the 1920s; correct.

24   Q.   Yes.

25        And you stated in the past -- I believe as

1  recently as last week in another hearing -- "immigration

2  requires a push, a pull, and a process," correct?

3     A.  Correct.

4     Q.  Can you explain a little bit what you mean by

5  that?

6     A.  Sure.

7        Well, this is established in immigration theory

8  that you need a reason why people want to leave their

9  homes, right?  That's a pretty deep and profound need

10  to leave your home.  And that could be many things.  It

11  could be war or violence or it could be the need for

12  labor.  Um, it could be a family needs to reconnect with

13  someone who has left.  The needs could be many.  That

14  push can come from many factors.

15        A pull factor is why do you choose to go where

16  you go?  And a pull factor can be your family is in

17  this other place or better jobs are in that other place

18  or safety and security seems to be in that other place.

19  Those are all kind of pull factors.

20        The other piece that's really important that, you

21  know, the last, really, 20, 30 years, that migration

22  scholars have taken a more closer look at is that

23  process piece, right?  There has to be some way for

24  you to get from point A to point B, so that you'll

25  go there.  And during this time period for Mexican

1    immigrants, that process was largely the railroad,

2    right, which had been built by U.S. investors in Mexico.

3    It could also be by foot, but, largely, the railroad

4    played a big role.

5        Q.   Okay.  So fair to say in this period the -- as

6    far as Mexican labor immigrants went, the push from

7    Mexico would be a dearth of economic opportunity,

8    correct?

9        A.   Yes.

10       Q.   And then a pull from the United States would be

11   a severer economic opportunity, correct?

12       A.   Yeah.  That's correct.

13            And I would frame that as a more integrated

14   story, in the sense that what creates the push factors

15   in Mexico is the increasing integration of the U.S.

16   in Mexican economies that begins, um, late 19th century,

17   but it really escalates as you move into 1910, the

18   1920s, and continued, even, into the 1930s.

19            And so it's the rise of U.S. investment in

20   Mexico, with the railroads and the mines and cotton

21   and whatnot, that displaces a rural population, forces

22   them to find work which is insufficient and which has

23   segregated, uh, protocols, even within Mexico, according

24   to, sort of, U.S. Gemco (phonetic) law.  And then people

25   begin to take those railroads north.  And, they're often

1    invited into the United States by labor recruiters.

2       Q.   And they're looking for jobs, correct?

3       A.   Yes.  Certainly.

4       Q.   Yeah.  And it's fair to say that this pull,

5    this looking for jobs is the trend that remained a

6    factor driving labor migration from Mexico to the

7    United States in the decades following the 1920s,

8    correct?

9       A.   That is correct.

10      Q.   Okay.

11          In fact, undocumented immigration also rose

12   during the 1940s, correct?

13      A.   That's correct, alongside the Bracero program.

14      Q.   Right.

15          And workers in America who competed with these

16   immigrants for jobs, typically, opposed this migration,

17   correct?

18      A.   Yeah, until the 1970s, labor option was opposed

19   to immigrate in general.

20      Q.   And you wrote in your book Migra, specifically,

21   "Leaders of the Mexican American middle class --" so

22   these are people of Mexican descent, who are American

23   citizens "-- in the 1950s, supported aggressive

24   immigration enforcement," correct?

25      A.   Yeah.  I mean, that goes back to the 1920s.

1    Certainly, you see that at politics and in place.

2       Q.   And one of the reasons they did that I believe

3    you wrote in Migra, is because they thought that

4    increased border enforcement would improve job security

5    and living conditions for Mexican-American workers,

6    correct?

7       A.   Yeah.   There was a notion that there was a, sort

8    of, zero sum game of jobs, right, and that people of

9    Mexican descent, largely because of segregation in the

10   United States and because of that racial subrogation,

11   gave this notion that Mexican-origin folks had to fight

12   for the same jobs as to opposed to having all jobs open

13   to them, and that certainly helped to create this notion

14   that they were in competition with each other.

15       There was this really great labor organizer -- I

16   know.   I'm getting a little off-topic -- named Ernesto

17   Galarza during this time period.   He tested that.

18       Q.   Thank you.

19       Although fair to say that this hostility to

20   labor competition isn't unique to the Mexican-American

21   community in spirit, correct?

22       A.   Correct.

23       Q.   Right.

24       It's generally people who, who believe that

25   Mexican immigrant laborers might compete with them

1  for jobs, typically, are hostile to that proposition.

2  Yeah?

3     A.  It -- this is correct.  It's more complicated.

4        Of course there's another side to the story,

5  that there's an emerging immigrant right to movement.

6  There's an emerging analysis about what's the connection

7  between why Mexican immigrants leave Mexico, and why

8  they come to the United States, and that we're all,

9  actually, part of the same economic system, as opposed

10  to on, sort of, separate sides; when people need to go

11  back to their place.  It's all the same place.  It's all

12  the same economic system.

13     Q.  Turning to some other maybe drivers of

14  enforcement, you also wrote in Migra, you went down

15  to the archive in Mexico and you learned, uh, that

16  there was a Mexican Department of Migration that started

17  in, I believe, 1926, correct?

18     A.  That's correct.

19     Q.  And this is actually a bit of a surprise to

20  you at the time, if I'm not mistaken.  It was something

21  you didn't know about before -- other story -- and I

22  apologize.  You're not -- and I'm kind of rambling on --

23  but it was something that you didn't know prior to your

24  trip to Mexico, correct?

25     A.  Well, I went there because I'd seen in the

1  archive little hints that that might be the case.  And

2  I was persistent because I'd seen those things.

3  　　　　But, yes, that was relatively new to me.

4  　　Q.  All right.

5  　　　　And this Department of Mexican migration,

6  its focus was trying to prevent Mexican workers from

7  illegally crossing into the U.S., right?

8  　　A.  From crossing, period, largely, there was a

9  strong opposition.  For Mexican national reasons, you

10  know, concerns about how Mexican immigrants were treated

11  north of the border.  There were concerns by Mexican

12  employers, or U.S. employers in Mexico, about losing

13  access to labor.

14  　　　　Those are, sort of, the general politics of that

15  time period.

16  　　Q.  But if the U.S. Border Patrol can be understood

17  as serving a function to keep outsiders out, the Mexican

18  Department of Migration's function was to keep Mexicans

19  in, correct?

20  　　A.  I think this comes back to how we understand

21  the inside and the outside, right?

22  　　　　So you have like a -- also in Migra, Ernesto

23  Galarza, and others, who are really thinking about --

24  and you have to understand the importance of Mexico in

25  the rise of the United States economy in the late

1    19th and through the 20th century; that these are

2    conjoined initiatives, economies, and so there is no

3    inside/outside.  There is an increasingly integrated

4    space for a laborer.  And that critique is developing

5    and growing stronger across the 20th century.

6        Q.  All right.

7            But you did also write in <u>Migra</u>, did you not,

8    that Mexican officials, including the Department of --

9    the Mexican Department of Migration, they lobbied

10   the U.S. Department of State, the U.S. Immigration and

11   Nationalization Service, and the U.S. Border Patrol to

12   improve border patrol control this period, correct?

13       A.  That is correct.

14       Q.  And, to deport Mexican nationals who broke

15   U.S. and Mexican law by illegally entering, correct?

16       A.  Yeah.  They wanted to control the flow, as well,

17   of Mexican immigrant laborers into the United States.

18   And if we're talking about the 1940s, that's where the

19   Bracero program comes from, is this bi-, trilateral

20   set of agreements about controlling the flow of

21   migrants.

22       Q.  All right.

23           And so fair to say that, in part, border

24   enforcement decisions or control of migration across

25   the southern U.S. border at this time was also impacted

1    by foreign policy?

2        A.   Foreign policy, certainly, is a player in this.

3             And I also go to, you know, lengths in Migra to

4    talk about the power relationship between the United

5    States and Mexico; that Mexico is a junior partner in

6    this partnership, and that they're not dictating, by

7    any means, to the United States Government about how

8    this is going to go.  Rather, the United States

9    Government is receptive because it's aligned with

10   their political, cultural interests.

11       Q.   Although you also write in Migra, do you not,

12   that in 1943 -- you mentioned a little ago the Bracero

13   program, which is a program through which Mexican

14   immigrant laborers can receive legal status in the

15   U.S. to work, correct?

16       A.   Yeah.  They're short term contracts, usually

17   six months.

18       Q.   So is it not true that in 1943, the Mexican

19   Embassy in Washington D.C., warned the U.S. Department

20   of State that if control was not established over

21   illegal immigration into the U.S., that Mexico would

22   cut off the Bracero program?

23       A.   This is true.

24       Q.   Okay.

25            Now it's also true that in the early years of

```
 1    the -- well, actually, I beg your pardon.  Let me take
 2    a brief step back.
 3         Let's talk about the Bracero program for a
 4    moment, if we could --
 5              MS. GORMAN:  Your Honor, just to be
 6    clear, I tried as much as possible to streamline the
 7    presentation given our limitation and how, sort of,
 8    Professor Lytle Hernandez focused on the periods leading
 9    up to the periods of 1929.  So this is -- I mean, it's
10    up to Court whether to permit this line of inquiry, but
11    it is, certainly, beyond the scope of the direct.
12              MR. WALKINGSHAW:  With respect, Your Honor,
13    I believe there was commentary about enforcement
14    patterns following the passage of the 1929 laws act.
15    I think it's only fair that we inquire into some of the
16    other driving factors.  Obviously, racial animus has
17    been discussed in Professor Lytle Hernandez's testimony.
18    It's a complicated story.  I think the other factors
19    should -- are fairly discussed and are within the scope
20    of cross.
21              THE COURT:  Because Ms. Gorman's direct
22    examination did touch on enforcement, I'm going
23    to permit the government to explore the area of
24    enforcement.
25              Even if what was touched upon was brief, I
```

1    want, as I indicated earlier, to have a thorough record.

2    And I want to have the government be able to examine

3    the expert witness as well, not just with the scope

4    presented today, but with the scope of the content of

5    the Declaration that's been offered in support of the

6    motion.

7                So to the extent there's an objection, I

8    overrule the objection.

9                Mr. Walkingshaw, you want to repeat your

10   question?

11               MR. WALKINGSHAW:  Certainly.

12               Um -- might withdraw the question and start

13   anew, if that's all right, Your Honor.

14               THE COURT:  It is your question.  You may

15   rephrase if you would like or withdraw if you like.

16               MR. WALKINGSHAW:  Yeah.  I have a hard time

17   summing up what I said before.

18   BY MR. WALKINGSHAW:

19      Q.  Professor Lytle Hernandez, the Bracero program

20   that we discussed, started in 1942, correct?

21      A.  Right.

22      Q.  That was extended in 1951?

23      A.  Correct.

24      Q.  It ran until 1964, correct?

25      A.  Correct.

1    Q.  So the start of the Bracero program happened

2    roughly around the onset of World War II, correct?

3    A.  Yes.  Post-U.S. entry into the war.

4    Q.  Right.

5        And you wrote in <u>Migra</u> that this triggered

6    increased national security and geopolitical concerns,

7    given that the U.S. shared a 2000-mile border with

8    Mexico, correct?

9    A.  Correct.

10   Q.  And you wrote that the U.S. State Department put

11   pressure on the INS and Border Patrol to close the door

12   to undocumented migrants during this time, correct?

13   A.  Correct.

14   Q.  In part, because of the national security concern

15   presented by having a forced border during the world

16   war, correct?

17   A.  In part, yeah.

18   Q.  Yeah.

19   A.  Also, you know, to keep Mexico, you know, a solid

20   partner during this time period.

21   Q.  So, again, foreign policy concerns, in part,

22   correct?

23   A.  (No response.)

24   Q.  Now you also talked about how there's an

25   integrated system going on here, correct?

1    A.  The economy we're talking about?

2    Q.  Yes.  I apologize.  I suppose that's a bit

3  vague.

4        But the enforcement of a border control between

5  the U.S. and Mexico, that was also something in the

6  integrated system, incorporating institutions from the

7  United States, and institution from Mexico, correct?

8    A.  Yeah.  From the 1940s and '50s, you see

9  increasing integration in immigration control.

10   Q.  Right.  The U.S. Border Patrol and the Mexican

11  Department of Migration, they worked together during

12  this period.  Yes?

13   A.  Yes.  Uh-huh.

14   Q.  Okay.

15       Now, is it correct you wrote this in Migra

16  that: "By the late 1940s, one-third of all

17  apprehensions were of repeat offenders who had

18  previously been deported," correct?

19   A.  That's correct.

20   Q.  And some were repeat offenders who had been

21  apprehended and deported several times in a year,

22  correct?

23   A.  That's correct.

24   Q.  And others had been apprehended and deported

25  several times in a day, correct?

1      A.   Correct.

2      Q.   Is it correct in this period that the Border

3  Patrol tried all different kinds of strategies to deter

4  repeat offenders from returning?

5      A.   Yes.  That's correct.

6      Q.   All right.

7           They tried detention?

8      A.   (Nodding head affirmatively.)

9           Yeah.

10      Q.   And you have to -- thank you.

11           Just for the benefit of the court reporter, if

12  you could respond orally -- although I am going to go

13  through a list, so I could understand why you started

14  nodding.

15           But, uh, they do bus lifts?

16      A.   Correct.

17      Q.   They did boat lifts?

18      A.   Yes.  All this was happening integration.

19      Q.   They erected fences?

20      A.   Correct.

21      Q.   And they even took unsanctioned actions, like

22  shaving repeat offenders' heads, correct?

23      A.   Yes.

24      Q.   Uh, but border patrol officers would still find

25  previously deported migrants, even after going through

1    some of these procedures, correct?

2      A.   That is correct.

3         I mean, all of this activity is happening, you

4    know, I would argue, uh, yes, within foreign relations,

5    with an (unintelligible) of foreign relations, with an

6    integrated economy, around labor concerns, concerns

7    about what's emerging as the Cold War.

8         Racial animus is also at play.  There is no way

9    in which we can understand the politics of head shaving

10   as something that would have been tolerable for other

11   than Mexican immigrants in this time period.  And the

12   involvement of the Mexican government does not mean

13   that rational animus is not at play.  Mexico has a long

14   and deep history of race and subrogation, especially for

15   indigenous folks.

16        So, the story of race transcends the border.

17     Q.   Thank you, Professor Hernandez.  I do appreciate

18   the analysis, although in the interest of time, with

19   respect, if you wouldn't mind answering my questions,

20   I think the analysis was put forth in your testimony.

21   And I know Ms. Gorman will be making these arguments

22   to the Court.

23        So just for purposes of today's proceeding, if

24   you wouldn't mind answering the questions that I put to

25   you, I think things will go a little faster -- although

1    I don't believe I have a ton more -- but can we agree

2    that that's fair?

3        A.   Well, I just want to be full in my answers, so --

4    everything is complicated, so yes/no is not always the

5    accurate answer.  So when I think that I need to give a

6    little bit more context, I would like to be able to do

7    that.

8        Q.   Okay.  Understood.

9            So there's another citation, and I believe it's

10   to your work from City of Inmates, in the motion.  It

11   refers to the same -- it, basically, immediately follows

12   the sentence we were discussing at the beginning of

13   cross-examination.

14           So, from 1929 to 1939, it says:  In each of these

15   years, individuals from Mexico comprise no fewer than

16   84 percent of those convicted, and often made up as many

17   as 99 percent of defendants for illegal, uh, for border

18   crossing crimes, correct?

19       A.   Correct.

20       Q.   Now, the majority of undocumented migrants in

21   this period crossing the Mexican border were Mexicans

22   at that time, correct?

23       A.   Certainly a substantial number.  I would also --

24   it's really important to understand the role that the

25   U.S. Border Patrol plays in identifying and arresting

1    people.  So this is why telling that law with the

2    (unintelligible) Border Patrol is really, really

3    significant, and why they came to focus on Mexican

4    immigrants.

5           So the 1924 Immigration Act, which dominates

6    immigration control between 1924 and to 1965, really,

7    there is a plethora of possibilities for immigration

8    law enforcement, right?  People likely to become public

9    charges.  People engaged in prostitution.  There's

10   lots of things that they could do.  But because of the

11   cultural and political dynamics of the establishment of

12   the Border Patrol, and who was hired as Border Patrol

13   officer, and where they worked, they made a set of,

14   sort of, granular decisions, at the local and regional

15   level, that shifted away from broad enforcement of the

16   immigration law, and all the possibilities, and targeted

17   their attention on Mexican immigrants.  This is the way

18   that they built power for themselves as immigration law

19   enforcement officers.

20          So, this is important because how you get from

21   a notion of all these different people crossing the

22   border -- people with trachoma who were kept out, people

23   likely to become public charges -- to just largely

24   Mexicans being delivered up as the undocumented, being

25   delivered up as the people who are arrested and

1   imprisoned, that happens in the -- in the sort of

2   vestibule of immigration law enforcement.  So, it's

3   really, really important to see that how you go from

4   law to law enforcement, to who gets imprisoned, happens

5   at that juncture.

6       Q.   Okay.  Thank you, Professor.

7            I do want to make sure that my question did get

8   answered.  The question is, yes, a substantial majority,

9   they were Mexicans, correct?

10      A.   Well, a substantial number.  Right?

11      Q.   Okay.

12      A.   So you're talking about what we don't know about

13  unauthorized immigrants.

14      Q.   Okay.

15      A.   There's -- certainly, we don't know the number,

16  so "majority" is tough.  "Substantial number," certainly

17  is true.

18      Q.   Okay.

19           Now, you were speaking a little bit ago about

20  enforcement priorities.  Isn't it correct, as you

21  wrote in Migra, that by the mid to late 1930s, the

22  U.S./Mexico border was not the epicenter of border

23  control activity, correct?

24      A.   Yeah, it wasn't as early as the 1920s.  That

25  increases over time.

1    Q.   And by the point of the mid/late 1930s, there

2    were more officers on the U.S./Canadian border, than in

3    the U.S./ Mexico border, correct?

4    A.   Yeah.   That border is longer.   So when the

5    border was started, there were even more officers or

6    allocations for the northern border.   Slowly, for the

7    vast reasons I was just discussing about, sort of,

8    border patrol force in the U.S./Mexico border region,

9    that shifts allocations to the southern border, and

10   that that really ampli -- ramps up during World War II.

11   Q.   Now, roughly, in this same period, I believe

12   in Migra, you cite that mid 1920s, "80 to 95 percent

13   of California's laborers were people of Mexican origin,"

14   correct?

15   A.   Of the working class, right, of --

16   Q.   The laborers -- I beg your pardon.   I didn't mean

17   to interrupt you.

18        But the laborers -- yeah, so the working class.

19   Laborers, roughly, to use equivalent terms?

20   A.   Well, I mean, laborers could be highly skilled

21   laborers.   It's a general term.   But, certainly, the

22   agricultural workforces, street workers, all of that.

23   Yes, Mexicans are a substantial portion of that.

24   Q.   And during this same period, I believe you wrote

25   that 80 to 98 percent of Texas' working class were

1  Mexican, correct?

2      A.  Of the low wage workforce, yes.

3      Q.  Right.

4          And, again -- I believe we discussed before -- a

5  substantial pull for these people, these working class

6  people, is increased economic opportunity, correct?

7      A.  Jobs.  Yes.

8      Q.  Exactly.

9          Now, I believe you also wrote in <u>Migra</u>, so you

10  would agree then, that at least in the 1930s, when

11  prosecution for entry crimes increased, the fines and

12  incarceration that were imposed, uh, diminished the

13  basic pecuniary function of labor immigration, correct?

14      A.  Yeah.

15      Q.  If you get fined, you lose your money, correct?

16      A.  If you get fined, you lose your money.  If you

17  go to prison, you can't work.

18      Q.  Right.  So criminal penalties served as

19  a deterrent to some folks seeking these labor

20  opportunities, correct?

21      A.  It served as a deterrent in its actual form, but

22  it also served as a mechanism of making Mexican laborers

23  more vulnerable.  Right?  Because of the way the law was

24  racially enforced, Mexicans were more vulnerable to

25  arrest.  And so it's a tool that agribusiness,

1    especially during this 1930s period, is using in

2    conjunction with border patrol officers, to make

3    sure that Mexican workers remain temporary, so-called,

4    quote, docile, um, and controlled.

5        Q.  Yeah.

6            You testified on direct about a social structure

7    that rose up.

8        A.  Juan Crow.

9        Q.  Yes.

10           And I believe you said it made these workers

11   more desirable for certain kind of employers, correct?

12       A.  Yeah.  It was a racialized form of social

13   hierarchy that's known in the American south as

14   Jim Crow, in the America southwest is Juan Crow --

15       Q.  Right?

16       A.  -- and that's what creates them as a marginalized

17   workforce.  Yes.

18       Q.  Right.

19           You said that the undocumented status of

20   these folks allows them to be subject to increased

21   control by their employers, correct?

22       A.  Well, there's the racialized system, right,

23   which is that Juan Crow.  And then undocumented status

24   accentuates that, and I would say that the threat of

25   imprisonment only deepens that marginalization.

1      Q.   Right.

2           I believe you testified in the past that, you

3      know, for folks who are undocumented, there's always the

4      threat, "We can just call the Border Patrol," correct?

5      A.   That's correct.

6      Q.   It's a threat that can be made against these

7      people?

8      A.   Correct.

9      Q.   And, in effect, it makes them more exploitable,

10     correct?

11     A.   Correct.

12     Q.   You can pay them lower wages, correct?

13     A.   Yeah.

14     Q.   You could submit them to, uh, working conditions

15     that wouldn't be accepted, or might even be illegal in

16     terms of standards put forth for people with status,

17     correct?

18     A.   Yeah.  So, there's status and non-status.  But,

19     again, we have to understand all this -- and Migra goes

20     into this in depth, and so does City of Inmates -- that

21     that's a racialized concept of who is undocumented by

22     this time period, and who gets policed, who that threat

23     is meaningful for, is a racialized situation and scheme.

24     Q.   But as you just said, Professor, isn't it correct

25     that undocumented status for some of these people

1    accentuates that threat?

2    A.   Undocumented status, certainly.  The fact,

3    though, is also that that status has deeper meaning

4    for people who are more vulnerable to the enforcement.

5    Q.   And folks who are undocumented are necessarily

6    more vulnerable to enforcement, are they not, Professor?

7    A.   Racialized workers who are the targets of

8    policing are the most vulnerable to enforcement per

9    immigration law.

10    Q.   With respect, Professor, the answer to my

11    question is yes; undocumented people are more vulnerable

12    to these kinds of enforcement?

13    A.   Only within a racialized context.

14    Q.   So you do not agree that, um, in a context such

15    as, uh -- Canadian workers, for example.  The Canadian

16    worker, without -- in the U.S. illegally, without any

17    kind of status, you do not agree -- and let's say for

18    purposes of the example, that this person was white.

19    The person is not more vulnerable than a similarly

20    situated Canadian white worker who has a visa?

21    A.   Uh, that is certainly the case.

22        In addition to that, their sense of vulnerability

23    is deeply impacted by the likelihood of them being

24    targeted for arrest, of them being brought to the

25    consequences of that status.

1    Q.   Okay.

2              MR. WALKINGSHAW: I have no further

3    questions.

4              Thank you, Professor Lytle Hernandez, for

5    your testimony today.

6              I'll pass the witness.

7              THE COURT:  Ms. Gorman.

8              THE WITNESS:  You're welcome.

9                      **REDIRECT EXAMINATION**

10   BY MS. GORMAN:

11   Q.   Professor Lytle Hernandez, I think there were so

12   many important points to hit on and I want to use your

13   time as wisely as possible, but one of the interesting,

14   sort of, differences that the government brought up was

15   related to Canada.

16        So, can you talk a little bit about the

17   differences between the treatment of Canadians, both

18   legally, like, you know, in terms of visa overstaying

19   or regularizing status, and people south of the border.

20   So, generally, Mexican people or Latinos?

21   A.   Yeah.  So there's scholar historian named

22   Mae Ngai, who has written a considerable amount on

23   this.  And one of the things that she helps us to

24   see and to understand is the development of something

25   that was called the Pre-examination program that was

1    available, I believe starting in late -- in the 1920s,
2    that people who did not have regular status or proper
3    paperwork, for whatever reason, could get pre-examined
4    in the United States, go back -- go to Canada, and then
5    re-enter legally into the United States.
6         So this is a scheme that's only available in
7    Canada, which is sort of setup for people who are -- for
8    immigrants who are close to the Canadian border, have
9    access to the Canadian border.  And, you know, largely,
10   it was European immigrants that crossed through Canada
11   who had access to the Pre-examination program.
12        So that's one example of how regularization
13   was made available to, disproportionately, European
14   immigrants.
15   Q.  And what were the differences in terms of
16   Mexico for -- what would be the analogous situation
17   in Mexico that was or was not available to those
18   individuals?
19   A.  There was no pre-examination process that was
20   available in Mexico or through Mexico.  And again, as
21   I had mentioned earlier, by 1928, consulate officials
22   in Mexico were systematically denying visas to Mexican
23   workers in particular.
24   Q.  So -- which actually brings up an interesting
25   point.

1    Did Congress ever decide to criminalize visa

2  overstaying?

3    A.   I am unaware of any such move.

4    Q.   But, Canadians did have access to visas that

5  Mexicans did not?

6    A.   It was not -- the Pre-examination program did not

7  have these national limits to it.  But, the way in which

8  it's set up, because you have to return to Canada to

9  cross, it meant that it was more available to people

10 who crossed the Canadian border as opposed to people who

11 crossed the Mexican border.

12   Q.   And a few times I noted you tried to provide a

13 racial context to some of the prosecutor's questions,

14 and I want you to be able to elaborate on that.

15    How do you, as a historian, suss out racial

16 animus, when you have so many competing interests,

17 right?  You have economic interests and foreign policy.

18 So, how do you conceptualize race?  And then how do

19 you suss out racial animus when you're studying this

20 issue?

21   A.   You know, that's a good question.  I mean, of

22 course, the world is always complicated and there are

23 many dynamics of play in any congressional decision.

24 Why is that, you know, I, as a scholar of race and

25 immigration policing, think that immigration law and

1    immigration control are highly racialized?

2           First, the entire body of scholarship of

3    immigration law, I'm within the mainstream of that

4    scholarship that's discussing, um, the rise of the

5    1924 Act and heading into the 1929.

6           Also, let's -- can I read you a couple things

7    from the, sort of, pre-1929 period about --

8       Q.   Sure.

9       A.   -- this distinction, from their own words, not

10   mine?

11          We can talk about racial capitalism and how

12   racial formation and class are always bound together.

13   That the way that you extract (unintelligible) from

14   people is by dehumanizing and subjugating, so that,

15   you know, that extra portion of profit comes through

16   that racialization process.  But, let's take the words

17   of a people who were passing immigration law themselves.

18          So, for example, we know eugenics was a primary

19   science that was utilized as we're heading into the

20   1924 Act, and the efforts to include Mexicans in the

21   quota.  After the 1924 Act, you get a Society of

22   America, which Howard Johnson was the President of

23   in the mid 1920s, and it issues a series of reports.

24   I want to read from a couple of those reports.

25          Why?

1          Because they really hit on this issue of race

2     versus the economy.

3          So from a second report of the subcommittee on

4     Selected Immigration of the Eugenics Committee of the

5     United States of America, published by the Eugenics

6     Society of America, quote:  "Immigration Act of 1924,

7     established a new immigration policy.  It expressed

8     the conviction of the American people that immigration

9     is a long-time investment in family stocks, rather

10    than a short term investment in productive labor.

11    That is a question of future race character, and not

12    primarily an economic problem."

13         So, you know, this is the kind of thinking

14    that the eugenicists were deploying as they were coming

15    to develop the 1924 Act, the efforts to include Mexican

16    immigrants on the quota system.  And when that failed,

17    you have the development of the 1929 law.

18    Q.   So -- and when you talk about race and when you

19    talk about racial animus, how are you conceptualizing

20    race as opposed to nationhood?

21         So what is the -- so that was -- and that was the

22    second part of my question.

23         And I'm sorry.  I tend to ask compound questions

24    and that's my problem.

25    A.   Yeah.  I appreciate simple questions.  It's hard

1    to hold on to, like, multiple questions at a time.  So,

2    thank you for following up.

3           The concern, certainly during the 1920s, of

4    Mexican immigrants was not about a national concern.

5    The concern was about what was understood as non-white

6    immigrants coming from south of the U.S./Mexico border.

7           The way in which Mexicans were constructed as

8    racially undesirable, is that they were seen as being

9    majority indigenous, part black, mixed race; that they'd

10   be a threat to sort of the Nordic, particularly, of the

11   1924 legislation.

12          You know, James Davis, who was really, you know,

13   instrumental in the passage of the 1929 legislation.  He

14   was the Secretary of Labor and he worked very closely

15   with (unintelligible), I think the record is quite

16   clear was a ardent white supremacist.

17          James Davis commissioned a study in 1925 in

18   response to the 1924 Act, and he wrote -- or in that

19   study it's written, quote:  "In blood, the people of

20   the United States are mainly European and white.  In

21   blood, the people of Latin America and the West Indies

22   are mainly Asiatic.  And by that, they mean Indian or

23   African.  Mainly black or brown."

24          And it's that sort of notion about who is coming

25   from south of the border being, quote, unquote, the

1    sort of (unintelligible) Indian migration of history,

2    that makes Mexican immigrants seem racially unfit,

3    undesirable to the white population of the United

4    States.

5        Q.   And thank you.

6            You know, one thing I think you touched on, I

7    think, super briefly, was, um, there's a part of

8    history -- I will admit I knew nothing about before

9    this -- but sort of going into the 1920s, there were

10   certain, uh -- I think they were called the Juarez Riots

11   or the Bath Riots.

12           So there were -- there was this, sort of, system

13   at the border, sort of, going into the 1920s that, as I

14   understand it, people coming from south of the border

15   were subjected to, but north weren't.  And can you talk

16   a little bit more about that, or can you elaborate a

17   little bit more about that?

18       A.   Sure.

19           I mean, there's a scholar Alexandra Minna Stern,

20   who has written on this quite extensively on a the book

21   -- the book she has on Eugenics and Immigration, and

22   an article that she has on "Boundaries of Building and

23   Blood."  So, what happens is in 1917, U.S. Immigration

24   Service institutes a new process by which they're going

25   to quarantine and delouse all Mexican immigrants -- or

1    many Mexican immigrants crossing the U.S. and Mexico

2    border, that delousing consisted of, really, a kerosene

3    bath and a washing of the clothes, out of a fear that

4    they were going to bring Typhus fever into the United

5    States.  There was an uprising against this system, and

6    that's called the Juarez Riot, as you call it.  And,

7    yet, it continues through the 1920s, of the process of

8    sort of cleansing Mexican immigrants as they're entering

9    the United States.

10         People who had, sort of, border crossing cards

11   had to subject to these -- were subjected to these

12   weekly baths.  And people who were crossing to, you

13   know, go farther from the border were also subjected

14   on their way in.

15         And it's my understanding, uh, that, you know,

16   later on, some of the chemicals that were used in these

17   baths would become chemicals that were used, um, in the

18   genocidal campaigns in Nazi Germany.

19   Q.  And specifically the gas -- and I -- are you

20   referring to -- and I know I have it written down

21   somewhere -- but are you referring to the gas

22   specifically used in the gas chambers in Nazi Germany?

23   A.  I'm forgetting the title of the gas, but, yes.

24   Q.  Zyklon B.  Pardon me.  I had it written down

25   here somewhere.

1          So, is that what you're referring to is the gas

2     that was used in Nazi Germany?

3        A.  I am.  It just hurts so much to say that.

4          Uh, you know, Harry Laughlin, who was the

5     eugenics expert brought into Congress by Howard Johnson

6     in particular, uh, was heralded in Germany during the

7     1930s for the immigration laws and, um, studies.  And

8     there's a terribly close relationship between the two

9     regimes that developed.

10       Q.  All right.

11         And I notice you are -- I will give you a

12    moment because I, I didn't want to upset you with

13    that question.

14         But -- and so when we talk about the use of

15    this gas at the border, and the kerosene baths, um,

16    in addition, were individuals at the southern border

17    also required, including, you know, women and young

18    girls, to strip naked for inspection?

19       A.  That is correct.

20       Q.  And was anybody at the northern border, to your

21    understanding, ever subjected to this kind of, um,

22    treatment?

23       A.  No.

24         And, you know, the, the historical literature

25    is clear on this that about 99 percent of the people

who came through Ellis Island were allowed passage into

the United States, often with little more than, like,

an eye exam for trachoma.  And what was happening to

immigrants, mainly at the El Paso border, because that's

the main passage point on the southern border, and at

Angel Island in San Francisco, which is the main passage

point for Asian immigrants, were subjected to far

different procedures of immigration control than in

El Paso.

　　　As you say, the delousing baths and the

quarantine were particularly harmful, enraging,

unhealthy to the point that, you know, they invited

the riots of 1917.

　　Q.  I believe there was a 17-year-old girl that

incited those riots.  Are you familiar with the name

Carmelita Torres?

　　A.  I know the case lightly.

　　Q.  Well, then I won't make you go into it.

　　　　　MS. GORMAN:  And Your Honor, I would pass,

um -- I guess, ultimately, before I let you go, is it

your ultimate conclusion that racial animus was a strong

motivating -- motivating force in the passage of illegal

re-entry in 1929?

　　　　　THE WITNESS:  Yes.  It is my professional

opinion that racial animus was a motivating factor, a

1  significant motivating factor in the passage of the

2  Immigration Act of March 4th of 1929.

3          MS. GORMAN:  And is it your opinion that it

4  continues to have a desperate impact on Latino or Latinx

5  individuals?

6          THE WITNESS:  It is my professional opinion

7  that it was constructed to do just that, and that it

8  continues to have a dispersate impact.  Yes.

9          MS. GORMAN:  And are you aware of any

10  period, since 1929, when illegal re-entry has not been

11  on the books.

12          THE WITNESS:  I am not aware of any such

13  period.

14          MS. GORMAN:  Your Honor, I will pass the

15  witness.

16          MR. WALKINGSHAW:  Thank you.

17                **RECROSS EXAMINATION**

18  BY MR. WALKINGSHAW:

19    Q.  Professor Hernandez, this will be as brief as I

20  can.

21          You testified on redirect that the opinion that

22  you just voiced is, I believe you used the phrase

23  "within the mainstream of immigration scholarship,"

24  is that correct?

25    A.  That racial animus was a driving factor in the

1    passage of immigration law, especially leading into

2    1924, and then the concerns, post-1924, around Mexican

3    immigration.  Yes.

4        Q.  So that opinion, you know, you testified is

5    within the mainstream of immigration scholarship,

6    correct?

7        A.  Yes.

8        Q.  And now you testified in a hearing in the

9    District of Oregon last week, correct?

10       A.  Correct.

11       Q.  At that hearing, uh, did you not say that, "in

12   the academy, you can always find differing opinions"?

13       A.  I, I don't recall saying that.  But, yes, I would

14   affirm that today.

15       Q.  It is true, correct?

16       A.  Of course.  Yes.

17       Q.  Yeah.

18           Then, briefly, we discussed, on redirect, some

19   differences between the enforcement at the Canadian

20   border and enforcement at the Mexican border.

21           Did Canada have anything remotely like the

22   Bracero program at any point in history?

23       A.  No.

24       Q.  Okay.  The Bracero program permitted -- I believe

25   you wrote in Migra -- two million Mexican laborers to

1    work illegally in the United States under the auspices

2    of the program, correct?

3        A.   Yes.  It also included West Indian laborers.

4    There's a strong sense of wanting to have, again,

5    non-white, racially marginalized populations included in

6    this workforce.  So, it wouldn't have been something

7    constituted for a majority white Canadian population.

8            The other distinction for the Canadian border

9    that's important is that under treaty rights, indigenous

10   folks, moving across the Canadian border, have free

11   passage.

12       Q.   All right.

13           And then just very briefly, I'd just like to make

14   sure I get some dates correctly.

15           I believe you said the Juarez Riot took place in

16   1917, is that correct?

17       A.   Uh-huh.

18       Q.   And the quotes that you wrote from the -- I'm

19   forgetting the term -- but the Eugenics Committee -- on

20   redirect, do you know the quotes I'm referring to?

21       A.   Yes.

22       Q.   Those are from 1920s, correct?

23       A.   Yes.  That's correct.

24       Q.   Okay.

25               MR. WALKINGSHAW:  Nothing further --

```
1              THE WITNESS:  -- the 1924 Act.
2              MR. WALKINGSHAW:  Nothing further.  Thank
3  you.
4              MS. GORMAN:   Your Honor --
5              FURTHER REDIRECT EXAMINATION
6  BY MS. GORMAN:
7    Q.  Professor Hernandez, and I'll be brief because I
8  know I want to touch on this with Professor Gonzalez
9  O'Brien too, but in terms of the Bracero program, was
10 there -- can you talk to me about race and exploitation
11 in terms of that program; or, is that beyond the scope
12 of your -- I don't want to put you in a position where
13 you're talking, you know, where I'm asking you to talk
14 beyond the scope of your, you know, your specialization
15 or expertise.  So, feel free to turn me down.
16   A.  No.  That's fine.  I think, as Mr. Walkingshaw
17 has indicated, my book Migra, I spent a considerable
18 amount of time on the Bracero program.
19         So, first of all, you know, as I think I had just
20 mentioned, the fact that the bilateral agreements that
21 become known as the Bracero program are only effectuated
22 between the United States and Mexico and West Indian
23 countries, is one indication that there was a desire
24 to find a -- not just close, but a certain type of
25 population to come in and do this temporary labor.
```

1  So, non-white populations were targeted for these

2  agreements, and that was Mexico and the West Indies

3  in particular.  And so I think that that's one of the

4  key indicators of the dynamics at play, that it's not

5  just labor, it's a racialized labor form that people

6  wanted to have through the Bracero program.

7       You also have, just through the implementation

8  of the program -- you know, especially in Texas, but

9  elsewhere -- this constant struggle over how Mexican

10  Braceros are going to be treated in the communities.

11  Are they going to be given access to restaurants?

12  Are they going to be given access to dances?  And

13  pretty consistently, uh, they are subject to, uh,

14  Juan Crow.  And that becomes a real sticking point

15  in the relationship, the bilateral relationship, to

16  the point that, you know, that Texas is largely kicked

17  out of the program.

18  Q.  In terms of -- and in terms of the Bracero

19  program, you have talked, sort of, briefly, about the,

20  I guess what we would call delousing or the gassing that

21  had happened at the border going into the 1920s.  But,

22  are you aware of the Braceros being -- and this would

23  be a different chemical.  It would be DDT -- but sort of

24  being subjected to very similar nude inspections, um,

25  sort of being gassed with DDT during that process,

1    when they were, uh, brought to American, I guess,

2    agricultural industries?

3        A.   Yes.   The Bracero workers were gassed

4    systematically with DDT, and there's, you know, many

5    photos and studies on that process.

6        Q.   And subjected, also, to these nude and invasive

7    inspections?

8        A.   That is correct.

9        Q.   And when -- you know one of the, I guess,

10   more arresting images I've come across in the Bracero

11   was, sort of, inspections by agricultural, I guess, land

12   owners or farm owners, uh -- but Braceros, when they

13   were brought in to be used as migrant labor force,

14   was there -- were they able to, sort of, be picked for,

15   I guess, physical fitness, or the ability to toil well,

16   by American agricultural interests?

17       A.   Um, well, so that's certainly true.   There have

18   long been a stereotype at play that Mexican workers, as

19   a race, right, were fit for agricultural labor because

20   they were, I think, believed and thought, you know,

21   shorter to the ground and ready for stoop labor.

22           So, there's sort of a racialized (unintelligible)

23   of people's appearance to do this kind of work.   And,

24   you know, it's part of the reason -- you know, one of

25   the little trowels that Braceros were given to work

1   with, which forced them to sort of bend over constantly,

2   really, literally, broke backs, and became a really

3   important issue that people organized around.

4        You know, a lot of the reasons they were

5   given those trowels was the stereotype that they, as

6   a racial group, um, were more stout and close to the

7   ground and sort of fit for this kind of labor, and so

8   they didn't need the accoutrement that others did.

9   Q.   So -- and in terms of the Braceros, I guess

10  what little protections were afforded to them on paper,

11  did they -- were they generally violated by industry?

12  A.   Oh, I mean, that's where Operation Wetback

13  comes from in 1954, is the persistent violation of

14  the Bracero contracts.  In many ways, that's a campaign

15  that is simultaneously anti-Mexican, and meant to bend

16  employers to comply.

17  Q.   In your general opinion, were Braceros an

18  exploited labor force and racialized?

19  A.   Absolutely.

20       MS. GORMAN:  Your Honor, I think at this

21  point I would pass the witness.  I am worried about

22  going into too much overlap with Dr. Gonzalez O'Brien.

23       And Professor Lytle Hernandez has been

24  very generous with her time already, so I'll pass

25  the witness.

```
 1                    THE COURT:  Mr. Walkingshaw, do you have any

 2   additional questions based on the re-redirect?

 3                    MR. WALKINGSHAW:  No, Your Honor.  Thank

 4   you.

 5                    THE COURT:  All right.  Thank you.

 6                    Thank you, Professor Lytle Hernandez, for

 7   your time here this morning.

 8                    THE WITNESS:  Thank you for having me.

 9                    THE COURT:  Let's take a brief recess before

10   we resume with the next expert witness.

11                    THE CLERK:  Yes, Your Honor.

12                    THE COURT:  We'll take about 15 minutes.

13                    MR. WALKINGSHAW:  Beg your pardon, Your

14   Honor, how long should we -- I might excuse myself from

15   the room.

16                    THE COURT:  We'll take a 15-minute recess.

17                    MR. WALKINGSHAW:  All right.  Thank you,

18   Your Honor.

19                    (Recess taken.)

20                    THE CLERK:  Court is back in session.

21                    THE COURT:  All right.  Ms. Gorman, let's

22   resume with the defense's next witness.

23                    MS. GORMAN:  Your Honor, we call Professor

24   Gonzalez O'Brien.

25   \\\
```

1

2  **BENJAMIN GONZALEZ O'BRIEN,**
called as a witness on behalf of the Defendant,
was sworn and testified as follows:

3

4          THE CLERK:  Thank you.

5          Please state for the record your full name

6  and spell both your first name and your last names.

7          THE WITNESS:  Benjamin Gonzalez O'Brien.

8  Last names G-o-n-z-a-l-e-z; O, apostrophe, B-r-i-e-n.

9  First name, B-e-n-j-a-m-i-n.

10          MS. GORMAN:  May I, Your Honor?

11          THE COURT:  Yes.

12          MS. GORMAN:  Thank you.

13          **DIRECT EXAMINATION**

14  BY MS. GORMAN:

15   Q.  Professor Gonzalez O'Brien, can you introduce

16  yourself to the Court, and explain a little bit about

17  your employment and your occupational background?

18   A.  Certainly.  I'm an Associate Professor of

19  Political Science at San Diego State University.  I'm

20  also the author of two books on U.S. immigration policy,

21  Handcuffs and Chain Link, Criminalizing the Undocumented

22  in America.  That came out in 2018, with the University

23  Virginia Press.  And also, Sanctuary Cities.  The

24  Policies of Refuge, that came out in 2019, with Oxford

25  University Press.

1          In addition to the two books that I have, uh,

2     I've also -- I'm also the author of a number of articles

3     that have been published in a range of journals.

4          Q.  Can you describe how you developed an expertise,

5     in particular in this area that we are talking about

6     today, in criminalization and migration?

7          A.  So my expertise is based on a reading of

8     committee reports, as well as congressional debate

9     over different pieces of immigration legislation,

10    including the 1929 Undesirable Aliens Act; the 1924

11    Johnson-Reed Act; the 1986 Immigration Reform and

12    Control Act; and the 1996 Illegal Immigration Reform

13    and Immigrant Responsibility Act.

14          I also do some quantitative work looking at

15    stereotypes of undocumented immigrants.  That was part

16    of my first book.  And also some quantitative work,

17    looking at things like crime rates in sanctuary and

18    non-sanctuary cities, which is part of that second.

19          Q.  And Professor, can you also talk about how, as

20    a political scientist, you sort of conceptualize or

21    understand history in your work.  Because I know there's

22    a distinction between the historian and a political

23    scientist, so I'm trying to, sort of, tease that out

24    because they're connected.

25          A.  Right.

1          So, you know, one of the connections that I draw

2     in my first book between the Undesirable Aliens Act

3     and the later Illegal Immigration Reform and Immigrant

4     Responsibility Act, is that -- is the influence of

5     initial decision -- policy-making decisions on future

6     choices, as well as, uh, how policy decisions at one

7     point in time, or policies themselves at one point

8     in time, can change how groups are characterized, can

9     change how groups are discussed; and how that, in

10    turn, influences future congressional debates, future

11    congressional decisions on policy in that area.

12    Q.   And is your work on these topics based on

13    principles and methodologies generally deemed reliable

14    in the field of political science?

15    A.   Yes.  Both of my books were peer reviewed by

16    both presses, and all of my articles, to date, have

17    been peer reviewed.  Sometimes multiple times.

18    Q.   And in your work, do you also -- do you

19    collaborate with other, sort of, notable academics on

20    these topics about immigration history and policy?

21    A.   Yeah.  I've collaborated with a number of other

22    academics at different institutions.  Uh, researchers

23    at the University of New Mexico; University of Oklahoma;

24    University of Washington, Tacoma; and then some work

25    in the past with, with a researcher at UCLA.

1    Q.  And I skipped over this, and I know you're a

2    professor, but just to be clear for the record, you

3    have a Ph.D in Political Science, is that correct?

4    A.  I do.  Not only a Ph.D, but also two master's

5    degrees.

6    Q.  Well, thank you.

7         MS. GORMAN:  And, Your Honor, I would ask

8    that the Court recognize Professor Gonzalez O'Brien as

9    an expert in political science, and particularly with

10   a focus on, um -- his words are going to be way better

11   than mine -- but on the intersection between criminal

12   law and immigration and policy, if -- unless Professor

13   Gonzalez O'Brien has a different characterization that

14   would be better.

15        THE WITNESS:  Um, I think the way that I

16   would characterize it would be between past policy

17   decisions and future policy choices when it comes to

18   law-making in Congress.

19        MS. GORMAN:  Your Honor -- and Your Honor, I

20   guess with that, would the Court --

21        THE WITNESS:  I see a wrinkled brow.

22        THE COURT:  I'm sorry.  So the request is

23   to recognize Professor Gonzalez O'Brien as an expert

24   in political science, with a focus on the intersection

25   between past policy decisions and its impact on future

1  choices and debate when it comes to legislation?

2              THE WITNESS:  If I may clarify, Your Honor.

3              I think political science, with expertise

4  in immigration policy, race, and public policy would

5  probably be a more accurate characterization of my

6  areas of expertise.

7              THE COURT:  All right.

8              Does the government have any objection?

9              MR. WALKINGSHAW:  Not -- beg your pardon,

10  Your Honor.  I'm having some microphone difficulties.

11              Can you hear me?

12              THE COURT:  Yes.

13              THE WITNESS:  Yes.

14              MR. WALKINGSHAW:  Apologies.

15              No objection to the expertise framed as it

16  was in that last instance.

17              THE COURT:  So the request is for the Court

18  to recognize Professor Gonzalez O'Brien as an expert

19  in political science, with a particular expertise in

20  immigration policy, race, and public policy.

21              Is that correct?

22              MS. GORMAN:  That sounds right to me,

23  Your Honor.

24              THE COURT:  All right.  The request is

25  granted.

1          MR. WALKINGSHAW:  Um, yeah, I'm fine with

2     that, Your Honor.  Thank you.

3          THE COURT:  All right.  The request is

4     granted and the Court will so certify.

5     BY MS. GORMAN:

6        Q.  So, Professor Gonzalez O'Brien, I don't want

7     to be -- I'll try not to be duplicative, but -- and

8     I wouldn't fault you if you didn't -- but were you

9     present and were you able to listen to Professor Lytle

10    Hernandez's testimony that she just provided to the

11    Court?

12       A.  I was both present and over-caffeinated.

13       Q.  Great.  Me too.

14          So, Professor O'Brien, I guess I want to ask,

15    sort of, generally, you know, do you agree with,

16    uh, Professor Lytle Hernandez's characterizations,

17    particularly with reference to the historical and

18    legislative record that culminated in the 1929

19    Undesirable Aliens Act?

20       A.  I do.

21       Q.  And to the best of your knowledge, is 1939

22    the first criminalization of illegal re-entry in the

23    United States?

24       A.  1929, but --

25       Q.  Oh.  Sorry.  I don't know what I said.

1    So since 1929, has there ever been a time that
2  illegal re-entry was not on the books?
3    A.  No.
4    Q.  Okay.
5    So, Professor Gonzalez O'Brien, I wanted to try
6  to, as much as possible, provide a bridge between both
7  1929, and the events leading up to it, and 1952.  So I
8  want to start, I guess, so that I don't ask a million
9  questions in one question, would something that happened
10  after 1929 -- just to trace its, sort of, historical
11  origin -- but, is it your understanding that starting
12  at about the Great Depression era, there was what we
13  call, or what is called, sort of, the re-patronization
14  of Mexican people to Mexico and the United States during
15  the Great Depression?
16    A.  Yes.
17    Q.  Tell me what that is.
18    A.  So, the 1920s was a period of increasing
19  immigration restriction.  I don't want to retread
20  over a lot of the things that Dr. Lytle Hernandez has
21  already covered, but the passage of the Johnson-Reed,
22  the discussion over quotas being placed on Mexico in
23  the period between Johnson-Reed and the passage of the
24  Undesirable Aliens Act in 1929, and then in the period
25  following -- well, in the period -- in the same year as

the passage of the Undesirable Aliens Act, you also do
have the beginning of a program that's been referenced
as Mexican re-patronization, which was this push, as
the U.S. headed into the Great Depression, this push
to get Mexican immigrants to repatriate to Mexico.  And,
it was relatively successful.  The numbers vary in
terms of the number of immigrants -- or the number of
Mexicans -- let me clarify that -- the number of
Mexicans who left the United States, with, kind of,
the lowest estimates being around 400,000, and some of
the higher estimates being well over a million who
left for Mexico.  And some of the estimates of that
is, you know, that around 60 percent of those who
left -- who went back to the Mexico or went to Mexico
were, in fact, American citizens.

    Now, there's a question of, well, why are
Mexican -- if they're American citizens, why are they
returning to Mexico?

    And I think that part of the story here is that
this was a campaign that was meant to fuel voluntary
re-patronization.  But, that voluntary re-patronization
was, in some cases, driven by a sense of the threat of
deportation or the threat of additional penalties if
those individuals did not return to Mexico.  And in
particular, there was -- there were a number of raids

in Los Angeles. And along with those raids, there was
publicity released announcing the raids in advance; that
there would be arrests; and that these raids were coming
to the area; and that, uh -- this idea that this would
create kind of a psychological push to get people to
leave for Mexico.

And the majority of the people who are questioned
during these raids are, uh, are Mexicans. A raid in
the El Monte area on February 13th, questioned about
300 people. Only 13 were arrested. But, 12 of the 13
were Mexicans.

So you have this period of the Great Depression
where, in part, because of concerns about employment,
you have this push to force Mexicans out of the United
States and out of competition with American laborers.
And this runs, roughly, from 1929 to 1936. And on the
heels of this, though, you have this, this change in
labor demands as the United States emerges from the
Great Depression. And as this -- you have this change
in labor demands. And as Dr. Lytle Hernandez has
already covered, you have the beginning of the Bracero
program.

The Bracero program, I don't want to retread
the ground that Dr. Lytle Hernandez covered, but what
I would like to talk about a little bit is the parallel

1    growth in the term of the undocumented population

2    and also the characterization of that population as

3    "wetbacks."  And that term "wetback" is one that is

4    racially derogatory, was recognized as being racially

5    derogatory at the time, and has roots that link back to

6    some of the discussions around both the quotas being

7    applied to Mexico, of discussions and debate of the

8    Undesirable Aliens Act.

9         And this term "wetback" is referenced in a number

10   of pieces of legislation at the time, including a Senate

11   Bill 1851 -- well, also known as the, uh, Act of March

12   20th, 1952, which is referenced in the Congressional

13   Record as the Wetback Bill.  And this was an empty

14   harboring Bill, but regularly referred to Mexicans as

15   wetbacks.

16        And the term with "wetback" comes from the idea

17   that individuals who are entering without inspection

18   have to do so at an area where there is no bridge

19   over the Rio Grande River and, therefore, they get wet

20   and, therefore, the term wetback.

21        But across the period of the 1940s and 1950s,

22   this term has -- is associated, and almost synonymous

23   with Mexicans.  And in addition to being synonymous with

24   Mexicans and racialized in much the same way, it also

25   has the attribution of a lot of the negative stereotypes

1    that were associated with Mexican immigrants in the

2    push, or quotas to be applied to immigration from Mexico

3    and south of the Rio Grande, as well as during debate

4    over the Undesirable Aliens Act.

5        So, I would like to talk a little bit about

6    that, unless you have -- unless you have any additional

7    questions or would like to redirect me.

8    Q.  One thing that struck me, because, you know, the

9    focus, I think, is on racial animus and the construction

10    of race, was -- I mean, one thing that you mentioned,

11    but sort of glossed over, was that during the Great

12    Depression, when you see this, I guess, competition

13    between, I guess, what's seen as American potential

14    employees and immigrant employees, this re-patronization

15    drive is not -- is targeting 60 percent of Mexican

16    Americans as in United States citizens, so how, sort

17    of, being Mexican becomes then associated with being in

18    competition with, quote, Americans, even though these

19    are Americans?

20    A.  Well, you know, Mexicans during this time -- and

21    Mexicans today, really, are, in the words of Mae Ngai,

22    the iconic illegal aliens.  So when you're making

23    this push for re-patronization, the idea is that a lot

24    of the -- you know, that anybody who is Mexican is also,

25    potentially, an illegal immigrant, or is someone who is

 1  here competing with American workers for jobs and

 2  working for lower wages, and a lot of that baggage

 3  that goes hand-in-hand with that characterization of

 4  the illegal work -- of the illegal immigrant.

 5      And so the targeting during this period is

 6  broadly aimed at Mexicans.  And, you know, most of

 7  the -- most of the writing that I'd seen describing

 8  some of those raids in L.A., the individuals who are

 9  being questioned are individuals of Mexican descent.

10  And this is regardless of whether their American

11  citizens, or Mexican nationals who are here legally,

12  or illegal Mexican entrants.  They are being questioned

13  because they are being identified as, uh, potential --

14  of having potential illegality.  Illegality.  And

15  that is something that becomes attached to the, kind

16  of, racial identification of Americans under the

17  Undesirable Aliens Act, is this potential identification

18  of criminality, or this ascribing of a criminal identity

19  that is very much linked to a Mexican identity.

20      Now, there are distinctions that can be drawn,

21  right, between those who are here illegally or Mexican

22  Americans but, broadly speaking, if you are trying to

23  identify someone who could be an undocumented immigrant.

24  And we see this in some of the debates around Bills,

25  like, Arizona's SB-1070, and the question of if you are

1    saying that police officers can ask people who they

2    suspect of being an undocumented immigrant, they can

3    ask them for additional documentation.

4         Well, the problem is that that raises the

5    question of racial profiling because we know that in

6    this country, uh, being an illegal immigrant is also

7    seen as a racially -- it's seen as racially coded, as

8    being someone who is, uh -- appears to be a Latino.

9    Q.   So the term "wetback," even though it describes

10   people who have to cross via, uh, you know, non-ports

11   of entry, would apply to sort of, generally, to Latinos

12   or to Mexicans?

13   A.   Yeah, it would.  And there was a study, um,

14   titled the -- a 1951 study titled, "The Wetback In

15   the Lower Rio Grande Valley."  And in this study, what

16   the authors found is, and I quote:  "There are no

17   careful" -- "no careful distinctions are made between

18   illegal aliens and local citizens of Mexican descent.

19   They are lumped together as Mexicans.  And the

20   characteristics that are observed among the wetbacks

21   are, by extension, assigned to local people."  Again

22   saying that this term -- the illegality, this term

23   "wetback," and all the racial baggage that goes with

24   it, is ascribed broadly to anyone who could be seen as

25   being of Mexican descent.

```
1      Q.  So when you're talking about Mexican
2  re-patronization during the Great Depression -- I
3  didn't mean to cut you off, but then you had also sort
4  of transitioned and talked about the Bracero program.
5  And I think it's important, particularly, because these
6  are two events that sort of bridge 1929, and then the
7  codification in 1952.
8          So I didn't mean to cut you off, but following
9  this, I guess -- I want -- it's not re-patronization, I
10 guess, to the extent that 60 percent were U.S. citizens,
11 and I'll refer to it, for ease of reference, as
12 re-patronization.  But then can you sort of go back
13 to talking about what the Braceros program was, and,
14 sort of, the ways that it sort of changed the debate
15 around Mexicans and Mexican Americans and Latinos in
16 general?
17     A.  Sure.
18          One of the things that happens with the Bracero
19 program -- and Dr. Lytle Hernandez already covered some
20 of this in her testimony, so I won't restate of all of
21 it -- but one of the things that happens alongside the
22 Bracero program is this (unintelligible) undocumented
23 population.  And that occurs for a number of reasons.
24 That occurs, again, because of some of the things that
25 had to be endured by individuals who wanted to be
```

1    Braceros.  It also is linked to the -- there being

2    more demand for spots in the Bracero program than there

3    were actual spots available.  And, it also goes to the

4    process that Braceros had to pursue, as well as the

5    process that some of the employers had to pursue.  And

6    employers, particularly those in border regions and in

7    border areas, oftentimes saw it easier just to recruit

8    an undocumented immigrant, than go through the red tape

9    of the Bracero program.

10            And so alongside the growth of the Bracero

11   program and the implementation of the Bracero program,

12   you also have -- you also have an increase and a growth

13   in the size of the undocumented population, and the

14   number of the undocumented entrants that is occurring

15   alongside this, and is also, um, sometimes seen as a

16   consequence of the Bracero program itself; that this

17   is acting as a -- this is spurring undocumented

18   immigration in some ways.  Both because there is

19   greater discussion of, you know, there are jobs

20   available, but also because of some of the conditions

21   under the Bracero program, which -- you know, it's a

22   bilateral agreement -- although as Dr. Lytle Hernandez

23   points out, Mexico is a -- or a trilateral agreement.

24   Excuse me -- although Mexico was a junior partner in

25   this.  And many of the protections that were supposed

1  to be in place for Mexican workers simply weren't

2  there.

3         And you know, of -- in 1956, there were 1631

4  employers who violated the program in some way, only

5  50 of those were removed from the (unintelligible) of

6  having future access to Bracero workers.

7         So alongside this, kind of, legal employment

8  program, you have the growth of the undocumented

9  population, and you also have increasing discussion of

10  the quote, unquote, wetback problem.  And this harkens

11  back, in many ways, to -- the discussion of wetbacks

12  harkens back, in many ways, to the racialized discussion

13  of Mexicans in the period following the passage of

14  Johnson-Reed, so in the discussion of quotas, but also

15  in the debate around the Undesirable Aliens Act.

16         So during the debate around the Undesirable

17  Aliens Act -- there we go.  Sometimes these names for

18  legislation are tongue twisters, especially if you say

19  them multiple times -- but, John Box of Texas, noted

20  that they are badly infected with tuberculosis and other

21  diseases.  There are many paupers among them.  There

22  are many criminals.  They work for lower wages.  They

23  are as objectionable as immigrants when tried by the

24  tests applied to other aliens.

25         Representative Green of Florida noted that the

1   (unintelligible) examine the criminal records, you

2   will find that the percentage of criminals is largely

3   foreign.

4          These were all attributions of criminality that

5   we know oftentimes -- that we know go hand-in-hand with

6   notions of racial superiority and inferiority.  And this

7   was part a big part of the debate around eugenics during

8   this period of the 1920s.

9          And this idea about one of the reason -- one of

10  the things that was inherent in racial inferiority was,

11  kind of, feeble-mindedness, a lack of impulse control

12  and, therefore, a greater tendency towards criminal

13  behavior.

14         So, we see this in the debate around the

15  Undesirable Aliens Act in 1929.  And then moving forward

16  and talking about the wetback problem, a 1956 paper

17  references a joint study by the GI form in Texas and

18  the Texas Federation of Labor.  And the question was

19  to look at the problem of undocumented entry and the

20  problem of wetbacks.  And they said that you could

21  divide wetbacks into two different groups.  And again,

22  these have a lot racialized traits ascribed to them.

23         So, one group was a docile group of agricultural

24  workers, who have accepted good or bad treatment,

25  starvation wages, diarrhea and other sicknesses for

 1   his children, and unsanitary living conditions.  These

 2   were individuals who came here, who were brought here

 3   to work.

 4        But then there's also a distinction that you

 5   made between those individuals and the Chucos, who

 6   were portrayed as criminals, the marijuana peddlers,

 7   the users -- and users, the falsifiers of identity

 8   documents, the smugglers, the prostitutes, and the

 9   homosexuals.

10        So, you have this attribution to the term

11   wetback.  Of these racialized traits, of criminality, of

12   submissiveness, that trace back both to the discussion

13   around eugenics in the 1920s, but also trace back to

14   the general discussions around racial identities that

15   we see in that early part of the 20th century.

16        In 1952, prior to the passage of the

17   McCarran-Walter Act, you have a Bill that is introduced

18   and passed on March 20th that is nicknamed the

19   Wetback Bill.  And this is a piece of anti-harboring

20   legislature where, throughout the debate, Mexican

21   undocumented entrants are regularly referenced as

22   wetbacks.  And Senator McFarland, during the debate

23   over the Act of March 20th, 1952, notes that Senate

24   Bill 1851, a Bill known as the Wetback Bill, was going

25   to be debated.  Initially, this legislation was aimed

1    strictly at Mexicans.  It referenced Mexicans.

2         Now this was struck from -- or this was

3    struck from the Bill because Senator Aiken of

4    Vermont, questioned whether you could discriminate,

5    constitutionally, against the aliens of one

6    particular nation.  And he also noted that while

7    he felt it needed to apply to all aliens, that he

8    knew of no instances of the illegal employment of

9    Canadians.  And that, certainly, this isn't common.

10        And, again, we have this dual construction of

11   the two borders.  The construction of one border as,

12   kind of, a racialized threat to the nation.  The

13   construction of Mexican immigrants in 1920.  But then

14   by the 1950s, undocumented entrance, or wetbacks, as

15   criminal threats to the nation.  But then, on the other

16   hand, this construction of Canadians as individuals who

17   could be assimilated, individuals, ho posed no threat.

18   And that goes back to early debates, immigration

19   restriction league noted early on in the 1920s, that

20   we didn't need to worry about Canadians because,

21   racially, they're the same as Americans, and quotas

22   really needed to be applied to Mexico and other

23   countries of North and South America, because these

24   were the, kind of, mongrelized people that we didn't

25   want diluting the, kind of, Anglo bloodline in the

1    United States.

2         And so the debate around wetbacks is -- also

3    enters into the McCarran-Walter Act.  And with

4    McCarran-Walter, you don't have a lot of debate around

5    the recodification of 1326, right, that's initially

6    passed in 19 -- that initially becomes part of U.S.

7    law in 1929.  You don't have a lot of debate around

8    1326 in McCarran-Walter.  But what you do have is

9    that you do have this note that's entered in the

10   support for 1326 by the Department of Justice, and

11   it's a letter from the Deputy Attorney General,

12   Peyton Ford.  And in this letter, he specifically

13   notes that:  "Statutory clarification on the above

14   points will aid in taking action against the conveyors

15   and receivers of the wetback."

16        So, again, you have the use of this racialized

17   term to describe Mexican immigrants, even though you

18   don't have debate around Mexican immigration in the

19   McCarran-Walter Act itself, or during debate for the

20   McCarran-Walter Act, in part, because you have this

21   Bill that precedes it by two months, where much of

22   the debate is how do we limit the number of Mexican

23   immigrants and the trafficking of undocumented Mexican

24   immigrants into the United States?  And that Bill

25   also contained the Texas proviso, which gave workers

1   the kind of loophole of, you know, if you're employing

2   undocumented laborers, it doesn't constitute harboring.

3      Q.   Now, when we're talking about -- so we're

4   talking about the, sort of, Wetback Bill in the

5   context of the McCarran-Walter -- I know, that various

6   (unintelligible), sort of, commented on the lack of,

7   sort of, deep discussion about 1326.  Um, is that --

8   but still in the Walter -- the McCarran-Walter Bill,  do

9   you have the -- so it seems like you have the term in

10  this -- even in the Congressional Record, they're using

11  this, sort of, racial slur of "wetback."

12       Is that fair?

13     A.   That is fair.  Yes.

14     Q.   And then in this, sort of, the legislation -- the

15  Wetback Bill that passes, I guess three months earlier,

16  you have this exemption of employers from those who

17  are, quote, harboring aliens.

18       Is that a fair characterization?

19     A.   That is.

20     Q.   So can you talk about -- so these are, sort

21  of the, sort of historical -- so, I guess is it a

22  fair characterization to sort of encompass both

23  the historical link between 1929 and the 1952

24  codification.  Was there also reference in the

25  legislative history of an explicit desire to carry

1  forward the 1929 Act?  Of course, making it more

2  easy to, to, um, establish venue, as you had discussed

3  before?

4      A.  Right.  That was part of Peyton -- a part of

5  Peyton Ford's letter, that this needed -- that this

6  should be carried forward.  But, it didn't receive any

7  debate during the, kind of, longer debate over the

8  McCarran-Walter Act, which was largely dedicated to a

9  question of the, uh, the revision of the quota system,

10  and some of the issues inherent in the McCarran-Walter

11  Act itself, and some of the racialized aspects, right,

12  that didn't have to do with Mexican immigrants, but did

13  have to do with the assigning of quotas to the age of

14  specific triangle.

15      Q.  In terms of the, sort of the addition to the

16  1929 legislation, is it your understanding that 1326

17  was also expanded so that -- I guess, in their words,

18  "wetbacks could be prosecuted with venue in any

19  jurisdiction where they existed"?

20      A.  Right.

21      Q.  So that they would not be limited to having --

22  to the jurisdiction where they re-entered, but rather

23  any place that you are living or existing in the United

24  States who are then, at that moment, subject to criminal

25  prosecution wherever you're found?

1    A.  That's correct.  And, again, there was no -- you

2  know, there was no substantial debate, or there was

3  no debate over the problematic way in which the original

4  codification of 1326 occurred in 1929.  This received

5  no attention in 1952, despite the fact that you do have

6  a relatively robust debate around the problematic, uh,

7  implementation, and the problematic aspects of the

8  Johnson-Reed Act that's passed in 1924.  But, yet,

9  Mexican immigration receives almost no attention.

10       And, again, if you go back three months, Mexican

11  immigration is now talked about in terms of the -- in

12  terms of wetbacks.  Instead of talking about this in

13  the very overtly racialized terms of the Undesirable

14  Aliens Act in 1929, where you have discussions of

15  the, kind of, mongrel -- mongrelized blood of Mexicans,

16  but this changes to now you're talking about wetbacks.

17       So you're sidestepping a little bit about talking

18  about racial purity, but you're assigning those, and

19  you're ascribing those same traits now to these

20  individuals that you're characterizing as wetbacks,

21  individuals who are not distinguishable in any way,

22  shape, or form from individuals of Mexican origin, or

23  people who look as if they could be individuals of

24  Mexican origin.

25    Q.  Now we talk about the -- so, I guess, is it fair

1   to say that there was an understanding of the 1920s

2   history of the legislation when we're going forward in

3   1952?

4      A.   There was.  And there was an understanding

5   of the problematic attributions of criminality to

6   Mexican immigrants.  The Wickersham Commission, just

7   together in 1929 by Herbert Hoover, to study the

8   question of the impact that immigrations had on the

9   United States, had an entire volume of their final

10   report, which was released in 1931, on criminality in

11   the foreign born.  And a substantial number of pages

12   of that was dedicated to the question of Mexican

13   criminality.  And, you know, with the -- because these

14   attributions had been made, there was this idea that

15   there was something about certain national groups

16   or certain races that made them predisposed towards

17   criminal behavior.

18        And over, I think it's around -- it's well

19   over 100 pages is dedicated to the, kind of, Mexican

20   question.  And they didn't find any support for this

21   in 1931, right?  And they say, well, you know, in some

22   areas Mexican immigrants offend at a higher rate, and

23   in some areas they offend at a lower rate.  And some

24   specific studies, so the study of the State of Texas,

25   finds no relationship there.  And yet, by the time you

```
1   move forward to the 1950s, you still have these
2   attributions of criminality.  Now you're talking about
3   wetbacks instead of Mexicans, but as the term was
4   understood, this was a racialized term that applied
5   to all individuals who looked as if they could be of
6   Mexican descent.  And going back to that comment I
7   mentioned earlier in that 1951 study of the wetback
8   in the lower Rio Grande, that this was broadly an
9   attribution of all of these negative stereotypes that
10  were made to the wetback, to all individuals of Mexican
11  descent or nationality.
12      Q.  Is there any --
13              THE COURT:  I'm sorry.  Ms. Gorman --
14              MS. GORMAN:  Pardon me.
15              THE COURT:  -- if I may interject.
16              I'm trying to understand because
17  Dr. Gonzalez O'Brien just testified that there was an
18  understanding of the -- and I'm -- I hope I'm quoting
19  right -- the problematic criminalization on Mexican
20  immigrants when the statute 1326 was codified in 1952.
21              Is that a fair statement of what your
22  opinion is?
23              THE WITNESS:  Yes.  There was a governmental
24  commission report from 1931, that looked at the question
25  of Mexican criminality, and found no relationship to --
```

1   between Mexican nationality or race and criminal

2   behavior.

3           MS. GORMAN:  And just, Professor Gonzalez --

4           THE COURT:  No, but --

5           MS. GORMAN:  Oh.  Sorry.

6           THE COURT:  I'm sorry.  I'm still trying

7   to understand.

8           When you said there was a general

9   understanding of this -- the problem of criminalizing

10  Mexican immigrants, in the discussion -- well, from -- I

11  thought what you meant was when the statute was codified

12  in 1952, there was that general understanding of that

13  aspect.  And I -- and so if I'm wrong, let me know

14  if I'm wrong.  If I'm correct, then I want to know

15  what evidence is there to show that there was such an

16  understanding.

17          THE WITNESS:  Well, the evidence -- I

18  mean, the evidence is that you have, you know, a

19  governmental report released in 1931, and one that

20  wasn't, you know -- I would expect wouldn't be unknown

21  to members of Congress serving on the Immigration and

22  Naturalization Committee, or to members of Congress

23  more broadly.  I mean, it is the duty of Congress to

24  be aware of, especially relatively significant reports.

25  I mean, this was the second large-scale study after

1    the Dillingham Commission in the earlier part of the

2    20th century.  This was the second big examination of

3    the impact of the immigration on the United States, as

4    well as the first to specifically look at the question

5    of immigrant criminality.

6    BY MS. GORMAN:

7        Q.  But to be clear, Professor Gonzalez -- and

8    I think maybe -- and maybe I'm misunderstanding

9    Chief Judge Du's question -- I think the question

10   went to was the association of criminality with

11   wetbacks, in spite of the fact that there was empirical

12   evidence of no criminality, or was it understood

13   that  it was problematic to associate wetbacks with

14   criminality?

15          And Chief Judge Du, am I understanding the

16   distinction correctly of your question?

17                THE COURT:  I think that -- well, based

18   on Professor Gonzalez O'Brien's answer, I think I

19   misunderstood his earlier testimony.  I think what

20   he meant to say is that by the time of the 1952

21   codification, there was a clear understanding there

22   was no connection between Mexican nationalities and

23   criminality.  And yet --

24                THE WITNESS:  Right.

25                THE COURT:  Right?  Is that -- so when you

1    said there was that general understanding, that's what

2    you were talking about?

3                    THE WITNESS:  Yes.  That's what I'm talking

4    about.

5                    And, you know, the, the point I'm trying to

6    make is despite the fact you have empirical evidence

7    that there is no association between these two things,

8    you have the continued referencing of criminality as

9    a reason for immigration restriction, either, as I

10   mentioned earlier, you know, through that study at

11   the GI form, but you also have individuals, like,

12   Senator Kilgore of West Virginia, who notes in debate

13   over the quote, unquote, Wetback Bill, that practically

14   every state in the Union has had the wetback problem.

15   Some of these people cannot meet the standards of

16   immigration.  They may be criminals because they are

17   wetbacks.  They can be kept in a state of peonage.

18                   So this link between the, kind of,

19   undocumented identity or the Mexican identity --

20   because, again, this was kind of understood as a

21   racialized identity at the time -- is still being

22   linked to criminality, despite the evidence, the

23   empirical evidence that there are no linkages between

24   these two things.

25                   THE COURT:  And Ms. Gorman, I think the

1    focus I would like for us to focus on is evidence of

2    the latter.

3              MS. GORMAN:  The latter?

4              Sorry.

5              THE COURT:  In other words --

6              MS. GORMAN:  What do you mean?

7              THE COURT:  I understand, Professor Gonzalez

8    O'Brien to testify that despite empirical evidence

9    that doesn't support this link, there continues to be,

10   I guess, a disregard for the empirical evidence,

11   when in -- at least surrounding the codification of

12   Section 1326.  So I'm looking for evidence of that

13   discussion, or lack thereof, which is, to me, the one

14   quintessential issue I have left in deciding the motion.

15   BY MS. GORMAN:

16     Q.  Professor Gonzalez O'Brien, then talk to me, I

17   guess, as a social scientist, about how you would suss

18   out racial animus and the codification of Section 19 --

19   or 1326.  I want to say 1926.

20          So how does a social scientists do that?

21     A.  Well, I think part of this is looking at,

22   you know, what were the justifications made for the

23   recodification of 1326 in 1952, but also going forward,

24   right?

25          I mean, the most recent codification of 1326 is

1    in 1996 under the Illegal Immigration Reform and

2    Immigrant Responsibility Act.  So if you are looking to

3    establish that racial animus is kind of a motivating

4    factor -- now I think we have relatively clear evidence

5    that this the case in 1929, right?  You know, we have,

6    we have these statements by members of the Immigration

7    and Naturalization Committee, and leading proponents of

8    this legislation, that part of the reason that you need

9    this is as a control on Mexican entry into the United

10   States because Mexicans are of a, kind of, mongrelized

11   bloodline.

12          But also in addition to these notions of racial

13   purity, you also have these attributions of certain

14   inherent traits that go hand-in-hand with Mexican

15   identity:  Criminality, the tendency towards peonage,

16   some mentions of illiteracy, of potentially being

17   disease carriers.  Now that carries forward in

18   discussions over future immigrations legislation.

19   You do see that reflected in discussions of the

20   Wetback Bill in 1952, preceding McCarran-Walter.  You

21   have a recognition that the term "wetback" is used to

22   reference these individuals who are seen of being as --

23   of inferior quality, of having criminalistic tendencies.

24   And, you see references -- you see the use of that

25   term -- a racially derogatory term -- in that letter

from Peyton Ford, the Deputy Attorney General, that
was entered into the Congressional Record.  And so you
have that present in 1952, even if the McCarran-Walter
Act itself does not contain discussion of Mexican
immigration to the United States, because that was
not the thrust of the McCarran-Walter Act, right?  That
was the thrust of the earlier Senate Bill 1851, or the
Wetback Bill.

        But I think if you look at even debate over
the Illegal Immigration Reform and Immigrant
Responsibility Act, you still have these continued
attributions of criminality to illegal immigrants.
And by the time you get all the way up to 1996, it
is not just one governmental report by that point.  It
is two governmental reports:  The 1931 Wickersham
Commission and the 1994 U.S. Commission on Immigration
Reform, which preceded the passage of the Illegal
Immigration Reform and Immigrant Responsibility Act.
And despite that, you still have individuals, like
Lamar Smith, ranking member of the Judiciary Committee,
in debate over the Illegal Immigration Reform and
Responsibility Act, noting that illegal aliens are ten
times more likely than Americans, as a whole, to have
been convicted of a federal offense.  Think about the
cost, in pain and suffering, to the innocent victims

1    and families.

2         You have Representative Greg Laughlin of Texas

3    stating that because of the border fence, the rapes,

4    the robberies, the drug sales, the murders went down.

5         Spencer Abraham, in the Senate, noting that by

6    conservative estimates almost half-a-million felons

7    are living in this country illegally.  These aliens

8    have been convicted of murder, rape, drug trafficking,

9    potentially such crimes as espionage, sabotage, treason,

10   and a whole -- and a number of other serious crimes.

11        So, you have this continued attribution of

12   criminality to illegal immigrants, a racially coded

13   category.  And despite that, though, you have a raft

14   of evidence proving otherwise.  Evidence going back

15   to 1931, but evidence that grew in the periods following

16   that, and particularly across the 1990s and 2000s.

17        So, you have that U.S. Commission on Immigration

18   Reform report in 1994, that found that crime rates in

19   border cities were actually lower than crime rates --

20   than crime rates in cities in the interior.

21        Now, again, if you're making a -- if you're

22   arguing that undocumented immigrants are more

23   predisposed towards criminal behavior, then in those

24   border cities, which have a larger percentage of

25   undocumented immigrants, then -- or are likely to have a

1    larger percentage of undocumented immigrants -- then

2    you would expect crime rates to be higher.  And that's

3    not what you're finding.

4         A survey of all the literature to date, in 2000,

5    found no empirical support in any of the published

6    studies, either governmental or academic, for any

7    linkage between illegal immigration, immigration, and

8    criminal behavior.  And this is something -- and the

9    Cato Institute has put out a whole host of studies also

10   looking at this question, which similarly have found

11   no support for the idea that illegal immigrants are

12   more predisposed towards criminal behavior.  And, yet,

13   we continue to see this reference.  And we continue to

14   see this reference because it is linked to these notions

15   of otherness, of racial otherness.  And it is something

16   that is synonymous in many ways with the construction of

17   the illegal immigrant in the, kind of, American psyche

18   at this point.

19        And some public opinion work, I -- you know, I

20   did back for my first book, looked at agreement among

21   the American public with this -- with the statement

22   that illegal immigrants are more likely to be involved

23   in drugs and gangs -- with drugs and gangs, and over

24   45 percent agreed.  And so you have this attribution of

25   a racialized trait that we see begin in 1929 -- because

1    you really don't see a great deal of discussion of

2    this in Mexican criminality prior to that -- but you

3    see that carried forward.  You see it carried forward

4    into the discussion of wetbacks in 1952, and the

5    construction of the, uh, the stereotype of what a

6    wetback was.  And then you see that carried forward

7    into 1996, where now we're taking about illegal

8    immigrants.  But, all of these are just reconstructions

9    of the same term.

10        Q.  When we talk about racial animus as a motivating

11   factor in the recodification in 1952, I guess is it

12   fair to summarize it -- as a social scientist, one of

13   the ways you suss out racial animus is, you know, this

14   sort of awareness of the eugenist history of the

15   legislation being codified; but, in addition to that,

16   the sort of racial slurs and the historical context

17   around it, including the re-patronization of Mexican

18   Americans, and the use of the term "wetback" and

19   discussion of the wetback in not just McCarran-Walter,

20   but in the Wetback Bill that preceded it by three

21   months?  So you see the same, sort of, eugenics tropes

22   and language being used to characterize Mexicans or

23   undocumented immigrants in 1952, as you did in,

24   essentially, 1929?

25        A.  Right.  And, you know, policy-making doesn't

1    occur in a vacuum.  I mean, it doesn't occur without
2    the influence of the policies that came before it, and
3    especially policies in related areas.  And so the
4    influence not only of the past policy decisions, but
5    of, uh, thinking on race at that period in time, and
6    also of the kind of long-term construction of racial
7    categories, and racial categorization in this country.
8    You know, the construction of racial categories is a
9    project.  It doesn't just occur at one point in time
10   and then never change.  It does change over time.  And
11   the attributions sometimes change over time.

12        But, you see many of the same references back
13   to ascribed inherent traits in the discussion of
14   wetbacks in the 1950s, or the discussion of illegal
15   aliens in the 1990s, despite the fact that, again,
16   especially with the -- with the notion that they're
17   more inclined towards criminal behavior -- which has
18   been something that has long been used to argue for
19   immigration restriction in this country -- um, you don't
20   have support for it.  And it's something that even, you
21   know, after 1996, we continue to see the attribution
22   of criminal -- of criminal tendencies to undocumented
23   immigrants or Mexican immigrants, depending on who is
24   speaking at the time.  But, we continue to see this
25   attribution.  It's a racial attribution.  It was in

1 1929. It was in the 1950s. And, it continues to be

2 today because it is applied broadly.

3 As the 1951 report noted, people can't tell if

4 someone is undocumented or not. So we can split hairs

5 over, well, we're just saying these are the undocumented

6 folks. But that racial categorization is applied -- or

7 that negative categorization is applied to all people

8 who look as if they could be of that group that is

9 characterized as the kind of iconic undocumented

10 immigrant, and that is the Mexican.

11 Q. One of the things that sort of struck me in

12 thinking of about it, is that Truman -- who, I guess,

13 I didn't conceptualize as, you know, necessarily, a

14 progressive in any sense -- but he actually veto'd

15 the McCarran-Walter Act. And can you talk a little

16 bit about that?

17 A. Well, the McCarran-Walter Act is sometimes

18 pointed to as a piece of richly progressive legislation.

19 And it wasn't. Now it's true it removed racial

20 restrictions on immigration. So prior to

21 McCarran-Walter, and under the Johnson-Reed Act,

22 individuals of Asian descent, because they could

23 not become American citizens, they also could not

24 immigrate. McCarran-Walter removes those racial

25 restrictions, so now Asian immigrants can come to

the United States.  But, the quota that is assigned to
all the Asian Pacific Triangle is 2,000 quota spots,
2,000 visas.  And I believe that was roughly equivalent
to the number of visas given to a single country like
Sweden at the time, and was dwarfed by the number of
visas given to, say, the United -- to the UK during this
period.

So McCarran-Walter is viewed as -- is sometimes
characterized as racially progressive because it removes
these restrictions, but Truman's veto explicitly notes
that there -- that the McCarran-Walter Act, while it
had some good things going for it, also, uh, in the
words of Truman, from his letter to Congress, "would
perpetuate injustices of longstanding against many other
nations of the world..." -- and jumping forward a little
bit -- "...and intensify the repressive and inhumane
aspects of our immigrations procedures.  The price is
too high and, in good conscience, I can't agree to
pay it.

And there were also -- you know, there also were
a few times where the masks flipped a little bit off the
face of this is racially neutral, at least, legislation,
with Representative Wood of Georgia noting during the
debate on McCarran-Walter, that, "It seems to me the
question of racial origins, though i am not a follower

1  of Hitler, there is something to it.  We cannot tie a

2  stone around its neck and drop it in the middle of the

3  Atlantic, just because it worked to the contrary in

4  Germany.  The fact still remains that the peoples of

5  western Europe have made good American citizens.  I

6  believe that possibly statistics would show that the

7  western European races have made the best citizens in

8  America."

9       And McCarran-Walter continued to privilege

10  northern and western Europeans, over all others, in

11  terms of the quotas that were assigned based on either

12  national origin or race.

13     Q.  One of the things that you touched on in talking

14  about that was, sort of, the different treatment of

15  Mexican Americans or Latinos from immigrants from, let's

16  say, like, northern Europe or Nordic countries, and --

17  which sort of harkens back to some of the treatment that

18  we had talked about at the border, that were at the

19  southern border.  They weren't at the northern border.

20  So going into this time period, do you still see --

21  like, for the example, with the Bracero program, this

22  sort of -- the way that people are treated at the

23  southern border, being very different from the way that

24  people are being treated at the northern border?  So is

25  that still --

1    A.  You do still -- you do still see some

2  differences.  And I think Dr. Lytle Hernandez already

3  spoke to some of those.  But in terms of the admission

4  procedures for Braceros during this period, the need

5  for, you know, medical inspections, chest x-rays, other

6  things like that, because there continued to be, you

7  know, again, attributions that go back to the 1920s,

8  of -- you know, that Mexico was a dirty place, where

9  people lived in slums and were more predisposed towards

10  carrying illnesses.  So, you know, that does carry

11  forward.

12      And you do see some of that.  It's not as

13  pronounced, certainly, by the 1950s as what you see in

14  the 1920s.  But, the 1920s is very openly and explicitly

15  racialized and racist.  You get -- that gets a little

16  cleaned up, and some of the procedures are not quite as

17  invasive as what you were seeing in the period of the

18  1920s.  But, you continued -- you continue to see a

19  different treatment of the two borders.

20      And again, that ability for pre-examination in

21  Canada, in 1945, Mexicans are excluded from that.  So,

22  initially, there -- you know, there's this difficulty of

23  if you're Mexican and you can apply for pre-examination,

24  you still have to get up to Canada to go to one of

25  the -- to go to one of the consuls and get approved to

1    return back into the United States, as illegal entrant.

2    But after 1945 that is revised, and citizens of Mexico

3    are just excluded from that.  So they no longer can

4    even utilize what is extended to Canadians.  And the --

5    that that wouldn't end for Canadians until '61.

6       Q.   So one of the things that you had -- that

7    Professor Lytle Hernandez talked about also -- was the

8    sort of -- the difference between just straightup

9    exclusion, and then using Latinos and Mexican Americans

10   as the sort of temporary labor force that can be, um,

11   incarcerated or expelled at will, but could still be

12   utilized by American agriculture.

13          And one of the things we had talked about was,

14   in the Wetback Bill, was the sort of exemption of the

15   American employer from the -- essentially from harboring

16   an alien.  So, the employer was sort of cutout from this

17   because the employer still needed a, sort of, migrant

18   laborer.  But, is it your understanding also that an

19   illegal re-entry, let's say conviction, would also

20   cut off your path to that sort of permanency --

21      A.   Uh-huh.

22      Q.   -- that sort of creating roots, and sort of

23   funnel you in again to being this sort of temporary

24   source of racialized labor?

25      A.   Right.  And, you know, criminal convictions can

1   bar, you know, bar you from legal entry into the United

2   States.  And so the attachment of these, especially

3   felony convictions, was 1929.  Uh, to undocumented entry

4   means that, you know, in the period following 1929, and

5   if, you know, you cross back in after being deported,

6   then that, that makes it impossible for you to legally

7   immigrate at any point.

8        And there have always been exceptions, right?

9   You know, Dr. Lytle Hernandez talked about these kind

10  of push and pull factors.  But one thing that is -- one

11  exception that has traditionally been made in the,

12  in American immigration policy, has been an exception

13  for the responsibility of employers.  As I mentioned,

14  and as Dr. Lytle Hernandez mentioned, employers were

15  oftentimes knowingly employing undocumented immigrants.

16  Even during the period of the Bracero program, you had

17  employers who were still -- who are on record saying,

18  you know, it's still easier to go down to the southern

19  border and get workers, than it is to go through the,

20  kind of, red tape of all of this.

21       And the attempts to place some of the

22  responsibility on the shoulder of American employers

23  of undocumented immigrants have been either not present

24  at all in 1929, or relatively half-hazard in the years

25  following that.  I mean, there were employer sanctions

1　extended under the Immigration Reform and Control Act

2　of 1986, but those, those had so many loopholes, that

3　the fines were so low and the loopholes so big, that it

4　really didn't have much of a significant effect

5　on employers.

6　　　　　And also, of course, other things changed in

7　the 1980s and the 1990s in terms of forged documents and

8　other things like that.  But, you do have, you know --

9　the idea was that Mexicans were fine as long as they

10　came here only to work.  They were -- they were meant

11　to be a disposable labor force.  This is noted in the

12　1911 Dillingham Commission report, that:  "While

13　Mexicans are not easily assimilated, this is not of

14　great importance, as long as they return to their

15　native land in a short time."

16　　　　　And this was the point of the Bracero program,

17　right?  We'll bring them in.  We'll have them do the

18　labor that they're needed for, and then have it -- we

19　can make sure that they go back to Mexico.  The problem

20　with wetbacks is that there is no guarantee that they

21　go back to Mexico, right, because they are undocumented.

22　You don't know that they leave.  You don't have that

23　additional level of control over them.

24　　　　　And so there's a desire to preserve access to

25　this thing that American -- especially American cultural

1    interests say we need Mexican labor, right?  You have

2    cut off all these other potential spickets for labor

3    force, right?  You cut off access to Chinese labor.  You

4    cut off access to southern and eastern European labor.

5    And now what we have left are the Mexicans.  Or, as

6    Dr. Lytle Hernandez pointed out, or the blacks.  And

7    you don't want -- you know, you don't want the blacks

8    coming into Texas, so you say, well, we'll go with the

9    Mexicans.

10          And so they were viewed as disposable labor.  As

11   long as they returned, they didn't pose a racial threat

12   to the United States.  They didn't provoke those racial

13   anxieties.  It was when that control started slipping

14   during the period of 1950s, when you start to -- and

15   in the period leading up in 1929, right, when you have,

16   kind of, unfettered crossing between the United States

17   and Mexico, especially in terms of undocumented

18   entry.  But when you start to have the growth of the

19   undocumented population in the 1950s, this is when

20   you start to see the beginning of these, kind of, really

21   large-scale deportation actions, such as Operation

22   Wetback, and the discussion of the potential performance

23   of illegal immigrants in the United States.  And,

24   this idea that they are no longer that controllable

25   population.  Because part of what you want, right, out

1  of a racially inferior, but necessary labor force,

2  is you want to ensure that they, that they go back,

3  that they are here for as long as we need them.

4       And on the one hand, those temporary employment

5  programs worked for that.  And that is paired with this

6  idea -- you know, with the ability to designate them as

7  illegal and deport them when they are no longer needed,

8  or at least you try apply enough pressure to force them

9  to, kind of, self-deport, right?  Something that was

10  referenced by Mitt Romney in 2012, right?  This idea,

11  well, maybe if we just make this things bad enough,

12  all those illegal immigrants will just return to

13  Mexico.

14       And this harkens back, again, to the Mexican

15  re-patronization program.  And, again, is a

16  demonstration that none of these things occur in a

17  vacuum, without knowledge of what came before, right?

18  Lawmakers, in most cases, have some knowledge of the,

19  kind of, general arch of immigration policy --

20  especially if they're serving on some of these

21  committees.  Or, uh, I guess I shouldn't say that

22  they do.  If they don't, they should.

23  Q.  So I -- so you had talked about, a little bit

24  about, sort of, Operation Wetback, but I don't think --

25  I want to distinguish Operation Wetback from the

1  re-patronization of Mexicans that happened during the

2  Depression, and then the Braceros program.

3      And then talk a little bit about the exploitation

4  of migrant labor during the Braceros program, both by

5  Braceros and by undocumented immigrants.

6      That's three questions.

7  A.  Can you break that into pieces and chunks,

8  please?

9      I'll do my best to respond to that.

10     So, we didn't talk a lot about Operation Wetback.

11 I think Dr. Lytle Hernandez mentioned -- talked about

12 it a little bit.  But it was a -- you know, it was a

13 mass deportation program that was meant to address some

14 of these issues with the growth of the undocumented

15 population, and also supposed to be kind of a prod

16 to employers who were employing large number of

17 undocumenteds, that you need to kind of employ Braceros

18 and not undocumented immigrants.  But, the estimates are

19 that -- and it begins in 1954 -- the estimates are that

20 around 1.1 million people were deported under Operation

21 Wetback or returned -- although, again, you get into

22 kind of fuzzy numbers in some cases.  So I don't want to

23 be -- I will say that that number is -- that number is

24 probably not definitive, right?  It's an approximate.

25 But, it also utilizes -- again, to go back to this idea

1    of racial animus, it also utilizes a term that is,

2    you know, recognized as racially derogatory.  Again,

3    going back to that 1951 report that I cited earlier,

4    this idea that, you know, there was a recognition that

5    the term "wetback" carried all this baggage, and was

6    broadly applied to anybody of Mexican descent.

7            In addition, you know, there was a lot of

8    exploitation, both the Bracero program -- as Dr. Lytle

9    Hernandez pointed out, Mexico was a junior partner.

10   And in, in the 19 -- I think it was -- hold on.  Let me

11   find my -- let me look at my notes here.

12           In 1954, Mexico gave up its ability to

13   unilaterally blacklist employers who were exploiting

14   Mexican laborers.  So, in some cases, that exploitation

15   may take the form of a promised wage of $0.50 an hour,

16   and workers show up and, you know, they're told that

17   they're going to be paid $0.30 an hour; or, they're --

18   one of the things that was supposed to be provided for

19   Braceros was housing and, uh, some additional funds to,

20   kind of, feed themselves.  And in some cases, either the

21   housing was substandard, the food was not enough to

22   feed the number of people who were there, and so you

23   did have this exploitation of the program because there

24   just weren't a lot of consequences for violations of

25   the program.

1        You know, as I mentioned, in 1956, you have

2    1631 employers reported for violating the program,

3    and only 50 of them are removed.  So there's an

4    understanding of, like, what are you going to do?

5        Like, you went -- as a Bracero, you went through

6    this whole process to get this job, right, to improve

7    your life, or the life of your family, and now you're

8    here and they say, well, we're not going to pay you what

9    you were supposed to be guaranteed.  We're going to pay

10   you less than that.  If you don't like it, you can go

11   back to Mexico.  And so, you know, the mechanisms that

12   Braceros had at their -- you know, that they could use

13   to kind of leverage this agreement for their benefit,

14   uh, were more limited.

15       Now, were they as limited as they were for

16   undocumented immigrants?  Certainly not.  But, they

17   still were very limited.  And the legal status accorded

18   to them was based, in many ways, just on the need

19   for their labor, and not out of any desire to actually

20   protect them.

21   Q.  One thing I had learned, sort of, about the

22   Braceros that I didn't know before is, I guess, the

23   life of a Bracero was assigned $1,000 to his widow or

24   other family, but that it wasn't necessarily -- or I

25   guess -- or wasn't paid when a Bracero died on a farm

1   or a factory.

2       Do you know -- so, I guess, is it sort of your

3   general understanding that the protections that were

4   supposed to at least on paper be afforded to these

5   people coming from Mexico, just as a general matter,

6   were they actually protected in practice?

7       A.  I mean, I think there, you know, there is

8   variation there.  In some areas and with some employers,

9   perhaps the employers observed the terms of those

10  contracts more closely than other employers did.  But,

11  again, the ability for Braceros to take action -- I

12  mean, they could complain to the consulate.  They could

13  do things like that.  But, in many cases, you don't

14  see -- you don't see action taken on the part of the

15  government to ensure that employers are following the

16  terms of the contract.  And I think that's reflected

17  in that statistic, that this is just not being enforced

18  as much.

19      And so if you're an employer who, perhaps, is

20  shorting Braceros on wages, or providing unsafe or

21  substandard living conditions for them, you know,

22  their avenues to have that addressed are both uncertain

23  and relatively limited.

24          THE COURT:  All right.  Ms Gorman, I'm going

25  to interject.  I think that I should take a break to

1       allow everyone time to take a lunch break.

2              So, this is all very interesting.  As

3       someone who majored in history, I find it interesting.

4       But, I also don't want this to be out of control, in

5       the sense that it's not -- the hearing is not to have

6       a discussion or dissertation on just a general history.

7       When we return from the break, I would like to refocus

8       because earlier -- and I will have some follow-up

9       questions for Professor Gonzalez O'Brien after the

10      attorneys are finished, but just for my general thought,

11      earlier, Professor Gonzalez O'Brien began to talk about

12      the justification for the codification of Section 1326

13      in 1952, but then I didn't really get a clear answer, so

14      I would like to refocus on that issue.  And like I said,

15      I'll have some questions.  If you don't refocus, I'll

16      refocus you.

17             So let's take -- oh, did Ms. Gorman drop

18      off?

19             THE CLERK:  Yeah.

20             MS. GORMAN:  I'm here.

21             THE COURT:  We'll take our lunch break and

22      resume at -- let's resume at 1:30.

23             (Noon recess taken.)

24

25

1      Reno, Nevada, Tuesday, February, 2, 2021, 1:30 p.m.

2                          ---OoO---

3

4           THE CLERK:  Court is back in session.

5           THE COURT:  Ms. Gorman, are you ready to

6    resume?

7           MS. GORMAN:  I am, Your Honor.

8           May I resume?

9           THE COURT:  Yes.

10          MS. GORMAN:  Okay.

11              **DIRECT EXAMINATION (resumed)**

12   BY MS. GORMAN:

13      Q.  So I guess to be more to the point, Professor

14   Gonzalez O'Brien, regarding the 1952 recodification,

15   is it your opinion, as a political scientist, that it

16   was motivated by racial animus?

17      A.  It is.

18      Q.  And can you tell me, as a social scientist, how

19   you reached that conclusion?  Looking at the historical

20   context and the legislative context?  Can you try to

21   summarize it?  And I know we've been through a lot of

22   it.  Sorry.

23      A.  Well, I think you have to look at a couple

24   things.  I think, first, you have to look at the context

25   in which, uh, Mexican immigration was being discussed at

that historical moment.  We talked about that a little
bit in regards to the Wetback Bill; also the reference
to wetbacks in that document by the Deputy Attorney
General.

So, I think it's important to understand it in
the context of that.  But it's, I think -- even though
it's recodified in 1952, I think the fact that there is
no debate on the prob -- the very overt problematic
aspects of its original codification in 1929, suggests
that there was nothing -- there was no problem seen
with the motivation for the original codification of
1326 in 1929.  Again, using language that was very
openly and explicitly racist, that made numerous
references to the necessity of preserving the kind of
purity of racial bloodlines in the United States, the
mongrelization of the Mexican or Latino bloodline.
So I think in understanding the recodification under
McCarran-Walter, it has to be done in the context both
of what came before it, but also what was occurring at
that historical moment, and at that moment in time.

And I think if you look at all of those things,
including the racial animus that was demonstrated in the
McCarran-Walter Act itself, in the continued assignment
of individuals of Asian descent to a kind of broad
category, and the assignment of national identities to

1    Europeans, which continued under McCarran-Walter, then I
2    think all of those things suggest that the decision to
3    pass this without debate, was largely driven by the same
4    things that drove the original codification of 1326;
5    and that was, in part, a desire to control access to
6    Mexican labor, and also a tendency to view Mexicans,
7    individuals from south of the Rio Grande, and at least
8    in the terms of the 1950s, the wetback, as a problematic
9    population.  And you don't see any significant debate
10   over -- you have a stretch between 1959 and 1952, where
11   you have 1326 in effect, and you don't see any debate
12   over that policy on its merits.
13        We've been doing this for over 20 years by that
14   point.  What are the merits of 1326?  Why should it
15   be recodified?  Is it serving the function it was
16   originally intended to serve -- even if we characterize
17   that as one of maintaining racial purity, but is it
18   serving the purpose that it is supposedly -- if we think
19   about it in race neutral terms, it is meant to serve
20   as a deterrent.  Is it just serving that deterrent
21   function?  You don't have a debate over that in 1952.
22        And, you, actually, don't have a debate over
23   that, really, in most of the either initial
24   codification -- or sorry -- the recodification in
25   '52, or the subsequent reenactments in legislation

1    going forward.

2         What is the purpose of this?  If it is racially

3    neutral, then does it serve its stated goals of acting

4    as a deterrent to undocumented immigration.

5             MS. GORMAN:  I don't know if the Court has

6    any follow-up questions as well -- and then I guess I --

7    and as part of that context if the, sort of, original

8    motivation is this compromise over eugenics, and having

9    a control over an exploitable labor force, was that

10   effective going forward when you talk about Mexican

11   re-patronization and the Bracero program, and the

12   utilization of those migrants as sort of a temporary

13   labor force?

14            THE WITNESS:  Yeah.  You know, one of the

15   points of the Undesirable Aliens Act was to create a

16   labor force in the United States that would serve

17   the interests of, um, usually southern agribusiness,

18   but the United States more broadly, but at the same

19   time have no permanence, be deportable, be controllable

20   and, therefore, offer a mechanism by which to preserve

21   the racial integrity of the United States, by ensuring

22   that these populations don't establish permanence, which

23   then can lead to (unintelligible) and other effects on

24   the racial purity of the nation.

25            MS. GORMAN:  Your Honor, I know if this

1    Court have any follow-up questions before I pass the

2    witness?

3              THE COURT:  Well, I'm going to let

4    Mr. Walkingshaw do his cross-examination.  And I'll

5    let you both exhaust your questions.  And if I find the

6    questions I have are not answered, I'll intervene.

7              Mr. Walkingshaw.

8              MR. WALKINGSHAW:  Thank you, Your Honor.

9                      **CROSS-EXAMINATION**

10   BY MR. WALKINGSHAW:

11     Q.  Good afternoon, Professor O'Brien.

12     A.  Good afternoon.

13     Q.  I was going to say good morning.

14         So, Professor Gonzalez O'Brien, I believe you

15   mentioned at the outset of your direct testimony

16   that you have a written a few books on the subject of

17   immigration, correct?

18     A.  Uh-huh.

19     Q.  One of them is called <u>Handcuffs and Chain Link</u>,

20   correct?

21     A.  Yes.

22     Q.  Is it fair to say that that work is based

23   off a dissertation that you wrote, I believe it was

24   copyrighted in 2014, for your Ph.D thesis at the

25   University of Washington?

1    A.   That's accurate.  It's an expanded version of

2   what was submitted for my dissertation.

3    Q.   Yeah.  But much of the text is the same, correct?

4    A.   There's, uh -- I mean, I don't know -- I don't

5   know the exact percentage of text that is -- that

6   mirrors exactly what was in my dissertation.  It went

7   through a couple peer -- it went through a period of

8   peer review with the University of Virginia Press before

9   going to publication, so there were changes and then

10  there were expansions to certain segments based on some

11  of the reviews from the individuals who were sent a copy

12  of the manuscript.

13   Q.   I would like to ask you some questions about

14  those documents --

15   A.   Okay.

16   Q.   -- if I could.  So --

17   A.   If I may of clarify, are you asking me, also,

18  questions about my dissertation, my memory of which

19  is now quite foggy, since I submitted my dissertation

20  in 2014, and have really only read this in the form

21  of the subsequent publication of it.  That would be

22  Handcuffs and Chain Link.  I don't know how accurately

23  I can speak to exactly what appears in my dissertation

24  from 2014.

25   Q.   Fair enough.  I'll try to frame it as things you

1    wrote in the book.

2           So in the introduction of the book, you did

3    write that:  "The 1929 Act" -- uh, which I -- I'll use

4    a shorthand -- I'm going to use some shorthand terms for

5    the benefit of the court reporter.  And I'll try to

6    speak slowly -- but I'm going to call the Undesirable

7    Aliens Act of 1929, "the '29 Act."

8           Fair?

9    A.   Sure.

10   Q.   Do you understand?

11   A.   Yes.

12   Q.   Okay.

13   A.   I get it.

14   Q.   And I'll try to define terms as I go.

15          But you wrote that:  "The 1929 Act was

16   attributable to a few things, including the success

17   of immigration restriction in 1924" --

18   A.   Uh-huh.

19   Q.   Correct?

20   A.   Correct.

21   Q.   "Hardening notions of sovereignty following

22   World War I," correct?

23   A.   Correct.

24   Q.   "And the Great Depression," correct?

25   A.   Correct -- well, the beginning of the Great

1   Depression, yeah.  The beginning of an economic

2   downturn.

3     Q.  And you wrote that:  "The Great Depression, like

4   most economic downturns, increased nativism," correct?

5     A.  Yeah.  You see an increase in nativism associated

6   with most economic downturns.

7     Q.  Right.

8     That "it helped drive perceptions of economic" --

9   "the Great Depression," rather, "helped drive

10  perceptions of economic threat from immigration,"

11  correct?

12    A.  Yeah.

13    Q.  All right.

14    And in your dissertation and your book -- I

15  believe they're both the same on this point --

16    A.  Yeah.

17    Q.  You, uh, you write that:  "The passage of the

18  1929 Act led to a 57-year period where there would be,

19  in your view, no congressional action on undocumented

20  immigration," correct?

21    A.  Very little.  I mean, I mention the Wetback Bill

22  in Handcuffs and Chain Link in passing, as a kind of,

23  uh, you know, expansion of some of the things.  But what

24  I'm talking about -- oh, sorry.  I'm talking too fast

25  again.

1   What I'm -- you know, what I mean by that 57-year

2 period is that you don't see a significant overhaul

3 of how we really approach immigration until the

4 immigration -- the Immigration Reform and Control Act

5 of 1986.  So, you don't see a significant overhaul of

6 how undocumented immigration specifically is addressed.

7   Now, that is not to say legal immigration is not

8 addressed in 1952 with McCarran-Walter, or 1965, with

9 Hart and Celler; nor that there isn't -- there aren't

10 other pieces of legislation that occur over the

11 course of this period.

12   But in terms of significant legislation and

13 legislation that constituted a significant overhaul

14 of how we address undocumented entry into this country,

15 the argument that I make is that 1929 and 1986 are

16 two of the big moments in U.S. immigration policy

17 in terms of undocumented immigration specifically.

18 Q.  And, uh --

19 A.  I do think I make that point both in my

20 dissertation and in my book.

21 Q.  I believe that's correct.

22   So, fair to say then, based on your answer

23 just now, you view the 1986 Immigration Control and

24 Reform Act as a major overhaul of how we approach

25 undocumented immigrations in this country?

```
 1      A.  I mean, yeah, the Immigration and Control Act was

 2   a significant piece of legislation.  I mean, I think

 3   that is, uh, in -- to borrow from Dr. Lytle Hernandez --

 4   I think that is in the mainstream of writing on U.S.

 5   immigration policy.

 6      Q.  All right.

 7          And for the benefit of the court reporter,

 8   I'm going to refer to that act as IRCA, which is a

 9   pronunciation of I-R-C-A.  Is that a fair -- do you

10   understand that --

11      A.  That's fair.

12      Q.  Okay.

13      A.  I like the tongue twisters better.  But, it's

14   probably easier for the court reporter.

15      Q.  Right.

16          And to summarize the -- and correct me if

17   I'm wrong here, but the thesis -- or one of the thesis

18   of your dissertation and your book is that IRCA was

19   an opportunity to re-envision how we approach or

20   documented immigration in this country, correct?

21      A.  Certainly.  Yeah.

22      Q.  And you refer to it in both documents as what's

23   referred to as a "critical policy failure," correct?

24      A.  Yeah.

25      Q.  And what you mean by that, among other things,
```

1   is that it failed to reduce the overall undocumented

2   population in the U.S., correct?

3       A.   Uh-huh.  Yes.

4       Q.   Thank you.

5            And just for the benefit of the court reporter,

6   if you could -- I know you caught it eventually -- but

7   if you could respond with a "yes" as opposed to a

8   "uh-huh."

9       A.   Yes.

10      Q.   And I will try to speak slower.

11      A.   Yes.  I agree.

12      Q.   All right.

13           And then the sort of further thesis of both

14  your dissertation and your, and your book, is that

15  this critical policy failure led to a return to

16  the criminalization of immigration itself.  So,

17  criminalizing the immigrants --

18      A.   Uh-huh.

19      Q.   -- as embodied in the -- what I'll call IIRIRA,

20  but the 1996 Act, correct?

21      A.   Yes.

22      Q.   And, I'm sorry.  What's the full name of the Act

23  that I'm referring to?

24      A.   The Illegal Immigrations Reform and Immigrant

25  Responsibility Act.

1    Q.   Okay.  And I'll call that IIRIRA.

2    A.   Okay.  I didn't write it, so you can call it

3    whatever you want.

4    Q.   Fair enough.

5         Sorry.  Lots of terms here.  I'm trying to

6    cutdown on fingers typing?

7         And you referred to, in your direct testimony,

8    that's the last time that Congress really addressed

9    this issue as well, correct?

10   A.   Uh, as a point of clarification, that's the

11   last time a significant legislative package was passed

12   overhauling how undocumented immigration is addressed.

13   It certainly isn't the last time immigration is

14   addressed period, either legal immigration or illegal.

15   But, that's the last passage of a significant policy

16   that changes, kind of, the approach to undocumented

17   immigration, or addresses it in some manner.

18   Q.   Well, thank you for the clarification.

19        So as you discussed earlier, there were times

20   when Congress addressed legal immigration in this

21   intervening period, correct?

22   A.   Yes.

23   Q.   And as we've discussed, the 1952 Act is -- and

24   when I say "the 1952 Act," I'm referring to the

25   McCarran-Walter Act.  That's one of them, correct?

 1      A.   Yeah.

 2      Q.   That is the Act that passed -- I'm trying to

 3   frame this in a way that we won't disagree about it --

 4   but that's the Act that passed the, uh, 19 -- the 1326

 5   provision that is in effect today, subject to further

 6   amendment, correct?

 7      A.   Right.   Correct.   The recodification of the -- of

 8   the, uh, the Undesirable Aliens Act.

 9      Q.   Okay.

10           And if you had written -- sorry.

11           You testified earlier that there is some

12   disagreement as to whether or not the McCarran-Walter

13   Bill was a progressive Bill, correct?

14      A.   Yeah.   I mean, I, I think in -- sometimes when

15   I've seen it referred to just in news stories and things

16   like that -- and some of the early encounters I had with

17   McCarran-Walter as a graduate student, if we want to go

18   all the way back to the yesteryears of my professional

19   experience, you know, the removal of racial restrictions

20   on immigration was seen as being a liberalization of the

21   immigration policy, right?   You were no longer saying

22   that you can't immigrate -- you can't come to this

23   country if you're Asian, right?   You cannot become a

24   citizen if you're Asian.   So, that did represent a

25   liberalization of immigration policy.   But, I think

1  that term is often stretched a little thin when

2  referencing McCarran-Walter, when you actually look

3  at the provisions of the Act itself.

4      Q.  All right.

5        So, fair to say you don't view it as progressive

6  though?

7      A.  I don't view it -- uh, I will say yes, but...  I

8  view the removal of racial restrictions as something

9  that is -- that was a good thing at that point in time.

10  I don't think, as a whole, that it is necessarily a --

11  or that it is a what I would call, or what I would label

12  as a progressive piece of legislation.

13        And when I say "progressive piece of

14  legislation," I want to clarify further that I'm

15  talking about this in terms of a racially progressive

16  piece of legislation.

17      Q.  All right.

18        Now, Mae Ngai -- Ngai, spelled N-g-a-i, for the

19  benefit of the court reporter -- writes in her book,

20  Impossible Subjects, about the McCarran-Walter Bill,

21  correct?

22      A.  She does.  Correct.

23      Q.  And you're familiar with her work, correct?

24      A.  Oh, I mean, if you've read my book, you know I

25  cite her frequently.

1    Q.   Yes.

2    A.   By the way, thank you for the royalty.

3         But, anyway, go ahead and continue.

4    Q.   You're very welcome.  I don't know what that

5    comes out to, but --

6    A.   Like, $0.75.

7    Q.   Fair enough.

8    A.   That would be a stick of gum these days.

9    Q.   Right.

10        And in addition, in the summary of anticipated

11   testimony that you provided for this hearing, you also

12   referenced Ngai's work, correct?

13   A.   That's true.  Yeah.

14   Q.   Is it correct that in her book, Ngai says

15   that:  "Preserving the national origins quota was not

16   the central motivation for the McCarran-Walter Bill"?

17   A.   Uh, I believe so.

18        I mean, if you want to read me that particular

19   passage, you're welcome too.  I don't know what page it

20   appears on.

21   Q.   Sure.

22   A.   I, I didn't have a chance to reread all of

23   Mae Ngai's 350-plus-page book before testimony this

24   morning or on the lunch break.  So, my apologies with

25   my unfamiliarity with that specific passage.

1    Q.  Yeah.  That's okay.

2        Do you have a copy handy?

3    A.  Right there.

4    Q.  All right.

5    A.  The good thing about working from your home

6    office, slash, bedroom.

7        Anyway, go ahead.

8    Q.  Does the phrase that I read to you appear on

9    page 237 of the book?

10   A.  Now I have to look old by taking off my glasses.

11   I'm almost ready for bifocals at this point.

12       Okay.  Yes.  What paragraph are you referencing?

13   Q.  Oh, boy.  Um --

14   A.  You didn't highlight it?

15   Q.  I really should have.

16       All right.  So, it's the first paragraph.

17   A.  Are you talking at the top of page 237?

18   Q.  Yeah.  It's the first -- it's not a full

19   paragraph, but it's the first paragraph.  If you go

20   four full lines up from the bottom, the sentence

21   beginning with the word --

22           COURT REPORTER:  Wait.  Beginning with the

23   word what?

24   BY MR.  WALKINGSHAW:

25   Q.  Does it say, "preserving the national origins

1    quota was not the central motivation for the Bill"?

2       A.   It does say that.

3       Q.   And does it continue, "maintaining the status quo

4    hardly required such major review and revision of the

5    code"?

6       A.   That's true.

7       Q.   And does it follow, "McCarran saw revision of

8    the nation's immigration laws as a tool in the United

9    States' urgent battle against communism"?

10      A.   That's accurate.  Yes.

11      Q.   Is it fair to say that the 1952 law received

12   political support for a variety of reasons?

13      A.   Yeah.

14      Q.   Earlier you referenced -- you were having

15   discussion as to whether or not the Bill was racially

16   progressive, and you referenced the elimination of the

17   bar on Asian immigration, correct?

18      A.   Uh, the elimination of the qualification under

19   Johnson-Reed, that the only people who could utilize

20   the quotas that were assigned to Asia, had to be people

21   who could become citizens of the United States, which

22   were not people of Asian descent at that point in time.

23      Q.   Right.

24           And Secretary of State, Dean Acheson supported

25   this Bill because it eliminated this provision, correct?

1    A.   Uh, to my knowledge.  Again, I haven't -- I --

2    you could reference that specific passage, if you'd

3    like.  I won't claim to know that off the top of my

4    head.

5    Q.   Okay.  It's on the following page, 238.

6    A.   Okay.

7    Q.   I promise we won't do much more of this.

8         So, the second full paragraph, second paragraph:

9    "Secretary of Dean Acheson..."

10   A.   Yep.

11   Q.   So that's where the sentence begins.

12   A.   I got it.

13   Q.   "Secretary of State, Dean Acheson, supported

14   the McCarran-Walter Act because its elimination of the

15   racial bar to citizenship, promises to resolve a, quote,

16   serious irritant of longstanding in the U.S./Japanese

17   relations," end quote.

18   A.   Yeah.

19   Q.   Would you agree with that?  Would you agree with

20   that statement?

21   A.   Would I agree with the statement, or would I

22   agree that that appears on page 238 of Mae Ngai's book?

23   Q.   Well, let's take them in turn.

24        Do you agree with the statement?

25   A.   I agree with the statement that that is why

1    that particular individual supported that piece of

2    legislation.

3        Q.   Okay.

4            Now, the McCarran-Walter Bill was preceded by --

5    you've mentioned in your prior testimony -- well, let me

6    back up and I'll withdraw the question and I'll try to

7    reframe it in a way that makes sense.

8            You've referenced in your prior testimony,

9    reports that have been compiled prior to the passage

10   of immigration laws, correct?

11       A.   Yes.  I have referenced a couple reports, as well

12   as, I think, a couple academic works from the period of

13   the 1950s.

14       Q.   And there was one done prior to the

15   McCarran-Walter Act, right, a report?

16       A.   I mean, there were lots of reports done.  Which

17   one are you referencing?  Are you talking about the, uh,

18   the Wetback in the Lower Rio Grande Valley?

19       Q.   No.  I believe there was a comprehensive report

20   that was about --

21       A.   Are you referencing the Wickersham Commission

22   report in 1931?

23       Q.   I'm referring to the Senate judiciary

24   Subcommittee report that ran about 900 pages.

25       A.   Of what year?

1    Q.  Well, I hate to break the book out again, but

2    it's back on page 237 -- I promise this is the last

3    one.

4    A.  Well, at least we're only going between two

5    pages here.

6    Q.  So back to the first paragraph --

7    A.  Yep.

8    Q.  -- following the sentence that says:  "McCarran,

9    a conservative and devout Catholic from Nevada, was

10   a dedicated anti-communist and, quote, warrior --"

11   A.  Uh-huh.

12   Q.  "-- but that 100-page report submitted by the

13   subcommittee, and the accompanying 200-page draft

14   omnibus Bill introduced by McCarran in 1950, and the

15   legislation that Congress ultimately passed in 1952,

16   have been considered most notable for their preservation

17   of the national origins support system."

18   A.  Okay.  Yeah.  It did preserve the national quota

19   system, although it changed the references point to the

20   census of 1920, I believe, instead of 1890, which was

21   the reference for Johnson-Reed.

22   Q.  So a few questions on that.

23       First, have you read that report that Ngai

24   references at page 237?

25   A.  I haven't read the 900-page report,

1    Q.  Okay?

2    A.  You know, if -- since you've read <u>Handcuffs and</u>

3 <u>Chain Link</u>, you know that I don't go into a great

4 amount of detail on McCarran-Walter, since it was, in

5 the history of undocumented immigration, uh, this

6 recodification in 1952 is something that is done very

7 much without debate, as we've covered in my testimony.

8 And so I did not read the 900-page report from the

9 Judiciary Committee.

10    Q.  Okay.

11    And the national origins quota system that that

12 sentence that we read referenced, that's no longer a

13 part of immigration law, correct?

14    A.  Uh, it is.  You don't get rid of national origins

15 quotas until 1965.

16    Q.  Right.  I'm sorry.  I mean, today, it's no longer

17 part of -- like you said, the national origins quota

18 system was eliminated in congressional legislation in

19 1965, correct?

20    A.  Yes.

21    Q.  Right.  So, today, if someone is trying to

22 immigrate to the U.S., they're not subject to any

23 quota with respect to their national origin, correct?

24    A.  They are not.

25    Q.  In fact, the 1965 Act included an explicitly

1    anti-discriminatory provision that banned consideration

2    of national origin, ancestry, or race, correct?

3        A.   That's true.   That doesn't mean there were

4    country level caps that were still imposed.   There was

5    a 20,000, uh -- 20,000 per year quota that was put on --

6    that was applied to Mexico in 1976.

7        Q.   All right.

8            I would like to shift perspective for a little

9    bit to IRCA, if we could.

10       A.   Okay.

11       Q.   Well, if you think it's --

12       A.   I love revisiting my first book, so --

13       Q.   Got it.

14           So, again, you view this as a significant shift

15   in the way that American law treated the, I guess what

16   we could call the problem of undocumented immigration?

17       A.   I mean, I think the way that I reference it in

18   my book is that I think this represented the potential

19   for a significant shift.   You did see the first amnesty

20   program that was part of the Immigration Reform and

21   Control Act -- or, sorry, IRCA -- in 1986.   And you did

22   see some shifts in language at this point in time.

23       Q.   Right.

24           With respect to the shifts in language, you wrote

25   that:   "The debate over IRCA differed significantly from

1    earlier debates on undocumented immigration in 1929,

2    right?

3        A.   That's correct.  I mean, we would -- you know,

4    we would hope that the debate on immigrations shifts

5    from one that is, uh, strictly talking about the racial

6    purity of the United States, to something different by

7    the 1980s.

8        Q.   And you reference in your book a floor statement

9    by Representative Fish as expressing -- well, you

10   believed "it was a feeling no doubt shared by many, that

11   IRCA represented an opportunity to address immigration

12   control in a way that was not driven by nativists or a

13   reaction to the (unintelligible)," correct?

14       A.   That's correct.

15       Q.   You say that, "The floor statements reflected a

16   significant shift from the way in which Mexican and

17   undocumented immigration was discussed in the 1924 and

18   the 1928 Acts," correct?

19       A.   That's correct.

20       Q.   I believe we've touched on this briefly, but

21   IRCA did fail to reduce the influx of undocumented

22   immigrants, correct?

23       A.   Correct.  You have the passage of an amnesty

24   program, and then you have the beginning of the surge in

25   undocumented immigration.  And I forget -- I don't have

1  the charts in front of me.  But you have a surge in

2  undocumented immigration around the early part of the

3  1990s, I believe.

4      Q.  Okay.

5          And I'll throw out some numbers here that I've

6  taken from your book.  Let me know if you disagree with

7  them.

8          After IRCA, the undocumented population dropped

9  from 3.2 million in 1986, to 1.9 million in 1988,

10  correct?

11     A.  Yes.  The size of -- the estimated size of the

12  undocumented population -- and I want to be careful

13  to clarify that language because by virtue of being

14  undocumented, it is also a population that can be

15  difficult to measure in terms of its full size.

16     Q.  Right.

17     A.  So those are the estimated size of the

18  undocumented populations as represented in my book,

19  yes.

20     Q.  And by 1990, the estimated undocumented

21  population had risen above three million, correct?

22     A.  That's correct.

23     Q.  And by 1996, the estimate had risen to five

24  million, correct?

25     A.  That's correct, based on whatever member -- or I

```
1    think, what really fancy chart that I have in there.
2        Q.   Right.
3            1996 was when IIRIRA, the I-I-R-I-R-A was
4    enacted, correct?
5        A.   Correct.
6        Q.   And you mention in your book a number of
7    motivating factors.  And I believe you reference a
8    scholar named Don Johnson who identified them, but
9    you refer to them in your book, correct?
10       A.   I think so.  I don't specifically remember
11   Don Johnston, but --
12       Q.   Okay.
13           So one of the things you mention is the failure
14   of IRCA to stem the illegal immigration --
15       A.   Right.
16       Q.   The other was the passage of NAFTA?
17       A.   Right.
18       Q.   And that's the North American Free Trade
19   Agreement?
20       A.   That's correct.
21       Q.   Which you write, "focused the public's attention
22   on immigration and its effect on the U.S. economy,"
23   correct?
24       A.   Correct.
25       Q.   You also reference the 1993 World Trade
```

1    Center bombing?

2       A.   I have no -- I have no recollection of

3    referencing that, but, um -- I don't know if you're

4    referencing my dissertation or my book, but I don't

5    recall that off the top of my head, and I don't

6    recall the context for referencing that off the

7    top of my head.

8       Q.   Okay.  You also --

9       A.   My apologies for not recalling it, but when

10   you -- you know, I have a little distance since that

11   was written.

12          But, anyway, go ahead.  Continue.

13      Q.   If I e-mailed you a copy of your dissertation

14   and pointed you to the page, would you be able to say

15   whether or not it was fairly characterized?

16      A.   If it appears in my book, I would be -- I think

17   it is more relevant to the testimony that I'm offering

18   today, since, again, my book went through the -- the

19   manuscript submitted as my dissertation went through

20   multiple rounds of peer review before being released as

21   my book; and, therefore, as a dissertation is not what

22   I can -- is not a publication, nor is it something that

23   I would consider a final version of my work.  That is,

24   essentially, a draft version.  That is a dissertation,

25   but it is not a publication.

```
 1      Q.  Okay.

 2          It's hard to e-mail it to you since there's a

 3   digital copyright provision for the benefit of your

 4   royalties.  Maybe we'll just move along.

 5      A.  Well, I mean, I have my book, but I don't -- I

 6   don't get any royalties from my dissertation --

 7   although, you know, if you want to send me $0.75, I'll

 8   take it.

 9      Q.  Sure.

10          So you do have a copy of your book?

11      A.  Yeah.  Somewhere.

12      Q.  Okay.  So the phrase that I'm referring to does

13   appear in your book.

14      A.  Okay.

15      Q.  The sentence --

16      A.  Hold on one second.  Let me pull it up.

17      Q.  You have it --

18      A.  I also have a pdf of it.

19      Q.  Okay.

20      A.  So, uh -- and my apologies to -- my camera --

21   give me one second.  I just lost my monitor, so --

22              MS. GORMAN:  Personally, I'm losing a thread

23   because I don't know what people are referring to.  If

24   somebody could share a screen, or if Mr. Walkingshaw

25   could share his screen so I can -- I'm trying to --
```

```
 1              MR. WALKINGSHAW:  I will try.  I have the

 2   Kindle version of the Professor's book, which was cited

 3   in the motion.  Let me see if I can find a way to share

 4   my screen.

 5              Can you Control F in your pdf?

 6              Oh, dear, we lost his video.

 7              THE WITNESS:  Yes.  Give me one second.

 8   I'm trying to correct my video.  My monitor cut out.

 9   I'm trying to do a quick fix on that, but I can still

10   hear you.  Hold on.

11              Okay.  What am I -- what page did you

12   reference?

13   BY MR. WALKINGSHAW:

14      Q.  So it's hard with the Kindle version because it

15   doesn't have pages, but if you can search within the

16   document for the phrase "the 1993 bombing."

17      A.  Let's see.

18      Q.  I'm afraid I'm unable to share my screen.

19      A.  And I'm down a monitor.

20          Um, yes, "the 1993 bombing of the World Trade

21   Center by" -- whoop.  Am I getting it back now?

22      Q.  Yes.

23      A.  Now it's over here.

24          Okay.  Let me just switch this over real quick,

25   and then I'm looking at the right screen.
```

```
 1                    THE CLERK:  Mr. Walkingshaw, give it a try
 2      now to try and share your screen.
 3                    MR. WALKINGSHAW:  All right.  One moment.
 4                    THE WITNESS:  Okay.  I can read the passage
 5      if you'd like, since I have it right here.
 6                    MR. WALKINGSHAW:  Sure.  That would be
 7      great.
 8                    THE COURT:  Well, before you do that, I'm
 9      just trying to -- he's sharing the screen?
10                    MR. WALKINGSHAW:  I'm sorry, Your Honor.  I
11      can take it down if it's preferable.
12                    Did Your Honor have a question?
13                    THE COURT:  I'm trying to understand this
14      line of questioning.  You're asking if Professor
15      Gonzalez O'Brien referenced the 1993 bombing of the
16      World Trade Center?
17                    MR. WALKINGSHAW:  As a driving factor for
18      the passage of the 1996 IIRIRA Act.
19                    THE COURT:  And I think that the answer
20      earlier was that he wasn't sure if he did.  And that's
21      what you were trying to demonstrate, is that it was
22      referenced?
23                    MR. WALKINGSHAW:  Yes.  That he identified
24      it as one of the driving factors of the passage of
25      IIRIRA.
```

1          THE WITNESS:  If I may offer a point of

2     clarification.  I mean, all of this that is cited in

3     that paragraph, both the North American Free Trade

4     Agreement and the bombing of the World Trade Center,

5     is talking about the environment at the time

6     preceding the passage and the debate other the

7     Illegal Immigration Reform and Immigrant Responsibility

8     Act, or IIRIRA, or I-eera (phonetic), or however --

9     whatever we're calling it right now.  So, I -- what

10    is your -- what is your question relating to that

11    particular passage?

12    BY MR. WALKINGSHAW:

13       Q.   So you have identified the World Trade Center

14    bombing as an event that made the passage of this Bill

15    more likely, correct?

16       A.   It was an event, at least the identification

17    of the individual, the suspect in that case as someone

18    who was believed to be an immigrant, did heighten public

19    fears around immigration, I think is the point that I'm

20    making there.

21       Q.   Okay.

22            And you also reference in your book -- I believe

23    you referenced this on direct -- a statement by John

24    Doolittle during the debates over IIRIRA, regarding a

25    drive-by shooting in his district where the perpetrator

1  was an undocumented alien.  He served his sentence.

2  And then he was back within one week after he was

3  deported.

4       Correct?

5    A.  Correct -- well, I don't know that I referenced

6  it that explicitly, but I did mention it in passing.

7  Yes.

8    Q.  Right.

9       And I believe you also referenced a statement

10  by an Iowa legislator who referred to a stabbing by

11  a previously deported, undocumented immigrant at a

12  party, correct?

13    A.  Correct.

14    Q.  Okay.

15       I will try and cease sharing my screen at this

16  point.  I think we've more than --

17       Or, Peggie, have I stopped sharing my screen?

18            THE CLERK:  You have.

19            THE WITNESS:  You're good.

20            MR. WALKINGSHAW:  Okay.

21  BY MR. WALKINGSHAW:

22    Q.  You teach immigration and border politics,

23  correct?

24    A.  Uh, I have.  Yes.

25    Q.  Yeah.  And at Highline -- I'm sorry.  Is it

1    Highline College or University?

2        A.   It's Highline College.  It's a community college

3    in Washington, where I was before taking the job at

4    San Diego State.

5        Q.   You taught comparative government there, correct?

6        A.   Yeah.  I mean, at a community college, you teach

7    whatever classes they tell you to teach because there

8    are only four classes that are offered.

9        Q.   Gotcha.

10        And it's true --

11        A.   Actually, as a point of clarification, I did not

12   teach immigration and border policy at Highline.  I

13   taught a racial and ethnic politics class, I believe.

14   But I don't recall teaching an immigration and border

15   policy class.

16        Q.   Oh, I'm sorry.  I don't believe that I said at

17   Highline, but have you taught immigration and border

18   politics generally.

19        A.   Yes.  Yes.

20        Q.   Okay.

21        And at Highline you did teach comparative

22   government, even though it's, perhaps, one of only

23   four classes that they offer in political science?

24        A.   It is.  And if you're going to ask me questions

25   regarding comparative government, that is not one of

1  the areas of my expertise, so, uh -- I, I am happy to

2  say I taught that class, based on my limited expertise

3  in comparative government, but it is not one of my areas

4  of specialization.

5      Q.  Okay.

6      Do you know if other countries around the

7  world criminalize entry to their borders without

8  authorization?

9      A.  Some do.  There is a wide range of immigration

10  policies worldwide in regards to undocumented entry,

11  and there's a wide range of policies that are used by

12  countries to address it.  And I think, also, uh, to

13  give that question a little additional context, you also

14  have to look at not only the penalties for entry, but

15  the opportunities for normalization of status after

16  that, um, initial act of undocumented entry.  And some

17  countries do provide more opportunities to normalize

18  status than the United States does.  Although, again,

19  I'm not an expert in comparative government, nor is that

20  the area that I write in.

21      Q.  Right.

22      But, isn't it true that a substantial majority of

23  countries around the world criminalize entry into their

24  borders without authorization?

25      A.  Are you planning on citing a specific number?

1    Because I don't know what would -- I don't know that

2    I can say that a majority do, without looking at the

3    immigration policies of all of the individual countries

4    in the international system, and also then having a

5    debate around what you would identify as "criminalize

6    undocumented entry."

7        Q.   Okay.

8             So, fair to say you don't know then?

9        A.   I know that immigration policies from country

10   to country vary in how they treat undocumented entrants.

11       Q.   But, you don't know whether or not a majority

12   or minority of those policies include a criminal penalty

13   for entry into the country without authorization?

14       A.   I don't.  If you've quantified that, I would love

15   to see a chart.  I can use it in my classes.

16       Q.   I'm scared to do more screen sharing, and so

17   perhaps I'll just move on.

18            So, I think I only have a little more.  I would

19   like to ask you some questions about the term -- the

20   term "wetback."

21       A.   Uh-huh.

22       Q.   You discussed it in your direct testimony,

23   correct?

24       A.   That's correct.

25       Q.   And it's not the first time you've been asked to

1    provide expert testimony on the meaning of its -- on the

2    meaning of that term, correct?

3        A.  Uh, that's correct.

4        Q.  Right.

5            You've testified in a hearing last week in Oregon

6    on the same subject, correct?

7        A.  Yeah.  I testified -- I mean, you know, my

8    testimony was not just to define the term "wetback,"

9    but --

10       Q.  That's true.

11       A.  -- but I believe I did offer -- that testimony

12   was partial testimony that was then cut short.  So my

13   recollection of what exactly I discussed over the course

14   of that testimony is, um, is a wee bit foggy in terms

15   of where the stopping point was.

16       Q.  Okay.

17           This happened last Thursday, right?

18       A.  To my recollection, yes.

19       Q.  Right.

20           And I mean --

21       A.  I mean it's COVID time so, you know, everything

22   kind of ebbs and flows, and days of the week lose their

23   meaning.  But, yes, Thursday.

24       Q.  Sure.

25           And it was for a hearing on a motion very much

 1    like this one, correct?

 2        A.  That's correct.  Yeah.

 3        Q.  I mean, can you think of any differences, aside

 4    from the district and the defendant, from the two

 5    motions that you're aware of?

 6        A.  Not off the top -- I mean, I would have to look

 7    at them side by side.

 8        Q.  Right.

 9        A.  I mean, I'm not going to pretend to have a

10    perfect recollection of both motions as were filed.

11        Q.  Sure.  But, you know, nothing major pops out

12    to you?

13        A.  They're similar motions based on my recollection

14    of the two.

15        Q.  Okay.

16        A.  Again, how similar they are and how -- in terms

17    of the actual text offered, I don't feel like I can

18    confidently say.

19        Q.  Okay.

20            You were asked at that hearing to discuss the

21    meaning of the term "wetback" as it was used in the

22    early 1950s, correct?

23        A.  Uh-huh.  Correct.

24        Q.  And in response, you stated, "The term was used

25    largely to denote anyone who had entered the United

1  States illegally," correct?

2      A.  Correct.

3      Q.  You stated that, "The term was used rather

4  broadly without any kind of national designation,"

5  correct?

6      A.  Correct.  Meaning, you know -- by which I meant

7  -- and I'm not sure if you're going to offer this

8  part of my testimony either, or if this was part of

9  my testimony -- but in terms of this being a designation

10  made solely to Mexicans versus anyone from, say,

11  Central America, who also crossed illegally, that

12  term would have been applicable to them as well.

13      Q.  All right.

14          And it refers, exclusively, to people in the

15  country without any documented status, correct?

16      A.  The term "wetback" does.  Yes.

17      Q.  Right.

18          And, again, the term originates from -- I believe

19  you covered that in your direct testimony.

20          Are you familiar with Cesar Chavez?

21      A.  No.  I've never heard of him before -- yeah.

22      Q.  Okay.

23          Uh, he was a Mexican-American labor organizer,

24  correct?

25      A.  Yes.

1       Yeah, and I already know where you're going with
2  this, but continue.
3     Q.  Okay.  Well, let's get there and then I think we
4  should -- ought to be done.
5       He was considered a civil rights hero for many
6  Mexican Americans, correct?
7     A.  Correct.
8     Q.  And in fact, in the 1950s and '60s and '70s,
9  isn't it true that Cesar Chavez, himself, referred to
10  undocumented strikebreakers who were in the country
11  illegally as wetbacks?
12    A.  That's true.
13    Q.  Okay.
14       And he wasn't referring to Mexicans in general,
15  was he?
16    A.  He was drawing a distinction between legal
17  Mexicans and illegal Mexicans.
18    Q.  Right.
19       You wouldn't say that Cesar Chavez bore a racial
20  animus against Latinx people, would you?
21    A.  I would not.
22    Q.  Okay.
23          MR. WALKINGSHAW:  Those are all the
24  questions I have at this time.
25          So, at this point, Your Honor, I'd pass

 1    the witness.

 2                    **REDIRECT EXAMINATION**

 3    BY MS. GORMAN:

 4       Q.  So, Professor, that covered a lot.  Most of which

 5    I have not read.  But just to be -- to be very clear,

 6    when you're referring to -- because I, likewise,

 7    listened to your testimony last week in the District

 8    of Oregon -- is it fair to say you testified for several

 9    minutes and then time ran out?

10       A.  That seems accurate.  Again, I don't remember

11    the exact number of minutes, but I didn't testify for

12    very long.  I was having unfortunate audio issues, which

13    I've since addressed with this neat little thing right

14    here.

15       Q.  Is there a difference in the use of, of a racial

16    -- of what could be a racial slur for one group, and not

17    for another group?

18       A.  I think there is.

19       Q.  As in -- okay.

20       A.  I think to contextualize my answer to the

21    previous question about Cesar Chavez, and about, uh,

22    the positions of some Mexican Americans, more broadly,

23    in regards to the undocumented population or to

24    wetbacks, uh, Mexicans in the United States have

25    long had issues with their own status.  And so there

1    are some divisions that you see, both at the time that

2    was referenced earlier in regards to Cesar Chavez,

3    but I also think there are -- there continue to be

4    some division on this question -- or on the issue of

5    undocumented immigration because, as I mentioned,

6    with -- as I mentioned with that 1951 report on the

7    wetback in the Rio Grande Valley, this attribution of

8    inferiority and criminality to the wetback was seen by

9    Mexican Americans as something that was generalized

10   to them as well -- because it was generalized to them.

11   And again, that is what I mean by this is a racialized

12   term.  This is a term that was used to characterize

13   people who appeared as if they could be undocumented,

14   regardless of their actual legal status or citizenship.

15   And so there, there is some -- there is some necessary

16   nuance to that.

17       Q.  And is it true that when you talk about Operation

18   Wetback, that actually included both Mexicans who had

19   legally entered the country and Mexicans who had entered

20   without permission?

21       A.  That's correct.

22       Q.  And, you know, you were left with this sort of

23   question about Cesar Chavez, and you touches on, I

24   think, something very -- an important part of that

25   history, which we didn't go into too deeply, but is

1  it your understanding since Cesar Chavez was very much

2  a, uh, an advocate of worker's rights in general, humane

3  treatment of workers?

4       Is that fair?

5    A.   Yes.

6    Q.   And during periods in American history, were

7  undocumented and Braceros actually used to break strikes

8  by agricult -- by farm interests and farm owners?

9    A.   That's correct.

10   Q.   And I want to make sure, if there's any

11  additional context that you wanted to add to that,

12  uh, you know, feel free to.  But those are just, sort

13  of, points that I noticed from the government's

14  cross-examination.

15       Was there anything further regarding that

16  terminology?

17   A.   Yeah.

18       So, uh -- so, you know, there -- again, there

19  were -- there has been, to a certain extent, this

20  playing off of the undocumented population and the

21  either legal Mexican population or Latino population,

22  and American citizens, and these tensions between

23  groups because, again, Mexican -- undocumented Mexicans

24  could be used as strikebreakers.  They were seen as

25  contributing to notions of racial inferiority of

1    Mexicans generally; essentially, of giving Mexican

2    Americans a bad name.  And so the context of

3    undocumented immigrants, and the context of the

4    term "wetback" and/or "illegal immigrant," has to be

5    understood through the lens of both how white America

6    interpreted those terms, but also how those were used

7    to categorize not just the immigrants, not just those

8    who were here without status, but to characterize an

9    entire group of people.  Because at the end of the

10   day, that was -- those were racial attributions.

11   There was no way for anybody to tell if somebody

12   was undocumented or legal or a citizen of the United

13   States.  And a lot of the activity on the part of

14   Mexican Americans, or legal Mexicans, and a lot of

15   the hostility toward some of the undocumented community,

16   was because there was a fear that that would be

17   generalized to the Mexican population as a whole, and

18   that would further lower the status of Latinos in the

19   United States as a group.

20       Q.  You know, another point that you had hat I

21   think was brought to your attention, was the use of

22   anecdotal testimony in congressional debates.  I

23   want you to comment further about the use of these

24   anecdotal -- of these anecdotes by lawmakers of violent

25   crimes committed by undocumented immigrants, to further

1   a general anti-immigrant agenda, and whether or not that

2   is intentioned with the empirical literature or not.

3       A.   Yeah.  So what you see sprinkled throughout the

4   congressional debate, you know -- and I go into this

5   quite a bit with the Illegal Immigration Reform and

6   Immigrant Responsibility Act, or IIRIRA, but what you

7   see is you see these instances, the use of the example

8   of the drive-by shooting, uh, these anecdotal instances

9   of criminality -- which this, again, you know, I'm not

10  downplaying the severities of that criminal behavior,

11  or the impact that that had either on the victims or

12  their families -- but that is essentially being used

13  in a way to characterize an entire population, when

14  the empirical support for immigrant criminality is

15  lacking, and when all contemporary examinations of

16  the criminality of illegal immigrants or undocumented

17  immigrants has found that undocumented immigrants

18  actually offend at lower rates than the native born

19  population.  And this is not something that was unknown,

20  even during the -- um, if I can pull this up for a

21  second, which I can't -- even during the debate of

22  McCarran-Walter, there was a correction on the part

23  of Representative Celler, when another member of

24  Congress -- and this is not specifically in reference

25  to Mexicans, but it is in reference to the kinds of

1  ideas that the foreign born are more inclined toward

2  criminality -- and Representative -- and Celler notes

3  that what you find, and what the FBI found -- and this

4  is in 1952 as well -- is the native born offend at

5  higher rates than the foreign born.  And this is

6  something that's been replicated over and over again

7  in multiple academic studies and, as I mentioned, in

8  numerous governmental publications and reports.  And,

9  yet, you continue to see it referenced.

10         You saw it referenced in the -- in the 1996, uh,

11  legislation during debate.  You also saw it referenced,

12  repeatedly, on the push on the part of President Trump

13  to crack down on sanctuary cities and things like this,

14  these references to tragedies; but, ultimately, to

15  anecdotal evidence of criminality on the part of the

16  undocumented population.

17         And, again, the criminality that we know tends

18  to be more, more generalized towards all people who look

19  like they could be undocumented immigrants because,

20  again, that term is a racialized one, and remains a

21  racialized one in this country.

22  Q.  The fact that -- I mean, there were the two,

23  sort of, notable examples, or several during that

24  administration, which I don't know if you're familiar

25  with, but one involved -- I think the first name of the

1  young woman might have been Mollie -- and her parents

2  came out and said don't use this tragedy to further a

3  racist agenda.

4       Do you recall, sort of that -- I understand this

5  post-dates this litigation, but --

6  A.    Right.  That was -- yeah, that was the murder

7  of Mollie Tibbetts in, I believe, in Iowa, by an

8  undocumented immigrant.  And this was picked up

9  as an example of the threat posed by undocumented

10  immigration, in much the same way that, Kathryn Steinle,

11  or Kate Steinle's death in San Francisco in 2015 was

12  used as an example of the threat posed by immigrant

13  criminality.  And this is something -- sorry.  I'm

14  moving my web cam.  I'm having -- there we go -- this

15  was something that you see referenced -- you see

16  referenced repeatedly in regards to both Mollie

17  Tibbetts, and Kathryn Steinle, but it was also something

18  that was part of Trump's general push in his campaign.

19  He brought the families of victims of undocumented

20  crime, he brought them on his campaign tour.  He had

21  them tell their story.

22       And, again, I am not saying these are not

23  tragedies, but this is -- the political reason for

24  this is it activates longstanding racial anxieties

25  in this country regarding nonwhite peoples, and

1    specifically Latinos.

2              THE COURT:  All right.  I forget --

3              THE WITNESS:  And at the same time --

4              THE COURT:  I'm sorry to interject.  I

5    forget what the original question was now and why we're

6    down this line of questioning.

7              Ms. Gorman, would you redirect.

8              MS. GORMAN:  Well, I think we can end it.

9    I think that the general point was -- that I was

10   at least attempting to conceptualize, was that

11   Mr. Walkingshaw had referenced this part of his

12   cross-examination, these anecdotal stories of violent

13   acts committed by undocumented immigrants, and to place

14   that in the context that those -- that these, sort of,

15   anecdotal pieces of evidence have sort of a long history

16   of being used to justify ultimately racists laws or

17   racist enforcement of laws, either facially neutral or

18   racially motivated laws.

19             THE COURT:  All right.  Do you have any more

20   in terms of your recross -- redirect, I mean?

21             MS. GORMAN:  I will mercifully say no,

22   other than, um -- yeah, I think I've -- I think we've

23   exhausted this.

24             And I guess just to be clear, there

25   was a lot of talk about IRCA, and I think -- and maybe

1    I misunderstood, but I guess it's my understanding, and

2    correct me if I'm wrong, but there was no amendment or

3    change to 1326 in IRCA, is that --

4              THE WITNESS:  No, there was not.

5              MS. GORMAN:  Okay.  So I think I

6    was confused by the testimony regarding IRCA

7    because -- okay.  That makes more sense then.

8         And, Your Honor, I don't know if this court had

9    additional questions or if we covered everything.

10             THE COURT:  Mr. Walkingshaw, do you have

11   more?

12             MR. WALKINGSHAW:  Your Honor, I don't

13   have any further questions, but I would ask the Court

14   for the opportunity to submit the transcript from

15   Professor Gonzalez O'Brien's testimony in the hearing

16   in Oregon on Thursday.  Obviously, it's only five days

17   ago, so that transcript hasn't been prepared yet.  But,

18   I think the Court should have the benefit of being able

19   to look at what Professor Gonzalez O'Brien said in that

20   proceeding because I believe there's some disagreement

21   between the parties as to what happened there.

22             MS. GORMAN:  And Your Honor, just if it

23   might help, I know that his testimony is going to

24   continue tomorrow in that proceeding, so we may just

25   want to get the transcript as a whole.  And I'm happy

1   to looking into providing that too.

2         THE COURT: I'll address the post-hearing

3   issue in a moment. I have some follow up questions for

4   Professor Gonzalez O'Brien. And I may be jumping around

5   just a little.

6         Going back to your testimony from before

7   the break, where you indicated there was justification

8   for the codification of Section 1326 in the 1952 Act,

9   I believe, I thought you testified that the

10   McCarran-Walter Act itself did not contain any

11   discussion of Mexican entry into the United States

12   because that was not part of that Bill, but there

13   was continued attributions of criminality to illegal

14   immigrants. And as evidence of that, you referenced

15   the utilization of the term wetbacks to describe

16   undocumented immigrants as Mexicans.

17         Is that -- am I --

18         THE WITNESS: Correct.

19         THE COURT: -- summarizing all that

20   correctly?

21         THE WITNESS: Yeah. Um, and, you know,

22   what I was referencing with the term "wetback," is if

23   you look at the debate over McCarran-Walter, at least

24   the debate that I've read over McCarran-Walter, uh, you

25   don't really see that come up. That was a letter that

1    was -- that was put into the Congressional Record

2    in support of certain changes to the McCarran -- under

3    the McCarran-Walter, including some changes in language

4    to 1326.  And that was from Peyton Ford, the Deputy

5    Attorney General, on behalf of the DOJ.  And in that

6    document, the term "wetback" is referenced.

7              But, again, in the McCarran-Walter debate,

8    broadly, most of the conversation is about the national

9    origins quotas, and about legal immigration into the

10   United States.  And you actually don't see Mexicans

11   referenced in the, kind of, broad congressional debate,

12   outside of this kind of throw away reference -- or not

13   throw away -- to this reference in the AG's, the deputy

14   AG's letter.  But, my understanding and my read of

15   the congressional debate over McCarran-Walter is that

16   Mexicans just didn't come up.

17             MS. GORMAN:  Your Honor, just to be -- for

18   clarification, in terms of McCarran-Walter, Mexico was

19   among the countries, when we're talking about legal

20   immigration, that was discussed in McCarran-Walter.

21             I just want to make a distinction between

22   1326 and, sort of, the Western Hemisphere quota --

23             THE WITNESS:  Right.

24             MS. GORMAN:  -- generally.

25             So I don't know if that provides -- at

1    least, for me, that provided some clarification.  I

2    don't know if that (unintelligible).

3              So Mexico was part of the conversation in

4    McCarran-Walter in terms of just the overall sort of

5    quota and system.  But with respect to illegal, or

6    with respect to 1326, that was what was the minimally

7    discussed provision in McCarran-Walter.

8              Is that a fair characterization?

9              THE COURT:  I'm sorry.  Are you asking --

10             THE WITNESS:  Are you asking me?

11             THE COURT:  -- Professor Gonzalez O'Brien a

12   question now?

13             MS. GORMAN:  Yeah.

14             THE WITNESS:  Yeah.  And most of the

15   discussion under McCarran-Walter is about, uh, the --

16   you know, the re-constitution of the natural origins

17   quotas, Asian immigration, and some of the issues that

18   were taken with the designation of Asian ancestry,

19   as what determined your -- what quota you could apply

20   to --

21             THE COURT:  I do see that --

22             THE WITNESS:  (Unintelligible).

23             THE COURT:  I'm sorry.

24             I do see that as a different issue and

25   I'm not asking questions about that.  So, I understand

1    that context.

2              MS. GORMAN:  I just wanted to be sure that,

3    yeah, the testimony wasn't characterized that Mexico was

4    not discussed at all.  I think I just wanted to make

5    sure that that was clear.

6              THE COURT:  So then after the lunch break,

7    when you opined that the codification was motivated, in

8    part, by racial animus, you identified several reasons

9    for you reaching that conclusion.  And I believe you

10   testified that even though there was -- it was codified,

11   there was no debate on the -- and I'm quoting -- overt

12   problematic aspects of the original enactment of the

13   statute in 1929.  And also there was no debate over

14   the merits of the Act because it was in effect for -- I

15   don't want to do the math -- between 1929 and 1952.  For

16   a lengthy period of time --

17              THE WITNESS:  Correct.

18              THE COURT:  -- as to whether or not the

19   statute serves important policy.

20              So I guess my question is, all that may be

21   good, while it may be good to have, kind of, a policy

22   examination, I don't know that the absence of that

23   suggests any racial animus.  So my question for you

24   is if you're aware of other instances where Congress

25   re-codified a statute and did do so with robust debate

1     over what may have been overt problematic aspects of

2     the original enactment.

3                Do you have an example.

4                THE WITNESS:  Well, we see that debate with

5     the McCarran-Walter Act, I mean the debate over national

6     origins, and the kind of racial aspects of the, of

7     the limits placed on quotas for southern and eastern

8     Europeans.  You see that in 1965 with debate over the

9     Hart-Celler Act, and the elimination of national quotas,

10    and the acknowledgement that the national quota system

11    had been one that was very clearly and explicitly meant

12    to privilege certain groups based on perceptions of

13    superiority and inferiority, particularly -- you

14    know, especially with 1924.  But, also, you see the

15    continuation of that with the McCarran- Walter Act,

16    and the insertion of tables during committee testimony,

17    the insertion of tables showing that the largest quotas

18    will still go to northern and western Europeans.

19                So, I think you certainly see that debate.

20    And you see that debate in regards to the quotas that

21    were applicable to the age of specific triangle under

22    McCarran-Walter.  And so that debate occurs.  And I

23    think that's one of the -- you know, that's one of

24    the reasons that I'm willing to say that this is a

25    demonstration of racial -- of continued racial animus,

1    is that you're acknowledging in the debate over

2    the McCarran-Walter Act, members of Congress are

3    acknowledging that there are problematic racial aspects

4    to the 1924 Johnson-Reed Act, which comes five years

5    before the Undesirable Aliens Act, and yet they choose

6    to not only recodify the 1326, but to recodify it, uh,

7    without any examination.

8                    THE COURT:  Was there support for the

9    recodification or the codification of Section 1326?

10                   I guess I would charact -- is it correct

11   to characterize it as a codification?  Because 1326 as

12   a statute, Section 1326 was really codified in 1952,

13   right?

14                   So, my question is was there support for

15   that recodification of Section 1326 during the debate

16   in 1952?

17                   THE WITNESS:  I did not come across -- in

18   my reading of the debate over the McCarran- Walter Act,

19   I did not come across any specific references to

20   either the -- you know, regardless of whether we're

21   characterizing it as a codification or recodification

22   of 1326, it was just not debated, at least in what I

23   have, uh -- what I have come across, and based on my

24   reading of the Congressional Record.

25                   THE COURT:  So would it be fair to say it is

1  not clear that there was any particular groups

2  that supported or opposed the codification of

3  Section 1326 in 1952?

4          THE WITNESS:  There was no specific, uh --

5  there was no specific mention of it, again, outside of

6  some changes to the language that were suggested by

7  Peyton Ford in that letter.  Again, based on my reading

8  of the Congressional Record, there was no significant

9  debate over 1326.

10          MS. GORMAN:  Your Honor, may I ask a

11  follow-up question?

12          THE COURT:  You may when I'm finished.

13          Hang on.

14          Are you familiar with the ways in which

15  Section -- the statute changed, from 1929 to 1952, in

16  terms of the criminalization of re-entry?

17          THE WITNESS:  The language was changed a

18  little to allow for people who were apprehended outside

19  of -- I believe.  I would have to refer to the specific

20  language again -- but I believe that people who were

21  apprehended outside of instances of the Act of the area

22  that they had initially entered, illegally entered.  And

23  this was largely aimed at immigrants that had preceded

24  into the interior of the United States and were -- to

25  ease prosecutions of those individuals because, um, I

1   think as something that was mentioned in earlier

2   testimony, visa overstays and things like that had not

3   been criminalized in the same manner that the Act of

4   undocumented entry has been criminalized, and so the

5   language to that has been adjusted.  But, you know,

6   I'm -- based on my recollection of reading both

7   1929  and the final codification in 1929, and the

8   recodification then of 1326, as well as the 1326 as

9   it exists today, the differences are not wildly

10  significant in the, in the changes in language.

11          But, again, I would have to say that, uh,

12  with complete confidence, I would actually have to

13  refer to those statutes.

14          THE COURT:  That's why I asked if you're

15  familiar because I didn't compare the statute.  That

16  was a foundational question as to your familiarity,

17  and it sounds like you're not entirely -- you may be

18  familiar, but you're not -- you don't entirely recall

19  the difference between the two.  And I think that's

20  fair.

21          Ms. Gorman, do you have follow-up questions?

22  I don't have any further questions for Professor

23  Gonzalez O'Brien.  Do you have any?

24          MS. GORMAN:  I do.

25          So, Professor Gonzalez O'Brien, you have

1    made -- you know, I want to be clear when we say, in

2    terms of what it means to debate something, versus

3    what it means to explicitly choose to carry something

4    forward.

5              So, is it your understanding that

6    explicitly, in 1952, there was an affirmative decision

7    made by that legislative body, to carry forward the

8    1952 Act of illegal re-entry?

9              THE WITNESS:  Yes.  I mean, they chose to,

10   you know, to codify or recodify what had been passed in

11   1929.  And that was part of the legislation, and members

12   of Congress are responsible for knowing what is in the

13   Bills that they're voting on.

14             MS. GORMAN:  So is there also -- and

15   you had gotten some questions from chief Judge Du

16   regarding -- and I'll refer to it as the "found-in

17   language."  So to the extent that this Bill was --

18   there was a decision to carry it forward, was there --

19   then there was this adoption of the found-in language

20   at the suggestion of the Deputy Attorney General?

21             Is that fair?

22             THE WITNESS:  That's fair.

23             MS. GORMAN:  And that adoption was

24   explicitly to make it easier to enforce the 1929 law,

25   by allowing prosecution of immigrants wherever they

1    were found, even if you couldn't establish where they

2    crossed.

3              Is that your understanding?

4              THE WITNESS:  That's correct.  That's my

5    understanding.  Yes.

6              MS. GORMAN:  And so I just want to be

7    very clear that the -- you know, the Congressional

8    Record, at least in Walter -- in McCarran-Walter, is

9    not silent on the point of illegal re-entry.

10             And then to just sort of reiterate that

11   one of the contexts of this sort of lack of, I guess,

12   robust debate, stands in contrast to robust debates

13   about other aspects of legal immigration.

14             Is that fair?

15             THE WITNESS:  That's fair.  And other

16   racialized aspects of immigration.

17             MS. GORMAN:  And part of the legislative

18   background also is the Wetback Bill that occurred two

19   months earlier.

20             Is that fair?

21             THE WITNESS:  That is fair.

22             MS. GORMAN:  And the Wetback Bill explicitly

23   carved out from the harboring of aliens employers?

24             THE WITNESS:  That is correct.

25             MS. GORMAN:  And that tension between

 1    employers and the utilization of south of the border

 2    migrants was the same sort of tension that we see

 3    animating that debate in 1929.

 4              Is that fair?

 5              THE WITNESS:  That's fair.

 6              THE COURT:  Ms. Gorman, have you concluded

 7    your follow-up questions?

 8              MS. GORMAN:  I think so, Your Honor.

 9              THE COURT:  Mr. Walkingshaw, do you have

10    any follow-up questions based on the questions I

11    asked and the additional questions that Ms. Gorman

12    asked?

13              MR. WALKINGSHAW:  No, Your Honor.

14    Thank you.

15              THE COURT:  All right.

16              In terms of post-hearing briefs, let me

17    first address the question that Mr. Walkingshaw asked

18    about submitting Professor Gonzalez O'Brien's -- the

19    transcript of his testimony in a hearing, I assume

20    before the District of Oregon, on a similar motion to

21    dismiss a Section 1326 Count.

22              I don't want testimony for the sake of

23    testimony.  So if you believe that Professor Gonzalez

24    O'Brien testified -- that the testimony somehow is

25    pertinent to his testimony today in terms of what's

1    offered, or in terms of credibility or inconsistency,

2    I'll allow it.  So, you can file it in your post-hearing

3    briefs, submit the transcript, and point out what I

4    should focus on.  I don't want the testimony to be the

5    same testimony that I've heard already in this case.

6                    MR. WALKINGSHAW:  (Nodding head

7    affirmatively.)

8                    THE COURT:  I would assume that much of --

9    there will be much overlap because the issue is the

10   same.  Not that it's not very interesting, but I don't

11   need the records to be redundant.  So that's -- so to

12   the extent that you find that the testimony offered in

13   the other case will be somehow relevant for -- on the

14   issues raised or pertinent to determine credibility, I

15   will permit it.

16                    And so if you need additional time because

17   Professor Gonzalez O'Brien is expected to testify

18   again on Thursday, then I will set the deadline for

19   post-hearing briefs to be submitted, and then I'm

20   going to close the briefing period so I can make a

21   decision on the motion.

22                    So how much time do the parties think you

23   need to submit post-hearing briefs?

24                    MR. WALKINGSHAW:  Uh, well -- I'm sorry --

25   if Ms. Gorman --

```
 1                    THE COURT:  That's all right.
 2   Mr. Walkingshaw, you can go ahead and tell me since
 3   you were the one that asked for post-hearing briefs.
 4                    MR. WALKINGSHAW:  Thank you, Your Honor.
 5                    So we can order -- I do believe that
 6   having the transcript from this hearing is important
 7   to properly focus and present the issues.  We can order
 8   that on an expedited basis and I believe that will take
 9   one week to arrive.  Although, I don't know if Kathy is
10   in the room, she might be able to tell me otherwise.
11   But, I do think we will need a one week delay for
12   purposes of receiving that transcript.
13                    I will order the Oregon transcript as soon
14   as possible.  I assume it won't take any longer.
15                    If Ms. Gorman -- I don't plan on submitting
16   anything on testimony going forward in the Oregon
17   hearing, but if Ms. Gorman would like to that, I
18   believe -- and perhaps Professor Gonzalez O'Brien
19   can correct -- can let us know as far as scheduling,
20   but I believe that's scheduled to resume tomorrow.  But,
21   what I would suggest is build in a week to receive the
22   transcripts, and then perhaps three weeks to write
23   them?
24                    THE COURT:  I'm sorry.  Three weeks to
25   what?
```

 1          MR. WALKINGSHAW:  To write the briefs.  So,

 2   perhaps, a month from now?

 3          MS. GORMAN:  I guess I want to be clear,

 4   Your Honor, in terms of Professor -- I would have to

 5   contact the District of Oregon, but I would assume

 6   that Your Honor would want the complete testimony of

 7   Professor O'Brien because I know he only testified for

 8   a few minutes.  And I don't know if that will change

 9   the timeline from the District of Oregon.  So, I

10   can check in with them too.

11          But I guess in terms of post-hearing

12   briefing, I want to know what areas this court would

13   like us to brief, I guess.

14          THE COURT:  I'll tell you that it's the same

15   area I've been struggling with, so I'll tell you what

16   they are.  And then Mr. Walkingshaw seems to think that

17   he would want the opportunity to offer any additional

18   arguments based on what's been presented so far and I'll

19   let him do that.

20          So, let me talk about timing.  I'll talk

21   about the page limit.  And I'll tell you the issues.

22          You want a 30-day deadline?  I may not

23   remember what I've heard already, so --

24          MR. WALKINGSHAW:  I'm open to other ideas,

25   Your Honor.  That seemed like it would be -- to review

the transcript and then put forth the argument, that

seemed appropriate.  But, I'm certainly open to if the

Court has other ideas in mind, I don't mean to preclude

the Court from suggesting an alternate schedule.

THE COURT:  All right.  I'm going to give

you until February 23rd to submit the post-hearing

briefs.  So, both hearing briefs will be due the same

day.

The issue that's important for me is still

the issue of one of the questions I posed previously

at the hearing before; and that is, whether or not

the absence of any repudiation of the history that

led to the adoption of the statute in 1929 should be

construed as the defendant meeting his burden of

demonstrating that the codification in 1952 was

motivated by racial animus.

So that's a broad question, but I think it's

more nuance because I think it's important to focus on

the difference between the 1930 -- the 1929 version of

the statute, and the 1952 version of the statute.  And

you can argue it either way.  If there was not much,

as Ms. Gorman argued, there's not much changed to the

statute, other than adding a remedy that's more

punitive, then it would be easier for the defendant

to argue that the lack of any rejection of the prior

 1    history is indicia of racial animus; or, you can argue

 2    the opposite.  So I see the parties, both sides, can

 3    argue either way.

 4            What I'm looking for is, I guess, case

 5    law that would support your position, and so far I

 6    haven't seen any case law that supports either position,

 7    unfortunately.  So that's why it's still the same issue

 8    I've been struggling with from reading the initial set

 9    of briefs, even after the hearing, and through today.

10            I don't know that you will be able to shed

11    more light on that, but it's and issue I would like you

12    to think about it in terms of the post-hearing brief

13    that you wanted to submit.

14            There may be one more.  Let me look at my

15    notes on the issues.

16            Oh.  And I reiterate that to the extent

17    that the transcript of any of the experts who testified

18    today, to the extent they have testified in other

19    proceedings, I don't want the transcript just to be

20    informed that they've testified.  It will be only

21    relevant if it's relevant for my purposes.

22            MS. GORMAN:  Your Honor, I would just ask,

23    in terms of the District of Oregon transcript, since I

24    presume it's regarding Professor O'Brien -- or Gonzalez

25    O'Brien, that we have the complete transcripts.  And I

1   just want to make sure that I can get those.

2          THE COURT:  Well, if you're not able to get

3   those, I don't want that to hold up my decision in this

4   case.  So the deadline is what it is already, which is

5   February 23rd.

6          All right.  Any other questions that you

7   have before I conclude the hearing?

8          (No response.)

9          THE COURT: So to summarize, post-hearing

10  briefs will be due on February 23rd -- oh, did I address

11  the page limit?

12         THE CLERK:  You didn't.

13         THE COURT:  I did?

14         MR. WALKINGSHAW:  No, Your Honor.

15         THE COURT:  I haven't?

16         MR. WALKINGSHAW:  I don't believe so, but

17  I might have missed it.  Peggie thinks you didn't.

18         THE COURT:  I would like to say 10 pages per

19  side as a limit because there's been exhaustive briefing

20  already.  I think 10 pages is fair.  If you, uh -- but

21  I'll accept comments if you think you need more than

22  10 pages.

23         MR. WALKINGSHAW:  Your Honor, I certainly

24  appreciate that a lot of ink has been spilled on this

25  case, not only the motion, the response, the reply,

1    the supplements.  Uh, I can certainly try and keep it --
2    I mean, and I'll let Ms. Gorman speak for herself -- I
3    could certainly try to keep it at 10 pages.  My only
4    worry is that -- and I think the Court -- and I think
5    everyone appreciates this.  I mean, this is an important
6    issue.  I think -- you know, this is, uh -- and it's
7    a complex issue.  So, uh, I don't know.  I would maybe
8    ask for 12?  But I don't want -- I don't want to overly
9    negotiate the -- you know, and if Ms. Gorman thinks 10
10   is fine, I can curve my voracity to the extent possible.
11            MS. GORMAN:  Mess with the margins.
12            THE COURT:  In a way, I kind of invited a
13   debate -- or a request for more because I had said that
14   I would be open to suggestions.
15            I'm going to give you up to 15 pages.  I
16   would say the parties' briefs were about 30 pages, and
17   a lot of it relates to issues that I'm no longer
18   concerned about.  So, certainly, I think you could
19   do it in five, if not 10 pages, but I'm going to give
20   you up to 15.
21            MR. WALKINGSHAW:  Okay.
22            THE COURT:  That way, you're not reducing
23   the margin or making the font so small that you're
24   violating Local Rules and I can't read it.
25            All right.  15-page limit.

1          MR. WALKINGSHAW:  Actually, Your Honor, and

2     since you bring it up, I just do have a brief question

3     or just a point of clarification, if I could.

4               So I am taking the presumption that the

5     Court put on the record at the prior hearing, that the

6     Court is inclined to employ the Arlington Heights

7     framework.  I'll certainly answer the question the

8     Court asked.  I just want to make sure that I'm being

9     clear for the record that, you know, we've preserved

10    our positions as to the stan -- I'm happy to answer

11    the question.  I think it's, uh -- you know, that's the

12    brief I'm going to write.  I just don't want to be

13    construed as waiving any of our prior positions by

14    addressing those issues, if that makes sense.

15              And perhaps I'm being overly concerned here.

16    But since we're moving to post-hearing briefing, I just

17    want to make sure that those issues, you know, will be

18    ruled on in some form or other, if that's -- I won't

19    include the, you know, O'Brien, the deference stuff in

20    the new brief.  But, I just don't want to be construed

21    as waiving any of that by leaving it out of the new

22    brief, if that makes sense.

23              THE COURT:  You're inviting me to limit more

24    pages here because the nature -- so let's be clear for

25    the record.  Whatever arguments that both sides have

 1    already raised in the prior briefs, they're are deemed

 2    to be part of the record.  I am not construing that you

 3    waive any of the arguments by not addressing them in the

 4    post-hearing briefs.  I granted post-hearing briefs,

 5    primarily, because, Mr. Walkingshaw, you asked for it.

 6    And because you asked for it, I wanted you to have the

 7    full opportunity to brief the issue that I'm focusing

 8    on, that I just indicated.

 9              If you want to, you can also focus on

10    another issue that the government raised in the response

11    that was briefly addressed in the reply; and that is,

12    that whether if -- assuming that the defendant met his

13    burden under Arlington Heights, the burden then shifts

14    to the government, and the question whether the

15    government met its burden.

16              So, you can briefly address that issue

17    as well, if you want.  But not addressing issues you

18    have already addressed, will not be construed as you

19    waiving, unless you specifically conceded an issue,

20    which you did, with respect to the passage of the 1929

21    statute.

22              MR. WALKINGSHAW:  Thank you, Your Honor.

23    I appreciate that.  And I think that's entirely

24    correct.

25              The COURT:  All right.

1        Thank you everyone.  I'm going to conclude

2   the hearing then.

3

4        (Court Adjourned.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              -o0o-

2

3          I certify that the foregoing is a correct
           transcript from the record of proceedings
4          in the above-entitled matter.

5

           \s\ Kathryn M. French          February 5, 2021
6          _____    _____

7          KATHRYN M. FRENCH, RPR, CCR              DATE
           Official Reporter
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                              **I N D E X**

2

3    **DEFENDANT'S WITNESSES:**                          **PAGE:**

4

1)  **KELLY LYTLE HERNANDEZ**

        Direct Examination By Ms. Gorman        18
        Cross-examination By Mr. Walkingshaw     37
        Redirect Examination by Ms. Gorman       62
        Recross-Examination By Mr. Walkingshaw   72
        Further Redirect Examination By Ms. Gorman  75

2)  **BENJAMIN GONZALEZ O'BRIEN**

        Direct Examination By Ms. Gorman        80
        Cross-examination By Mr. Walkingshaw    133
        Redirect Examination by Ms. Gorman      167

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# DEFENDANT'S EXHIBIT EE

## TRANSCRIPT OF *USA v. MUNOZ-DE LA O* EXPERT TESTIMONY

**IN UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | No. 21 CR 665 |
| | ) | Judge Matthew F. Kennelly |
| v. | ) | |
| | ) | |
| ALFREDO VIVEROS-CHAVEZ | ) | |
| Defendant. | ) | |

**DECLARATION OF PROFESSOR S. DEBORAH KANG**

1.  I, S. Deborah Kang, am an associate professor in the Department of History at the University of Virginia. I am attaching my curriculum vitae hereto.

2.  I researched the legislative history of 8 U.S.C. §1326 and have prepared a 102-page declaration with my analysis which I am attaching hereto.

3.  On January 28, 2022, I testified on this topic at an evidentiary hearing in *United States v. Marciano Munoz-De La O*, Case No. 2:20-CR-00134-RMP-1 (E.D. Wash), and was qualified as an expert. More specifically, the Court qualified me as an expert in history and the legislative history of U.S. immigration law.

4.  I reaffirm the testimony I provided in *Munoz-De La O* and, if called to testify before this Court, I would testify consistently with prior testimony and my attached declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Dated:  May 17, 2022

**Professor S. Deborah Kang**

# COPY

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| UNITED STATES OF AMERICA, | )Case No. 2:20-CR-00134-RMP-1 |
| Plaintiff, | )January 28, 2022; 9:01 am |
| v. | )By Videoconference |
| MARCIANO MUNOZ-DE LA O, | )Motion to Dismiss Hearing |
| Defendant. | )Pages 1 to 166 |

BEFORE THE HONORABLE ROSANNA MALOUF PETERSON
SENIOR UNITED STATES DISTRICT COURT JUDGE

APPEARANCES:

For the Plaintiff:            MR. MICHAEL J. A. ELLIS
                             USAWAE.MEllisECF@usdoj.gov
                             US Attorney's Office
                             920 W. Riverside Avenue, Suite 300
                             Spokane, Washington 99210-1494
                             509-353-2767

For the Defendant:           MR. J. HOUSTON GODDARD
                             houston_goddard@fd.org
                             MS. PAYTON B. MARTINEZ
                             payton_martinez@fd.org
                             Federal Defenders
                             10 North Post, Suite 700
                             Spokane, Washington 99201
                             509-624-7606

Court-Certified Interpreters:  Ms. Natalia Rivera
                             Ms. Susan Evans

Official Court Reporter:     Marilynn S. McMartin, CCR #2515
                             United States District Courthouse
                             P.O. Box 2706
                             Yakima, Washington 98907
                             509-573-6613

Proceedings reported by mechanical stenography; transcript
produced by computer-aided transcription.

2

**INDEX**

**Proceedings**:                                              **Page**

    Motion to Dismiss Hearing - January 28, 2022      3
    Argument by Mr. Goddard                         135
    Argument by Mr. Ellis                           150
    Rebuttal by Mr. Goddard                         161
    Court's Oral Comments                           164

**WITNESS INDEX**

**Plaintiff Witnesses:**                                       **Page**


      (None)

* * * * *

**Defense Witnesses**:                                         **Page**

  S. DEBORAH KANG, PhD
      Direct Examination by Mr. Goddard              5
      Cross-Examination by Mr. Ellis                78
      Redirect Examination by Mr. Goddard          128

**EXHIBITS ADMITTED**

**Plaintiff**
  **Number**        **Description**                     **Page**
      (None)


**Defense**
  **Number**        **Description**                     **Page**
      (None)

**GENERAL INDEX**

                                                     **Page**

Reporter's Certificate................................. 166

1  (January 28, 2022; 9:01 am)

2       (Call to order of the court)

3       THE COURTROOM DEPUTY:  The matter now before the court

4  is *United States of America v. Marciano Munoz-De La O*, Case

09:02:05  5  No. 2:20-CR-134-RMP-1, time set for motion hearing.  Appearing

6  for the government is Michael J. A. Ellis, and appearing for the

7  defendant is J. Houston Goddard.

8       THE COURT:  Mr. Munoz, you do have the right to have

9  this hearing in open court, but to avoid cross-contamination

09:02:32 10  during COVID, we've arranged for this video hearing.  Do you

11  agree to proceed by video today?  And you can speak --

12       THE DEFENDANT:  Yes, yes.

13       THE COURT:  All right.  Now we are going to mute your

14  microphone and -- there we go.

09:02:52 15       Okay.  Mr. Goddard, I want to make sure there's no other

16  echoing, so if you'll just speak for a second.

17       MR. GODDARD:  Certainly, Your Honor.  I hope this is

18  coming through okay.

19       THE COURT:  Yes.

09:03:03 20       Okay.  Mr. Ellis, your sound's okay?

21       MR. ELLIS:  Yes, Your Honor.  I can hear everybody, and

22  is there any echo on my end or anything?

23       THE COURT:  No.  I think we're good.

24       So, Counsel, I've read your briefs.  I've looked over

09:03:16 25  Dr. Kang's affidavit.  I don't know if you want to make opening

1  statements of any sort or if you want to proceed directly to

2  your examination of Dr. Kang.

3       The other thing is -- I don't know if Ms. Lamb has

4  reached out to you yet, Mr. Goddard and Mr. Ellis.  We're

09:03:42  5  curious as to whether the parties anticipate if this hearing

6  will extend to 3:00 o'clock just because we have an interpreter

7  issue.  What do you think, Mr. Goddard?

8       MR. GODDARD:  I would not anticipate we would still be

9  going at 3:00 pm, Your Honor.

09:03:57  10       THE COURT:  Okay.  Mr. Ellis?

11       MR. ELLIS:  I agree.  That would be very surprising.

12       THE COURT:  Okay.  I don't want to rush you, though.  If

13  you need more time, we'll take more time.  We'll figure out

14  something else.  But that helps Ms. Lamb plan a little bit.

09:04:14  15       So, Mr. Goddard, this is your motion, so do you want to

16  make an opening statement or call your witness?

17       MR. GODDARD:  Thank you, Your Honor.  I would like to

18  proceed directly to the examination of Dr. Kang.

19       THE COURT:  Okay.  Can you -- is Dr. Kang admitted into

09:04:31  20  the Zoom room?

21       MR. GODDARD:  I spoke with her just a moment ago, Your

22  Honor.  My understanding is she is in the waiting room, and it

23  looks like -- here she comes.

24       THE COURT:  Okay.  Good.  Dr. Kang, the first thing

09:04:44  25  we're going to do is place you under oath.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*                                                    5

1   THE COURTROOM DEPUTY:  Please raise your right hand.

2

3                    **S. DEBORAH KANG, PhD**,

4   called as a witness on behalf of the defendant, having first

5   been duly sworn or affirmed, testified under oath as follows:

6

7            THE WITNESS:  Yes.

8            THE COURTROOM DEPUTY:  Thank you.

9            THE COURT:  You may lower your hand.  Thank you.

09:05:03   10        Would you please state your full name and spell your

11  last name.

12           THE WITNESS:  Yes.  My full name is Shulamith Deborah

13  Kang.  My last name is spelled K-a-n-g.

14           THE COURT:  Okay.  Good.  Are you being able to hear and

09:05:19   15  see us okay, Dr. Kang?

16           THE WITNESS:  Yes.

17           THE COURT:  All right.  Mr. Goddard, please proceed.

18           MR. GODDARD:  Thank you, Your Honor.

19                        DIRECT EXAMINATION

20  BY MR. GODDARD:

21  Q    Good morning, Dr. Kang.  Thank you for being here.  I'd

22  like to begin by setting out your experience.

23           Dr. Kang, how are you currently employed?

24  A    I'm currently an associate professor in the Department of

09:05:40   25  History at the University of Virginia.  I'm also a member of the

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

USA v. Munoz-De La O/2:20-CR-00134-RMP-1
Motion to Dismiss Hearing - January 28, 2022
Kang/D/Goddard                                          6

1   faculty advisory committee of the Democracy Initiative also at

2   the University of Virginia.

3   Q    How long have you been in that position?

4   A    Since August 2021.

09:05:56   5   Q    And prior to that position, have you held positions at

6   other academic universities?

7   A    Yes, the University of Texas at Dallas and California State

8   University San Marcos.

9        THE COURT:  I'm gonna stop you just for a second.  I'm

09:06:11   10   just getting a message.  Are the interpreters doing okay with

11   this?

12        You selected English, is that correct, Dr. Kang, on the

13   choice?

14        THE WITNESS:  Yes.

09:06:23   15        THE COURT:  Okay.  And, Natalia, is everything flowing

16   okay?

17        THE INTERPRETER:  (No response heard)

18        THE COURT:  Okay.  If you need your cameras reactivated,

19   Natalia, you can do that.  It was -- you and Susan, Ms. Evans,

09:07:02   20   can go ahead and activate your cameras if that makes it easier

21   for you.

22        THE INTERPRETER:  (No response heard)

23      (Interruption by court reporter for IT assistance)

24        INTERPRETER RIVERA:  Interpreter Rivera speaking.

09:08:27   25        Your Honor, yes, everything seems to be working well.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*                    7
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

1    Thank you.  However, if it is possible, we would need our

2    cameras to be turned on.  We need a little bit more practice.

3    We usually use the camera to be able to more effectively do

4    interpreter changes.  For now, it seems to be working well.  If

09:08:48   5    we run into any issue, we will let Your Honor know.  Thank you.

6              THE COURT:  Okay.  Thank you.

7              Marilynn, are you ready to proceed now?

8         (Court reporter replied)

9              THE COURT:  Okay.  Mr. Goddard, I apologize again.  And

09:09:06  10    Mr. Way is just concerned that Dr. Kang may not have the English

11    channel on, but I'm not sure if that will matter, because I

12    don't think your client is going to be speaking today.  Is he,

13    Mr. Goddard?

14             MR. GODDARD:  I would not anticipate so, Your Honor.

09:09:22  15             THE COURT:  Okay.  So I think we're okay with that.

16             Mr. Goddard, I was following you going through the

17    credentials.  And I did read the CV, but please go ahead.

18             MR. GODDARD:  Understood.  Thank you, Your Honor.

19    Q    (By Mr. Goddard) Dr. Kang, what is your academic

09:09:40  20    background?

21    A    I earned my PhD in United States history from the

22    University of California at Berkeley.  I earned my master's

23    degree in jurisprudence and social policy also from the

24    University of California at Berkeley.  I earned my

09:09:55  25    undergraduate degree in European literature and history from

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

8

1    Cornell University.

2    Q    When did you receive your PhD?

3    A    In 2005.

4    Q    And what was your PhD dissertation on?

09:10:08   5    A    My PhD dissertation was a history of the Immigration and

6    Naturalization Service on the US-Mexico border.

7    Q    As a historian, do you have a particular area of expertise?

8    A    Yes, the history of US -- of immigration to the United

9    States.

09:10:25   10    Q    Does that expertise extend to legislative history of US

11    immigration law?

12    A    Yes.

13    Q    And would that encompass assessing legislative intent?

14    A    Yes.

09:10:38   15    Q    How did you learn to assess legislative intent?

16    A    I learned how to do legislative histories as a master's

17    student in the jurisprudence and social policy program at the

18    University of California at Berkeley.

19         While there in that program, I was required to take

09:10:55   20    principally law school classes, and in my first year in that

21    program, I was required to take legal research and writing.

22    This is a class that was also required of all 1L students at

23    Berkeley Law.

24         In that class we were taught how to do legislative

09:11:14   25    histories using a textbook called *Finding the Law* by law

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

1    professor Bob Berring, who was affiliated with the University of

2    California at Berkeley Law School.

3           In addition to that, I served as an associate editor of the

4    *Asian Law Journal* and a member of the *Berkeley Women's Law*

09:11:32    5    *Journal*, both which are published out of the University of

6    California Berkeley Law School, although their titles today may

7    be slightly different.

8           And then in preparing my dissertation as well as my book

9    manuscript, I prepared extensive legislative histories that were

09:11:49    10   relevant to my own research.  And then as a scholar and teacher

11   of immigration law and policy, I continued to hone and develop

12   my skills with respect to legislative history by reading such

13   books as Victoria Nourse's *Misreading the Law, Misreading*

14   *Democracy*.  Victoria Nourse is a law professor at Georgetown,

09:12:13    15   and her book is used in law schools today to teach students how

16   to do legislative history.

17   Q    Thank you.

18          Could you summarize just briefly what you learned from

19   those various textbooks and courses.

09:12:26    20   A    So I learned how to do a legislative history, and I learned

21   about the various databases that were relevant to the

22   preparation of a legislative history, the very-detail-oriented

23   work involved in tracing the story of how a bill becomes a law.

24   This requires the extensive reading of the *Congressional Record*,

09:12:49    25   congressional committee reports, as well as conference reports.

1    I also learned how -- I also learned about standards of

2   evidence, and this was particularly the case with the *Asian Law*

3   *Journal*.  My first year on that journal, the journal subjected

4   all new members to a kind of hazing where you were asked to

09:13:09    5   memorize *The Blue Book*.

6    You were also taught how to cite check, and in the law

7   school context, cite checking first to not only making sure that

8   the format of the footnotes were correct, but also making sure

9   that if there were any cite, any direct quotes or paraphrases in

09:13:28   10   a manuscript that the journal might have received, it was our

11   job as first-year members to literally go to the library, find a

12   paper copy of the source, Xerox it, and ensure that the

13   references to the source, the paraphrases and the quotes were

14   accurate.

09:13:50   15    And then I also learned how to edit manuscripts, and that

16   training was invaluable because that training emphasized

17   evidence, providing adequate evidence for an argument.  And to

18   this day, I draw upon that training in writing my own historical

19   monographs, journal articles, and even this affidavit.

09:14:15   20    And I think that sometimes I get a backhanded compliment

21   from other historians who like to tell me that I footnote like a

22   law student and so that applies to, again, my historical

23   scholarship as well as the work I did for this affidavit.

24   Q    Thank you, Dr. Kang.

09:14:36   25    Have you published academic work in your area of expertise?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

11

1    A    Yes.

2    Q    Were those works peer-reviewed?

3    A    Yes.

4    Q    And did you receive awards for those academic works?

09:14:49    5    A    Yes, for the publication of my first, first solo-authored

6    monograph.

7    Q    And have you lectured on your area of expertise?

8    A    Yes.

9    Q    Have you taught university-level courses in your area of

09:15:03    10    expertise?

11    A    Yes.

12        MR. GODDARD:  Thank you, Dr. Kang.

13        Your Honor, at this point I'd ask for Dr. Kang to be

14    certified as an expert in the history and legislative history of

09:15:14    15    US immigration law.

16        THE COURT:  Mr. Ellis, any objection?

17        MR. ELLIS:  No, Your Honor.

18        THE COURT:  Okay.  You may inquire, Mr. Goddard.

19        MR. GODDARD:  Thank you, Your Honor.

09:15:25    20    Q    (By Mr. Goddard)  Dr. Kang, I'd like to walk through the

21    work you've done with regard to this case.  What were you asked

22    to do in this case?

23    A    I was asked to research and write about the legislative

24    history of the 1952 McCarran-Walter Act which recodified the

09:15:45    25    reentry statute under Section 1326.  I was also asked to do a

1   legislative history of the amendments to 1326 in the late

2   twentieth century.  And, in general, I was asked to research and

3   write about the legislative intent underlying those bills.

4   Q   Dr. Kang, when you were first asked to undertake these

5   tasks, what did you expect to find?

6   A   So when I began this work, I didn't expect to find much.  I

7   was very doubtful that I would find anything of interest for

8   that particular Federal Defender at the time, and this is

9   because 1326 is a small clause in each one of these bills.  And

10  each one of these bills from '52 onwards are massive pieces of

11  legislation, and they're also very complex pieces of

12  legislation.

13  Q   All right.  So when you began this task, not thinking you

14  would find much, what was your process?

15  A   So my process was to conduct extensive legislative

16  histories using the now pervasive online databases that are

17  available for doing those legislative histories.  They include

18  HeinOnline, LexisNexis, ProQuest Congressional, and more.

19      In addition to that, I read the relevant secondary sources.

20  This includes books, journal articles, and newspaper articles.

21  I also conducted archival research in Washington, DC, at the

22  Library of Congress and the George Washington University

23  library.

24      And at the Library of Congress I looked at some of the

25  records of House Speaker Newt Gingrich so as to discern the

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

13

1  speaker's stance on immigration law reform, and then I also

2  looked at the archival records of the Federation for American

3  Immigration Reform at the George Washington University library

4  and archives.

09:17:54
5  Q    This in-person archival work that you conducted, how long

6  did that take?

7  A    So I spent two weeks in Washington conducting that archival

8  research.

9  Q    And after conducting all of this research, you produced a

09:18:08
10  report; is that right?

11  A    Yes.

12  Q    Did that report include conclusions on the congressional

13  intent behind the bills that you studied?

14  A    Yes.

09:18:17
15  Q    And as a professional historian, how do you assess

16  legislative intent?

17  A    So historians assess legislative intent by looking at the

18  historical context underlying a piece of legislation and also by

19  considering the motivations of the drafters and sponsors of a

09:18:39
20  bill or a particular section of a bill.

21  Q    Thank you.

22       So let's start with historical context.  Why is that

23  important to understanding legislative intent?

24  A    So for historians, historical context is critical in

09:18:57
25  understanding the legislative intent of a bill.  Historians

1    consider historical context to be inseparable from legislative

2    intent, and that's because you can't understand the intent or

3    meaning underlying a single word or a phrase in a piece of

4    legislation without knowing the historical context.

09:19:28    5        So without that historical context, the meaning of a single

6    word or a phrase in a bill or a statute is arbitrary, so you

7    really need to look at the historical context to understand

8    legislative intent.

9    Q    So it would be impossible to assess legislative intent of a

09:19:50    10    bill in a vacuum?

11    A    Yes.  And here Victoria Nourse's work is very, very

12    helpful.  She points out that without understanding historical

13    context, a specific phrase, a phrase such as "fundamental

14    rights," the meaning of that very phrase would be arbitrary.  It

09:20:09    15    would be simply up to the whims or prejudices of the reader at

16    any particular moment.  And so you really need to look at the

17    historical context to understand what was meant by that phrase

18    "fundamental rights" at a particular time.

19    Q    And when you're assessing laws that have to do with

09:20:32    20    immigration in the United States, is there any particular

21    historical context that is particularly important?

22    A    Yes.  So there is broad agreement among immigration

23    historians that when it comes to the history of immigration law

24    and policy, it's essential to understand the contemporaneous

09:20:51    25    attitudes about immigration, immigrants, race, racism, as well

1    as nativism.

2         And this is because, once again, there's broad consensus

3    among immigration historians that the history of American

4    immigration law and policy is entangled with the history of

09:21:12    5    American xenophobia.  The pattern is very clear that from the

6    nation's founding to the present, American immigration laws and

7    policies are often formed in response to xenophobia.

8    Q    Thank you.

9         You mentioned that in addition to historical context, it's

09:21:31    10   important to understand the motivations of the drafters or

11   sponsors of legislation or certain provisions in bills; is that

12   right?

13   A    Yes.  That's right.  So it's essential.  The motivations of

14   the drafters or sponsors are just as essential as understanding

09:21:52    15   the historical context because, again, that eliminates some of

16   the arbitrariness in discerning the intent and the meaning of

17   single words and phrases in a bill or a statute.

18   Q    Is it ever the case that the drafter or sponsor of a bill

19   does not explicitly state his or her motivations --

09:22:14    20   A    Yes.

21   Q    -- of the bill?

22   A    Yeah.  That's quite common.

23   Q    And does that prevent you from assessing legislative

24   intent?

09:22:23    25   A    No, not at all, because you can discern the stands of the

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

16

1    particular legislator who's involved in the drafting or

2    sponsoring of a measure by looking at his or her stands on

3    analogous policy proposals or analogous bills.

4         You can also discern their thoughts on a particular section

09:22:46  5    of a bill or a bill in its entirety by looking at the things

6    that they might say on the floor of Congress or any documents

7    that they might have submitted and added to the *Congressional*

8    *Record*.  You can also look at their contributions to various

9    congressional committee hearings, conference reports.

09:23:07  10        You should also take into consideration statements that

11   they might have made outside of Congress to the media or through

12   the preparation of law review articles or op-eds.

13        And you should also take into consideration their

14   relationships with various kinds of organizations, whether

09:23:26  15   private sector, public sector, lobbying organizations, and so

16   on.

17        So there are a lot of ways.  There are a lot of tools at

18   our disposal to discern the motivations of a particular

19   legislator even if they've been silent on a specific part of a

09:23:47  20   bill within Congress itself.

21   Q    Thank you, Dr. Kang.

22        So there are other tools you could use to --

23   A    Yes.

24   Q    -- assess the motivations, and you said one of those is if

09:23:57  25   you don't have a direct statement on one particular topic, you

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

17

1  could look to that legislator's views on analogous topics.

2  Could you speak a little bit more about that particularly in the

3  immigration context.

4  A    So in the immigration context, if -- you know, if we take

09:24:12  5    the example of 1326, a legislator has been silent on that

6  specific provision or proposed amendments to that provision, you

7  can understand that particular legislator's thoughts on

8  immigration law enforcement as well as the assignment of

9  criminal penalties to undocumented immigration by looking at

09:24:38  10   other statements they might have made within Congress or outside

11  of Congress as well as any publications they may have issued or

12  interviews they might have given to the media.  So, once again,

13  there are a lot of tools.

14  Q    Thank you.

09:24:57  15       And that's -- we've been speaking about divining the intent

16  behind the drafters or sponsors of legislation.  Of course,

17  there are other legislators who have to vote for these bills to

18  get them passed.

19  A    Yes.

09:25:09  20  Q    Do you expect to have insights into what's going on in the

21  minds of each legislator who votes for a bill?

22  A    No.  In preparing a legislative history, that's not the

23  expectation.  And, again, this comes from Victoria Nourse's

24  work.  When historians prepare a legislative history, our goal,

09:25:28  25   our aim is to tell a story of the winners.

1    As Victoria Nourse explains, legislative history is, at

2    bottom, a history of winners.  And it's our job as historians to

3    explain how it is that these so-called winners in Congress

4    managed to transform a bill into a law.

09:25:52  5    And as Nourse explains, and as many of us know, getting a

6    bill to become a law is an extremely lengthy and difficult

7    process, and so our job as historians telling legislative

8    histories is to really answer the question of how is it that

9    this member of Congress or this group of members of Congress

09:26:19  10   managed this very difficult process of transforming a bill into

11   a law, getting a bill enacted into law.  So the legislative

12   history is, again, at bottom, a history of the winners.

13   Q    Is it ever the case that a legislature passes a bill

14   without much discussion of the bill itself or of a certain

09:26:45  15   provision within the bill?

16   A    Yes.

17   Q    And does that prevent you from assessing the legislative

18   intent?

19   A    No, it doesn't, and that -- again, there are several

09:26:59  20   reasons for this.  First, it's because there are other tools

21   that one can draw upon to assess the legislative intent and also

22   because historians understand that frequently legislators are

23   silent with respect to a bill or Congress might be silent with

24   respect to specific provisions of a bill because those

09:27:24  25   provisions are uncontroversial.

```
                    USA v. Munoz-De La O/2:20-CR-00134-RMP-1        19
                    Motion to Dismiss Hearing - January 28, 2022
                              Kang/D/Goddard
```

1    And because it is so challenging to make a bill into a law,

2  legislators know that it's in their interest to be as efficient

3  as possible, and so during congressional debates or in a

4  conference hearing, a conference committee hearing, they're

09:27:52  5  gonna spend their time debating about the most contested aspects

6  of a bill, the most controversial features of the bill.  They're

7  not gonna waste their time on features of the bill that they

8  consider to be uncontroversial.

9  Q    Understood.  Thank you, Dr. Kang.

09:28:08  10    So you've explained to us the variety of tools you have as

11  a historian to assess legislative intent.  Did you use those

12  tools that you've discussed in assessing congressional intent in

13  the report you prepared?

14  A    Yes.

09:28:22  15  Q    And in your research for that report, were you able to

16  gather enough information to make informed and comprehensive

17  findings regarding congressional intent?

18  A    Yes.

19  Q    And this report we're discussing, to be clear, is that the

09:28:37  20  102-page report that was filed as part of this case?

21  A    Yes.

22  Q    And have you had a chance to review that report since it

23  was filed?

24  A    Yes.

09:28:46  25  Q    And is everything in that report true and correct, to the

1  best of your knowledge?

2  A    Yes.

3  Q    Thank you, Dr. Kang.

4        THE COURT:  Mr. Goddard?

5        MR. GODDARD:  Yes, Your Honor.

6        THE COURT:  Just for the record, I'd like to refer to

7  the ECF number, which I think is 78-2; is that correct?

8        MR. GODDARD:  Your Honor, one moment.  I don't have any

9  reason to think it's not, but let me just check.

09:29:20  10        Yes, Your Honor, ECF 78-2.

11        THE COURT:  Thank you.

12  Q    (By Mr. Goddard)  Dr. Kang, I'd now like to walk you

13  through the historical events and the evolution of 8 US Code

14  1326, the reentry statute, from Congress's initial

09:29:41  15  criminalization of reentry in 1929 through the recodification in

16  1952 and through the amendments in 1980s and 1990s.

17        I know your report focused on the 1952 act forward, but are

18  you familiar with the Undesirable Aliens Act of 1929?

19  A    Yes.

09:29:58  20  Q    And is there an academic consensus as to Congress's

21  motivation in criminalizing reentry in that act?

22  A    Yes.

23  Q    And what is that academic consensus?

24  A    The academic consensus is that anti-Latino racism motivated

09:30:12  25  the passage of the 1929 Undesirable Aliens Act, and that

1    anti-Latino racism had at least two eugenicist threads.

2         The first thread was this idea that Mexican nationals as a

3    mestizo, or mixed race, were unfit for permanent residence and

4    citizenship in the United States.  As a part of that thought, it

09:30:47  5    was further argued that Mexican nationals would degrade the

6    racial character of the United States.

7         The second thread of this eugenicist thinking was that

8    Mexican nationals were biologically inclined to be a transient

9    population and that Mexican nationals were less inclined to want

09:31:21 10    to settle down in any one place.  And as a part of that

11    eugenicist thread, there is also the belief that Mexican

12    nationals were biologically best suited for manual labor.

13         So farmers in the southwest, in the American southwest,

14    subscribed to these eugenicist views of Mexican immigrants.  And

09:31:55 15    based on those eugenicist views, for much of the twentieth

16    century they lobbied Congress to have easy access to a steady

17    supply of Mexican immigrant labor.  And in the 1920s, Congress

18    acceded to those demands in at least two ways.

19         So in 1924, Congress made the conscious choice to not

09:32:29 20    establish any numerical quotas on Western Hemisphere

21    immigration, and in particular immigration from Mexico, and this

22    was to guarantee that southwestern growers had an easy and

23    regular supply of exploitable Mexican national workers.

24         And then in 1929, Congress passed the Undesirable Aliens

09:32:58 25    Act, and this was one of many tools that southwestern growers

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

22

1    and xenophobes had at their disposal to detain, penalize, and

2    remove unwanted Mexican nationals from the United States.

3         And this measure was seen as necessary to preventing the

4    permanent settlement of Mexican nationals in the United States

5    and, from the eugenicist perspective, facilitating a settlement

6    of Mexican nationals in the United States that would degrade the

7    white population in the United States.

8         And from the 1920s onwards, what these laws did is they

9    created this racist cycle whereby in good economic times,

10   Mexican nationals were welcome to come to the United States for

11   temporary periods of time to work on the nation's farms,

12   particularly those farms in the southwest; but then in times of

13   economic distress, they were summarily detained, punished, and

14   removed from the United States.

15   Q    Dr. Kang, as I understand your testimony, the Undesirable

16   Aliens Act was, essentially, a compromise between nativists, who

17   did not want any Latinos in the country, and industry,

18   particularly southwest agribusiness, who wanted continued access

19   to that cheap and exploitable source of labor coming from

20   Mexico.

21   A    Yes.

22   Q    With the compromise being Congress would not stop

23   immigration of Mexicans to the US, but it would allow the

24   nativists tools to drive out Mexicans when they saw fit and that

25   reentry was one of those tools.  Is that a fair summary?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

23

1    A    Yes, that's a fair characterization.

2    Q    Dr. Kang, you said that there's academic consensus that

3    this is -- this was the motivation of the Undesirable Aliens

4    Act?

09:35:11    5    A    Yes.

6    Q    When you say that is the academic consensus, what do you

7    mean by academic consensus?

8    A    So this is the mainstream view, and it's the prevailing

9    view among academics.

09:35:23    10    Q    Are you aware of any historians who believe Congress acted

11    with race-neutral motivation when it criminalized reentry?

12    A    No.

13    Q    And do you know what this academic consensus is based on?

14    A    Yes.  This academic consensus is based on extensive

09:35:42    15    archival research.  Some of this research has been awarded with

16    very prestigious research awards, including an award from the

17    MacArthur Foundation.  One of the authors of this research is a

18    MacArthur genius fellow.  And this extensive archival research

19    clearly demonstrates that eugenicists wrote and sponsored the

09:36:12    20    law that became the Undesirable Aliens Act of 1929.

21    Q    Thank you, Dr. Kang.

22         And that researcher who received the MacArthur genius

23    fellowship, was that Professor Lytle Hernandez who testified in

24    the case of *Carrillo-Lopez* in Nevada?

09:36:31    25    A    Yes, Kelly Lytle Hernandez, who is a faculty member in the

1    history department at UCLA.

2    Q    Thank you, Dr. Kang.

3         Are you aware of any evidence that Congress acted with

4    race-neutral motivation when it criminalized reentry?

09:36:46  5    A    No.

6    Q    Are you aware of evidence that Congress would have

7    criminalized reentry in --

8              INTERPRETER RIVERA:  The interpreter is speaking.

9              Your Honor, the interpreter respectfully requests that

09:36:54  10   Counsel Goddard please speak significantly slower, and please.

11   Thank you very much.

12             THE COURT:  Okay.  Mr. Goddard, you heard that?

13             MR. GODDARD:  Message received.  My apologies.

14             THE COURT:  Okay.  Why don't you repeat your last

09:37:08  15   question.  Okay?

16             MR. GODDARD:  I will.

17   Q    (By Mr. Goddard)  Dr. Kang, are you aware of any evidence

18   that Congress in 1929 would have criminalized reentry were it

19   not for racial animus?

09:37:20  20   A    No.

21   Q    So to summarize, Dr. Kang, the academic consensus is that

22   Congress acted with racial animus when it criminalized reentry

23   in 1929, and there is no reason to believe Congress would have

24   criminalized reentry were it not for that racial animus?

09:37:41  25   A    That's correct.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

25

1    Q    Thank you.

2         The next evolution in the history of the reentry law is the

3    McCarran-Walter Act of 1952 that you have mentioned where

4    Congress recodified the reentry provision at Section 1326.

09:38:02    5    Now, Dr. Kang, you've discussed the importance of

6    historical context.  Were there any developments between 1929

7    and 1952 that inform the passage of the McCarran-Walter Act?

8    A    Yes.  So there were several events, but among the most

9    important were the forced repatriation drives of the 1930s and

09:38:30    10    the Bracero Program that began in 1942.

11    Q    Thank you.

12         Let's start with the forced repatriations.  Could you

13    explain what those were.

14    A    Yes.  In the 1930s, and from approximately 1931 to 1939,

09:38:51    15    Americans chose to scapegoat ethnic Mexicans, and "ethnic

16    Mexicans" refers to both Mexican immigrants and Mexican

17    Americans.

18         So during the Great Depression, America chose to scapegoat

19    ethnic Mexicans for the nation's economic crisis.  In addition,

09:39:15    20    Americans wrongly blamed ethnic Mexicans for taking their unfair

21    share of welfare.

22         Now, in response to this xenophobia and racism, states and

23    localities decided to take matters into their own hands, and the

24    city of Los Angeles began this process by launching its own

09:39:40    25    removal campaign against ethnic Mexicans.

1        And what Los Angeles City officials did was that they

2   worked in cooperation with the INS to conduct these so-called

3   roundups in public places in the city of Los Angeles.  And

4   immediately after these roundups, they placed ethnic Mexicans on

09:40:07   5   the backs of trucks and summarily removed them, often within the

6   space of 24 to 48 hours.

7        As a part of these roundups, Los Angeles City officials

8   also decided to publicize these removals, and so there would

9   have been articles in the *Los Angeles Times* and other city and

09:40:30   10   county papers.  And the goal of this publicity for Los Angeles

11   City officials was to scare the remaining ethnic Mexicans into

12   leaving Los Angeles County.

13        And this scare tactic worked.  As numerous historians have

14   shown, over the course of the 1930s ethnic Mexicans in the city

09:40:56   15   of Los Angeles as well as other localities throughout the nation

16   were scared into leaving the United States.  And there are

17   various estimates, but the most accepted estimate is that

18   approximately a half million ethnic Mexicans -- and, again, this

19   includes Mexican Americans -- were forced to leave the United

09:41:18   20   States.

21        By the early 2000s, the California State assembly decided

22   to revisit the repatriations of the 1930s, and this movement was

23   led by a California State Senator named Joseph Dunn.  And Joseph

24   Dunn began the very thoughtful process of considering whether

09:41:47   25   the state of California owed these ethnic Mexicans reparations,

1    financial reparations, or an apology.

2         And, ultimately, after much debate, Governor Arnold

3    Schwarzenegger in the mid-2000s signed an official apology for

4    the repatriation drives of the 1930s.  And in this revisiting of

09:42:16  5    the repatriations of the 1930s, it was widely understood that

6    these forced removals occurred solely because of racial animus

7    against ethnic Mexicans at the time.

8    Q    Thank you, Dr. Kang.

9         And these forced repatriations, this driving out of half a

09:42:38  10   million ethnic Mexicans based purely on racial animus, what is

11   the relevance of that to Congress's passage of the

12   McCarran-Walter Act and specifically its recodification of the

13   reentry statute?

14   A    So the forced repatriations reflect the enduring and

09:42:57  15   persuasive anti-Latino animus in the United States.  And it's

16   the same form of racial animus that was expressed in the 1920s,

17   this racist idea that Latinos and Mexican nationals did not

18   belong in the United States.  They weren't fit to be permanent

19   residents and citizens.

09:43:23  20   Q    Thank you.

21        The other historical development you had mentioned as

22   relevant is the Bracero Program.  Dr. Kang, could you please

23   speak about that for a minute.

24   A    Yes.  So the Bracero Program was a farm labor importation

09:43:40  25   program that began in 1942.  The United States and Mexico agreed

1    to start this program in 1942 as a temporary measure.  It was

2    originally intended to be an emergency measure that only lasted

3    the duration of World War II, and it was intended to satisfy the

4    demands of southwestern farmers for Mexican agricultural

5    workers.

6         But due to the intense lobbying of southwestern farmers,

7    the Bracero Program lasted 22 years, from 1942 to 1964.  And

8    over the course of those 22 years, approximately 4.5 million

9    Mexican nationals were brought into the United States to work on

10   the nation's farms.

11        Now, because Mexico was deeply reluctant to sign the

12   bracero accords because of the forced expulsions of the 1930s

13   and because Mexico was so worried about the pervasive racial

14   discrimination faced by Mexicans in the United States, it had

15   the United States write into the bracero accords -- and these

16   were the international treaties that launched the Bracero

17   Program.  So Mexico had the United States write into the bracero

18   accords a series of protections for the Mexican braceros, and

19   these protections pertained to wages, working conditions, and

20   living conditions.

21        But as numerous observers at the time discovered, and as

22   historians have since written about, these protections were not

23   observed in practice, so braceros over the course of -- over the

24   22-year course of the program faced widespread humanitarian

25   abuses and racial discrimination.

1    And as a reflection of the pervasive racial discrimination,

2  faced by the braceros, the former Under Secretary of State to

3  President Franklin Delano Roosevelt -- his name was Sumner

4  Welles -- penned an op-ed in the *Washington Post*.  And in this

09:46:17  5  op-ed, Sumner Welles tried to alert the American nation to the

6  pervasive racism faced by the braceros in the United States.  He

7  tried to make Americans aware that Mexican braceros faced the

8  same kinds of racial discrimination as Mexican Americans in the

9  US.  And I quoted extensively from Sumner Welles in my

09:46:44 10  affidavit, and I also included his op-ed as an exhibit to my

11  affidavit.

12    Now, Welles was so distraught by the scope of the racial

13  discrimination experienced by the braceros, and he was so

14  frustrated that the Roosevelt administration wasn't doing more

09:47:05 15  to alleviate it, that he actually resigned.  He resigned from

16  his position as the Under Secretary of State.

17  Q    Thank you.

18    Dr. Kang, you mentioned that the braceros suffered, I

19  believe your term was, widespread humanitarian abuses.

09:47:21 20  A    Uh-huh.

21  Q    Would you explain what you mean by that.

22  A    Yes.  So Sumner Welles actually called -- he characterized

23  those abuses and the discrimination as, quote/unquote,

24  "poisonous."  So the humanitarian abuses range from, you know,

09:47:40 25  poor working and living conditions.  They weren't paid what they

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

30

1    were supposed to be paid.

2         And then perhaps most famously -- and this was captured by

3    photo journalists at the time -- the braceros when they arrived

4    at processing centers on the US side of the US-Mexico border,

09:48:03   5    they were forced to take off all their clothes, and then they

6    were sprayed with chemicals such as DDT and also the kinds of

7    chemicals that were later used by Nazi Germany to euthanize the

8    Jews.

9         And these abuses were so widely known in Mexico that it was

09:48:37  10    one of the reasons that many Mexicans decided to enter the

11    United States without a bracero contract.  Mexicans had heard

12    from newspaper accounts and from word of mouth that these were

13    the kinds of racial discrimination and humanitarian abuses that

14    they would face under the Bracero Program.

09:49:05  15    Q    Dr. Kang, do you know approximately how many Mexicans came

16    to the United States as part of the Bracero Program and

17    separately, outside the Bracero Program, during this time?

18    A    Yes.  Approximately 4.5 million Mexican nationals signed

19    bracero contracts and came into the United States under the

09:49:22  20    auspices of the Bracero Program.  And then in that same 22-year

21    period, approximately 5 million Mexican nationals came to the

22    United States without a bracero contract.

23    Q    So is it fair to say that the Bracero Program, while it was

24    intended or purportedly was intended to bring Mexicans to the

09:49:45  25    United States lawfully, had the consequence of increasing the

1    levels of unlawful migration to the United States?

2    A    Yes.  The Bracero Program is attributed with the increases

3    in undocumented immigration at mid-century.

4    Q    Was there any push in the United States to respond to this

09:50:10    5    unlawful migration?

6    A    Yes.  So the INS -- and included in the INS is the Border

7    Patrol.  So this agency pushed vigorously for greater controls

8    on undocumented migration to the United States.

9    Q    And what controls specifically was INS asking for?

09:50:34    10    A    So among other things, they demanded employer penalties as

11    well as more funding for additional manpower and equipment.

12    Q    Do you know why INS would have been pushing for employer

13    sanctions?

14    A    So they would have been pushing for employer sanctions for

09:50:57    15    multiple reasons, but the INS was -- based on my own review of

16    the archival record, the INS was absolutely infuriated that it

17    didn't have more manpower and more money to control the

18    undocumented population along the US-Mexico border.

19        And much of their fury would have been informed by their

09:51:31    20    own racial biases against Mexican nationals, and this is

21    attested by the fact that INS officials regularly use the racial

22    slur "wetback" in their correspondence with each other and even

23    in their own annual reports.

24    Q    Understood.  Thank you.

09:51:54    25        I could have phrased my question better.  What I was

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*                                          32

1    getting at was:  Did INS believe that sanctioning employers

2    would have been an effective way to stem the flow of unlawful

3    migration from Mexico to the United States?

4    A    Yes.

09:52:10  5    Q    And how did Congress respond to INS's demands for increased

6    border enforcement funding and employer sanctions?

7    A    They regularly rejected those requests.

8    Q    Why did they do so?

9    A    Because some of the most powerful members of Congress

09:52:32  10   defended the interests of southwestern agribusiness and

11   specifically their demands for access to an easy and regular

12   supply of exploitable and deportable Mexican farm labor.

13   Q    Thank you.

14        Just getting back to the Bracero Program, could you just

09:52:51  15   explain the relevance of that program to the McCarran-Walter Act

16   and then specifically to the recodification of the reentry

17   provision.

18   A    Uh-huh.  So the Bracero Program, like the forced

19   repatriations of the 1930s, reflects the enduring and pervasive

09:53:13  20   anti-Latino and anti-Mexican animus that existed in the United

21   States.

22        The very existence of the Bracero Program was premised,

23   again, on this longstanding racist view that Mexican nationals

24   were best suited for manual labor and that they were more

09:53:36  25   inclined to be transients rather than permanent residents or

33

1    citizens.  So the Bracero Program perpetuated these longstanding

2    forms of racial animus against Mexican immigrants.

3    Q    Thank you, Dr. Kang.

4         So in 1952, is it fair to say that the compromise struck in

09:54:01  5    1929 between nativists and industry has continued?

6    A    Yes.

7    Q    And to take a step back to where the country is more

8    broadly in 1952, was the country racially segregated at this

9    time?

09:54:18  10   A    Yes.  In 1952, *Plessy v. Ferguson* was still the law of the

11   land.  *Brown v. Board of Education* wouldn't be handed down by

12   the courts until 1954.  And Washington, DC, itself, while it

13   would begin the process of desegregation slightly earlier than

14   the rest of the country, that process wouldn't begin until 1953.

09:54:44  15        So if you imagine yourself in 1952, Washington, DC, this is

16   a deeply segregated town.  The Capitol itself is segregated.

17   The facilities are segregated.  The lunchrooms are segregated.

18   The bathrooms are segregated.

19        And yes, there were a few African-American members of

09:55:08  20   Congress, but life for them was very, very difficult.  Some of

21   them made the choice to speak out, but historians have shown

22   that there is a price to be paid if they spoke out against the

23   racial discrimination within the Capitol building; but many

24   others chose to remain silent and just tried to go along and

09:55:28  25   effectively accommodate themselves to the segregation that

1    existed in the Capitol.

2    Q    Thank you, Dr. Kang.

3         I think in this country we were taught the history of the

4    Jim Crow laws, the racial segregation of blacks particularly in

09:55:50    5    the American south.  Was there a similar regime for Latinos?

6    A    Yes, and this is something that's now widely written about

7    by historians.  And the phenomenon is referred to as "Juan

8    Crow," and this refers to the de jure and de facto segregation

9    experienced by Latinos and, in particular, Mexican Americans and

09:56:13    10    Mexican immigrants.

11         And, again, going back to Sumner Welles's op-ed, he

12    provides a very eloquent account of what Juan Crow exactly

13    looked like for Mexican Americans and Mexican immigrants in

14    America.

09:56:33    15    Q    Thank you, Dr. Kang.

16    A    Uh-huh.

17    Q    So I think you've been very helpful in providing us the

18    understanding of where we were in 1952 as Congress begins

19    debating the McCarran-Walter Act.  I'd like to talk about that

09:56:44    20    act.  It is named after its two sponsors, Senator McCarran and

21    Representative Walter; is that right?

22    A    Yes.

23    Q    And what can you tell us about Senator McCarran?

24    A    So Senator McCarran was one of the most powerful

09:56:59    25    congresspersons in Congress at the time.  He was the chair of

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

35

1    the Senate Judiciary Committee and a member of the

2    Appropriations Committee.  Senator McCarran was also a widely

3    known anti-Semite, xenophobe, and racist.  And we know --

4    Q    Thank you.

09:57:23    5    A    Oh, sorry.

6    Q    No.  Please go ahead.

7    A    So we know this because --

8    Q    What --

9    A    -- Senator McCarran -- yes?

09:57:32    10    Q    I'm sorry.  I'm speaking over you.  I will stop.  Please

11    continue.

12    A    Yeah.  So we know that Senator McCarran was anti-Semitic

13    because he was one of the most powerful proponents of blocking

14    the ability of European Jews to enter the country after World

09:57:55    15    War II.

16        And this is a very striking decision because after World

17    War II, Europe was in shambles.  Cities were reduced to rubble.

18    Millions of people were homeless, hungry, and grieving the loss

19    of family members, their neighborhoods, and their communities.

09:58:12    20        And there were only two nations in the world -- after World

21    War II, there were only two nations in the world that had the

22    resources and the capacity to assist Europe and then also Japan,

23    and those two nations were the United States and the Soviet

24    Union.  So it's quite striking that McCarran, in his role as the

09:58:36    25    chair of the Senate Judiciary Committee, worked vigorously to

1    block and/or restrict the entry of European Jews.

2        In addition to this, it's widely known that Senator

3    McCarran was one of the strongest supporters of the racist

4    national origins quota system, and then Senator McCarran also

09:59:05    5    articulated his racist views toward Mexican nationals by using

6    the racial slur "wetback" to refer to them on the floor of the

7    Senate.

8    Q    Thank you.

9        Dr. Kang, I believe you described Senator McCarran as both

09:59:23    10    a xenophobe and a racist.  Could you explain the difference

11    between those two terms.

12    A    Yes.  So xenophobia is a form of racism, but it's a form of

13    racism that's directed towards foreigners.

14    Q    Understood.

09:59:41    15        So xenophobia is a subset of racism?

16    A    I tell my students that you can see xenophobia as racism

17    plus nativism, and that's -- nativism is fear of the foreigner.

18    Racism is discrimination against an individual on the basis of

19    race.  And so if you put those two things together, racism plus

10:00:08    20    nativism, you get xenophobia.  And xenophobia is considered to

21    be a form of racism.

22    Q    Understood.

23        So would it be fair to say that someone who is expressing

24    xenophobic views is expressing racial animus?

10:00:22    25    A    Yes.

1    Q    Thank you.

2         Dr. Kang, I'd like to show you a statement from Senator

3    McCarran and ask my co-counsel -- oh, we apparently lost

4    connection.  I was going to put it up on the screen, but I will

10:00:35    5    just read it into the record -- I'll just read it to you, I

6    should say.  This is a statement from Senator McCarran I believe

7    you included in your report, quote (reading):

8         Except when you get down to the Mexican boundary.  Of

9    course, you have all kinds of deportations there and removals

10:00:56   10    from the territory of the United States.  But this is a

11   come-and-go proposition.  In other words, there is a flood of

12   people who come across the boundary.  They are called wetbacks,

13   and they come across legally or illegally during the various

14   harvest seasons.  Then they go back, and so you have this

10:01:22   15   come-and-go drifting there.

16        Dr. Kang, could you give us the context for this statement

17   from Senator McCarran.

18   A    Yes.  So Senator McCarran made this statement during a 1951

19   Appropriations Committee hearing, and during this hearing the

10:01:40   20   INS was asking for additional appropriations to respond to

21   undocumented migration along the US-Mexico border.  And McCarran

22   throughout his career routinely defended the interests of

23   southwestern agribusiness in gaining easy access to an

24   exploitable and deportable source of Mexican labor.

10:02:05   25        And so what he's telling the INS during this hearing is

1    effectively he can't support their call for increased

2    appropriations, and he's telling the INS that they just have to

3    accept the reality of this racist cycle whereby Mexican

4    nationals are welcome to the US in times of economic prosperity

10:02:32    5    but then are summarily removed from the country in times of

6    economic distress.

7    Q    Thank you, Dr. Kang.

8        And this, as Senator McCarran calls it, the come-and-go

9    proposition or the come-and-go drifting, what is the connection

10:02:51   10    between that concept and the compromise we've discussed from

11    1929 between nativists and industry?

12    A    Yes.  So McCarran there is perpetuating that compromise,

13    and, again, he's telling the INS that they have to accept it,

14    that this is just the way things work on the US-Mexico border;

10:03:12   15    and that Mexican nationals are the ideal farm labor workforce,

16    and that they should be welcome to come in times of economic

17    prosperity but that they should be summarily removed when things

18    are no longer good.

19    Q    Thank you, Dr. Kang.

10:03:30   20        I'd like to read you one more statement from Senator

21    McCarran.  This is actually an exchange between Senator McCarran

22    and another senator, Senator Ellender.

23        Senator McCarran (reading):  In that regards, Senator, I

24    think you will agree with me that on this side of the border

10:03:53   25    there is a desire for these wetbacks.  We might as well face

1   this thing realistically.  The agricultural people, the farmers

2   on this side of the border want this help.  They want this farm

3   labor.  They just cannot get along without it.  They do not know

4   what they would do if they did not have it.  It would be

10:04:18   5   impossible to harvest certain agricultural commodities unless we

6   have that help.

7       Senator Ellender (reading):  The Mexican government has

8   gone so far as to make us, in a contract, agree to feed these

9   people while en route, take them back, provide minimum wages,

10:04:43   10   and give them health insurance, all that.  It is something they

11   do not get at home.

12       Senator McCarran (reading):  The wetback is little

13   interested in that sort of thing.

14       Dr. Kang, could you give us the context for that exchange.

10:05:03   15   A   Yes.  So during a 1953 appropriations hearing, the INS,

16   once again, requested additional appropriations for immigration

17   law enforcement along the US-Mexico border.  And, once again,

18   Senator McCarran is denying their request by justifying the

19   needs and demands of southwestern farmers by defending, by

10:05:36   20   defending their access to Mexican farm labor.

21       And that statement further reflects his xenophobic

22   sentiment and the xenophobic sentiment of the times by

23   characterizing Mexican immigrants as a population that didn't

24   need to live at the same standard of living as an ordinary

10:06:04   25   American.  It perpetuates this racist stereotype that Mexican

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

40

1    immigrants could get by with less.

2    Q    Thank you, Dr. Kang.

3         And in both of those statements, Senator McCarran uses the

4    term "wetback."

10:06:20  5    A    Yes.

6    Q    I believe you've testified that he used that term

7    regularly.

8    A    Yes.

9    Q    Could you explain that term.

10:06:27  10    A    Yes.  That term is a racist slur, and it was used to

11    objectify, demean, and degrade persons of Mexican descent, and

12    McCarran used it with respect to both legal and undocumented

13    Mexican immigrants.

14    Q    Are there any other racial slurs that you would consider

10:06:50  15    perhaps the equivalent of this slur?

16    A    Yes.  I see it as equivalent to the N word.

17    Q    And was "wetback" understood as a racial slur equivalent to

18    the N word in the early 1950s?

19    A    Yes.

10:07:07  20    Q    Thank you, Dr. Kang.

21         Despite Senator McCarran's history of racism, it's my

22    understanding the international airport in Las Vegas was named

23    after him; is that right?

24    A    Yes.

10:07:21  25    Q    And is it still?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*                                                    41

1    A    No.

2    Q    When was that changed?

3    A    Last month.

4    Q    Do you know why that was changed?

10:07:31   5    A    It was changed because of McCarran's longstanding

6    anti-Semitism, xenophobia, and racism.

7    Q    And who made that change?

8    A    The Clark County Board of Commissioners.

9    Q    And do you know whether the Board of Commissioners

10:07:49   10   explicitly stated its reason for changing the name of the

11   airport?

12   A    Yes, they did.

13   Q    And do you know whether this was a controversial decision

14   among the commissioners?

10:08:00   15   A    No, it was not.  It was a unanimous decision.

16   Q    Thank you, Dr. Kang.  Those are my questions on Senator

17   McCarran.

18        I'd like to move to Representative Walter.  What can you

19   tell us about Representative Walter?

10:08:14   20   A    Representative Walter was the chair of the House

21   subcommittee on immigration.  He shared McCarran's xenophobic

22   views, and he was known as a staunch supporter of the racist

23   national origins quota system.  And until his death in 1963, he

24   did everything in power to ensure that the national origins

10:08:41   25   quota system was not amended nor eliminated by Congress.

1  He was also known to be a member of the Pioneer Fund, which

2  exists to this very day, and is a eugenicist organization that

3  seeks to preserve the American nation as a white, European

4  nation.

10:09:02  5  Q   Thank you, Dr. Kang, for that background on Senator

6  McCarran and Representative Walter.

7  I'd now like to move on to the act that bears their name.

8  Could you give us a brief overview of the McCarran-Walter Act.

9  A   Yes.  The McCarran-Walter Act of 1952 was a consolidation

10:09:24  10  act that brought together all the various laws that had been

11  passed with respect to immigration and consolidated them into

12  one place, into one statute.  In addition to consolidating the

13  nation's immigration laws, it also reorganized them and

14  eliminated various forms of repetition.

10:09:47  15  Q   Thank you.

16  And did that reorganization or consolidation include moving

17  the reentry statute from Title 8 US Code 180 to Title 8 US Code

18  1326?

19  A   Yes.

10:10:06  20  Q   And when Congress moved the reentry statute, did it change

21  that law?

22  A   Yes.  It added a so-called "found in" clause.

23  Q   Do you know who pushed for that change to the law?

24  A   I believe it was the Immigration and Naturalization

10:10:29  25  Service.

USA v. Munoz-De La O/2:20-CR-00134-RMP-1
Motion to Dismiss Hearing - January 28, 2022
Kang/D/Goddard

43

1  Q   And do you know why the INS pushed for that change?

2  A   That change would have -- that change actually did assist

3  the INS insofar as it saved the INS the trouble of having to

4  transport an immigrant from the place in which they were

10:10:50  5  apprehended to the place at which they originally crossed the

6  US-Mexico border.

7  Q   Thank you.

8      Did Congress change any language regarding the lawfulness

9  of the predicate removal order?

10:11:05  10  A   Yes.  It dropped a lawfulness phrase from the 1929 act.

11  Q   So my understanding is the '29 act had required that the

12  predicate removal must have been, quote, "in pursuant to law,"

13  end quote, and the 1952 act dropped that.  Does that line up

14  with your understanding?

10:11:28  15  A   Yes.  That's correct.

16  Q   Thank you.

17      When Congress debated the McCarran-Walter Act, did it spend

18  much time discussing the reentry provision?

19  A   No.

10:11:41  20  Q   In debating the McCarran-Walter Act, did Congress

21  acknowledge or discuss the racial animus that had motivated its

22  initial criminalization of reentry?

23  A   No.

24  Q   Based on your review of the legislative history of the

10:12:01  25  McCarran-Walter Act, are you able to form an opinion as to

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

44

1    Congress's intent in recodifying the reentry statute?

2    A    Yes.

3    Q    And what is that opinion?

4    A    Congress is motivated by racial animus.

10:12:19    5    Q    What is that opinion based on?

6    A    So that opinion is based on the historical context; the

7    sweeping racial animus that continued to be expressed against

8    Latinos in this time period; as well as the statements of the

9    drafters and sponsors of the bill; as well as, in this case, the

10:12:46    10    statements of other members of Congress who openly acknowledged

11    the ways in which racism informed the shaping of the

12    McCarran-Walter Act.

13    Q    Thank you.

14         How certain are you of this conclusion, Dr. Kang?

10:13:03    15    A    Very certain.

16    Q    When you say "very certain," would you be able to quantify

17    that perhaps on a scale from 0 to 100?

18    A    So, I would place it somewhere in the 90s.

19    Q    Thank you.

10:13:18    20         And in your review from the legislative history of the

21    McCarran-Walter Act, did you find evidence of Congress acting

22    with any race-neutral motivation when it recodified the reentry

23    provision?

24    A    No.

10:13:34    25    Q    Based on your review of that legislative history, are you

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

45

1  able to form an opinion as to whether Congress would have

2  recodified the reentry provision were it not for racial animus?

3  A    Yes.

4  Q    What is your opinion?

10:13:53  5  A    My opinion is that Congress would not have recodified 1326

6  were it not for racial animus.

7  Q    What is that opinion based on?

8  A    So, once again, it's based on the pervasive racial animus

9  of the times, the racial animus that was expressed during the

10:14:17  10  debates over the act.

11  Q    How certain are you of this conclusion?

12  A    Very certain.

13  Q    And, again, if I were to ask you to quantify that

14  numerically on a scale of 0 to 100, what would you say?

10:14:34  15  A    It would be in the high 90s.

16  Q    Thank you, Dr. Kang.  That covers my questions for the

17  McCarran-Walter Act of 1952.

18      The next and final step in the evolution of the reentry

19  statute are the five amendments in the late twentieth century.

10:14:55  20  I want to make sure we cover any important historical

21  developments.  Were there any developments between 1952 and the

22  first amendment in 1988 that informed Congress's passage of

23  those amendments?

24  A    Yes, and those developments included the passage of the

10:15:19  25  Immigration and Nationality Act of 1965 as well as the arrival

USA v. Munoz-De La 0/2:20-CR-00134-RMP-1
Motion to Dismiss Hearing - January 28, 2022
Kang/D/Goddard

46

1   of Cuban, Haitian, and Central American refugees from the late

2   1970s through the eighties and nineties.

3   Q    Thank you, Dr. Kang.

4        Let's start with the INA, the bill you mentioned from 1965.

10:15:36   5   What did that bill do?

6   A    So the Immigration and Nationality Act of 1965 overhauled

7   the nation's immigration laws.  And at the time, the sponsors,

8   the drafters and sponsors of that act promised that it wouldn't

9   change the racial composition of the nation; but it, in fact,

10:16:01   10   did just that by leading to the unprecedented increase in Asian

11   migration as well as increases in undocumented migration from

12   Mexico.

13       So as a result of these new immigrants there was a backlash

14   among Americans, and we saw in the post-1965 period a rise in

10:16:34   15   xenophobia.  And it was this xenophobia that would go on to

16   inform, inform the immigration policy developments of the

17   eighties and nineties.

18   Q    The INA in 1965 did not amend 1326, did it?

19   A    No.

10:16:53   20   Q    So if this bill did not amend 1326, how is it relevant to

21   the historical context of the later amendments?

22   A    Yeah.  So, again, this act triggered a backlash in America,

23   and it was a measure that, frankly, made xenophobes extremely

24   angry, and this is something that's reflected in the *Law Review*

10:17:20   25   article written by Representative Lamar Smith of Texas.

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

1    He saw the immigration act of 1965 as transforming

2    immigration into what he saw as a, quote/unquote, "unwarranted

3    civil right."  And, again, he and other xenophobes were

4    absolutely furious about the passage of that act, and they

10:17:44  5    worked vigorously from the seventies and, in particular, the

6    eighties and nineties.  They did everything possible to retrench

7    the gains that were made for immigrants and particularly

8    immigrants from the global south.  So they did everything

9    possible to reverse those perceived gains made by immigrants

10:18:05  10   under that act.

11   Q    Thank you, Dr. Kang.  We will come back to Representative

12   Smith.

13        For now I'd like to ask you about the second historical

14   development you mentioned, the arrival of refugees from Cuba,

10:18:19  15   Haiti, and Central America.  Could you speak a little bit about

16   that.

17   A    Yes.  So the arrival of these refugees in the eighties and

18   nineties added fuel to the fire.  It added fuel to the fire of

19   this backlash to the 1965 act.  And this is particularly the

10:18:39  20   case because these Cuban and Haitian arrivals were perceived to

21   be -- perceived in the most negative of terms.

22        And also because of their skin color -- because many of the

23   Cubans were darker skinned and even black, and because the

24   Haitians were black -- this triggered a new wave of racism and

10:19:09  25   nativism, triggered a new and powerful wave of anti-Black racism

1    in the eighties and nineties.

2    Q    And how was this arrival, the arrival of these refugees,

3    how is that relevant to the later amendments to 1326?

4    A    So it's relevant insofar as the legislators who drafted and

10:19:34    5    sponsored the amendments to 1326 were responding to this

6    backlash.  They were responding to the intense, intense

7    antipathy toward the Cuban and Haitian arrivals of the eighties

8    and nineties.

9    Q    My understanding, Dr. Kang, is that a large number of these

10:19:57    10    refugees were arriving in Florida; is that right?

11    A    Yes.  That's correct.

12    Q    Was there a particular backlash in Florida?

13    A    Yes.  There was a particularly powerful backlash in Florida

14    with respect to these Cuban and Haitian arrivals, and Floridians

10:20:16    15    began characterizing these arrivals -- even though they were

16    humanitarian refugees, they began characterizing them in the

17    most negative of terms.  They were perceived as undocumented

18    immigrants, as lawbreakers, as criminals, as drug traffickers,

19    drug addicts, as diseased peoples, and as, quote/unquote,

10:20:44    20    "social deviants."

21    Q    Dr. Kang, up to this point, the history of anti-Latino

22    racial animus we've been discussing has focused on Mexicans, has

23    focused on the nativists wanting to keep the Mexicans out and

24    southwest agribusiness wanting to bring Mexicans in but in a way

10:21:05    25    that they could control them.

```
                    USA v. Munoz-De La O/2:20-CR-00134-RMP-1          49
                     Motion to Dismiss Hearing - January 28, 2022
                                 Kang/D/Goddard
```

1    A    Uh-huh.

2    Q    How did this new form of anti-Latino racism fit in with the

3    racism we've been discussing up to this point?

4    A    So, first, it's important to note that anti-Mexican and

10:21:18    5    anti-Latin American animus continues in this period.  These

6    longstanding stereotypes with respect to Mexican immigrants

7    don't go away, and the arrival of Central American refugees also

8    triggers waves of xenophobia with respect to those immigrants.

9         But what's very striking about the xenophobia that emerges

10:21:48    10    in the eighties and nineties are the parallels with the

11    xenophobia of the 1920s.  So as historians have found,

12    xenophobia in the eighties and nineties reached new highs, and

13    historians have shown that the xenophobia of the eighties and

14    nineties was just as widespread as it was in the 1920s.

10:22:14    15         Another striking parallel is that by the eighties and

16    nineties, xenophobes are using the same adjectives, the same

17    metaphors, the same frameworks to talk about undesirable or

18    unwanted immigrants.  So in the 1920s, xenophobes describe

19    Mexican nationals as criminals, as drug addicts, as, again,

10:22:41    20    quote/unquote, "socially deviant," and you see the application

21    of those very same descriptors to Central Americans, Haitians,

22    Cubans, and Mexicans, once again, in the eighties and nineties.

23         Another very striking parallel is that by the eighties and

24    nineties, xenophobes are expressing the same concerns that

10:23:04    25    xenophobes of the 1920s expressed, and that is this concern with

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

50

1  the impact of these new immigrants upon the composition of the

2  country.

3      In the 1920s, those xenophobes said outright that their

4  concern was -- their concern pertained to the impact of these

10:23:26  5  new arrivals on the, quote/unquote, "racial" composition of this

6  country; but by the eighties and nineties that word "race" or

7  "racial" drops out of that phrasing, and by the eighties and

8  nineties you hear xenophobes couching their concern as, you

9  know, the impact of these new arrivals on the composition of the

10:23:50  10  country or the culture of the country or the, quote/unquote,

11  "face of the nation."

12      But despite the dropping of the word "race" or "racial" in

13  the eighties and nineties, the xenophobes are effectively saying

14  the same thing.  They're saying that these new immigrants will

10:24:11  15  have a negative impact on the racial character of the nation.

16  Q    Thank you.

17      And these new immigrants that xenophobes are concerned

18  about affecting the racial makeup of the United States, you said

19  they were primarily at this point in time, the 1980s, from

10:24:32  20  Central America, Cuba, and Haiti; is that right?

21  A    Yes.

22  Q    Dr. Kang, are Cubans Latinos?

23  A    Yes.

24  Q    And are Haitians Latinos?

10:24:44  25  A    Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

51

1    Q    Thank you.

2         Dr. Kang, we were previously speaking about earlier eras,

3    the 1920s, the 1950s.  The historical record is full of

4    congressmen using racial slurs openly on the floors -- on the

10:25:06    5    floor of the Senate and the floor of the House.  Does that

6    continue into the 1980s and 1990s?

7    A    Within Congress, it's rarely seen.  It's not as common.

8    And what's happened is as a result of the civil rights movement

9    it becomes, it becomes unacceptable to express, express racism

10:25:30    10    in overt or explicit terms.

11        So what happens by the eighties and nineties is that

12    xenophobes begin to couch their racist sentiments in coded

13    terms.  And historians have found that this is the case with

14    organizations -- which I know we'll talk about it later, but

10:25:54    15    organizations such as the Federation for American Immigration

16    Reform use proxies to talk about their racist sentiments.

17        Another example would be the language used to talk about

18    the war on drugs.  Scholars such as Michelle Alexander have

19    shown that in the eighties and nineties, politicians discovered

10:26:22    20    that this rhetoric and the politics of the war on drugs often

21    tracked onto the racist views of their constituents.  So

22    Michelle Alexander explains that, for example, Reagan used the

23    word -- used the war on drugs to effectively talk about race and

24    to elicit the racist sentiments of his supporters.

10:26:52    25    Q    So the lack of racial slurs in the *Congressional Record*, is

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

52

1  that any indication that racial animus has decreased in the

2  country or in Congress?

3  A    Not at all.

4  Q    And, Dr. Kang, you mentioned that rather than using racial

10:27:12  5  slurs, they have been replaced by proxies.  Could you explain

6  what you mean by "proxies."

7  A    So proxies, again, would include things like the discourse

8  and the rhetoric surrounding the war on drugs, and these are

9  ways, these are putatively race-neutral ways to express one's

10:27:34  10  own racist views.

11      Other examples would be the kind of language and frameworks

12  used by the federation for immigration reform.  They often couch

13  their racist and xenophobic views in terms of population control

14  or in terms of environmental preservation, and so on.

10:27:58  15  Q    Thank you.

16      So by the time we get to 1988, the prior forms of

17  anti-Latino racial animus that we've been discussing still exist

18  unchanged?

19  A    Yes.

10:28:10  20  Q    On top of that, there's a new form of anti-Latino racial

21  animus in response to the arrival of refugees?

22  A    Yes.

23  Q    And while language has shifted how the country and Congress

24  speaks about Latinos, the racial animus has not decreased?

10:28:29  25  A    That's correct.

1   Q    Thank you.

2        So that brings us to the first of five amendments to 1326.

3   I'm gonna run through each amendment and ask you a few questions

4   about --

10:28:42   5        THE COURT:  Mr. Goddard, I'm just wondering, is this a

6   good time for a break or are you close to the end of your

7   direct?

8        MR. GODDARD:  I think this would be an appropriate time

9   for a break, Your Honor.  Thank you.

10:28:55   10       THE COURT:  Okay.  We'll take a 15-minute recess.  Court

11  is in recess.

12       (Recess taken:  10:29 am to 10:46 am)

13       THE COURT:  Court is reconvened.

14       Okay.  Mr. Goddard, you were in the middle of your

10:46:28   15  direct.

16       MR. GODDARD:  Thank you, Your Honor.

17  Q    (By Mr. Goddard)  Before I get back to where I was, I'd

18  just like to cover one little bit of housekeeping I'm not sure I

19  remembered to cover at the very beginning.

10:46:38   20       Dr. Kang, as we discussed, you prepared a report in this

21  case, a 102-page report filed at ECF 78-2; correct?

22  A    Yes.

23  Q    And as you testify today under oath, does that (audio

24  connection gap) capture your research and your opinions?

10:47:02   25  A    You know, I -- can I ask you to repeat that?  My connection

1  froze for a little bit.

2       THE COURT:  I'm sure -- Mr. Goddard, I think it was you.

3  You skipped, so I hope that you're not going to have problems.

4       MR. GODDARD:  I hope so too, Your Honor.  Please let me

10:47:21  5  know if that happens again.

6  Q    (By Mr. Goddard)  So, Dr. Kang, as you testify today under

7  oath, does your report fairly and accurately capture your

8  research and your opinions?

9  A    Yes.

10:47:35  10  Q    Thank you.

11       Okay.  Getting back to where we were in the evolution of

12  the reentry statute, we were at the first amendment to 1326

13  which came in 1988.  Dr. Kang, what was the name of the bill

14  that included that amendment?

10:47:54  15  A    The Anti-Drug Abuse Act of 1988.

16  Q    And how did that bill amend 1326?

17  A    It increased the penalties.

18  Q    Was that amendment to 1326 a major focus of the Anti-Drug

19  Abuse Act?

10:48:12  20  A    No.

21  Q    Do you know who drafted that amendment to 1326?

22  A    Senator Lawton Chiles of Florida.

23  Q    What can you tell us about Senator Chiles?

24  A    So Senator Chiles was long concerned about how the new

10:48:32  25  immigration, especially immigration from Cuba and Haiti, was

1     changing the composition of the country.  So in 1985 in a *Time*

2     magazine article, he explained in an alarmist tone that if the

3     United States didn't gain control over its borders, the United

4     States would -- and here I'm paraphrasing -- the United States

10:49:05  5     would cease to look the way that it did in his day.

6         And so in response to that alarm, Senator Chiles over the

7     course of his career proposed numerous anti-immigration

8     measures.  These included measures that would have reduced

9     immigration to the United States over all, also reduced the

10:49:31  10    admission of asylum seekers and refugees, and would have also

11    increased the punitive measures taken against undocumented

12    immigrants as well as asylum seekers and refugees.

13        He also opposed the grant of various kinds of public

14    benefits to undocumented immigrants, and he was also vehemently

10:49:59  15    opposed to the kinds of -- vehemently opposed to the kinds of

16    due process rights that migrants, especially refugees and asylum

17    seekers, were exercising in this time period.  In this time

18    period, as I explain in my affidavit, many were going to court

19    to challenge their detentions and removals.

10:50:26  20    Q     Did Senator Chiles have any connections to the Federation

21    for American Immigration Reform, or FAIR?

22    A     Yes.  So Senator Chiles collaborated with FAIR on various

23    immigration policy proposals, and he also advanced proposals

24    that align with FAIR legislative agenda.

10:50:54  25    Q     And, Dr. Kang, at the beginning of our conversation, you

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

56

1    mentioned you had conducted in-person archival research at

2    George Washington University which has a collection of FAIR

3    materials.  Is this the same FAIR?

4    A    Yes.

10:51:09    5    Q    What can you tell us about FAIR?

6    A    So FAIR was founded in the late 1970s, and today it has

7    been designated by the Southern Poverty Law Center as a hate

8    group.  Since its founding, it has subscribed to and articulated

9    eugenicist and white supremacist views, and it has worked

10:51:43   10    assiduously to promote immigration policies that will preserve

11    the white, European character of the American population.

12         It in the late twentieth century became one of the most

13    important forces shaping immigration law and policy, and it did

14    so by meeting regularly with individual members of the House and

10:52:07   15    Senate.  It also routinely held workshops and panels for members

16    of the House and Senate in the offices of the House and the

17    Senate.

18         It routinely published articles and op-eds in the major

19    newspapers.  It appeared on major media outlets to explain its

10:52:32   20    anti-immigration policy proposals.  And in the late eighties and

21    nineties, FAIR made sure that one of its members testified at

22    nearly each and every immigration-related hearing in the House

23    and the Senate.

24         Then when it came to Florida, FAIR had been closely

10:52:59   25    watching developments in Florida.  It had been closely watching

1    the arrival of Cuban and Haitian refugees in the eighties and

2    nineties, and it witnessed and observed the rise of intense

3    xenophobia expressed by Floridians towards the Cubans and

4    Haitians.

10:53:20   5        And FAIR realized that it needed to strengthen its outreach

6    among the members of Florida's congressional delegation, and

7    FAIR believed that these federal legislators would be more

8    inclined to embrace and also to introduce FAIR's immigration

9    policy proposals or FAIR's immigration policy ideas on the floor

10:53:51  10   of the House and the Senate.

11        And so that, that explains how FAIR came to cultivate

12   relationships with the congresspeople I talk about in my

13   affidavit, Senator Chiles, Senator Graham, and Representative

14   Bill McCollum.

10:54:13  15   Q    Thank you, Dr. Kang.

16        I'd like to read you a couple of statements from members of

17   FAIR.  The first is the statement from FAIR's founder, John

18   Tanton, and this is from a letter he wrote to eugenicist Garrett

19   Hardin.  The quote is (reading):  I've come to the point of view

10:54:33  20   that for European-American society and culture to persist

21   requires a European-American majority, and a clear one at that.

22        The second statement I'd like to read to you, Dr. Kang, is

23   from FAIR's president, Dan Stein.  This is a statement he made

24   during an interview with Tucker Carlson.  The quote is

10:54:56  25   (reading):  Immigrants don't come all church-loving,

1  freedom-loving, God-fearing.  Many of them hate America, hate

2  everything that the United States stands for.  Talk to some of

3  these Central Americans.

4      Dr. Kang, are those statements representative of FAIR's

5  views?

6  A    Yes.  And it's important to note that FAIR expressed those

7  views in direct response to the arrival of Haitian and Cuban

8  migrants.  And, more broadly, FAIR was an organization that

9  deeply despised the Immigration and Nationality Act of 1965 and

10 its impact on the US population, and it was committed to

11 reversing the gains made by that act for immigrants throughout

12 the world.

13 Q    And what were Senator Chiles's connections to FAIR?

14 A    So Senator Chiles collaborated with FAIR.  It also held a

15 workshop on behalf of FAIR on some of its anti-immigration

16 policy proposals.  And then Chiles's own legislative agenda,

17 immigration agenda, reflects a clear alignment with FAIR's own

18 immigration policy proposals.

19 Q    Thank you.

20     I'd also like to read you a statement this time from

21 Senator Chiles himself, a statement he made on the Senate floor

22 (reading):  There's a new bumper sticker that you will see on

23 more and more cars in the Miami area.  It says, quote, "Will the

24 last person to leave please bring the flag," end quote.  That

25 sums up a lot of the feeling of frustration that is down there

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

59

1     presently, and I would say with the tremendous movement that we

2     have in Florida and people buying new homes -- I now find that

3     people in the central part of the state, the real estate agents

4     are telling me, it is not the people that are coming from out of

10:57:11  5   state that they are selling homes to, it is the migration from

6     south Florida that they are selling homes to, people that are

7     leaving the county.  This is bad.  It is a situation that we

8     have to reverse.

9         Dr. Kang, could you give us some context for that statement

10:57:31  10  from Senator Chiles.

11    A     Yes.  Senator Chiles made this statement in the early

12    eighties during a Senate Judiciary Committee hearing on

13    immigration and refugees, and he was speaking about Haitian

14    refugees.  And his statements reflect his own xenophobic

10:57:53  15  sentiments as well as the xenophobic sentiments of his fellow

16    Floridians, which perceived Cuban and Haitian refugees in the

17    most negative of terms; and Floridians perceived these

18    individuals to be, once again, criminals, disease ridden,

19    socially deviant.  And more broadly, they were cast again in

10:58:23  20  these xenophobic terms as a kind of invasion.

21        So what Chiles is saying in this statement is that these

22    Haitian migrants were moving into Floridians' neighborhoods and

23    ruining the character of those neighborhoods and likely the

24    property values which then compelled these Floridians to move

10:58:51  25  away.

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

60

1      So in that statement, Chiles again is expressing his own

2  xenophobic views towards refugees in Florida, and then he

3  concludes by saying that something needs to be done about it.

4  The trend needs to be reversed.  And he worked assiduously as a

10:59:17  5  member of Congress to pass the kinds of laws that would prevent

6  the entry of these refugees.

7  Q    Is this statement representative of Senator Chiles's views

8  on race?

9  A    Yes.

10:59:32  10  Q    So to recap, the first amendment to 1326 was authored by a

11  Senator from Florida who expressed xenophobic views and had

12  connections to an anti-immigrant hate group?

13  A    Yes.

14  Q    Thank you.

10:59:49  15      It takes us to the second amendment to 1326.  What was the

16  name of the bill that included that second amendment?

17  A    The Immigration Act of 1990.

18  Q    And how did that bill amend 1326?

19  A    It increased the penalties.

11:00:09  20  Q    And was this amendment to 1326 a major focus of the

21  Immigration Act of 1990?

22  A    No.

23  Q    Do you know who drafted this amendment to 1326?

24  A    Senator Bob Graham of Florida.

11:00:25  25  Q    What can you tell us about Senator Graham?

```
                USA v. Munoz-De La O/2:20-CR-00134-RMP-1          61
                Motion to Dismiss Hearing - January 28, 2022
                             Kang/D/Goddard
```

1    A    So, like Senator Lawton Chiles, Senator Graham was under

2    intense pressure from his Florida constituents to articulate

3    xenophobic views and to pass anti-immigration policies.

4         Senator Graham himself characterized Haitian and Cuban

11:00:50   5    refugees as criminals even though the data at the time and

6    subsequent studies conducted by historians have shown that the

7    vast majority of the Cuban refugees were not criminals, did not

8    have a criminal background.

9         And he made these characterizations of the Cuban and

11:01:13   10   Haitian refugees even though studies at the time and then

11   subsequent studies have either shown that immigrants -- the

12   presence of immigrants in a community actually lowers crime or

13   have been inconclusive with respect to the degree of crime

14   committed by these Cuban and Haitian immigrants.

11:01:42   15   Q    Dr. Kang, was this -- the idea of referencing Cuban and

16   Haitian arrivals as criminals, was this one of the proxies you

17   mentioned earlier that had replaced the use of racial slurs?

18   A    Yes.

19   Q    So to summarize, the first two amendments to 1326 were

11:02:01   20   authored by senators from Florida who spoke of immigrants in

21   xenophobic terms at a time when the electorate in Florida was

22   demanding anti-immigrant legislation?

23   A    Yes.

24   Q    Thank you.

11:02:18   25        That takes us to the third amendment to 1326.  What bill

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

62

1   was that amendment a part of?

2   A    The Violent Crime Control and Law Enforcement Act of 1994.

3   Q    Is that act better known as the Clinton crime bill?

4   A    Yes.

11:02:37   5   Q    (Audio connection gap) Clinton crime bill amend 1326?

6        THE COURT:  Mr. Goddard, I think you broke up a little

7   bit again.

8        MR. GODDARD:  I apologize.

9        THE COURT:  We heard the first time of the Clinton crime

11:03:02   10   bill, and then you were going to ask a second question.

11        MR. GODDARD:  Yes.  My apologies, Your Honor.

12   Q    (By Mr. Goddard)  Dr. Kang, how did the Clinton crime bill

13   amend 1326?

14   A    It increased the penalties.

11:03:16   15   Q    And was this amendment to 1326 a major focus of the Clinton

16   crime bill?

17   A    No.

18   Q    Who drafted this amendment to 1326?

19   A    Representative Bill McCollum of Florida.

11:03:31   20   Q    What can you tell us about Representative McCollum?

21   A    Representative Bill McCollum long expressed anti-immigrant,

22   xenophobic views, and he dedicated much of his career to

23   drafting, cosponsoring -- drafting and cosponsoring

24   anti-immigrant legislation.  By 1994, he was a senior and

11:03:59   25   influential member of the House.

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

63

1    Q    Did Representative McCollum have ties to FAIR?

2    A    Yes.

3    Q    What were those ties?

4    A    So early in his career, the early 1980s he worked with FAIR

11:04:18   5    to pass legislation that would have restricted the issuance of

6    public benefits to undocumented immigrants.

7       By the mid-1980s, he worked with FAIR in hosting a workshop

8    for members of Congress in the offices of the House on the

9    so-called problems surrounding legalization and what was then

11:04:44   10    called amnesty, and his proposals received the regular

11    endorsement of FAIR.

12    Q    Thank you, Dr. Kang.

13       Your report included a quote from Representative McCollum

14    where he said that President Reagan should, quote, "find a hole

11:05:03   15    in our fence at Guantanamo and push these aliens through it,"

16    end quote. Could you let us know the context of that statement.

17    A    Yes. So this statement reflects McCollum's longstanding

18    xenophobic views with respect to Haitian and Cuban refugees in

19    Florida. It also reflects the fact that McCollum's views

11:05:40   20    towards immigrants and vulnerable populations in general were

21    deeply punitive. It wasn't good enough for McCollum to remove

22    refugees from the United States. It was also necessary, in his

23    mind, to detain them at a place like Guantanamo. So just more

24    broadly, the statement is reflective and characteristic of

11:06:09   25    McCollum's deep-seated, anti-immigrant hostilities.

```
                    USA v. Munoz-De La O/2:20-CR-00134-RMP-1        64
                    Motion to Dismiss Hearing - January 28, 2022
                                 Kang/D/Goddard
```

1    Q    Understood.

2         Mr. McCollum, Representative McCollum drafted an amendment

3    to 1326.  Were there changes from his initial language to what

4    Congress initially passed in the Clinton crime bill?

11:06:31  5    A    Yes.  When the Clinton crime bill passed, it excised what

6    had been a Clause C in McCollum's original bill, and that

7    Clause C would have limited collateral attacks on removal orders.

8    Q    So in addition to the enhanced penalties that were passed,

9    Representative McCollum had also wanted to limit 1326

11:06:56  10   defendants' ability to collaterally attack their prior removal

11   orders?

12   A    Yes.

13   Q    Did Representative McCollum eventually vote for the Clinton

14   crime bill?

11:07:09  15   A    No.

16   Q    Why not?

17   A    McCollum, like many other Republicans, was absolutely

18   enraged by the Clinton crime bill.  McCollum saw it as being too

19   soft on crime, and he and other Republicans characterized it as

11:07:29  20   a welfare bill because it allocated billions of dollars to crime

21   prevention programs and also to community support programs.

22   Q    So Representative McCollum, who made xenophobic comments

23   and was associated with an anti-immigrant hate group, drafted an

24   amendment to 1326, and voted against the larger bill for reasons

11:07:55  25   unrelated to 1326?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

65

1    A    Yes.

2    Q    Thank you.

3         That takes us to the fourth amendment to 1326.  What bill

4    included this amendment?

11:08:09  5    A    The Antiterrorism and Effective Death Penalty Act of 1996.

6    Q    Is that act sometimes known as AEDPA?  And for the court

7    reporter, that is A-E-D-P-A.

8    A    Yes.

9    Q    How did AEDPA amend 1326?

11:08:33  10    A    It increased the penalties.

11    Q    Did AEDPA limit collateral attacks on predicate removal

12    orders?

13    A    Yes.

14    Q    And was this amendment to 1326 a focus of AEDPA?

11:08:51  15    A    No.

16    Q    Who drafted this amendment to 1326?

17    A    Representative Bill McCollum.

18    Q    The same Representative McCollum who drafted the prior

19    amendment to 1326?

11:09:02  20    A    Yes.

21    Q    Had there been any relevant changes in Congress in the time

22    between these two amendments?

23    A    Yes.  The Republicans took control of the House and the

24    Senate for the first time in 40 years.

11:09:21  25    Q    And what is the relevance of that change in leadership?

1 A So it meant that Republicans like Senator -- like

2 Representative Bill McCollum had much more power to enact their

3 legislative agenda.

4 Q So Representative McCollum, following a Republican

11:09:40 5 takeover, drafted an amendment to change 1326 in the way he had

6 previously tried to change it?

7 A Yes.

8 Q And did Representative McCollum vote for AEDPA?

9 A Yes.

11:09:54 10 Q So Representative McCollum, who had made xenophobic

11 comments and had ties to an anti-immigrant hate group, tried to

12 amend 1326 to limit collateral attacks.  That amendment was

13 watered down, and two years later he reintroduced that same

14 amendment?

11:10:14 15 A Yes.

16 Q Thank you.

17 That takes us to the fifth, and final, amendment to 1326.

18 What bill included this amendment?

19 A The Illegal Immigration Reform and Immigrant Responsibility

11:10:32 20 Act of 1996.

21 Q And is that better known as IIRIRA?

22 A Yes.

23 Q For the court reporter, that is I-I-R-A-I-R-A.

24 Dr. Kang, how did IIRIRA amend 1326?

11:10:51 25 A It increased the penalties.

*USA v. Munoz-De La 0/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*                                    67

1  Q   And was this amendment to 1326 a focus of IIRIRA?

2  A   No.

3  Q   And who drafted this amendment to 1326?

4  A   Representative Lamar Smith of Texas.

11:11:08  5  Q   What can you tell us about Representative Smith?

6  A   Representative Smith was a longstanding xenophobe and the

7  author of anti-immigration measures in Congress.  He was a

8  longstanding member of FAIR, and to this day he serves on its

9  national board of advisors.

11:11:33  10      Shortly after the passage of IIRIRA, he penned a *Law Review*

11  article explaining his rationale for proposing the bill.  And in

12  it he made clear his xenophobic views, his intense anger about

13  the passage of the Immigration Act of 1965, its -- the putative

14  harms that it caused to the composition and culture of the

11:12:03  15  nation, and so on.

16      And Representative Smith is said to have drafted and

17  sponsored IIRIRA, although contemporary observers have

18  subsequently attested that an attorney named Cordelia Strom

19  authored IIRIRA.

11:12:34  20  Q   What can you tell us about Ms. Strom?

21  A   So Cordelia Strom, at the time in which IIRIRA was being

22  authored and debated in Congress, served as the counsel to

23  Representative Smith, who at the time was the chair of the House

24  subcommittee on immigration.  And prior to that, Cordelia Smith

11:13:08  25  [*sic*] had served as an immigration expert to Senator Alan

1    Simpson of Wyoming, who served as the chair of the Senate

2    immigration subcommittee and who is, to this day, a member of

3    the national board of advisors for FAIR.

4         Prior to serving as an immigration expert for Senator

11:13:31  5    Simpson, Cordelia Strom was a long-standing member of FAIR and

6    served as a staff attorney to Dan Stein, who was one of the

7    leaders of FAIR.  And during her tenure on the Senate

8    subcommittee on immigration as well as the House subcommittee on

9    immigration, she continued to have an affiliation with FAIR.

11:13:59  10   Q    So to summarize, the most recent amendment to 1326 was

11   introduced by a congressman who has explicitly stated his

12   xenophobic views and was, in fact, drafted by a lawyer who works

13   for an anti-immigrant hate group?

14   A    Yes.

11:14:17  15   Q    Thank you, Dr. Kang.

16        That takes us through the five amendments to 1326.  I'd

17   like to ask you a few questions about those amendments

18   generally.  For each of the five bills we've discussed, the

19   particular amendment to 1326 was not a major focus of the bill;

11:14:38  20   is that right?

21   A    Yes.  That's correct.

22   Q    Did Congress spend much time debating the provisions of

23   these bills that amended 1326?

24   A    No.

11:14:48  25   Q    Were these amendments to 1326 controversial?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

69

1   A    No.

2   Q    Why not?

3   A    They weren't controversial because of the xenophobia, the

4   widespread and pervasive xenophobia at the time.  And

11:15:08   5   congresspersons in the late eighties and nineties knew that it

6   would be political suicide for them to try to revoke 1326 or

7   water it down, and this was because members of the House and the

8   Senate in the eighties and nineties faced intense pressure from

9   their constituents across the country to do something about

11:15:34   10   immigration.

11   Q    Thank you.

12        In debating the five amendments to 1326, did Congress ever

13   acknowledge or discuss the racial animus that had motivated the

14   criminalization of reentry?

11:15:52   15   A    No.

16   Q    Dr. Kang, based on your review of the legislative history

17   of these five amendments, are you able to form an opinion as to

18   Congress's intent in amending 1326?

19   A    Yes.

11:16:10   20   Q    What is that opinion?

21   A    Congress was motivated by racial animus.

22   Q    What is that opinion based on?

23   A    That's based on my exploration of the legislative history,

24   a broader social context, and the motivations of the law's

11:16:29   25   drafters and sponsors.

```
                        USA v. Munoz-De La O/2:20-CR-00134-RMP-1              70
                         Motion to Dismiss Hearing - January 28, 2022
                                      Kang/D/Goddard
```

1    Q    How certain are you of this conclusion?

2    A    Very certain.

3    Q    If I were to ask you to quantify your level of certainty

4    numerically on a scale from 0 to 100, what would you say?

11:16:48  5    A    It would be in the high nineties.

6    Q    Thank you.

7         In your review of the legislative history of the amendments

8    to 1326, did you find any evidence that Congress acted with any

9    race-neutral motivation when it passed those amendments?

11:17:05  10    A    No.

11    Q    Based on your review of the legislative history of the

12    amendments to 1326, were you able to form an opinion as to

13    whether Congress would have passed those amendments were it not

14    for racial animus?

11:17:24  15    A    Yes.

16    Q    And what is that opinion?

17    A    Congress would not have passed those amendments were it not

18    for racial animus.

19    Q    What is that opinion based on?

11:17:35  20    A    It's, again, based on my research of the historical context

21    and the motives of the drafters and sponsors and the

22    pervasiveness of the racial animus and the xenophobia at the

23    time.  And it was a xenophobia that infected not only the

24    population at large but also members of Congress on both sides

11:18:00  25    of the aisle, both Democrats and Republicans.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

71

1  Q  Dr. Kang, how certain are you of this conclusion?

2  A  Very, very certain.

3  Q  And once again, if I were to ask you to quantify that

4 numerically on a scale from 0 to 100, what would you say?

11:18:20  5  A  High nineties.

6  Q  Thank you.

7      Dr. Kang, that covers the history of the reentry statute

8 for its entire 90 years.  I'd like to ask you a few questions to

9 get your response to some of the government's concerns with your

11:18:38  10 report.  I believe there are five.

11      The government points to the fact that the amendments to

12 1326 were often passed by large majorities in Congress, and the

13 government argues the amendments, quote, "appear to have been

14 relatively uncontroversial," end quote.  Is this a valid

11:19:01  15 concern?

16  A  No.  And, in fact, the support for 1326 reflects the

17 widespread xenophobia of the times and within Congress.

18  Q  So did a large -- if an amendment passes by a large

19 majority, does that suggest in any way that Congress was acting

11:19:28  20 without racial animus?

21  A  No, not -- no, not necessarily.

22  Q  Thank you.

23  A  And, again, in this case, the votes for the amendments to

24 1326 are an indicator of the widespread xenophobia in this time

11:19:43  25 period.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

72

1  Q    Thank you.

2       Government's second concern has to do with Representative

3  McCollum.  The government argues Representative McCollum's views

4  with respect to the Clinton crime bill's amendment to 1326 are

11:20:01  5  quote, "meaningless," end quote, because Representative McCollum

6  voted against that bill.  Is this a valid concern?

7  A    No, and it's -- because it's critical to look at Bill

8  McCollum, because he drafted the amendment to 1326 that ends up

9  in the Clinton crime bill.  It's also critical because, as Bill

11:20:27  10  McCollum and others explained in the debates regarding the

11  Clinton crime bill, McCollum authored that clause, so he's

12  credited with authoring that clause.

13       And even though he didn't vote for the Clinton crime bill,

14  he then quickly went on to try to get the version of the

11:20:50  15  amendment to 1326 that he wanted.  He worked very hard to

16  quickly get that passed by 1996.

17  Q    Thank you, Dr. Kang.

18       The government's third concern is that you offer, quote,

19  "scant legislative history," end quote, concerning 1326 and its

11:21:13  20  amendments.  You instead, according to the government, focus on

21  other aspects of immigration law -- asylum, refugee policy,

22  admission quotas, and removal proceedings -- and, quote,

23  "attempt to paint unlawful reentry with the same brush," end

24  quote.  Is this a valid concern?

11:21:33  25  A    No, because it's important to understand the legislative

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

73

1    intent surrounding the amendments to 1326 are related to these

2    other issues insofar as the drafters of 1326 took these other

3    issues into account and began the work of reframing these

4    issues.  Particularly with respect to asylum and refugee law,

5    they began reframing them not as admissions policies but as

6    enforcement issues, as enforcement questions.

7        And hence you see in this period the transformation of the

8    thinking about refugees and asylum seekers.  That thinking

9    begins to change, and you see these conservative legislators

10   beginning to argue that these individuals were undocumented

11   immigrants and criminals.

12   Q    Thank you.

13       The government's fourth concern is that you, quote,

14   "attempt to ascribe the supposed motives of single legislators

15   to all those who ultimately voted to enact," end quote, the

16   amendments of 1326.  Is this a valid concern?

17   A    No, and it's because -- there are several reasons.  One is

18   that when Congress asks individuals to draft a bill or a portion

19   of a bill, Congress in many ways delegates their authority to

20   that individual to draft these measures and to speak for the

21   body or large subsets of the body as a whole.  And, again, this

22   is something that Victoria Nourse explains in her book

23   *Misreading Law, Misreading Democracy.*

24       Another reason, as I've explained before, in doing a

25   legislative history, historians focus on telling the story of

11:22:04
11:22:25
11:22:42
11:23:14
11:23:37

1    the winners rather than the losers.  So we really focus on the

2    question what were the specific elements; who were the specific

3    individuals involved in getting the law to pass.

4         And then, you know, another reason is that in this time

11:24:05  5    period, even though one might not have divined the intention of

6    every single member of Congress -- I believe it's 535

7    individuals -- it's important to note that when you do peruse

8    the legislative history, the numbers of congresspeople -- and,

9    again, on both sides of the aisle -- who are expressing

11:24:40  10   xenophobic sentiments is widespread, and it's striking.

11        And as other historians have written, Democrats and

12   Republicans in this period, the late eighties and nineties, are

13   quote/unquote, "falling all over themselves to propose

14   anti-immigration bills," and I list several of those in my own

11:25:08  15   affidavit.

16        So even though I might not have, have an account of the

17   views of all 535 members of Congress, I believe I've captured a

18   representative sample of the views of the members at large.

19   Q    Thank you, Dr. Kang.

11:25:37  20        The government's last concern is that without knowing the

21   views of the individual legislators who voted for the amendments

22   to 1326, you were, quote, "incorrect," end quote, to claim the

23   five amendments to 1326 were passed in a, quote, "xenophobic

24   context," end quote.  Is that a valid concern?

11:26:04  25   A    No.

1    And can I add to sort of my last answer?  Is that --

2  Q    Certainly.

3  A    So even though, again, I might not have specific

4  statements, sentences, paragraphs, writings from the 535

11:26:23  5  members, again, we do have their votes.  As I just explained, we

6  also have the bills that other members of the House and Senate

7  propose in this time period.

8         And we also know, when you look at the broader context,

9  that all members of the House and the Senate were under intense

11:26:52  10  electoral pressure, again, from their constituents to pass these

11  deeply xenophobic, anti-immigrant measures.

12         And I think that the timing of these bills is an important

13  piece of this larger historical context insofar as many of these

14  bills were passed on the cusp or the eve of the midterm or

11:27:17  15  presidential election; right.

16         And that just speaks to the importance of xenophobia in

17  this period, the importance for congresspeople in the House and

18  the Senate in this period -- and, again, no matter what side of

19  the aisle you're on -- the importance for them of taking a

11:27:37  20  xenophobic stand on immigration.

21  Q    Thank you very much, Dr. Kang.

22         We are coming to the end now.  I believe you've made five

23  conclusions that are very important here, and I just wanted to

24  recap those quickly.

11:27:53  25         First, you testified there's an academic consensus that

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

76

1    Congress was motivated by anti-Latino racial animus when it

2    first criminalized reentry in 1929; is that right?

3    A    Yes.

4    Q    Second is your opinion -- second is you saying with more

11:28:17  5    than 90 percent certainty that Congress was motivated by

6    anti-Latino racial animus when it recodified the reentry statute

7    in 1952; is that right?

8    A    Yes.

9    Q    Three, you can say with more than 90 percent certainty that

11:28:36  10   Congress was motivated by anti-Latino racial animus when it

11   amended 1326 in the 1980s and 1990s; is that right?

12   A    Yes.

13   Q    Four, you are aware of no evidence that Congress acted with

14   any race-neutral motivation when it criminalized reentry, when

11:29:01  15   it recodified the reentry statute at 1326, or when it amended

16   1326; is that right?

17   A    Yes.

18   Q    And, finally, you can say with more than 90 percent

19   certainty that absent anti-Latino racial animus, Congress would

11:29:19  20   not have criminalized reentry the way it did in 1929, Congress

21   would not have recodified the reentry statute the way it did in

22   1952, and Congress would not have amended 1326 the way it did in

23   the 1980s and 1990s; is that correct?

24   A    Yes.

11:29:40  25   Q    Thank you, Dr. Kang.

*USA v. Munoz-De La 0/2:20-CR-00134-RMP-1*                    77
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/D/Goddard*

1      I have one final question for you.  You mentioned at the

2   outset that when you began your research into the

3   McCarran-Walter Act of 1952 and subsequent amendments to 1326,

4   you didn't expect to find much.  Could you describe your

5   surprise at what your research did uncover.

6   A    Yes.  So by the time I finished my first affidavit, I was

7   stunned to find the extent of xenophobia that inform the

8   amendments to 1326 in the late twentieth century, and that

9   feeling only continued to grow as I continued my research for

10  other FDs and then most recently for this last affidavit that

11  got filed with your office.

12       And it's why I conclude the affidavit by saying that the

13  racial animus that informed 1326 and its amendments is profound,

14  because it is profound.  The racial animus that was initially

15  directed against Mexican migrants in 1929 only expanded and

16  proliferated.

17       It continued to be applied to Mexican nationals in the

18  1950s and the eighties and nineties and then was propagated and

19  applied to different immigrant groups and, again, on the basis

20  of racial animus.

21       So the scope, the scope of the racial animus that informed

22  the amendments to 1326 as well as the passage of these broader

23  immigration measures in the 1980s and 1990s is profound.

24       MR. GODDARD:  Thank you very much, Dr. Kang.

25       Your Honor, I have no more questions.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*                          78
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

1        THE COURT:  All right.  Mr. Ellis, are you ready to

2   begin your cross or do you need a break?

3        MR. ELLIS:  I'm ready to start.  If anyone wants a

4   break, I don't mind either way.

11:31:59   5        THE COURT:  No.  Let's go ahead, and then we'll see in

6   another hour or so, if you're still going, we might take a break

7   then.  Okay?

8        MR. ELLIS:  All right.  Thank you, Your Honor.

9                    CROSS-EXAMINATION

10   BY MR. ELLIS:

11   Q    Good morning, Dr. Kang.  So first I'd like to just ask you

12   a couple of questions about how bills become laws in general.

13   And so you write in your affidavit that it was in the xenophobic

14   context -- after describing the xenophobic context -- the

11:32:32  15   members of Florida's congressional delegation amended 8 United

16   States Code Section 1326 in 1988, 1990, 1994, and 1996; right?

17   A    Yes.

18   Q    But those congressmen, those Floridian congressmen, they

19   only, as you discussed with Mr. Goddard, perhaps authored and

11:32:54  20   advocated for those bills; right?

21   A    Yes.

22   Q    And as with any bill it takes a majority, or in the case

23   of, say, overturning a presidential veto, a substantial majority

24   of Congress to actually enact a specific provision into law;

11:33:14  25   right?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

79

1   A   Yes.

2   Q   Okay.  So lots of bills get written, right, all the time?

3   A   Yes.

4   Q   And as you mentioned, you profiled a lot of bills in your

11:33:27  5  affidavit that never went anywhere, never became law; right?

6   A   Yes.

7   Q   So I'd also like to ask, you mentioned to Mr. Goddard this

8  idea that Congress asks -- and I think that may have been your

9  word -- asks legislators to draft bills; right?  I think -- was

11:33:50  10  "ask" the word that you used?

11   A   So . . .  Yes, I believe so.

12   Q   And so how does -- who does, who does that asking?

13   A   So it would typically be the head of a congressional

14  committee through which the bill would then be -- would then

11:34:16  15  flow after its drafting.

16   Q   Okay.  So, for instance, who asked Senator Chiles to draft

17  the amendment that was ultimately included in the Anti-Drug

18  Abuse Act of 1988?

19   A   So I would not be able to answer at this time, but I'd be

11:34:37  20  happy to supply you with the answer.

21   Q   Okay.  And the same question, really, for who asked Senator

22  Graham, who asked Representative McCollum, who asked

23  Representative Smith about their amendments?  Are you aware of

24  who asked them to draft them?

11:34:52  25   A   So for McCollum, it's -- the picture is much clearer,

1    especially by '96.  It would have been House Speaker Newt

2    Gingrich.

3    Q    I thought you said his was -- really is building off of his

4    1994 version; right?

11:35:12  5    A    Yes.

6    Q    So is it possible that these senators and representatives

7    just wrote these bills themselves without having -- being asked

8    by anyone to do so?

9    A    In some cases that can occur, yes.

11:35:24  10    Q    And how about all of the other bills that were profiled?

11    Harry Reid, Senator Harry Reid's bill, many other

12    representatives and senators, are you aware of who asked them to

13    draft those provisions?

14    A    No.  But, you know, in the immigration context, if a

11:35:49  15    congressperson is asked to write an immigration bill, it would

16    typically be the chair of the House or Senate immigration

17    subcommittees.  So prior nineteen ninety -- prior to the

18    November -- well, let's say prior to January 1995, in the House,

19    that would have been Representative Mazzoli; in the Senate, that

11:36:15  20    would have been Kennedy.  By January 1995, the heads of the

21    immigration subcommittees were Senator Alan Simpson in the

22    Senate and then Representative Smith in the House.

23         So those individuals, they would have, you know, asked --

24    if it's the case that they wanted a certain kind of immigration

11:36:41  25    bill to be drafted, those would have been the individuals

1 principally responsible for asking.

2 Q But sitting here today, based on -- and I acknowledge that

3 there may be way more research out there that could potentially

4 shed some light on this.  But sitting here today, you don't know

11:37:00 5 who, if anyone, asked -- with the exception of McCollum in

6 '96 -- these representatives and senators to write their

7 respective provisions amending Section 1326?

8 A So I can speculate as to who might have asked these

9 individuals to have written these bills, but, again, I can

11:37:27 10 provide you with a more definitive answer after this hearing.

11 Q All right.  Thank you.

12 And just generally, if one writes a provision, they don't

13 have to vote for it; right?

14 A That's correct.  Yes.

11:37:49 15 Q That's the case with Representative McCollum in 1994;

16 right?

17 A Yes.  That's correct.

18 Q Okay.  Now, lobbyists -- so is it fair to say that, well,

19 there are a lot of lobbyists in Washington, DC?

11:38:09 20 A Yes.

21 Q And those lobbyists represent interests, a large variety of

22 interest groups spanning the entire political spectrum?

23 A Yes.

24 Q And industries and, really, probably everything else on the

11:38:28 25 planet?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

82

1    A    Yes.

2    Q    They don't vote, right, the lobbyists?

3    A    No, they don't vote.

4    Q    You talked about this with Mr. Goddard quite a bit.  And so

11:38:43  5    these bills, the 1952 INA, the AEDPA -- all of them -- they were

6    really quite enormous packages of legislation; right?

7    A    Yes.

8    Q    Of which Section 1326 or subsequently the amendments to

9    Section 1326 were relatively small parts?

11:39:10  10    A    Yes.

11    Q    And in some of them, is it fair to say, let alone focusing

12    on 1326, didn't even focus on immigration?

13    A    I -- that would be a slight mischaracterization.  I think

14    each one of the bills that I examined deals with immigration to

11:39:36  15    a greater or lesser extent.  Immigration is certainly not absent

16    from any of these bills.

17    Q    Oh, no.  Certainly not absent but -- I know 1326 is in each

18    of them so --

19    A    Yes.

11:39:48  20    Q    -- certainly not absent.  But -- and is it fair to say that

21    the focus of some, if not many of them, was on other aspects of

22    law, such as crime?

23    A    Yes.

24    Q    And even when focused on immigration, is it fair to say

11:40:11  25    that the bills touched on a variety of subtopics within

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

83

1      immigration policy?

2   A     Yes.

3   Q     Such as, as Mr. Goddard mentioned, refugee policy, asylum

4   policy, how removal proceedings operate, and that kind of thing?

11:40:28  5   A     Yes.

6   Q     And so I think, as you testified to, 1326 and any

7   amendments thereto were relatively minor parts of these greater

8   wholes?

9   A     Yes.

11:40:43  10   Q     Okay.  Before we kind of dive into, you know, some specific

11   questions about each of these bills, I'd like to talk to you

12   just a little bit about bias.  Now, is it fair to say that to a

13   greater or lesser degree, bias really affects everyone and every

14   profession?

11:41:04  15   A     Yes.

16   Q     Does it include academia?

17   A     Yes.

18   Q     And historians?

19   A     Yes.

11:41:17  20   Q     All right.  So how -- so the Federal Defenders of Eastern

21   Washington were not the first Federal Defenders' office that

22   you've worked on this issue with; is that right?

23   A     That's correct.

24   Q     And I think is it -- the exact one's gonna escape me, but

11:41:40  25   is it one of the districts in Texas that --

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*                                                      84

1   A    Yes.

2   Q    -- was the very first you worked with?

3   A    Yes, west Texas.

4   Q    Western Texas.  Thank you.

11:41:48  5        So how were you initially contacted by, I'm assuming, the

6   Federal Defenders' office of the Western District of Texas?

7   A    I cannot remember the exact details, but I believe I was

8   contacted by Molly Roth in an email message, and I cannot

9   remember the exact date.

11:42:10  10  Q    Okay.  And that's fine.  I'm more wondering if you ever

11  became aware of how Ms. -- was it Roth? -- found you and decided

12  to contact you.

13  A    My understanding from Molly Roth -- and, again, I would

14  have to review my email to recollect more clearly.  But based on

11:42:48  15  my recollection now, without having looked back at my email from

16  Molly Roth, is that she got my name from a local professor.

17  Q    Okay.  Because perhaps she was interested in someone with

18  insight into immigration history or something?

19  A    I . . .  I'm trying to recollect, and I think that she

11:43:20  20  wanted someone -- I think that -- let's say this.  I think that

21  is the general idea.  I think Molly Roth had been looking for a

22  professor who had expertise on immigration, and she got my name

23  from another professor.

24  Q    Okay.  And do you consider yourself and kind of your

11:43:48  25  conclusions on these issues part of what you discussed as kind

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

85

1  of the academic consensus on, really, this interplay between

2  immigration law and immigration history?

3  A    Yes.

4  Q    And are you familiar -- I know Professor, I think, Lytle

11:44:06  5  Hernandez --

6  A    Lytle, Kelly Lytle Hernandez.

7  Q    Lytle Hernandez, thank you.

8       -- came up during your direct.  Is Professor Lytle

9  Hernandez also part of what you would consider to be the

11:44:19  10  academic consensus on this issue?

11  A    Yes.

12  Q    And you're also familiar with another professor who's done

13  some work and testimony, I believe Professor, is it, Gonzalez

14  O'Brien?

11:44:29  15  A    Yes.

16  Q    And would you consider Professor Gonzalez O'Brien to also

17  be part of this academic consensus?

18  A    So to the best of my knowledge, his work is considered to

19  be a part of the academic consensus.

11:44:50  20  Q    And so were you aware or have you had contact with, say,

21  Professor Lytle Hernandez prior to beginning your work on this

22  historical background information concerning Section 1326?

23  A    No.  And I actually did not know that she had filed an

24  affidavit and had been participating in this endeavor.

11:45:17  25  Q    And are you aware that Professor Lytle Hernandez and

1    perhaps other relevant members of the academic consensus, in

2    addition to filing these affidavits in these kinds of cases,

3    have also been filing amicus briefs and that sort of thing in a

4    variety of other immigration-related cases?

11:45:36    5    A    Yes.

6    Q    And have you been, have you been a part of any sort of

7    amicus brief or signed on to anyone's amicus brief or anything

8    like that?

9    A    No.

11:45:48    10    Q    So is this some -- is this an activity that historians have

11    regularly engaged in, being in this sort of advocate, advocacy

12    role, in filing amicus briefs and that kind of thing as part of

13    legal cases?

14    A    In order to answer that question, I would actually need to

11:46:14    15    do some historical research.  I'm reluctant to answer that

16    question without knowing more historical context.

17    Q    Okay.  Fair enough.

18        Do you have personal views on the merits, or lack thereof,

19    of the United States immigration system?

11:46:30    20    A    I think, like anyone --

21        MR. GODDARD:  Your Honor, Your Honor, I would object to

22    that question.  Dr. Kang is here testifying as to the history.

23    She's not here to offer any personal opinions.  She was not

24    asked any personal opinions on direct.

11:46:44    25        THE COURT:  Mr. Goddard, for whatever reason, your video

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*                    87
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

 1    dropped, at least on my screen.  There you are.

 2          MR. GODDARD:  My apologies.  Here I am.

 3          THE COURT:  Okay.  So your objection is that this is

 4    outside the scope?  Is that how you're framing this objection,

11:46:59  5    Mr. Goddard?

 6          MR. GODDARD:  Yes, Your Honor.  It's outside the scope,

 7    and it's also not relevant to what -- why Dr. Kang's here.

 8    She's here to talk about the history of the illegal reentry

 9    statute.  She's not here to offer personal opinions.

11:47:12 10          THE COURT:  But she was asked by you about what she

11    expected to find.

12          MR. GODDARD:  Certainly, Your Honor, as a historian,

13    knowing the history that she did before she started, what she

14    expected to find in the history; not what she wanted to find or

11:47:28 15    what she thought the history should have been.

16          THE COURT:  Mr. Ellis, your response to this?

17          MR. ELLIS:  Your Honor, the only purpose of this line of

18    questioning -- which won't be very long -- is simply that

19    Professor Kang has acknowledged that bias permeates many persons

11:47:50 20    in professions, to include academia and historians.  And a

21    question like this just simply probes any bias that might have

22    been present while researching and drafting the affidavit.

23          THE COURT:  I'm going to overrule the objection.  If you

24    want to ask the question again, Mr. Ellis, so the professor

11:48:09 25    knows what question it is, then she may answer.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

88

1      MR. ELLIS:  Thank you, Your Honor.

2  Q   (By Mr. Ellis)  So, Professor Kang, the question was,

3  essentially:  Do you have any personal views on the merits, or

4  lack thereof, concerning the United States immigration system?

11:48:24  5  A   Yes, I have personal opinions on the nation's immigration

6  system, but I think in that regard I'm no different from anyone

7  else in this courtroom or in society at large.

8      And in preparing the affidavit, I did not prepare it on the

9  basis of my personal opinion but upon the highest standards of

11:48:46  10  academic research that I was taught at Cornell and at the

11  University of California at Berkeley.

12      And because this is a public document that's read by

13  attorneys and judges as well as my own peers in the academic

14  community, I hold myself and that document to the highest

11:49:06  15  academic standards.

16  Q   All fair enough.  But do you personally have a positive

17  view of the United States immigration system?

18  A   I'm not . . .

19      So as I've just said, my own personal views on immigration

11:49:40  20  don't shape my scholarship, and so I'm not, I'm not certain of

21  the salience of the question.

22      THE COURT:  So for the court to examine your credibility

23  and to analyze your reports and your statements, please answer

24  the question.

11:50:15  25      THE WITNESS:  Okay.  Thank you.

1    So my own views of the nation's immigration system are

2    mixed.  I think there have been some positive things about the

3    nation's immigration system, and I have to say that because I'm

4    a second-generation immigrant.

11:50:36    5    Without certain features of the nation's immigration

6    system, my own parents would not have been able to come here,

7    and I would not have been able to have been a native-born

8    citizen and benefited from many of the positive things there are

9    about living in this country.

11:50:52    10    But at the same time, my own value system that I learned

11    from my parents and going to church with my parents, the value

12    system that I learned from my parents and from church often make

13    me on a personal level feel uncomfortable with some of the ways

14    that our nation's immigration system treats immigrants.

11:51:25    15    So it does pain me to see refugees put in detention for

16    extended periods of time, often in terrible conditions, and it

17    is actually very difficult for me to talk about the racism faced

18    by the immigrants over the course of the twentieth century

19    because it's very painful on just a fundamental, fundamental

11:52:00    20    level.

21    Q    (By Mr. Ellis)  Thank you, Dr. Kang.

22    A    So my views on immigration are mixed.

23    Q    Thank you.

24    So moving on, my plan is just to kind of walk through some

11:52:09    25    questions on each of the various acts that you talked about with

1    Mr. Goddard, but before we get there, I'd like to follow up on a

2    question that Mr. Goddard asked you.

3         So on direct you discussed both -- as kind of predecessors

4    to the 1952 INA, you discussed both the repatriation drives and

11:52:31  5    the Bracero Program.  Do you recall that, generally discussing

6    those two --

7    A    Yes.

8    Q    -- historical events?

9         All right.  And Mr. Goddard asked you concerning both of

11:52:43  10   those what the relevance of those was specifically to unlawful

11   reentry criminalization and Section 1326.  Do you recall being

12   asked that question?

13   A    Yes.

14   Q    And so your answer, which I would summarize as,

11:52:57  15   essentially, they were evidence of continuing animus, didn't

16   mention reentry or criminalization of reentry or Section 1326.

17        So I'm just gonna ask you Mr. Goddard's question again,

18   which is:  Specifically what relevance did these programs have

19   to the codification of Section 1326 in 1952?

11:53:25  20   A    So they reflected the ongoing racial animus towards Mexican

21   immigrants in this time period.

22   Q    Okay.  But, again, with the -- I guess the question being

23   narrowed by the word "specifically," do you have any historical

24   insights or statements from persons that connect attitudes

11:53:51  25   towards the Bracero Program and the repatriation drives directly

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

91

1    to the codification of Section 1326 in 1952?  Because I think

2    that was Mr. Goddard's question, and that's the question I don't

3    think was answered.

4    A    So could I ask you to repeat that question?

11:54:13  5    Q    Sure.  So Mr. Goddard's question was something along the

6    lines of what relevance did these two historical events

7    specifically have to Section 1326 and its codification in 1952.

8    And I'm just wondering if there's an answer as to -- that is

9    more specifically related to Section 1326 because -- yeah.

11:54:37  10   That's, that's the question.

11   A    So I think those two events reflect the longstanding racist

12   view that it was acceptable to expeditiously remove and punish

13   Mexican nationals when they were no longer wanted in the United

14   States.

11:55:02  15   Q    This leads to another kind of thing I'm sort of struggling

16   with as part of your testimony.  And so how does it benefit --

17   how did it benefit southwestern agribusiness or farming

18   businesses to imprison and lock up their laborers when they were

19   done with them?

11:55:27  20   A    It was a deterrent.  That's what it was.  So in times of

21   economic distress, when southwestern farmers felt that:  Okay.

22   It's now time to shut off the valve.  It's time to close the

23   valve and stop Mexican migrants from coming into the country.

24       I mean, if it's the case that we begin prosecuting and

11:55:48  25   detaining Mexican migrants, we will then send the message to

1    prospective Mexican migrants that they should not enter the

2    country.

3    Q    And is it kind of fair to sum up that that sort of comes

4    about at the end of harvesttime; that they no longer need the

11:56:04  5    laborers because the harvest is over, so they want them to go

6    home?

7    A    Yes, and there are multiple scenarios:  end of harvesttime;

8    an economic crisis; if a farm employer feels that a worker is

9    being intransigent; if workers try to initiate a labor action,

11:56:25  10   you know, form some kind of union, decide to go on some kind of

11   strike; or, frankly, if the farmer decided they just didn't like

12   the worker or workers, they would pick up the phone and call the

13   INS.

14   Q    Okay.  So there may be an aspect of specific deterrence,

11:56:43  15   that perhaps a farmer wanted to specifically deter a given

16   worker from returning.  Is that kind of a fair sum-up of those

17   last couple of comments?

18   A    Yes.

19   Q    So going back to the harvest, I mean, there's a harvest

11:56:59  20   every year, right, hopefully?

21   A    You know, I don't know enough about farming.  I think there

22   can actually be multiple harvests in a single year, and it

23   actually depends on the crop and . . .  But you know what?  I

24   should stop myself, because I really -- I don't know enough

11:57:22  25   about agriculture.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

93

1  Q   Fair enough.  I don't either.

2      But a farmer would anticipate having a future harvest or

3  harvests, right, down the road?

4  A   Yes.

11:57:39  5  Q   And then would need that laborer to come back for such

6  future harvests or harvest; right?

7  A   Yes.

8  Q   So that's what I'm struggling with, because I don't see --

9  from taking, you know, what you've testified to, I understand

11:57:57  10  how they may have a motive to have folks removed at the end of

11  harvest, but I struggle to see how it benefits the farmers to

12  then deter workers from coming back when they're gonna have a

13  harvest next year and the year after that.  And so, I guess, is

14  there any more insight you can provide as to how -- why farmers

11:58:16  15  benefited and supported deterrent measures from returning?

16  A   So farmers would support deterrent measures, again, in

17  economic downturns when they actually might have to cease having

18  a harvest with respect to their crop or crops.

19  Q   So perhaps -- okay.  I'll move on.

11:58:45  20     I'll move on directly to the 1952 McCarran-Walter Act.  So

21  you wrote about this a little bit.  Is it fair to say that this

22  act is being motivated by a number of political concerns?

23  A   Yes.

24  Q   And with one being maybe the foreign policy, circumstances

11:59:07  25  of the Cold War?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*                    94
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

1    A    Yes.

2    Q    And another being perhaps labor pressures from labor unions

3    and that kind of thing?

4    A    Yes.

11:59:23    5    Q    So, again, a number of, a number of motivating or

6    influencing factors behind the 1952 INA?

7    A    Yes, and I think -- yes.

8    Q    Okay.  So as we discussed, is it fair to say the 1952 INA

9    has a substantially large number of provisions of which Section

11:59:50    10    1326 is only one; right?

11    A    Yes.  That's correct.

12    Q    I want to talk a little bit about how the newly codified

13    Section 1326 differs from its predecessors.  So you testified,

14    you discussed with Mr. Goddard that a new, quote/unquote, "found

12:00:09    15    in" clause was added; is that right?

16    A    Yes.

17    Q    And so this made it, essentially, a crime to be -- where a

18    crime to have reentered the United States, it was prosecutable

19    wherever that individual was found within the United States;

12:00:27    20    right?

21    A    Yes.

22    Q    As opposed to before, where the government would have to

23    ascertain the exact district or state where that individual had

24    reentered the United States?

12:00:38    25    A    Yes.

USA v. Munoz-De La O/2:20-CR-00134-RMP-1
Motion to Dismiss Hearing - January 28, 2022
Kang/X/Ellis

95

1  Q    And so is it not fair to say that this is a quite expansive

2  broadening of the criminal prohibition that was previously

3  enacted in the 1929 act?

4  A    So I'm not a legal -- I'm not -- without knowing the exact

12:01:14  5  numbers of persons who were prosecuted under 1326 pre- and

6  post-1952, I can't answer definitively.

7  Q    But it certainly adds an entire new charging mechanism to

8  the criminalization of unlawful reentry; right?

9  A    Yes.  In theory, you would think that it would broaden the

12:01:44  10  ability of the INS to apprehend undocumented immigrants.

11  Q    Well, let's take, for example, a pretty immediate example.

12  Mr. Munoz-De La O's case is charged as a "found in" case.  Is it

13  not true that his case would not exist in this district under

14  the 1929 act?

12:02:08  15  A    Yes.

16  Q    In fact, is it not true that except for perhaps rare

17  circumstances where people enter across the Canadian border

18  between the Cascades and North Idaho, this district would see

19  almost no 1326 cases, almost no unlawful reentry cases under the

12:02:31  20  1929 act?

21  A    Yes.

22  Q    And so it's really only following the 1952 act and the

23  creation of Section 1326 that this prosecution even became

24  possible?

12:02:51  25  A    Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

96

1  Q    You also mentioned that the change or the language adopted

2  in 1952 dropped a lawfulness requirement from the burden of

3  proof on the government?

4  A    Yes.

12:03:09  5  Q    Okay.  So another change from what had previously existed

6  under the 1929 act; right?

7  A    Yes.

8  Q    And is it not also true that Section 1326 kind of melds

9  together a number of other prohibitions, such as statutes that

12:03:27  10  had specifically criminalized the reentry of folks removed as

11  anarchists or prostitutes?

12  A    Yes.

13  Q    So it's sort of a melding, a combining what had previously

14  been disparate statutes into one?

12:03:43  15  A    Yes.

16  Q    You talked about some of the government's motives in 1952

17  for creating, say, the "found in" clause.  Is it not a valid

18  government interest to preserve public moneys?

19  A    Yes.

12:04:06  20  Q    And so the motive, as I think you testified to, of the INS

21  to preserve money that was unnecessarily being spent

22  transporting people back to the districts that they reentered

23  in, is that not a valid governmental concern?

24  A    Yes.

12:04:27  25  Q    And is it not also a governmental concern to simply make

1    criminal laws practically enforceable?

2    A    Yes, so long as they don't perpetuate forms of racial

3    discrimination or serve as a pretext for racial discrimination.

4    And the "found in" clause was very much a function of this

12:05:03    5    widespread anti-Latino animus.

6    Q    Well, is it not fair that -- I think you wrote -- that the

7    INS was concerned because under the 1929 act, the government

8    somehow had to prove where the exact district that a person had

9    reentered the United States in with regards to --

12:05:29    10    A    Yes.

11    Q    And is it fair to say they thought that was pretty hard to

12    do?

13    A    Yes.

14    Q    And, in fact, would it be fair to say that, in your

12:05:45    15    opinion, that might be a little difficult to prove given that

16    there won't be any documentation or anything like that?

17    A    It would be fair to say that it was difficult to prove, but

18    it would also be fair to say that the INS and the Border Patrol

19    in this period had a reputation for being racially

12:06:14    20    discriminatory and for inflicting various forms of racial

21    violence against the Latino population in the southwest.  And

22    this is something that's been written about by Kelly Lytle

23    Hernandez and then also another MacArthur genius fellow named

24    Monica Munoz Martinez.

12:06:36    25         And so what happens in the twenties, thirties, forties, and

1    beyond is that the Border Patrol and the INS are populated by

2    former members of the Clan and also former members of the Texas

3    Rangers who had participated in the lynching of Mexican

4    Americans and Mexican immigrants in Texas.

12:06:56    5          And so the Border Patrol and the INS in the southwest at

6    this time was infected with pervasive anti-Latino animus.  And

7    oftentimes that animus, if it wasn't articulated in actual

8    physical violence and egregious forms of physical violence

9    inflicted upon Mexican immigrants, it was also articulated in

12:07:22   10    the efforts, and the very aggressive efforts, of the Border

11    Patrol and the INS to rewrite this nation's immigration laws,

12    whether it be through the creation of a 100-mile zone or through

13    the addition of a "found in" clause.

14          The reason that the Border Patrol and the INS tried as much

12:07:44   15    as possible and as aggressively as possible to expand their

16    legal powers is because of the widespread anti-Mexican animus

17    within that institution.

18    Q    But could it not also be said that the government simply

19    has an interest in taking laws that don't work in practice and

12:08:07   20    making them functional --

21    A    But that has to be balanced against the government's

22    interests in not drafting statutes and writing laws that

23    perpetuate racial discrimination and racial violence, and that

24    balancing, that balancing did not occur in this period.

12:08:28   25          THE COURT:  And you just need to let Mr. Ellis finish

1    the question before you answer.

2            THE WITNESS:  Okay.  I'm sorry.  I'm very sorry.

3            THE COURT:  Go ahead.

4            MR. ELLIS:  No.  That's okay.  I'll just ask the same

12:08:39  5    question again.

6    Q    (By Mr. Ellis)  Is it a legitimate government interest to,

7    when you have a statute that doesn't work in practice, change it

8    so that it can function as it's supposed to?

9    A    So here, I think that this whole idea of having a statute

12:09:02  10    work in practice, this is also something that really needs to be

11    contextualized, and, again, contextualized in light of events in

12    the 1920s, thirties, forties, and beyond; and contextualized

13    with respect to the ways in which the Border Patrol and the INS

14    operated in the southwestern borderlands, because this is an

12:09:31  15    agency that had a very different view of what it meant for a

16    statute to work or not work.

17            It's right -- this agency's metrics for deciding whether or

18    not a statute worked or didn't work would have been different

19    from the metrics that might have been implemented by the -- that

12:09:52  20    might have been applied by the US Forest Service, so that it

21    really -- that's a claim that really has to be put in context.

22            And based on my own research into the INS and the Border

23    Patrol, they were largely unsatisfied with most of the statutes

24    that they were given, because most of the statutes that governed

12:10:16  25    them and that were drafted by Congress never gave them enough

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

100

1  power.  The history of the Border Patrol and the INS is the

2  history of an agency that is constantly seeking more power, more

3  statutory authority, right, more funds, more manpower.

4      And what's important and interesting -- interesting and

12:10:44  5  stunning about the history of the INS and the Border Patrol with

6  respect to the immigration statutes is they've pushed for

7  expansions of their statutory authority even when that authority

8  in other contexts would be violative of the Constitution.

9      THE COURT:  Dr. Kang, would you mind answering the

12:11:06  10  question Mr. Ellis asked as to whether it would be a legitimate

11  government interest to, in fact, alter a statute so it could be

12  enforced.  I believe that was the question, Mr. Ellis, if I've

13  got that right.  Go ahead.

14      MR. ELLIS:  Yes, Your Honor.  And I think I can actually

12:11:25  15  get there through a hypothetical outside the immigration context

16  which might get us to where we need to go.

17  Q    (By Mr. Ellis)  And so, Professor Kang, just -- Congress

18  wants to pass a statute prohibiting convicted felons from

19  possessing guns.  Someone messes up at the computer, and they

12:11:40  20  pass a statute saying convicted felons cannot possess gum, with

21  an "m."  That statute does not serve the purpose Congress

22  intended.  That statute is not useful.  Is it a legitimate

23  purpose for Congress to go back and fix that statute so that it

24  can do what it was intended to do?

12:11:59  25  A    In that specific example, yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

101

1    Q    Okay.  I'll move on.

2         So you wrote in your affidavit -- and you discussed this

3    with Mr. Goddard as well -- that Congress remained largely

4    silent with respect to the recodification of the criminal entry

12:12:22    5    and reentry provisions of the immigration laws in the 1952 act;

6    right?

7    A    Yes.

8    Q    And based on your review of the legislative history, the

9    hearings, the debates, all that, do you agree that that is an --

12:12:37   10    what you wrote is an accurate reflection of the congressional

11    debates concerning Section 1326 in 1952?

12    A    Yes.

13    Q    Okay.  And then you concluded that Congress -- that in your

14    opinion, based on your research and all that, that Congress was

12:12:56   15    motivated by racial animus largely based on the historical

16    context when enacting Section 1326 in 1952?

17    A    Yes.

18    Q    And you were able to reach that conclusion despite the lack

19    of direct statements from congressmen when debating the 1952 INA

12:13:20   20    concerning the codification of Section 1326; right?

21    A    Yes.

22    Q    Okay.  And then you were able to quantify your level of

23    certainty; is that right?

24    A    Yes.

12:13:33   25    Q    And I think you went for high 90s?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

102

1    A    Yes.

2    Q    Is that scientific?

3    A    Yes.

4    Q    How?

12:13:56    5    A    It's scientific in the sense that I feel that the evidence

6    is overwhelming that Congress is motivated by anti-Latino racial

7    animus in passing this iteration of 1326.

8    Q    Okay.  So more of a -- so less scientific, more of a

9    feeling?

12:14:22    10    A    I wouldn't say -- it's not a feeling.  It's based on

11    evidence.

12    Q    Okay.  So what would get you to 100 on this scale?

13    A    You know, I'm not, I'm not certain.  And, again, it's --

14    yeah, I'm not certain what it, what it would be.  It's hard to

12:15:19    15    envision what exactly it would be, what specific piece of

16    evidence or pieces of evidence.

17    Q    Okay.  And is this -- is that kind of, the idea of

18    quantifying the level of certainty, is that a common practice

19    among academic historians?

12:15:40    20    A    You know, it's not a common practice among academic

21    historians.  But, again, when we prepare our journal articles,

22    our monographs, and our books, we hold ourselves to the highest

23    standards of evidence.

24    Q    Okay.  So just to take another historical example down this

12:16:07    25    vein, I assume just as part of, you know, your general history,

1  education, that you had to take classes and courses, do

2  coursework that concerned areas of history outside United States

3  immigration policy; right?

4  A    Yes.

12:16:25  5  Q    So to the extent you know, what is a historian's general

6  feeling for the idea that the Roman Emperor Nero played the

7  fiddle while Rome burned?

8  A    I do not know.

9  Q    Well, is it fair to say that such things like that might be

12:16:46 10  tainted by bias or limited evidence that survives over the 2,000

11  years since that supposed event?

12  A    Yes.

13  Q    So things like limited evidence might color how historians

14  view what certain folks say happened in the past?

12:17:04 15  A    Yes.  That's correct.

16  Q    And bias such as -- I mean, that story comes from the Roman

17  writer Suetonius, who may well have been biased, may well also

18  taint whether or not what's been reported as happening actually

19  happened; right?

12:17:24 20  A    Yes, but bias doesn't mean that an account is patently

21  wrong and that it ought to be discarded altogether.

22  Q    Oh, true, but I think the gist of that one is that I don't

23  think -- not many people contest that Rome burned down.  I think

24  it's just to do with Emperor Nero's attitude and his demeanor

12:17:47 25  while that event occurred, right, and that's what's in question.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

104

1   A   Yes, but even that account provides some form of evidence.

2   Q   And so -- I'd just like to sum up.  So you describe your

3   certainty as overwhelming that --

4   A   Yeah.

12:18:06   5   Q   -- in 1952, Section 1326 was motivated by racial bias?

6   A   Yes.

7   Q   And that's in spite of the lack of statements --

8   A   Yeah.

9   Q   -- and the lack of debate?

12:18:16   10   A   Because what I do is -- again, when you consider the larger

11   historical context, the statements of these legislators on the

12   Florida House and the Senate; when you consider that the

13   opponents to the McCarran-Walter Act even admitted that the

14   racism was so pervasive that they weren't gonna challenge the

12:18:45   15   national origins quota system; and, you know, when you consider

16   that -- when you envision the counterfactual, which is, you

17   know, what if somebody had proposed dismantling 1326, it's just

18   not conceivable in that time period, and that's because of the

19   racism.  There would have been an absolute uproar if someone had

12:19:14   20   proposed dismantling or revising 1326.  It just would not have

21   been feasible.

22   Q   Well, I get that, but isn't it also true there's no

23   statements in support either?  There's nothing.

24   A   So the lack of controversy, again, indicates this general

12:19:32   25   consensus for 1326.

Q    Okay.  So finishing up on 1952, you also write that

(reading):  In 1952, Washington lawmakers consciously chose not

to erase the animus -- or the racial animus -- sorry -- from the

nation's immigration laws, including 1326.

12:19:55    Right?

A    Yes.

Q    So to your knowledge, how many lawmakers remained in

Congress in 1952 who were present as elected representatives in

1929?

12:20:10    A    That I am not certain of, but one thing that historians do

know is that one of the reasons that the national origins quota

system -- which originated in 1924 -- had such longevity is that

nativists and xenophobic members of Congress, who had been in

the House in 1924, often were in Congress for many, many years.

12:20:39    And then, again, those members of Congress who had supported the

national origins quota system in '52 remained in Congress well

into the sixties and played a role in sharply opposing the

dismantling of the quota system in '65.

So that the longevity of xenophobia in American immigration

12:21:05    law is very much a function of the structural features of

Congress and that you have, you continue to have these

legislators in Congress over the long durée, and sometimes in

these very powerful positions such as the chair of the House and

Senate judiciary committees as well as the House and Senate

12:21:25    immigration subcommittees.

1  Q    Is there any -- in reviewing the records, in reviewing the

2  hearings, the debates, all that, did you find any evidence that

3  lawmakers in 1952 reviewed the *Congressional Record* from 1929?

4  A    No.

12:21:44  5  Q    Or any hearings, any eugenicists who were invited to

6  Congress, any of that?

7  A    So with respect to 1952 . . .

8     Well, I can't answer definitively as to whether or not

9  eugenicists were invited.  The best places --

12:22:20  10  Q    I'll --

11  A    Yeah.

12  Q    Sorry.  I'll rephrase it.

13     The question is:  Generally, are you aware of any evidence

14  that legislators in 1952 reviewed anything -- from the testimony

12:22:30  15  to the debates to statements from other legislators -- anything

16  from 1929 when the 1929 act was passed?

17  A    To the best of my knowledge, no.

18  Q    Okay.  And so just circling back just a little bit, so is

19  it fair to say that a large part of the 1952 INA, a topic you've

12:23:02  20  discussed a couple of times, was revising the entry quota

21  system?

22  A    Yes.

23  Q    So aside from just both being parts of immigration law, how

24  is the entry quota system related to the criminalization of

12:23:18  25  reentry into the United States after you've been deported?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*                                        107

1    A    So are you referring to the national origins quota system?

2    Q    Yes.

3    A    So the national origins quota system is related to 1326

4    insofar as it left -- insofar as it did not place a numerical

12:23:45  5    quota on Western Hemisphere immigration and, in turn,

6    facilitated the easy entry of Mexican workers at the behest of

7    southwestern agricultural labor.

8    Q    But in general, is it fair to say that the quota system --

9    so say there's -- say the quota system allows for 2,000 English

12:24:09  10   people to come into the United States a year.  Those would be

11   legal entries, right, those 2,000?  They'd give them visas;

12   right?

13   A    Yes.

14   Q    And so the quota system deals with legal entries while

12:24:24  15   Section 1326 deals with unlawful entries; right?

16   A    Yes.

17   Q    And undocumented entries as opposed to entries with visas

18   and other documentation; right?

19   A    Yes.

12:24:38  20   Q    Okay.  So I'll move on.

21        And, Your Honor, it's been about 55 minutes.  I'm jumping

22   now into the eighties and nineties.  I don't know if this might

23   be a good time for a break?

24        THE COURT:  Okay.  I think that makes some sense.  So

12:25:03  25   does everyone -- and I'm just going to ask the interpreters

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

108

1    first.  I'm gonna ask Ms. Rivera.  Can you manage with a

2    15-minute break or do you need a half-hour break?

3            INTERPRETER RIVERA:  The interpreter is speaking.  The

4    interpreter asks for a brief moment to consult with her

12:25:26    5    colleague.  One moment, please, Your Honor.

6            THE COURT:  Okay.

7        (Pause in proceedings)

8            INTERPRETER RIVERA:  Interpreter Rivera speaking.  Thank

9    you, Your Honor.

12:26:00    10        Interpreter Rivera has consulted with her colleague, and

11    a 15-minute break would be sufficient for both interpreters.

12    Thank you.

13            THE COURT:  Okay.  And I just need to check with the

14    court reporter too.  Does the court reporter think 15 minutes

12:26:14    15    will work or do you need longer?

16        (Court reporter replied)

17            THE COURT:  Okay.  So since I've taken so long to ask

18    these questions, we'll resume at 12:45.

19            Court is in recess.

12:26:46    20        (Recess taken:  12:26 pm to 12:44)

21            THE COURT:  I think we have everyone.  So, Mr. Ellis,

22    please continue.

23            MR. ELLIS:  Thank you, Your Honor.

24    Q    (By Mr. Ellis)  Dr. Kang, as I mentioned before the break,

12:45:03    25    I'm going to jump to the later amendments in the eighties and

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

109

1    nineties, and I just have a couple of questions about, really

2    about each amendment and the process that went behind it.

3         So starting with the Anti-Drug Abuse Act of 1988, if I

4    remember your affidavit correctly, is it fair to say that then

12:45:22  5    Senator Chiles wrote, I think, five different kind of major

6    bills that were ultimately folded into the Anti-Drug Abuse Act

7    of '88?  Is that fair to say?

8    A    Yes.

9    Q    Of which one was the amendment to Section 1326 increasing

12:45:39  10   the penalties?

11   A    Yes.

12   Q    Okay.  I want to ask you about a couple of the other ones.

13   So I believe one such change, though, is made in the Anti-Drug

14   Abuse Act of '88, was a mandatory detention in immigration

12:45:58  15   proceedings for aggravated felons; is that right?

16   A    Yes.

17   Q    Okay.  So --

18        INTERPRETER RIVERA:  And the interpreter is speaking.

19        Mr. Ellis, would you please repeat that question a

12:46:10  20   little bit more slowly, please.  Thank you.

21        MR. ELLIS:  Sure.  And my apologies.

22   Q    (By Mr. Ellis)  So the question was:  Was one of those

23   provisions mandating detention in immigration proceedings for

24   aggravated felons?

12:46:26  25   A    Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

110

1  Q    Okay.  So persons are not born with aggravated felony

2  convictions; right?

3  A    That's correct.

4  Q    You know, having -- you have to do something when you're

12:46:43  5  here.  You know, you have to be convicted of murder or drug

6  trafficking or child abuse or something, right, to merit being

7  an aggravated felon; right?

8  A    Yes.

9  Q    So I guess I'm wondering, how -- so if you have the overall

12:47:01  10  subset of aliens, and then you assume that a smaller, much

11  smaller subset of that overall group are aliens with aggravated

12  felonies, I guess, how is it racist to enact a policy that is

13  more punitive, or whatever word you want to use, against folks

14  who do have those aggravated felony convictions?

12:47:27  15  A    So, again, based on the research that I conducted into

16  Senator Chiles and his own motivations for trying to amend the

17  nation's immigration laws and Section 1326, he was motivated by

18  his own racial antipathies toward Cuban and Haitian refugees,

19  and he was also responding to the deeply xenophobic sentiments

12:48:02  20  of his Florida constituents.

21  Q    And I get that, and you talk in your affidavit about, you

22  know, the terms like criminal aliens that were being thrown

23  around at the time, but this provision literally deals with

24  aliens who are criminals.  And so I just struggle to see how,

12:48:19  25  when you're literally dealing with aliens who are criminals, you

1    drift into the potentially not great language of criminal

2    aliens?

3    A    Yes.  So I think that when it comes to this measure, it's

4    very important to take into account the many critiques that were

12:48:40  5    issued at the time.  And one such powerful critique was issued

6    by Wade Henderson, an attorney for the ACLU, and he really asked

7    many probing questions of Senator Chiles's amendment and really

8    questioned whether there was anything there to Chiles's attempts

9    to characterize immigrants as felons, right, as criminals.

12:49:15  10   And, you know, Henderson also finds that the data that had

11   been used to bolster such claims and to fashion such legislation

12   really didn't bear out the idea that immigrants and refugees

13   were criminals and merited the kinds of punishments that Chiles

14   was proposing in these bills.

12:49:42  15   Q    And I get that, but, again, this provision isn't dealing

16   with some hypothetical persona of the criminal alien in the

17   community.  It is literally dealing with an alien who is a

18   criminal.  It does not impact in any way an alien who does not

19   have an aggravated felony conviction.

12:50:03  20   And so I struggle to see how this provision is influenced

21   by a negative and perhaps false persona of a criminal alien when

22   it targets, literally, aliens who are criminals and no one else.

23   So I guess -- I don't know if you have anything else to add, but

24   I just am -- I just don't really see the link.

12:50:26  25   A    I think we really need to bring a healthy skepticism to

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*                                                    112

1    measures that Chiles was proposing in this period.  So, you

2    know, first, I referenced Wade Henderson's critique; but I think

3    we also have to keep in mind that, you know, Chiles wasn't -- we

4    have to ask ourselves, you know, Chiles wasn't necessarily

12:50:48  5    thinking about actual crime.  He was also thinking about his own

6    reelection, and he knew that in order to get reelected, he had

7    to pander to the xenophobic sentiments of his Florida

8    constituents, right, and hence draft these kinds of measures.

9    Q    But, again, I mean, can't this kind of provision be easily

12:51:13  10   justified as a public safety analysis?  I mean, again, you're

11   not -- a person isn't born an aggravated felon.  You have to do

12   something first to get there.  Is it not -- is public safety not

13   a potentially valid reason justifying this kind of provision?

14   A    Yeah, public, public safety is a valid concern, but it also

12:51:35  15   has to be balanced against the concerns of the community to not

16   be racially discriminated against, and also balanced against the

17   concerns of the community to have laws that are proposed on the

18   basis of solid empirical evidence.  And that's -- it's not clear

19   to me that those two, those two sort of balancing tests were met

12:52:03  20   in this case.

21   Q    And so I think if the provision Chiles had proposed had

22   been mandatory detention for all aliens, then I think I could

23   follow your reasoning, but I guess I just don't because it's

24   mandatory detention for aggravated felons.  It's a subset.

12:52:25  25        And so I'll move on to another provision of Chiles's, the

1  criminal penalties for persons who assist aliens with drug

2  trafficking convictions from reentering the United States.  So,

3  again, is it not fair to say that we're not dealing with all

4  aliens here?  We're dealing with a specific subset --

12:52:46  5  A    Yeah.

6  Q    -- who have done something that, essentially, moves them

7  into another class, here, those with drug trafficking

8  convictions?

9  A    Yeah.  So the broader legislative history of that provision

12:53:02  10  is that Chiles, as well as other legislators, were extremely

11  upset about the way in which the so-called Mariel Cuban refugees

12  arrived in the United States, and oftentimes they were able to

13  make it to America's shores with the assistance of relatives.

14  Some of them chartered boats and sailed them to Cuba to pick up

12:53:29  15  their relatives in Cuba.  Some of them may have been in Cuba and

16  had sailing vessels there and sailed them to the United States.

17      So that provision was directed to those family members who

18  were trying to offer humanitarian assistance to their relatives.

19  And the interpretation, the standard interpretation is that

12:53:51  20  these efforts to penalize these humanitarian family members was

21  a function of racial animus.

22  Q    But, again, I mean, this provision would only impact

23  someone who -- and I haven't read the exact language, but I

24  would assume knowingly, they would probably have to know that

12:54:12  25  the person they were helping had a drug trafficking conviction,

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*                        114
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

1    and it only impacts that very small group.  Is it not fair to

2    say that it only impacts a very small subset of folks who may

3    have been coming from Cuba or Haiti or other places?

4    A    And, again, I think that, yes, it might be fair to say that

12:54:43   5    it impacts a small group of people, but then you would also have

6    to take into account, in assessing the value or worth of this

7    legislation, is that impact disparate in any way; right?  Is it

8    targeting certain individuals of a particular race or

9    nationality to a greater extent than others?

12:55:07   10   Q    Well, isn't it fair to say it's targeting folks with drug

11   trafficking convictions?  I mean, that's what it does; right?

12   That's the only people it impacts?

13   A    So yes, it's fair to say that.

14   Q    Okay.  So, again, as with many of these other statutes, you

12:55:30   15   know, this Anti-Drug Abuse Act was passed overwhelmingly.  I

16   think you wrote and testified that it was 346 to 11, I'm

17   assuming in the House?

18   A    Uh-huh.

19   Q    So we heard, obviously, about Senator Chiles.  We heard

12:55:45   20   about -- can you tell us about any other, any other statements,

21   debates, hearings, anything where a congressman or woman who

22   subsequently voted for this bill gave an opinion on increasing

23   the penalties for Section 1326?

24   A    Not at this time, no.

12:56:08   25   Q    Thank you.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*                      115
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

1    So I'm gonna move now to the Immigration Act of 1990, the

2    next one in our series of amendments.  And so, again, similar,

3    you wrote here that -- and correct me if I'm wrong -- but the

4    legislative history of the 1990 amendment of Section 1326 was

12:56:29  5    very thin; right?

6    A    Yes.

7    Q    And because -- and then the section in the affidavit kind

8    of then veered off, talking about Senator Graham.  I'm assuming

9    "very thin" means not really anything; again, no debates, no

12:56:44  10   hearings, no nothing?

11   A    That's correct.

12   Q    Okay.  And then moving to the Violent Crime Control and Law

13   Enforcement Act of 1994, again, in a similar vein, I think you

14   wrote that during the floor debates, Congress said very little

12:57:04  15   regarding the proposed changes to Section 1326; right?

16   A    Yes.

17   Q    And, again, in a similar vein, I'm assuming "very little"

18   means nothing, because nothing was --

19   A    No.

12:57:13  20   Q    -- mentioned as to quotes or anything like that?

21   A    So we're talking about the Clinton crime bill?

22   Q    Yes.

23   A    So it's definitely not nothing.  There are discussions of

24   1326 in those debates.

12:57:35  25   Q    Okay.  And is that from Representative McCollum or others

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

116

1    or who?  Who was a proponent -- who was expressing views in a

2    positive manner towards these changes to Section 1326?

3    A    So what happens in '94 is McCollum proposes his version of

4    1326 that ultimately gets folded into the Clinton crime bill.

12:58:04    5    But at the same time, you have Senator Harry Reid proposing

6    his own version of 1326 and making that now widely publicized

7    speech about how he believed that -- and here I'm paraphrasing --

8    that no sane country would grant birthright citizenship to

9    children born in the United States to undocumented parents.

12:58:36    10    And then at the same time, during a congressional committee

11    hearing, Chris Sale, who I believe was the head of the INS at

12    the time, endorsed 1326.

13    Q    I think I do remember that.  I think you wrote that the INS

14    director was perhaps the sole witness to discuss 1326.

12:59:03    15    But, again, relatively uncontroversial, and the bills

16    passed with relatively broad support.  Is that fair to say?

17    A    Yes.

18    Q    So, again, the AEDPA, the Antiterrorism and Effective Death

19    Penalty Act of '96, again, similarly you wrote that no

12:59:26    20    congressmen challenged the additions to Section 1326; right?

21    A    That's correct.

22    Q    And, again, the overall statute passed with broad

23    bipartisan support?

24    A    Yeah.  And I should go back to the Clinton crime bill.

12:59:39    25    That bill didn't pass with bipartisan support.  That was really

1    heavy -- it was principally the Democrats who voted for that

2    crime bill.

3    Q    Thank you for clarifying.

4         And then finally, the last one, the Illegal Immigration

12:59:58    5    Reform and Immigrant Responsibility Act of '96, IIRIRA, and,

6    again, similarly, is it fair that you wrote that the change to

7    Section 1326 stirred no debate in Congress?

8    A    That's correct.

9    Q    And, again, you know, relatively strong support for the

01:00:19    10    bill overall?

11    A    Yes.

12    Q    So you sum up after the discussion of IIRIRA by writing

13    that between 1996 and 2013, immigration prosecutions primarily

14    under Sections 1325 and 1326 increased by a factor of 10; is

01:00:39    15    that right?

16    A    I believe so.

17    Q    And then I think you also wrote that this increase was a

18    result of IIRIRA as well as Operation Streamline?

19    A    Yes.  That's based on a study that I was -- I believe was

01:00:59    20    produced by TRAC, but I would have to double-check that.

21    Q    Okay.  I'm just wondering about the causation.

22    A    Okay.

23    Q    Is it fair -- like, my understanding of the changes to 1326

24    in IIRIRA is that they added 1326(b)(4); right?

01:01:23    25    A    Yes, and I would need to look at the code to refresh my

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*                    118
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

1    memory on (b)(4).

2    Q    I think long story short, it increases the statutory

3    maximum penalty to 10 years for persons convicted of nonviolent

4    offenses while on probation, supervised release, or parole with

01:01:46  5    reentry of the United States.  Is that a fair summation of that

6    legislative change?

7    A    Okay.  Yes.

8    Q    How did that spur a tenfold increase in prosecutions?

9    A    So while I can't speak to that specific provision, there's

01:02:09  10   a consensus among immigration scholars that immigration

11   legislation from nineteen -- at least 1988 onwards, 1988, 1990,

12   1994, the measure's passed in '96, and then '96/'97.  The

13   enforcement provisions of these immigration laws all contributed

14   to a situation that we have now in which we have an

01:02:39  15   unprecedented number of detentions and deportations.

16   Q    Okay.  But, I mean, it isn't -- this is a criminal statute;

17   right?  It doesn't directly have anything to do with folks then

18   being removed from the United States; right?

19   A    Yes.  Yes, and so it's also argued, again -- and this is

01:03:02  20   the prevailing view among immigration scholars -- that the

21   criminalization of immigration under these laws, again '88, '90,

22   '94, '96, and IIRIRA of '96, contributed to the situation where

23   1325 and 1326 cases constitute the bulk of the workloads in the

24   offices of Federal Defenders around the country.

01:03:36  25   Q    Okay.  And I guess I just wonder, because increasing the

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

119

1    statutory maximum penalty for something doesn't on its face

2    directly correlate with increased prosecutions; right?  There's

3    no direct spatial link between those two concepts; right?

4    A    So I can only make an assumption that that's correct, but

01:04:05    5    my world is not the world of the court, so I don't claim to be

6    an expert on the number of actual prosecutions that have

7    occurred as a result of the various provisions of 1326.  But, if

8    necessary, I would be happy to provide those to you afterwards.

9    Q    I think that's okay.  I'll move on.

01:04:34    10    So generally, you know, these amendments in the eighties

11    and nineties -- with some exceptions, but is it fair to say they

12    generally increase the maximum penalties for certain persons

13    convicted under Section 1326?

14    A    Yes.

01:04:50    15    Q    For example, the VCCLEA increased the maximum statutory

16    penalty for persons with aggravated felony convictions; right?

17    A    Yes.

18    Q    And so, again, going back to what we were talking about

19    before, I mean, that is targeting persons with certain

01:05:12    20    convictions; right?  It's not targeting everyone?

21    A    Yes.

22    Q    And, you know, if there's a big circle of everyone who is

23    an alien, there's gonna be a smaller circle of those persons who

24    qualify for that increased maximum penalty; right?

01:05:30    25    A    Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

120

1  Q    Okay.  So Congress has generally -- and also it increased

2  the penalty for persons with non-aggravated felony convictions;

3  right?  That's another one?

4  A    Yes.

01:05:47  5  Q    So these provisions, is it not fair to say, are just

6  increasing the penalties for persons who have done, say, either

7  serious or very serious criminal acts while present in the

8  United States?

9  A    Yes, it is fair to say that.

01:06:10  10  Q    And could that not be a public safety concern that persons

11  should be treated perhaps more punitively if they have done more

12  serious things while present in the United States?

13  A    Yes.  It is -- you know, public safety is a legitimate

14  concern, but I think that, you know, one of the questions at

01:06:40  15  issue here is that these punishments, which may be legitimate,

16  deserve a heightened level of what lawyers call scrutiny.  And

17  this is because these are penalties under the criminal law, and

18  that's made explicit in 1326.

19  Q    But being an alien when you're charged under Section 1326,

01:07:17  20  the fact that if the person is an alien has nothing to do with

21  whether their maximum penalty is 2 years or 20 years; right?

22  It's solely a function of their criminal history; right?

23  A    I would think so, but I am not certain.

24  Q    Okay.  So moving on, so as part of, kind of, a wrap-up,

01:07:47  25  conclusion -- and you talked about this with Mr. Goddard as

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

121

1    well -- you wrote that during the 1988, 1990, 1994, and 1996

2    legislative debates, lawmakers made no effort to acknowledge

3    and/or amend the racial animus that informed earlier iterations

4    of this provision in Title 8; right?

01:08:09    5    A    Yes.

6    Q    And I think you testified to something very similar with

7    Mr. Goddard.

8         So I'm gonna ask you some questions that are similar to

9    some I asked about 1952.  I'm assuming the answer to this one is

01:08:22    10    "No," but are you aware of any members of Congress who were

11    still in Congress in the eighties and nineties who were in

12    Congress in 1929?

13    A    No.

14    Q    And the same question for 1952.  Are you aware of any

01:08:36    15    members of Congress who were in Congress in 1952 who were still

16    in Congress in the eighties and nineties?

17    A    No.

18    Q    And have you in your review of the legislative history of

19    those various bills from the eighties and nineties, do you see

01:08:54    20    any evidence that congressmen or women in the eighties and

21    nineties reviewed the hearings, the records, anything, the

22    debates, from either 1929 or 1952?

23    A    No.

24    Q    So just to summarize it a little bit, is it fair to say

01:09:15    25    that with these bills 1952 through the eighties and nineties,

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

122

1    Section 1326 and then its subsequent amendments spurred little
2    to zero debate as part of the overall debates concerning those
3    measures?
4    A    I would say yes, little debate.
01:09:38   5    Q    And you discussed when going through your background that,
6    you know, part of determining legislative history is you
7    extensively review and read, you know, records, reports,
8    hearings transcripts, you know, everything -- anything and
9    everything that went into the *Congressional Record*, and debates,
01:09:56   10    when they were considering these statutes; right?
11    A    Yes.
12    Q    And, in fact, here you physically went to the *Congressional*
13    *Record* to review such items?
14    A    Yes.
01:10:08   15    Q    And when you started out, I think you testified that you
16    really weren't thinking you were gonna find very much?
17    A    That's correct.
18    Q    Isn't that true concerning Section 1326 specifically?  If
19    there was little to no debate, if there was not much said about
01:10:27   20    it, is it not true that you didn't find very much?
21    A    No, because the *Congressional Record*, the legislative
22    history, and the broader historical context make it very clear
23    that racial animus was pervasive in the recodification and the
24    amendments to 1326.
01:10:57   25        And what's even more striking is that there is no way that

1    anyone could have or would have dared to have raised a challenge

2    to 1326 in these periods of US history, because it would have

3    been political suicide.  In the 1980s and '90s these

4    congresspersons would have lost reelection if they made any

01:11:26  5    attempt to expunge the racial animus from 1326 or dilute it in

6    any way.  It was in their best political interest, to put it

7    colloquially, to get on the xenophobia bandwagon and propose and

8    support anti-immigration measures in this period.

9    Q    So is it not fair to say that your opinions are really more

01:11:51  10   about the overall bills than Section 1326?  Like, take the 1952

11   INA.  You have nothing specific about 1326, but you say it's

12   overwhelmingly animated by racial animosity.  Isn't that

13   conclusion really about the entire 1952 INA?

14   A    But those conclusions about the larger bill form an

01:12:18  15   essential part of the historical context that are important to

16   understanding the legislative intent underlying 1326, especially

17   since so many components of those bills pertain to the issue of

18   immigration law enforcement, and that, and that is related to

19   1326.

01:12:41  20   Q    And so is the same true for -- you know, 1326 is not

21   specifically discussed in the variety of bills in the eighties

22   and nineties.  So is it not fair to say that your opinion that

23   it was motivated by racial animosity is really an opinion that

24   the immigration provisions in, say, the AEDPA were motivated by

01:13:01  25   racial animosity?  Is that not a fair, kind of, jump to make

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

124

1    given your testimony?

2    A    You know, I'm sorry.  I missed some of that.  Could you

3    repeat that?  I'm sorry.

4    Q    So -- right.  So take AEDPA; right?

01:13:14   5    A    Yes.

6    Q    AEDPA makes a change to Section 1326 of which there are no

7    statements, there are no anything from legislators specific to

8    that, but you have statements that you've talked about

9    concerning general immigration policy in the AEDPA.

01:13:29   10        So is not your opinion that 1326, as amended in AEDPA, was

11    motivated by racial animus, really an opinion that the entire

12    immigration structure from AEDPA was motivated by racial animus

13    because there's nothing specific about 1326?

14    A    No.  I would have to disagree because, again, in trying to

01:13:52   15    understand the legislative intent of any particular clause in a

16    piece of legislation, it's legitimate to look at the larger

17    history of the bill itself.

18    Q    Exactly, though the larger history is the same for every

19    immigration provision in that bill.  And if all you're looking

01:14:12   20    at is the larger history, shouldn't the conclusion trickle down

21    to every individual immigration provision?

22    A    In the late -- for the late twentieth century, that

23    actually would not be an unwarranted conclusion.

24    Q    Okay.  So based on --

01:14:32   25    A    But especially when you consider the electoral pressures

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

125

 1    that these congresspersons were under.  The American public was

 2    very angry, extremely xenophobic.  They would have been

 3    satisfied with nothing less than xenophobic immigration bills.

 4    Q    So is it fair to say that IIRIRA in '96 was kind of the

01:14:59  5    last big overhaul of immigration law?

 6    A    Yes.  And what's fascinating about the debates about

 7    IIRIRA, when you read the congressional debates, the early floor

 8    statements begin with legislators saying, you know, this is a

 9    racist bill.  The same goes for AEDPA.  There is a large outcry

01:15:21  10    about the racism in that bill.

11    Q    So if the immigration system has not really been changed

12    since IIRIRA in '96, and IIRIRA and the precursor statutes that

13    crafted that immigration system were racially motivated, is it

14    your opinion that the entirety of the United States immigration

01:15:41  15    system is racist?

16    A    I think I -- and I recognize that, you know, that might be

17    one conclusion that you could draw; but, first, without having

18    looked at every single immigration statute that was ever

19    written, it's very difficult to come to that conclusion.  But I

01:16:21  20    would state --

21    Q    How about --

22    A    Yeah.

23    Q    No.  Go ahead.  Please finish your thought.

24    A    Yeah.  But I would say that I am convinced that racial

01:16:28  25    animus informed the passage of the 1952 McCarran-Walter Act, the

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*                                                    126

1   1988, the 1990, the 1994, and the 1996 laws.

2   Q    And as those laws, in combination or separately, created

3   the immigration system that we have today, then it follows,

4   right, that your opinion is that racial animosity taints the

5   entire immigration system?

6   A    So I -- again, I don't think that those laws constitute the

7   entirety of our nation's immigration system, and especially when

8   you look at it from a historical perspective; so . . .

9   Q    How about, so you've testified and you wrote that a variety

10  of congressmen, senators -- Senator Chiles, Representative

11  McCollum, and others -- were motivated by racial animosity;

12  right?

13  A    Yes.

14  Q    Is it your opinion that any congressman or senator who

15  voted for these bills was motivated by racial animosity?

16  A    I'm sorry.  I missed that again.  Could you repeat?

17  Q    I'll repeat.  That's fine.

18  A    Yeah.

19  Q    So is it your opinion that any representative or senator

20  who voted for these bills was motivated by racial animosity and

21  a discriminatory purpose?

22  A    I think many of them were.  I cannot account for all of

23  them.  But, again, when you read the congressional debates

24  pertaining to this bill, one of the -- all of these bills, there

25  are several striking things.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/X/Ellis*

127

1    And it goes back to this point that historians have made

2    that both Democrats and Republicans were, quote/unquote, falling

3    all over themselves to propose anti-immigrant bills, to

4    rearticulate the xenophobic rhetoric of the times.

01:18:36    5    And Harry Reid here is the classic example, and Harry Reid

6    has now apologized twice for that speech he gave on the floor of

7    the House and his statements about the native-born children of

8    undocumented immigrants.

9    So one of the striking things when you do this legislative

01:18:58    10    history is just the pervasiveness of the xenophobia on both

11    sides, both sides of the aisle, and just the overwhelming

12    concern on the part of senators and members of the House, you

13    know, that they have to adopt this rhetoric and propose these

14    kinds of bills and then vote for these xenophobic bills so that

01:19:25    15    they can get reelected.  Right?

16    You know, one of the shocking things I found, Dianne

17    Feinstein -- I spent many years in California, you know, and got

18    to know a bit more about Dianne Feinstein.  Always assumed that

19    she was something of a liberal lion, so it was a shock for me to

01:19:46    20    learn that she early in her career was a staunch supporter of

21    increased appropriations for the Border Patrol and the

22    construction of a border wall.  And soon after she made those

23    recommendations, her poll numbers shot up.  So that's one of the

24    big takeaways of my research.

01:20:12    25    MR. ELLIS:  All right.  Thank you, Dr. Kang.  I don't

1  have any other questions, so I'll pass you back to Mr. Goddard.

2       THE WITNESS:  Thank you.

3       THE COURT:  Redirect, Mr. Goddard?

4       MR. GODDARD:  Thank you, Your Honor.

01:20:27  5       Dr. Kang, I know you've been testifying for quite some

6  time.  I appreciate it.  I'll try --

7       THE COURT:  And we shouldn't speed up at this time

8  because the interpreters and the court reporter are tired, so

9  time to slow down.  Okay?

01:20:40  10      MR. GODDARD:  Yes, Your Honor.

11                      REDIRECT EXAMINATION

12  BY MR. GODDARD:

13  Q    Dr. Kang, Mr. Ellis asked you some questions about whether

14  you knew who had asked --

01:20:52  15      MR. ELLIS:  Your Honor, I'm sorry to jump in.  I'm

16  having a really hard time hearing Mr. Goddard.  He's very, very

17  quiet.

18      THE COURT:  So, Mr. Goddard, you seemed a little fast to

19  me.  Maybe just a little louder, a little slower.

01:21:07  20      MR. GODDARD:  Certainly.  Is this better?  Can you hear

21  me, Mr. Ellis?

22      MR. ELLIS:  (Moves head up and down)

23  Q    (By Mr. Goddard)  Okay.  So, Dr. Kang, Mr. Ellis asked you

24  a series of questions about whether you had knowledge of who had

01:21:22  25  asked certain legislators to draft certain bills.  Do you

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/ReD/Goddard*

129

1    remember that line of questioning?

2    A    Yes.

3    Q    And you did not have exact knowledge of who asked whom to

4    draft each bill.  Does that lack of knowledge alter any of your

01:21:40    5    conclusions in any way?

6    A    No.

7    Q    Why not?

8    A    Because the statements of the legislators themselves and

9    their legislative record speak for themselves and attest to the

01:21:57    10    xenophobia that motivated their amendments to 1326.

11    Q    Thank you.

12        Mr. Ellis also asked you a series of questions suggesting

13    that Congress could have multiple motivations for passing a

14    bill.  Do you recall that?

01:22:18    15    A    Yes.

16    Q    And as I recall from your testimony when you and I spoke

17    earlier, you said that legislative intent is the history of

18    winners and losers; is that right?

19    A    Yes.

01:22:31    20    Q    And you look to the winners to get insight on legislative

21    intent; right?

22    A    Yes.

23    Q    Who were the winners of the 1952 act?

24    A    So the winners were Senator McCarran and Representative

01:22:51    25    Walter.

```
                    USA v. Munoz-De La O/2:20-CR-00134-RMP-1          130
                    Motion to Dismiss Hearing - January 28, 2022
                              Kang/ReD/Goddard
```

          1    Q    And who were the winners of the bills that amended 1326 in

          2    the 1980s and the 1990s?

          3    A    Senator Lawton Chiles, Senator Bob Graham, Representative

          4    Bill McCollum, and Representative Smith.

01:23:09  5    Q    Thank you.

          6         Dr. Kang, Mr. Ellis also asked you a series of questions

          7    about bias.  Do you recall that?

          8    A    Yes.

          9    Q    And you acknowledged that bias can impact historians just

01:23:28  10   as it can impact anyone; correct?

          11   A    Yes.

          12   Q    Do you have any concerns that your conclusions in your

          13   report or in your testimony here today were impacted or shaped

          14   by your personal biases?

01:23:42  15   A    No.

          16   Q    Is it fair to say that the opinions you've shared with the

          17   court are grounded in evidence and your professional opinion

          18   rather than your personal biases?

          19   A    Yes.

01:23:58  20   Q    Thank you.

          21        Dr. Kang, Mr. Ellis asked you a series of questions about

          22   the Bracero Program.  Do you recall that?

          23   A    Yes.

          24   Q    And you've previously testified that the Bracero Program is

01:24:14  25   an important historical context for understanding the

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/ReD/Goddard*                                                    131

1    legislative intent behind the 1952 act; correct?

2    A    Yes.

3    Q    And you've testified the bills and legislative intent

4    cannot be understood in a vacuum --

5    A    Yes.

6    Q    -- is that right?

7    A    Yes.  That's correct.

8    Q    And is it fair to say that Bracero Program is crucial to

9    understanding Congress's motivation --

01:24:43   10    A    Yes.

11    Q    -- in clarifying the reentry statute in the 1952 act?

12    A    Yes.

13    Q    Thank you.

14         Dr. Kang, Mr. Ellis asked you a series of questions about

01:24:55   15    whether members of Congress and certain congresses had read

16    testimony from prior congresses.  Do you recall that?

17    A    Yes.

18    Q    And you stated that you did not whether members of the 1952

19    Congress had read transcripts from 1929.  You did not know

01:25:15   20    whether members of Congress in the eighties and nineties had

21    read transcripts from decades prior; is that correct?

22    A    That's correct.

23    Q    Does that fact alter any of your conclusions in any way?

24    A    No.

01:25:28   25    Q    Why not?

*USA v. Munoz-De La 0/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/ReD/Goddard*

132

1  A   Because, once again, the statements of the drafters of the

2  amendments to 1326 speak for themselves and attest to the racial

3  animus that motivated the recodification and the amendments.

4  Q   Thank you.

01:25:54  5      Dr. Kang, Mr. Ellis suggested that there were certain

6  potentially valid governmental interests that may have or could

7  have, hypothetically, motivated Congress to pass the 1952 act or

8  to amend 1326, such as public safety or saving the government

9  money by making it easier to prosecute 1326.  Do you recall that

01:26:23  10 line of questioning?

11  A   Yes.

12  Q   And these purported or hypothetical reasons Congress might

13  have been justified in passing these laws, do they impact in any

14  way your conclusion that Congress was, in fact, motivated by

01:26:42  15 racial animus?

16  A   No.

17  Q   Why not?

18  A   Because, once again, the legislative history and the

19  broader historical record demonstrate that racial animus was a

01:26:59  20 principal motivation of the drafters of 1326.

21  Q   Thank you.

22      Dr. Kang, Mr. Ellis towards the end of his questioning

23  asked you a series of questions about aggravated felonies.  Do

24  you recall that?

01:27:18  25  A   Yes.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/ReD/Goddard*

133

1  Q    And I believe Mr. Ellis gave the examples of murder, child

2  abuse.  And there was a third crime I'm forgetting, but it was a

3  particularly heinous crime.  Do you recall that?

4  A    Yes.

01:27:26  5  Q    Over the course of the amendments to 1326 we have

6  discussed, are you aware of the definition of aggravated felony

7  changing in any ways?

8  A    Yes.

9  Q    And how did that definition change?

01:27:42  10  A    So over the course of the eighties and nineties it changed

11  by broadening quite substantially.

12  Q    And am I correct to understand that currently an aggravated

13  felony could include a misdemeanor conviction?

14  A    Yes.

01:28:00  15  Q    Thank you.

16       Mr. Ellis also discussed how -- his line of questioning, as

17  I recall it, was that it made sense to target certain aliens

18  convicted of these types of crimes.  Do you recall that line of

19  questioning?

01:28:20  20  A    Yes.

21  Q    And, again, Dr. Kang, you've testified that we cannot

22  understand legislative intent in a vacuum; correct?

23  A    That's correct.

24  Q    In your opinion, do you think it's a coincidence that

01:28:34  25  Congress enhanced penalties for aliens with aggravated felony

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Kang/ReD/Goddard*

134

1  convictions in the 1980s and 1990s, a time you have described as

2  a peak in this country's history of xenophobia?

3  A    No.

4  Q    And, Dr. Kang, do you believe it's coincidence that

01:28:53  5  Congress enhanced the penalties for aliens with aggravated

6  felony convictions, that those amendments were drafted by

7  legislators from Florida at the time when this sentiment was at

8  its peak in that state?

9  A    No.  And can I add to that a little bit?

01:29:11  10  Q    Certainly.

11  A    So here again, I would refer to the work of Michelle

12  Alexander, who talks about how the characterization and the

13  imposition of penalties against undocumented immigrants for

14  these other kinds of crimes often won conservative legislators

01:29:34  15  the votes of racist constituents, particularly white,

16  working-class Americans.  And, again, Michelle Alexander has

17  empirical research, and she cites to empirical research for this

18  claim.

19      So that was the value of these kinds of penalties and for

01:29:54  20  the expansion of this definition of an aggravated felony.  It

21  had real, sort of, on-the-ground electoral value for these

22  politicians who were trying to curry the xenophobic vote.

23  Q    Thank you.

24      Dr. Kang, this Michelle Alexander you mentioned, am I

01:30:15  25  correct, she authored a book, I believe, called *The New Jim*

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

1    *Crow*; is that right?

2    A    Yes, uh-huh.

3              MR. GODDARD:  Thank you, Dr. Kang.  I have no further

4    questions.

01:30:24    5         THE COURT:  Mr. Ellis, recross?

6              MR. ELLIS:  And, Your Honor, I have no recross; so I'd

7    like to thank Dr. Kang for her time.

8              THE COURT:  Okay.  May Dr. Kang be excused then,

9    Mr. Goddard?

01:30:36    10        MR. GODDARD:  Yes.  Thank you very much, Dr. Kang.

11             THE COURT:  Thank you.  And you are free to leave, or

12   you can turn off your camera and mute your microphone and stay

13   if you would like.

14             THE WITNESS:  Okay.  Thank you.

01:30:51    15        THE COURT:  Goodbye.

16             THE WITNESS:  Bye.

17        (Witness excused)

18             THE COURT:  Mr. Goddard, any other witnesses?

19             MR. GODDARD:  No, Your Honor.

01:30:57    20        THE COURT:  Okay.  And, Mr. Ellis, any witnesses?

21             MR. ELLIS:  No, Your Honor.  Thank you.

22             THE COURT:  Okay.  So, Mr. Goddard, your argument first,

23   please.

24             MR. GODDARD:  Thank you, Your Honor.

01:31:13    25        Marciano Munoz-De La O is the latest in a long, long,

136

1    long parade of Latinos to appear in federal court charged with
2    illegal reentry, accused of coming back to this country after
3    being removed.  Mr. Munoz came to this country as a minor; has
4    been a member of our community for 35 years.  He has four adult
01:31:41   5    children who know no home but this country.

6            All of us have been a part of so many cases like this,
7    and none of us have known the shameful history behind this law.
8    Not even Dr. Kang, a professional historian specializing in
9    immigration law, knew the full extent of this law before she
01:32:00  10   began to research it.

11           Only recently, through the work of Dr. Kang and other
12   historians, has that history come to light, and that history is
13   continuing to develop case by case as historians delve deeper
14   and deeper into this record.  And no court has had nearly as
01:32:19  15   extensive a record as this court does in this case.

16           And the question for the court is what do we do with
17   this shameful history, and the Supreme Court has given us an
18   answer in *Arlington Heights*.  That's where the court set out the
19   standard for determining what to do with a law that targets a
01:32:36  20   racial group.

21           It's a simple test.  Was Congress motivated by racial
22   animus in part when it enacted the law, and does the law
23   disparately impact the targeted racial group?  Effectively, did
24   Congress intend to target a race, and did it succeed?

01:32:56  25           The answer is "Yes."  It's up to the government to show

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

137

1    that Congress would have passed that law without any racial

2    animus.  And the application of *Arlington Heights* in this case

3    is straightforward.  The law does bear more heavily on Latinos.

4    We've all seen that with our own eyes.  And Dr. Kang has

01:33:17   5    comprehensively established that racial animus motivated the

6    enactment of that law.

7         That shifts the burden to the government, and the

8    government has put on no evidence to meet that burden.  The

9    government has not called a historian to counter anything

01:33:34  10    Dr. Kang has said or -- is aware that we pushed this hearing out

11    several months to allow Dr. Kang time to go to archives to

12    conduct research to prepare a 102-page report.  And the

13    government had all the time in the world to find an expert, to

14    find any historian to come and say that Congress acted with

01:33:55  15    race-neutral motivation enacting this law.  The government found

16    no one.  The silence here speaks volumes.

17         So what the government does, instead of putting on its

18    own historian, is to argue that the court should ignore the

19    history altogether.  It's not possible under *Arlington Heights,*

01:34:15  20    so the government argues for an entirely different standard of

21    review, a rational basis review -- which, not coincidentally,

22    would prevent the court from looking behind the curtain and

23    assessing Congress's intent in criminalizing reentry.

24         The government's argument for rational basis review is

01:34:35  25    incorrect on the law and would lead to absurd and untenable

*USA v. Munoz-De La 0/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

138

1    results.  The government's argument is, essentially, that any

2    immigration-related law gets the highest possible level of

3    deference.  *Arlington Heights* doesn't apply, rational basis

4    does, says the government.

01:34:52  5         But the Supreme Court and the Ninth Circuit have

6    recently applied *Arlington Heights* in immigration-related cases

7    in the civil context.  If *Arlington Heights* applies in civil

8    immigration cases, surely it applies in criminal cases when

9    folks like Mr. Munoz have their liberty on the line.  So the

01:35:12  10   government is wrong on the law, and it's worth taking a minute

11   to consider the consequences of the government's position.

12        The government would give Congress free rein to pass

13   laws targeting disfavored racial groups.  Just say the word

14   "immigration," and the courts have to look the other way.  It's

01:35:31  15   not difficult to think of quite troubling hypotheticals if that

16   were the law.

17        Imagine the exact same statute, 1326, existing.  There's

18   explicit, explicit evidence from -- statements from Congress, a

19   statement of purpose from Congress amended to the bill saying

01:35:51  20   that the purpose of the law is to keep Latinos out of the United

21   States.  Under rational basis review, the court couldn't look to

22   that.  It would just have to say:  It's immigration related;

23   it's fine.

24        It cannot possibly be our Constitution prevents [*sic*]

01:36:10  25   this end run around equal protection and shields laws from any

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*                                    139

1    judicial scrutiny.  *Arlington Heights* is the standard for

2    race-based equal protection claims for a reason, and there is no

3    reason we should look away from the shameful history of the

4    reentry law just because it touches on immigration.

01:36:27    5        And that takes us to the test under *Arlington Heights*.

6    It's a two-prong test, disparate impact and racial animus, and

7    I'll start with disparate impact.  Does the law bear more

8    heavily on one race than another?  That's the question.  It's a

9    matter of numbers.

01:36:45    10       The government does not dispute the numbers.  How could

11   they?  Almost every single 1326 prosecution is against a Latino.

12   That should be the end of the inquiry.  The government instead

13   tries to explain away these numbers.  It says the numbers aren't

14   like that because of immigration animus.  It's just because we

01:37:06    15   have this long border with Mexico and remind that most folks in

16   this country unlawfully are here because they overstayed their

17   visas, not because they crossed the southern border.

18       But putting that aside, the government's argument misses

19   the point.  Disparate impact inquiry is not about why the law

01:37:23    20   bears more heavily on one race.  It's just whether the law bears

21   more heavily on one race.  It's undisputed that 1326 bears more

22   heavily on Latinos.  The law clearly bears more heavily on one

23   race.  Mr. Munoz has made a showing of disparate impact.  So

24   that's the first prong.

01:37:43    25       The second prong is racial animus.  The question is:

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

140

1    Was Congress motivated in part by racial animus when it enacted

2    the reentry law?  And there's no dispute that Congress was

3    motivated by racial animus when it criminalized reentry as part

4    of the Undesirable Aliens Act of 1929.

01:38:03    5         The government conceded this point in proceedings in

6    Nevada with good reason.  It bears an incredibly fulsome record.

7    Dr. Kang testified today that the academic consensus is that the

8    government -- that Congress's motivation was racial animus.  She

9    said she's not aware of any historian who holds a contrary view.

01:38:25   10         As she explained it, it was a deal struck between two

11   different forms of anti-Latino racial animus:  the nativists,

12   who wanted to keep all Latinos out of the country; and industry,

13   who wanted access to cheap and exploitable Latino labor.

14        The deal was Congress would not prevent Mexicans from

01:38:48   15   coming to the United States but would give the nativists tools

16   to drive out those Mexicans when the nativists saw fit, and one

17   of those tools was the reentry law.

18        And this law also helped industry in that it allowed

19   industry to ensure that this source of labor, the Mexican labor,

01:39:10   20   remained exploitable; that it was never comfortable; it never

21   knew that it could stay in this country.

22        So the government does not dispute the shameful history.

23   It has offered no evidence of a race-neutral motive for Congress

24   criminalizing reentry in 1929, so that should be the end of the

01:39:29   25   inquiry on racial animus.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

141

1    But the government argues that instead of looking to

2  1929, we should instead look to the McCarran-Walter Act of 1952.

3  This is despite the government describing the Undesirable Aliens

4  Act of 1929 as the, quote, "first version," unquote, of 1326.

01:39:52  5    As Dr. Kang testified, McCarran-Walter Act was a

6  reorganization of the nation's immigration laws.  It moved the

7  reentry provision from Section 180 to Section 1326.  The

8  government's position is that moving this provision wipes the

9  racist history away.

01:40:11  10    It's not surprising the government wants the court to

11  look away from 1929 and to focus just on 1952 because in 1952,

12  Congress did not have much discussion of this provision.  The

13  law doesn't allow us to ignore 1929, and doing so would, again,

14  have absurd and untenable results.

01:40:33  15    Now, the government's argument as to why we should look

16  to 1952 hangs on its interpretation of the Supreme Court's

17  decision in *Abbott v. Perez*.  The facts in that case are a

18  little bit confusing, so I think it merits taking a minute to

19  understand what was going on in that case.

01:40:52  20    In 2011, the Texas legislature drew up a redistricting

21  plan.  That plan was challenged on equal protection grounds for

22  racial gerrymandering.  The law never went into effect.  Before

23  it could go into effect, the district court proposed an

24  alternative plan that acknowledged and addressed the racial

01:41:15  25  animus of the gerrymandering and fixed it.

1    In 2013, the Texas legislature then enacted that plan,

2    the plan that had acknowledged and addressed the racial animus

3    of the 2011 plan.  The 2013 plan is then challenged, makes its

4    way to the Supreme Court, and what the Supreme Court holds is

01:41:35  5    that the racial animus from 2011 did not automatically condemn

6    any future plan.

7    That holding does not help the government.  It supports

8    Mr. Munoz's position, because Mr. Munoz is not arguing that the

9    racial animus of 1929 automatically condemns all future reentry

01:41:55  10    statutes.  Congress is free to criminalize reentry whenever it

11    likes.  It just has to do so with a race-neutral motivation.

12    The Supreme Court in *Abbott* recognized and stressed the

13    differences between that case and cases like Mr. Munoz's.  In

14    *Abbott* the Supreme Court said -- the Supreme Court stressed that

01:42:17  15    it was not addressing a case where, quote, "a law originally

16    enacted with discriminatory intent is later reenacted by a

17    different legislature," end quote.

18    That perfectly describes where we are, Your Honor.  The

19    1929 law was originally enacted with discriminatory intent and

01:42:40  20    later reenacted by the 1952 legislature.  In *Abbott*, the Supreme

21    Court took pains to distinguish its holding and the Supreme

22    Court's earlier holding at *Hunter* where changes that failed to

23    remove racial animus from a law did not, quote, "legitimate,"

24    end quote, that law.  Again, that is where we are today.

01:42:57  25    Changes in 1952 did not remove the racial animus and legitimate

1    the 1929 law.

2         And, finally, in *Abbott* the Supreme Court stressed that

3    the 2013 legislature had, quote, "fixed the problems

4    identified," end quote, in the 2011 plan.  Here, the 1952

01:43:18    5    Congress did not take any actions that could be described as

6    fixing racial animus that infected the 1929 law.  The government

7    wants this court to read *Abbott* to say that recodification of a

8    racist law automatically wipes the slate clean of that racial

9    animus, and that's simply not what *Abbott* says.

01:43:40    10         Again, it's worth taking a minute to consider the

11   consequences of the government's position, what messages it

12   would send to Congress and also to state legislatures.  The

13   government would have the court tell those legislatures:  It's

14   fine to pass laws for any racist reason.  Use any racial slurs

01:44:00    15   you want in your debate on those bills.  Just make sure you move

16   the statute within the code book before it's challenged.  That

17   will scrub all the racism from the bill.  The law will be

18   forever insulated from equal protection challenges, and no court

19   will ever be able to look at your racial animus.

01:44:18    20         And, again, this just cannot be that our Constitution

21   permits such an end run around equal protection and shields

22   legislation from judicial scrutiny.

23         So Mr. Munoz's position is that the court need not look

24   to 1952 at all.  The proper *Arlington Heights* analysis is in

01:44:39    25   1929.  But if the court were to assess the 1952 recodification,

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

144

1   there's no question that racial animus motivated that

2   recodification as well.  That was what Dr. Kang testified to.

3   She said she had certainty in the above 90 percent that that was

4   the case.  She's a professional historian.

01:44:57   5       There is no evidence from any historian to the contrary.

6   The government has offered no evidence of any race-neutral

7   motivation.  It has hypothesized certain motivations that could

8   potentially have been this or could potentially have been that

9   but no evidence that Congress was acting with a race-neutral

01:45:16  10  motivation.  It just says there was a lack of discussion.

11  Therefore, there's a lack of racial animus.  Therefore, the law

12  is fine.

13      That is not how legislative history works.  Dr. Kang has

14  testified at length that a lack of discussion is not a lack of

01:45:30  15  racial animus.  *Abbott* tells us that a lack of discussion is not

16  a lack of racial animus.

17      In *Abbott,* the Supreme Court said you look to the prior

18  legislature's intent, the extent it naturally gives rise to

19  inferences regarding the later legislature's intent.  When the

01:45:50  20  later legislature, as in 1952, offers no new motivation for a

21  law, the natural inference is that there is no new motivation.

22  The prior motivation continues from the 1929 act.  That was

23  racial animus.

24      And, finally, *Arlington Heights* itself tells us that a

01:46:08  25  lack of discussion is not a lack of racial animus.  In *Arlington*

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

145

1  *Heights*, the court directed courts to conduct a, quote,

2  "sensitive inquiry into such circumstantial and direct evidence

3  of intent as may be available," end quote.

4        What the Supreme Court is saying here, what the Supreme

01:46:31  5  Court is recognizing, is that there is not always going to be a

6  statement from each legislator explaining precisely why he or

7  she voted for a bill.  There are other tools that courts can use

8  to assess legislative intent.  Dr. Kang has explained the tools

9  she uses as a professional historian.

01:46:52  10        In *Arlington Heights*, the court set out what tools

11  courts can use, including historical context.  And Dr. Kang has

12  testified extensively about:  the historical context of the 1952

13  McCarran-Walter Act, the historical context of the repatriation

14  drives, of the Bracero Program, the fact that Senator McCarran

01:47:17  15  is a known racist, the fact that Representative Walter was a

16  known eugenicist.

17        This whole context shows that Congress was continuing

18  the 1929 compromise between nativists and industry and using --

19  continuing the use of the reentry statute as a tool in that

01:47:37  20  compromise.  It can't be that we simply ignore that historical

21  context.  It can't be; that doing so would just entirely gut

22  *Arlington Heights*.  *Arlington Heights* directs courts to look to

23  this context.  The courts must look to that context.

24        This lack of discussion in 1952 in no way suggests a

01:47:58  25  lack of racial animus; quite the opposite.  As Dr. Kang has

1    testified, there's overwhelming evidence that the 1952 Congress

2    acted with anti-Latino racial animus when it recodified the

3    reentry statute.

4              So as Mr. Munoz has shown both disparate impact and

01:48:18  5    racial animus, he has carried his burden.  That shifts the

6    burden to the government to show that the same decision would

7    have resulted.

8              The government has not presented any evidence of

9    Congress acting with race-neutral motivation.  The government

01:48:36  10   simply points to the amendments from the 1980s and the 1990s

11   that were passed with little discussion.

12             Those amendments are not enough for two reasons.  The

13   first is that the question is whether the enacting Congress

14   would have passed a bill absent racial animus, not what a later

01:48:56  15   amending Congress would have done.

16             And even if the focus were on the later amending

17   Congress, here what those congresses did was to raise the

18   penalties for a certain subset of potential defendants without

19   any discussion.  That is not evidence that Congress -- those

01:49:16  20   congresses would have passed the exact same law.

21             There is a categorical difference between enacting a law

22   out of nothing versus increasing the fines and penalties for

23   that crime once it's been on the books for nearly 70 years.

24   Increasing fines does not prove that the amending Congress would

01:49:37  25   have made the same decision that Congress made in 1929.

1    The second reason these amendments are not enough to

2    carry the government's burden are that the congresses that

3    passed those amendments were themselves acting with racial

4    animus, as Dr. Kang has established.

01:49:55   5    Those amendments were drafted by xenophobes working with

6    anti-immigrant hate groups at a peak time of anti-Latino racial

7    animus.  By this time, it was obvious to everyone that 1326 was

8    being used almost exclusively against Latinos, and Congress

9    chose repeatedly to ratchet up the penalties and to limit

01:50:19   10    collateral attacks, assuring more Latinos spent more time in

11    jail.  A Congress motivated by racial animus cannot save a

12    racist law.

13    And the government's response to this is, essentially:

14    Well, the drafters were xenophobes working with an

01:50:38   15    anti-immigrant hate group, but what about everybody else?  We

16    don't know about them.

17    That's, again, not how legislative history works, as

18    Dr. Kang has testified.  And, importantly, it ignores the fact

19    that at this point the burden is on the government.  The

01:50:52   20    government has to show evidence of race-neutral motivation.

21    Instead of putting on any evidence, instead of calling a

22    historian, instead of pointing to anything in the historical

23    record, that's not what the government does here.  It just says

24    there is no discussion, and therefore there's no animus.

01:51:12   25    This is not the showing -- the government, it's -- I

1  apologize, Your Honor.  The point I'm making is:  The burden

2  here is on the government.  The government has not cured that

3  burden by simply saying there is no discussion.

4       So the amendments do not prove that Congress would have

01:51:26  5  made the same decision absent racial animus.  The government has

6  not met its burden, and that is the end of the *Arlington Heights*

7  inquiry.

8       Mr. Munoz has shown that Congress acted with anti-Latino

9  racial animus when it criminalized reentry.  Mr. Munoz has shown

01:51:43  10  that the reentry law bears more heavily on Latinos, and the

11  government has not offered any evidence to carry its burden.

12  Having satisfied *Arlington Heights*, Mr. Munoz has shown that

13  1326 violates equal protection.

14       And, Your Honor, I'd just like to wrap up by responding

01:51:59  15  to the government's argument that a decision in Mr. Munoz's

16  favor would be the death knell for this country's immigration

17  laws and policies.  The government says Mr. Munoz is asking this

18  court to, quote, "embrace the theory that any racism of the

19  1920s poisons United States immigration law no matter the

01:52:21  20  motives of a given Congress," and then Mr. Munoz's -- that's the

21  end of that quote, and then Mr. Munoz's argument, quote, "would

22  invalidate essentially every immigration-related statute," end

23  quote.

24       This is not the case.  First, a decision in Mr. Munoz's

01:52:38  25  favor would have no effect on civil immigration proceedings.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Goddard*

149

1    The government could continue to remove noncitizens not

2    involving the judiciary at all.

3         More importantly, Mr. Munoz is not suggesting that

4    Congress cannot criminalize reentry.  He is just arguing that

01:52:58   5    Congress must have race-neutral reasons to do so.  Congress

6    might have race-neutral reasons to criminalize reentry today.

7         The government has suggested, quote, "deterrence of

8    repeat violators," end quote, and, quote, "protection of the

9    public from unlawful aliens," end quote.  Are those race-neutral

01:53:19  10    reasons?  They might be; they might not be.

11        The point is that the government has the burden of

12    showing Congress did, in fact, act; did, in fact, have

13    race-neutral motivation when it criminalized reentry.

14    Hypothesizing that such reasons might exist today simply doesn't

01:53:37  15    cut it.

16        The government fails to meet its burden because it can't

17    meet its burden because, as Dr. Kang testified, there is no

18    evidence that Congress acted with race-neutral motivation, not

19    in 1929, not in 1952, not in the 1980s or the 1990s.  No

01:53:56  20    historian has said anything different.  No historian would say

21    anything different.

22        If Congress now has race-neutral reasons to criminalize

23    reentry, it could fix this tomorrow.  All it has to do is pass a

24    law motivated by those race-neutral reasons.  But until that

01:54:12  25    happens, we can only assess the law that is on the books, and

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Ellis*

150

1   the law on the books was motivated by anti-Latino racial animus.

2   It violates the Constitution's guarantee of equal protection,

3   and it cannot stand.

4       Thank you.

01:54:29   5   THE COURT:  Thank you.

6   Mr. Ellis.

7   MR. ELLIS:  Thank you, Your Honor.

8       This court should decline to accept the defendant's

9   invitation to follow *Carrillo-Lopez* and instead look at what

01:54:45   10  every single other district court who's addressed this question

11  has done when asked to determine whether or not Section 1326

12  violates the Equal Protection Clause of the Fifth Amendment.

13      So initially it is the government's position that the

14  court doesn't need to get any more close to *Arlington Heights* in

01:55:05   15  that analysis.  That's because, ultimately, this is, Section

16  1326 is a congressional immigration-related statute.  And that

17  means under a long line of caselaw that deference is

18  appropriate; that Congress has wide latitude in how to govern

19  and adjudicate and run the United States immigration system.

01:55:29   20      And that -- and the Supreme Court and the Ninth Circuit

21  have held that that stretches into equal protection claims.  You

22  have *Fiallo v. Bell*, which is an equal protection claim where,

23  you know, the plaintiff says:  Oh, I'm being discriminated

24  against based on my gender.

01:55:50   25      And the Supreme Court says:  Well, we're gonna look at

MARILYNN S. McMARTIN, RDR, CRR, CCR #2515
OFFICIAL COURT REPORTER

1  this under rational basis review.  We're not gonna apply what

2  might otherwise be applied in a gender-based equal protection

3  claim, because this is related to an immigration statute.

4          And, you know, to the extent that the defense says,

01:56:06  5  "Well, this is criminal so this is different," it doesn't change

6  the analysis.  You have at least two Ninth Circuit cases,

7  *Ruiz-Chairez* and *Lopez-Flores*, which deal with equal protection

8  challenges in criminal contexts.

9          And, again, the Ninth Circuit says:  Well, these are

01:56:24  10  immigration related.  Therefore, we're going to apply rational

11  basis review, again, as they are immigration-related

12  congressional statutes.  Section 1326 is no different.

13          Now, you know, it came up in the reply brief.  It's come

14  up here as well.  You know, Mr. Goddard seems to take rational

01:56:46  15  basis review as though there is no review, and you don't get

16  anything.  That's not the case.

17          The government still needs a reason to do what it's

18  doing.  There can't just be no reason.  There can't be an

19  irrational reason.  There has to be a rational, articulable

01:57:04  20  reason as to why the statute needs to exist.

21          And here the Ninth Circuit has already said that this

22  statute has a rational basis, it is rationally related to

23  deterrence, and that's *Hernandez-Guerrero*.  They said that was

24  the exact point of the whole decision is as an equal protection

01:57:24  25  challenge to -- as a challenge to 1326.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Ellis*

152

 1    And the court said:  Well, there's an obvious rational

 2    basis.  It's a necessary part of the immigration structure.

 3    Without it, the immigration system is all bark and no bite, and

 4    there's no deterrent measure.  There's no consequence for not

01:57:42   5    following along with what you're told to do by immigration

 6    judges.

 7    So there is a rational basis.  The Ninth Circuit has

 8    already determined there is a rational basis.  And just because

 9    Mr. Munoz's claim here has basically already been adjudicated

01:57:58  10    doesn't mean he somehow has been stripped of his claim.  It just

11    simply has a rational basis behind it, and that's the end of the

12    story, really, with evaluating the statute.

13    So, again, right off the bat, the government would just

14    urge the court to do what courts have done repeatedly and apply

01:58:17  15    rational basis review to this equal protection challenge to a

16    congressional immigration statute.

17    If the court does want to move into *Arlington Heights*, I

18    would note right off the bat that what *Arlington Heights* looks

19    at is it looks at the challenged action, looks at the challenged

01:58:36  20    piece of legislation that allegedly is discriminating based on a

21    protected clause, in violation of the Equal Protection Clause.

22    I think that's relevant for two reasons.  First, it's

23    relevant because the challenge is to Section 1326.  The

24    challenge is not and cannot be to all immigration policy, to

01:58:55  25    general immigration policy.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Ellis*

153

 1      And that is largely what the defense has presented.
 2  That's largely what Dr. Kang testified about.  It is a series of
 3  statements and actions from legislatures addressing other things
 4  in immigration policy; addressing asylum policy, addressing
 5  refugee policy, addressing the standards that someone could be
 6  removed from the United States initially.

 7      That's not what is being challenged here.  What is being
 8  challenged is Section 1326, and the court has to determine
 9  whether the defense has presented sufficient evidence that
10  Section 1326, and not any or all other immigration-related
11  statutes, has been tainted by racial animus.

12      And the second reason that 1326 being the focus is
13  important, because it focuses the court on which legislative
14  enactions are important, and that means this story starts,
15  really, in 1952.

16      1929 did have a version of the criminal unlawful
17  reentry.  However, as Dr. Kang confirmed during her testimony,
18  there are more changes that happened in 1952 than simply moving
19  the provision from one place in the US Code to another.

20      An entirely new way of proving the charge of committing
21  the crime was added, the "found in" clause.  Without that clause
22  this case, this motion, this wouldn't exist, because Mr. Munoz
23  would not have been chargeable in this district.  His case -- if
24  1929 was all we had, this case would not be here.  This case
25  would not exist.

01:59:14
01:59:28
01:59:53
02:00:12
02:00:33

1  1952 and Section 1326 is what makes this case even

2  possible.  It's a massive, substantive change to how this crime

3  can be committed and how the government can prove that it has

4  been committed.

02:00:52  5  That's not the only difference.  Dr. Kang testified that

6  1952 dropped out a requirement that the government prove that

7  the prior removal was lawful.  Dr. Kang confirmed that Section

8  1326 is, in fact, a merger, a combination of a variety of other

9  prior reentry-esque criminalization statutes, ones affecting

02:01:14  10  folks removed as anarchists, people removed as prostitutes.

11  This is a combination.  So what we have here in Section

12  1326, as created in 1952, is a new statute that combines older

13  statutes together; that creates a brand new way of committing

14  and proving the crime, and changes the elements.  It's far, far

02:01:36  15  more than what the defense says, which is a copy-and-pasted from

16  one section to another.  It's simply not the case.  It's quite a

17  few changes.

18  And that's, again, important because Mr. Munoz is

19  charged with violating Section 1326.  He's not charged with

02:01:52  20  violating a nonexistent or repealed statute that was created in

21  1929.

22  And so there are quite a few reasons to reject the idea

23  that this story begins and the analysis begins in 1929.  And I

24  understand why the defense is so committed to making 1929 the

02:02:14  25  start point, because from 1952 onwards, there is very little to

1   no evidence concerning Section 1326 specifically.

2          Mr. Goddard describes it as comprehensively established.

3   Professor Kang described it as overwhelming the amount of

4   evidence that 1326 was motivated by racial animus.  For the most

02:02:40   5   part, that just cannot be the case because nothing has been

6   presented.  There are no, no statements.  These were not

7   debated.  Section 1326 was not debated in '52.  The amendments

8   were not debated in '88, in '90, '94, '96.

9          How no evidence can somehow shift into overwhelming

02:03:05  10   evidence, into a somehow quantifiable 90-plus percent certainty,

11   it's a little bit mind-boggling.  The lack of evidence is not

12   evidence.

13          And, ultimately, when you're looking at Section 1326,

14   Dr. Kang confirmed that she searched the records, she searched

02:03:30  15   the *Congressional Record,* she read the transcripts, and there

16   simply is nothing to base it on, that Section 1326 in

17   particular -- not immigration policy in general, not the larger

18   bill Section 1326 was part of, but Section 1326 was motivated by

19   racial animus.

02:03:50  20          And the Supreme Court has confirmed how difficult --

21   actually, an uphill battle the defendant's task is here.  I'm

22   looking at the *O'Brien* case which has as a quote about how

23   difficult this -- an *Arlington Heights* analysis would be, and it

24   went into the congressional action (reading):

02:04:05  25          It is entirely a different matter when we are asked to void

1  a statute that is, under well-settled criteria, constitutional

2  on its face, on the basis of what fewer than a handful of

3  congressmen said about it.  What motivates one legislator to

4  make a speech about a statute is not necessarily what motivates

02:04:23  5  scores of others to enact it, and the stakes are sufficiently

6  high for us to eschew guesswork.

7        What the defendant has presented are the statements of a

8  few congressmen.  The defendant has then asked to attribute

9  those statements to these scores and hundreds of representatives

02:04:40  10  and senators who subsequently voted for these bills and say,

11  "Well, they must also have been similarly racially motivated."

12  That's exactly what the Supreme Court has told this court not to

13  do.  That's the wrong approach for dealing with this issue.

14        Now, in 1952 the defendant really has four, they call it

02:05:03  15  four pieces of evidence; putting aside the general historical

16  context as testified to by Dr. Kang, four pieces of evidence.

17        You have the letter from Deputy Attorney General Peyton

18  Ford, who is not a member of Congress; who didn't vote for

19  anything; who was just putting forth what the Department of

02:05:21  20  Justice's recommendations were for the 1952 INA.

21        You have President Truman's letter explaining his veto

22  of the originally passed 1952 INA which, by reading through it,

23  is largely about his objections to continuing the quota-based

24  admission system.  He never once mentions the unlawful reentry,

02:05:43  25  the criminalization of the unlawful reentry or Section 1326.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Ellis*

157

1    You have the fact that Congress had earlier debated and

2    passed the so-called wetback bill which, again, had nothing to

3    do -- was not the 1952 INA.  The bill had nothing to do with

4    unlawful reentry, had nothing to do with Section 1326.

02:06:02    5    And then per Dr. Kang, you have statements from Senator

6    McCarran which also do not mention Section 1326, have nothing to

7    do with criminalization of unlawful reentry.

8    So what you really have is you get back to Dr. Kang's

9    statement that during the 1952 debates over the INA Section,

02:06:24    10    1326 was not debated.  It was not controversial.  No one really

11    said anything about it, and that is not somehow evidence that it

12    was motivated by racial bias.

13    And the same is true for the subsequent reenactments.

14    The lack of debate cannot be transformed into an assumption that

02:06:44    15    all of these representatives and senators are acting out of

16    racial animus.  It just -- the dearth of evidence just goes to

17    show how lacking the defendant's support is for both 1952 and

18    every subsequent amendment.

19    Just pointing to the statements of a few, pointing to

02:07:09    20    kind of general ideas of public opinion at the time does not get

21    you to inside the head of the congressmen who voted to pass

22    these various bills.

23    So then you get to the forever tainted argument, that

24    once tainted it is forever tainted until Congress issues some

02:07:29    25    kind of *mea culpa* and repasses the legislation based on another

1    reason.  So this not only is not very practical, it's also just

2    not supported by the law.  As noted by the Supreme Court in *City*

3    *of Mobile* (reading):  Past discrimination cannot, in the manner

4    of original sin, condemn governmental action that is not itself

02:07:52    5    unlawful.

6            So whatever happened in 1929, it doesn't carry forward

7    to -- automatically to 1952 and '88 and all of the other

8    reenactments.  And as I noted, the defendant hasn't presented,

9    really, anything to show that 1326 in particular was motivated

02:08:09    10    by racial bias in '52 or in any of the other subsequent bills.

11            So, ultimately, getting to *Abbott*, and *Abbott* is -- you

12    know, Mr. Goddard wants to kind of similarly ignore the focus

13    on -- ignore, I guess, what the Supreme Court was saying.  The

14    Supreme Court pretty clearly in *Abbott* says:  We don't, we don't

02:08:35    15    make a subsequent legislature have a true change of heart.  We

16    don't make them put on the record that, oh, we're changing

17    our -- we're doing the exact same thing, but we're charging

18    our -- you know, publicly changing our reasoning behind it.

19    *Abbott* says that you don't do that.

02:08:52    20            And, of course, there are so many differences between

21    the redistricting plans in *Abbott* from 1326.  *Abbott* is from

22    2011 to 2013.  Presumably, a lot of the same people are

23    involved.  Here we're dealing with 70 years where, you know,

24    no -- as far as Dr. Kang knows, no member of Congress in '29 is

02:09:14    25    still in Congress in '52.  No member of Congress from '52 is

1    still in Congress in the eighties and nineties.

2         To say that there is a natural inference that a

3    completely different group of people -- that Dr. Kang has no

4    evidence -- reviewed the record that was in front of the prior

02:09:30    5    people can be assumed to be acting out of the same motive just

6    cannot be the case.

7         It may have been more appropriate in the Texas case

8    where we're talking about a two-year difference with presumably

9    the same people.  But when you're dealing with such a timespan

02:09:46   10    and different people, for that to be a natural inference

11    somewhat seems to undermine what that term actually means.

12         So, ultimately, you know, if the court does reach

13    *Arlington Heights*, it's the defendant's burden to show racial

14    animus arising from Section 1326, and the defendant hasn't

02:10:07   15    really presented much evidence at all concerning Section 1326 in

16    particular in '52 or onwards.

17         The idea that these subsequent congresses are just

18    tainted by whatever happened in '29 is not borne out either

19    practically or by the Supreme Court's statements on the issue,

02:10:26   20    and so the defendant's claim fails there.

21         And as for disparate impact, I would just -- I think

22    this has been briefed pretty heavily.  I would just point the

23    court to *Regents* where the Supreme Court makes some statements

24    about the percentage of Latino individuals in the DACA program

02:10:46   25    and how that by itself or in concert with the other proposed

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Argument by Mr. Ellis*

160

1    evidence of animus doesn't get you there.  For preliminary

2    injunction, that alone actually substantiated the challenge.  As

3    a number of other courts have held, it's a high percentage

4    number.  It's a matter of geography and socioeconomic conditions

02:11:04    5    as compared between the United States and Mexico.

6         So, ultimately, even if the court engages in *Arlington*

7    *Heights*, the defendant just hasn't met his burden.  If the court

8    finds the defendant has, it's the government's position that not

9    only is -- Section 1326 had a number of very valid bases

02:11:28   10   supporting why it exists, as the Ninth Circuit has held in the

11   case of deterrence.

12        But the fact that Congress repeatedly went to the

13   trouble of increasing the penalties for violating the statute

14   for certain groups of people, it seems somewhat far-fetched to

02:11:39   15   conclude that if they went to the trouble of increasing the

16   penalties, they would not have criminalized the conduct in the

17   first place if it was not -- if the statute wasn't already on

18   the books.

19        So to sum up, you know, rational basis review should

02:11:59   20   apply.  If the court finds that it doesn't, the defendant hasn't

21   met his burden, because we're talking about 1326 and not all

22   other immigration policy lumped together in a big group.  And,

23   ultimately, the defendant just hasn't really presented anything

24   about Section 1326 from 1952 on.

02:12:19   25        Thank you.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Rebuttal by Mr. Goddard*

161

1    THE COURT:  Thank you, Mr. Ellis.

2        Mr. Goddard, your rebuttal?

3        MR. GODDARD:  Thank you, Your Honor.

4        Mr. Ellis began by noting that several courts have sided

02:12:31    5    with the government on this issue.  What's different here is the

6    amount of evidence before this court.  This court has heard

7    testimony and evidence that no other court has.  This court has,

8    by far, the most well-developed record on this issue.

9    Dr. Kang's evidence was comprehensive and clear.  Mr. Ellis

02:12:52    10    repeatedly said that Mr. Munoz has not put on much evidence.

11    We've been here for hours listening to Dr. Kang.  We've heard

12    nothing from the government.

13        Turning to the rational basis deference the government

14    would have this court adopt, the government, Mr. Ellis, points

02:13:14    15    the court to two cases where courts applied rational basis in

16    the criminal context in equal protection.

17        One had to do with alienage, race, which is entirely

18    different.  The other, as I recall -- this is *Ruiz-Chairez* -- it

19    was the difference between someone convicted of a certain type

02:13:36    20    of felony versus someone convicted of a different type of

21    felony.  That's clearly, drastically, a different question than

22    someone of one race than another race.

23        I just want to take a minute to respond to Mr. Ellis's

24    insistence that Mr. Munoz has to find direct statements from

02:13:56    25    legislators on exactly, precisely, why they passed this

1     provision of this bill.  It's just not supported in the caselaw.

2     It's not what *Arlington Heights* says.

3          And Dr. Kang, a professional historian, has said over

4     and over and over again that that is not required.  That is not

02:14:15    5     what professional historians need.  There are so many other

6     tools that they can use and do use regularly.  There's no

7     dispute on that.

8          The government has not suggested that historians

9     shouldn't use those tools or put on a historian to say, "No.

02:14:34   10     Actually, we don't use those tools," or put on a historian to

11     say anything contradicting Dr. Kang.

12          Dr. Kang is a professional.  She has dedicated her

13     career to this.  And she has come here today and informed the

14     court that she has taken the tools she has learned, and she has

02:14:51   15     applied them to the question before this court, and she has no

16     doubt that racial animus was a motivating factor in 1952, in the

17     1980s, and the 1990s.

18          And I also want to respond briefly to these changes in

19     1952.  I agree Mr. Munoz is not suggesting that the language was

02:15:10   20     word for word the same, but let's look at what the changes were

21     between 1929 and 1952.

22          One was the addition of "found in," which changes how

23     the government can prosecute this crime.  It doesn't change what

24     is being criminalized, which is being deported and coming back

02:15:27   25     to the country.  Congress in 1929 criminalized reentry.

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Rebuttal by Mr. Goddard*

163

1    Congress in 1952 just made it easier to prosecute that crime.

2            The other change Mr. Ellis points to is that Congress in

3    1952 dropped the requirement that the prior removal be lawful.

4    The Supreme Court in *Mendoza-Lopez* a few decades later said that

02:15:51  5    the Constitution actually requires that and wrote it back into

6    the statute.

7            So what Congress did in 1952 was, essentially, try to --

8    or make a change that the Supreme Court later said was basically

9    unconstitutional and had to read it back into the law.  So I

02:16:07  10   don't think that Congress in 1952 making that change suggests

11   any lack of racial animus.

12           And what I think is really important here is that the

13   standard for a showing of racial animus under *Arlington Heights*

14   is that that racial animus be a motivating factor -- not the

02:16:29  15   only factor, not the controlling factor, not the predominant

16   factor -- a motivating factor.

17           Mr. Ellis has suggested there may have been all other --

18   all kinds of other factors.  He hasn't shown evidence of that.

19   He suggested it may have been.  But putting that aside, all

02:16:47  20   Mr. Munoz has to do to meet his burden is show that racial

21   animus was a motivating factor.

22           And it's clear from Dr. Kang's testimony we have known

23   racists, known eugenicists, we have recodifying laws to make it

24   easier to lock up Latinos at a time when Latinos were despised

02:17:10  25   in this country.  It is not a huge leap, as Mr. Ellis suggests

1    it is, to find that Congress in 1952 and in the 1980s and in the

2    1990s was acting with racial animus.

3         And what Mr. Ellis . . .

4         I think that, Your Honor, really is the point that I

02:17:43  5    want the court -- to leave the court with, is that it is a

6    motivating factor of racial animus.

7         Dr. Kang came here today, testified for hours on her

8    professional opinion that it was an overwhelming factor, and

9    that clearly meets the bar of a factor which shifts the burden

02:18:01  10    over to the government.

11         And I believe I heard Mr. Ellis say that a lack of

12    evidence is not evidence.  And the amendments in the 1980s and

13    the 1990s, we all agree that Congress didn't really discuss

14    reentry.  So if a lack of evidence is not evidence, then the

02:18:20  15    government cannot meet its burden of showing that Congress would

16    have enacted the reentry statute absent racial animus.

17         I'd be happy to answer questions from the court on any

18    of this.

19         THE COURT:  I don't have any questions.

02:18:34  20         I want to thank both counsel for an interesting day and

21    have quite a bit of work ahead of me.  What I would like to do

22    is end the record unless there's anything else the government

23    wants to add?

24         MR. ELLIS:  No, Your Honor.  Thank you.

02:18:52  25         THE COURT:  Okay.  Mr. Goddard, anything else from you?

*USA v. Munoz-De La O/2:20-CR-00134-RMP-1*
*Motion to Dismiss Hearing - January 28, 2022*
*Oral Comments by Court*

165

1      MR. GODDARD:  No, Your Honor.  Thank you very much.

2      THE COURT:  Okay.  And I just -- I'd like counsel to

3  stay on just for a minute.  I'm going to excuse the court

4  reporter and the interpreters.  Court is in recess.  I will

02:19:11   5  issue an opinion later.

6      So court's in recess.

7      (Hearing concluded at 2:19 pm)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*USA v. Munoz-De La 0/2:20-CR-00134-RMP*
*Motion to Dismiss Hearing - January 28, 2022*
*Reporter's Certificate*

166

1               C E R T I F I C A T E

2

3        I, MARILYNN S. McMARTIN, Registered Diplomate Reporter and

4    Certified Realtime Reporter, do hereby certify:

5        That I am an Official Court Reporter for the United States

6    District Court for the Eastern District of Washington in Yakima,

7    Washington;

8        That the foregoing proceedings were taken on the date and

9    at the time and place as shown on the first page hereto; and

10       That the foregoing proceedings are a full, true and

11   accurate transcription of the requested proceedings, duly

12   transcribed by me or under my direction, to the best of my

13   ability.

14       I do further certify that I am not a relative of, employee

15   of, or counsel for any of said parties, or otherwise interested

16   in the event of said proceedings.

17       DATED this 21st day of February, 2022.

18

19

20              s/ Marilynn S. McMartin

21              Marilynn S. McMartin, RDR, CRR

22              Washington CCR #2515

23              Official Court Reporter

24              Yakima, Washington

25

# S. DEBORAH KANG

Associate Professor
Corcoran Department of History • Democracy Initiative
University of Virginia

## EDUCATION

University of California at Berkeley
　　Ph.D., United States History, 2005
　　*Fields:* United States History, Late Modern European History, Law and Social Theory
　　*Dissertation:* "The Legal Construction of the Borderlands: The INS, Immigration Law, and
　　Immigrant Rights on the U.S.-Mexico Border, 1917-1954" (Professor Jon Gjerde, Chair)

University of California at Berkeley
　　M.A., Jurisprudence and Social Policy, 1997
　　*Fields:* American Legal History, Asian American History, Law and Social Theory

Cornell University
　　B.A., *magna cum laude,* College Scholar, European Literature and History, 1992
　　*Thesis:* "The Representation of the Doctor in the Work of Balzac, Flaubert, and Zola"

## ACADEMIC APPOINTMENTS AND AFFILIATIONS

Corcoran Department of History and the Democracy Initiative, University of Virginia
　　Associate Professor, August 2021-Present

Department of History, University of Texas at Dallas
　　Anne Stark and Chester Watson Associate Professor of History, 2020-2021

US Immigration Policy Center, University of California at San Diego
　　Immigration Policy Fellow, 2019-2020

Department of History, California State University San Marcos
　　Associate Professor, 2017-2020

Center for Comparative Immigration Studies, University of California at San Diego
　　Visiting Scholar, 2015-2020

Department of History, California State University San Marcos
　　Assistant Professor, 2011-2017

Department of History, University of California at Berkeley
　　Postdoctoral Scholar, 2009-2011

Department of History, Harvard University
　　Lecturer on History, 2008-2009

Department of History, University of California at Berkeley
     Lecturer, 2007-2008

The William P. Clements Center for Southwest Studies, Southern Methodist University
     Research Fellow, 2006-2007

Department of History, Cornell in Washington, Cornell University
     Adjunct Assistant Professor, 2006


## AWARDS

Theodore Saloutos Book Award, 2018
     Immigration and Ethnic History Society

Henry Adams Prize, 2018
     Society for History in the Federal Government

Berkshire Conference of Women Historians Book Prize, 2017
     Berkshire Conference of Women Historians

W. Turrentine-Jackson Book Prize, 2018
     Western History Association

Américo Paredes Book Award for Nonfiction, 2018
     Center for Mexican American Studies, South Texas College

Finalist, David J. Weber and Bill Clements Prize, 2018
     Western History Association

Nominee, Joseph R. Levenson Memorial Teaching Prize, 2009
     Undergraduate Council, Harvard University

Harvard University Certificate of Distinction in Teaching, 2009
     Derek Bok Center for Teaching and Learning, Harvard University

Harvard University Certificate of Distinction in Teaching, 2008
     Derek Bok Center for Teaching and Learning, Harvard University

American Jurisprudence Award in Jurisprudence, 1995
     Berkeley Law, University of California at Berkeley

Phi Beta Kappa, Cornell University, 1992


## GRANTS AND FELLOWSHIPS

Summer Stipend Award, 2019
     National Endowment for the Humanities

Grant Proposal Seed Money, Summer 2018
Office of Graduate Studies and Research, California State University San Marcos

CSUSM Affordable Learning Materials Grant, 2017-2018
California State University San Marcos

Proven Course Redesign Grant, 2015-2016
Chancellor's Office, California State University
- Awarded $10,148 to implement redesign of the Modern United States history survey course.

Participant, Building and Strengthening Digital Humanities through a Regional Network, 2015-2016
National Endowment for the Humanities Start-Up Grant Project

University Professional Development Grant, 2014-2015
California State University San Marcos

Faculty Center Professional Development Grant, 2013-2014, 2017-2020
California State University San Marcos

College of Humanities, Arts, Behavioral, & Social Sciences Faculty Development Grant, 2013-2014, 2017-2020
California State University San Marcos

Innovations in Teaching Faculty Learning Community Grant, 2012-2013
California State University San Marcos

Faculty Center Connections Grant, 2011-2013
California State University San Marcos

Andrew W. Mellon Foundation Fellow, June 2012
The Huntington Library, San Marino California

Institute on Global Conflict and Cooperation Dissertation Fellowship, 2002-2003
University of California at San Diego

Eugene Irving McCormac Graduate Scholarship, 2001-2003
University of California at Berkeley

Mentored Research Award, 1995-1996
University of California at Berkeley

Graduate Opportunity Fellowship, 1993-1995
University of California at Berkeley

National Endowment for the Humanities Younger Scholars Summer Research Grant, 1991
Cornell University

## PUBLICATIONS

### BOOKS AND EDITED VOLUMES

S. Deborah Kang, *The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954* (New York: Oxford University Press, 2017).

Jon Gjerde, *Catholicism and the Shaping of Nineteenth Century America*, edited with a Preface and Epilogue by S. Deborah Kang (New York: Cambridge University Press, 2012).

### ARTICLES AND BOOK CHAPTERS

Tom K. Wong, Ph.D., S. Deborah Kang, Ph.D., Carolina Valdivia, M.A., Josefina Espino, Michelle Gonzalez, Elia Peralta, "How Interior Immigration Enforcement Erodes Trust in Law Enforcement," *Perspectives on Politics*, vol. 17, n. 4 (2019), 1-14.

S. Deborah Kang, "Implementation: How the Borderlands Redefined Federal Immigration Law and Policy, 1917-1924," *California Legal History: Journal of the California Supreme Court Historical Society*, vol. 7 (2012).

S. Deborah Kang, "Jon Gjerde's Immigrant America," in *Norwegian American Essays 2010*, edited by Øyvind Gulliksen (Oslo: Novus Forlag, 2011).

S. Deborah Kang, "Crossing the Line: The INS and the Federal Regulation of the Mexican Border," in *Bridging National Borders in North America,* edited by Andrew Graybill and Benjamin Heber Johnson (Durham, N.C.: Duke University Press, 2010).

### BOOK REVIEWS

S. Deborah Kang, review of *Porous Borders: Multiracial Migrations and the Law in the US-Mexico Borderlands*, by Julian Lim, *Journal of Social History* (August 14, 2018).

S. Deborah Kang, review of *The Refugee Challenge in Post-Cold War America*, by María Cristina García, *American Historical Review*, vol. 123, n. 3 (2018): 983-84.

S. Deborah Kang, review of *Deportation: The Origins of U.S. Policy*, by Torrie Hester, *Western Historical Quarterly*, vol. 49, n. 1 (2018): 102-103.

S. Deborah Kang, review of *Border Dilemmas: Racial and National Uncertainties in New Mexico, 1848-1912,* by Anthony P. Mora, *Social History*, vol. 37, n. 2 (2012): 228-230.

S. Deborah Kang, review of *Migra! A History of the U.S. Border Patrol,* by Kelly Lytle Hernández, *Western Historical Quarterly,* vol. 42, n. 2 (2011): 248.

### POLICY BRIEFS

Krista Kshatriya, J.D. and S. Deborah Kang, Ph.D., "Walls to Protection: The Grim Reality of Trump's 'Remain in Mexico' Policy," Policy Brief (La Jolla: U.S. Immigration Policy Center, 2019).

Tom K. Wong, Ph.D., S. Deborah Kang, Ph.D., Carolina Valdivia, M.A., Josefina Espino, Michelle Gonzalez, Elia Peralta, "How Interior Immigration Enforcement Erodes Trust in Law Enforcement," Working Paper No. 2 (La Jolla: U.S. Immigration Policy Center, 2019).

## AMICUS BRIEFS AND DECLARATIONS

*Brief of Amicus Curiae Dr. S. Deborah Kang in Support of Defendant-Appellant for Affirmance,* United States of America v. Gustavo Carrillo-Lopez, No. 21-10233 (9th Cir. April 14, 2022)

*Brief of Amicus Curiae Dr. S. Deborah Kang in Support of Defendant-Appellant for Reversal*, United States of America v. Manuel Rodrigues-Barios, No. 21-50145 (9th Cir. March 21, 2022)

*Affidavit of Dr. S. Deborah Kang, Associate Professor, University of Virginia, United States v. Marciano Munoz-De La O,* Case No. 2:20-cr-00134-RMP (E.D. Wash. December 22, 2021). (103-page affidavit tracing the racist origins of 8 U.S.C. 1326.)

*Affidavit of Dr. S. Deborah Kang, Associate Professor, University of Virginia, United States of America v. Darwin Lopez Ramos,* Case No. 2:18-cr-00112-AWA-DEM (E.D. Va. December 6, 2021). (100-page affidavit tracing the racist origins of 8 U.S.C. 1326)

*Affidavit of Dr. S. Deborah Kang, Associate Professor, University of Virginia, United States of America v. Cadena-Salina*s, Case No. 5:19-cr-00850-XR (W.D. Tex. September 21, 2021). (Sixty-five-page affidavit tracing the racist origins of 8 U.S.C. 1326)

*Affidavit of Dr. S. Deborah Kang, Anne Stark and Chester Watson Associate Professor of History, University of Texas at Dallas, United States of America v. Juan Rendon Rodriguez,* Case No. 5:20-cr-00526-XR (W.D. Tex. April 26, 2021). (Forty-six-page affidavit tracing the racist origins of 8 U.S.C. 1326)

## ESSAYS

"TPS for Ukrainians is good. But our selective approach to refugees excludes many," *Washington Post*, March 4, 2022.

"Border Fiction Made Real: How Search and Seizure Laws Degrade on the 100-Mile Border Zone," *KCET Artbound*, November 12, 2019.

"The History of Citizenship Day is a Reminder That Being an American Has Always Been Complicated," *Time Magazine*, September 17, 2019.

Carly Goodman, S. Deborah Kang, and Yael Schacher, "How advocates can defeat Trump's latest assault on asylum seekers," *Washington Post*, July 18, 2019.

"Annual Meeting Preview: The Academic #MeToo Movement: Scholars, Advocates, and Solutions to the Problems of Sexual Assault and Sexual Harassment in the Academy," *OAH Insights,* Organization of American Historians, January 7, 2019.

"The US Begins Mass Deportation of Mexican Migrants," "7 Moments that Changed America" *Time Magazine* (print), July 9, 2018.

"The US Begins Mass Deportation of Mexican Migrants," "25 Moments in American History that Matter Right Now, "*Time Magazine* (online), June 28, 2018.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," IEHS Blog, IEHS Online: The Website of the Immigration and Ethnic History Society, February 18, 2017.

## WORK IN PROGRESS

"The Legal Innovations of the Immigration and Naturalization Service in the U.S.-Mexico Borderlands, 1917-1946," in *Migration and Borders in North America: Views from the Twentieth Century*, edited by Graciela Martínez-Zalce and Mónica Verea (forthcoming, University of Texas Press).

Danielle Battisti and S. Deborah Kang, eds., *The Hidden Histories of Unauthorized European Immigration in the United States,* (under review).

"Sovereign Mercy: The Legalization of the White Russian Refugees and the Development of American Immigration and Refugee Law during the Great Depression." (conditionally accepted for publication)

"Equal Protection and American Immigration Law: A Long History of 8 U.S.C. 1326." (in preparation)

*Pathways to Citizenship: A History of Immigration Legalization in the United States, 1906-1986.* (in preparation)

## ACADEMIC CONFERENCES AND PRESENTATIONS

"The INS on the Line," Invited Classroom Speaker, Graduate Reading Seminar on the American West, Department of History, Southern Methodist University, March 1, 2022.

"Borderland Locales: A Global Perspective," Invited Panelist, Annual Meeting, American Historical Association, New Orleans, Louisiana, February 26, 2022.

"Historians and Federal Defenders on the Racist Origins of the Laws Criminalizing Undocumented Immigration," Invited Panelist, "2022 Immigration Symposium," St. Mary's Law Review on Race and Social Justice, School of Law, St. Mary's University, San Antonio, Texas, February 25, 2022.

"50 Years of Title IX: Evolutions in the Struggle Against Sex Discrimination in Education," Panel Chair, Annual Meeting, American Historical Association, New Orleans, Louisiana, February 23, 2022.

"History and Advocacy: The History of Racial Animus and the Legal Challenge to 8 U.S.C. 1326," Invited Panelist, Regulation and Administration in American Life: Legal Historical Perspectives, Pre-conference, Annual Meeting, American Society for Legal History, New Orleans, Louisiana, November 4-6, 2021.

"Law on the U.S.-Mexico Borderland: Critical Approaches in Legal History," Invited Commentator, Annual Meeting, American Society for Legal History, New Orleans, Louisiana, November 4-6, 2021.

"Policing and the Penitentiary in the Borderlands," Invited Commentator, Annual Meeting, Western History Association, October 2021. (Withdrew due to COVID-19 pandemic.)

"Redefining the Immigrant South: Indian and Pakistani Immigration to Houston during the Cold War," Invited Commentator for Book Panel of Dr. Uzma Quraishi, Sam Houston State University, April 26, 2021.

"Between a Hot and a Cold War: The Legalization of the White Russian Refugees and the Development of American Refugee Law and Policy," Panelist and Panel Organizer, "Centering War in the Study of Immigration History," Annual Meeting, Organization of American Historians, Chicago, Illinois, April 15-18, 2021

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, Graduate Seminar led by Dr. Kimberly Gauderman, History Department, University of New Mexico, February 11, 2021.

"Reconstructing the Academic Workplace: A Conversation about the Work of the Committee on Assault Response and Educational Strategies of the Western History Association (WHA CARES)" Invited Presentation, History Department, Columbia University, January 27, 2021.

"Constructing the Story of the Present: An Assignment for Teaching Immigration at the US-Mexico Border," Invited Presentation, American Historical Association, Conference on Latin American History, January 7, 2021.

"Episode 13: The 1920s," The Past, the Promise, the Presidency: Race and the American Legacy, Center for Presidential History Podcast, Southern Methodist University, December 17, 2020.

"Reconstructing the Academic Workplace: A Conversation about the Work of the Committee on Assault Response and Educational Strategies of the Western History Association (WHA CARES)," Invited Presentation, Graduate Seminar led by Dr. Gautham Rao, History Department, American University, November 10, 2020.

"Unpredictable Spaces?: Teaching Borderlands and Immigration History in the Trump Era – A Roundtable Session," Invited Chair, Annual Meeting, Western History Association, Virtual Conference, October 16, 2020.

"Crossing Borders and Boundaries," Invited Plenary Speaker, Western History Association, Virtual Conference, October 15, 2020.

"WHA Spark Session: Saying 'No,'" Panel Organizer and Co-Chair, Annual Meeting, Western History Association," Virtual Conference, October 14, 2020.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, The Pandemic Book Club, May 15, 2020.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, Cross-Border Mobility and Confinement in the Americas: An Inter-UC-CSU Migration Studies Workshop, University of California at Santa Cruz, April 30, 2020. (Postponed due to COVID-19)

"Reconstructing the Academic Workplace: A Conversation about the Work of the Committee on Assault Response and Educational Strategies of the Western History Association (WHA CARES)" Invited Presentation, Midwest Political Science Association, Committee on the Status of Gender and Sexual Minorities in the Discipline, April 17, 2020. (Canceled due to COVID-19)

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, Center for the Study of Representative Institutions, Macmillan Center, Yale University, April 6, 2020. (Rescheduled for October 23, 2020 due to COVID-19)

"Reconstructing the Academic Workplace: A Conversation about the Work of the Committee on Assault Response and Educational Strategies of the Western History Association (WHA CARES)" Invited Presentation, History Department, Yale University, April 6, 2020. (Canceled due to COVID-19)

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, History Department, Columbia University, March 23, 2020. (Postponed due to COVID-19)

"Reconstructing the Academic Workplace: A Conversation about the Work of the Committee on Assault Response and Educational Strategies of the Western History Association (WHA CARES)" Invited Presentation, History Department, Columbia University, March 23, 2020. (Rescheduled for January 27, 2021 due to COVID-19)

"Sovereign Mercy:  The Legalization of the White Russian Refugees and the Development of American Immigration and Refugee Law during the Great Depression," Invited Keynote Lecture, "The Anatomy of Crisis: Meeting the Current Moment through Entangled Histories," The 2020 Paul Lucas Conference in History at Indiana University, Indiana University Graduate Student Association, Indiana University Bloomington, March 6, 2020.

"Legalizing the Impossible Subject: The White Russian Refugees and the Development of American Immigration and Refugee Law during the Great Depression," Invited Presentation, Center for Comparative Immigration Studies, University of California at San Diego, February 24, 2020.

Op-Ed Workshop, Co-organizer, San Diego Scholars Strategy Network, January 17, 2020. (Half-day training for San Diego scholars and advocacy organizations, including the San Diego ACLU, International Rescue Committee, and Alliance San Diego, among others.)

"Shifting the Boundaries of Inclusion: Immigrant Rights in the 20th Century United States," Invited Chair and Commentator, Annual Meeting, American Historical Association, New York, New York, January 4, 2020.

"Pathways to Citizenship: Undocumented European Immigrants in the United States, 1906-1986," Invited Panelist, "The Other Illegals: Unauthorized European Immigration to the U.S. in the 20th Century," Annual Meeting, American Historical Association, New York, New York, January 3, 2020.

"State Policies and Migrant Knowledge," Invited Presentation, "Archives of Migration, Annual Academic and Policy Symposium "Innovation through Migration," Pacific Regional Office, German Historical Institute, University of California at Berkeley, December 9, 2019.

"Legalizing the Impossible Subject: The White Russian Refugees and the Development of American Immigration and Refugee Law during the Great Depression," Invited Presentation, UCLA Center for the Study of Migration, Los Angeles, California, November 8, 2019.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, North American Colloquium, Gerald R. Ford School of Public Policy, University of Michigan, National Autonomous University of Mexico, and the University of Toronto, Mexico City, November 6-7, 2019.

"Courage and Change in the Fight Against Sexual Harassment in the Academy," Panel Organizer, Annual Meeting, Western History Association, Las Vegas, Nevada, October 15-19, 2019.

"Thinking in Time: Immigration History and Public Policy in the Trump Era," Invited Panelist, "Immigrant Advocacy as a Matter of Law and History," Annual Meeting, Western History Association, Las Vegas, Nevada, October 15-19, 2019.

"The New Challenges at the U.S.-Mexico Border," Invited Commentator for presentation delivered by Professor Douglas Massey, Princeton University, Center for U.S.-Mexican Studies, University of California at San Diego, September 26, 2019.

"Walls and Borders: A History of Deterrence in American Immigration Law Enforcement," Invited Panelist, "Debates about Immigration: American and European Experiences in a Comparative Perspective," An International Symposium Organized by Center Austria: The Austrian Marshall Plan Center for European Studies and the Institute for Contemporary History, Innsbruck University in Celebration of the University of Innsbruck's 350th Anniversary, The University of New Orleans, New Orleans, Louisiana, May 23, 2019.

"Walls to Protection: Remain in Mexico and US Asylum Policy under Trump," Invited Panelist, Annual Meeting, Western Political Science Association Preconference, San Diego, California, April 17, 2019.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-19754," Invited Presentation, Center for Mexican American Studies, South Texas College, McAllen, Texas, April 11, 2019.

"The Academic #MeToo Movement: Scholars, Advocates, and Solutions to the Problems of Sexual Assault and Sexual Harassment in the Academy," Panel Organizer, Annual Meeting, Organization of American Historians, Philadelphia, Pennsylvania, April 6, 2019

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, American Political History Seminar, Institute for Governmental Studies, University of California at Berkeley, March 15, 2019.

"Pathways to Citizenship: Undocumented European Immigrants in the United States, 1906-1986," Newberry Seminar in Borderlands and Latino/a Studies, The Newberry Library, March 8, 2019.

"WHA Spark Session: Sexual Harassment, Sexual Assault, and the Academy (#AcademicMe Too), Annual Meeting, Western History Association, San Antonio, Texas, October 18, 2018.

"Immigration Law In, Through, and Beyond Moments of Distress," Invited Panelist, Biennial Immigration Law Professors Workshop, Drexel University Law School, May 24-26, 2018.

"Immigration Law and Policy and the Making of the American State on the US-Mexico Border," Invited Panelist, Institute for Historical Studies, University of Texas, Austin, April 27-28, 2018.

"Making Law on the Border: The INS and Immigration Law and Policy in Modern America," Invited Panelist, "Immigration Detention and Removal: Historical Practices and Contemporary Legacies," Annual Meeting, Law and Society Association, Mexico City, Mexico, June 20-23, 2017.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited book talk, Center for Comparative Immigration Studies, University of California at San Diego, March 13, 2017.

"Digital History in the American Institutions Survey Course," Panelist, San Diego Digital History Initiative: Learning through Digital Humanities, University of San Diego, October 21, 2016.

"Native Americans, Mexican Nationals, and the Shaping of a State Employment Agency in Arizona, 1942 1970," Presentation, International Migration Workshop, Center for Comparative Immigration Studies, University of California, San Diego, May 19, 2016.

"The Politics of Immigration Policy in the Twentieth Century," Invited Panel Chair and Commentator, Policy History Conference, Columbus, Ohio, June 7, 2014.

"Roundtable: New Directions in Borderlands History," Panel Chair, Annual Meeting, Organization of American Historians, Atlanta, Georgia, April 10-13, 2014.

"California and the West Coast," Panel Chair, Phi Alpha Theta Southern California Regional Conference, California State University San Marcos, April 20, 2013.

"Moving Forward and Looking Back: A Student's Perspective on the Legacies of Jon Gjerde," Invited Panelist, "Remembering Immigration Historian Jon Gjerde," Panel sponsored by the Immigration and Ethnic History Society, Annual Meeting, Organization of American Historians, San Francisco, California, April 11-14, 2013.

"Implementation: How the Borderlands Redefined Federal Immigration Law and Policy, 1917-1924," Invited Panelist, "The Golden Laboratory: Legal Innovation in Twentieth Century California," Panel sponsored by the California Supreme Court Historical Society, Annual Meeting, American Society for Legal History, St Louis, Missouri, November 8-11, 2012.

"Making the Bracero Program Local: Migratory Labor and Anti-Statism in Arizona, 1942-1964," Panel Organizer and Participant, Annual Meeting, Pacific Coast Branch of the American Historical Association, San Diego, California, August 11, 2012.

"A Genealogy of Anti-Statism in Borderlands History," Invited Panelist, State of the Field Panel: Borderlands History, Annual Meeting, Organization of American Historians, Milwaukee, Wisconsin, April 19-22, 2012.

"The Domestic and International Origins of the Bracero Program: Tracing the Intersections between Immigration and International History in the Classroom," Invited Presentation, Internationalizing the United States History Survey Symposium, Department of History, Kent State University, Kent, Ohio, February 11, 2011.

"At the Border and Beyond: The Immigration Border Patrol and Federal Immigration Enforcement Policy, 1917 – 1954," Panelist, Annual Meeting, Organization of American Historians, Washington, D.C., April 10, 2010.

"Inventing the Border: The Border Patrol and the Border Exception to the Fourth Amendment," Invited Presentation, Hubert Howe Bancroft and Current Studies on California, Mexico, and the American West, The Bancroft Library 150th Anniversary Symposium, Berkeley, California, March 5, 2010.

"Immigrant Rights Awareness Week," Invited Panelist, Harvard College Act on a Dream Club, Harvard University, Cambridge, Massachusetts, April 29, 2009.

"Immigration History for the Millennial Generation," Invited Presentation, 2008 Summer Institute: Teaching American History for All, University of California at Berkeley History-Social Science Project, Berkeley, California, August 6, 2008.

"Crossing the Line: The INS and the Federal Regulation of the Mexican Border – Law and Demography," Invited Presentation, Bridging National Borders in North America, William P. Clements Center for Southwest Studies 2007 Annual Public Symposium Part II, Southern Methodist University, Dallas, Texas, March 24, 2007.

"Peripheries and Center: Immigration Law and Policy on the U.S.-Mexico Border," Invited Presentation, William P. Clements Center for Southwest Studies, Southern Methodist University, Dallas, Texas, February 14, 2007.

"Undocumented and Illegal Immigration in the Contemporary World," Panel Chair and Discussant, Annual Meeting, Social Science History Association, Minneapolis, Minnesota, November 2-5, 2006.

"Crossing the Line: The INS and the Federal Regulation of the Mexican Border – Law and Society," Invited Presentation, Bridging National Borders in North America, William P. Clements Center for Southwest Studies 2007 Annual Public Symposium Part I, Simon Fraser University, Vancouver, Canada, September 15-16, 2006.

## CAMPUS PRESENTATIONS

"CUSLAI Conversations," Invited Presentation, Center for US-Latin American Initiatives, University of Texas at Dallas, November 20, 2020.

"Could We Ever?" Invited Guest, The CometCast Network Podcast Series, University of Texas at Dallas, November 12, 2020.

"Arts and Humanities Teach-In Series: Border Policing and ICE," Invited Presentation, School of Arts and Humanities, University of Texas at Dallas, October 30, 2020.

"Throwing Away the Etiquette Book: Practical Tips for Women in the Academic Workplace," Tukwut Talk, Cross-Cultural Center, California State University San Marcos, November 7, 2018.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, Latin@ Center, California State University San Marcos, October 23, 2018.

"Making Law on the Border: The INS and Immigration Law and Policy in Modern America," Faculty Center, Immigration and Diaspora Studies Symposium, California State University San Marcos, February 8, 2018.

"Immigration and the Wall," Invited Faculty Facilitator, Civility Dialogues, Cross-Cultural Center, California State University San Marcos, February 6, 2018.

"The Battle for the Border: The INS and the Shaping of American Immigration Policy," Invited Presentation, History Department Reading Group, California State University San Marcos, April 6, 2017.


## PUBLIC LECTURES

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, Dallas Bar Association, February 19, 2021.

"US Immigration and Border Policy in the Trump Era," Invited Presentation, "US Migration Policy: A Joint Project for EUR and NEA Regions," International Visitor Leadership Program, U.S. Department of State, San Diego, California, March 17, 2020. (Canceled due to COVID-19)

"US Immigration and Border Policy in the Trump Era," Invited Presentation, Hillcrest Indivisible, San Diego, California, September 19, 2019.

"From Undocumented to DACA: A Short History of Undocumented Immigration in America, 1965-1917," Migration and Borders in the Twenty-First Century, United States Naval Staff College, United States War College, February 15, 2019.

"DACA and Immigrant Rights," Invited speaker, Women's March of North San Diego County, January 20, 2018.

"Center and Periphery: A History of Federal Immigration Law and Policy in the US-Mexico Borderlands," Invited Presentation, United We Dream, Washington, DC, October 7, 2017.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, Francis Parker School, Western History Association, Take a Historian to School Day, San Diego, California, October 12, 2017.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Presentation, Covington and Burling, LLP, San Francisco, California, August 14, 2017.

"The Practice of Immigration Law on the US-Mexico Border, 1917-1954," Invited Panelist, "No Borders and Walls: A Scholar, Activist, and Artist Symposium," Centro Cultural de la Raza, Balboa Park, San Diego, California, May 27, 2017.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Annual Alumni Reception, Department of History, California State University San Marcos, March 2, 2017.

"Westering Women: Gender, Immigration, and Race in the American West, 1850 to the Present." Invited Speaker, "California Dreaming: The Story of Migration and Immigration to the Golden State, Pre-History to the Present," Anza-Borrego Desert Natural History Association, Borrego Springs, California, January 28, 2017.

"The INS on the Line: Making Immigration Law on the US-Mexico Border, 1917-1954," Invited Speaker, "California Dreaming: The Story of Migration and Immigration to the Golden State, Pre-History to the Present," Anza-Borrego Desert Natural History Association, Borrego Springs, California, January 27, 2017.

"The Migration and Immigration History of California." Invited Speaker, "California Dreaming: The Story of Migration and Immigration to the Golden State, Pre-History to the Present," Anza-Borrego Desert Natural History Association, Borrego Springs, California, January 30, 2016.

## FORTHCOMING PRESENTATIONS

Chair and Commentator, "Immigration and Internal Migration, International Relations, Nationalism and Transnationalism," Annual Meeting, Organization of American Historians, March 30-April 2, 2023.

Conference organizer and moderator, "Practicing Asylum: History and Civic Engagement," Democracy Initiative, University of Virginia, October 26-29, 2022.

Conference organizer and participant, "The Hidden Histories of Unauthorized European Immigration in the United States," Democracy Initiative, University of Virginia, September 13-16, 2022.

Title TBD, Invited Panelist, "The Way We Were? Law, Racial Mythologies, and Historical Memory," Annual Meeting, Law and Society Association, Lisbon, Portugal, July 13-16, 2022

Title TBD, Invited Panelist, Migration Roundtable, SHAFR, June 11, 2022.

Title TBD, Invited Panelist, "Historians in the Public Sphere," GAGE: Governing America in a Global Era and the Center for the Study of the Age of Jefferson, University of Virginia, May 26-27, 2022.

"The INS on the Line," Invited Classroom Speaker, Research Seminar on Latin American History, Corcoran Department of History, University of Virginia, April 19, 2022.

## MEDIA APPEARANCES

"Criminal Laws"
     *Democracy in Danger Podcast,* May 11, 2022

"Surge in Migrants at Southern Border"
     *Wisconsin Public Radio*, May 14, 2021

"Migrants Crossing Arizona/Mexico Border"
     *CBS11* (Dallas), April 2, 2021

Comment on seasonal increases in undocumented migration and unaccompanied minors
     *NBCLX*, April 1, 2021

"Big immigration changes planned in U.S."
     *KRLD News* (Dallas), January 22, 2021

"'Dreamer' shares hopes, fears as Biden administration drafts legislation to protect DACA recipients"
    *WFAA ABC 8* (Dallas), January 22, 2021

"The Trump administration has used the coronavirus threat to swiftly kick more than 200,000 immigrants out of the U.S."
    *Dallas Morning News*, October 17, 2020

"CBP Drones Conducted Flyovers Near Homes of Indigenous Pipeline Activists, Flight Records Show"
    *Gizmodo*, September 18, 2020

"Immigration Historian Says Border Patrol's Role In Protest Law Enforcement Is Troubling"
    *Texas Standard*, June 12, 2020

"The INS on the Line: Making Immigration Law on the U.S.-Mexico Border, 1917-1954"
    *New Books Network, History*, November 11, 2019

"ICE Raids Begin in Select Cities"
    *Wisconsin Public Radio,* July 16, 2019

"Border Apprehensions: Looking to the past to understand the current spike in illegal crossings"
    *San Diego Union Tribune*, June 23, 2019

Comment on Trump administration's policy on deportation of Vietnamese refugees.
    *BBC Newsday*, December 14, 2018

"The US Begins Mass Deportation of Mexican Migrants," "7 Moments that Changed America"
    *Time Magazine* (print), July 9, 2018

"What's Driving the Movement to Abolish ICE?"
    *PBS Newshour* (online), July 6, 2018

"'Abolish ICE' Movement is Growing. Is the Agency's Disbanding Likely?"
    *Politifact*, July 3, 2018

"What Do You Want to Know about ICE?" 1A: Speak Freely
    WAMU, National Public Radio, Washington, DC, July 3, 2018

"Immigration Nation," Code Switch: Race and Identity Remixed
    National Public Radio, June 27, 2018

Segment on Immigration and Customs Enforcement, Steele and Ungar
    Sirius XM Radio, June 25, 2018

"15 Years After Its Creation Critics Want to Abolish ICE," Here and Now
    WBUR, National Public Radio, Boston, June 25, 2018

"The Wall," (Documentary film series on border walls around the world)
    Rondo Media, S4C (Wales, United Kingdom), and Jeonju Television (South Korea), in production.

"California to Join Guard Border Mission, but with Conditions," KPBS Midday Edition
　　KPBS, San Diego Public Radio, San Diego, California, April 12, 2018

"Border Security," KPBS Evening Edition
　　KPBS, San Diego Public Television, San Diego, California, April 11, 2018

"Trump's Mexico Border Wall," Take Two
　　National Public Radio, Los Angeles/KPCC Affiliate, Pasadena, California, January 26, 2017.

"Bridging National Borders in North America," Think with Kris Boyd
　　National Public Radio, KERA-Dallas Affiliate, Dallas, Texas, March 22, 2007.


**FACULTY TEACHING EXPERIENCE**

UNIVERSITY OF VIRGINIA
HIUS 3501: Immigration, Race, and Rights in the United States

UNIVERSITY OF TEXAS AT DALLAS

History 4369: Topics in Borderlands History
History 6390: Topics in Borderlands History

CALIFORNIA STATE UNIVERSITY SAN MARCOS

History 131: U.S. History, 1865 to the Present, Lecture Course
History 300: Violence and the History of the US-Mexico Border, Lecture Course
History 301: Historical Methods and Writing, Seminar
History 338A: Modern US Indian Policy, Lecture Course
History 345: Immigration History, Lecture Course
History 346: Western History, Lecture Course
History 347: California History, Lecture Course
History 350: Chicano/a History, Lecture Course
History 430: Social Movements in Modern United States History, Seminar
History 538: North American Borderlands History, Graduate Seminar
History 538: Modern United States History, Graduate Seminar

UNIVERSITY OF CALIFORNIA AT BERKELEY

History 100: Asian American History, Seminar
History 101: Senior Thesis Seminar
History 103: Readings in American Immigration History, Seminar
History 103: American Immigration Law and Policy in Historical Perspective, Seminar
History 103: Landscapes of Migration: Immigration, Ethnicity, and Race in the Twentieth Century, Seminar
History 137AC: American Immigration History from 1492 to the Present, Lecture Course

HARVARD UNIVERSITY

History 74k: American Immigration Law and Policy in Historical Perspective, Seminar

History 84k: Senior Thesis Seminar
History 91r: Transnational Approaches to Mexican Immigration History, Seminar
History 1435: American Legal History from 1492 to the Present, Lecture Course
History 1436: American Immigration History from 1492 to the Present, Lecture Course

CORNELL UNIVERSITY

American Studies: American Immigration Law and Policy in Historical Perspective, Seminar

**PROFESSIONAL SERVICE**

EDITORIAL BOARDS

Member, Editorial Advisory Board, 2020 – Present
      David J. Weber Series in the New Borderlands History, University of North Carolina Press

Member, Board of Editors, 2020 – 2021
      *Western Historical Quarterly*

Member, Editorial Board, 2016-Present
      *Western Legal History: The Journal of the Ninth Judicial Circuit Historical Society*

Book Review Editor, 2013-2016
      *Western Legal History: The Journal of the Ninth Judicial Circuit Historical Society*

PROFESSIONAL SOCIETIES

Member, Program Committee, 2021 Annual Meeting, Western History Association, 2020-2021
      Western History Association

Member, Executive Board, April 2019 – Present
      Immigration and Ethnic History Society

Chair, WHA Committee on Assault Response and Educational Strategies, April 2018 – 2021
      Western History Association

Chair, Working Group on Sexual Harassment/Sexual Violence in the Academy, March-April, 2018
      Western History Association

Co-Chair, Local Arrangements Committee, 2016-2017
      2017 Annual Meeting of the Western Historical Association, San Diego, California

PRIZE COMMITTEES

Member, Prize Committee, Theodore Saloutos Book Award, 2021-Present
      Immigration and Ethnic History Society

Chair, Prize Committee, Littleton-Griswold Research Grant for US Legal History, 2020 – Present
      American Historical Association

Member, Prize Committee, WHA Graduate Student Prize, 2020 – 2021
 Western History Association

Committee Member, Research Travel Grant in California Legal History, Spring 2019
 California Supreme Court Historical Society

Committee Member, Prize Committee, Jerome I. Braun Prize, 2015
 The Ninth Judicial Circuit Historical Society

Committee Member, Prize Committee, Graduate Student Writing Competition, 2013
 California Supreme Court Historical Society

RESEARCH CENTERS

Member, Scholars Strategy Network, Dallas-Fort Worth, 2021

Faculty Affiliate, Center for US-Latin American Initiatives, University of Texas at Dallas, 2020-2021

External Research Associate, UCSD Center for Comparative Immigration Studies, 2020-Present

Member, Scholars Strategy Network, San Diego, 2018-2020

HISTORY EDUCATION

Member, Advisory Team, Literacy and the Law: K-12 Civics Curricula, 2017-2020
 California State University San Marcos and the Superior Court of San Diego

Adviser, *Immigrant Nation,* 2013-2014
 Multimedia immigration history website produced by documentary filmmaker Kate McLean.

EXPERT WITNESS EXPERIENCE

*United States of America v. Miguel Quintanilla- Dominguez,* Case No. 1:21-cr-00406-RM, Denver, Colorado, February 8, 2022.

*United States v. Marciano Munoz-De La O*, Case No. 2:20-cr-00134-RMP, Spokane, Washington, January 28, 2022 (via Zoom).

## CAMPUS SERVICE

UNIVERSITY

Member, Leadership in Academic Matters Program, Fall 2022
 University of Virginia

Member, Nau Lab, Democracy Initiative, August 2021-Present
 University of Virginia

Chair, Academic Policy Committee, Fall 2018, Fall 2017, Spring 2020
    Academic Senate, California State University San Marcos

Member, University Without Borders Action Group, January 2017 – 2018
    Executive Committee, Academic Senate, California State University San Marcos

Co-Organizer, DACA: Know Your Rights Information Session, January 24, 2017
    College of Humanities, Arts, Behavioral, and Social Sciences, California State University San Marcos

Co-Organizer, DACA/AB540 Teach-In, December 8, 2016
    Office of Diversity, Educational Equity, and Inclusion, California State University San Marcos

Co-Author, California State University San Marcos Faculty Handbook, 2016-2017
    Faculty Center Advisory Committee, California State University San Marcos

Member, Academic Senate, 2016-2017
    California State University San Marcos

Member, 2014-2017
    Academic Policy Committee, California State University San Marcos

Member, 2014-2016
    Faculty Center Advisory Committee, California State University San Marcos

Member, 2014-2016
    Community Engagement Faculty Advisory Committee, California State University San Marcos

Member, 2013-2015
    Library and Academic Technology Committee, California State University San Marcos

COLLEGE

Member, Visual and Performing Arts Search Committee, Spring 2021
    College of Arts and Humanities, University of Texas at Dallas

Member, Ethnic Studies Development Board, March 2017 – 2019
    College of Humanities, Arts, Behavioral, and Social Sciences, California State University San Marcos

Member, Faculty Development Committee, 2016-2018
    College of Humanities, Arts, Behavioral, and Social Sciences, California State University San Marcos

HISTORY DEPARTMENT

Member, Borderlands Colloquium, January 2022-Present
    Department of History, University of Virginia

Member, Global Legal History Group, August 2021-Present
    Department of History, University of Virginia

Member, Graduate Program Review Committee, 2021-Present
    Department of History, University of Texas at Dallas

Member, Curriculum Committee, 2020
Department of History, California State University San Marcos

Member, Graduate Program Committee, 2016-2020
Department of History, California State University San Marcos

Faculty/Graduate Student Reading Group Founder and Coordinator, 2015-2020
Department of History, California State University San Marcos

Member, 2013-2016
Graduate Student Admissions Committee, History Department, California State University San Marcos

Member, 2013-2014
History Department B.A. Assessment Committee, California State University San Marcos

Fundraiser, 2012-2013
War at Home and Abroad Digital History Archive, California State University San Marcos

Affidavit

Dr. S. Deborah Kang
Associate Professor of History
University of Virginia
sdkang@virginia.edu
December 22, 2021

Introduction

I have been asked to research the legislative history of 8. U.S.C. 1326 and address the question of whether racial animus motivated the passage of the original law and its subsequent amendments. This affidavit provides a report of my findings, which are based on the relevant historical scholarship, the events leading to the legislation, and legislative history.[1] In sum, the Undesirable Aliens Act of 1929 and its amendments under the McCarran-Walter Act of 1952, the Anti-Drug Abuse Act of 1988 (ADAA), the Immigration Act of 1990, the Violent Crime Control and Law Enforcement Act of 1994 (VCCLEA), the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA) were enacted with a discriminatory purpose. Whereas anti-Mexican racism informed the passage of the Undesirable Aliens Act and its 1952 revision, a combination of anti-Haitian and anti-Hispanic racism drove the enactment of the subsequent amendments in 1988, 1990, 1994, and 1996. Part I focuses on the first two acts while Part II supplies a history of the re-enactments under the 1988 and 1990 Acts. Part III discusses the changes made to §1326 under the VCCLEA and AEDPA and Part IV addresses those rendered by IIRIRA.

---

[1] *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. at 265 (1977).

Part I: The Undesirable Aliens Act (1929) and the McCarran-Walter Act (1952)

*Historical Background and Legislative History*

For more than a century, anti-Mexican racism has been a driving factor in the shaping of America's citizenship and immigration policies. Since the signing of the Treaty of Guadalupe Hidalgo in 1848, racial animus led many Americans to harbor deep reservations about the fitness of ethnic Mexicans for United States citizenship.[2] Thus, despite the promises of citizenship and equal protection guaranteed by the Treaty and the Constitution, widespread racial discrimination and racial violence prevented ethnic Mexicans from the full enjoyment of their political, economic, and social rights.[3] Anti-Mexican racism also tainted nearly every immigration policy pertaining to ethnic Mexicans, including admissions, deportation, enforcement, legalization, and criminal prosecution under measures such as the Undesirable Aliens Act. From the late nineteenth century to the present, the racist assumptions underlying the nation's immigration laws conveyed the perennial message that ethnic Mexicans did not belong and that they were unfit for citizenship.

In the early twentieth century, anti-Mexican racism took a new form. Whereas earlier articulations of these sentiments denigrated the lifestyles of the Californios, Hispanos, and Tejanos (former subjects of Mexico who became US citizens or legal permanent residents under the Treaty), by the early twentieth century, a different form of xenophobia emerged in response to the migration of 1.5 million Mexicans between 1910 and 1920.[4] In particular, American

---

[2] David G. Gutiérrez, *Walls and Mirrors: Mexican Americans, Mexican Immigrants, and the Politics of Ethnicity* (Berkeley: University of California Press, 1995).

[3] Neil Foley, *The White Scourge: Mexicans, Blacks, and Poor Whites in Texas Cotton Culture* (Berkeley: University of California Press, 1999); Monica Munoz Martinez, *The Injustice Never Leaves You: Anti-Mexican Violence in Texas* (Cambridge: Harvard University Press, 2018).

[4] David Lorey, *The U.S.-Mexican Border in the Twentieth Century* (New York: Rowman and Littlefield), 69.

industries, especially southwestern agribusiness, created and perpetuated a negative stereotype of the new arrivals as a cheap, exploitable, and deportable labor force. In so doing, they relied upon the ideas of contemporary eugenicists who argued that Mexican migrants were mentally and morally inferior to European immigrants.[5] These qualities, they further claimed, made Mexicans the ideal work force, particularly for the corporate farms that began to proliferate throughout the American Southwest. As historian Lawrence Cardoso writes, the farmers

> claimed that the braceros' physical and mental makeup ideally suited them for manual labor. The hot climate of Mexico and the demanding tasks of hacienda labor had conditioned them to withstand high temperatures and carry out stoop labor. This being the case, the 'betters' of society, the whites, were allowed to pursue occupations more appropriate to their superior station in life.[6]

Growers further asserted that this work force would be a submissive one; they claimed that "braceros were a unique docile group of people, denuded of ambition and complacent with their status in life as a result of centuries of servitude and brutal exploitation on the haciendas."[7] Eugenicist ideas also led American employers to believe that nature or biology had rendered Mexican migrants "birds of passage." In other words, their so-called biological instincts made it impossible for Mexicans to settle in one locale for long periods of time; as a result, it was alleged that Mexicans would never want to remain in the United States as permanent residents and, in turn, pursue American citizenship.

Southwestern agribusiness organizations and their congressional representatives employed these racist stereotypes in lobbying for immigration policies in the early twentieth century. Most prominently, until 1965, they successfully defeated the efforts of other

---

[5] Daniel J. Tichenor, *Dividing Lines: The Politics of Immigration Control in America* (Princeton: Princeton University Press, 2002)*,* Kindle Loc. 226-262.
[6] Lawrence A. Cardoso, *Mexican Emigration to the United States,*1897-1931 (Tucson: University of Arizona Press, 1980), 125 (paraphrasing statements of farmers interviewed by Paul S. Taylor).
[7] Cardoso, *Mexican Emigration to the United States,* 124.

congressional lawmakers who, while like-minded in their racist antipathy toward Mexican migrants, wanted to establish an explicit ban against the entry of Mexican nationals into the United States. Their victory hinged on their repeated reassurances that Mexican nationals would never remain in the country and thereby threaten the nation's so-called racial stock. Others added that if Mexican nationals chose to remain, their removal, unlike the deportation of unwanted Chinese and European migrants, would be relatively easy given the proximity of Mexico to the United States.[8]  Indeed, by agreeing to the creation of an immigration Border Patrol in 1924 and the Undesirable Aliens Act, which established the first criminal penalties for the acts of illegal entry and re-entry, they demonstrated that their commitment to the elimination of unwanted Mexicans was not merely symbolic.[9]  In addition to placating their opponents, these measures also served agribusiness interests by providing them with a state-financed mechanism to manage their workforce or, more concretely, to detain and/or deport their Mexican employees when they were no longer needed at the end of the harvest season. In short, by 1929, anti-Mexican stereotypes drove the creation of immigration policies that limited their access to permanent residence and citizenship and consigned ethnic Mexicans to a perpetual cycle of welcome and return.

By the early 1930s, the Great Depression triggered another shift in anti-Mexican sentiment by hardening the association between an ethnic Mexican identity and undocumented immigration; as historian Mae Ngai writes, Mexican immigrants became the nation's iconic

---

[8] Tichenor, *Dividing Lines,* Kindle Loc. 228, 252-254.
[9] For an extended discussion of the racial animus that motivated the passage of the Undesirable Aliens Act, see *Brief for Professors Kelly Lytle Hernández, Mae Ngai, and Ingrid Eagly as Amici Curiae Supporting Respondent, United States of America v. Refugio Palomar-Santiago,* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-437.html; Eric S. Fish, "Race, History and Immigration Crimes," *Iowa Law Review*, forthcoming, available at SSRN: https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3827488.

illegal alien.[10]  Although anti-Mexican forces pronounced that Mexican migrants would never

stay in the United States, they ultimately did settle throughout the country, building families,

livelihoods, and communities.[11]  Yet, in the Depression era, these communities became a source

of resentment among nativists who sought a scapegoat for the economic crisis. Wrongly blamed

for taking the jobs of native-born Americans and consuming an unfair share of welfare benefits,

the federal government, states, and localities used scare tactics to force undocumented Mexican

immigrants into leaving the United States.[12]  These campaigns generated so much fear that

Mexican American citizens and Mexican immigrants, as well as undocumented Mexican

migrants, were driven out of the country; by the end of the decade, it's estimated that nearly half

a million ethnic Mexicans were forcibly repatriated.[13]  On the impact of these removals, historian

Erika Lee writes, "An entire generation of American citizens of Mexican descent were de-

Americanized and exiled to the country of their parents' birth."[14]

    The federal government further cemented the link between Mexican identity and

illegality through the enforcement of the Undesirable Aliens Act. In the decade following the

law's passage, "seventy-one percent (71%) of all Mexican federal prisoners [were] charged with

---

[10] Mae Ngai, *Impossible Subjects: Illegal Aliens and the Making of Modern America* (Princeton: Princeton University Press, 2004).

[11] George J. Sanchez, *Becoming Mexican American: Ethnicity, Culture, and Identity in Chicano Los Angeles, 1900*-1945 (New York: Oxford University Press, 1995); Kelly Lytle Hernández, *City of Inmates: Conquest, Rebellion, and the Rise of Human Caging in Los Angeles, 1771-1965* (Chapel Hill: University of North Carolina Press, 2017), 131-32

[12] Abraham Hoffman, *Unwanted Mexican Americans: The Great Depression Repatriation Pressures, 1929-1939* (Tucson: University of Arizona Press, 1974); Francisco E. Balderrama and Raymond Rodríguez, *Decade of Betrayal: Mexican Repatriation in the 1930s* (Albuquerque: University of New Mexico Press, 1995); Deirdre Maloney, *National Insecurities: Immigrants and U.S. Deportation Policy Since* 1882 (Chapel Hill: University of North Carolina Press, 2012); Cybelle Fox, *Three Worlds of Welfare Relief: Race, Immigration and the American Welfare State, from the Progressive Era to the New* Deal (Princeton: Princeton University Press, 2012); Adam Goodman, *The Deportation Machine: America's Long History of Expelling Immigrants* (Princeton: Princeton University Press, 2020)

[13] Goodman, *Deportation Machine,* 46.

[14] Erika Lee, *America for Americans: A History of Xenophobia in the United States* (New York: Basic Books, 2019), Kindle Loc. 3007.

immigration crimes."[15] As historian Kelly Lytle Hernández observes, "no other federal legislation—not prohibition, not drug laws, and neither laws against prostitution nor the Mann act—sent more Mexicans to federal prison in those years."[16]  Taken together, the disparate prosecution of Mexicans under the Undesirable Aliens Act and local, state, and federal removal campaigns transformed the United States into a "'deportation nation' that made no distinction between foreign-born Mexican aliens who had entered the United States without documentation, lawful residents, naturalized citizens, and American-born citizens of Mexican descent."[17]

Yet, as World War II loomed on the horizon in the late 1930s, southwestern agribusiness began to resuscitate old arguments regarding the need for a temporary farm labor work force from Mexico.[18] Unwilling to pay the wages that would attract a native-born workforce, southwestern agribusinesses lobbied the government to create what would become the Bracero Program, a federally-sponsored farm labor program that led to the admission of approximately 4.5 million temporary workers from Mexico between 1942 and 1964.[19]  In creating the Bracero Program, the federal government secured the Mexico's assent and, through a series of bilateral treaties, the US pledged that Mexican nationals who signed Bracero contracts would receive a

---

[15] Declaration of Professor Kelly Lytle Hernández, *United States v. Bruno Rios-Montano,* 8.

[16] Declaration of Professor Kelly Lytle Hernández, *United States v. Bruno Rios-Montano*, 8.

[17] Lee, *America for Americans*, Kindle Loc. 3005.

[18] Mireya Loza, *Defiant Bracero: How Migrant Workers Fought for Racial, Sexual, and Political Freedom* (Chapel Hill: University of North Carolina Press, 2016), 34.

[19] Kirstein, *Anglo over Bracero,* 89; Grover C. Wilmoth, District Director, El Paso to Maurice T. Van Hecke, Chairman, President's Commission on Migratory Labor, October 29, 1950, file 56302/267, pt. 1, RG 85, National Archives; Grover C. Wilmoth, District Director, El Paso to Central Office, October 13, 1950, file 56302/267, pt. 1, RG 85, National Archives; Grover C. Wilmoth, "Statement prepared by Grover C. Wilmoth, District Director, Immigration and Naturalization Service, El Paso District, for the President's Commission on Migratory Labor, Holding Sessions at El Paso, Texas on August 4 and 5, 1950," file 56302/267, pt. 1, RG 85, National Archives; Carson Morrow, Chief Patrol Inspector to Grover C. Wilmoth, District Director, El Paso, October 13, 1950, file 56302/267, pt. 1, RG 85, National Archives.

fair minimum wage and humane working and living conditions.[20] In the aftermath of the mass

deportation drives of the 1930s, both nations viewed the Bracero Program as a fresh chapter in

U.S.-Mexico relations, a chapter in which the two nations would act as wartime allies and in

which Mexican national workers would be treated with dignity and respect.

Yet, these optimistic pronouncements belied the ways in which anti-Mexican racism

shaped the Bracero Program itself. US officials admitted that the pervasive racism faced by

ethnic Mexicans in the United States jeopardized the very signing of the Bracero accords and

their subsequent renewal.[21] George S. Messersmith, the US ambassador to Mexico, expressed

these reservations shortly after the signing of the Bracero agreement, "The question of

discrimination against Mexicans in the United States is one of the few outstanding problems we

have with Mexico."[22] For its part, Mexico, long cognizant of the anti-Mexican animus in the

United States, sought to protect its nationals by demanding the inclusion of humanitarian

protections in the Bracero accords and banning Texas, where anti-Mexican racism took

particularly violent forms, from the Bracero Program.[23] These efforts, however, failed to shield

Mexican braceros from discrimination. From the onset of the Program, braceros complained

---

[20] These protections were not observed in practice. S. Deborah Kang, The *INS on the Line*: *Making Immigration Law on the U.S.-Mexico Border* (New York: Oxford University Press, 2017), 134.

[21] Having commissioned multiple studies on the issue of anti-Mexican racism in the late 1930s and 1940s, federal officials were keenly aware of the discrimination and racism faced by ethnic Mexicans in the United States. For an account of these studies, see Emilio Zamora, *Claiming Rights and Righting Wrongs in Texas: Mexican Workers and Job Politics During World War II* (College Station, Tex.: Texas A & M Press, 2010), 73-75; 89-93.

[22] Justin Hart, "Making Democracy Safe for the World: Race, Propaganda, and the Transformation of U.S. Foreign Policy during World War II," *Pacific Historical Review,* vol. 72, n. 1 (February 2004):65 (citing George S. Messersmith to the Secretary of State, November 12, 1942, 811.4016 Decimal File, 1940-1944, RG 59, National Archives, College Park, MD). Federal officials were also very concerned that entrenched anti-Mexican racism would disrupt Roosevelt's efforts to create hemispheric unity, especially after the US entered World War II. As the War continued, they feared that Axis powers would campaign for the hearts and minds of Latin American nations by drawing attention to the anti-Latin American animus in the United States. Hart, "Making Democracy Safe for the World," 59, 62.

[23] Zamora, *Claiming Rights and Righting Wrongs in Texas*, 68-71.

about "receiving 'a lower rate of pay for the same work'; on-the-job segregation between Mexicans and Anglos; separate recreational and toilet facilities; and a glass ceiling that prevented them from advancing beyond 'certain low-paying jobs.'"[24] In a widely circulated op-ed, Sumner Welles, former Under Secretary of State to President Franklin Delano Roosevelt, excoriated the "poisoning discriminations" faced by bracero workers and equated their experiences with those of ethnic Mexicans in the United States:

> . . . Mexican children are not permitted in some places to attend the public schools. They do not realize that Mexicans are not permitted in certain regions to travel in cars set aside for "white persons." They do not know that in some communities they are not permitted entrance into hotels or moving-picture theaters. They would be amazed to learn that only recently a high official of the Mexican government was refused service in the restaurant of a leading hotel in one of our Southwestern States. They would be shocked to hear that the proprietors of a public recreation center announced that they would not permit the entrance of Mexicans or persons of Mexican origin, "regardless of their state of culture, either social or economic." They are probably not aware that the slum conditions in which many thousands of Mexicans are forced to live in some of our Southwestern States are solely due to the unwillingness of the authorities and residents of those communities to afford them the same opportunity for betterment afforded their neighbors of United States origin. They do not know of the exploitation to which some Mexican laborers have been subjected."[25]

Over the twenty-two-year course of the Bracero Program, multiple investigations and complaints filed by the braceros themselves demonstrated the failure of the Program to protect workers from workplace abuses and discrimination.[26]

By 1943, the Bracero Program triggered an unprecedented increase in the number of undocumented entries; over the twenty-two-year course of the Program, approximately five

---

[24] Hart, "Making Democracy Safe for the World," (citing Ernest W. Trimble to Lawrence Cramer, October 26, 1942, 811.4016, Decimal File, 1940-1944, RG 59 NARA; William P. Blocker, "Some Places Where Mexicans are Discriminated Against in Texas Either by Denying Them Service or by Segregating Them from Anglo-Americans," January 15, 1945, in *ibid.*).

[25] Sumner Welles, "Mexican Nationals: Unfriendly Treatment," *Washington Post*, February 16, 1944, 10.

[26] Maggie Elmore, *In the Name of the Father: Catholic Bureaucrats and Human Rights in the Borderlands,* Draft book manuscript presented at the Clements Center for Southwest Studies, Southern Methodist University, Dallas, Texas, December 11, 2021, 63-121.

million undocumented immigrants would cross the U.S.-Mexico border. By serving as an indicator of the availability of jobs in the United States, the Bracero Program acted like a magnet, drawing workers to the country. Yet, the overwhelming demand for Bracero contracts and the dehumanizing screening process created strong incentives for migrants to pursue employment outside of the confines of the Bracero Program. Photographer Leonard Nadal, for example, documented the fumigation of braceros with DDT at the processing centers in the United States[27] Upon the completion of their medical and immigration inspections, braceros found themselves further humiliated by growers and their representatives who applied a racist logic in selecting hires; as Elvon De Vaney, a contractor for Texas cotton growers explained:

> There was only one type of individual or group of individuals we kinda shied away from and this was the little bitty short Indian fellas from way down on the southern end of Mexico. . . . So we had to shy away from them little guys especially in the [irrigation]. . . . They were kinda dwarf, midget type . . . .We tried to get boys. . . if they were from the states of Durango or Zacatecas, San Luis Potosi. . . what we'd call the mountain states . . . those boys were generally bigger and stronger. They were meat eaters, ranch country-type folk. . . . They were bigger and stronger and more stable. A lot of time, Chihuahua and border state boys were kinda rascals, just a little bit a lot of times, so if we had a choice we'd get your mountain type fellars."[28]

More recently, hundreds of former braceros have attested to their experiences of abuse and discrimination in oral histories collected by the Bracero History Archive, a digital repository that serves as one of the primary sources of information about the Bracero Program.[29]

---

[27] Leonard Nadel, "Braceros were fumigated with DDT while others stand in line at the Hidalgo Processing Center, Texas," in Bracero History Archive, Item #3000, http://bracoroarchive.org/items/show/3000, accessed December 6, 2021. For a short documentary on the history of "gasoline baths" used against Mexican migrants and braceros, see Ranjani Chakraborty, "The dark history of "gasoline baths" at the border: Toxic chemicals—and Nazis—are part of US border history," *Vox*, July 29, 2019, https://www.vox.com/2019/7/29/8934848/gasoline-baths-border-mexico-dark-history, accessed December 6, 2021.

[28] Loza, *Defiant Bracero*, 43 (citing Interview with Elvon De Vaney by Jeff Townsend on March 9, 1974, SWC).

[29] Roy Rosenzweig Center for History and New Media, George Mason University, the Smithsonian Institution National Museum of American History, Brown University, and the Institute of Oral History at the University of Texas at El Paso, *Bracero History Archive*, http://braceroarchive.org/, accessed December 17, 2021.

In crossing without a Bracero contract, many Mexicans sought not only to avoid the indignities of the contracting process but also were encouraged by southwestern growers to make unauthorized entries. Due to the state's banishment from the Program, Texas growers increased their hiring of undocumented Mexican workers. Given that of all farmworkers in the US, undocumented Mexicans typically received the lowest wages and endured the worst working conditions, some Texas growers preferred to hire unauthorized workers rather than be bound by labor protections stipulated in the Bracero contracts.[30] They had become so dependent on this workforce that many, echoing the language of Southern slaveholders, felt that it was their right to employ Mexicans whom they pejoratively referred to as "wetbacks."  As the *New York Times* observed, "They [the farmers] assert boldly that this 3,000 square-mile agricultural empire, with 300,000 inhabitants and an annual income of more than $3,000,000, was built on cheap 'wetback' labor like the Southern slave owners of a century ago—it is a violation of their rights to take it away even if the 'wetbacks' are lawbreakers."[31] Facing enormous pressure from federal lawmakers who represented southwestern agribusiness interests, the Immigration and Naturalization Service (INS) facilitated growers' access to undocumented labor by suspending their enforcement operations during the harvest season. At the same time, many INS officials, particularly those stationed in the Southwest, shared the worldview of southwestern growers regarding their so-called entitlement to undocumented Mexican labor.

---

[30]     Of undocumented Mexican workers, a government investigation wrote, "Last in order of security and first in order of exclusion from the community is the illegal Mexican alien, commonly referred to as a "wet back." Under constant threat of apprehension and deportation, his life is one of furtive insecurity.  In the hands of employers inclined to make use of the wetback's disabilities, the result is virtually peonage." President's Commission on Migratory Labor, *Migratory Labor,* 5, 65-89, 105, 130, 137.

[31] Juan Ramon García, *Operation Wetback: The Mass Deportation of Mexican Undocumented Workers in 1954* (New York: ABC-CLIO, 1980), 214 (citing Gladwin Hill, "'Wetback' Drive Irks 'The Valley,'" *New York Times*, August 2, 1954, 8.)

Despite the complicity of many federal officials in the undocumented entries of Mexican nationals, the federal government ultimately responded to the perceived border crisis by developing an immigration enforcement strategy. Motivated by the same anti-Mexican impulses that informed the immigration enforcement policies of the 1920s, American and Mexican policymakers deployed punitive measures, such as deportation and criminal prosecution for illegal entry and re-entry, to scare Mexican migrants and induce them into signing Bracero contracts. In short, the immigration enforcement policies of the Bracero era powerfully reinforced longstanding racist notions that Mexican migrants deserved admission into the United States not as prospective citizens but instead as a cheap, exploitable, and deportable labor force.[32] These policies began to take shape in the 1940s as the Mexican government, concerned about losing a source of low-cost labor for its own domestic economy, stipulated that future extensions of the Bracero Program would be contingent on US efforts to halt undocumented migration across the border. To keep the Bracero Program alive, the US government, via the INS, implemented two border control strategies: with the occasional assistance of the Mexican government, the sporadic mass deportation of undocumented workers (particularly at the end of the harvest season); and so-called legalization, which did not provide Mexican migrants with a pathway to citizenship, but instead funneled them back into the Bracero Program as temporary laborers. Thus, for example, during the infamous "El Paso Incident" of October 1948, the INS unilaterally opened the border to the thousands of bracero hopefuls who had gathered upon a rumor that a new recruiting center would open along the line. But instead of granting them

---

[32] Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949*, 32.

bracero contracts, the INS arrested them on the spot and then paroled them to waiting employers.[33]

By the late 1940s, federal policymakers began to adopt a harder vision of immigration law enforcement thanks to the lobbying efforts of the INS.[34]  As many historians have observed, anti-Mexican racism long drove the policies and practices of immigration officials, particularly members of the Border Patrol.[35]  During the Bracero era, the agency clearly shared the anti-Mexican biases of its contemporaries.  In a 1949 tribute to the twenty-fifth anniversary of the Border Patrol, agency leaders reiterated negative stereotypes of Mexican migrants as passive and unintelligent laborers, ". . . each year the number of Mexican farm laborers illegally entering the United States is alarmingly larger than that of the preceding year. The reasons, of course, are that the Mexican farm laborers are more docile and are willing to work for lower wages than are the domestic farm laborers."[36] The agency also helped to dehumanize undocumented Mexican migrants; its correspondence and annual reports, which were available to federal policymakers and the public, routinely used the racist slur "wetback" to refer to undocumented Mexican migrants. The agency not only denigrated Mexican migrants through its words but also its practices. Its treatment of Mexicans during the Bracero era, particularly its unilateral decision to hire out undocumented Mexican migrants to southwestern growers, plainly evidenced the agency's view of Mexican migrants as an exploitable workforce.

The agency's objectification of Mexican migrants enabled it to imagine and implement highly militarized immigration enforcement strategies. Thus, even though Mexican migrants,

---

[33] Kang, *INS on the Line*, 112-113.
[34] Kang, *INS on the Line,* 114-138.
[35] Kelly Lytle Hernández, *Migra!: A History of the U.S. Border Patrol* (Berkeley: University of California Press, 2010); Martinez, *The Injustice Never Leaves You.*
[36] Department of Justice, *Annual Report of the Immigration and Naturalization Service for the Fiscal Year Ended June 30, 1949*, 32.

like the hundreds of thousands of European, Asian, and African migrants who came to the United States since its founding, migrated to the United States in search of better lives for themselves and their families, they were regularly described as an "invasion" and treated as such.[37] During the Bracero era, the agency acquired military jeeps, aircraft, and radar to detect undocumented entries on the line, and redesigned its approach to deportation based on combat strategies.

At the same time, the INS worked vigorously to bolster its enforcement authority under law. In 1946, agency officials, particularly those stationed in the Southwest, lobbied for the creation of the so-called 100-mile zone in order to legalize practices, such as its car stops, that it admitted were illegal.[38] By 1949, INS leaders also won the ear of the Truman administration and, as a result, played a central role in helping it to define a response to undocumented immigration on the U.S-Mexico border.[39] This response included the following policy proposals: the increased statutory authority for the INS to enter places of employment to locate undocumented migrants; the creation of employer penalties; a ban on the legalization of undocumented migrants for the purposes of employment in the United States; and a bilateral approach to migration control that included immigration enforcement support from the government of Mexico. The Truman administration published these recommendations as part of its broader effort to investigate the plight faced by undocumented migrants and migrant farm workers in general. In the process, the administration, despite its own use of the term "wetback" and reference to undocumented Mexican migration as an "invasion," tried to present a sensitive portrait of undocumented immigrants in a report titled, *Migratory Labor in American*

---

[37] Kitty Calavita, *Inside the State: The Bracero Program, Immigration, and the I.N.S.* (New York: Routledge, 1992)*,* 47 (citing President's Commission on Migratory Labor, *Migratory Labor*, 69).
[38] Kang, *INS on the Line*, 123-25.
[39] Kang, *INS on the Line,* 114-138.

*Agriculture*.[40] More specifically, it explained the hardships that led many to seek employment in the United States and the discrimination and exploitation they faced as farmworkers. Moreover, the report argued that the Mexican government and American growers created the conditions that drew undocumented workers to the United States in the first place and, as a result, recommended that they, rather than the migrants themselves, bear the principal responsibility for the so-called crisis on the border.

Although the Truman administration appeared to take a more humanitarian approach to the issues of undocumented Mexican migration and immigration law enforcement, it is important to note that it was far from averse to adopting punitive measures vis-a-vis undocumented migrants. As historians have observed, the Truman administration and his wing of the Democratic Party adopted a bifurcated approach to immigration policy.[41] On the one hand, Truman's Cold War priorities led him to advocate for the dismantling of the racist national origins quota system of 1924, which barred Asian immigration and limited migration from southern and European nations. Yet, on the other hand, the Party's labor union constituents compelled it to adopt a hardline approach to immigration law enforcement, one that included more funding for the Border Patrol, a robust deportation policy, an extensive detention system, and employer penalties. In short, it was an approach that perpetuated the so-called deportability of Mexican migrants. When the Truman administration failed to win passage of an employer sanctions measure in Congress, it made clear its commitment to deportation as an alternative

---

[40] President's Commission on Migratory Labor, *Migratory Labor in American Agriculture* (Washington, D.C.: U.S. Government Printing Office, 1951). For photos of the working and living conditions faced by Bracero workers, see, Smithsonian National Museum of American History, "Broken Promises/Promesas Rotas," Bittersweet Harvest: The Bracero Program 1942-1964/Cosecha Amarga Cosecha Dulce: El programa Bracero 1942-1964, Digital history exhibit, https://americanhistory.si.edu/bracero/introduction, accessed December 6, 2021.
[41] Kang, *INS on the Line,* 114-138.

response to undocumented Mexican immigration; in a telephone call with Border Patrol supervisor Willard F. Kelly, David Stowe, assistant to President Truman, declared, "we should enforce the law and continue to enforce it as hard as we can, and clean out every wetback in the United States, right now."[42]

Ultimately, congressional conservatives, particularly southern and western Democrats, played a key role in weakening or blocking immigration enforcement bills. As in the 1920s, racist conceptions of Mexican migrants as the ideal agricultural workforce led congressional conservatives to cut appropriations for the Border Patrol and reject efficacious employer penalty proposals.[43] Thus, during a conference committee on P.L. 78 (the 1951 statute that authorized the extension of the Bracero Program until its termination in 1964), Senator Allen Ellender (D-LA), chair of Senate Committee on Agriculture, deleted an amendment that would have penalized employers for hiring undocumented immigrants.[44] The son of Louisiana plantation owners, a

---

[42] Typed notes regarding meeting between Willard F. Kelly and David Stowe at the White House, July 6, 1951, 3:30pm, file 56321/448, RG 85, National Archives. At the same time, the administration, congressional Democrats, and the INS worked closely, albeit in vain, to craft a bill that would appropriate $12 million for the construction of immigration detention facilities. Kang, *INS on the Line,* 133.

[43] The longevity of this orientation toward Mexican migrants was not coincidental; as political scientists have explained, nativist, pro-agribusiness senators and congressmen had held the chairs of the Immigration and Judiciary committees in both chambers where they regularly deployed parliamentary procedures to block the passage and even release of measures that would exercise oversight over and even terminate the Bracero Program and enable the Border Patrol to close the border to undocumented migrants. At the same time, they used their committee chairmanships to block legislation that would abolish the 1924 national origins quota system. Tichenor, *Dividing Lines*, Kindle Loc. 269

[44] On his racism, Ellender's biographer writes: "For his treatment of black Americans alone, he fell short, even if one makes a scrupulous effort to judge him by the standards of his times. During his tenure of office, many striking changes in race relations occurred; he simply refused to change with the times and recognize that most Americans had reached a consensus and agreed at least that racial segregation should end and blacks be given the right to vote. Ellender favored racial segregation all of his political life. By this measurement alone, he could never be considered a great senator." Thomas A. Becnel, "Allen J. Ellender, Consensus Politician," *Louisiana History: The Journal of the Louisiana Historical Association*, vol. 32, n. 3 (1991): 237-238.

On Ellender's staunch opposition to desegregation and civil rights, his biographer recounts: Ellender believed in segregation to the end and denounced decisions that struck down laws to reenforce segregation. He liked blacks as individuals, but he feared giving the race special legal status. Starting with his 1937 filibuster of antilynch legislation, Ellender maintained a consistent policy on race: he opposed

lifelong segregationist who opposed civil rights legislation, and an "aggressive [ally] of agribusiness,"[45] Ellender played a key role in ensuring that growers had easy access to Mexican labor. He not only defeated the employer sanctions amendment to P.L. 78, he also successfully convinced reluctant Mexican officials to sign a new set of Bracero accords in 1951, facilitated the swift passage of S. 984 (P.L. 78), and blocked increased appropriations for the Border Patrol.[46] For southern and western Democrats like Ellender, segregation and weak immigration law enforcement were two halves of a whole; both policies reinforced a racist worldview that relegated ethnic and racial minorities to the bottom of the socioeconomic ladder and justified the denial of their civil and human rights.

As the chair of the Senate Judiciary Committee and the co-author of the McCarran-Walter Act of 1952 (the first major overhaul of the nation's immigration laws since the passage of the Immigration Act of 1924), Senator Pat McCarran (D-NV) was keenly aware of the debates regarding Mexican immigration. For the most part, McCarran expressed his own views on Mexican migration during the hearings of the Senate Appropriations committee. A shrewd political tactician, McCarran must have known that in this venue he could exert more control over the development of Mexican migration policy than he could in the Judiciary Committee (through which he oversaw the debates on the McCarran Walter Act).[47] In the Appropriations Committee, he heard INS leaders repeatedly plea for increased appropriations that would allow

---

the Federal Employment Practices Commission and voted against funding it; he voted against all civil rights bills passed by Congress from 1947 to 1968, he opposed the Voting Rights Act of 1965, and he signed the 1956 Southern Manifesto which denounced the 1954 Brown decision." Thomas Becnel, "Louisiana Senator Allen J. Ellender and IWW Leader Covington Hall: An Agrarian Dichotomy," *Louisiana History: The Journal of the Louisiana Historical Association*, vol. 23, n. 3 (1982): 268.
[45] Calavita, *Inside the State,* 45.
[46] Calavita, *Inside the State*, 43-45.
[47] Von V. Pittman, Jr., "Senator Patrick A. McCarran and the Politics of Containment," (Ph.D. diss., University of Georgia, 1979): 1.

the agency to strengthen its enforcement capacities along the US-Mexico border. The agency specifically requested funds for the hiring of more Border Patrol agents, the execution of more deportations via air, and the construction of detention facilities for the processing of deportees and incarceration of those awaiting criminal prosecution. Agency leaders particularly stressed that by augmenting the airlift program and building detention centers, it could control the increasing number of undocumented entries of Mexican nationals along the U.S.-Mexico border.[48] Yet, like Ellender, McCarran worked to remove obstacles to the undocumented crossings of Mexican workers. In the Senate Appropriations committee, he and his allies routinely supported reductions in funding for border enforcement operations.[49]

McCarran's support of INS budget cuts were not motivated by a desire to reform the racially discriminatory features of US immigration law vis-à-vis Mexican nationals. Instead, McCarran defended a widespread system of labor exploitation premised upon racist notions of Mexican migrants as expendable farmworkers. Indeed, during 1951 appropriations hearing McCarran himself referred to both legal and undocumented Mexicans as "wetbacks":

> Except when you get down to the Mexican boundary. Of course, you have all kinds of deportations there and removals from the territory of the United States. But that is a come-and-go proposition. In other words, there is a flood of people who come across the boundary. They are called wet-backs, and they come across legally or illegally during the various harvest seasons. Then they go back, and so you have this come-and-go drifting there.[50]

---

[48] See, for example, Hearings before the Subcommittees of the Committee on Appropriations House of Representatives: The Supplemental Appropriation Bill for 1952, Part 2, Eighty-Second Congress, First Session, May 29, 1951, 751-56.

[49] Calavita, *Inside the State*, 36. See also García, *Operation Wetback*, 121. (citing Ernesto Galarza, *Merchants of Labor: The Mexican Bracero Story* (Charlotte: McNally and Loftin, 1964, 61).

[50] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: Making Appropriations for the Departments of State, Justice, Commerce, and the Judiciary for the Fiscal Year ending June 30, 1952, Part I, Eighty-Second Congress, first session, March 8, 1951, 124.

Relying on this racial slur, McCarran justified a 1952 denial of an INS appropriations request by explaining that the "desire for these wetbacks" among growers in US border states took precedence over the agency's enforcement needs.[51] In the same hearing, Ellender complained about the strictures imposed by the Bracero Program: ". . . the Mexican Government has gone so far as to make us, in a contract, agree to feed these people while en route, take them back, provide minimum wages, and give them health insurance, and all that. It is something they do not get at home." In reply, McCarran added that growers' demands for undocumented Mexican workers superseded the well-being of the migrants themselves; as Ellender concurred, McCarran stated, "The wetback is little interested in that sort of thing. In other words, a farmer can get a wetback and he does not have to go through that red tape."[52]

While congressional conservatives worked to preserve growers' access to a steady supply of legal and undocumented Mexican workers, they also fought to preserve the racist national origins quota system during the debates regarding the McCarran Walter Act of 1952. Proposals to eliminate or modify the national origins quota system, according to Representative Rankin of Mississippi, threatened to "destroy the white race," and discriminated against "White Gentiles."[53] Leading the defense of the quota system, McCarran stated on the floor of the Senate, ""the national origins quota formula was a rational and logical method of numerically restricting immigration in such a manner as to best preserve the sociological and cultural balance in the population of the United States."[54] Immigration restrictionists further argued that the dismantling

---

[51] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: H.R. 4974-Making Appropriations for the Departments of State, Justice, and Commerce for the Fiscal Year ending June 30, 1954, Eighty-Third Congress, first session, March 25, 1953, 245.
[52] Hearings before the Subcommittee of the Committee on Appropriations United States Senate: H.R. 4974, 246.
[53] 98 Cong. Rec. 4318, 4320 (April 23, 1952)..
[54] 99 Cong. Rec.1517-18 (March 2, 1953). McCarran's racism and anti-Semitism also led him to work vigorously to limit European refugee admissions in the 1940s. Thus, for example, as a co-sponsor of the

of the national origins quota system would expose the nation to the entry of communists, as McCarran averred, "by opening the floodgates of unlimited immigration, without screening and without curtailment, we will have destroyed the national security of the United States."[55]

As chairman of the Senate Judiciary Committee, McCarran regularly wielded his authority to delay and block the passage of any liberal immigration reforms.[56] With respect to Truman's reform proposals, one historian observes that ". . . the Nevada Democrat used tactics of obstruction, amendment, and congressional investigation to challenge the presidential ascendancy."[57] During a series of Joint Hearings by the Senate and House Subcommittees on Immigration (which fell under the aegis of the Judiciary Committees) to discuss the McCarran and Walter bills (S. 716 and H.R. 2379, respectively), McCarran blocked debate on Celler's reform bill (H.R. 2816)[58] and refused to even report out the Humphrey-Lehman bill (S. 2842).[59] Ultimately, the liberals failed to pass any major amendments to the McCarran and Walter bills. By 1956, Senator James Eastland (D-MS), a cotton planter, strident segregationist, and xenophobe, assumed the chair of the Senate Judiciary Committee until 1978.[60] Along with

---

Displaced Persons Act of 1948, McCarran linked refugee admissions to the quota system. Given the volume of refugee admissions, some quotas were quickly filled and many others were mortgaged for decades. McCarran also drafted the provisions which restricted the issuance of Displaced Persons visas to Jews from the Soviet Union and other Eastern European countries. Tichenor, *Dividing Lines,* Kindle Loc. 278.

[55] Joint Hearings, 2.

[56] McCarran characterized his role as chairman of the Judiciary Committee as follows, "[t]he chairman of a committee or a subcommittee cannot always assure passage of a bill which has been referred to his group, but can almost always kill the bill if he wishes to do so." Frank Elmer Whited, Jr., "The Rhetoric of Senator Patrick Anthony McCarran," (Ph.D. diss., University of Oregon, 1973), 23.

[57] Von V. Pittman, Jr., "Senator Patrick A. McCarran and the Politics of Containment," (Ph.D. diss., University of Georgia, 1979): 1.

[58] Joint Hearings, 6.

[59] McCarran and his cohort rarely remained in chambers long enough to take questions and debate the merits of his bill. As a result, liberals held the floor for much of the two-week debate. When he was present in chambers, McCarran refused to yield to questions or simply repeated his own points in answer to a question. 98 Cong. Rec. 5765 (May 22, 1952).

[60] Eastland himself hired both legal and undocumented Mexican workers and worked directly with the INS to obtain those workers. Thus, for example, INS records reveal that in 1948, an Eastland staffer

Representative Walter, the Chair of the House Judiciary Committee, Eastland blocked any major reform or repeal of the McCarran Walter Act, staunchly opposing the elimination of the national origins quota system during debates over the Immigration and Nationality Act of 1965 and preventing the passage of an employer sanctions measure well into the 1970s.[61]

Realizing that they did not have the political clout to enact any comprehensive immigration reform, no liberal congressman introduced a bill eradicating the national origins quota system during the debates over the McCarran Walter Act. In his autobiography, Congressman Emanuel Celler (D-NY), a longtime opponent of national origins, observed, ". . . I knew that a really liberal immigration bill, particularly the discarding of the national origins theory, had no more chance of being enacted this session than could a bit of butter remain intact on a hot stove."[62] In the Senate, Lehman noted with regret that his amendment to the McCarran bill retained the national origins quota system "as a practical matter, designed to achieve what can and must be achieved now."[63] Thus, all of the liberal reform bills contained some variation of the national origins quota system. Some tried to mitigate its effects by changing the base year for the calculation of the immigration ceiling from 1920 to 1950.[64] Most of the reform bills tried to ameliorate the quota system's impact by re-pooling and redistributing unused quotas on the basis of preference classes or for the sake of family reunification and refugee relief.[65]

---

contacted A. R. Mackey to follow up on a promise that "he would get 50 Mexican laborers from Monterey." In lieu of these legally contracted workers, however, Eastland's office indicated that the Senator could procure "50 'wetbacks'" from his uncle who had a ranch in Texas. A.R. Mackey, Memorandum of telephone call between A. R. Mackey and Mr. Payce, Staff Member for Senator Eastland of Mississippi, September 16, 1948, 1:50p.m., file 56246/339B, RG 85, National Archives.
[61] Tichenor, *Dividing Lines,* Kindle Loc. 308, 315, 337.
[62] Celler, *You Never Leave Brooklyn*, 101. See also, 98 Cong. Rec. 5102 (May 13, 1952).
[63] 98 Cong. Rec. 5102 (May 13, 1952).
[64] 98 Cong. Rec. 4407 (April 24, 1952)..
[65] 98 Cong. Rec. 4414 (April 24, 1952); 98 Cong. Rec. 5607-10 (May 21, 1952).

In this context, Congress remained largely silent with respect to the recodification of the criminal entry and re-entry provisions of the immigration laws in the 1952 Act. It made no effort to examine or cleanse the anti-Mexican racism that infected the Act of March 4, 1929. Indeed, McCarran's structural position in Congress as well as the xenophobia among congressional conservatives would have rendered such an examination nearly impossible. Such an exploration, moreover, would have compelled both congressional conservatives and liberals to ask difficult questions about the nation's engagement with the Bracero Program and whether it also perpetuated anti-Mexican animus. In sum, the recodification of the laws under the McCarran Walter Act did not purge the racial animus of the criminal entry and re-entry provisions.

The changes made to the 1952 Act, moreover, strengthened the clauses regarding unlawful entry and re-entry by making them easier to prosecute. With respect to re-entry, it combined what had been three disparate provisions regarding anarchism, prostitution, and illegal reentry into one general illegal re-entry clause. It also revised the 1929 law by penalizing migrants for being "found in" the United States after a previous deportation. This clause allowed prosecutors to try defendants in the districts in which they were found by the INS, thereby freeing the agency and prosecutors from the task of determining the place of reentry.[66] In addition, the change saved the INS the expense of transporting defendants from the districts in which they were found to the districts in which they re-entered the United States.[67]

Congress also made a minor alteration to the illegal entry provision of the 1952 Act. It specifically lessened the penalty for a first unauthorized entry from one year to six months and thereby rendered it a petty offense. As a result of this revision, defendants, charged under Section

---

[66] Joint Hearings on S. 716, H.R. 2379, and H.R. 2816 Before the House and Senate Subcommittees of the Committees on the Judiciary, Eighty Second Congress, first session, (1951), 716.
[67] United States, Department of Justice, Immigration and Naturalization Service, *Regional Conference, El Paso, Texas, May* 7-10*, 1951*, 13, file 56316/925, RG 85, National Archives.

275 of the 1952 law, lost their right to a jury trial. Legal scholar Ingrid Eagly explains that the INS, seeking a way to manage the increasing number of criminal prosecutions under the 1929 Act, pursued this revision; she writes, "[the INS] lobbied Congress to establish a misdemeanor court that would allow for criminal immigration enforcement 'at less expense and with a greater amount of effectiveness' than was possible with Article III courts."[68]  As part of this effort, the agency also urged Congress to lessen the sentence for a first offense. For the INS, decoupling the criminal prosecution of illegal entry cases from juries was essential since they typically shared the sentiments of southwestern agribusiness regarding Mexican farm workers[69] and, as a result, often refused to indict.[70] This change persisted in the ensuing reenactments to the statute and "eventually opened the door to having magistrate judges, rather than Article III judges, preside over illegal entry trials."[71]

The Undesirable Aliens Act and its subsequent revision in 1952 were passed in a historical period when anti-Mexican racism was explicit and widespread. White House officials, members of Congress, and the INS articulated eugenicist stereotypes of Mexican migrants as an exploitable and deportable workforce and, through their policy innovations, treated them as such. Farm labor programs like the Bracero Program and measures such as the Undesirable Aliens Act and Sections 275 and 276 of Public Law 414 cemented the second-class status of Mexican nationals in America. Instead of welcoming them as prospective permanent residents and citizens or providing them with a pathway to citizenship in acknowledgement of their contributions to the

---

[68] Ingrid Eagly, "Prosecuting Immigration," *Northwestern University Law Review*, vol. 104, n. 4 (Fall 2010), 1326
[69] For example, Eagly notes that "in El Paso, Texas in the late 1940s, over 90% of immigration crime cases sent to the grand jury were returned as 'no bills.'" Eagly, "Prosecuting Immigration," 1327.
[70] Eagly, "Prosecuting Immigration, 1327, n. 269.
[71] *Brief for Professors Kelly Lytle Hernández, Mae Ngai, and Ingrid Eagly as Amici Curiae Supporting Respondent, United States of America v. Refugio Palomar-Santiago,* https://www.supremecourt.gov/search.aspx?filename=/docket/docketfiles/html/public/20-437.html, 25.

American economy and society, lawmakers ensured the contingency of Mexican migrants' presence in the United States, summarily admitting and deporting them at the will and whim of southwestern growers. The racist stereotype of Mexicans as an exploitable workforce also exposed them to a variety of abuses, from their fumigation with poison gas at Bracero processing centers to the unsafe and unsanitary working and living conditions they faced on the nation's farms.

Just as important, in 1952, Washington lawmakers consciously chose not to erase the racial animus from the nation's immigration laws, including §1326. Those congressmen who were most likely to attack the racist premises of the nation's immigration laws admitted that such a challenge would fail due to the pervasive racism among their fellow members in Congress and the institutional advantage wielded by the nativists and segregationists. In particular, as the chair of the Senate Judiciary Committee, Senator Pat McCarran wielded a tremendous amount of power to shape the nation's immigration laws to his liking. Cognizant of McCarran's power and their lack of support among congressional nativists and segregationists, congressional liberals admitted that no truly anti-racist immigration measure could pass under McCarran's watch. As a result, none of the congressional liberals dared to propose a bill that completely eradicated the racist national origins quota system and, instead, drafted bills that perpetuated it. In sum, both congressional conservatives and liberals played an active and deliberate role in extending the racism that inhered in the nation's immigration laws via the passage of the McCarran Walter Act of 1952.

Part II: The Anti-Drug Abuse Act (1988) and the Immigration Act of 1990
*Historical Background*

The 1965 Immigration and Nationality Act marked a watershed in US history. It eliminated the discriminatory national origins quota system and outlawed racial discrimination based on race, sex, nationality, place of birth, or place of residence in the admission of immigrants to the United States. Although the measure was celebrated as a symbol of racial justice and equality, its drafters won the law's passage by reassuring congressional detractors that it would not change the ethnic and racial composition of the United States.[72] To that end, the new law imposed the first cap on migration from the Western Hemisphere.[73] It also created an admissions system that favored elite migrants or those with higher degrees and specialized skills.[74]  Finally, members of Congress argued that the family reunification provisions would principally benefit white ethnics rather than non-Europeans, as Rep. Emanuel Celler (D-NY) explained, "Since the people of Africa and Asia have very few relatives here, comparatively few could immigrate from those countries . . . [There is] no danger whatsoever of an influx from the countries of Asia and Africa."[75]

Yet, in the ensuing decades, the 1965 law wrought several unanticipated consequences that changed the size and composition of the nation. The Act sparked an unprecedented increase in arrivals from Asia, Latin America, and the Caribbean.[76] Asian migrants entered the country via the family reunification and employment-based provisions of the law. Meanwhile, set at

---

[72] Lee, *America for Americans*, Kindle Loc. 3937.
[73] On the racial animus that informed the creation of the ceiling on Western Hemisphere migration, see Lee, *America for Americans*, Kindle Loc. 3836, 3895-3936.
[74] Tichenor, *Dividing Lines,* Kindle Loc. 319.
[75] Lee, *America for Americans,* Kindle Loc. 3947 (citing *Congressional Record*, August 25, 1965, 21758).
[76] David M. Reimers, *Unwelcome Strangers: American Identity and the Turn against Immigration* (New York: Columbia University Press, 1998), 28-29.

120,000, the Western Hemisphere quota failed to reflect the actual number of crossings that had transpired along the US-Mexico border for decades. As a result, the quota transformed former legal border crossers into undocumented immigrants overnight. Finally, from the 1970s through the 1990s, refugees from Vietnam, Cuba, Haiti, and Central America would further change the face of the nation. These new immigrants triggered recurring waves of nativism and racism[77] and fueled the conservative reaction to the legislative victories, including the 1965 Immigration and Nationality Act, of the Civil Rights era. Their antipathy to the reforms of the Kennedy and Johnson administrations led to a fundamental transformation of the nation's immigration laws and immigration law enforcement

In the late twentieth century, Florida's congressional contingent played a key role in expanding federal immigration enforcement capacities. Although immigration scholars have focused on more widely known figures such as President Ronald Reagan and California Governor Pete Wilson, the research undertaken for this affidavit underscores the importance of examining the part of local and state officials in immigration law reform. As explained below, Senator Lawton Chiles (D-FL), Senator Bob Graham (D-FL), and Rep. Bill McCollum (R-FL) authored the bills that would substantially revise 8 U.S.C. §1326 in 1988, 1990, 1994, and 1996. Their common role in the revision of §1326 was no mere coincidence. Like legislators of other border states in this period, Chiles, Graham, and McCollum tried to respond to a perceived crisis that the nation had "lost control of its borders."[78]  In Florida, the arrival of so-called Mariel Cuban refugees and Haitian asylum seekers in the early 1980s led federal policymakers

---

[77] Tichenor, *Dividing Lines*, Kindle Loc. 326.
[78] Tichenor, *Dividing Lines,* Kindle Loc. 376 (citing William French Smith, *Law and Justice in the Reagan Administration* (Stanford: Hoover Institution, 1991), 194-95).

to take draconian steps to prevent their resettlement in the United States and deter additional arrivals. These included the routine denial of asylum, long-term detention in facilities in the United States, Puerto Rico, and Guantanamo, and interdiction at sea.[79]

Many contemporaries, however, criticized these policies for racially discriminating against both the Mariel Cubans and Haitians. As part of its effort to win the loyalties of citizens in communist and incipient communist states during the Cold War, the United States had been admitting Cuban refugees and easing their pathways to citizenship since the mid-1960s.[80]  In contrast, upon their arrival in the spring of 1980, Mariel Cubans were indefinitely detained on US military bases throughout the country.[81]  Although they left Cuba due to their political opposition to the Castro regime, Castro sought to stoke a crisis in the United States by characterizing the Mariel refugees as "'scum,'" undesirables, prisoners, troublemakers, and homosexuals."[82] Indeed, prior to their departure, Castro forced the refugees to "sign documents confessing that they were social deviants and had committed crimes against the state."[83]  Since the Mariel Cubans tended to be "more working-class, blacker, and far less elite than earlier Cuban migrants,"[84] American policymakers and the media "[took] Castro's lead and bait" and disseminated negative images of the refugees on the basis of their race, class, and sexuality.[85] Perhaps most prominently, policymakers and the public associated the refugees with criminality

[79] Jana K. Lipman, "The Fish Trusts the Water, and It is in the Water That It Is Cooked": The Caribbean Origins of the Krome Detention Center," *Radical History Review,* vol. 115 (Winter 2013): 131.
[80] Lipman, "The Fish Trusts the Water,"120 (citing to the Cuban Adjustment Act of 1966).
[81] Lipman, "The Fish Trusts the Water," 120.
[82] Jana Lipman, "A Refugee Camp in America: Fort Chaffee and Vietnamese and Cuban Refugees, 1975-1982," *Journal of American Ethnic History*, vol. 33, n. 2 (Winter 2014):71.
[83] Maria Cristina Garcia, *Havana, USA: Cuban Exiles and Cuban Americans in South Florida, 1959-1994* (Berkeley: University of California Press, 1997), Kindle Loc. 915.
[84] Lipman, "The Fish Trusts the Water," 139, fn. 39. Garcia, *Havana, USA*, Kindle Loc. 981
[85] Lipman, "The Fish Trusts the Water," 71. Perhaps most famously, the Hollywood film *Scarface* popularized negative stereotypes of these Cuban refugees. In response, Miami Cubans protested and formed Facts about Cuban Exiles (FACE), an organization that challenged these negative images and stereotypes. Garcia, *Havana, USA,* Kindle Loc. 1003, 1115.

even though the "vast majority were working-class men and women without any criminal background."[86]

Haitian asylum seekers also experienced racially disparate treatment upon their arrival in the United States. Even though they fled political persecution under the political regimes of François Duvalier and Jean-Claude Duvalier, American lawmakers routinely defined them as economic migrants rather than refugees.[87] As historian Jana Lipman writes, "[c]ountless scholars, activists, and legal advocates have noted the hypocrisy and Cold War narrowness of US refugee policy: the US government presumed that Cubans were "refugees" and presumed that Haitians were not."[88] Through nation-wide marches, hunger strikes, and letters and visits to Carter administration officials, these advocates tried to draw attention to the racially discriminatory treatment of the Haitians.[89] Despite their efforts, in the 1970s and 1980s, only 25 of the approximately 50,000 Haitians who pursued an asylum claim succeeded.[90] In lieu of relief, the United States employed a set of harsh strategies designed to expel the Haitians from the United States and deter future arrivals from that country. Under a so-called "Haitian Program,"

---

[86] Lipman, "The Fish Trusts the Water," 71 (citing Garcia, *Havana, USA,* 54-68; James Stuart Olson and Judith Olson, *Cuban Americans: From Trauma to Triumph* (New York, 1995), 78-91; and Carl Bon Tempo, *Americans at the Gate: The United States and Refugees during the Cold* War (Princeton: Princeton University Press, 2015), 179-84). Maria Cristina Garcia explains that less than 4 percent of the Cuban refugees had committed serious felonies; despite this figure, the media chose to "[focus] an exaggerated amount of attention on those with mental disabilities and on the hardcore felons." She continues, "Few journalists ever mentioned the fact that up to 80 percent of the Mariel Cubans had no criminal history." Garcia, *Havana, USA*, Kindle Loc. 933

[87] On the repression and violence of the François Duvalier and Jean-Claude Duvalier regimes, see Laurent DuBois, *Haiti: The Aftershocks of History* (New York: Metropolitan Books, Henry Holt and Company, 2010), 311-359.

[88] Lipman, "The Fish Trusts the Water," 121.

[89] Alex Stepick, "Haitian Boat People: A Study in the Conflicting Force Shaping U.S. Immigration Policy," *Law and Contemporary Problems*, vol. 45, n. 2 (1982): 188.

[90] Lipman, "The Fish Trusts the Water," (citing Joyce A. Hughes and Linda R. Crane, "Haitians: Seeking Refuge in the United States," *Georgia Immigration Law Journal* 7 (1993): 766-67 and Cheryl Little, "United States Haitian Policy: A History of Discrimination," *New York Law Journal of Human Rights,* vol. 10, n. 2 (1993): 273-76).

the US developed an expedited asylum procedure that deported more Haitians than it admitted; as Lipman writes, "At its peak, INS held up to eighty deportation hearings a day, and Haitians were offered as little as fifteen minutes to consult with their lawyers. Of the more than 4,000 Haitians involved, none received asylum."[91] In 1980, the program ended after a judge issued an injunction in response to a class action lawsuit, *Haitian Refugee Center v. Civiletti,* 503 F. Supp. 442 (S.D. Fla. 1980). In its opinion, the court drew immediate attention to the discrimination of the Program:

> The Haitians allege that the actions of INS constitute impermissible discrimination on the basis of national origin. They have proven their claim. This court cannot close its eyes, however, to a possible underlying reason why these plaintiffs have been subjected to intentional "national origin" discrimination. The plaintiffs are part of the first substantial flight of black refugees from a repressive regime to this country. All of the plaintiffs are black. In contrast, for example, only a relatively small percent of the Cuban refugees who have fled to this country are black. Prior to the most recent Cuban exodus, all of the Cubans who sought political asylum in individual 8 C.F.R. Sec. 108 hearings were granted asylum routinely. None of the over 4,000 Haitians processed during the INS "program" at issue in this lawsuit were granted asylum. No greater disparity can be imagined.[92]

Continuing to condemn the program, the court concluded:

> Those Haitians who came to the United States seeking freedom and justice did not find it. Instead, they were confronted with an Immigration and Naturalization Service determined to deport them. The decision was made among high INS officials to expel Haitians, despite whatever claims to asylum individual Haitians might have. A Program was set up to accomplish this goal. The Program resulted in wholesale violations of due process, and only Haitians were affected. This Program, in its planning and executing, is offensive to every notion of constitutional due process and equal protection. The Haitians whose claims for asylum were rejected during the Program shall not be deported until they are given a fair chance to present their claims for political asylum.[93]

Yet rather than afford Haitian refugees an opportunity to seek relief as stipulated by the court, the new Carter administration "developed a plan to circumvent the landmark ruling."[94] It

---

[91] Lipman, "The Fish Trusts the Water," 121.
[92] *Haitian Refugee Center v. Civiletti,* 503 F. Supp. 442, 451.
[93] *Haitian Refugee Center v. Civiletti,* 503 F. Supp. 442, 522.
[94] Lindskoog, *Detain and Punish,* 31.

determined that the ruling only applied to Haitians in the Southern District of Florida and, by September 1980, resumed the streamlined processing of Haitians abroad at a highly controversial detention center at Fort Allen, Puerto Rico.[95]

By refusing to grant asylum to Mariel Cuban and Haitian refugees, the Carter administration contravened both the spirit and substance of the Refugee Act of 1980. Signed by Carter only a few weeks before the arrival of the Mariel Cubans, it signaled the nation's commitment to refugee relief, authorized the admission of 50,000 refugees per year, enabled the president to admit refugees above this cap in response to humanitarian emergencies, and adopted the United Nations' definition of a refugee as an individual who has a "well-founded fear of persecution on account of race, religion, nationality, membership in a particular social group, or political opinion."[96] To bypass the 1980 law, US officials created a new legal status—"Cuban-Haitian entrant (status pending)" that maintained the legal fiction that the asylum seekers had not yet entered the country despite their physical presence on U.S. soil.[97] This legal designation enabled US officials to detain Cubans and Haitians in prisons and military bases, which became functional equivalents of the border. In addition, as individuals deemed not to have entered the United States, they, under law, were considered excludable rather than deportable. As excludable noncitizens, they had far fewer rights than deportees and "[could] be detained indefinitely."[98]

---

[95] The detention of Haitians at Fort Allen and sites throughout the country led the migrants to file multiple lawsuits against the government, see Lipman, "The Fish Trusts the Water," 130-134.

[96] The refugee definition under the 1980 Act also aimed to broaden the nation's approach to refugee admissions that, since World War II, served American geopolitical interests during the Cold War by favoring migrants fleeing communist and proto-communist states. Lipman, "The Fish Trusts the Water," 122.

[97] Lipman notes that the Carter administration created this designation in response to charges that the Mariel Cubans received "preferential treatment" vis-à-vis Haitian asylum seekers who arrived at the same time. Lipman, "The Fish Trusts the Water,"122. For criticisms of the Carter administration's unwillingness to process Haitian refugees under the 1980 Act, see Lindskoog, *Detain and Punish,* 38.

[98] Lipman, "The Fish Trusts the Water," 123.

In creating the "Cuban-Haitian entrant" category, the Carter administration aimed to convey the impression that both groups were treated equally. Yet, as it sought ways to expand the nation's detention capacities in response to refugee arrivals, the administration acknowledged that Haitians continued to receive disparate treatment. In detention centers such as Florida's Krome Avenue site, administration officials admitted in August 1980:

> Newly arriving Haitians are either housed in inadequate, unsafe facilities, such as Krome South, or detained in jails and prisons. Cubans are being sent to army camps or being reunified with their families. Grants of $300 per person have been provided to the [voluntary agencies] for the Cubans. The CAA, if it "resettles" the 18,000 Haitians which the grant covers, will be given $27 per person for resettlement. The Cubans have been and are being resettled while the Haitians have not. Cubans are still being processed by INS as applicants for political asylum while Haitians are not. The INS processing itself is done differently for both groups.[99]

Meanwhile, journalists, immigration advocates, and administration officials also documented the disparate treatment faced by Haitian refugees at Krome. Ian Kurzban, a prominent advocate for the Haitian refugees, reported the verbal and physical abuses inflicted by INS officials at Krome.[100] Secretary of Health and Human Services Patricia Roberts Harris wrote to the White House to express her concerns about the inhumane conditions faced at the Florida site:

> For example, no running water is available in the open housing area, water from temporary showers remains stagnant in pools near the tents, toilet facilities are inadequate and stench permeates the air. The Haitians were not provided sheets, towels, soap, toothbrushes or toothpaste. Women and children are housed in an overcrowded administrative building where many of the women sleep on soiled mattresses placed directly on the floor. The males sleep outdoors in open, dirty tents in areas where both mosquitos and coral snakes are prevalent. Housing Haitians, or any other people, in such an intolerable and unsanitary environment is totally unacceptable from the perspective of both health and human decency.[101]

---

[99] Lindskoog, *Detain and Punish*, 42 (citing Phyllis Dichter to Syl Ligsukis, "Policy Issues for the Haitian Entrant Program," August 5, 1980, reel 12, *Records of the Cuban-Haitian Task Force*).
[100] Lindskoog, *Detain and Punish,* 43 (citing Christian R. Holmes to David Crosland, "Haitian INS Processing and Procedures," ca. August 28, 1980, reel 26, *Records of the Cuban-Haitian Task Force*).
[101] Lindskoog, *Detain and Punish*, 43 (citing Patricia Roberts Harris to Victor H. Palmieri, August 9, 1980, reel 12, *Records of the Cuban-Haitian Task Force*; Patricia Roberts Harris to Eugene Eidenberg, August 19, 1980, reel 3, *Records of the Cuban-Haitian Task Force*).

Joseph Innocent, a 23-year-old Haitian carpenter, shared with a *Miami Herald* reporter: "The conditions here are very bad. We live like animals. The food is bad. At night there is no light and we fight the snakes. There are no telephones. We have no way to let our families know that we made it here alive."[102]

Subsequent administrations built upon the precedents established by Carter. In a renewed effort to deter Haitian arrivals, the Reagan administration, in October 1980, redefined them as excludable aliens.[103] He also initiated an interdiction policy whereby the US Coast Guard stopped sailing vessels transporting Haitians, conducted interviews to assess their eligibility for asylum, and pushed back the vast majority to Haiti. Under this policy, "INS officials deemed less than 1 percent of Haitian migrants to have a legitimate 'fear of persecution.'"[104] As a further deterrence measure, the administration, with the Haitians foremost in mind, began searching for sites that could serve as permanent detention centers.[105]  In response to these developments, advocates and journalists harshly criticized the Reagan administration. In a letter to the White House, the National Association for the Advancement of Colored People (NAACP) charged the administration with violating *Civiletti* and the Refugee Act of 1980 and discriminating against the Haitian refugees: "the Haitians alone have been singled out for a peculiar classification and treatment."[106] Despite the widespread condemnation of its interdiction and detention policies, the Reagan administration continued its efforts to "contain a single group [Haitian refugees]."[107]

---

[102] Lipman, "The Fish Trusts the Water," 123 (citing Sarah Rimer, "Haitian, Cuban Camps Side by Side, Worlds Apart," *Miami Herald*, September 13, 1980, Carter, RG 220, box 42, Press Clippings).

[103] Lipman, "The Fish Trusts the Water," 130.

[104] Lipman, "The Fish Trusts the Water," 131.

[105] Lindskoog, *Detain and* Punish, 67; Lipman, "The Fish Trusts the Water," 131.

[106] Lindskoog, *Detain and Punish*, 68 (citing to NAACP to Ronald Reagan, November 25, 1981, box 24, folder 3, Haitian Refugee Collection). For other criticisms of Reagan's Haitian policies, see Lindskoog, *Detain and Punish*, 51-70.

[107] Lindskoog, *Detain and Punish*, 50. On the precedents set by the Haitian detention for immigration detention more generally, see Lindskoog, *Detain and Punish*, 70, 74. See also, Kristina Shull, "Reagan's

Moreover, the Haitian migration led Reagan and restrictionist lawmakers in Congress to undertake the "monumental transformation of immigration policy."[108]

The animus toward the Haitian migrants was a local phenomenon as much as it was a federal one. In the penumbra of the Civil Rights Movement, Floridians feared the cultural, economic, and social impacts of racial integration in their communities. The arrival of the Haitian refugees further triggered their anti-Black sentiments, as historian Carl Lindskoog writes, "The prospect of large numbers of poor black refugees frightened many residents of South Florida."[109] Locals scapegoated the Haitians, blaming them for the economic and public health crises of the 1970s and 1980s, as one contemporary observed, "negative stereotypes and fears of Haitians became firmly embedded in the general South Florida population. Haitians were perceived by many to be not only disease-ridden, but also uneducated, unskilled peasants who could only prove [to be] a burden to the community."[110] South Floridians' anxieties about the new immigrants led them to initiate the nation's first English-only movement.[111] As one scholar observes, "Miami's English-only campaign was 'a vehicle for the expression of mass native white resistance to Latinization' and a 'political project aimed at symbolically reestablishing Anglo dominance.'"[112]

---

Cold War on Immigrants: Resistance and the Rise of a Detention Regime, 1981-1985," *Journal of American Ethnic History,* vol. 40, n. 2 (Winter 2021).

[108] Lindskoog, *Detain and Punish*, 50.

[109] Lindskoog, *Detain and Punish*, 16.

[110] Lindskoog, *Detain and Punish,* 17 (citing Alex Stepick, "The Refugees Nobody Wants: Haitians in Miami," in *Miami Now! Immigration, Ethnicity, and Social Change,* edited by Guillermo J. Grenier and Alex Stepick III (Gainesville: University Press of Florida, 1992), 58-60).

[111] Lindskoog, *Detain and Punish*, 39.

[112] Lindskoog, *Detain and Punish,* 39 (citing Max J. Castro, "The Politics of Language in Miami," in *Miami Now! Immigration, Ethnicity, and Social Change,* edited by Guillermo J. Grenier and Alex Stepick III (Gainesville: University Press of Florida, 1992, 119-123, 128).

As the state's nativist movement grew, Floridians placed enormous pressure on federal

lawmakers to remove Haitians from their communities, as Lindskoog writes:

> Local political groups goaded national authorities into an unparalleled campaign to
> repress the flow of Haitians into Miami and to deport those Haitians already in Florida.
> Members of south Florida's political elite—including Democratic party members, elected
> officials and some Cubans—believed that the boat people were a disruptive force,
> destroying the community and draining resources. They appealed to their local
> members of Congress, who apparently pressured the INS into a response. The INS
> thereafter began to expend a far greater effort in controlling the flow of Haitians than was
> expended on nearly any other group of illegal immigrants.[113]

Whether Democrat or Republican, members of Florida's congressional delegation echoed the

anti-immigrant concerns of their constituents. Senator Paula Hawkins (R-FL) was particularly

outspoken in her attacks on Florida's refugee community, as Lindskoog explains:

> Paula Hawkins added to the sense of crisis by painting a sordid picture of life in South
> Florida amid wave after wave of refugee arrivals. She referred to 'reports that diseases
> have been brought into this country by the entrants' and cited one report that claimed that
> 80 to 90 percent of Haitian refugees were infected with parasites . . .Senator Hawkins
> warned, 'The greatest concern to Floridians is the increase in crime that has accompanied
> the arrival of the Cubans and Haitians in this latest influx.'[114]

Chiles added further fuel to the nativist fire when, during a July 31, 1981 hearing of the Senate

Subcommittee on Immigration and Refugee Policy, he described how many South Floridians felt

that the refugees' arrival forced them to move:

> There is a new bumper sticker that you will see on more and more cars in the Miami area.
> It says, "Will the last person to leave please bring the flag." That sums up a lot of the
> feeling of frustration that is down there presently, and I would say with the tremendous
> movement that we have in Florida and people buying new homes—I now find that people
> in the central part of the State, the real estate agents are telling me, it is not the people
> that are coming from out of State that they are selling homes to, it is the migration from

---

[113] Lindskoog, *Detain and Punish,* 17 (citing Alex Stepick, "The Refugees Nobody Wants: Haitians in Miami," in *Miami Now! Immigration, Ethnicity, and Social Change,* edited by Guillermo J. Grenier and Alex Stepick III (Gainesville: University Press of Florida, 1992), 58-60). See also, Stepick, "Haitian Boat People," 179.
[114] Lindskoog, *Detain and Punish*, 53 (citing Paula Hawkins, *United States as a Country of Mass First Asylum*, 37).

south Florida that they are selling homes to, people that are leaving the county. This is bad. It is a situation that we have to reverse.[115]

At the 1981 hearing, both Hawkins and Chiles recommended approaches, including interdiction, detention, and abbreviated exclusion procedures, that had been castigated by policymakers, advocates, and even the courts as discriminatory and inhumane.[116] Even more important, Florida lawmakers sated the nativist demands of their constituents and supported the anti-Haitian agenda of the Reagan administration through statutory means. As the White House developed punitive enforcement practices, Florida's congressional delegation rewrote the law on the books in ways that reclassified asylum seekers as undocumented migrants and criminals who merited perpetually increasing civil and criminal penalties.

It was in this xenophobic context that members of Florida's congressional delegation amended 8 U.S.C. § 1326 in 1988, 1990, 1994, and 1996. The following legislative history reveals that their racial animus toward Haitian and Mariel Cuban refugees motivated them to revise the criminal penalties for the reentry of removed aliens. The legislative history further indicates that, by the early 1990s, their anti-Hispanic animus, in addition to their ongoing anti-Haitian sentiments, informed the 1994 and 1996 changes to the law. Finally, during the 1988, 1990, 1994, and 1996 legislative debates, lawmakers made no effort to acknowledge and/or amend the racial animus that informed earlier iterations of this provision of Title 8.

In tracing the racial animus that informed the late twentieth-century revisions to § 1326, it is important to note that this animus took different forms. The racial reforms of the Civil

---

[115] United States as a Country of Mass First Asylum: Hearing before the Subcommittee on Immigration and Refugee Policy of the Committee on the Judiciary, United States Senate, 97 Cong., 1st sess., July 31, 1981, 48.

[116] Chiles also expressed his frustration that the Reagan administration was not doing enough in response to the so-called Haitian crisis. Lindskoog, *Detain and Punish,* 54.

Rights movement slowly instantiated a cultural shift that rendered unacceptable overt expressions of racism. In contrast to the early twentieth century congressional debates regarding § 1326, the late twentieth century debates yield fewer instances of manifest racism. Lawmakers, for example, ceased using the racial slur "wetback" to refer to Mexican migrants. The following discussion, then, examines at least three types of racial animus that emerged in the debates over § 1326. First, it recounts the moments when policymakers did resort to the use of racial slurs, explicitly racist language, or racial stereotypes. Second, it describes racial animus in terms of racially disparate impact; thus, for example, it traces the divergent application of US refugee and asylum policies based on nationality and race. Third, it explores the proxies that supplied policymakers with a race-neutral vocabulary to express their antipathies toward immigrants and racial minorities. Such proxies included anti-population growth movements, the War on Drugs, English-only movements, and anti-birthright citizenship campaigns, among others.

*Legislative History*

In the 1980s, the Federation for American Immigration Reform (FAIR), a Southern Poverty Law Center designated hate group, played a pre-eminent role in the effort to "[upend] the Immigration and Nationality Act of 1965."[117] From its founding to the present, FAIR has lobbied local, state, and federal lawmakers to pass anti-immigration measures premised on eugenics and racism.[118] In 2009, Dan Stein, who assumed the leadership of FAIR in 1988,

---

[117] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021

[118] Deepa Fernandes, *Targeted: Homeland Security and the Business of Immigration* (New York: Seven Stories Press, 2007), 212.

"boasted that FAIR leaders had testified before Congress about 100 times."[119] In these public venues, FAIR made a concerted effort to cloak its white supremacist agenda in neutral terms so as to appeal to ordinary Americans.[120] They frequently referred to the impacts of immigration on the environment, population growth, and the economy in order to make their extremist message more palatable.[121] Yet as the SPLC and scholars have repeatedly reported, a combination of eugenics, racism, and xenophobia clearly motivated its policy goals.[122]

In 1979, John Tanton, a self-described environmentalist, founded FAIR with the specific aim of reducing non-white immigration to the United States.[123] He believed that the increasing numbers of family-sponsored visas, refugees, and undocumented migrants[124] threatened the white race, as he explained to fellow eugenicist Garrett Hardin in 1993, "I've come to the point of view that for European-American society and culture to persist requires a European-American

---

[119] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021

[120] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021.

[121] Tichenor explains that in the aftermath of the Civil Rights Movement nativists had to articulate their anti-immigrant sentiments in the race-neutral terms of "environmentalists, population control activists, and cultural protectionists." Tichenor, *Dividing Lines*, Kindle Loc. 724.

[122] Southern Poverty Law Center, "Federation for American Immigration Reform," 237. https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021; Carly Goodman, "The shadowy network shaping Trump's anti-immigration policies," *Washington Post*, September 27, 2018; Carly Goodman, "John Tanton has died. He made American less open to immigrants – and more open to Trump," *Washington Post,* July 18, 2019; Southern Poverty Law Center, "John Tanton is the Mastermind Behind the Organized Anti-Immigrant Movement," *The Intelligence Report,* June 18, 2002; Tichenor, *Dividing Lines*, Kindle Loc. 349.

[123] Tichenor explains that Tanton's own approach to environmental studies was tainted by racism. In an oral history, Tanton remarked, "The cultural values that led to the conservation ethos that's typified by the Sierra Club . . . are values that are characteristic of American society. We could probably trace their roots back through Western civilization. If we look at the conservation ethic of some of the countries from which large numbers of immigrants are coming, we don't find the same sort of respect for the land and our fellow creatures that has developed here. We certainly don't see this in many of the southeastern Asian cultures or in Latin America." Tichenor, *Dividing Lines*, Kindle Loc. 349 (citing Oral History of John Tanton, 72-73).

[124] Tichenor, *Dividing Lines*, Kindle Loc. 349.

majority, and a clear one at that."[125]  Stein, who succeeded Tanton as the head of FAIR, shared

Tanton's white supremacist views, as the SPLC notes, "He told Tanton that those who supported

the 1965 reform wanted to 'retaliate against Anglo-Saxon dominance' and that this 'revengism'

against whites had created a policy that is causing 'chaos and will continue to create chaos.'"[126]

Shortly after FAIR's founding, Tanton and Roger Conner, FAIR Executive Director,

aggressively pursued an anti-immigration policy agenda. In meetings with members of Congress

and their staff, appearances at congressional hearings on immigration, op-eds and advertisements

in print media, and televised interviews on network news programs, FAIR advocated for the

following: limits to legal immigration and refugee admissions; controls on undocumented

immigration; and the termination of public benefits for undocumented immigrants. In response to

several federal court decisions regarding undocumented immigration, Tanton also attacked what

he dubbed the "civil rights movement of the 1980s" and claimed that the Supreme Court's

---

[125] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021.

[126] Southern Poverty Law Center, "Federation for American Immigration Reform," https://www.splcenter.org/fighting-hate/extremist-files/group/federation-american-immigration-reform, accessed April 18, 2021. By 1994, Stein also expressed his anti-Haitian sentiments during a congressional hearing on Haitian asylum seekers. In an alarmist tone, he urged the exclusion of Haitian and Global South refugees, arguing that their admission would lead to the nation's downfall. These migrants, Stein argued, would transplant to the United States the crises of their home countries – ecological disaster, civil and political unrest, economic collapse, anarchy, and war. Lindskoog, *Detain and Punish*, 132 (citing Haitian Asylum Seekers: Hearing before the Subcommittee on International Law, Immigration, and Refugees of the Committee on the Judiciary, House of Representatives, 103rd Congress, 2nd Session, on H.R. 3663, H.R. 4114, and H.R. 4264, June 15, 1994, 221-222, 233.)

holding in *Plyler v. Doe*, 452 U.S. 202 (1982)[127] and a federal district court ruling in *FAIR v. Klutznick,* 486 F. Supp. 564 (1980)[128] were "against the law."[129]

In the 1980s, Senator Lawton Chiles (D-Florida), the drafter of the immigration provisions of the Anti-Drug Abuse Act of 1988, coordinated with FAIR. An oral history of Roger Conner reveals that Chiles and his staff helped to brief other members of Congress on an immigration bill backed by FAIR. Conner specifically recalls that on March 11, 1983:

> We were going around to members of Congress and their staffs, briefing them on our positions on an immigration bill because we were anticipating this as coming out of committee and we were trying to lay the groundwork for what later would be floor votes in both the House and the Senate by going to offices . . . We had a briefing on the 11th of March where we had Simpson, Huddleston, and Lawton Chiles speak.[130]

Conner's decision to have Chiles speak most likely stemmed from FAIR's belief that because of the "Mariel problem," the "Florida delegation would always be the strongest delegation for immigration reform. A combination of the Southerners and the people in Miami who had been affected by the Mariel flotilla."[131]  Chiles worked with not only Conner and FAIR but also

---

[127] In *Plyler,* the Supreme Court struck down a Texas law that prohibited the use of state funds for the education of undocumented children in the United States. FAIR also filed an amicus brief in *Plyer.*

[128] In *Fair v. Klutznick,* the US District Court for the District of Columbia concluded that FAIR lacked standing to pursue its claim that the "exclusion of illegal aliens from the apportionment population base is mandated . . . by the Constitution." *FAIR v. Klutznick,* 486 F. Supp. 564 (1980).

[129] John Tanton, "Illegal Aliens' Movement Gains Support," *Daily Record (Morristown, New Jersey),* February 7, 1982, B3.

[130] Roger Conner, Tenth Anniversary Oral History Project for the Federation for American Immigration Reform, interviewed by Otis Graham Jr., January 27, 1989, box 23, folder 4, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University. 131. The author wishes to thank Dr. Carly Goodman for sharing this source, a copy of which is in her possession.

Senator Alan Simpson (R-WY) remains on FAIR's National Board of Advisors to this day; see https://www.fairus.org/about-fair/board-directors, accessed September 17, 2021. Senator Walter Huddleston (D-KY) also served on the Board and, upon his death, was highly praised by Dan Stein for his service to FAIR and his work on immigration policy in the Senate. Dan Stein, "Sen. Walter Huddleston was a reminder that immigration used to be a bipartisan issue," *The Hill*, October 19, 2018.

[131] Roger Conner, Tenth Anniversary Oral History Project for the Federation for American Immigration Reform, interviewed by Otis Graham Jr., January 27, 1989, box 23, folder 4, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University. 131.

Senator Walter Huddleston (D-KY) who "worked closely with FAIR and other restrictionist groups, which helped his office draft restrictive immigration bills."[132]

The bills introduced and co-sponsored by Chiles served FAIR's immigration policy agenda. Several of these bills, for example, aimed to reduce immigration and refugee admissions. As the co-sponsor of a 1981 comprehensive immigration reform bill (S. 776), Chiles criticized the exclusion of certain migrants—specifically, refugees and recipients of family reunification visas, from the yearly immigration cap, which, in 1981, was set at 270,000. In turn, he called for the creation of a 350,000 cap on yearly immigration that would include refugee admissions and family members of U.S. citizens. On this point, Chiles received Conner's endorsement. Testifying on behalf of FAIR before the Select Commission on Immigration and Refugee Policy (SCIRP),[133] Conner expressed FAIR's concern that the exclusion of refugees and family members led to the undue admission of hundreds of thousands of immigrants over and above the annual immigration cap and, as a response to this purported problem, "support[ed] the kind of ceiling set in the Immigration and National Security Act of 1981, which is S. 776 and H.R. 2782."[134]

Later that year, Chiles pursued other approaches to reducing the number of entries into the United States. In December, Chiles and Huddleston co-sponsored S. 2003 which, in

---

[132] Tichenor, *Dividing Lines*, Kindle Loc. 350. Huddleston also firmly supported Reagan's detention policy vis-à-vis Haitian refugees in Florida. Lindskoog, *Detain and Punish,* 53.

[133] The Select Commission helped to define the parameters of immigration law and policy in the 1980s. Tichenor, *Dividing Lines*, Kindle Loc. 367. See also Maggie Jane Elmore, "Wielding the Cross: How Mexican American Organizations and the Catholic Church Made Immigration Reform a Civil Rights Issue," in *Claiming the Cross: How Mexican Americans, Mexican Immigrants, and the Catholic Church Worked to Create a More Inclusive National State, 1923-1986* (Ph.D. Diss., University of California at Berkeley, 2017): 158-189.

[134] Final report of the Select Commission on Immigration and Refugee Policy: joint hearings before the Subcommittee on Immigration and Refugee Policy of the Senate Committee on the Judiciary and Subcommittee on Immigration, Refugees, and International Law of the House Committee on the Judiciary, Ninety-seventh Congress, first session, on the final report of the Select Commission on Immigration and Refugee Policy, May 5, 6, and 7, 1981, 342, 338.

Huddleston's words, sought to close "one of the biggest loopholes in our immigration laws," specifically the recently passed Refugee Act of 1980.[135] Expanding upon Huddleston's claim, Chiles discussed the "refugee crisis" in Florida and charged that the weaknesses of federal immigration statutes and immigration authorities placed economic burdens upon the state of Florida for the care and education of the refugees. Chiles further argued that the remedy included stronger immigration laws and immigration enforcement capacities, a fixed cap on immigration to the United States, and the rescission of "special rights" accorded to undocumented immigrants (which, for Chiles, referred to Mariel Cuban and Haitian asylum seekers in Florida).[136]  By enabling states and localities to assist the federal government in setting the annual refugee ceiling, S. 2003, Chiles averred, would begin the work of reducing migration to the United States.

Two years later, Chiles and Huddleston co-sponsored two bills that intended to staunch the entries of asylum seekers and refugees through the expansion of the nation's immigration enforcement capacities. Although they titled S. 588, "A bill to amend the Immigration and Nationality Act to prevent the unauthorized entry into, and the transportation to and within, the United States of illegal aliens," it clearly targeted the Mariel Cubans and the family members who had helped them to leave Cuba.[137] The so-called lapses of illegal entry statutes, Chiles concluded, made it impossible to deter their arrival, as he stated on the floor of the Senate:

> One U.S. district court concluded that the current law against illegal entry only applies to "surreptitious entries." In the court's view, the thousands of Cubans who came with the

---

[135] A bill to amend the Immigration and Nationality Act with respect to procedures for the annual admission of refugees, S. 2003, 97th Cong., December 16, 1981.

[136] 127 Cong. Rec. 32202 (December 16, 1981).

[137] A bill to amend the Immigration and Nationality Act to prevent the unauthorized entry into, and the transportation to and within, the United States of illegal aliens, S. 588, 98th Cong, February 24, 1983. See also 129 Cong. Rec. 2925-26 (February 24, 1983). On the role of families in the flight of refugees from Cuba, see Garcia, *Havana, USA*, Kindle Loc. 668-1148.

flotilla did not come surreptitiously and, therefore, those who assisted them were not guilty of violating immigration law.[138]

Targeting the individuals who assisted the refugees' entry into the United States, S. 588, then, created criminal penalties for the "bringing in and harboring of illegal aliens in this country."[139]

On the same day, Chiles and Huddleston sponsored S. 592, "Immigration Emergency Powers and Procedures Act of 1983," which proposed an even more draconian response to the arrival of asylum seekers and refugees. More specifically, in the event of a sudden increase in asylum arrivals at the nation's borders, it authorized the President to declare an immigration emergency, employ various forms of deterrence (such as the interdiction and/or return of sailing vessels transporting migrants), enforce the nation's admission and asylum laws "beyond the territorial limits of the United States, including the high seas," and deploy the United States military to assist in the execution of the stipulated emergency powers.[140] In short S. 592, largely encompassed the much maligned practices the Reagan administration had already undertaken vis-à-vis the Haitian refugees.[141] In 1981, the Congressional Black Caucus led the critique of Reagan's policy, charging that it violated the Universal Declaration of Human Rights and "[compared] the forceful return of refugees to Haiti with the United States' earlier refusal to accept Jewish refugees fleeing Nazi Germany."[142] Rep. Shirley Chisholm (D-NY), the chair of the Caucus's task force on refugees testified before a Senate committee in July 1981, '"We

---

[138] 129 Cong. Rec. 2925 (February 24, 1983).
[139] 129 Cong. Rec. 2925 (February 24, 1983).
[140] Immigration Emergency Powers and Procedures Act of 1983, S. 592, 98th Cong, February 24, 1983. See also 129 Cong. Rec. 2930-31 (February 24, 1983).
[141] It is possible that Chiles and Huddleston proposed this measure because the Reagan administration had qualms about the lack of statutory authority for its Haitian interdiction program. See Lindskoog, *Detain and Punish,* 58-59.
[142] Lindskoog, *Detain and Punish,* 60.

cannot hope to retain the respect and admiration of the world if our immigration and refugee policies are discriminatory on the basis of ideology or skin color.'"[143]

Meanwhile, Chiles continued to sound the alarm about the increasing number of immigrants, whether legal or undocumented in the United States. During debates regarding a 1982 comprehensive immigration reform bill (S. 2222[144]), Chiles argued that legal and undocumented migrants made undue contributions to the nation's population growth; he stated, "In fact, the reports of the Judiciary Committee indicate that the immigration, legal and illegal, is now amount to 30 to 50 percent of the annual population growth in the United States. Those figures show us that our present immigration policy is, in fact, not a policy at all."[145]  With respect to legal immigration, Chiles particularly objected to the large numbers of immediate relatives of US citizens admitted to the United States and proposed to limit their entries by counting their admissions against the annual immigration cap.[146] Although Chiles did not reference any particular racial or national group, his proposal would have singled out Asian and immigrants who, thanks to the family reunification provisions of the 1965 Immigration and Nationality Act, constituted one of the fastest growing immigrant groups in the late twentieth century. As he had in earlier years, Chiles also called for the inclusion of refugee admissions within the new immigration cap; reiterating Huddleston's earlier attacks on US refugee policy, Chiles claimed that this approach would close "one of the loopholes in legal immigration policies today."[147] By the mid-1980s, Chiles's views continued to propagate the eugenicist ideas

---

[143] Lindskoog, *Detain and Punish*, 60 (citing Statement by New York member of Congress Shirley Chisholm, in United States as a Country of Mass First Asylum, 113, 115).

[144] Immigration Reform and Control Act of 1982, S. 2222, 97th Cong, March 17, 1982. Tichenor, *Dividing Lines,* Kindle Loc. 371-72.

[145] 128 Cong. Rec. S10320 (August 12, 1982).

[146] Chiles specifically stated, "Between 1976 and 1980, the number of immediate relatives increased 40 percent from 114,000 to 152,000." 128 Cong. Rec. S10322 (August 12, 1982).

[147] 128 Cong. Rec. S10323 and S10359 (August 12, 1982).

elaborated by groups such as FAIR; in a 1985 *Time Magazine* cover story on the increasing number of legal and undocumented arrivals, Chiles spoke in an "alarmist" tone about undocumented migration along the U.S.-Mexico border, stating, "If we do not regain control of our borders . . . I think that within ten years, we will not recognize the United States as the United States we see today."[148]

Finally, like FAIR, Chiles criticized what he characterized as an excessive expansion of immigrant rights. During the debate regarding S. 2222, he created a sense of anxiety about the Supreme Court's decision in *Plyler*: "The word is going out that the Texas case says we now provide educational benefits to all illegal alien children."[149]  In a moment when Haitian asylum seekers vigorously fought against the immigration policies of the Reagan administration (particularly with respect to detention),[150] Chiles denounced their habeas corpus petitions as ploys that allowed them to "tie that process up forever"; he further warned:

> If we do not do something to close off the process of allowing the alien to have all the constitutional rights of a citizen, then, again, we might as well admit that we have given up the game, we might as well get ready for the deluge of people who are going to come because that word is beginning to go out.[151]

He also firmly supported the ongoing detention of the Haitian asylum seekers, despite clear empirical evidence and the subsequent decision of the Eleventh Circuit Court that such detention was racially discriminatory.[152] While testifying in support of S. 2222, he expressed his

---

[148] Otto Friedrich, Douglas Brew, and Sidney Urquhart, "The Changing Face of America," *Time Magazine,* July 8, 1985, 26.
[149] 128 Cong. Rec. S. 10322 (August 12, 1982).
[150] Lindskoog, *Detain and Punish,* 63-64, 68-69, 71-98.
[151] 128 Cong. Rec. S10322 (August 12, 1982).
[152] *Jean v. Nelson*, 683 F.2d 1311 (11th Cir. 1982). See also, Jeffrey C. Gilbert and Steven Kas, *Jean v. Nelson:* A Stark Pattern of Discrimination, University of Miami Law Review, vol. 36, n. 5 (September 1982): 1012. The *New York Times* compared the Haitian detention to the incarceration of Japanese Americans during World War II. Lindskoog, *Detain and Punish,* 72 (citing "Release the Haitians," *New York Times*, April 19, 1982). Prominent legal scholars also condemned immigration detention as did the United Nations High Commissioner for Refugees, the U.S. Committee for Refugees, the Lawyers

opposition to the June 1982 decision of federal district court judge Eugene P. Spellman to release Haitian refugees from detention,[153] "The word is now going out from the Spellman case that we cannot hold an illegal alien, we cannot detain them while they are seeking to determine their status."[154]

In many ways the immigration provisions of the Anti-Drug Abuse Act of 1988 mark the culmination of Chiles's efforts to expand federal immigration enforcement capacities to exclude, deport, and detain asylum seekers, refugees, and immigrants, particularly from Haiti.[155] Indeed, it

---

Committee for Human Rights and fifty-six members of Congress. Lindskoog, *Detain and Punish*, 29, 86-89.

[153] Gregory Jaynes, "Parole of Haitians Ordered; U.S. Balks and Sets Appeal," *New York Times*, June 30, 1982.

[154] 128 Cong. Rec. S10322 (August 12, 1982).

[155] It is important to note that Chiles, Graham, and McCollum pursued aggressive crime control agendas; Chiles and Graham, for example, were both active participants in the War on Drugs of the Reagan and Bush eras while McCollum staunchly advocated for the expansion of the death penalty. These crime control initiatives served a critical purpose for these elected officials as social scientists in the 1970s found that "racial attitudes—not crime rates or likelihood of victimization—are an important determinant of white support for 'get tough on crime' and antiwelfare measures." The War on Drugs thus offered lawmakers and their constituents a race-neutral language for expressing their antipathies toward racial minorities, particularly Black Americans and Black immigrants.

Indeed, when the Reagan administration announced its War on Drugs, "less than 2 percent of the American public viewed drugs as the most important issue facing the nation." (62) By 1985, it seized on the emergence of crack cocaine (a commodity that was being sold out of economic desperation by residents of the nation's deindustrializing cities) as an opportunity to expand its drug war. Whereas other nations chose to invest in economic revitalization campaigns or drug treatment, prevention, and education programs, the Reagan administration prioritized "an all-out war on an 'enemy' that had been racially defined years before." (65) As Alexander explains, Reagan's rhetoric on drugs, as well as crime and welfare, enabled him to stoke anti-Black sentiment without explicit references to race. This, in turn, enabled Reagan to win the votes of working-class whites, former Democrats angered by the perceived gains made by African Americans in the post-civil rights era.

The Anti-Drug Abuse Acts of 1986 and 1988 were the legislative centerpieces of Reagan's campaign. The former appropriated $2 billion and authorized the military to participate in drug control efforts, sanctioned the death penalty for certain drug crimes, and weakened the exclusionary rule for drug trials. The Anti-Drug Abuse Act of 1988 also took an "extraordinarily punitive" (68) approach to drug crimes by permitting public housing authorities to evict tenants, revoking public benefits such as student loans, expanding the death penalty for certain drug crimes, and establishing severe mandatory minimum sentences for drug offenses. Thanks to Chiles, the 1988 law also drew immigrants into the ambit of the War on Drugs by establishing new criminal penalties for noncitizens convicted of drug offenses and engaging the INS in the work of drug control.

Michelle Alexander, *The New Jim Crow: Mass Incarceration in the Age of Colorblindness* (New York: New Press, 2012), 61-69.

would be one of the last measures Chiles would present before his retirement from the Senate in 1989 and the commencement of his tenure as the governor of Florida—where he would continue to pursue his anti-immigrant agenda. Chiles presented the law as an essential tool in the nation's war on drugs; by engaging the nation's immigration laws and the INS in the work of criminal law enforcement, it would enhance the capacities of the federal government to pursue and prosecute so-called criminal aliens. It specifically required mandatory detention for those convicted of aggravated felonies (defined as murder, rape, kidnapping, and drug trafficking); created a criminal offense for failure to appear at an immigration proceeding; expanded the criminal penalties against those who assisted immigrants convicted of drug offenses in entering the United States; enhanced cooperation between state and local law enforcement, the FBI, DEA, and INS through the sharing of databases regarding criminal offenders; and greatly expanded the criminal penalties for illegal re-entry.

As Chiles defended these measures (S. 972, S. 973, S. 974, S. 975, S. 976) in Congress, he explained how they would help states like Florida penalize undocumented immigrants for the nation's putative drug crisis.[156] In so doing, he racially profiled Florida's Haitian and Jamaican migrant communities as the sources of the state's so-called drug problem. Appearing before the Senate Subcommittee on Immigration and Naturalization to explain the five bills, he began:

---

[156] S. 972, A bill to amend the Immigration and Nationality Act to require, pending deportation proceedings, the detention of aliens who have been convicted of aggravated felonies; S. 973, A bill to provide for additional criminal penalties for deported aliens who reenter the United States, and for other purposes; S. 974, A bill to impose criminal penalties upon persons who neglect or refuse to appear before certain proceedings under the Immigration and Nationality Act; S. 975, A bill to impose criminal penalties against persons aiding aliens violating certain laws to enter the United States; S. 976, A bill to amend the Immigration and Nationality Act to establish a connection between certain computerized indexes containing information on deportable aliens.

A year ago when I introduced my package on alien felons, I found I had to describe these criminals. Today, I simply have to say: Jamaican posses. Haitian crack syndicates. [A]nd there is immediate recognition.[157]

In describing these "alien felons" the year prior, Chiles once again zeroed in on the role of Haitian migrants and called witnesses, including local police officials and a police informant, who supported his claims that Haitians bore responsibility for Florida's drug trade.[158]  At the same time, the hearings reinforced racist stereotypes of the Haitian refugees as criminals.  Thus, for example, the police informant perpetuated negative images of the refugee community when he claimed, "Many Haitians are brought into the United States illegally for the sole purpose of dealing drugs and to recruit other Haitians for the drug business. These dealers are mixed with political refugees to hide their identity."[159]

During the Senate subcommittee hearings, the American Civil Liberties Union (ACLU) challenged Chiles's claims. In his written testimony, Wade J. Henderson, Associate Director of the ACLU Washington office, began the organization's assessment of Chiles's bills by noting,

 Chiles' proposals are offered as a modest step at correcting perceived flaws in the existing system of immigration law enforcement . . . However, the bills misperceive the problem. There is only limited evidence to suggest that the magnitude of the criminal alien problem is as significant as the proposed legislation would suggest.[160]

He based this conclusion on a November 1987 report from the General Accounting Office that examined INS enforcement operations vis-à-vis criminal aliens. While the GAO conceded that

---

[157] United States, Senate, Subcommittee on Immigration and Refugee Affairs of the Committee on the Judiciary, The Implementation of the Immigration Reform and Control Act, April 14, 1988, Serial No. J-100-60 (US GPO, 1989), 26.
[158] Illegal alien felons: a federal responsibility: hearing before the Subcommittee on Federal Spending, Budget, and Accounting of the Committee on Governmental Affairs, United States Senate, One Hundredth Congress, first session, March 12, 1987.
[159] Illegal alien felons: a federal responsibility, 13.
[160] The Implementation of the Immigration Reform and Control Act, 38.

INS officials in five cities believed that "alien involvement in crime is a serious problem," it also

discovered that there was no objective basis for such a belief; as Henderson explained:

> The GAO also found generally that crime statistics identify individuals as foreign-born rather than as aliens. Accordingly, the GAO report examined the problem by using FBI arrest statistics related to foreign-born individuals (which includes aliens and naturalized citizens) reported by law enforcement agencies as an indicator of the problem. As a result, in cities which have experienced immigration-related demographic change, the percentage of criminal aliens may seem higher in comparison to localities which have not experienced such demographic change. [161]

Henderson continued to cast doubt on the perceived increase in the number of criminal aliens:

> For example, FBI statistics indicate that in fiscal year 1985, in Harris County (Houston) and Los Angeles County, more than 20 percent of the arrests in which the offender's place of birth was known involved foreign-born individuals. In Dade County (Miami) the comparable figure was 38 percent. However, each of these localities has recently experienced a relatively high volume of immigration and each has changed dramatically within the last several years which may render percentage assessments of this kind somewhat meaningless. [162]

During his spoken testimony, Henderson offered a summary of the above findings and

concluded, "As a result, there are frequently hyperbolic exaggerations of the volume of the

problem which frequently distorts the way Congress and the public look at these issues." [163]

Henderson then scrutinized each one of Chiles's bills and concluded that they raised

serious civil liberties concerns and failed to achieve the goals of the nation's immigration laws.

On this latter point, Henderson observed that the bills "may be counterproductive in terms of our

immigration policy objectives" [164] and singled out S. 973 (which increased the penalties for

illegal re-entries). He specifically wrote:

> The question presented is whether stiffer fines or greater prison terms will itself solve the problem presented by the failure to deport "illegal alien felons." The answer may well be that such a proposal will have only a marginal impact on the problem since the real

---

[161] The Implementation of the Immigration Reform and Control Act, 38.
[162] The Implementation of the Immigration Reform and Control Act, 38-39.
[163] The Implementation of the Immigration Reform and Control Act, 32.
[164] The Implementation of the Immigration Reform and Control Act, 40.

difficulty seems to be found in the INS' inability to adequately identify and apprehend persons subject to deportation.[165]

As legal scholars have observed, multiple congressional investigations of the criminal alien removal system traced its weaknesses to INS identification procedures, database systems, and a lack of detention space. But, reluctant to appropriate the funds to address these implementation problems and desirous of a quick fix that would satisfy a nativist electorate, Congress repeatedly chose to curtail the procedural rights of immigrants.[166]

He also criticized the bills as "redundant" since the Anti-Drug Abuse Act of 1986 and Immigration Reform and Control Act of 1986, in Henderson's words, "[placed] primary emphasis on the expeditious removal of aliens convicted of serious crimes."[167] Henderson ended his written statement with a broad critique of Chiles's proposals, asking whether the INS ought to be involved in the work of drug enforcement in the first place. Indeed, he, referring to an October 9, 1987 letter from Assistant Attorney General John Bolton to Vice President George H. W. Bush, observed that there was "some doubt as to the statutory authority of the INS' drug and other enforcement activity."[168] Henderson continued,

> The point here is that the INS has an important responsibility for the enforcement of the nation's immigration laws. The agency was never intended to become a front-line soldier in the war on drugs. To the extent that the INS may play a role in the enforcement of other criminal laws, this function should not overshadow the agency's principal mission. In that regard, proposals for change in the present immigration law should be evaluated first on the merit of its impact on immigration policy.[169]

---

[165] The Implementation of the Immigration Reform and Control Act, 43.

[166] Peter H. Schuck and John Williams, "Removing Criminal Aliens: The Pitfalls and Promises of Federalism," *Harvard Journal of Law and Public Policy*, vol. 22, (1999): 423.

[167] The Implementation of the Immigration Reform and Control Act, 40.

[168] The Implementation of the Immigration Reform and Control Act, 48 (enclosing letter from John R. Bolton, Assistant Attorney General, to Honorable George Bush, President of the Senate, October 9, 1987).

[169] The Implementation of the Immigration Reform and Control Act, 49-50. On the longer history of the precise parameters of the INS's authority, see Kang, *INS on the Line*, 36-61.

Congress continued to debate Chiles's proposals and the issue of drug trafficking more generally in a Senate hearing, "Haitian Narcotics Activities," which was held on May 21, 1988, a month after Chiles introduced his bills.[170] During the hearing, Edward Piou, Charge D'Affaires of the Embassy of Haiti criticized lawmakers' approach to hemispheric drug smuggling as racist. Piou specifically expressed his nation's concerns about "attempts to single out [Haiti] for any special blame" and the "inordinate and undeserved attention that this hearing focuses on the Haitian people, undeserved attention that reminds us the AIDS propaganda that stigmatizes our people."[171] Piou outlined the steps the Haitian nation had taken to assist the United States in combatting hemispheric drug trafficking and expressed his dismay that the hearing's organizers did not extend an invitation to his office; as he testified, "I am, it is true, the representative of a small country, but of a sovereign country that deserves recognition."[172] Yet, despite Piou's pleas, the hearing continued to perpetuate racist stereotypes of Haitian immigrants by linking an entire community with criminality. The hearing created a narrative arc whereby Haitian immigrants, while once deserving of sympathy for the hardships they suffered at the hands of their political leaders, succumbed to the temptations of the drug trade.[173]

At the same time, the hearing served an important function in validating Chiles's bills (S. 972, S. 973, S. 974, S. 975, S. 976) as the best solution to the problem of Haitian drug trafficking. The INS lauded Chiles's for "look[ing] for loopholes in the existing law that would allow for Immigration and Naturalization Service to get a better handle on criminal aliens, on convicted offenders, on re-entrants after previous deportation, or against aliens who have

---

[170] Haitian narcotics activities: hearing before the Caucus on International Narcotics Control of the United States Senate, One Hundredth Congress, second session, on the magnitude of Haiti's role as a transshipment point for narcotics in the United States, May 21, 1988, Miami, FL, 4.
[171] Haitian narcotics activities, 4.
[172] Haitian narcotics activities, 4-5.
[173] Haitian narcotics activities, 6, 12.

absconded from the present process."[174] The agency also praised his efforts to expand the agency's detention capacities and asserted that S. 973 would put an end to the re-entry of undocumented drug smugglers: "That is one of Senator Chiles' provisions. If we can catch those guys coming back in, and if we can identify them with a different set of identification documents and nail them, and give them a mandatory 15 or 10 years as opposed to the circular process."[175] Ultimately, the INS and Chiles won the day as Congress expressed its resounding support for the Anti-Drug Abuse Act in a 346-11 vote.[176]

The Anti-Drug Abuse Act of 1988 constituted a major turning point in the history of American immigration law. According to legal scholars Peter Schuck and John Williams, it "created a new class of criminal alien: the 'aggravated felon'"[177] and created the foundation for the ensuing amendments to the criminal penalty provisions of the nation's immigration laws.[178] These revisions, moreover, failed to expunge the racial animus that drove the passage of the 1988 law. The legislative history of the modifications made in 1990, 1994, and twice in 1996 demonstrate that lawmakers made no effort to examine and acknowledge the legacy of racism that informed the passage of the Undesirable Aliens Act of 1929, the Immigration and Nationality Act of 1952, and the Anti-Drug Abuse Act of 1988. Instead, they perpetuated the anti-Mexican and anti-Black racism that informed the passage of these earlier laws.

---

[174] Haitian narcotics activities, 44.

[175] Haitian narcotics activities, 42, 49.

[176] Alexander, *The New Jim Crow*, 68.

[177] Schuck and Williams, "Removing Criminal Aliens," 434.

[178] See also Keller who writes that after 1987, "crimes of illegal entry and re-entry saw a shift at the conceptual level, as the crimes were reconceived as a way to target individuals likely to commit crimes while in the United States illegally." Doug Keller, "Re-thinking Illegal Entry and Re-Entry," *Loyola University of Chicago Law Journal,* vol. 44 (Fall 2012): 92; Schuck and Williams, "Removing Criminal Aliens," 433. Schuck also observes that the 1988 Act "curtail[ed] the procedural rights of aliens" (433); it specifically, "limited relief for aggravated felons, forced them to file expedited appeals, and subjected them to more stringent re-entry conditions and penalties. Had a conference with the House not revised it, the law also would have created an expedited "administrative deportation procedure" allowing for removal without a hearing before an immigration judge." (434)

While the legislative history of the 1990 amendment to 8 U.S.C. § 1326 is very thin, another Floridian--Senator Bob Graham (D-FL), sponsored the amendment to the law. Like Chiles, Graham adopted a hardline strategy on immigration enforcement in response to Mariel Cuban and Haitian migrants in Florida in the 1980s and 1990s. Prior to taking his seat in the Senate, Graham served as the governor of Florida where he criticized the federal government for shifting the costs of immigration law enforcement to states like his own. By 1981, Graham sued the Reagan administration for failing to prevent the entry of Mariel Cuban and Haitian asylum seekers and asserted that federal inaction led to the overcrowding of Dade County jails.[179] As he sought to expand federal immigration enforcement capacities, he occasionally perpetuated racist stereotypes of Haitians and Cubans as criminals and drug traffickers. Thus, for example, in a 1982 letter President Reagan, Graham wrote:

> More than two years ago, I proposed a plan to return these criminals and other undesirables through the gates at our Naval base at Guantanamo Bay. This would show that our country is serious and tough with Castro in finding a resolution to a major problem. By taking action on the matter of these criminals, you would show all Floridians of your concern.[180]

By the time Graham joined the Senate in 1987, he continued to characterize Hispanic asylum seekers in a negative light. As Nicaraguan refugees began making their way from the U.S.-Mexico border to Florida in 1989, newspapers reported, "Graham told President Reagan in a message that Florida has suffered enough [and that] 'America must regain control of its borders.'" Graham continued by effectively urging asylum seekers to remain at home and

---

[179] *Graham v. Smith*, Case No. 81-1497-CIV-JE (S.D. Fla.).

[180] Jenna M. Loyd and Alison Mountz, *Boats, Borders, and Bases: Race, the Cold War, and the Rise of Migration Detention in the United States*, 130 (citing Graham to Reagan, September 9, 1982, "Case 097544," White House Office Records Management Central Files: Subject Files: Immigration/Naturalization, Ronald Reagan Presidential Library, Simi Valley, California).

"[abiding] by our strict law on asylum . . . [that] states immigrants must prove persecution at home in order to be granted asylum."[181]

In the Senate, Graham quickly joined forces with others seeking to enhance not only federal immigration enforcement capacities but also local, state, and federal cooperation on the so-called criminal alien problem. More broadly, Graham, like the drafters of the ADAA, worked to yoke the nation's immigration agencies in the work of criminal law enforcement, particularly to make use of these agencies' broad legal authority to detain and expel unwanted migrants in the war on drugs.  In May 1988, Graham co-chaired the Senate committee hearing on "Haitian Narcotics Activities"[182] with Senator Alfonse D'Amato (R-NY) who, like Graham, blamed state prison overcrowding on noncitizens and worked to obtain federal compensation for their detention.[183]  Together, Graham and D'Amato would lead the legislative effort "to more closely align state corrections and federal migration authorities."[184]  With Chiles, Graham also co-chaired a bipartisan task force on law enforcement and interdiction that culminated in the passage of the ADAA.[185] Upon its passage in November of 1988, Graham described it as taking "'important steps toward solving a major problem faced by Federal and State criminal justice

---

[181] Register Wire Services, "Refugee influx pushes Miami to its threshold," *Des Moines Sunday Register*, January 15, 1989, 3A.

[182] Haitian narcotics activities.

[183] Loyd and Mountz, *Boats,* 132. D'Amato is a key figure in the development of so-called crimmigration law. Representing a state experiencing high immigrant inflows, D'Amato, like his border state peers, worked vigorously to expand the nation's immigration enforcement capacities. In the process, he contributed to the racialization of immigrants as lawbreakers and criminals which, in turn, enabled him to justify the deployment of the INS in the work of crime control and the expansion of civil and criminal penalties vis-à-vis criminal aliens. Loyd and Mountz, *Boats,* 131-35.

[184] Loyd and Mountz, *Boats,* 129. On D'Amato's legislative agenda and the ways it sought to bring local law enforcement officials into greater coordination with federal officials, see Loyd and Mountz, *Boats,* 131-42; Schuck and Williams, "Removing Criminal Aliens," 369-70.

[185] Jacquelyn Swearingen, "Senate Oks alien-felon penalties: Chiles proposed tough measures," *The Miami Herald*, October 16, 1988.

systems—the problem of how to expeditiously remove from our streets those aliens who are convicted of murder, or trafficking in drugs and weapons.'"[186]

Yet, many policymakers, including Graham, soon argued that ADAA and the Immigration Reform and Control Act of 1986 (IRCA) did not go far enough.[187] Indeed, two prominent investigations of the nation's deportation system discovered that a lack of resources, particularly appropriations, prevented the implementation of the ADAA's criminal alien provisions.[188] Even before the publication of these reports, however, Graham began preparing amendments to the law that would remedy the perceived lapses of the ADAA and federal immigration enforcement more generally. As Graham explained in broader terms, "[a]ll too often, these nomadic criminals—who are involved in the drug trade—slip away from justice because they move faster than our immigration system."[189] These amendments included an expanded definition of "aggravated felony," increased enforcement authority for INS officers, and the removal of aggravated felon noncitizens from eligibility for suspended deportation or stays of deportation, among others.[190]

Between 1989 and 1990, he sought to incorporate iterations of these amendments into two drug bills—S. 1711: A bill to implement the President's 1989 National Drug Control Strategy and S. 2652: National Drug Control Strategy Implementation Act of 1990. In addition,

---

[186] Loyd and Mountz, *Boats,* 134 (citing Feldman, 202).
[187] The Immigration and Reform Control Act of 1986 was a comprehensive immigration reform measure that aimed to control undocumented immigration. See Tichenor, *Dividing Lines,* Kindle Loc. 326-421.
[188] Schuck and Williams, "Removing Criminal Aliens," 434-435; Criminal aliens : hearing before the Subcommittee on Immigration, Refugees, and International Law of the Committee on the Judiciary, House of Representatives, One Hundred First Congress, first session, on H.R. 3333, November 1, 1989; United States, General Accounting Office, Report to the Chairman, Subcommittee on Immigration, Refugees, and International Law, Committee on the Judiciary, House of Representatives: Immigration Control, Deporting and Excluding Aliens from the United States, October 26, 1989.
[189] United States, General Accounting Office, Immigration Control, Deporting and Excluding Aliens from the United States, October 26, 1989, 132.
[190] 136 Cong. Rec. 35621 (October 26, 1990).

during the debates regarding S. 1711, Graham and D'Amato co-sponsored S. Amdt 972 ("To direct the United States Sentencing Commission to establish penalties that constitute a meaningful deterrence to deported aggravated felons reentering the United States"[191]), a " 'sense of the Congress' recommendation to the Federal Sentencing Commission that would upgrade the penalty for an aggravated criminal felon who after conviction returns to the United States in violation of Federal law."[192] Although neither S. 1711 nor S. 2652 became law, Graham's amendments found a place in S. 358, which would become the Immigration Act of 1990.[193] It is also likely that his "sense of the Congress" recommendation to the Federal Sentencing Commission led to the 1990 modifications of 8 U.S.C §1326.

Part III: Violent Crime Control and Law Enforcement Act (1994) and the Antiterrorism and Effective Death Penalty Act (1996)

*Historical Background*

By the 1990s, Floridians, once again, led the effort to revise 8 U.S.C §1326. Representing a deeply conservative and predominantly white district in Central Florida, Rep. Bill McCollum (R-FL) authored the 1994 and 1996 revisions to §1326. These revisions, in conjunction with his contributions to the 1996 Antiterrorism and Effective Death Penalty Act, marked the pinnacle of a career dedicated to the reconfiguration of the nation's criminal and immigration laws.[194] As

---

[191] 135 Cong. Rec. S12799 (October 5, 1989).

[192] Criminal aliens: hearing before the Subcommittee on Immigration, Refugees, and International Law of the Committee on the Judiciary, House of Representatives, One Hundred First Congress, first session, on H.R. 3333, November 1, 1989, 120.

[193] *Immigration Act of 1990*, P.L. 101-649, *United States Statutes at Large* 104 (1990): 4978-5088.

[194] According to Schrag, McCollum's district was 81% white. Philip G. Schrag, *A Well-Founded Fear: The Congressional Battle to Save Political Asylum in America* (New York: Taylor and Francis Group, 2000), 44; James G. Gimpel and James R. Edwards, Jr. *The Congressional Politics of Immigration Reform* (Needham Heights, MA: Allyn and Bacon, 1999), 164.

McCollum explained in a 1993 C-SPAN interview, he adopted a "weed and seed" approach to crime control.[195] Rather than implement programs that focused on crime prevention, he vigorously supported harsh punitive measures that would effectively remove a wide range of convicted individuals from civil society. He specifically sought to limit habeas corpus appeals in death penalty cases, enable the use of evidence collected in violation of the exclusionary rule, abolish parole through "truth-in-sentencing" measures, implement "three strikes" sentencing rules that mandated life imprisonment for repeat offenders, and incarcerate children and teenagers.[196] At the same time, McCollum applied the logic and language of the criminal law to his immigration law enforcement proposals, especially because he believed that many asylum seekers and refugees were lawbreakers and criminals. As he sought to end what he called the "revolving door" in the criminal law context, he also pursued tough criminal penalties for undocumented entry and re-entry. He harbored few qualms about the indefinite detention of low-level offenders, children and teenagers, asylum seekers, and undocumented immigrants or, in his words, "lock[ing] them up and throw[ing] away the key."[197] To eliminate what he considered time-consuming and frivolous appeals, McCollum worked vigorously to end collateral attacks in death penalty appeals and in challenges to deportation orders.

In their empirical analysis of late twentieth century congressional debates, Smita Ghosh and Mary Hoopes found that "asylum policy was transformed by congressional rhetoric that

---

[195] Crime Legislation, *C-SPAN*, November 3, 1993, https://www.c-span.org/video/?52008-1/crime-legislation, accessed December 1, 2021.

[196] With respect to the latter, McCollum stated on the floor of the House, ". . . these violent youthful offenders, young people 12, 13, 14, 15 years of age. We need to take those very violent criminals, whatever age they are they are off the streets, lock them up and throw away the key." 139 Cong. Rec. 30466 (November 19, 1993).

[197] 139 Cong. Rec. 30466 (November 19, 1993).

stigmatized asylum seekers as dangerous, risky criminals."[198]  McCollum played a critical role in

this shift. His efforts were buoyed by the rampant xenophobia of the 1990s that was triggered by

a confluence of factors, including an economic recession, the bombing of the World Trade

Center in February of 1993, the arrival of nearly 300 Chinese asylum seekers on the Golden

Venture a few months later, the 1995 bombing of the Alfred P. Murrah Federal Building in

Oklahoma City, and increases in legal and undocumented immigration that had changed the

demography and culture of communities throughout the nation. While anti-Haitian and anti-

Cuban efforts informed McCollum's immigration enforcement agenda, he found common cause

with legislators, particularly from border states, who lobbied for tough sanctions against

undocumented Mexican immigrants. Their combined efforts led to the amendment of §1326

under the VCCLEA in 1994 and AEDPA in 1996.

     During his twenty years in Congress, McCollum worked tirelessly to pass laws that

blocked the admission of refugees and asylum seekers and curtailed their rights in the United

States. Attuned to the anti-immigrant sentiments of his Florida constituents, McCollum

supported legislation that took an enforcement-minded rather than humanitarian approach to the

arrival of Cuban and Haitian asylum seekers. At the same time, his legislative agenda reflected

an aversion toward Latin American migrants in general; the arrival of Salvadoran and

Nicaraguan asylum seekers and undocumented immigrants from Mexico drove McCollum to

pursue harsh sanctions for unauthorized entry and severely limit access to asylum. McCollum's

sustained attack on Latin American migration led many observers to criticize his immigration

policy proposals for their racially discriminatory impacts and the racist ideas that informed them.

---

[198] Smita Ghosh and Mary Hoopes, "Learning to Detain Asylum Seekers and the Growth of Mass
Immigration Detention in the United States," *Law and Social Inquiry,* vol. 46, n. 4 (November 2021):
1013.

McCollum's stand on Latin American migration often aligned him with FAIR. Indeed, very early in his term, he appeared to be working with them on a 1983 measure that would strip undocumented immigrants of welfare benefits.[199] In the ensuing years, he would go on to co-sponsored or endorse measures drafted by FAIR. His own bills occasionally received FAIR's endorsement. While FAIR publicly described its legislative agenda in race-neutral terms, by the mid-1980s, its position on Latin American migration became widely known with the leak of the WITAN memos, a series of writings by Tanton and Connor.[200] Law professor Philip Schrag describes Tanton's views as follows:

> Tanton had agonized over the supposed consequences of Latin American immigration. "Will Latin American migrants bring with them the tradition of the mordida (bribe), the lack of involvement in public affairs, etc?" the memo asked. It suggested that if Latin American Catholics reproduce more quickly than other citizens and "get a majority of the voters," they might "pitch out" the concept of the separation of church and state. And on the declining political influence of older immigrant groups with lower rates of reproduction than Hispanic Americans, Tanton's memo warned that "this is the first instance in which those with their pants up are going to get caught by those with their pants down."[201]

In the early 1980s, McCollum came to prominence for his unrelenting opposition to legalization, a procedure that, at the time, would principally benefit Hispanic immigrants in the United States. FAIR supported McCollum by giving him the chance to educate fellow members of Congress about the issue during a FAIR-sponsored congressional briefing held at the House Rayburn

---

[199] Barnaby Zall, Federation for American Immigration Reform, to Hon. Bill McCollum, Esq. and Hon Hal Daub, Esq., March 18, 1983, box 23, folder 4, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University.

[200] WITAN stands for "witenagemot," an old English word for a council of wise men. Tanton and Connor wrote the memos in 1986 and they were leaked shortly thereafter. The memos explain Tanton's views on immigration policy, his plans for gaining influence in Congress and the judiciary to implement his policy agenda, and the racism that informed his immigration policy goals. Deepa Fernandes, *Targeted: Homeland Security and the Business of Immigration* (New York: Seven Stories Press, 2007), 212.

[201] Schrag, *A Well-Founded Fear*, 42. For a copy of the WITAN memo cited by Schrag, see: https://www.splcenter.org/fighting-hate/intelligence-report/2015/witan-memo-iii, accessed September 17, 2021.

office on June 4, 1984.[202] FAIR also endorsed his so-called killer amendment or his aggressive effort to strike the legalization provisions of a 1984 comprehensive immigration reform bill.[203] Two years later, McCollum himself drew upon anti-Hispanic sentiments in a failed attempt to quash the legalization provisions of the 1986 IRCA; along with Rep. Henry Hyde (R-IL), he stoked racist fears that legalization would ultimately lead to the migration of one-third to one-half of the entire population of Mexico to the United States.[204]

McCollum further promoted an anti-Hispanic immigration policy agenda by serving as one of the original co-sponsors of H.J. Res. 96, "A joint resolution proposing an amendment to the constitution of the United States establishing English as the official language of the United States."[205] Introduced on January 24, 1985 by Rep. Norman Shumway (R-CA), the measure was backed by U.S. English, an organization founded by Tanton to challenge "self-serving ethnic politicians" who promoted multilingual education and election ballots.[206] As explained in a 1986 *Miami Herald* story about U.S. English, Tanton perceived multilingual education as a threat because it preserved "'language ghettos' of non-English speakers who vote as they were told."[207] Although Shumway, who currently serves on the U.S. English Advisory Board, denied that anti-Hispanic sentiment informed the measure, his description of the widespread use of the Spanish language in Los Angeles suggested otherwise.[208] In a 1985 interview, he recounted:

---

[202] Agenda, Immigration Reform Briefing, June 4, 1983, box 30, folder 8, Federation for American Immigration Reform Records, Special Collections MS2195, George Washington University.

[203] "Immigration amnesty provision will have House test Tuesday," *The El Paso Times,* June 18, 1984, A6; see also, "Immigration bill scheduled for major surgery," *St. Petersburg Times,* August 19, 1984, A3.

[204] 132 Cong. Rec. H9785 (October 9, 1986). See also, Bill Ong Hing, "No Place for Angels: In Reaction to Kevin Johnson," *University of Illinois Law Review,* vol. 2000, n. 2 (2000): 600.

[205] William E. Gibson, "Rule sought in Congress on making English official," *South Florida Sun Sentinel* (Fort Lauderdale, Florida), January 31, 1985, A6.

[206] Chris Chrystal, "Resolutions would designate English as official language," *Argus-Courier* (Petaluma, California), April 24, 1985, B4; William Trombley, "English-only proposition traced to small resort city in Michigan," *The Miami Herald,* October 21, 1986, A16.

[207] Trombley, "English-only proposition," A16.

[208] See https://www.usenglish.org/advisory-board/, accessed September 17, 2021.

> I was appalled to see that department stores in downtown Los Angeles have ads in their windows all in Spanish, the music inside the stores is all music you'd expect to here [sic] in Mexico. It's Latin music. The whole commercial sector of Los Angeles – at least where I was – was just totally devoted to something non-English, non-American.[209]

Meanwhile, other policymakers criticized U.S. English and its federal and state English-only campaigns as xenophobic and racist; Jerry Tinker, an aide to Sen. Edward Kennedy (D-MA), observed, "Long before they took the garb of U.S. English, this [FAIR] was an anti-immigrant outfit . . .and their newsletters contained barely disguised racism."[210] Author Norman Cousins reinforced Tinker's point when, in October 1986, he resigned from the board of U.S. English because its campaigns "denigrated and demeaned" Latinos and other racial minorities.[211]

As further indicators of McCollum's anti-Hispanic animus, he co-sponsored measures that would deny birthright citizenship to children of undocumented immigrants. Advocates of these measures argued that they would enable border states like California and Florida to mitigate the supposed financial burdens created by undocumented immigration.[212] More broadly, they sought to divest migrants of what they characterized as a reward (birthright citizenship) for violating the nation's immigration laws.[213]  In response, critics frequently charged that these bills were racially discriminatory, as Rep. Jose Serrano forcefully explained (D-NY) during a debate over a bill co-sponsored by McCollum:

> This issue is part of the misguided immigrant bashing that is taking place in this country . . . this is also directed at the perception that there is a large number of Hispanics in the

---

[209] "Congressmen revive bid for official language," *Calgary Herald* (Calgary, Alberta, Canada), January 31, 1985, D16.

[210] Trombley, "English-only proposition," A16.

[211] Trombley, "English-only proposition," A16.

[212] Societal and Legal Issues Surrounding Children Born in the United States to Illegal Alien Parents, Joint Hearing before the Subcommittee on Immigration and Claims and the Subcommittee on the Constitution of the Committee on the Judiciary, House of Representatives, One Hundred Fourth Congress, First Session, on H.R. 705, H.R. 1362, H.J. Res 56, H.J. Res. 64, H.J. Res. 87, H.J. Res 88, and H.J. Res, 93, December 13, 1995, 23-25, 40.

[213] "Societal and Legal Issues Surrounding Children Born in the United States to Illegal Alien Parents," 23-25, 40.

country. This is not about people coming from Europe . . . If everyone in this country were coming from Europe right now, we would not be having these discussions right now. We're concerned about language and the browning of America.[214]

Despite these objections, McCollum repeatedly endorsed these bills. On January 23, 1996, he elected to co-sponsor H.J. Res. 93 "Proposing an amendment to the Constitution of the United States to provide that no person born in the United States will be a United States citizen unless a parent is a United States citizen, is lawfully in the United States, or has a lawful immigration status at the time of the birth" that was introduced by Rep. Mark Foley (R-FL) on May 5, 1995.[215] A year later, McCollum co-sponsored Rep. Brian Bilbray's (R-CA) H.R. 7 "Citizenship Reform Act of 1997," which was introduced on January 7, 1997.[216]

For much of his career, McCollum also worked assiduously to transform the nation's asylum system to deter the entry of refugees from countries of the Global South. Claiming that these migrants were not refugees but instead economic migrants and undocumented immigrants, McCollum adopted a punitive rather than humanitarian approach to asylum seekers. In the early 1980s, he focused his efforts on Cuban and Haitian refugees in Florida and, in a 1982 speech delivered before the Dade City Chamber of Commerce, offered a crude overview of his legislative strategy when he recommended that President Reagan "find a hole in our fence at Guantanamo and push these aliens [Cuban refugees] through it. And maybe we can do something similar with the Haitians."[217] In the months following the speech, McCollum

---

[214] "Societal and Legal Issues Surrounding Children Born in the United States to Illegal Alien Parents," 62-63.

[215] In 2006, Foley abruptly resigned from his seat after the media alleged that he had been sending sexually explicit internet messages to under-age Congressional pages. Kate Zernike and Abby Goodnough, *Lawmaker Quits Over Messages Sent to Teenage Pages*, September 30, 2006, https://www.nytimes.com/2006/09/30/us/30foley.html, accessed November 30, 2021.

[216] Bilbray currently serves on FAIR's National Board of Advisors. See: https://www.fairus.org/about-fair/board-directors, accessed September 17, 2021.

[217] Andy Taylor, "A Bum Rap? 'Marielista' fears unwarranted," *Tampa Tribune*, March 3, 1982, A1.

sponsored two bills that aimed to make his harsh recommendations a reality. H.R. 7234, "The Immigration Emergency Act," imbued the President with the authority to declare an "immigration emergency" in response to future inflows of refugees and deploy the military to carry out emergency orders. The bill would have also conferred explicit legal sanction for the indefinite detention of migrants pending a determination of their admissibility.[218] Introduced a year later in 1983, H. Con. Res. 215, recommended the return to Cuba those refugees incarcerated in local, state, and federal prisons.[219]

Although neither of these proposals became law, McCollum was undeterred. Each new group of asylum seekers from the Global South seemed to spur McCollum into action as he sponsored additional measures that would block access to asylum and other humanitarian protections for refugees. In response to the presence of 921 Nicaraguan refugees in Miami, McCollum, between 1984 and 1989, proposed three bills that would enable immigration officers to summarily exclude individuals suspected of making fraudulent asylum claims. While McCollum expressed his sympathy for the plight of the refugees, he claimed that at least 50% were economic migrants. McCollum further claimed that the 971 Nicaraguan refugees in Miami imposed undue financial burdens estimated at $21 million.[220] By 1990, McCollum emerged as the main opponent of the law that would create temporary protected status (TPS); refusing to refer to the prospective beneficiaries of the measure as refugees or even migrants, McCollum described them as "El Salvador, Lebanon, Liberia, and Kuwait illegals" and "the illegals who are here from Nicaragua." In so doing, McCollum connoted that TPS unfairly benefited

---

[218] H.R. 7234, Immigration Emergency Act (September 30, 1982) McCollum introduced a similar measure in 1983—H.R. 2304, Immigration Emergency Act (March 23, 1983).

[219] 98 H. Con. Res. 215, Concurrent resolution to express the sense of Congress regarding the return to Cuba of certain Cuban nationals who arrived in the Mariel boatlift and are currently incarcerated in the United States (November 10, 1983).

[220] Rep. Bill McCollum, "U.S. Asylum Stretched too far," *The Miami Herald,* February 5, 1989, C4.

lawbreakers.[221] During the TPS debates, McCollum also argued that if these individuals needed

humanitarian protection such protections might be pursued through an application for asylum.[222]

      This recommendation, however, rang hollow, particularly given McCollum's ensuing

effort to bar the entry of Haitian refugees fleeing the violence and persecution that resulted from

the military overthrow of Father Jean-Bertrand Aristide, Haiti's first democratically elected

president. As in the 1980s, McCollum, in 1991, supported measures that "impeded the flow of

immigration from Haiti and other 'third world' nations."[223] At the federal level, the Bush

administration, like the Carter and Reagan administrations, insisted that the Haitians were

economic migrants rather than asylum seekers. Disinclined to take seriously Haitian asylum

claims, the administration authorized the US Coast Guard to intercept Haitian boats on which the

INS then conducted five-minute interviews and made an initial determination as to whether an

applicant had a credible fear of persecution.[224] Arguing that these abbreviated asylum

proceedings failed to meet the standards established under domestic and international law, the

Haitian Refugee Center of Miami won an injunction against the refugees' return to Haiti.[225] Yet,

in response, the Bush administration created a refugee camp at a US navy base in Guantanamo

---

[221] 136 Cong. Rec. 27129 (October 2, 1990).

[222] Commentators have observed that in making this claim, McCollum either ignored or failed to understand that the conditions that qualified individuals for TPS status (typically war and natural disasters) would not have rendered them eligible for refugee and asylum status under US law. Andrew I. Schoenholt, *The Promise and Challenge of Humanitarian Protection in the United States: Making Temporary Protected Status Work as a Safe Haven, Northwestern Journal of Law and Social Policy*, vol. 15, n. 1 (Fall 2019): 10.

[223] Carl Lindskoog, *Detain and Punish*, 105 (citing Christopher Mitchell, "The Political Costs of State Power: U.S. Border Control in South Florida," in *The Wall around the West: State Borders and Immigration Controls in North America and Europe,* edited by Peter Andreas and Timothy Snyder (Lanham, Md.: Rowman and Littlefield, 2000), 89-91; Reimers, *Unwelcome Strangers,* 30).

[224] Those who passed this initial screening were taken to the United States for a regular asylum interview. But Schrag reports that the INS returned a majority to Haiti after determining that they were economic migrants or individuals fleeing general conditions of political unrest rather than persecution. Schrag, *A Well-Founded Fear,* 36. For more on the interdiction and detention policies adopted by the Bush administration vis-à-vis the Haitians, see Lindskoog, *Detain and Punish,* 99-125.

[225] Schrag, *A Well-Founded Fear,* 36.

Bay, Cuba.[226] Seeking an even more powerful deterrent to Haitian arrivals, Bush dismantled the refugee camps at Guantanamo and issued his "Kennebunkport Order," which instructed the Coast Guard to "surround Haiti" and force fleeing refugees back to that country.[227] Since the refugees were unable to reach US soil, the Bush administration argued that domestic and international refugee law protections did not apply.[228]

During his presidential campaign, Bill Clinton condemned the Kennebunkport Order and promised to end the policy. But, upon taking office, he reversed course after the Bush administration "put forth exaggerated estimates" that 200,000 to 500,000 Haitian refugees" planned to sail to the US during his inauguration and FAIR ran xenophobic radio ads in Florida and Georgia about the Haitian arrivals.[229] Clinton further expanded the enforcement-minded approach of his predecessors by continuing to detain Haitian and Cuban asylum seekers at Guantanamo. Ultimately, Clinton decided to invade Haiti and restore Aristide to power, believing that military intervention would bring stability to the nation and deter the departure of Haitians for America's shores.[230]

In a television interview, McCollum lauded the Bush and Clinton administrations for their Haitian policies, stating,

> And I frankly believe also that it's a problem for us in the sense that if we did not intercept the Haitian boat people and either repatriate them forcibly, as President Bush

---

[226] On the summary screening procedures and poor conditions at Guantanamo, see Schrag, *A Well-Founded Fear*, 36; Lindskoog, *Detain and Punish,* 99-125.

[227] As Schrag explains, "When Coast Guard cutters arrived with refugees in the harbor at Port-au-Prince, the Coast Guard officers used fire hoses to force them off the boats, into the hands of Haitian military officials who were waiting to arrest them." Schrag, *A Well-Founded Fear,* 36.

[228] A federal appeals court issued an injunction against the implementation of the Kennbunkport Order. But the Supreme Court later stayed and reversed the injunction. Schrag, *A Well-Founded Fear*, 37.

[229] Joseph Nevins, *Operation Gatekeeper: The Rise of the "Illegal Alien" and the Making of the U.S.-Mexico Boundary* (New York: Routledge), 88; Schrag, *A Well-Founded Fear,* 38; Lindskoog, *Detain and Punish,* 188.

[230] On Clinton's decision to continue detaining Cubans and Haitians at Guantanamo, see Lindskoog, *Detain and Punish,* 115-131. On his invasion of Haiti, see Lindskoog, *Detain and Punish*, 124.

was doing and President Clinton did up until just recently, or do some other alternative that's constructive, these boat people would come to Florida, and would inundate our state, as many of them have been doing.[231]

He also contributed to their efforts by taking legislative action. From the late 1980s to the early 1990s, McCollum repeatedly introduced bills to bar the entry of individuals diagnosed with AIDS[232]-- bills that fueled racist stereotypes by associating Haitians with illness and disease.[233] By 1993, lawmakers used the language of one of these bills, H.R. 985 ("To include infection with the agent for acquired immune deficiency syndrome as a communicable disease of public health significance for which an alien is excludable under the Immigration and Nationality Act"[234]) to codify the exclusion of HIV-positive immigrants under the National Institutes of Health Revitalization Act of 1993.[235] In so doing, they wrested control over the determination of the excludability of AIDS sufferers from the Public Health Service (PHS). The agency garnered the ire of anti-immigrant lawmakers when it proposed to lift the AIDS exclusion applied to HIV-infected Haitians at Guantanamo between 1991 and 1993.[236] Concern for the well-being of the Haitians as well as the unscientific premises of the exclusion motivated the agency's

---

[231] Interview with Senator Bill McCollum, *ABC News This Week With David Brinkley*, ABC, July 10, 1994.

[232] These included H.R. 2590, A bill to amend the Immigration and Nationality Act to clarify that immigrant visas may not be issued to aliens who are infected with the etiologic agent for acquired immune deficiency syndrome," introduced on June 3, 1987, and H.R. 278, To amend the Immigration and Nationality Act to clarify that immigrant visas may not be issued to aliens who are infected with the etiologic agent for acquired immune deficiency syndrome, introduced on January 3, 1989.

[233] On a 1983 "flawed declaration" by the Centers for Disease Control that created the racist stereotype of Haitians a high-risk group for AIDS, see Lindskoog, *Detain and Punish*, 105.

[234] McCollum introduced H.R. 985 on February 18, 1993.

[235] National Institutes of Health Revitalization Act of 1993, Pub. L. 103-43, 107 Stat. 122 (1993). For an account of the congressional debates regarding the 1993 Act and the inclusion of H.R. 985, see, Juan P. Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus: Recent Developments and Prospects for the Future," *Houston Journal of International Law*, vol. 16, n. 1 (Fall 1993): 18-39.

[236] On the HIV exclusion, see Michael Ratner, "How We Closed the Guantanamo HIV Camp: The Intersection of Politics and Litigation," *Harvard Human Rights Journal,* vol. 11 (1998): 187-220.

recommendation; more specifically, the agency's research demonstrated that "[t]he risk of (or protection from) HIV infection comes not from the nationality of the infected person, but from the specific behaviors that are practiced."[237] In response, conservative lawmakers such as Connie Mack (R-FL) argued that the admission of the detained Haitians would impose unfair fiscal burdens on their states.[238]

Senator Ted Kennedy (D-MA) rebutted these arguments by observing that immigrants with other types of diseases, such as kidney failure and cancer, were not excluded due to cost concerns. He further cited to recent immigrant admission statistics to deflect claims that the lifting of the ban would result in the admission of thousands of HIV noncitizens.[239] Finally, he argued that anti-Haitian racism and homophobia inspired the HIV ban: "[W]hat the supporters of the Nickles amendment are saying--and we all know what they are saying here today-- is you have 268 black Haitians in Guantanamo Bay, 40 children and 2 have HIV, and 20 pregnant women . . . The proponents of this amendment say, 'Send them back. Send them back. We do not care'."[240] By June 1993, the Clinton administration paroled 139 HIV-infected Haitians who had been held at Guantanamo since early 1992; yet the administration did so without challenging the new HIV exclusion.

---

[237] Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 19. Yet, in response to the outcry about its proposal, the PHS reversed course and retained HIV on its list of communicable diseases. Widespread public criticism of its reversal ensued; Rep. Jim McDermott (D-Wash.) charged, "[o]ur immigration policy toward HIV infected people reflects the Bush administration's continuing capitulation to hysteria, bigotry, and irrational fear." Perhaps most prominently, the Eighth Annual Conference on AIDS moved its conference to Amsterdam in protest of the revived PHS ban. Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 20-21 (citing 138 Cong. Rec. H6253 (daily ed. July 21, 1992) (statement of Rep. Jim McDermott (D-Wash.)).

[238] Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 30 (citing 139 Cong. Rec. S1766 (daily ed. February 18, 1993)).

[239] Kennedy observed that "only 450 out of 700,000 immigrants tested positive for the AIDS virus and were thus excluded. Last year only 600 tested positive." Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 31.

[240] Osuna, "The Exclusion from the United States of Aliens Infected with the AIDS Virus," 31-32.

In a 1994 televised interview with ABC News host David Brinkley, Carrie Meek (D-FL), a recently elected congresswoman and member of the Congressional Black Caucus, challenged McCollum's anti-Haitian policies,[241] alleging that they created a "double standard" between Haitians and other immigrants:

> I think we need to remember that the Haitian immigration is less than six percent of the total immigration coming into the United States. There's a loud furor about Haitians but not about other immigrants. Certainly, there is a double standard between the immigration policies as they are inflicted upon Haitians vis-à-vis Cubans and other immigrants. I think it's an unfair policy and it should be corrected.[242]

Meek also contested McCollum's claim that the Haitians were economic migrants, arguing that they, like Cubans, were asylum seekers fleeing political persecution particularly given the documented and widespread violence inflicted upon the Haitian people by coup leader Lieutenant General Raoul Cedras and the military. McCollum was unmoved by Meek's appeals. On the eve of the US invasion of Haiti, McCollum recommended that Clinton assist Aristide in establishing a new government on a neighboring island--an island that, in lieu of the United States, would serve as an asylum for Aristide's supporters.

By the 1990s, McCollum's restrictionist initiatives received a boost from the virulent xenophobia that emerged as a result of an economic recession, the first bombing of the World Trade Center, the arrival of Chinese asylum seekers in New York City in 1993, the Oklahoma City bombing, and increases in both the legal and undocumented immigrant population in the United States, among others. Capturing the popular mood, the headline on the April 1990 cover of *Time* magazine declared, "America's Changing Colors: What Will the U.S. Be Like When Whites Are No Longer the Majority?" and depicted an image of an American flag composed of

---

[241] Interview with Senator Bill McCollum.
[242] Interview with Senator Bill McCollum.

black, brown, and yellow stripes[243] Meanwhile public opinion polls traced Americans'

increasing hostility toward migrants as an unprecedented 54 percent expressed their support for a

reduction in immigration in 1992; that figure grew to 61 percent in 1993 and 65 percent in

1994.[244] Placing these statistics in perspective, Joseph Nevins writes: "Although opinion polls

have consistently shown that since 1945 Americans have wanted lower levels of immigration,

the 1993 results reflected the highest level of hostility toward immigrants 'since the heyday of

nativism in the 1920s.'"[245] Right wing intellectuals flourished in this milieu, publishing best

sellers that "promoted a white supremacist and nativist . . . . vision of the United States."[246]

White nationalist Peter Brimelow characterized the arrival of new migrants from Africa, Asia,

and Latin America as "de facto *discrimination against* Europe" and called for the restoration of

the nation's "specific ethnic core. . . And that core has been white."[247] Summing up the

xenophobia of the 1990s, one *New York Times* reporter wrote, "Americans have felt freer to

voice a rude inhospitality that at other times they might have considered racist or at least

xenophobic."[248]

  Yet, as Lee observes, the anti-immigrant sentiment of the 1990s "did not treat all new

immigrants the same."[249] Thus, while Asian immigrants were increasingly represented as so-

called model minorities, Latin American migrants—and particularly Mexican migrants—were

---

[243] *Time*, April 9, 1990, vol. 135, n. 15,
http://content.time.com/time/magazine/0,9263,7601900409,00.html, accessed November 19, 2021.
[244] Coleman, *The Walls Within: The Politics of Immigration in Modern America* (Princeton: Princeton University Press, 2021), Kindle Loc. 109.
[245] Nevins, *Operation Gatekeeper*, 90.
[246] Lee, *America for Americans,* Kindle Loc. 278.
[247] Lee, *America for Americans,* Kindle Loc. 278 (citing Peter Brimelow, *Alien Nation: Common Sense About America's Immigration Disaster* (New York; Harper Perennial, 1995), xvi, xvii, 79, 219 [emphasis in original]).
[248] Coleman, *The Walls Within,* Kindle Loc. 109 (citing Debora Sontag, "Calls to Restrict Immigration Come from Many Quarters," *New York Times,* December 13, 1992).
[249] Lee, *America for Americans,* Kindle Loc. 260.

represented in negative terms that cemented the association between a Mexican identity and undocumented status.[250] Indeed, numerous studies found that from the 1960s to the 1990s, the media "paired the terms "*undocumented, illegal,* and *unauthorized* with *Mexico* or *Mexican immigrants* and *crisis, flood,* or *invasion.*"[251] Undocumented Mexican migrants, moreover, were blamed for nearly all of the nation's economic, social, and political problems.[252] Conservative writers and policymakers also believed that Mexican immigrants, unlike European immigrants, were incapable of adjusting or assimilating to American society.[253] Former presidential candidate and political commentator Patrick Buchanan revived the early twentieth century eugenicist notion of "race suicide," arguing that declining white birth rates and increasing Mexican birth rates would render Americans of European descent a minority in a nation that supposedly belonged to them.[254] Given the popular embrace of anti-immigrant sentiment, politicians and policymakers began to adopt stronger approaches to immigration law enforcement, particularly with respect to asylum seekers and undocumented immigrants.

In the early 1990s, the battle for stronger border enforcement measures began at the state and local level where FAIR and other restrictionist organizations launched grassroots

---

[250] Lee, *America for Americans*, Kindle Loc. 260. On the ways in which the model minority myth was used to mask the ongoing racism faced by Asian Americans, denigrated African Americans, and promoted the notion of a colorblind society, see Ellen Wu, *The Color of Success: Asian Americans and the Origins of the Model Minority* (Princeton: Princeton University Press, 2015).

[251] Emphasis in original. Lee, *America for Americans,* Kindle Loc. 261. (citing Leo Chavez, *The Latino Threat: Constructing Immigrants, Citizens, and the Nation* (Stanford, CA: Stanford University Press, 2013), 24, 27, 31-33; Otto Santa Ana, *Brown Tide Rising: Metaphors of Latinos in Contemporary American Public Discourse* (Austin: University Texas Press, 2002), 77).

[252] Lee, *America for Americans,* Kindle Loc. 281 (discussing the contributions of former Harvard University professor Samuel Huntington to anti-Mexican animus in the late twentieth century and early aughts).

[253] Lee, *America for Americans,* Kindle Loc. 280 (citing Patrick Buchanan, *The Death of the West: How Dying Populations and Immigrant Invasions Imperil Our Country and Civilization* (New York: St. Martin's Press, 2001), 3).

[254] Lee, *America for Americans,* Kindle Loc. 280 (citing Buchanan, *Death of the West,* 12; Patrick Buchanan, *State of Emergency: The Third World Invasion and Conquest of America* (New York: St. Martin's Press, 2006), 12).

campaigns.[255] In California, local restrictionists, former INS officials such as Harold Ezell,[256] and members of the California Coalition for Immigration Reform (an organization funded by Tanton's US Inc.) met in October 1993 to discuss their shared concerns regarding legal and undocumented immigration.[257] By the end of the meeting, they decided to create the Save our State Committee (SOS) and sponsor a ballot initiative (Proposition 187) that would prohibit undocumented immigrants in California from non-emergency medical care, public schools, and social services. It also required state and local officials to report suspected undocumented immigrants to the state attorney general and the INS. Elaborating on the committee's strategy, one committee member explained, "It made sense to target the most objectionable recipients first—illegals. Then we could put the issue of too much legal immigration on the table."[258] Even though the federal courts issued an injunction against Proposition 187, the resounding support of California voters for the measure (they approved it by a 59 to 41 margin[259]) reflected the vigor of anti-immigrant sentiment in the state.

Proposition 187 garnered the attention of local, state, and federal officials. In Arizona, Texas, and Florida, anti-immigration forces sought to pass similar ballot measures.[260] It also

---

[255] Tichenor writes, ". . . FAIR and other restrictionist groups set about to build strong grassroots opposition to immigration in key receiving states like California, Texas, and Florida." Tichenor, *Dividing Lines,* Kindle Loc. 402.

[256] On Ezell, Lee writes that he "famously stated that 'illegal aliens' should be caught, skinned and fried" and that Californians were "tired of watching their state run wild and become a third world country." Lee, *America for Americans,* Kindle Loc. 269 (citing Daniel B. Wood, "Ballot Vote on Illegal Immigrants Set for Fall in California," *Christian Science Monitor*, June 1, 1994, 1, 18).

[257] On CCIR's stance on undocumented immigration, Coleman writes, "CCIR claimed that immigration was an 'invasion' that was destroying the cultural fabric of the nation and that unauthorized immigration was a crippling problem for the state. CCIR's literature noted 'illegal aliens . . . [brought] their values and culture into our midst, are major contributors to our mounting financial burdens and moral and social degradation." Coleman, *The Walls Within,* Kindle Loc. 121 (citing Dave Lesher and Eric Lichtblau, "O.C. Group Helps Fuel Anti-Immigrant Furor," *Los Angeles Times,* August 30, 1993).

[258] Tichenor, *Dividing Lines,* Kindle Loc. 403 (citing author's interview with Harold Ezell and anonymous interview with SOS staffer).

[259] Coleman, *The Walls Within,* Kindle Loc. 126.

[260] Coleman, *The Walls Within,* Kindle Loc. 126.

fulfilled the wishes of CCIR leaders by becoming a "blueprint" at the federal level for the

passage of anti-immigrant measures.[261] Indeed, Proposition 187 compelled both the Democratic

Party and the GOP to adopt hardline stances on the issue of immigration law enforcement

particularly given the importance of winning California's electoral votes in the 1996 election.[262]

Clinton, who closely watched the progress of Proposition 187 and the re-election of Governor

Pete Wilson, realized he had to "placate restrictionists."[263] As a result, he remained silent on the

litigation that ensued after the passage of Proposition 187 and reassured California voters he was

working to curtail undocumented immigration.[264] From early in his presidency, Clinton began to

develop an aggressive approach to immigration law enforcement that co-opted the rhetoric and

policies of the right.[265] He "took a hard line on mass asylum," prohibiting the entry of Cubans

and Haitians intercepted at sea.[266] With the approach of the 1994 midterm elections, Clinton

endorsed the recommendations of the Jordan Commission for aggressive enforcement with

respect to undocumented immigration.[267] During his two terms in office, Clinton would pen

---

[261] Coleman, *The Walls Within,* Kindle Loc. 127.

[262] Coleman, *The Walls Within,* Kindle Loc. 116, 124, 127 (citing Melissa Healy, "House GOP Charts California Agenda Congress," *Los Angeles Times,* November 13, 1994.

[263] Coleman, *The Walls Within,* Kindle Loc. 116.

     In the early 1990s, Governor Pete Wilson became one of the leading anti-immigrant voices in the country. As Joseph Nevins writes, "Wilson undoubtedly set the stage for immigrant bashing," particularly with respect to undocumented immigration from Mexico. His xenophobic rhetoric and policy proposals escalated with Clinton's election and his own race for a second gubernatorial term. Nevins, *Operation Gatekeeper*, 85, 87.

     During his 1994 campaign, Wilson pushed Clinton further to the right by placing full page advertisements in the *New York Times, USA Today,* and the *Washington Times* that called on the administration to end birthright citizenship and deny education and public services to undocumented immigrants. Wilson's strategy paid off as Californians voted to return him to the governor's office. Nevins, *Operation Gatekeeper,* 87; Coleman, *The Walls Within,* Kindle Loc. 115.

[264] Tichenor, *Dividing Lines*, Kindle Loc. 413.

[265] Nevins, *Operation Gatekeeper;* Coleman, *The Walls Within*, Kindle Loc. 127.

[266] As Tichenor observes, this decision broke with a three-decade long precedent by which Cubans were treated as refugees. Tichenor, *Dividing Lines,* Kindle Loc. 413.

[267] Established by the Immigration Act of 1990, the Commission on Immigration Reform (CIR) was led by former representative Barbara Jordan (D-TX) and generated a series of reports on legal and undocumented immigration. The reports were used by both policymakers on both the left and the right to

tough immigration enforcement bills and ultimately sign three of the most draconian law

enforcement measures in United States history: the Violent Crime Control and Law Enforcement

Act of 1994, the Antiterrorism and Effective Death Penalty Act of 1996, and the Illegal

Immigration Reform and Immigrant Responsibility Act of 1996.

Meanwhile, restrictionist forces, led by then House minority leader Newt Gingrich, took

precedence within the GOP. They shunted aside the concerns of other GOP leaders, such as

Governor-elect George W. Bush and William Bennett, regarding the potentially harmful impacts

of Proposition 187; the latter accused Wilson of "scapegoating . . . stirring up nativist juices."[268]

Although Jack Kemp supported the rescission of services to undocumented immigrants, he also

felt that a national version of Proposition 187 could cost the GOP the immigrant vote and land

the party "on the wrong side of the civil rights debates of the 1950s and 1960s."[269]  Despite these

concerns, Gingrich, upon assuming the speakership, created the Speaker's Task Force on

Immigration Reform in December 1994. In so doing he paid heed to the importance of the recent

developments in California by assigning Rep. Elton Gallegly (R-CA) as chair and ensuring that

almost half of the Task Force's fifty-four members were from California.[270] The year before,

GOP restrictionists formed the House Republican Research Committee's Task Force on Illegal

Immigration and held hearings in four US cities. In Los Angeles, much of the testimony

reinforced the themes articulated by Governor Wilson regarding the negative impact of

justify their policy proposals with respect to legal and undocumented immigration. Tichenor, *Dividing Lines*, Kindle Loc. 407.

[268] Coleman, *The Walls Within*, Kindle Loc. 128-129 (citing Andrew Wroe, *The Republican Party and Immigration Politics: From Proposition 187 to George W. Bush* (London: Palgrave Macmillan, 2008, 121-22).

[269] Coleman, *The Walls Within*, Kindle Loc. 129 (citing Marc Sandalow, "Republicans Battle Over Immigration for 'Soul of Party,'" *San Francisco Chronicle*, November 22, 1994, A3).

[270] Coleman explains that Gingrich created task forces to shift power from congressional committee chairs to the GOP leadership. Gingrich appointed the members of the task forces and his aides served as staff. Coleman, *The Walls Within*, Kindle Loc. 128.

undocumented migrants on the state's economy, crime rate and social services. Witnesses demanded stronger border controls, including the assignment of the US military to the border, and the denial of citizenship to US-born children of undocumented immigrants, among others.[271]

In response to the anti-immigrant fervor of the early 1990s, members of Congress from both sides of the aisle "began tripping over one another to take a tough stand on boundary enforcement and unauthorized immigration."[272] Republicans and Democrats paid multiple visits to the border and held many congressional hearings on the issues of undocumented immigration, so-called criminal aliens, and border enforcement to signal their dedication to these issues.[273] The also proposed numerous immigration enforcement bills. Thus, for example, Representatives Becerra (D-CA) and Nadler (D-NY) introduced bills on summary exclusion (H.R. 3162) and asylum reform (H.R. 3223). In the Senate, Simpson (R-WY) introduced a summary exclusion bill (S. 667) while Senator Bryan (D-NV) addressed asylum and alien smuggling in S. 1348. Meanwhile, California Senators Feinstein (D-CA) and Boxer (D-CA) proposed to increase resources for border enforcement under S. 1571.[274] In proposing these bills, many followed the

---

[271] Others protested the Los Angeles hearing by marching outside the event venue and chanting in Spanish, "We are not illegal here." Pasadena Mayor Rick Cole attended the meeting and told the *Los Angeles Times*, "The issue of immigration is a profound one, and deserves attention and goodwill, but the demonization of immigrants is inhumane and wrong, particularly if it's for partisan gain." Lee Romney, "Illegal Immigration Targeted at Hearing," *Los Angeles Times,* August 17, 1993, A21.

[272] Nevins, *Operation Gatekeeper*, 89; Coleman, *The Walls Within*, Kindle Loc. 128.

[273] Among others, see Criminal Aliens: A Federal Responsibility and a State and Local Burden, Eleventh Report by the Committee on Government Operations, Committee of the Whole House, One Hundred Third Congress, second session, August 1, 1994; The Impact of Federal Immigration Policy and INS Activities on Communities, Hearings before the Information, Justice, Transportation, and Agriculture Subcommittee of the Committee on Government Operations, House of Representatives, One Hundred Third Congress, First and Second Sessions, June 2, August 31, and March 28, 1994; and Federal Prison Population: Present and Future Trends, Hearings before the Subcommittee on Intellectual Property and Judicial Administration of the Committee on the Judiciary, House of Representatives, One Hundred Third Congress, First Session, May 12 and July 29, 1993.

[274] For an overview of these and other immigration-related bills proposed in 1993, see, Larry M. Eig, Joyce C. Vialet, Ruth Ellen Wasem, "CRS Issue Brief, Immigration: Illegal Entry and Asylum Issues," January 24, 1994 (Washington, D.C.: Library of Congress, 1994). For an account of the rightward shift of

lead of Clinton who, during a July 27, 1993 press conference, announced his Immigration Initiative, a series of proposals to strengthen border enforcement.[275] During the event, Clinton expressed support for an amendment introduced by Rep. Duncan Hunter (R-CA) that would add 600 officers to the Border Patrol.[276] He also transmitted to Congress his own immigration enforcement bill, the Expedited Exclusion and Alien Smuggling Enhanced Penalties Act of 1993. Despite criticism from civil rights groups[277] about provisions that would deny due process to asylum applicants, various features of the administration bill eventually made their way into a bipartisan bill, H.R. 3363, the Immigration Enforcement and Asylum Reform Act, sponsored by Representatives Mazzoli (D-KY), McCollum (R-FL), and Schumer (D-NY).[278]

Political scientist Daniel Tichenor observes that in the 1990s, "neither Republican nor Democratic leaders wanted to appear lax in their response to unpopular illegal immigration."[279] In this context, members of Congress made no effort to examine or expunge the racial animus from the laws criminalizing undocumented entry. Indeed, as in the 1950s, 1980s, and the 1990s, it would have been politically imprudent for both conservatives and liberals to propose such an examination. Opinion polls attested to Americans' antipathies toward undocumented immigrants

---

Democrats on immigration detention in the early 1990s, see Ghosh and Hoopes, "Learning to Detain Asylum Seekers," 1007-1013.

[275] In July 1993, Clinton asked Congress for $172.5 million to support the Border Patrol, legislation increasing criminal penalties for alien smugglers, and a corps of immigration officers who would hear asylum claims at ports of entry, among other things. Associated Press, "Immigration crackdown unveiled: Clinton's plan gets bipartisan support," *Daily Press* (Newport News, Virginia), July 28, 1993, 15

[276] Nevins, *Operation Gatekeeper,* 89.

[277] Associated Press, "Immigration crackdown unveiled" (citing Lucas Guttentag, ACLU who said of the asylum provisions of the administration bill, It "panders to America's most primitive fears about immigration.").

[278] Message from the President of the United States Transmitting A Draft of Proposed Legislation Designed to Address the Growing Abuse of Legal Immigration and Political Asylum Systems by Illegal Aliens Holding Fraudulent Documents and by Alien Smugglers; Including a Section-by Section Analysis, 103rd Cong., 2d sess., July 27, 1993. The administration's bill was introduced as S. 1333 in the Senate and H.R. 2836 in the House. See also, Eig, Vialet, Wasem, *CRS Issue Brief,* 10.

[279] Tichenor, *Dividing Lines,* Kindle Loc. 413.

and the passage of Proposition 187 reflected their frustration with federal immigration law enforcement efforts.[280] By taking an aggressive stance on immigration enforcement, politicians saw their own poll numbers rise and increased their chances of reelection. For Democrats and Republicans from border states (including Florida), the issue of undocumented entry and re-entry was of particular concern; as a result, while McCollum drafted the language of the §1326 re-enactment, members of both parties paved the road to its incorporation in and passage under the 1994 VCCLEA.

*Legislative History*

By 1993, McCollum was the ranking member of both the House Subcommittee on Crime and the House Subcommittee on International Law, Immigration, and Refugees. As such, he played an active and prominent role in the debates on the many crime and immigration bills introduced on the floor of the House and even the Senate. Moreover, McCollum was well positioned to consolidate his interests on these issues by advancing the amendment of the nation's immigration laws via the major crime measures of the late twentieth century. On March 24, 1993, McCollum introduced the Criminal Aliens Deportation Act of 1993 (H.R. 1459, "To amend the Immigration and Nationality Act to expand the definition of "aggravated felony," to eliminate the administrative deportation hearing and review process for aliens convicted of aggravated felonies who are not permanent residents or for other purposes").[281] His bill proposed

---

[280] For a discussion of the polls, see Tichenor, *Dividing Lines*, Kindle Loc. 405.

[281]Days before presenting this measure, McCollum held a press conference announcing his plan to reintroduce his summary exclusion bill. In so doing, he role the wave of anti-immigrant sentiment aroused by a *60 Minutes* interview with Dan Stein (FAIR) and William Slattery, the New York INS district director. During the segment, Stein and Slattery used the asylum application of Sheik Omar Abdel Rahman, a cleric who incited the 1993 World Trade Center bombers, to impugn the US asylum system as a whole. Having anticipated the media attention that would follow the CBS interview, FAIR presented a detailed legislative proposal the very next day. Two days later, McCollum, as Schrag describes it, "was

74

to expand the definition of an aggravated felony to widen the net of deportable aliens, expedited the removal of criminal aliens upon the completion of their sentences, conferred upon US district court judges the authority to issue deportation orders during sentencing, and restricted various deportation defenses for certain criminal aliens. H.R. 1459 also modified §1326 to enlarge the class of individuals subject to criminal prosecution for unauthorized reentry; as McCollum explained, "Currently, an alien convicted of a felony other than an aggravated felony who re-enters is subject to 5 years in prison and a criminal fine: this subsection extends the penalties to aliens convicted of three or more misdemeanors and increases the maximum prison sentence to 10 years. Language is also added to make it clear that any alien who stipulates to deportation during a criminal trial shall be considered to have been formally deported."[282]  Finally, H.R. 1459 added a section (c), "Collateral Attacks on Underlying Deportation Order," that served as the precursor to section (d) of 8 U.S.C. 1326.

Although H.R. 1459 never became law, its proposed modifications to the criminal penalties for illegal reentry served as the basis for its re-enactment under the 1994 VCCLEA. As McCollum himself explained, "Many of the provisions of H.R. 1459 have been incorporated into other bills, including H.R. 2872, the House Republican Crime bill; H.R. 3320, Mr. Bilbray's Immigration Stabilization Act of 1993, Mr. Smith's Illegal Immigration Control Act of 1994;

---

ready to legislate."  Schrag, *A Well-Founded Fear,* 42-44. On McCollum's 1993 summary exclusion bill, see Schrag, *A Well-Founded Fear,* 44, 47-48, 70-71.

    During his press conference, McCollum succumbed to the anti-Muslim sentiment that emerged in the wake of the bombing and used a racial slur to describe an asylum seeker featured in the *Sixty Minutes* interview. He specifically stated, "If you watched the *60 Minutes* thing, you watched that Paki fellow wander off to go get a cab or something. . .This brings us back to the fact that – you'll remember it was a Pakistani who has been accused . . .." Schrag, *A Well-Founded Fear,* 44 (citing News Conference, Introduction of a bill on immigration, *Federal News Service*, March 16, 1993).

[282] 139 Cong. Rec. E749 (March 24, 1993).

and the Senate-passed crime bill."[283]  Sponsored by Senate Judiciary Chair Joe Biden (D-DE), the Senate crime bill to which McCollum referred originally contained no immigration enforcement provisions and instead focused exclusively on the issues of crime control and prevention.[284] Yet, by November 19, 1993, the Senate chose to pass a much tougher crime bill, substituting Biden's bill for H.R. 3355, a House crime bill sponsored by congressmen Jack Brooks (D-TX) and Charles Schumer (D-NY), with substantial amendments.[285] In drafting these amendments, Biden worked primarily with Orrin Hatch (R-UT),[286] the ranking member of the Judiciary Committee, although both acknowledged the many contributions of their colleagues. The amended Senate crime bill (referred to as the Biden-Hatch bill) incorporated new immigration provisions proposed by Senators Simpson, Bob Smith (R-NH),[287] and Robert Dole (R-KS) as well as Rep. McCollum. Indeed, McCollum had helped Hatch and Dole draft their own crime bill, [288] S. 1356, which they introduced on August 3, 1993.[289]  Unlike the original

---

[283] The Smith bill referenced by McCollum was H.R. 3860, introduced by Rep. Lamar Smith (R-TX) on February 10, 1994. Criminal Aliens: Hearing Before the Subcommittee on International Law, Immigration, and Refugees of the Committee on the Judiciary House of Representatives, One Hundred Third Congress, Second Session, H.R. 723, H.R. 1067, H.R. 1279, H.R. 1459, H.R. 1496, H.R. 2041, H.R. 2438, H.R. 2730, H.R. 2993, H.R. 3302, H.R. 3320 (Title IV), H.R. 3860 (Titles II, V, VI), H.R. 2872, and H. Con. Res. 47, February 23, 1994, 157.

[284] S. 1607, A Bill to Control and Prevent Crime, November 1, 1993.

[285] In its original form, H.R. 3355 contained no immigration provisions. H.R. 3355, To amend the Omnibus Crime Control and Safe Streets Act of 1968 to allow grants to increase police presence, to expand and improve cooperative efforts between law enforcement agencies and members of the community to address crime and disorder problems, and otherwise to enhance public safety, October 26, 1993.

[286] 140 Cong. Rec. 30099 (November 18, 1993).

[287] 140 Cong. Rec. 30106 (November 18, 1993),

[288] While speaking in support of S. 1356, Senator Connie Mack (R-FL), thanked Bill McCollum, along with Dole and Hatch, for working on the measure; Mack said, "I am very grateful to all those who have helped formulate this program, especially Congressman Bill McCollum and my colleagues Senator Hatch and Senator Dole and I am confident we can pass this amendment with bipartisan support." 139 Cong. Rec. 27477 (November 4, 1993).

[289] S. 1356, To restore order, deter crime, and make our neighborhoods and communities safer and more secure places in which to live and work, August 4, 1993. On the same day, McCollum introduced his own crime bill, H.R. 2872, To prevent and punish crime, to strengthen the rights of crime victims, to assist

Biden bill (S. 1607), Title III of Dole-Hatch bill, "Criminal Aliens and Alien Smuggling," proposed substantial revisions to the laws regarding deportation, immigrant smuggling, and the Border Patrol.[290] Section 304 of the bill, "Enhancing Penalties for Failing to Depart, or Reentering, After Final Order of Deportation," revised §1326 (b) and added a new section -- §1326 (c), on collateral attacks to underlying deportation orders in terms that were nearly identical to McCollum's H.R. 1459.

On November 19, 1993, the Senate passed the Biden-Hatch bill (S. 1607/H.R. 3355) by a vote of 95 to 4 and sent the measure to the House. It, however, took almost another year for House to debate, further amend, and ultimately pass the measure. During the floor debates, Congress said very little regarding the proposed changes to §1326. Yet, on February 23, 1994, the House Subcommittee on International Law, Immigration, and Refugees held a hearing to review the numerous immigration enforcement bills that had been introduced by Republicans and Democrats to address the so-called criminal alien problem.[291] During the session, the American Bar Association and the American Immigration Lawyers Association, among others, expressed their concerns about H.R. 1459, particularly its summary deportation provisions, expanded definition of aggravated felony, and limits on deportation relief available to long-term permanent residents.[292] Yet, they offered no substantive analysis or commentary on §1326.

In its testimony during the February 23 hearing, the INS also expressed its concerns regarding the new aggravated felony definition and the judicial deportation provisions of

---

State and local efforts against crime, and for other purposes, August 4, 1993. This bill incorporated the modifications to §1326 that he first presented in March 1993 under H.R. 1459.

[290] Hatch explained the differences between his bill and Biden's bill at length. See, 139 Cong. Rec. 27207-212 (November 3, 1993).

[291] In so doing, the Subcommittee acknowledged that debates regarding these measures would continue in the debates regarding the Senate-passed crime bill. Criminal Aliens, February 23, 1994, 2.

[292] Criminal Aliens, February 23, 1994, 199-219.

McCollum's bill. [293] It was also one of the only witnesses that addressed and endorsed the bill's amendments to §1326. Speaking for the INS, Deputy Commissioner Chris Sale observed of the section's increased penalties, "Such an increase in penalties is necessary and helpful and would apply only in cases where the underlying offense was criminal in nature or constituted a security-related ground. These penalties are needed to deter the many aliens who abscond and then continually attempt illegal reentries into the United States." With respect to the new section (c), she wrote, "The amendment would appropriately limit collateral attacks on prior deportation orders to questions of basic due process. It would deter frivolous challenges during criminal prosecutions for illegal reentry into the United States. Deportation and exclusion adjudications provide ample due process protection. Collateral attack in a distant, unrelated criminal proceeding is unnecessary and inefficient."[294]

While he did not discuss Section §1326, Senator Harry Reid also sanctioned the provision insofar as he incorporated it into his own immigration enforcement bill, S. 1351, "To curb criminal activity by aliens, to defend against acts of international terrorism, to protect American workers from unfair labor competition, and to relieve pressure on public services by strengthening border security and stabilizing immigration into the United States." Introduced on September 4, 1993, its proposed amendment of §1326 was more stringent than that of McCollum's bill. Whereas H.R. 1459 subjected to criminal prosecution those who had committed three or more misdemeanors, S. 1351 would include those who had committed "two or more misdemeanors." Reid's version of section (c) simply stated "In any criminal proceeding

---

[293] At the hearing, the INS was represented by Chris Sale, Deputy Commissioner, Immigration and Naturalization Service. She was accompanied by G. H. Kleinknecht, Associate Commissioner for Enforcement, and Paul Virtue, Deputy General Counsel, U.S. Department of Justice. Criminal Aliens, February 23, 1994, 174-183.
[294] Criminal Aliens, February 23, 1994, 178-79.

under this section, no alien may challenge the validity of the deportation order described in subsection (a)(1) or subsection (b)."

In 2006, Reid apologized[295] for introducing S. 1351 and the September 3, 1993 floor speech defending the bill's proposal to revoke birthright citizenship for children born to undocumented immigrants. In the impassioned speech, Reid declared that "no sane country" would confer birthright citizenship to out-of-status parents.[296] Cognizant of the racism underlying his proposal, Reid explained in his 2006 apology:

> . . . I want to relate to the Senate that the biggest mistake I ever made, the largest error I ever made was 15 or 18 years ago …A group of people came and talked to us and convinced us that the thing to do would be to close the borders between Mexico and the United States; in effect, stop people from coming across our borders to the United States. This period of time for which I am so apologetic — to my family, mostly — lasted about a week or two. I introduced legislation. My little wife is 5 feet tall. We have been together for soon to be 50 years. As I said here on the floor a few days ago, her father was born in Russia. He was run out of Russia. His name was Goldfarb, his family. They were Jewish. My wife heard that I had done this. She does not interfere with my legislation. Only when I ask her does she get involved in what I am doing. I didn't ask her about this. She, in effect, said: I can't believe that you have done it. But I had done it.[297]

On August 21, 1994, H.R. 3355 passed in the House and on August 25, 1994, it was approved by the Senate. During the ten months of debate in the House, the bill underwent several changes and by August 21, 1994, section (b) qualified the phrase "three or more misdemeanors" to include "drugs, crimes against the person, or both." In addition, a House conference committee decided to drop section (c) regarding limits on collateral attacks.[298] The latter

---

[295] In 2018, Reid apologized again when former President Trump, in a tweet, cited to Reid's 1993 speech and used it as support for his own efforts to end birthright citizenship. Michael Brice-Saddler, "Harry Reid once said "no sane country" would allow birthright citizenship. He regrets it again," *Washington Post*, October 31, 2018, https://www.washingtonpost.com/politics/2018/10/31/harry-reid-once-said-no-sane-country-would-allow-birthright-citizenship-he-regrets-it-again/, accessed November 21, 2021.
[296] 140 Cong. Rec., S21710 (September 20, 1993).
[297] Jon Ralston, "An immigration push Reid regrets," *Las Vegas Sun,* July 21, 2010, https://m.lasvegassun.com/news/2010/jul/21/immigration-push-reid-regrets/, accessed November 22, 2021.
[298] 140 Cong. Rec. S23481 (August 21, 1994).

alteration as well as many others made with respect to the criminal and immigration provisions of the bill enraged Senate and House Republicans, including McCollum.[299] They charged that the bill was "soft" on crime and that its crime prevention programs functioned as forms of welfare.[300] McCollum himself voted against the bill and immediately began pursuing amendments to the nation's criminal and immigration laws, including 8 U.S.C. §1326.

Upon its signing by President Clinton on September 13, 1994, the VCCLEA became the largest crime bill passed by Congress, a status it retains to this day.[301] It enabled the hiring of 100,000 new police officers, authorized $9.7 billion for prisons, and $6.1 billion for prevention programs. It also addressed the so-called criminal alien problem by allocating $1.2 billion for border control, deportation, asylum reform, and the creation of a criminal alien tracking center. It also established a $1.8 billion fund to reimburse states for the costs surrounding immigrant detention.[302] Even though the law contained provisions that aimed to protect communities through an assault weapons ban and protected women in abusive relationships, the VCCLEA also created the "three strikes" sentencing rules and authorized the application of the death penalty to dozens of federal crimes.[303] It also became a "major driver of mass incarceration" of citizens and immigrants alike.[304] Yet, the unprecedented spending on crime control had little impact on crime rates and an outsized impact on Black and Latino communities that were

---

[299] 140 Cong. Rec. H23570-23604 (August 21, 1994); 140 Cong. Rec. S23655-656; S23677-678; S23685-687 (August 22, 1994).
[300] 140 Cong. Rec. H7200-201 (August 9, 1994).
[301] Lauren-Brooke Eisen, "The 1994 Crime Bill and Beyond: How Federal Funding Shapes the Criminal Justice System," *The Brennan Center for Justice*, https://www.brennancenter.org/our-work/analysis-opinion/1994-crime-bill-and-beyond-how-federal-funding-shapes-criminal-justice, accessed November 21, 2021.
[302] U.S. Dep't of Justice, Violent Crime Control and Law Enforcement Act of 1994: Fact Sheet (1994), https://www.ncjrs.gov/txtfiles/billfs.txt, accessed November 22, 2021.
[303] Eisen, "The 1994 Crime Bill and Beyond."
[304] Eisen, "The 1994 Crime Bill and Beyond."

disproportionately sentenced and imprisoned under the new law.[305] One 2019 study found that while Blacks and Hispanics represented 31% of the U.S. population, they constituted 53% of death row inmates.[306]

Despite the scope and scale of the measure, Clinton continued to face criticism from the right and the left that he was not doing enough to stop undocumented border crossings. On the same day that he signed the VCCLEA, Democratic gubernatorial candidate Kathleen Brown called upon the Clinton administration to implement a border enforcement council operation in California similar to Operation Hold-the-Line. Trailing behind Governor Wilson in the polls, she hoped that the announcement of such a campaign would help improve her election day chances.[307] In response, Clinton launched Operation Gatekeeper on October 1, 1994. Rather than pursue immigrants beyond the international boundary (as had been INS strategy since mid-century), the INS placed hundreds of officers at the line itself as a "visible show of force" to block undocumented entries.[308] The line strategy, in turn, forced migrants to alter their crossing

---

[305] Ed Chung, Lea Hunter, and Betsy Pearl, "The 1994 Crime Bill Continues to Undercut Justice Reform—Here's How to Stop It," *Center for American Progress*, March 26, 2019, https://americanprogress.org/article/1994-crime-bill-continues-undercut-justice-reform-heres-stop/, accessed November 21, 2021 (citing John L. Worrall and Tomislav V. Kovandzic, "COPS Grants and Crime Revisited," *Criminology* 45 (1) (2007): 159–190; National Research Council, *The Growth of Incarceration in the United State: Exploring Causes and Consequences* (Washington: The National Academies Press, 2014)).

[306] Ranya Shannon, "3 Ways the 1994 Crime Bill Continues to Hurt Communities of Color," *Center for American Progress,* May 10, 2019, https://americanprogress.org/article/3-ways-1994-crime-bill-continues-hurt-communities-color/, accessed November 21, 2021.

The harsh legacies of the VCCLEA led Clinton to acknowledge that the law "overshot the mark." Michelle Alexander, "Why Hillary Clinton Doesn't Deserve the Black Vote," *The Nation*, February 10, 2016, https://www.thenation.com/article/archive/hillary-clinton-does-not-deserve-black-peoples-votes/, accessed November 25, 2021. During his presidential campaign, Biden proposed a crime plan that would reverse some of the policies created by the 1994 crime law. German Lopez, "Joe Biden's criminal justice reform plan, explained," *Vox,* August 12, 2020, https://www.vox.com/policy-and-politics/2019/7/23/20706987/joe-biden-criminal-justice-reform-plan-mass-incarceration-war-on-drugs, accessed November 25, 2021.

[307] Nevins, *Operation Gatekeeper*, 92.

[308] Nevins, *Operation Gatekeeper*, 90.

routes; rather than crossing at or near urban ports of entry, they attempted dangerous journeys through the Sonoran Desert. The ensuing increase in migrant deaths transformed the Arizona borderlands, in the words of anthropologist Jason De Léon, into a "killing field."[309]

The political landscape had tilted in McCollum's favor as he began seeking amendments to the VCCLEA. Two months after its passage, the Republican Party had taken control of Congress for the first time in 40 years and supplanted Democrats from the chairs of the Senate and House immigration committees.[310] In the House and the Senate, members of the GOP worked to draft legislation based on the policy proposals authored by Gingrich in his *Contract with America.*[311] While the book said little about border enforcement, Gingrich's Task Force on Immigration Reform issued a June 1995 report that supplied the talking points for Republicans' immigration agenda, particularly with respect to the issue of undocumented immigration.[312] Yet,

---

[309] Jason De Léon, *The Land of Open Graves: Living and Dying on the Migrant* Trail (Berkeley: University of California Press, 2015); Joseph Nevins, *Operation* Gatekeeper, 145; Ana Minian, *Undocumented Lives: The Untold Story of Mexican Migration*, (Cambridge: Harvard University Press, 2018), 231. One humanitarian organization estimated that 3496 migrants had died in the Sonoran Desert between October 1999 and December 2019. Humane Borders/Fronteras Compasivas, "1999-2019 Recorded Migrant Deaths and Human Borders Water Stations," https://humaneborders.org/wp-content/uploads/deathpostercumulative_2019_stewardship_mid_letter.pdf, accessed December 6, 2021.

[310] In the Senate, Senator Alan Simpson (R-WY) replaced Sen. Kennedy as chair; in the House, Rep. Lamar Smith (R-Tex.) supplanted Rep. Romano Mazzoli (D-KY). Both members of FAIR's National Advisory Board, Simpson and Smith "envisioned a fresh round of restrictive immigration reform to limit legal admissions, to make immigrants ineligible for welfare benefits, and to finally curb illegal immigration." Tichenor, *Dividing Lines*, Kindle Loc. 406.

[311] Ed Gillespie and Bob Schellhas, eds., *Contract with America: The Bold Plan by Rep. Newt Gingrich, Rep. Dick Armey and the House Republicans to Change the Nation* (New York: Times Books, 1994).

[312] To remove undocumented immigrants from the United States, the Task Force specifically proposed dramatic increases in detention space, expedited exclusion at the ports of entry, streamlined deportation proceedings, federal reimbursement of state and local government expenses for the costs of immigration detention, and more "resources to prosecute deported felons who illegally re-enter" the country, among many other proposals. To deter unauthorized entry, it called for increased support for immigration law enforcement along the US-Mexico border and legislative changes. Such legislation would include mandatory fines of no less than $50 and no more than $250 for migrants attempting to enter illegally, asset seizures for undocumented migrants caught re-entering the country twice in one year, mandatory prosecution and full sentencing of all undocumented immigrants caught re-entering the United States over two times, and increased penalties for immigrant smuggling. Finally, the Task Force also recommended the denial of public education and public benefits to undocumented immigrants and an end to birthright citizenship to children of undocumented immigrants. Congressional Task Force on Immigration Reform,

McCollum, who now chaired the House Subcommittee on Crime and led the Political Asylum Working Group of the Task Force on Immigration Reform, didn't wait for the issuance of the report to present his new crime and immigration enforcement bills. On January 4, 1995, he introduced H.R. 3, "Taking Back Our Streets Act of 1995" and, on January 25, H.R. 668, the "Criminal Alien Deportation Improvements Act of 1995." While the House Subcommittee on Crime held hearings on H.R. 3, Congress took no further action on the measure. Despite this, the bill served as a Republican rejoinder to the VCCLEA; sponsored by 124 Republicans and 5 Democrats, it took a hardline on punishment and would have repealed all of the VCCLEA subtitles that pertained to crime prevention and community support.[313] Through H.R. 3, McCollum also aimed to further streamline deportation procedures; as part of this effort, the bill reintroduced the language from H.R. 1459 that limited collateral attacks on underlying deportation orders.

A few weeks after introducing H.R. 3, McCollum presented H.R. 668 because the VCCLEA, in his words, "not gone far enough."[314] The new bill replicated nearly all of the immigration provisions of H.R. 3.[315] Yet, unlike H.R. 3, H.R. 668 received strong bipartisan support and passed in the House on February 10, 1995 by a 380-20 margin. After passage in the House, H.R. 668 was incorporated into S. 735, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA).[316] Among other things, H.R. 668 provided additional resources for immigration law enforcement, added new offenses to the definition of an aggravated felony,

*Report to the Speaker, The Honorable Newt Gingrich*, June 29, 1995 (Washington, D.C.: The Task Force, 1995), 3-6, Law Library of Congress, Washington, D.C.

[313] Title IX, Amendments to Violent Crime Control and Law Enforcement Act, H.R. 3.

[314] 141 Cong. Rec. H1586 (February 10, 1995).

[315] H. Rpt. 104-22, Criminal Alien Deportation Improvements Act of 1995, 9.

[316] Charles Doyle, "Terrorism: Comparison of House and Senate Versions of S. 735 of the 104th Congress," March 29, 1996 (Washington, DC: Congressional Research Service, the Library of Congress, 1996).

eliminated long term residency as a defense to a deportation or exclusion order, expanded

expedited deportation to permanent residents convicted of an aggravated felony, and rendered

certain immigrant smuggling crimes RICO offenses, and authorized wiretap authority for

immigrant smuggling investigations. H.R. 668 also added new clauses to §1326 that limited

collateral attacks on deportation orders.

During the few congressional debates on §1326, policymakers made clear that the

amended section, like H.R. 668 as a whole, aimed to streamline the deportation process. As Rep.

Lamar Smith (R-TX) explained, "The deportation process can be years in length. H.R. 668 will

streamline the process by eliminating frivolous challenges to deportation orders . . . This bill

addresses the concerns of the American people by giving the INS and prosecutors the tools they

need to expedite the deportation of criminal aliens."[317] McCollum himself explained that

challenges to the original deportation order could only occur in limited circumstances:

> The penalties for illegal reentering were enhanced by the Violent Crime Control and Law
> Enforcement Act of 1994. This section amends the INA to provide that the alien charged
> with this crime may only challenge the validity of the original deportation order if the
> alien can show that he or she has exhausted all administrative remedies, that the
> deportation order improperly deprived the aliens of the opportunity for judicial review,
> and that the deportation order was fundamentally unfair.[318]

In addition to McCollum's proposed changes to §1326, the House agreed to a last-minute

amendment proposed by Mark Foley (R-FL) and Richard Burr (R-NC). Both first term

congressmen, they quickly established their restrictionist credentials through this proposal as

well as their sponsorship of measures that would have denied birthright citizenship to children of

undocumented immigrants.[319]  Responding to the concerns of border states regarding the

perceived lapses in federal immigration law enforcement, Foley and Burr amended H.R. 668 to

---

[317] 141 Cong. Rec. E325 (February 13, 1995).
[318] H. Rpt. 104-22, Criminal Alien Deportation Improvements Act of 1995, 6, 16.
[319] In 1995, Burr co-sponsored H.R. 1363, the Citizenship Reform Act of 1995.

magnify the civil and criminal penalties for undocumented entry. With respect to §1326, they created a new section (c) that mandated incarceration for individuals who reentered after being deported. Their amendment also authorized the deportation of noncitizens convicted of nonviolent crimes prior to the completion of their sentences and it precluded the early release of noncitizens convicted of violent crimes.[320]  While Foley publicly denied that racism had anything to do with his views on undocumented immigration, one of his constituents thought otherwise. In an op-ed, she objected to Foley's description of undocumented immigrants:

> [Foley] claims that these unwanted illegal immigrants come here "with no intention of learning the language, no willingness to obey our laws and no desire to work hard like many of our ancestors." How is it possible for him to know their intentions? Which group is he referring to? Is he talking about Cuban refugees who choose to continue using Spanish? Or is he talking only about Mexican illegal aliens? Do all legal aliens intend to work hard and learn English? Or are the only immigrants that Rep. Foley approves of those who already speak English? According to the standards Rep. Foley is putting in place, my grandmother – who emigrated from Poland and never learned to read or write English – should not have been allowed to come here.[321]

While a few congressmen raised objections to other provisions of HR 668, none challenged the additions to §1326.[322] Indeed, during the House Judiciary markup of the bill, McCollum reported that the Department of Justice, speaking for the administration, supported

---

[320] The amendment also contained language drafted by Burr that explicitly authorized the Attorney General to deport nonviolent noncitizen offenders prior to the completion of their sentences; this language was not included in the final bill. 141 Cong. Rec. H1595-96 (February 10, 1995).

[321] Bonnie S. Cohen, "Foley shows only bigotry in ideas on immigration," *The Palm Beach Post*, April 22, 1996, A17; U.S. Representative Mark Foley, "Tightening immigration isn't bigotry," *The Palm Beach Post*, May 2, 1996, A19.

[322] During the House Judiciary markup of the bill, Becerra tried in vain to amend the provisions regarding the expedited deportation of legal residents. H. Rpt. 104-22, Criminal Alien Deportation Improvements Act of 1995, 10.

   A few days later, Rep. Jerrold Nadler (D-NY) spoke against the bill's proposed Prisoner Treaty Transfer because it would return asylum seekers to persecution. As he stated, "People should be punished for their crimes, but do we want them to have the death penalty for car theft? That is what this bill would do. A person convicted of trafficking in stolen cars could be deported and could not even have a court hear evidence that he would be persecuted or murdered if deported. Is that really what our constituents want? Send car thieves summarily back to the Nazis? Is that what America stands for?" 141 Cong. Rec. H1594 (February 10, 1995).

the limiting of collateral attacks on deportation orders in reentry prosecutions as stipulated by H.R. 3 and, by extension, H.R. 668.[323] Proposals to add section (b)(3) received further bipartisan support; indeed, the Clinton administration first drafted the amendment as part of its antiterrorism bill. Introduced by Biden in the Senate and Schumer in the House on February 10, 1995, S. 390/H.R. 896 amended section 276(b) so that a noncitizen terrorist excluded under 235(c) who attempted an unauthorized entry would be imprisoned for ten years. Thanks to its provisions regarding the deportation of suspected noncitizen terrorists based on secret information, the Clinton bill generated a tremendous amount of controversy and opposition.[324] Yet, none objected to its proposal to add the new language to §1326. As a further indicator of the bipartisan support for §1326(b)(3), it appeared in measures proposed by Republicans and Democrats, including the following: H.R. 1635 introduced by Richard Gephardt (D-MO) on May 15, 1995; H.R. 1710 and H.R. 2703 introduced by Henry Hyde (R-IL) on May 25, 1995.

By December 5, 1995, the entirety of H.R. 668 was added to H.R. 1710 or the "Comprehensive Antiterrorism Act of 1995."[325] (H.R. 1710, as just noted, also included an iteration of §1326(b)(3).) Sponsored by Rep. Henry Hyde (R-IL), it was one of many bills presented in Congress that sought to strengthen national security, crime control, and border control in response to the April 19, 1995 bombing of the Alfred P. Murrah Federal Building in Oklahoma City. Yet, by December 19, 1995, the House Republican leadership, in Schumer's words, "abruptly yanked" the bill from the floor schedule.[326] In its stead, the House began its

---

[323] H. Rpt. 104-22, "Criminal Alien Deportation Improvements Act of 1995, 18.
[324] Counterterrorism Legislation: Hearing before the Subcommittee on Terrorism, Technology, and Government Information of the Committee on the Judiciary, United States Senate, One Hundred Fourth Congress, First Session on S. 390, A Bill to Improve the Ability of the United States to Respond to the International Terrorist Threat and S. 735, A Bill to Combat Terrorism, May 4, 1995.
[325] 141 Cong. Rec. H13977 (December 5, 1995).
[326] 141 Cong. Rec. E2416 (December 19, 1995).

consideration of H.R. 2703, the Effective Death Penalty and Public Safety Act of 1996. (H.R.

2703 incorporated the additions to §1326 first proposed under H.R. 668 and S. 390/H.R. 896.)

By March 14, 1996, the House tabled H.R. 2703 and passed S. 735, the Antiterrorism and

Effective Death Penalty Act of 1996, after amending it to include the text of H.R. 2703. By mid-

April, S. 735 passed with broad bipartisan support (91-8 in the Senate and 293-133 in the

House).[327] On April 24, 1996, President Clinton signed the measure that became AEDPA.

During the debates regarding H.R. 668, H.R. 1710, H.R. 2703, and S. 735, Congress

made no effort to review and cleanse the racial animus that informed §1326. As with the

VCCLEA of 1994, both Democrats and Republicans strove to win the votes of anti-immigrant

electorate in anticipation of the 1996 elections. In this context, policymakers were reluctant to

raise questions about the immigration laws that could cost them votes on election day. Instead,

members on both sides of the aisle deployed restrictionist arguments. Thus, during the debates on

H.R. 668, Bob Menendez (D-NJ) and Porter Goss (R-FL) expressed their frustration with federal

immigration law enforcement efforts and argued that the bill's streamlined deportation

procedures would ease the burden on the states for noncitizen incarceration.[328] Rep. Gerald

Solomon (R-NY), also during debates regarding H.R. 668, reinforced racist stereotypes of

Mexican immigrants and complained about the numbers of children born to undocumented

immigrants in California, Texas, and Florida.[329]

Even more prominently, H.R. 1710, S. 390, and S. 735 triggered much criticism about

how they perpetuated racist stereotypes of Arabs and Muslims.[330] During a Senate Judiciary

---

[327] https://www.govtrack.us/congress/votes/104-1996/h126, accessed November 29, 2021.
[328] 141 Cong. Rec. H1589-90 (February 10, 1995).
[329] 141 Cong. Rec. H1586 (February 10, 1995).
[330] Counterterrorism Legislation. On the anti-Muslim sentiment that emerged after the 1993 World Trade Center bombing and the 1995 bombing of the federal building in Oklahoma City, see Lee, *America for Americans*, Kindle Loc. 303.

Committee hearing on S. 390 and S. 735, Khalil E. Jahshan of the National Association of Arab

Americans (NAAA) reminded the members that many Americans wrongly assumed that Arabs

and Muslims were to blame for the Oklahoma City bombing. "By reinforcing stereotypes and

implying collective guilt," Jahshan continued, "the rumors induced a backlash against the Arab

and Muslim communities and caused considerable anguish and pain for many Americans of

Arab descent, particularly to our children."[331] Jahshan and other advocates further argued that

H.R. 1710 and S. 390 did nothing to unseat these racist views; as Mary Moura Ramada of the

American-Arab Anti-Discrimination Committee (AAADC) wrote:

> In section after section of the proposed legislation, we hear echoes from dark moments in
> this nation's struggle for national civil and political rights. Those grievous periods are
> remembered most painfully by members of many once-persecuted groups or ethnic
> minorities, including Chinese-Americans in the late 1800's, Japanese Americans interned
> during the Second World War, and victims of McCarthyism in the 1950's.[332]

Jahshan and Moura Ramada went on to offer detailed critiques of the bills, highlighting how they

would prevent the Arab American community from fully enjoying their constitutionally

protected freedoms pertaining to speech, association, and privacy, among others. Both

organizations also opposed the creation of a special immigration court that would have the

authority to deport individuals on the basis of secret evidence as well as illegally collected

evidence.[333] On the latter issue, Moura Ramada cautioned, in the same way that a spurned lover

served as the source of the government's secret evidence in the famous case of Ellen Knauff,

---

[331] Counterterrorism Legislation, 56. At least 13 national Jewish organizations and 177 local Jewish
agencies joined the NAAA in its expression of concern about the two bills.

[332] Counterterrorism Legislation, 97.

[333] Counterterrorism Legislation, 56-57, 101-103. On June 13, 1995, the NAAA, AAADC, and the
American Muslim Council testified before the House Judiciary Committee on the racial discriminatory
impacts of H.R. 1710. International Terrorism: Threats and Responses, Hearings Before the Committee
on the Judiciary, House of Representatives, One Hundred Fourth Congress, First Session on H.R. 1710,
Comprehensive Antiterrorism Act of 1995, April 6, June 12 and 13, 1995, 420-427, 440-445, 496-502.

""informants" with their own self-serving political agenda will rush at the opportunity to play a role in ex parte proceedings" against members of the Arab American community.[334]

Three years later McCollum expressed his regrets about the punitive turn in the nation's immigration laws. Speaking about the Illegal Immigration Reform and Immigrant Responsibility Act, he stated, "The 1996 law went too far. We are a just and fair nation and must strike a just and fair balance in our immigration laws." On October 1, 1999, he introduced H.R. 2999, "The Fairness for Permanent Residents Act of 1999," a measure that would enable permanent residents convicted of minor crimes to receive a waiver of deportation. It also would provide relief for permanent residents indefinitely detained and awaiting deportation for crimes committed in the past.[335] He explained that his measure would "'right' a wrong that was created by the 1996 changes to the immigration law." [336] To illustrate the harsh impacts of the 1996 law, McCollum recounted the story of Bob, a permanent resident unjustly deported to Scotland with his family due to a crime he had committee thirteen years prior. Yet, during his presentation, McCollum neglected to mention that he himself had authored the provisions of the law that resulted in Bob's misfortune.[337]

Despite McCollum's effort to soften his aggressive approach to immigration law enforcement, he did not go far enough. He was careful to stress that H.R. 2999 did not apply to foreigners but only permanent residents. He also retracted nothing with respect to his revisions of

---

[334] Counterterrorism Legislation, 102. In an exclusion case, Ellen Knauff was detained on Ellis Island for two and a half years based on classified evidence. *United States ex. rel. Knauff v. Shaughnessy*, 388 U.S. 537 (1950).

[335] H.R. 2999, To permit the Attorney General to grant relief to certain permanent resident aliens of good moral character who are adversely affected by changes made in 1996 to the definition of aggravated felony under the Immigration and Nationality Act, and to amend certain provisions of such Act relating to detention of an alien pending and after a decision on whether the alien is to be removed from the United States.

[336] 145 Cong. Rec. 23794 (October 4, 1999)

[337] 145 Cong. Rec. 23794 (October 4, 1999)

§1326 under the VCCLEA and AEDPA. Perhaps most tellingly, McCollum had sought relief from the 1996 law for two permanent residents from Global North countries.[338] He made no mention of permanent residents from the Global South who might benefit from H.R. 2999. Most importantly, he made no moves to expunge the racism from the 1996 law by acknowledging the various forms of racial animus that inspired its creation.

Part IV: The Illegal Immigration Reform and Immigrant Responsibility Act of 1996

*Historical Background and Legislative History*

FAIR was "elated" by the GOP victory in 1994. It began promoting its immigration agenda in Congress more aggressively than it had before, as Dan Stein explained, "We expected to see the tightening up of the whole deportation process, eliminating needless appeals, presumption in favor of detention, curtailing of asylum, and summary exclusion at the border."[339] To this end, it greatly benefited from the contributions of Cordelia A. Strom, Esq. who was a favorite of Tanton's and had once worked for Dan Stein as a staff attorney at the Immigration Reform Law Institute, the nonprofit litigation arm of FAIR.[340] She later served as one of two senior immigration experts on Senator Simpson's staff. By 1995, Rep. Lamar Smith (R-TX) hired her to be the chief counsel to the House immigration subcommittee, which he chaired from

---

[338] In addition to seeking relief for Bob and his family, McCollum tried in vain to obtain a private relief bill for Robert A. Broley, the son of the Republican Party treasurer in Orange County, Florida. Convicted on felony and fraud charges in 1993, Broley was deported to Canada in December 1998. Richard H. P. Sia, "Deportation Law Now Alien to McCollum," *National Journal*, October 30, 1999, 3141; 145 Cong. Rec. E62 (January 6, 1999) (Relief for Robert Anthony Broley).

[339] Schrag, *A Well-Founded Fear*, 56 (citing Marcus Stern, "U.S. Poised to Reform Immigration," *The San Diego Union Tribune*, November 10, 1994).

[340] As one indicator of her elite status within FAIR and her own views on white supremacy, she regularly participated in the organization's WITAN retreats. Journalist Deepa Fernandes describes the retreats as follows: "After the exposure of the WITAN memos, even the most conservative Republicans tied to Tanton anti-immigration groups could not deny the organization's racist intent. Thus, those like Strom, who chose to continue participating in WITAN retreats, appear unequivocal in their support of these groups' racist ideals." Fernandes, *Targeted,* 217.

1994 to 2000.[341] With her positive working relationships with the House and Senate immigration chairs (both of whom had longstanding relationships with FAIR and currently serve on its National Board of Advisors[342]), Strom could greatly influence the legislation that emerged from both committees.[343] Indeed, policymakers credited Strom with "ghostwriting" the bill that became the 1996 Illegal Immigration Reform and Immigration Responsibility Act; former INS commissioner, Doris Meissner was more emphatic about Strom's role and declared "she [Strom] directly wrote it."[344] More broadly, Strom's work led some observers to conclude that "Lamar Smith, in effect, turned the congressional immigration subcommittee over to FAIR."[345]

While Strom may have written H.R. 2202 (the bill that became IIRIRA), Smith served as its principal sponsor and introduced the bill on August 4, 1995. In so doing, he aimed to correct what he perceived to be the missteps of the Immigration and Nationality Act of 1965; it, in Smith's words rendered "immigration as a form of 'civil right' that is owed to an unspecified portion of the world's population without regard to objective criteria of selection based in the national interest."[346] The increases in both legal and undocumented entry that followed the passage of the Act, moreover, supposedly created numerous economic, social, and cultural crises. As a result, Smith concluded "there exists an inchoate sense among the American people that our culture is changed by immigration and that the pace of and direction of that change

---

[341] Jake Bernstein, "Lamar's Alien Agenda: Why is Mr. Smith Still in Washington?" *Texas Observer*, October 25, 2002, https://www.texasobserver.org/1120-lamars-alien-agenda-why-is-mr-smith-still-in-washington/, accessed December 1, 2021; Schrag, *A Well-Founded Fear,* 59. See also, Fernandes, *Targeted* (citing interview with Doris Meissner, August 25, 2005), 216.
[342] https://www.fairus.org/about-fair/board-directors, accessed December 1, 2021.
[343] Schrag, *A Well-Founded Fear*, 59.
[344] Fernandes, *Targeted* (citing interview with Doris Meissner, August 25, 2005), 216, 218.
[345] Fernandes, *Targeted* (citing interview with Ira Kurzban, Esq., November 2005), 217.
[346] Rep. Lamar Smith and Edward R. Grant, "Immigration Reform: Seeking the Right Reasons," *St. Mary's Law Journal*, vol. 28, n. 4 (1997): 888.

ought to be debated more openly."[347] Through H.R. 2202, Smith not only provoked this debate but also sought to alter the "pace and direction" of migration to the United States.

Unlike recent immigration measures, Smith's bill addressed both legal and undocumented immigration.[348] With respect to the former, it reduced legal immigration by eliminating family reunification visas for siblings and adult children, capped humanitarian admissions at 70,000, and limited access to public benefits. With respect to the latter, it strengthened border and worksite enforcement, limited the adjudication of asylum claims, expanded the definition of an aggravated felony, and expedited the deportation of criminal aliens. On March 19, 1996, the House agreed by voice vote to an amendment authored by Smith, which added a fourth paragraph to §1326(b). It added a penalty of up to 10 years imprisonment for individuals convicted of nonviolent offense who had been removed while on parole, supervised release, or probation, who then reenter.[349]

While the change to §1326 stirred no debate in Congress, the bill was repeatedly characterized as mean-spirited and racist. During floor debates, Jerrold Nadler (D-NY) criticized H.R. 2202,

> Let there be no mistake; This Nation has every right and obligation to control our borders and to enforce our immigration laws. But absurd boondoggles, like building a giant fence, mindless cruelty, like sending legitimate refugees back to be murdered or tortured by their oppressors, and good old-fashioned Xenophobia, have nothing to do with legitimate protection of our borders.[350]

---

[347] Smith and Grant, "Immigration Reform," 905.
[348] In this regard, Smith's bill echoed recommendations made by Stein before the Task Force on Illegal Immigration to restrict both legal and undocumented immigration. Testimony of Dan Stein, Executive Director of the Federation for American Immigration Reform before the Task Force on Illegal Immigration of the House Republican Research Committee, August 30, 1993, box 158, folder 14, Federation for American Immigration Reform, Special Collections MS2195, George Washington University.
[349] 142 Cong. Rec. H2441 (March 19, 1996).
[350] 142 Cong. Rec. H2390 (March 19, 1996).

As the debates continued, some members similarly attacked the immigration enforcement provisions of the bill. Becerra opposed an amendment that authorized state and local law enforcement officials to undertake the work of federal immigration law enforcement and warned that it might lead to racial profiling. As support for his argument, he referred to a report by the Commission on Civil Rights that found that local law enforcement officials had a history of "detain[ing] people because of their foreign-looking appearance or because of their racial or ethnic appearance."[351]  Taking a broader perspective on the questions raised by Becerra, Rep. Sheila Jackson Lee (D-TX) asked why local law enforcement needed to be engaged in immigration law enforcement when the Justice Department, FBI, and local law enforcement agencies "indicate[d] that over the last couple of years crime has gone down."[352]

Becerra and others further questioned the disparate treatment of undocumented border crossers and visa overstays. Thus, in debates with Rep. Tate (R-WA) over his "one-strike" proposal – an amendment that would forever bar undocumented immigrants from future legal admission to the United States, Becerra pointed out that least 50% of all undocumented persons in the United States were visa overstays. He, then, questioned why Tate's proposal "would do nothing to those individuals who have come into the country under legal means, yet overstayed and are now undocumented."[353] Becerra further argued that Tate's measure singled out Mexican migrants:

> Here again we seem to see an amendment that attacks the issue with a very small perspective, with blinders, and says only to those who have crossed a border, and certainly the focus is on the southern border, and certainly it is in regard to people who look like they come from across the southern border, and it says to those individuals, "Forever more you will be denied access to this country."[354]

---

[351] 142 Cong. Rec. H2478 (March 20, 1996).
[352] 142 Cong. Rec. H2478 (March 20, 1996).
[353] 142 Cong. Rec. H2458 (March 19, 1996).
[354] 142 Cong. Rec. H2458 (March 19, 1996). See also 142 Cong. Rec. H2487 (March 19, 1996).

Becerra conceded that undocumented border crossing merited punishment but that the Tate amendment meted out an excessive penalty for such an infraction. As Rep. John Bryant (D-TX), emphatically added, "There is no point in putting these folks in the same category that you put an international terrorist."[355]

Ultimately, Becerra, Bryant, and Jackson Lee voted against H.R. 2202. Yet, they were in the minority as 79% of the House voted to pass the bill on March 21, 1996.[356] Republicans and Democrats who initially opposed the bill because it reduced legal immigration supported it once those legal immigration provisions had been struck from the measure. As in earlier congresses, pro-immigration policymakers recognized that they had little "leverage"[357] against the Republican bill.[358] Thus, by splitting the bill, they hoped to "limit the damage" by blocking restrictions on legal immigration and some of the restrictions on asylum.[359] Yet, even though Becerra, Bryant, and Jackson Lee drew attention to the racial animus underlying the immigration enforcement provisions of the bill, the "criminal alien provisions," as immigration journalist Dara Lind observes, "were too popular to stop—not only among Republicans, but among congressional Democrats and the Clinton White House."[360] Moreover, the pressure to appear

---

[355] 142 Cong. Rec. H2459 (March 29, 1995).

[356] https://www.govtrack.us/congress/votes/104-1996/h89, accessed December 1, 2021.

[357] Dara Lind, "The disastrous, forgotten 1996 law that created today's immigration problem," *Vox*, April 28, 2016 (citing Charles Kamasaki of the National Council of La Raza), https://www.vox.com/2016/4/28/11515132/iirira-clinton-immigration, accessed December 2, 2021.

[358] Indeed, prior to the issuance of the final conference report on September 25, 1996, Republicans made sweeping changes to the bill, in Becerra's words, "in the back room in the dead of night." Becerra further asserted, "procedurally it is disappointing to see, in the greatest democracy in the world, that the Republicans, the majority in this Congress, saw fit not to allow anyone to participate in the structuring of this final version of the bill unless one happened to be Republican." 142 Cong. Rec. 11076 (September 25, 1996). Bernstein explains, "Many of the harsh revisions in the law occurred behind closed doors during conference committee meetings to reconcile the House and Senate versions of the legislation. Immigration advocates say that Democrats in Congress didn't get to see the sweeping changes until four days before they were supposed to vote on it." Bernstein, "Lamar's Alien Agenda."

[359] Lind, "The disastrous, forgotten 1996 law," (citing Charles Kamasaki of the National Council of La Raza).

[360] Lind, The disastrous, forgotten 1996 law."

tough on undocumented immigration was particularly acute given that 1996 was an election year. As a result, the bill also passed in the Senate and was signed by Clinton in late September.[361]

The final version of IIRIRA enhanced immigration law enforcement at the borders, established a consolidated removal process that applied to immigrant arrivals and noncitizens in the United States, expanded the offenses (including the definition of "aggravated felony") that led to removal, severely limited avenues of relief from removal, instituted expedited removals for undocumented migrants and asylum seekers apprehended at the border, created a one-year filing deadline for affirmative asylum applications, expanded mandatory detention to a broader range of noncitizens as well as asylum seekers, increased the penalties for immigration-related crimes, and rendered a new set of immigration offenses crimes. IIRIRA also made it more difficult for previously deported individuals to adjust their status, engaged state and local law enforcement agencies in the work of federal law enforcement under 287(g), and limited immigrant access to public benefits.

IIRIRA, as Smith himself wrote, was "the toughest legislation against illegal immigration enacted in our lifetimes."[362] Yet, by 1999, many, including Smith himself, argued that the law had gone too far. In November, he, along with 28 members of Congress, penned a letter to the Attorney General and INS urging the use of prosecutorial discretion in the case of legal permanent residents with citizen children.[363] Earlier that year, organizations such as the National Immigration Forum, the American Immigration Lawyers' Association, and the ACLU initiated

---

[361] Tichenor, *Dividing Lines,* Kindle Loc. 415.
[362] Smith and Grant, "Immigration Reform," 913.
[363] Patrisia Macías-Rojas, "Immigration and the War on Crime: Law and Order Politics and the Illegal Immigration Reform and Immigrant Responsibility Act of 1996," *Journal on Migration and Human Security,* vol. 6, n. 1 (2018), 15 (citing Lamar Smith, "Guideline for Use of Prosecutorial Discretion in Removal Proceedings," Letter to Janet Reno, Attorney General and INS Commissioner Doris Meissner, *Interpreter Releases* 76: 1730).

the "Fix '96" campaign to amend a broader swath of IIRIRA's provisions, including mandatory detention, expedited removal, and retroactive deportation, among others. While Smith opposed changes to the law itself, Democrats and Republicans proposed five bills, including McCollum's H.R. 2999, that would amend the 1996 law.[364]

Since 1999, immigration advocates, legal experts, investigative journalists, and scholars have continued to challenge the legacies of IIRIRA. Their investigations have found that the law failed to achieve its principal goal of reducing undocumented immigration. Indeed, as Lind reports, IIRIRA itself facilitated the growth of the undocumented population from 5 million in 1997 to 12 million in 2006; its aggressive border enforcement provisions led many to settle in the United States while its barriers to legalization prevented them from adjusting their status.[365] Nevertheless, the federal government continues to expend vast resources in the detention, deportation, and prosecution of undocumented immigrants. Since IIRIRA, the detention system has expanded from 9000 beds to more than 38,000.[366] Deportation, according to Lind, "went from a rare phenomenon to a relatively common one."[367] And, between 1996 and 2013, immigration prosecutions, primarily under §1325 and §1326, increased by a factor of ten.[368] As a result of IIRIRA and Operation Streamline, immigration prosecutions "monopolized the

---

[364] Eric Lipton (New York Times), "Tough deportation laws questioned," *Pittsburgh Post-Gazette,* December 22, 1999, A19.

[365] Lind, "The disastrous, forgotten 1996 law" (citing to studies conducted by Douglas Massey and Karen Pren of Princeton University).

[366] Donald Kerwin, "From IIRIRA to Trump: Connecting the Dots to the Current US Immigration Policy Crisis," *Journal of Migration and Human* Security, vol. 6, n. 3 (2018): 197.

[367] Lind, "The disastrous, forgotten 1996 law."

[368] Kerwin, "From IIRIRA to Trump," 198 (citing TRAC (Transactional Records Access Clearinghouse), "Criminal Immigration Prosecutions Down 14% in FY 2017," http://trac.syr.edu/tracreports/crim/494/).

resources of magistrate courts, federal prosecutors, and public defenders . . . with the predictable effect of limiting prosecutions for more serious offenses."[369]

Even more fundamentally, numerous social scientific studies have undermined the assumptions that drove the passage of IIRIRA, AEDPA, the VCCLEA, and the ADAA, among others. For decades, social scientists have found no evidence to support the claim that immigrants are more likely to commit crime than the native born.[370] In a widely cited 2007 study, Rubén Rumbaut and Walter A. Ewing find that "contemporary and historical data, including investigations carried out by major government commissions over the past century, have shown repeatedly and systematically that immigration is actually associated with *lower* crime rates."[371] When it comes to incarceration rates, in 2019, Alex Nowrasteh of the Cato Institute wrote, "All immigrants have a lower incarceration rate and there are lower crime rates in the neighborhoods where they live, according to the near-unanimous findings of the peer-reviewed evidence."[372] Since forty-nine states do not compile immigration status data on convicted and incarcerated persons, it has been difficult for experts to draw conclusions about

---

[369] Kerwin, "From IIRIRA to Trump," 198 (citing Joanna Lydgate, "Assembly-Line Justice: A Review of Operation Streamline," January, The Chief Justice Earl Warrant Institute on Race, Ethnicity and Diversity, University of California, Berkeley Law School, https://www.law.berkeley.edu/files/Operation_Streamline_Policy_Brief.pdf).

[370] See, for example, Anna Flagg, "Is There a Connection Between Undocumented Immigrants and Crime?" *The Marshall Project,* May 13, 2019, https://www.themarshallproject.org/2019/05/13/is-there-a-connection-between-undocumented-immigrants-and-crime, accessed December 5, 2021; Alex Nowrasteh, "Illegal Immigrants and Crime – Assessing the Evidence," *Cato* Institute, March 4, 2019, https://www.cato.org/blog/illegal-immigrants-crime-assessing-evidence, accessed December 5, 2019; Robert J. Sampson, "Open Doors Don't Invite Criminals," *New York Times*, March 11, 2006, A15; Matthew T. Lee, Ramiro Martinez, Richard Rosenfeld, "Does Immigration Increase Homicide? Negative Evidence from Three Border Cities," *The Sociological Quarterly,* vol. 42, n. 4 (2001): 559-580; Kristen F. Butcher and Anne Morrison Piehl, "Recent Immigrants: Unexpected Implications for Crime and Incarceration," *ILR Review*, vol. 51, n. 4 (July 1998): 654-679.

[371] Rubén Rumbaut and Walter A. Ewing, "The Myth of Immigrant Criminality," *Social Science Research Council,* May 23, 2007, https://items.ssrc.org/border-battles/the-myth-of-immigrant-criminality/, accessed December 5, 2021. See also, Nowrasteh, "Illegal immigrants and Crime."

[372] Nowrasteh, "Illegal immigrants and Crime."

the relationships between undocumented immigrants and crime. But, in a 2017 study, Nowrasteh and Michelangelo Landgrave estimated that undocumented immigrant incarceration rates were approximately half those of native-born Americans.[373] Multiple studies have also examined the conviction and incarceration data from Texas, the only state to record the immigration status of its inmates.[374]  These have repeatedly found that undocumented immigrants have "substantially lower rates of crime compared to both native US citizens and legal immigrants."[375] The authors of the most recent Texas study further conclude, "these findings clearly run counter to some of the basic assumptions behind strict immigration enforcement strategies."[376]

Conclusion

      Even though Helena Torrez, the President of the Hispanic Chamber of Commerce in Merced, California wanted the federal government to assist states and localities with the issues related to legal and undocumented immigration, she was troubled by the tone of the congressmen who had solicited her testimony on this subject. As she explained to Chairman Gary Condit (D-CA), who led the 1993 and 1994 hearings on federal immigration policy,

      I would like to ask that, if you take one thing back with you, please take back the fact that referring to an immigrant as a criminal or an alien or any other referral to a resident

---

[373] Michelangelo Landgrave and Alex Nowrasteh, "Criminal Immigrants in 2017: Their Numbers, Demographics, and Countries of Origins," March 4, 2019, https://www.cato.org/publications/immigration-resgearch-policy-brief/criminal-immigrants-2017-their-numbers-demographics, accessed December5, 2021; Flagg, "Is There a Connection Between Undocumented Immigrants and Crime?"

[374] Alex Nowrasteh, "Criminal Immigrants in Texas: Illegal Immigrant Conviction and Arrest Rates for Homicide, Sex Crimes, Larceny, and Other Crimes," *Cato Institute*, February 26, 2018, https://www.cato.org/publications/immigration-research-policy-brief/criminal-immigrants-texas-illegal-immigrant, accessed December 5, 2021.

[375] Michael T. Light, Jingying He, and Jason P. Robey, "Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas, *Proceedings of the National Academy of Sciences of the United States of America,* vol. 117, n. 51 (December 22, 2020), https://www.pnas.org/content/117/51/32340, accessed December 5, 2021.

[376] Light, He, and Robey, "Comparing crime rates between undocumented immigrants, legal immigrants, and native-born US citizens in Texas."

coming from another country is disturbing. That word, I don't know where it came from; I am sure I could research back. But it is very disturbing. And, if anything, please cross it out of your policies, procedures, whatever may be occurring.[377]

Torrez understood that references to immigrants as "alien," "criminal," or "criminal aliens" were derogatory, insulting, and racist. Her comments underscored the fact that such terms were by no means objective or merely legal terms of art. Instead, she recognized that they had a history. As this affidavit has shown, the very notion of the "criminal alien" emerged in response to some of the most virulent strains of racism in the twentieth century. One cannot separate the history of this term, the history of the criminalization of undocumented immigration, and the history of 8 U.S.C. §1326 from the histories of racism and xenophobia in the United States. From 1929 to 1996, several varieties racial animus, particularly anti-Hispanic and anti-Black racism, informed the development of §1326 and the nation's immigration laws.

In the early twentieth century, anti-Mexican animus informed the passage of the 1929 Undesirable Aliens Act and its 1952 revision. Racist conceptions of Mexican immigrants as exploitable and deportable farm workers led to the passage of laws that facilitated the labor management needs of southwestern agribusiness. In times of prosperity, agricultural labor programs, such as the Bracero Program, welcomed Mexicans to the United States; in moments of economic crisis, however, laws such as the Undesirable Aliens Act and Sections 275 and 276 of Public Law 414 could be used to deter prospective arrivals. In short, the 1929 and 1952 criminal penalties for undocumented re-entry reinforced the precarious status of Mexican workers in the US and reflected the racist notion that Mexican migrants were unfit for citizenship.

The subsequent amendments to 8 U.S.C. §1326 failed to extinguish the racial animus of the 1929 and 1952 laws. Instead, they reproduced the anti-Mexican sentiments that first inspired

---

[377] The Impact of Federal Immigration Policy and INS Activities on Communities, 134.

the criminalization of undocumented immigration. In the early 1990s, anti-Mexican animus clearly informed McCollum's immigration policy agenda as he repeatedly lobbied for measures that would deny undocumented Mexican migrants a pathway to legal status and US citizenship, penalize Mexican nationals for unauthorized entry and re-entry, limit the access of ethnic Mexicans to Spanish-language resources in schools and at the ballot box, and strip Mexican Americans of birthright citizenship as guaranteed by the Constitution.

McCollum not only bolstered the racial animus underlying the 1929 and 1952 laws, he, along with Chiles and Graham, drew upon other varieties of racial animus in drafting the 1988, 1990, 1994, and 1996 iterations of §1326. The legislative history reveals that anti-Black racism led Chiles, Graham, and McCollum to use the immigration laws to prevent Mariel Cuban and Haitian refugees from becoming members of their South Florida communities. The three lawmakers drew upon racist stereotypes to characterize these refugees as lawbreakers, criminals, and public health threats and, in turn, rationalize their exclusion and expulsion from the polity. On other occasions, they relied upon the race-neutral vocabulary of population control, English-only campaigns, and the War on Drugs to make the same point—that Cubans and Haitians were not welcome in Florida. They also collaborated with or received the endorsement of FAIR, a hate group that articulated virulently anti-Latin American sentiments and argued that the nation's very existence hinged on the exclusion of Haitian and other Global South refugees.

Over the course of two decades, Chiles, Graham, and McCollum worked to transform US immigration and asylum law to deter the arrival of Black refugees on Florida's shores. Each attempted to retrench the few humanitarian protections available to refugees and asylum seekers under US immigration law; Chiles, for instance, tried to expand INS enforcement capacities, reduce refugee admissions, and check detained asylum seekers' right to habeas corpus. In an

even more aggressive attack on asylum, McCollum proposed legislation that would activate the military during so-called immigration emergencies, authorize indefinite detention, deny TPS protections, render HIV a justification for exclusion, and create a summary exclusion procedure for suspect asylum claims and a thirty-day deadline for the filing of affirmative asylum applications.

The Florida congressmen routinely characterized the Mariel Cubans and Haitians as undocumented immigrants and criminals rather than asylum seekers. As such, each recognized the importance of the criminal penalties against undocumented entry and re-entry as additional deterrents to the arrival of these refugees. At the same time, racial stereotypes of the Haitian refugees as drug traffickers led Chiles and Graham to enhance the deterrent effect of these laws by increasing the criminal penalties for undocumented re-entrants with previous felony and aggravated felony convictions. In the process, Chiles and Graham played a key role in transforming the immigration statute so that its provisions might be deployed in crime campaigns such as the War on Drugs. Building on the work of Chiles and Graham, McCollum further increased the penalties for undocumented re-entry for those migrants with felony and aggravated felony convictions.

By the early 1990s, the nativist campaign to criminalize undocumented immigration achieved one of its greatest victories in the passage of IIRIRA. Drafted by a former FAIR staffer and sponsored by Rep. Lamar Smith, a member of FAIR's National Board of Advisors, it aimed to cure what Smith referred to as the "excesses of multiculturalism."[378] It would do so by curtailing undesirable immigration to the United States and expanding the civil and criminal penalties for undocumented entry and re-entry, particularly vis-à-vis Mexican nationals. During

---

[378] Smith and Grant, "Immigration Reform," 906.

floor debates, the bill was regularly criticized as racist and cruel. To this day, journalists, legal experts, and scholars continue to compile data and publish much research on the racially discriminatory impacts of the law's enforcement provisions. Meanwhile, cognizant of the racial animus underlying §1325 and §1326, lawmakers, in 2019 and 2021, authored bills that would repeal these provisions of the immigration code.[379]

The historical record reveals that the racial animus informing the 1929 law and its subsequent re-enactments was not limited to the laws' sponsors. The passage of the reenactments rested upon the complicity of both liberal and conservative lawmakers who co-opted racist and restrictionist talking points to improve their election day chances. At other times, pro-immigration lawmakers conceded that structural factors—such as the power wielded by Senate Judiciary Chair McCarran and House Speaker Gingrich or Republican majorities in the 1994 House and Senate—led them to compromise their own values and vote for patently racist measures. In other words, these factors – the ballot box and the congressional balance of power – frequently led lawmakers to conclude that any attempt to examine and cleanse the racial animus from the nation's immigration laws would be futile and even antithetical to their own survival in Congress.

The legislative history of the Undesirable Aliens Act reveals that various forms of racial animus motivated the creation of the original act and its subsequent revisions. These revisions, moreover, not only failed to acknowledge and expunge the racial animus of the 1929 Act, they also propagated it. In sum, the racial animus that has infected the Undesirable Aliens Act and its revisions is profound.

---

[379] H.R. 5383, A New Way Forward Act (December 10, 2019); H.R. 536, A New Way Forward Act (January 28, 2021).