**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **vs.** | ) | **Case No. 21 CR 665** |
| | ) | |
| **ALFREDO VIVEROS-CHAVEZ** | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

MATTHEW F. KENNELLY, District Judge:

A federal statute, 8 U.S.C. § 1326, criminalizes the unlawful reentry of noncitizens who lack legal status. Defendant Alfredo Viveros-Chaves has filed a motion to dismiss the indictment in this case, which charges him with violating section 1326. He argues that this statute violates the Fifth Amendment's equal protection guarantee because it was enacted with discriminatory intent and disparately impacts Mexican and Latino individuals. The Court agrees with Viveros-Chavez that the statute is subject to traditional equal protection scrutiny but denies his motion to dismiss for the reasons set forth below.

### Background

Viveros-Chavez, a citizen of Mexico and not of the United States, has been removed from the United States twice in the past: once in March 2010, and again in September 2012. Nearly seven years later, in May 2019, he was convicted in Cook County for felony aggravated robbery. At the time of that conviction, Viveros-Chavez did not have citizenship or lawful immigration status in the United States.

On November 17, 2021, a grand jury returned an indictment against Viveros-

Chavez charging him with unlawful reentry in violation of section 1326.  In short, this statute makes it a crime for a noncitizen to reenter or to be found in the United States after one "has been denied admission, excluded, deported or removed" without obtaining advance consent from the appropriate U.S. government official.  8 U.S.C. § 1326(a).

On February 18, 2022, Viveros-Chavez filed a motion to dismiss the indictment. He argues that his constitutional challenge to section 1326 is subject to traditional equal protection review and that the statute runs afoul of the Fifth Amendment's equal protection component because it was passed with discriminatory intent.  His challenge follows in the wake of dozens of similar challenges around the country, including at least three in this district.[1]  Every court to decide this issue has rejected the constitutional challenge, except for one court in the District of Nevada.  *See United States v. Carrillo-Lopez*, 555 F. Supp. 3d 996 (D. Nev. 2021).

**Discussion**

**A.    Standard of review**

The Supreme Court has construed the Fifth Amendment's Due Process Clause to provide analogous protection as the Fourteenth Amendment's Equal Protection Clause.  *See Bolling v. Sharpe*, 347 U.S. 497, 499 (1954).  Accordingly, constitutional challenges to federal laws that discriminate on the basis of race are subject to strict scrutiny.  When this kind of challenge is based on a law that is facially neutral, the law

---

[1] *See United States v. Calvillo-Diaz*, No. 21 CR 445, 2022 WL 1607525 (N.D. Ill. May 20, 2022); *United States v. Porras*, No. 21 CR 158, 2022 WL 1444311 (N.D. Ill. May 6, 2022).  Judge Feinerman has not yet issued an opinion on this issue in *United States v. Leonides-Seguira*, No. 21 CR 390 (N.D. Ill.).

may be struck down only "if it can be proved that the law was motivated by a racial purpose or object, or if it is unexplainable on grounds other than race." *Hunt v. Cromartie*, 526 U.S. 541, 546 (1999) (cleaned up). This discriminatory intent inquiry was first formulated by the Supreme Court in *Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977).

Viveros-Chavez argues that the *Arlington Heights* framework should govern his challenge to section 1326 because he is asserting that Congress passed the law with discriminatory intent. The government disagrees. It contends that rational basis review should apply because section 1326 concerns immigration.

The Supreme Court has explained that federal immigration laws are afforded "special judicial deference," meaning judicial review is "narrow" and "limited." *Fiallo v. Bell*, 430 U.S. 787, 792–93 (1977). The government points to a handful of cases where the Seventh Circuit has applied rational basis review to constitutional challenges of laws that concern immigration. *See, e.g.*, *Lopez-Ramos v. Barr*, 942 F.3d 376 (7th Cir. 2019) (statutory scheme conferring citizenship to some children born abroad); *Klementanovsky v. Gonzales*, 501 F.3d 788 (7th Cir. 2007) (statute providing for removal waiver depending on whether noncitizen has left country); *United States v. Montenegro*, 231 F.3d 389, 395 (7th Cir. 2000) (statute criminalizing hostage taking in connection with international terrorism); *City of Chicago v. Shalala*, 189 F.3d 598 (7th Cir. 1999) (statute disqualifying noncitizens from various welfare programs). Because section 1326 touches on immigration, the government contends rational basis review likewise should govern Viveros-Chavez's challenge to section 1326.

The Court disagrees with the government. At its essence, Viveros-Chavez's

3

challenge is based on a claimed racial classification. Specifically, he contends that the Congress that passed section 1326 intended to discriminate against Latinos and Mexicans. As the Supreme Court explained in *Bolling*, "[c]lassifications based solely upon race must be scrutinized with particular care, since they are contrary to our traditions and hence constitutionally suspect." *Bolling*, 347 U.S. at 499. The fact that section 1326 relates to immigration does not alter the thrust of the constitutional challenge, which involves a racial classification.

Taken to its extreme, the government's position would effectively require rational basis review even when a statute facially discriminates against specific races and nationalities so long as the statute concerns immigration. The Supreme Court, however, has not limited review in this way. In *Department of Homeland Security v. Regents of the University of California*, 140 S. Ct. 1891 (2020), a majority of the Court concluded that the *Arlington Heights* framework applied to the plaintiffs' Fifth Amendment equal protection challenge to the termination of the immigration program known as Deferred Action for Childhood Arrivals, or DACA.[2] *See id.* at 1915–16 (plurality); *id.* at 1917–18 (Sotomayor, J., concurring in part). And though the government in this case cites *Regents* to support its argument regarding the lack of disparate impact (as discussed below), it has not grappled with the Supreme Court's willingness to engage in an *Arlington Heights* analysis in the first place. Put simply, the Court finds *Regents* instructive.

The Seventh Circuit cases that the government relies upon are inapposite.

---

[2] The *Arlington Heights* framework applies equally to legislative government action, or, as in the case of DACA, executive government action. *See Miller v. Johnson*, 515 U.S. 900, 913 (1995).

4

Those cases, cited above, concern immigration-related statutes where the constitutional challenge involved a classification based on legal status—specifically alienage, in other words treating noncitizens differently from citizens. Classifications based on immigration status are subject to rational basis review, and Viveros-Chavez does not suggest otherwise. *See Mathews v. Diaz*, 426 U.S. 67, 81 (1976). This case, in contrast, presents a constitutional challenge based on a claimed racial classification. The Seventh Circuit has cautioned against employing a rational basis test when a suspect class or fundamental right is at issue. *See Eby-Brown Co., LLC v. Wisconsin Dep't. of Agric.*, 295 F.3d 749, 754 (7th Cir. 2002) (explaining rational basis should apply "[a]bsent some antipathy directed at a particular group"). Rational basis review is thus inappropriate in the present circumstances.

The Court concludes that the *Arlington Heights* framework applies to Viveros-Chavez's constitutional challenge to section 1326.

## B. Equal protection challenge

Under *Arlington Heights*, a facially neutral statute may nevertheless be subject to strict scrutiny "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision." *Arlington Heights*, 429 U.S. at 252; *see also Hunt*, 526 U.S. at 546. The statute's impact on a certain race or ethnicity provides "an important starting point." *Arlington Heights*, 429 U.S. at 266. But disparate impact alone is not enough. *See Washington v. Davis*, 426 U.S. 229, 239 (1976) (rejecting that a law "is unconstitutional solely because it has a racially disproportionate impact"). Courts must also assess other historical evidence in determining whether a racially discriminatory purpose was a motivating factor in the statute's passage. Pertinent

5

evidence includes: 1) the "historical background of the decision"; 2) the "specific sequence of events leading to [passage]"; 3) "procedural" and "[s]ubstantive departures" from the typical legislating process; and 4) "legislative or administrative history" including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Arlington Heights*, 429 U.S. at 267–68.

The party challenging the law bears the burden of establishing discriminatory purpose. If the party carries that burden, the government has the opportunity to establish that "the same decision would have resulted even had the impermissible purpose not been considered." *Id.* at 270 n.21.

The Court will follow the parties' briefing and will address first the historical evidence underlying Congress' intent in passing section 1326, and then the issue of disparate impact.

### 1.    Historical evidence

In 1929, Congress passed a law that criminalized reentry into the United States after removal. *See* Act of Mar. 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551. Also known as the Undesirable Aliens Act (UAA), this statute made unlawful reentry a felony punishable by up to two years' imprisonment and a fine of up to $1,000. Prior to the Act of 1929, there was no criminal penalty for reentering the country after removal, aside from repeated removal.

Nearly 25 years later, in 1952, Congress passed the Immigration and Nationality Act (INA). *See* Pub. L. No. 82-414, 66 Stat. 163. Included in this comprehensive overhaul of the nation's immigration system was the provision that is codified today as 8 U.S.C. § 1326—the provision under which Viveros-Chavez is now charged. Although

6

section 1326 has since been amended on numerous occasions, both parties agree that the subsequent amendments are not at issue for the purpose of establishing a prima facie case of discriminatory intent.

Viveros-Chavez's primary argument is that the UAA was enacted with a discriminatory purpose and that section 1326 is a continuation of the UAA such that it is tainted with the discriminatory purpose of its predecessor. For this argument, he primarily focuses on the intent of the 71st Congress, which enacted the UAA in 1929. In the alternative, he argues that the passage of the INA in 1952, including what is now section 1326, was also premised on a discriminatory purpose within the meaning of *Arlington Heights*, even if considered without the taint from the 71st Congress. The Court will address each argument in turn.

### a. 1929 UAA

The history of the passage of the 1929 UAA reflects an ugly chapter in our nation's past. Throughout the 1920s, nativist interests clashed with large agricultural interests over immigrant Mexican labor. As Viveros-Chavez points out, legislators routinely proposed bills that would restrict Mexican immigration, but agricultural employers consistently blocked them. Eventually, Senator Coleman Blease brokered the passage of UAA as a compromise "between those who wanted an outright ban on Mexican migration and those who wanted to keep control over Mexican labor." Alina Das, *Inclusive Immigrant Justice: Racial Animus and the Origins of Crime-Based Deportation*, 52 U.C. Davis L. Rev. 171, 193 (2018).

There is no question that racism "permeated the official congressional debate" when the 71st Congress passed the UAA. *United States v. Machic-Xiap*, 552 F. Supp.

7

3d. 1055, 1061 (D. Or. 2021).  Although the UAA was passed in the Senate without debate, a number of House members expressed overt hostility toward Mexican immigrants.  One House member referred to them as "hordes," and another member said that they were "very undesirable" and "poisoning the American citizen."  *See* Def.'s Mot. to Dismiss at 16 (dkt. no. 24).  Without revisiting the entirety of this history, the Court agrees with the findings of many other courts, including this Court's colleague Judge John Tharp in *Calvillo-Diaz*, and acknowledges that Congress acted with a racially discriminatory purpose in passing the 1929 UAA.  *See United States v. Hernandez-Lopez*, No. CR H-21-440, 2022 WL 313774, at *2 (S.D. Tex. Feb. 2, 2022) (collecting cases); *Calvillo-Diaz*, 2022 WL 1607525, at *6.

Nevertheless, as the government correctly points out, what matters it is the intent of the Congress that enacted the statute at issue, specifically section 1326.  Thus, the pivotal question on Viveros-Chavez's primary argument is whether the intent behind the 1929 UAA should be imputed to the Congress that enacted section 1326 in 1952.

Viveros-Chavez contends that the intent of the 71st Congress should be imputed and cites a handful of Supreme Court cases to support his position.  *See Espinoza v. Montana Dep't of Revenue*, 140 S. Ct. 2246 (2020); *Ramos v. Louisiana*, 140 S. Ct. 1390 (2020); *Abbott v. Perez*, 138 S. Ct. 2305 (2018); *Hunter v. Underwood*, 471 U.S. 222 (1985).  Put most simply, he argues that the discriminatory intent of the legislature that enacts the original law is imputed to the subsequent legislature that enacts the derivative law unless there is a "deliberative process to remove any such taint."  *Abbott*, 138 S. Ct. at 2318.  And he asserts that the 82nd Congress in 1952 did not remove the stain of the 71st Congress's action in 1929.

8

The Court finds *Abbott* instructive. *Abbott* concerned Texas's state and federal redistricting following the 2010 census. *See id.* at 2315–18. The state adopted a plan in 2013 after its original plan in 2011 was tied up in litigation in federal district court. That 2013 plan was subsequently challenged, and the same district court invalidated it on the ground that it was tainted by the discriminatory intent of the state legislature that passed the 2011 plan.

The Supreme Court reversed. The Court explained that this was not "a case in which a law originally enacted with discriminatory intent is later reenacted by a different legislature," because the 2013 plan differed from the 2011 plan. *Id.* at 2325. Given this difference, the Court rejected the district court's imposition of a "duty to expiate its predecessor's bad intent" and reasoned that a successor legislature is entitled to a presumption of good faith. *Id*. The 2011 legislature's intent was relevant only to the extent that it could give rise to inferences regarding the 2013 legislature's intent. In other words, the past discrimination was one piece of historical evidence to be considered within the broader *Arlington Heights* analysis as applied to the successor legislature. Having determined the proper analytical framework, the Court concluded that there was a lack of direct and circumstantial evidence that the Texas state legislature adopted the 2013 redistricting plan with discriminatory intent.

Viveros-Chavez's principal response to *Abbott* is that the 1952 passage of section 1326 amounts to a reenactment of the 1929 UAA. If so, then this case arguably would be distinguishable from *Abbott*. *See id.* (explaining that *Abbott* was not a "case in which a law . . . is later reenacted").

The Court is not persuaded. There are key substantive differences between the

two statutes that establish that section 1326 is not a mere reenactment of the UAA. The

UAA, in relevant part, provides:

> if any alien has been arrested and deported in pursuance of law, he shall
> be excluded from admission to the United States whether such
> deportation took place before or after the enactment of this act, and if he
> enters or attempts to enter the United States after the expiration of sixty
> days after the enactment of this act, he shall be guilty of a felony and upon
> conviction thereof shall, unless a different penalty is otherwise expressly
> provided by law, be punished by imprisonment for not more than two
> years or by a fine of not more than $1,000 or by both such fine and
> imprisonment.

Act of Mar. 4, 1929, Pub. L. No. 70-1018, 45 Stat. 1551. In comparison, section 1326

provides, in relevant part:

> Subject to subsection (b), any alien who—
>
> (1) has been denied admission, excluded, deported, or removed or has
> departed the United States while an order of exclusion, deportation, or
> removal is outstanding, and thereafter
>
> (2) enters, attempts to enter, or is at any time found in, the United States,
> unless (A) prior to his reembarkation at a place outside the United States
> or his application for admission from foreign contiguous territory, the
> Attorney General has expressly consented to such alien's reapplying for
> admission; or (B) with respect to an alien previously denied admission and
> removed, unless such alien shall establish that he was not required to
> obtain such advance consent under this chapter or any prior Act, shall be
> fined under Title 18, or imprisoned not more than 2 years, or both.

8 U.S.C. § 1326(a).

There are three notable differences between the two statutes quoted above that

demonstrate why section 1326 is more than merely reenactment. The first difference

involves the predicates listed in paragraph 1 of section 1326. In addition to deportation,

the statute also includes those who were "denied admission," meaning any noncitizen

entering or found in the United States need not have previously entered the country to

be subject to prosecution. The UAA, in contrast, applies only to those who have been

"arrested and deported."

The second difference concerns the language "is at any time found in" in paragraph 2 of section 1326. This language, which has no parallel in the UAA, was included based on the recommendation of the Attorney General, as discussed below. Prior to 1952, the government had trouble ascertaining some defendants' point of entry and thus could not establish proper venue for prosecution. The addition of the "found in" language directly addressed that problem.

Third, section 1326 permits noncitizens who would otherwise be subject to prosecution under the statute to avoid prosecution by obtaining the advance consent of the Attorney General for their entry into the United States. The UAA contains no such provision, and in stark contrast, is absolute in barring reentry.

These differences establish that section 1326 is not simply a reenactment of the UAA. Although it is true that the two statutes cover the same subject matter—criminalizing unlawful reentry—the same could be said of the two redistricting plans passed by the Texas state legislature. Accordingly, the Court concludes that *Abbott* controls the disposition of this case. The 82nd Congress is entitled to a presumption of good faith, and the 71st Congress's intent is relevant only to the extent that it can provide the basis for an inference regarding Congress's intent in 1952.

The Court rejects Viveros-Chavez's primary argument that section 1326, as adopted by the 82nd Congress, is tainted with prior discriminatory intent. The Court will next address whether the INA was itself passed with discriminatory intent.

  **b.**   **1952 INA**

Congress enacted the INA on June 27, 1952, over the veto of President Harry

Truman.  The law was the product of a three-year study that represented "a most intensive and searching investigation," which entailed a committee report of nearly 1,000 pages.  *Pena-Cabanillas v. United States*, 394 F.2d 785, 790 (9th Cir. 1968).  Today's section 1326, which at the time was section 276, was just one provision within this wide-ranging immigration legislation.

Aside from the history underlying the UAA, Viveros-Chavez's evidence of discriminatory intent concerning the passage of the INA consists of a contemporaneous bill and the public commentary of a few legislators, the Attorney General, and the President.  *See* Def.'s Mot. to Dismiss at 20–22 (dkt. no. 24).  He first points to Public Law 283 from 1952, which he says was referred to as the "Wetback bill," as indicative of Congress' intent.  Viveros-Chavez also points to the statements of four legislators, as well as letters from Attorney General Peyton Ford and President Truman.

Public Law 283 was adopted three months prior to the INA on March 20, 1952. *See* Pub. L. No. 82-283, 66 Stat. 26 (1952), codified as amended at 8 U.S.C. § 1324(a). This law sought to prevent the unlawful entry of noncitizens by criminalizing actions that facilitated their entry or residence.  For example, the law criminalized the transportation of undocumented noncitizens.  It also criminalized concealing, harboring, or shielding undocumented noncitizens from detection, though it expressly carved out employers from liability, as the law defined employment as not constituting harboring.

The thrust of Viveros-Chavez's argument is not that this legislation matters from a substantive standpoint, but rather that the "nonchalance with which Congress used 'wetback' near the time of the INA's passage . . . is further evidence that at least some members of Congress harbored racial animus toward immigrants from Latin America."

12

*Machic-Xiap*, 552 F. Supp. 3d at 1074.  This context is particularly relevant, Viveros-Chavez argues, because there "was little debate leading up to the passage of the [INA]."  *See* Def.'s Mot. to Dismiss at 20 (dkt. no. 24).

The Court views this legislation as relevant historical background, under the *Arlington Heights* framework, as opposed to evidence that directly connects to the passage of section 1326.  There is little doubt, as further illustrated by the statements below, that some legislators in 1952 harbored racist sentiments and willingly used the derogatory epithet "wetback" to describe immigrants from Latin America.  But critically, Public Law 283 is an entirely different piece of legislation from section 1326, with different substantive terms.  Whereas the latter directly deters an excluded or removed noncitizen from unlawfully reentering the United States, the former deters both citizens and noncitizens from assisting *any* unlawful entry, not just reentry.  *Compare* 8 U.S.C. § 1326 *with* 8 U.S.C. § 1324(a).  Furthermore, Public Law 283 was passed three months prior to the INA.  For these reasons, the Court disagrees with Viveros-Chavez's contention that the colloquial name of Public Law 283 provides relevant legislative history for section 1326.  That said, it does provide relevant historical background.

Turning directly to the legislative history of the INA, Viveros-Chavez does cite a handful of public statements supporting his claim of racial animus.  He offers the following statements by legislators:

- Representative John Wood of Idaho: "It seems to me the question of racial-origins, though I am not a follower of Hitler, there is something to it . . . I believe that possibly statistics would show that the Western European races have made the best citizens in America."  Def.'s Mot. to Dismiss at 20 (dkt. no. 24).

13

- Senator Pat McCarran of Nevada: "We changed the language a little to meet the wetback situation, which applies to the southern section of the country."  *Id.*

- Senator Alben Barkley of Kentucky: "I[t] has become unpopular to be wholly American. The real basic purpose [behind] the immigration act which we finally enacted in 1924 was to preserve something of the homogeneity of the American people . . . .[L]et all the aliens who desire to do so come here if you wish, but, in that event, American labor will suffer as American labor has never suffered before."  Def.'s Reply in Supp. of Mot. to Dismiss, Ex. Z at 5774 (dkt. no. 30-5).

- Representative Thomas Jenkins of Ohio: "The past day or two has been reminiscent of the days of 20 years ago when the wishes of the Members was to keep away from our shores the thousands of undesirables just as it is their wish now . . . ."  Def.'s Reply in Supp. of Mot. to Dismiss, Ex. Y at 4442 (dkt. no. 30-4).

The Court agrees with Viveros-Chavez that these statements can be taken at face value and are probative of the intent of these specific legislators.  All four statements speak for themselves.  Additionally, the last two appear to connect the INA to the passage of the UAA in 1929.

Viveros-Chavez next points to Attorney General Ford's letter responding to Senator McCarran's request for the views of the Department of Justice.  *See id.*, Ex. AA (dkt. no. 30-6).  This letter provided section-by-section commentary on the proposed legislation.  With respect to what is now section 1326, Ford wrote. in relevant part:

> [This provision] adds to existing law by creating a crime which will be
> committed if a previously deported alien is subsequently found in the
> United States.  This change would overcome the inadequacies in existing
> law which have been observed in those cases in which it is not possible
> for the Immigration and Naturalization Service to establish the place of
> reentry, and hence proper venue, arising in prosecutions against a

14

deported alien under the 1929 Act.

*Id.* at 7.  Later in the letter, in discussing a different section that authorizes immigration officers to conduct searches, Attorney General Ford quoted a 1951 report from the President's Commission on Migratory Labor, which stated, "Statutory clarification on the above points [regarding conducting searches on private property] will aid in taking action against the conveyors and receivers of the wetback."  *Id.* at 9.

Reading this in context, the Court does not agree with Viveros-Chavez's interpretation that Ford "asked for the phrase 'found in' to be added to section 1326 to make it easier to prosecute 'wetback[s].'"  Def.'s Mot. to Dismiss at 21 (dkt. no. 24).  To the extent one might infer that Ford harbored discriminatory intent based on his quote from a presidential commission report's usage of the derogatory term, he did so in reference to an entirely different provision of the INA.  The Court does not find Viveros-Chavez's argument persuasive.

Finally, Viveros-Chavez contends that President Truman's veto statement proves that the entire legislation was racist.  Viveros-Chavez quotes the following excerpt as indicative of Congress's racist intent:

> [The INA is] a mass of legislation which would perpetuate injustices of long standing against many other nations of the world, hamper the efforts we are making to rally the men of East and West alike to the cause of freedom, and intensify the repressive and inhumane aspects of our immigration procedures. The price is too high, and in good conscience I cannot agree to pay it.

*Id.* (emphasis removed).  The Court does not find this statement to have any bearing on the intent behind the adoption of section 1326.  Read in context, it concerned the INA's retention of the country-quota system, which President Truman wanted to end.  *See* Harry S. Truman, *Veto of Bill to Revise the Laws Relating to Immigration, Naturalization*

15

*and Nationality*, Am. Presidency Project (June 25, 1952),

https://www.presidency.ucsb.edu/node/231060. President Truman did not mention

section 1326 in the veto statement, nor did he say anything about the INA arising from a

desire to target Latinos or Mexicans. Like Ford's letter, the Court does not find

President Truman's veto statement to be persuasive evidence of the discriminatory

intent of Congress.

Taken as a whole, the evidence that Viveros-Chavez has offered is insufficient to

support a finding of discriminatory intent. The statements of just four legislators, even if

one of them was the bill's primary Senate sponsor, cannot be used to ascribe intent to

the other hundreds of members of Congress. *See United States v. O'Brien*, 391 U.S.

367, 384 (1968) ("What motivates one legislator to make a speech about a statute is not

necessarily what motivates scores of others to enact it, and the stakes are sufficiently

high for us to eschew guesswork."). Nor are the statements of four legislators

sufficiently numerous to permit an inference that they in effect represented the intent of

others in Congress.

Furthermore, to the extent that Senator Barkley's and Representative Jenkins's

comments tie the INA to the UAA, only thirty congressmen from the 71st Congress

remained in office in 1952. The 82nd Congress is entitled to a presumption of good

faith, and even if the Court imputed discriminatory intent to all thirty overlapping

congressmen, that would only bring the total count to thirty-two. In overriding President

Truman's veto, the House voted 278-13, and the Senate voted 57-26. That means that

at most, less than ten percent of the legislators who voted for the INA harbored

discriminatory intent.

16

The Court acknowledges that Viveros-Chavez has also presented circumstantial historical evidence tending to show that Latino immigrants were the subject of an immigration regime that disproportionately targeted them in the decades prior to the INA's passage in 1952. *See, e.g.*, Def.'s Reply in Supp. of Mot. to Dismiss at 15–16 (dkt. no. 30) (describing pre-examination procedures as applied to Mexicans versus Canadians). Additionally, he has Public Law 283 and the evidence surrounding the UAA's passage in 1929 insofar as each provides additional historical background.

But this history does not tip the balance. Applying the factors laid out in *Arlington Heights*, Viveros-Chavez has not identified anything awry in the "specific sequence of events leading to" the INA's passage, nor has he identified any "procedural" or "[s]ubstantive departures" from the typical legislating process. *Arlington Heights*, 429 U.S. at 267–68. Furthermore, the four public statements discussed above do not directly address section 1326. *See United States v. Johnson*, 40 F.3d 436, 440 (D.C. Cir. 1994) ("[S]cattered pieces of legislative history are quite inadequate to serve to attribute a discriminatory purpose to the Congress."). As discussed at oral argument, Viveros-Chavez's position would effectively nullify the entirety of the INA based on the statements of a few legislators. The Court disagrees that the evidence offered here is sufficient to establish that Congress passed the INA with racially discriminatory intent under the standard established in *Arlington Heights*.

In sum, the Court concludes that Viveros-Chavez has not shown that racial animus toward Latinos was a motivating reason for the INA's passage.

### 2. Disparate impact

Viveros-Chavez's evidence also falls short in establishing that section 1326

disparately impacts Latinos today. Doing so would require him to provide evidence that

section 1326 "bears more heavily on one race than another." *Arlington Heights*, 429

U.S. at 266. But proving disparate impact also requires offering evidence of a

comparator group. *See Alston v. City of Madison*, 853 F.3d 901, 908 (7th Cir. 2017)

(discussing proper statistical comparisons for an equal protection claim); *Chi.*

*Firefighters Loc. 2 v. City of Chicago*, 249 F.3d 649, 653 (7th Cir. 2001) (similar).

Viveros-Chavez points to government data indicating that in fiscal year 2020,

99.1 percent of unlawful reentry offenders charged in federal court were Hispanic. But

when pressed to offer comparator numbers to demonstrate disproportionality, Viveros-

Chavez cited nothing. Instead, he contends that the government's comparator

argument "is circular logic" and that the 99.1 figure, considered on its own, aligns with

other cases where courts have found disparate impact. *See* Def.'s Reply in Supp. of

Mot. to Dismiss at 24 (dkt. no. 30).

The absence of comparator evidence undercuts Viveros-Chavez's disparate

impact argument. The 99.1 percent figure certainly is sufficient to raise an eyebrow.

But there needs to be *some* evidence of a comparator to give that figure context. The

Court cannot, for example, rule out the possibility that 99.1 percent of those attempting

to unlawfully reenter the United States in 2020 were Hispanic. If so, the fact that 99.1

percent of unlawful reentry defendants were also Hispanic would be proportional. It is

Viveros-Chavez's burden to establish disparate impact. He has not carried that burden

on the present record.

### 3. Inevitable passage

Because Viveros-Chavez has not carried his burden in establishing that

Congress passed section 1326 with discriminatory intent, the Court need not decide whether Congress would have enacted the law absent such discriminatory intent.

### Conclusion

The Court denies Viveros-Chavez's motion to dismiss the indictment [dkt. no. 24]. The case is set for a telephonic status hearing on June 17, 2022 at 8:55 AM, using call-in number 888-684-8852, access code 746-1053.

MATTHEW F. KENNELLY
United States District Judge

Date:  June 13, 2022